**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| JASON INDUSTRIES, INC. *et al.*,[1] | ) | Case No. 20- 22766 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### FINAL ORDER (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, AND (II) GRANTING CERTAIN PROTECTIONS TO FIRST LIEN SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 507

Upon the motion of Jason Industries, Inc. ("**Jason**"), and its affiliated debtors, as debtors and debtors in possession (collectively, with Jason, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), dated June 24, 2020 (the "**Motion**"),[2] for an interim order (the "**Interim Order**") and a final order (this "**Final Order**" and, together with this Interim Order, the "**Cash Collateral Orders**"), under sections 105, 361, 362, 363, 503, 506(c), 507(b), and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "**Bankruptcy Rules**"), and rules 4001-2 and 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), which sought, among other things, the following relief:

---

[1] The last four digits of the Debtors' tax identification numbers, if any, are:  Jason Industries, Inc. (8322); Jason Partners Holdings, Inc. (1977); Jason Holdings, Inc. I (9929); Jason Incorporated (6840); Milsco, LLC (7243); Osborn, LLC (5279); Schaffner Manufacturing Co., Inc. (0894); and Jason International Holdings, Inc. (7730). The location of the Debtors' service address for purposes of these chapter 11 cases is:  777 Westchester Avenue, Suite 101, White Plains, NY 10604.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or as the context otherwise requires.

(a)    authorization of the Debtors' use of Cash Collateral (as defined below),
subject to and pursuant to the terms and conditions set forth in this Final Order;

(b)    the granting of adequate protection on account of the Debtors' use of Cash
Collateral and solely to the extent of any diminution in value of the First Lien Secured Parties'
(as defined below) interests in the Prepetition Collateral (as defined below), subject to and pursuant
to the terms and conditions set forth in this Final Order, to:

i.    the First Lien Secured Parties (as defined below) under that certain
First Lien Credit Agreement dated as of June 30, 2014 (as amended, restated, amended and
restated, supplemented, or otherwise modified, the "**First Lien Credit Agreement**") and that
certain First Lien Security Agreement dated as of June 30, 2014 (as amended, restated, amended
and restated, supplemented, or otherwise modified, the "**First Lien Security Agreement**" and,
collectively with the First Lien Credit Agreement and all other agreements, documents, notes,
mortgages, security agreements, pledges, guarantees, intercreditor agreements, subordination
agreements, deeds, instruments, indemnities, indemnity letters, working fee letters, assignments,
charges, amendments, and any other agreements delivered pursuant thereto or in connection
therewith, the "**First Lien Credit Documents**"), by and among Jason, as borrower, each of the
guarantors named therein (the "**First Lien Credit Agreement Guarantors**" and, collectively with
Jason, the "**First Lien Credit Agreement Obligors**"), and The Bank of New York Mellon (as
successor to Deutsche Bank AG New York Branch), as administrative agent (in such capacity, the
"**First Lien Credit Agreement Administrative Agent**") for the lenders thereunder from time to
time (the "**First Lien Lenders**"), and Deutsche Bank AG New York Branch as L/C Issuer and
Swing Line Lender (collectively, with the First Lien Credit Agreement Administrative Agent, First

Lien Lenders and other Secured Parties (as defined in the First Lien Credit Agreement), the "**First Lien Secured Parties**"); and

ii.        the Collateral Agent (as defined below) under that certain Closing Date Intercreditor Agreement, dated as of June 30, 2014 (as amended, restated, supplemented, or otherwise modified, the "**Intercreditor Agreement**") between (A) The Bank of New York Mellon (as successor to Deutsche Bank AG New York Branch), as First Lien Credit Agreement Administrative Agent (the "**Collateral Agent**," and, in its capacity as both First Lien Credit Agreement Administrative Agent and Collateral Agent, the "**Prepetition Agent**") for each of all of the holders of First Lien Credit Agreement Secured Obligations (as defined in the Intercreditor Agreement and referred to herein as the "**First Lien Credit Agreement Secured Obligations**"), Jason, and each of the First Lien Credit Agreement Guarantors, and (B) The Bank of New York Mellon (as successor to Deutsche Bank AG New York Branch), as administrative agent (in such capacity, the "**Second Lien Credit Agreement Administrative Agent**") for the lenders under that certain Credit Agreement dated as of June 30, 2014 by and among Jason, as borrower, each of the guarantors named therein (the "**Second Lien Credit Agreement Guarantors**" and, collectively with Jason, the "**Second Lien Credit Agreement Obligors**") and the Second Lien Credit Agreement Administrative Agent (as amended, restated, amended and restated, supplemented, or otherwise modified, the "**Second Lien Credit Agreement**") and Second Lien Security Agreement dated as of June 30, 2014 (as amended, restated, supplemented, or otherwise modified, the "**Second Lien Security Agreement**," collectively with the Second Lien Credit Agreement and all other agreements, documents, notes, mortgages, security agreements, pledges, guarantees, intercreditor agreements, subordination agreements, deeds, instruments, indemnities, indemnity letters, working fee letters, assignments, charges, amendments, and any other agreements delivered

pursuant thereto or in connection therewith, the "**Second Lien Credit Documents**," and together with the First Lien Credit Documents, the "**Prepetition Loan Documents**");

(c)     the approval of the stipulations by the Debtors as set forth in this Final Order with respect to, among other things, the First Lien Credit Documents and the liens and security interests arising therefrom;

(d)     the Debtors' waiver of any right to surcharge the Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code or other applicable law;

(e)     the modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors and the First Lien Secured Parties to implement the terms of the Cash Collateral Orders; and

(f)     the waiver of any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Final Order.

And the Interim Order granting on an interim basis the relief sought in the Motion having been entered by this Court on June 29, 2020 at Docket No. 42; and due, proper, and sufficient notice of the Motion and the final hearing on the Motion (the "**Final Hearing**") having been given under the circumstances and the opportunity for objection having been provided; and the Final Hearing having been held; and it appearing that no other or further notice or hearing are necessary with respect to the Court's entry of this Final Order; and after considering all the pleadings filed with this Court pertaining to the Motion; and upon the *Declaration of Chad M. Paris, Senior Vice President and Chief Financial Officer at Jason Industries, Inc., (I) in Support of Chapter 11 Petitions and First Day Pleadings and (II) Pursuant to Local Bankruptcy Rule 1007-2* (the "**First Day Declaration**"), the evidence submitted, and the record made at the interim hearing and Final Hearing; and the Court having found and determined that the relief sought in the Motion is

necessary to avoid immediate and irreparable harm to the Debtors and is otherwise fair and reasonable and in the best interests of the Debtors, their estates and creditors, and is essential for the continued operation of the Debtors' businesses; and all objections to the entry of this Final Order having been withdrawn, resolved, or overruled by the Court for the reasons stated by the Court on the record of the Final Hearing; and after due deliberation and good and sufficient cause appearing therefor,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

        A.      <u>Petition Date</u>.  On June 24, 2020 (the "**Petition Date**"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Court**"), thereby commencing these Chapter 11 Cases.   The Debtors are managing and operating their business and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 3].  No trustee or examiner has been appointed in the Chapter 11 Cases.

        B.      <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3]  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact whenever the context requires.  *See* Fed. R. Bankr. P. 7052.

C.    Notice.  Notice of the Final Hearing and the relief requested in the Motion has been provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances.  Without limiting the foregoing, due notice was afforded, whether by facsimile, electronic mail, overnight courier, or hand delivery, to parties in interest, including (a) the United States Trustee for the Southern District of New York, Attn: Richard C. Morrissey (the **"U.S. Trustee"**); (b) the holders of the 35 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agent under the Debtors' prepetition first lien credit agreement and counsel thereto; (d) the agent under the Debtors' prepetition second lien credit agreement and counsel thereto; (e) counsel to an ad hoc group of lenders under the Debtors' prepetition first lien credit agreement (the "**First Lien Ad Hoc Group**"); (f) counsel to the ad hoc group of lenders under the Debtors' prepetition second lien credit agreement; and (g) the United States Attorney's Office for the Southern District of New York.

D.    Debtors' Stipulations.  Subject to paragraph 8 of this Final Order, the Debtors admit, acknowledge, agree, and stipulate to the following (collectively, the "**Debtors' Stipulations**"), which stipulations shall be binding on the Debtors, and, subject to the Challenge Period, their estates, and all parties in interest:

1.    Description of First Lien Credit Agreement Secured Obligations.  Prior to the Petition Date, pursuant to the First Lien Credit Agreement, and the other First Lien Credit Documents, the lenders thereunder extended credit to Jason in the aggregate principal amount of $350,000,000.  Each of the First Lien Credit Agreement Guarantors have unconditionally guaranteed, jointly and severally, the First Lien Credit Agreement Secured Obligations (as defined below) arising under the First Lien Credit Documents.  As of the Petition Date, the First Lien

Credit Agreement Obligors were indebted to the First Lien Secured Parties pursuant to the First Lien Credit Documents, without defense, counterclaim, offset, claim, or cause of action of any kind, in the aggregate amount of not less than (i) $278,648,244.00 of outstanding principal under the First Lien Credit Agreement, plus (ii) accrued and unpaid interest with respect thereto, fees, costs, and expenses (including any attorneys', financial advisors', and other professionals' fees and expenses that are chargeable or reimbursable under the First Lien Credit Documents), and all other "Obligations" (as defined in the First Credit Agreement or any security document related thereto) under the First Lien Credit Documents, plus (iii) the Deferred Forbearance Fee (as defined in that certain Restructuring Support Agreement between the Debtors and the Consenting Creditors therein dated June 5, 2020 (the "**Restructuring Support Agreement**")) (collectively, the "**First Lien Credit Agreement Obligations**").

2.      <u>Validity of First Lien Credit Agreement Obligations and First Lien Credit Documents</u>.  The First Lien Credit Agreement Obligations constitute legal, valid, and binding obligations of the First Lien Credit Agreement Obligors (collectively, the "**Obligors**").  No offsets, defenses, or counterclaims to, or claims or causes of action that could reduce the amount or ranking of, the First Lien Credit Agreement Obligations exist.  No portion of the First Lien Credit Agreement Obligations (including any interest owed thereunder) is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity.  The First Lien Credit Agreement Documents are valid and enforceable by the First Lien Secured Parties against each of the Obligors.  The First Lien Credit Agreement Obligations constitute allowed claims against each of the Obligors' estates.  As

of the Petition Date, none of the Debtors or their estates have any claim or cause of action against

the First Lien Secured Parties or their agents, in such capacities, whether arising under applicable

state, federal, or foreign law (including, without limitation, any recharacterization, subordination,

avoidance, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of

the Bankruptcy Code), or whether arising under or in connection with any of the First Lien Credit

Documents (or the transactions contemplated thereunder), the First Lien Credit Agreement

Obligations, or the Prepetition Liens (as defined herein).  For the avoidance of doubt, nothing in

this Final Order shall constitute a determination of whether the First Lien Credit Agreement

Obligations are allowed secured claims pursuant to section 506 of the Bankruptcy Code.

    3.    <u>Description of Prepetition Liens and Prepetition Collateral and
Intercreditor Agreement</u>.

    (a)    Pursuant to the First Lien Credit Documents, the First Lien Credit

Agreement Obligations are secured by, among other things, duly perfected first priority liens or

mortgages on, security interests in, and assignments or pledges of (the "**Prepetition Liens**"), all

property described in the First Lien Credit Documents, including, without limitation, certain Cash

Collateral (as defined herein), and other "Collateral" as such term is defined in the First Lien Credit

Agreement (collectively, the "**Prepetition Collateral**"), including, without limitation, certain cash

collateral as defined in section 363 of the Bankruptcy Code ("**Cash Collateral**").  All cash of the

Debtors and cash proceeds of the Collateral (as defined below), including all such cash and cash

proceeds of such Collateral held at any time and from time to time in any of the Debtors' banking,

checking, or other deposit accounts with financial institutions (in each case, other than trust,

escrow, payroll, and custodial funds held as of the Petition Date in properly established trust,

escrow, payroll, and custodial accounts), are and will be Cash Collateral of the First Lien Secured Parties.

(b)    The Intercreditor Agreement governs, among other things:  (i) the relative priority of the First Liens and Second Liens (each as defined in the Intercreditor Agreement), (ii) the payment priority with respect to proceeds of the Collateral (as defined in the Intercreditor Agreement), (iii) the rights and remedies of the holders of Secured Obligations (as defined in the Intercreditor Agreement) with respect to use of cash collateral, and adequate protection in a chapter 11 case, and (iv) the rights and remedies of the holders of Secured Obligations (as defined in the Intercreditor Agreement) with respect to the valuation, use, protection, release or disposition (including pursuant to a credit bid under section 363(k) of the Bankruptcy Code) and challenges thereof.  Pursuant to the Intercreditor Agreement, each Second Lien Secured Party has, among other things (i) agreed that it shall not oppose or object to the Debtors' use of Cash Collateral unless the Designated First Lien Representative (as defined by the Intercreditor Agreement), shall have opposed or objected to such use of Cash Collateral, (ii) agreed that it shall not oppose or object to the determination of the extent of any Liens held by any of the First Lien Secured Parties or the value of any claims of the First Lien Secured Parties under Section 506(a) of the Bankruptcy Code or under any other applicable law or otherwise, (iii) waived any claim it or such Second Lien Secured Party may have against any First Lien Secured Party (as defined in the Intercreditor Agreement) have arising out of, among other things, the valuation, use, protection or release of any Collateral (as defined in the Intercreditor Agreement), and (iv) agreed the Intercreditor Agreement constitutes a 'subordination agreement' under Section 510 of the Bankruptcy Code as well as all other nonbankruptcy laws.

4.    <u>Validity and Perfection of Prepetition Liens</u>.

(a)    The Prepetition Liens are (i) valid, binding, perfected, and enforceable liens on and security interests in the Prepetition Collateral; (ii) not subject to, pursuant to the Bankruptcy Code or other applicable law (foreign or domestic), avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual, or otherwise), attachment, offset, counterclaim, defense, "claim" (as defined in the Bankruptcy Code), impairment, or any other challenge of any kind by any person or entity; and (iii) subject and subordinate only to (A) the Carve Out (as defined below) and (B) valid and enforceable liens and encumbrances in the Prepetition Collateral that were expressly permitted to be senior to the First Lien Secured Parties' liens under the applicable First Lien Credit Documents, that are valid, perfected, enforceable, and non-avoidable as of the Petition Date and that are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law ("**Permitted Liens**"), and each Debtor irrevocably waives, for itself and its estate, any right to challenge or contest in any way the scope, extent, perfection, priority, validity, non-avoidability, and enforceability of the Prepetition Liens or the validity, enforceability, or priority of payment of the First Lien Credit Agreement Obligations and the First Lien Credit Documents.  The Prepetition Liens were granted to the respective First Lien Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with the making of loans, commitments, and/or other financial accommodations under the First Lien Credit Documents.

(b)    Pursuant to and as more particularly described in the Prepetition Loan Documents, the Prepetition Liens are valid, binding, properly perfected, enforceable, non-avoidable, first-priority liens and security interests in and against the Prepetition Collateral

(including, without limitation, Cash Collateral), and are senior in right, priority, operation and effect to the Second Liens in all respects, notwithstanding any provision of the Uniform Commercial Code or any other Federal, State or foreign law.

5.    <u>Releases by Debtors</u>.  Subject to paragraph 8 ("Effect of Stipulations on Third Parties") below, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present, and future predecessors, successors, heirs, subsidiaries, and assigns (collectively, the "**Releasors**") shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge the First Lien Secured Parties in all capacities under the First Lien Credit Documents as applicable, and applicable law, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "**Releasees**"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description based on or arising from any events, facts or circumstances that have occurred or exist as of the date hereof arising from or relating in any way to any of the First Lien Credit Documents or the obligations thereunder, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising

under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, enforceability, perfection, or avoidability of the Prepetition Liens or First Lien Credit Agreement Secured Obligations of the First Lien Secured Parties.    The Debtors' acknowledgments, stipulations, waivers, and releases shall be binding on the Debtors and their respective representatives, successors, and assigns, and on each of the Debtors' estates and all entities and persons, including any creditors of the Debtors, and each of their respective representatives, successors, and assigns, including, without limitation, any trustee or other representative appointed in these Chapter 11 Cases, or upon conversion to chapter 7, whether such trustee or representative is appointed under chapter 11 or chapter 7 of the Bankruptcy Code.    For the avoidance of doubt, nothing in this paragraph shall in any way limit or release the obligations of the First Lien Secured Parties under this order, if any.

E.    Approved Budget.  Attached to the Interim Order as **Exhibit 1** is a 13-week cash flow forecast setting forth all projected cash receipts and cash disbursements on a weekly basis (as may be revised from time to time with the prior written consent of counsel to the First Lien Ad Hoc Group, which approval shall not be unreasonably withheld, the "**Approved Budget**") (with the understanding that the Approved Budget attached to the Interim Order is acceptable to the First Lien Ad Hoc Group), with notice of any such revision promptly provided to counsel to an Unsecured Creditors' Committee, if any, along with a copy of any revised Approved Budget.

F.    The Approved Budget includes and contains the Debtors' reasonable estimate of all operational receipts and all operational disbursements, fees, costs, and other expenses that will be payable, incurred, and/or accrued by any of the Debtors during the period covered by the Approved Budget.  If the First Lien Ad Hoc Group, in its sole discretion, and the Debtors do not agree to an updated Approved Budget, the Approved Budget shall be the then

12

existing Approved Budget, and the First Lien Ad Hoc Group, nor any other party, shall have any obligation to consent to the Debtors' continued use of Cash Collateral beyond the period contemplated by the Approved Budget. The Debtors shall provide to the advisors to each of the First Lien Ad Hoc Group and counsel to an Unsecured Creditors' Committee, if any, a Budget Variance Report (as defined below) in accordance with the provisions of paragraph 5(d) hereof; *provided* that professional fees (including, without limitation, Allowed Professional Fees (as defined in paragraph 9 below)), payments to the professional advisors of the First Lien Ad Hoc Group, payments to the U.S. Trustee, interest and fees payable to third parties pursuant to this Final Order, and adequate protection payments shall not be subject to such operating disbursement test pursuant to the Budget Variance Report.

G.      Use of Cash Collateral. An immediate and critical need exists for the Debtors to use the Cash Collateral in accordance with the Approved Budget for (i) working capital purposes, (ii) other general corporate purposes of the Debtors, and (iii) the satisfaction of the costs and expenses of administering the Chapter 11 Cases.

H.      Consent by First Lien Secured Parties. The First Lien Credit Agreement Administrative Agent has consented to, conditioned on the entry of this Final Order, the Debtors' proposed use of Cash Collateral, on the terms and conditions set forth in this Final Order, and such consent is binding on the First Lien Secured Parties.

I.      Adequate Protection. The adequate protection provided to the First Lien Secured Parties, as set forth more fully in paragraphs 4 and 5 hereof, including on account of the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, or the use, sale, or lease of the Prepetition Collateral (including any Cash Collateral) under section 363 of the Bankruptcy Code, is consistent with, and authorized by, the Bankruptcy Code and is offered by

the Debtors to protect the First Lien Secured Parties' interests in the Prepetition Collateral, solely to the extent of any diminution in value of such Prepetition Collateral. The adequate protection provided herein and other benefits and privileges contained herein are necessary in order to protect the First Lien Secured Parties from the diminution of their respective interests in the value of their Prepetition Collateral and to obtain their consent to the use of such Cash Collateral; *provided* that, nothing herein shall limit or be deemed to limit the rights of the First Lien Secured Parties to seek additional or other adequate protection.

J.    <u>Good Cause Shown; Best Interest</u>.  This Court concludes that good cause has been shown and entry of this Final Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for a successful reorganization.

K.    <u>No Liability to Third Parties</u>.  The Debtors stipulate and the Court finds that with respect to Debtors' use of Cash Collateral pursuant to this Final Order, the Interim Order, or the Prepetition Loan Documents, the First Lien Secured Parties shall not (i) be deemed to have liability to any third party or be deemed to be in control of the operation of any of the Debtors or to be acting as a "controlling person," "responsible person," "owner or operator," or "participant" with respect to the operation or management of any of the Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any other federal, state, or applicable international statute or regulation) as a result of its consent to the use of Cash Collateral hereunder, so long as, the First Lien Secured Parties' actions do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a vessel

14

or facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or

state government or the status of responsible person or managing agent to exist under applicable

law (as such terms, or any similar terms, are used in the United States Comprehensive

Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq*., as amended,

the Internal Revenue Code, or any other federal or state statute), or (ii) owe any fiduciary duty to

any of the Debtors, their creditors or estates, or shall constitute or be deemed to constitute a joint

venture or partnership with any of the Debtors as a result of its consent to the use of Cash Collateral

hereunder.   For the avoidance of doubt, in (i) determining to permit the use of Cash Collateral,

(ii) negotiating the terms of consensual use of Cash Collateral pursuant to the Budget, (iii) solely

performing under the applicable Prepetition Loan Documents, and/or (iv) solely exercising any

rights or remedies as and when permitted pursuant to this Final Order or the Prepetition Loan

Documents, as applicable (each of the actions listed in (i)–(iv) of this provision, a "Lender Action,"

and collectively, the "Lender Actions") , no First Lien Secured Parties shall be deemed to have

participated in the management or operational affairs of a vessel or facility owned or operated by

the Debtors, or to have otherwise caused lender liability to arise or assumed the status of control,

responsible person, owner, or operator; *provided* that nothing in this Final Order shall prevent a

governmental unit from asserting claims that the First Lien Secured Parties' actions do or did

constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management

or operational affairs of a vessel or facility owned or operated by a Debtor, or otherwise cause

liability to arise to the federal or state government or the status of responsible person or managing

agent to exist under applicable law solely to the extent that any such action exceeded the scope of

the Lender Actions.   Each First Lien Secured Party preserves and is not waiving any defenses it

may have to any claims as set forth in 42 U.S.C. § 9601(20)(F) or comparable federal, state, or

local law.  Nothing in this Final Order, the Interim Order, or the Prepetition Loan Documents shall permit the Debtors to violate 28 U.S.C. § 959(b). As to the United States, its agencies, departments, or agents, nothing in this Final Order, the Interim Order, Prepetition Loan Documents shall discharge, release or otherwise preclude any valid right of setoff or recoupment that any such entity may have.

L.    Section 552(b).  The "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the First Lien Secured Parties.

Based upon the foregoing, and upon the record made before this Court at the Final Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    Motion Granted.  The Motion is granted on a final basis as provided herein, and the use of Cash Collateral is authorized for each Debtor, subject and pursuant to the terms and conditions set forth in this Final Order.  Any objections, statements, or reservations of rights to the Motion with respect to the entry of this Final Order that have not previously been withdrawn, waived, or otherwise resolved are hereby denied and overruled.  This Final Order shall become effective immediately upon its entry.

2.    Authorization to Use Cash Collateral.  Subject to the terms and conditions of this Final Order, including the Carve Out, the Debtors are authorized to use Cash Collateral in accordance with this Final Order and the Approved Budget during the period beginning with the Petition Date and ending on the Termination Date for:  (a) working capital purposes; (b) other general corporate purposes of the Debtors; (c) the satisfaction of the costs and expenses of administering the Chapter 11 Cases; and (d) for the purposes identified in the Approved Budget.

3.      Termination Date.  The authority for use of Cash Collateral under this Final Order shall terminate (the "**Termination Date**") upon the expiration of the Notice Period after an Event of Default, in each case in accordance with paragraphs 6 and 7 hereof (a "**Termination Event**").

4.      First Lien Secured Parties' Adequate Protection.  Subject in each case to the Carve Out, the Debtors grant to the First Lien Secured Parties, pursuant to sections 361, 362, 363(c)(2), 363(e), 503, and 507 of the Bankruptcy Code, adequate protection of the First Lien Secured Parties' interests in the Prepetition Collateral, including, without limitation, solely on account of any diminution in value resulting from (a) the sale, lease, or use by the Debtors of Prepetition Collateral, including Cash Collateral, (b) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, or (c) the subordination of the First Lien Secured Parties' interests in the Prepetition Collateral to the Carve Out (as defined below) ("**Diminution in Value**").  The Court finds that the First Lien Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), 503, and 507 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral (including the Cash Collateral), for Diminution in Value (the "**Adequate Protection Obligations**").

5.      The First Lien Secured Parties, in exchange for consent to the use of the Prepetition Collateral, are hereby granted, solely to the extent of any Diminution in Value of their interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, the following:

(a)      Adequate Protection Liens.  To the extent set forth below and subject to the Carve Out, the Debtors grant the First Lien Secured Parties first ranking valid, binding, enforceable, and perfected security interests in and liens upon (the "**Adequate Protection Liens**") all property, whether now owned or hereafter acquired or existing and wherever located, of each

17

Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code),

property of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing

or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods,

contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and

licenses therefor, accounts receivable, receivables and receivables records, general intangibles,

payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned

real estate, real property leaseholds, vessels, charter-hire receipts, earnings, insurance policies and

proceeds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments,

investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real

property, leases (and proceeds from the disposition thereof), all of the issued and outstanding

capital stock of each Debtor, other equity or ownership interests, including equity interests in

subsidiaries and non-wholly-owned subsidiaries, money, investment property, choses in action,

Cash Collateral, documents, vehicles, intellectual property, securities, partnership or membership

interests in limited liability companies and capital stock, and the proceeds of causes of action,

including proceeds of causes of action arising under sections 502(d), 544, 545, 547, 548, 550, 551,

or 553 of the Bankruptcy Code (collectively, the "**Avoidance Actions**"), and all cash and non-cash

proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described

above, including, without limitation, the products, proceeds, and supporting obligations thereof,

whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever

located (all such property, collectively with the Prepetition Collateral, the "**Collateral**") without

the necessity of the execution of mortgages, security agreements, pledge agreements, financing

statements, or other agreements.  The foregoing Collateral shall not include assets or property

(other than Prepetition Collateral, including Cash Collateral) upon which, and solely to the extent

that, the grant of an Adequate Protection Lien as contemplated in this Final Order, would not be enforceable pursuant to applicable law, but shall include the proceeds thereof, which Adequate Protection liens are granted thereupon. The Adequate Protection Liens granted to the First Lien Secured Parties, shall be senior liens and shall rank immediately senior to the security interests and liens under the respective Prepetition Loan Documents, except the Adequate Protection Liens shall be subject and subordinate to (x) the Carve Out and (y) Permitted Liens.

(b)    Superpriority Claims. To the extent set forth below, pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, the Debtors grant the First Lien Secured Parties first ranking allowed superpriority administrative expense claims (the "**Superpriority Claims**"). Any Superpriority Claims shall be subject and subordinate to the Carve Out, and shall be allowed claims against the applicable Debtors (jointly and severally) with priority over any and all administrative expenses and all other claims against such Debtors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment. The Superpriority Claims shall be payable from and have recourse to the proceeds of all Collateral, and shall have recourse to the proceeds of the Avoidance Actions. The allowed Superpriority Claims shall be payable from and have recourse to all Collateral and unencumbered pre- and postpetition property of the applicable Debtors. Other than the Carve Out, no cost or expense of administration under sections 105, 503, or 507 of the Bankruptcy Code or otherwise, including any such cost or expense resulting from or

19

arising after the conversion of any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code, shall be senior to, or *pari passu* with, the Superpriority Claims.

(c)     Fees and Expenses.  The Debtors shall pay (or shall have paid, as applicable) in full, in cash and in immediately available funds all reasonable and documented fees, costs and categorized expenses whether incurred prior to, on, or after the Petition Date, without duplication, incurred by (i) the First Lien Credit Agreement Administrative Agent, including fees and categorized expenses for services performed in connection with these Chapter 11 Cases, and including fees and expenses of Emmet, Marvin & Martin, LLP, as counsel to the First Lien Credit Agreement Administrative Agent, (ii) the First Lien Ad Hoc Group, including fees and expenses of (A) Weil, Gotshal & Manges LLP and (B) Houlihan Lokey, Inc., as financial advisor (collectively, the "**Fee Parties**") (x) promptly upon entry of this Final Order in the full amounts set forth in any outstanding invoices from the Fee Parties provided to the Debtors at least five (5) business days prior to entry of the Final Order (provided that any such unpaid invoices as of the Petition Date were provided to the U.S. Trustee), and (y) thereafter, within ten (10) business days after the presentment of any such invoices to the Debtors, the U.S. Trustee, and counsel to an official committee of general unsecured creditors appointed by the U.S. Trustee (an "**Unsecured Creditors' Committee**"), if any; *provided*, *however,* that the Fee Parties shall submit copies of the Fee Parties' legal counsels' and financial advisor's invoices to the U.S. Trustee, an Unsecured Creditors' Committee, if any, and the Debtors, and the Debtors, the U.S. Trustee, and an Unsecured Creditors' Committee, if any, shall have ten (10) days following their receipt of such invoices to object to the reasonableness of the fees and expenses included in any such invoice; *provided, further,* that, upon the request of the U.S. Trustee prior to the expiration of such review period, the Fee Parties shall provide more detailed support of the Invoiced Fees to the U.S. Trustee

20

on a confidential basis.  If any such objection is not resolved within ten (10) days after such objection is interposed, a hearing with respect thereto shall be conducted at a regularly-scheduled omnibus hearing in the Chapter 11 Cases, *provided* that the Debtors shall pay any undisputed portion of such fees, costs and expenses within fifteen (15) days after the initial presentment to the Debtors of such invoice.  The Fee Parties shall not be required to comply with the U.S. Trustee fee guidelines or file any fee applications with the Court.  If it is subsequently determined, upon a duly filed notice after notice and a hearing, that such fees and expenses were not payable under section 506 of the Bankruptcy Code, such amounts will instead be deemed recharacterized as repayments of principal in reduction of the applicable Obligations; and *provided*, *further*, that if an Obligation is determined to be wholly unsecured, any amounts paid under this paragraph shall be returned to the Debtors within fifteen (15) days of any such final determination.  Any creditor who is obliged to return funds under this paragraph may assert that such amounts were otherwise payable as adequate protection and the Court will determine the validity of any such assertion.

(d)    Budget Compliance.  Every week (beginning with the fourth full week after the Petition Date), on the fourth business day of such week, the Debtors shall deliver to the advisors to (i) the First Lien Credit Agreement Administrative Agent, (ii) the First Lien Ad Hoc Group, and (iii) counsel to an Unsecured Creditors' Committee, if any, a variance report from the previous week comparing the actual cash receipts and disbursements of the Debtors with the receipts and disbursements in the Approved Budget on a line item basis (the "**Budget Variance Report**"); *provided* that professional fees (including, without limitation, Allowed Professional Fees (as defined in paragraph 9 below)), payments to the professional advisors of the First Lien Ad Hoc Group, payments to the U.S. Trustee, interest and fees payable to third parties pursuant to this Final Order, and adequate protection payments shall not be subject to such operating disbursement

test pursuant to the Budget Variance Report.  Each Budget Variance Report shall be cumulative, in that it shall include all previous weeks in the current Budget Variance Report.  Any material variance shall be accompanied by a qualitative explanation.

(e)    <u>Reporting</u>.  The Debtors shall provide the Prepetition Agent, the First Lien Ad Hoc Group's advisors, and counsel to an Unsecured Creditors' Committee, if any, with (a) any weekly financial reporting given to the U.S. Trustee, and (b) any additional reports reasonably requested by the First Lien Credit Agreement Administrative Agent and advisors to the First Lien Ad Hoc Group.

(f)    <u>Access to Records and Collateral</u>.  Upon reasonable notice, at reasonable times during normal business hours, the Debtors shall, subject to mutually agreeable confidentiality agreements, permit the professional advisors to the First Lien Ad Hoc Group (i) to have access to and inspect the Debtors' properties and other Collateral of any Debtor against whom they are granted Adequate Protection Liens or Superiority Claims under this Final Order, (ii) to examine the Debtors' books and records, and (iii) to discuss the Debtors' affairs, finances, and condition with the Debtors' financial advisors and, if and when reasonably practicable and mutually agreed upon, officers, whom the Debtors shall make reasonably available, in each case excluding (x) all privileged and attorney-client work product, (y) trade secrets, and (z) information that the Debtors are otherwise prohibited from disclosing pursuant to a third-party confidentiality agreement.

(g)    <u>First Lien Interest Payments</u>.  The Debtors shall pay to the First Lien Credit Agreement Administrative Agreement (for the ratable benefit of the First Lien Lenders), on an ongoing monthly basis, the cash payment of interest at the default contract rate (the "**Interest Payments**") (whether or not such interest payments are included in the Approved Budget), and

the First Lien Credit Agreement Administrative Agent shall, subject to the First Lien Credit Agreement Administrative Agent's right to offset or recoup amounts owed to it and its representatives for fee and expenses to the extent not otherwise paid hereunder, including pursuant to the First Lien Credit Agreement, remit such Interest Payments deposited with it by the Debtors to the First Lien Lenders.  On or before the fifth day prior to the date of each Interest Payment, the Debtors shall provide a notice to the First Lien Credit Agreement Administrative Agent setting forth a calculation of the amount of such Interest Payment.  The Debtors shall deposit each Interest Payment with the First Lien Credit Agreement Administrative Agent on or before the tenth day of each month (or, if such date is not a business day, on the next succeeding business day thereafter).  The special record date for determining the First Lien Lenders entitled to any such Interest Payment shall be the first business day of each month, and the First Lien Credit Agreement Administrative Agent shall, subject to the First Lien Credit Agreement Administrative Agent's right to offset or recoup amounts owed to it and its representatives for fees and expenses to the extent not otherwise paid hereunder, including pursuant to the First Lien Credit Agreement, use any such funds deposited with it by the Debtors to pay such Interest Payment to the First Lien Lenders on the date that is fifteen (15) days after such special record date (or, if such day is not a business day, on the next succeeding business day thereafter).  For the avoidance of doubt, (i) the interest payment made by the Debtors to the First Lien Credit Agreement Administrative Agent on July 10, 2020 shall be paid by the First Lien Credit Agreement Administrative Agent in accordance with the provisions of this paragraph, and (ii) the Debtors' obligations under this paragraph shall be satisfied upon providing the required notices and remitting the Interest Payment to the First Lien Credit Agreement Administrative Agent.  The Interest Payments shall not be subject to avoidance, reduction, disallowance, disgorgement, counterclaim, or subordination;

23

*provided* that if the Court finally determines that the First Lien Lenders are not entitled to receive all or any portion of the Interest Payments under section 506(b) of the Bankruptcy Code or otherwise, such amounts paid to or for the benefit of the First Lien Credit Agreement Administrative Agent and individual First Lien Lenders, as applicable, will instead be deemed recharacterized as repayments of principal in reduction of the applicable First Lien Credit Agreement Secured Obligations.

(h)    <u>Right to Seek Additional Adequate Protection</u>.  Subject in all respects to the Intercreditor Agreement, this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the respective First Lien Secured Parties to request additional forms of adequate protection at any time.

6.    <u>Events of Default</u>.  The occurrence and continuation of any of the following events, unless waived in writing by the First Lien Ad Hoc Group (email from its counsel shall suffice), in its sole discretion, shall constitute an event of default (each an "**Event of Default**" and collectively, the "**Events of Default**"):

(a)    Any Debtor shall file a motion seeking any modification or extension of this Final Order without the prior written consent of the First Lien Credit Agreement Administrative Agent or counsel to the First Lien Ad Hoc Group, which shall not be unreasonably withheld.

(b)    Any Debtor shall have asserted, in a pleading filed with the Court (or another court of competent jurisdiction), a claim or challenge against the First Lien Secured Parties in any way materially contrary to any of the Debtors' acknowledgements, stipulations, and releases contained herein.

(c)    The Court shall have entered an order appointing a chapter 11 trustee or any examiner with expanded powers relating to the operation of the businesses in the Chapter 11 Cases, unless consented to in writing by the Prepetition Agent and counsel to the First Lien Ad Hoc Group.

(d)    The Court enters an order converting any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases, unless the Prepetition Agent and counsel to the First Lien Ad Hoc Group have consented to such order in writing.

24

(e)    The Court shall have entered (x) an order or orders of the Court granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any of the Debtors' assets or (y) a postpetition judgment or judgments of any U.S. court against any Debtor, in each case of (x) and (y), which have a value in the aggregate in excess of $500,000.

(f)    The Court shall have entered an order (x) reversing, amending, supplementing, vacating, or otherwise modifying this Final Order without the consent of counsel to the First Lien Ad Hoc Group, or (y) avoiding or requiring repayment of any portion of the payments made to the First Lien Secured Parties pursuant to the terms hereof, unless such order is entered in connection with any successful Challenge (as defined below).

(g)    The Debtors fail to make any payment when due under paragraph 5 hereof, unless such failure is cured within five (5) business days.

(h)    As measured at the conclusion of each period for which Budget Variance Reports are required, either (x) the Debtors' total operating disbursements for the applicable Budget Variance Report period exceed 120% of the amount, exclusive of professional fees and other restructuring related expenses incurred, set forth in the Approved Budget for the applicable Budget Variance Report period, or (y) actual receipts for the applicable Budget Variance Report period are more than 25% below the receipts set forth in the Approved Budget for the applicable Budget Variance Report period (which amounts, for the avoidance of doubt, shall take into account any positive or negative variances—i.e., the amount by which total operating disbursements and/or receipts is less or greater than 100% of the budgeted amount—from any prior testing period that may be carried forward and applied to the current period), unless counsel to the First Lien Ad Hoc Group has provided a written waiver of such variance, as applicable.

(i)    The Debtors shall have filed a motion (x) seeking to obtain credit or incur indebtedness that is, or is proposed to be, secured by a security interest, mortgage, or other lien on all or any portion of the Prepetition Collateral that is equal or senior to any security interest, mortgage, or other lien of the First Lien Secured Parties (including, without limitation, the Adequate Protection Liens and the Prepetition Liens), or entitled to administrative expense priority status that is equal or senior to that granted to the First Lien Secured Parties herein, unless consented to by counsel to the First Lien Ad Hoc Group; or (y) seeking authority to use Cash Collateral on a non-consensual basis, unless the Debtors have first indefeasibly paid the First Lien Credit Agreement Secured Obligations in full in cash.

(j)    The payment of any prepetition claims that are junior in priority or right to the liens and mortgages on such collateral held by First Lien Secured Parties, other than as permitted by an order entered in the Chapter 11 Cases.

25

(k)      Three (3) business days after the Debtors and their lead restructuring counsel receive written notice from counsel to the First Lien Ad Hoc Group that any of the following milestones, which may be extended by written agreement as between the Debtors, the First Lien Credit Agreement Administrative Agent, and counsel to the First Lien Ad Hoc Group, are not met by the Debtors:

i)      **Final Order Effectiveness**:  The date this Final Order ceases to be in full force and effect for any reason.

ii)      **Plan Solicitation**:  July 8, 2020 (Petition Date + 14) to the extent the Debtors have not completed solicitation on that certain *Joint Prepackaged Plan of Reorganization of Jason Industries, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Plan**").

iii)      **Confirmation Hearing**:  August 23, 2020 (Petition Date + 60) to the extent that the Court has not commenced the hearing to consider disclosure statement approval and Plan confirmation (the "**Combined Hearing**").

iv)      **Disclosure Statement Approval & Plan Confirmation**: to the extent that, not later than five (5) business days after the commencement of the Combined Hearing, the Court has not entered an order confirming the Plan and approving the disclosure statement and solicitation procedures on terms acceptable to the First Lien Ad Hoc Group.

v)      **Effective Date**:  to the extent that the effective date of the Plan has not occurred on or before the first business day that is fourteen (14) days after entry of a confirmation order in a form and substance acceptable to the First Lien Ad Hoc Group.

(l)      The Debtors shall have failed to comply with any other provision hereof in any material respect, and such failure shall not have been cured after five (5) days written notice which, for the avoidance of doubt, includes the use of Cash Collateral in a manner prohibited by this Order.

7.      <u>Rights and Remedies upon Event of Default</u>.  Upon the occurrence and during the continuance of an Event of Default, the Debtors, upon five (5) business days' written notice to the Debtors, their lead restructuring counsel, the U.S. Trustee, and an Unsecured Creditors' Committee, if any (the "**Notice Period**"), shall immediately cease using Cash Collateral and the First Lien Ad Hoc Group may, by its counsel, in accordance with the terms and conditions of this Final Order, the Prepetition Loan Documents, or the Intercreditor Agreement, revoke the First Lien

Secured Parties' consent to the Debtors' use of Cash Collateral hereunder; *provided* that, during the Notice Period, the Debtors may continue to use Cash Collateral pursuant to the terms of this Final Order. Upon the expiration of the Notice Period and the occurrence of an Event of Default, (a) the Debtors shall immediately cease using Cash Collateral, other than to pay employee wages, payroll, and benefits, (b) the Adequate Protection Obligations, if any, shall become immediately due and payable, and (c) subject to prior authorization contained in a further Court order (which further Court order may be sought on an expedited basis) and the terms of the Intercreditor Agreement, each First Lien Secured Party may exercise the rights and remedies available under the Prepetition Loan Documents, the Intercreditor Agreement, this Final Order, or applicable law, as applicable (subject only to the Carve Out), including, without limitation, foreclosing upon and selling all or a portion of the Prepetition Collateral or Collateral in order to collect and satisfy the Adequate Protection Obligations, and First Lien Credit Agreement Obligations, in accordance with this Final Order and the Intercreditor Agreement. The automatic stay under section 362 of the Bankruptcy Code is hereby deemed modified except with respect to subsection (c) of this paragraph and vacated to the extent necessary to permit such actions; *provided*, that during the Notice Period, unless the Court orders otherwise and as set forth herein, the automatic stay under section 362 of the Bankruptcy Code (to the extent applicable) shall remain in effect. Any delay or failure of the First Lien Secured Parties to exercise rights under the Prepetition Loan Documents or this Final Order shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable document. Without limiting the First Lien Secured Parties' rights under the First Lien Credit Documents, the First Lien Credit Agreement Administrative Agent shall be entitled to apply the payments or proceeds of the Prepetition Collateral and the Collateral in

accordance with the provisions of the Prepetition Loan Documents and the Intercreditor Agreement, as applicable, subject to section 506 of the Bankruptcy Code and paragraph 8 of this Final Order.  Notwithstanding the occurrence of an Event of Default or anything herein, all of the rights, remedies, benefits and protections provided to the Collateral Agent and the First Lien Secured Parties under this Final Order shall survive the Event of Default.  In any hearing related to such nonconsensual use of Cash Collateral, the Debtors, the Collateral Agent and the First Lien Secured Parties may raise, assert, prosecute, or otherwise advance any and all rights and arguments that could be asserted at such hearing.

8.    <u>Effect of Stipulations on Third Parties</u>.  The Debtors' Stipulations shall be binding upon the Debtors and their affiliates and any of their respective successors (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any Debtor), but not their estates, in all circumstances upon entry of this Final Order.  The Debtors' Stipulations shall be binding upon each other party in interest, including an Unsecured Creditors' Committee, if any, except to the extent and only to the extent such Unsecured Creditors' Committee, if any, or, solely as provided in clause (y) below, any other party in interest with proper standing (including any chapter 11 trustee) other than the Debtors (or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), *first*, commences, by the earlier of (x) the date of entry of an order confirming a chapter 11 plan, (y) with respect to an Unsecured Creditors' Committee, if any, sixty (60) calendar days following the date of entry of the Interim Order, and (z) with respect to other parties in interest with requisite standing other than the Debtors or an Unsecured Creditors' Committee, if any, seventy-five (75) calendar days following the date of entry of the Interim Order (such time period established by the earlier of clauses (x), (y), and (z), as the same may be extended

28

as provided for herein, shall be referred to as the "**Challenge Period**," and the date that is the next

calendar day after the termination of the Challenge Period in the event that either (i) no Challenge

(as defined below) is properly raised during the Challenge Period or (ii) with respect only to those

parties who properly file a Challenge, such Challenge is fully and finally adjudicated, shall be

referred to as the "**Challenge Period Termination Date**"), a contested matter, adversary

proceeding, or other matter challenging or otherwise objecting to the admissions, stipulations,

findings, or releases included in the Debtors' Stipulations (each, a "**Challenge**"), and *second*,

obtains a final, non-appealable order in favor of such party in interest sustaining any such

Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any

such Challenge timely brought for which such a final and non-appealable order is so obtained, a

"**Successful Challenge**").  If a chapter 7 trustee or a chapter 11 trustee is appointed or elected

during the Challenge Period, then the Challenge Period Termination Date with respect to such

trustee only, shall be the later of (i) the last day of the Challenge Period and (ii) the date that is

twenty (20) days after the date on which such trustee is appointed or elected.  Except as otherwise

expressly provided herein, from and after the Challenge Period Termination Date and for all

purposes in these Chapter 11 Cases and any Successor Cases (and after the dismissal of these Cases

or any Successor Cases), (i) any and all payments made to or for the benefit of the First Lien

Secured Parties or otherwise authorized by the Cash Collateral Orders (whether made prior to, on,

or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off,

subordination, recharacterization, defense, disallowance, recovery, or avoidance, (ii) any and all

such Challenges by any party in interest shall be deemed to be forever released, waived, and barred,

(iii) all of the First Lien Credit Agreement Secured Obligations shall be deemed to be fully allowed

claims within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtors'

Stipulations shall be binding on all parties in interest in these Cases or any Successor Cases, including an Unsecured Creditors' Committee, if any, or chapter 11 or chapter 7 trustee. Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on an Unsecured Creditors' Committee, if any, and on any other party in interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge.  The Challenge Period may be extended only (i) with the written consent of the Debtors and, with respect to any challenge related to the First Lien Credit Agreement Obligations, with the written consent of the Debtors and the First Lien Credit Agreement Administrative Agent, and the First Lien Ad Hoc Group or (ii) by order of the Court for good cause shown. Notwithstanding any provision to the contrary herein, nothing in this Final Order shall be construed to grant standing on any party in interest, including an Unsecured Creditors' Committee, if any, to bring any Challenge on behalf of the Debtors' estates.  The failure of any party in interest, including an Unsecured Creditors' Committee, if any, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this paragraph or to require or permit an extension of the Challenge Period Termination Date.

9.    <u>Carve Out</u>.

(a)    <u>Carve Out</u>.  As used in this Final Order, the "**Carve Out**" means the sum of:  (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States

Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, but subject to Paragraph 10 of this Final Order, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and an Unsecured Creditors' Committee, if any, pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**," if any, and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the Prepetition Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,250,000 incurred after the first business day following delivery by the Prepetition Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the Prepetition Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to an Unsecured Creditors' Committee, if any, which notice may be delivered following the occurrence and during the continuation of a Termination Event, and upon termination of the Debtors' right to use Cash Collateral by the First Lien Lenders, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)    <u>Carve Out Reserves</u>.  On the day on which a Carve Out Trigger Notice is given by the Prepetition Agent to the Debtors with a copy to the U.S. Trustee and counsel to an Unsecured Creditors' Committee, if any (the "**Termination Declaration Date**"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such then unpaid Allowed Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims.  On the Termination Declaration Date, after funding the Pre-Carve Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Prepetition Agent for the benefit of the First Lien Secured Parties, unless the First Lien Credit Agreement Secured Obligations have been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the Debtors' creditors in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "**Post-Carve Out Amounts**"), and then, to the extent the Post-Carve Out Trigger Notice

32

Reserve has not been reduced to zero, to pay the Prepetition Agent for the benefit of the First Lien

Secured Parties, unless the First Lien Credit Agreement Secured Obligations have been

indefeasibly paid in full, in cash, in which case any such excess shall be paid to the Debtors'

prepetition secured creditors in accordance with their rights and priorities as of the Petition

Date.  Notwithstanding anything to the contrary in the Prepetition Loan Documents or the Cash

Collateral Orders, if either of the Carve Out Reserves is not funded in full in the amounts set forth

in this paragraph 9(b), then, any excess funds in one of the Carve Out Reserves following the

payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used

to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 9(b),

prior to making any payments to the Prepetition Agent or any of the Debtors' creditors, as

applicable.  Notwithstanding anything to the contrary in the Prepetition Loan Documents or the

Cash Collateral Orders, following delivery of a Carve Out Trigger Notice, the Prepetition Agent

shall not sweep or foreclose on cash (including cash received as a result of the sale or other

disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but

shall have a security interest in any residual interest in the Carve Out Reserves, with any excess

paid to the Prepetition Agent for application in accordance with the Prepetition Loan

Documents.  Further, notwithstanding anything to the contrary in the Cash Collateral Orders,

(i) disbursements by the Debtors from the Carve Out Reserves shall not constitute, increase, or

reduce First Lien Credit Agreement Secured Obligations, (ii) the failure of the Carve Out Reserves

to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and

(iii) in no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve

Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the

Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and

notwithstanding anything to the contrary in the Prepetition Loan Documents or the Cash Collateral Orders, the Carve Out shall be senior to all liens and claims securing the First Lien Credit Agreement Secured Obligations, the Adequate Protection Liens, and the Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing the First Lien Credit Agreement Secured Obligations.

(c)      <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Professional Fees shall not reduce the Carve Out.

(d)      <u>Payment of Carve Out On or After the Termination Declaration Date</u>. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar for dollar basis.

10.      <u>Restrictions on Use of Proceeds of Collateral and the Carve Out</u>. Notwithstanding any other provision of this Final Order, no proceeds of Collateral, including any Cash Collateral, or the Carve Out shall be used for the purpose of: (a) investigating, objecting to, challenging, or contesting in any manner, or in raising any defenses to, the amount, validity, extent, perfection, priority, enforceability, or avoidability of the First Lien Credit Agreement Secured Obligations, or any liens or security interests with respect thereto, or any other rights or interests of the First Lien Secured Parties, including with respect to any disposition of Collateral, and including with respect to the Adequate Protection Liens, or in asserting any claims or causes of action against any of the First Lien Secured Parties, including, without limitation, for lender liability or pursuant to sections 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; or (b) paying any amount on account of any claims arising before the Petition Date

unless such payments are approved by an order of this Court; *provided* that prior to the Termination Declaration Date, up to $50,000 of Cash Collateral shall be made available to an Unsecured Creditors' Committee, if any, for fees and expenses incurred in connection with any investigation of (but not preparing, drafting or filing any documents or pleadings objecting to, challenging, or contesting in any manner, or raising any defenses to) the liens and claims of the First Lien Secured Parties (the "**Committee Investigation Budget**").  No claim for amounts incurred in connection with such activities (including amounts incurred in connection with an investigation in excess of the Committee Investigation Budget) shall be allowed, treated, or payable as an administrative expense claim for purposes of section 1129(a)(9)(A) of the Bankruptcy Code.  Nothing contained in this paragraph 10 shall prohibit the Debtors from responding or objecting to or complying with discovery requests of an Unsecured Creditors' Committee, if any, in whatever form, made in connection with such investigation or the payment from the Cash Collateral of professional fees related thereto or from contesting or challenging whether a Termination Event has in fact occurred.

11.    <u>Proceeds of Sale or Additional Financing</u>.  The proceeds of any (i) sale of any Collateral outside the ordinary course in excess of $100,000, whether pursuant to section 363 of the Bankruptcy Code or a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (ii) additional financing, including any transaction involving the public or private issuance, sale, or placement of newly-issued equity, equity-linked, or debt securities, instruments, obligations, or other funded debt of the Debtors, shall be applied to pay down the First Lien Credit Agreement Secured Obligations.

12.    <u>No Waiver of First Lien Secured Parties' Rights; Reservation of Rights</u>.  Except as set forth herein, this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, any of the First Lien Secured Parties' rights with respect to any person or

entity other than the Debtors, or with respect to any other collateral owned or held by any person or entity other than the Debtors.  The rights of the First Lien Secured Parties are expressly reserved and entry of this Final Order shall be without prejudice to, and does not constitute a waiver, expressly or implicitly, of:

(a)    the First Lien Secured Parties' rights under any of the Prepetition Loan Documents and the Intercreditor Agreement;

(b)    the First Lien Secured Parties' rights to seek any other or supplemental relief in respect of the Debtors;

(c)    the First Lien Secured Parties' rights to seek modification of the grant of adequate protection provided under this Final Order so as to provide different or additional adequate protection at any time;

(d)    any of the First Lien Secured Parties' rights under the Bankruptcy Code or under non-bankruptcy law including, without limitation, to the right to: (i) request modification of the automatic stay of section 362 of the Bankruptcy Code; (ii) request dismissal of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with extended powers; or (iii) propose, subject to section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; and

(e)    any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the First Lien Secured Parties.

13.    <u>First Lien Secured Parties' Right to Credit Bid</u>.  Subject to the Prepetition Loan Documents, the Intercreditor Agreement, and section 363(k) of the Bankruptcy Code, the First Lien Credit Agreement Administrative Agent shall have the right to credit bid up to the full amount of any remaining First Lien Credit Agreement Obligations (as applicable) in the sale of any

36

Prepetition Collateral whether pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code and the First Lien Credit Agreement Administrative Agent shall be deemed a qualified bidder (or such analogous term) in connection with any such sale.

14.    Further Assurances.  The Debtors shall execute and deliver to the First Lien Credit Agreement Administrative Agent and counsel to the First Lien Ad Hoc Group all such agreements, financing statements, instruments, and other documents as they may reasonably request to evidence, confirm, validate, or evidence the perfection of the Adequate Protection Liens granted pursuant hereto.

15.    506(c) Waiver.  Except to the extent of the Carve Out, no costs or expenses of administration which have been or may be incurred in any of the Chapter 11 Cases at any time shall be charged against the First Lien Secured Parties, any of the First Lien Credit Agreement Secured Obligations, any of their respective claims, or the Collateral pursuant to sections 506(c) or 105(a) of the Bankruptcy Code, or otherwise, without the prior written consent of the First Lien Credit Agreement Administrative Agent, and no such consent shall be implied from any other action, inaction, or acquiescence by any of the First Lien Secured Parties or their respective representatives.

16.    Bankruptcy Code Section 552(b).  The First Lien Secured Parties shall be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the First Lien Secured Parties.

17.    <u>Restrictions on Granting Postpetition Claims and Liens</u>.  Except with respect to the Carve Out, no claim or lien that is *pari passu* with or senior to the claims and liens of the First Lien Secured Parties shall be offered by any Debtor, or granted, to any other person, except in connection with any financing used to pay in full in cash the claims of the First Lien Secured Parties or that would constitute a Permitted Lien with respect to the Debtor against whom such lien is granted; *provided* that anything in the foregoing is consistent with the Intercreditor Agreement.

18.    <u>Automatic Effectiveness of Liens</u>.  The Adequate Protection Liens shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non-avoidable, and effective by operation of law as of the Petition Date, without any further action by the Debtors or the First Lien Secured Parties and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with the U.S. Patent and Trademark Office, the U.S. Copyright Office, or the Library of Congress, or other documents or the taking of any other actions.  If the First Lien Credit Agreement Administrative Agent hereafter reasonably requests that the Debtors execute and deliver to them financing statements, security agreements, collateral assignments, mortgages, or other instruments and documents considered by such agent to be reasonably necessary or desirable to further evidence the perfection of the Adequate Protection Liens, as applicable, the Debtors are hereby authorized and directed to execute and deliver such financing statements, security agreements, mortgages, collateral assignments, instruments, and documents, and the First Lien Credit Agreement Administrative Agent is hereby authorized to file or record such documents in their discretion without seeking modification of the automatic stay under section 362 of the

Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Final Order.

19.    <u>No Marshaling/Application of Proceeds</u>.  In no event shall the First Lien Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral; *provided* that the First Lien Secured Parties shall be entitled to seek to apply such marshaling or other similar doctrines with respect the Collateral against any other party.

20.    <u>Proofs of Claim</u>.  None of the First Lien Secured Parties shall be required to file proofs of claim in any of the Chapter 11 Cases for any First Lien Credit Agreement Secured Obligation or any Superpriority Claim or other claim arising in connection with this Final Order. Notwithstanding any order entered by the Court in relation to the establishment of a bar date, the Prepetition Agent, on behalf of themselves and First Lien Secured Parties, as applicable, is hereby authorized and entitled, in its sole and absolute discretion, but not required, to file (and amend and/or supplement, as each sees fit) a proof of claim and/or aggregate proofs of claim in the Chapter 11 Cases for any such claims; for avoidance of doubt, any such proof of claim may (but is not required to be) filed as one consolidated proof of claim against all of the applicable Debtors, rather than as separate proofs of claim against each such Debtor.  Any proof of claim filed by the Prepetition Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the respective First Lien Secured Parties.  The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party in interest or their respective successors-in-interest.

21.    <u>Binding Effect</u>.  The provisions of this Final Order shall be binding upon and inure to the benefit of the First Lien Secured Parties to the extent and as set forth herein, the Debtors,

any Unsecured Creditors' Committee, if any, and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors).  To the extent permitted by applicable law, this Final Order shall bind any trustee hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Final Order.

22.     <u>Survival</u>.  The provisions of this Final Order and any actions taken pursuant hereto shall survive the entry of any order:  (a) confirming any plan of reorganization in any of the Chapter 11 Cases, (b) converting any of the Chapter 11 Cases to a chapter 7 case, or (c) dismissing any of the Chapter 11 Cases, and, with respect to the entry of any order as set forth in clause (b) or (c) of this paragraph, the terms and provisions of this Final Order as well as the Adequate Protection Liens and Superpriority Claims shall continue in full force and effect notwithstanding the entry of any such order.

23.     <u>Effect of Dismissal of Chapter 11 Cases</u>.  If any of the Chapter 11 Cases is dismissed, converted, or substantively consolidated, such dismissal, conversion, or substantive consolidation of these Chapter 11 Cases shall not affect the rights of the First Lien Secured Parties under this Final Order, and all of their rights and remedies hereunder shall remain in full force and effect as if the Chapter 11 Case had not been dismissed, converted, or substantively consolidated. If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that:

(a) the Prepetition Liens, Adequate Protection Liens, and Superpriority Claims granted to and conferred upon the First Lien Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Final Order (and that such Superpriority Claims shall, notwithstanding such dismissal, remain binding on all interested parties), and (b) to the greatest extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the Prepetition Liens, Adequate Protection Liens, and Superpriority Claims referred to in this Final Order.

24.    <u>Order Effective</u>.  This Final Order shall be effective as of the date of the signature by the Court.

25.    <u>Controlling Effect of Final Order</u>.  To the extent any provision of this Final Order conflicts or is inconsistent with any provision of the Motion, the Interim Order, or the First Lien Credit Agreement, the provisions of this Final Order shall control to the extent of such conflict.


Dated:  July 27, 2020
White Plains, New York

*/s/Robert D. Drain*
_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT 1</u>**

**Approved Budget**