Jonathan S. Henes, P.C.
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Laura E. Krucks (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| JASON INDUSTRIES, INC. *et al.,*[1] | ) ) | Case No. 20-22766 (RDD) |
| Debtors. | ) ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF FILING SECOND AMENDED PLAN SUPPLEMENT

**PLEASE TAKE NOTICE** that on July 29, 2020, Jason Industries, Inc. and its affiliated

debtors and debtors in possession (collectively, the "Debtors") filed the *Notice of Filing Plan*

*Supplement* [Docket No. 144] (the "Original Plan Supplement") to the *Joint Prepackaged Plan of*

*Reorganization of Jason Industries, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the*

*Bankruptcy Code* [Docket No. 139] (as may be amended, supplemented, or otherwise modified

from time to time, the "Plan"),[2] as set forth in the Plan and in accordance with the terms and

conditions in the Restructuring Support Agreement.

---

[1]    The last four digits of the Debtors' tax identification numbers, if any, are:  Jason Industries, Inc. (8322); Jason Partners Holdings, Inc. (1977); Jason Holdings, Inc. I (9929); Jason Incorporated (6840); Milsco, LLC (7243); Osborn, LLC (5279); Schaffner Manufacturing Co., Inc. (0894); and Jason International Holdings, Inc. (7730). The location of the Debtors' service address for purposes of these chapter 11 cases is:  777 Westchester Avenue, Suite 101, White Plains, NY 10604.

[2]    Capitalized terms used but not otherwise defined shall have the meaning ascribed to such terms in the Plan.

**PLEASE TAKE NOTICE** that on August 14, 2020, the Debtors filed the *Notice of Filing First Amended Plan Supplement* [Docket No. 199] (the "First Amended Plan Supplement") to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file this *Notice of Filing of Second Amended Plan Supplement* (the "Second Amended Plan Supplement" and, together with the Original Plan Supplement and the First Amended Plan Supplement, the "Plan Supplement"), which includes the following documents:

| | |
|---|---|
| **Exhibit A:** | New First Lien Credit Agreement |
| **Exhibit A-1:** | Redline to Version in the First Amended Plan Supplement |
| **Exhibit B:** | Stockholders' Agreement |
| **Exhibit B-1:** | Redline to Version in the First Amended Plan Supplement |
| **Exhibit D:** | New Revolving Exit Facility Credit Agreement |
| **Exhibit D-1:** | Redline to Version in the First Amended Plan Supplement |
| **Exhibit E:** | New Junior Lien Convertible Credit Agreement |
| **Exhibit E-1:** | Redline to Version in the First Amended Plan Supplement |
| **Exhibit G:** | New Organizational Documents |
| **Exhibit G-1:** | Redline to Version in the First Amended Plan Supplement |

**PLEASE TAKE FURTHER NOTICE** that certain documents or portions thereof contained in the Plan Supplement remain subject to ongoing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained therein, at any time before the Effective Date of the Plan, or any such other date as may be provided for in the Plan or an order of the Bankruptcy Court. Each of the documents contained in the Plan

Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan and the Restructuring Support Agreement.

**PLEASE TAKE FURTHER NOTICE** that on August 26, 2020 the Honorable Robert D. Drain entered the *Order (I) Approving the Disclosure Statement for and Confirming the Joint Prepackaged Chapter 11 Plan of Reorganization of Jason Industries, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 222].

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan, Disclosure Statement and Plan Supplement may be obtained free of charge at http://dm.epiq11.com/jason or by calling +1 (855) 917-3541 (toll free) or +1 (503) 597-7669 (international). All pleadings filed in the cases may be inspected at the office of the Clerk of the Bankruptcy Court for the Southern District of New York, 300 Quarropas St, White Plains, NY 10601 and the Bankruptcy Court's website, http://www.nysb.uscourts.gov. Note that you need a PACER password and login to access documents on the Bankruptcy Court's website (a PACER password may be obtained by accessing the PACER website, http://pacer.psc.uscourts.gov). In addition, all pleadings filed in Jason's chapter 11 cases will be posted on Jason's restructuring website at http://dm.epiq11.com/jason.

Dated: August 28, 2020
New York, New York

*/s/ Jonathan S. Henes, P.C.*

Jonathan S. Henes, P.C.
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Laura E. Krucks (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

Jonathan S. Henes, P.C.
Emily E. Geier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Laura E. Krucks (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JASON INDUSTRIES, INC. *et al.,*[3] | ) | Case No. 20-22766 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## SECOND AMENDED PLAN SUPPLEMENT

The documents contained herein are provided in accordance with the *Joint Prepackaged Plan of Reorganization of Jason Industries, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan")[4] and the Restructuring Support Agreement. Copies of such documents can also be obtained on the Debtors' public restructuring website at http://dm.epiq11.com/jason. Certain documents or portions thereof contained in the Plan Supplement remain subject to ongoing negotiations among the Debtors and interested parties with respect to the applicable document and in accordance with the Plan and the Restructuring Support Agreement. The respective rights of the Debtors and the Consenting Creditors are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement and any of the documents and designations contained herein at any time before the Effective Date of the Plan or any such other date as may be provided for in the Plan or an order of the Bankruptcy Court, and filing of the forms of the documents set forth in this Plan Supplement shall not be deemed as acceptance of such document by any party to the

---

[3]   The last four digits of the Debtors' tax identification numbers, if any, are:  Jason Industries, Inc. (8322); Jason Partners Holdings, Inc. (1977); Jason Holdings, Inc. I (9929); Jason Incorporated (6840); Milsco, LLC (7243); Osborn, LLC (5279); Schaffner Manufacturing Co., Inc. (0894); and Jason International Holdings, Inc. (7730). The location of the Debtors' service address for purposes of these chapter 11 cases is:  777 Westchester Avenue, Suite 101, White Plains, NY 10604.

[4]   Capitalized terms used but not defined herein have the same meaning as set forth in the Plan.

Restructuring Support Agreement or a waiver of any of the rights of any such party under the Restructuring Support Agreement, the Bankruptcy Code or otherwise.

[*Remainder of page intentionally left blank*]

## TABLE OF CONTENTS

**Exhibit A:**     New First Lien Credit Agreement

**Exhibit A-1:**   Redline to Version in the First Amended Plan Supplement

**Exhibit B:**     Stockholders' Agreement

**Exhibit B-1:**   Redline to Version in the First Amended Plan Supplement

**Exhibit D:**     New Revolving Exit Facility Credit Agreement

**Exhibit D-1:**   Redline to Version in the First Amended Plan Supplement

**Exhibit E:**     New Junior Lien Convertible Credit Agreement

**Exhibit E-1:**   Redline to Version in the First Amended Plan Supplement

**Exhibit G:**     New Organizational Documents

**Exhibit G-1:**   Redline to Version in the First Amended Plan Supplement

## Exhibit A

### New First Lien Credit Agreement

Certain documents or portions thereof contained in this **Exhibit A** and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The respective rights of the Debtors and the Consenting Creditors are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement and any of the documents and designations contained herein at any time before the Effective Date of the Plan or any such other date as may be provided for in the Plan or an order of the Bankruptcy Court, and filing of the forms of the documents set forth in this Plan Supplement (including this Exhibit A) shall not be deemed as acceptance of such document by any party to the Restructuring Support Agreement or a waiver of any of the rights of any such party under the Restructuring Support Agreement, the Bankruptcy Code or otherwise.

**Dated August [●], 2020**

**FIRST LIEN CREDIT AGREEMENT**

$76,600,000

among

**JASON GROUP INC.,**
as Borrower,

**THE GUARANTORS PARTY HERETO FROM TIME TO TIME,**

**CANTOR FITZGERALD SECURITIES,**
as Administrative Agent,

and

**THE OTHER LENDERS PARTY HERETO FROM TIME TO TIME**

## Table of Contents

**Page**

Article I Definitions and Accounting Terms...................................................................................1

    Section 1.01    Defined Terms ..............................................................................................1
    Section 1.02    Other Interpretive Provisions.....................................................................38
    Section 1.03    Accounting Terms .....................................................................................39
    Section 1.04    Rounding ...................................................................................................39
    Section 1.05    References to Agreements, Laws, Etc. .......................................................39
    Section 1.06    Times of Day ............................................................................................39
    Section 1.07    Timing of Payment or Performance...........................................................39
    Section 1.08    [Reserved]. ................................................................................................39
    Section 1.09    Pro Forma Calculations ............................................................................39
    Section 1.10    Exchange Rates; Currency.........................................................................40
    Section 1.11    Certifications.............................................................................................40

Article II Credit Extensions ........................................................................................................41

    Section 2.01    The Loans .................................................................................................41
    Section 2.02    Conversions and Continuations of Loans ..................................................41
    Section 2.03    [Reserved].................................................................................................42
    Section 2.04    [Reserved].................................................................................................42
    Section 2.05    Prepayments..............................................................................................42
    Section 2.06    [Reserved].................................................................................................50
    Section 2.07    Repayment of Loans .................................................................................50
    Section 2.08    Interest .....................................................................................................51
    Section 2.09    Fees..........................................................................................................51
    Section 2.10    Computation of Interest and Fees ..............................................................52
    Section 2.11    Evidence of Indebtedness ..........................................................................52
    Section 2.12    Payments Generally ..................................................................................53
    Section 2.13    Sharing of Payments .................................................................................54
    Section 2.14    [Reserved].................................................................................................55
    Section 2.15    [Reserved].................................................................................................55
    Section 2.16    [Reserved].................................................................................................55
    Section 2.17    Defaulting Lenders ...................................................................................55
    Section 2.18    Effect of Benchmark Transition Event ......................................................55

Article III Taxes, Increased Costs Protection and Illegality .........................................................58

    Section 3.01    Taxes........................................................................................................58
    Section 3.02    Illegality...................................................................................................61
    Section 3.03    Inability to Determine Rates......................................................................61
    Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; Eurocurrency Rate Loan
                        Reserves...................................................................................................62
    Section 3.05    Funding Losses .........................................................................................63
    Section 3.06    Matters Applicable to All Requests for Compensation ...............................63
    Section 3.07    Replacement of Lenders under Certain Circumstances ...............................64
    Section 3.08    Survival....................................................................................................65

Article IV Conditions Precedent to Credit Extensions ................................................................65

    Section 4.01    Conditions to Initial Credit Extension .......................................................65

Article V Representations and Warranties....................................................................................68

    Section 5.01    Existence, Qualification and Power; Compliance with Laws.......................68

WEIL:\97507497\16\10143.0003

                                                                                    **Page**

Section 5.02    Authorization; No Contravention .................................................68
Section 5.03    Governmental Authorization; Other Consents.................................68
Section 5.04    Binding Effect..................................................................69
Section 5.05    Financial Statements; No Material Adverse Effect...........................69
Section 5.06    Litigation .....................................................................69
Section 5.07    Ownership of Property; Liens..................................................69
Section 5.08    Environmental Matters .........................................................70
Section 5.09    Taxes...........................................................................70
Section 5.10    ERISA Compliance ..............................................................70
Section 5.11    Subsidiaries; Equity Interests.................................................71
Section 5.12    Margin Regulations; Investment Company Act ...................................71
Section 5.13    Disclosure .....................................................................71
Section 5.14    Labor Matters..................................................................71
Section 5.15    Intellectual Property; Licenses, Etc ..........................................72
Section 5.16    Solvency .......................................................................72
Section 5.17    [Reserved].....................................................................72
Section 5.18    USA Patriot Act; OFAC; FCPA ...................................................72
Section 5.19    Security Documents.............................................................72
Section 5.20    EEA Financial Institutions ....................................................73
Section 5.21    Beneficial Ownership Certification ............................................73

Article VI Affirmative Covenants .....................................................................73

Section 6.01    Financial Statements...........................................................73
Section 6.02    Certificates; Other Information.................................................75
Section 6.03    Notices........................................................................76
Section 6.04    Payment of Taxes ..............................................................77
Section 6.05    Preservation of Existence, Etc.................................................77
Section 6.06    Maintenance of Properties .....................................................77
Section 6.07    Maintenance of Insurance ......................................................77
Section 6.08    Compliance with Laws ..........................................................78
Section 6.09    Books and Records .............................................................78
Section 6.10    Inspection Rights .............................................................78
Section 6.11    Additional Collateral; Additional Guarantors...................................78
Section 6.12    Compliance with Environmental Laws.............................................80
Section 6.13    Further Assurances ............................................................80
Section 6.14    [Reserved].....................................................................80
Section 6.15    Ratings .......................................................................81
Section 6.16    Use of Proceeds ...............................................................81
Section 6.17    Lender Meetings ...............................................................81
Section 6.18    End of Fiscal Years............................................................81
Section 6.19    Lines of Business .............................................................81
Section 6.20    Post-Closing Covenant .........................................................81
Section 6.21    Anti-Terrorism Law; Anti-Money Laundering; Embargoed Persons..................81
Section 6.22    Account Control Agreements ....................................................82

Article VII Negative Covenants........................................................................82

Section 7.01    Liens .........................................................................82
Section 7.02    Investments....................................................................86
Section 7.03    Indebtedness ..................................................................89
Section 7.04    Fundamental Changes............................................................92

WEIL:\97507497\16\10143.0003

**Page**

| | | |
|---|---|---|
| Section 7.05 | Dispositions | 93 |
| Section 7.06 | Restricted Payments | 95 |
| Section 7.07 | [Reserved] | 97 |
| Section 7.08 | Transactions with Affiliates | 97 |
| Section 7.09 | Burdensome Agreements | 99 |
| Section 7.10 | Maximum Capital Expenditures | 100 |
| Section 7.11 | Consolidated First Lien Net Leverage Ratio | 101 |
| Section 7.12 | Interest Coverage Ratio | 101 |
| Section 7.13 | Prepayments, Etc. of Indebtedness | 102 |
| Section 7.14 | Permitted Activities | 102 |

**Article VIII Events of Default and Remedies** ........................................................... 103

| | | |
|---|---|---|
| Section 8.01 | Events of Default | 103 |
| Section 8.02 | Remedies Upon Event of Default | 105 |
| Section 8.03 | Application of Funds | 105 |
| Section 8.04 | Borrower's Right to Cure | 106 |

**Article IX Administrative Agent** ............................................................................... 107

| | | |
|---|---|---|
| Section 9.01 | Appointment and Authority | 107 |
| Section 9.02 | Rights as a Lender | 108 |
| Section 9.03 | Exculpatory Provisions | 108 |
| Section 9.04 | Reliance by Administrative Agent | 110 |
| Section 9.05 | Delegation of Duties | 111 |
| Section 9.06 | Resignation of Administrative Agent | 111 |
| Section 9.07 | Non-Reliance on Administrative Agent and Other Lenders | 111 |
| Section 9.08 | No Other Duties, Etc. | 112 |
| Section 9.09 | Administrative Agent May File Proofs of Claim | 112 |
| Section 9.10 | Collateral and Guaranty Matters | 112 |
| Section 9.11 | [Reserved] | 114 |
| Section 9.12 | Withholding Tax Indemnity | 114 |
| Section 9.13 | Non-U.S. Administrative Agent Tax Matters | 114 |

**Article X Miscellaneous** ............................................................................................ 114

| | | |
|---|---|---|
| Section 10.01 | Amendments, Etc. | 114 |
| Section 10.02 | Notices and Other Communications; Facsimile Copies | 116 |
| Section 10.03 | No Waiver; Cumulative Remedies | 119 |
| Section 10.04 | Attorney Costs and Expenses | 119 |
| Section 10.05 | Indemnification by the Borrower | 120 |
| Section 10.06 | Payments Set Aside | 121 |
| Section 10.07 | Successors and Assigns | 121 |
| Section 10.08 | Confidentiality | 127 |
| Section 10.09 | Setoff | 128 |
| Section 10.10 | Interest Rate Limitation | 128 |
| Section 10.11 | Counterparts | 128 |
| Section 10.12 | Integration | 128 |
| Section 10.13 | Survival of Representations and Warranties | 129 |
| Section 10.14 | Severability | 129 |
| Section 10.15 | GOVERNING LAW | 129 |
| Section 10.16 | WAIVER OF RIGHT TO TRIAL BY JURY | 129 |
| Section 10.17 | Binding Effect | 130 |

**Page**

Section 10.18   USA Patriot Act...........................................................................................130
Section 10.19   No Advisory or Fiduciary Responsibility................................................130
Section 10.20   Judgment Currency........................................................................................131
Section 10.21   Intercreditor Agreement................................................................................131
Section 10.22   Acknowledgement and Consent to Bail-In of EEA Financial Institutions ...............131
Section 10.23   Certain ERISA Matters..................................................................................131

Article XI Guarantee............................................................................................................133

Section 11.01   The Guarantee..............................................................................................133
Section 11.02   Obligations Unconditional............................................................................133
Section 11.03   Reinstatement ..............................................................................................134
Section 11.04   Subrogation; Subordination .........................................................................135
Section 11.05   Remedies ......................................................................................................135
Section 11.06   [Reserved]....................................................................................................135
Section 11.07   Continuing Guarantee ..................................................................................135
Section 11.08   General Limitation on Guarantee Obligations............................................135
Section 11.09   Release of Guarantors..................................................................................135
Section 11.10   Right of Contribution...................................................................................136
Section 11.11   Keepwell......................................................................................................136
Section 11.12   Independent Obligation ...............................................................................136

SCHEDULES

| | |
|---|---|
| 1.01(B) | Guarantors |
| 2.01 | Term Loans |
| 2.03 | Existing Letters of Credit |
| 4.01(a) | Collateral Documents |
| 5.07 | Ownership of Property |
| 5.11 | Subsidiaries |
| 6.20 | Post-Closing Covenants |
| 7.01(b) | Liens |
| 7.02(f) | Investments |
| 7.03(b) | Indebtedness |
| 7.05(v) | Dispositions |
| 7.08(k) | Transactions with Affiliates |
| 7.09(b) | Burdensome Agreements |
| 10.02(a) | Certain Addresses for Notices |

WEIL:\97507497\16\10143.0003

**Page**

EXHIBITS

*Form of*

| | |
|---|---|
| A | Committed Loan Notice |
| B | Note |
| C | Compliance Certificate |
| D | Solvency Certificate |
| E-1 | Assignment and Assumption |
| E-2 | [Reserved] |
| E-3 | Acceptance and Prepayment Notice |
| E-4 | Discount Range Prepayment Notice |
| E-5 | Discount Range Prepayment Offer |
| E-6 | Solicited Discounted Prepayment Notice |
| E-7 | Solicited Discounted Prepayment Offer |
| E-8 | Specified Discount Prepayment Notice |
| E-9 | Specified Discount Prepayment Response |
| F | Security Agreement |
| G | Intercompany Note |
| H | United States Tax Compliance Certificate |
| I | Joinder Agreement |

WEIL:\97507497\16\10143.0003

## FIRST LIEN CREDIT AGREEMENT

This FIRST LIEN CREDIT AGREEMENT is entered into as of [●], 2020, among JASON GROUP INC., a Delaware corporation and successor by merger with Old Jason (hereinafter defined) (the "**Company**" and the "**Borrower**"), the Guarantors party hereto from time to time, Cantor Fitzgerald Securities, as Administrative Agent, and each lender from time to time party hereto (collectively, the "**Lenders**" and, individually, a "**Lender**").

## PRELIMINARY STATEMENTS

On June [●], 2020 (the "**Petition Date**"), Jason Incorporated, a Wisconsin corporation ("**Old Jason**"), Jason Partners Holdings Inc., a Delaware corporation ("**Old Holdings**"), Jason Holding, Inc. I, a Delaware corporation ("**Old Intermediate Holdings**"), the Guarantors and each of the Domestic Subsidiaries of Old Jason (collectively, the "**Debtors**") as debtors and debtors-in-possession, commenced voluntary cases under chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), which cases are being jointly administered under the caption [●] (the "**Chapter 11 Cases**").

The Joint Prepackaged Plan of Reorganization of Jason Industries, Inc. and its Debtor Affiliates pursuant to Chapter 11 of the Bankruptcy Code filed with the Bankruptcy Court on June 20, 2020 Docket No. 22 (the "**Prepackaged Plan**") has been confirmed pursuant to the Confirmation Order (as defined below), and concurrently with the Term Loans (as defined below) deemed made hereunder, the "Effective Date" as defined in and under the Prepackaged Plan (the "**Plan Effective Date**") has occurred.

Prior to the Petition Date, certain lenders extended credit to Old Jason, as borrower, pursuant to that certain First Lien Credit Agreement, dated as of June 30, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Pre-Petition First Lien Credit Agreement**") by and among Old Jason, the guarantors party thereto from time to time, the Bank of New York Mellon, as administrative agent, the lenders party thereto from time to time (the "**Pre-Petition First Lien Lenders**") and Deutsche Bank AG New York Branch, as L/C Issuer (as defined therein) and Swing Line Lender (as defined therein).

The Prepackaged Plan provides that, on the Plan Effective Date, each Pre-Petition First Lien Lender under the Pre-Petition First Lien Credit Agreement shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for their First Lien Secured Credit Agreement Claim (as defined in the Prepackaged Plan) its pro rata share of, among other things, (i) the Term Loans, (ii) the Second Lien Terms Loans and (iii) 100% of the equity of Holdings, subject to dilution in accordance with the terms of the Prepackaged Plan.

After giving effect to the Transactions (herein defined) on the Plan Effective Date, (i) Jason Holdings Inc., a Delaware corporation ("**Holdings**") shall own 100% of the outstanding equity interests in Jason Intermediate Inc., a Delaware corporation ("**Intermediate Holdings**"), which shall hold 100% of the outstanding equity interests in the Company; and (ii) Old Jason shall have merged with and into the Company, with the Company as successor by merger.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**Section 1.01**     **Defined Terms**.

As used in this Agreement, the following terms shall have the meanings set forth below:

"**ABL Agent**" has the meaning assigned to the term "Administrative Agent" under and as defined in the ABL Credit Agreement and shall include any successor administrative agent under the ABL Credit Agreement.

"**ABL Credit Agreement**" means that certain ABL Credit Agreement, dated as of the date hereof, by and among the Borrower, the Holdcos, the other Guarantors from time to time party thereto, the lenders party thereto from time to time and Wells Fargo Bank, National Association, as the ABL Agent.

"**ABL Loan Documents**" means the "Loan Documents" as defined in the ABL Credit Agreement.

"**ABL Obligations**" means the "Obligations" (or any comparable term) as defined in the ABL Credit Agreement.

"**ABL Secured Obligations**" means the "Secured Obligations" as defined in the ABL Credit Agreement.

"**ABL Facility**" means the ABL Loans and commitments in respect thereof.

"**ABL Loans**" means the "Loans" as defined in the ABL Credit Agreement.

"**Acceptable Discount**" has the meaning set forth in Section 2.05(a)(v)(D)(2).

"**Acceptable Prepayment Amount**" has the meaning set forth in Section 2.05(a)(v)(D)(3).

"**Acceptance and Prepayment Notice**" means a notice of the Borrower's acceptance of the Acceptable Discount in substantially the form of Exhibit E-3.

"**Account Control Agreement**" means any deposit account control agreement, securities account control agreement or similar agreement entered into by a Loan Party, the Administrative Agent and the applicable financial institution, granting to the Administrative Agent, for the benefit of the Secured Parties, a perfected, first-priority Lien and "control" (as defined in the UCC) in the applicable deposit account or securities account of a Loan Party.

"**Administrative Agent**" means Cantor Fitzgerald Securities, in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"**Administrative Agent's Office**" means the Administrative Agent's address and account as set forth in Section 10.02(a), or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form approved by the Administrative Agent.

"**Advisors**" has the meaning set forth in Section 10.08.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Agent Fee Letter**" means the letter agreement, dated as of the date of this Agreement, between the Borrower and the Administrative Agent.

"**Agent Parties**" has the meaning set forth in Section 10.02(b).

"**Agent-Related Persons**" means the Administrative Agent, together with its Affiliates, officers, directors, employees, partners, agents, advisors and other representatives.

<div align="center">2</div>

"**Agreement**" means this First Lien Credit Agreement, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Agreement Currency**" has the meaning assigned to such term in Section 10.20.

"**Annual Financial Statements**" means the audited consolidated balance sheets of Old Jason as of December 31, 2017, December 31, 2018 and December 31, 2019, and the related consolidated statements of income and statements of cash flows for the Old Jason for the fiscal years then ended.

"**Anti-Terrorism Law**" has the meaning set forth in Section 6.21(a).

"**Applicable Discount**" has the meaning set forth in Section 2.05(a)(v)(C)(2).

"**Applicable Rate**" means a percentage per annum equal to (i) for Eurocurrency Rate Loans, 6.00% and (ii) for Base Rate Loans, 5.00%.

"**Approved Bank**" has the meaning set forth in clause (c) of the definition of "Cash Equivalents."

"**Approved Fund**" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"**Assignee**" has the meaning set forth in Section 10.07(b)(i).

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit E-1 hereto."

"**Assignment Taxes**" has the meaning set forth in Section 3.01(b).

"**Attorney Costs**" means and includes all reasonable and documented fees, out-of-pocket expenses and disbursements of any law firm or other external legal counsel.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Auction Agent**" means (a) the Administrative Agent or (b) any other financial institution or advisor employed by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Discounted Term Loan Prepayment pursuant to Section 2.05(a)(v); provided that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent); provided, further, that neither the Borrower nor any of its Affiliates may act as the Auction Agent.

"**Available Cash**" means at any time, (a) (i) the aggregate amount of unrestricted cash and Cash Equivalents of the Loan Parties and their Domestic Subsidiaries at such time plus (ii) the amount of cash and Cash Equivalents of the Loan Parties and their Domestic Subsidiaries that is restricted in favor of the ABL Facility, the Second Lien Credit Agreement and/or this Agreement, minus, to the extent included in clause (a), (b) the aggregate amount of any cash or Cash Equivalents (i) set aside to pay royalty obligations, working capital obligations, suspense payments, severance taxes, payroll, payroll taxes, other taxes, employee wage and benefit payments and trust and fiduciary obligations for which a Loan Party or any Subsidiary thereof has issued checks or has initiated wires or ACH transfers (or, in the Borrower's discretion, will issue checks or initiate wires or ACH transfers within five Business Days) in order to pay such amounts, (ii) in respect of other amounts for which a Loan Party or any Subsidiary thereof has issued checks or has initiated wires or ACH transfers but have not yet been subtracted from the balance in the relevant account of such Loan Party or relevant Subsidiary, (iii) constituting purchase price deposits or amounts subject to other contractual or legal requirements to deposit money to be held by an unaffiliated third party, (iv) constituting deposits from

3

unaffiliated third parties that are subject to return pursuant to binding agreements with such third parties, or (v) held in escrow.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" has the meaning set forth in the preliminary statements to this Agreement.

"**Base Rate**" means for any day a fluctuating rate per annum equal to the highest of (i) the Federal Funds Effective Rate *plus* 1/2 of 1%, (ii) the rate quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent)and (iii) the rate per annum determined in the manner set forth in clause (ii) of the definition of Eurocurrency Rate *plus* 1%; *provided* that, notwithstanding the foregoing, in no event shall the Base Rate applicable to the Term Loans at any time be less than 2.00% per annum.  Any change in the Base Rate due to a change in such rate announced by the Administrative Agent or in the Federal Funds Effective Rate shall take effect at the opening of business on the day specified in the announcement of such change.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation, which certification shall be substantially similar in form and substance to the form of Certification Regarding Beneficial Owners of Legal Entity Customers published jointly, in May 2018, by the Loan Syndications and Trading Association and Securities Industry and Financial Markets Association.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Board**" has the meaning set forth in the definition of "Statutory Reserves."

"**Borrower**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Borrower Materials**" has the meaning set forth in Section 6.01.

"**Borrower Offer of Specified Discount Prepayment**" means the offer by any Company Party to make a voluntary prepayment of Term Loans at a Specified Discount to par pursuant to Section 2.05(a)(v)(B).

"**Borrower Solicitation of Discount Range Prepayment Offers**" means the solicitation by any Company Party of offers for, and the corresponding acceptance by a Lender of, a voluntary prepayment of Term Loans at a specified range of discounts to par pursuant to Section 2.05(a)(v)(C).

4

"**Borrower Solicitation of Discounted Prepayment Offers**" means the solicitation by any Company Party of offers for, and the subsequent acceptance, if any, by a Lender of, a voluntary prepayment of Term Loans at a discount to par pursuant to Section 2.05(a)(v)(D).

"**Borrowing**" means a borrowing consisting of Term Loans of the same Type and, in the case of Eurocurrency Rate Loans, having the same Interest Period, made by each of the Lenders pursuant to Section 2.01.

"**Business Day**" means (i) any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of New York, and (ii) if such day relates to any Eurocurrency Rate Loan, any such day that is also a London Banking Day.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capitalized Leases) by the Borrower and its Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on the consolidated statement of cash flows of the Borrower and its Subsidiaries.

"**Capitalized Leases**" means all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; *provided* that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"**Carry Over Amount**" has the meaning set forth in Section 7.10.

"**Cash Election**" has the meaning set forth in Section 2.08(c).

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by the Borrower or any Subsidiary:

(a)     Dollars;

(b)     readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of the United States having average maturities of not more than 24 months from the date of acquisition thereof; *provided* that the full faith and credit of the United States is pledged in support thereof;

(c)     time deposits or eurodollar time deposits with, insured certificates of deposit, bankers' acceptances or overnight bank deposits of, or letters of credit issued by, any commercial bank that (i) is a Lender or (ii) (A) is organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development or is the principal banking Subsidiary of a bank holding company organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development and is a member of the Federal Reserve System, and (B) has combined capital and surplus of at least $250,000,000 or $100,000,000 in the case of any non-U.S. bank (any such bank in the foregoing clauses (i) or (ii) being an "**Approved Bank**"), in each case with maturities not exceeding 24 months from the date of acquisition thereof;

(d)     commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation (other than structured investment vehicles and other than corporations used in structured financing transactions) and rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 24 months from the date of acquisition thereof;

(e)     marketable short-term money market and similar funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be

5

rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(f)    repurchase obligations for underlying securities of the types described in clauses (b), (c) and (e) above entered into with any Approved Bank;

(g)    securities with average maturities of 24 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h)    Investments (other than in structured investment vehicles and structured financing transactions) with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's;

(i)    securities with maturities of 12 months or less from the date of acquisition backed by standby letters of credit issued by any Approved Bank;

(j)    (i) instruments equivalent to those referred to in clauses (a) through (i) above denominated in Euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction and (ii) in the case of any Foreign Subsidiary, such local currencies in those countries in which such Foreign Subsidiary transacts business from time to time in the ordinary course of business;

(k)    Investments, classified in accordance with GAAP as Current Assets of the Borrower or any Subsidiary, in money market investment programs which are registered under the Investment Company Act of 1940 or which are administered by financial institutions having capital of at least $250,000,000, and, in either case, the portfolios of which are limited such that substantially all of such Investments are of the character, quality and maturity described in clauses (a) through (j) above; and

(l)    investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (k) above.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clauses (a) and (j) above; *provided* that such amounts are converted into any currency listed in clause (a) or (j) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

"**Casualty Event**" means any event that gives rise to the receipt by the Borrower or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**CFC**" means a Subsidiary of the Borrower that is a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"**CFC Holding Company**" means a Domestic Subsidiary of the Borrower that owns no material assets (directly or through one or more disregarded entities) other than the equity (including any debt instrument treated as equity for U.S. federal income tax purposes) of one or more Foreign Subsidiaries that are CFCs.

"**Change of Control**" shall be deemed to occur if:

6

(a)     (i) any person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Closing Date), but excluding (x) any employee benefit plan of such person and its Subsidiaries and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan or (y) any combination of Permitted Holders, shall have, directly or indirectly, acquired beneficial ownership of Equity Interests representing 35% or more of the aggregate voting power represented by the issued and outstanding Equity Interests of Holdings or (ii) during each period of 12 consecutive months, the board of directors of Holdings shall not consist of a majority of the Continuing Directors;

(b)     a "change of control" (or similar event) shall occur in any document pertaining to the ABL Credit Agreement or the Second Lien Credit Agreement;

(c)     other  than as described in Section 7.04(a)(i), Intermediate Holdings shall cease to own, directly or indirectly, 100% of the Equity Interests of the Borrower; or

(d)     other  than as described in Section 7.04(a)(i), Holdings shall cease to own, directly or indirectly, 100% of the Equity Interests of Intermediate Holdings.

"**Chapter 11 Cases**" has the meaning set forth in the preliminary statements to this Agreement.

"**Closing Date**" means August [●], 2020.

"**Code**" means the U.S. Internal Revenue Code of 1986, and the United States Treasury Department regulations promulgated thereunder, as amended from time to time (unless as specifically provided otherwise).

"**Collateral**" means the "Collateral" as defined in the Security Agreement and all the "Collateral" or "Pledged Assets" (or equivalent terms) as defined in any other Collateral Document and any other assets pledged pursuant to any Collateral Document (but in any event excluding the Excluded Assets).

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(a)     subject to Sections 4.01(a) and 6.20, the Administrative Agent shall have received each Collateral Document required to be delivered (i) on the Closing Date, pursuant to Section 4.01(a)(v) and Section 6.11(c) and (ii) at such time as may be designated therein or herein, pursuant to the Collateral Documents or Section 6.11 or 6.13, duly executed by each Loan Party thereto;

(b)     subject to Sections 4.01(a) and 6.20, all Obligations shall have been unconditionally guaranteed by Holdings, Intermediate Holdings, the Borrower (other than with respect to its direct Obligations as a primary obligor (as opposed to a guarantor) under the Loan Documents) and each Material Domestic Subsidiary (other than any Excluded Subsidiary) including those that are listed on Schedule 1.01(B) hereto (each, a "**Guarantor**");

(c)     the Secured Obligations and the Guaranty shall have been secured pursuant to the Security Agreement by a first-priority security interest (subject to Liens permitted by Section 7.01) in (i) all of the Equity Interests of Intermediate Holdings and the Borrower, (ii) all of the Equity Interests of each Subsidiary that is a wholly owned Domestic Subsidiary (other than a Domestic Subsidiary described in the following clause (iii)) directly owned by the Loan Parties, (iii) the issued and outstanding Equity Interests of each Subsidiary that is a CFC Holding Company, and (iv) the issued and outstanding Equity Interests of each Subsidiary that is a wholly owned Foreign Subsidiary that is directly owned by the Borrower or by any Subsidiary Guarantor, in each case other than any Excluded Assets; *provided*, *however*, in the case of (iii) and (iv), such term shall not include the pledge of any stock in a CFC Holding Company or Foreign Subsidiary to the extent such pledge would result in material adverse tax consequences to the Borrower or its Subsidiaries as determined by the Borrower in good faith;

7

(d)      except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, or under any Collateral Document, the Secured Obligations and the Guaranty shall have been secured by a perfected first-priority security interest (to the extent such security interest may be perfected by delivering certificated securities, filing financing statements under the Uniform Commercial Code or making any necessary filings with respect to the security interest with the United States Patent and Trademark Office or United States Copyright Office or to the extent required in the Security Agreement (or any other Collateral Document)) or by Mortgages referred to in clause (e) below in Collateral of the Borrower and each Guarantor (including accounts, inventory, equipment, investment property, contract rights, applications and registrations of intellectual property filed in the United States, other general intangibles, Material Real Property, intercompany notes and proceeds of the foregoing), in each case, (i) with the priority required by the Collateral Documents and (ii) subject to exceptions and limitations otherwise set forth in this Agreement (for the avoidance of doubt, including the limitations and exceptions set forth in Section 4.01) and the Collateral Documents; and

(e)      the Administrative Agent shall have received (i) counterparts of a Mortgage with respect to each Material Real Property required to be delivered pursuant to Sections 6.11 and 6.13 (the "**Mortgaged Properties**") duly executed and delivered by the applicable Loan Party, (ii) a title insurance policy for such property available in each applicable jurisdiction (the "**Mortgage Policies**") insuring the Lien of each such Mortgage as a valid first-priority Lien on the property described therein, free of any other Liens except as permitted by Section 7.01, together with such endorsements, coinsurance and reinsurance as the Required Lenders may reasonably request, (iii) a completed Life-of-Loan Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto) and, if any improvements on any Mortgaged Property are located within an area designated a "**flood hazard area,**" evidence of such flood insurance as may be required under Section 6.07, (iv) ALTA surveys in form and substance reasonably acceptable to the Required Lenders or such existing surveys together with no-change affidavits sufficient for the title company to remove all standard survey exceptions from the Mortgage Policies and issue the endorsements required in clause (ii) above, (v) copies of any existing abstracts and appraisals and (vi) such legal opinions and other documents as the Required Lenders may reasonably request with respect to any such Mortgaged Property; and

(f)      except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, or under any Collateral Document, the Secured Obligations and the Guaranty shall have been secured by a perfected second-priority security interest (to the extent such security interest may be perfected by delivering certificated securities, filing financing statements under the Uniform Commercial Code) in ABL Priority Collateral of the Borrower and each Guarantor (including accounts, inventory and proceeds of the foregoing), in each case, (i) with the priority required by the Collateral Documents and (ii) subject to exceptions and limitations otherwise set forth in this Agreement (for the avoidance of doubt, including the limitations and exceptions set forth in Section 4.01) and the Collateral Documents;

*provided*, *however*, that (i) the foregoing definition shall not require, and the Loan Documents shall not contain any requirements as to, (A) the creation or perfection of pledges of, security interests in, Mortgages on, or the obtaining of title insurance, surveys, abstracts or appraisals or taking other actions with respect to any Excluded Assets and (B) any other assets that, in the reasonable judgment of the Required Lenders and the Borrower, the cost of creating, perfecting or maintaining such pledges or security interests in such assets or obtaining title insurance, surveys, abstracts or appraisals in respect of such assets shall be excessive in view of the value of such assets or the practical benefit to the Lenders afforded thereby and (ii) the Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in this Agreement and the Collateral Documents.

WEIL:\97507497\16\10143.0003

The Administrative Agent (at the direction of the Required Lenders) may grant extensions of time for the perfection of security interests in, or the delivery of the Mortgages and the obtaining of title insurance and surveys with respect to, particular assets and the delivery of assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) or any other compliance with the requirements of this definition where it reasonably determines, in consultation with the Borrower, that perfection or compliance cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

No actions in any non-U.S. jurisdiction or required by the Laws of any non-U.S. jurisdiction shall be required in order to create any security interests in assets located, titled, registered or filed outside of the U.S. or to perfect such security interests (it being understood that there shall be no security agreements or pledge agreements governed under the Laws of any non-U.S. jurisdiction).

The foregoing definition shall not require landlord waivers, estoppels and collateral access letters.

"**Collateral Documents**" means, collectively, the Security Agreement, the Intercreditor Agreement, the Intellectual Property Security Agreements, any Mortgages, any Account Control Agreements, collateral assignments, Security Agreement Supplements, security agreements, pledge agreements, intellectual property security agreements or other similar agreements delivered to the Administrative Agent pursuant to Section 4.01(a)(v), 6.11, 6.13 or 6.20 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties.

"**Committed Loan Notice**" means a written notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other or (c) a continuation of Eurocurrency Rate Loans pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit A hereto.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Company**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Company Parties**" means, collectively, the Holdcos, the Borrower and its Subsidiaries, and "**Company Party**" means any one of them.

"**Compensation Period**" has the meaning set forth in Section 2.12(c)(ii).

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit C hereto.

"**Confirmation Order**" means an Order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Lenders, confirming the Prepackaged Plan pursuant to section 1129 of the Bankruptcy Court and in accordance with the terms of the Prepackaged Plan, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms of the Prepackaged Plan so long as any such amendment, supplement or modification does not adversely affect the interests of the Lenders.

"**Consolidated EBITDA**" means, for any period, the Consolidated Net Income for such period, *plus*:

(a)        without duplication and, except with respect to clauses (vii)(B), (x) and (xi) below, to the extent deducted (and not added back or excluded) in arriving at such Consolidated Net Income, the sum of the following amounts for such period with respect to the Borrower and its Subsidiaries:

(i)        total interest expense determined in accordance with GAAP, including, to the extent deducted and not added back in computing Consolidated Net Income, (A) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (B) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers acceptances, (C) non-cash interest payments, (D) the interest component of Capitalized Leases, (E) net payments, if any, pursuant to interest Swap

9

Contracts with respect to Indebtedness, (F) amortization of deferred financing fees, debt issuance costs, commissions and fees, (G) the interest component of any pension or other post-employment benefit expense and (H) commissions, discounts, yield and other fees and, to the extent not reflected in such total interest expense, any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations, and costs of surety bonds in connection with financing activities (whether amortized or immediately expensed),

(ii)     without duplication, provision for taxes based on income, profits or capital gains of the Borrower and the Subsidiaries, including, without limitation, federal, state, foreign, local, franchise and similar taxes and foreign withholding taxes paid or accrued during such period including penalties and interest related to such taxes or arising from any tax examinations and any tax distributions made pursuant to Section 7.06(h)(iii),

(iii)     depreciation and amortization (including amortization of intangible assets, deferred financing fees, debt issuance costs, commissions, fees and expenses, bridge, commitment and other financing fees, discounts, yield) and other fees and charges (including amortization of unrecognized prior service costs and actuarial gains and losses related to pensions and other post-employment benefits, of the Borrower and its Subsidiaries),

(iv)     (x) any unusual or non-recurring extraordinary charges for such period (provided, that the aggregate amount of unusual or non-recurring extraordinary charges added back to Consolidated EBITDA pursuant to this clause (a)(iv)(x) shall not exceed 15% of Consolidated EBITDA for such period) and (y) any unusual or non-recurring non-cash charges for such period,

(v)     other non-cash charges, expenses or losses, including, without limitation, any non-cash expense relating to the vesting of warrants (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period),

(vi)     retention, recruiting, relocation and signing bonuses and expenses, stock option and other equity-based compensation expenses, severance costs, stay bonuses, transaction fees and expenses and management fees and expenses, and any one time expense relating to enhanced accounting function or other transaction costs, including those associated with becoming a standalone entity or a public company (including, without duplication, any such payments made in connection with the consummation of the Transactions),

(vii)     (A) the amount of any restructuring charges and related charges, restructuring costs, integration costs, transition costs, consolidation and closing costs for facilities, costs incurred in connection with any non-recurring strategic initiatives, costs incurred in connection with acquisitions and non-recurring intellectual property development after the Closing Date, other business optimization expenses (including costs and expenses relating to business optimization programs and new systems design and implementation costs), project start-up costs and other restructuring charges, accruals or reserves (including restructuring costs related to acquisitions after the Closing Date and to closure/consolidation of facilities, retention charges, systems establishment costs and excess pension charges) and (B) the amount of cost savings, operating expense reductions, other operating improvements and "run rate" synergies projected by the Borrower in good faith to result from actions taken or expected to be taken in connection with the

10

Transactions or any Specified Transaction or the implementation of an operational initiative or operational change after the Closing Date (in each case calculated on a Pro Forma Basis as though such cost savings, operating expense reductions, other operating improvements and synergies had been realized on the first day of such period and as if such cost savings, operating expense reductions, other operating improvements and synergies were realized during the entirety of such period), net of the amount of actual benefits realized during such period from such actions; *provided* that (w) in no event shall the amount added back pursuant to this clause (vii) exceed $5,000,000 for any Test Period, (x) a duly completed certificate signed by a Responsible Officer of the Borrower shall be delivered to the Administrative Agent together with the Compliance Certificate required to be delivered pursuant to Section 6.02, certifying that such cost savings, operating expense reductions, other operating improvements and synergies are (i) reasonably supportable and quantifiable in the good faith judgment of the Borrower, and (ii) reasonably anticipated to be realized within (I) in the case of any such cost savings, operating expense reductions, other operating improvements and synergies in connection with the Transactions, six (6) months after the Closing Date and (II) in all other cases, six (6) months after the consummation of the Specified Transaction or the implementation of an initiative or change, which is expected to result in such cost savings, expense reductions, other operating improvements or synergies, (y) no cost savings, operating expense reductions and synergies shall be added pursuant to this clause (vii) to the extent duplicative of any expenses or charges otherwise added to Consolidated EBITDA, whether through a *pro forma* adjustment or otherwise, for such period and (z) to the extent that any cost savings, operating expense reductions, other operating improvements and synergies are not associated with the Transactions or a Specified Transaction following the Closing Date, all steps shall have been taken for realizing such savings,

(viii)   [reserved],

(ix)   other accruals, payments and expenses (including rationalization, legal, tax, structuring and other costs and expenses), or any amortization thereof, related to the Transactions (including all Transaction Expenses), acquisitions, Investments, dividends, Dispositions, or any amortization thereof, issuances of Indebtedness or Equity Interests permitted under the Loan Documents or repayment of debt, issuance of equity securities, initial public offering, refinancing transactions or amendment or other modification of any debt instrument (in each case, including any such transaction consummated on the Closing Date and any such transaction undertaken but not completed),

(x)   to the extent not already included in Consolidated Net Income, proceeds of business interruption insurance (to the extent actually received),

(xi)   cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added back,

(xii)   any non-cash increase in expenses (A) resulting from the revaluation of inventory (including any impact of changes to inventory valuation policy methods including changes in capitalization of variances) or other inventory adjustments, or (B) due to purchase accounting associated with the Transactions, or any acquisition constituting an Investment permitted under this Agreement consummated prior to or after the Closing Date,

(xiii)   the amount of any expense or reduction of Consolidated Net Income consisting of Subsidiary income attributable to minority interests or non-controlling

11

interests of third parties in any non-wholly owned Subsidiary, *minus* the amount of dividends or distributions that are paid in cash by such non-wholly owned Subsidiary to such third party; *provided* that the amount of such cash dividends or distributions deducted pursuant to this clause (xiii) in any Test Period shall not exceed such third party's *pro rata* share of the Consolidated EBITDA (to the extent positive) of such non-wholly owned Subsidiary for such Test Period,

(xiv)    letter of credit fees,

(xv)    [reserved],

(xvi)    any Equity Funded Employee Plan Costs,

(xvii)    any net loss from disposed, abandoned or discontinued operations or product lines,

(xviii)    any costs or expenses incurred relating to environmental remediation, litigation or other disputes in respect of events and exposures that occurred prior to the Closing Date, and

(xix)    expenses during such period in connection with earn-outs and other deferred payments in connection with any acquisitions constituting an Investment permitted under this Agreement, to the extent included in the calculation of Consolidated Net Income in accordance with GAAP as an accounting adjustment to the extent that the actual amount payable or paid in respect of such earn-outs or other deferred payments exceeds the liability booked by the applicable Person therefor,

*minus* (b) without duplication and to the extent included in arriving at such Consolidated Net Income, (i) non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period), (ii) any net gain from disposed, abandoned or discontinued operations or product lines and (iii) the amount of any minority interest income consisting of Subsidiary losses attributable to minority interests or non-controlling interests of third parties in any non-wholly owned Subsidiary; *provided* that:

(A)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA (x) currency translation gains and losses related to currency remeasurements of Indebtedness (including the net loss or gain (i) resulting from Swap Contracts for currency exchange risk and (ii) resulting from intercompany indebtedness) and (y) all other foreign currency translation gains or losses to the extent such gains or losses are non-cash items;

(B)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any adjustments resulting from the application of FASB Accounting Standards Codification 815 and International Accounting Standard No. 39 and their respective related pronouncements and interpretations; and

(C)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any income (loss) for such period attributable to the early extinguishment of (i) Indebtedness, (ii) obligations under any Swap Contracts or (iii) other derivative instruments.

Notwithstanding anything to the contrary contained herein, for purposes of determining Consolidated EBITDA under this Agreement for any period that includes the fiscal quarter ended (i) September 30, 2020 Consolidated EBITDA for the fiscal quarter ended September 30, 2020 shall be deemed to be the greater of (a) Consolidated EBITDA calculated in accordance with the terms of this Agreement for such fiscal quarter and

12

WEIL:\97507497\16\10143.0003

(b) $2,000,000 and (ii) December 31, 2020, Consolidated EBITDA for the fiscal quarter ended December 31, 2020 shall be deemed to be the greater of (a) Consolidated EBITDA calculated in accordance with the terms of this Agreement for such fiscal quarter and (b) $2,000,000.  For the avoidance of doubt, Consolidated EBITDA shall be calculated, including pro forma adjustments, in accordance with Section 1.09.

"**Consolidated First Lien Net Debt**" means, as of any date of determination, the aggregate principal amount of Indebtedness of the Borrower and its Subsidiaries outstanding on such date, in an amount that would be reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with the Transactions or any acquisition constituting an Investment permitted under this Agreement) consisting of Indebtedness for borrowed money, purchase money debt and Attributable Indebtedness and debt obligations evidenced by promissory notes or similar instruments that is secured by a Lien on any asset or property of the Borrower or any Subsidiary, including Indebtedness under the ABL Credit Agreement, but excluding any such Indebtedness in which the applicable Liens are expressly subordinated or junior to the Liens securing the Obligations (other than in accordance with the Intercreditor Agreement) *minus* the aggregate amount of cash and Cash Equivalents included on the consolidated balance sheet of the Borrower and the Subsidiaries as of such date, free and clear of all Liens (other than Liens permitted by Section 7.01); *provided* that Consolidated First Lien Net Debt shall not include Indebtedness in respect of letters of credit, except to the extent of unreimbursed amounts thereunder; *provided* that any unreimbursed amount under commercial letters of credit shall not be counted as Consolidated First Lien Net Debt until three Business Days after such amount is drawn.  For the avoidance of doubt, it is understood that obligations under Swap Contracts and Treasury Services Agreements do not constitute Consolidated First Lien Net Debt.

"**Consolidated First Lien Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated First Lien Net Debt as of the last day of such Test Period to (b) Consolidated EBITDA for such Test Period.

"**Consolidated Interest Expense**" shall mean, with respect to any Person for any period, the sum of (1) interest expense (including that attributable to obligations with respect to Capital Leases), net of interest income of such Person and its Subsidiaries with respect to all outstanding Indebtedness of such Person and its Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under hedging agreements, *plus* (2) non-cash interest expense resulting solely from pay in kind interest expense of such Person and its Subsidiaries, but excluding, for the avoidance of doubt, (a) amortization of deferred financing costs, debt issuance costs, commissions, fees and expenses and any other amounts of non-cash interest other than referred to in clause (2) above (including as a result of the effects of acquisition method accounting or pushdown accounting), (b) non-cash interest expense attributable to the movement of the mark-to-market valuation of Indebtedness or obligations under derivative instruments pursuant to FASB Accounting Standards Codification Topic 815—Derivatives and Hedging, (c) any one-time cash costs associated with breakage in respect of hedging agreements for interest rates, (d) any "additional interest" owing pursuant to a registration rights agreement with respect to any securities, (e) any payments with respect to make whole premiums or other breakage costs of any Indebtedness, including, without limitation, any Indebtedness issued in connection with the Transactions, (f) penalties and interest relating to taxes, (g) accretion or accrual of discounted liabilities not constituting Indebtedness, (h) interest expense attributable to a direct or indirect parent entity resulting from pushdown accounting, (i) any expense resulting from the discounting of Indebtedness in connection with the application of recapitalization or purchase accounting, and (j) any interest expense attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential), with respect thereto and with respect to the Transactions, any acquisition or Investment permitted hereunder, all as calculated on a consolidated basis.

"**Consolidated Net Income**" means, for any period, the net income (loss) of the Borrower and the Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; *provided*, *however*, that, without duplication,

13

WEIL:\97507497\16\10143.0003

(a)    any after-tax effect of extraordinary items (including gains or losses and all fees and expenses relating thereto) for such period shall be excluded,

(b)    the cumulative effect of a change in accounting principles during such period to the extent included in Consolidated Net Income shall be excluded,

(c)    accruals and reserves that are established or adjusted within 12 months after the Closing Date that are so required to be established or adjusted as a result of the Transactions (or within 12 months after the closing of any acquisition that are so required to be established or adjusted as a result of such acquisition) in accordance with GAAP or changes as a result of adoption or modification of accounting policies in accordance with GAAP shall be excluded,

(d)    any net after-tax effect of gains or losses (*less* all fees, expenses and charges relating thereto) attributable to asset dispositions or abandonments or the sale or other disposition of any Equity Interests of any Person, in each case other than in the ordinary course of business, as determined in good faith by the Borrower, shall be excluded,

(e)    the net income (loss) for such period of any Person that is not a Subsidiary of the Borrower, or that is accounted for by the equity method of accounting, shall be excluded; *provided* that Consolidated Net Income of the Borrower shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents (or to the extent subsequently converted into cash or Cash Equivalents) to the Borrower or a Subsidiary thereof in respect of such period,

(f)    any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a change in law or regulation, in each case, pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP shall be excluded,

(g)    any non-cash compensation charge or expense, including any such charge or expense arising from the grants of stock appreciation or similar rights, stock options, restricted stock or other rights or equity incentive programs or any other equity-based compensation shall be excluded, and any cash charges associated with the rollover, acceleration or payout of Equity Interests by management of the Borrower or any of its direct or indirect parents in connection with the Transactions or an initial public offering, shall be excluded,

(h)    any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment, Permitted Acquisition or any sale, conveyance, transfer or other disposition of assets permitted under this Agreement, to the extent actually reimbursed, or, so long as the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is (A) not denied by the applicable indemnitor in writing within 180 days of the occurrence of such event and (B) in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365-day period), shall be excluded,

(i)    to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount (A) is not denied by the applicable carrier in writing within 180 days of the occurrence of such event and (B) is in fact reimbursed within 365 days of the date of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within such 365 days), expenses, charges or losses with respect to liability or casualty events or business interruption shall be excluded, and

14

WEIL:\97507497\16\10143.0003

(j)      the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of the Borrower or is merged into or consolidated with the Borrower or any of its Subsidiaries or such Person's assets are acquired by the Borrower or any of its Subsidiaries shall be excluded (except to the extent required for any calculation of Consolidated EBITDA on a Pro Forma Basis in accordance with Section 1.09).

There shall be excluded from Consolidated Net Income for any period the purchase accounting effects of adjustments in component amounts required or permitted by GAAP (including in the inventory, property and equipment, software, goodwill, intangible assets, in-process research and development, deferred revenue and debt line items thereof) and related authoritative pronouncements (including the effects of such adjustments pushed down to the Borrower and the Subsidiaries), as a result of the Transactions, any acquisition constituting an Investment permitted under this Agreement consummated prior to or after the Closing Date, or the amortization or write-off of any amounts thereof.  For the avoidance of doubt, Consolidated Net Income shall be calculated, including *pro forma* adjustments, in accordance with Section 1.09.

"**Consolidated Net Sales**" means, for any period, the net sales of the Borrower and the Subsidiaries in the ordinary course of business calculated in accordance with GAAP.

"**Continuing Directors**" means the directors of Holdings on the Closing Date, as elected or appointed after giving effect to the Transactions, directors appointed in accordance with any stockholders agreement entered into by and among Holdings and its stockholders and each other director, if, in each case, such other director's nomination for election to the board of directors of Holdings is recommended by a majority of the then Continuing Directors or such other director receives the vote of, or is appointed or otherwise approved by, prior to a Qualified IPO by the Borrower or a Relevant Public Company, or those Permitted Holders which then hold a majority of the voting Equity Interests in Holdings then held by all Permitted Holders, in each case in his or her election by the holders of Equity Interests in Holdings necessary to elect such director.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" has the meaning set forth in the definition of "Affiliate."

"**Credit Extension**" means a Borrowing.

"**Cure Amount**" has the meaning set forth in Section 8.04(a).

"**Cure Expiration Date**" has the meaning set forth in Section 8.04(a).

"**Current Assets**" means, with respect to the Borrower and the Subsidiaries on a consolidated basis at any date of determination, all assets (other than cash and Cash Equivalents) that would, in accordance with GAAP, be classified on a consolidated balance sheet of the Borrower and its Subsidiaries as current assets at such date of determination, other than amounts related to current or deferred Taxes based on income or profits (but excluding assets held for sale, loans (permitted) to third parties, pension assets, deferred bank fees and derivative financial instruments).

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtors**" has the meaning set forth in the preliminary statements to this Agreement.

"**Declined Proceeds**" has the meaning set forth in Section 2.05(b)(viii).

WEIL:\97507497\16\10143.0003

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, without cure or waiver hereunder, would be an Event of Default.

"**Default Rate**" means an interest rate equal to (a) the Base Rate *plus* (b) the Applicable Rate, if any, applicable to Base Rate Loans *plus* (c) 2.0% per annum; *provided* that with respect to a Eurocurrency Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan *plus* 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

"**Defaulting Lender**" means any Lender whose acts or failure to act, whether directly or indirectly, cause it to meet any part of the definition of Lender Default.

"**Discount Prepayment Accepting Lender**" has the meaning set forth in Section 2.05(a)(v)(B)(2).

"**Discount Range**" has the meaning set forth in Section 2.05(a)(v)(C)(1).

"**Discount Range Prepayment Amount**" has the meaning set forth in Section 2.05(a)(v)(C)(1).

"**Discount Range Prepayment Notice**" means a written notice of a Borrower Solicitation of Discount Range Prepayment Offers made pursuant to Section 2.05(a)(v)(C) substantially in the form of Exhibit E-4.

"**Discount Range Prepayment Offer**" means the irrevocable written offer by a Lender, substantially in the form of Exhibit E-5, submitted in response to an invitation to submit offers following the Auction Agent's receipt of a Discount Range Prepayment Notice.

"**Discount Range Prepayment Response Date**" has the meaning set forth in Section 2.05(a)(v)(C)(1).

"**Discount Range Proration**" has the meaning set forth in Section 2.05(a)(v)(C)(3).

"**Discounted Prepayment Determination Date**" has the meaning set forth in Section 2.05(a)(v)(D)(3).

"**Discounted Prepayment Effective Date**" means in the case of a Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offer or Borrower Solicitation of Discounted Prepayment Offer, five Business Days following the Specified Discount Prepayment Response Date, the Discount Range Prepayment Response Date or the Solicited Discounted Prepayment Response Date, as applicable, in accordance with Section 2.05(a)(v)(B)(1), 2.05(a)(v)(C)(1) or 2.05(a)(v)(D)(1), respectively, unless a shorter period is agreed to between the Borrower and the Auction Agent.

"**Discounted Term Loan Prepayment**" has the meaning set forth in Section 2.05(a)(v)(A).

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale or issuance of Equity Interests (other than directors' qualifying shares or other shares required by applicable Law) in a Subsidiary) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Disqualified Competitor**" means such Persons who are competitors of the Borrower and its Subsidiaries that are separately identified in writing by the Borrower to the Administrative Agent from time to time, and any of their Affiliates (other than any such Affiliate that is affiliated with a financial investor in such Person and that is not itself an operating company or otherwise an Affiliate of an operating company so long as such Affiliate is a bona fide Fund) that are either (a) identified in writing by the Borrower to the Administrative Agent from time to time or (b) clearly identifiable on the basis of such Affiliate's name (it being agreed that the Administrative Agent shall be entitled to conclusively rely on such Person's representations in the applicable Assignment and Assumption).

16

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than (i) solely for Qualified Equity Interests and cash in lieu of fractional shares or (ii) solely at the discretion of the issuer), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable), (b) is redeemable at the option of the holder thereof (other than (i) solely for Qualified Equity Interests and cash in lieu of fractional shares or (ii) as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable), in whole or in part, (c) provides for the scheduled payments of dividends in cash or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 91 days after the Maturity Date at the time of issuance of such Equity Interests; *provided* that if such Equity Interests are issued pursuant to a plan for the benefit of employees of Holdings (or any direct or indirect parent thereof), the Borrower or the Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by the Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"**Distressed Person**" has the meaning set forth in the definition of "Lender-Related Distress Event."

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" has the meaning set forth in Section 10.07(a)(i).

"**Embargoed Person**" has the meaning set forth in Section 6.21(c).

"**EMU Legislation**" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"**Enforcement Qualifications**" has the meaning set forth in Section 5.04.

"**Environment**" means indoor air, ambient air, surface water, groundwater, drinking water, land surface, subsurface strata, and natural resources such as wetlands, flora and fauna.

"**Environmental Laws**" means any applicable Law relating to the prevention of pollution or the protection of the Environment and natural resources, and the protection of human health and safety as it relates to the Environment.

17

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of investigation and remediation, fines, penalties or indemnities), of the Loan Parties or any Subsidiary resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage or treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement to the extent liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Funded Employee Plan Costs**" means cash costs or expenses, incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or stockholders agreement, to the extent funded with cash proceeds contributed to the capital of the Borrower or net cash proceeds of an issuance of Qualified Equity Interests of the Borrower or Equity Interests of any direct or indirect parent of the Borrower (other than any amount designated as a Cure Amount).

"**Equity Interests**" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities); *provided*, that any instrument evidencing Indebtedness convertible or exchangeable for Equity Interests shall not be deemed to be Equity Interests unless and until such instrument is so converted or exchanged.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is under common control with a Loan Party or any Subsidiary within the meaning of Section 414(b) or (c) of the Code or Section 4001 of ERISA (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code or Section 302 of ERISA).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by a Loan Party, any Subsidiary or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by a Loan Party, any Subsidiary or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization (within the meaning of Section 4241 of ERISA) or insolvent (within the meaning of Section 4245 of ERISA) or in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (d) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (e) the filing of a notice of intent to terminate, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for, and that could reasonably be expected to result in, the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) with respect to a Pension Plan, the failure to satisfy the minimum funding standard of Section 412 of the Code or Section 302 of ERISA, whether or not waived; (h) a failure by a Loan Party, any Subsidiary or any ERISA Affiliate to make a required contribution to a Multiemployer Plan; (i) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could reasonably be expected to result in liability to a Loan Party or any Subsidiary; or (j) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon a Loan Party, any Subsidiary or any ERISA Affiliate.

18

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Euro**", "**EUR**" and "**€**" mean the lawful currency of the Participating Member States introduced in accordance with the EMU Legislation.

"**Eurocurrency Rate**" means:

(a)     for any Interest Period with respect to a Eurocurrency Rate Loan, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the commencement of such Interest Period by reference to the interest settlement rates for deposits in Dollars (as published by Reuters on page LIBOR01 of the Reuters Screen or the applicable Markit desktop) (as set forth by (i) the Intercontinental Exchange Group, or (ii) any publicly available successor service or entity that has been authorized by the U.K. Financial Conduct Authority to administer the London Interbank Offered Rate for a period equal to such Interest Period), and

(b)     for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on such date by reference to the interest settlement rates for deposits in Dollars (as published by Reuters on page LIBOR01 of the Reuters Screen or the applicable Markit desktop) from time to time with a term of one month (as set forth by (i) the Intercontinental Exchange Group, or (ii) any publicly available successor service or entity that has been authorized by the U.K. Financial Conduct Authority to administer the London Interbank Offered Rate),

in the case of clauses (a) and (b) above, multiplied by Statutory Reserves, provided that, in the case of clauses (a) and (b) above, the Eurocurrency Rate with respect to Term Loans, shall not be less than 1.00% per annum; *provided further* that, subject to clauses (i) and (ii) of immediately succeeding sentence, if the Administrative Agent is unable to determine the Eurocurrency Rate for the relevant interest period under clause (a) or (b), the Administrative Agent shall use the Eurocurrency Rate for the immediately preceding interest period. Notwithstanding the foregoing:

(i)     subject to clause (ii) below, if on the relevant Eurocurrency determination date the relevant London interbank offered rate for U.S. dollar deposits has been discontinued, then the Administrative Agent shall use (a) an industry-accepted successor rate to the relevant London interbank offered rate for U.S. dollar deposits or (b) if no such industry-accepted successor rate exists, the most comparable substitute or successor rate to the relevant London interbank offered rate for U.S. dollar deposits, in each case as determined by the Required Lenders; and

(ii)     upon approval of such rate by the Required Lenders, the Borrower, the Administrative Agent and the Required Lenders agree to enter into any amendments to this Agreement that are necessary to implement such rate.

The Administrative Agent shall be held harmless for any acts or omissions in connection with the calculation of the Eurocurrency Rate in accordance with clauses (i) and (ii) of the preceding sentence.

"**Eurocurrency Rate Loan**" means a Loan that bears interest at a rate based on clause (a) of the definition of "Eurocurrency Rate."

"**Event of Default**" has the meaning set forth in Section 8.01.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded Assets**" means (i) any fee owned real property (other than Material Real Properties) and any leasehold rights and interests in real property (including landlord waivers, estoppels and collateral access letters), (ii) motor vehicles, airplanes and other assets subject to certificates of title, to the extent a Lien therein cannot be perfected by the filing of a UCC financing statement, (iii) [reserved], (iv) governmental licenses, state or local franchises, charters and authorizations and any other property and assets to the extent that the

19

Administrative Agent may not validly possess a security interest therein under, or such security interest is restricted by, applicable Laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or the pledge or creation of a security interest in which would require governmental consent, approval, license or authorization, other than to the extent such prohibition or limitation is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition (but excluding proceeds of any such governmental license), (v) any lease, license, permit or agreement to the extent that, and so long as, a grant of a security interest therein (A) is prohibited by applicable Law other than to the extent such prohibition is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition or (B) to the extent and for so long as it would violate the terms thereof (in each case, after giving effect to the relevant provisions of the UCC or other applicable Laws) or would give rise to a termination right thereunder in favor of a party thereto other than the Borrower or a Guarantor (except to the extent such provision is overridden by the UCC or other applicable Laws), in each case, other than the proceeds thereof and (a) excluding any such agreement that relates to a Permitted Refinancing of any of the foregoing and (b) only to the extent that and for so long as such limitation on such pledge or security interest is otherwise permitted under Section 7.09, (vi) Margin Stock, (vii) Equity Interests and assets of captive insurance Subsidiaries, (viii) assets of non-Loan Party Immaterial Subsidiaries, (ix) Equity Interests in joint ventures and non-wholly owned Subsidiaries, in each case, which cannot be pledged without the consent of a third party (that is not a Loan Party), to the extent such consent has not been obtained (other than to the extent such limitation is rendered ineffective under the UCC or other applicable law), (x) any property subject to a Lien permitted by Section 7.01(u) or (aa) (to the extent relating to a Lien originally incurred pursuant to Section 7.01(u)) to the extent that a grant of a security interest therein would violate or invalidate such underlying obligations or create a right of termination in favor of any other party thereto (other than a Loan Party) or otherwise require consent thereunder (after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law), (xi) letter of credit rights, except to the extent constituting support obligations for other Collateral as to which perfection of the security interest in such other Collateral is accomplished solely by the filing of a UCC financing statement (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement), (xii) any assets to the extent a security interest in such assets could reasonably be expected to result in material adverse tax consequences as reasonably determined by the Borrower, (xiii) [reserved], (xiv) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application (or any registration that issues therefrom) under applicable federal law and (xv) assets where the cost of obtaining a security interest therein exceeds the practical benefit to the Lenders afforded thereby as agreed by the Borrower and the Administrative Agent (at the direction of the Required Lenders) in writing; *provided*, *however*, that Excluded Assets shall not include any Proceeds, substitutions or replacements of any Excluded Assets referred to in clauses (i) through (xv) (unless such Proceeds, substitutions or replacements would independently constitute Excluded Assets referred to in clauses (i) through (xv)).  The Borrower shall not be required to take any action under the law of any non-U.S. jurisdiction to create or perfect a security interest in any assets located outside the United States or any other assets that require such action, including any intellectual property registered in any non-U.S. jurisdiction (and no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction shall be required).

"**Excluded Subsidiary**" means (a) any Subsidiary that is not a wholly owned Domestic Subsidiary of the Borrower or a Guarantor, (b) any Subsidiary that is prohibited or restricted by applicable Law or by Contractual Obligations existing on the Closing Date (or, in the case of any newly acquired Subsidiary, in existence at the time of acquisition but not entered into in contemplation thereof) from guaranteeing the Obligations or if guaranteeing the Obligations would require governmental (including regulatory) consent, approval, license or authorization or could result in material adverse tax consequences as reasonably determined by the Borrower, (c) any other Subsidiary with respect to which, in the reasonable judgment of the Borrower and the Required Lenders, the burden or cost of providing a Guarantee shall be excessive in view of the benefits to be obtained by the Lenders therefrom, (d) any not-for-profit Subsidiaries, (e) [reserved], (f) [reserved], (g) any CFC Holding Company, (h) any Domestic Subsidiary that is a Subsidiary of a Foreign

WEIL:\97507497\16\10143.0003

Subsidiary that is a CFC, (i) captive insurance Subsidiaries and (j) each other Subsidiary acquired pursuant to a Permitted Acquisition permitted hereunder and financed with assumed secured Indebtedness, and each Subsidiary acquired in such Permitted Acquisition permitted hereunder that guarantees such Indebtedness, in each case to the extent that, and for so long as, the documentation relating to such Indebtedness to which such Subsidiary is a party prohibits such Subsidiary from guaranteeing the Obligations and such prohibition was not created in contemplation of such Permitted Acquisition permitted hereunder.

"**Excluded Swap Obligation**" means, with respect to any Guarantor, any Swap Obligation, if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of such Guarantor or the grant of the security interest would otherwise have become effective with respect to such Swap Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof).

"**Executive Order**" has the meaning set forth in Section 6.21(a).

"**Excluded Account**" means any (a) deposit accounts specially and exclusively used in the ordinary course of business for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any Loan Party's salaried employees, which accounts are funded only in the ordinary course of business, (b) pension fund accounts, 401(k) accounts and trust accounts and (c) withholding tax and other tax accounts, fiduciary accounts, escrow accounts and other accounts in which any Loan Party holds funds on behalf of any third party.

"**Existing Debt**" means all Indebtedness for borrowed money of the Borrower and its Affiliates under (i) the Pre-Petition First Lien Credit Agreement and (ii) that certain Second Lien Credit Agreement, dated as of June 30, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Pre-Petition Second Lien Credit Agreement**") by and among the Borrower, the guarantors party thereto from time to time, the Bank of New York Mellon (or its successor, if appointed), as administrative agent, and the lenders party thereto from time to time (the "**Pre-Petition Second Lien Lenders**").

"**Existing Letters of Credit**" means any letters of credit outstanding on the Closing Date described in Schedule 2.03.  Schedule 2.03 contains a description of all Existing Letters of Credit and sets forth, with respect to each such Existing Letter of Credit, (i) the name of the issuing lender, (ii) the letter of credit number, (iii) the name(s) of the account party or account parties, (iv) the stated amount (including the currency in which such letter of credit is denominated), (v) the name of the beneficiary and (vi) the expiry date.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), or any current or future Treasury regulations or other administrative guidance promulgated thereunder, and any intergovernmental agreements implementing the foregoing , and any related fiscal or regulatory legislation, rules or official administrative practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities implementing the foregoing.

"**FCPA**" means the United States Foreign Corrupt Practices Act of 1977, as amended.

"**Federal Funds Effective Rate**" means, for any day, the rate per annum equal to the rates on overnight Federal funds transactions with members of the Federal Reserve System (as determined in such

21

manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time), as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent from three brokers of recognized standing selected by it; provided further that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"**FIRREA**" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"**Fitch**" means Fitch Ratings, Inc.

"**Flood Insurance Laws**" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"**Foreign Casualty Event**" has the meaning set forth in Section 2.05(b)(vi).

"**Foreign Disposition**" has the meaning set forth in Section 2.05(b)(vi).

"**Foreign Subsidiary**" means any direct or indirect Subsidiary which is not a Domestic Subsidiary.

"**Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**GAAP**" means generally accepted accounting principles in the United States of America, as in effect from time to time; *provided*, *however*, that, subject to Section 1.03, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof (including through conforming changes made consistent with IFRS) on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof (including through conforming changes made consistent with IFRS), then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national body exercising such powers or functions, such as the European Union or the European Central Bank).

"**Granting Lender**" has the meaning set forth in Section 10.07(h).

"**Guarantee**" means, as to any Person, without duplication, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment or performance of such Indebtedness, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash

22

WEIL:\97507497\16\10143.0003

flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning set forth in Section 11.01.

"**Guarantors**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement" and shall include each Holdco, the Borrower (solely with respect to its Secured Obligations other than its direct Secured Obligations as a primary obligor (as opposed to a guarantor) under the Loan Documents) and each Subsidiary of the Borrower that shall have become a Guarantor pursuant to Section 6.11 or 6.20, in any case until released in accordance with the terms hereof,  it being understood and agreed that the Borrower in its sole discretion may (with the consent of the Administrative Agent (at the direction of the Required Lenders), such consent not to be unreasonably withheld) cause any Subsidiary that is not a Guarantor to Guarantee the Obligations by causing such Subsidiary to execute a Joinder Agreement, and any such Subsidiary shall be a Guarantor, Loan Party and Subsidiary Guarantor hereunder for all purposes; *provided*, *however*, that that Administrative Agent (at the direction of the Required Lenders) may condition its consent by limiting the purposes for which such Subsidiary shall constitute a Loan Party and Subsidiary Guarantor for purposes of Section 7 and related definitions used therein.

"**Guaranty**" means, collectively, the guaranty of the Obligations by the Guarantors pursuant to this Agreement.

"**Hazardous Materials**" means all materials, pollutants, contaminants, chemicals, compounds, constituents, substances or wastes, in any form, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, mold, medical waste, in each case regulated under Environmental Laws.

"**Holdcos**" means Holdings and Intermediate Holdings.

"**Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Identified Participating Lenders**" has the meaning set forth in Section 2.05(a)(v)(C)(3).

"**Identified Qualifying Lenders**" has the meaning set forth in Section 2.05(a)(v)(D)(3).

"**IFRS**" means international accounting standards as promulgated by the International Accounting Standards Board.

"**Immaterial Subsidiary**" means any Subsidiary that is not a Material Subsidiary.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following:

(a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b) the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances, bank guarantees, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c) net obligations of such Person under any Swap Contract;

23

(d)      all obligations of such Person to pay the deferred purchase price of property or services;

(e)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)      all Attributable Indebtedness;

(g)      all obligations of such Person in respect of Disqualified Equity Interests if and to the extent that the foregoing would constitute indebtedness or a liability in accordance with GAAP; and

(h)      to the extent not otherwise included above, all Guarantees of such Person in respect of Indebtedness described in clauses (a) through (g) in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall (A) include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Consolidated First Lien Net Debt, (B) in the case of the Borrower and its Subsidiaries, exclude all intercompany Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business and (C) exclude (i) trade accounts and accrued expenses payable in the ordinary course of business, (ii) any earn-out obligation until such obligation is not paid after becoming due and payable, (iii) accruals for payroll and other liabilities accrued in the ordinary course of business and (iv) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (e) that is expressly made non-recourse or limited recourse (limited solely to the assets securing such Indebtedness) to such Person shall be deemed to be equal to the lesser of (x) the aggregate unpaid amount of such Indebtedness and (y) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Liabilities**" has the meaning set forth in Section 10.05.

"**Indemnified Taxes**" means, with respect to the Admnistrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, all Taxes imposed on or with respect to any payment under any Loan Documents, other than (i) any Taxes imposed on or measured by its net income, however denominated, and franchise (and similar) Taxes imposed on it in lieu of net income Taxes, imposed by a jurisdiction as a result of such recipient being organized in or having its principal office or, in the case of any Lender, applicable Lending Office in such jurisdiction, or as a result of any other present or former connection between such recipient and such jurisdiction, other than any connections arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, receiving payments under, or enforcing, any Loan Document, (ii) any Taxes attributable to the failure of the Administrative Agent or Lender to comply with Section 3.01(e), (iii) any branch profits Taxes imposed by the United States under Section 884(a) of the Code, or any similar Tax, imposed by any  jurisdiction described in clause (a), (iv) in the case of a Lender (other than an assignee pursuant to a request by the Borrower under Section 3.07(a)), any U.S. federal withholding Tax that is in effect and would apply to amounts payable hereunder pursuant to a Law in effect at the time such Lender becomes a party to this Agreement, or designates a new Lending Office, except to the extent such Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrower or any Guarantor with respect to such withholding Tax pursuant to Section 3.01, and (v) any withholding Taxes imposed under FATCA.

24

"**Indemnitees**" has the meaning set forth in <u>Section 10.05</u>.

"**Independent Financial Advisor**" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged and that is independent of the Borrower and its Affiliates.

"**Information**" has the meaning set forth in <u>Section 10.08</u>.

"**Intellectual Property Security Agreement**" has the meaning set forth in the Security Agreement.

"**Intercompany Note**" means a promissory note substantially in the form of <u>Exhibit G</u>.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of the date hereof, by and among the Administrative Agent, as first lien credit agreement administrative agent, the ABL Agent, the Second Lien Administrative Agent, as second lien credit agreement administrative agent and the Borrower and Guarantors party thereto.

"**Interest Coverage Ratio**" shall mean as of any date of determination with respect to any Person, the ratio of (i) Consolidated EBITDA of such Person for the Test Period most recently ended on or prior to such date of determination to (ii) the sum of (x) solely to the extent paid in cash during the applicable period, Consolidated Interest Expense of such Person for the Test Period most recently ended on or prior to such date of determination plus (y) all regularly scheduled cash dividend payments (excluding items eliminated in consolidation) on any series of Disqualified Equity Interests made during such period, in each case on a Pro Forma Basis.

"**Interest Payment Date**" means, (a) as to any Eurocurrency Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; *provided* that if any Interest Period for a Eurocurrency Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date.

"**Interest Period**" means, as to each Eurocurrency Rate Loan, the period commencing on the date such Eurocurrency Rate Loan is disbursed or converted to or continued as a Eurocurrency Rate Loan and ending on the date one, two, three or six months thereafter or to the extent agreed by each Lender of such Eurocurrency Rate Loan, 12 months or less than one month (but other than a one week period unless consented to by, the Administrative Agent), thereafter, as selected by the Borrower in its Committed Loan Notice; *provided* that:

> (a)　　any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

> (b)　　any Interest Period (other than an Interest Period having a duration of less than one month) that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

> (c)　　no Interest Period shall extend beyond the Maturity Date.

"**Intermediate Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower

25

WEIL:\97507497\16\10143.0003

and its Subsidiaries, intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business) or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made), without adjustment for subsequent increases or decreases in the value of such Investment, less any Returns of the Borrower or a Subsidiary in respect of such Investment.

"**IP Rights**" has the meaning set forth in Section 5.15.

"**Joinder Agreement**" means a joinder agreement substantially in the form of Joinder Agreement attached as Exhibit I hereto.

"**Judgment Currency**" has the meaning assigned to such term in Section 10.20.

"**Laws**" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Lender**" has the meaning set forth in the introductory paragraph to this Agreement and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender."

"**Lender Default**" means a Distressed Person has admitted in writing that it is insolvent or such Distressed Person becomes subject to a Lender-Related Distress Event.

"**Lender-Related Distress Event**" shall mean, with respect to any Lender or any other Person that directly or indirectly controls such Lender (each, a "**Distressed Person**"), (i) such Distressed Person has become subject to a Bail-in Action and/or (ii) a voluntary or involuntary case with respect to such Distressed Person under any debt relief law, or a custodian, conservator, receiver, or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person, or any Person that directly or indirectly controls such Distressed Person or is subject to a forced liquidation or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any governmental authority having regulatory authority over such Distressed Person to be, insolvent or bankrupt; *provided* that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Lender or any Person that directly or indirectly controls such Lender by a governmental authority or an instrumentality thereof.

"**Lending Office**" means, as to any Lender, such office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Lien**" means, with respect to any asset, any mortgage, deed of trust, pledge, hypothecation, collateral assignment, security deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest of any kind or nature in respect of such asset (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing).

"**Loan**" means an extension of credit under Article II by a Lender to the Borrower in the form of a Term Loan.

"**Loan Documents**" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Collateral Documents, (iv) the Intercreditor Agreement, (v) the Agent Fee Letter, (vi) any other document or instrument designated by the Borrower and the Administrative Agent as a "Loan Document" and (vii) any amendment or joinder to this Agreement.

26

"**Loan Parties**" means, collectively, the Borrower and each Guarantor.

"**London Banking Day**" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"**Make-Whole Amount**" means, as of any date of determination, an amount in cash equal to all interest that would have been paid on the Term Loans that are repaid or prepaid, from the date of repayment or prepayment (including following acceleration of the Term Loans) through and including the third anniversary of the Closing Date calculated on the basis of the interest rate with respect to the Term Loans that is in effect on the date of such repayment or prepayment, discounted to the date of repayment or prepayment on a quarterly basis (assuming a 365-day year and actual days elapsed) at a rate equal to the sum of the treasury rate plus 0.50%; provided, that following any acceleration, the Make-Whole Amount shall be reduced by the amount of any interest (other than interest payable at the Default Rate) accruing after the date of such acceleration that is actually paid in cash to the Lenders. The Borrower shall calculate the Make-Whole Amount in good faith.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Master Agreement**" has the meaning set forth in the definition of "Swap Contract."

"**Material Adverse Effect**" means any event, change or condition that, individually or in the aggregate, has had, or would reasonably be expected to have a material adverse effect on (i) the business, assets, financial condition or results of operations of the Borrower and its Subsidiaries, taken as a whole, (ii) the ability of the Borrower and the Guarantors (taken as a whole) to perform their payment obligations under any Loan Document to which the Borrower or any of the Loan Parties is a party or (iii) the material rights and remedies of the Administrative Agent and the Lenders under the Loan Documents, taken as a whole, including the legality, validity, binding effect or enforceability of the Loan Documents.

"**Material Domestic Subsidiary**" means, at any date of determination, each of the Borrower's Domestic Subsidiaries that are Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Subsidiaries for such period, in each case determined in accordance with GAAP; provided that if, at any time and from time to time after the Closing Date, Domestic Subsidiaries that are not Guarantors solely because they do not meet the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended fiscal quarter of the Borrower for which financial statements have been delivered pursuant to Section 6.01 or more than 5.0% of the consolidated gross revenues of the Borrower and the Subsidiaries for such Test Period, then the Borrower shall, not later than 45 days after the date by which financial statements for such quarter or Test Period, as applicable, are required to be delivered pursuant to this Agreement (or such longer period as the Required Lenders may agree in their reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of Section 6.11 applicable to such Subsidiary.

"**Material Foreign Subsidiary**" means, at any date of determination, each of the Borrower's Foreign Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Subsidiaries for such period, in each case determined in accordance with GAAP; provided that if, at any time and from time to time after the Closing Date, Foreign Subsidiaries not meeting the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended fiscal quarter of the Borrower for which financial statements have been delivered pursuant to Section 6.01 or more than 5.0% of the consolidated gross revenues of the Borrower and the Subsidiaries for such Test Period, then the Borrower shall, not later than 45 days after the date by which financial statements for such quarter or Test Period, as

27

WEIL:\97507497\16\10143.0003

applicable, are required to be delivered pursuant to this Agreement (or such longer period as the Required Lenders may agree in their reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Foreign Subsidiaries as "Material Foreign Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of the definition of "Collateral and Guarantee Requirement."

"**Material Non-Public Information**" means information which is (a) not publicly available, (b) material with respect to Holdings and its Subsidiaries or their respective securities for purposes of United States federal and state securities laws and (c) not of a type that would be publicly disclosed in connection with any issuance by Holdings or any of its Subsidiaries of debt or equity securities issued pursuant to a public offering, a Rule 144A offering or other private placement where assisted by a placement agent.

"**Material Real Property**" means any fee-owned Real Property located in the United States that is owned by any Loan Party and that has a fair market value in excess of $1,250,000 (at the Closing Date or, with respect to Real Property acquired after the Closing Date, at the time of acquisition, in each case, as reasonably estimated by the Borrower in good faith).

"**Material Subsidiary**" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"**Maturity Date**" means the fifth anniversary of the Closing Date; *provided* that, if such day is not a Business Day, the Maturity Date shall be the Business Day immediately succeeding such day.

"**Maximum Capital Expenditures Amount**" has the meaning set forth in Section 7.10.

"**Maximum Rate**" has the meaning set forth in Section 10.10.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgage Policies**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement."

"**Mortgaged Properties**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement."

"**Mortgages**" means collectively, the deeds of trust, trust deeds, hypothecs and mortgages made by the Loan Parties in favor or for the benefit of the Administrative Agent on behalf of the Secured Parties creating and evidencing a Lien on a Mortgaged Property in form and substance reasonably satisfactory to the Administrative Agent, and any other mortgage executed and delivered pursuant to Sections 6.11 and 6.13, in each case, as the same may from time to time be amended, restated, supplemented or otherwise modified.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which a Loan Party, any Subsidiary or any ERISA Affiliate makes or is obligated to make contributions, or has made or been obligated to make contributions.

"**Net Proceeds**" means:

(a) 100% of the cash proceeds actually received by the Borrower or any of the Subsidiaries (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards, but in each case only as and when received) from any Disposition or Casualty Event, net of (i) attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees and expenses actually incurred in connection therewith, (ii) the principal amount of any Indebtedness that is secured by a Lien (other than a Lien that ranks *pari passu* with or is subordinated to the Liens securing the Obligations) on the asset subject to such Disposition or

28

Casualty Event and that is required to be repaid in connection with such Disposition or Casualty Event (other than Indebtedness under the Loan Documents), together with any applicable premium, penalty, interest and breakage costs, (iii) in the case of any Disposition or Casualty Event by a non-wholly owned Subsidiary, the *pro rata* portion of the Net Proceeds thereof (calculated without regard to this clause (iii)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a wholly owned Subsidiary as a result thereof, (iv) Taxes or Tax Distributions paid or reasonably estimated to be payable or, without duplication, permitted to be paid as a result thereof (including any income or withholding Taxes imposed on any repatriation of such proceeds to the Borrower), (v) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) above) (x) related to any of the applicable assets and (y) retained by the Borrower or any of the Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Proceeds of such Disposition or Casualty Event occurring on the date of such reduction) and (vi) any funded escrow established pursuant to the documents evidencing any such sale or disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or disposition (*provided* that to the extent that any amounts are released from such escrow to the Borrower or a Subsidiary, such amounts net of any related expenses shall constitute Net Proceeds); and

(b)      100% of the cash proceeds from the incurrence, issuance or sale by the Borrower or any of the Subsidiaries of any Indebtedness, net of all taxes paid or reasonably estimated to be payable as a result thereof and fees (including investment banking fees and discounts), commissions, costs and other expenses, in each case incurred in connection with such incurrence, issuance or sale.

For purposes of calculating the amount of Net Proceeds, fees, commissions and other costs and expenses payable to the Borrower shall be disregarded.

"**Non-Consenting Lender**" has the meaning set forth in Section 3.07(d).

"**Non-Defaulting Lender**" means, at any time, a Lender that is not a Defaulting Lender.

"**Note**" means a promissory note of the Borrower payable to any Lender or its registered assigns, in substantially the form of Exhibit B hereto, evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Term Loans made by such Lender.

"**Notice of Intent to Cure**" has the meaning set forth in Section 8.04.

"**Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party and its Subsidiaries arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and of their Subsidiaries to the extent they have obligations under the Loan Documents) include (a) the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document, (b) the obligation to pay any applicable fee pursuant to Section 2.09(b) and (c) the obligation of any Loan Party to reimburse any amount in respect of any of the foregoing that any Lender may elect to pay or advance on behalf of such Loan Party in accordance with the terms of the Loan Documents.

"**Offered Amount**" has the meaning set forth in Section 2.05(a)(v)(D)(1).

29

WEIL:\97507497\16\10143.0003

"**Offered Discount**" has the meaning set forth in Section 2.05(a)(v)(D)(1).

"**OFAC**" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"**OID**" means original issue discount.

"**Old Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Old Intermediate Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Old Jason**" has the meaning set forth in the preliminary statements to this Agreement.

"**Order**": means any order, writ, judgement, injunction, decree, rule, ruling, directive, stipulation, determination or award made, issued or entered by the Bankruptcy Court or any other Governmental Authority, whether interim or final.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement or limited liability company agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" has the meaning set forth in Section 3.01(b).

"**Outstanding Amount**" means, with respect to the Term Loans, the outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Term Loans.

"**Overnight Rate**" means, for any day, the greater of the Federal Funds Effective Rate and an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"**Participant**" has the meaning set forth in Section 10.07(e).

"**Participant Register**" has the meaning set forth in Section 10.07(e).

"**Participating Lender**" has the meaning set forth in Section 2.05(a)(v)(C)(2).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time.

"**Perfection Certificate**" means a certificate substantially in the form of Exhibit II to the Security Agreement or any other form reasonably approved by the Required Lenders, as the same shall be supplemented from time to time.

"**Permitted Acquisition**" has the meaning set forth in Section 7.02(i).

"**Permitted Holders**" means each of Lenders and the Second Lien Credit Agreement Lenders holding the common equity of Holdings on the Closing Date.

30

WEIL:\97507497\16\10143.0003

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal, restructuring, replacement or extension of any Indebtedness of such Person; *provided* that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, restructured, refunded, renewed, replaced or extended except by an amount equal to unpaid accrued interest and premium thereon *plus* other amounts owing or paid related to such Indebtedness, and fees and expenses incurred, in connection with such modification, refinancing, refunding, renewal, restructuring, replacement or extension *plus* an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e), such modification, refinancing, refunding, renewal, replacement or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended, (c) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e) or (f), at the time thereof, no Event of Default shall have occurred and be continuing, (d) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal, replacement or extension is subordinated in right of payment to the Obligations on terms (i) at least as favorable (taken as a whole) (as reasonably determined by the Borrower) to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended or (ii) as otherwise reasonably acceptable to the Administrative Agent, (e) if such Indebtedness being modified, refinanced, replaced, refunded, renewed or extended is Indebtedness permitted pursuant to Sections 7.03(s), 7.03(w), and 7.03(x), (i) to the extent such Indebtedness being modified, refinanced, replaced, refunded, renewed or extended is unsecured or secured by Liens that are subordinated to the Liens securing the Obligations, such modification, refinancing, replacement, refunding, renewal or extension is unsecured or (with respect to refinanced debt secured by Liens that are subordinated to the Liens securing the Obligations) secured by Liens that are subordinated to the Liens securing the Obligations on terms (x) at least as favorable (taken as a whole) (as reasonably determined by the Borrower) to the Lenders as those contained in the documentation (including any intercreditor or similar agreements) governing the Indebtedness being modified, refinanced, replaced, refunded, renewed or extended or (y) otherwise reasonably acceptable to the Administrative Agent and (ii) notwithstanding anything contained in Section 7.03(c), such modification, refinancing, refunding, renewal, replacement or extension is incurred only by one or more Persons who is an obligor of the Indebtedness being modified, refinanced, replaced, refunded, renewed or extended and (f) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is outstanding pursuant to the Second Lien Credit Agreement or any other Second Lien Loan Document, such modification, refinancing, refunding, renewal, replacement or extension does not violate the terms of the Intercreditor Agreement.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning set forth in the preliminary statements to this Agreement.

"**PIK Election**" has the meaning set forth in Section 2.08(c).

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established or maintained by any Loan Party or any Subsidiary or, with respect to any such plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA, any ERISA Affiliate.

"**Plan Effective Date**" has the meaning set forth in the preliminary statements to this Agreement.

"**Platform**" has the meaning set forth in Section 6.01(d).

"**Pledged Debt**" has the meaning set forth in the Security Agreement.

"**Pledged Equity**" has the meaning set forth in the Security Agreement.

31

"**Prepackaged Plan**" has the meaning set forth in the preliminary statements to this Agreement.

"**Pre-Petition First Lien Credit Agreement**" has the meaning set forth in the preliminary statements to this Agreement.

"**Pre-Petition First Lien Lenders**" has the meaning set forth in the preliminary statements to this Agreement.

"**Proceeding**" has the meaning set forth in Section 10.05.

"**Proceeds**" has the meaning set forth in the Security Agreement.

"**Pro Forma Balance Sheet**" has the meaning set forth in Section 5.05(b).

"**Pro Forma Basis**" and "**Pro Forma Effect**" means, with respect to compliance with any test or covenant or calculation of any ratio hereunder, the determination or calculation of such test, covenant or ratio (including in connection with Specified Transactions) in accordance with Section 1.09.

"**Pro Forma Financial Statements**" has the meaning set forth in Section 5.05(b).

"**Pro Rata Share**" means, with respect to each Lender, at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the Outstanding Amount of the Term Loans of such Lender at such time and the denominator of which is the Total Outstandings at such time.

"**Projections**" has the meaning set forth in Section 6.01(c).

"**Public Lender**" has the meaning set forth in Section 6.01(d).

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests.

"**Qualified IPO**" means the issuance by the Borrower or any direct or indirect parent of the Borrower of its common Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the U.S. Securities and Exchange Commission in accordance with the Securities Act (whether alone or in connection with a secondary public offering).

"**Qualifying Lender**" has the meaning set forth in Section 2.05(a)(v)(D)(3).

"**Quarterly Financial Statements**" means the unaudited consolidated balance sheets and related consolidated statements of income and cash flows of the Old Jason and its Subsidiaries for the fiscal quarter ended closest to June 30, 2020 and each subsequent fiscal quarter of the Company ended at least 45 days prior to the Closing Date.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned or leased by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures.

"**Register**" has the meaning set forth in Section 10.07(d).

"**Rejection Notice**" has the meaning set forth in Section 2.05(b)(viii).

WEIL:\97507497\16\10143.0003

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"**Release**" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing or migrating in, into, onto or through the Environment or in an uncontained manner from or through any facility, property or equipment.

"**Relevant Public Company**" means Holdings or any direct or indirect parent thereof that (i) owns, directly or indirectly, 100% of the Equity Interests of Holdings and the Borrower and (ii) is the registrant with respect to a Qualified IPO.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the otherwise applicable notice period has been waived by regulation or otherwise by the PBGC.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the Total Outstandings; *provided* that the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Responsible Officer**" means the chief executive officer, president, vice president, chief financial officer, chief administrative officer, secretary or assistant secretary, treasurer or assistant treasurer, controller or other similar officer of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the Borrower's or a Subsidiary's equity holders, partners or members (or the equivalent Persons thereof).

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of June 5, 2020, by and among the Debtors and the Pre-Petition Lenders party thereto as Consenting Creditors (as defined therein).

"**Returns**" means, with respect to any Investment, any dividends, distributions, interest, fees, premium, return of capital, repayment of principal, income, profits (from a Disposition or otherwise) and other amounts received or realized in respect of such Investment.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Same Day Funds**" means immediately available funds.

"**Sanctions**" means all economic sanctions and regulations maintained by OFAC.

"**Sanctioned Person**" means any Person located, organized, or resident in Crimea, Cuba, Iran, North Korea, or Syria, and any Person named on any OFAC sanctions list, including OFAC's Specially Designated Nationals List, the Sectoral Sanctions Identifications List, and the Foreign Sanctions Evaders List.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

33

WEIL:\97507497\16\10143.0003

"**Second Lien Administrative Agent**" has the meaning assigned to the term "Administrative Agent" under and as defined in the Second Lien Credit Agreement and shall include any successor administrative agent under the Second Lien Credit Agreement.

"**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of the date hereof, by and among the Borrower, the Holdcos, the other Guarantors from time to time party thereto, the lenders party thereto from time to time and Cantor Fitzgerald Securities, as administrative agent for such lenders.

"**Second Lien Loan Documents**" means the "Loan Documents" as defined in the Second Lien Credit Agreement.

"**Second Lien Obligations**" means the "Obligations" (or any comparable term) as defined in the Second Lien Credit Agreement.

"**Second Lien Secured Obligations**" means the "Junior Lien Obligations" as defined in the Intercreditor Agreement.

"**Second Lien Term Facility**" means the Second Lien Term Loans and commitments in respect thereof.

"**Second Lien Term Loans**" means the "Term Loans" (or any comparable term) as defined in the Second Lien Credit Agreement.

"**Secured Obligations**" means, collectively, the Obligations, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise.

"**Secured Parties**" means, collectively, the Administrative Agent, the Lenders, and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.05.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Security Agreement**" means a security agreement substantially in the form of Exhibit F.

"**Security Agreement Supplement**" has the meaning set forth in the Security Agreement.

"**Solicited Discount Proration**" has the meaning set forth in Section 2.05(a)(v)(D)(3).

"**Solicited Discounted Prepayment Amount**" has the meaning set forth in Section 2.05(a)(v)(D)(1).

"**Solicited Discounted Prepayment Notice**" means a written notice of the Borrower of Solicited Discounted Prepayment Offers made pursuant to Section 2.05(a)(v)(D) substantially in the form of Exhibit E-6.

"**Solicited Discounted Prepayment Offer**" means the irrevocable written offer by each Lender, substantially in the form of Exhibit E-7, submitted following the Auction Agent's receipt of a Solicited Discounted Prepayment Notice.

"**Solicited Discounted Prepayment Response Date**" has the meaning set forth in Section 2.05(a)(v)(D)(1).

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date (i) the sum of the debt (including contingent liabilities) of such Person and its Subsidiaries, taken as a whole, does not exceed the present fair saleable value of the assets of the Person and its Subsidiaries, taken as a whole; (ii) the capital of such Person and its Subsidiaries, taken as a whole, is not unreasonably small in relation to the business of such Person and its Subsidiaries, taken as a whole, contemplated as of the Closing

34

WEIL:\97507497\16\10143.0003

Date; and (iii) such Person and its Subsidiaries, taken as a whole, do not intend to incur, or believe that they will incur, debts (including current obligations) beyond their ability to pay such debt as they mature in the ordinary course of business.  For the purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"**SPC**" has the meaning set forth in Section 10.07(h).

"**Specified Discount**" has the meaning set forth in Section 2.05(a)(v)(B)(1).

"**Specified Discount Prepayment Amount**" has the meaning set forth in Section 2.05(a)(v)(B)(1).

"**Specified Discount Prepayment Notice**" means a written notice of the Borrower Offer of Specified Discount Prepayment made pursuant to Section 2.05(a)(v)(B) substantially in the form of Exhibit E-8.

"**Specified Discount Prepayment Response**" means the irrevocable written response by each Lender, substantially in the form of Exhibit E-9, to a Specified Discount Prepayment Notice.

"**Specified Discount Prepayment Response Date**" has the meaning set forth in Section 2.05(a)(v)(B)(1).

"**Specified Discount Proration**" has the meaning set forth in Section 2.05(a)(v)(B)(3).

"**Specified Transaction**" means any Investment that results in a Person becoming a Subsidiary, any Permitted Acquisition or any Disposition that results in a Subsidiary ceasing to be a Subsidiary of the Borrower, any Investment constituting an acquisition of assets constituting a business unit, line of business or division of, or all or substantially all of the Equity Interests of, another Person or any Disposition of a business unit, line of business or division of the Borrower or a Subsidiary, in each case whether by merger, consolidation, amalgamation or otherwise, or any incurrence or repayment of Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility or line of credit for working capital purposes) or Restricted Payment, that by the terms of this Agreement requires such test to be calculated on a "Pro Forma Basis" or after giving "Pro Forma Effect."

"**Statutory Reserves**" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board of Governors of the Federal Reserve System of the United States (the "**Board**") and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the Board).  Eurocurrency Rate Loans shall be deemed to constitute Eurocurrency Liabilities (as defined in Regulation D of the Board) and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Submitted Amount**" has the meaning set forth in Section 2.05(a)(v)(C)(1).

"**Submitted Discount**" has the meaning set forth in Section 2.05(a)(v)(C)(1).

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (excluding, for the avoidance of doubt, any charitable organizations, and any other Person that meets the requirements of Section 501(c)(3) of the Code) of which (i) a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time

35

beneficially owned, (ii) more than half of the issued share capital is at the time beneficially owned or (iii) the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" means any Guarantor other than the Borrower and the Holdcos.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Target Person**" has the meaning set forth in Section 7.02.

"**Tax Distribution**" means any distribution made or permitted to be made pursuant to Section 7.06(h)(iii).

"**Tax Group**" has the meaning set forth in Section 7.06(h)(iii).

"**Taxes**" means all present or future taxes, duties, levies, imposts, assessments, withholdings (including backup withholding) or other similar charges imposed by any Governmental Authority including any interest, penalties and additions to tax applicable thereto.

"**Term Loan**" means the term loan deemed made by the Lenders on the Closing Date to the Borrower pursuant to Section 2.01. As of the Closing Date, the aggregate amount of the Term Loans is $76,600,000.

"**Test Period**" means, for any date of determination under this Agreement, the four consecutive fiscal quarters of the Borrower most recently ended as of such date of determination.

"**Threshold Amount**" means $10,000,000.

"**Total Assets**" means the total assets of the Borrower and the Subsidiaries on a consolidated basis in accordance with GAAP, as shown on the most recent balance sheet of the Borrower delivered pursuant to Section 6.01(a) or (b) or, for the period prior to the time any such statements are so delivered pursuant to Section 6.01(a) or (b), the Pro Forma Financial Statements.

36

"**Total Outstandings**" means the aggregate Outstanding Amount of all Loans.

"**Transaction Expenses**" means any fees or expenses incurred or paid by Holdings, Intermediate Holdings, the Borrower or any of their respective Subsidiaries in connection with the Transactions (including expenses in connection with hedging transactions), this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby.

"**Transactions**" means, collectively, (a) the deemed funding of the Term Loans on the Closing Date and the execution, delivery and performance of the Loan Documents to be entered into on the Closing Date, (b) the funding of any ABL Loans on the Closing Date, issuance of any Letters of Credit (as defined in the ABL Credit Agreement) and the execution, delivery and performance of the ABL Loan Documents to be entered into on the Closing Date, (c) the deemed funding of the Second Lien Term Loans under the Second Lien Credit Agreement on the Closing Date and the execution, delivery and performance of the Second Lien Loan Documents to be entered into on the Closing Date, (d) the extinguishment of the Existing Debt in accordance with the Prepackaged Plan, (e) the restructuring of the Holdcos and certain of their Subsidiaries pursuant to the Prepackaged Plan, the Chapter 11 Cases and any related transactions and (f) the payment of Transaction Expenses earned, due and payable on the Closing Date.

"**Transferred Guarantor**" has the meaning set forth in <u>Section 11.09</u>.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a Eurocurrency Rate Loan.

"**Uniform Commercial Code**" or "**UCC**" means (i) the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or (ii) the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it applies to any item or items of Collateral.  References in this Agreement and the other Loan Documents to specific sections of the Uniform Commercial Code are based on the Uniform Commercial Code as in effect in the State of New York on the Closing Date.  In the event such Uniform Commercial Code is amended or another Uniform Commercial Code described in clause (ii) is applicable, such Section reference shall be deemed to be references to the comparable Section in such amended or other Uniform Commercial Code.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" has the meaning set forth in <u>Section 3.01(e)(ii)(C)</u>.

"**USA Patriot Act**" means the USA PATRIOT ACT (Title III of Pub. Law 107-56 (signed into law October 26, 2001) (as amended from time to time).

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness.

"**Write-Down and Conversion Powers**" means with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

"**wholly owned**" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

37

**Section 1.02**    <u>Other Interpretive Provisions</u>.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(c)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(d)    The term "including" is by way of example and not limitation.

(e)    The word "or" is not exclusive.

(f)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(g)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(h)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(i)    For purposes of determining compliance with any Section of <u>Article VII</u> at any time, in the event that any Lien (other than Liens securing Indebtedness of the types described in clauses (v) through (z) of the proviso appearing in the last paragraph of <u>Section 7.03</u>, which shall at all times be deemed to be incurred in reliance on the applicable express exception therefor in <u>Section 7.01</u>), Investment, Disposition, Restricted Payment, Affiliate transaction, Contractual Obligation or prepayment of Indebtedness meets the criteria of one or more than one of the categories of transactions permitted pursuant to any clause of such Sections, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time.

(j)    All references to "knowledge" of any Loan Party or a Subsidiary of Holdings means the actual knowledge of a Responsible Officer.

(k)    The words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(l)    All references to any Person shall be constructed to include such Person's successors and assigns (subject to any restriction on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(m)    The word "will" shall be construed to have the same meaning and effect as the word "shall."

<center>38</center>

WEIL:\97507497\16\10143.0003

(n)      All references to any Lender "making" or "funding" a Term Loan or a Term Loan being "made" or "funded" (or any similar concept) by a Lender shall for all purposes hereunder, be a reference to the deemed making or funding of such Loan by such Lender or such Loan being deemed made or funded (or any similar concept) by such Lender.

**Section 1.03      Accounting Terms**.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.  Notwithstanding any other provision contained herein, (a) any lease that is treated as an operating lease for purposes of GAAP as of the Closing Date shall not be treated as Indebtedness, Attributable Indebtedness or as a Capitalized Lease and shall continue to be treated as an operating lease (and any future lease, if it were in effect on the Closing Date, that would be treated as an operating lease for purposes of GAAP as of the Closing Date shall be treated as an operating lease), in each case for purposes of this Agreement, notwithstanding any actual or proposed change in GAAP after the Closing Date and (b) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to (i) Statement of Financial Accounting Standards 141R or ASC 805 (or any other financial accounting standard having a similar result or effect) or (ii) any election under Financial Accounting Standards Codification No. 825—Financial Instruments, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of a Holdco, the Borrower or any Subsidiary at "fair value" as defined therein.

**Section 1.04      Rounding**.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

**Section 1.05      References to Agreements, Laws, Etc**.  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, refinancings, restatements, renewals, restructurings, extensions, supplements and other modifications thereto, but only to the extent that such amendments, refinancings, restatements, renewals, restructurings, extensions, supplements and other modifications are not prohibited by the Loan Documents; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

**Section 1.06      Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**Section 1.07      Timing of Payment or Performance**.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day.

**Section 1.08      [Reserved].**

**Section 1.09      Pro Forma Calculations**.  (a)  Notwithstanding anything to the contrary herein, financial ratios and tests, including the Interest Coverage Ratio and the Consolidated First Lien Net Leverage Ratio shall be calculated in the manner prescribed by this Section 1.09; *provided* that notwithstanding anything to the contrary in Section 1.09(b), (c) or (d), when calculating the Interest Coverage Ratio or Consolidated First Lien Net Leverage Ratio for purposes of determining actual quarterly compliance with the financial covenants pursuant to Section 7.11 or Section 7.12, as applicable (and not compliance on a Pro Forma Basis for purposes of testing the permissibility of a transaction hereunder), the events described in this Section 1.09

39

that occurred subsequent to the end of the applicable Test Period shall not be given *pro forma* effect. In addition, whenever a financial ratio or test is to be calculated on a pro forma basis, the reference to the "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which internal financial statements of Holdings are available (as determined in good faith by the Borrower); *provided* that, the provisions of this sentence shall not apply for purposes of calculating the Interest Coverage Ratio or the Consolidated First Lien Net Leverage Ratio for purposes of determining actual quarterly compliance with Section 7.11 or Section 7.12, as applicable (and not compliance on a Pro Forma Basis for purposes of testing the permissibility of a transaction hereunder), which shall be based on the financial statements delivered pursuant to Section 6.01(a) or (b), as applicable, for the relevant Test Period.

(b)    For purposes of calculating any financial ratio or test, Specified Transactions (with any incurrence or repayment of any Indebtedness in connection therewith to be subject to Section 1.09(d)) that have been made (i) during the applicable Test Period and (ii) if applicable as described in Section 1.09(a), subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio or test is made shall be calculated on a *pro forma* basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day (or, in case of the determination of Total Assets, the last day) of the applicable Test Period. If since the beginning of any applicable Test Period any Person that subsequently became a Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Subsidiaries since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.09, then such financial ratio or test (or Total Assets) shall be calculated to give *pro forma* effect thereto in accordance with this Section 1.09.

(c)    [reserved].

(d)    In the event that the Borrower or any Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Indebtedness included in the calculations of any financial ratio or test (in each case, other than Indebtedness incurred or repaid under any revolving credit facility), (i) during the applicable Test Period or (ii) subject to Section 1.09(a) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving *pro forma* effect to such incurrence or repayment of Indebtedness, to the extent required, as if the same had occurred on the last day of the applicable Test Period.

**Section 1.10    Exchange Rates; Currency**. (a)  For purposes of determining compliance with Article VII with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Investment is incurred (so long as such Indebtedness or Investment, at the time incurred, made or acquired, was permitted hereunder).

(b) Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect the (i) adoption of the Euro by any member state of the European Union and any relevant market conventions or practices relating to the Euro or (ii) a change in currency of any other country and any relevant market conventions or practices relating to the change in currency.

**Section 1.11    Certifications**.  All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such person in his or her capacity solely as an officer or a representative of such Loan Party, on such Loan Party's behalf and not in such Person's individual capacity.

40

WEIL:\97507497\16\10143.0003

## ARTICLE II
## CREDIT EXTENSIONS

**Section 2.01**   **The Loans**.   Subject to the terms and conditions expressly set forth herein, each Lender, pursuant to the terms of the Prepackaged Plan, exchanged or otherwise agreed to deem satisfied a portion of the obligations held by it under the Pre-Petition First Lien Credit Agreement for an outstanding Term Loan under this Agreement in the amount set forth opposite such Lender's name on Schedule 2.01. Amounts borrowed under this Section 2.01 and repaid or prepaid may not be re-borrowed.   On the Closing Date, the Term Loans shall be Eurocurrency Rate Loans with an Interest Period of one month.

**Section 2.02**   **Conversions and Continuations of Loans**.   (a)   Each conversion of Term Loans from one Type to the other and each continuation of Eurocurrency Rate Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent.   Each such notice must be received by the Administrative Agent not later than (1) 12:00 noon New York City time three Business Days prior to the requested date of any continuation of Eurocurrency Rate Loans or any conversion of Base Rate Loans to Eurocurrency Rate Loans, and (2) 10:00 a.m. New York City time one Business Day prior to the requested date of the conversion of any Eurocurrency Rate Loans to Base Rate Loans.   Each notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery (including via email) to the Administrative Agent of a written Committed Loan Notice (and will not be effective until so confirmed), appropriately completed and signed by a Responsible Officer of the Borrower.   Except as otherwise provided in Section 2.14, each conversion to or continuation of Eurocurrency Rate Loans shall be in a minimum principal amount of $500,000, or a whole multiple of $100,000 in excess thereof or such other multiple as the Required Lenders may agree from time to time.   Except as provided herein, conversion to Base Rate Loans shall be in a minimum principal amount of $250,000 or a whole multiple of $100,000 in excess thereof.   Each Committed Loan Notice  shall specify (i) whether the Borrower is requesting a conversion of Term Loans from one Type to the other or a continuation of Eurocurrency Rate Loans, (ii) the requested date of the conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be converted or continued, (iv) the Type of Loans to which existing Term Loans are to be converted and (v) if applicable, the duration of the Interest Period with respect thereto.   If the Borrower fails to specify a Type of Loan in a Committed Loan Notice or fails to give a timely notice requesting a conversion or continuation, then the applicable Term Loans shall be converted to Base Rate Loans.   Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurocurrency Rate Loans.   If the Borrower requests a conversion to or continuation of Eurocurrency Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month.

(b)   Following receipt of a Committed Loan Notice, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans or continuation described in Section 2.02(a).

(c)   Except as otherwise provided herein, a Eurocurrency Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurocurrency Rate Loan unless the Borrower pays the amount due, if any, under Section 3.05 in connection therewith.   During the occurrence and continuation of an Event of Default, the Administrative Agent (at the direction of the Required Lenders) may require that no Loans may be converted to or continued as Eurocurrency Rate Loans and/or that any outstanding Eurocurrency Rate Loans be converted to Base Rate Loans.

(d)   The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurocurrency Rate Loans upon determination of such interest rate. The determination of the Eurocurrency Rate by the Administrative Agent shall be conclusive in the absence of manifest error.

41

WEIL:\97507497\16\10143.0003

(e)      After giving effect to the initial Borrowing, all conversions of Term Loans from one Type to the other, and all continuations of Term Loans as the same Type, there shall not be more than 3 (or such greater amount as may be agreed by the Administrative Agent in its sole discretion) Interest Periods in effect.

**Section 2.03      [Reserved].**

**Section 2.04      [Reserved]**.

**Section 2.05      Prepayments**.

(a)      *Optional*.  (i) The Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay the Term Loans in whole or in part without premium or penalty (except as expressly set forth in Section 2.09(b)); *provided* that (1) such notice must be received by the Administrative Agent not later than 11:00 a.m. New York City time (A) three Business Days prior to any date of prepayment of Eurocurrency Rate Loans and (B) one Business Day prior to the date of prepayment of Base Rate Loans; (2) any prepayment of Eurocurrency Rate Loans shall be in a minimum principal amount of $500,000, or a whole multiple of $100,000 in excess thereof and (3) any prepayment of Base Rate Loans shall be in a minimum principal amount of $250,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment.  The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such prepayment.  If such notice is given by the Borrower, unless rescinded pursuant to clause (iii) below, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05.

(ii)      [Reserved].

(iii)      Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.05(a)(i) by notice to the Administrative Agent if such prepayment would have resulted from a refinancing of all or any portion of the Term Loans or occurrence of another event, which refinancing or event shall not be consummated or shall otherwise be delayed.

(iv)      Voluntary prepayments of any Term Loans permitted hereunder shall be applied to the remaining scheduled installments of principal thereof pursuant to Section 2.07 in a manner determined at the discretion of the Borrower and specified in the notice of prepayment (and absent such direction, in direct order of maturity).

(v)      Notwithstanding anything in any Loan Document to the contrary, in addition to the terms set forth in Sections 2.05(a)(i) and 10.07, so long as (x) no Event of Default has occurred and is continuing and (y) no proceeds of ABL Loans are used for this purpose, after the third anniversary of the Closing Date, any Company Party may prepay the outstanding Term Loans (which shall, for the avoidance of doubt, be automatically and permanently canceled immediately upon such prepayment) (or Holdings or any of its Subsidiaries may purchase such outstanding Loans and immediately cancel them) without premium or penalty on the following basis:

(A)      Any Company Party shall have the right to make a voluntary prepayment of Term Loans at a discount to par pursuant to a Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offers or Borrower Solicitation of Discounted Prepayment Offers (any such prepayment, the

42

"**Discounted Term Loan Prepayment**"), in each case made in accordance with this Section 2.05(a)(v) and without premium or penalty (except as provided in Section 2.09(d)).

(B)   (1) Any Company Party may from time to time offer to make a Discounted Term Loan Prepayment by providing the Auction Agent with five Business Days' notice in the form of a Specified Discount Prepayment Notice (or such shorter period as agreed by the Auction Agent); *provided* that (I) any such offer shall be made available, at the sole discretion of the Company Party, to (x) each Lender and/or (y) each Lender with respect to any Term Loans on an individual tranche basis, (II) any such offer shall specify the aggregate principal amount offered to be prepaid (the "**Specified Discount Prepayment Amount**") with respect to each applicable tranche, the tranche or tranches of Term Loans subject to such offer and the specific percentage discount to par (the "**Specified Discount**") of such Term Loans to be prepaid (it being understood that different Specified Discounts and/or Specified Discount Prepayment Amounts may be offered with respect to different tranches of Term Loans and, in such event, each such offer will be treated as a separate offer pursuant to the terms of this Section 2.05(a)(v)(B)), (III) the Specified Discount Prepayment Amount shall be in an aggregate amount not less than $5,000,000 and whole increments of $1,000,000 in excess thereof and (IV) unless rescinded, each such offer shall remain outstanding through the Specified Discount Prepayment Response Date.  The Auction Agent will promptly provide each Lender with a copy of such Specified Discount Prepayment Notice and a form of the Specified Discount Prepayment Response to be completed and returned by each such Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m. New York City time on the third Business Day after the date of delivery of such notice to such Lenders (or such later date specified therein) (the "**Specified Discount Prepayment Response Date**").

(2)   Each Lender receiving such offer shall notify the Auction Agent (or its delegate) by the Specified Discount Prepayment Response Date whether or not it agrees to accept a prepayment of any of its applicable then outstanding Term Loans at the Specified Discount and, if so (such accepting Lender, a "**Discount Prepayment Accepting Lender**"), the amount and the tranches of such Lender's Term Loans to be prepaid at such offered discount.  Each acceptance of a Discounted Term Loan Prepayment by a Discount Prepayment Accepting Lender shall be irrevocable.  Any Lender whose Specified Discount Prepayment Response is not received by the Auction Agent by the Specified Discount Prepayment Response Date shall be deemed to have declined to accept the applicable Borrower Offer of Specified Discount Prepayment.

(3)   If there is at least one Discount Prepayment Accepting Lender, the relevant Company Party will make a prepayment of outstanding Term Loans pursuant to this Section 2.05(a)(v)(B) to each Discount Prepayment Accepting Lender in accordance with the respective outstanding amount and tranches of Term Loans specified in such Lender's Specified Discount Prepayment Response given pursuant to clause (2) above; *provided* that, if the aggregate principal amount of Term Loans accepted for prepayment by all Discount Prepayment Accepting Lenders exceeds the Specified Discount Prepayment Amount, such prepayment shall be made *pro rata* among the Discount Prepayment Accepting Lenders in accordance with the respective principal amounts accepted to be prepaid by each such Discount Prepayment Accepting Lender and the Auction Agent (with the consent of such Company Party and subject to rounding requirements of the Auction Agent made in its reasonable discretion) will calculate such proration (the "**Specified Discount Proration**").  The Auction Agent shall promptly, and in any case within three Business Days following the Specified Discount Prepayment Response Date, notify (I) the relevant Company Party of the respective Lenders' responses to such offer, the

43

Discounted Prepayment Effective Date and the aggregate principal amount of the Discounted Term Loan Prepayment and the tranches to be prepaid, (II) each Lender of the Discounted Prepayment Effective Date, and the aggregate principal amount and the tranches of Term Loans to be prepaid at the Specified Discount on such date and (III) each Discount Prepayment Accepting Lender of the Specified Discount Proration, if any, and confirmation of the principal amount, tranche and Type of Term Loans of such Lender to be prepaid at the Specified Discount on such date. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the Company Party and such Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to the Company Party shall be due and payable by such Company Party on the Discounted Prepayment Effective Date in accordance with Section 2.05(a)(v)(F) below (subject to Section 2.05(a)(v)(J) below).

(C)     (1) Any Company Party may from time to time solicit Discount Range Prepayment Offers by providing the Auction Agent with five Business Days' notice in the form of a Discount Range Prepayment Notice (or such shorter period as agreed by the Auction Agent); *provided* that (I) any such solicitation shall be extended, at the sole discretion of such Company Party, to (x) each Lender and/or (y) each Lender with respect to any Term Loans on an individual tranche basis, (II) any such notice shall specify the maximum aggregate principal amount of the relevant Term Loans (the "**Discount Range Prepayment Amount**"), the tranche or tranches of Term Loans subject to such offer and the maximum and minimum percentage discounts to par (the "**Discount Range**") of the principal amount of such Term Loans with respect to each relevant tranche of Term Loans willing to be prepaid by such Company Party (it being understood that different Discount Ranges and/or Discount Range Prepayment Amounts may be offered with respect to different tranches of Term Loans and, in such event, each such offer will be treated as separate offer pursuant to the terms of this Section 2.05(a)(v)(C)), (III) the Discount Range Prepayment Amount shall be in an aggregate amount not less than $5,000,000 and whole increments of $1,000,000 in excess thereof and (IV) unless rescinded, each such solicitation by a Company Party shall remain outstanding through the Discount Range Prepayment Response Date. The Auction Agent will promptly provide each Lender with a copy of such Discount Range Prepayment Notice and a form of the Discount Range Prepayment Offer to be submitted by a responding Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m. New York City time on the third Business Day after the date of delivery of such notice to such Lenders (or such later date specified therein) (the "**Discount Range Prepayment Response Date**"). Each Lender's Discount Range Prepayment Offer shall be irrevocable and shall specify a discount to par within the Discount Range (the "**Submitted Discount**") at which such Lender is willing to allow prepayment of any or all of its then outstanding Term Loans of the applicable tranche or tranches and the maximum aggregate principal amount and tranches of such Lender's Term Loans (the "**Submitted Amount**") such Lender is willing to have prepaid at the Submitted Discount. Any Lender whose Discount Range Prepayment Offer is not received by the Auction Agent by the Discount Range Prepayment Response Date shall be deemed to have declined to accept a Discounted Term Loan Prepayment of any of its Term Loans at any discount to their par value within the Discount Range.

(2)     The Auction Agent shall review all Discount Range Prepayment Offers received on or before the applicable Discount Range Prepayment Response Date and shall determine (with the consent of such Company Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the Applicable Discount and Term Loans to be prepaid at such Applicable Discount in accordance with this Section 2.05(a)(v)(C). The relevant Company Party agrees to accept on the Discount Range Prepayment Response Date all Discount

44

WEIL:\97507497\16\10143.0003

Range Prepayment Offers received by Auction Agent by the Discount Range Prepayment Response Date, in the order from the Submitted Discount that is the largest discount to par to the Submitted Discount that is the smallest discount to par, up to and including the Submitted Discount that is the smallest discount to par within the Discount Range (such Submitted Discount that is the smallest discount to par within the Discount Range being referred to as the "**Applicable Discount**") which yields a Discounted Term Loan Prepayment in an aggregate principal amount equal to the lower of (I) the Discount Range Prepayment Amount and (II) the sum of all Submitted Amounts.  Each Lender that has submitted a Discount Range Prepayment Offer to accept prepayment at a discount to par that is larger than or equal to the Applicable Discount shall be deemed to have irrevocably consented to prepayment of Term Loans equal to its Submitted Amount (subject to any required proration pursuant to the following clause (3)) at the Applicable Discount (each such Lender, a "**Participating Lender**").

(3)    If there is at least one Participating Lender, the relevant Company Party will prepay the respective outstanding Term Loans of each Participating Lender in the aggregate principal amount and of the tranches specified in such Lender's Discount Range Prepayment Offer at the Applicable Discount; *provided* that if the Submitted Amount by all Participating Lenders offered at a discount to par greater than the Applicable Discount exceeds the Discount Range Prepayment Amount, prepayment of the principal amount of the relevant Term Loans for those Participating Lenders whose Submitted Discount is a discount to par greater than or equal to the Applicable Discount (the "**Identified Participating Lenders**") shall be made *pro rata* among the Identified Participating Lenders in accordance with the Submitted Amount of each such Identified Participating Lender and the Auction Agent (with the consent of such Company Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "**Discount Range Proration**").  The Auction Agent shall promptly, and in any case within five Business Days following the Discount Range Prepayment Response Date, notify (I) the relevant Company Party of the respective Lenders' responses to such solicitation, the Discounted Prepayment Effective Date, the Applicable Discount, and the aggregate principal amount of the Discounted Term Loan Prepayment and the tranches to be prepaid, (II) each Lender of the Discounted Prepayment Effective Date, the Applicable Discount, and the aggregate principal amount and tranches of Term Loans to be prepaid at the Applicable Discount on such date, (III) each Participating Lender of the aggregate principal amount and tranches of such Lender to be prepaid at the Applicable Discount on such date, and (IV) if applicable, each Identified Participating Lender of the Discount Range Proration.  Each determination by the Auction Agent of the amounts stated in the foregoing notices to the relevant Company Party and Lenders shall be conclusive and binding for all purposes absent manifest error.  The payment amount specified in such notice to the Company Party shall be due and payable by such Company Party on the Discounted Prepayment Effective Date in accordance with Section 2.05(a)(v)(F) below (subject to Section 2.05(a)(v)(J) below).

(D)    (1) Any Company Party may from time to time solicit Solicited Discounted Prepayment Offers by providing the Auction Agent with five Business Days' notice in the form of a Solicited Discounted Prepayment Notice (or such later notice specified therein); *provided* that (I) any such solicitation shall be extended, at the sole discretion of such Company Party, to (x) each Lender and/or (y) each Lender with respect to any Term Loans on an individual tranche basis, (II) any such notice shall specify the maximum aggregate amount of the Term Loans (the "**Solicited Discounted Prepayment Amount**") and

45

the tranche or tranches of Term Loans the Borrower is willing to prepay at a discount (it being understood that different Solicited Discounted Prepayment Amounts may be offered with respect to different tranches of Term Loans and, in such event, each such offer will be treated as separate offer pursuant to the terms of this Section 2.05(a)(v)(D)), (III) the Solicited Discounted Prepayment Amount shall be in an aggregate amount not less than $5,000,000 and whole increments of $1,000,000 in excess thereof and (IV) unless rescinded, each such solicitation by a Company Party shall remain outstanding through the Solicited Discounted Prepayment Response Date.  The Auction Agent will promptly provide each Lender with a copy of such Solicited Discounted Prepayment Notice and a form of the Solicited Discounted Prepayment Offer to be submitted by a responding Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m. New York City time on the third Business Day after the date of delivery of such notice to such Lenders (the "**Solicited Discounted Prepayment Response Date**").  Each Lender's Solicited Discounted Prepayment Offer shall (x) be irrevocable, (y) remain outstanding until the Acceptance Date and (z) specify both a discount to par (the "**Offered Discount**") at which such Lender is willing to allow prepayment of its then outstanding Term Loan and the maximum aggregate principal amount and tranches of such Term Loans (the "**Offered Amount**") such Lender is willing to have prepaid at the Offered Discount.  Any Lender whose Solicited Discounted Prepayment Offer is not received by the Auction Agent by the Solicited Discounted Prepayment Response Date shall be deemed to have declined prepayment of any of its Term Loans at any discount.

(2)     The Auction Agent shall promptly provide the relevant Company Party with a copy of all Solicited Discounted Prepayment Offers received on or before the Solicited Discounted Prepayment Response Date.  Such Company Party shall review all such Solicited Discounted Prepayment Offers and select the largest of the Offered Discounts specified by the relevant responding Lenders in the Solicited Discounted Prepayment Offers that is acceptable to the Company Party (the "**Acceptable Discount**"), if any.  If the Company Party elects to accept any Offered Discount as the Acceptable Discount, then as soon as practicable after the determination of the Acceptable Discount, but in no event later than by the fifth Business Day after the date of receipt by such Company Party from the Auction Agent of a copy of all Solicited Discounted Prepayment Offers pursuant to the first sentence of this clause (2) (the "**Acceptance Date**"), the Company Party shall submit an Acceptance and Prepayment Notice to the Auction Agent setting forth the Acceptable Discount.  If the Auction Agent shall fail to receive an Acceptance and Prepayment Notice from the Company Party by the Acceptance Date, such Company Party shall be deemed to have rejected all Solicited Discounted Prepayment Offers.

(3)     Based upon the Acceptable Discount and the Solicited Discounted Prepayment Offers received by the Auction Agent by the Solicited Discounted Prepayment Response Date, within five Business Days after receipt of an Acceptance and Prepayment Notice (the "**Discounted Prepayment Determination Date**"), the Auction Agent will determine (with the consent of such Company Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the aggregate principal amount and the tranches of Term Loans (the "**Acceptable Prepayment Amount**") to be prepaid by the relevant Company Party at the Acceptable Discount in accordance with this Section 2.05(a)(v)(D).  If the Company Party elects to accept any Acceptable Discount, then the Company Party agrees to accept all Solicited Discounted Prepayment Offers received by Auction Agent by the Solicited Discounted Prepayment Response Date, in the order from largest Offered Discount to smallest Offered Discount, up to and including the Acceptable Discount.  Each Lender that has submitted a Solicited Discounted Prepayment Offer with an Offered Discount that is greater than or equal

46

WEIL:\97507497\16\10143.0003

to the Acceptable Discount shall be deemed to have irrevocably consented to prepayment of Term Loans equal to its Offered Amount (subject to any required pro-rata reduction pursuant to the following sentence) at the Acceptable Discount (each such Lender, a "**Qualifying Lender**").  The Company Party will prepay outstanding Term Loans pursuant to this Section 2.05(a)(v)(D) to each Qualifying Lender in the aggregate principal amount and of the tranches specified in such Lender's Solicited Discounted Prepayment Offer at the Acceptable Discount; *provided* that if the aggregate Offered Amount by all Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount exceeds the Solicited Discounted Prepayment Amount, prepayment of the principal amount of the Term Loans for those Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount (the "**Identified Qualifying Lenders**") shall be made *pro rata* among the Identified Qualifying Lenders in accordance with the Offered Amount of each such Identified Qualifying Lender and the Auction Agent (with the consent of such Company Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "**Solicited Discount Proration**").  On or prior to the Discounted Prepayment Determination Date, the Auction Agent shall promptly notify (I) the relevant Company Party of the Discounted Prepayment Effective Date and Acceptable Prepayment Amount comprising the Discounted Term Loan Prepayment and the tranches to be prepaid, (II) each Lender of the Discounted Prepayment Effective Date, the Acceptable Discount, and the Acceptable Prepayment Amount of all Term Loans and the tranches to be prepaid at the Applicable Discount on such date, (III) each Qualifying Lender of the aggregate principal amount and the tranches of such Lender to be prepaid at the Acceptable Discount on such date, and (IV) if applicable, each Identified Qualifying Lender of the Solicited Discount Proration.  Each determination by the Auction Agent of the amounts stated in the foregoing notices to such Company Party and Lenders shall be conclusive and binding for all purposes absent manifest error.  The payment amount specified in such notice to such Company Party shall be due and payable by such Company Party on the Discounted Prepayment Effective Date in accordance with Section 2.05(a)(v)(F) below (subject to Section 2.05(a)(v)(J) below).

(E)     In connection with any Discounted Term Loan Prepayment, the Company Parties and the Lenders acknowledge and agree that the Auction Agent may require as a condition to any Discounted Term Loan Prepayment, the payment of customary fees and expenses from a Company Party in connection therewith.

(F)     If any Term Loan is prepaid in accordance with Sections 2.05(a)(v)(B) through 2.05(a)(v)(D) above, a Company Party shall prepay such Term Loans on the Discounted Prepayment Effective Date.  The relevant Company Party shall make such prepayment to the Administrative Agent, for the account of the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable, at the Administrative Agent's Office in immediately available funds not later than 11:00 a.m. New York City time on the Discounted Prepayment Effective Date and all such prepayments shall be applied to the remaining principal installments of the relevant tranche of Loans being prepaid on a *pro rata* basis across such installments.  The Term Loans so prepaid shall be accompanied by all accrued and unpaid interest on the par principal amount so prepaid up to, but not including, the Discounted Prepayment Effective Date.  Each prepayment of the outstanding Term Loans pursuant to this Section 2.05(a)(v) shall be paid to the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable, and shall be applied to the relevant Loans of such Lenders in accordance with their respective Pro Rata Share.  The aggregate principal amount of the tranches and installments of the

47

relevant Term Loans outstanding shall be deemed reduced by the full par value of the aggregate principal amount of the tranches of Term Loans prepaid on the Discounted Prepayment Effective Date in any Discounted Term Loan Prepayment.  In connection with each prepayment pursuant to this Section 2.05(a)(v), each Lender participating in any prepayment described in this Section 2.05(a)(v) acknowledges and agrees that in connection therewith, (1) the Borrower or any Company Party then may have, and later may come into possession of, information regarding the Borrower, and its Affiliates not known to such Lender and that may be material to a decision by such Lender to participate in such prepayment (including Material Non-Public Information) ("**Excluded Information**"), (2) such Lender has independently and, without reliance on the Borrower, any of its Subsidiaries, the Administrative Agent or any of their respective Affiliates, made its own analysis and determination to participate in such prepayment notwithstanding such Lender's lack of knowledge of the Excluded Information, (3) none of the Company Parties or any of their respective Affiliates shall be required to make any representation that it is not in possession of Excluded Information and all parties to the relevant transaction shall render customary "big boy" disclaimer letters, and (4) none of the Borrower, its Subsidiaries, the Administrative Agent or any of their respective Affiliates shall have any liability to such Lender, and such Lender hereby waives and releases, to the extent permitted by law, any claims such Lender may have against the Borrower, its Subsidiaries, the Auction Agent, the Administrative Agent and their respective Affiliates, under applicable laws or otherwise, with respect to the nondisclosure of the Excluded Information.

(G)     To the extent not expressly provided for herein, each Discounted Term Loan Prepayment shall be consummated pursuant to procedures consistent with the provisions in this Section 2.05(a)(v), established by the Auction Agent acting in its reasonable discretion and as reasonably agreed by the Borrower.

(H)     [Reserved].

(I)     Each of the Company Parties and the Lenders acknowledge and agree that the Auction Agent may perform any and all of its duties under this Section 2.05(a)(v) by itself or through any Affiliate of the Auction Agent and expressly consents to any such delegation of duties by the Auction Agent to such Affiliate and the performance of such delegated duties by such Affiliate.  The exculpatory provisions pursuant to this Agreement shall apply to each Affiliate of the Auction Agent and its respective activities in connection with any Discounted Term Loan Prepayment provided for in this Section 2.05(a)(v) as well as activities of the Auction Agent.

(J)     Each Company Party shall have the right, by written notice to the Auction Agent, to revoke in full (but not in part) its offer to make a Discounted Term Loan Prepayment and rescind the applicable Specified Discount Prepayment Notice, Discount Range Prepayment Notice or Solicited Discounted Prepayment Notice therefor at its discretion at any time on or prior to the Specified Discount Prepayment Response Date, Discount Range Prepayment Response Date or Solicited Discount Prepayment Response Date, as applicable (and if such offer is revoked pursuant to the preceding clauses, any failure by such Company Party to make any prepayment to a Lender, as applicable, pursuant to this Section 2.05(a)(v) shall not constitute a Default or Event of Default under Section 8.01 or otherwise).

(vi)     In connection with any prepayment pursuant to this Section 2.05(a) consummated prior to the third anniversary of the Closing Date, the Borrower shall pay to each Lender the applicable fee required by Section 2.09(b).

48

WEIL:\97507497\16\10143.0003

(b)      Mandatory.

(i)      Within 30 Days after March 31 of each year during the term of this Agreement (commencing with March 31, 2021), to the extent the Loan Parties have Available Cash in excess of $10,000,000, the Borrower shall prepay the Term Loans in an amount aggregate equal such excess above $10,000,000.

(ii)      If (1) the Borrower or any Subsidiary of the Borrower Disposes of any property or assets (other than any Disposition of any property or assets permitted by Sections 7.05(a), (b), (c), (d), (e), (f), (g), (h), (i), (l), (m) (except as set forth in the proviso thereof and except to the extent such property is subject to a Mortgage), (n), (p), (q), (r) and (u)), or (2) any Casualty Event occurs, which results in the realization or receipt by the Borrower or Subsidiary of Net Proceeds, subject to Section 2.05(b)(vi), the Borrower shall cause to be prepaid on or prior to the date which is 5 Business Days after the date of the realization or receipt by the Borrower or any Subsidiary of such Net Proceeds, an aggregate principal amount of Term Loans in an amount equal to 100% of all such Net Proceeds; *provided* that if at any time such prepayment would be required hereunder with respect to any ABL Priority Collateral at any time when any ABL Credit Agreement is in effect, the Net Proceeds of any such Disposition or Casualty Event that relate or are attributable to any such ABL Priority Collateral shall not be required to be applied to the prepayment of the Term Loans hereunder to the extent such Net Proceeds are required to prepay or repay the ABL Loans in order to remain in compliance with the "Borrowing Base" (as defined in the ABL Credit Agreement) under the ABL Credit Agreement (or any documentation governing any ABL Loans).

(iii)      If the Borrower or any Subsidiary incurs or issues any Indebtedness after the Closing Date not permitted to be incurred or issued pursuant to Section 7.03, the Borrower shall cause to be prepaid an aggregate principal amount of Term Loans in an amount equal to 100% of all Net Proceeds received therefrom on or prior to the date which is five Business Days after the receipt by the Borrower or such Subsidiary of such Net Proceeds.  In connection with any prepayment under this Section 2.05(b)(iii) is consummated in respect of all or any portion of the Term Loans on or prior to the third anniversary of the Closing Date, the Borrower shall pay to each Lender the applicable fee required by Section 2.09(b).

(iv)      [reserved].

(v)      [reserved].

(vi)      Notwithstanding any other provisions of this Section 2.05, (i) to the extent that the repatriation to the United States of any or all of the Net Proceeds of any Disposition by a Foreign Subsidiary ("**Foreign Disposition**") or the Net Proceeds of any Casualty Event incurred by a Foreign Subsidiary ("**Foreign Casualty Event**") would be (x) prohibited or delayed by applicable local law or (y) restricted by applicable material constituent documents, including as a result of minority ownership (so long as such restrictions were not implemented for the purpose of avoiding such mandatory prepayment requirements), an amount equal to the Net Proceeds that would be so affected were the Borrower to attempt to repatriate such cash will not be required to be applied to repay Term Loans at the times provided in this Section 2.05 so long, but only so long, as the applicable local law or applicable material constituent documents would not otherwise permit repatriation to the United States (Holdings, Intermediate Holdings, the Borrower and its Subsidiaries hereby agree to use all commercially reasonable efforts to overcome or eliminate any such restrictions on repatriation, even if the Borrower does not intend to actually repatriate such cash, so that an amount equal to the full amount of such Net Proceeds will otherwise be subject to repayment under this Section 2.05), and if within one year following the date on which the respective prepayment would otherwise have been required such repatriation of any of such affected Net Proceeds is permissible under the applicable local law or applicable material constituent documents, even if such cash is not actually repatriated at such time, an amount equal to the amount of the Net Proceeds will be promptly (and in any event not later than five Business Days) applied (net of an amount equal to the additional taxes of the Borrower, its Subsidiaries and the direct and indirect holders of Equity Interests in the Borrower that would be payable or reserved against and any

49

WEIL:\97507497\16\10143.0003

additional costs that would be incurred as a result of a repatriation, whether or not a repatriation actually occurs) by the Borrower to the repayment of the Term Loans pursuant to this Section 2.05 and (ii) to the extent that the Borrower has determined in good faith that repatriation of any of or all the Net Proceeds of any Foreign Disposition or Foreign Casualty Event would have adverse tax cost consequences (including the imposition of withholding Taxes) with respect to such Net Proceeds, an amount equal to such Net Proceeds that would be so affected will not be subject to repayment under this Section 2.05; *provided*, that in the case of each of clauses (i) and (ii), such nonpayment shall not constitute an Event of Default (and such amounts shall be available for working capital purposes of the Borrower and the Subsidiaries, subject to the prepayment provisions in this Section 2.05(b)(vi)).  For the avoidance of doubt, nothing in this Section 2.05 shall require the Borrower to cause any amounts to be repatriated to the United States (whether or not such amounts are used in or excluded from the determination of the amount of any mandatory prepayments hereunder).

(vii)    Each prepayment of Term Loans pursuant to this Section 2.05(b) shall be applied ratably to the Term Loans then outstanding; (B) each prepayment pursuant to clauses (i), (ii) and (iii) of this Section 2.05(b) shall be applied to the scheduled installments of principal thereof following the date of such prepayment in direct order of maturity; and (C) each such prepayment shall be paid to the Lenders in accordance with their respective Pro Rata Shares of such prepayment.

(viii)    The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made by the Borrower pursuant to clauses (i), (ii) and (iii) of this Section 2.05(b) at least three Business Days prior to the date of such prepayment.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the aggregate amount of such prepayment to be made by the Borrower.  The Administrative Agent will promptly notify each Lender of the contents of the Borrower's prepayment notice and of such Lender's Pro Rata Share of the prepayment.  Each Lender may reject all or a portion of its Pro Rata Share of any mandatory prepayment (such declined amounts, the "**Declined Proceeds**") of Term Loans required to be made pursuant to clauses (i), (ii) and (iii) of this Section 2.05(b) by providing written notice (each, a "**Rejection Notice**") to the Administrative Agent and the Borrower no later than 5:00 p.m. New York City time one Business Day after the date of such Lender's receipt of notice from the Administrative Agent regarding such prepayment; *provided*, *however*, in no event may the a Lender reject a prepayment that represents a refinancing of the Total Outstandings.  Each Rejection Notice from a given Lender shall specify the principal amount of the mandatory repayment of Term Loans to be rejected by such Lender.  If a Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Term Loans to be rejected, any such failure will be deemed an acceptance of such mandatory prepayment of Term Loans.  Subject to proviso at the end of Section 2.05(b)(ii), any Declined Proceeds shall be offered by the Borrower to the Second Lien Administrative Agent for the benefit of the lenders under the Second Lien Term Facility in accordance with the Second Lien Credit Agreement.  To the extent such lenders under the Second Lien Term Facility elect to decline their Pro Rata Share of such Declined Proceeds, any Declined Proceeds remaining thereafter shall be retained by the Borrower.

(c)    *Interest, Funding Losses, Etc*.  All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a Eurocurrency Rate Loan on a date prior to the last day of an Interest Period therefor, any amounts owing in respect of such Eurocurrency Rate Loan pursuant to Section 3.05.

**Section 2.06**    **[Reserved].**

**Section 2.07**    **Repayment of Loans**. The Borrower shall repay to the Administrative Agent for the ratable account of the Lenders (A) on the last Business Day of each March, June, September and December, commencing with the fiscal quarter ending closest to March 31, 2022, an aggregate principal amount equal to 0.25% of the aggregate principal amount of all Term Loans outstanding on the Closing Date (which payments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth

WEIL:\97507497\16\10143.0003

in Section 2.05 or Section 10.07 to the extent such Indebtedness is cancelled) and (B) on the Maturity Date for the Term Loans, the aggregate principal amount of all Term Loans outstanding on such date.

**Section 2.08** **Interest**. (a) Subject to the provisions of Section 2.08(b), (i) each Eurocurrency Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurocurrency Rate, for such Interest Period *plus* the Applicable Rate and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate *plus* the Applicable Rate;.

(b) During the continuance of an Event of Default, at the election of the Required Lenders, the Borrower shall pay interest on the Total Outstandings and any other overdue amounts owing by it hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued and unpaid interest on such amounts (including interest on past due interest) shall be due and payable upon written demand.

(c) Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto, on the Maturity Date and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law; provided that, the Borrower may, in its sole discretion, by delivering a written notice thereof to the Administrative Agent by 11:00 a.m. at least three (3) Business Days prior to the commencement of the applicable Interest Period with respect to any Term Loan (or such later time as the Required Lenders may agree), elect: (i) to pay a portion of the Applicable Rate equal to (and not less than or greater than) (A) 4.0% in the case of Eurocurrency Rate Loans and (B) 3.0% in the case of Base Rate Loans of such interest in kind by adding such amounts so elected to the aggregate outstanding principal balance of the Term Loans (such election, a "**PIK Election**") or (b) to pay all of the Applicable Rate in cash (such election, a "**Cash Election**"), provided, further, that, other than at the election of the Required Lenders during the continuance of an Event of Default (which election shall govern and control over any election by the Borrower), absent a written notification to the Administrative Agent that the Borrower has chosen to make a Cash Election in accordance with this Section 2.08(c) with respect to any Interest Period, the Borrower shall be deemed to have delivered a written notice of PIK Election with respect to such Interest Period concurrently with the delivery of the Committed Loan Notice applicable thereto in the maximum principal amount of the Term Loans that are subject to such Committed Loan Notice. The Borrower hereby makes a PIK Election for the period beginning on the Closing Date until the first Interest Payment Date.

**Section 2.09** **Fees**.

(a) The Borrower shall pay to the Administrative Agent such fees (including, but not limited to, administrative agent fees) as shall have been separately agreed upon in writing, including in the Agent Fee Letter, in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the Administrative Agent).

(b) *Prepayment Premium*. (i) In the event that, prior to the third anniversary of the Closing Date, (A) the Borrower prepays any Term Loans pursuant to Section 2.05(a), (B) the Borrower prepays or refinances any Term Loans pursuant to Section 2.05(b)(iii) or (C) the outstanding principal amount of the Term Loans shall become due pursuant to Section 8.02, in each case, the Borrower shall pay to the Administrative Agent, for the ratable account of each of the Lenders, a premium of (x) 4.00% of the aggregate principal amount of the Term Loans so prepaid, refinanced or accelerated prior to the first anniversary of the Closing Date *plus* the Make-Whole Amount, (y) 3.00% of the aggregate principal amount of the Term Loans so prepaid, refinanced or accelerated on or after the first anniversary of the Closing Date but prior to the second anniversary of the Closing Date or (z) 2.00% of the

51

WEIL:\97507497\16\10143.0003

aggregate principal amount of the Term Loans so prepaid, refinanced or accelerated on or after the second anniversary of the Closing Date but prior to the third anniversary of the Closing Date. It is agreed, for the avoidance of doubt, that no prepayment premium shall be payable on or after the third anniversary of the Closing Date. All such amounts payable pursuant to this Section 2.09(b) shall be due and payable on the date of the applicable prepayment, refinancing or acceleration.

(c)      THE LOAN PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE AMOUNTS SPECIFIED IN SECTION 2.09(b) IN CONNECTION WITH ANY ACCELERATION, IN EACH CASE, TO THE MAXIMUM EXTENT SUCH WAIVER IS PERMITTED UNDER APPLICABLE LAW. The Loan Parties expressly agree that (i) the amounts specified in Section 2.09(b) are reasonable and the product of an arm's length transaction between sophisticated business people, ably represented by counsel, (ii) the amounts specified in Section 2.09(b) shall be payable notwithstanding the then prevailing market rates at the time payment is made, (iii) there has been a course of conduct between Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay the amounts specified in Section 2.09(b), (iv) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this provision, (v) their agreement to pay the amounts specified in Section 2.09(b) is a material inducement to the Lenders to accept the Term Loans pursuant to the Prepackaged Plan, and (vi) the amounts specified in Section 2.09(b) represent a good faith, reasonable estimate and calculation of the lost profits or damages of the Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to the Lenders or profits lost by the Lenders as a result of any early optional repayment, mandatory prepayment or early repayment due to acceleration of the Term Loans, as the case may be.

**Section 2.10    Computation of Interest and Fees**.  All computations of interest for Base Rate Loans when the Base Rate is determined in accordance with clause (b) of the definition thereof shall be made on the basis of a year of 365 days, or 366 days, as applicable, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**Section 2.11    Evidence of Indebtedness**.  (a)  The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for this purpose as a non-fiduciary agent for the Borrower, in each case in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be *prima facie* evidence absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender, the Borrower shall execute and deliver to such Lender a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b)      [Reserved].

52

(c)      Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.11(a), and by each Lender in its account or accounts pursuant to Section 2.11(a) shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

**Section 2.12**      **Payments Generally**.   (a)  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.   Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office in Dollars and in Same Day Funds not later than 2:00 p.m. New York City time on the date specified herein.   The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share provided for under this Agreement) of such payment in like funds as received by wire transfer to such Lender's applicable Lending Office.   All payments received by the Administrative Agent after 2:00 p.m. New York City time shall in each case be deemed received (in the Administrative Agent's sole discretion) on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)      Except as otherwise provided herein, if any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; *provided* that, if such extension would cause payment of interest on or principal of Eurocurrency Rate Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

(c)      Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder, that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto.  If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then:

(i)      if the Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in Same Day Funds at the applicable Overnight Rate from time to time in effect; and

(ii)      if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Same Day Funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "**Compensation Period**") at a rate per annum equal to the applicable Overnight Rate from time to time in effect.   When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing.  If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to

53

the applicable Borrowing.  Nothing herein shall be deemed to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(c) shall be conclusive, absent manifest error.

(d)      [Reserved].

(e)      [Reserved].

(f)      [Reserved].

(g)      Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03.  If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may (to the fullest extent permitted by mandatory provisions of applicable Law), but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the Outstanding Amount of all Loans outstanding at such time in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

(h)      Amounts to be applied to the prepayment of Term Loans in connection with any mandatory prepayments by the Borrower of the Term Loans pursuant to Section 2.05(b) shall be applied, as applicable, on a *pro rata* basis to the then outstanding Term Loans being prepaid irrespective of whether such outstanding Term Loans are Base Rate Loans or Eurocurrency Rate Loans; *provided* that if no Lenders exercise the right to waive a given mandatory prepayment of the Term Loans pursuant to Section 2.05(b)(viii), then, with respect to such mandatory prepayment, the amount of such mandatory prepayment shall be applied first to reduce outstanding Base Rate Loans.  Any amounts remaining after each such application shall be applied to prepay Eurocurrency Rate Loans.

Section 2.13      **Sharing of Payments**.  If, other than as provided elsewhere herein, any Lender shall obtain on account of the Loans made by it, any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase (in Dollars) from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, *pro rata* with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon.  For the avoidance of doubt, the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement as in effect from time to time (including the application of funds arising from the existence of a Defaulting Lender) or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder.  The Borrower agrees that any Lender so purchasing a participation from another Lender

54

may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to <u>Section 10.09</u>) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this <u>Section 2.13</u> and will in each case notify the Lenders following any such purchases or repayments.  Each Lender that purchases a participation pursuant to this <u>Section 2.13</u> shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

**Section 2.14**     **[Reserved]**.

**Section 2.15**     **[Reserved]**.

**Section 2.16**     **[Reserved]**.

**Section 2.17**     **Defaulting Lenders**.

(a)     *Adjustments*.   Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law, such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in <u>Section 10.01</u>.

(b)     *Defaulting Lender Cure*.  If the Borrower and the Administrative Agent, agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will cease to be a Defaulting Lender.

**Section 2.18**     **Effect of Benchmark Transition Event**.

(a)     *Benchmark Replacement*.  Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent (with the consent of the Required Lenders) and the Borrower may amend this Agreement to replace the Eurocurrency Rate with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders accept such amendment. No replacement of Eurocurrency Rate with a Benchmark Replacement pursuant to this <u>Section 2.18</u> will occur prior to the applicable Benchmark Transition Start Date.

(b)     *Benchmark Replacement Conforming Changes*.   In connection with the implementation of a Benchmark Replacement, the Administrative Agent will join with the Borrower in any amendment implementing have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement except as may be required by the definition of Benchmark Replacement Conforming Changes; provided that the Administrative Agent shall not be obligated to enter into any such amendment that might expose it to personal liability and in the event

<center>55</center>

of any ambiguity shall be entitled to seek the consent of the Required Lenders and shall have no liability to any Person for any delay caused by such consent.

(c)       *Notices, Standards for Decisions and Determinations*.  Each Lender will promptly notify the Borrower, the Administrative Agent and the other Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Lenders pursuant to this Section 2.18, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.18.

(d)       *Benchmark Unavailability Period*.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During any Benchmark Unavailability Period, the component of Base Rate based upon Eurocurrency Rate will not be used in any determination of Base Rate.

(e)       *Certain Defined Terms*.  As used in this Section 2.18:

"**Benchmark Replacement**" means the sum of: (a) the alternate benchmark rate (which may include Term SOFR) that has been selected by the Required Lenders and the Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to Eurocurrency Rate for U.S. dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; *provided* that, if the Benchmark Replacement as so determined would be less than zero, the Benchmark Replacement will be deemed to be zero for the purposes of this Agreement.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of Eurocurrency Rate with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Required Lenders and the Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of Eurocurrency Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of Eurocurrency Rate with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time.

"**Benchmark Replacement Conforming Changes**" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Borrower determines in good faith may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Borrower or the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Borrower and Required Lenders determine that no market practice for the

56

administration of the Benchmark Replacement exists, in such other manner of administration as the Borrower determines in good faith is reasonably necessary in connection with the administration of this Agreement).

"**Benchmark Replacement Date**" means the earlier to occur of the following events with respect to Eurocurrency Rate:

(1)       in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of Eurocurrency Rate permanently or indefinitely ceases to provide Eurocurrency Rate; or

(2)       in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to Eurocurrency Rate:

(1)       a public statement or publication of information by or on behalf of the administrator of Eurocurrency Rate announcing that such administrator has ceased or will cease to provide Eurocurrency Rate, permanently or indefinitely, *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide Eurocurrency Rate;

(2)       a public statement or publication of information by the regulatory supervisor for the administrator of Eurocurrency Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for Eurocurrency Rate, a resolution authority with jurisdiction over the administrator for Eurocurrency Rate or a court or an entity with similar insolvency or resolution authority over the administrator for Eurocurrency Rate, which states that the administrator of Eurocurrency Rate has ceased or will cease to provide Eurocurrency Rate permanently or indefinitely, *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide Eurocurrency Rate; or

(3)       a public statement or publication of information by the regulatory supervisor for the administrator of Eurocurrency Rate announcing that Eurocurrency Rate is no longer representative.

"**Benchmark Transition Start Date**" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the [90th] day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than [90] days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Required Lenders, as applicable, by notice to the Borrower, the Administrative Agent and the Lenders.

"**Benchmark Unavailability Period**" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to Eurocurrency Rate and solely to the extent that Eurocurrency Rate has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced Eurocurrency Rate for all purposes hereunder in accordance with Section 2.18 and (y) ending at the time that a Benchmark Replacement has replaced Eurocurrency Rate for all purposes hereunder pursuant to Section 2.18.

"**Early Opt-in Election**" means the occurrence of:

(1)       a notification by the Required Lenders to the Administrative Agent (with a copy to the Borrower) that the Required Lenders have determined that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in this Section 2.18, are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace Eurocurrency Rate, and

57

WEIL:\97507497\16\10143.0003

(2)      the election by the Required Lenders to declare that an Early Opt-in Election has occurred and the provision by the Required Lenders of written notice of such election to the Administrative Agent (with a copy to the Borrower).

"**Federal Reserve Bank of New York's Website**" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"**Relevant Governmental Body**" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"**SOFR**" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"**Term SOFR**" means the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"**Unadjusted Benchmark Replacement**" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

## ARTICLE III
## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

**Section 3.01     Taxes**.  (a)  Except as provided in this Section 3.01, any and all payments made by or on account of the Borrower or any Guarantor under any Loan Document shall be made free and clear of and without deduction for any Taxes, except to the extent required by any Laws.  If the Borrower, any Guarantor or other applicable withholding agent shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Loan Document to the Administrative Agent or any Lender, (i) if the Tax in question is an Indemnified Tax or Other Tax, the sum payable by the Borrower or any Guarantor shall be increased as necessary so that after all required deductions for Indemnified Taxes or Other Taxes have been made (including deductions applicable to additional sums payable under this Section 3.01), each Lender (or, in the case of a payment made to the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions for Indemnified Taxes or Other Taxes been made, (ii)  the applicable withholding agent shall make such deductions, (iii) the applicable withholding agent shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Laws, and (iv) within 30 days after the date of such payment (or, if receipts or evidence are not available within 30 days, as soon as possible thereafter), if the Borrower or any Guarantor is the applicable withholding agent, it shall furnish to the Administrative Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof or other evidence acceptable to the Administrative Agent or Lender.

(b)      In addition, the Borrower agrees to pay any and all present or future stamp, court or documentary Taxes and any other excise, property, intangible or mortgage recording Taxes, imposed by any Governmental Authority, which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document excluding, in each case, any such Tax imposed as a result of the Administrative Agent's or any Lender's Assignment and Assumption, grant of a participation, transfer or assignment to or designation of a new applicable Lending Office or other office for receiving payments under any Loan Document (collectively, "**Assignment Taxes**") if such Assignment Tax is imposed as a result of a present or former connection of the assignor or assignee with the jurisdiction imposing such Assignment Tax (other than any connection arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, receiving payments under, and/or enforcing or receiving or perfecting a security interest under any Loan Document), except for Assignment Taxes resulting from assignment or

58

participation that is requested or required in writing by the Borrower (all such non-excluded taxes described in this Section 3.01(b) being hereinafter referred to as "**Other Taxes**").

(c)     The Borrower and each Guarantor agree to indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for (i) the full amount of Indemnified Taxes and Other Taxes paid or payable by the Administrative Agent or such Lender (including Indemnified Taxes or Other Taxes imposed on or attributable to amounts payable under this Section 3.01) and (ii) any expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the Governmental Authority.  A certificate as to the amount of such payment or liability prepared in good faith and delivered by the Administrative Agent or Lender (or by the Administrative on behalf of such Lender), accompanied by a written statement thereof setting forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) the basis and calculation of such amounts shall be conclusive absent manifest error.

(d)     <u>Indemnification by the Lenders</u>.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.07(e) relating to the maintenance of a Participant Register and (iii) any Taxes excluded from the definition of Indemnified Taxes that are attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)     Each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Law or reasonably requested by the Borrower or the Administrative Agent certifying as to any entitlement of such Lender to an exemption from, or reduction in, any applicable withholding Tax with respect to any payments to be made to such Lender or Agent under the Loan Documents.  Each such Lender and the Administrative Agent shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documentation required below in this Section 3.01(e)) obsolete, expired or inaccurate in any material respect, deliver promptly and on or before the date such documentation expires, becomes obsolete or inaccurate to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and the Administrative Agent in writing of its inability to do so.  In addition, each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with such other documentation prescribed by Law or reasonably requested by the Borrower or Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether such Lender or Administrative Agent is subject to backup withholding or information reporting requirements.  Notwithstanding any other provision of this Section 3.01(e), a Lender or the Administrative Agent shall not be required to deliver any form pursuant to this Section 3.01(e) that such Lender or the Administrative is not legally eligible to deliver.  Without limiting the foregoing:

(i)     Each Lender that is a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower

59

WEIL:\97507497\16\10143.0003

or the Administrative Agent) two properly completed and duly signed original copies of Internal Revenue Service Form W-9 certifying that such Lender is exempt from federal backup withholding.

(ii)     Each Lender that is not a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(A)     two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN (or any successor forms) claiming eligibility for the benefits of an income tax treaty to which the United States is a party,

(B)     two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)     in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (A) a certificate substantially in the form of Exhibit H hereto (any such certificate a "**United States Tax Compliance Certificate**") and (B) two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN (or any successor forms),

(D)     to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or has sold a participation), Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, Form W-8BEN, United States Tax Compliance Certificate, Form W-9, Form W-8IMY or any other required information from each beneficial owner, as applicable (*provided* that, if the Lender is a partnership (and not a participating Lender) and if one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

(E)     two properly completed and duly signed original copies of any other form prescribed by applicable U.S. federal income tax laws (including the Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, United States federal withholding tax on any payments to such Lender under the Loan Documents.

(iii)     If the Administrative Agent is a "United States person" (as defined in Section 7701(a)(30) of the Code), it shall deliver to the Borrower two properly completed and duly signed original copies of Internal Revenue Service Form W-9 with respect to fees received on its own behalf, certifying that the Administrative Agent is exempt from federal backup withholding.

(iv)     If the Administrative Agent is not a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI with respect to fees received on its own behalf.

(v)     If a payment made to a Lender or the Administrative Agent under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender or the Administrative Agent were to fail to comply with the applicable reporting requirements of FATCA, such Lender or the Administrative Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by Laws and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Laws and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender or the Administrative Agent has or has not complied with such Person's obligations under FATCA and, if

60

necessary, to determine the amount to deduct and withhold from such payment.  Solely for purposes of this Section 3.01(e)(v), "FATCA" shall include any amendments made to FATCA after the Closing Date.

(f)       The Administrative Agent or any Lender claiming any additional amounts payable pursuant to this Section 3.01 shall use its commercially reasonable efforts (subject to such Lender's or Administrative Agent's overall internal policies of general application and legal and regulatory restrictions) to mitigate or reduce the additional amounts payable, which commercially reasonable efforts may include a change in the jurisdiction of its Lending Office (or any other measures reasonably requested by the Borrower) if such a change or other measures would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender.

(g)       If any Lender or Agent determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Indemnified Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by a Loan Party pursuant to this Section 3.01, it shall promptly remit such refund to such Loan Party (but only to the extent of indemnification or additional amounts paid by the Loan Party under this Section 3.01 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including any Taxes) of the Lender or Administrative Agent, as the case may be, and without interest (other than any interest paid by the relevant taxing authority with respect to such refund net of any Taxes payable by the Administrative Agent or any Lender on such interest); *provided* that the Loan Parties, upon the request of the Lender or Administrative Agent, as the case may be, agree promptly to return such refund (*plus* any penalties, interest or other charges imposed by the relevant taxing authority) to such party in the event such party is required to repay such refund to the relevant taxing authority.  This Section 3.01 shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to Taxes that it deems confidential) to any Loan Party or any other person.

**Section 3.02      Illegality**.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Eurocurrency Rate Loans, or to determine or charge interest rates based upon the Eurocurrency Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, in each case after the Closing Date then, on written notice thereof by such Lender to the Borrower and the Administrative Agent, any obligation of such Lender to make or continue Eurocurrency Rate Loans or to convert Base Rate Loans to Eurocurrency Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower shall promptly following written demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all applicable Eurocurrency Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Rate Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurocurrency Rate Loans.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment or conversion under Section 3.05.  Each Lender agrees to use commercially reasonable efforts (subject to such Lender's overall internal policies of general application and legal and regulatory restrictions) to designate a different Lending Office if such designation will avoid the need for such notice, will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender.

**Section 3.03      Inability to Determine Rates**. If the Administrative Agent or the Required Lenders determine after the Closing Date that for any reason adequate and reasonable means do not exist for determining the applicable Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan, or that the Eurocurrency Rate for any requested Interest Period with respect to a

61

proposed Eurocurrency Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that Dollar deposits are not being offered to banks in the London interbank eurodollar, or other applicable, market for the applicable amount and the Interest Period of such Eurocurrency Rate Loan, the Administrative Agent will promptly so notify the Borrower in writing and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Eurocurrency Rate Loans or to convert Base Rate Loans to Eurocurrency Rate Loans shall be suspended and (y) in the event of a determination described in the preceding sentence with respect to the Eurocurrency Rate component of the Base Rate, the utilization of the Eurocurrency Rate component in determining the Base Rate shall be suspended, in each case, until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of such Eurocurrency Rate Loans or, failing that, will be deemed to have converted such request, if applicable, into a request for a Borrowing of Base Rate Loans in the amount specified therein.

**Section 3.04**   **Increased Cost and Reduced Return; Capital Adequacy; Eurocurrency Rate Loan Reserves**.  (a)  If any Lender reasonably determines that as a result of the introduction of or any change in or in the interpretation of any Law, in each case after the Closing Date, or such Lender's compliance therewith, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any Eurocurrency Rate Loans, or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.04(a) any such increased costs or reduction in amount resulting from (i) Indemnified Taxes or Other Taxes indemnified pursuant to Section 3.01, or any Taxes excluded from the definition of (x) "Indemnified Taxes" or (y) "Other Taxes" or (ii) reserve requirements contemplated by Section 3.04(c)) and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining the Eurocurrency Rate Loan (or of maintaining its obligations to make any Loan), or to reduce the amount of any sum received or receivable by such Lender, then from time to time within 15 Business Days after written demand by such Lender setting forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) such increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction. Notwithstanding anything herein to the contrary, for all purposes under this Agreement, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change in Law, regardless of the date enacted, adopted or issued.

(b)     If any Lender determines that the introduction of any Law regarding capital adequacy or liquidity requirements or any change therein or in the interpretation thereof, in each case after the Closing Date, or compliance by such Lender (or its Lending Office) therewith, has the effect of reducing the rate of return on the capital of such Lender or any company controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and such Lender's desired return on capital), then from time to time promptly following written demand of such Lender setting forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction within 15 Business Days after receipt of such demand. Notwithstanding anything herein to the contrary, for all purposes under this Agreement, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change in Law, regardless of the date enacted, adopted or issued.

62

(c)     The Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits, additional interest on the unpaid principal amount of each applicable Eurocurrency Rate Loan of the Borrower equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive in the absence of manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the the funding of any Eurocurrency Rate Loans of the Borrower, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such Loan, *provided* the Borrower shall have received at least 15 Business Days' prior written notice (with a copy to the Administrative Agent) of such additional interest or cost from such Lender. If a Lender fails to give notice 15 Business Days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable 15 Business Days from receipt of such notice.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation.

(e)     If any Lender requests compensation under this Section 3.04, then such Lender will, if requested by the Borrower, use commercially reasonable efforts (subject to such Lender's overall internal policies of general application and legal and regulatory restrictions) to designate another Lending Office for any Loan affected by such event; *provided* that such efforts are made on terms that, in the commercially reasonable judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no material economic, legal or regulatory disadvantage and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender; *provided*, *further*, that nothing in this Section 3.04(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.04(a), (b), (c) or (d).

**Section 3.05     Funding Losses**.  Promptly following written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense (excluding loss of anticipated profits and calculated without giving effect to any interest rate floor) actually incurred by it as a result of:

(a)     any continuation, conversion, payment or prepayment of any Eurocurrency Rate Loan of the Borrower on a day other than the last day of the Interest Period for such Loan; or

(b)     any failure by the Borrower to prepay, borrow, continue or convert any Eurocurrency Rate Loan of the Borrower on the date or in the amount notified by the Borrower;

including any loss or expense (excluding loss of anticipated profits) arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Eurocurrency Rate Loan made by it at the Eurocurrency Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Eurocurrency Rate Loan was in fact so funded.

**Section 3.06     Matters Applicable to All Requests for Compensation**.  (a) The Administrative Agent or any Lender claiming compensation under this Article III shall deliver a certificate to the Borrower

63

WEIL:\97507497\16\10143.0003

setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error.  In determining such amount, the Administrative Agent or such Lender may use any reasonable and customary averaging and attribution methods.

(b)      With respect to any Lender's claim for compensation under Section 3.02, 3.03 or 3.04, the Borrower shall not be required to compensate such Lender for any amount incurred if such Lender notifies the Borrower of the event that gives rise to such claim more than 180 days after such event; *provided*, that if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  If any Lender requests compensation by the Borrower under Section 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another applicable Eurocurrency Rate Loan, or, if applicable, to convert Base Rate Loans into Eurocurrency Rate Loan, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(c) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)      If the obligation of any Lender to make or continue any Eurocurrency Rate Loan, or to convert Base Rate Loans into Eurocurrency Rate Loans shall be suspended pursuant to Section 3.06(b) hereof, such Lender's applicable Eurocurrency Rate Loans shall be automatically converted into Base Rate Loans (or, if such conversion is not possible, repaid) on the last day(s) of the then current Interest Period(s) for such Eurocurrency Rate Loans (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to such conversion no longer exist:

(i)      to the extent that such Lender's Eurocurrency Rate Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's applicable Eurocurrency Rate Loans shall be applied instead to its Base Rate Loans; and

(ii)      all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as Eurocurrency Rate Loans shall be made or continued instead as Base Rate Loans (if possible), and all Base Rate Loans of such Lender that would otherwise be converted into Eurocurrency Rate Loans shall remain as Base Rate Loans.

(d)      If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of any of such Lender's Eurocurrency Rate Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurocurrency Rate Loans made by other Lenders are outstanding, if applicable, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurocurrency Rate Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurocurrency Rate Loans and by such Lender are held *pro rata* (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Term Loans.

**Section 3.07      Replacement of Lenders under Certain Circumstances**.  (a)  If at any time (i) the Borrower becomes obligated to pay additional amounts or indemnity payments described in Section 3.01 or 3.04 as a result of any condition described in such Sections or any Lender ceases to make any Eurocurrency Rate Loans as a result of any condition described in Section 3.02 or 3.04 or requires the Borrower to pay additional amounts as a result thereof, (ii) any Lender becomes a Defaulting Lender or (iii) any Lender becomes a Non-Consenting Lender, then the Borrower may, on five (5) Business Days' prior written notice to the Administrative Agent and such Lender, (x) replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.07(b) (so long as the assignment fee is paid by the Borrower in such instance) all of its rights and obligations under this Agreement to one or more Eligible

64

Assignees; *provided* that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person; *provided*, *further*, that (A) in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments and (B) in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to, and shall be sufficient (together with all other consenting Lenders) to cause the adoption of, the applicable departure, waiver or amendment of the Loan Documents; or (y) in the case of a Lender, repay (in Dollars) all Obligations of the Borrower due and owing to such Lender relating to the Loans held by such Lender as of such termination date; *provided* that in the case of any such termination of a Non-Consenting Lender such termination shall be sufficient (together with all other consenting Lenders after giving effect hereto) to cause the adoption of the applicable departure, waiver or amendment of the Loan Documents.

(b)     Any Lender being replaced pursuant to Section 3.07(a) above shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's applicable outstanding Loans, and (ii) deliver any Notes evidencing such Loans to the Borrower or the Administrative Agent.  Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's outstanding Loans, (B) all obligations of the Borrower owing to the assigning Lender relating to the Loans so assigned shall be paid in full by the assignee Lender to such assigning Lender concurrently with such Assignment and Assumption and (C) upon such payment and, if so requested by the assignee Lender, delivery to the assignee Lender of the appropriate Note or Notes executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender.  In connection with any such replacement, if any such Lender does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within five Business Days of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Lender, then such Lender shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Lender and the Administrative Agent shall be entitled (but not obligated) to execute and deliver such Assignment and Assumption and/or such other documentation on behalf of such Lender.

(c)     [Reserved].

(d)     In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each affected Lender in accordance with the terms of Section 10.01 or all the Lenders and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

**Section 3.08     Survival**.  All the Loan Parties' obligations under this Article III shall survive repayment of all other Obligations hereunder.

## ARTICLE IV
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

**Section 4.01     Conditions to Initial Credit Extension**.  The obligation of each Lender to make a Credit Extension hereunder on the Closing Date is subject to satisfaction (or waiver) of the following conditions precedent:

(a)     The Administrative Agent's receipt of the following, each of which shall be original, .pdf or facsimile copies or delivered by other electronic method (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party each in form and substance reasonably satisfactory to the Required Lenders:

WEIL:\97507497\16\10143.0003

(i)        [reserved];

(ii)       executed counterparts of this Agreement;

(iii)      a Note executed by the Borrower in favor of each Lender that has requested a Note at least two Business Days in advance of the Closing Date;

(iv)       a copy of the Organization Documents in relation to each Loan Party;

(v)        the Security Agreement, the Intercreditor Agreement, each other Collateral Document and each other document set forth on Schedule 4.01(a) required to be executed on the Closing Date as indicated on such schedule, duly executed by each Loan Party thereto, together with:

(A)        subject to Section 6.20, certificates, if any, representing the Pledged Equity referred to therein accompanied by undated stock powers executed in blank and instruments, if any, evidencing the Pledged Debt endorsed in blank; and

(B)        proper financing statements (Form UCC-1 or the equivalent) naming each Loan Party for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary to perfect the security interests purported to be created by the foregoing Security Agreement;

(vi)       such certificates of good standing (to the extent such concept exists) from the applicable secretary of state of the state of organization of each Loan Party, certificates of resolutions or other corporate or limited liability company action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party and resolutions of the board of directors, board of managers or members of each Loan Party (in each case, as appropriate or applicable) as the Required Lenders may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date;

(vii)      an opinion from (x) Kirkland & Ellis LLP, counsel to the Loan Parties and (y) the general counsel, or other appropriate attorney, of the Borrower with respect to any Loan Party covering opinions not included in the opinion provided pursuant to the foregoing clause (x) as to certain customary organizational items (including, for the avoidance of doubt, that the entry by such Loan Party into the Loan Documents to which it is a party does not conflict with such Loan Party's Organizational Documents and the requirements of Laws), in each case in form and substance reasonably satisfactory to the Required Lenders; and

(viii)     a solvency certificate from the chief financial officer, chief accounting officer or other officer with equivalent duties of the Borrower (immediately after giving effect to the Transactions) substantially in the form attached hereto as Exhibit D.

(b)        All fees and expenses required to be paid hereunder (and, with respect to expenses, invoiced at least three Business Days before the Closing Date) shall have been paid, including fees pursuant to any Agent Fee Letter, the fees of Weil, Gotshal & Manges LLP, as counsel to the Lenders, Shipman & Goodwin LLP, as counsel to the Administrative Agent, and all reasonable out-of-pocket expenses payable on the Closing Date.

(c)        Prior to or substantially concurrently with the initial Borrowing on the Closing Date, (i) all Existing Debt shall have been extinguished in accordance with the Prepackaged Plan; (ii) the Loan Parties shall have entered into, and provided executed copies of, the ABL Loan Documents providing for the ABL Loans (A) with availability as of the Closing Date of at least $20,000,000 after giving effect to

66

WEIL:\97507497\16\10143.0003

any amount of Existing Letters of Credit backstopped or otherwise included in such ABL Loan Documents and (B) with aggregate commitments of not less than $30,000,000 and (iv) the Loan Parties shall have entered into, and provided executed copies of, the Second Lien Loan Documents providing for the Second Lien Term Loans in an aggregate principal amount equal to $50,000,000, in the case of clause (ii) and (iii) above, in form and substance reasonably satisfactory to the Required Lenders.

(d)     Since the Petition Date, other than by virtue of the Chapter 11 Cases, the events and conditions related, resulting from, and/or leading up thereto and the effects thereon and any action required to be taken under the Loan Documents, there shall not have occurred any development or event, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(e)     No Default or Event of Default shall exist or would result from the consummation of the Transactions.

(f)     The Administrative Agent shall have received the Annual Financial Statements and the Quarterly Financial Statements (it being understood the Administrative Agent hereby acknowledges receipt thereof).

(g)     The Lenders shall have received the Pro Forma Financial Statements.

(h)     The Administrative Agent shall have received at least three Business Days prior to the Closing Date all documentation and other information about the Borrower and the Guarantors required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act that has been requested by the Administrative Agent in writing at least 10 days prior to the Closing Date.

(i)     The representations and warranties of each Loan Party set forth in Article V and in each other Loan Document shall be true and correct in all material respects on and as of the Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; *provided* that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(j)     At all times prior to the Closing Date, the Borrower shall have used commercially reasonable efforts to obtain ratings for this Agreement and the Second Lien Credit Agreement from at least two of Moody's, S&P and Fitch.

(k)     Upon consummation of the Transactions, the Lenders shall own at last 90% of the common equity of Holdings (subject to dilution pursuant to any warrants issued pursuant to the Warrant Agreement (as defined in the Prepackaged Plan) and any management incentive plan.

(l)     The Bankruptcy Court shall have entered the Confirmation Order, which order shall (a) approve, among other things, the Transactions, (b) be in form and substance reasonably acceptable to the Required Lenders and consistent in all respects with the Restructuring Support Agreement, (c) not be subject to any stay or be reversed, vacated, amended or otherwise modified in any respect and (d) all covenants and conditions of the Prepackaged Plan (other than the effectiveness of this Agreement, the Second Lien Credit Agreement and the ABL Credit Agreement) shall have been satisfied or waived in accordance with the terms thereof.

(m)     The Restructuring Support Agreement shall not have been terminated and remains in full force and effect.

WEIL:\97507497\16\10143.0003

Without limiting the generality of the provisions of Section 9.03(e), for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Each Holdco, the Borrower and each of the Subsidiary Guarantors party hereto represent and warrant to the Administrative Agent and the Lenders on the Closing Date that:

**Section 5.01    Existence, Qualification and Power; Compliance with Laws**.  Each Loan Party and each Subsidiary that is a Material Subsidiary (a) is a Person duly organized, incorporated or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation, organization or formation to the extent such concept exists in such jurisdiction, (b) has all requisite organizational power and authority to, in the case of the Loan Parties, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (where relevant) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, orders, writs and injunctions and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case, referred to in clauses (c), (d) or (e), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**Section 5.02    Authorization; No Contravention**.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the Transactions, (a) have been duly authorized by all necessary corporate or other organizational action, and (b) do not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by Section 7.01), or require any payment to be made under (x) any Contractual Obligation to which such Person is a party or by which it or any of its property or assets is bound or (y) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any Law; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clauses (ii) and (iii), to the extent that such violation, conflict, breach, contravention or payment could not reasonably be expected to have a Material Adverse Effect.

**Section 5.03    Governmental Authorization; Other Consents**.  No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) approval, consent, exemption, authorization, or other action by, or notice to, or filing necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties (or release existing Liens) under applicable U.S. law, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement) and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect.

WEIL:\97507497\16\10143.0003

**Section 5.04**    **Binding Effect**.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is a party thereto.  This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is a party thereto in accordance with its terms, except as such enforceability may be limited by (i) Debtor Relief Laws and by general principles of equity, (ii) the need for filings and registrations necessary to create or perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties and (iii) the effect of foreign Laws, rules and regulations as they relate to the granting of security interests in assets of, pledges of Equity Interests in or Indebtedness owed by Foreign Subsidiaries (clauses (i), (ii) and (iii), the "**Enforcement Qualifications**").

**Section 5.05**    **Financial Statements; No Material Adverse Effect**.  (a)  The Annual Financial Statements and the Quarterly Financial Statements fairly present in all material respects the financial condition of the Company and its Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (A) except as otherwise expressly noted therein and (B) subject, in the case of the Quarterly Financial Statements, to changes resulting from normal year-end adjustments and the absence of footnotes.

(b)    The unaudited *pro forma* consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as of the last day of the 12-month period ending on the last day of the most recently completed four-fiscal quarter period ended at least 45 days (or 105 days if such four-fiscal quarter period is the end of the Company's fiscal year) prior to the Closing Date, prepared after giving effect to the Transactions as if the Transactions had occurred as of such date (including the notes thereto) (the "**Pro Forma Balance Sheet**") and the unaudited *pro forma* consolidated statement of income of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries for the 12-month period ended at least 45 days (or 105 days if such four-fiscal quarter period is the end of the Company's fiscal year) prior to the Closing Date, prepared after giving effect to the Transactions as if the Transactions had occurred at the beginning of such period and any other adjustments reasonably acceptable to the Required Lenders (together with the Pro Forma Balance Sheet, the "**Pro Forma Financial Statements**"), copies of which have heretofore been furnished to the Administrative Agent, have been prepared based on the Annual Financial Statements and the Quarterly Financial Statements and have been prepared in good faith, based on assumptions believed by the Borrower to be reasonable as of the date of delivery thereof and adjustment as agreed by the Borrower, and present fairly in all material respects on a *pro forma* basis the estimated financial position of the Borrower and its Subsidiaries as at the Closing Date and their estimated results of operations for the period covered thereby; *provided* that no such *pro forma* financial statement shall be required to include adjustments for purchase accounting (including adjustments of the type contemplated by Financial Account Standards Board Accounting Standards Codification 805, Business Combinations (formerly SFAS 141R)).

(c)    Since the Closing Date, there has been no event, circumstance or change, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

**Section 5.06**    **Litigation**.  There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any Subsidiary or against any of their properties or revenues that have a reasonable likelihood of adverse determination and such determination, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**Section 5.07**    **Ownership of Property; Liens**.  The Borrower and each of its Subsidiaries has good record title to, or valid leasehold interests in, or easements or other limited property interests in, all Real Property necessary in the ordinary conduct of its business, free and clear of all Liens, except (a) as set forth on Schedule 5.07, (b) minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes, (c) Liens permitted by Section 7.01 and (d) where the

69

failure to have such title could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 5.08    Environmental Matters**.  Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)    Each Loan Party and its respective properties and operations are and have been in compliance with all Environmental Laws, which includes obtaining and maintaining all applicable Environmental Permits required under such Environmental Laws to carry on the business of the Loan Parties;

(b)    the Loan Parties have not received any written notice that alleges any of them is in violation of or potentially liable under any Environmental Laws, and none of the Loan Parties nor any of the Real Property is the subject of any claims, investigations, liens, demands, or judicial, administrative or arbitral proceedings pending or, to the knowledge of the Borrower, threatened in writing, under any Environmental Law or to revoke or modify any Environmental Permit held by any of the Loan Parties;

(c)    there has been no Release of Hazardous Materials on, at, under or from any Real Property or facilities owned, operated or leased by any of the Loan Parties, or, to the knowledge of the Borrower, Real Property formerly owned, operated or leased by any Loan Party or arising out of the conduct of the Loan Parties that could reasonably be expected to require investigation, remedial activity or corrective action or cleanup or could reasonably be expected to result in the Borrower or any of its Subsidiaries incurring liability under any Environmental Laws; and

(d)    there are no facts, circumstances or conditions arising out of or relating to the operations of the Loan Parties or Real Property or facilities owned, operated or leased by any of the Loan Parties or, to the knowledge of the Borrower, Real Property or facilities formerly owned, operated or leased by the Loan Parties that could reasonably be expected to result in the Borrower or any of its Subsidiaries incurring liability under any Environmental Laws.

The representations and warranties contained in this Section 5.08 are the sole and exclusive representations and warranties of the Borrower, the Holdcos and the Subsidiary Guarantors with respect to matters arising under or relating to Environmental Laws, Environmental Permits, Environmental Liabilities or Hazardous Materials.

**Section 5.09    Taxes**.  Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each of the Loan Parties and their Subsidiaries have timely filed all tax returns required to be filed, and have paid all Taxes levied or imposed upon them or their properties, income, profits or assets, that are due and payable (including in their capacity as a withholding agent), except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.  To the knowledge of the Loan Parties, there is no proposed Tax deficiency or assessment against the Loan Parties or their Subsidiaries that, if made would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

**Section 5.10    ERISA Compliance**.  (a)    Except as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with its terms, the applicable provisions of ERISA, the Code and other Federal or state Laws.

(b)    (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) neither any Loan Party, Subsidiary nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due but not

70

WEIL:\97507497\16\10143.0003

delinquent under Section 4007 of ERISA); (iii) neither any Loan Party, Subsidiary nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (iv) neither any Loan Party, Subsidiary nor any ERISA Affiliate has engaged in a transaction that could reasonably be expected to be subject to Sections 4069 or 4212(c) of ERISA; except, with respect to each of the foregoing clauses of this Section 5.10(b), as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.11    **Subsidiaries; Equity Interests**.  As of the Closing Date (after giving effect to the Transactions), no Loan Party has any Subsidiaries other than those specifically disclosed on Schedule 5.11, and all of the outstanding Equity Interests owned by the Loan Parties (or a Subsidiary of any Loan Party) in such Subsidiaries have been validly issued and are fully paid and all Equity Interests owned by a Loan Party (or a Subsidiary of any Loan Party) in such Subsidiaries are owned free and clear of all Liens except (i) those created under the Collateral Documents, under the ABL Loan Documents (which Liens shall be subject to the Intercreditor Agreement) or under the Second Lien Loan Documents (which Liens shall be subject to the Intercreditor Agreement) and (ii) any Lien that is permitted under Section 7.01.  As of the Closing Date, Schedules 1 and 9 of the Perfection Certificate (a) set forth the name and jurisdiction of each Domestic Subsidiary that is a Loan Party, (b) set forth the ownership interest of the Borrower and any other Subsidiary thereof in each Subsidiary, including the percentage of such ownership and (c) identify each Subsidiary that is a Subsidiary the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

Section 5.12    **Margin Regulations; Investment Company Act**.  (a)  The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation T, U or X of the Board of Governors of the United States Federal Reserve System.

(b)      None of the Holdcos, the Borrower or any of the Subsidiaries is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 5.13    **Disclosure**.  No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party (other than projected financial information, *pro forma* financial information, budgets, estimates and information of a general economic or industry nature) to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were made, not materially misleading.  With respect to projected financial information and *pro forma* financial information, the Borrower represents that such information was prepared in good faith based upon assumptions believed to be reasonable at the time furnished, it being understood that such projected financial information and *pro forma* financial information are not to be viewed as facts or as a guarantee of performance or achievement of any particular results and that actual results may vary from such forecasts and that such variations may be material and that no assurance can be given that the projected results will be realized.

Section 5.14    **Labor Matters**.  Except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against the Borrower or any of its Subsidiaries pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of the Borrower or any of its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with such matters; and (c) all payments due from the Borrower or any of its Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant party.

71

**Section 5.15**   **Intellectual Property; Licenses, Etc**.   Each of the Borrower and the Subsidiaries owns, licenses, possesses or otherwise has the right to use all of the trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, technology, software, know-how database rights, design rights and other intellectual property rights (collectively, "**IP Rights**") that are reasonably necessary for the operation of its businesses as currently conducted, except to the extent the failure to own, license, possess or otherwise have the right to use such IP Rights, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.   To the knowledge of the Borrower, the Borrower and the Subsidiaries' present business operations do not infringe upon any IP Rights held by any Person except for such infringements, individually or in the aggregate, which could not reasonably be expected to have a Material Adverse Effect.   No claim or litigation regarding IP Rights is pending or, to the knowledge of the Borrower, threatened, against any Loan Party or any of the Subsidiaries, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

As of the Closing Date, all registrations material to the Loan Parties' business under the name of each Loan Party listed on Schedule 11 of the Perfection Certificate are valid and in full force and effect.

**Section 5.16**   **Solvency**.   On the Closing Date, after giving effect to the Transactions, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

**Section 5.17**   **[Reserved]**.

**Section 5.18**   **USA Patriot Act; OFAC; FCPA**.   (a)   To the extent applicable, each Loan Party and any Subsidiary is, and for the past five years has been, in compliance with (i) the Trading with the Enemy Act, as amended, and Sanctions, (ii) the USA Patriot Act and (iii) the FCPA.

(b)      No Loan Party, no Subsidiary and no director, officer, employee, agent or any other Person acting for or on behalf of any of the foregoing is a Sanctioned Person; and no Loan Party and no Subsidiary will use the proceeds of the Loans or otherwise make available, directly or indirectly, such proceeds to a Sanctioned Person.

(c)      No part of the proceeds of the Loans will be used, directly or indirectly by any Loan Party or any Subsidiary for any payments to or for the benefit of any governmental official or employee, political party, official of a political party, candidate for political office, public international organization official or employee or anyone else acting in an official capacity, in order to obtain, retain or direct business, influence any act or decision or the omission of any act or decision, or obtain any improper advantage, in violation of the FCPA.

(d)      Each Loan Party and each Subsidiary is subject to policies, procedures and internal controls designed to reasonably ensure compliance with Sanctions, the FCPA and all other applicable anti-bribery laws.

**Section 5.19**   **Security Documents**.   Except as otherwise contemplated hereby or under any other Loan Documents, the provisions of the Collateral Documents are effective to create in favor of the Administrative Agent for the benefit of the Secured Parties legal, valid and enforceable Liens on, and security interests in, the Collateral and, (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable Laws (which filings or recordings shall be made to the extent required by any Collateral Document) and (ii) upon the taking of possession or control by the Administrative Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent required by any Collateral Document), such Collateral Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral, in each case subject to no Liens other than the applicable Liens permitted under the Loan Documents, a legal, valid, enforceable and perfected Lien (if and to the extent perfection may be achieved by the filings and/or other actions required to be taken hereby or by the

72

WEIL:\97507497\16\10143.0003

applicable Collateral Documents) on all right, title and interest of the respective Loan Parties in the Collateral described therein subject to the Enforcement Qualifications and Liens permitted by Section 7.01.

Notwithstanding anything herein (including this Section 5.19) or in any other Loan Document to the contrary, neither the Borrower nor any other Loan Party makes any representation or warranty as to (A) the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest (other than with respect to those pledges and security interests made under the Laws of the jurisdiction of formation of the applicable Foreign Subsidiary) in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of the Administrative Agent or any Lender with respect thereto, in each case under foreign Law, (B) the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest to the extent such pledge, security interest, perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or (C) on the Closing Date and until required pursuant to Section 6.11, 6.13 or 4.01(a)(v), the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or enforceability of any pledge or security interest to the extent not required on the Closing Date pursuant to Section 4.01(a)(v).

Section 5.20    **EEA Financial Institutions**. None of the Holdcos, the Borrower or any Subsidiary thereof is an EEA Financial Institution.

Section 5.21    **Beneficial Ownership Certification**.    As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Loan or other Obligation (other than contingent obligations not yet due and owing as to which no claim has been asserted), hereunder which is accrued and payable which remains unpaid or unsatisfied, then from and after the Closing Date, Holdings and Intermediate Holdings (solely in the case of Sections 6.01, 6.02, 6.04, 6.05, 6.06, 6.08, 6.09, 6.10, 6.11, 6.13, 6.19, 6.20 and 6.21) and the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of its respective Subsidiaries to:

Section 6.01    **Financial Statements**. (a)  Commencing with the fiscal year ended December 31, 2020, deliver to the Administrative Agent for prompt further distribution to each Lender, within 90 days after the end of each fiscal year, a consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail (together with, in all cases, a management discussion and analysis with respect thereto) and prepared in accordance with GAAP, audited and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing or other independent registered public accounting firm approved by the Required Lenders (such consent not to be unreasonably withheld, delayed or conditioned), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification (other than related (i) solely to the occurrence of the Maturity Date or the upcoming maturity date under the ABL Credit Agreement or the Second Lien Credit Agreement, in each case, occurring within one year from the date such report is delivered or (ii) any potential inability to satisfy any financial maintenance covenant on a future date or in a future period) or any qualification or exception as to the scope of such audit except for qualifications relating to changes in accounting principles or practices reflecting changes in GAAP and required or approved by such independent certified public accountants;

(b)    Deliver to the Administrative Agent for prompt further distribution to each Lender, within 45 days (or 75 days in the case of the first full fiscal quarter following the Closing Date) after the end of each fiscal quarter of each fiscal year of Holdings, a consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as at the end of such fiscal quarter and the related (x) consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal

73

WEIL:\97507497\16\10143.0003

year then ended and (y) consolidated statements of cash flows for such fiscal quarter and the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail together with, in all cases, a management discussion and analysis with respect thereto) and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes; and

(c)     Deliver to the Administrative Agent, for prompt further distribution to each Lender, within 35 days (or 45 days in the case of the first three such months following the Closing Date) after the end of (i) the period beginning on the Closing Date through September 30, 2020 and (ii) thereafter, each of the first two months in any fiscal quarter of Holdings, an unaudited consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries at the end of such month and the related unaudited consolidated statements of cash flows as of and for such month and the portion of the fiscal year then ended, setting forth in each case, in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail; and

(d)     Deliver to the Administrative Agent for prompt further distribution to each Lender, no later than 90 days after the end of the fiscal year ending December 31, 2020 and each subsequent fiscal year, a reasonably detailed consolidated budget for the following fiscal year on a quarterly basis (including a projected consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as of the end of the following fiscal year, the related consolidated statements of projected cash flow and projected income and a summary of the material underlying assumptions applicable thereto) (collectively, the "**Projections**").

Notwithstanding the foregoing, the obligations in Sections 6.01(a) and (b) may be satisfied with respect to financial information of Holdings, Intermediate Holdings, the Borrower and the Subsidiaries by furnishing (I) the applicable financial statements of Holdings (or any direct or indirect parent, as applicable, of Holdings) or (II) the Form 10-K or 10-Q of Holdings (or any direct or indirect parent of Holdings), as applicable filed with the SEC; *provided* that, with respect to clauses (I) and (II), (i) to the extent such information relates to a parent of Holdings, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent, on the one hand, and the information relating to Holdings, Intermediate Holdings, the Borrower and the Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under Section 6.01(a), such materials are accompanied by a report and opinion of Deloitte & Touche LLP or any other independent registered public accounting firm of nationally recognized standing or other independent registered public accounting firm approved by the Required Lenders (such consent not to be unreasonably withheld, delayed or conditioned), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going-concern" or like qualification (other than related (i) solely to the occurrence of the Maturity Date or the upcoming maturity date under the ABL Credit Agreement or the Second Lien Credit Agreement, in each case, occurring within one year from the date such report is delivered or (ii) any potential inability to satisfy any financial maintenance covenant on a future date or in a future period) or exception or any qualification or exception as to the scope of such audit except for qualifications relating to changes in accounting principles or practices reflecting changes in GAAP and required or approved by such independent certified public accountants.

Any financial statement required to be delivered pursuant to Section 6.01(a) or 6.01(b) shall not be required to include purchase accounting adjustments relating to the Transactions or any Permitted Acquisition to the extent it is not practicable to include them.

Documents required to be delivered pursuant to Sections 6.01 and 6.02(a) through (d) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower (or any direct or indirect parent of the Borrower) posts such documents, or provides a link thereto on

74

the website on the Internet at the website address listed on Schedule 10.02(a); or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that (x) promptly following such posting, the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender and (y) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "**Borrower Materials**") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive Material Non-Public Information and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC**,**" the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any Material Non-Public Information (although it may be sensitive and proprietary) (*provided*, *however*, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.08); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."  Notwithstanding the foregoing, the Borrower shall be under no obligation to mark any Borrower Materials "PUBLIC".

**Section 6.02   Certificates; Other Information**.  Deliver to the Administrative Agent for prompt further distribution to each Lender:

> (a)     concurrently the delivery of the financial statements referred to in Sections 6.01(a) and (b), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower;

> (b)     promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which Holdings, Intermediate Holdings, the Borrower or any Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 6.02;

> (c)     promptly after the furnishing thereof, copies of any material written notices received by any Loan Party (other than in the ordinary course of business) or material statements or material reports furnished to any holder of debt securities (other than in connection with any board observer rights) of any Loan Party or of any of its Subsidiaries pursuant to the terms of any ABL Loan Document or Second Lien Loan Document and, in

75

each case, not otherwise required to be furnished to the Lenders pursuant to any other clause of Section 6.01, 6.02 or 6.03;

(d)      together with the delivery of each Compliance Certificate pursuant to Section 6.02(a), (i) in the case of annual Compliance Certificates only, a report setting forth the legal name and the jurisdiction of formation of each Loan Party and the location of the chief executive office of each Loan Party on the Perfection Certificate or confirming that there has been no change in such information since the Closing Date or the date of the last such report; (ii) a description of each event, condition or circumstance during the last fiscal quarter or fiscal year covered by such Compliance Certificate requiring a mandatory prepayment under Section 2.05(b) (to the extent notice of such event has not been previously furnished to the Administrative Agent) and (iii) a list of each Subsidiary of the Borrower that identifies each Subsidiary as of the date of delivery of such Compliance Certificate (to the extent that there have been any changes in the identity or status as a Subsidiary of any such Subsidiaries since the Closing Date or the most recent list provided);

(e)      [reserved]; and

(f)      promptly, such additional information regarding the business, legal, financial or corporate affairs of the Loan Parties or any of their respective Subsidiaries, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request.

In no event shall the requirements set forth in Section 6.02(f) require Holdings, Intermediate Holdings, the Borrower or any of its Subsidiaries to provide any such information which (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or (iii) is subject to attorney-client or similar privilege or constitutes attorney work-product.

**Section 6.03      Notices**.  Promptly (and in the case of clause (a) below, not later within three (3) Business Days) after a Responsible Officer of the Borrower or any Subsidiary Guarantor has obtained knowledge thereof, notify the Administrative Agent:

(a)      Of the occurrence of any Default or Event of Default;

(b)      of the occurrence of an ERISA Event which could reasonably be expected to result in a Material Adverse Effect;

(c)      of the filing or commencement of, or any threat or notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority against the Borrower or any of its Subsidiaries that would reasonably be expected to result in a Material Adverse Effect;

(d)      of the occurrence of any other matter or development that has had or could reasonably be expected to have a Material Adverse Effect; and

(e)      of any change in the information provided in any certification regarding beneficial ownership as required by 31 C.F.R. § 1010.230 that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification.

Each notice pursuant to this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of the Borrower delivered to the Administrative Agent for prompt further distribution to

76

WEIL:\97507497\16\10143.0003

each Lender (x) that such notice is being delivered pursuant to Section 6.03(a), (b), (c) or (d) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

**Section 6.04    Payment of Taxes.**  Pay, discharge or otherwise satisfy as the same shall become due and payable in the normal conduct of its business, all its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (a) any such Tax is being contested in good faith and by appropriate proceedings for which appropriate reserves have been established in accordance with GAAP or (b) the failure to pay or discharge the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 6.05    Preservation of Existence, Etc.**  (a)  Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization; and

(b)      take all reasonable action to maintain all rights, privileges (including its good standing where applicable in the relevant jurisdiction), permits, authorizations, licenses and franchises necessary or desirable in the normal conduct of its business;

except, in the case of Section 6.05(a) (other than with respect to the Borrower) or this Section 6.05(b), to the extent (i) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (ii) pursuant to any merger, consolidation, liquidation, dissolution or Disposition permitted by Article VII.

**Section 6.06    Maintenance of Properties.**  Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and fire, casualty or condemnation excepted.

**Section 6.07    Maintenance of Insurance.**  (a) Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Subsidiaries) as are customarily carried under similar circumstances by such other Persons.  Not later than 30 days after the Closing Date (or the date any such insurance is obtained, in the case of insurance obtained after the Closing Date) (in each case, or such later date as the Required Lenders may agree in their sole discretion), each such policy of insurance (other than director and officer insurance and worker's compensation insurance) shall as appropriate (i) name the Administrative Agent as additional insured thereunder or (ii) in the case of each casualty insurance policy, contain a lender loss payable clause or endorsement that names the Administrative Agent, on behalf of the Lenders, as lender loss payee or mortgagee thereunder.  If the improvements on any Mortgaged Property are at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then, to the extent required by applicable Flood Insurance Laws, the Borrower shall, or shall cause each Loan Party to, (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount reasonably satisfactory to the Required Lenders and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) upon the reasonable request of the Administrative Agent at the direction of the Required Lenders (not to exceed one time per fiscal year, unless an Event of Default has occurred and is continuing) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Required Lenders.

(b) Give the Administrative Agent prompt notice of any loss exceeding $500,000 covered by the casualty or business interruption insurance of any Loan Party or its Subsidiaries.  Upon the occurrence and

77

WEIL:\97507497\16\10143.0003

during the continuance of an Event of Default and subject to the Intercreditor Agreement, the Administrative Agent (at the direction of the Required Lenders) shall have the sole right (but not the obligation) to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

Section 6.08   **Compliance with Laws**.  Comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except if the failure to comply therewith could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.09   **Books and Records**.  Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP and which reflect all material financial transactions and matters involving the assets and business of the Borrower or a Subsidiary, as the case may be (it being understood and agreed that certain Foreign Subsidiaries maintain individual books and records in conformity with generally accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder).

Section 6.10   **Inspection Rights**.   Permit representatives and independent contractors of the Administrative Agent (on its own behalf or acting on behalf of the Lenders) to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that, only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.10 and the Administrative Agent shall not exercise such rights more often than one time during any calendar year and such time shall be at the Borrower's expense; *provided*, *further*, that during the continuation of an Event of Default, the Administrative Agent (or any of its respective representatives or independent contractors), on behalf of the Lenders, may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.

Notwithstanding anything to the contrary in this Section 6.10, none of Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (c) is subject to attorney-client or similar privilege or constitutes attorney work product.

Section 6.11   **Additional Collateral; Additional Guarantors**.   At the Borrower's expense, subject to the terms, conditions and provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

> (a)   Upon the formation or acquisition of any new direct or indirect wholly owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) by any Loan Party or the designation in accordance with Section 6.14 of any existing direct or indirect wholly owned Material Domestic Subsidiary as a Subsidiary (in each case, other than an Excluded Subsidiary) or any Subsidiary becoming a wholly owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) or any Excluded Subsidiary ceasing to be an Excluded Subsidiary:

<center>78</center>

(i)      within 45 days after such formation, acquisition, designation or occurrence or such longer period as the Required Lenders may agree in writing in their discretion:

(A)      cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Administrative Agent,  a Joinder Agreement to become a Guarantor under this Agreement, Security Agreement Supplements, Intellectual Property Security Agreements, and other security agreements and documents as reasonably requested by and in form and substance reasonably satisfactory to the Required Lenders (consistent with Security Agreement, Intellectual Property Security Agreements and other security agreements in effect on the Closing Date), in each case granting Liens required by the Collateral and Guarantee Requirement;

(B)      cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement (and the parent of each such Domestic Subsidiary that is the Borrower or a Guarantor) to deliver any and all certificates representing Equity Interests (to the extent certificated) and intercompany notes constituting negotiable instruments (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and instruments evidencing Indebtedness held by such Material Domestic Subsidiary and required to be delivered pursuant to the Collateral and Guarantee Requirement endorsed in blank to the Administrative Agent;

(C)      take and cause such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement and each direct or indirect parent of such Material Domestic Subsidiary to take whatever action (including the recording of Mortgages, the filing of UCC financing statements and delivery of stock and membership interest certificates) as may be necessary in the reasonable opinion of the Administrative Agent (at the direction of the Required Lenders) to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and perfected Liens to the extent required by the Collateral and Guarantee Requirement, and to otherwise comply with the requirements of the Collateral and Guarantee Requirement;

(D)      if requested by the Administrative Agent or the Required Lenders, deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the Lenders, of counsel for the Loan Parties reasonably acceptable to the Required Lenders as to such matters set forth in this Section 6.11(a) as the Required Lenders may reasonably request (or otherwise consistent with the opinions delivered on the Closing Date);

(ii)      as promptly as practicable after the request therefor by the Administrative Agent, deliver to the Administrative Agent with respect to each Material Real Property, any existing title reports, abstracts or environmental assessment reports, to the extent available and in the possession or control of a Loan Party; *provided*, *however*, that there shall be no obligation to deliver to the Administrative Agent any environmental assessment report whose disclosure to the Administrative Agent would require the consent of a Person other than a Loan Party or one of its Subsidiaries, where, despite the commercially reasonable efforts of the Borrower to obtain such consent, such consent cannot be obtained; and

(iii)      if reasonably requested by the Administrative Agent or the Required Lenders, deliver to the Administrative Agent any other items necessary from time to time to satisfy the Collateral and Guarantee Requirement with respect to perfection and existence of

WEIL:\97507497\16\10143.0003

security interests with respect to property of any Guarantor (and the direct parent of each such Guarantor) acquired after the Closing Date and subject to the Collateral and Guarantee Requirement, but not specifically covered by preceding clauses (i), (ii) or (iii) or Section 6.11(b) below.

(b)     Not later than 120 days (or such longer period as the Required Lenders may agree in writing in their discretion) after (i) any Material Real Property is acquired by a Loan Party after the Closing Date or (ii) an entity becomes a Loan Party if such entity owns Material Real Property at the time it becomes a Loan Party, cause such Material Real Property, if such property is required to be provided as Collateral pursuant to the Collateral and Guarantee Requirement but is not automatically subject to a Lien pursuant to pre-existing Collateral Documents, to be subject to a Lien and Mortgage in favor of the Administrative Agent for the benefit of the Secured Parties and take, or cause the relevant Loan Party to take, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect or record such Lien, in each case to the extent required by, and subject to the limitations and exceptions of, the Collateral and Guarantee Requirement and to otherwise comply with the requirements of the Collateral and Guarantee Requirement.

(c)     Each Domestic Subsidiary required to be designated as a "Material Domestic Subsidiary" pursuant to the proviso in the definition of "Material Domestic Subsidiary" shall have taken all actions to comply with the provisions of Section 6.11 within the timeframe required by the definition of "Material Domestic Subsidiary".

**Section 6.12     Compliance with Environmental Laws**.  Except, in each case, to the extent that the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, comply, and take all commercially reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply, with all Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and occupancy of its properties; and, in each case to the extent the Loan Parties are required to do so by Environmental Laws, conduct any investigation, remedial or other corrective action necessary to address Hazardous Materials at any property or facility in accordance with Environmental Laws.  If an Event of Default arising out of an Environmental Liability has occurred and is continuing, within 60 days of receiving a written request by the Administrative Agent (at the direction of the Required Lenders), the Borrower will provide the Administrative Agent with an environmental assessment report regarding the scope of the Environmental Liability and the likely cost of mitigating such Environmental Liability, prepared at Borrower's sole cost and expense and by an environmental consultant reasonably acceptable to the Required Lenders.  If such report is not timely provided, the Administrative Agent may have them prepared by an environmental consultant of its choosing, at Borrower's sole cost and expense.

**Section 6.13     Further Assurances**.  Promptly upon reasonable request by the Administrative Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as are necessary or that the Administrative Agent may reasonably request from time to time in order to carry out more effectively the purposes of this Agreement and the Collateral Documents, to the extent required pursuant to the Collateral and Guarantee Requirement and subject in all respects to the limitations therein.  If the Administrative Agent or the Required Lenders reasonably determine that it is required by applicable Law to have appraisals prepared in respect of the Real Property of any Loan Party subject to a mortgage constituting Collateral, the Borrower shall promptly provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA.

**Section 6.14     [Reserved].**

80

**Section 6.15    Ratings**.  If the Borrower has not obtained the ratings contemplated by Section 4.01(j) on or before the Closing Date, the Borrower shall, within 30 days of the Closing Date (or such later date as the Administrative Agent at the direction of the Required Lenders may agree), obtain ratings for the this Agreement and the Second Lien Credit Agreement by at least two (2) of Moody's, S&P and Fitch. After the Borrower obtains the ratings contemplated by the foregoing sentence, the Borrower shall maintain a rating (but not any specific rating) in respect of this Agreement from at least two (2) of Moody's, S&P and Fitch.

**Section 6.16    Use of Proceeds**.  Use the proceeds of the Term Loans to finance a portion of the Transactions pursuant to the Prepackaged Plan.

**Section 6.17    Lender Meetings**.  To the extent requested by the Administrative Agent or the Required Lenders, participate in a meeting (which may be in the form of a conference call) (including a customary question and answer session) with the Administrative Agent and Lenders once during each fiscal quarter to be held at such time as may be agreed to by the Borrower and the Administrative Agent at the direction of the Required Lenders, but in any event within 15 Business Days of each date that financial statements are required to be delivered pursuant to Section 6.01(b).

**Section 6.18    End of Fiscal Years**.  For financial reporting purposes, cause its fiscal year to end on December 31 (other than any Subsidiary acquired after the Closing Date); *provided*, *however*, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Required Lenders, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

**Section 6.19    Lines of Business**. Holdings, Intermediate Holdings, the Borrower and the Subsidiaries, taken as a whole, will not engage in any material line of business substantially different from those lines of business conducted by Holdings, Intermediate Holdings, the Borrower and the Subsidiaries on the Closing Date or any business reasonably related, complementary, corollary, synergistic or ancillary thereto (including related, complementary, synergistic or ancillary technologies) or reasonable extensions thereof.

**Section 6.20    Post-Closing Covenant**. Holdings agrees that it will deliver, or will cause to be delivered, to the Administrative Agent, in form and substance reasonably satisfactory to the Required Lenders, the items described on Schedule 6.20(a) hereof by the times specified with respect to such items, or such later time as the Required Lenders may agree in their reasonable discretion.

**Section 6.21    Anti-Terrorism Law; Anti-Money Laundering; Embargoed Persons**.    (a) Conduct its business in such manner so as to not, directly or indirectly, (i) deal in, or otherwise engage in any transaction relating to, a Sanctioned Person or any property or interests in property blocked pursuant to Executive Order No. 13224 on Terrorist Financing effective September 24, 2001 (the "**Executive Order**") or any other law or regulation with respect to exports, terrorism or money laundering ("**Anti-Terrorism Law**"), or (ii) engage in or conspire to engage in any transaction that violates, or attempts to violate, any Anti-Terrorism Law or Sanctions.

(a)    Repay the Loans exclusively with funds that are not derived from any unlawful activity such that the result of any such repayment would not cause the making of the Loans to be in material violation of any applicable Law.

(b)    (x) Use funds or properties of Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries to repay the Loans only to the extent it does not constitute property of, or is beneficially owned directly or indirectly by, a Sanctioned Person or any Person subject trade restrictions under United States law ("**Embargoed Person**") that is identified on (1) the "List of Specially Designated Nationals and Blocked Persons" maintained by OFAC and/or on any other similar list maintained by OFAC pursuant to any authorizing statute including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Order or any applicable Law promulgated thereunder, with the result that the investment in

WEIL:\97507497\16\10143.0003

Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries (whether directly or indirectly) is prohibited by any applicable Law, or the Loans made by the Lenders would be in violation of any applicable Law, or (2) the Executive Order or Sanctions, any related enabling legislation or any other similar Executive Orders or (y) to the knowledge of the Borrower, any Embargoed Person to have any direct or indirect interest, in Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries, with the result that the investment in Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries (whether directly or indirectly) is prohibited by any applicable Law or the Loans are in violation of any applicable Law.

**Section 6.22    Account Control Agreements**.  With respect to each deposit account, securities account or other similar account established prior to or on the Closing Date, deliver an Account Control Agreement with respect to each such account (other than any Excluded Accounts) within 30 days after the Closing Date or such later date as the Required Lenders may agree in their sole discretion. With respect to each deposit account, securities account or other similar account (other than any Excluded Accounts) established following the Closing Date, deliver on the date thirty (30) days following the establishment thereof (or such later date agreed to by the Required Lenders in their sole discretion), an Account Control Agreement with respect to each such account. The Administrative Agent's rights with respect to each account subject to an Account Control Agreement shall be governed by such Account Control Agreement. Following the Closing Date, the Borrower shall give the Administrative Agent prompt written notice of the opening of any deposit, securities or other similar account by any Loan Party.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Loan or other Obligation hereunder (other than contingent obligations not yet due and owing as to which no claim has been asserted), then from and after the Closing Date, the Borrower (and, with respect to Section 7.14 only, the Holdcos) shall not and shall not permit any of its Subsidiaries to, directly or indirectly:

**Section 7.01    Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

> (a)    Liens (i) created pursuant to any Loan Document and (ii) on the Collateral securing other Secured Obligations;

> (b)    Liens existing on the Closing Date and listed in Schedule 7.01(b) and any modifications, replacements, renewals, restructurings, refinancings or extensions thereof; *provided* that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under Section 7.03 and (B) proceeds and products thereof and (ii) the replacement, renewal, extension or refinancing of the obligations secured or benefitted by such Liens, to the extent constituting Indebtedness, is permitted by Section 7.03;

> (c)    Liens for taxes, assessments or governmental charges that are not overdue for a period of more than any applicable grace period related thereto or (i) that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP to the extent required by GAAP or (ii) the failure to pay of discharge the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

> (d)    statutory or common law Liens of landlords, sub-landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like

<div align="center">82</div>

Liens, so long as, in each case, such Liens secure amounts not overdue for a period of more than 30 days or if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Liens or that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e)     (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Subsidiaries;

(f)     pledges or deposits to secure the performance of bids, trade contracts, utilities, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(g)     covenants, conditions, easements, rights-of-way, building codes, restrictions (including zoning restrictions), encroachments, licenses, protrusions and other similar encumbrances and minor title defects, in each case affecting Real Property and that do not in the aggregate materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole, and any exceptions on the Mortgage Policies issued in connection with the Mortgaged Properties;

(h)     Liens (i) securing judgments or orders for the payment of money not constituting an Event of Default under Section 8.01(h) and (ii) notices of *lis pendens* and associated rights related to litigation being contested in good faith by appropriate proceedings for which adequate reserves have been made;

(i)     leases, licenses, subleases or sublicenses (including licenses and sublicenses of software and other intellectual property rights) and terminations thereof, in each case either granted to others with respect to intellectual property that is not material to the business of the Borrower and Subsidiaries or in the ordinary course of business, which (i) do not interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, (ii) do not secure any Indebtedness and (iii) are permitted by Section 7.05;

(j)     Liens in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(k)     Liens (i) of a collection bank arising under Section 4-208 of the Uniform Commercial Code on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business, (iii) in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions, and (iv) that are contractual rights of setoff or rights of pledge relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

<div align="center">83</div>

(l)      Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Sections 7.02(g), (i) and (n) or to the extent related to any of the foregoing, Section 7.02(s), to be applied against the purchase price for such Investment, and (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(m)     Liens (i) in favor of the Borrower or any Subsidiary Guarantor and (ii) in favor of a Subsidiary that is not a Loan Party on assets of a Subsidiary that is not a Loan Party securing Indebtedness permitted under Section 7.03;

(n)      any interest or title of a lessor, sub-lessor, licensor or sub-licensor under leases, subleases, licenses or sublicenses entered into by the Borrower or any of its Subsidiaries in the ordinary course of business or with respect to intellectual property that is not material to the business of the Borrower and its Subsidiaries;

(o)      Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business permitted by this Agreement;

(p)      Liens deemed to exist in connection with Investments in repurchase agreements under Section 7.02;

(q)      Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(r)      Liens that are contractual rights of setoff or rights of pledge (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any of its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(s)      Liens solely on any cash earnest money deposits made by the Borrower or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(t)      ground leases in respect of Real Property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(u)      Liens to secure Indebtedness permitted under Section 7.03(e); *provided* that (i) such Liens are created within 270 days of the acquisition, construction, repair, lease or improvement of the property subject to such Liens, (ii) such Liens do not at any time encumber property (except for replacements, additions, accessions and proceeds to such property) other than the property financed by such Indebtedness and the proceeds and products thereof and customary security deposits and (iii) with respect to Capitalized Leases, such Liens do not at any time extend to or cover any assets (except for replacements, additions and accessions to such assets) other than the assets subject to such Capitalized Leases and the proceeds and products thereof and customary security deposits; *provided* that

84

WEIL:\97507497\16\10143.0003

individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(v)        Liens on property of any Subsidiary that is not a Loan Party, which Liens secure Indebtedness of any Subsidiary that is not a Loan Party permitted under Section 7.03;

(w)        Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Subsidiary (other than by designation as a Subsidiary pursuant to Section 6.14) (other than Liens on the Equity Interests of any Person that becomes a Subsidiary to the extent such Equity Interests are owned by the Borrower or another Subsidiary), in each case, securing Indebtedness permitted pursuant to Section 7.03(g),

(x)        (i) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business complies, and (ii) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any Real Property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole;

(y)        Liens arising from precautionary Uniform Commercial Code financing statement or similar filings;

(z)        Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(aa)        the modification, replacement, renewal or extension of any Lien permitted by Sections 7.01(b), (u) and (w); *provided* that (i) the Lien does not extend to any additional property, other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien and (B) proceeds and products thereof, and (ii) the renewal, extension, restructuring or refinancing of the obligations secured or benefited by such Liens is permitted by Section 7.03 (to the extent constituting Indebtedness);

(bb)        Liens with respect to property or assets of the Borrower or any of its Subsidiaries securing obligations, other than Indebtedness for borrowed money, in an aggregate principal amount outstanding at any time not to exceed $5,000,000, in each case determined as of the date of incurrence;

(cc)        [reserved];

(dd)        [reserved];

(ee)        Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(ff)        deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

(gg)        [reserved];

(hh)        [reserved];

85

WEIL:\97507497\16\10143.0003

(ii)     Liens on property of any Foreign Subsidiary securing Indebtedness of such Foreign Subsidiary permitted under Section 7.03;

(jj)     Subject to the Intercreditor Agreement, Liens on the Collateral securing (i)(A) Indebtedness incurred pursuant to Section 7.03(w) and (B) related Second Lien Secured Obligations under the Second Lien Loan Documents governing such Indebtedness and (ii)(A) Indebtedness incurred pursuant to Section 7.03(x) and (b) related to ABL Secured Obligations under the ABL Loan Documents governing such Indebtedness;

(kk)    [reserved];

(ll)     in the case of any non-wholly owned Subsidiary, any put and call arrangements or restrictions on disposition related to its Equity Interests set forth in its organizational documents or any related joint venture or similar agreement;

(mm)   Liens securing Swap Contracts so long as the value of the property securing such Swap Contracts does not exceed $2,500,000 at any time;

(nn)    Liens on property incurred pursuant to any sale-leaseback transaction permitted hereunder and general intangibles related thereto;

(oo)    [reserved]; and

(pp)    Liens arising by operation of law in the United States under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods.

Section 7.02     **Investments**.  Make or hold any Investments, except:

(a)     Investments by the Borrower or any of its Subsidiaries in assets that were cash or Cash Equivalents when such Investment was made;

(b)     loans or advances to officers, directors and employees of any Loan Party (or any direct or indirect parent thereof) or any of its Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests of Holdings or any direct or indirect parent thereof or to permit the payment of taxes with respect thereto; *provided* that, to the extent such loans or advances are made in cash, the amount of such loans and advances used to acquire such Equity Interests shall be contributed to the Borrower in cash as common equity; *provided*, *further*, that the aggregate principal amount outstanding at any time under this clause (ii) shall not exceed $3,750,000, and (iii) for any other purposes not described in the foregoing clauses (i) and (ii); *provided* that the aggregate principal amount outstanding at any time under this clause (iii) shall not exceed $1,250,000;

(c)     Investments (i) by the Borrower or any Subsidiary in any Loan Party (other than a Holdco), (ii) by any Subsidiary that is not a Loan Party in any other Subsidiary that is not a Loan Party and (iii) by any Loan Party in any Subsidiary that is not a Loan Party; *provided* that (A) no such Investments made pursuant to clause (iii) in the form of intercompany loans shall be evidenced by a promissory note unless any such promissory note constituting a negotiable instrument is pledged to the Administrative Agent in accordance with the terms of the Security Agreement, (B) any Investments in the form of intercompany loans constituting Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be unsecured and subordinated to the Obligations on terms consistent with the subordination provisions of the Intercompany Note and (C) the aggregate

86

amount of Investments made pursuant to clause (iii) shall not exceed $20,000,000 at any time outstanding;

(d)        Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e)        Investments (excluding loans and advances made in lieu of Restricted Payments pursuant to and limited by Section 7.02(m) below) consisting of transactions permitted under Sections 7.01, 7.03 (other than 7.03(c) and (d)), 7.04 (other than 7.04(c)(ii) or (e)), 7.05 (other than 7.05(d)(ii) or 7.05(e)), 7.06 (other than 7.06(d)) and 7.13, respectively;

(f)        Investments (i) existing or contemplated on the Closing Date or made pursuant to legally binding written contracts in existence on the Closing Date, in each case set forth on Schedule 7.02(f) and any modification, replacement, renewal, reinvestment or extension thereof and (ii) existing on the Closing Date by the Borrower or any Subsidiary in the Borrower or any other Subsidiary and any modification, renewal or extension thereof; *provided* that (x) the amount of the original Investment is not increased except by the terms of such Investment or as otherwise permitted by this Section 7.02 and (y) any Investment in the form of Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be subject to subordination terms substantially consistent with the terms of the Intercompany Note;

(g)        Investments in Swap Contracts permitted under Section 7.03;

(h)        promissory notes, securities and other non-cash consideration received in connection with Dispositions permitted by Section 7.05;

(i)        any acquisition of all or substantially all the assets of a Person or any Equity Interests in a Person that becomes a Subsidiary or division or line of business of a Person (or any subsequent Investment made in a Person, division or line of business previously acquired in a Permitted Acquisition), in a single transaction or series of related transactions, if no Event of Default exists on the date that the Borrower or the applicable Subsidiary enters into a binding agreement with respect to such acquisition and, immediately after giving effect to such acquisition, (i) any acquired or newly formed Subsidiary shall not be liable for any Indebtedness except for Indebtedness otherwise permitted by Section 7.03; (ii) to the extent required by the Collateral and Guarantee Requirement, (A) the property, assets and businesses acquired in such purchase or other acquisition shall constitute Collateral and (B) any such newly created or acquired Subsidiary (other than an Excluded Subsidiary) shall become a Guarantor, in each case, in accordance with Section 6.11; and (iii) the aggregate amount of Investments by Loan Parties pursuant to this Section 7.02(i) in assets (other than Equity Interests) that are not (or do not become at the time of such acquisition) directly owned by a Loan Party or in Equity Interests of Persons that do not become Loan Parties shall not exceed, when taken together with the aggregate amount of all Investments made pursuant to Section 7.02(c)(iii), $20,000,000 (any such acquisition, a "**Permitted Acquisition**");

(j)        Investments made in connection with the Transactions;

87

WEIL:\97507497\16\10143.0003

(k)      Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(l)      Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(m)      loans and advances to any direct or indirect parent of the Borrower, in lieu of and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof) Restricted Payments to the extent permitted to be made to such parent in accordance with Section 7.06(h), such Investment being treated for purposes of the applicable clause of Section 7.06, including any limitations, as if a Restricted Payment had been made pursuant to such clause;

(n)      Investments (including Permitted Acquisitions) in an aggregate amount pursuant to this Section 7.02(n) (valued at the time of the making thereof, and without giving effect to any write-downs or write-offs thereof) at any time not to exceed $12,500,000;

(o)      Investments made in respect of joint ventures or other similar agreements or partnership not to exceed $10,000,000;

(p)      Investments in any Person to which the Borrower or any Subsidiary outsources operational activities or otherwise related to the outsourcing of operational activities in the ordinary course of business in an aggregate amount not to exceed $2,500,000;

(q)      advances of payroll payments to employees in the ordinary course of business;

(r)      (i) Investments made in the ordinary course of business in connection with obtaining, maintaining or renewing client contracts and loans or advances made to distributors and suppliers in the ordinary course of business and (ii) Investments to the extent that payment for such Investments is made solely with Equity Interests of Holdings permitted to be issued hereunder (or any direct or indirect parent of the Borrower);

(s)      Investments of a Subsidiary acquired after the Closing Date in accordance with Section 7.02 or of a Person merged or amalgamated or consolidated into the Borrower or merged, amalgamated or consolidated with a Subsidiary in accordance with Section 7.04 after the Closing Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger or consolidation; *provided* that this clause (s) is intended solely to grandfather such Investments as are indirectly acquired as a result of an acquisition of a Person otherwise permitted hereunder and any consideration paid in connection with such acquisition that may be allocable to such Investments that consist of Subsidiaries that are not Loan Parties must be permitted by, and be taken into account in computing compliance with, any basket amounts or limitations applicable to such acquisition hereunder;

88

WEIL:\97507497\16\10143.0003

(t)     Investments made by a Subsidiary that is not a Loan Party to the extent such Investments are financed with the proceeds received by such Subsidiary from an Investment in such Subsidiary by a Loan Party permitted under this Section 7.02;

(u)     [reserved];

(v)     [reserved];

(w)     Investments in deposit accounts, securities accounts and commodities accounts maintained by the Borrower or such Subsidiary, as the case may be;

(x)     Investments constituting any part of a reorganization and other activities related to tax planning; *provided* that (i) no Event of Default shall have occurred and be continuing and (ii) any security interests granted to the Administrative Agent for the benefit of the Secured Parties in the Collateral pursuant to the Collateral Documents shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, consolidation, dissolution or liquidation) and all actions required to maintain said perfected status have been or will promptly be taken; and

(y)     contributions of the Equity Interests of any Subsidiary that is not a Loan Party to any other Subsidiary that is not a Loan Party to the extent necessary in connection with any intercompany reorganization and/or other activities related to tax planning; *provided* that no Event of Default shall have occurred and be continuing.

To the extent an Investment is permitted to be made by a Loan Party directly in any Subsidiary or any other Person who is not a Loan Party (each such person, a "**Target Person**") under any provision of this Section 7.02, such Investment may be made by advance, contribution or distribution by a Loan Party to a Subsidiary, or a Holdco, and further contemporaneously advanced or contributed to a Subsidiary for purposes of making the relevant Investment in the Target Person without constituting an Investment for purposes of Section 7.02 (it being understood that such Investment must satisfy the requirements of, and shall count towards any thresholds in, a provision of this Section 7.02 as if made by the applicable Loan Party directly to the Target Person).

Section 7.03     **Indebtedness**.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)     Indebtedness of any Loan Party under the Loan Documents;

(b)     Indebtedness outstanding on the Closing Date and listed on Schedule 7.03(b) and any Permitted Refinancing thereof; *provided* that all such Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be unsecured and subordinated to the Obligations pursuant to an Intercompany Note;

(c)     Guarantees by the Borrower and any Subsidiary in respect of Indebtedness of the Borrower or any Subsidiary otherwise permitted hereunder; *provided* that (A) no Guarantee by any Subsidiary of any Indebtedness that is secured by a Lien on the Collateral shall be permitted unless such guaranteeing party shall have also provided a Guarantee of the Obligations on the terms set forth herein, (B) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guarantee of the Obligations on terms at least as favorable (as reasonably determined by the Borrower) to the Lenders as those contained in the subordination of such Indebtedness and (C) any Guarantee by a Subsidiary that is not a Loan Party of any Indebtedness under Section 7.03(g) or (m) (or any Permitted Refinancing in respect thereof) shall only be permitted if such Guarantee meets the requirements of clauses (s), (g) or (m), as the case may be, of this Section 7.03;

89

(d)	Indebtedness of the Borrower or any Subsidiary owing to any Loan Party or any other Subsidiary (or issued or transferred to any direct or indirect parent of a Loan Party which is substantially contemporaneously transferred to a Loan Party or any Subsidiary of a Loan Party) to the extent constituting an Investment permitted by Section 7.02; *provided* that (x) no such Indebtedness owed to a Loan Party shall be evidenced by a promissory note unless such promissory note constitutes a negotiable instrument and is pledged to the Administrative Agent in accordance with the terms of the Security Agreement and (y) with respect to Indebtedness of any Loan Party owed to a Subsidiary that is not a Loan Party, all such Indebtedness shall be unsecured and subordinated to the Obligations pursuant to subordination terms substantially consistent with the terms of the Intercompany Note;

(e)	(i) Attributable Indebtedness and other Indebtedness (including Capitalized Leases) financing an acquisition, construction, repair, replacement, lease or improvement of a fixed or capital asset incurred by the Borrower or any Subsidiary prior to or within 270 days after the acquisition, lease or improvement of the applicable asset and any Permitted Refinancing thereof in an aggregate amount not to exceed $7,500,000, determined at the time of incurrence (together with any Permitted Refinancings thereof) at any time outstanding and (ii) Attributable Indebtedness arising out of sale-leaseback transactions permitted by Section 7.05(m) and any Permitted Refinancing of such Attributable Indebtedness;

(f)	Indebtedness in respect of Swap Contracts designed to hedge against the Borrower's or any Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes and Guarantees thereof;

(g)	Indebtedness of the Borrower or any Subsidiary (i) assumed in connection with any Permitted Acquisition (provided that such Indebtedness is not created or incurred in contemplation of such Permitted Acquisition) or (ii) incurred to finance any Permitted Acquisition; provided that (A) the aggregate amount of Indebtedness assumed and/or incurred pursuant to this clause (g) shall not exceed $25,000,000 and (B) after giving Pro Forma Effect to the incurrence of such Indebtedness (x) at any time when the financial covenant contained in Section 7.11 is not in effect, the Consolidated First Lien Net Leverage Ratio does not exceed [●]:1.00 or (y) the Consolidated First Lien Net Leverage Ratio does not exceed the Consolidated First Lien Net Leverage Ratio as of the last day of the most recently ended Test Period;

(h)	Indebtedness representing deferred compensation to employees of the Borrower or any of its Subsidiaries incurred in the ordinary course of business;

(i)	Indebtedness consisting of promissory notes issued by the Borrower or any of its Subsidiaries to current or former officers, managers, consultants, directors and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of the Borrower or any direct or indirect parent of the Borrower permitted by Section 7.06; *provided* that such Indebtedness shall be subordinated in right of payment to the Obligations on terms reasonably satisfactory to the Required Lenders;

(j)	Indebtedness incurred by the Borrower or any of its Subsidiaries in a Permitted Acquisition, any other Investment permitted hereunder (including through a merger) or any Disposition permitted hereunder, in each case, constituting indemnification obligations or obligations in respect of purchase price (including earnouts) or other similar adjustments;

(k)	Indebtedness consisting of obligations of the Borrower or any of its Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with the Transactions, and Permitted Acquisitions or any other Investment permitted hereunder;

(l)	Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements

90

in the ordinary course of business and any Guarantees thereof or the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished in the ordinary course of business;

(m)    Indebtedness in an aggregate principal amount that at the time of, and after giving effect to, the incurrence thereof, would not exceed $7,500,000 determined at the time of incurrence;

(n)    Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(o)    Indebtedness incurred by the Borrower or any of its Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers' compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims;

(p)    obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of its Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(q)    [reserved];

(r)    [reserved];

(s)    [reserved];

(t)    [reserved];

(u)    Indebtedness incurred by a Foreign Subsidiary which, when aggregated with the principal amount of all other Indebtedness incurred pursuant to this Section 7.03(u) and then outstanding for all such Persons taken together (and any Permitted Refinancing of the foregoing, to the extent assumed or incurred by a Subsidiary that is not a Loan Party), does not exceed $25,000,000;

(v)    [reserved];

(w)    (i) Indebtedness under the Second Lien Credit Agreement in an aggregate principal amount not to exceed $50,000,000 and (ii) any Permitted Refinancing in respect of any of the foregoing Indebtedness in accordance with the terms of the Intercreditor Agreement;

(x)    (i) Indebtedness under the ABL Credit Agreement in an aggregate principal amount not to exceed $30,000,000 and (ii) any Permitted Refinancing in respect of any of the foregoing Indebtedness in accordance with the terms of the Intercreditor Agreement;

(y)    [reserved];

(z)    [reserved]; and

(aa)    all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in Sections 7.03(a) through Section 7.03(aa);

91

*provided*, *however*, that all Indebtedness permitted by this Section 7.03 which is permitted to be secured pursuant to Section 7.01 and is secured by the Collateral shall be subject to the following: (1) in the case of the Indebtedness described in Section 7.03(w), all such Indebtedness incurred on the Closing Date shall constitute "Junior Lien Obligations" under (and as defined in) the Intercreditor Agreement and the Second Lien Administrative Agent acting on behalf of the holders of such Indebtedness shall have become party to the Intercreditor Agreement on the Closing Date; (2) in the case of the Indebtedness described in Section 7.03(x), all such Indebtedness incurred on the Closing Date shall constitute "ABL Obligations" under (and as defined in) the Intercreditor Agreement and the ABL Agent acting on behalf of the holders of such Indebtedness shall have become party to the Intercreditor Agreement on the Closing Date;

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased, *plus* the aggregate amount of fees, underwriting discounts, premiums (including tender premiums) and other costs and expenses (including OID) incurred in connection with such refinancing.

The accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 7.03.  The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

For purposes of determining compliance with this Section 7.03, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Indebtedness described in Sections 7.03(a) through 7.03(aa), Holdings shall, in its sole discretion, classify and reclassify or later divide, classify or reclassify such item of Indebtedness (or any portion thereof) and will only be required to include the amount and type of such Indebtedness in one or more of the above clauses; *provided* that (w) all Indebtedness outstanding under the Loan Documents will at all times be deemed to be outstanding in reliance only on the exception in Section 7.03(a), (x) the ABL Credit Agreement and any Permitted Refinancing in respect of the foregoing will at all times be deemed to be outstanding in reliance only on the exception in Section 7.03(x) and (y) the Second Lien Term Facility and any Permitted Refinancing in respect of the foregoing will at all times be deemed to be outstanding in reliance only on the exception in Section 7.03(w).

**Section 7.04     Fundamental Changes**. Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of related transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person (other than as part of the Transactions), except that:

> (a)     (i) Any Loan Party (other than Holdings or the Borrower) and any Subsidiary may merge, amalgamate or consolidate with the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction); *provided* that the Borrower shall be the continuing or surviving Person and (ii) any Subsidiary may merge with one or more other Subsidiaries; *provided* that when any Person that is a Loan Party is merging with a Subsidiary that is not a Loan Party, the Loan Party shall be the continuing or surviving Person or the surviving entity shall substantially concurrently become a Loan Party; *provided*, *further*, that any security interests granted to the Administrative Agent for

92

the benefit of the Secured Parties in the Collateral pursuant to the Collateral Documents shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, consolidation, dissolution or liquidation) and all actions required to maintain said perfected status have been or will promptly be taken, in each case, as required by Sections 6.11 or 6.13 to the extent required pursuant to the Collateral and Guarantee Requirement;

(b)      (i) any Subsidiary that is not a Loan Party may merge, amalgamate or consolidate with or into any other Subsidiary that is not a Loan Party, (ii) any Subsidiary may liquidate or dissolve and (iii) any Subsidiary may change its legal form if, with respect to clauses (ii) and (iii), the Borrower determines in good faith that such action is in the best interest of the Borrower and its Subsidiaries and is not materially disadvantageous to the Lenders (it being understood that in the case of any change in legal form, a Subsidiary that is a Guarantor will remain a Guarantor unless such Guarantor is otherwise permitted to cease being a Guarantor hereunder);

(c)      any Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Subsidiary; *provided* that if the transferor in such a transaction is a Guarantor, then (i) the transferee must be a Subsidiary Guarantor or the Borrower or (ii) to the extent constituting an Investment, such Investment must be a permitted Investment in or Indebtedness of a Subsidiary which is not a Loan Party in accordance with Sections 7.02 (other than Section 7.02(e) or 7.02(h)) and 7.03, respectively;

(d)      [reserved];

(e)      so long as no Event of Default has occurred and is continuing or would result therefrom (in the case of a merger involving a Loan Party), any Subsidiary may merge or consolidate with any other Person in order to effect an Investment permitted pursuant to Section 7.02; *provided* that the continuing or surviving Person shall be a Subsidiary, which together with each of such surviving Person's Subsidiaries that are Subsidiaries, shall have complied with the requirements of Section 6.11 or 6.13 to the extent required pursuant to the Collateral and Guarantee Requirement;

(f)      [reserved]; and

(g)      so long as no Event of Default has occurred and is continuing or would result therefrom, a merger, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 7.05 or a Restricted Payment permitted pursuant to Section 7.06.

**Section 7.05    Dispositions**.  Make any Disposition, except:

(a)      Dispositions of obsolete, worn out, used or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Borrower or any of its Subsidiaries;

(b)      Dispositions of inventory in the ordinary course of business or consistent with past practice, goods held for sale in the ordinary course of business and immaterial assets (including allowing any registrations or any applications for registration of any immaterial intellectual property to lapse or go abandoned in the ordinary course of business) and termination of leases and licenses in the ordinary course of business;

93

WEIL:\97507497\16\10143.0003

(c)        Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)        Dispositions of property to the Borrower or any Subsidiary; *provided* that if the transferor of such property is a Loan Party, (i) the transferee thereof must be a Loan Party (other than a Holdco) or (ii) if such transaction constitutes an Investment, such transaction is permitted under Section 7.02 other than Section 7.02(e);

(e)        to the extent constituting Dispositions, transactions permitted by (i) Section 7.01 (other than Section 7.01(i) and (l)(ii)), (ii) Section 7.02 (other than 7.02(e) or (h)), (iii) Section 7.04 (other than 7.04(g)) and (iv) Section 7.06 (other than 7.06(d));

(f)        Dispositions to consummate the Transactions;

(g)        Dispositions of cash and Cash Equivalents;

(h)        leases, subleases, licenses or sublicenses (including licenses and sublicenses of software or other intellectual property rights) and terminations thereof, in each case in the ordinary course of business, and which do not materially interfere with the business of the Borrower and its Subsidiaries (taken as a whole) and (ii) Dispositions of intellectual property (including inbound licenses) that is no longer material to the business of the Borrower and its Subsidiaries;

(i)        transfers of property subject to Casualty Events;

(j)        Dispositions of property; *provided* that (i) at the time of such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Default has occurred and is continuing), no Event of Default shall have occurred and be continuing or would result from such Disposition, (ii) with respect to Dispositions pursuant to this Section 7.05(j) for an aggregate purchase price for all such Dispositions in excess of $5,000,000 in any fiscal year, the Borrower or any of its Subsidiaries shall receive not less than 75% of such consideration in the form of cash or Cash Equivalents (in each case, free and clear of all Liens at the time received, other than non-consensual Liens permitted by Section 7.01 and Liens permitted by Sections 7.01(a), (f), (k), (l), (m), (n), (p), (q), (r)(i), (r)(ii), (s), (jj) and (kk) (only to the extent the Obligations are secured by such cash and Cash Equivalents)); *provided, however*, that for the purposes of this clause (ii), the following shall be deemed to be cash: (A) any liabilities (as shown on the Borrower's most recent balance sheet provided hereunder or in the footnotes thereto) of the Borrower or such Subsidiary, other than liabilities that are by their terms subordinated to the payment in cash of the Obligations, that are assumed by the transferee with respect to the applicable Disposition and for which the Borrower and all of its Subsidiaries shall have been validly released by all applicable creditors in writing, (B) any securities received by the Borrower or the applicable Subsidiary from such transferee that are converted by the Borrower or such Subsidiary into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of the applicable Disposition, and (C) aggregate non-cash consideration received by the Borrower or the applicable Subsidiary having an aggregate fair market value (determined as of the closing of the applicable Disposition for which such non-cash consideration is received) not to exceed the $6,250,000 at any time and (iii) the Borrower or the applicable Subsidiary complies with the applicable provision of Section 2.05(b);

94

WEIL:\97507497\16\10143.0003

(k)      Dispositions of non-core assets acquired in connection with Permitted Acquisitions or other Investments; *provided* that (i) the aggregate amount of such sales shall not exceed 25% of the fair market value of the acquired entity or business and (ii) each such sale is in an arm's-length transaction and the Borrower or the respective Subsidiary receives at least fair market value in exchange therefor;

(l)      Dispositions or discounts without recourse of accounts receivable in connection with the compromise or collection thereof in the ordinary course of business;

(m)      Dispositions of property pursuant to sale-leaseback transactions; *provided* that any Net Proceeds from such Disposition shall be applied to prepay Loans in accordance with Section 2.05(b)(ii);

(n)      any swap of assets in exchange for services or other assets in the ordinary course of business of comparable or greater value or usefulness to the business of the Borrower and its Subsidiaries as a whole, as determined in good faith by the management of the Borrower;

(o)      [reserved];

(p)      Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(q)      the unwinding or settlement of any Swap Contract;

(r)      the lapse or abandonment in the ordinary course of business of any registrations or applications for registration of any immaterial IP Rights;

(s)      [reserved];

(t)      [reserved];

(u)      Dispositions of non-Collateral assets in an aggregate amount not to exceed, over the life of this Agreement, $2,500,000; and

(v)      Dispositions pursuant to agreements, instruments or arrangements in existence on the Closing Date and set forth on Schedule 7.05(v);

*provided* that any Disposition of any property pursuant to this Section 7.05 (except pursuant to Sections 7.05(a), (b), (d), (e), (f), (h), (i), (l), (p), (q) and (r) and except for Dispositions from a Loan Party to any other Loan Party) shall be for no less than the fair market value of such property at the time of such Disposition as determined by the Borrower in good faith.  To the extent any Collateral is Disposed of as permitted by this Section 7.05 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

**Section 7.06    Restricted Payments**.  Declare or make, directly or indirectly, any Restricted Payment, except:

(a)      each Subsidiary may make Restricted Payments to the Borrower, and other Subsidiaries of the Borrower (and, in the case of a Restricted Payment by a non-wholly owned Subsidiary, to the Borrower and any other Subsidiary and to each other owner of

95

WEIL:\97507497\16\10143.0003

Equity Interests of such Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(b)      the Borrower and each Subsidiary may declare and make dividend payments or other Restricted Payments payable solely in the Equity Interests of such Person (and, in the case of such a Restricted Payment by a non-wholly owned Subsidiary, to the Borrower and any other Subsidiary and to each other owner of Equity Interests of such Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(c)      [reserved];

(d)      to the extent constituting Restricted Payments, the Borrower (or any direct or indirect parent thereof) and its Subsidiaries may enter into and consummate transactions permitted by any provision of Section 7.02 (other than 7.02(e) and 7.02(m)), 7.04 (other than 7.04(g)), 7.05 (other than 7.05(e)(iv) and 7.05(g)) or 7.08 (other than 7.08(f), 7.08(g), 7.08(h), and 7.08(m));

(e)      repurchases of Equity Interests in the Borrower or any Subsidiary deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(f)      [reserved]:

(g)      [reserved];

(h)      the Borrower may make Restricted Payments to any direct or indirect parent of the Borrower:

(i)      to pay its operating costs and expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), incurred in the ordinary course of business and attributable to the ownership or operations of the Borrower and its Subsidiaries, Transaction Expenses and any indemnification claims made by directors or officers of such parent attributable to the ownership or operations of the Borrower and its Subsidiaries;

(ii)      the proceeds of which shall be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) ordinary course franchise or similar Taxes, other fees and expenses required to maintain its (or any of its direct or indirect parents') corporate existence; and

(iii)      for any taxable period in which the Borrower and/or any of its Subsidiaries is a member of a consolidated, combined or similar income tax group of which a direct or indirect parent of the Borrower is the common parent (a "**Tax Group**"), to pay the portion of any federal, foreign, state and/or local income taxes of such Tax Group that are attributable to the taxable income of the Borrower and/or its Subsidiaries *provided* that, for each taxable period, the amount of such payments made in respect of such taxable period in the aggregate shall not exceed the amount that the Borrower and its Subsidiaries would have been required to pay as a stand-alone consolidated, combined or similar income tax group (any amount permitted to be paid under this Section 7.06(h)(iii), a "**Tax Distribution**");

(i)      payments made or expected to be made by a Holdco, Borrower or any of the Subsidiaries (or Restricted Payments to allow any direct or indirect parent thereof to

96

WEIL:\97507497\16\10143.0003

make payments) in respect of withholding or similar Taxes payable by or with respect to any future, present or former employee, director, manager or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) and any repurchases of Equity Interests in consideration of such payments including deemed repurchases, in each case, in connection with the exercise of stock options;

(j)        [after a Qualified IPO by the Borrower or a Relevant Public Company, (i) any Restricted Payment by the Borrower to pay listing fees and other costs and expenses attributable to the Borrower or such Relevant Public Company being a publicly traded company which are reasonable and customary and (ii) additional Restricted Payments in an aggregate amount per annum not to exceed an amount equal to 6.0% of the net proceeds received by (or contributed to) the Borrower from such Qualified IPO];

(k)        the Borrower or any of the Subsidiaries may pay (or to make Restricted Payments to allow any direct or indirect parent thereof to pay) cash in lieu of fractional Equity Interests in connection with (x) any dividend, split or combination thereof or (y) any Permitted Acquisition; and

(l)        [reserved].

**Section 7.07    [Reserved]**.

**Section 7.08    Transactions with Affiliates**.   Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, in each case involving aggregate payments or consideration in excess of $1,000,000, other than:

(a)        transactions among the Borrower and its Subsidiaries or any entity that becomes a Subsidiary as a result of such transaction;

(b)        on terms substantially as favorable to the Borrower or such Subsidiary as would be obtainable by the Borrower or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(c)        the Transactions and the payment of fees and expenses (including Transaction Expenses) as part of or in connection with the Transactions;

(d)        the issuance of Equity Interests to any officer, director, employee or consultant of the Borrower or any of its Subsidiaries in connection with the Transactions;

(e)        [reserved];

(f)        Restricted Payments permitted under Section 7.06;

(g)        loans and other Investments among Holdings, Intermediate Holdings, the Borrower and its Subsidiaries and joint ventures (to the extent any such Subsidiary that is not a Subsidiary or any such joint venture is only an Affiliate as a result of Investments by the Holdcos, the Borrower and/or its Subsidiaries in such Subsidiary or joint venture) to the extent otherwise permitted under Section 7.02;

(h)        transactions by the Borrower and its Subsidiaries permitted under an express provision (including any exceptions thereto) of this Article VII;

97

(i)      employment and severance arrangements between the Borrower and its Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee benefit plans and arrangements in the ordinary course of business;

(j)      the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers, employees and consultants of the Borrower and its Subsidiaries (or any direct or indirect parent of the Borrower) in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and its Subsidiaries;

(k)      transactions pursuant to agreements, instruments or arrangements in existence on the Closing Date and set forth on Schedule 7.08(k) or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect;

(l)      [reserved];

(m)      payments by the Borrower or any of its Subsidiaries pursuant to any tax sharing agreements with any direct or indirect parent of the Borrower to the extent attributable to the ownership or operation of the Borrower and the Subsidiaries, but only to the extent permitted by Section 7.06(h)(iii);

(n)      the issuance or transfer of Equity Interests (other than Disqualified Equity Interests) of Holdings to any Permitted Holder or to any former, current or future director, manager, officer, employee or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees, distributes or Affiliate of any of the foregoing) of the Borrower, any of its Subsidiaries or any direct or indirect parent thereof;

(o)      transactions with customers, clients, joint venture partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and the Subsidiaries, in the reasonable determination of the board of directors or the senior management of the Borrower, or are on terms at least as favorable (as reasonably determined by the Borrower) as might reasonably have been obtained at such time from an unaffiliated party;

(p)      the Transactions;

(q)      the payment of reasonable out-of-pocket costs and expenses and indemnities pursuant to the stockholders agreement or the registration and participation rights agreement entered into on the Closing Date in connection therewith;

(r)      transactions in which the Borrower or any of the Subsidiaries, as the case may be, deliver to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Borrower or such Subsidiary from a financial point of view or meets the requirements of Section 7.08(b); and

(s)      payments to or from, and transactions with, joint ventures (to the extent any such joint venture is only an Affiliate as a result of Investments by the Borrower and the Subsidiaries in such joint venture) in the ordinary course of business to the extent otherwise permitted under Section 7.02.

98

**Section 7.09**     **Burdensome Agreements**.  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that limits the ability of:

(a)     any Subsidiary that is not a Guarantor to make Restricted Payments to the Borrower or any Guarantor; or

(b)     any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Lenders with respect to the Facilities and the Obligations;

*provided* that the foregoing Sections 7.09(a) and (b) shall not apply to Contractual Obligations which:

(i)     (x) exist on the Closing Date and (to the extent not otherwise permitted by this Section 7.09) are listed on Schedule 7.09(b) and (y) to the extent Contractual Obligations permitted by clause (x) are set forth in an agreement evidencing Indebtedness, are set forth in any agreement evidencing any permitted modification, replacement, renewal, extension or refinancing of such Indebtedness so long as such modification, replacement, renewal, extension or refinancing (taken as a whole) does not materially expand the scope of such Contractual Obligation (as reasonably determined by the Borrower);

(ii)     are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Subsidiary; *provided*, *further*, that this clause (ii) shall not apply to Contractual Obligations that are binding on a Person that becomes a Subsidiary pursuant to Section 6.14;

(iii)     represent Indebtedness of a Subsidiary which is not a Loan Party which is permitted by Section 7.03 and which does not apply to any Loan Party;

(iv)     are customary restrictions (as reasonably determined by the Borrower) that arise in connection with (x) any Lien permitted by Sections 7.01(a), (b), (f), (i), (j)(i), (k), (l), (p), (q), (r)(i), (r)(ii), (s), (u), (v), (w), (z), (aa), (ee), (ii), (jj), and (kk) and relate to the property subject to such Lien or (y) arise in connection with any Disposition permitted by Section 7.04 or 7.05 and relate solely to the assets or Person subject to such Disposition;

(v)     are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 7.02 and applicable solely to such joint venture and its equity entered into in the ordinary course of business;

(vi)     are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 7.03 but solely to the extent any negative pledge relates to (i) the property financed by such Indebtedness and the proceeds, accessions and products thereof or (ii) the property secured by such Indebtedness and the proceeds, accessions and products thereof so long as the agreements governing such Indebtedness permit the Liens securing the Obligations;

(vii)     are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the property interest, rights or the assets subject thereto;

(viii)     comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Sections 7.03(b), (e), (g), (n)(i), (u), (w) and (x) and to the extent that such restrictions apply only to the property or assets securing such Indebtedness

99

or, in the case of Section 7.03(g) or (u), to the Subsidiaries incurring or guaranteeing such Indebtedness;

(ix)     are customary provisions restricting subletting, transfer or assignment of any lease governing a leasehold interest of the Borrower or any Subsidiary;

(x)     are customary provisions restricting assignment or transfer of any agreement entered into in the ordinary course of business;

(xi)     are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(xii)     arise in connection with cash or other deposits permitted under Sections 7.01 and 7.02 and limited to such cash or deposit;

(xiii)     comprise restrictions imposed by any agreement governing Indebtedness entered into on or after the Closing Date and permitted under Section 7.03 that are, taken as a whole, in the good faith judgment of the Borrower, either (a) no more restrictive than the restrictions contained in this Agreement or (b) no more restrictive with respect to the Borrower or any Subsidiary than customary market terms for Indebtedness of such type, so long as the Borrower shall have determined in good faith that such restrictions pursuant to this clause (b) will not affect its obligation or ability to make any payments required hereunder;

(xiv)     are restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(xv)     are restrictions regarding licensing or sublicensing by the Borrower and its Subsidiaries of intellectual property (including customary restrictions on assignment contained in license or sublicense agreements) entered into in the ordinary course of business;

(xvi)     are restrictions contained in the Second Lien Loan Documents and documents otherwise governing Indebtedness permitted pursuant to Section 7.03(w);

(xvii)     are restrictions on cash earnest money deposits in favor of sellers in connection with acquisitions not prohibited hereunder; and

(xviii)     are restrictions contained in the ABL Loan Documents and documents otherwise governing Indebtedness permitted pursuant to Section 7.03(x).

**Section 7.10     Maximum Capital Expenditures**. Permit the aggregate amount of Capital Expenditures made by the Borrower and its Subsidiaries in any fiscal year to exceed the amount provided in the table set forth below for such fiscal year (the "**Maximum Capital Expenditures Amount**"); provided that the Maximum Capital Expenditures Amount for any fiscal year may, at the election of the Borrower, be increased by an amount equal to 100% of the excess, if any, of the Maximum Capital Expenditures Amount for the previous fiscal year over the actual amount of Capital Expenditures made during such Fiscal Year (the "**Carry Over Amount**"). For purposes of determining compliance with this Section 7.10, (x) the amount of Capital Expenditures in any fiscal year shall (i) first be applied toward the Maximum Capital Expenditures Amount allocated to such fiscal year (without giving effect to any Carry Over Amount from the prior fiscal year) then (ii) from the Carry Over Amount available in such fiscal year until it has been fully utilized.

100

| Fiscal Year | Maximum Net Capital Expenditures Amount |
|---|---|
| 2021 | $14,200,000 |
| 2022 | $9,600,000 |
| 2023 | Greater of (i) $10,300,000 and (ii) 2.75% of Consolidated Net Sales |
| 2024 | Greater of (i) $10,600,000 and (ii) 2.75% of Consolidated Net Sales |
| 2025 | Greater of (i) $11,000,000 and (ii) 2.75% of Consolidated Net Sales |

**Section 7.11    Consolidated First Lien Net Leverage Ratio**.  Permit the Consolidated First Lien Net Leverage Ratio as of the last day of any Test Period ending on or after December 31, 2021 and set forth below to be greater than the ratio set forth below opposite such last day of a Test Period below.

| Test Period Ended | Consolidated First Lien Net Leverage Ratio |
|---|---|
| June 30, 2021 | 6.50:1.00 |
| September 30, 2021 | 5.25:1.00 |
| December 31, 2021 | 4.25:1.00 |
| March 31, 2022 | 4.25:1.00 |
| June 30, 2022 | 4.25:1.00 |
| September 30, 2022 | 4.25:1.00 |
| December 31, 2022 | 2.75:1.00 |
| March 31, 2023 | 2.75:1.00 |
| June 30, 2023 | 2.75:1.00 |
| September 30, 2023 | 2.75:1.00 |
| December 31, 2023 and thereafter | 1.75:1.00 |

**Section 7.12    Interest Coverage Ratio**. Permit the Interest Coverage Ratio as of the last day of any Test Period ending on or after December 31, 2021 and set forth below to be less than the ratio set forth below opposite such last day of a Test Period below.

| Test Period Ended | Interest Coverage Ratio |
|---|---|
| June 30, 2021 | 1.00:1.00 |
| September 30, 2021 | 1.25:1.00 |
| December 31, 2021 | 1.25:1.00 |
| March 31, 2022 | 1.25:1.00 |
| June 30, 2022 | 1.25:1.00 |
| September 30, 2022 | 1.25:1.00 |
| December 31, 2022 | 1.75:1.00 |
| March 31, 2023 | 1.75:1.00 |
| June 30, 2023 | 1.75:1.00 |
| September 30, 2023 | 1.75:1.00 |
| December 31, 2023 and thereafter | 2.50:1.00 |

101

**Section 7.13     Prepayments, Etc. of Indebtedness**.

(a)     Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner (it being understood that payments of regularly scheduled principal, interest and mandatory prepayments and "AHYDO" payments and, subject to no Event of Default then existing or resulting therefrom, in connection with the amendment of the Second Lien Credit Agreement, the payment of related fees (other than in connection with any amendment that reduces or forgives the commitments, outstanding principal amount or effective yield of such Second Lien Credit Agreement) shall be permitted) any (i) Indebtedness subordinated in right of payment incurred under Section 7.03, or (ii) any other Indebtedness for borrowed money of a Loan Party that is (x) subordinated in right of payment to the Obligations expressly by its terms or (y) is secured on a junior lien basis to the Liens securing the Obligations, except (i) the refinancing thereof with any Indebtedness (to the extent such Indebtedness constitutes a Permitted Refinancing and, if such Indebtedness was originally incurred under Section 7.03(g), is permitted pursuant to Section 7.03(g)), to the extent not required to prepay any Loans pursuant to Section 2.05(b), (ii) the conversion or exchange of the Second Lien Obligations to Equity Interests (other than Disqualified Equity Interests) of Holdings or any of its direct or indirect parents, (iii) the prepayment of Indebtedness of the Borrower or any Subsidiary to the Borrower or any Subsidiary, subject to the subordination provisions applicable to any such Indebtedness, (iv) prepayments of principal of and any required premium on loans under the Second Lien Credit Agreement (or any comparable provision of a Permitted Refinancing thereof) in connection with the removal of a lender pursuant to Section 3.07 of the Second Lien Credit Agreement (or any comparable provision of a Permitted Refinancing thereof or the payment of any fees in connection with amendments thereto) and (v) prepayments of principal of and any required premium on loans under the Second Lien Credit Agreement (or any comparable provision of a Permitted Refinancing thereof) in connection with the removal of a lender pursuant to Section 3.07 of the Second Lien Credit Agreement (or any comparable provision of a Permitted Refinancing thereof or the payment of any fees in connection with amendments thereto).

(b)     Amend, modify or change any term or condition of any Indebtedness (x) in the case of the Indebtedness under the ABL Credit Agreement and any other ABL Secured Obligations (and any Permitted Refinancing in respect of the foregoing) in violation of the Intercreditor Agreement, (y) in the case of the Indebtedness under the Second Lien Credit Agreement and any other Second Lien Secured Obligations (and any Permitted Refinancing in respect of the foregoing), in violation of the Intercreditor Agreement or the definition of "Permitted Refinancing" and (z) in the case of any other Indebtedness in excess of the Threshold Amount in a manner adverse to the Lenders.

Notwithstanding anything to the contrary in any Loan Document, the Borrower may make regularly scheduled payments of interest and fees on the ABL Facility or the Second Lien Term Facility, and may make any payments required by the terms of such Indebtedness in order to avoid the application of Section 163(e)(5) of the Code to such Indebtedness.

**Section 7.14     Permitted Activities**.  With respect to a Holdco, engage in any material operating or business activities; *provided* that the following and any activities incidental thereto shall be permitted in any event: (i) (a) in the case of Intermediate Holdings, its ownership of the Equity Interests of the Borrower and activities incidental thereto, including payment of dividends and other amounts in respect of its Equity Interests and (b) in the case of Holdings, its ownership of the Equity Interests of Intermediate Holdings and activities incidental thereto, including payment of dividends and other amounts in respect of its Equity Interests, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations with respect to the Loan Documents, the ABL Loan Documents, the Second Lien Loan Documents and any other documents governing Indebtedness permitted to be incurred by the Borrower or a Subsidiary pursuant to Section 7.03, (iv) any public offering of its common stock or any other issuance or sale of its Equity Interests, (v)(1) Guaranteed Obligations in respect of Indebtedness of, the Borrower and its Subsidiaries permitted under Section 7.03, including any Permitted Refinancing thereof and (2) guaranties of other obligations not constituting Indebtedness incurred by, the Borrower or any of the Subsidiaries, (vi) if applicable, participating in tax, accounting and other administrative

102

matters as a member of the consolidated group of Holdings, Intermediate Holdings and the Borrower, (vii) holding any cash or property (but not operating any property), (viii) [reserved], (ix) providing indemnification to officers and directors and (x) any activities incidental or reasonably related to the foregoing.  No Holdco shall incur any Liens on Equity Interests of Intermediate Holdings or the Borrower, other than non-consensual Liens and those for the benefit of the Secured Obligations, ABL Secured Obligations (subject at all times to the Intercreditor Agreement) and the Second Lien Secured Obligations (subject at all times to the Intercreditor Agreement).  Holdings shall not own any Equity Interests other than those of Intermediate Holdings, and Intermediate Holdings shall not own any Equity Interests other than those of the Borrower.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**Section 8.01    Events of Default**.  Any of the following from and after the Closing Date shall constitute an event of default (an "**Event of Default**"):

(a)    *Non-Payment*.  Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within three Business Days after the same becomes due, any interest on any Loan, any fees or other amounts payable hereunder or with respect to any other Loan Document; or

(b)    *Specific Covenants*.  The Borrower, any Subsidiary or, in the case of Section 7.14, a Holdco, fails to perform or observe (i) any term, covenant or agreement contained in any of Section 6.03(a) or 6.05(a) (solely with respect to the Borrower), 6.20(b) or 6.22 or Article VII; *provided* that the covenants in Section 7.11 and Section 7.12 are subject to cure pursuant to Section 8.04 or (ii) any term, covenant or agreement contained in any of Section 6.01 or 6.02 and such failure shall continue for a period of five (5) Business Days or (iii) any term, covenant or agreement contained in any of Section 6.11 or 6.13 and such failure shall continue for a period of fifteen (15) days; or

(c)    *Other Defaults*.  Any Holdco, the Borrower or any Subsidiary fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a), (b) or (d)) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days after (i) a Responsible Officer of any Loan Party obtaining knowledge thereof or (ii) receipt by the Borrower of written notice thereof from the Administrative Agent; or

(d)    *Representations and Warranties*.  Any representation, warranty, certification or statement of fact made or deemed made by any Loan Party herein or in any other Loan Document, or any certification in any document required to be delivered in connection herewith or therewith shall be incorrect in any material respect (or, in the case of any representation and warranty qualified by materiality, in all respects) when made or deemed made; or

(e)    *Cross-Default*.  Any Loan Party or any Subsidiary (A) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder, but including Indebtedness outstanding under the ABL Loan Documents and Second Lien Loan Documents) having an aggregate outstanding principal amount of not less than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness referenced in clause (A) above, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any default thereunder by any Loan Party), the effect of

103

which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause (after delivery of any notice if required and after giving effect to any waiver, amendment, cure or grace period), with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that this clause (B) shall not apply to (i) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder, (ii) any Indebtedness if (x) the sole remedy of the holder thereof in the event of the non-payment of such Indebtedness or the non-payment or non-performance of obligations related thereto or (y) the sole rights of the holder(s) thereof is to elect, in each case, to convert such Indebtedness into Qualified Equity Interests and cash in lieu of fractional shares and (iii) in the case of Indebtedness which the holder thereof may elect to convert into Qualified Equity Interests, such Indebtedness from and after the date, if any, on which such conversion has been effected; *provided*, *further*, that such failure is unremedied or is not waived by the holders of such Indebtedness prior to any acceleration of the Loans pursuant to Section 8.02; or

(f)      *Insolvency Proceedings, Etc.*   Other than with respect to any dissolutions otherwise permitted hereunder, any Loan Party or any Material Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes a general assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for 60 calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or substantially all of its property is instituted without the consent of such Person and continues undismissed or unstayed for 60 consecutive calendar days, or an order for relief is entered in any such proceeding; or

(g)      [Reserved]; or

(h)      *Judgments.*   There is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by either (i) independent third-party insurance as to which the insurer does not deny coverage or (ii) another creditworthy (as reasonably determined by the Required Lenders) indemnitor); and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of 60 consecutive days; or

(i)      *Invalidity of Loan Documents.*   Any material provision of the Loan Documents, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05) or as a result of acts or omissions by the Administrative Agent or any Lender due to such person's gross negligence or willful misconduct which do not arise from a breach by a Loan Party of its obligations under the Loan Documents or the satisfaction in full of all the Obligations (other than contingent obligations as to which no claim has been asserted), ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document or the validity or priority of a Lien as required by the Collateral Documents on a material portion of the

104

Collateral; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations (other than in accordance with its terms)), or purports in writing to revoke or rescind any Loan Document (other than in accordance with its terms); or

(j)      *Change of Control*.  There occurs any Change of Control; or

(k)      *Collateral Documents*.  Any Collateral Document after delivery thereof pursuant to Sections 4.01, 6.11 or 6.13 shall for any reason (other than pursuant to the terms thereof including as a result of a transaction not prohibited under this Agreement) cease to create a valid and perfected Lien, with the priority required by the Collateral Documents on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01 or any Loan Party contests in writing the validity or priority of a Lien, (i) except to the extent that any such perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities or negotiable instruments pledged under the Collateral Documents or take other required actions required to be taken by the Administrative Agent under the Loan Documents, in each case, which does not arise from a breach by a Loan Party of its obligations under the Loan Documents, and (ii) except as to Collateral consisting of Real Property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

(l)      *ERISA*.  (i) An ERISA Event occurs which has resulted or could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, or (ii) a Loan Party, any Subsidiary or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan and a Material Adverse Effect could, individually or in the aggregate, reasonably be expected to result.

**Section 8.02      Remedies Upon Event of Default**.  (a)  If any Event of Default occurs and is continuing, the Administrative Agent may, at the request of the Required Lenders, take any or all of the following actions:

(i)      [reserved];

(ii)      declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower (to the extent permitted by applicable law); and

(iii)      exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that upon the occurrence of an Event of Default pursuant to Section 8.01(f), the unpaid principal amount of all outstanding Loans and all interest, fees, premiums and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.

**Section 8.03      Application of Funds**.  After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable), any amounts received on

105

WEIL:\97507497\16\10143.0003

account of the Obligations shall be applied by the Administrative Agent in the following order (to the fullest extent permitted by mandatory provisions of applicable Law):

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to the Administrative Agent in its capacity as such hereunder;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders hereunder (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and any Secured Obligations constituting fees and premiums, ratably among the Secured Parties in proportion to the respective amounts described in this clause Third payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

*Fifth*, to the payment of all other Secured Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

*Last*, the balance, if any, after all of the Secured Obligations then earned, due and payable have been paid in full, to the Borrower or as otherwise required by Law.

**Section 8.04    Borrower's Right to Cure**.  Notwithstanding anything to the contrary contained in Section 8.01 or Section 8.02:

(a)    For the purpose of determining whether an Event of Default under Section 7.11 and/or Section 7.12 has occurred, the Borrower may on one or more occasions designate any portion of the net cash proceeds from a sale or issuance of Qualified Equity Interests of the Borrower or any cash contribution to the common capital of the Borrower (the "**Cure Amount**") as an increase to Consolidated EBITDA for the applicable fiscal quarter; *provided* that (A) such amounts to be designated (i) are actually received by the Borrower after the first day of the applicable fiscal quarter and on or prior to the tenth Business Day after the date on which financial statements are required to be delivered with respect to such fiscal quarter (the "**Cure Expiration Date**") and (ii) do not exceed the aggregate amount necessary to cure any Event of Default under Section 7.11 and/or Section 7.12 as of such date and (B) the Borrower shall have provided notice (the "**Notice of Intent to Cure**") to the Administrative Agent that such amounts are designated as a "Cure Amount".  The Cure Amount shall be added to Consolidated EBITDA for the applicable fiscal quarter and included when calculating Consolidated EBITDA for each Test Period that includes such fiscal quarter.

(b)    The parties hereby acknowledge that this Section 8.04 may not be relied on for purposes of calculating any financial ratios other than for determining actual compliance with Section 7.11 and/or Section 7.12 and shall not result in any adjustment to any amounts hereunder (including the amount of Indebtedness, Total Assets, Consolidated First Lien Net Debt, Consolidated Interest Expense or any other calculation of net leverage or Indebtedness hereunder (directly or by way of netting) and shall not be included for purposes of determining pricing, mandatory prepayments, financial ratio-based conditions and the availability or amount permitted pursuant to any covenant under Article VII) with respect to

106

the quarter with respect to which such Cure Amount was made other than the amount of the Consolidated EBITDA referred to in Section 8.04(a) above.

(c)     In furtherance of Section 8.04(a) above, (i) upon actual receipt and designation of the Cure Amount by the Borrower, the covenant under Section 7.11 and/or Section 7.12  shall be deemed retroactively cured with the same effect as though there had been no failure to comply with the covenant under such Section 7.11 and/or Section 7.12 and any Event of Default or potential Event of Default under Section 7.11 and/or Section 7.12 shall be deemed not to have occurred for purposes of the Loan Documents, and (ii) after delivery of an applicable Notice of Intent to Cure, neither the Administrative Agent nor any Lender may exercise any rights or remedies under Section 8.02 (or under any other Loan Document) on the basis of any actual or purported Event of Default under Section 7.11 and/or Section 7.12 until and unless the Cure Expiration Date has occurred without the Cure Amount having been received.  Notwithstanding the foregoing, no Credit Extension shall be made until receipt by the Borrower of the Cure Amount or waiver of the Event of Default.

(d)     (i) In each period of four consecutive fiscal quarters, there shall be at least two fiscal quarters in which no cure right set forth in this Section 8.04 is exercised and (ii) there shall be no *pro forma* reduction in Indebtedness (directly or by way of netting) with the Cure Amount for determining compliance with Section 7.11 and/or Section 7.12 for the fiscal quarter with respect to which such Cure Amount was made.

(e)     There can be no more than five fiscal quarters in which the cure rights set forth in this Section 8.04 are exercised during the term of this Agreement.

## ARTICLE IX
## ADMINISTRATIVE AGENT

**Section 9.01     Appointment and Authority**. (a)  Each of the Lenders hereby irrevocably appoints Cantor Fitzgerald Securities to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental or related thereto.  The provisions of this Article IX (other than Sections 9.01, 9.06 and 9.09 through and including 9.12) are solely for the benefit of the Administrative Agent and the Lenders, and no Loan Party has rights as a third party beneficiary of any of such provisions.

(b)     The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article IX and Article X (including the second paragraph of Section 10.05), as though such co- agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents as if set forth in full herein with respect thereto.  Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent to (i) execute any and all documents (including releases) with respect to the Collateral (including each Intercreditor Agreement and any amendment, supplement, modification or joinder with respect thereto) and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by the Administrative Agent shall bind the Lenders and (ii) negotiate, enforce or settle

107

any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender. The rights, privileges and immunities of the Administrative Agent in this Agreement shall be automatically incorporated by reference into each Collateral Document, whether or not expressly stated therein.

Section 9.02   **Rights as a Lender**.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 9.03   **Exculpatory Provisions**.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(a)   shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)   shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) including instructions by e-mail from the Required Lenders or counsel to the Required Lenders (which on the date hereof is Weil, Gotshal & Manges LLP; *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may (i) expose it to liability or that is contrary to any Loan Document or applicable law or (ii) be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; *provided*, *further*, that prior to taking any action, the Administrative Agent may require an indemnity (such indemnity to be satisfactory to the Administrative Agent in all respects) from the Required Lenders or Lenders, as applicable, against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any action;

(c)   shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity;

(d)   shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and nonappealable judgment.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice describing such Default is given to the Administrative Agent by the Borrower or a Lender;

108

WEIL:\97507497\16\10143.0003

(e)      shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent;

(f)      shall not be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on or the payment of taxes with respect to any of the Collateral.  The actions described in items (i) through (iii) shall be the sole responsibility of the Borrower;

(g)      shall not be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Administrative Agent has been advised of the likelihood of such loss or damage and regardless of the form of action;

(h)      shall not be liable for any error of judgment made in good faith by a responsible officer of the Administrative Agent unless it shall be proved that the Administrative Agent was negligent in ascertaining the pertinent facts;

(i)      shall not be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as Administrative Agent;

(j)      shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or the other Loan Documents arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; business interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action; and

(k)      shall not have any obligation to file financing statements, amendments to financing statements, or continuation statements, or to perfect or maintain the perfection of the Administrative Agent's Lien on the Collateral, other than, in each case, as instructed by the Required Lenders or the foregoing's counsel, together with the form of such financing statement to be filed..

In addition, any assignor of a Loan or seller of a participation hereunder shall be entitled to rely conclusively on a representation of the assignee Lender or Participant in the relevant assignment or participation agreement, as applicable, that such assignee or purchaser is not a Disqualified Competitor; *provided* that such representation shall only be required to be made if the list of Disqualified Competitors is

WEIL:\97507497\16\10143.0003

made to all Lenders and such assignees. The Administrative Agent shall not have any responsibility or liability for monitoring the list or identities of, or enforcing provisions relating to, Disqualified Competitors.

Notwithstanding anything herein to the contrary or in any of the other Loan Documents, in each instance where the Loan Documents confer discretionary rights or powers upon the Administrative Agent which may be exercised or refrained from being exercised herein or in any of the Loan Documents, the Administrative Agent shall not be required to take any action in the absence of direction from the Required Lenders (accompanied by indemnity, if requested by the Administrative Agent in its discretion), and shall have the absolute right, in its sole discretion, to consult with, or seek the affirmative or negative vote from the Required Lenders or, if otherwise applicable, the Lenders, and it may do so pursuant to a negative notice, negative consent or otherwise.

Delivery of any reports, information and documents to the Administrative Agent is for informational purposes only and the Administrative Agent's receipt of such shall not constitute actual or constructive notice of any information contained therein or determinable from information contained therein, including the Borrower's compliance with any of its covenants hereunder.

No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby shall require the Administrative Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers.

The Administrative Agent has accepted and is bound by the Loan Documents executed by the Administrative Agent as of the Closing Date and, as directed in writing by the Required Lenders, the Administrative Agent shall execute additional Loan Documents delivered to it after the Closing Date; *provided, however,* that such additional Loan Documents do not adversely affect the rights, privileges, benefits and immunities of the Administrative Agent. The Administrative Agent will not otherwise be bound by, or be held obligated by, the provisions of any credit agreement, indenture or other agreement governing the Obligations (other than this Agreement and the other Loan Documents to which the Administrative Agent is a party).

For the avoidance of doubt the Borrower, the Guarantors and the Lenders hereby agree that the Administrative Agent shall be under no obligation to make any determination, demand or request, grant or withhold any approval or consent or deliver any notice pursuant to the defined terms "Additional Refinancing Lender", "Collateral and Guarantee Requirement", "Excluded Assets", "Excluded Subsidiary", "Guarantors", "Material Domestic Subsidiary, "Material Foreign Subsidiary", "Mortgages", "Intercreditor Agreement", "Permitted Refinancing", and pursuant to Sections 2.03(b) and (g), 2.14, 2.15, 2.16, 5.05(b), 6.01(a) and (d), 6.07, 6.11, 6.12, 6.18, 7.03(g) and (i), 8.01(h), 9.02(d) and (e) and 10.01 without the written direction of Required Lenders or Lenders, as applicable.

**Section 9.04     Reliance by Administrative Agent**. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it in good faith to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it in good faith to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

<div align="center">110</div>

**Section 9.05    Delegation of Duties**.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article IX shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**Section 9.06    Resignation of Administrative Agent**.  The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower.  If the Administrative Agent is a Defaulting Lender, the Borrower may remove such Defaulting Lender from such role upon 15 days' notice to the Lenders.  Upon receipt of any such notice of resignation or removal of the Administrative Agent by the Borrower, the Required Lenders shall have the right, with the consent of the Borrower at all times other than upon the occurrence and during the continuation of an Event of Default (which consent of the Borrower shall not be unreasonably withheld, conditioned or delayed), to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above (including consent of the Borrower); *provided* that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section 9.06.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.06).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Sections 10.04 and 10.05 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

**Section 9.07    Non-Reliance on Administrative Agent and Other Lenders**.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.  Each Lender, by delivering its signature page to this Agreement or an Assignment and Assumption, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan

111

WEIL:\97507497\16\10143.0003

Document and each other document required to be approved by the Administrative Agent, Required Lenders or Lenders, as applicable on the Closing Date.

**Section 9.08   No Other Duties, Etc**.   Anything herein to the contrary notwithstanding, the Administrative Agent, shall not have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder.

**Section 9.09   Administrative Agent May File Proofs of Claim**.   In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower), at the direction of the Required Lenders, shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.03(h), 2.03(i), 2.09, 10.04 and 10.05) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09, 10.04 and 10.05.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

**Section 9.10   Collateral and Guaranty Matters**.   Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Collateral Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Administrative Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to the occurrence and continuance of an Event of Default, to take any action with respect to any Collateral or Collateral Documents which may be necessary to create, perfect and maintain perfected security interests in and liens upon the Collateral granted pursuant to the Collateral Documents. Each of the Lenders irrevocably authorizes the Administrative Agent, at its option, and in its sole discretion:

(a)      to enter into and sign for and on behalf of the Lenders as Secured Parties the Collateral Documents for the benefit of the Lenders and the other Secured Parties;

112

WEIL:\97507497\16\10143.0003

(b)     to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon payment in full of all Obligations (other than contingent obligations for which no claim has been made), (ii) at the time the property subject to such Lien is Disposed or to be Disposed as part of or in connection with any Disposition permitted hereunder or under any other Loan Document (including any Disposition of Equity Interests of a Subsidiary that is not a Loan Party to another Subsidiary that is not a Loan Party in connection with an Investment permitted under Section 7.02(y)), (iii) subject to Section 10.01, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders or (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to Section 9.10(d);

(c)     to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted to be senior to the Liens securing the Secured Obligations pursuant to Sections 7.01(b), (u), (w) (with respect to assumed Indebtedness), (aa) (with respect to Sections 7.01(b), (u), (w) (as to assumed Indebtedness) and (bb); and

(d)     to release any Subsidiary Guarantor from its obligations under this Agreement if such Person ceases to be a Subsidiary or becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.10. In each case as specified in this Section 9.10, the Administrative Agent will (and each Lender irrevocably authorizes the Administrative Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

Beyond the exercise of reasonable care in the custody of the Collateral in its possession, the Administrative Agent will not have any duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto. The Administrative Agent will be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and the Administrative Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Administrative Agent in good faith.

The Administrative Agent will not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Administrative Agent, as determined by a court of competent jurisdiction in a final, nonappealable order, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any grantor to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Administrative Agent hereby disclaims any representation or warranty to the present and future holders of the Obligations concerning the perfection of the Liens granted hereunder or in the value of any of the Collateral.

In the event that the Administrative Agent is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for

113

WEIL:\97507497\16\10143.0003

the benefit of another, which in the Administrative Agent's sole discretion may cause the Administrative Agent to be considered an "owner or operator" under any environmental laws or otherwise cause the Administrative Agent to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, the Administrative Agent reserves the right, instead of taking such action, either to resign as Administrative Agent or to arrange for the transfer of the title or control of the asset to a court appointed receiver.  The Administrative Agent will not be liable to any person for any environmental liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Administrative Agent's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any hazardous materials into the environment.

**Section 9.11** **[Reserved].**

**Section 9.12** **Withholding Tax Indemnity**.  To the extent required by any applicable Laws (as determined in good faith by the Administrative Agent), the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  If the Internal Revenue Service or any other authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of, withholding Tax ineffective or if any payment has been made by the Administrative Agent to any Lender without applicable withholding tax being deducted from such payment), such Lender shall, within 10 days after written demand therefor, indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrower pursuant to Section 3.01 and 3.04 and without limiting or expanding the obligation of the Borrower to do so) for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise, together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.12.  The agreements in this Section 9.12 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other Obligations.

**Section 9.13** **Non-U.S. Administrative Agent Tax Matters**.

If legally entitled to do so, any successor or supplemental Administrative Agent that is not a United States person under Section 7701(a)(30) of the Code, shall deliver to the Borrower two duly completed copies of Internal Revenue Service Form W-8IMY certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of a trade or business in the United States and that it is using such form as evidence of its agreement with the Borrower to be treated as a United States person with respect to such payments (and the Borrower and the Administrative Agent agree to so treat the Administrative Agent as a United States person with respect to such payments as contemplated by Treasury Regulation Section 1.1441-1(b)(2)(iv)(A)), with the effect that the Borrower can make such payments to the Administrative Agent without deduction or withholding of any Taxes imposed by Section 1441 of the Code.

### ARTICLE X
### MISCELLANEOUS

**Section 10.01** **Amendments, Etc**.  Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (or by the

114

WEIL:\97507497\16\10143.0003

Administrative Agent with the consent of the Required Lenders) (other than with respect to any amendment or waiver contemplated in Sections 10.01(a) through (j) below, which shall only require the consent of the Lenders expressly set forth therein and not Required Lenders) (or by the Administrative Agent with the consent of the Required Lenders) and the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that, no such amendment, waiver or consent shall:

(a)     [reserved];

(b)     postpone any date scheduled for any payment of principal (including final maturity), interest or fees under Section 2.07, 2.08 or 2.09, respectively, without the written consent of each Lender directly and adversely affected thereby (it being understood that the waiver (or amendment to the terms) of any mandatory prepayment of the Loans or any obligation of the Borrower to pay interest at the Default Rate, any Default or Event of Default or mandatory prepayment shall not constitute such a postponement of any date scheduled for the payment of principal or interest and it further being understood that any change to the definition of "Consolidated First Lien Net Leverage Ratio" or the component definitions thereof shall not constitute a postponement of such scheduled payment);

(c)     reduce or forgive the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (iii) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document (or extend the timing of payments of such fees or other amounts) without the written consent of each Lender directly and adversely affected thereby (it being understood that the waiver of (or amendment to the terms of) any obligation of the Borrower to pay interest at the Default Rate, any mandatory prepayment of the Loans or any Default or Event of Default shall not constitute such a reduction);

(d)     change any provision of Section 2.12(a), 2.13 or 8.03 or the definition of "Pro Rata Share" in any manner that would alter the *pro rata* sharing or order of payments or other amounts required thereby, without the written consent of each Lender directly and adversely affected thereby; *provided* that modifications to Section 2.12(a), Section 2.13, Section 8.03 or the definition of "Pro Rata Share" in connection with any buy back of Term Loans by any Holdco or the Borrower pursuant to Section 10.07(k), shall only require approval (to the extent any such approval is otherwise required) of the Required Lenders;

(e)     change any provision of (i) this Section 10.01 or (ii) the definition of "Required Lenders" or any other provision specifying the number of Lenders or portion of the Loans required to take any action under the Loan Documents to reduce the percentage set forth therein, without the written consent of each Lender directly and adversely affected thereby;

(f)     other than in connection with a transaction permitted under Section 7.04 or 7.05, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(g)     other than in connection with a transaction permitted under Section 7.04 or 7.05, release all or substantially all of the aggregate value of the Guarantees, without the written consent of each Lender; or

*provided*, *further*, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, adversely affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan

115

WEIL:\97507497\16\10143.0003

Document; (ii) only the consent of the parties to the Agent Fee Letter shall be required to amend, modify or supplement the terms thereof; (iii) Section 10.07(h) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; (iv)  no Lender consent is required to effect any amendment expressly contemplated by Section 6.18 and (v) this Agreement may be amended in the manner prescribed in Section 2.18.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except (x) in respect of an amendment, waiver or consent under Section 10.01(a) or (b) and (y) any waiver, amendment or modification requiring the consent of all Lenders or each directly and adversely affected Lender that by its terms materially and adversely affects any Defaulting Lender to a greater extent than other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding the foregoing, no Lender consent is required for the Administrative Agent (but the Administrative Agent may seek such consent) to enter into or to effect any amendment, modification or supplement to any Intercreditor Agreement or arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral for the purpose of adding the holders of such Indebtedness (or their Representative) as a party thereto and otherwise causing such Indebtedness to be subject thereto, in each case as contemplated by the terms of such Intercreditor Agreement or arrangement permitted under this Agreement, as applicable (it being understood that any such amendment or supplement may make such other changes to the applicable Intercreditor Agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and *provided* that such other changes are not adverse, in any material respect (taken as a whole), to the interests of the Lenders); *provided*, *further*, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent.

Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

Notwithstanding anything to the contrary contained in this Section 10.01, guarantees, collateral security documents and related documents executed by the Loan Parties or the Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel or (ii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

Notwithstanding anything to the contrary contained in Section 10.01, if at any time after the Closing Date, the Borrower shall have identified in good faith an obvious error or any error or omission of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders within five Business Days following receipt of notice thereof.  The Administrative Agent shall be entitled to a certificate of a Responsible Officer of the Borrower stating that any such amendment is authorized and permitted by the terms of the Loan Document.

**Section 10.02   Notices and Other Communications; Facsimile Copies**.

116

(a)      Notices; Effectiveness; Electronic Communications.

(i)      *Notices Generally.*  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 10.02(a)(ii)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(A)      if to:

(1)      the Administrative Agent, to:

Cantor Fitzgerald Securities
as First Lien Term Agent
1801 N. Military Trail, Suite 202
Boca Raton, FL 33431
Telecopier: (646) 219-1180
Attention: N. Horning (Jason)
E-mail: NHorning@cantor.com

and

Cantor Fitzgerald Securities
as First Lien Term Agent
900 West Trade Street, Suite 725
Charlotte, NC 28202
Phone: (704) 374-0574
Telecopier: (646) 390-1764
Attention: B. Young (Jason)
E-mail: BYoung@cantor.com

with a copy (which shall not constitute notice) to:

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attn: N. Plotkin (Jason)

; and

(2)      if to the Borrower to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02(a); and

(B)      if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for

117

WEIL:\97507497\16\10143.0003

the recipient).  Notices and other communications delivered through electronic communications to the extent provided in Section 10.02(a)(ii) shall be effective as provided in such Section 10.02(a)(ii).

(ii)     *Electronic* Communications.   Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.   The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(b)     *The Platform.*   THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."   THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Loan Parties, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of the Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party (or its representatives); *provided*, *however*, that in no event shall any Person have any liability to any other Person hereunder for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages); *provided* that nothing in this sentence shall limit any Loan Party's indemnification obligations set forth herein.

(c)     *Change of Address, Etc*.  Each of the Borrower and the Administrative Agent may change its address, electronic mail address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, electronic mail address, facsimile or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.   In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities

118

Laws, to make reference to the Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain Material Non-Public Information.

(d)       *Reliance by Administrative Agent and Lenders*.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in accordance with Section 10.05 hereof.

**Section 10.03   No Waiver; Cumulative Remedies**.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Lenders; *provided*, *however*, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) [reserved], (c) any Lender from exercising setoff rights in accordance with Section 10.09 (subject to the terms of Section 2.13) or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; *provided*, *further*, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**Section 10.04   Attorney Costs and Expenses**.  The Borrower agrees to pay or reimburse the Administrative Agent, the Lenders and their respective Affiliates for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication, execution and delivery of this Agreement and the other Loan Documents, and  to pay or reimburse the Administrative Agent, the Lenders and their respective Affiliates for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the administration of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including, in each case, all Attorney Costs, which shall be limited to counsel to the Administrative Agent and its Affiliates, one counsel to the Lenders and their respective Affiliates, taken as a whole, and, if reasonably necessary, one local counsel in each relevant jurisdiction material to the interests of the Lenders, taken as a whole  and to pay or reimburse the Administrative Agent and the Lenders for all reasonable and documented out-of-pocket costs, charges and expenses incurred in connection with the enforcement or protection of any rights or remedies under this Agreement or the other Loan Documents (including all such costs, charges and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all respective Attorney Costs, which shall be limited to Attorney Costs of counsel to the Administrative Agent and its Affiliates, one counsel to the Lenders and their Affiliates, taken as a whole, and, if reasonably necessary, one

119

local counsel in each relevant jurisdiction material to the interests of the Lenders taken as a whole and, solely in the case of an actual conflict of interest, one additional counsel in each relevant jurisdiction to each group of similarly situated affected parties). The agreements in this Section 10.04 shall survive repayment of all Obligations. All amounts due under this Section 10.04 shall be paid within 30 days following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail (provided that the Lender need not be required to disclose any confidential information or to the extent prohibited by law or regulation); provided that, with respect to the Closing Date, all amounts due under this Section 10.04 shall be paid on the Closing Date solely to the extent invoiced to the Borrower within two Business Days of the Closing Date. If any Loan Party fails to pay when due any costs, charges, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its discretion following five Business Days' prior written notice to the Borrower. For the avoidance of doubt, this Section 10.04 shall not apply to Taxes, except any Taxes that represent costs and expenses arising from any non-Tax claim.

Section 10.05    **Indemnification by the Borrower**.    The Borrower shall indemnify and hold harmless the Administrative Agent, each Agent-Related Person, Lender and their respective Affiliates and controlling Persons, and their respective officers, directors, employees, partners, agents, advisors and other representatives of each of the foregoing and their respective successors (collectively the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses, charges and disbursements (including Attorney Costs but limited in the case of legal fees and expenses to the reasonable and documented out-of-pocket fees, disbursements and other charges of counsel to the Administrative Agent and its Affiliates, one counsel to all other Indemnitees taken as a whole, and, if reasonably necessary, one local counsel for all Indemnitees taken as a whole in each relevant jurisdiction that is material to the interests of the Lenders, and in the case of an actual or potential conflict of interest, one additional counsel in each relevant jurisdiction to each group of similarly situated affected Indemnitees ), joint or several, of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Loan or the use or proposed use of the proceeds therefrom, (c) any actual or alleged presence or Release of Hazardous Materials at, in, on, under or from any property or facility currently or formerly owned, leased or operated by the Loan Parties or any Subsidiary, or any Environmental Liability or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (a "**Proceeding**") and regardless of whether any Indemnitee is a party thereto or whether or not such Proceeding is brought by the Borrower or any other person and, in each case, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee (all of the foregoing, collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses, charges or disbursements resulted from (x) the gross negligence or willful misconduct of such Indemnitee or of any of its controlled Affiliates or their respective directors, officers, employees, partners, advisors or other representatives, as determined by a final non-appealable judgment of a court of competent jurisdiction, (y) any dispute solely among Indemnitees other than any claims by or against an Indemnitee in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under this Agreement and other than any claims arising out of any act or omission of any Holdco, the Borrower or any of their Affiliates or (z) settlements effected without the Borrower's prior written consent (such consent not to be unreasonably withheld, delayed or conditioned), but if settled with the Borrower's written consent, or if there is a final judgment against an Indemnitee in any such Proceeding, the Borrower shall indemnify and hold harmless such Indemnitee to the extent and the manner set forth above. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through electronic, telecommunications or other information transmission systems, including, without limitation, SyndTrak, IntraLinks, the internet, email or similar electronic transmission systems in connection with this Agreement, in

120

each case, except to the extent any such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee (or its controlling Persons, controlled Affiliates or their respective directors, officers, employees, partners, advisors or other representatives), nor shall any Indemnitee, Loan Party or any Subsidiary have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date); it being agreed that this sentence shall not limit the indemnification obligations of any Holdco or any Subsidiary (including, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party and for any out-of-pocket expenses). In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, any Subsidiary of any Loan Party, its directors, equity holders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents are consummated. All amounts due under this Section 10.05 shall be paid within thirty (30) days after written demand therefor (together with reasonable backup documentation supporting such reimbursement request); *provided, however*, that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification rights with respect to such payment pursuant to the express terms of clauses (x) through (z) above. The agreements in this Section 10.05 shall survive the resignation or removal of the Administrative Agent, the replacement of any Lender, and the repayment, satisfaction or discharge of all the other Obligations. For the avoidance of doubt, this Section 10.05 shall not apply to Taxes, except any Taxes that represent liabilities, obligations, losses, damages, penalties, claims, demands, actions, prepayments, suits, costs, expenses, charges and disbursements arising from any non-Tax claims.

To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under this Section 10.05 or Section 10.04 to be paid by it to the Administrative Agent (or any sub-agent thereof), or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), or such Related Party, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity. The obligations of the Lenders under this paragraph are subject to the provisions of Section 2.12(e).

Section 10.06   **Payments Set Aside**.   To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, *plus* interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 10.07   **Successors and Assigns**.   (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Administrative Agent (at the direction of the Required Lenders) and each Lender (except as permitted by Section 7.04) and no Lender may assign or

121

otherwise transfer any of its rights or obligations hereunder except (i) to an Assignee pursuant to an assignment made in accordance with the provisions of Section 10.07(b) (such an assignee, an "**Eligible Assignee**") and in the case of any Assignee that is Holdings or any of its Subsidiaries, Section 10.07(k), or (ii) by way of participation in accordance with the provisions of Section 10.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(g) or (iv) to an SPC in accordance with the provisions of Section 10.07(h) (and any other attempted assignment or transfer by any party hereto shall be null and void); *provided*, *however*, that notwithstanding the foregoing, no Lender may assign or transfer by participation any of its rights or obligations hereunder to (i) any Person that is a Defaulting Lender, (ii) a natural Person, (iii) a Disqualified Competitor and (iv) Holdings, the Borrower or any of their respective Subsidiaries (except pursuant to Section 10.07(k)).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in Section 10.07(b)(ii) below and the proviso to Section 10.07(a), any Lender may at any time assign to one or more assignees (each, an "**Assignee**") all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

(A)    the Borrower; *provided* that no consent of the Borrower shall be required for (i) an assignment of all or a portion of the Term Loans to a Lender or to an Affiliate of a Lender or an Approved Fund thereof and (ii) after the occurrence and during the continuance of an Event of Default, an assignment to any Assignee; *provided*, *further*, that the Borrower shall be deemed to have consented to any such assignment unless it shall have objected thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof; and

(B)    the Administrative Agent; *provided* that no consent of the Administrative Agent shall be required for an assignment (i) of all or any portion of a Term Loan to a Lender, an Affiliate of a Lender or an Approved Fund and (ii) of all or a portion of the Term Loans pursuant to, and in accordance with the terms of, Section 10.07(k).

Notwithstanding the foregoing or anything to the contrary set forth herein, to the extent any Lender is required to assign any portion of its Loans and other rights, duties and obligations hereunder in order to comply with applicable Laws, such assignment may be made by such Lender without the consent of the Borrower, the Administrative Agent, or any other party hereto so long as such Lender complies with the requirements of Section 10.07(b)(ii).

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment of the entire remaining amount of the assigning Lender's Loans, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, and shall be in increments of an amount of $1,000,000, in excess thereof unless each of the Borrower and the Administrative Agent otherwise consents; *provided* that concurrent assignments to any Lender and its Affiliates or Approved Funds and concurrent assignments from any Lender and its Affiliates or Approved Funds to a single Assignee (or to an Assignee and its Affiliates or Approved Funds) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

122

(B)      the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); provided that only one such fee shall be payable in the event of simultaneous assignments to or from two or more Approved Funds;

(C)      other than in the case of assignments pursuant to Section 10.07(k), the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire; and

(D)      the Assignee shall execute and deliver to the Administrative Agent and the Borrower the forms described in Sections 3.01(e) and 3.01(f) applicable to it.

In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable *pro rata* share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full Pro Rata Share of all Loans.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(c)      Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d), from and after the effective date specified in each Assignment and Assumption, (1) other than in connection with an assignment pursuant to Section 10.07(k), the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement (subject to Section 10.07(k),), and (2) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, and the surrender by the assigning Lender of its Note, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.07(c) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(e).

(d)      The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it, and each notice of cancellation of any Loans delivered by the Borrower pursuant to Section 10.07(k) and a register for the recordation of the names and addresses of the Lenders and principal amounts (and related interest amounts) of the Loans owing to each Lender pursuant to the terms hereof from time to time (the "**Register**").  Upon its receipt of, and consent to, a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee

123

WEIL:\97507497\16\10143.0003

referred to in Section 10.07(b)(ii)(B) above, if applicable, and, if required, the written consent of the Administrative Agent and/or the Borrower to such assignment and any applicable tax forms, the Administrative Agent shall (i) accept such Assignment and Assumption and (ii) promptly record the information contained therein in the Register. No assignment shall be effective unless it has been recorded in the Register as provided in this Section 10.07(d). The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and, with respect to itself, any Lender, at any reasonable time and from time to time upon reasonable prior notice, *provided* that the information contained in the Register which is shared with each Lender (other than the Administrative Agent and its affiliates) shall be limited to the entries with respect to such Lender including the principal amount of and stated interest on the Term Loans owing to such Lender. This Section 10.07(d) and Section 2.11 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

(e)    Any Lender may at any time (other than to a natural person, a Defaulting Lender, a Holdco, the Borrower, or any Disqualified Competitor) sell participations to any Person (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (a) through (i) of the first proviso to Section 10.01 that requires the affirmative vote of such Lender. Subject to Section 10.07(f), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations of such Sections and Section 3.07, including Section 3.01(e), and it being understood that the documentation required under Section 3.01(e) shall be delivered solely to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(c). To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is reasonably necessary to establish that such Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The Participant Register shall be conclusive, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(f)    A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the

124

Borrower's consent or except to the extent such entitlement to a greater payment results from a change in any Law after the sale of the participation takes place.

(g)     Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any central bank having jurisdiction over such Lender; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)     Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof and (iii) such SPC and the applicable Loan or any applicable part thereof, shall be appropriately reflected in the Participant Register.  Each party hereto hereby agrees that (i) an SPC shall be entitled to the benefit of Sections 3.01, 3.04 and 3.05 (subject to the requirements and the limitations of such Sections and Section 3.07, including Section 3.01(e), and it being understood that the documentation required under Section 3.01(e) shall be delivered solely to the participating Lender), but neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement except, in the case of Section 3.01 and 3.04, unless such entitlement to a greater payment results from a change in any Law after the grant to the SPC takes place, (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(i)     Notwithstanding anything to the contrary contained herein, without the consent of the Borrower or the Administrative Agent, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(j)     [Reserved].

(k)     Any Lender may, so long as no Event of Default has occurred and is continuing, at any time, without any consent, assign all or a portion of its rights and obligations with respect to Term Loans under this Agreement to a Holdco or the Borrower through (x) Dutch auctions open to all Lenders on a *pro rata* basis in accordance with procedures of the type described in Section 2.05(a)(v) or (y) notwithstanding

125

Sections 2.12 and 2.13 or any other provision in this Agreement, open market purchase on a non-*pro rata* basis, in each case subject to the following:

(i)    if Holdings or Intermediate Holdings is the assignee, upon such assignment, transfer or contribution, such entity shall automatically be deemed to have contributed the principal amount of such Term Loans, plus all accrued and unpaid interest thereon, to the Borrower as common equity;

(ii)    if the Borrower is the assignee (including through contribution or transfers set forth in clause (i) above), (a) the principal amount of such Term Loans, along with all accrued and unpaid interest thereon, so contributed, assigned or transferred to the Borrower shall be deemed automatically cancelled and extinguished on the date of such contribution, assignment or transfer, (b) the aggregate outstanding principal amount of Term Loans of the remaining Lenders shall reflect such cancellation and extinguishment of the Term Loans then held by the Borrower and (c) the Borrower shall promptly provide notice to the Administrative Agent of such contribution, assignment or transfer of such Term Loans, and the Administrative Agent, upon receipt of such notice, shall reflect the cancellation of the applicable Term Loans in the Register;

(iii)    purchases of Term Loans pursuant to this Section 10.07(k) may not be funded with the proceeds of ABL Loans;

(iv)    the assigning Lender and Holdings, Intermediate Holdings or the Borrower, as applicable, shall execute and deliver to the Administrative Agent an Assignment and Assumption;

(v)    the aggregate principal amount of Term Loans repurchased by Holdings, Intermediate Holdings or the Borrower, collectively, during the term of this Agreement shall not exceed 10% of the aggregate principal amount of the Term Loans made to the Borrower on the Closing Date; and

(vi)    notwithstanding anything to the contrary contained herein (including in the definitions of "Consolidated Net Income" and "Consolidated EBITDA") any non-cash gains in respect of "cancellation of indebtedness" resulting from the cancellation of any Terms Loans purchased by a Holdco or the Borrower shall be excluded from the determined amount of Consolidated Net Income and Consolidated EBITDA.

Each Lender participating in any assignment to any Holdco or the Borrower acknowledges and agrees that in connection with such assignment, (1) such Holdco or the Borrower then may have, and later may come into possession of Excluded Information, (2) such Lender has independently and, without reliance on any Holdco, the Borrower or any of their Subsidiaries, the Administrative Agent or any other Agent-Related Persons, made its own analysis and determination to participate in such assignment notwithstanding such Lender's lack of knowledge of the Excluded Information, (3) none of Intermediate Holdings, the Borrower or their respective Subsidiaries, the Administrative Agent or any other Agent-Related Persons shall have any liability to such Lender, and such Lender hereby waives and releases, to the extent permitted by law, any claims such Lender may have against Holdings, Intermediate Holdings, the Borrower and their respective Subsidiaries, the Administrative Agent and any other Agent- Related Persons, under applicable laws or otherwise, with respect to the nondisclosure of the Excluded Information and (4) that the Excluded Information may not be available to the Administrative Agent or the other Lenders.

The aggregate outstanding principal amount of the Term Loans shall be deemed reduced by the full par value of the aggregate principal amount of the Term Loans purchased by, or contributed to (in each case, and subsequently cancelled hereunder), Holdings or its Subsidiaries pursuant to this Section 10.07(k) and each principal repayment installment with respect to the Term Loans pursuant to Section 2.07 shall be reduced *pro rata* by the par value of the aggregate principal amount of Term Loans so purchased or contributed (and subsequently cancelled).

126

Any purchase of Term Loans pursuant to this Section 10.07(k) shall not constitute voluntary or mandatory payment or prepayment under this Agreement.

**Section 10.08   Confidentiality.**   Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its Affiliates and its Affiliates' managers, administrators, directors, officers, employees, trustees, partners, investors, funding sources, investment advisors and agents, including accountants, legal counsel and other advisors (collectively "**Advisors**") on a "need to know basis" (*provided* that (i) the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and agree or otherwise have an obligation to keep such Information confidential and (ii) the Administrative Agent or Lender, as applicable, shall be responsible for the compliance of its Affiliates and such Affiliates' Advisors with this paragraph); (b) to the extent required or requested by, or upon the good faith determination by counsel that such information should be disclosed in light of ongoing oversight or review of such Person, by any Governmental Authority or self-regulatory authority having or asserting jurisdiction over such Person (including any Governmental Authority regulating any Lender or its Affiliates), *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation; (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation; (d) to any other party to this Agreement; (e) to (i) any pledgee referred to in Section 10.07(g), (ii) subject to an agreement containing provisions at least as restrictive as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Borrower), any direct or indirect contractual counterparty to a Swap Contract, Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in any of its rights or obligations under this Agreement (other than any Disqualified Competitor or Person whom the Borrower has affirmatively denied to provide consent to assignment in accordance with Section 10.07(b)(i)(A))); or (iii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder (other than any Disqualified Competitor or Person whom the Borrower has affirmatively denied to provide consent to assignment in accordance with Section 10.07(b)(i)(A)); (f) with the prior written consent of the Borrower; (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.08 or other obligation of confidentiality owed to the Borrower or its Affiliates or becomes available to the Administrative Agent, any Lender, or any of their respective Affiliates on a non-confidential basis from a source other than a Loan Party or their respective related parties (so long as such source is not known (after due inquiry) to the Administrative Agent, such Lender, or any of their respective Affiliates to be bound by confidentiality obligations to any Loan Party or its Affiliates); (h) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to Loan Parties and their Subsidiaries received by it from such Lender) or to the CUSIP Service Bureau or any similar organization;  (i) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of its rights hereunder or thereunder; (j) to the extent such information is independently developed by the Administrative Agent, any Lender, or any of their respective Affiliates; or (k) for purposes of establishing a due diligence defense.   In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and publicly available information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Administrative Agent and the Lenders in connection with the administration, settlement and management of this Agreement, the other Loan Documents and the Credit Extensions.  For the purposes of this Section 10.08, "**Information**" means all information received from the Loan Parties relating to any Loan Party, its Affiliates or its Affiliates' directors, officers, employees, trustees, investment advisors or agents, other than any such information that is publicly available to the Administrative Agent, or any Lender prior to disclosure by any Loan Party other than as a result of a breach of this Section 10.08 or any other confidentiality obligation owed to any Loan Party or their Affiliates.

127

**Section 10.09    Setoff**.  In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates (and the Administrative Agent, in respect of any unpaid fees, costs and expenses payable hereunder) is authorized at any time and from time to time, without prior notice to the Borrower, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and each of its Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) (other than escrow, payroll, petty cash, trust and tax accounts) at any time held by, and other Indebtedness at any time owing by, such Lender and its Affiliates or the Administrative Agent to or for the credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations owing to such Lender and its Affiliates or the Administrative Agent hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not the Administrative Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit of other obligations; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.17 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of the Administrative Agent and each Lender under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent and such Lender may have at Law.

**Section 10.10    Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**Section 10.11    Counterparts**.  This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by facsimile, Docusign or other electronic transmission of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document.  The Administrative Agent may also require that any such documents and signatures delivered by facsimile, Docusign or other electronic transmission be confirmed by a manually signed original thereof; *provided* that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile, Docusign or other electronic transmission.

**Section 10.12    Integration**.  This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  Subject to Section 10.21, in the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; *provided* that the inclusion of supplemental rights or remedies in favor of the Administrative Agent or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and

128

shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

Section 10.13    **Survival of Representations and Warranties**.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.    Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.14    **Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions; *provided*, that the Lenders shall charge no fee in connection with any such amendment.    The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.    Without limiting the foregoing provisions of this Section 10.14, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 10.15    **GOVERNING LAW**.    (a)    THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)    ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY (BOROUGH OF MANHATTAN) OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, OR ANY APPELLATE COURT FROM ANY THEREOF, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY, THE ADMINISTRATIVE AGENT AND EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS AND AGREES THAT IT WILL NOT COMMENCE OR SUPPORT ANY SUCH ACTION OR PROCEEDING IN ANOTHER JURISDICTION.    EACH LOAN PARTY, THE ADMINISTRATIVE AGENT AND EACH LENDER IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS IN THE MANNER PROVIDED FOR NOTICES (OTHER THAN FACSIMILE) IN SECTION 10.02.  NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.16    **WAIVER OF RIGHT TO TRIAL BY JURY**.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE

129

WEIL:\97507497\16\10143.0003

LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.16</u>.

**Section 10.17    <u>Binding Effect</u>**.  This Agreement shall become effective when it shall have been executed and delivered by the Loan Parties and each other party hereto and the Administrative Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Loan Parties, the Administrative Agent and each Lender and their respective successors and assigns, in each case in accordance with <u>Section 10.07</u> (if applicable) and except that no Loan Party shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders except as permitted by <u>Section 7.04</u>.

**Section 10.18    <u>USA Patriot Act</u>**.  Each Lender that is subject to the USA Patriot Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name, address and tax identification number of such Loan Party and other information regarding such Loan Party that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the USA Patriot Act.  This notice is given in accordance with the requirements of the USA Patriot Act and is effective as to the Lenders and the Administrative Agent.  The Borrower shall, promptly following a reasonable request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

**Section 10.19    <u>No Advisory or Fiduciary Responsibility</u>**.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent are arm's-length commercial transactions between the Loan Parties and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (B) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent and each Lender each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for each Loan Party or any of their respective Affiliates, or any other Person and (B) neither the Administrative Agent nor any Lender has any obligation to the Loan Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and neither the Administrative Agent nor any other Arranger nor any Lender has any obligation to disclose any of such interests to the Loan Parties or any of their respective Affiliates.  To the fullest extent permitted by law, each Loan Party hereby waives and releases any claims that it may have against the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

<div align="center">130</div>

**Section 10.20   Judgment Currency**.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable law).

**Section 10.21   Intercreditor Agreement**.  Each Lender hereunder (a) acknowledges that it has received a copy of the Intercreditor Agreement, (b) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement and (c) authorizes and instructs the Administrative Agent to enter into the Intercreditor Agreement as Administrative Agent and on behalf of such Lender.  The foregoing provisions are intended as an inducement to the lenders under the ABL Loan Documents, the Second Lien Loan Documents and the Loan Documents to extend credit to the Loan Parties and such lenders are intended third party beneficiaries of such provisions.  In the event of any conflict or inconsistency between the provisions of any Intercreditor Agreement and this Agreement, the provisions of such Intercreditor Agreement shall control.

**Section 10.22   Acknowledgement and Consent to Bail-In of EEA Financial Institutions**.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)   the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution; and

(b)   the effects of any Bail-In Action on any such liability, including, if applicable:

(i)   a reduction in full or in part or cancellation of any such liability;

(ii)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)   the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

**Section 10.23   Certain ERISA Matters.**

131

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans,

(ii)    the transaction exemption set forth in one or more prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time ("PTEs"), such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

(i)    none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans and this

132

WEIL:\97507497\16\10143.0003

Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans and this Agreement is a fiduciary under ERISA or the US Internal Revenue Code, or both, with respect to the Loans and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v) no fee or other compensation is being paid directly to the Administrative Agent or any its Affiliates for investment advice (as opposed to other services) in connection with the Loans or this Agreement.

(c) The Administrative Agent hereby inform the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans and this Agreement, (ii) may recognize a gain if it extended the Loans for an amount less than the amount being paid for an interest in the Loans by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

<div align="center">

**ARTICLE XI**
**GUARANTEE**

</div>

**Section 11.01    The Guarantee**.    Each Guarantor hereby jointly and severally with the other Guarantors guarantees, as a primary obligor and not as a surety to each Secured Party and their respective permitted successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of (i) the Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code and (ii) any other Debtor Relief Laws) on the Loans made by the Lenders to, and the Notes held by each Lender of, the Borrower, and all other Secured Obligations from time to time owing to the Secured Parties by any Loan Party under any Loan Document strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"); *provided*, *however*, that Guaranteed Obligations shall exclude all Excluded Swap Obligations.    The Guarantors hereby jointly and severally agree that if the Borrower or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

**Section 11.02    Obligations Unconditional**.    The obligations of the Guarantors under Section 11.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrower under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety

<div align="center">

133

</div>

or Guarantor (except for payment in full).  Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

> (a)      at any time or from time to time, without notice to the Guarantors, to the extent permitted by Law, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

> (b)      any of the acts mentioned in any of the provisions of this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted (including incurring any increase or decrease in the principal amount of the Guaranteed Obligations or the rate of interest or the fees thereon);

> (c)      the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or except as permitted pursuant to Section 11.09, any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

> (d)      any Lien or security interest granted to, or in favor of, any Lender or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

> (e)      the release of any other Guarantor pursuant to Section 11.09.

The Guarantors hereby expressly waive (to the fullest extent permitted by Law) diligence, presentment, demand of payment, protest and, to the extent permitted by Law, all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations.  The Guarantors waive, to the extent permitted by Law, any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee.  This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrower or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto.  This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

**Section 11.03   Reinstatement**.  The obligations of the Guarantors under this Article XI shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any

134

holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 11.04   **Subrogation; Subordination**.  Each Guarantor hereby agrees that until the payment in full in cash and satisfaction in full of all Guaranteed Obligations (other than contingent obligations not yet due and owing) it shall subordinate any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 11.01, whether by subrogation or otherwise, against the Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.

Section 11.05   **Remedies**.   The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrower under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 8.02 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.02) for purposes of Section 11.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 11.01.

Section 11.06   **[Reserved]**.

Section 11.07   **Continuing Guarantee**.  The guarantee in this Article XI is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 11.08   **General Limitation on Guarantee Obligations**.   In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other Law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 11.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 11.09, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount (after giving effect to the liability under this Guaranty and the right of contribution established in Section 11.10, but before giving effect to any other guarantee (including any guarantee of the ABL Obligations and/ or the Second Lien Obligations)) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 11.09   **Release of Guarantors**.  If, in compliance with the terms and provisions of the Loan Documents, (i) all or substantially all of the Equity Interests of any Subsidiary Guarantor are sold or otherwise transferred to a Person or Persons none of which is a Loan Party in a transaction permitted hereunder or (ii) any Subsidiary Guarantor ceases to be a Subsidiary or becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder (any such Subsidiary Guarantor, and any Subsidiary Guarantor referred to in clause (i), a "**Transferred Guarantor**"), such Transferred Guarantor shall, upon the consummation of such sale or transfer or other transaction (but subject to the proviso below), be automatically released from its obligations under this Agreement (including under Section 10.05 hereof) and the other Loan Documents, including its obligations to pledge and grant any Collateral owned by it pursuant to any Collateral Document and, in the case of a sale of all or substantially all of the Equity Interests of the Transferred Guarantor, the pledge of such Equity Interests to the Administrative Agent pursuant to the Collateral Documents shall be automatically released, and, so long as the Borrower shall have provided the Administrative Agent such certifications or documents as the Administrative Agent shall reasonably request, the Administrative Agent shall take such actions as are reasonably requested by the Borrower or such Guarantor to effect each release described in this Section 11.09 in accordance with the relevant provisions of the Collateral Documents; *provided*, *however*, that the release of any Subsidiary Guarantor from its obligations

135

under this Agreement and the other Loan Documents if such Subsidiary Guarantor becomes an Excluded Subsidiary of the type described in clause (a) of the definition thereof shall only be permitted if at the time such Subsidiary Guarantor becomes an Excluded Subsidiary of such type (1) no Default or Event of Default shall have occurred and be outstanding, (2) after giving *pro forma* effect to such release and the consummation of the transaction that causes such Person to be an Excluded Subsidiary of such type, the Borrower is deemed to have made a new Investment in such Person for purposes of Section 7.02 (as if such Person were then newly acquired) and such Investment is permitted pursuant to Section 7.02 (other than Section 7.02(f)) at such time and (3) a Responsible Officer of the Borrower certifies to the Administrative Agent compliance with preceding clauses (1) and (2); *provided*, *further*, that no such release shall occur if such Subsidiary Guarantor continues to be a guarantor in respect of the ABL Obligations, the Second Lien Obligations or any Permitted Refinancing in respect of any of the foregoing.

When all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied (other than contingent obligations as to which no claim has been asserted), this Agreement and the Guarantees made herein shall terminate with respect to all Obligations, except with respect to Obligations that expressly survive such repayment pursuant to the terms of this Agreement.

**Section 11.10   Right of Contribution**.   Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment.  Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 11.04.  The provisions of this Section 11.10 shall in no respect limit the obligations and liabilities of any Guarantor to the Administrative Agent and the Lenders, and each Subsidiary Guarantor shall remain liable to the Administrative Agent and the Lenders for the full amount guaranteed by such Guarantor hereunder.

**Section 11.11   Keepwell**.   Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Guaranty in respect of Swap Obligations (*provided*, *however*, that each Qualified ECP Guarantor shall only be liable under this Section 11.11 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 11.11, or otherwise under this Guarantee, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Guarantor under this Section 11.11 shall remain in full force and effect until all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied.  Each Qualified ECP Guarantor intends that this Section 11.11 constitute, and this Section 11.11 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**Section 11.12   Independent Obligation**.   The obligations of each Guarantor hereunder are independent of the obligations of any other Guarantor, any other party or any Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not action is brought against any other guarantor, any other party or any Borrower and whether or not any other guarantor, any other party or any Borrower be joined in any such action or actions.  Each Guarantor waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof.  Any payment by the Borrower or other circumstance which operates to toll any statute of limitations as to the Borrower shall operate to toll the statute of limitations as to the Guarantors.

[Signature Pages Follow]

136

**<u>Exhibit A-1</u>**


**Redline to Version in the First Amended Plan Supplement**

Weil Draft 7/23/2020 / Subject to Negotiation

**Dated August [●], 2020**

**FIRST LIEN CREDIT AGREEMENT**

$75,00076,600,000

among

**JASON GROUP INC.,**
as Borrower,

**THE GUARANTORS PARTY HERETO FROM TIME TO TIME,**

**CANTOR FITZGERALD SECURITIES,**
as Administrative Agent,

and

**THE OTHER LENDERS PARTY HERETO FROM TIME TO TIME**

# Table of Contents

<div align="right">**Page**</div>

Article I Definitions and Accounting Terms ................................................................................................ 1

    Section 1.01    Defined Terms ................................................................................................ 1
    Section 1.02    Other Interpretive Provisions ....................................................................... 37
    Section 1.03    Accounting Terms ......................................................................................... 38
    Section 1.04    Rounding ....................................................................................................... 38
    Section 1.05    References to Agreements, Laws, Etc. ........................................................... 38
    Section 1.06    Times of Day ................................................................................................ 38
    Section 1.07    Timing of Payment or Performance .............................................................. 38
    Section 1.08    [Reserved]. .................................................................................................... 39
    Section 1.09    Pro Forma Calculations ................................................................................ 39
    Section 1.10    Exchange Rates; Currency ............................................................................ 39
    Section 1.11    Certifications ................................................................................................ 40

Article II Credit Extensions .......................................................................................................................... 40

    Section 2.01    The Loans ...................................................................................................... 40
    Section 2.02    Conversions and Continuations of Loans ...................................................... 40
    Section 2.03    [Reserved]. .................................................................................................... 41
    Section 2.04    [Reserved] ..................................................................................................... 41
    Section 2.05    Prepayments .................................................................................................. 41
    Section 2.06    [Reserved]. .................................................................................................... 50
    Section 2.07    Repayment of Loans ..................................................................................... 50
    Section 2.08    Interest .......................................................................................................... 50
    Section 2.09    Fees ............................................................................................................... 50
    Section 2.10    Computation of Interest and Fees ................................................................. 51
    Section 2.11    Evidence of Indebtedness ............................................................................. 51
    Section 2.12    Payments Generally ...................................................................................... 52
    Section 2.13    Sharing of Payments ..................................................................................... 53
    Section 2.14    [Reserved] ..................................................................................................... 54
    Section 2.15    [Reserved] ..................................................................................................... 54
    Section 2.16    [Reserved]. .................................................................................................... 54
    Section 2.17    Defaulting Lenders ....................................................................................... 54

Article III Taxes, Increased Costs Protection and Illegality ........................................................................ 54

    Section 3.01    Taxes ............................................................................................................ 54
    Section 3.02    Illegality ....................................................................................................... 57
    Section 3.03    Inability to Determine Rates ......................................................................... 58
    Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; Eurocurrency Rate Loan Reserves .................................................................................................... 58
    Section 3.05    Funding Losses ............................................................................................. 59
    Section 3.06    Matters Applicable to All Requests for Compensation ................................. 60
    Section 3.07    Replacement of Lenders under Certain Circumstances ................................. 61
    Section 3.08    Survival ........................................................................................................ 62

Article IV Conditions Precedent to Credit Extensions ................................................................................. 62

    Section 4.01    Conditions to Initial Credit Extension .......................................................... 62

Article V Representations and Warranties ..................................................................................................... 64

AMERICAS 94626185

WEIL:\97507497\9\10143.0003

WEIL:\97507497\16\10143.0003

**Page**

Section 5.01    Existence, Qualification and Power; Compliance with Laws ............................... 64
Section 5.02    Authorization; No Contravention ............................................................... 64
Section 5.03    Governmental Authorization; Other Consents ............................................ 65
Section 5.04    Binding Effect ...................................................................................... 65
Section 5.05    Financial Statements; No Material Adverse Effect ..................................... 65
Section 5.06    Litigation ............................................................................................ 66
Section 5.07    Ownership of Property; Liens ................................................................. 66
Section 5.08    Environmental Matters .......................................................................... 66
Section 5.09    Taxes .................................................................................................. 67
Section 5.10    ERISA Compliance ............................................................................... 67
Section 5.11    Subsidiaries; Equity Interests ................................................................ 67
Section 5.12    Margin Regulations; Investment Company Act .......................................... 67
Section 5.13    Disclosure ........................................................................................... 67
Section 5.14    Labor Matters ...................................................................................... 68
Section 5.15    Intellectual Property; Licenses, Etc ........................................................ 68
Section 5.16    Solvency ............................................................................................. 68
Section 5.17    [Reserved] .......................................................................................... 68
Section 5.18    USA Patriot Act; OFAC; FCPA ............................................................. 68
Section 5.19    Security Documents .............................................................................. 69
Section 5.20    EEA Financial Institutions. .................................................................... 69
Section 5.21    Beneficial Ownership Certification.  s. ................................................... 69

Article VI Affirmative Covenants ........................................................................................ 69

Section 6.01    Financial Statements ............................................................................. 69
Section 6.02    Certificates; Other Information .............................................................. 71
Section 6.03    Notices ............................................................................................... 72
Section 6.04    Payment of Taxes ................................................................................. 73
Section 6.05    Preservation of Existence, Etc ................................................................ 73
Section 6.06    Maintenance of Properties ..................................................................... 73
Section 6.07    Maintenance of Insurance ...................................................................... 73
Section 6.08    Compliance with Laws .......................................................................... 74
Section 6.09    Books and Records ............................................................................... 74
Section 6.10    Inspection Rights ................................................................................. 74
Section 6.11    Additional Collateral; Additional Guarantors .......................................... 74
Section 6.12    Compliance with Environmental Laws ..................................................... 76
Section 6.13    Further Assurances ............................................................................... 76
Section 6.14    [Reserved]. .......................................................................................... 77
Section 6.15    Ratings ................................................................................................ 77
Section 6.16    Use of Proceeds ................................................................................... 77
Section 6.17    Lender Meetings .................................................................................. 77
Section 6.18    End of Fiscal Years .............................................................................. 77
Section 6.19    Lines of Business ................................................................................. 77
Section 6.20    Post-Closing Covenant ......................................................................... 77
Section 6.21    Anti-Terrorism Law; Anti-Money Laundering; Embargoed Persons ............ 77
Section 6.22    Account Control Agreements. ................................................................ 78

Article VII Negative Covenants ........................................................................................... 78

Section 7.01    Liens .................................................................................................. 78

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

**Page**

Section 7.02    Investments ..................................................................................... 82
Section 7.03    Indebtedness .................................................................................. 85
Section 7.04    Fundamental Changes .................................................................... 89
Section 7.05    Dispositions ................................................................................... 90
Section 7.06    Restricted Payments ...................................................................... 92
Section 7.07    [Reserved]. .................................................................................... 93
Section 7.08    Transactions with Affiliates .......................................................... 93
Section 7.09    Burdensome Agreements ............................................................... 95
Section 7.10    Maximum Capital Expenditures ..................................................... 97
Section 7.11    Consolidated First Lien Net Leverage Ratio ................................... 97
Section 7.12    Interest Coverage Ratio ................................................................. 97
Section 7.13    Prepayments, Etc. of Indebtedness ................................................ 98
Section 7.14    Permitted Activities ....................................................................... 99

Article VIII Events of Default and Remedies ........................................................... 99

Section 8.01    Events of Default ........................................................................... 99
Section 8.02    Remedies Upon Event of Default ................................................. 101
Section 8.03    Application of Funds .................................................................... 102
Section 8.04    Borrower's Right to Cure ............................................................. 102

Article IX Administrative Agent ............................................................................ 103

Section 9.01    Appointment and Authority .......................................................... 103
Section 9.02    Rights as a Lender ....................................................................... 104
Section 9.03    Exculpatory Provisions ................................................................ 104
Section 9.04    Reliance by Administrative Agent ................................................ 106
Section 9.05    Delegation of Duties .................................................................... 106
Section 9.06    Resignation of Administrative Agent ............................................ 107
Section 9.07    Non-Reliance on Administrative Agent and Other Lenders ............ 107
Section 9.08    No Other Duties, Etc. ................................................................... 107
Section 9.09    Administrative Agent May File Proofs of Claim ........................... 107
Section 9.10    Collateral and Guaranty Matters .................................................. 108
Section 9.11    [Reserved]. .................................................................................. 110
Section 9.12    Withholding Tax Indemnity .......................................................... 110
Section 9.13    Non-U.S. Administrative Agent Tax Matters ................................. 110

Article X Miscellaneous ....................................................................................... 110

Section 10.01    Amendments, Etc. ....................................................................... 110
Section 10.02    Notices and Other Communications; Facsimile Copies ................. 112
Section 10.03    No Waiver; Cumulative Remedies ................................................ 114
Section 10.04    Attorney Costs and Expenses ...................................................... 115
Section 10.05    Indemnification by the Borrower .................................................. 115
Section 10.06    Payments Set Aside ..................................................................... 117
Section 10.07    Successors and Assigns ............................................................... 117
Section 10.08    Confidentiality ............................................................................ 122
Section 10.09    Setoff .......................................................................................... 123
Section 10.10    Interest Rate Limitation .............................................................. 123
Section 10.11    Counterparts ............................................................................... 124
Section 10.12    Integration ................................................................................. 124

**Page**

Section 10.13    Survival of Representations and Warranties ................................................124
Section 10.14    Severability.............................................................................................124
Section 10.15    GOVERNING LAW ................................................................................124
Section 10.16    WAIVER OF RIGHT TO TRIAL BY JURY ..............................................125
Section 10.17    Binding Effect ........................................................................................125
Section 10.18    USA Patriot Act .....................................................................................125
Section 10.19    No Advisory or Fiduciary Responsibility ................................................125
Section 10.20    Judgment Currency .................................................................................126
Section 10.21    Intercreditor Agreements.........................................................................126
Section 10.22    Acknowledgement and Consent to Bail-In of EEA Financial Institutions. ........126
Section 10.23    Certain ERISA Matters. ..........................................................................127

Article XI Guarantee.........................................................................................................128

Section 11.01    The Guarantee .........................................................................................128
Section 11.02    Obligations Unconditional .......................................................................129
Section 11.03    Reinstatement .........................................................................................130
Section 11.04    Subrogation; Subordination......................................................................130
Section 11.05    Remedies ...............................................................................................130
Section 11.06    [Reserved] ..............................................................................................130
Section 11.07    Continuing Guarantee...............................................................................130
Section 11.08    General Limitation on Guarantee Obligations ............................................130
Section 11.09    Release of Guarantors ..............................................................................131
Section 11.10    Right of Contribution ...............................................................................131
Section 11.11    Keepwell.................................................................................................131
Section 11.12    Independent Obligation ............................................................................132


Article I Definitions and Accounting Terms.........................................................................1

Section 1.01      Defined Terms .........................................................................................1
Section 1.02      Other Interpretive Provisions....................................................................37
Section 1.03      Accounting Terms ...................................................................................38
Section 1.04      Rounding ................................................................................................39
Section 1.05      References to Agreements, Laws, Etc. .......................................................39
Section 1.06      Times of Day ..........................................................................................39
Section 1.07      Timing of Payment or Performance...........................................................39
Section 1.08      [Reserved].............................................................................................39
Section 1.09      Pro Forma Calculations ...........................................................................39
Section 1.10      Exchange Rates; Currency........................................................................40
Section 1.11      Certifications..........................................................................................40

Article II Credit Extensions .............................................................................................40

Section 2.01      The Loans ...............................................................................................40
Section 2.02      Conversions and Continuations of Loans ...................................................40
Section 2.03      [Reserved]..............................................................................................41
Section 2.04      [Reserved]..............................................................................................41
Section 2.05      Prepayments...........................................................................................41
Section 2.06      [Reserved]..............................................................................................50
Section 2.07      Repayment of Loans ................................................................................50

**Page**

Section 2.08      Interest ..................................................................................................50
Section 2.09      Fees .........................................................................................................51
Section 2.10      Computation of Interest and Fees ..........................................................52
Section 2.11      Evidence of Indebtedness .......................................................................52
Section 2.12      Payments Generally ................................................................................52
Section 2.13      Sharing of Payments ...............................................................................54
Section 2.14      [Reserved].................................................................................................54
Section 2.15      [Reserved].................................................................................................54
Section 2.16      [Reserved].................................................................................................54
Section 2.17      Defaulting Lenders ..................................................................................54
Section 2.18      Effect of Benchmark Transition Event ...................................................55

Article III Taxes, Increased Costs Protection and Illegality ..........................................57
Section 3.01      Taxes........................................................................................................57
Section 3.02      Illegality...................................................................................................61
Section 3.03      Inability to Determine Rates ...................................................................61
Section 3.04      Increased Cost and Reduced Return; Capital Adequacy; Eurocurrency Rate Loan
                  Reserves...................................................................................................61
Section 3.05      Funding Losses ........................................................................................63
Section 3.06      Matters Applicable to All Requests for Compensation ...........................63
Section 3.07      Replacement of Lenders under Certain Circumstances ............................64
Section 3.08      Survival....................................................................................................65

Article IV Conditions Precedent to Credit Extensions .....................................................65
Section 4.01      Conditions to Initial Credit Extension ...................................................65

Article V Representations and Warranties.........................................................................67
Section 5.01      Existence, Qualification and Power; Compliance with Laws...................67
Section 5.02      Authorization; No Contravention ............................................................67
Section 5.03      Governmental Authorization; Other Consents.........................................68
Section 5.04      Binding Effect..........................................................................................68
Section 5.05      Financial Statements; No Material Adverse Effect..................................68
Section 5.06      Litigation .................................................................................................69
Section 5.07      Ownership of Property; Liens...................................................................69
Section 5.08      Environmental Matters ............................................................................69
Section 5.09      Taxes.........................................................................................................70
Section 5.10      ERISA Compliance ..................................................................................70
Section 5.11      Subsidiaries; Equity Interests...................................................................70
Section 5.12      Margin Regulations; Investment Company Act .......................................70
Section 5.13      Disclosure .................................................................................................71
Section 5.14      Labor Matters............................................................................................71
Section 5.15      Intellectual Property; Licenses, Etc .........................................................71
Section 5.16      Solvency ...................................................................................................71
Section 5.17      [Reserved].................................................................................................71
Section 5.18      USA Patriot Act; OFAC; FCPA ..............................................................71
Section 5.19      Security Documents..................................................................................72
Section 5.20      EEA Financial Institutions.......................................................................72
Section 5.21      Beneficial Ownership Certification .........................................................72

Article VI Affirmative Covenants .....................................................................................72

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

**Page**

Section 6.01    Financial Statements ................................................................73
Section 6.02    Certificates; Other Information .................................................75
Section 6.03    Notices ....................................................................................76
Section 6.04    Payment of Taxes ....................................................................76
Section 6.05    Preservation of Existence, Etc. ................................................76
Section 6.06    Maintenance of Properties .......................................................76
Section 6.07    Maintenance of Insurance ........................................................77
Section 6.08    Compliance with Laws .............................................................77
Section 6.09    Books and Records ..................................................................77
Section 6.10    Inspection Rights ....................................................................77
Section 6.11    Additional Collateral; Additional Guarantors............................78
Section 6.12    Compliance with Environmental Laws........................................79
Section 6.13    Further Assurances ..................................................................80
Section 6.14    [Reserved].................................................................................80
Section 6.15    Ratings .....................................................................................80
Section 6.16    Use of Proceeds .......................................................................80
Section 6.17    Lender Meetings ......................................................................80
Section 6.18    End of Fiscal Years...................................................................80
Section 6.19    Lines of Business .....................................................................80
Section 6.20    Post-Closing Covenant .............................................................80
Section 6.21    Anti-Terrorism Law; Anti-Money Laundering; Embargoed Persons........81
Section 6.22    Account Control Agreements ....................................................81

Article VII Negative Covenants.......................................................................81

Section 7.01    Liens ........................................................................................82
Section 7.02    Investments...............................................................................86
Section 7.03    Indebtedness ............................................................................89
Section 7.04    Fundamental Changes................................................................92
Section 7.05    Dispositions .............................................................................93
Section 7.06    Restricted Payments..................................................................95
Section 7.07    [Reserved].................................................................................96
Section 7.08    Transactions with Affiliates.......................................................96
Section 7.09    Burdensome Agreements............................................................98
Section 7.10    Maximum Capital Expenditures ................................................100
Section 7.11    Consolidated First Lien Net Leverage Ratio ...............................100
Section 7.12    Interest Coverage Ratio ............................................................100
Section 7.13    Prepayments, Etc. of Indebtedness ...........................................101
Section 7.14    Permitted Activities .................................................................102

Article VIII Events of Default and Remedies ...................................................102

Section 8.01    Events of Default .....................................................................102
Section 8.02    Remedies Upon Event of Default ...............................................104
Section 8.03    Application of Funds .................................................................105
Section 8.04    Borrower's Right to Cure ...........................................................105

Article IX Administrative Agent ......................................................................106

Section 9.01    Appointment and Authority .......................................................106
Section 9.02    Rights as a Lender ....................................................................107
Section 9.03    Exculpatory Provisions..............................................................107
Section 9.04    Reliance by Administrative Agent...............................................109

**Page**

Section 9.05     Delegation of Duties .................................................................................110
Section 9.06     Resignation of Administrative Agent .......................................................110
Section 9.07     Non-Reliance on Administrative Agent and Other Lenders ......................111
Section 9.08     No Other Duties, Etc. ...............................................................................111
Section 9.09     Administrative Agent May File Proofs of Claim.......................................111
Section 9.10     Collateral and Guaranty Matters...............................................................111
Section 9.11     [Reserved].................................................................................................113
Section 9.12     Withholding Tax Indemnity.......................................................................113
Section 9.13     Non-U.S. Administrative Agent Tax Matters .............................................113

Article X Miscellaneous ...................................................................................................114
Section 10.01     Amendments, Etc.....................................................................................114
Section 10.02     Notices and Other Communications; Facsimile Copies ...........................116
Section 10.03     No Waiver; Cumulative Remedies ...........................................................118
Section 10.04     Attorney Costs and Expenses ..................................................................118
Section 10.05     Indemnification by the Borrower...............................................................119
Section 10.06     Payments Set Aside .................................................................................120
Section 10.07     Successors and Assigns ............................................................................121
Section 10.08     Confidentiality .........................................................................................126
Section 10.09     Setoff .......................................................................................................127
Section 10.10     Interest Rate Limitation ...........................................................................127
Section 10.11     Counterparts.............................................................................................127
Section 10.12     Integration................................................................................................128
Section 10.13     Survival of Representations and Warranties..............................................128
Section 10.14     Severability ..............................................................................................128
Section 10.15     GOVERNING LAW .................................................................................128
Section 10.16     WAIVER OF RIGHT TO TRIAL BY JURY.............................................129
Section 10.17     Binding Effect..........................................................................................129
Section 10.18     USA Patriot Act........................................................................................129
Section 10.19     No Advisory or Fiduciary Responsibility .................................................129
Section 10.20     Judgment Currency ..................................................................................130
Section 10.21     Intercreditor Agreement...........................................................................130
Section 10.22     Acknowledgement and Consent to Bail-In of EEA Financial Institutions ...............130
Section 10.23     Certain ERISA Matters.............................................................................131

Article XI Guarantee.........................................................................................................132
Section 11.01     The Guarantee..........................................................................................132
Section 11.02     Obligations Unconditional........................................................................133
Section 11.03     Reinstatement ..........................................................................................134
Section 11.04     Subrogation; Subordination .....................................................................134
Section 11.05     Remedies .................................................................................................134
Section 11.06     [Reserved]................................................................................................134
Section 11.07     Continuing Guarantee..............................................................................134
Section 11.08     General Limitation on Guarantee Obligations ..........................................134
Section 11.09     Release of Guarantors...............................................................................134
Section 11.10     Right of Contribution................................................................................135
Section 11.11     Keepwell..................................................................................................135
Section 11.12     Independent Obligation ............................................................................135

SCHEDULES

**Page**

| | |
|---|---|
| 1.01(B) | Guarantors |
| 2.01 | Term Loans |
| 2.03 | Existing Letters of Credit |
| 4.01(a) | Collateral Documents |
| 5.07 | Ownership of Property |
| 5.11 | Subsidiaries |
| 6.20 | Post-Closing Covenants |
| 7.01(b) | Liens |
| 7.02(f) | Investments |
| 7.03(b) | Indebtedness |
| 7.05(v) | Dispositions |
| 7.08(k) | Transactions with Affiliates |
| 7.09(b) | Burdensome Agreements |
| 10.02(a) | Certain Addresses for Notices |

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

**Page**

EXHIBITS

*Form of*

| | |
|---|---|
| A | Committed Loan Notice |
| B | Note |
| C | Compliance Certificate |
| D | Solvency Certificate |
| E-1 | Assignment and Assumption |
| E-2 | [Reserved] |
| E-3 | Acceptance and Prepayment Notice |
| E-4 | Discount Range Prepayment Notice |
| E-5 | Discount Range Prepayment Offer |
| E-6 | Solicited Discounted Prepayment Notice |
| E-7 | Solicited Discounted Prepayment Offer |
| E-8 | Specified Discount Prepayment Notice |
| E-9 | Specified Discount Prepayment Response |
| F | Security Agreement |
| G | Intercompany Note |
| H | United States Tax Compliance Certificate |
| I | Joinder Agreement |

**FIRST LIEN CREDIT AGREEMENT**

This FIRST LIEN CREDIT AGREEMENT is entered into as of [●], 2020, among JASON GROUP INC., a Delaware corporation and successor by merger with Old Jason (hereinafter defined) (the "**Company**" and the "**Borrower**"), the Guarantors party hereto from time to time, Cantor Fitzgerald Securities, as Administrative Agent, and each lender from time to time party hereto (collectively, the "**Lenders**" and, individually, a "**Lender**").

**PRELIMINARY STATEMENTS**

On June [●], 2020 (the "**Petition Date**"), Jason Incorporated, a Wisconsin corporation ("**Old Jason**"), Jason Partners Holdings Inc., a Delaware corporation ("**Old Holdings**"), Jason Holding, Inc. I, a Delaware corporation ("**Old Intermediate Holdings**"), the Guarantors and each of the Domestic Subsidiaries of Old Jason (collectively, the "**Debtors**") as debtors and debtors-in-possession, commenced voluntary cases under chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), which cases are being jointly administered under the caption [●] (the "**Chapter 11 Cases**").

The Joint Prepackaged Plan of Reorganization of Jason Industries, Inc. and its Debtor Affiliates pursuant to Chapter 11 ~~Plan~~ of ~~[●]~~the Bankruptcy Code filed with the Bankruptcy Court on ~~[●]~~June 20, 2020 Docket No. ~~[●]~~22 (the "**Prepackaged Plan**") has been confirmed pursuant to the Confirmation Order (as defined below), and concurrently with the Term Loans (as defined below) deemed made hereunder, the "Effective Date" as defined in and under the Prepackaged Plan (the "**Plan Effective Date**") has occurred.

Prior to the Petition Date, certain lenders extended credit to Old Jason, as borrower, pursuant to that certain First Lien Credit Agreement, dated as of June 30, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Pre-Petition First Lien Credit Agreement**") by and among Old Jason, the guarantors party thereto from time to time, the Bank of New York Mellon, as administrative agent, the lenders party thereto from time to time (the "**Pre-Petition First Lien Lenders**") and Deutsche Bank AG New York Branch, as L/C Issuer (as defined therein) and Swing Line Lender (as defined therein).

The Prepackaged Plan provides that, on the Plan Effective Date, each Pre-Petition First Lien Lender under the Pre-Petition First Lien Credit Agreement shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for their First Lien Secured Credit Agreement Claim (as defined in the Prepackaged Plan) its pro rata share of, among other things, (i) the Term Loans, (ii) the Second Lien Terms Loans and (iii) 100% of the equity of Holdings, subject to dilution in accordance with the terms of the Prepackaged Plan.

After giving effect to the Transactions (herein defined) on the Plan Effective Date, (i) Jason Holdings Inc., a Delaware corporation ("**Holdings**") shall own 100% of the outstanding equity interests in Jason Intermediate Inc., a Delaware corporation ("**Intermediate Holdings**"), which shall hold 100% of the outstanding equity interests in the Company; and (ii) Old Jason shall have merged with and into the Company, with the Company as successor by merger.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

**ARTICLE I**
**DEFINITIONS AND ACCOUNTING TERMS**

**Section 1.01    Defined Terms**.

As used in this Agreement, the following terms shall have the meanings set forth below:

["""**ABL Agent**" has the meaning assigned to the term "Administrative Agent" under and as defined in the ABL Credit Agreement and shall include any successor administrative agent under the ABL Credit Agreement~~]~~.

~~"**ABL Credit Agreement**" means [●].~~

["""**ABL Credit Agreement**" means that certain ABL Credit Agreement, dated as of the date hereof, by and among the Borrower, the Holdcos, the other Guarantors from time to time party thereto, the lenders party thereto from time to time and Wells Fargo Bank, National Association, as the ABL Agent.

"**ABL Loan Documents**" means the "Loan Documents" as defined in the ABL Credit Agreement~~]~~.

["""**ABL Obligations**" means the "Obligations" (or any comparable term) as defined in the ABL Credit Agreement~~]~~.

["""**ABL Secured Obligations**" means the "Secured Obligations" as defined in the ABL Credit Agreement~~]~~.

"**ABL Facility**" means the ABL Loans and commitments in respect thereof.

"**ABL Loans**" means the "Loans" as defined in the ABL Credit Agreement.

"**Acceptable Discount**" has the meaning set forth in Section 2.05(a)(v)(D)(2).

"**Acceptable Prepayment Amount**" has the meaning set forth in Section 2.05(a)(v)(D)(3).

"**Acceptance and Prepayment Notice**" means a notice of the Borrower's acceptance of the Acceptable Discount in substantially the form of Exhibit E-3.

"**Account Control Agreement**" means any deposit account control agreement, securities account control agreement or similar agreement entered into by a Loan Party, the Administrative Agent and the applicable financial institution, granting to the Administrative Agent, for the benefit of the Secured Parties, a perfected, first-priority Lien and "control" (as defined in the UCC) in the applicable deposit account or securities account of a Loan Party.

"**Administrative Agent**" means Cantor Fitzgerald Securities, in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"**Administrative Agent's Office**" means the Administrative Agent's address and account as set forth in Section 10.02(a), or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form ~~supplied~~approved by the Administrative Agent.

"**Advisors**" has the meaning set forth in Section 10.08.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Agent Fee Letter**" means the letter agreement, dated as of the date of this Agreement, between the Borrower and the Administrative Agent.

"**Agent Parties**" has the meaning set forth in Section 10.02(b).

~~WEIL:\97507497\9\10143.0003~~WEIL:\97507497\16\10143.0003

"**Agent-Related Persons**" means the ~~Agents~~Administrative Agent, together with ~~their respective~~its Affiliates, officers, directors, employees, partners, agents, advisors and other representatives.

"**Agreement**" means this First Lien Credit Agreement, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Agreement Currency**" has the meaning assigned to such term in Section 10.20.

"**Annual Financial Statements**" means the audited consolidated balance sheets of Old Jason as of December 31, 2017, December 31, 2018 and December 31, 2019, and the related consolidated statements of income and statements of cash flows for the Old Jason for the fiscal years then ended.

"**Anti-Terrorism Law**" has the meaning set forth in Section 6.21(a).

"**Applicable Discount**" has the meaning set forth in Section 2.05(a)(v)(C)(2).

"**Applicable Rate**" means a percentage per annum equal to (i) for Eurocurrency Rate Loans, 6.00% and (ii) for Base Rate Loans, 5.00~~%; and~~%.

"**Approved Bank**" has the meaning set forth in clause (c) of the definition of "Cash Equivalents."

"**Approved Fund**" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"**Assignee**" has the meaning set forth in Section 10.07(b)(i).

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit E-1 hereto."

"**Assignment Taxes**" has the meaning set forth in Section 3.01(b).

"**Attorney Costs**" means and includes all reasonable and documented fees, out-of-pocket expenses and disbursements of any law firm or other external legal counsel.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Auction Agent**" means (a) the Administrative Agent or (b) any other financial institution or advisor employed by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Discounted Term Loan Prepayment pursuant to Section 2.05(a)(v); provided that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent); provided, further, that neither the Borrower nor any of its Affiliates may act as the Auction Agent.

~~[~~"**Available Cash**" means at any time, (a) (i) the aggregate amount of unrestricted cash and Cash Equivalents of the Loan Parties and their Domestic Subsidiaries at such time plus (ii) the amount of cash and Cash Equivalents of the Loan Parties and their Domestic Subsidiaries that is restricted in favor of the ABL Facility, the Second Lien Credit Agreement and/or this Agreement, minus, to the extent included in clause (a), (b) the aggregate amount of any cash or Cash Equivalents (i) set aside to pay royalty obligations, working capital obligations, suspense payments, severance taxes, payroll, payroll taxes, other taxes, employee wage and benefit payments and trust and fiduciary obligations for which a Loan Party or any Subsidiary thereof has issued checks or has initiated wires or ACH transfers (or, in the Borrower's discretion, will issue checks or initiate wires or ACH transfers within five Business Days) in order to pay such amounts, (ii) in respect of other amounts for which a Loan Party or any Subsidiary thereof has issued checks or has initiated wires or ACH

3

transfers but have not yet been subtracted from the balance in the relevant account of such Loan Party or relevant Subsidiary, (iii) constituting purchase price deposits or amounts subject to other contractual or legal requirements to deposit money to be held by an unaffiliated third party, (iv) constituting deposits from unaffiliated third parties that are subject to return pursuant to binding agreements with such third parties, or (v) held in escrow~~]~~.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" has the meaning set forth in the preliminary statements to this Agreement.

"**Base Rate**" means for any day a fluctuating rate per annum equal to the highest of (i) the Federal Funds Effective Rate *plus* 1/2 of 1%, (ii) the rate ~~of interest in effect for such day as announced from time to time by the Administrative Agent as its "prime rate" at its principal office in New York City~~ quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent)and (iii) the rate per annum determined in the manner set forth in clause (ii) of the definition of Eurocurrency Rate *plus* 1%; *provided* that, notwithstanding the foregoing, in no event shall the Base Rate applicable to the Term Loans at any time be less than 2.00% per annum.  Any change in the Base Rate due to a change in such rate announced by the Administrative Agent or in the Federal Funds Effective Rate shall take effect at the opening of business on the day specified in the announcement of such change.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation, which certification shall be substantially similar in form and substance to the form of Certification Regarding Beneficial Owners of Legal Entity Customers published jointly, in May 2018, by the Loan Syndications and Trading Association and Securities Industry and Financial Markets Association.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Board**" has the meaning set forth in the definition of "Statutory Reserves."

"**Borrower**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Borrower Materials**" has the meaning set forth in Section 6.01.

"**Borrower Offer of Specified Discount Prepayment**" means the offer by any Company Party to make a voluntary prepayment of Term Loans at a Specified Discount to par pursuant to Section 2.05(a)(v)(B).

4

"**Borrower Solicitation of Discount Range Prepayment Offers**" means the solicitation by any Company Party of offers for, and the corresponding acceptance by a Lender of, a voluntary prepayment of Term Loans at a specified range of discounts to par pursuant to Section 2.05(a)(v)(C).

"**Borrower Solicitation of Discounted Prepayment Offers**" means the solicitation by any Company Party of offers for, and the subsequent acceptance, if any, by a Lender of, a voluntary prepayment of Term Loans at a discount to par pursuant to Section 2.05(a)(v)(D).

"**Borrowing**" means a borrowing consisting of Term Loans of the same Type and Class and, in the case of Eurocurrency Rate Loans, having the same Interest Period, made by each of the Lenders pursuant to Section 2.01.

"**Business Day**" means (i) any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of New York, and (ii) if such day relates to any Eurocurrency Rate Loan, any such day that is also a London Banking Day.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capitalized Leases) by the Borrower and its Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on the consolidated statement of cash flows of the Borrower and its Subsidiaries.

"**Capitalized Leases**" means all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; *provided* that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"**Carry Over Amount**" has the meaning set forth in Section 7.10.

"**Cash Election**" has the meaning set forth in Section 2.08(c).

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by the Borrower or any Subsidiary:

(a)     Dollars;

(b)     readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of the United States having average maturities of not more than 24 months from the date of acquisition thereof; *provided* that the full faith and credit of the United States is pledged in support thereof;

(c)     time deposits or eurodollar time deposits with, insured certificates of deposit, bankers' acceptances or overnight bank deposits of, or letters of credit issued by, any commercial bank that (i) is a Lender or (ii) (A) is organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development or is the principal banking Subsidiary of a bank holding company organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development and is a member of the Federal Reserve System, and (B) has combined capital and surplus of at least $250,000,000 or $100,000,000 in the case of any non-U.S. bank (any such bank in the foregoing clauses (i) or (ii) being an "**Approved Bank**"), in each case with maturities not exceeding 24 months from the date of acquisition thereof;

(d)     commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation (other than structured investment vehicles and other than corporations used in structured financing transactions) and rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the

5

equivalent thereof) or better by Moody's, in each case with average maturities of not more than 24 months from the date of acquisition thereof;

(e)       marketable short-term money market and similar funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(f)       repurchase obligations for underlying securities of the types described in clauses (b), (c) and (e) above entered into with any Approved Bank;

(g)       securities with average maturities of 24 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h)       Investments (other than in structured investment vehicles and structured financing transactions) with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's;

(i)       securities with maturities of 12 months or less from the date of acquisition backed by standby letters of credit issued by any Approved Bank;

(j)       (i) instruments equivalent to those referred to in clauses (a) through (i) above denominated in Euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction and (ii) in the case of any Foreign Subsidiary, such local currencies in those countries in which such Foreign Subsidiary transacts business from time to time in the ordinary course of business;

(k)       Investments, classified in accordance with GAAP as Current Assets of the Borrower or any Subsidiary, in money market investment programs which are registered under the Investment Company Act of 1940 or which are administered by financial institutions having capital of at least $250,000,000, and, in either case, the portfolios of which are limited such that substantially all of such Investments are of the character, quality and maturity described in clauses (a) through (j) above; and

(l)       investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (k) above.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clauses (a) and (j) above; *provided* that such amounts are converted into any currency listed in clause (a) or (j) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

"**Casualty Event**" means any event that gives rise to the receipt by the Borrower or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**CFC**" means a Subsidiary of the Borrower that is a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"**CFC Holding Company**" means a Domestic Subsidiary of the Borrower that owns no material assets (directly or through one or more disregarded entities) other than the equity (including any debt

6

instrument treated as equity for U.S. federal income tax purposes) of one or more Foreign Subsidiaries that are CFCs.

"**Change of Control**" shall be deemed to occur if:

(a)    (i) any person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Closing Date), but excluding (x) any employee benefit plan of such person and its Subsidiaries and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan or (y) any combination of Permitted Holders, shall have, directly or indirectly, acquired beneficial ownership of Equity Interests representing 35% or more of the aggregate voting power represented by the issued and outstanding Equity Interests of Holdings or (ii) during each period of 12 consecutive months, the board of directors of Holdings shall not consist of a majority of the Continuing Directors;

(b)    a "change of control" (or similar event) shall occur in any document pertaining to the ABL Credit Agreement or the Second Lien Credit Agreement;

(c)    other than as described in Section 7.04(a)(i), Intermediate Holdings shall cease to own, directly or indirectly, 100% of the Equity Interests of the Borrower; or

(d)    other than as described in Section 7.04(a)(i), Holdings shall cease to own, directly or indirectly, 100% of the Equity Interests of Intermediate Holdings.

"**Chapter 11 Cases**" has the meaning set forth in the preliminary statements to this Agreement.

"**Closing Date**" means August [●], 2020.

"**Code**" means the U.S. Internal Revenue Code of 1986, and the United States Treasury Department regulations promulgated thereunder, as amended from time to time (unless as specifically provided otherwise).

"**Collateral**" means the "Collateral" as defined in the Security Agreement and all the "Collateral" or "Pledged Assets" (or equivalent terms) as defined in any other Collateral Document and any other assets pledged pursuant to any Collateral Document (but in any event excluding the Excluded Assets).

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(a)    subject to Sections 4.01(a) and 6.20, the Administrative Agent shall have received each Collateral Document required to be delivered (i) on the Closing Date, pursuant to Section 4.01(a)(v) and Section 6.11(c) and (ii) at such time as may be designated therein or herein, pursuant to the Collateral Documents or Section 6.11 or 6.13, duly executed by each Loan Party thereto;

(b)    subject to Sections 4.01(a) and 6.20, all Obligations shall have been unconditionally guaranteed by Holdings, Intermediate Holdings, the Borrower (other than with respect to its direct Obligations as a primary obligor (as opposed to a guarantor) under the Loan Documents) and each Material Domestic Subsidiary (other than any Excluded Subsidiary) including those that are listed on Schedule 1.01(B) hereto (each, a "**Guarantor**");

(c)    the Secured Obligations and the Guaranty shall have been secured pursuant to the Security Agreement by a first-priority security interest (subject to Liens permitted by Section 7.01) in (i) all of the Equity Interests of Holdings, Intermediate Holdings and the Borrower, (ii) all of the Equity Interests of each Subsidiary that is a wholly owned Domestic Subsidiary (other than a Domestic Subsidiary described in the following clause (iii)) directly owned by the Loan Parties, (iii) the issued and outstanding Equity Interests of each Subsidiary that is a CFC Holding Company, and (iv) the issued and outstanding Equity Interests of each Subsidiary that is a wholly owned Foreign Subsidiary that is directly owned by the Borrower or by any Subsidiary Guarantor, in each case other than any Excluded Assets; *provided*, *however*, in the case of (iii) and (iv), such term shall not include

7

the pledge of any stock in a CFC Holding Company or Foreign Subsidiary to the extent such pledge would result in material adverse tax consequences to the Borrower or its Subsidiaries as determined by the Borrower in good faith and in consultation with the Administrative Agent);.

(d)        except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, or under any Collateral Document, the Secured Obligations and the Guaranty shall have been secured by a perfected first-priority security interest (to the extent such security interest may be perfected by delivering certificated securities, filing financing statements under the Uniform Commercial Code or making any necessary filings with respect to the security interest with the United States Patent and Trademark Office or United States Copyright Office or to the extent required in the Security Agreement (or any other Collateral Document)) or by Mortgages referred to in clause (e) below in Collateral of the Borrower and each Guarantor (including accounts, inventory, equipment, investment property, contract rights, applications and registrations of intellectual property filed in the United States, other general intangibles, Material Real Property, intercompany notes and proceeds of the foregoing), in each case, (i) with the priority required by the Collateral Documents and (ii) subject to exceptions and limitations otherwise set forth in this Agreement (for the avoidance of doubt, including the limitations and exceptions set forth in Section 4.01) and the Collateral Documents; and

(e)        the Administrative Agent shall have received (i) counterparts of a Mortgage with respect to each Material Real Property required to be delivered pursuant to Sections 6.11 and 6.13 (the "**Mortgaged Properties**") duly executed and delivered by the applicable Loan Party, (ii) a title insurance policy for such property available in each applicable jurisdiction (the "**Mortgage Policies**") insuring the Lien of each such Mortgage as a valid first-priority Lien on the property described therein, free of any other Liens except as permitted by Section 7.01, together with such endorsements, coinsurance and reinsurance as the Administrative AgentRequired Lenders may reasonably request, (iii) a completed Life-of-Loan Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto) and, if any improvements on any Mortgaged Property are located within an area designated a "**flood hazard area,**" evidence of such flood insurance as may be required under Section 6.07, (iv) ALTA surveys in form and substance reasonably acceptable to the Administrative AgentRequired Lenders or such existing surveys together with no-change affidavits sufficient for the title company to remove all standard survey exceptions from the Mortgage Policies and issue the endorsements required in clause (ii) above, (v) copies of any existing abstracts and appraisals and (vi) such legal opinions and other documents as the Administrative AgentRequired Lenders may reasonably request with respect to any such Mortgaged Property; and

(f)        except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, or under any Collateral Document, the Secured Obligations and the Guaranty shall have been secured by a perfected second-priority security interest (to the extent such security interest may be perfected by delivering certificated securities, filing financing statements under the Uniform Commercial Code) in ABL Priority Collateral of the Borrower and each Guarantor (including accounts, inventory and proceeds of the foregoing), in each case, (i) with the priority required by the Collateral Documents and (ii) subject to exceptions and limitations otherwise set forth in this Agreement (for the avoidance of doubt, including the limitations and exceptions set forth in Section 4.01) and the Collateral Documents;

*provided*, *however*, that (i) the foregoing definition shall not require, and the Loan Documents shall not contain any requirements as to, (A) the creation or perfection of pledges of, security interests in, Mortgages on, or the obtaining of title insurance, surveys, abstracts or appraisals or taking other actions with respect to any Excluded Assets and (B) any other assets that, in the reasonable judgment of the Administrative AgentRequired Lenders and the Borrower, the cost of creating, perfecting or maintaining such pledges or security interests in such assets or obtaining title insurance, surveys, abstracts or appraisals in respect of such

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

assets shall be excessive in view of the value of such assets or the practical benefit to the Lenders afforded thereby and (ii) the Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in this Agreement and the Collateral Documents.

The Administrative Agent (at the direction of the Required Lenders) may grant extensions of time for the perfection of security interests in, or the delivery of the Mortgages and the obtaining of title insurance and surveys with respect to, particular assets and the delivery of assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) or any other compliance with the requirements of this definition where it reasonably determines, in consultation with the Borrower, that perfection or compliance cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

No actions in any non-U.S. jurisdiction or required by the Laws of any non-U.S. jurisdiction shall be required in order to create any security interests in assets located, titled, registered or filed outside of the U.S. or to perfect such security interests (it being understood that there shall be no security agreements or pledge agreements governed under the Laws of any non-U.S. jurisdiction).

The foregoing definition shall not require landlord waivers, estoppels and collateral access letters.

"**Collateral Documents**" means, collectively, the Security Agreement, the Intercreditor Agreement, the Intellectual Property Security Agreements, theany Mortgages, any Account Control Agreements, collateral assignments, Security Agreement Supplements, security agreements, pledge agreements, intellectual property security agreements or other similar agreements delivered to the Administrative Agent pursuant to Section 4.01(a)(v), 6.11, 6.13 or 6.20 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties.

"**Committed Loan Notice**" means a written notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other or (c) a continuation of Eurocurrency Rate Loans pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit A hereto.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Company**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Company Parties**" means, collectively, the Holdcos, the Borrower and its Subsidiaries, and "**Company Party**" means any one of them.

"**Compensation Period**" has the meaning set forth in Section 2.12(c)(ii).

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit C hereto.

[""**Confirmation Order**" means an Order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Lenders, confirming the Prepackaged Plan pursuant to section 1129 of the Bankruptcy Court and in accordance with the terms of the Prepackaged Plan, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms of the Prepackaged Plan so long as any such amendment, supplement or modification does not adversely affect the interests of the Lenders.][1].

"**Consolidated EBITDA**" means, for any period, the Consolidated Net Income for such period, *plus*:

(a)     without duplication and, except with respect to clauses (vii)(B), (x) and (xi) below, to the extent deducted (and not added back or excluded) in arriving at such Consolidated Net Income, the sum of the following amounts for such period with respect to the Borrower and its Subsidiaries:

---

[1] NTD: Under review.

9

(i)        total interest expense determined in accordance with GAAP (, including, to the extent deducted and not added back in computing Consolidated Net Income, (A) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (B) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers acceptances, (C) non-cash interest payments, (D) the interest component of Capitalized Leases, (E) net payments, if any, pursuant to interest Swap Contracts with respect to Indebtedness, (F) amortization of deferred financing fees, debt issuance costs, commissions and fees, (G) the interest component of any pension or other post-employment benefit expense and (H) commissions, discounts, yield and other fees and, to the extent not reflected in such total interest expense, any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations, and costs of surety bonds in connection with financing activities (whether amortized or immediately expensed),

(ii)       without duplication, provision for taxes based on income, profits or capital gains of the Borrower and the Subsidiaries, including, without limitation, federal, state, foreign, local, franchise and similar taxes and foreign withholding taxes paid or accrued during such period including penalties and interest related to such taxes or arising from any tax examinations and any tax distributions made pursuant to Section 7.06(h)(iii),

(iii)      depreciation and amortization (including amortization of intangible assets, deferred financing fees, debt issuance costs, commissions, fees and expenses, bridge, commitment and other financing fees, discounts, yield) and other fees and charges (including amortization of unrecognized prior service costs and actuarial gains and losses related to pensions and other post-employment benefits, of the Borrower and its Subsidiaries),

(iv)      unusual or non-recurring charges, expenses or losses,

(iv)      (x) any unusual or non-recurring extraordinary charges for such period (provided, that the aggregate amount of unusual or non-recurring extraordinary charges added back to Consolidated EBITDA pursuant to this clause (a)(iv)(x) shall not exceed 15% of Consolidated EBITDA for such period) and (y) any unusual or non-recurring non-cash charges for such period,

(v)       other non-cash charges, expenses or losses, including, without limitation, any non-cash expense relating to the vesting of warrants (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period),

(vi)      retention, recruiting, relocation and signing bonuses and expenses, stock option and other equity-based compensation expenses, severance costs, stay bonuses, transaction fees and expenses and management fees and expenses, and any one time expense relating to enhanced accounting function or other transaction costs, including those associated with becoming a standalone entity or a public company (including, without duplication, any such payments made in connection with the consummation of the Transactions),

(vii)     (A) the amount of any restructuring charges and related charges, restructuring costs, integration costs, transition costs, consolidation and closing costs for facilities, costs incurred in connection with any non-recurring strategic initiatives, costs incurred in connection with acquisitions and non-recurring intellectual property

10

development after the Closing Date, other business optimization expenses (including costs and expenses relating to business optimization programs and new systems design and implementation costs), project start-up costs and other restructuring charges, accruals or reserves (including restructuring costs related to acquisitions after the Closing Date and to closure/consolidation of facilities, retention charges, systems establishment costs and excess pension charges) and (B) the amount of cost savings, operating expense reductions, other operating improvements and "run rate" synergies projected by the Borrower in good faith to result from actions taken or expected to be taken in connection with the Transactions or any Specified Transaction or the implementation of an operational initiative or operational change after the Closing Date (in each case calculated on a Pro Forma Basis as though such cost savings, operating expense reductions, other operating improvements and synergies had been realized on the first day of such period and as if such cost savings, operating expense reductions, other operating improvements and synergies were realized during the entirety of such period), net of the amount of actual benefits realized during such period from such actions; *provided* that (w) in no event shall the amount added back pursuant to this clause (vii) exceed $5,000,000 for any Test Period, (x) a duly completed certificate signed by a Responsible Officer of the Borrower shall be delivered to the Administrative Agent together with the Compliance Certificate required to be delivered pursuant to Section 6.02, certifying that such cost savings, operating expense reductions, other operating improvements and synergies are (i) reasonably supportable and quantifiable in the good faith judgment of the Borrower, and (ii) reasonably anticipated to be realized within (I) in the case of any such cost savings, operating expense reductions, other operating improvements and synergies in connection with the Transactions, six (6) months after the Closing Date and (II) in all other cases, six (6) months after the consummation of the Specified Transaction or the implementation of an initiative or change, which is expected to result in such cost savings, expense reductions, other operating improvements or synergies, (y) no cost savings, operating expense reductions and synergies shall be added pursuant to this clause (vii) to the extent duplicative of any expenses or charges otherwise added to Consolidated EBITDA, whether through a *pro forma* adjustment or otherwise, for such period and (z) to the extent that any cost savings, operating expense reductions, other operating improvements and synergies are not associated with the Transactions or a Specified Transaction following the Closing Date, all steps shall have been taken for realizing such savings,

(viii)    [reserved],

(ix)    other accruals, payments and expenses (including rationalization, legal, tax, structuring and other costs and expenses), or any amortization thereof, related to the Transactions (including all Transaction Expenses), acquisitions, Investments, dividends, Dispositions, or any amortization thereof, issuances of Indebtedness or Equity Interests permitted under the Loan Documents or repayment of debt, issuance of equity securities, initial public offering, refinancing transactions or amendment or other modification of any debt instrument (in each case, including any such transaction consummated on the Closing Date and any such transaction undertaken but not completed),

(x)    to the extent not already included in Consolidated Net Income, proceeds of business interruption insurance (to the extent actually received),

(xi)    cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added back,

11

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

(xii)    any non-cash increase in expenses (A) resulting from the revaluation of inventory (including any impact of changes to inventory valuation policy methods including changes in capitalization of variances) or other inventory adjustments, or (B) due to purchase accounting associated with the Transactions, or any acquisition constituting an Investment permitted under this Agreement consummated prior to or after the Closing Date,

(xiii)    the amount of any expense or reduction of Consolidated Net Income consisting of Subsidiary income attributable to minority interests or non-controlling interests of third parties in any non-wholly owned Subsidiary, *minus* the amount of dividends or distributions that are paid in cash by such non-wholly owned Subsidiary to such third party; *provided* that the amount of such cash dividends or distributions deducted pursuant to this clause (xiii) in any Test Period shall not exceed such third party's *pro rata* share of the Consolidated EBITDA (to the extent positive) of such non-wholly owned Subsidiary for such Test Period,

(xiv)    letter of credit fees,

(xv)    [reserved],

(xvi)    any Equity Funded Employee Plan Costs,

(xvii)    any net loss from disposed, abandoned or discontinued operations or product lines,

(xviii)    any costs or expenses incurred relating to environmental remediation, litigation or other disputes in respect of events and exposures that occurred prior to the Closing Date, and

(xix)    expenses during such period in connection with earn-outs and other deferred payments in connection with any acquisitions constituting an Investment permitted under this Agreement, to the extent included in the calculation of Consolidated Net Income in accordance with GAAP as an accounting adjustment to the extent that the actual amount payable or paid in respect of such earn-outs or other deferred payments exceeds the liability booked by the applicable Person therefor,

*minus* (b) without duplication and to the extent included in arriving at such Consolidated Net Income, (i) non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period), (ii) any net gain from disposed, abandoned or discontinued operations or product lines and (iii) the amount of any minority interest income consisting of Subsidiary losses attributable to minority interests or non-controlling interests of third parties in any non-wholly owned Subsidiary; *provided* that:

(A)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA (x) currency translation gains and losses related to currency remeasurements of Indebtedness (including the net loss or gain (i) resulting from Swap Contracts for currency exchange risk and (ii) resulting from intercompany indebtedness) and (y) all other foreign currency translation gains or losses to the extent such gains or losses are non-cash items;

(B)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any adjustments resulting from the application of FASB Accounting Standards Codification 815 and International Accounting Standard No. 39 and their respective related pronouncements and interpretations; and

12

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

(C)      to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any income (loss) for such period attributable to the early extinguishment of (i) Indebtedness, (ii) obligations under any Swap Contracts or (iii) other derivative instruments.

Notwithstanding anything to the contrary contained herein, for purposes of determining Consolidated EBITDA under this Agreement for any period that includes the fiscal quarter ended (i) September 30, 2020 Consolidated EBITDA for the fiscal quarter ended September 30, 2020 shall be deemed to be the greater of (a) Consolidated EBITDA calculated in accordance with the terms of this Agreement for such fiscal quarter and (b) $2,000,000 and (ii) December 31, 2020, Consolidated EBITDA for the fiscal quarter ended December 31, 2020 shall be deemed to be the greater of (a) Consolidated EBITDA calculated in accordance with the terms of this Agreement for such fiscal quarter and (b) $2,000,000.  For the avoidance of doubt, Consolidated EBITDA shall be calculated, including pro forma adjustments, in accordance with Section 1.09.

"**Consolidated First Lien Net Debt**" means, as of any date of determination, the aggregate principal amount of Indebtedness of the Borrower and its Subsidiaries outstanding on such date, in an amount that would be reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with the Transactions or any acquisition constituting an Investment permitted under this Agreement) consisting of Indebtedness for borrowed money, purchase money debt and Attributable Indebtedness and debt obligations evidenced by promissory notes or similar instruments that is secured by a Lien on any asset or property of the Borrower or any Subsidiary, including Indebtedness under the ABL Credit Agreement, but excluding any such Indebtedness in which the applicable Liens are expressly subordinated or junior to the Liens securing the Obligations (other than in accordance with the Intercreditor Agreement) *minus* the aggregate amount of cash and Cash Equivalents included on the consolidated balance sheet of the Borrower and the Subsidiaries as of such date, free and clear of all Liens (other than Liens permitted by Section 7.01); *provided* that Consolidated First Lien Net Debt shall not include Indebtedness in respect of letters of credit, except to the extent of unreimbursed amounts thereunder; *provided* that any unreimbursed amount under commercial letters of credit shall not be counted as Consolidated First Lien Net Debt until three Business Days after such amount is drawn.  For the avoidance of doubt, it is understood that obligations under Swap Contracts and Treasury Services Agreements do not constitute Consolidated First Lien Net Debt.

"**Consolidated First Lien Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated First Lien Net Debt as of the last day of such Test Period to (b) Consolidated EBITDA for such Test Period.

"**Consolidated Interest Expense**" shall mean, with respect to any Person for any period, the sum of (1) interest expense (including that attributable to obligations with respect to Capital Leases), net of interest income of such Person and its Subsidiaries with respect to all outstanding Indebtedness of such Person and its Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under hedging agreements, *plus* (2) non-cash interest expense resulting solely from pay in kind interest expense of such Person and its Subsidiaries, but excluding, for the avoidance of doubt, (a) amortization of deferred financing costs, debt issuance costs, commissions, fees and expenses and any other amounts of non-cash interest other than referred to in clause (2) above (including as a result of the effects of acquisition method accounting or pushdown accounting), (b) non-cash interest expense attributable to the movement of the mark-to-market valuation of Indebtedness or obligations under derivative instruments pursuant to FASB Accounting Standards Codification Topic 815—Derivatives and Hedging, (c) any one-time cash costs associated with breakage in respect of hedging agreements for interest rates, (d) any "additional interest" owing pursuant to a registration rights agreement with respect to any securities, (fe) any payments with respect to make whole premiums or other breakage costs of any Indebtedness, including, without limitation, any Indebtedness issued in connection with the Transactions, (gf) penalties and interest relating to taxes, (hg) accretion or accrual of discounted liabilities not constituting Indebtedness, (ih) interest expense attributable to a direct or indirect parent entity resulting from pushdown accounting, (ji) any expense resulting from the discounting of Indebtedness in connection with the application

13

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

of recapitalization or purchase accounting, and (k̶j) any interest expense attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential), with respect thereto and with respect to the Transactions, any acquisition or Investment permitted hereunder, all as calculated on a consolidated basis.

"**Consolidated Net Income**" means, for any period, the net income (loss) of the Borrower and the Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; *provided*, *however*, that, without duplication,

(a)     any after-tax effect of extraordinary items (including gains or losses and all fees and expenses relating thereto) for such period shall be excluded,

(b)     the cumulative effect of a change in accounting principles during such period to the extent included in Consolidated Net Income shall be excluded,

(c)     accruals and reserves that are established or adjusted within 12 months after the Closing Date that are so required to be established or adjusted as a result of the Transactions (or within 12 months after the closing of any acquisition that are so required to be established or adjusted as a result of such acquisition) in accordance with GAAP or changes as a result of adoption or modification of accounting policies in accordance with GAAP shall be excluded,

(d)     any net after-tax effect of gains or losses (*less* all fees, expenses and charges relating thereto) attributable to asset dispositions or abandonments or the sale or other disposition of any Equity Interests of any Person, in each case other than in the ordinary course of business, as determined in good faith by the Borrower, shall be excluded,

(e)     the net income (loss) for such period of any Person that is not a Subsidiary of the Borrower, or that is accounted for by the equity method of accounting, shall be excluded; *provided* that Consolidated Net Income of the Borrower shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents (or to the extent subsequently converted into cash or Cash Equivalents) to the Borrower or a Subsidiary thereof in respect of such period,

(f)     any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a change in law or regulation, in each case, pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP shall be excluded,

(g)     any non-cash compensation charge or expense, including any such charge or expense arising from the grants of stock appreciation or similar rights, stock options, restricted stock or other rights or equity incentive programs or any other equity-based compensation shall be excluded, and any cash charges associated with the rollover, acceleration or payout of Equity Interests by management of the Borrower or any of its direct or indirect parents in connection with the Transactions or an initial public offering, shall be excluded,

(h)     any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment, Permitted Acquisition or any sale, conveyance, transfer or other disposition of assets permitted under this Agreement, to the extent actually reimbursed, or, so long as the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is (A) not denied by the applicable indemnitor in writing within 180 days of the occurrence of such event and (B) in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365-day period), shall be excluded,

14

(i)      to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount (A) is not denied by the applicable carrier in writing within 180 days of the occurrence of such event and (B) is in fact reimbursed within 365 days of the date of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within such 365 days), expenses, charges or losses with respect to liability or casualty events or business interruption shall be excluded, and

(j)      the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of the Borrower or is merged into or consolidated with the Borrower or any of its Subsidiaries or such Person's assets are acquired by the Borrower or any of its Subsidiaries shall be excluded (except to the extent required for any calculation of Consolidated EBITDA on a Pro Forma Basis in accordance with Section 1.09).

There shall be excluded from Consolidated Net Income for any period the purchase accounting effects of adjustments in component amounts required or permitted by GAAP (including in the inventory, property and equipment, software, goodwill, intangible assets, in-process research and development, deferred revenue and debt line items thereof) and related authoritative pronouncements (including the effects of such adjustments pushed down to the Borrower and the Subsidiaries), as a result of the Transactions, any acquisition constituting an Investment permitted under this Agreement consummated prior to or after the Closing Date, or the amortization or write-off of any amounts thereof.  For the avoidance of doubt, Consolidated Net Income shall be calculated, including *pro forma* adjustments, in accordance with Section 1.09.

"**Consolidated Net Sales**" means, for any period, the net sales of the Borrower and the Subsidiaries in the ordinary course of business calculated in accordance with GAAP.

"**Continuing Directors**" means the directors of Holdings on the Closing Date, as elected or appointed after giving effect to the Transactions, directors appointed in accordance with any stockholders agreement entered into by and among Holdings and its stockholders and each other director, if, in each case, such other director's nomination for election to the board of directors of Holdings is recommended by a majority of the then Continuing Directors or such other director receives the vote of, or is appointed or otherwise approved by, prior to a Qualified IPO by the Borrower or a Relevant Public Company, or those Permitted Holders which then hold a majority of the voting Equity Interests in Holdings then held by all Permitted Holders, in each case in his or her election by the holders of Equity Interests in Holdings necessary to elect such director.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" has the meaning set forth in the definition of "Affiliate."

"**Credit Extension**" means a Borrowing.

"**Cure Amount**" has the meaning set forth in Section 8.04(a).

"**Cure Expiration Date**" has the meaning set forth in Section 8.04(a).

"**Current Assets**" means, with respect to the Borrower and the Subsidiaries on a consolidated basis at any date of determination, all assets (other than cash and Cash Equivalents) that would, in accordance with GAAP, be classified on a consolidated balance sheet of the Borrower and its Subsidiaries as current assets at such date of determination, other than amounts related to current or deferred Taxes based on income or profits (but excluding assets held for sale, loans (permitted) to third parties, pension assets, deferred bank fees and derivative financial instruments).

15

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtors**" has the meaning set forth in the preliminary statements to this Agreement.

"**Declined Proceeds**" has the meaning set forth in Section 2.05(b)(viii).

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, without cure or waiver hereunder, would be an Event of Default.

"**Default Rate**" means an interest rate equal to (a) the Base Rate *plus* (b) the Applicable Rate, if any, applicable to Base Rate Loans *plus* (c) 2.0% per annum; *provided* that with respect to a Eurocurrency Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan *plus* 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

"**Defaulting Lender**" means any Lender whose acts or failure to act, whether directly or indirectly, cause it to meet any part of the definition of Lender Default.

"**Discount Prepayment Accepting Lender**" has the meaning set forth in Section 2.05(a)(v)(B)(2).

"**Discount Range**" has the meaning set forth in Section 2.05(a)(v)(C)(1).

"**Discount Range Prepayment Amount**" has the meaning set forth in Section 2.05(a)(v)(C)(1).

"**Discount Range Prepayment Notice**" means a written notice of a Borrower Solicitation of Discount Range Prepayment Offers made pursuant to Section 2.05(a)(v)(C) substantially in the form of Exhibit E-4.

"**Discount Range Prepayment Offer**" means the irrevocable written offer by a Lender, substantially in the form of Exhibit E-5, submitted in response to an invitation to submit offers following the Auction Agent's receipt of a Discount Range Prepayment Notice.

"**Discount Range Prepayment Response Date**" has the meaning set forth in Section 2.05(a)(v)(C)(1).

"**Discount Range Proration**" has the meaning set forth in Section 2.05(a)(v)(C)(3).

"**Discounted Prepayment Determination Date**" has the meaning set forth in Section 2.05(a)(v)(D)(3).

"**Discounted Prepayment Effective Date**" means in the case of a Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offer or Borrower Solicitation of Discounted Prepayment Offer, five Business Days following the Specified Discount Prepayment Response Date, the Discount Range Prepayment Response Date or the Solicited Discounted Prepayment Response Date, as applicable, in accordance with Section 2.05(a)(v)(B)(1), 2.05(a)(v)(C)(1) or 2.05(a)(v)(D)(1), respectively, unless a shorter period is agreed to between the Borrower and the Auction Agent.

"**Discounted Term Loan Prepayment**" has the meaning set forth in Section 2.05(a)(v)(A).

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale or issuance of Equity Interests (other than directors' qualifying shares or other shares required by applicable Law) in a Subsidiary) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

16

"**Disqualified Competitor**" means such Persons who are competitors of the Borrower and its Subsidiaries that are separately identified in writing by the Borrower to the Administrative Agent from time to time, and any of their Affiliates (other than any such Affiliate that is affiliated with a financial investor in such Person and that is not itself an operating company or otherwise an Affiliate of an operating company so long as such Affiliate is a bona fide Fund) that are either (a) identified in writing by the Borrower to the Administrative Agent from time to time or (b) clearly identifiable on the basis of such Affiliate's name (it being agreed that the Administrative Agent shall be entitled to conclusively rely on such Person's representations in the applicable Assignment and Assumption).

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than (i) solely for Qualified Equity Interests and cash in lieu of fractional shares or (ii) solely at the discretion of the issuer), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable), (b) is redeemable at the option of the holder thereof (other than (i) solely for Qualified Equity Interests and cash in lieu of fractional shares or (ii) as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable), in whole or in part, (c) provides for the scheduled payments of dividends in cash or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 91 days after the ~~Latest~~ Maturity Date at the time of issuance of such Equity Interests; *provided* that if such Equity Interests are issued pursuant to a plan for the benefit of employees of Holdings (or any direct or indirect parent thereof), the Borrower or the Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by the Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"**Disqualified Competitor**" means such Persons who are competitors of the Borrower and its Subsidiaries that are separately identified in writing by the Borrower to the Administrative Agent from time to time, and any of their Affiliates (other than any such Affiliate that is affiliated with a financial investor in such Person and that is not itself an operating company or otherwise an Affiliate of an operating company so long as such Affiliate is a bona fide Fund) that are either (a) identified in writing by the Borrower to the Administrative Agent from time to time or (b) clearly identifiable on the basis of such Affiliate's name.

"**Distressed Person**" has the meaning set forth in the definition of "Lender-Related Distress Event."

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein and Norway.

17

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" has the meaning set forth in Section 10.07(a)(i).

"**Embargoed Person**" has the meaning set forth in Section 6.21(c).

"**EMU Legislation**" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"**Enforcement Qualifications**" has the meaning set forth in Section 5.04.

"**Environment**" means indoor air, ambient air, surface water, groundwater, drinking water, land surface, subsurface strata, and natural resources such as wetlands, flora and fauna.

"**Environmental Laws**" means any applicable Law relating to the prevention of pollution or the protection of the Environment and natural resources, and the protection of human health and safety as it relates to the Environment.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of investigation and remediation, fines, penalties or indemnities), of the Loan Parties or any Subsidiary resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage or treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement to the extent liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Funded Employee Plan Costs**" means cash costs or expenses, incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or stockhareholders agreement, to the extent funded with cash proceeds contributed to the capital of the Borrower or net cash proceeds of an issuance of Qualified Equity Interests of the Borrower or Equity Interests of any direct or indirect parent of the Borrower (other than any amount designated as a Cure Amount).

"**Equity Interests**" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities); *provided*, that any instrument evidencing Indebtedness convertible or exchangeable for Equity Interests shall not be deemed to be Equity Interests unless and until such instrument is so converted or exchanged.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is under common control with a Loan Party or any Subsidiary within the meaning of Section 414(b) or (c) of the Code or Section 4001 of ERISA (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code or Section 302 of ERISA).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by a Loan Party, any Subsidiary or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a

18

cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by a Loan Party, any Subsidiary or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization (within the meaning of Section 4241 of ERISA) or insolvent (within the meaning of Section 4245 of ERISA) or in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (d) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (e) the filing of a notice of intent to terminate, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for, and that could reasonably be expected to result in, the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) with respect to a Pension Plan, the failure to satisfy the minimum funding standard of Section 412 of the Code or Section 302 of ERISA, whether or not waived; (h) a failure by a Loan Party, any Subsidiary or any ERISA Affiliate to make a required contribution to a Multiemployer Plan; (i) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could reasonably be expected to result in liability to a Loan Party or any Subsidiary; or (j) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon a Loan Party, any Subsidiary or any ERISA Affiliate.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Euro**", "**EUR**" and "**€**" mean the lawful currency of the Participating Member States introduced in accordance with the EMU Legislation.

"**Eurocurrency Rate**" means:

(a)     for any Interest Period with respect to a Eurocurrency Rate Loan, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the commencement of such Interest Period by reference to the interest settlement rates for deposits in Dollars (as published by Reuters on page LIBOR01 of the Reuters Screen or the applicable Markit desktop) (as set forth by (i) the Intercontinental Exchange Group, or (ii) any publicly available successor service or entity that has been authorized by the U.K. Financial Conduct Authority to administer the London Interbank Offered Rate for a period equal to such Interest Period), and

(b)     for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on such date by reference to the interest settlement rates for deposits in Dollars (as published by Reuters on page LIBOR01 of the Reuters Screen or the applicable Markit desktop) from time to time with a term of one month (as set forth by (i) the Intercontinental Exchange Group, or (ii) any publicly available successor service or entity that has been authorized by the U.K. Financial Conduct Authority to administer the London Interbank Offered Rate),

in the case of clauses (a) and (b) above, multiplied by Statutory Reserves, provided that, in the case of clauses (a) and (b) above, the Eurocurrency Rate with respect to Term Loans, shall not be less than 1.00% per annum; *provided further* that, subject to clauses (i) and (ii) of immediately succeeding sentence, if the Administrative Agent is unable to determine the Eurocurrency Rate for the relevant interest period under clause (a) or (b), the Administrative Agent shall use the Eurocurrency Rate for the immediately preceding interest period. Notwithstanding the foregoing:

(i)     subject to clause (ii) below, if on the relevant Eurocurrency determination date the relevant London interbank offered rate for U.S. dollar deposits has been discontinued, then the Administrative Agent shall use (a) an industry-accepted successor rate to the relevant London interbank offered rate for U.S. dollar deposits or (b) if no such industry-accepted successor rate exists, the most comparable substitute or successor rate to the relevant London interbank offered rate for U.S. dollar deposits, in each case as determined by a financial agent (which

19

may be an affiliate of the Administrative Agentthe Required Lenders; and

(ii)   if the financial agent has determined a substitute or successor rate, the Administrative Agent shall notify the Borrower and the Lenders of such rate and, upon approval of such rate by the Required Lenders, the Borrower, the Administrative Agent and the Required Lenders agree to enter into any amendments to this Agreement that are necessary to implement such rate.

The Administrative Agent and financial agent shall be held harmless for any acts or omissions in connection with the calculation of the Eurocurrency Rate in accordance with clauses (i) and (ii) of the preceding sentence.

"**Eurocurrency Rate Loan**" means a Loan that bears interest at a rate based on clause (a) of the definition of "Eurocurrency Rate."

"**Event of Default**" has the meaning set forth in Section 8.01.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded Assets**" means (i) any fee owned real property (other than Material Real Properties) and any leasehold rights and interests in real property (including landlord waivers, estoppels and collateral access letters), (ii) motor vehicles, airplanes and other assets subject to certificates of title, to the extent a Lien therein cannot be perfected by the filing of a UCC financing statement, (iii) [reserved], (iv) governmental licenses, state or local franchises, charters and authorizations and any other property and assets to the extent that the Administrative Agent may not validly possess a security interest therein under, or such security interest is restricted by, applicable Laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or the pledge or creation of a security interest in which would require governmental consent, approval, license or authorization, other than to the extent such prohibition or limitation is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition (but excluding proceeds of any such governmental license), (v) any lease, license, permit or agreement to the extent that, and so long as, a grant of a security interest therein (A) is prohibited by applicable Law other than to the extent such prohibition is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition or (B) to the extent and for so long as it would violate the terms thereof (in each case, after giving effect to the relevant provisions of the UCC or other applicable Laws) or would give rise to a termination right thereunder in favor of a party thereto other than the Borrower or a Guarantor (except to the extent such provision is overridden by the UCC or other applicable Laws), in each case, other than the proceeds thereof and (a) excluding any such agreement that relates to a Permitted Refinancing of any of the foregoing and (b) only to the extent that and for so long as such limitation on such pledge or security interest is otherwise permitted under Section 7.09, (vi) Margin Stock, (vii) Equity Interests and assets of captive insurance Subsidiaries, (viii) assets of non-Loan Party Immaterial Subsidiaries, (ix) Equity Interests in joint ventures and non-wholly owned Subsidiaries, in each case, which cannot be pledged without the consent of a third party (that is not a Loan Party), to the extent such consent has not been obtained (other than to the extent such limitation is rendered ineffective under the UCC or other applicable law), (x) any property subject to a Lien permitted by Section 7.01(u) or (aa) (to the extent relating to a Lien originally incurred pursuant to Section 7.01(u)) to the extent that a grant of a security interest therein would violate or invalidate such underlying obligations or create a right of termination in favor of any other party thereto (other than a Loan Party) or otherwise require consent thereunder (after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law), (xi) letter of credit rights, except to the extent constituting support obligations for other Collateral as to which perfection of the security interest in such other Collateral is accomplished solely by the filing of a UCC financing statement (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement), (xii) any assets to the extent a security interest in such assets could reasonably be expected to result in material adverse tax consequences as reasonably determined by the Borrower, (xiii) [reserved], (xiv) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application (or any registration that issues therefrom)

20

under applicable federal law and (xv) assets where the cost of obtaining a security interest therein exceeds the practical benefit to the Lenders afforded thereby as agreed by the Borrower and the Administrative Agent (at the direction of the Required Lenders) in writing; *provided*, *however*, that Excluded Assets shall not include any Proceeds, substitutions or replacements of any Excluded Assets referred to in clauses (i) through (xv) (unless such Proceeds, substitutions or replacements would independently constitute Excluded Assets referred to in clauses (i) through (xv)).  The Borrower shall not be required to take any action under the law of any non-U.S. jurisdiction to create or perfect a security interest in any assets located outside the United States or any other assets that require such action, including any intellectual property registered in any non-U.S. jurisdiction (and no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction shall be required).

"**Excluded Subsidiary**" means (a) any Subsidiary that is not a wholly owned Domestic Subsidiary of the Borrower or a Guarantor, (b) any Subsidiary that is prohibited or restricted by applicable Law or by Contractual Obligations existing on the Closing Date (or, in the case of any newly acquired Subsidiary, in existence at the time of acquisition but not entered into in contemplation thereof) from guaranteeing the Obligations or if guaranteeing the Obligations would require governmental (including regulatory) consent, approval, license or authorization or could result in material adverse tax consequences as reasonably determined by the Borrower, (c) any other Subsidiary with respect to which, in the reasonable judgment of the Borrower and the Administrative AgentRequired Lenders, the burden or cost of providing a Guarantee shall be excessive in view of the benefits to be obtained by the Lenders therefrom, (d) any not-for-profit Subsidiaries, (e) [reserved], (f) [reserved], (g) any CFC Holding Company, (h) any Domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary that is a CFC, (i) captive insurance Subsidiaries and (j) each other Subsidiary acquired pursuant to a Permitted Acquisition permitted hereunder and financed with assumed secured Indebtedness, and each Subsidiary acquired in such Permitted Acquisition permitted hereunder that guarantees such Indebtedness, in each case to the extent that, and for so long as, the documentation relating to such Indebtedness to which such Subsidiary is a party prohibits such Subsidiary from guaranteeing the Obligations and such prohibition was not created in contemplation of such Permitted Acquisition permitted hereunder.

"**Excluded Swap Obligation**" means, with respect to any Guarantor, any Swap Obligation, if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of such Guarantor or the grant of the security interest would otherwise have become effective with respect to such Swap Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof).

"**Executive Order**" has the meaning set forth in Section 6.21(a).

"**Excluded Account**" means any (a) deposit accounts specially and exclusively used in the ordinary course of business for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any Loan Party's salaried employees, which accounts are funded only in the ordinary course of business, (b) pension fund accounts, 401(k) accounts and trust accounts and (c) withholding tax and other tax accounts, fiduciary accounts, escrow accounts and other accounts in which any Loan Party holds funds on behalf of any third party.

"**Existing Debt**" means all Indebtedness for borrowed money of the Borrower and its Affiliates under (i) the Pre-Petition First Lien Credit Agreement and (ii) that certain Second Lien Credit Agreement, dated as of June 30, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the

21

Petition Date, the "**Pre-Petition Second Lien Credit Agreement**") by and among the Borrower, the guarantors party thereto from time to time, the Bank of New York Mellon (or its successor, if appointed), as administrative agent, and the lenders party thereto from time to time (the "**Pre-Petition Second Lien Lenders**").

"**Existing Letters of Credit**" means any letters of credit outstanding on the Closing Date described in Schedule 2.03.  Schedule 2.03 contains a description of all Existing Letters of Credit and sets forth, with respect to each such Existing Letter of Credit, (i) the name of the issuing lender, (ii) the letter of credit number, (iii) the name(s) of the account party or account parties, (iv) the stated amount (including the currency in which such letter of credit is denominated), (v) the name of the beneficiary and (vi) the expiry date.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), or any current or future Treasury regulations or other administrative guidance promulgated thereunder, and any intergovernmental agreements implementing the foregoing. , and any related fiscal or regulatory legislation, rules or official administrative practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities implementing the foregoing.

"**FCPA**" means the United States Foreign Corrupt Practices Act of 1977, as amended.

"**Federal Funds Effective Rate**" means, for any day, the rate per annum equal to the rates on overnight Federal funds transactions with members of the Federal Reserve System (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time), as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent from three brokers of recognized standing selected by it; provided further that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"**Fee Letters**" means [●].

"**FIRREA**" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

["**First Lien Secured Obligations**" means the "First Lien Secured Obligations" as defined in the Intercreditor Agreement.]

"**Fitch**" means Fitch Ratings, Inc.

"**Flood Insurance Laws**" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"**Foreign Casualty Event**" has the meaning set forth in Section 2.05(b)(vi).

"**Foreign Disposition**" has the meaning set forth in Section 2.05(b)(vi).

"**Foreign Subsidiary**" means any direct or indirect Subsidiary which is not a Domestic Subsidiary.

"**Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

22

"**GAAP**" means generally accepted accounting principles in the United States of America, as in effect from time to time; *provided*, *however*, that, subject to Section 1.03, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof (including through conforming changes made consistent with IFRS) on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof (including through conforming changes made consistent with IFRS), then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national body exercising such powers or functions, such as the European Union or the European Central Bank).

"**Granting Lender**" has the meaning set forth in Section 10.07(h).

"**Guarantee**" means, as to any Person, without duplication, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment or performance of such Indebtedness, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning set forth in Section 11.01.

"**Guarantors**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement" and shall include each Holdco, the Borrower (solely with respect to its Secured Obligations other than its direct Secured Obligations as a primary obligor (as opposed to a guarantor) under the Loan Documents) and each Subsidiary of the Borrower that shall have become a Guarantor pursuant to Section 6.11 or 6.20, in any case until released in accordance with the terms hereof,  it being understood and agreed that the Borrower in its sole discretion may (with the consent of the Administrative Agent, (at the direction of the Required Lenders), such consent not to be unreasonably withheld) cause any Subsidiary that is not a Guarantor to Guarantee the Obligations by causing such Subsidiary to execute a Joinder Agreement, and any such Subsidiary shall be a Guarantor, Loan Party and Subsidiary Guarantor hereunder for all purposes; *provided*, *however*, that that Administrative Agent (at the direction of the Required Lenders) may condition its consent by limiting the purposes for which such Subsidiary shall constitute a Loan Party and Subsidiary Guarantor for purposes of Section 7 and related definitions used therein.

"**Guaranty**" means, collectively, the guaranty of the Obligations by the Guarantors pursuant to this Agreement.

"**Hazardous Materials**" means all materials, pollutants, contaminants, chemicals, compounds, constituents, substances or wastes, in any form, including petroleum or petroleum distillates, asbestos or

23

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

asbestos-containing materials, polychlorinated biphenyls, radon gas, mold, medical waste, in each case regulated under Environmental Laws.

"**Holdcos**" means Holdings and Intermediate Holdings.

"**Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Identified Participating Lenders**" has the meaning set forth in Section 2.05(a)(v)(C)(3).

"**Identified Qualifying Lenders**" has the meaning set forth in Section 2.05(a)(v)(D)(3).

"**IFRS**" means international accounting standards as promulgated by the International Accounting Standards Board.

"**Immaterial Subsidiary**" means any Subsidiary that is not a Material Subsidiary.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)    net obligations of such Person under any Swap Contract;

(d)    all obligations of such Person to pay the deferred purchase price of property or services;

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness;

(g)    all obligations of such Person in respect of Disqualified Equity Interests if and to the extent that the foregoing would constitute indebtedness or a liability in accordance with GAAP; and

(h)    to the extent not otherwise included above, all Guarantees of such Person in respect of Indebtedness described in clauses (a) through (g) in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall (A) include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Consolidated First Lien Net Debt, (B) in the case of the Borrower and its Subsidiaries, exclude all intercompany Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business and (C) exclude (i) trade accounts and accrued expenses payable in the ordinary course of business, (ii) any earn-out obligation until such obligation is not paid after becoming due and payable, (iii) accruals for payroll and other liabilities accrued in the ordinary course of business and (iv) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

24

The amount of Indebtedness of any Person for purposes of underline(clause (e)) that is expressly made non-recourse or limited recourse (limited solely to the assets securing such Indebtedness) to such Person shall be deemed to be equal to the lesser of (x) the aggregate unpaid amount of such Indebtedness and (y) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Liabilities**" has the meaning set forth in Section 10.05.

"**Indemnified Taxes**" means, with respect to ~~any~~the Admnistrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, all Taxes imposed on or with respect to any payment under any Loan Documents, other than (i) any Taxes imposed on or measured by its net income, however denominated, and franchise (and similar) Taxes imposed on it in lieu of net income Taxes, imposed by a jurisdiction as a result of such recipient being organized in or having its principal office or, in the case of any Lender, applicable Lending Office in such jurisdiction, or as a result of any other present or former connection between such recipient and such jurisdiction, other than any connections arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, receiving payments under, or enforcing, any Loan Document, (ii) any Taxes attributable to the failure of ~~such~~the Administrative Agent or Lender to comply with Section 3.01(e), (iii) any branch profits Taxes imposed by the United States under Section 884(a) of the Code, or any similar Tax, imposed by any jurisdiction described in clause (a), (iv) in the case of a Lender (other than an assignee pursuant to a request by the Borrower under Section 3.07(a)), any U.S. federal withholding Tax that is in effect and would apply to amounts payable hereunder pursuant to a Law in effect at the time such Lender becomes a party to this Agreement, or designates a new Lending Office, except to the extent such Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrower or any Guarantor with respect to such withholding Tax pursuant to Section 3.01, and (v) any ~~U.S. federal~~ withholding Taxes imposed under FATCA.

"**Indemnitees**" has the meaning set forth in Section 10.05.

"**Independent Financial Advisor**" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged and that is independent of the Borrower and its Affiliates.

"**Information**" has the meaning set forth in Section 10.08.

"**Intellectual Property Security Agreement**" has the meaning set forth in the Security Agreement.

"**Intercompany Note**" means a promissory note substantially in the form of Exhibit G.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of the date hereof, by and among the Administrative Agent, as first lien credit agreement administrative agent, the ABL Agent, the Second Lien Administrative Agent, as second lien credit agreement administrative agent and the Borrower and Guarantors party thereto.

"**Interest Coverage Ratio**" shall mean as of any date of determination with respect to any Person, the ratio of (i) Consolidated EBITDA of such Person for the Test Period most recently ended on or prior to such date of determination to (ii) the sum of (x) solely to the extent paid in cash during the applicable period, Consolidated Interest Expense of such Person for the Test Period most recently ended on or prior to such date of determination plus (y) all regularly scheduled cash dividend payments (excluding items eliminated in consolidation) on any series of Disqualified Equity Interests made during such period, in each case on a Pro Forma Basis.

"**Interest Payment Date**" means, (a) as to any Eurocurrency Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; *provided* that if any Interest Period for a Eurocurrency Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date.

"**Interest Period**" means, as to each Eurocurrency Rate Loan, the period commencing on the date such Eurocurrency Rate Loan is disbursed or converted to or continued as a Eurocurrency Rate Loan and ending on the date one, two, three or six months thereafter or to the extent agreed by each Lender of such Eurocurrency Rate Loan, 12 months or less than one month (but other than a one week period unless consented to by, the Administrative Agent), thereafter, as selected by the Borrower in its Committed Loan Notice; *provided* that:

(a)       any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)       any Interest Period (other than an Interest Period having a duration of less than one month) that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)       no Interest Period shall extend beyond the Maturity Date.

"**Intermediate Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and its Subsidiaries, intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business) or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made), without adjustment for subsequent increases or decreases in the value of such Investment, less any Returns of the Borrower or a Subsidiary in respect of such Investment.

"**IP Rights**" has the meaning set forth in Section 5.15.

"**Joinder Agreement**" means a joinder agreement substantially in the form of Joinder Agreement attached as Exhibit I hereto ~~or in such other form agreed by the Administrative Agent~~.

"**Judgment Currency**" has the meaning assigned to such term in Section 10.20.

"**Laws**" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Lender**" has the meaning set forth in the introductory paragraph to this Agreement and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender."

"**Lender Default**" means a Distressed Person has admitted in writing that it is insolvent or such Distressed Person becomes subject to a Lender-Related Distress Event.

"**Lender-Related Distress Event**" shall mean, with respect to any Lender or any other Person that directly or indirectly controls such Lender (each, a "**Distressed Person**"), (i) such Distressed Person has become subject to a Bail-in Action and/or (ii) a voluntary or involuntary case with respect to such Distressed

26

Person under any debt relief law, or a custodian, conservator, receiver, or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person, or any Person that directly or indirectly controls such Distressed Person or is subject to a forced liquidation or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any governmental authority having regulatory authority over such Distressed Person to be, insolvent or bankrupt; *provided* that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Lender or any Person that directly or indirectly controls such Lender by a governmental authority or an instrumentality thereof.

"**Lending Office**" means, as to any Lender, such office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Lien**" means, with respect to any asset, any mortgage, deed of trust, pledge, hypothecation, collateral assignment, security deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest of any kind or nature in respect of such asset (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing).

"**Loan**" means an extension of credit under Article II by a Lender to the Borrower in the form of a Term Loan.

"**Loan Documents**" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Collateral Documents, (iv) the Intercreditor Agreement, (v) the Agent Fee Letter, (vi) any other document or instrument designated by the Borrower and the Administrative Agent as a "Loan Document" and (vii) any amendment or joinder to this Agreement.

"**Loan Parties**" means, collectively, the Borrower and each Guarantor.

"**London Banking Day**" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"**Make-Whole Amount**" means, as of any date of determination, an amount in cash equal to all interest that would have been paid on the Term Loans that are repaid or prepaid, from the date of repayment or prepayment (including following acceleration of the Term Loans) through and including the third anniversary of the Closing Date calculated on the basis of the interest rate with respect to the Term Loans that is in effect on the date of such repayment or prepayment, discounted to the date of repayment or prepayment on a quarterly basis (assuming a 365-day year and actual days elapsed) at a rate equal to the sum of the treasury rate plus 0.50%; provided, that following any acceleration, the Make-Whole Amount shall be reduced by the amount of any interest (other than interest payable at the Default Rate) accruing after the date of such acceleration that is actually paid in cash to the Lenders.  The Borrower shall calculate the Make-Whole Amount in good faith.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Master Agreement**" has the meaning set forth in the definition of "Swap Contract."

"**Material Adverse Effect**" means any event, change or condition that, individually or in the aggregate, has had, or would reasonably be expected to have a material adverse effect on (i) the business, assets, financial condition or results of operations of the Borrower and its Subsidiaries, taken as a whole, (ii) the ability of the Borrower and the Guarantors (taken as a whole) to perform their payment obligations under any Loan Document to which the Borrower or any of the Loan Parties is a party or (iii) the material rights and remedies of the Administrative Agent and the Lenders under the Loan Documents, taken as a whole, including the legality, validity, binding effect or enforceability of the Loan Documents.

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

"**Material Domestic Subsidiary**" means, at any date of determination, each of the Borrower's Domestic Subsidiaries that are Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Subsidiaries for such period, in each case determined in accordance with GAAP; *provided* that if, at any time and from time to time after the Closing Date, Domestic Subsidiaries that are not Guarantors solely because they do not meet the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended fiscal quarter of the Borrower for which financial statements have been delivered pursuant to Section 6.01 or more than 5.0% of the consolidated gross revenues of the Borrower and the Subsidiaries for such Test Period, then the Borrower shall, not later than 45 days after the date by which financial statements for such quarter or Test Period, as applicable, are required to be delivered pursuant to this Agreement (or such longer period as the ~~Administrative Agent~~Required Lenders may agree in ~~its~~their reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of Section 6.11 applicable to such Subsidiary.

"**Material Foreign Subsidiary**" means, at any date of determination, each of the Borrower's Foreign Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Subsidiaries for such period, in each case determined in accordance with GAAP; *provided* that if, at any time and from time to time after the Closing Date, Foreign Subsidiaries not meeting the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended fiscal quarter of the Borrower for which financial statements have been delivered pursuant to Section 6.01 or more than 5.0% of the consolidated gross revenues of the Borrower and the Subsidiaries for such Test Period, then the Borrower shall, not later than 45 days after the date by which financial statements for such quarter or Test Period, as applicable, are required to be delivered pursuant to this Agreement (or such longer period as the ~~Administrative Agent~~Required Lenders may agree in ~~its~~their reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Foreign Subsidiaries as "Material Foreign Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of the definition of "Collateral and Guarantee Requirement."

"**Material Non-Public Information**" means information which is (a) not publicly available, (b) material with respect to Holdings and its Subsidiaries or their respective securities for purposes of United States federal and state securities laws and (c) not of a type that would be publicly disclosed in connection with any issuance by Holdings or any of its Subsidiaries of debt or equity securities issued pursuant to a public offering, a Rule 144A offering or other private placement where assisted by a placement agent.

"**Material Real Property**" means any fee-owned Real Property located in the United States that is owned by any Loan Party and that has a fair market value in excess of $1,250,000 (at the Closing Date or, with respect to Real Property acquired after the Closing Date, at the time of acquisition, in each case, as reasonably estimated by the Borrower in good faith).

"**Material Subsidiary**" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"**Maturity Date**" means the fifth anniversary of the Closing Date; *provided* that, if such day is not a Business Day, the Maturity Date shall be the Business Day immediately succeeding such day.

"**Maximum Capital Expenditures Amount**" has the meaning set forth in Section 7.10.

"**Maximum Rate**" has the meaning set forth in Section 10.10.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

28

"**Mortgage Policies**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement."

"**Mortgaged Properties**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement."

"**Mortgages**" means collectively, the deeds of trust, trust deeds, hypothecs and mortgages made by the Loan Parties in favor or for the benefit of the Administrative Agent on behalf of the Secured Parties creating and evidencing a Lien on a Mortgaged Property in form and substance reasonably satisfactory to the Administrative Agent, and any other mortgage executed and delivered pursuant to Sections 6.11 and 6.13, in each case, as the same may from time to time be amended, restated, supplemented or otherwise modified.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which a Loan Party, any Subsidiary or any ERISA Affiliate makes or is obligated to make contributions, or has made or been obligated to make contributions.

"**Net Proceeds**" means:

(a)        100% of the cash proceeds actually received by the Borrower or any of the Subsidiaries (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards, but in each case only as and when received) from any Disposition or Casualty Event, net of (i) attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees and expenses actually incurred in connection therewith, (ii) the principal amount of any Indebtedness that is secured by a Lien (other than a Lien that ranks *pari passu* with or is subordinated to the Liens securing the Obligations) on the asset subject to such Disposition or Casualty Event and that is required to be repaid in connection with such Disposition or Casualty Event (other than Indebtedness under the Loan Documents), together with any applicable premium, penalty, interest and breakage costs, (iii) in the case of any Disposition or Casualty Event by a non-wholly owned Subsidiary, the *pro rata* portion of the Net Proceeds thereof (calculated without regard to this clause (iii)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a wholly owned Subsidiary as a result thereof, (iv) Taxes or Tax Distributions paid or reasonably estimated to be payable or, without duplication, permitted to be paid as a result thereof (including any income or withholding Taxes imposed on any repatriation of such proceeds to the Borrower), (v) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) above) (x) related to any of the applicable assets and (y) retained by the Borrower or any of the Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Proceeds of such Disposition or Casualty Event occurring on the date of such reduction) and (vi) any funded escrow established pursuant to the documents evidencing any such sale or disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or disposition (*provided* that to the extent that any amounts are released from such escrow to the Borrower or a Subsidiary, such amounts net of any related expenses shall constitute Net Proceeds); and

(b)        100% of the cash proceeds from the incurrence, issuance or sale by the Borrower or any of the Subsidiaries of any Indebtedness, net of all taxes paid or reasonably estimated to be payable as a result thereof and fees (including investment banking fees and discounts), commissions, costs and other expenses, in each case incurred in connection with such incurrence, issuance or sale.

29

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

For purposes of calculating the amount of Net Proceeds, fees, commissions and other costs and expenses payable to the Borrower shall be disregarded.

"**Non-Consenting Lender**" has the meaning set forth in Section 3.07(d).

"**Non-Defaulting Lender**" means, at any time, a Lender that is not a Defaulting Lender.

"**Note**" means a promissory note of the Borrower payable to any Lender or its registered assigns, in substantially the form of Exhibit B hereto, evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Term Loans made by such Lender.

"**Notice of Intent to Cure**" has the meaning set forth in Section 8.04.

"**Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party and its Subsidiaries arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and of their Subsidiaries to the extent they have obligations under the Loan Documents) include (a) the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document, (b) the obligation to pay any applicable fee pursuant to Section 2.09(b) and (c) the obligation of any Loan Party to reimburse any amount in respect of any of the foregoing that any Lender may elect to pay or advance on behalf of such Loan Party in accordance with the terms of the Loan Documents.

"**Offered Amount**" has the meaning set forth in Section 2.05(a)(v)(D)(1).

"**Offered Discount**" has the meaning set forth in Section 2.05(a)(v)(D)(1).

"**OFAC**" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"**OID**" means original issue discount.

"**Old Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Old Intermediate Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Old Jason**" has the meaning set forth in the preliminary statements to this Agreement.

"**Order**": means any order, writ, judgement, injunction, decree, rule, ruling, directive, stipulation, determination or award made, issued or entered by the Bankruptcy Court or any other Governmental Authority, whether interim or final.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement or limited liability company agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" has the meaning set forth in Section 3.01(b).

30

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

"**Outstanding Amount**" means, with respect to the Term Loans, the outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Term Loans.

"**Overnight Rate**" means, for any day, the greater of the Federal Funds Effective Rate and an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"**Participant**" has the meaning set forth in Section 10.07(e).

"**Participant Register**" has the meaning set forth in Section 10.07(e).

"**Participating Lender**" has the meaning set forth in Section 2.05(a)(v)(C)(2).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time.

"**Perfection Certificate**" means a certificate substantially in the form of Exhibit II to the Security Agreement or any other form reasonably approved by the ~~Administrative Agent~~Required Lenders, as the same shall be supplemented from time to time.

"**Permitted Acquisition**" has the meaning set forth in Section 7.02(i).

[""**Permitted Holders**" means each of Lenders and the Second Lien Credit Agreement Lenders holding the common equity of Holdings on the Closing Date~~.~~].

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal, restructuring, replacement or extension of any Indebtedness of such Person; *provided* that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, restructured, refunded, renewed, replaced or extended except by an amount equal to unpaid accrued interest and premium thereon *plus* other amounts owing or paid related to such Indebtedness, and fees and expenses incurred, in connection with such modification, refinancing, refunding, renewal, restructuring, replacement or extension *plus* an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e), such modification, refinancing, refunding, renewal, replacement or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended, (c) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e) or (f), at the time thereof, no Event of Default shall have occurred and be continuing, (d) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal, replacement or extension is subordinated in right of payment to the Obligations on terms (i) at least as favorable (taken as a whole) (as reasonably determined by the Borrower) to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended or (ii) as otherwise reasonably acceptable to the Administrative Agent, (e) if such Indebtedness being modified, refinanced, replaced, refunded, renewed or extended is Indebtedness permitted pursuant to Sections 7.03(s), 7.03(w), and 7.03(x), (i) to the extent such Indebtedness being modified, refinanced, replaced, refunded, renewed or extended is unsecured or secured by Liens that are subordinated to the Liens securing the Obligations, such modification, refinancing, replacement, refunding, renewal or extension is unsecured or (with respect to refinanced debt secured by Liens that are subordinated to the Liens securing the Obligations) secured by Liens that are subordinated to the Liens securing the Obligations on terms (x) at least as favorable (taken as a whole)

31

~~WEIL:\97507497\9\10143.0003~~WEIL:\97507497\16\10143.0003

(as reasonably determined by the Borrower) to the Lenders as those contained in the documentation (including any intercreditor or similar agreements) governing the Indebtedness being modified, refinanced, replaced, refunded, renewed or extended or (y) otherwise reasonably acceptable to the Administrative Agent and (ii) notwithstanding anything contained in Section 7.03(c), such modification, refinancing, refunding, renewal, replacement or extension is incurred only by one or more Persons who is an obligor of the Indebtedness being modified, refinanced, replaced, refunded, renewed or extended and (f) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is outstanding pursuant to the Second Lien Credit Agreement or any other Second Lien Loan Document, such modification, refinancing, refunding, renewal, replacement or extension does not violate the terms of the Intercreditor Agreement.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning set forth in the preliminary statements to this Agreement.

"**PIK Election**" has the meaning set forth in Section 2.08(c).

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established or maintained by any Loan Party or any Subsidiary or, with respect to any such plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA, any ERISA Affiliate.

"**Plan Effective Date**" has the meaning set forth in the preliminary statements to this Agreement.

"**Platform**" has the meaning set forth in Section 6.01(d).

"**Pledged Debt**" has the meaning set forth in the Security Agreement.

"**Pledged Equity**" has the meaning set forth in the Security Agreement.

"**Prepackaged Plan**" has the meaning set forth in the preliminary statements to this Agreement.

"**Pre-Petition First Lien Credit Agreement**" has the meaning set forth in the preliminary statements to this Agreement.

"**Pre-Petition First Lien Lenders**" has the meaning set forth in the preliminary statements to this Agreement.

"**Proceeding**" has the meaning set forth in Section 10.05.

"**Proceeds**" has the meaning set forth in the Security Agreement.

"**Pro Forma Balance Sheet**" has the meaning set forth in Section 5.05(b).

"**Pro Forma Basis**" and "**Pro Forma Effect**" means, with respect to compliance with any test or covenant or calculation of any ratio hereunder, the determination or calculation of such test, covenant or ratio (including in connection with Specified Transactions) in accordance with Section 1.09.

"**Pro Forma Financial Statements**" has the meaning set forth in Section 5.05(b).

"**Pro Rata Share**" means, with respect to each Lender, at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the Outstanding Amount of the Term Loans of such Lender at such time and the denominator of which is the Total Outstandings at such time.

"**Projections**" has the meaning set forth in Section 6.01(c).

"**Public Lender**" has the meaning set forth in Section 6.01(d).

32

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests.

"**Qualified IPO**" means the issuance by the Borrower or any direct or indirect parent of the Borrower of its common Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the U.S. Securities and Exchange Commission in accordance with the Securities Act (whether alone or in connection with a secondary public offering).

"**Qualifying Lender**" has the meaning set forth in Section 2.05(a)(v)(D)(3).

"**Quarterly Financial Statements**" means the unaudited consolidated balance sheets and related consolidated statements of income and cash flows of the Old Jason and its Subsidiaries for the fiscal quarter ended closest to June 30, 2020 and each subsequent fiscal quarter of the Company ended at least 45 days prior to the Closing Date.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned or leased by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures.

"**Register**" has the meaning set forth in Section 10.07(d).

"**Rejection Notice**" has the meaning set forth in Section 2.05(b)(viii).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"**Release**" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing or migrating in, into, onto or through the Environment or in an uncontained manner from or through any facility, property or equipment.

"**Relevant Public Company**" means Holdings or any direct or indirect parent thereof that (i) owns, directly or indirectly, 100% of the Equity Interests of Holdings and the Borrower and (ii) is the registrant with respect to a Qualified IPO.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the otherwise applicable notice period has been waived by regulation or otherwise by the PBGC.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the Total Outstandings; *provided* that the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Responsible Officer**" means the chief executive officer, president, vice president, chief financial officer, chief administrative officer, secretary or assistant secretary, treasurer or assistant treasurer, controller or other similar officer of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

33

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the Borrower's or a Subsidiary's equity holders, partners or members (or the equivalent Persons thereof).

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of June 5, 2020, by and among the Debtors and the Pre-Petition Lenders party thereto as Consenting Creditors (as defined therein).

"**Returns**" means, with respect to any Investment, any dividends, distributions, interest, fees, premium, return of capital, repayment of principal, income, profits (from a Disposition or otherwise) and other amounts received or realized in respect of such Investment.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Same Day Funds**" means immediately available funds.

"**Sanctions**" means all economic sanctions and regulations maintained by OFAC.

"**Sanctioned Person**" means any Person located, organized, or resident in Crimea, Cuba, Iran, North Korea, or Syria, and any Person named on any OFAC sanctions list, including OFAC's Specially Designated Nationals List, the Sectoral Sanctions Identifications List, and the Foreign Sanctions Evaders List.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Second Lien Administrative Agent**" has the meaning assigned to the term "Administrative Agent" under and as defined in the Second Lien Credit Agreement and shall include any successor administrative agent under the Second Lien Credit Agreement.

"**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as ~~fo~~of the date hereof, by and among the Borrower, the Holdcos, the other Guarantors from time to time party thereto, the lenders party thereto from time to time and ~~[●],~~Cantor Fitzgerald Securities, as administrative agent for such lenders.

"**Second Lien Loan Documents**" means the "Loan Documents" as defined in the Second Lien Credit Agreement.

"**Second Lien Obligations**" means the "Obligations" (or any comparable term) as defined in the Second Lien Credit Agreement.

"**Second Lien Secured Obligations**" means the "~~Second~~Junior Lien ~~Secured~~ Obligations" as defined in the Intercreditor Agreement.

"**Second Lien Term Facility**" means the Second Lien Term Loans and commitments in respect thereof.

"**Second Lien Term Loans**" means the "Term Loans" (or any comparable term) as defined in the Second Lien Credit Agreement.

"**Secured Obligations**" means, collectively, the Obligations, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise.

34

"**Secured Parties**" means, collectively, the Administrative Agent, the Lenders, and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.05.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Security Agreement**" means a security agreement substantially in the form of Exhibit F.

"**Security Agreement Supplement**" has the meaning set forth in the Security Agreement.

"**Solicited Discount Proration**" has the meaning set forth in Section 2.05(a)(v)(D)(3).

"**Solicited Discounted Prepayment Amount**" has the meaning set forth in Section 2.05(a)(v)(D)(1).

"**Solicited Discounted Prepayment Notice**" means a written notice of the Borrower of Solicited Discounted Prepayment Offers made pursuant to Section 2.05(a)(v)(D) substantially in the form of Exhibit E-6.

"**Solicited Discounted Prepayment Offer**" means the irrevocable written offer by each Lender, substantially in the form of Exhibit E-7, submitted following the ~~Administrative~~Auction Agent's receipt of a Solicited Discounted Prepayment Notice.

"**Solicited Discounted Prepayment Response Date**" has the meaning set forth in Section 2.05(a)(v)(D)(1).

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date (i) the sum of the debt (including contingent liabilities) of such Person and its Subsidiaries, taken as a whole, does not exceed the present fair saleable value of the assets of the Person and its Subsidiaries, taken as a whole; (ii) the capital of such Person and its Subsidiaries, taken as a whole, is not unreasonably small in relation to the business of such Person and its Subsidiaries, taken as a whole, contemplated as of the Closing Date; and (iii) such Person and its Subsidiaries, taken as a whole, do not intend to incur, or believe that they will incur, debts (including current obligations) beyond their ability to pay such debt as they mature in the ordinary course of business.  For the purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"**SPC**" has the meaning set forth in Section 10.07(h).

"**Specified Discount**" has the meaning set forth in Section 2.05(a)(v)(B)(1).

"**Specified Discount Prepayment Amount**" has the meaning set forth in Section 2.05(a)(v)(B)(1).

"**Specified Discount Prepayment Notice**" means a written notice of the Borrower Offer of Specified Discount Prepayment made pursuant to Section 2.05(a)(v)(B) substantially in the form of Exhibit E-8.

"**Specified Discount Prepayment Response**" means the irrevocable written response by each Lender, substantially in the form of Exhibit E-9, to a Specified Discount Prepayment Notice.

"**Specified Discount Prepayment Response Date**" has the meaning set forth in Section 2.05(a)(v)(B)(1).

"**Specified Discount Proration**" has the meaning set forth in Section 2.05(a)(v)(B)(3).

"**Specified Transaction**" means any Investment that results in a Person becoming a Subsidiary, any Permitted Acquisition or any Disposition that results in a Subsidiary ceasing to be a Subsidiary of the Borrower, any Investment constituting an acquisition of assets constituting a business unit, line of business or

35

division of, or all or substantially all of the Equity Interests of, another Person or any Disposition of a business unit, line of business or division of the Borrower or a Subsidiary, in each case whether by merger, consolidation, amalgamation or otherwise, or any incurrence or repayment of Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility or line of credit for working capital purposes) or Restricted Payment, that by the terms of this Agreement requires such test to be calculated on a "Pro Forma Basis" or after giving "Pro Forma Effect."

"**Statutory Reserves**" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board of Governors of the Federal Reserve System of the United States (the "**Board**") and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the Board).   Eurocurrency Rate Loans shall be deemed to constitute Eurocurrency Liabilities (as defined in Regulation D of the Board) and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.   Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Submitted Amount**" has the meaning set forth in Section 2.05(a)(v)(C)(1).

"**Submitted Discount**" has the meaning set forth in Section 2.05(a)(v)(C)(1).

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (excluding, for the avoidance of doubt, any charitable organizations, and any other Person that meets the requirements of Section 501(c)(3) of the Code) of which (i) a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, (ii) more than half of the issued share capital is at the time beneficially owned or (iii) the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person.   Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" means any Guarantor other than the Borrower and the Holdcos.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any

36

date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Target Person**" has the meaning set forth in Section 7.02.

"**Tax Distribution**" means any distribution made or permitted to be made pursuant to Section 7.06(h)(iii).

"**Tax Group**" has the meaning set forth in Section 7.06(h)(iii).

"**Taxes**" means all present or future taxes, duties, levies, imposts, assessments, withholdings (including backup withholding) or other similar charges imposed by any Governmental Authority including any interest, penalties and additions to tax applicable thereto.

"**Term Loan**" means the term loan deemed made by the Lenders on the Closing Date to the Borrower pursuant to Section 2.01. As of the Closing Date, the aggregate amount of the Term Loans is $75,00076,600,000.

"**Test Period**" means, for any date of determination under this Agreement, the four consecutive fiscal quarters of the Borrower most recently ended as of such date of determination.

"**Threshold Amount**" means $10,000,000.

"**Total Assets**" means the total assets of the Borrower and the Subsidiaries on a consolidated basis in accordance with GAAP, as shown on the most recent balance sheet of the Borrower delivered pursuant to Section 6.01(a) or (b) or, for the period prior to the time any such statements are so delivered pursuant to Section 6.01(a) or (b), the Pro Forma Financial Statements.

"**Total Outstandings**" means the aggregate Outstanding Amount of all Loans.

"**Transaction Expenses**" means any fees or expenses incurred or paid by Holdings, Intermediate Holdings, the Borrower or any of their respective Subsidiaries in connection with the Transactions (including expenses in connection with hedging transactions), this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby.

"**Transactions**" means, collectively, (a) the deemed funding of the Term Loans on the Closing Date and the execution, delivery and performance of the Loan Documents to be entered into on the Closing Date, (b) the funding of any ABL Loans on the Closing Date, issuance of any Letters of Credit (as defined in the ABL Credit Agreement) and the execution, delivery and performance of the ABL Loan Documents to be entered into on the Closing Date, (c) the deemed funding of the Second Lien Term Loans under the Second Lien Credit Agreement on the Closing Date and the execution, delivery and performance of the Second Lien Loan Documents to be entered into on the Closing Date, (ed) the extinguishment of the Existing Debt in accordance with the Prepackaged Plan, (fe) the restructuring of the Holdcos and certain of their Subsidiaries pursuant to the Prepackaged Plan, the Chapter 11 Cases and any related transactions and (gf) the payment of Transaction Expenses earned, due and payable on the Closing Date.

"**Transferred Guarantor**" has the meaning set forth in Section 11.09.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a Eurocurrency Rate Loan.

"**Uniform Commercial Code**" or "**UCC**" means (i) the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or (ii) the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it applies to any item or items of Collateral. References in this Agreement and the other Loan Documents to specific sections of the Uniform Commercial Code are based on

37

the Uniform Commercial Code as in effect in the State of New York on the Closing Date.  In the event such Uniform Commercial Code is amended or another Uniform Commercial Code described in clause (ii) is applicable, such Section reference shall be deemed to be references to the comparable Section in such amended or other Uniform Commercial Code.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" has the meaning set forth in <u>Section 3.01(e)(ii)(C)</u>.

"**USA Patriot Act**" means the USA PATRIOT ACT (Title III of Pub. Law 107-56 (signed into law October 26, 2001) (as amended from time to time).

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness.

"**Write-Down and Conversion Powers**" means with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

"**wholly owned**" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

**Section 1.02    Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(c)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(d)    The term "including" is by way of example and not limitation.

(e)    The word "or" is not exclusive.

(f)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(g)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

(h)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(i)     For purposes of determining compliance with any Section of Article VII at any time, in the event that any Lien (other than Liens securing Indebtedness of the types described in clauses (v) through (z) of the proviso appearing in the last paragraph of Section 7.03, which shall at all times be deemed to be incurred in reliance on the applicable express exception therefor in Section 7.01), Investment, Disposition, Restricted Payment, Affiliate transaction, Contractual Obligation or prepayment of Indebtedness meets the criteria of one or more than one of the categories of transactions permitted pursuant to any clause of such Sections, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time.

(j)     All references to "knowledge" of any Loan Party or a Subsidiary of Holdings means the actual knowledge of a Responsible Officer.

(k)     The words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(l)     All references to any Person shall be constructed to include such Person's successors and assigns (subject to any restriction on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(m)     The word "will" shall be construed to have the same meaning and effect as the word "shall."

(n)     All references to any Lender "making" or "funding" a Term Loan or a Term Loan being "made" or "funded" (or any similar concept) by a Lender shall, for all purposes hereunder, be a reference to the deemed making or funding of such Loan by such Lender or such Loan being deemed made or funded (or any similar concept) by such Lender.

**Section 1.03     Accounting Terms**.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.  Notwithstanding any other provision contained herein, (a) any lease that is treated as an operating lease for purposes of GAAP as of the Closing Date shall not be treated as Indebtedness, Attributable Indebtedness or as a Capitalized Lease and shall continue to be treated as an operating lease (and any future lease, if it were in effect on the Closing Date, that would be treated as an operating lease for purposes of GAAP as of the Closing Date shall be treated as an operating lease), in each case for purposes of this Agreement, notwithstanding any actual or proposed change in GAAP after the Closing Date and (b) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to (i) Statement of Financial Accounting Standards 141R or ASC 805 (or any other financial accounting standard having a similar result or effect) or (ii) any election under Financial Accounting Standards Codification No. 825—Financial Instruments, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of a Holdco, the Borrower or any Subsidiary at "fair value" as defined therein.

**Section 1.04     Rounding**.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this

39

Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

**Section 1.05     References to Agreements, Laws, Etc**.  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, refinancings, restatements, renewals, restructurings, extensions, supplements and other modifications thereto, but only to the extent that such amendments, refinancings, restatements, renewals, restructurings, extensions, supplements and other modifications are not prohibited by the Loan Documents; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

**Section 1.06     Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**Section 1.07     Timing of Payment or Performance**.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day.

**Section 1.08     [Reserved].**

**Section 1.09     Pro Forma Calculations**.  (a)  Notwithstanding anything to the contrary herein, financial ratios and tests, including the Interest Coverage Ratio and the Consolidated First Lien Net Leverage Ratio shall be calculated in the manner prescribed by this Section 1.09; *provided* that notwithstanding anything to the contrary in Section 1.09(b), (c) or (d), when calculating the Interest Coverage Ratio  or Consolidated First Lien Net Leverage Ratio for purposes of determining actual quarterly compliance with the financial covenants pursuant to Section 7.11 or Section 7.12, as applicable (and not compliance on a Pro Forma Basis for purposes of testing the permissibility of a transaction hereunder), the events described in this Section 1.09 that occurred subsequent to the end of the applicable Test Period shall not be given *pro forma* effect.  In addition, whenever a financial ratio or test is to be calculated on a pro forma basis, the reference to the "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which internal financial statements of Holdings are available (as determined in good faith by the Borrower); *provided* that, the provisions of this sentence shall not apply for purposes of calculating the Interest Coverage Ratio or the Consolidated First Lien Net Leverage Ratio for purposes of determining actual quarterly compliance with Section 7.11 or Section 7.12, as applicable (and not compliance on a Pro Forma Basis for purposes of testing the permissibility of a transaction hereunder), which shall be based on the financial statements delivered pursuant to Section 6.01(a) or (b), as applicable, for the relevant Test Period.

(b)     For purposes of calculating any financial ratio or test, Specified Transactions (with any incurrence or repayment of any Indebtedness in connection therewith to be subject to Section 1.09(d)) that have been made (i) during the applicable Test Period and (ii) if applicable as described in Section 1.09(a), subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio or test is made shall be calculated on a *pro forma* basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day (or, in case of the determination of Total Assets, the last day) of the applicable Test Period.  If since the beginning of any applicable Test Period any Person that subsequently became a Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Subsidiaries since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.09, then such financial ratio or test (or Total Assets) shall be calculated to give *pro forma* effect thereto in accordance with this Section 1.09.

40

(c)    [reserved].

(d)    In the event that the Borrower or any Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Indebtedness included in the calculations of any financial ratio or test (in each case, other than Indebtedness incurred or repaid under any revolving credit facility), (i) during the applicable Test Period or (ii) subject to Section 1.09(a) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving *pro forma* effect to such incurrence or repayment of Indebtedness, to the extent required, as if the same had occurred on the last day of the applicable Test Period.

**Section 1.10    Exchange Rates; Currency**.    (a)    For purposes of determining compliance with Article VII with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Investment is incurred (so long as such Indebtedness or Investment, at the time incurred, made or acquired, was permitted hereunder).

(b)    Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect the (i) adoption of the Euro by any member state of the European Union and any relevant market conventions or practices relating to the Euro or (ii) a change in currency of any other country and any relevant market conventions or practices relating to the change in currency.

**Section 1.11    Certifications**.    All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such person in his or her capacity solely as an officer or a representative of such Loan Party, on such Loan Party's behalf and not in such Person's individual capacity.

## ARTICLE II
## CREDIT EXTENSIONS

**Section 2.01    The Loans**.    Subject to the terms and conditions expressly set forth herein, each Lender, pursuant to the terms of the Prepackaged Plan, exchanged or otherwise agreed to deem satisfied a portion of the obligations held by it under the Pre-Petition First Lien Credit Agreement for an outstanding Term Loan under this Agreement in the amount set forth opposite such Lender's name on Schedule 2.01. Amounts borrowed under this Section 2.01 and repaid or prepaid may not be re-borrowed.  On the Closing Date, the Term Loans shall be [Eurocurrency] Rate Loans with an Interest Period of [three months].one month.

**Section 2.02    Conversions and Continuations of Loans**.    (a)    Each conversion of Term Loans from one Type to the other and each continuation of Eurocurrency Rate Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent, which may be given by telephone..  Each such notice must be received by the Administrative Agent not later than (1) 12:00 noon New York City time three Business Days prior to the requested date of any continuation of Eurocurrency Rate Loans or any conversion of Base Rate Loans to Eurocurrency Rate Loans, and (2) 10:00 a.m. New York City time one Business Day prior to the requested date of the conversion of any Eurocurrency Rate Loans to Base Rate Loans.  Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery (including via email) to the Administrative Agent of a written Committed Loan Notice (and will not be effective until so confirmed), appropriately completed and signed by a Responsible Officer of the Borrower. Except as otherwise provided in Section 2.14, each conversion to or continuation of Eurocurrency Rate Loans shall be in a minimum principal amount of $500,000, or a whole multiple of $100,000 in excess thereof or such other multiple as the Administrative AgentRequired Lenders may agree from time to time.  Except as provided herein, conversion to Base Rate Loans shall be in a minimum principal amount of $250,000 or a whole multiple of $100,000 in excess thereof.  Each Committed Loan Notice (whether telephonic or written)

41

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

shall specify (i) whether the Borrower is requesting a conversion of Term Loans from one Type to the other or a continuation of Eurocurrency Rate Loans, (ii) the requested date of the conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be converted or continued, (iv) the Type of Loans to which existing Term Loans are to be converted and (v) if applicable, the duration of the Interest Period with respect thereto.  If the Borrower fails to specify a Type of Loan in a Committed Loan Notice or fails to give a timely notice requesting a conversion or continuation, then the applicable Term Loans shall be converted to Base Rate Loans.  Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurocurrency Rate Loans.  If the Borrower requests a conversion to or continuation of Eurocurrency Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month.

(b)       Following receipt of a Committed Loan Notice, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans or continuation described in Section 2.02(a).

(c)       Except as otherwise provided herein, a Eurocurrency Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurocurrency Rate Loan unless the Borrower pays the amount due, if any, under Section 3.05 in connection therewith.  During the occurrence and continuation of an Event of Default, the Administrative Agent or(at the direction of the Required Lenders) may require that no Loans may be converted to or continued as Eurocurrency Rate Loans and/or that any outstanding Eurocurrency Rate Loans be converted to Base Rate Loans.

(d)       The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurocurrency Rate Loans upon determination of such interest rate.  The determination of the Eurocurrency Rate by the Administrative Agent shall be conclusive in the absence of manifest error.

(e)       After giving effect to the initial Borrowing, all conversions of Term Loans from one Type to the other, and all continuations of Term Loans as the same Type, there shall not be more than [●]3 (or such greater amount as may be agreed by the Administrative Agent in its sole discretion) Interest Periods in effect.

Section 2.03    [Reserved].

Section 2.04    [Reserved].

Section 2.05    Prepayments.

(a)       *Optional*.  (i) The Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay the Term Loans in whole or in part without premium or penalty (except as expressly set forth in Section 2.09(b)); *provided* that (1) such notice must be received by the Administrative Agent not later than 11:00 a.m. New York City time (A) three Business Days prior to any date of prepayment of Eurocurrency Rate Loans and (B) one Business Day prior to the date of prepayment of Base Rate Loans; (2) any prepayment of Eurocurrency Rate Loans shall be in a minimum principal amount of $500,000, or a whole multiple of $100,000 in excess thereof; and (3) any prepayment of Base Rate Loans shall be in a minimum principal amount of $250,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment.  The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such prepayment.  If such notice is given by the Borrower, unless rescinded pursuant to clause (iii) below, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a

42

~~Eurocurrency Rate~~ Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05.

(ii)    [Reserved].

(iii)    Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.05(a)(i) by notice to the Administrative Agent if such prepayment would have resulted from a refinancing of all or any portion of the ~~applicable Class~~Term Loans or occurrence of another event, which refinancing or event shall not be consummated or shall otherwise be delayed.

(iv)    Voluntary prepayments of any Term Loans permitted hereunder shall be applied to the remaining scheduled installments of principal thereof pursuant to Section 2.07 in a manner determined at the discretion of the Borrower and specified in the notice of prepayment (and absent such direction, in direct order of maturity).

(v)    Notwithstanding anything in any Loan Document to the contrary, in addition to the terms set forth in Sections 2.05(a)(i) and 10.07, so long as (x) no Event of Default has occurred and is continuing and (y) no proceeds of ABL Loans are used for this purpose, after the third anniversary of the Closing Date, any Company Party may prepay the outstanding Term Loans (which shall, for the avoidance of doubt, be automatically and permanently canceled immediately upon such prepayment) (or Holdings or any of its Subsidiaries may purchase such outstanding Loans and immediately cancel them) without premium or penalty on the following basis:

(A)    Any Company Party shall have the right to make a voluntary prepayment of Term Loans at a discount to par pursuant to a Borrower Offer of Specified Discount Prepayment, Borrower Solicitation of Discount Range Prepayment Offers or Borrower Solicitation of Discounted Prepayment Offers (any such prepayment, the "**Discounted Term Loan Prepayment**"), in each case made in accordance with this Section 2.05(a)(v) and without premium or penalty (except as provided in Section 2.09(d)).

(B)    (1) Any Company Party may from time to time offer to make a Discounted Term Loan Prepayment by providing the Auction Agent with five Business Days' notice in the form of a Specified Discount Prepayment Notice (or such shorter period as agreed by the Auction Agent); *provided* that (I) any such offer shall be made available, at the sole discretion of the Company Party, to (x) each Lender and/or (y) each Lender with respect to any Term Loans on an individual tranche basis, (II) any such offer shall specify the aggregate principal amount offered to be prepaid (the "**Specified Discount Prepayment Amount**") with respect to each applicable tranche, the tranche or tranches of Term Loans subject to such offer and the specific percentage discount to par (the "**Specified Discount**") of such Term Loans to be prepaid (it being understood that different Specified Discounts and/or Specified Discount Prepayment Amounts may be offered with respect to different tranches of Term Loans and, in such event, each such offer will be treated as a separate offer pursuant to the terms of this Section 2.05(a)(v)(B)), (III) the Specified Discount Prepayment Amount shall be in an aggregate amount not less than $5,000,000 and whole increments of $1,000,000 in excess thereof and (IV) unless rescinded, each such offer shall remain outstanding through the Specified Discount Prepayment Response Date.  The Auction Agent will promptly provide each Lender with a copy of such Specified Discount Prepayment Notice and a form of the Specified Discount Prepayment Response to be completed and returned by each such Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m. New York City time on the third Business Day after the date of delivery of such notice to such Lenders (or such later date specified therein) (the "**Specified Discount Prepayment Response Date**").

43

(2)        Each Lender receiving such offer shall notify the Auction Agent (or its delegate) by the Specified Discount Prepayment Response Date whether or not it agrees to accept a prepayment of any of its applicable then outstanding Term Loans at the Specified Discount and, if so (such accepting Lender, a "**Discount Prepayment Accepting Lender**"), the amount and the tranches of such Lender's Term Loans to be prepaid at such offered discount.  Each acceptance of a Discounted Term Loan Prepayment by a Discount Prepayment Accepting Lender shall be irrevocable.  Any Lender whose Specified Discount Prepayment Response is not received by the Auction Agent by the Specified Discount Prepayment Response Date shall be deemed to have declined to accept the applicable Borrower Offer of Specified Discount Prepayment.

(3)        If there is at least one Discount Prepayment Accepting Lender, the relevant Company Party will make a prepayment of outstanding Term Loans pursuant to this Section 2.05(a)(v)(B) to each Discount Prepayment Accepting Lender in accordance with the respective outstanding amount and tranches of Term Loans specified in such Lender's Specified Discount Prepayment Response given pursuant to clause (2) above; *provided* that, if the aggregate principal amount of Term Loans accepted for prepayment by all Discount Prepayment Accepting Lenders exceeds the Specified Discount Prepayment Amount, such prepayment shall be made *pro rata* among the Discount Prepayment Accepting Lenders in accordance with the respective principal amounts accepted to be prepaid by each such Discount Prepayment Accepting Lender and the Auction Agent (with the consent of such Company Party and subject to rounding requirements of the Auction Agent made in its reasonable discretion) will calculate such proration (the "**Specified Discount Proration**").  The Auction Agent shall promptly, and in any case within three Business Days following the Specified Discount Prepayment Response Date, notify (I) the relevant Company Party of the respective Lenders' responses to such offer, the Discounted Prepayment Effective Date and the aggregate principal amount of the Discounted Term Loan Prepayment and the tranches to be prepaid, (II) each Lender of the Discounted Prepayment Effective Date, and the aggregate principal amount and the tranches of Term Loans to be prepaid at the Specified Discount on such date and (III) each Discount Prepayment Accepting Lender of the Specified Discount Proration, if any, and confirmation of the principal amount, tranche and Type of Term Loans of such Lender to be prepaid at the Specified Discount on such date. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the Company Party and such Lenders shall be conclusive and binding for all purposes absent manifest error.  The payment amount specified in such notice to the Company Party shall be due and payable by such Company Party on the Discounted Prepayment Effective Date in accordance with Section 2.05(a)(v)(F) below (subject to Section 2.05(a)(v)(J) below).

(C)        (1) Any Company Party may from time to time solicit Discount Range Prepayment Offers by providing the Auction Agent with five Business Days' notice in the form of a Discount Range Prepayment Notice (or such shorter period as agreed by the Auction Agent); *provided* that (I) any such solicitation shall be extended, at the sole discretion of such Company Party, to (x) each Lender and/or (y) each Lender with respect to any Term Loans on an individual tranche basis, (II) any such notice shall specify the maximum aggregate principal amount of the relevant Term Loans (the "**Discount Range Prepayment Amount**"), the tranche or tranches of Term Loans subject to such offer and the maximum and minimum percentage discounts to par (the "**Discount Range**") of the principal amount of such Term Loans with respect to each relevant tranche of Term Loans willing to be prepaid by such Company Party (it being understood that different Discount Ranges and/or

44

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

Discount Range Prepayment Amounts may be offered with respect to different tranches of Term Loans and, in such event, each such offer will be treated as separate offer pursuant to the terms of this Section 2.05(a)(v)(C)), (III) the Discount Range Prepayment Amount shall be in an aggregate amount not less than $5,000,000 and whole increments of $1,000,000 in excess thereof and (IV) unless rescinded, each such solicitation by a Company Party shall remain outstanding through the Discount Range Prepayment Response Date.  The Auction Agent will promptly provide each Lender with a copy of such Discount Range Prepayment Notice and a form of the Discount Range Prepayment Offer to be submitted by a responding Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m. New York City time on the third Business Day after the date of delivery of such notice to such Lenders (or such later date specified therein) (the "**Discount Range Prepayment Response Date**").  Each Lender's Discount Range Prepayment Offer shall be irrevocable and shall specify a discount to par within the Discount Range (the "**Submitted Discount**") at which such Lender is willing to allow prepayment of any or all of its then outstanding Term Loans of the applicable tranche or tranches and the maximum aggregate principal amount and tranches of such Lender's Term Loans (the "**Submitted Amount**") such Lender is willing to have prepaid at the Submitted Discount.  Any Lender whose Discount Range Prepayment Offer is not received by the Auction Agent by the Discount Range Prepayment Response Date shall be deemed to have declined to accept a Discounted Term Loan Prepayment of any of its Term Loans at any discount to their par value within the Discount Range.

(2)    The Auction Agent shall review all Discount Range Prepayment Offers received on or before the applicable Discount Range Prepayment Response Date and shall determine (with the consent of such Company Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the Applicable Discount and Term Loans to be prepaid at such Applicable Discount in accordance with this Section 2.05(a)(v)(C).  The relevant Company Party agrees to accept on the Discount Range Prepayment Response Date all Discount Range Prepayment Offers received by Auction Agent by the Discount Range Prepayment Response Date, in the order from the Submitted Discount that is the largest discount to par to the Submitted Discount that is the smallest discount to par, up to and including the Submitted Discount that is the smallest discount to par within the Discount Range (such Submitted Discount that is the smallest discount to par within the Discount Range being referred to as the "**Applicable Discount**") which yields a Discounted Term Loan Prepayment in an aggregate principal amount equal to the lower of (I) the Discount Range Prepayment Amount and (II) the sum of all Submitted Amounts.  Each Lender that has submitted a Discount Range Prepayment Offer to accept prepayment at a discount to par that is larger than or equal to the Applicable Discount shall be deemed to have irrevocably consented to prepayment of Term Loans equal to its Submitted Amount (subject to any required proration pursuant to the following clause (3)) at the Applicable Discount (each such Lender, a "**Participating Lender**").

(3)    If there is at least one Participating Lender, the relevant Company Party will prepay the respective outstanding Term Loans of each Participating Lender in the aggregate principal amount and of the tranches specified in such Lender's Discount Range Prepayment Offer at the Applicable Discount; *provided* that if the Submitted Amount by all Participating Lenders offered at a discount to par greater than the Applicable Discount exceeds the Discount Range Prepayment Amount, prepayment of the principal amount of the relevant Term Loans for those Participating Lenders whose Submitted Discount is a discount to par greater than or equal to the Applicable Discount (the "**Identified Participating Lenders**") shall be made *pro rata* among the Identified Participating Lenders in accordance with

45

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

the Submitted Amount of each such Identified Participating Lender and the Auction Agent (with the consent of such Company Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "**Discount Range Proration**"). The Auction Agent shall promptly, and in any case within five Business Days following the Discount Range Prepayment Response Date, notify (I) the relevant Company Party of the respective Lenders' responses to such solicitation, the Discounted Prepayment Effective Date, the Applicable Discount, and the aggregate principal amount of the Discounted Term Loan Prepayment and the tranches to be prepaid, (II) each Lender of the Discounted Prepayment Effective Date, the Applicable Discount, and the aggregate principal amount and tranches of Term Loans to be prepaid at the Applicable Discount on such date, (III) each Participating Lender of the aggregate principal amount and tranches of such Lender to be prepaid at the Applicable Discount on such date, and (IV) if applicable, each Identified Participating Lender of the Discount Range Proration. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the relevant Company Party and Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to the Company Party shall be due and payable by such Company Party on the Discounted Prepayment Effective Date in accordance with Section 2.05(a)(v)(F) below (subject to Section 2.05(a)(v)(J) below).

(D) (1) Any Company Party may from time to time solicit Solicited Discounted Prepayment Offers by providing the Auction Agent with five Business Days' notice in the form of a Solicited Discounted Prepayment Notice (or such later notice specified therein); *provided* that (I) any such solicitation shall be extended, at the sole discretion of such Company Party, to (x) each Lender and/or (y) each Lender with respect to any Term Loans on an individual tranche basis, (II) any such notice shall specify the maximum aggregate amount of the Term Loans (the "**Solicited Discounted Prepayment Amount**") and the tranche or tranches of Term Loans the Borrower is willing to prepay at a discount (it being understood that different Solicited Discounted Prepayment Amounts may be offered with respect to different tranches of Term Loans and, in such event, each such offer will be treated as separate offer pursuant to the terms of this Section 2.05(a)(v)(D)), (III) the Solicited Discounted Prepayment Amount shall be in an aggregate amount not less than $5,000,000 and whole increments of $1,000,000 in excess thereof and (IV) unless rescinded, each such solicitation by a Company Party shall remain outstanding through the Solicited Discounted Prepayment Response Date. The Auction Agent will promptly provide each Lender with a copy of such Solicited Discounted Prepayment Notice and a form of the Solicited Discounted Prepayment Offer to be submitted by a responding Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m. New York City time on the third Business Day after the date of delivery of such notice to such Lenders (the "**Solicited Discounted Prepayment Response Date**"). Each Lender's Solicited Discounted Prepayment Offer shall (x) be irrevocable, (y) remain outstanding until the Acceptance Date and (z) specify both a discount to par (the "**Offered Discount**") at which such Lender is willing to allow prepayment of its then outstanding Term Loan and the maximum aggregate principal amount and tranches of such Term Loans (the "**Offered Amount**") such Lender is willing to have prepaid at the Offered Discount. Any Lender whose Solicited Discounted Prepayment Offer is not received by the Auction Agent by the Solicited Discounted Prepayment Response Date shall be deemed to have declined prepayment of any of its Term Loans at any discount.

(2) The Auction Agent shall promptly provide the relevant Company Party with a copy of all Solicited Discounted Prepayment Offers received on or before the Solicited Discounted Prepayment Response Date. Such Company Party shall review all such Solicited Discounted Prepayment Offers and select the

46

largest of the Offered Discounts specified by the relevant responding Lenders in the Solicited Discounted Prepayment Offers that is acceptable to the Company Party (the "**Acceptable Discount**"), if any.  If the Company Party elects to accept any Offered Discount as the Acceptable Discount, then as soon as practicable after the determination of the Acceptable Discount, but in no event later than by the fifth Business Day after the date of receipt by such Company Party from the Auction Agent of a copy of all Solicited Discounted Prepayment Offers pursuant to the first sentence of this clause (2) (the "**Acceptance Date**"), the Company Party shall submit an Acceptance and Prepayment Notice to the Auction Agent setting forth the Acceptable Discount.  If the Auction Agent shall fail to receive an Acceptance and Prepayment Notice from the Company Party by the Acceptance Date, such Company Party shall be deemed to have rejected all Solicited Discounted Prepayment Offers.

(3)    Based upon the Acceptable Discount and the Solicited Discounted Prepayment Offers received by the Auction Agent by the Solicited Discounted Prepayment Response Date, within five Business Days after receipt of an Acceptance and Prepayment Notice (the "**Discounted Prepayment Determination Date**"), the Auction Agent will determine (with the consent of such Company Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) the aggregate principal amount and the tranches of Term Loans (the "**Acceptable Prepayment Amount**") to be prepaid by the relevant Company Party at the Acceptable Discount in accordance with this Section 2.05(a)(v)(D).  If the Company Party elects to accept any Acceptable Discount, then the Company Party agrees to accept all Solicited Discounted Prepayment Offers received by Auction Agent by the Solicited Discounted Prepayment Response Date, in the order from largest Offered Discount to smallest Offered Discount, up to and including the Acceptable Discount.  Each Lender that has submitted a Solicited Discounted Prepayment Offer with an Offered Discount that is greater than or equal to the Acceptable Discount shall be deemed to have irrevocably consented to prepayment of Term Loans equal to its Offered Amount (subject to any required pro-rata reduction pursuant to the following sentence) at the Acceptable Discount (each such Lender, a "**Qualifying Lender**").   The Company Party will prepay outstanding Term Loans pursuant to this Section 2.05(a)(v)(D) to each Qualifying Lender in the aggregate principal amount and of the tranches specified in such Lender's Solicited Discounted Prepayment Offer at the Acceptable Discount; *provided* that if the aggregate Offered Amount by all Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount exceeds the Solicited Discounted Prepayment Amount, prepayment of the principal amount of the Term Loans for those Qualifying Lenders whose Offered Discount is greater than or equal to the Acceptable Discount (the "**Identified Qualifying Lenders**") shall be made *pro rata* among the Identified Qualifying Lenders in accordance with the Offered Amount of each such Identified Qualifying Lender and the Auction Agent (with the consent of such Company Party and subject to rounding requirements of the Auction Agent made in its sole reasonable discretion) will calculate such proration (the "**Solicited Discount Proration**").  On or prior to the Discounted Prepayment Determination Date, the Auction Agent shall promptly notify (I) the relevant Company Party of the Discounted Prepayment Effective Date and Acceptable Prepayment Amount comprising the Discounted Term Loan Prepayment and the tranches to be prepaid, (II) each Lender of the Discounted Prepayment Effective Date, the Acceptable Discount, and the Acceptable Prepayment Amount of all Term Loans and the tranches to be prepaid at the Applicable Discount on such date, (III) each Qualifying Lender of the aggregate principal amount and the tranches of such Lender to be prepaid at the Acceptable Discount on such date, and (IV) if applicable,

<div align="center">47</div>

each Identified Qualifying Lender of the Solicited Discount Proration. Each determination by the Auction Agent of the amounts stated in the foregoing notices to such Company Party and Lenders shall be conclusive and binding for all purposes absent manifest error. The payment amount specified in such notice to such Company Party shall be due and payable by such Company Party on the Discounted Prepayment Effective Date in accordance with Section 2.05(a)(v)(F) below (subject to Section 2.05(a)(v)(J) below).

(E)    In connection with any Discounted Term Loan Prepayment, the Company Parties and the Lenders acknowledge and agree that the Auction Agent may require as a condition to any Discounted Term Loan Prepayment, the payment of customary fees and expenses from a Company Party in connection therewith.

(F)    If any Term Loan is prepaid in accordance with Sections 2.05(a)(v)(B) through 2.05(a)(v)(D) above, a Company Party shall prepay such Term Loans on the Discounted Prepayment Effective Date. The relevant Company Party shall make such prepayment to the Administrative Agent, for the account of the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable, at the Administrative Agent's Office in immediately available funds not later than 11:00 a.m. New York City time on the Discounted Prepayment Effective Date and all such prepayments shall be applied to the remaining principal installments of the relevant tranche of Loans being prepaid on a *pro rata* basis across such installments. The Term Loans so prepaid shall be accompanied by all accrued and unpaid interest on the par principal amount so prepaid up to, but not including, the Discounted Prepayment Effective Date. Each prepayment of the outstanding Term Loans pursuant to this Section 2.05(a)(v) shall be paid to the Discount Prepayment Accepting Lenders, Participating Lenders, or Qualifying Lenders, as applicable, and shall be applied to the relevant Loans of such Lenders in accordance with their respective Pro Rata Share. The aggregate principal amount of the tranches and installments of the relevant Term Loans outstanding shall be deemed reduced by the full par value of the aggregate principal amount of the tranches of Term Loans prepaid on the Discounted Prepayment Effective Date in any Discounted Term Loan Prepayment. In connection with each prepayment pursuant to this Section 2.05(a)(v), each Lender participating in any prepayment described in this Section 2.05(a)(v) acknowledges and agrees that in connection therewith, (1) the Borrower or any Company Party then may have, and later may come into possession of, information regarding the Borrower, and its Affiliates not known to such Lender and that may be material to a decision by such Lender to participate in such prepayment (including Material Non-Public Information) ("**Excluded Information**"), (2) such Lender has independently and, without reliance on the Borrower, any of its Subsidiaries, the Administrative Agent or any of their respective Affiliates, made its own analysis and determination to participate in such prepayment notwithstanding such Lender's lack of knowledge of the Excluded Information, (3) none of the Company Parties or any of their respective Affiliates shall be required to make any representation that it is not in possession of Excluded Information and all parties to the relevant transaction shall render customary "big boy" disclaimer letters, and (4) none of the Borrower, its Subsidiaries, the Administrative Agent or any of their respective Affiliates shall have any liability to such Lender, and such Lender hereby waives and releases, to the extent permitted by law, any claims such Lender may have against the Borrower, its Subsidiaries, the Auction Agent, the Administrative Agent and their respective Affiliates, under applicable laws or otherwise, with respect to the nondisclosure of the Excluded Information.

(G)    To the extent not expressly provided for herein, each Discounted Term Loan Prepayment shall be consummated pursuant to procedures consistent with the

48

provisions in this Section 2.05(a)(v), established by the Auction Agent acting in its reasonable discretion and as reasonably agreed by the Borrower.

(H)    [Reserved].

(I)    Each of the Company Parties and the Lenders acknowledge and agree that the Auction Agent may perform any and all of its duties under this Section 2.05(a)(v) by itself or through any Affiliate of the Auction Agent and expressly consents to any such delegation of duties by the Auction Agent to such Affiliate and the performance of such delegated duties by such Affiliate.  The exculpatory provisions pursuant to this Agreement shall apply to each Affiliate of the Auction Agent and its respective activities in connection with any Discounted Term Loan Prepayment provided for in this Section 2.05(a)(v) as well as activities of the Auction Agent.

(J)    Each Company Party shall have the right, by written notice to the Auction Agent, to revoke in full (but not in part) its offer to make a Discounted Term Loan Prepayment and rescind the applicable Specified Discount Prepayment Notice, Discount Range Prepayment Notice or Solicited Discounted Prepayment Notice therefor at its discretion at any time on or prior to the Specified Discount Prepayment Response Date, Discount Range Prepayment Response Date or Solicited Discount Prepayment Response Date, as applicable (and if such offer is revoked pursuant to the preceding clauses, any failure by such Company Party to make any prepayment to a Lender, as applicable, pursuant to this Section 2.05(a)(v) shall not constitute a Default or Event of Default under Section 8.01 or otherwise).

(vi)    In connection with any prepayment pursuant to this Section 2.05(a) consummated prior to the third anniversary of the Closing Date, the Borrower shall pay to each Lender the applicable fee required by Section 2.09(b).

(b)    Mandatory.

(i)    Within 30 Days after March 31 of each year during the term of this Agreement (commencing with March 31, 2021), to the extent the Loan Parties have Available Cash in excess of $10,000,000, the Borrower shall prepay the Term Loans in an amount aggregate equal such excess above $10,000,000.

(ii)    If (1) the Borrower or any Subsidiary of the Borrower Disposes of any property or assets (other than any Disposition of any property or assets permitted by Sections 7.05(a), (b), (c), (d), (e), (f), (g), (h), (i), (l), (m) (except as set forth in the proviso thereof and except to the extent such property is subject to a Mortgage), (n), (p), (q), (r) and (u)), or (2) any Casualty Event occurs, which results in the realization or receipt by the Borrower or Subsidiary of Net Proceeds, subject to Section 2.05(b)(vi), the Borrower shall cause to be prepaid on or prior to the date which is 5 Business Days after the date of the realization or receipt by the Borrower or any Subsidiary of such Net Proceeds, an aggregate principal amount of Term Loans in an amount equal to 100% of all such Net Proceeds; *provided* that if at any time such prepayment would be required hereunder with respect to any ABL Priority Collateral at any time when any ABL Credit Agreement is in effect, the Net Proceeds of any such Disposition or Casualty Event that relate or are attributable to any such ABL Priority Collateral shall not be required to be applied to the prepayment of the Term Loans hereunder to the extent such Net Proceeds are required to prepay or repay the ABL Loans in order to remain in compliance with the "Borrowing Base" (as defined in the ABL Credit Agreement) under the ABL Credit Agreement (or any documentation governing any ABL Loans).

(iii)    If the Borrower or any Subsidiary incurs or issues any Indebtedness after the Closing Date not permitted to be incurred or issued pursuant to Section 7.03, the Borrower shall cause to be

49

prepaid an aggregate principal amount of Term Loans in an amount equal to 100% of all Net Proceeds received therefrom on or prior to the date which is five Business Days after the receipt by the Borrower or such Subsidiary of such Net Proceeds.  In connection with any prepayment under this Section 2.05(b)(iii) is consummated in respect of all or any portion of the Term Loans on or prior to the third anniversary of the Closing Date, the Borrower shall pay to each Lender the applicable fee required by Section 2.09(b).

(iv)    [reserved].

(v)    [reserved].

(vi)    Notwithstanding any other provisions of this Section 2.05, (i) to the extent that the repatriation to the United States of any or all of the Net Proceeds of any Disposition by a Foreign Subsidiary ("**Foreign Disposition**") or the Net Proceeds of any Casualty Event incurred by a Foreign Subsidiary ("**Foreign Casualty Event**") would be (x) prohibited or delayed by applicable local law or (y) restricted by applicable material constituent documents, including as a result of minority ownership (so long as such restrictions were not implemented for the purpose of avoiding such mandatory prepayment requirements), an amount equal to the Net Proceeds that would be so affected were the Borrower to attempt to repatriate such cash will not be required to be applied to repay Term Loans at the times provided in this Section 2.05 so long, but only so long, as the applicable local law or applicable material constituent documents would not otherwise permit repatriation to the United States (Holdings, Intermediate Holdings, the Borrower and its Subsidiaries hereby agree to use all commercially reasonable efforts to overcome or eliminate any such restrictions on repatriation, even if the Borrower does not intend to actually repatriate such cash, so that an amount equal to the full amount of such Net Proceeds will otherwise be subject to repayment under this Section 2.05), and if within one year following the date on which the respective prepayment would otherwise have been required such repatriation of any of such affected Net Proceeds is permissible under the applicable local law or applicable material constituent documents, even if such cash is not actually repatriated at such time, an amount equal to the amount of the Net Proceeds will be promptly (and in any event not later than five Business Days) applied (net of an amount equal to the additional taxes of the Borrower, its Subsidiaries and the direct and indirect holders of Equity Interests in the Borrower that would be payable or reserved against and any additional costs that would be incurred as a result of a repatriation, whether or not a repatriation actually occurs) by the Borrower to the repayment of the Term Loans pursuant to this Section 2.05 and (ii) to the extent that the Borrower has determined in good faith that repatriation of any of or all the Net Proceeds of any Foreign Disposition or Foreign Casualty Event would have adverse tax cost consequences (including the imposition of withholding Taxes) with respect to such Net Proceeds, an amount equal to such Net Proceeds that would be so affected will not be subject to repayment under this Section 2.05; *provided*, that in the case of each of clauses (i) and (ii), such nonpayment shall not constitute an Event of Default (and such amounts shall be available for working capital purposes of the Borrower and the Subsidiaries, subject to the prepayment provisions in this Section 2.05(b)(vi)).  For the avoidance of doubt, nothing in this Section 2.05 shall require the Borrower to cause any amounts to be repatriated to the United States (whether or not such amounts are used in or excluded from the determination of the amount of any mandatory prepayments hereunder).

(vii)    Each prepayment of Term Loans pursuant to this Section 2.05(b) shall be applied ratably to the Term Loans then outstanding; (B) each prepayment pursuant to clauses (i), (ii) and (iii) of this Section 2.05(b) shall be applied to the scheduled installments of principal thereof following the date of such prepayment in direct order of maturity; and (C) each such prepayment shall be paid to the Lenders in accordance with their respective Pro Rata Shares of such prepayment.

(viii)    The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made by the Borrower pursuant to clauses (i), (ii) and (iii) of this Section 2.05(b) at least three Business Days prior to the date of such prepayment.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the aggregate amount of such prepayment to be made by the Borrower.  The Administrative Agent will promptly notify each Lender of the contents of the Borrower's prepayment notice and of such Lender's Pro Rata Share of the

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

prepayment. Each Lender may reject all or a portion of its Pro Rata Share of any mandatory prepayment (such declined amounts, the "**Declined Proceeds**") of Term Loans required to be made pursuant to clauses (i), (ii) and (iii) of this Section 2.05(b) by providing written notice (each, a "**Rejection Notice**") to the Administrative Agent and the Borrower no later than 5:00 p.m. New York City time one Business Day after the date of such Lender's receipt of notice from the Administrative Agent regarding such prepayment; *provided*, *however*, in no event may the a Lender reject a prepayment that represents a refinancing of the Total Outstandings. Each Rejection Notice from a given Lender shall specify the principal amount of the mandatory repayment of Term Loans to be rejected by such Lender. If a Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Term Loans to be rejected, any such failure will be deemed an acceptance of such mandatory prepayment of Term Loans. Subject to proviso at the end of Section 2.05(b)(ii), any Declined Proceeds shall be offered ~~to~~by the Borrower to the Second Lien Administrative Agent for the benefit of the lenders under the Second Lien Term Facility ~~on a *pro rata* basis~~ in accordance with the ~~amounts of the Second Lien Term Loans of such lender (and each lender under the~~ Second Lien ~~Term Facility shall have the right to decline any prepayment with Declined Proceeds at the time and in the manner specified by the Administrative Agent).~~Credit Agreement. To the extent such lenders under the Second Lien Term Facility elect to decline their Pro Rata Share of such Declined Proceeds, any Declined Proceeds remaining thereafter shall be retained by the Borrower.

(c)       *Interest, Funding Losses, Etc*. All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a Eurocurrency Rate Loan on a date prior to the last day of an Interest Period therefor, any amounts owing in respect of such Eurocurrency Rate Loan pursuant to Section 3.05.

**Section 2.06        [Reserved].**

**Section 2.07      Repayment of Loans**. The Borrower shall repay to the Administrative Agent for the ratable account of the Lenders (A) on the last Business Day of each March, June, September and December, commencing with the fiscal quarter ending closest to March 31, 2022, an aggregate principal amount equal to 0.25% of the aggregate principal amount of all Term Loans outstanding on the Closing Date (which payments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.05 or Section 10.07 to the extent such Indebtedness is cancelled) and (B) on the Maturity Date for the Term Loans, the aggregate principal amount of all Term Loans outstanding on such date.

**Section 2.08      Interest**. (a) Subject to the provisions of Section 2.08(b), (i) each Eurocurrency Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurocurrency Rate, for such Interest Period *plus* the Applicable Rate and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate *plus* the Applicable Rate;.

(b)       During the continuance of an Event of Default, at the election of the Required Lenders, the Borrower shall pay interest on the Total Outstandings and any other overdue amounts owing by it hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued and unpaid interest on such amounts (including interest on past due interest) shall be due and payable upon written demand.

(c)       Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto, on the Maturity Date and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law; provided that, the Borrower may, in its sole discretion, by delivering a written notice thereof to the Administrative Agent by 11:00 a.m. at least [●]three (3) Business Days prior to the commencement of the applicable Interest Period with respect to any Term Loan, (or such later time as the Required Lenders may agree), elect (such election,

51

a "PIK Election"): (i) to pay a portion of the Applicable Rate equal to (iand not less than or greater than) (A) 4.0% in the case of Eurocurrency Rate Loans and (iiB) 3.0% in the case of Base Rate Loans. of such interest in kind by adding such amounts so elected to the aggregate outstanding principal balance of the Term Loans, (such election, a "PIK Election") or (b) to pay all of the Applicable Rate in cash (such election, a "Cash Election"), provided, further, that, other than at the election of the Required Lenders during the continuance of an Event of Default, (which election shall govern and control over any election by the Borrower), absent a written notification to the Administrative Agent that the Borrower has chosen not to make a PIKCash Election (which notice shall be delivered no later than [●] a.m. [●] Business Days before the relevant Interest Period (or such later time as the Administrative Agent may agree))in accordance with this Section 2.08(c) with respect to any Interest Period, the Borrower shall be deemed to have delivered a written notice of PIK Election with respect to such Interest Period concurrently with the delivery of the Committed Loan Notice applicable thereto in the maximum principal amount permitted therebyof the Term Loans that are subject to such Committed Loan Notice.  The Borrower hereby makes a PIK Election for the period beginning on the Closing Date until the first Interest Payment Date.

**Section 2.09**     **Fees**.

(a)     The Borrower shall pay to the Administrative Agent such fees (including, but not limited to, administrative agent fees) as shall have been separately agreed upon in writing, including in the Agent Fee Letters, in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the Administrative Agent).

(b)     *Prepayment Premium*. (i) In the event that, prior to the third anniversary of the Closing Date, (A) the Borrower prepays any Term Loans pursuant to Section 2.05(a), (B) the Borrower prepays or refinances any Term Loans pursuant to Section 2.05(b)(iii) or (C) the outstanding principal amount of the Term Loans shall become due pursuant to Section 8.02, in each case, the Borrower shall pay to the Administrative Agent, for the ratable account of each of the Lenders, a premium of (x) 4.00% of the aggregate principal amount of the Term Loans so prepaid, refinanced or accelerated prior to the first anniversary of the Closing Date *plus* the Make-Whole Amount, (y) 3.00% of the aggregate principal amount of the Term Loans so prepaid, refinanced or accelerated on or after the first anniversary of the Closing Date but prior to the second anniversary of the Closing Date or (z) 2.00% of the aggregate principal amount of the Term Loans so prepaid, refinanced or accelerated on or after the second anniversary of the Closing Date but prior to the third anniversary of the Closing Date. It is agreed, for the avoidance of doubt, that no prepayment premium shall be payable on or after the third anniversary of the Closing Date. All such amounts payable pursuant to this Section 2.09(b) shall be due and payable on the date of the applicable prepayment, refinancing or acceleration.

(c)     THE LOAN PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE AMOUNTS SPECIFIED IN SECTION 2.09(b) IN CONNECTION WITH ANY ACCELERATION, IN EACH CASE, TO THE MAXIMUM EXTENT SUCH WAIVER IS PERMITTED UNDER APPLICABLE LAW. The Loan Parties expressly agree that (i) the amounts specified in Section 2.09(b) are reasonable and the product of an arm's length transaction between sophisticated business people, ably represented by counsel, (ii) the amounts specified in Section 2.09(b) shall be payable notwithstanding the then prevailing market rates at the time payment is made, (iii) there has been a course of conduct between Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay the amounts specified in Section 2.09(b), (iv) the Loan Parties shall be estopped hereafter from claiming differently than as

52

agreed to in this provision, (v) their agreement to pay the amounts specified in Section 2.09(b) is a material inducement to the Lenders to accept the Term Loans pursuant to the Prepackaged Plan, and (vi) the amounts specified in Section 2.09(b) represent a good faith, reasonable estimate and calculation of the lost profits or damages of the Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to the Lenders or profits lost by the Lenders as a result of any early optional repayment, mandatory prepayment or early repayment due to acceleration of the Term Loans, as the case may be.

Section 2.10    **Computation of Interest and Fees**.  All computations of interest for Base Rate Loans when the Base Rate is determined in accordance with clause (b) of the definition thereof shall be made on the basis of a year of 365 days, or 366 days, as applicable, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11    **Evidence of Indebtedness**.  (a)  The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for this purpose as a non-fiduciary agent for the Borrower, in each case in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be *prima facie* evidence absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b)    [Reserved].

(c)    Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.11(a), and by each Lender in its account or accounts pursuant to Section 2.11(a) shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

Section 2.12    **Payments Generally**.  (a)  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office in Dollars and in Same Day Funds not later than 2:00 p.m. New York City time on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share provided for under this Agreement) of such payment in like funds as received by wire transfer to such Lender's applicable Lending Office.  All payments received by the Administrative Agent after

53

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

2:00 p.m. New York City time shall in each case be deemed received (in the Administrative Agent's sole discretion) on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)      Except as otherwise provided herein, if any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; *provided* that, if such extension would cause payment of interest on or principal of Eurocurrency Rate Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

(c)      Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder, that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto.  If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then:

(i)      if the Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in Same Day Funds at the applicable Overnight Rate from time to time in effect; and

(ii)      if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Same Day Funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "**Compensation Period**") at a rate per annum equal to the applicable Overnight Rate from time to time in effect.  When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing.  If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing.  Nothing herein shall be deemed to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(c) shall be conclusive, absent manifest error.

(d)      [Reserved].

(e)      [Reserved].

(f)      [Reserved].

(g)      Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03.  If the Administrative

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may (to the fullest extent permitted by mandatory provisions of applicable Law), but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the Outstanding Amount of all Loans outstanding at such time in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

(h)     Amounts to be applied to the prepayment of Term Loans in connection with any mandatory prepayments by the Borrower of the Term Loans pursuant to Section 2.05(b) shall be applied, as applicable, on a *pro rata* basis to the then outstanding Term Loans being prepaid irrespective of whether such outstanding Term Loans are Base Rate Loans or Eurocurrency Rate Loans; *provided* that if no Lenders exercise the right to waive a given mandatory prepayment of the Term Loans pursuant to Section 2.05(b)(viii), then, with respect to such mandatory prepayment, the amount of such mandatory prepayment shall be applied first to reduce outstanding Base Rate Loans.  Any amounts remaining after each such application shall be applied to prepay Eurocurrency Rate Loans.

**Section 2.13     Sharing of Payments**.  If, other than as provided elsewhere herein, any Lender shall obtain on account of the Loans made by it, any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase (in Dollars) from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, *pro rata* with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon.  For the avoidance of doubt, the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement as in effect from time to time (including the application of funds arising from the existence of a Defaulting Lender) or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder.  The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.13 and will in each case notify the Lenders following any such purchases or repayments.  Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.14     **[Reserved]**.

Section 2.15     **[Reserved]**.

Section 2.16     **[Reserved]**.

Section 2.17     **Defaulting Lenders**.

(a)      *Adjustments*.      Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law, such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.01.

(b)      *Defaulting Lender Cure*.  If the Borrower and the Administrative Agent, agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will cease to be a Defaulting Lender.

**Section 2.18      Effect of Benchmark Transition Event**.

(a)      *Benchmark Replacement*.  Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent (with the consent of the Required Lenders) and the Borrower may amend this Agreement to replace the Eurocurrency Rate with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders accept such amendment. No replacement of Eurocurrency Rate with a Benchmark Replacement pursuant to this Section 2.18 will occur prior to the applicable Benchmark Transition Start Date.

(b)      *Benchmark Replacement Conforming Changes*.   In connection with the implementation of a Benchmark Replacement, the Administrative Agent will join with the Borrower in any amendment implementing have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement except as may be required by the definition of Benchmark Replacement Conforming Changes; provided that the Administrative Agent shall not be obligated to enter into any such amendment that might expose it to personal liability and in the event of any ambiguity shall be entitled to seek the consent of the Required Lenders and shall have no liability to any Person for any delay caused by such consent.

(c)      *Notices, Standards for Decisions and Determinations*.  Each Lender will promptly notify the Borrower, the Administrative Agent and the other Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Lenders pursuant to this Section 2.18, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.18.

(d)      *Benchmark Unavailability Period*.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans to be made, converted or continued

56

during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During any Benchmark Unavailability Period, the component of Base Rate based upon Eurocurrency Rate will not be used in any determination of Base Rate.

(e)     *Certain Defined Terms.*  As used in this Section 2.18:

"**Benchmark Replacement**" means the sum of: (a) the alternate benchmark rate (which may include Term SOFR) that has been selected by the Required Lenders and the Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to Eurocurrency Rate for U.S. dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; *provided* that, if the Benchmark Replacement as so determined would be less than zero, the Benchmark Replacement will be deemed to be zero for the purposes of this Agreement.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of Eurocurrency Rate with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Required Lenders and the Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of Eurocurrency Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of Eurocurrency Rate with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time.

"**Benchmark Replacement Conforming Changes**" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Borrower determines in good faith may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Borrower or the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Borrower and Required Lenders determine that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Borrower determines in good faith is reasonably necessary in connection with the administration of this Agreement).

"**Benchmark Replacement Date**" means the earlier to occur of the following events with respect to Eurocurrency Rate:

(1)     in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of Eurocurrency Rate permanently or indefinitely ceases to provide Eurocurrency Rate; or

(2)     in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to Eurocurrency Rate:

(1)     a public statement or publication of information by or on behalf of the administrator of Eurocurrency Rate announcing that such administrator has ceased or will cease to provide Eurocurrency Rate,

57

permanently or indefinitely, *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide Eurocurrency Rate;

(2)    a public statement or publication of information by the regulatory supervisor for the administrator of Eurocurrency Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for Eurocurrency Rate, a resolution authority with jurisdiction over the administrator for Eurocurrency Rate or a court or an entity with similar insolvency or resolution authority over the administrator for Eurocurrency Rate, which states that the administrator of Eurocurrency Rate has ceased or will cease to provide Eurocurrency Rate permanently or indefinitely, *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide Eurocurrency Rate; or

(3)    a public statement or publication of information by the regulatory supervisor for the administrator of Eurocurrency Rate announcing that Eurocurrency Rate is no longer representative.

"**Benchmark Transition Start Date**" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the [90th] day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than [90] days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Required Lenders, as applicable, by notice to the Borrower, the Administrative Agent and the Lenders.

"**Benchmark Unavailability Period**" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to Eurocurrency Rate and solely to the extent that Eurocurrency Rate has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced Eurocurrency Rate for all purposes hereunder in accordance with Section 2.18 and (y) ending at the time that a Benchmark Replacement has replaced Eurocurrency Rate for all purposes hereunder pursuant to Section 2.18.

"**Early Opt-in Election**" means the occurrence of:

(1)    a notification by the Required Lenders to the Administrative Agent (with a copy to the Borrower) that the Required Lenders have determined that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in this Section 2.18, are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace Eurocurrency Rate, and

(2)    the election by the Required Lenders to declare that an Early Opt-in Election has occurred and the provision by the Required Lenders of written notice of such election to the Administrative Agent (with a copy to the Borrower).

"**Federal Reserve Bank of New York's Website**" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"**Relevant Governmental Body**" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"**SOFR**" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"**Term SOFR**" means the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

58

"**Unadjusted Benchmark Replacement**" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

## ARTICLE III
## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

**Section 3.01**     **Taxes**.  (a)  Except as provided in this Section 3.01, any and all payments made by or on account of the Borrower or any Guarantor under any Loan Document shall be made free and clear of and without deduction for any Taxes, except to the extent required by any Laws.  If the Borrower, any Guarantor or other applicable withholding agent shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Loan Document to ~~any~~the Administrative Agent or any Lender, (i) if the Tax in question is an Indemnified Tax or Other Tax, the sum payable by the Borrower or any Guarantor shall be increased as necessary so that after all required deductions for Indemnified Taxes or Other Taxes have been made (including deductions applicable to additional sums payable under this Section 3.01), each Lender (or, in the case of a payment made to ~~an~~the Administrative Agent for its own account, ~~such~~the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions for Indemnified Taxes or Other Taxes been made, (ii)  the applicable withholding agent shall make such deductions, (iii) the applicable withholding agent shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Laws, and (iv) within 30 days after the date of such payment (or, if receipts or evidence are not available within 30 days, as soon as possible thereafter), if the Borrower or any Guarantor is the applicable withholding agent, it shall furnish to ~~such~~the Administrative Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof or other evidence acceptable to ~~such~~the Administrative Agent or Lender.

(b)     In addition, the Borrower agrees to pay any and all present or future stamp, court or documentary Taxes and any other excise, property, intangible or mortgage recording Taxes, imposed by any Governmental Authority, which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document excluding, in each case, any such Tax imposed as a result of ~~an Agent or~~the Administrative Agent's or any Lender's Assignment and Assumption, grant of a participation, transfer or assignment to or designation of a new applicable Lending Office or other office for receiving payments under any Loan Document (collectively, "**Assignment Taxes**") if such Assignment Tax is imposed as a result of a present or former connection of the assignor or assignee with the jurisdiction imposing such Assignment Tax (other than any connection arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, receiving payments under, and/or enforcing or receiving or perfecting a security interest under any Loan Document), except for Assignment Taxes resulting from assignment or participation that is requested or required in writing by the Borrower (all such non-excluded taxes described in this Section 3.01(b) being hereinafter referred to as "**Other Taxes**").

(c)     The Borrower and each Guarantor agree to indemnify ~~each~~the Administrative Agent and each Lender, within 10 days after demand therefor, for (i) the full amount of Indemnified Taxes and Other Taxes paid or payable by ~~such~~the Administrative Agent or such Lender (including Indemnified Taxes or Other Taxes imposed on or attributable to amounts payable under this Section 3.01) and (ii) any expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the Governmental Authority.  A certificate as to the amount of such payment or liability prepared in good faith and delivered by ~~such~~the Administrative Agent or Lender (or by ~~an Agent~~the Administrative on behalf of such Lender), accompanied by a written statement thereof setting forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) the basis and calculation of such amounts shall be conclusive absent manifest error.

(d)     Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent

<center>59</center>

for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.07(e) relating to the maintenance of a Participant Register and (iii) any Taxes excluded from the definition of Indemnified Taxes that are attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)     Each Lender and Agent shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Law or reasonably requested by the Borrower or the Administrative Agent certifying as to any entitlement of such Lender to an exemption from, or reduction in, any applicable withholding Tax with respect to any payments to be made to such Lender or Agent under the Loan Documents.  Each such Lender and the Administrative Agent shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documentation required below in this Section 3.01(e)) obsolete, expired or inaccurate in any material respect, deliver promptly and on or before the date such documentation expires, becomes obsolete or inaccurate to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and the Administrative Agent in writing of its inability to do so.  In addition, each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with such other documentation prescribed by Law or reasonably requested by the Borrower or Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether such Lender or Administrative Agent is subject to backup withholding or information reporting requirements.  Notwithstanding any other provision of this Section 3.01(e), a Lender or anthe Administrative Agent shall not be required to deliver any form pursuant to this Section 3.01(e) that such Lender or such Agentthe Administrative is not legally eligible to deliver.  Without limiting the foregoing:

(i)     Each Lender that is a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) two properly completed and duly signed original copies of Internal Revenue Service Form W-9 certifying that such Lender is exempt from federal backup withholding.

(ii)     Each Lender that is not a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(A)     two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN (or any successor forms) claiming eligibility for the benefits of an income tax treaty to which the United States is a party,

(B)     two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)     in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (A) a certificate substantially in the form of Exhibit H hereto (any such certificate a "**United States Tax Compliance Certificate**")

60

and (B) two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN (or any successor forms),

(D)       to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or has sold a participation), Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, Form W-8BEN, United States Tax Compliance Certificate, Form W-9, Form W-8IMY or any other required information from each beneficial owner, as applicable (*provided* that, if the Lender is a partnership (and not a participating Lender) and if one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

(E)       two properly completed and duly signed original copies of any other form prescribed by applicable U.S. federal income tax laws (including the Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, United States federal withholding tax on any payments to such Lender under the Loan Documents.

(iii)       ~~Each~~If the Administrative Agent ~~that~~ is a "United States person" (as defined in Section 7701(a)(30) of the Code~~)~~), it shall deliver to the Borrower ~~and the Administrative Agent~~ two properly completed and duly signed original copies of Internal Revenue Service Form W-9 with respect to fees received on its own behalf, certifying that ~~such~~the Administrative Agent is exempt from federal backup withholding.

(iv)       ~~Each~~If the Administrative Agent ~~that~~ is not a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower ~~and the Administrative Agent~~ two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI with respect to fees received on its own behalf.

(v)       If a payment made to a Lender or the Administrative Agent under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender or the Administrative Agent were to fail to comply with the applicable reporting requirements of FATCA, such Lender or the Administrative Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by Laws and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Laws and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender or the Administrative Agent has or has not complied with such Person's obligations under FATCA and, if necessary, to determine the amount to deduct and withhold from such payment.  Solely for purposes of this Section 3.01(e)(v), "FATCA" shall include any amendments made to FATCA after the Closing Date.

(f)       ~~Any~~The Administrative Agent or any Lender ~~or Agent~~ claiming any additional amounts payable pursuant to this Section 3.01 shall use its commercially reasonable efforts (subject to such Lender's or Administrative Agent's overall internal policies of general application and legal and regulatory restrictions) to mitigate or reduce the additional amounts payable, which commercially reasonable efforts may include a change in the jurisdiction of its Lending Office (or any other measures reasonably requested by the Borrower) if such a change or other measures would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender.

(g)       If any Lender or Agent determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Indemnified Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by a Loan Party pursuant to this Section 3.01, it shall promptly remit such refund to such Loan Party (but only to the extent of indemnification or additional amounts paid

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

by the Loan Party under this <u>Section 3.01</u> with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including any Taxes) of the Lender or <u>Administrative</u> Agent, as the case may be, and without interest (other than any interest paid by the relevant taxing authority with respect to such refund net of any Taxes payable by ~~any~~<u>the Administrative</u> Agent or <u>any</u> Lender on such interest); *provided* that the Loan Parties, upon the request of the Lender or <u>Administrative</u> Agent, as the case may be, agree promptly to return such refund (*plus* any penalties, interest or other charges imposed by the relevant taxing authority) to such party in the event such party is required to repay such refund to the relevant taxing authority.  This <u>Section 3.01</u> shall not be construed to require ~~any~~<u>the Administrative</u> Agent or any Lender to make available its tax returns (or any other information relating to Taxes that it deems confidential) to any Loan Party or any other person.

**Section 3.02**     **Illegality**.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Eurocurrency Rate Loans, or to determine or charge interest rates based upon the Eurocurrency Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, in each case after the Closing Date then, on written notice thereof by such Lender to the Borrower ~~through~~and the Administrative Agent, any obligation of such Lender to make or continue Eurocurrency Rate Loans or to convert Base Rate Loans to Eurocurrency Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower shall promptly following written demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all applicable Eurocurrency Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Rate Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurocurrency Rate Loans.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment or conversion under <u>Section 3.05</u>.  Each Lender agrees to use commercially reasonable efforts (subject to such Lender's overall internal policies of general application and legal and regulatory restrictions) to designate a different Lending Office if such designation will avoid the need for such notice, will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender.

**Section 3.03**     **Inability to Determine Rates**.  If the Administrative Agent or the Required Lenders determine after the Closing Date that for any reason adequate and reasonable means do not exist for determining the applicable Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan, or that the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that Dollar deposits are not being offered to banks in the London interbank eurodollar, or other applicable, market for the applicable amount and the Interest Period of such Eurocurrency Rate Loan, the Administrative Agent will promptly so notify the Borrower in writing and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Eurocurrency Rate Loans or to convert Base Rate Loans to Eurocurrency Rate Loans shall be suspended and (y) in the event of a determination described in the preceding sentence with respect to the Eurocurrency Rate component of the Base Rate, the utilization of the Eurocurrency Rate component in determining the Base Rate shall be suspended, in each case, until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of such Eurocurrency Rate Loans or, failing that, will be deemed to have converted such request, if applicable, into a request for a Borrowing of Base Rate Loans in the amount specified therein.

**Section 3.04**     **Increased Cost and Reduced Return; Capital Adequacy; Eurocurrency Rate Loan Reserves**.  (a)  If any Lender reasonably determines that as a result of the introduction of or any change in or in the interpretation of any Law, in each case after the Closing Date, or such Lender's compliance therewith, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or

maintaining any Eurocurrency Rate Loans, or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.04(a) any such increased costs or reduction in amount resulting from (i) Indemnified Taxes or Other Taxes indemnified pursuant to Section 3.01, or any Taxes excluded from the definition of (x) "Indemnified Taxes" or (y) "Other Taxes" or (ii) reserve requirements contemplated by Section 3.04(c)) and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining the Eurocurrency Rate Loan (or of maintaining its obligations to make any Loan), or to reduce the amount of any sum received or receivable by such Lender, then from time to time within 15 Business Days after written demand by such Lender setting forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) such increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction. Notwithstanding anything herein to the contrary, for all purposes under this Agreement, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change in Law, regardless of the date enacted, adopted or issued.

(b)    If any Lender determines that the introduction of any Law regarding capital adequacy or liquidity requirements or any change therein or in the interpretation thereof, in each case after the Closing Date, or compliance by such Lender (or its Lending Office) therewith, has the effect of reducing the rate of return on the capital of such Lender or any company controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and such Lender's desired return on capital), then from time to time promptly following written demand of such Lender setting forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction within 15 Business Days after receipt of such demand. Notwithstanding anything herein to the contrary, for all purposes under this Agreement, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change in Law, regardless of the date enacted, adopted or issued.

(c)    The Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits, additional interest on the unpaid principal amount of each applicable Eurocurrency Rate Loan of the Borrower equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive in the absence of manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the the funding of any Eurocurrency Rate Loans of the Borrower, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such Loan, *provided* the Borrower shall have received at least 15 Business Days' prior written notice (with a copy to the Administrative Agent) of such additional interest or cost from such Lender. If a Lender fails to give notice 15 Business Days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable 15 Business Days from receipt of such notice.

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

(d)      Failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation.

(e)      If any Lender requests compensation under this Section 3.04, then such Lender will, if requested by the Borrower, use commercially reasonable efforts (subject to such Lender's overall internal policies of general application and legal and regulatory restrictions) to designate another Lending Office for any Loan affected by such event; *provided* that such efforts are made on terms that, in the commercially reasonable judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no material economic, legal or regulatory disadvantage and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender; *provided*, *further*, that nothing in this Section 3.04(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.04(a), (b), (c) or (d).

**Section 3.05      Funding Losses**.  Promptly following written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense (excluding loss of anticipated profits and calculated without giving effect to any interest rate floor) actually incurred by it as a result of:

(a)      any continuation, conversion, payment or prepayment of any Eurocurrency Rate Loan of the Borrower on a day other than the last day of the Interest Period for such Loan; or

(b)      any failure by the Borrower to prepay, borrow, continue or convert any Eurocurrency Rate Loan of the Borrower on the date or in the amount notified by the Borrower;

including any loss or expense (excluding loss of anticipated profits) arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Eurocurrency Rate Loan made by it at the Eurocurrency Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Eurocurrency Rate Loan was in fact so funded.

**Section 3.06      Matters Applicable to All Requests for Compensation**.   (a)    ~~Any~~The Administrative Agent or any Lender claiming compensation under this Article III shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error.  In determining such amount, ~~such~~the Administrative Agent or such Lender may use any reasonable and customary averaging and attribution methods.

(b)      With respect to any Lender's claim for compensation under Section 3.02, 3.03 or 3.04, the Borrower shall not be required to compensate such Lender for any amount incurred if such Lender notifies the Borrower of the event that gives rise to such claim more than 180 days after such event; *provided*, that if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  If any Lender requests compensation by the Borrower under Section 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another applicable Eurocurrency Rate Loan, or, if applicable, to convert Base Rate Loans into Eurocurrency Rate Loan, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(c) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

64

(c)    If the obligation of any Lender to make or continue any Eurocurrency Rate Loan, or to convert Base Rate Loans into Eurocurrency Rate Loans shall be suspended pursuant to Section 3.06(b) hereof, such Lender's applicable Eurocurrency Rate Loans shall be automatically converted into Base Rate Loans (or, if such conversion is not possible, repaid) on the last day(s) of the then current Interest Period(s) for such Eurocurrency Rate Loans (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to such conversion no longer exist:

(i)    to the extent that such Lender's Eurocurrency Rate Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's applicable Eurocurrency Rate Loans shall be applied instead to its Base Rate Loans; and

(ii)    all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as Eurocurrency Rate Loans shall be made or continued instead as Base Rate Loans (if possible), and all Base Rate Loans of such Lender that would otherwise be converted into Eurocurrency Rate Loans shall remain as Base Rate Loans.

(d)    If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of any of such Lender's Eurocurrency Rate Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurocurrency Rate Loans made by other Lenders are outstanding, if applicable, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurocurrency Rate Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurocurrency Rate Loans and by such Lender are held *pro rata* (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Term Loans.

**Section 3.07    Replacement of Lenders under Certain Circumstances**.  (a)  If at any time (i) the Borrower becomes obligated to pay additional amounts or indemnity payments described in Section 3.01 or 3.04 as a result of any condition described in such Sections or any Lender ceases to make any Eurocurrency Rate Loans as a result of any condition described in Section 3.02 or 3.04 or requires the Borrower to pay additional amounts as a result thereof, (ii) any Lender becomes a Defaulting Lender or (iii) any Lender becomes a Non-Consenting Lender, then the Borrower may, on five (5) Business Days' prior written notice to the Administrative Agent and such Lender, (x) replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.07(b) (so long as the assignment fee is paid by the Borrower in such instance) all of its rights and obligations under this Agreement to one or more Eligible Assignees; *provided* that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person; *provided*, *further*, that (A) in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments and (B) in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to, and shall be sufficient (together with all other consenting Lenders) to cause the adoption of, the applicable departure, waiver or amendment of the Loan Documents; or (y) in the case of a Lender, repay (in Dollars) all Obligations of the Borrower due and owing to such Lender relating to the Loans held by such Lender as of such termination date; *provided* that in the case of any such termination of a Non-Consenting Lender such termination shall be sufficient (together with all other consenting Lenders after giving effect hereto) to cause the adoption of the applicable departure, waiver or amendment of the Loan Documents.

(b)    Any Lender being replaced pursuant to Section 3.07(a) above shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's applicable outstanding Loans, and (ii) deliver any Notes evidencing such Loans to the Borrower or the Administrative Agent.  Pursuant to such

65

Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's outstanding Loans, (B) all obligations of the Borrower owing to the assigning Lender relating to the Loans so assigned shall be paid in full by the assignee Lender to such assigning Lender concurrently with such Assignment and Assumption and (C) upon such payment and, if so requested by the assignee Lender, delivery to the assignee Lender of the appropriate Note or Notes executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender.  In connection with any such replacement, if any such Lender does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within five Business Days of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Lender, then such Lender shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Lender and the Administrative Agent shall be entitled (but not obligated) to execute and deliver such Assignment and Assumption and/or such other documentation on behalf of such Lender.

(c)    [Reserved].

(d)    In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each affected Lender in accordance with the terms of Section 10.01 or all the Lenders and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

Section 3.08    **Survival**.  All the Loan Parties' obligations under this Article III shall survive repayment of all other Obligations hereunder.

## ARTICLE IV
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01    **Conditions to Initial Credit Extension**.  The obligation of each Lender to make a Credit Extension hereunder on the Closing Date is subject to satisfaction (or waiver) of the following conditions precedent:

(a)    The Administrative Agent's receipt of the following, each of which shall be original, .pdf or facsimile copies or delivered by other electronic method (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party each in form and substance reasonably satisfactory to the ~~Administrative Agent and the~~ Required Lenders:

(i)    ~~a Committed Loan Notice in accordance with the requirements hereof;~~

(i)    [reserved];

(ii)    executed counterparts of this Agreement;

(iii)    a Note executed by the Borrower in favor of each Lender that has requested a Note at least two Business Days in advance of the Closing Date;

(iv)    a copy of the Organization Documents in relation to each Loan Party;

(v)    the Security Agreement, the Intercreditor Agreement, each other Collateral Document and each other document set forth on Schedule 4.01(a) required to be executed on the Closing Date as indicated on such schedule, duly executed by each Loan Party thereto, together with:

66

(A)      subject to Section 6.20, certificates, if any, representing the Pledged Equity referred to therein accompanied by undated stock powers executed in blank and instruments, if any, evidencing the Pledged Debt endorsed in blank; and

(B)      proper financing statements (Form UCC-1 or the equivalent) naming each Loan Party for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary to perfect the security interests purported to be created by the foregoing Security Agreement;

(vi)      such certificates of good standing (to the extent such concept exists) from the applicable secretary of state of the state of organization of each Loan Party, certificates of resolutions or other corporate or limited liability company action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party and resolutions of the board of directors, board of managers or members of each Loan Party (in each case, as appropriate or applicable) as the Administrative AgentRequired Lenders may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date;

(vii)      an opinion from (x) Kirkland & Ellis LLP, counsel to the Loan Parties, and (y) [●], localthe general counsel, or other appropriate attorney, of the Borrower with respect to any Loan Party covering opinions not included in Nevada, and (z) [●], local counsel in Pennsylvania,the opinion provided pursuant to the foregoing clause (x) as to certain customary organizational items (including, for the avoidance of doubt, that the entry by such Loan Party into the Loan Documents to which it is a party does not conflict with such Loan Party's Organizational Documents and the requirements of Laws), in each case in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders; and

(viii)      a solvency certificate from the chief financial officer, chief accounting officer or other officer with equivalent duties of the Borrower (immediately after giving effect to the Transactions) substantially in the form attached hereto as Exhibit D.

(b)      All fees and expenses required to be paid hereunder (and, with respect to expenses, invoiced at least three Business Days before the Closing Date) shall have been paid, including fees pursuant to any Agent Fee Letter, the fees of Weil, Gotshal & Manges LLP, as counsel to the Lenders, Shipman & Goodwin LLP, as counsel to the Administrative Agent, and all reasonable out-of-pocket expenses payable on the Closing Date.

(c)      Prior to or substantially concurrently with the initial Borrowing on the Closing Date, (i) all Existing Debt shall have been extinguished in accordance with the Prepackaged Plan; (ii) the Loan Parties shall have entered into, and provided executed copies of, the ABL Loan Documents providing for the ABL Loans (A) with availability as of the Closing Date of at least $20,000,000 after giving effect to any amount of Existing Letters of Credit backstopped or otherwise included in such ABL Loan Documents and (B) with aggregate commitments of not less than $30,000,000 and (iv) the Loan Parties shall have entered into, and provided executed copies of, the Second Lien Loan Documents providing for the Second Lien Term Loans in an aggregate principal amount equal to $50,000,000, in the case of clause (ii) and (iii) above, in form and substance reasonably satisfactory to the Required Lenders.

(d)      Since the Petition Date, other than by virtue of the Chapter 11 Cases, the events and conditions related, resulting from, and/or leading up thereto and the effects thereon and any action required to be taken under the Loan Documents, there shall not have occurred any development or event, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

67

(e)     No Default or Event of Default shall exist or would result from the consummation of the Transactions.

(f)     The Administrative Agent shall have received the Annual Financial Statements and the Quarterly Financial Statements (it being understood the Administrative Agent hereby acknowledges receipt thereof).

(g)     The Lenders shall have received the Pro Forma Financial Statements.

(h)     The Administrative Agent shall have received at least three Business Days prior to the Closing Date all documentation and other information about the Borrower and the Guarantors required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act that has been requested by the Administrative Agent in writing at least 10 days prior to the Closing Date.

(i)     The representations and warranties of each Loan Party set forth in Article V and in each other Loan Document shall be true and correct in all material respects on and as of the Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; *provided* that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(j)     At all times prior to the Closing Date, the Borrower shall have used commercially reasonable efforts to obtain ratings for this Agreement and the Second Lien Credit Agreement from at least two of Moody's, S&P and Fitch.

(k)     Upon consummation of the Transactions, the Lenders shall own at last 90% of the common equity of Holdings (subject to dilution pursuant to any warrants issued pursuant to the Warrant Agreement (as defined in the Prepackaged Plan) and any management incentive plan.

(l)     The Bankruptcy Court shall have entered the Confirmation Order, which order shall (a) approve, among other things, the Transactions, (b) be in form and substance reasonably acceptable to the Required Lenders and consistent in all respects with the Restructuring Support Agreement, (c) not be subject to any stay or be reversed, vacated, amended or otherwise modified in any respect and (d) all covenants and conditions of the Prepackaged Plan (other than the effectiveness of this Agreement, the Second Lien Credit Agreement and the ABL Credit Agreement) shall have been satisfied or waived in accordance with the terms thereof.

(m)     The Restructuring Support Agreement shall not have been terminated and remains in full force and effect.

Without limiting the generality of the provisions of Section 9.03(e), for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

68

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Each Holdco, the Borrower and each of the Subsidiary Guarantors party hereto represent and warrant to the Administrative Agent and the Lenders on the Closing Date that:

**Section 5.01    Existence, Qualification and Power; Compliance with Laws**.  Each Loan Party and each Subsidiary that is a Material Subsidiary (a) is a Person duly organized, incorporated or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation, organization or formation to the extent such concept exists in such jurisdiction, (b) has all requisite organizational power and authority to, in the case of the Loan Parties, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (where relevant) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, orders, writs and injunctions and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case, referred to in clauses (c), (d) or (e), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**Section 5.02    Authorization; No Contravention**.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the Transactions, (a) have been duly authorized by all necessary corporate or other organizational action, and (b) do not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by Section 7.01), or require any payment to be made under (x) any Contractual Obligation to which such Person is a party or by which it or any of its property or assets is bound or (y) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any Law; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clauses (ii) and (iii), to the extent that such violation, conflict, breach, contravention or payment could not reasonably be expected to have a Material Adverse Effect.

**Section 5.03    Governmental Authorization; Other Consents**.  No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) approval, consent, exemption, authorization, or other action by, or notice to, or filing necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties (or release existing Liens) under applicable U.S. law, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement) and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect.

**Section 5.04    Binding Effect**.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is a party thereto.  This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is a party thereto in accordance with its terms, except as such enforceability may be limited by (i) Debtor Relief Laws and by general principles of equity, (ii)  the need for filings and registrations necessary to create or perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties and (iii) the effect of foreign Laws, rules and regulations as they relate to the granting of security interests in assets

69

of, pledges of Equity Interests in or Indebtedness owed by Foreign Subsidiaries (clauses (i), (ii) and (iii), the "**Enforcement Qualifications**").

Section 5.05 **Financial Statements; No Material Adverse Effect**. (a) The Annual Financial Statements and the Quarterly Financial Statements fairly present in all material respects the financial condition of the Company and its Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (A) except as otherwise expressly noted therein and (B) subject, in the case of the Quarterly Financial Statements, to changes resulting from normal year-end adjustments and the absence of footnotes.

(b) The unaudited *pro forma* consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as of the last day of the 12-month period ending on the last day of the most recently completed four-fiscal quarter period ended at least 45 days (or 105 days if such four-fiscal quarter period is the end of the Company's fiscal year) prior to the Closing Date, prepared after giving effect to the Transactions as if the Transactions had occurred as of such date (including the notes thereto) (the "**Pro Forma Balance Sheet**") and the unaudited *pro forma* consolidated statement of income of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries for the 12-month period ended at least 45 days (or 105 days if such four-fiscal quarter period is the end of the Company's fiscal year) prior to the Closing Date, prepared after giving effect to the Transactions as if the Transactions had occurred at the beginning of such period and any other adjustments reasonably acceptable to the ~~Administrative Agent~~Required Lenders (together with the Pro Forma Balance Sheet, the "**Pro Forma Financial Statements**"), copies of which have heretofore been furnished to the Administrative Agent, have been prepared based on the Annual Financial Statements and the Quarterly Financial Statements and have been prepared in good faith, based on assumptions believed by the Borrower to be reasonable as of the date of delivery thereof and adjustment as agreed by the Borrower, and present fairly in all material respects on a *pro forma* basis the estimated financial position of the Borrower and its Subsidiaries as at the Closing Date and their estimated results of operations for the period covered thereby; *provided* that no such *pro forma* financial statement shall be required to include adjustments for purchase accounting (including adjustments of the type contemplated by Financial Account Standards Board Accounting Standards Codification 805, Business Combinations (formerly SFAS 141R)).

(c) Since the Closing Date, there has been no event, circumstance or change, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

Section 5.06 **Litigation**. There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any Subsidiary or against any of their properties or revenues that have a reasonable likelihood of adverse determination and such determination, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.07 **Ownership of Property; Liens**. The Borrower and each of its Subsidiaries has good record title to, or valid leasehold interests in, or easements or other limited property interests in, all Real Property necessary in the ordinary conduct of its business, free and clear of all Liens, except (a) as set forth on Schedule 5.07, (b) minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes, (c) Liens permitted by Section 7.01 and (d) where the failure to have such title could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.08 **Environmental Matters**. Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a) Each Loan Party and its respective properties and operations are and have been in compliance with all Environmental Laws, which includes obtaining and maintaining

70

all applicable Environmental Permits required under such Environmental Laws to carry on the business of the Loan Parties;

(b)      the Loan Parties have not received any written notice that alleges any of them is in violation of or potentially liable under any Environmental Laws, and none of the Loan Parties nor any of the Real Property is the subject of any claims, investigations, liens, demands, or judicial, administrative or arbitral proceedings pending or, to the knowledge of the Borrower, threatened in writing, under any Environmental Law or to revoke or modify any Environmental Permit held by any of the Loan Parties;

(c)      there has been no Release of Hazardous Materials on, at, under or from any Real Property or facilities owned, operated or leased by any of the Loan Parties, or, to the knowledge of the Borrower, Real Property formerly owned, operated or leased by any Loan Party or arising out of the conduct of the Loan Parties that could reasonably be expected to require investigation, remedial activity or corrective action or cleanup or could reasonably be expected to result in the Borrower or any of its Subsidiaries incurring liability under any Environmental Laws; and

(d)      there are no facts, circumstances or conditions arising out of or relating to the operations of the Loan Parties or Real Property or facilities owned, operated or leased by any of the Loan Parties or, to the knowledge of the Borrower, Real Property or facilities formerly owned, operated or leased by the Loan Parties that could reasonably be expected to result in the Borrower or any of its Subsidiaries incurring liability under any Environmental Laws.

The representations and warranties contained in this Section 5.08 are the sole and exclusive representations and warranties of the Borrower, the Holdcos and the Subsidiary Guarantors with respect to matters arising under or relating to Environmental Laws, Environmental Permits, Environmental Liabilities or Hazardous Materials.

Section 5.09    Taxes.  Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each of the Loan Parties and their Subsidiaries have timely filed all tax returns required to be filed, and have paid all Taxes levied or imposed upon them or their properties, income, profits or assets, that are due and payable (including in their capacity as a withholding agent), except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.  To the knowledge of the Loan Parties, there is no proposed Tax deficiency or assessment against the Loan Parties or their Subsidiaries that, if made would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 5.10    ERISA Compliance.  (a)    Except as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with its terms, the applicable provisions of ERISA, the Code and other Federal or state Laws.

(b)      (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) neither any Loan Party, Subsidiary nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due but not delinquent under Section 4007 of ERISA); (iii) neither any Loan Party, Subsidiary nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (iv) neither any Loan Party, Subsidiary nor any ERISA Affiliate has engaged in a transaction that could reasonably be expected to be subject to Sections 4069 or 4212(c) of ERISA; except, with respect to each of the foregoing clauses of this Section 5.10(b), as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

71

**Section 5.11** **Subsidiaries; Equity Interests**.  As of the Closing Date (after giving effect to the Transactions), no Loan Party has any Subsidiaries other than those specifically disclosed on Schedule 5.11, and all of the outstanding Equity Interests owned by the Loan Parties (or a Subsidiary of any Loan Party) in such  Subsidiaries have been validly issued and are fully paid and all Equity Interests owned by a Loan Party (or a Subsidiary of any Loan Party) in such Subsidiaries are owned free and clear of all Liens except (i) those created under the Collateral Documents, under the ABL Loan Documents (which Liens shall be subject to the Intercreditor Agreement) or under the Second Lien Loan Documents (which Liens shall be subject to the Intercreditor Agreement) and (ii) any Lien that is permitted under Section 7.01.  As of the Closing Date, Schedules 1 and 9 of the Perfection Certificate (a) set forth the name and jurisdiction of each Domestic Subsidiary that is a Loan Party, (b) set forth the ownership interest of the Borrower and any other Subsidiary thereof in each Subsidiary, including the percentage of such ownership and (c) identify each Subsidiary that is a Subsidiary the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

**Section 5.12** **Margin Regulations; Investment Company Act**.  (a)  The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation T, U or X of the Board of Governors of the United States Federal Reserve System.

(b)  None of the Holdcos, the Borrower or any of the Subsidiaries is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**Section 5.13** **Disclosure**.  No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party (other than projected financial information, *pro forma* financial information, budgets, estimates and information of a general economic or industry nature) to ~~any~~the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were made, not materially misleading.  With respect to projected financial information and *pro forma* financial information, the Borrower represents that such information was prepared in good faith based upon assumptions believed to be reasonable at the time furnished, it being understood that such projected financial information and *pro forma* financial information are not to be viewed as facts or as a guarantee of performance or achievement of any particular results and that actual results may vary from such forecasts and that such variations may be material and that no assurance can be given that the projected results will be realized.

**Section 5.14** **Labor Matters**.  Except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against the Borrower or any of its Subsidiaries pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of the Borrower or any of its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with such matters; and (c) all payments due from the Borrower or any of its Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant party.

**Section 5.15** **Intellectual Property; Licenses, Etc**.  Each of the Borrower and the Subsidiaries owns, licenses, possesses or otherwise has the right to use all of the trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, technology, software, know-how database rights, design rights and other intellectual property rights (collectively, "**IP Rights**") that are reasonably necessary for the operation of its businesses as currently conducted, except to the extent the failure to own, license, possess or otherwise have the right to use such IP Rights, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  To the knowledge of the Borrower, the Borrower and the Subsidiaries' present business operations do not infringe upon any IP Rights held by any Person except for

72

such infringements, individually or in the aggregate, which could not reasonably be expected to have a Material Adverse Effect.  No claim or litigation regarding IP Rights is pending or, to the knowledge of the Borrower, threatened, against any Loan Party or any of the Subsidiaries, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

As of the Closing Date, all registrations material to the Loan Parties' business under the name of each Loan Party listed on Schedule 11 of the Perfection Certificate are valid and in full force and effect.

**Section 5.16**     **Solvency**.  On the Closing Date, after giving effect to the Transactions, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

**Section 5.17**     **[Reserved]**.

**Section 5.18**     **USA Patriot Act; OFAC; FCPA**.  (a)  To the extent applicable, each Loan Party and any Subsidiary is, and for the past five years has been, in compliance with (i) the Trading with the Enemy Act, as amended, and Sanctions, (ii) the USA Patriot Act and (iii) the FCPA.

(b)     No Loan Party, no Subsidiary and no director, officer, employee, agent or any other Person acting for or on behalf of any of the foregoing is a Sanctioned Person; and no Loan Party and no Subsidiary will use the proceeds of the Loans or otherwise make available, directly or indirectly, such proceeds to a Sanctioned Person.

(c)     No part of the proceeds of the Loans will be used, directly or indirectly by any Loan Party or any Subsidiary for any payments to or for the benefit of any governmental official or employee, political party, official of a political party, candidate for political office, public international organization official or employee or anyone else acting in an official capacity, in order to obtain, retain or direct business, influence any act or decision or the omission of any act or decision, or obtain any improper advantage, in violation of the FCPA.

(d)     Each Loan Party and each Subsidiary is subject to policies, procedures and internal controls designed to reasonably ensure compliance with Sanctions, the FCPA and all other applicable anti-bribery laws.

**Section 5.19**     **Security Documents**.  Except as otherwise contemplated hereby or under any other Loan Documents, the provisions of the Collateral Documents are effective to create in favor of the Administrative Agent for the benefit of the Secured Parties legal, valid and enforceable Liens on, and security interests in, the Collateral and, (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable Laws (which filings or recordings shall be made to the extent required by any Collateral Document) and (ii) upon the taking of possession or control by the Administrative Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent required by any Collateral Document), such Collateral Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral, in each case subject to no Liens other than the applicable Liens permitted under the Loan Documents, a legal, valid, enforceable and perfected Lien (if and to the extent perfection may be achieved by the filings and/or other actions required to be taken hereby or by the applicable Collateral Documents) on all right, title and interest of the respective Loan Parties in the Collateral described therein subject to the Enforcement Qualifications and Liens permitted by Section 7.01.

Notwithstanding anything herein (including this Section 5.19) or in any other Loan Document to the contrary, neither the Borrower nor any other Loan Party makes any representation or warranty as to (A) the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest (other than with respect to those pledges and security interests made under the Laws of the jurisdiction of formation of the applicable Foreign Subsidiary) in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of the Administrative Agent or any Lender with respect thereto, in each case under foreign

<div align="center">73</div>

Law, (B) the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest to the extent such pledge, security interest, perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or (C) on the Closing Date and until required pursuant to Section 6.11, 6.13 or 4.01(a)(v), the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or enforceability of any pledge or security interest to the extent not required on the Closing Date pursuant to Section 4.01(a)(v).

**Section 5.20    EEA Financial Institutions**. None of the Holdcos, the Borrower or any Subsidiary thereof is an EEA Financial Institution.

**Section 5.21    Beneficial Ownership Certification**.  As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

<div align="center">

**ARTICLE VI**
**AFFIRMATIVE COVENANTS**

</div>

So long as any Lender shall have any Loan or other Obligation (other than contingent obligations not yet due and owing as to which no claim has been asserted), hereunder which is accrued and payable which remains unpaid or unsatisfied, then from and after the Closing Date, Holdings and Intermediate Holdings (solely in the case of Sections 6.01, 6.02, 6.04, 6.05, 6.06, 6.08, 6.09, 6.10, 6.11, 6.13, 6.19, 6.20 and 6.21) and the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of its respective Subsidiaries to:

**Section 6.01    Financial Statements**.  (a)  Commencing with the fiscal year ended December 31, 2020, deliver to the Administrative Agent for prompt further distribution to each Lender, within 90 days after the end of each fiscal year, a consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail (together with, in all cases, a management discussion and analysis with respect thereto) and prepared in accordance with GAAP, audited and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing or other independent registered public accounting firm approved by the ~~Administrative Agent~~Required Lenders (such consent not to be unreasonably withheld, delayed or conditioned), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification (other than related (i) solely to the occurrence of the Maturity Date or the upcoming maturity date under the ABL Credit Agreement or the Second Lien Credit Agreement, in each case, occurring within one year from the date such report is delivered or (ii) any potential inability to satisfy any financial maintenance covenant on a future date or in a future period) or any qualification or exception as to the scope of such audit except for qualifications relating to changes in accounting principles or practices reflecting changes in GAAP and required or approved by such independent certified public accountants;

(b)    Deliver to the Administrative Agent for prompt further distribution to each Lender, ~~(i)~~ within ~~35~~45 days (or 75 days in the case of the first full fiscal quarter following the Closing Date) after the end of each fiscal quarter of each fiscal year of Holdings, a consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as at the end of such fiscal quarter and the related (x) consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (y) consolidated statements of cash flows for such fiscal quarter and the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail together with, in all cases, a management discussion and analysis with respect thereto) and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes~~, and (ii) within 45 days (or 75 days in the case of the first fiscal quarter following the~~

<div align="center">74</div>

~~Closing Date) after the end of each fiscal quarter of each fiscal year of Holdings, management discussion and analysis with respect to the information delivered pursuant to the foregoing clause (i);~~; and

(c)      Deliver to the Administrative Agent, for prompt further distribution to each Lender, within 35 days (or 45 days in the case of the first three such months following the Closing Date) after the end of (i) the period beginning on the Closing Date through September 30, 2020 and (ii) thereafter, each of the first two months in any fiscal quarter of Holdings, an unaudited consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries at the end of such month and the related unaudited consolidated statements of cash flows as of and for such month and the portion of the fiscal year then ended, setting forth in each case, in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail; and

(d)      Deliver to the Administrative Agent for prompt further distribution to each Lender, no later than 90 days after the end of the fiscal year ending December 31, 2020 and each subsequent fiscal year, a reasonably detailed consolidated budget for the following fiscal year on a quarterly basis (including a projected consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as of the end of the following fiscal year, the related consolidated statements of projected cash flow and projected income and a summary of the material underlying assumptions applicable thereto) (collectively, the "**Projections**").

Notwithstanding the foregoing, the obligations in Sections 6.01(a) and (b) may be satisfied with respect to financial information of Holdings, Intermediate Holdings, the Borrower and the Subsidiaries by furnishing (I) the applicable financial statements of Holdings (or any direct or indirect parent, as applicable, of Holdings) or (II) the Form 10-K or 10-Q of Holdings (or any direct or indirect parent of Holdings), as applicable filed with the SEC; *provided* that, with respect to clauses (I) and (II), (i) to the extent such information relates to a parent of Holdings, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent, on the one hand, and the information relating to Holdings, Intermediate Holdings, the Borrower and the Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under Section 6.01(a), such materials are accompanied by a report and opinion of Deloitte & Touche LLP or any other independent registered public accounting firm of nationally recognized standing or other independent registered public accounting firm approved by the ~~Administrative Agent~~Required Lenders (such consent not to be unreasonably withheld, delayed or conditioned), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going-concern" or like qualification (other than related (i) solely to the occurrence of the Maturity Date or the upcoming maturity date under the ABL Credit Agreement or the Second Lien Credit Agreement, in each case, occurring within one year from the date such report is delivered or (ii) any potential inability to satisfy any financial maintenance covenant on a future date or in a future period) or exception or any qualification or exception as to the scope of such audit except for qualifications relating to changes in accounting principles or practices reflecting changes in GAAP and required or approved by such independent certified public accountants.

Any financial statement required to be delivered pursuant to Section 6.01(a) or 6.01(b) shall not be required to include purchase accounting adjustments relating to the Transactions or any Permitted Acquisition to the extent it is not practicable to include them.

Documents required to be delivered pursuant to Sections 6.01 and 6.02(a) through (d) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower (or any direct or indirect parent of the Borrower) posts such documents, or provides a link thereto on the website on the Internet at the website address listed on Schedule 10.02(a); or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that (x) ~~upon written request by the Administrative Agent~~promptly following such posting, the Borrower shall deliver paper copies of such documents to the Administrative

75

Agent for further distribution to each Lender ~~until a written request to cease delivering paper copies is given by the Administrative Agent~~ and (y) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "**Borrower Materials**") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive Material Non-Public Information and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC**,**" the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any Material Non-Public Information (although it may be sensitive and proprietary) (*provided*, *however*, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.08); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."  Notwithstanding the foregoing, the Borrower shall be under no obligation to mark any Borrower Materials "PUBLIC".

**Section 6.02    Certificates; Other Information**.  Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)     concurrently the delivery of the financial statements referred to in Sections 6.01(a) and (b), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower;

(b)     promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which Holdings, Intermediate Holdings, the Borrower or any Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 6.02;

(c)     promptly after the furnishing thereof, copies of any material written notices received by any Loan Party (other than in the ordinary course of business) or material statements or material reports furnished to any holder of debt securities (other than in connection with any board observer rights) of any Loan Party or of any of its Subsidiaries pursuant to the terms of any ABL Loan Document or Second Lien Loan Document and, in each case, not otherwise required to be furnished to the Lenders pursuant to any other clause of Section 6.01, 6.02 or 6.03;

(d)     together with the delivery of each Compliance Certificate pursuant to Section 6.02(a), (i) in the case of annual Compliance Certificates only, a report setting forth

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

the legal name and the jurisdiction of formation of each Loan Party and the location of the chief executive office of each Loan Party on the Perfection Certificate or confirming that there has been no change in such information since the Closing Date or the date of the last such report; (ii) a description of each event, condition or circumstance during the last fiscal quarter or fiscal year covered by such Compliance Certificate requiring a mandatory prepayment under Section 2.05(b) (to the extent notice of such event has not been previously furnished to the Administrative Agent) and (iii) a list of each Subsidiary of the Borrower that identifies each Subsidiary as of the date of delivery of such Compliance Certificate (to the extent that there have been any changes in the identity or status as a Subsidiary of any such Subsidiaries since the Closing Date or the most recent list provided);

(e)        [reserved]; and

(f)        promptly, such additional information regarding the business, legal, financial or corporate affairs of the Loan Parties or any of their respective Subsidiaries, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request.

In no event shall the requirements set forth in Section 6.02(f) require Holdings, Intermediate Holdings, the Borrower or any of its Subsidiaries to provide any such information which (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or (iii) is subject to attorney-client or similar privilege or constitutes attorney work-product.

**Section 6.03    Notices**.  Promptly (and in the case of clause (a) below, not later within three (3) Business Days) after a Responsible Officer of the Borrower or any Subsidiary Guarantor has obtained knowledge thereof, notify the Administrative Agent:

(a)        Of the occurrence of any Default or Event of Default;

(b)        of the occurrence of an ERISA Event which could reasonably be expected to result in a Material Adverse Effect;

(c)        of the filing or commencement of, or any threat or notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority against the Borrower or any of its Subsidiaries that would reasonably be expected to result in a Material Adverse Effect;

(d)        of the occurrence of any other matter or development that has had or could reasonably be expected to have a Material Adverse Effect; and

(e)        of any change in the information provided in any certification regarding beneficial ownership as required by 31 C.F.R. § 1010.230 that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification.

Each notice pursuant to this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of the Borrower delivered to the Administrative Agent for prompt further distribution to each Lender (x) that such notice is being delivered pursuant to Section 6.03(a), (b), (c) or (d) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

**Section 6.04      Payment of Taxes**.  Pay, discharge or otherwise satisfy as the same shall become due and payable in the normal conduct of its business, all its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (a) any such Tax is being contested in good faith and by appropriate proceedings for which appropriate reserves have been established in accordance with GAAP or (b) the failure to pay or discharge the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 6.05      Preservation of Existence, Etc**.  (a)  Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization; and

(b)      take all reasonable action to maintain all rights, privileges (including its good standing where applicable in the relevant jurisdiction), permits, authorizations, licenses and franchises necessary or desirable in the normal conduct of its business;

except, in the case of Section 6.05(a) (other than with respect to the Borrower) or this Section 6.05(b), to the extent (i) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (ii) pursuant to any merger, consolidation, liquidation, dissolution or Disposition permitted by Article VII.

**Section 6.06      Maintenance of Properties**.  Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and fire, casualty or condemnation excepted.

**Section 6.07      Maintenance of Insurance**.  (a) Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Subsidiaries) as are customarily carried under similar circumstances by such other Persons.  Not later than 30 days after the Closing Date (or the date any such insurance is obtained, in the case of insurance obtained after the Closing Date) (in each case, or such later date as the ~~Administrative Agent~~Required Lenders may agree in ~~its~~their sole discretion), each such policy of insurance (other than ~~business interruption insurance (if any),~~ director and officer insurance and worker's compensation insurance) shall as appropriate (i) name the Administrative Agent as additional insured thereunder or (ii) in the case of each casualty insurance policy, contain a lender loss payable clause or endorsement that names the Administrative Agent, on behalf of the Lenders, as lender loss payee or mortgagee thereunder.  If the improvements on any Mortgaged Property are at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then, to the extent required by applicable Flood Insurance Laws, the Borrower shall, or shall cause each Loan Party to, (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount reasonably satisfactory to the ~~Administrative Agent~~Required Lenders and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) upon the reasonable request of the Administrative Agent at the direction of the Required Lenders (not to exceed one time per fiscal year, unless an Event of Default has occurred and is continuing) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the ~~Administrative Agent~~Required Lenders.

(b) Give the Administrative Agent prompt notice of any loss exceeding $500,000 covered by the casualty or business interruption insurance of any Loan Party or its Subsidiaries.  Upon the occurrence and during the continuance of an Event of Default and subject to the Intercreditor Agreement, the Administrative Agent (at the direction of the Required Lenders) shall have the sole right (but not the obligation) to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and

78

give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

Section 6.08   **Compliance with Laws**.  Comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except if the failure to comply therewith could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.09   **Books and Records**.  Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP and which reflect all material financial transactions and matters involving the assets and business of the Borrower or a Subsidiary, as the case may be (it being understood and agreed that certain Foreign Subsidiaries maintain individual books and records in conformity with generally accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder).

Section 6.10   **Inspection Rights**.   Permit representatives and independent contractors of the Administrative Agent (on its own behalf or acting on behalf of the Lenders) to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that, only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.10 and the Administrative Agent shall not exercise such rights more often than one time during any calendar year and such time shall be at the Borrower's expense; *provided*, *further*, that during the continuation of an Event of Default, the Administrative Agent (or any of its respective representatives or independent contractors), on behalf of the Lenders, may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.

Notwithstanding anything to the contrary in this Section 6.10, none of Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (c) is subject to attorney-client or similar privilege or constitutes attorney work product.

Section 6.11   **Additional Collateral; Additional Guarantors**.   At the Borrower's expense, subject to the terms, conditions and provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(a)   Upon the formation or acquisition of any new direct or indirect wholly owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) by any Loan Party or the designation in accordance with Section 6.14 of any existing direct or indirect wholly owned Material Domestic Subsidiary as a Subsidiary (in each case, other than an Excluded Subsidiary) or any Subsidiary becoming a wholly owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) or any Excluded Subsidiary ceasing to be an Excluded Subsidiary:

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

(i)      within 45 days after such formation, acquisition, designation or occurrence or such longer period as the ~~Administrative Agent~~Required Lenders may agree in writing in ~~its~~their discretion:

(A)      cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Administrative Agent,  a Joinder Agreement to become a Guarantor under this Agreement, Security Agreement Supplements, Intellectual Property Security Agreements, and other security agreements and documents as reasonably requested by and in form and substance reasonably satisfactory to the ~~Administrative Agent~~Required Lenders (consistent with ~~the Mortgages,~~ Security Agreement, Intellectual Property Security Agreements and other security agreements in effect on the Closing Date), in each case granting Liens required by the Collateral and Guarantee Requirement;

(B)      cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement (and the parent of each such Domestic Subsidiary that is the Borrower or a Guarantor) to deliver any and all certificates representing Equity Interests (to the extent certificated) and intercompany notes constituting negotiable instruments (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and instruments evidencing Indebtedness held by such Material Domestic Subsidiary and required to be delivered pursuant to the Collateral and Guarantee Requirement ~~i~~endorsed in blank to the Administrative Agent;

(C)      take and cause such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement and each direct or indirect parent of such Material Domestic Subsidiary to take whatever action (including the recording of Mortgages, the filing of UCC financing statements and delivery of stock and membership interest certificates) as may be necessary in the reasonable opinion of the Administrative Agent (at the direction of the Required Lenders) to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and perfected Liens to the extent required by the Collateral and Guarantee Requirement, and to otherwise comply with the requirements of the Collateral and Guarantee Requirement;

(D)      if requested by the Administrative Agent or the Required Lenders, deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the Lenders, of counsel for the Loan Parties reasonably acceptable to the ~~Administrative Agent~~Required Lenders as to such matters set forth in this Section 6.11(a) as the ~~Administrative Agent~~Required Lenders may reasonably request; (or otherwise consistent with the opinions delivered on the Closing Date);

(ii)      as promptly as practicable after the request therefor by the Administrative Agent, deliver to the Administrative Agent with respect to each Material Real Property, any existing title reports, abstracts or environmental assessment reports, to the extent available and in the possession or control of a Loan Party; *provided*, *however*, that there shall be no obligation to deliver to the Administrative Agent any environmental assessment report whose disclosure to the Administrative Agent would require the consent of a Person other than a Loan Party or one of its Subsidiaries, where, despite the commercially reasonable efforts of the Borrower to obtain such consent, such consent cannot be obtained; and

(iii)      if reasonably requested by the Administrative Agent or the Required Lenders, deliver to the Administrative Agent any other items necessary from time to time to

80

satisfy the Collateral and Guarantee Requirement with respect to perfection and existence of security interests with respect to property of any Guarantor (and the direct parent of each such Guarantor) acquired after the Closing Date and subject to the Collateral and Guarantee Requirement, but not specifically covered by preceding clauses (i), (ii) or (iii) or Section 6.11(b) below.

(b)    Not later than 120 days (or such longer period as the ~~Administrative Agent~~Required Lenders may agree in writing in ~~its~~their discretion) after (i) any Material Real Property is acquired by a Loan Party after the Closing Date or (ii) an entity becomes a Loan Party if such entity owns Material Real Property at the time it becomes a Loan Party, cause such Material Real Property, if such property is required to be provided as Collateral pursuant to the Collateral and Guarantee Requirement but is not automatically subject to a Lien pursuant to pre-existing Collateral Documents, to be subject to a Lien and Mortgage in favor of the Administrative Agent for the benefit of the Secured Parties and take, or cause the relevant Loan Party to take, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect or record such Lien, in each case to the extent required by, and subject to the limitations and exceptions of, the Collateral and Guarantee Requirement and to otherwise comply with the requirements of the Collateral and Guarantee Requirement.

(c)    Each Domestic Subsidiary required to be designated as a "Material Domestic Subsidiary" pursuant to the proviso in the definition of "Material Domestic Subsidiary" shall have taken all actions to comply with the provisions of Section 6.11 within the timeframe required by the definition of "Material Domestic Subsidiary".

**Section 6.12    Compliance with Environmental Laws**.  Except, in each case, to the extent that the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, comply, and take all commercially reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply, with all Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and occupancy of its properties; and, in each case to the extent the Loan Parties are required to do so by Environmental Laws, conduct any investigation, remedial or other corrective action necessary to address Hazardous Materials at any property or facility in accordance with Environmental Laws.  If an Event of Default arising out of an Environmental Liability has occurred and is continuing, within 60 days of receiving a written request by the Administrative Agent~~,~~ (at the direction of the Required Lenders), the Borrower will provide the Administrative Agent with an environmental assessment report regarding the scope of the Environmental Liability and the likely cost of mitigating such Environmental Liability, prepared at Borrower's sole cost and expense and by an environmental consultant reasonably acceptable to the ~~Administrative Agent.~~Required Lenders.  If such report is not timely provided, the Administrative Agent may have them prepared by an environmental consultant of its choosing, at Borrower's sole cost and expense.

**Section 6.13    Further Assurances**.  Promptly upon reasonable request by the Administrative Agent (i) correct any ~~mutually identified~~ material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as are necessary or that the Administrative Agent may reasonably request from time to time in order to carry out more effectively the purposes of this Agreement and the Collateral Documents, to the extent required pursuant to the Collateral and Guarantee Requirement and subject in all respects to the limitations therein.  If the Administrative Agent or the Required Lenders reasonably determine~~s~~ that it is required by applicable Law to have appraisals prepared in respect of the Real Property of any Loan Party subject to a mortgage constituting Collateral, the Borrower shall promptly provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA.

81

**Section 6.14**      [**Reserved**].

**Section 6.15**      **Ratings**.  If the Borrower has not obtained the ratings contemplated by <u>Section 4.01(j)</u> on or before the Closing Date, the Borrower shall, within 30 days of the Closing Date (or such later date as the Administrative Agent at the direction of the Required Lenders may agree), obtain ratings for the this Agreement and the Second Lien Credit Agreement by at least two (2) of Moody's, S&P and Fitch. After the Borrower obtains the ratings contemplated by the foregoing sentence, the Borrower shall maintain a rating (but not any specific rating) in respect of this Agreement from at least two (2) of Moody's, S&P and Fitch.

**Section 6.16**      **Use of Proceeds**.  Use the proceeds of the Term Loans to finance a portion of the Transactions pursuant to the Prepackaged Plan.

**Section 6.17**      **Lender Meetings**.  To the extent requested by the Administrative Agent or the Required Lenders, participate in a meeting (which may be in the form of a conference call) (including a customary question and answer session) with the Administrative Agent and Lenders once during each fiscal quarter to be held at such time as may be agreed to by the Borrower and the Administrative Agent at the direction of the Required Lenders, but in any event within 15 Business Days of each date that financial statements are required to be delivered pursuant to <u>Section 6.01(b)</u>.

**Section 6.18**      **End of Fiscal Years**.  For financial reporting purposes, cause its fiscal year to end on December 31 (other than any Subsidiary acquired after the Closing Date); *provided*, *however*, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the ~~Administrative Agent~~<u>Required Lenders</u>, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

**Section 6.19**      **Lines of Business**. Holdings, Intermediate Holdings, the Borrower and the Subsidiaries, taken as a whole, will not engage in any material line of business substantially different from those lines of business conducted by Holdings, Intermediate Holdings, the Borrower and the Subsidiaries on the Closing Date or any business reasonably related, complementary, corollary, synergistic or ancillary thereto (including related, complementary, synergistic or ancillary technologies) or reasonable extensions thereof.

**Section 6.20**      **Post-Closing Covenant**. Holdings agrees that it will deliver, or will cause to be delivered, to the Administrative Agent, in form and substance reasonably satisfactory to the ~~Administrative Agent~~<u>Required Lenders</u>, the items described on <u>Schedule 6.20(a)</u> hereof by the times specified with respect to such items, or such later time as the ~~Administrative Agent~~<u>Required Lenders</u> may agree in ~~its~~<u>their</u> reasonable discretion.

**Section 6.21**      **Anti-Terrorism Law; Anti-Money Laundering; Embargoed Persons**.      (a) Conduct its business in such manner so as to not, directly or indirectly, (i) deal in, or otherwise engage in any transaction relating to, a Sanctioned Person or any property or interests in property blocked pursuant to Executive Order No. 13224 on Terrorist Financing effective September 24, 2001 (the "**Executive Order**") or any other law or regulation with respect to exports, terrorism or money laundering ("**Anti-Terrorism Law**"), or (ii) engage in or conspire to engage in any transaction that violates, or attempts to violate, any Anti-Terrorism Law or Sanctions.

(a)      Repay the Loans exclusively with funds that are not derived from any unlawful activity such that the result of any such repayment would not cause the making of the Loans to be in material violation of any applicable Law.

(b)      (x) Use funds or properties of Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries to repay the Loans only to the extent it does not constitute property of, or is beneficially owned directly or indirectly by, a Sanctioned Person or any Person subject trade restrictions under United States law ("**Embargoed Person**") that is identified on (1) the "List of Specially Designated Nationals and Blocked Persons" maintained by OFAC and/or on any other similar list maintained by OFAC

~~WEIL:\97507497\9\10143.0003~~<u>WEIL:\97507497\16\10143.0003</u>

pursuant to any authorizing statute including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Order or any applicable Law promulgated thereunder, with the result that the investment in Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries (whether directly or indirectly) is prohibited by any applicable Law, or the Loans made by the Lenders would be in violation of any applicable Law, or (2) the Executive Order or Sanctions, any related enabling legislation or any other similar Executive Orders or (y) to the knowledge of the Borrower, any Embargoed Person to have any direct or indirect interest, in Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries, with the result that the investment in Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries (whether directly or indirectly) is prohibited by any applicable Law or the Loans are in violation of any applicable Law.

**Section 6.22**    **Account Control Agreements**.  With respect to each deposit account, securities account or other similar account established prior to or on the Closing Date, deliver an Account Control Agreement with respect to each such account (other than any Excluded Accounts) within 30 days after the Closing Date or such later date as the ~~Administrative Agent~~Required Lenders may agree in ~~its~~their sole discretion. With respect to each deposit account, securities account or other similar account (other than any Excluded Accounts) established following the Closing Date, deliver on the date thirty (30) days following the establishment thereof (or such later date agreed to by the ~~Administrative Agent~~Required Lenders in ~~its~~their sole discretion), an Account Control Agreement with respect to each such account. The Administrative Agent's rights with respect to each account subject to an Account Control Agreement shall be governed by such Account Control Agreement. Following the Closing Date, the Borrower shall give the Administrative Agent prompt written notice of the opening of any deposit, securities or other similar account by any Loan Party.

# ARTICLE VII
## NEGATIVE COVENANTS[2]

So long as any Lender shall have any Loan or other Obligation hereunder (other than contingent obligations not yet due and owing as to which no claim has been asserted), then from and after the Closing Date, the Borrower (and, with respect to Section 7.14 only, the Holdcos) shall not and shall not permit any of its Subsidiaries to, directly or indirectly:

**Section 7.01**    **Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens (i) created pursuant to any Loan Document and (ii) on the Collateral securing other Secured Obligations;

(b)    Liens existing on the Closing Date and listed in Schedule 7.01(b) and any modifications, replacements, renewals, restructurings, refinancings or extensions thereof; *provided* that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under Section 7.03 and (B) proceeds and products thereof and (ii) the replacement, renewal, extension or refinancing of the obligations secured or benefitted by such Liens, to the extent constituting Indebtedness, is permitted by Section 7.03;

(c)    Liens for taxes, assessments or governmental charges that are not overdue for a period of more than any applicable grace period related thereto or (i) that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto

---

[2] ~~NTD: Under negotiation.~~

~~WEIL:\97507497\9\10143.0003~~WEIL:\97507497\16\10143.0003

are maintained on the books of the applicable Person in accordance with GAAP to the extent required by GAAP or (ii) the failure to pay of discharge the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(d)       statutory or common law Liens of landlords, sub-landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens, so long as, in each case, such Liens secure amounts not overdue for a period of more than 30 days or if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Liens or that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e)       (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Subsidiaries;

(f)       pledges or deposits to secure the performance of bids, trade contracts, utilities, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(g)       covenants, conditions, easements, rights-of-way, building codes, restrictions (including zoning restrictions), encroachments, licenses, protrusions and other similar encumbrances and minor title defects, in each case affecting Real Property and that do not in the aggregate materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole, and any exceptions on the Mortgage Policies issued in connection with the Mortgaged Properties;

(h)       Liens (i) securing judgments or orders for the payment of money not constituting an Event of Default under Section 8.01(h), (ii) arising out of judgments or awards against the Borrower or any Subsidiary with respect to which an appeal or other proceeding for review is then being pursued and (iii) and (ii) notices of *lis pendens* and associated rights related to litigation being contested in good faith by appropriate proceedings for which adequate reserves have been made;

(i)       leases, licenses, subleases or sublicenses (including licenses and sublicenses of software and other intellectual property rights) and terminations thereof, in each case either granted to others with respect to intellectual property that is not material to the business of the Borrower and Subsidiaries or in the ordinary course of business, which (i) do not interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, (ii) do not secure any Indebtedness and (iii) are permitted by Section 7.05;

(j)       Liens (i) in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business or (ii) on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such person to facilitate the purchase, shipment or storage of such inventory or other goods in the ordinary course of business;.

84

(k)    Liens (i) of a collection bank arising under Section 4-208 of the Uniform Commercial Code on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business, (iii) in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions, and (iv) that are contractual rights of setoff or rights of pledge relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(l)    Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Sections 7.02(g), (i) and (n) or to the extent related to any of the foregoing, Section 7.02(s), to be applied against the purchase price for such Investment, and (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(m)    Liens (i) in favor of the Borrower or any Subsidiary Guarantor and (ii) in favor of a Subsidiary that is not a Loan Party on assets of a Subsidiary that is not a Loan Party securing Indebtedness permitted under Section 7.03;

(n)    any interest or title of a lessor, sub-lessor, licensor or sub-licensor under leases, subleases, licenses or sublicenses entered into by the Borrower or any of its Subsidiaries in the ordinary course of business or with respect to intellectual property that is not material to the business of the Borrower and its Subsidiaries;

(o)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business permitted by this Agreement;

(p)    Liens deemed to exist in connection with Investments in repurchase agreements under Section 7.02;

(q)    Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(r)    Liens that are contractual rights of setoff or rights of pledge (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any of its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(s)    Liens solely on any cash earnest money deposits made by the Borrower or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

85

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

(t)  ground leases in respect of Real Property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(u)  Liens to secure Indebtedness permitted under Section 7.03(e); *provided* that (i) such Liens are created within 270 days of the acquisition, construction, repair, lease or improvement of the property subject to such Liens, (ii) such Liens do not at any time encumber property (except for replacements, additions, accessions and proceeds to such property) other than the property financed by such Indebtedness and the proceeds and products thereof and customary security deposits and (iii) with respect to Capitalized Leases, such Liens do not at any time extend to or cover any assets (except for replacements, additions and accessions to such assets) other than the assets subject to such Capitalized Leases and the proceeds and products thereof and customary security deposits; *provided* that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(v)  Liens on property of any Subsidiary that is not a Loan Party, which Liens secure Indebtedness of any Subsidiary that is not a Loan Party permitted under Section 7.03;

(w)  Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Subsidiary (other than by designation as a Subsidiary pursuant to Section 6.14) (other than Liens on the Equity Interests of any Person that becomes a Subsidiary to the extent such Equity Interests are owned by the Borrower or another Subsidiary), in each case, securing Indebtedness permitted pursuant to Section 7.03(g),

(x)  (i) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business complies, and (ii) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any Real Property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole;

(y)  Liens arising from precautionary Uniform Commercial Code financing statement or similar filings;

(z)  Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(aa)  the modification, replacement, renewal or extension of any Lien permitted by Sections 7.01(b), (u) and (w); *provided* that (i) the Lien does not extend to any additional property, other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien and (B) proceeds and products thereof, and (ii) the renewal, extension, restructuring or refinancing of the obligations secured or benefited by such Liens is permitted by Section 7.03 (to the extent constituting Indebtedness);

(bb)  Liens with respect to property or assets of the Borrower or any of its Subsidiaries securing obligations, other than Indebtedness for borrowed money, in an aggregate principal amount outstanding at any time not to exceed $5,000,000, in each case determined as of the date of incurrence;

(cc)  [reserved];

(dd)  [reserved];

86

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

(ee)     Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(ff)     deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

(gg)     [reserved];

(hh)     [reserved];

(ii)     Liens on property of any Foreign Subsidiary securing Indebtedness of such Foreign Subsidiary permitted under Section 7.03;

(jj)     Subject to the Intercreditor Agreement, Liens on the Collateral securing (i)(A) Indebtedness incurred pursuant to Section 7.03(w) and (B) related Second Lien Secured Obligations under the Second Lien Loan Documents governing such Indebtedness and (ii)(A) Indebtedness incurred pursuant to Section 7.03(x) and (b) related to ABL Secured Obligations under the ABL Loan Documents governing such Indebtedness;

(kk)     [reserved];

(ll)     in the case of any non-wholly owned Subsidiary, any put and call arrangements or restrictions on disposition related to its Equity Interests set forth in its organizational documents or any related joint venture or similar agreement;

(mm)     Liens securing Swap Contracts so long as the value of the property securing such Swap Contracts does not exceed $2,500,000 at any time;

(nn)     Liens on property incurred pursuant to any sale-leaseback transaction permitted hereunder and general intangibles related thereto;

(oo)     [reserved]; and

(pp)     Liens arising by operation of law in the United States under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods.

Section 7.02     **Investments**.  Make or hold any Investments, except:

(a)     Investments by the Borrower or any of its Subsidiaries in assets that were cash or Cash Equivalents when such Investment was made;

(b)     loans or advances to officers, directors and employees of any Loan Party (or any direct or indirect parent thereof) or any of its Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests of Holdings or any direct or indirect parent thereof or to permit the payment of taxes with respect thereto; *provided* that, to the extent such loans or advances are made in cash, the amount of such loans and advances used to acquire such Equity Interests shall be contributed to the Borrower in cash as common equity; *provided*, *further*, that the aggregate principal amount outstanding at any time under this clause (ii) shall not exceed $3,750,000, and (iii) for any

87

other purposes not described in the foregoing clauses (i) and (ii); *provided* that the aggregate principal amount outstanding at any time under this clause (iii) shall not exceed $1,250,000;

(c)      Investments (i) by the Borrower or any Subsidiary in any Loan Party (other than a Holdco), (ii) by any Subsidiary that is not a Loan Party in any other Subsidiary that is not a Loan Party and (iii) by any Loan Party in any Subsidiary that is not a Loan Party; *provided* that (A) no such Investments made pursuant to clause (iii) in the form of intercompany loans shall be evidenced by a promissory note unless any such promissory note constituting a negotiable instrument is pledged to the Administrative Agent in accordance with the terms of the Security Agreement, (B) any Investments in the form of intercompany loans constituting Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be unsecured and subordinated to the Obligations on terms consistent with the subordination provisions of the Intercompany Note and (C) the aggregate amount of Investments made pursuant to clause (iii) shall not exceed $20,000,000 at any time outstanding;

(d)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e)      Investments (excluding loans and advances made in lieu of Restricted Payments pursuant to and limited by Section 7.02(m) below) consisting of transactions permitted under Sections 7.01, 7.03 (other than 7.03(c) and (d)), 7.04 (other than 7.04(c)(ii) or (e)), 7.05 (other than 7.05(d)(ii) or 7.05(e)), 7.06 (other than 7.06(d)) and 7.13, respectively;

(f)      Investments (i) existing or contemplated on the Closing Date or made pursuant to legally binding written contracts in existence on the Closing Date, in each case set forth on Schedule 7.02(f) and any modification, replacement, renewal, reinvestment or extension thereof and (ii) existing on the Closing Date by the Borrower or any Subsidiary in the Borrower or any other Subsidiary and any modification, renewal or extension thereof; *provided* that (x) the amount of the original Investment is not increased except by the terms of such Investment or as otherwise permitted by this Section 7.02 and (y) any Investment in the form of Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be subject to subordination terms substantially consistent with the terms of the Intercompany Note;

(g)      Investments in Swap Contracts permitted under Section 7.03;

(h)      promissory notes, securities and other non-cash consideration received in connection with Dispositions permitted by Section 7.05;

(i)      any acquisition of all or substantially all the assets of a Person or any Equity Interests in a Person that becomes a Subsidiary or division or line of business of a Person (or any subsequent Investment made in a Person, division or line of business previously acquired in a Permitted Acquisition), in a single transaction or series of related transactions, if no Event of Default exists on the date that the Borrower or the applicable Subsidiary enters into a binding agreement with respect to such acquisition and, immediately after giving effect to such acquisition, (i) any acquired or newly formed Subsidiary shall not be liable for any Indebtedness except for Indebtedness otherwise permitted by Section 7.03; (ii) to the extent required by the Collateral and Guarantee Requirement, (A) the property,

88

assets and businesses acquired in such purchase or other acquisition shall constitute Collateral and (B) any such newly created or acquired Subsidiary (other than an Excluded Subsidiary) shall become a Guarantor, in each case, in accordance with Section 6.11; and (iii) the aggregate amount of Investments by Loan Parties pursuant to this Section 7.02(i) in assets (other than Equity Interests) that are not (or do not become at the time of such acquisition) directly owned by a Loan Party or in Equity Interests of Persons that do not become Loan Parties shall not exceed, when taken together with the aggregate amount of all Investments made pursuant to Section 7.02(c)(iii), $20,000,000 (any such acquisition, a "**Permitted Acquisition**");

(j)        Investments made in connection with the Transactions;

(k)        Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(l)        Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(m)        loans and advances to any direct or indirect parent of the Borrower, in lieu of and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof) Restricted Payments to the extent permitted to be made to such parent in accordance with Section 7.06(h), such Investment being treated for purposes of the applicable clause of Section 7.06, including any limitations, as if a Restricted Payment had been made pursuant to such clause;

(n)        Investments (including Permitted Acquisitions) in an aggregate amount pursuant to this Section 7.02(n) (valued at the time of the making thereof, and without giving effect to any write-downs or write-offs thereof) at any time not to exceed $12,500,000;

(o)        Investments made in respect of joint ventures or other similar agreements or partnership not to exceed $10,000,000;

(p)        Investments in any Person to which the Borrower or any Subsidiary outsources operational activities or otherwise related to the outsourcing of operational activities in the ordinary course of business in an aggregate amount not to exceed $2,500,000;

(q)        advances of payroll payments to employees in the ordinary course of business;

(r)        (i) Investments made in the ordinary course of business in connection with obtaining, maintaining or renewing client contracts and loans or advances made to distributors and suppliers in the ordinary course of business and (ii) Investments to the extent that payment for such Investments is made solely with Equity Interests of Holdings permitted to be issued hereunder (or any direct or indirect parent of the Borrower);

(s)        Investments of a Subsidiary acquired after the Closing Date in accordance with Section 7.02 or of a Person merged or amalgamated or consolidated into the Borrower or merged, amalgamated or consolidated with a Subsidiary in accordance with Section 7.04

<center>89</center>

after the Closing Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger or consolidation; *provided* that this clause (s) is intended solely to grandfather such Investments as are indirectly acquired as a result of an acquisition of a Person otherwise permitted hereunder and any consideration paid in connection with such acquisition that may be allocable to such Investments that consist of Subsidiaries that are not Loan Parties must be permitted by, and be taken into account in computing compliance with, any basket amounts or limitations applicable to such acquisition hereunder;

(t)        [reserved]

(t)        Investments made by a Subsidiary that is not a Loan Party to the extent such Investments are financed with the proceeds received by such Subsidiary from an Investment in such Subsidiary by a Loan Party permitted under this Section 7.02;

(u)        [reserved];

(v)        [reserved];

(w)        Investments in deposit accounts, securities accounts and commodities accounts maintained by the Borrower or such Subsidiary, as the case may be;

(x)        Investments constituting any part of a reorganization and other activities related to tax planning; *provided* that (i) no Event of Default shall have occurred and be continuing and (ii) any security interests granted to the Administrative Agent for the benefit of the Secured Parties in the Collateral pursuant to the Collateral Documents shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, consolidation, dissolution or liquidation) and all actions required to maintain said perfected status have been or will promptly be taken; and

(y)        contributions of the Equity Interests of any Subsidiary that is not a Loan Party to any other Subsidiary that is not a Loan Party to the extent necessary in connection with any intercompany reorganization and/or other activities related to tax planning; *provided* that no Event of Default shall have occurred and be continuing.

To the extent an Investment is permitted to be made by a Loan Party directly in any Subsidiary or any other Person who is not a Loan Party (each such person, a "**Target Person**") under any provision of this Section 7.02, such Investment may be made by advance, contribution or distribution by a Loan Party to a Subsidiary, or a Holdco, and further contemporaneously advanced or contributed to a Subsidiary for purposes of making the relevant Investment in the Target Person without constituting an Investment for purposes of Section 7.02 (it being understood that such Investment must satisfy the requirements of, and shall count towards any thresholds in, a provision of this Section 7.02 as if made by the applicable Loan Party directly to the Target Person).

Section 7.03      **Indebtedness**.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)        Indebtedness of any Loan Party under the Loan Documents;

(b)        Indebtedness outstanding on the Closing Date and listed on Schedule 7.03(b) and any Permitted Refinancing thereof; *provided* that all such Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be unsecured and subordinated to the Obligations pursuant to an Intercompany Note;

90

(c)    Guarantees by the Borrower and any Subsidiary in respect of Indebtedness of the Borrower or any Subsidiary otherwise permitted hereunder; *provided* that (A) no Guarantee by any Subsidiary of any Indebtedness that is secured by a Lien on the Collateral shall be permitted unless such guaranteeing party shall have also provided a Guarantee of the Obligations on the terms set forth herein, (B) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guarantee of the Obligations on terms at least as favorable (as reasonably determined by the Borrower) to the Lenders as those contained in the subordination of such Indebtedness and (C) any Guarantee by a Subsidiary that is not a Loan Party of any Indebtedness under Section 7.03(g) or (m) (or any Permitted Refinancing in respect thereof) shall only be permitted if such Guarantee meets the requirements of clauses (s), (g) or (m), as the case may be, of this Section 7.03;

(d)    Indebtedness of the Borrower or any Subsidiary owing to any Loan Party or any other Subsidiary (or issued or transferred to any direct or indirect parent of a Loan Party which is substantially contemporaneously transferred to a Loan Party or any Subsidiary of a Loan Party) to the extent constituting an Investment permitted by Section 7.02; *provided* that (x) no such Indebtedness owed to a Loan Party shall be evidenced by a promissory note unless such promissory note constitutes a negotiable instrument and is pledged to the Administrative Agent in accordance with the terms of the Security Agreement and (y) with respect to Indebtedness of any Loan Party owed to a Subsidiary that is not a Loan Party, all such Indebtedness shall be unsecured and subordinated to the Obligations pursuant to subordination terms substantially consistent with the terms of the Intercompany Note;

(e)    (i) Attributable Indebtedness and other Indebtedness (including Capitalized Leases) financing an acquisition, construction, repair, replacement, lease or improvement of a fixed or capital asset incurred by the Borrower or any Subsidiary prior to or within 270 days after the acquisition, lease or improvement of the applicable asset and any Permitted Refinancing thereof in an aggregate amount not to exceed $7,500,000, determined at the time of incurrence (together with any Permitted Refinancings thereof) at any time outstanding and (ii) Attributable Indebtedness arising out of sale-leaseback transactions permitted by Section 7.05(m) and any Permitted Refinancing of such Attributable Indebtedness;

(f)    Indebtedness in respect of Swap Contracts designed to hedge against the Borrower's or any Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes and Guarantees thereof;

(g)    Indebtedness of the Borrower or any Subsidiary (i) assumed in connection with any Permitted Acquisition (provided that such Indebtedness is not created or incurred in contemplation of such Permitted Acquisition) in anor (ii) incurred to finance any Permitted Acquisition; provided that (A) the aggregate amount of Indebtedness assumed and/or incurred pursuant to this clause (g) shall not to exceed $25,000,000 and (B) after giving Pro Forma Effect to the incurrence of such Indebtedness (x) at any time when the financial covenant contained in Section 7.11 is not in effect, the Consolidated First Lien Net Leverage Ratio does not exceed [●]:1.00 or (y) the Consolidated First Lien Net Leverage Ratio does not exceed the Consolidated First Lien Net Leverage Ratio as of the last day of the most recently ended Test Period;

(h)    Indebtedness representing deferred compensation to employees of the Borrower or any of its Subsidiaries incurred in the ordinary course of business;

(i)    Indebtedness consisting of promissory notes issued by the Borrower or any of its Subsidiaries to current or former officers, managers, consultants, directors and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of the Borrower or any direct or indirect parent of the Borrower permitted by Section 7.06; *provided* that such Indebtedness shall be subordinated in right of payment to the Obligations on terms reasonably satisfactory to the Administrative AgentRequired Lenders;

91

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

(j)      Indebtedness incurred by the Borrower or any of its Subsidiaries in a Permitted Acquisition, any other Investment permitted hereunder (including through a merger) or any Disposition permitted hereunder, in each case, constituting indemnification obligations or obligations in respect of purchase price (including earnouts) or other similar adjustments;

(k)      Indebtedness consisting of obligations of the Borrower or any of its Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with the Transactions, and Permitted Acquisitions or any other Investment permitted hereunder;

(l)      Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantees thereof or the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished in the ordinary course of business;

(m)      Indebtedness in an aggregate principal amount that at the time of, and after giving effect to, the incurrence thereof, would not exceed $7,500,000 determined at the time of incurrence;

(n)      Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(o)      Indebtedness incurred by the Borrower or any of its Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers' compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims;

(p)      obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of its Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(q)      [reserved];

(r)      [reserved];

(s)      [reserved];

(t)      [reserved];

(u)      Indebtedness incurred by a Foreign Subsidiary which, when aggregated with the principal amount of all other Indebtedness incurred pursuant to this Section 7.03(u) and then outstanding for all such Persons taken together (and any Permitted Refinancing of the foregoing, to the extent assumed or incurred by a Subsidiary that is not a Loan Party), does not exceed $25,000,000;

(v)      [reserved];

(w)      (i) Indebtedness under the Second Lien Credit Agreement in an aggregate principal amount not to exceed $50,000,000 and (ii) any Permitted Refinancing in respect of any of the foregoing Indebtedness in accordance with the terms of the Intercreditor Agreement;

92

(x)      (i) Indebtedness under the ABL Credit Agreement in an aggregate principal amount not to exceed $30,000,000 and (ii) any Permitted Refinancing in respect of any of the foregoing Indebtedness in accordance with the terms of the Intercreditor Agreement;

(y)      [reserved];

(z)      [reserved]; and

(aa)      all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in Sections 7.03(a) through Section 7.03(aa);

*provided*, *however*, that all Indebtedness permitted by this Section 7.03 which is permitted to be secured pursuant to Section 7.01 and is secured by the Collateral shall be subject to the following: (1) in the case of the Indebtedness described in Section 7.03(w), all such Indebtedness incurred on the Closing Date shall constitute ["Second"Junior Lien Credit Agreement Secured Obligations"]" under (and as defined in) the Intercreditor Agreement and the Second Lien Administrative Agent acting on behalf of the holders of such Indebtedness shall have become party to the Intercreditor Agreement on the Closing Date; (2) in the case of the Indebtedness described in Section 7.03(x), all such Indebtedness incurred on the Closing Date shall constitute ["""ABL Credit Agreement Secured Obligations"]" under (and as defined in) the Intercreditor Agreement and the ABL Agent acting on behalf of the holders of such Indebtedness shall have become party to the Intercreditor Agreement on the Closing Date;

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased, *plus* the aggregate amount of fees, underwriting discounts, premiums (including tender premiums) and other costs and expenses (including OID) incurred in connection with such refinancing.

The accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 7.03.  The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

For purposes of determining compliance with this Section 7.03, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Indebtedness described in Sections 7.03(a) through 7.03(aa), Holdings shall, in its sole discretion, classify and reclassify or later divide, classify or reclassify such item of Indebtedness (or any portion thereof) and will only be required to include the amount and type of such Indebtedness in one or more of the above clauses; *provided* that (w) all Indebtedness outstanding under the Loan Documents will at all times be deemed to be outstanding in reliance only on the exception in Section 7.03(a), (x) the ABL Credit Agreement and any Permitted Refinancing in respect of the foregoing will at all times be deemed to be outstanding in reliance only on the exception in Section 7.03(x) and (y) the Second Lien Term Facility and any Permitted Refinancing in respect of the foregoing will at all times be deemed to be outstanding in reliance only on the exception in Section 7.03(w).

93

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

**Section 7.04    Fundamental Changes**.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of related transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person (other than as part of the Transactions), except that:

(a)    (i) Any Loan Party (other than Holdings or the Borrower) and any Subsidiary may merge, amalgamate or consolidate with (i) the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction); *provided* that the Borrower shall be the continuing or surviving Person orand (ii) any Subsidiary may merge with one or more other Subsidiaries; *provided* that when any Person that is a Loan Party is merging with a Subsidiary that is not a Loan Party, the Loan Party shall be the continuing or surviving Person or the surviving entity shall substantially concurrently become a Loan Party; *provided*, *further*, that any security interests granted to the Administrative Agent for the benefit of the Secured Parties in the Collateral pursuant to the Collateral Documents shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, consolidation, dissolution or liquidation) and all actions required to maintain said perfected status have been or will promptly be taken, in each case, as required by Sections 6.11 or 6.13 to the extent required pursuant to the Collateral and Guarantee Requirement;

(b)    (i) any Subsidiary that is not a Loan Party may merge, amalgamate or consolidate with or into any other Subsidiary that is not a Loan Party, (ii) any Subsidiary may liquidate or dissolve and (iii) any Subsidiary may change its legal form if, with respect to clauses (ii) and (iii), the Borrower determines in good faith that such action is in the best interest of the Borrower and its Subsidiaries and is not materially disadvantageous to the Lenders (it being understood that in the case of any change in legal form, a Subsidiary that is a Guarantor will remain a Guarantor unless such Guarantor is otherwise permitted to cease being a Guarantor hereunder);

(c)    any Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Subsidiary; *provided* that if the transferor in such a transaction is a Guarantor, then (i) the transferee must be a Subsidiary Guarantor or the Borrower or (ii) to the extent constituting an Investment, such Investment must be a permitted Investment in or Indebtedness of a Subsidiary which is not a Loan Party in accordance with Sections 7.02 (other than Section 7.02(e) or 7.02(h)) and 7.03, respectively;

(d)    [reserved];

(e)    so long as no Event of Default has occurred and is continuing or would result therefrom (in the case of a merger involving a Loan Party), any Subsidiary may merge or consolidate with any other Person in order to effect an Investment permitted pursuant to Section 7.02; *provided* that the continuing or surviving Person shall be a Subsidiary, which together with each of such surviving Person's Subsidiaries that are Subsidiaries, shall have complied with the requirements of Section 6.11 or 6.13 to the extent required pursuant to the Collateral and Guarantee Requirement;

(f)    [reserved]; and

(g)    so long as no Event of Default has occurred and is continuing or would result therefrom, a merger, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 7.05 or a Restricted Payment permitted pursuant to Section 7.06.

94

**Section 7.05**     **Dispositions**.  Make any Disposition, except:

(a)     Dispositions of obsolete, worn out, used or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Borrower or any of its Subsidiaries;

(b)     Dispositions of inventory in the ordinary course of business or consistent with past practice, goods held for sale in the ordinary course of business and immaterial assets (including allowing any registrations or any applications for registration of any immaterial intellectual property to lapse or go abandoned in the ordinary course of business) and termination of leases and licenses in the ordinary course of business;

(c)     Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)     Dispositions of property to the Borrower or any Subsidiary; *provided* that if the transferor of such property is a Loan Party, (i) the transferee thereof must be a Loan Party (other than a Holdco) or (ii) if such transaction constitutes an Investment, such transaction is permitted under Section 7.02 other than Section 7.02(e);

(e)     to the extent constituting Dispositions, transactions permitted by (i) Section 7.01 (other than Section 7.01(i) and (l)(ii)), (ii) Section 7.02 (other than 7.02(e) or (h)), (iii) Section 7.04 (other than 7.04(g)) and (iv) Section 7.06 (other than 7.06(d));

(f)     Dispositions to consummate the Transactions;

(g)     Dispositions of cash and Cash Equivalents;

(h)     leases, subleases, licenses or sublicenses (including licenses and sublicenses of software or other intellectual property rights) and terminations thereof, in each case in the ordinary course of business, and which do not materially interfere with the business of the Borrower and its Subsidiaries (taken as a whole) and (ii) Dispositions of intellectual property (including inbound licenses) that is no longer material to the business of the Borrower and its Subsidiaries;

(i)     transfers of property subject to Casualty Events;

(j)     Dispositions of property; *provided* that (i) at the time of such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Default has occurred and is continuing), no Event of Default shall have occurred and be continuing or would result from such Disposition, (ii) with respect to Dispositions pursuant to this Section 7.05(j) for an aggregate purchase price for all such Dispositions in excess of $5,000,000 in any fiscal year, the Borrower or any of its Subsidiaries shall receive not less than 75% of such consideration in the form of cash or Cash Equivalents (in each case, free and clear of all Liens at the time received, other than non-consensual Liens permitted by Section 7.01 and Liens permitted by Sections 7.01(a), (f), (k), (l), (m), (n), (p), (q), (r)(i), (r)(ii), (s), (jj) and (kk) (only to the extent the Obligations are secured by such cash and Cash Equivalents)); *provided*, *however*, that for the purposes of this clause (ii), the following shall be deemed to be cash: (A) any liabilities (as shown on the Borrower's most recent balance sheet provided hereunder or in the footnotes thereto) of the Borrower or such Subsidiary, other than liabilities that are by their terms subordinated to the

95

payment in cash of the Obligations, that are assumed by the transferee with respect to the applicable Disposition and for which the Borrower and all of its Subsidiaries shall have been validly released by all applicable creditors in writing, (B) any securities received by the Borrower or the applicable Subsidiary from such transferee that are converted by the Borrower or such Subsidiary into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of the applicable Disposition, and (C) aggregate non-cash consideration received by the Borrower or the applicable Subsidiary having an aggregate fair market value (determined as of the closing of the applicable Disposition for which such non-cash consideration is received) not to exceed the $6,250,000 at any time and (iii) the Borrower or the applicable Subsidiary complies with the applicable provision of Section 2.05(b);

(k)        Dispositions of non-core assets acquired in connection with Permitted Acquisitions or other Investments; *provided* that (i) the aggregate amount of such sales shall not exceed ~~12.5~~25% of the fair market value of the acquired entity or business and (ii) each such sale is in an arm's-length transaction and the Borrower or the respective Subsidiary receives at least fair market value in exchange therefor;

(l)        Dispositions or discounts without recourse of accounts receivable in connection with the compromise or collection thereof in the ordinary course of business;

(m)       Dispositions of property pursuant to sale-leaseback transactions; *provided* that any Net Proceeds from such Disposition shall be applied to prepay Loans in accordance with Section 2.05(b)(ii);

(n)        any swap of assets in exchange for services or other assets in the ordinary course of business of comparable or greater value or usefulness to the business of the Borrower and its Subsidiaries as a whole, as determined in good faith by the management of the Borrower;

(o)        [reserved];

(p)        Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(q)        the unwinding or settlement of any Swap Contract;

(r)        the lapse or abandonment in the ordinary course of business of any registrations or applications for registration of any immaterial IP Rights;

(s)        [reserved];

(t)        [reserved];

(u)        Dispositions of non-Collateral assets in an aggregate amount not to exceed, over the life of this Agreement, $2,500,000; and

(v)        Dispositions pursuant to agreements, instruments or arrangements in existence on the Closing Date and set forth on Schedule 7.05(v);

*provided* that any Disposition of any property pursuant to this Section 7.05 (except pursuant to Sections 7.05(a), (b), (d), (e), (f), (h), (i), (l), (p), (q) and (r) and except for Dispositions from a Loan Party to any other

96

Loan Party) shall be for no less than the fair market value of such property at the time of such Disposition as determined by the Borrower in good faith.  To the extent any Collateral is Disposed of as permitted by this Section 7.05 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

Section 7.06    **Restricted Payments**.    Declare or make, directly or indirectly, any Restricted Payment, except:

(a)    each Subsidiary may make Restricted Payments to the Borrower, and other Subsidiaries of the Borrower (and, in the case of a Restricted Payment by a non-wholly owned Subsidiary, to the Borrower and any other Subsidiary and to each other owner of Equity Interests of such Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(b)    the Borrower and each Subsidiary may declare and make dividend payments or other Restricted Payments payable solely in the Equity Interests of such Person (and, in the case of such a Restricted Payment by a non-wholly owned Subsidiary, to the Borrower and any other Subsidiary and to each other owner of Equity Interests of such Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(c)    [reserved];

(d)    to the extent constituting Restricted Payments, the Borrower (or any direct or indirect parent thereof) and its Subsidiaries may enter into and consummate transactions permitted by any provision of Section 7.02 (other than 7.02(e) and 7.02(m)), 7.04 (other than 7.04(g)), 7.05 (other than 7.05(e)(iv) and 7.05(g)) or 7.08 (other than 7.08(f), 7.08(g), 7.08(h), and 7.08(m));

(e)    repurchases of Equity Interests in the Borrower or any Subsidiary deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(f)    [reserved]:

(g)    [reserved];

(h)    the Borrower may make Restricted Payments to any direct or indirect parent of the Borrower:

(i)    to pay its operating costs and expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), incurred in the ordinary course of business and attributable to the ownership or operations of the Borrower and its Subsidiaries, Transaction Expenses and any indemnification claims made by directors or officers of such parent attributable to the ownership or operations of the Borrower and its Subsidiaries;

(ii)    the proceeds of which shall be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) ordinary course franchise or similar Taxes, other fees and expenses required to maintain its (or any of its direct or indirect parents') corporate existence; and

97

(iii)    for any taxable period in which the Borrower and/or any of its Subsidiaries is a member of a consolidated, combined or similar income tax group of which a direct or indirect parent of the Borrower is the common parent (a "**Tax Group**"), to pay the portion of any federal, foreign, state and/or local income taxes of such Tax Group that are attributable to the taxable income of the Borrower and/or its Subsidiaries *provided* that, for each taxable period, the amount of such payments made in respect of such taxable period in the aggregate shall not exceed the amount that the Borrower and its Subsidiaries would have been required to pay as a stand-alone consolidated, combined or similar income tax group (any amount permitted to be paid under this Section 7.06(h)(iii), a "**Tax Distribution**");

(i)    payments made or expected to be made by a Holdco, Borrower or any of the Subsidiaries (or Restricted Payments to allow any direct or indirect parent thereof to make payments) in respect of withholding or similar Taxes payable by or with respect to any future, present or former employee, director, manager or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) and any repurchases of Equity Interests in consideration of such payments including deemed repurchases, in each case, in connection with the exercise of stock options;

(j)    [after a Qualified IPO by the Borrower or a Relevant Public Company, (i) any Restricted Payment by the Borrower to pay listing fees and other costs and expenses attributable to the Borrower or such Relevant Public Company being a publicly traded company which are reasonable and customary and (ii) additional Restricted Payments in an aggregate amount per annum not to exceed an amount equal to 6.0% of the net proceeds received by (or contributed to) the Borrower from such Qualified IPO];

(k)    the Borrower or any of the Subsidiaries may pay (or to make Restricted Payments to allow any direct or indirect parent thereof to pay) cash in lieu of fractional Equity Interests in connection with (x) any dividend, split or combination thereof or (y) any Permitted Acquisition; and

(l)    [reserved].

Section 7.07    **[Reserved]**.

Section 7.08    **Transactions with Affiliates**.   Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, in each case involving aggregate payments or consideration in excess of $1,000,000, other than:

(a)    transactions among the Borrower and its Subsidiaries or any entity that becomes a Subsidiary as a result of such transaction;

(b)    on terms substantially as favorable to the Borrower or such Subsidiary as would be obtainable by the Borrower or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(c)    the Transactions and the payment of fees and expenses (including Transaction Expenses) as part of or in connection with the Transactions;

(d)    the issuance of Equity Interests to any officer, director, employee or consultant of the Borrower or any of its Subsidiaries in connection with the Transactions;

(e)    [reserved];

98

(f)       Restricted Payments permitted under Section 7.06;

(g)       loans and other Investments among Holdings, Intermediate Holdings, the Borrower and its Subsidiaries and joint ventures (to the extent any such Subsidiary that is not a Subsidiary or any such joint venture is only an Affiliate as a result of Investments by the Holdcos, the Borrower and/or its Subsidiaries in such Subsidiary or joint venture) to the extent otherwise permitted under Section 7.02;

(h)       transactions by the Borrower and its Subsidiaries permitted under an express provision (including any exceptions thereto) of this Article VII;

(i)       employment and severance arrangements between the Borrower and its Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee benefit plans and arrangements in the ordinary course of business;

(j)       the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers, employees and consultants of the Borrower and its Subsidiaries (or any direct or indirect parent of the Borrower) in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and its Subsidiaries;

(k)       transactions pursuant to agreements, instruments or arrangements in existence on the Closing Date and set forth on Schedule 7.08(k) or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect;

(l)       [reserved];

(m)       payments by the Borrower or any of its Subsidiaries pursuant to any tax sharing agreements with any direct or indirect parent of the Borrower to the extent attributable to the ownership or operation of the Borrower and the Subsidiaries, but only to the extent permitted by Section 7.06(h)(iii);

(n)       the issuance or transfer of Equity Interests (other than Disqualified Equity Interests) of Holdings to any Permitted Holder or to any former, current or future director, manager, officer, employee or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees, distributes or Affiliate of any of the foregoing) of the Borrower, any of its Subsidiaries or any direct or indirect parent thereof;

(o)       transactions with customers, clients, joint venture partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and the Subsidiaries, in the reasonable determination of the board of directors or the senior management of the Borrower, or are on terms at least as favorable (as reasonably determined by the Borrower) as might reasonably have been obtained at such time from an unaffiliated party;

(p)       the Transactions;

(q)       the payment of reasonable out-of-pocket costs and expenses and indemnities pursuant to the stockholders agreement or the registration and participation rights agreement entered into on the Closing Date in connection therewith;

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

(r)   transactions in which the Borrower or any of the Subsidiaries, as the case may be, deliver to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Borrower or such Subsidiary from a financial point of view or meets the requirements of Section 7.08(b); and

(s)   payments to or from, and transactions with, joint ventures (to the extent any such joint venture is only an Affiliate as a result of Investments by the Borrower and the Subsidiaries in such joint venture) in the ordinary course of business to the extent otherwise permitted under Section 7.02.

Section 7.09   **Burdensome Agreements**.  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that limits the ability of:

(a)   any Subsidiary that is not a Guarantor to make Restricted Payments to the Borrower or any Guarantor; or

(b)   any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Lenders with respect to the Facilities and the Obligations;

*provided* that the foregoing Sections 7.09(a) and (b) shall not apply to Contractual Obligations which:

(i)   (x) exist on the Closing Date and (to the extent not otherwise permitted by this Section 7.09) are listed on Schedule 7.09(b) and (y) to the extent Contractual Obligations permitted by clause (x) are set forth in an agreement evidencing Indebtedness, are set forth in any agreement evidencing any permitted modification, replacement, renewal, extension or refinancing of such Indebtedness so long as such modification, replacement, renewal, extension or refinancing (taken as a whole) does not materially expand the scope of such Contractual Obligation (as reasonably determined by the Borrower);

(ii)   are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Subsidiary; *provided*, *further*, that this clause (ii) shall not apply to Contractual Obligations that are binding on a Person that becomes a Subsidiary pursuant to Section 6.14;

(iii)   represent Indebtedness of a Subsidiary which is not a Loan Party which is permitted by Section 7.03 and which does not apply to any Loan Party;

(iv)   are customary restrictions (as reasonably determined by the Borrower) that arise in connection with (x) any Lien permitted by Sections 7.01(a), (b), (f), (i), (j)(i), (k), (l), (p), (q), (r)(i), (r)(ii), (s), (u), (v), (w), (z), (aa), (ee), (ii), (jj), and (kk) and relate to the property subject to such Lien or (y) arise in connection with any Disposition permitted by Section 7.04 or 7.05 and relate solely to the assets or Person subject to such Disposition;

(v)   are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 7.02 and applicable solely to such joint venture and its equity entered into in the ordinary course of business;

(vi)   are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 7.03 but solely to the extent any negative pledge relates to (i) the property financed by such Indebtedness and the proceeds, accessions and products thereof or (ii) the property secured by such Indebtedness and the proceeds, accessions and

100

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

products thereof so long as the agreements governing such Indebtedness permit the Liens securing the Obligations;

(vii)    are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the property interest, rights or the assets subject thereto;

(viii)    comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Sections 7.03(b), (e), (g), (n)(i), (u), (w) and (x) and to the extent that such restrictions apply only to the property or assets securing such Indebtedness or, in the case of Section 7.03(g) or (u), to the Subsidiaries incurring or guaranteeing such Indebtedness;

(ix)    are customary provisions restricting subletting, transfer or assignment of any lease governing a leasehold interest of the Borrower or any Subsidiary;

(x)    are customary provisions restricting assignment or transfer of any agreement entered into in the ordinary course of business;

(xi)    are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(xii)    arise in connection with cash or other deposits permitted under Sections 7.01 and 7.02 and limited to such cash or deposit;

(xiii)    comprise restrictions imposed by any agreement governing Indebtedness entered into on or after the Closing Date and permitted under Section 7.03 that are, taken as a whole, in the good faith judgment of the Borrower, either (a) no more restrictive than the restrictions contained in this Agreement or (b) no more restrictive with respect to the Borrower or any Subsidiary than customary market terms for Indebtedness of such type, so long as the Borrower shall have determined in good faith that such restrictions pursuant to this clause (b) will not affect its obligation or ability to make any payments required hereunder;

(xiv)    are restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(xv)    are restrictions regarding licensing or sublicensing by the Borrower and its Subsidiaries of intellectual property (including customary restrictions on assignment contained in license or sublicense agreements) entered into in the ordinary course of business;

(xvi)    are restrictions contained in the Second Lien Loan Documents and documents otherwise governing Indebtedness permitted pursuant to Section 7.03(w);

(xvii)    are restrictions on cash earnest money deposits in favor of sellers in connection with acquisitions not prohibited hereunder; and

(xviii)    are restrictions contained in the ABL Loan Documents and documents otherwise governing Indebtedness permitted pursuant to Section 7.03(x).

**Section 7.10    Maximum Capital Expenditures**. Permit the aggregate amount of Capital Expenditures made by the Borrower and its Subsidiaries in any fiscal year to exceed the amount provided in the table set forth below for such fiscal year (the "**Maximum Capital Expenditures Amount**"); provided that

101

the Maximum Capital Expenditures Amount for any fiscal year may, at the election of the Borrower, be increased by an amount equal to 100% of the excess, if any, of the Maximum Capital Expenditures Amount for the previous fiscal year over the actual amount of Capital Expenditures made during such Fiscal Year (the "**Carry Over Amount**"). For purposes of determining compliance with this Section 7.10, (x) the amount of Capital Expenditures in any fiscal year shall (i) first be applied toward the Maximum Capital Expenditures Amount allocated to such fiscal year (without giving effect to any Carry Over Amount from the prior fiscal year) then (ii) from the Carry Over Amount available in such fiscal year until it has been fully utilized.

| Fiscal Year[3] | Maximum Net Capital Expenditures Amount |
|---|---|
| 2021 | [$$14,200,000] |
| 2022 | [$$9,600,000] |
| 2023 | [Greater of (i) $10,300,000 and (ii) 2.75% of Consolidated Net Sales] |
| 2024 | [Greater of (i) $10,600,000 and (ii) 2.75% of Consolidated Net Sales] |
| 2025 | [Greater of (i) $11,000,000 and (ii) 2.75% of Consolidated Net Sales] |

**Section 7.11**    **Consolidated First Lien Net Leverage Ratio**.  Permit the Consolidated First Lien Net Leverage Ratio as of the last day of any Test Period ending on or after December 31, 2021 and set forth below to be greater than the ratio set forth below opposite such last day of a Test Period below.

| Test Period Ended[4] | Consolidated First Lien Net Leverage Ratio |
|---|---|
| June 30, 2021 | 6.50:1.00 |
| September 30, 2021 | 5.25:1.00 |
| December 31, 2021 | [3.754.25:1.00] |
| March 31, 2022 | [3.754.25:1.00] |
| June 30, 2022 | [3.754.25:1.00] |
| September 30, 2022 | [3.754.25:1.00] |
| December 31, 2022 | [2.5075:1.00] |
| March 31, 2023 | [2.5075:1.00] |
| June 30, 2023 | [2.5075:1.00] |
| September 30, 2023 | [2.5075:1.00] |
| December 31, 2023 and thereafter | [1.75:1.00] |

**Section 7.12**    **Interest Coverage Ratio**.  Permit the Interest Coverage Ratio as of the last day of any Test Period ending on or after December 31, 2021 and set forth below to be less than the ratio set forth below opposite such last day of a Test Period below.

[3] NTD: Under review

[4] NTD: Under review

102

| Test Period Ended[5] | Interest Coverage Ratio |
|---|---|
| June 30, 2021 | 1.00:1.00 |
| September 30, 2021 | 1.25:1.00 |
| December 31, 2021 | [1.~~75~~25:1.00] |
| March 31, 2022 | [1.~~75~~25:1.00] |
| June 30, 2022 | [1.~~75~~25:1.00] |
| September 30, 2022 | [1.~~75~~25:1.00] |
| December 31, 2022 | [~~2~~1.75:1.00~~:1.00~~] |
| March 31, 2023 | [~~2~~1.75:1.00~~:1.00~~] |
| June 30, 2023 | [~~2~~1.75:1.00~~:1.00~~] |
| September 30, 2023 | [~~2~~1.75:1.00~~:1.00~~] |
| December 31, 2023 and thereafter | [2.50:1.00] |

**Section 7.13    Prepayments, Etc. of Indebtedness.**

(a)    Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner (it being understood that payments of regularly scheduled principal, interest and mandatory prepayments and "AHYDO" payments and, subject to no Event of Default then existing or resulting therefrom, in connection with the amendment of the Second Lien Credit Agreement, the payment of related fees (other than in connection with any amendment that reduces or forgives the commitments, outstanding principal amount or effective yield of such Second Lien Credit Agreement) shall be permitted) any (i) Indebtedness subordinated in right of payment incurred under Section 7.03, or (ii) any other Indebtedness for borrowed money of a Loan Party that is (x) subordinated in right of payment to the Obligations expressly by its terms or (y) is secured on a junior lien basis to the Liens securing the Obligations, except (i) the refinancing thereof with any Indebtedness (to the extent such Indebtedness constitutes a Permitted Refinancing and, if such Indebtedness was originally incurred under Section 7.03(g), is permitted pursuant to Section 7.03(g)), to the extent not required to prepay any Loans pursuant to Section 2.05(b), (ii) the conversion or exchange of the Second Lien Obligations to Equity Interests (other than Disqualified Equity Interests) of Holdings or any of its direct or indirect parents, (iii) the prepayment of Indebtedness of the Borrower or any Subsidiary to the Borrower or any Subsidiary, subject to the subordination provisions applicable to any such Indebtedness, (iv) prepayments of principal of and any required premium on loans under the Second Lien Credit Agreement (or any comparable provision of a Permitted Refinancing thereof) in connection with the removal of a lender pursuant to Section 3.07 of the Second Lien Credit Agreement (or any comparable provision of a Permitted Refinancing thereof or the payment of any fees in connection with amendments thereto) and (v) prepayments of principal of and any required premium on loans under the Second Lien Credit Agreement (or any comparable provision of a Permitted Refinancing thereof) in connection with the removal of a lender pursuant to Section 3.07 of the Second Lien Credit Agreement (or any comparable provision of a Permitted Refinancing thereof or the payment of any fees in connection with amendments thereto).

(b)    Amend, modify or change any term or condition of any Indebtedness (x) in the case of the Indebtedness under the ABL Credit Agreement and any other ABL Secured Obligations (and any Permitted Refinancing in respect of the foregoing) in violation of the Intercreditor Agreement, (y) in the case of the Indebtedness under the Second Lien Credit Agreement and any other Second Lien Secured Obligations (and any Permitted Refinancing in respect of the foregoing), in violation of the Intercreditor Agreement or the definition of "Permitted Refinancing" and (z) in the case of any other Indebtedness in excess of the Threshold Amount in a manner adverse to the Lenders.

---

[5] ~~NTD: Under review~~

103

Notwithstanding anything to the contrary in any Loan Document, the Borrower may make regularly scheduled payments of interest and fees on the ABL Facility or the Second Lien Term Facility, and may make any payments required by the terms of such Indebtedness in order to avoid the application of Section 163(e)(5) of the Code to such Indebtedness.

**Section 7.14     Permitted Activities**.  With respect to a Holdco, engage in any material operating or business activities; *provided* that the following and any activities incidental thereto shall be permitted in any event: (i) (a) in the case of Intermediate Holdings, its ownership of the Equity Interests of the Borrower and activities incidental thereto, including payment of dividends and other amounts in respect of its Equity Interests and (b) in the case of Holdings, its ownership of the Equity Interests of Intermediate Holdings and activities incidental thereto, including payment of dividends and other amounts in respect of its Equity Interests, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations with respect to the Loan Documents, the ABL Loan Documents, the Second Lien Loan Documents and any other documents governing Indebtedness permitted to be incurred by the Borrower or a Subsidiary pursuant to Section 7.03, (iv) any public offering of its common stock or any other issuance or sale of its Equity Interests, (v)(1) Guaranteed Obligations in respect of Indebtedness of, the Borrower and its Subsidiaries permitted under Section 7.03, including any Permitted Refinancing thereof and (2) guaranties of other obligations not constituting Indebtedness incurred by, the Borrower or any of the Subsidiaries, (vi) if applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings, Intermediate Holdings and the Borrower, (vii) holding any cash or property (but not operating any property), (viii) [reserved], (ix) providing indemnification to officers and directors and (x) any activities incidental or reasonably related to the foregoing.  No Holdco shall incur any Liens on Equity Interests of Intermediate Holdings or the Borrower, other than non-consensual Liens and those for the benefit of the ~~First Lien~~ Secured Obligations, ABL Secured Obligations (subject at all times to the Intercreditor Agreement) and the Second Lien Secured Obligations (subject at all times to the Intercreditor Agreement).  Holdings shall not own any Equity Interests other than those of Intermediate Holdings, and Intermediate Holdings shall not own any Equity Interests other than those of the Borrower.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**Section 8.01     Events of Default**.  Any of the following from and after the Closing Date shall constitute an event of default (an "**Event of Default**"):

(a)     *Non-Payment*.  Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within three Business Days after the same becomes due, any interest on any Loan, any fees or other amounts payable hereunder or with respect to any other Loan Document; or

(b)     *Specific Covenants*.  The Borrower, any Subsidiary or, in the case of Section 7.14, a Holdco, fails to perform or observe (i) any term, covenant or agreement contained in any of Section 6.03(a) or 6.05(a) (solely with respect to the Borrower), 6.20(b) or 6.22 or Article VII; *provided* that the covenants in Section 7.11 and Section 7.12 are subject to cure pursuant to Section 8.04 or (ii) any term, covenant or agreement contained in any of Section 6.01 or 6.02 and such failure shall continue for a period of five (5) Business Days or (iii) any term, covenant or agreement contained in any of Section 6.11 or 6.13 and such failure shall continue for a period of fifteen (15) days; or

(c)     *Other Defaults*.  Any Holdco, the Borrower or any Subsidiary fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a), (b) or (d)) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days after (i) a Responsible Officer of any Loan Party obtaining knowledge thereof or (ii) receipt by the Borrower of written notice thereof from the Administrative Agent; or

104

(d)    *Representations and Warranties*.    Any representation, warranty, certification or statement of fact made or deemed made by any Loan Party herein or in any other Loan Document, or any certification in any document required to be delivered in connection herewith or therewith shall be incorrect in any material respect (or, in the case of any representation and warranty qualified by materiality, in all respects) when made or deemed made; or

(e)    *Cross-Default*.    Any Loan Party or any Subsidiary (A) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder, but including Indebtedness outstanding under the ABL Loan Documents and Second Lien Loan Documents) having an aggregate outstanding principal amount of not less than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness referenced in clause (A) above, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any default thereunder by any Loan Party), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause (after delivery of any notice if required and after giving effect to any waiver, amendment, cure or grace period), with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that this clause (B) shall not apply to (i) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder, (ii) any Indebtedness if (x) the sole remedy of the holder thereof in the event of the non-payment of such Indebtedness or the non-payment or non-performance of obligations related thereto or (y) the sole rights of the holder(s) thereof is to elect, in each case, to convert such Indebtedness into Qualified Equity Interests and cash in lieu of fractional shares and (iii) in the case of Indebtedness which the holder thereof may elect to convert into Qualified Equity Interests, such Indebtedness from and after the date, if any, on which such conversion has been effected; *provided*, *further*, that such failure is unremedied or is not waived by the holders of such Indebtedness prior to any acceleration of the Loans pursuant to Section 8.02; or

(f)    *Insolvency Proceedings, Etc*.    Other than with respect to any dissolutions otherwise permitted hereunder, any Loan Party or any Material Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes a general assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for 60 calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or substantially all of its property is instituted without the consent of such Person and continues undismissed or unstayed for 60 consecutive calendar days, or an order for relief is entered in any such proceeding; or

(g)    [Reserved]; or

105

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

(h)      *Judgments*.  There is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by either (i) independent third-party insurance as to which the insurer does not deny coverage or (ii) another creditworthy (as reasonably determined by the ~~Administrative Agent~~Required Lenders) indemnitor); and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of 60 consecutive days; or

(i)      *Invalidity of Loan Documents*.  Any material provision of the Loan Documents, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05) or as a result of acts or omissions by the Administrative Agent or any Lender due to such person's gross negligence or willful misconduct which do not arise from a breach by a Loan Party of its obligations under the Loan Documents or the satisfaction in full of all the Obligations (other than contingent obligations as to which no claim has been asserted), ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document or the validity or priority of a Lien as required by the Collateral Documents on a material portion of the Collateral; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations (other than in accordance with its terms)), or purports in writing to revoke or rescind any Loan Document (other than in accordance with its terms); or

(j)      *Change of Control*.  There occurs any Change of Control; or

(k)      *Collateral Documents*.  Any Collateral Document after delivery thereof pursuant to Sections 4.01, 6.11 or 6.13 shall for any reason (other than pursuant to the terms thereof including as a result of a transaction not prohibited under this Agreement) cease to create a valid and perfected Lien, with the priority required by the Collateral Documents on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01 or any Loan Party contests in writing the validity or priority of a Lien, (i) except to the extent that any such perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities or negotiable instruments pledged under the Collateral Documents or take other required actions required to be taken by the Administrative Agent under the Loan Documents, in each case, which does not arise from a breach by a Loan Party of its obligations under the Loan Documents, and (ii) except as to Collateral consisting of Real Property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

(l)      *ERISA*.  (i) An ERISA Event occurs which has resulted or could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, or (ii) a Loan Party, any Subsidiary or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan and a Material Adverse Effect could, individually or in the aggregate, reasonably be expected to result.

~~WEIL:\97507497\9\10143.0003~~WEIL:\97507497\16\10143.0003

**Section 8.02    Remedies Upon Event of Default**.  (a)  If any Event of Default occurs and is continuing, the Administrative Agent may ~~and~~, at the request of the Required Lenders ~~shall~~, take any or all of the following actions:

(i)    [reserved];

(ii)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower (to the extent permitted by applicable law); and

(iii)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that upon the occurrence of an Event of Default pursuant to Section 8.01(f), the unpaid principal amount of all outstanding Loans and all interest, fees, premiums and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.

**Section 8.03    Application of Funds**.  After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order (to the fullest extent permitted by mandatory provisions of applicable Law):

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to ~~each~~the Administrative Agent in its capacity as such hereunder;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders hereunder (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and any Secured Obligations constituting fees and premiums, ratably among the Secured Parties in proportion to the respective amounts described in this clause Third payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

*Fifth*, to the payment of all other Secured Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

*Last*, the balance, if any, after all of the Secured Obligations then earned, due and payable have been paid in full, to the Borrower or as otherwise required by Law.

**Section 8.04    Borrower's Right to Cure**.  Notwithstanding anything to the contrary contained in Section 8.01 or Section 8.02:

(a)    For the purpose of determining whether an Event of Default under Section 7.11 and/or Section 7.12 has occurred, the Borrower may on one or more occasions

107

designate any portion of the net cash proceeds from a sale or issuance of Qualified Equity Interests of the Borrower or any cash contribution to the common capital of the Borrower (the "**Cure Amount**") as an increase to Consolidated EBITDA for the applicable fiscal quarter; *provided* that (A) such amounts to be designated (i) are actually received by the Borrower after the first day of the applicable fiscal quarter and on or prior to the tenth Business Day after the date on which financial statements are required to be delivered with respect to such fiscal quarter (the "**Cure Expiration Date**") and (ii) do not exceed the aggregate amount necessary to cure any Event of Default under Section 7.11 and/or Section 7.12 as of such date and (B) the Borrower shall have provided notice (the "**Notice of Intent to Cure**") to the Administrative Agent that such amounts are designated as a "Cure Amount". The Cure Amount shall be added to Consolidated EBITDA for the applicable fiscal quarter and included when calculating Consolidated EBITDA for each Test Period that includes such fiscal quarter.

(b)     The parties hereby acknowledge that this Section 8.04 may not be relied on for purposes of calculating any financial ratios other than for determining actual compliance with Section 7.11 and/or Section 7.12 and shall not result in any adjustment to any amounts hereunder (including the amount of Indebtedness, Total Assets, Consolidated First Lien Net Debt, Consolidated Interest Expense or any other calculation of net leverage or Indebtedness hereunder (directly or by way of netting) and shall not be included for purposes of determining pricing, mandatory prepayments, financial ratio-based conditions and the availability or amount permitted pursuant to any covenant under Article VII) with respect to the quarter with respect to which such Cure Amount was made other than the amount of the Consolidated EBITDA referred to in Section 8.04(a) above.

(c)     In furtherance of Section 8.04(a) above, (i) upon actual receipt and designation of the Cure Amount by the Borrower, the covenant under Section 7.11 and/or Section 7.12 shall be deemed retroactively cured with the same effect as though there had been no failure to comply with the covenant under such Section 7.11 and/or Section 7.12 and any Event of Default or potential Event of Default under Section 7.11 and/or Section 7.12 shall be deemed not to have occurred for purposes of the Loan Documents, and (ii) after delivery of an applicable Notice of Intent to Cure, neither the Administrative Agent nor any Lender may exercise any rights or remedies under Section 8.02 (or under any other Loan Document) on the basis of any actual or purported Event of Default under Section 7.11 and/or Section 7.12 until and unless the Cure Expiration Date has occurred without the Cure Amount having been received. Notwithstanding the foregoing, no Credit Extension shall be made until receipt by the Borrower of the Cure Amount or waiver of the Event of Default.

(d)     (i) In each period of four consecutive fiscal quarters, there shall be at least two fiscal quarters in which no cure right set forth in this Section 8.04 is exercised and (ii) there shall be no *pro forma* reduction in Indebtedness (directly or by way of netting) with the Cure Amount for determining compliance with Section 7.11 and/or Section 7.12 for the fiscal quarter with respect to which such Cure Amount was made.

(e)     There can be no more than five fiscal quarters in which the cure rights set forth in this Section 8.04 are exercised during the term of this Agreement.

## ARTICLE IX
### ADMINISTRATIVE AGENT

**Section 9.01     Appointment and Authority**. (a) Each of the Lenders hereby irrevocably appoints [●]Cantor Fitzgerald Securities to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise

such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental or related thereto.  The provisions of this Article IX (other than Sections 9.01, 9.06 and 9.09 through and including 9.12) are solely for the benefit of the Administrative Agent and the Lenders, and no Loan Party has rights as a third party beneficiary of any of such provisions.

(b)     The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article IX and Article X (including the second paragraph of Section 10.05), as though such co- agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents as if set forth in full herein with respect thereto.  Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent to (i) execute any and all documents (including releases) with respect to the Collateral (including each Intercreditor Agreement and any amendment, supplement, modification or joinder with respect thereto) and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by ~~any~~the Administrative Agent shall bind the Lenders and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.  The rights, privileges and immunities of the Administrative Agent in this Agreement shall be automatically incorporated by reference into each Collateral Document, whether or not expressly stated therein.

**Section 9.02     Rights as a Lender**.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

**Section 9.03     Exculpatory Provisions**.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(a)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents~~);~~) including instructions by e-mail from the Required Lenders or counsel to the Required Lenders (which on the date hereof is Weil, Gotshal & Manges LLP; *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may (i) expose it to liability or that is contrary to any Loan Document or applicable law or (ii) be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender

109

in violation of any Debtor Relief Law; *provided*, *further*, that prior to taking any action, the Administrative Agent may require an indemnity (such indemnity to be ~~reasonably~~ satisfactory to the Administrative Agent in all respects) from the Required Lenders or Lenders, as applicable, against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any action;

(c)        shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity;

(d)        shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and nonappealable judgment.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice describing such Default is given to the Administrative Agent by the Borrower or a Lender;

(e)        shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent;

(f)        shall not be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on or the payment of taxes with respect to any of the Collateral.  The actions described in items (i) through (iii) shall be the sole responsibility of the Borrower;

(g)        shall not be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Administrative Agent has been advised of the likelihood of such loss or damage and regardless of the form of action;

(h)        shall not be liable for any error of judgment made in good faith by a responsible officer of the Administrative Agent unless it shall be proved that the Administrative Agent was negligent in ascertaining the pertinent facts;

110

(i)    shall not be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as Administrative Agent; and

(j)    shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or the other Loan Documents arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; business interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action.; and

(k)    shall not have any obligation to file financing statements, amendments to financing statements, or continuation statements, or to perfect or maintain the perfection of the Administrative Agent's Lien on the Collateral, other than, in each case, as instructed by the Required Lenders or the foregoing's counsel, together with the form of such financing statement to be filed..

In addition, any assignor of a Loan or seller of a participation hereunder shall be entitled to rely conclusively on a representation of the assignee Lender or Participant in the relevant assignment or participation agreement, as applicable, that such assignee or purchaser is not a Disqualified Competitor; *provided* that such representation shall only be required to be made if the list of Disqualified Competitors is made to all Lenders and such assignees.  The Administrative Agent shall not have any responsibility or liability for monitoring the list or identities of, or enforcing provisions relating to, Disqualified Competitors.

Notwithstanding anything herein to the contrary or in any of the other Loan Documents, in each instance where the Loan Documents confer discretionary rights or powers upon the Administrative Agent which may be exercised or refrained from being exercised herein or in any of the Loan Documents, the Administrative Agent shall not be required to take any action in the absence of direction from the Required Lenders (accompanied by indemnity, if requested by the Administrative Agent in its discretion), and shall have the absolute right, in its sole discretion, to consult with, or seek the affirmative or negative vote from the Required Lenders or, if otherwise applicable, the Lenders, and it may do so pursuant to a negative notice, negative consent or otherwise.

Delivery of any reports, information and documents to the Administrative Agent is for informational purposes only and the Administrative Agent's receipt of such shall not constitute actual or constructive notice of any information contained therein or determinable from information contained therein, including the Borrower's compliance with any of its covenants hereunder.

No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby shall require the Administrative Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers.

The Administrative Agent has accepted and is bound by the Loan Documents executed by the Administrative Agent as of the Closing Date and, as directed in writing by the Required Lenders, the Administrative Agent shall execute additional Loan Documents delivered to it after the Closing Date; *provided, however,* that such additional Loan Documents do not adversely affect the rights, privileges, benefits and immunities of the Administrative Agent.  The Administrative Agent will not otherwise be bound by, or be held obligated by, the provisions of any credit agreement, indenture or other agreement governing the Obligations (other than this Agreement and the other Loan Documents to which the Administrative Agent is a party).

111

For the avoidance of doubt the Borrower, the Guarantors and the Lenders hereby agree that the Administrative Agent shall be under no obligation to make any determination, demand or request, grant or withhold any approval or consent or deliver any notice pursuant to the defined terms "Additional Refinancing Lender", "Collateral and Guarantee Requirement", "Excluded Assets", "Excluded Subsidiary", "Guarantors", "Material Domestic Subsidiary, "Material Foreign Subsidiary", "Mortgages", "Intercreditor Agreement", "Permitted Refinancing", and pursuant to Sections 2.03(b) and (g), 2.14, 2.15, 2.16, 5.05(b), 6.01(a) and (d), 6.07, 6.11, 6.12, 6.18, 7.03(g) and (i), 8.01(h), 9.02(d) and (e) and 10.01 without the written direction of Required Lenders or Lenders, as applicable.

Section 9.04    **Reliance by Administrative Agent**.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it in good faith to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it in good faith to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.05    **Delegation of Duties**.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent ~~(including, without limitation, the Former Agent)~~. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article IX shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 9.06    **Resignation of Administrative Agent**.  The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower.  If the Administrative Agent is a Defaulting Lender, the Borrower may remove such Defaulting Lender from such role upon 15 days' notice to the Lenders. Upon receipt of any such notice of resignation or removal of the Administrative Agent by the Borrower, the Required Lenders shall have the right, with the consent of the Borrower at all times other than upon the occurrence and during the continuation of an Event of Default (which consent of the Borrower shall not be unreasonably withheld, conditioned or delayed), to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above (including consent of the Borrower); *provided* that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to

112

each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section 9.06.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.06).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Sections 10.04 and 10.05 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

Section 9.07    **Non-Reliance on Administrative Agent and Other Lenders**.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, the Former Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.  Each Lender, by delivering its signature page to this Agreement or an Assignment and Assumption, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by the Administrative Agent, Required Lenders or Lenders, as applicable on the Closing Date.

Section 9.08    **No Other Duties, Etc**.  Anything herein to the contrary notwithstanding, the Administrative Agent, shall not have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder.

Section 9.09    **Administrative Agent May File Proofs of Claim**.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower), at the direction of the Required Lenders, shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.03(h), 2.03(i), 2.09, 10.04 and 10.05) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and

113

counsel, and any other amounts due the Administrative Agent under <u>Sections 2.09</u>, <u>10.04</u> and <u>10.05</u>.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

**Section 9.10** <u>**Collateral and Guaranty Matters**</u>.  Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Collateral Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Administrative Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to the occurrence and continuance of an Event of Default, to take any action with respect to any Collateral or Collateral Documents which may be necessary to create, perfect and maintain perfected security interests in and liens upon the Collateral granted pursuant to the Collateral Documents.  Each of the Lenders irrevocably authorizes the Administrative Agent, at its option, and in its sole discretion:

(a)      to enter into and sign for and on behalf of the Lenders as Secured Parties the Collateral Documents for the benefit of the Lenders and the other Secured Parties;

(b)      to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon payment in full of all Obligations (other than contingent obligations for which no claim has been made), (ii) at the time the property subject to such Lien is Disposed or to be Disposed as part of or in connection with any Disposition permitted hereunder or under any other Loan Document (including any Disposition of Equity Interests of a Subsidiary that is not a Loan Party to another Subsidiary that is not a Loan Party in connection with an Investment permitted under <u>Section 7.02(y)</u>), (iii) subject to <u>Section 10.01</u>, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders or (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to <u>Section 9.10(d)</u>;

(c)      to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted to be senior to the Liens securing the Secured Obligations pursuant to <u>Sections</u> <u>7.01(b)</u>, <u>(u)</u>, <u>(w)</u> (with respect to assumed Indebtedness), <u>(aa)</u> (with respect to <u>Sections</u> <u>7.01(b)</u>, <u>(u)</u>, <u>(w)</u> (as to assumed Indebtedness) and <u>(bb)</u>; and

(d)      to release any Subsidiary Guarantor from its obligations under this Agreement if such Person ceases to be a Subsidiary or becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this <u>Section 9.10</u>.  In each case as specified in this <u>Section 9.10</u>, the Administrative Agent will (and each Lender irrevocably authorizes the Administrative Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this <u>Section 9.10</u>.

114

Beyond the exercise of reasonable care in the custody of the Collateral in its possession, the Administrative Agent will not have any duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto.  The Administrative Agent will be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and the Administrative Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Administrative Agent in good faith.

The Administrative Agent will not  be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Administrative Agent, as determined by a court of competent jurisdiction in a final, nonappealable order, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any grantor to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.  The Administrative Agent hereby disclaims any representation or warranty to the present and future holders of the Obligations concerning the perfection of the Liens granted hereunder or in the value of any of the Collateral.

In the event that the Administrative Agent is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in the Administrative Agent's sole discretion may cause the Administrative Agent to be considered an "owner or operator" under any environmental laws or otherwise cause the Administrative Agent to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, the Administrative Agent reserves the right, instead of taking such action, either to resign as Administrative Agent or to arrange for the transfer of the title or control of the asset to a court appointed receiver.  The Administrative Agent will not be liable to any person for any environmental liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Administrative Agent's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any hazardous materials into the environment.

Section 9.11    **[Reserved].**

Section 9.12    **Withholding Tax Indemnity**.  To the extent required by any applicable Laws (as determined in good faith by the Administrative Agent), the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  If the Internal Revenue Service or any other authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of, withholding Tax ineffective or if any payment has been made by the Administrative Agent to any Lender without applicable withholding tax being deducted from such payment), such Lender shall, within 10 days after written demand therefor, indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrower pursuant to Section 3.01 and 3.04 and without limiting or expanding the obligation of the Borrower to do so) for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise, together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.12.  The agreements in this Section 9.12 shall survive the resignation and/or replacement

115

of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other Obligations.

Section 9.13    **Non-U.S. Administrative Agent Tax Matters**.

If legally entitled to do so, any successor or supplemental Administrative Agent that is not a United States person under Section 7701(a)(30) of the Code, shall deliver to the Borrower two duly completed copies of Internal Revenue Service Form W-8IMY certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of a trade or business in the United States and that it is using such form as evidence of its agreement with the Borrower to be treated as a United States person with respect to such payments (and the Borrower and the Administrative Agent agree to so treat the Administrative Agent as a United States person with respect to such payments as contemplated by Treasury Regulation Section 1.1441-1(b)(2)(iv)(A)), with the effect that the Borrower can make such payments to the Administrative Agent without deduction or withholding of any Taxes imposed by Section 1441 of the Code.

## ARTICLE X
## MISCELLANEOUS

Section 10.01    **Amendments, Etc**.  Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (or by the Administrative Agent with the consent of the Required Lenders) (other than with respect to any amendment or waiver contemplated in Sections 10.01(a) through (j) below, which shall only require the consent of the Lenders expressly set forth therein and not Required Lenders) (or by the Administrative Agent with the consent of the Required Lenders) and the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that, no such amendment, waiver or consent shall:

(a)    [reserved];

(b)    postpone any date scheduled for any payment of principal (including final maturity), interest or fees under Section 2.07, 2.08 or 2.09, respectively, without the written consent of each Lender directly and adversely affected thereby (it being understood that the waiver (or amendment to the terms) of any mandatory prepayment of the Loans or any obligation of the Borrower to pay interest at the Default Rate, any Default or Event of Default or mandatory prepayment shall not constitute such a postponement of any date scheduled for the payment of principal or interest and it further being understood that any change to the definition of "Consolidated First Lien Net Leverage Ratio" or the component definitions thereof shall not constitute a postponement of such scheduled payment);

(c)    reduce or forgive the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (iii) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document (or extend the timing of payments of such fees or other amounts) without the written consent of each Lender directly and adversely affected thereby (it being understood that the waiver of (or amendment to the terms of) any obligation of the Borrower to pay interest at the Default Rate, any mandatory prepayment of the Loans or any Default or Event of Default shall not constitute such a reduction);

(d)    change any provision of Section 2.12(a), 2.13 or 8.03 or the definition of "Pro Rata Share" in any manner that would alter the *pro rata* sharing or order of payments or other amounts required thereby, without the written consent of each Lender directly and

116

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

adversely affected thereby; *provided* that modifications to <u>Section 2.12(a)</u>, <u>Section 2.13</u>, <u>Section 8.03</u> or the definition of "Pro Rata Share" in connection with any buy back of Term Loans by any Holdco or the Borrower pursuant to <u>Section 10.07(k)</u>, shall only require approval (to the extent any such approval is otherwise required) of the Required Lenders;

(e)     change any provision of (i) this <u>Section 10.01</u> or (ii) the definition of "Required Lenders" or any other provision specifying the number of Lenders or portion of the Loans required to take any action under the Loan Documents to reduce the percentage set forth therein, without the written consent of each Lender directly and adversely affected thereby;

(f)     other than in connection with a transaction permitted under <u>Section 7.04</u> or <u>7.05</u>, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender; ~~or~~

(g)     other than in connection with a transaction permitted under <u>Section 7.04</u> or <u>7.05</u>, release all or substantially all of the aggregate value of the Guarantees, without the written consent of each Lender; or

*provided*, *further*, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, adversely affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document; (ii) only the consent of the parties to the Agent Fee Letter shall be required to amend, modify or supplement the terms thereof; (iii) <u>Section 10.07(h)</u> may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; ~~and~~ (iv)  no Lender consent is required to effect any amendment expressly contemplated by <u>Section 6.18</u>. and (v) this Agreement may be amended in the manner prescribed in Section 2.18.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except (x) in respect of an amendment, waiver or consent under <u>Section 10.01(a)</u> or <u>(b)</u> and (y) any waiver, amendment or modification requiring the consent of all Lenders or each directly and adversely affected Lender that by its terms materially and adversely affects any Defaulting Lender to a greater extent than other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding the foregoing, no Lender consent is required for the Administrative Agent (but the Administrative Agent may seek such consent) to enter into or to effect any amendment, modification or supplement to any Intercreditor Agreement or arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral for the purpose of adding the holders of such Indebtedness (or their Representative) as a party thereto and otherwise causing such Indebtedness to be subject thereto, in each case as contemplated by the terms of such Intercreditor Agreement or arrangement permitted under this Agreement, as applicable (it being understood that any such amendment or supplement may make such other changes to the applicable Intercreditor Agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and *provided* that such other changes are not adverse, in any material respect (taken as a whole), to the interests of the Lenders); *provided*, *further*, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent.

Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of

117

~~WEIL:\97507497\9\10143.0003~~WEIL:\97507497\16\10143.0003

this Agreement and the other Loan Documents with the Term Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

Notwithstanding anything to the contrary contained in this Section 10.01, guarantees, collateral security documents and related documents executed by the Loan Parties or the Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel or (ii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

Notwithstanding anything to the contrary contained in Section 10.01, if at any time after the Closing Date, the ~~Administrative Agent and the~~ Borrower shall have ~~jointly~~ identified in good faith an obvious error or any error or omission of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders within five Business Days following receipt of notice thereof.  The Administrative Agent shall be entitled to a certificate of a Responsible Officer of the Borrower stating that any such amendment is authorized and permitted by the terms of the Loan Document.

### Section 10.02   Notices and Other Communications; Facsimile Copies.

(a)       Notices; Effectiveness; Electronic Communications.

(i)       *Notices Generally*.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 10.02(a)(ii)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(A)       if to:

(1)       the Administrative Agent, to:

~~[●]~~

Cantor Fitzgerald Securities
as First Lien Term Agent
1801 N. Military Trail, Suite 202
Boca Raton, FL 33431
Telecopier: (646) 219-1180
Attention: N. Horning (Jason)
E-mail: NHorning@cantor.com

and

Cantor Fitzgerald Securities
as First Lien Term Agent
900 West Trade Street, Suite 725
Charlotte, NC 28202
Phone: (704) 374-0574
Telecopier: (646) 390-1764

118

Attention: B. Young (Jason)
E-mail: BYoung@cantor.com


with a copy (which shall not constitute notice) to:

[●]
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attn: N. Plotkin (Jason)


; and

(2)    if to the Borrower to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02(a); and

(B)    if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in Section 10.02(a)(ii) shall be effective as provided in such Section 10.02(a)(ii).

(ii)    *Electronic* Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(b)    *The Platform*.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM

119

VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Loan Parties, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of the Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Agent Party (or its representatives); *provided*, *however*, that in no event shall any Person have any liability to any other Person hereunder for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages); *provided* that nothing in this sentence shall limit any Loan Party's indemnification obligations set forth herein.

(c)     *Change of Address, Etc*.  Each of the Borrower and the Administrative Agent may change its address, electronic mail address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, electronic mail address, facsimile or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to the Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain Material Non-Public Information.

(d)     *Reliance by Administrative Agent and Lenders*.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in accordance with Section 10.05 hereof.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

**Section 10.03    No Waiver; Cumulative Remedies**.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Lenders; *provided*, *however*, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit

120

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

(solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) [reserved], (c) any Lender from exercising setoff rights in accordance with Section 10.09 (subject to the terms of Section 2.13) or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; *provided*, *further*, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**Section 10.04   Attorney Costs and Expenses**.  The Borrower agrees to pay or reimburse the Administrative Agent, the Lenders and their respective Affiliates for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication, execution and delivery of this Agreement and the other Loan Documents, and  to pay or reimburse the Administrative Agent, the Lenders and their respective Affiliates for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the administration of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including, in each case, all Attorney Costs, which shall be limited to counsel to the Administrative Agent and its Affiliates, one counsel to the Lenders and their respective Affiliates, taken as a whole, and, if reasonably necessary, one local counsel in each relevant jurisdiction material to the interests of the Lenders, taken as a whole  and to pay or reimburse the Administrative Agent and the Lenders for all reasonable and documented out-of-pocket costs, charges and expenses incurred in connection with the enforcement or protection of any rights or remedies under this Agreement or the other Loan Documents (including all such costs, charges and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all respective Attorney Costs, which shall be limited to Attorney Costs of counsel to the Administrative Agent and its Affiliates, one counsel to the Lenders and their Affiliates, taken as a whole, and, if reasonably necessary, one local counsel in each relevant jurisdiction material to the interests of the Lenders taken as a whole and, solely in the case of an actual conflict of interest, one additional counsel in each relevant jurisdiction to each group of similarly situated affected parties). The agreements in this Section 10.04 shall survive repayment of all Obligations. All amounts due under this Section 10.04 shall be paid within 30 days following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail (provided that the Lender need not be required to disclose any confidential information or to the extent prohibited by law or regulation); provided that, with respect to the Closing Date, all amounts due under this Section 10.04 shall be paid on the Closing Date solely to the extent invoiced to the Borrower within two Business Days of the Closing Date. If any Loan Party fails to pay when due any costs, charges, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its discretion following five Business Days' prior written notice to the Borrower. For the avoidance of doubt, this Section 10.04 shall not apply to Taxes, except any Taxes that represent costs and expenses arising from any non-Tax claim.

**Section 10.05   Indemnification by the Borrower**.  The Borrower shall indemnify and hold harmless ~~each~~the Administrative Agent, each Agent-Related Person, Lender and their respective Affiliates and controlling Persons, and their respective officers, directors, employees, partners, agents, advisors and other representatives of each of the foregoing and their respective successors (collectively the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses, charges and disbursements (including Attorney Costs but limited in the case of legal fees and expenses to the reasonable and documented out-of-pocket fees, disbursements and other charges of counsel to the Administrative Agent and its Affiliates, one counsel to all other Indemnitees taken as a whole, and, if reasonably necessary, one local counsel for all Indemnitees taken as a whole in each relevant jurisdiction that is material to the interests of the Lenders, and in the case of an actual or potential conflict of interest, one additional counsel in each relevant jurisdiction to each group of similarly situated affected Indemnitees ), joint or several, of any kind or nature whatsoever which may at any time be imposed on,

<div align="center">121</div>

~~WEIL:\97507497\9\10143.0003~~WEIL:\97507497\16\10143.0003

incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Loan or the use or proposed use of the proceeds therefrom, (c) any actual or alleged presence or Release of Hazardous Materials at, in, on, under or from any property or facility currently or formerly owned, leased or operated by the Loan Parties or any Subsidiary, or any Environmental Liability or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (a "**Proceeding**") and regardless of whether any Indemnitee is a party thereto or whether or not such Proceeding is brought by the Borrower or any other person and, in each case, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee (all of the foregoing, collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses, charges or disbursements resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any of its controlled Affiliates or their respective directors, officers, employees, partners, advisors or other representatives, as determined by a final non-appealable judgment of a court of competent jurisdiction, (y) any dispute solely among Indemnitees other than any claims by or against an Indemnitee in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under this Agreement and other than any claims arising out of any act or omission of any Holdco, the Borrower or any of their Affiliates or (z) settlements effected without the Borrower's prior written consent (such consent not to be unreasonably withheld, delayed or conditioned), but if settled with the Borrower's written consent, or if there is a final judgment against an Indemnitee in any such Proceeding, the Borrower shall indemnify and hold harmless such Indemnitee to the extent and the manner set forth above. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through electronic, telecommunications or other information transmission systems, including, without limitation, SyndTrak, IntraLinks, the internet, email or similar electronic transmission systems in connection with this Agreement, in each case, except to the extent any such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee (or its controlling Persons, controlled Affiliates or their respective directors, officers, employees, partners, advisors or other representatives), nor shall any Indemnitee, Loan Party or any Subsidiary have any liability for any special,  punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date); it being agreed that this sentence shall not limit the indemnification obligations of any Holdco or any Subsidiary (including, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party and for any out-of-pocket expenses). In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, any Subsidiary of any Loan Party, its directors, equity holders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents are consummated. All amounts due under this Section 10.05 shall be paid within thirty (30) days after written demand therefor (together with reasonable backup documentation supporting such reimbursement request); *provided, however*, that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification rights with respect to such payment pursuant to the express terms of clauses (x) through (z) above. The agreements in this Section 10.05 shall survive the resignation or removal of the Administrative Agent, the replacement of any Lender, and the repayment, satisfaction or discharge of all the other Obligations. For the avoidance of doubt, this Section 10.05 shall not apply to Taxes, except any Taxes that represent liabilities, obligations, losses, damages, penalties, claims, demands, actions, prepayments, suits, costs, expenses, charges and disbursements arising from any non-Tax claims.

To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under this Section 10.05 or Section 10.04 to be paid by it to the Administrative Agent (or any sub-agent thereof), or any

122

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), or such Related Party, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this paragraph are subject to the provisions of Section 2.12(e).

Section 10.06    **Payments Set Aside**.    To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, *plus* interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 10.07    **Successors and Assigns**.    (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Administrative Agent (at the direction of the Required Lenders) and each Lender (except as permitted by Section 7.04) and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Assignee pursuant to an assignment made in accordance with the provisions of Section 10.07(b) (such an assignee, an "**Eligible Assignee**") and in the case of any Assignee that is Holdings or any of its Subsidiaries, Section 10.07(k), or (ii) by way of participation in accordance with the provisions of Section 10.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(g) or (iv) to an SPC in accordance with the provisions of Section 10.07(h) (and any other attempted assignment or transfer by any party hereto shall be null and void); *provided*, *however*, that notwithstanding the foregoing, no Lender may assign or transfer by participation any of its rights or obligations hereunder to (i) any Person that is a Defaulting Lender, (ii) a natural Person, (iii) a Disqualified Competitor and (iv)  Holdings, the Borrower or any of their respective Subsidiaries (except pursuant to Section 10.07(k)).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)        (i) Subject to the conditions set forth in Section 10.07(b)(ii) below and the proviso to Section 10.07(a), any Lender may at any time assign to one or more assignees (each, an "**Assignee**") all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

(A)        the Borrower; *provided* that no consent of the Borrower shall be required for (i) an assignment of all or a portion of the Term Loans to a Lender or to an Affiliate of a Lender or an Approved Fund thereof and (ii) after the occurrence and during the continuance of an Event of Default, an assignment to any Assignee; *provided*, *further*, that the Borrower shall be deemed to have consented to any such assignment unless it shall have

123

objected thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof; and

(B)     the Administrative Agent; *provided* that no consent of the Administrative Agent shall be required for an assignment (i) of all or any portion of a Term Loan to a Lender, an Affiliate of a Lender or an Approved Fund and (ii) of all or a portion of the Term Loans pursuant to, and in accordance with the terms of, Section 10.07(k).

Notwithstanding the foregoing or anything to the contrary set forth herein, to the extent any Lender is required to assign any portion of its Loans and other rights, duties and obligations hereunder in order to comply with applicable Laws, such assignment may be made by such Lender without the consent of the Borrower, the Administrative Agent, or any other party hereto so long as such Lender complies with the requirements of Section 10.07(b)(ii).

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment of the entire remaining amount of the assigning Lender's Loans, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, and shall be in increments of an amount of $1,000,000, in excess thereof unless each of the Borrower and the Administrative Agent otherwise consents; *provided* that concurrent assignments to any Lender and its Affiliates or Approved Funds and concurrent assignments from any Lender and its Affiliates or Approved Funds to a single Assignee (or to an Assignee and its Affiliates or Approved Funds) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(B)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); provided that only one such fee shall be payable in the event of simultaneous assignments to or from two or more Approved Funds;

(C)     other than in the case of assignments pursuant to Section 10.07(k), the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire; and

(D)     the Assignee shall execute and deliver to the Administrative Agent and the Borrower the forms described in Sections 3.01(e) and 3.01(f) applicable to it.

In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable *pro rata* share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full Pro Rata Share of all Loans. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under

124

applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(c)     Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d), from and after the effective date specified in each Assignment and Assumption, (1) other than in connection with an assignment pursuant to Section 10.07(k), the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement (subject to Section 10.07(k),), and (2) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, and the surrender by the assigning Lender of its Note, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.07(c) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(e).

(d)     The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it, and each notice of cancellation of any Loans delivered by the Borrower pursuant to Section 10.07(k) and a register for the recordation of the names and addresses of the Lenders and principal amounts (and related interest amounts) of the Loans owing to each Lender pursuant to the terms hereof from time to time (the "**Register**").  Upon its receipt of, and consent to, a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 10.07(b)(ii)(B) above, if applicable, and, if required, the written consent of the Administrative Agent and/or the Borrower to such assignment and any applicable tax forms, the Administrative Agent shall (i) accept such Assignment and Assumption and (ii) promptly record the information contained therein in the Register.  No assignment shall be effective unless it has been recorded in the Register as provided in this Section 10.07(d).  The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and, with respect to itself, any Lender, at any reasonable time and from time to time upon reasonable prior notice, *provided* that the information contained in the Register which is shared with each Lender (other than the Administrative Agent and its affiliates) shall be limited to the entries with respect to such Lender including the principal amount of and stated interest on the Term Loans owing to such Lender.  This Section 10.07(d) and Section 2.11 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

(e)     Any Lender may at any time (other than to a natural person, a Defaulting Lender, a Holdco, the Borrower, or any Disqualified Competitor) sell participations to any Person (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan

125

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (a) through (i) of the first proviso to Section 10.01 that requires the affirmative vote of such Lender.  Subject to Section 10.07(f), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations of such Sections and Section 3.07, including Section 3.01(e), and it being understood that the documentation required under Section 3.01(e) shall be delivered solely to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(c).  To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.13 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is reasonably necessary to establish that such Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The Participant Register shall be conclusive, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(f)    A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's consent or except to the extent such entitlement to a greater payment results from a change in any Law after the sale of the participation takes place.

(g)    Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any central bank having jurisdiction over such Lender; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)    Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof and (iii) such SPC and the applicable Loan or any applicable part thereof, shall be appropriately reflected in the Participant Register.  Each party hereto hereby agrees that (i) an SPC shall be entitled to the benefit of Sections 3.01, 3.04 and 3.05 (subject to the requirements and the limitations of such Sections and Section 3.07, including Section 3.01(e), and it being understood that the documentation required under Section 3.01(e) shall be delivered solely to the participating Lender), but neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement except, in the case of Section 3.01 and 3.04, unless such entitlement to a greater payment results from a change in any Law after the grant to the SPC takes place, (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any

126

amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(i)        Notwithstanding anything to the contrary contained herein, without the consent of the Borrower or the Administrative Agent, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(j)        [Reserved].

(k)        Any Lender may, so long as no Event of Default has occurred and is continuing, at any time, without any consent, assign all or a portion of its rights and obligations with respect to Term Loans under this Agreement to a Holdco or the Borrower through (x) Dutch auctions open to all Lenders on a *pro rata* basis in accordance with procedures of the type described in Section 2.05(a)(v) or (y) notwithstanding Sections 2.12 and 2.13 or any other provision in this Agreement, open market purchase on a non-*pro rata* basis, in each case subject to the following:

(i)        if Holdings or Intermediate Holdings is the assignee, upon such assignment, transfer or contribution, such entity shall automatically be deemed to have contributed the principal amount of such Term Loans, plus all accrued and unpaid interest thereon, to the Borrower as common equity;

(ii)        if the Borrower is the assignee (including through contribution or transfers set forth in clause (i) above), (a) the principal amount of such Term Loans, along with all accrued and unpaid interest thereon, so contributed, assigned or transferred to the Borrower shall be deemed automatically cancelled and extinguished on the date of such contribution, assignment or transfer, (b) the aggregate outstanding principal amount of Term Loans of the remaining Lenders shall reflect such cancellation and extinguishment of the Term Loans then held by the Borrower and (c) the Borrower shall promptly provide notice to the Administrative Agent of such contribution, assignment or transfer of such Term Loans, and the Administrative Agent, upon receipt of such notice, shall reflect the cancellation of the applicable Term Loans in the Register;

(iii)        purchases of Term Loans pursuant to this Section 10.07(k) may not be funded with the proceeds of ABL Loans;

(iv)        the assigning Lender and Holdings, Intermediate Holdings or the Borrower, as applicable, shall execute and deliver to the Administrative Agent an Assignment and Assumption;

(v)        the aggregate principal amount of Term Loans repurchased by Holdings, Intermediate Holdings or the Borrower, collectively, during the term of this Agreement shall not exceed 10% of the aggregate principal amount of the Term Loans made to the Borrower on the Closing Date; and

127

(vi)    notwithstanding anything to the contrary contained herein (including in the definitions of "Consolidated Net Income" and "Consolidated EBITDA") any non-cash gains in respect of "cancellation of indebtedness" resulting from the cancellation of any Terms Loans purchased by a Holdco or the Borrower shall be excluded from the determined amount of Consolidated Net Income and Consolidated EBITDA.

Each Lender participating in any assignment to any Holdco or the Borrower acknowledges and agrees that in connection with such assignment, (1) such Holdco or the Borrower then may have, and later may come into possession of Excluded Information, (2) such Lender has independently and, without reliance on any Holdco, the Borrower or any of their Subsidiaries, the Administrative Agent or any other Agent-Related Persons, made its own analysis and determination to participate in such assignment notwithstanding such Lender's lack of knowledge of the Excluded Information, (3) none of Intermediate Holdings, the Borrower or their respective Subsidiaries, the Administrative Agent or any other Agent-Related Persons shall have any liability to such Lender, and such Lender hereby waives and releases, to the extent permitted by law, any claims such Lender may have against Holdings, Intermediate Holdings, the Borrower and their respective Subsidiaries, the Administrative Agent and any other Agent- Related Persons, under applicable laws or otherwise, with respect to the nondisclosure of the Excluded Information and (4) that the Excluded Information may not be available to the Administrative Agent or the other Lenders.

The aggregate outstanding principal amount of the Term Loans shall be deemed reduced by the full par value of the aggregate principal amount of the Term Loans purchased by, or contributed to (in each case, and subsequently cancelled hereunder), Holdings or its Subsidiaries pursuant to this Section 10.07(k) and each principal repayment installment with respect to the Term Loans pursuant to Section 2.07 shall be reduced *pro rata* by the par value of the aggregate principal amount of Term Loans so purchased or contributed (and subsequently cancelled).

Any purchase of Term Loans pursuant to this Section 10.07(k) shall not constitute voluntary or mandatory payment or prepayment under this Agreement.

**Section 10.08    Confidentiality.**    Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its Affiliates and its Affiliates' managers, administrators, directors, officers, employees, trustees, partners, investors, funding sources, investment advisors and agents, including accountants, legal counsel and other advisors (collectively "**Advisors**") on a "need to know basis" (*provided* that (i) the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and agree or otherwise have an obligation to keep such Information confidential and (ii) ~~such~~the Administrative Agent or Lender, as applicable, shall be responsible for the compliance of its Affiliates and such Affiliates' Advisors with this paragraph); (b) to the extent required or requested by, or upon the good faith determination by counsel that such information should be disclosed in light of ongoing oversight or review of such Person, by any Governmental Authority or self-regulatory authority having or asserting jurisdiction over such Person (including any Governmental Authority regulating any Lender or its Affiliates), *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation; (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation; (d) to any other party to this Agreement; (e) to (i) any pledgee referred to in Section 10.07(g), (ii) subject to an agreement containing provisions at least as restrictive as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Borrower), any direct or indirect contractual counterparty to a Swap Contract, Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in any of its rights or obligations under this Agreement (other than any Disqualified Competitor or Person whom the Borrower has affirmatively denied to provide consent to assignment in accordance with Section 10.07(b)(i)(A))); or (iii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which

128

payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder (other than any Disqualified Competitor or Person whom the Borrower has affirmatively denied to provide consent to assignment in accordance with Section 10.07(b)(i)(A)); (f) with the prior written consent of the Borrower; (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.08 or other obligation of confidentiality owed to the Borrower or its Affiliates or becomes available to the Administrative Agent, any Lender, or any of their respective Affiliates on a non-confidential basis from a source other than a Loan Party or their respective related parties (so long as such source is not known (after due inquiry) to the Administrative Agent, such Lender, or any of their respective Affiliates to be bound by confidentiality obligations to any Loan Party or its Affiliates); (h) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to Loan Parties and their Subsidiaries received by it from such Lender) or to the CUSIP Service Bureau or any similar organization;  (i) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of its rights hereunder or thereunder; (j) to the extent such information is independently developed by the Administrative Agent, any Lender, or any of their respective Affiliates; or (k) for purposes of establishing a due diligence defense.  In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and publicly available information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Administrative Agent and the Lenders in connection with the administration, settlement and management of this Agreement, the other Loan Documents and the Credit Extensions.  For the purposes of this Section 10.08, "**Information**" means all information received from the Loan Parties relating to any Loan Party, its Affiliates or its Affiliates' directors, officers, employees, trustees, investment advisors or agents, other than any such information that is publicly available to ~~any~~the Administrative Agent, or any Lender prior to disclosure by any Loan Party other than as a result of a breach of this Section 10.08 or any other confidentiality obligation owed to any Loan Party or their Affiliates.

Section 10.09  **Setoff**.  In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates (and the Administrative Agent, in respect of any unpaid fees, costs and expenses payable hereunder) is authorized at any time and from time to time, without prior notice to the Borrower, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and each of its Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) (other than escrow, payroll, petty cash, trust and tax accounts) at any time held by, and other Indebtedness at any time owing by, such Lender and its Affiliates or the Administrative Agent to or for the credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations owing to such Lender and its Affiliates or the Administrative Agent hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not ~~such~~the Administrative Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit of other obligations; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.17 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of the Administrative Agent and each Lender under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent and such Lender may have at Law.

Section 10.10  **Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**").  If ~~any~~the

129

Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by anthe Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 10.11   **Counterparts**.  This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by facsimile, Docusign or other electronic transmission of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document.  The Administrative Agent may also require that any such documents and signatures delivered by facsimile, Docusign or other electronic transmission be confirmed by a manually signed original thereof; *provided* that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile, Docusign or other electronic transmission.

Section 10.12   **Integration**.  This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  Subject to Section 10.21, in the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; *provided* that the inclusion of supplemental rights or remedies in favor of the Administrative Agent or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement.  Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

Section 10.13   **Survival of Representations and Warranties**.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.14   **Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions; *provided*, that the Lenders shall charge no fee in connection with any such amendment.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Without limiting the foregoing provisions of this Section 10.14, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 10.15   **GOVERNING LAW**.  (a)  THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

<div align="center">130</div>

(b)   ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY (BOROUGH OF MANHATTAN) OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, OR ANY APPELLATE COURT FROM ANY THEREOF, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY, ~~EACH~~THE ADMINISTRATIVE AGENT AND EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS AND AGREES THAT IT WILL NOT COMMENCE OR SUPPORT ANY SUCH ACTION OR PROCEEDING IN ANOTHER JURISDICTION.   EACH LOAN PARTY, ~~EACH~~THE ADMINISTRATIVE AGENT AND EACH LENDER IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.   EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS IN THE MANNER PROVIDED FOR NOTICES (OTHER THAN FACSIMILE) IN SECTION 10.02.   NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.16   **WAIVER OF RIGHT TO TRIAL BY JURY**.   EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).   EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.16.

Section 10.17   **Binding Effect**.   This Agreement shall become effective when it shall have been executed and delivered by the Loan Parties and each other party hereto and the Administrative Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Loan Parties, ~~each~~the Administrative Agent and each Lender and their respective successors and assigns, in each case in accordance with Section 10.07 (if applicable) and except that no Loan Party shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders except as permitted by Section 7.04.

Section 10.18   **USA Patriot Act**.   Each Lender that is subject to the USA Patriot Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name, address and tax identification number of such Loan Party and other information regarding such Loan Party that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the USA Patriot Act.   This notice is given in accordance with the requirements of the USA Patriot Act and is effective as to the Lenders and the Administrative Agent.   The Borrower shall, promptly following a reasonable request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such

131

~~WEIL:\97507497\9\10143.0003~~WEIL:\97507497\16\10143.0003

Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

**Section 10.19** **No Advisory or Fiduciary Responsibility**. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent are arm's-length commercial transactions between the Loan Parties and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (B) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent and each Lender each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for each Loan Party or any of their respective Affiliates, or any other Person and (B) neither the Administrative Agent nor any Lender has any obligation to the Loan Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and neither the Administrative Agent nor any other Arranger nor any Lender has any obligation to disclose any of such interests to the Loan Parties or any of their respective Affiliates. To the fullest extent permitted by law, each Loan Party hereby waives and releases any claims that it may have against the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**Section 10.20** **Judgment Currency**. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable law).

**Section 10.21** **Intercreditor Agreement**. Each Lender hereunder (a) acknowledges that it has received a copy of the Intercreditor Agreement, (b) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement and (c) authorizes and instructs the Administrative Agent to enter into the Intercreditor Agreement as Administrative Agent and on behalf of such Lender. The foregoing provisions are intended as an inducement to the lenders under the ABL Loan Documents, the Second Lien Loan Documents and the Loan Documents to extend credit to the Loan Parties and such lenders are intended third party beneficiaries of such provisions. In the event of any conflict or inconsistency between the provisions of any Intercreditor Agreement and this Agreement, the provisions of such Intercreditor Agreement shall control.

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

**Section 10.22    <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>**.
Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or
understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is
an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may
be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents
to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution
Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA
Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other
instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that
may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be
accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan
Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of
the write-down and conversion powers of any EEA Resolution Authority.

**Section 10.23    <u>Certain ERISA Matters.</u>**

(a)    Each Lender (x) represents and warrants, as of the date such Person became a
Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the
date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its
Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party,
that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of 29 CFR §
2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the
Loans,

(ii)    the transaction exemption set forth in one or more prohibited transaction
class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to
time ("PTEs"), such as PTE 84-14 (a class exemption for certain transactions determined by independent
qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving
insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving
insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving
bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-
house asset managers), is applicable with respect to such Lender's entrance into, participation in,
administration of and performance of the Loans and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional
Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager
made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the
Loans and this Agreement, (C) the entrance into, participation in, administration of and performance of the
Loans and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and
(D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are

133

WEIL:\97507497\9\10143.0003WEIL:\97507497\16\10143.0003

satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

(i)    none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans and this Agreement is a fiduciary under ERISA or the US Internal Revenue Code, or both, with respect to the Loans and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)    no fee or other compensation is being paid directly to the Administrative Agent or any its Affiliates for investment advice (as opposed to other services) in connection with the Loans or this Agreement.

(c)    The Administrative Agent hereby inform the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans and this Agreement, (ii) may recognize a gain if it extended the Loans for an amount less than the amount being paid for an interest in the Loans by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

134

## ARTICLE XI
## GUARANTEE

**Section 11.01    The Guarantee**.  Each Guarantor hereby jointly and severally with the other Guarantors guarantees, as a primary obligor and not as a surety to each Secured Party and their respective permitted successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of (i) the Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code and (ii) any other Debtor Relief Laws) on the Loans made by the Lenders to, and the Notes held by each Lender of, the Borrower, and all other Secured Obligations from time to time owing to the Secured Parties by any Loan Party under any Loan Document strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"); *provided*, *however*, that Guaranteed Obligations shall exclude all Excluded Swap Obligations.  The Guarantors hereby jointly and severally agree that if the Borrower or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

**Section 11.02    Obligations Unconditional**.  The obligations of the Guarantors under Section 11.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrower under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full).  Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

> (a)    at any time or from time to time, without notice to the Guarantors, to the extent permitted by Law, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

> (b)    any of the acts mentioned in any of the provisions of this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted (including incurring any increase or decrease in the principal amount of the Guaranteed Obligations or the rate of interest or the fees thereon);

> (c)    the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or except as permitted pursuant to Section 11.09, any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

> (d)    any Lien or security interest granted to, or in favor of, any Lender or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

> (e)    the release of any other Guarantor pursuant to Section 11.09.

135

The Guarantors hereby expressly waive (to the fullest extent permitted by Law) diligence, presentment, demand of payment, protest and, to the extent permitted by Law, all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantors waive, to the extent permitted by Law, any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrower or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

Section 11.03    **Reinstatement**. The obligations of the Guarantors under this Article XI shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 11.04    **Subrogation; Subordination**. Each Guarantor hereby agrees that until the payment in full in cash and satisfaction in full of all Guaranteed Obligations (other than contingent obligations not yet due and owing) it shall subordinate any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 11.01, whether by subrogation or otherwise, against the Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.

Section 11.05    **Remedies**. The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrower under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 8.02 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.02) for purposes of Section 11.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 11.01.

Section 11.06    **[Reserved]**.

Section 11.07    **Continuing Guarantee**. The guarantee in this Article XI is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 11.08    **General Limitation on Guarantee Obligations**. In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other Law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 11.01 would otherwise be held or determined to be

136

void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 11.09, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount (after giving effect to the liability under this Guaranty and the right of contribution established in Section 11.10, but before giving effect to any other guarantee (including any guarantee of the ABL Obligations and/ or the Second Lien Obligations)) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 11.09   **Release of Guarantors**.  If, in compliance with the terms and provisions of the Loan Documents, (i) all or substantially all of the Equity Interests of any Subsidiary Guarantor are sold or otherwise transferred to a Person or Persons none of which is a Loan Party in a transaction permitted hereunder or (ii) any Subsidiary Guarantor ceases to be a Subsidiary or becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder (any such Subsidiary Guarantor, and any Subsidiary Guarantor referred to in clause (i), a "**Transferred Guarantor**"), such Transferred Guarantor shall, upon the consummation of such sale or transfer or other transaction (but subject to the proviso below), be automatically released from its obligations under this Agreement (including under Section 10.05 hereof) and the other Loan Documents, including its obligations to pledge and grant any Collateral owned by it pursuant to any Collateral Document and, in the case of a sale of all or substantially all of the Equity Interests of the Transferred Guarantor, the pledge of such Equity Interests to the Administrative Agent pursuant to the Collateral Documents shall be automatically released, and, so long as the Borrower shall have provided the Administrative Agent such certifications or documents as ~~any~~the Administrative Agent shall reasonably request, the Administrative Agent shall take such actions as are ~~necessary~~reasonably requested by the Borrower or such Guarantor to effect each release described in this Section 11.09 in accordance with the relevant provisions of the Collateral Documents; *provided*, *however*, that the release of any Subsidiary Guarantor from its obligations under this Agreement and the other Loan Documents if such Subsidiary Guarantor becomes an Excluded Subsidiary of the type described in clause (a) of the definition thereof shall only be permitted if at the time such Subsidiary Guarantor becomes an Excluded Subsidiary of such type (1) no Default or Event of Default shall have occurred and be outstanding, (2) after giving *pro forma* effect to such release and the consummation of the transaction that causes such Person to be an Excluded Subsidiary of such type, the Borrower is deemed to have made a new Investment in such Person for purposes of Section 7.02 (as if such Person were then newly acquired) and such Investment is permitted pursuant to Section 7.02 (other than Section 7.02(f)) at such time and (3) a Responsible Officer of the Borrower certifies to the Administrative Agent compliance with preceding clauses (1) and (2); *provided*, *further*, that no such release shall occur if such Subsidiary Guarantor continues to be a guarantor in respect of the ABL Obligations, the Second Lien Obligations or any Permitted Refinancing in respect of any of the foregoing.

When all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied (other than contingent obligations as to which no claim has been asserted), this Agreement and the Guarantees made herein shall terminate with respect to all Obligations, except with respect to Obligations that expressly survive such repayment pursuant to the terms of this Agreement.

Section 11.10   **Right of Contribution**.  Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment.  Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 11.04.  The provisions of this Section 11.10 shall in no respect limit the obligations and liabilities of any Guarantor to the Administrative Agent and the Lenders, and each Subsidiary Guarantor shall remain liable to the Administrative Agent and the Lenders for the full amount guaranteed by such Guarantor hereunder.

Section 11.11   **Keepwell**.  Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Guaranty in respect of Swap

137

Obligations (*provided*, *however*, that each Qualified ECP Guarantor shall only be liable under this Section 11.11 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 11.11, or otherwise under this Guarantee, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Guarantor under this Section 11.11 shall remain in full force and effect until all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied.  Each Qualified ECP Guarantor intends that this Section 11.11 constitute, and this Section 11.11 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 11.12  **Independent Obligation**.   The obligations of each Guarantor hereunder are independent of the obligations of any other Guarantor, any other party or any Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not action is brought against any other guarantor, any other party or any Borrower and whether or not any other guarantor, any other party or any Borrower be joined in any such action or actions.  Each Guarantor waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof.  Any payment by the Borrower or other circumstance which operates to toll any statute of limitations as to the Borrower shall operate to toll the statute of limitations as to the Guarantors.

[Signature Pages Follow]

138

**Exhibit B**

**Stockholders' Agreement**

Certain documents or portions thereof contained in this **Exhibit B** and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The respective rights of the Debtors and the Consenting Creditors are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement and any of the documents and designations contained herein at any time before the Effective Date of the Plan or any such other date as may be provided for in the Plan or an order of the Bankruptcy Court, and filing of the forms of the documents set forth in this Plan Supplement (including this Exhibit B) shall not be deemed as acceptance of such document by any party to the Restructuring Support Agreement or a waiver of any of the rights of any such party under the Restructuring Support Agreement, the Bankruptcy Code or otherwise.

**STOCKHOLDERS AGREEMENT**

dated as of

August 28, 2020

among

**JASON HOLDINGS INC.**

and

**CERTAIN OTHER PERSONS NAMED HEREIN**

WEIL:\97607817\1\10143.0003

**TABLE OF CONTENTS**

**Page**

ARTICLE 1      DEFINITIONS.................................................................................................2

   Section 1.01.   Definitions..............................................................................................2
   Section 1.02.   Other Definitional and Interpretative Provisions..............................6

ARTICLE 2      VOTING AGREEMENT; BOARD OF DIRECTORS; ACTIONS SUBJECT
   TO BOARD APPROVAL ................................................................................7

   Section 2.01.   Board of Directors.................................................................................7
   Section 2.02.   Vacancies..............................................................................................10
   Section 2.03.   Board Observer Rights........................................................................10
   Section 2.04.   Reimbursement ...................................................................................11
   Section 2.05.   Other Governing Document Provisions.............................................11
   Section 2.06.   Directors' and Officers' Insurance....................................................11
   Section 2.07.   No Liability for Board Designees or Board Observers.....................11
   Section 2.08.   Board Committees ..............................................................................11
   Section 2.09.   Actions Subject to Stockholder Approval..........................................11
   Section 2.10.   Actions Subject to Certain Specified Stockholder Approvals .........12

ARTICLE 3      DRAG-ALONG RIGHTS ...............................................................................13

   Section 3.01.   Drag-Along Rights...............................................................................13
   Section 3.02.   Additional Conditions to Drag-Along Rights...................................15

ARTICLE 4      TAG-ALONG RIGHTS...................................................................................16

   Section 4.01.   Tag-Along Rights.................................................................................16

ARTICLE 5      PREEMPTIVE RIGHTS ...............................................................................19

   Section 5.01.   Preemptive Rights...............................................................................19
   Section 5.02.   Excluded Issuances ............................................................................20

ARTICLE 6      INFORMATION RIGHTS, CONSULTATION RIGHT, AND SALE
   SUPPORT ARRANGEMENTS .....................................................................20

   Section 6.01.   Financial Statements and Periodic Reports.....................................20
   Section 6.02.   Information Rights...............................................................................22
   Section 6.03.   Delivery of Information; Confidentiality............................................22
   Section 6.04.   Sale Support Arrangements ...............................................................22

ARTICLE 7      CERTAIN COVENANTS AND AGREEMENTS ..........................................23

   Section 7.01.   Confidentiality ....................................................................................23
   Section 7.02.   Irrevocable Proxy and Power of Attorney .........................................24

i

Section 7.03.    Transfer Restrictions ...................................................................25

ARTICLE 8    MISCELLANEOUS .................................................................26

Section 8.01.    Binding Effect; Assignability; No Third Party Beneficiaries .......................26
Section 8.02.    Notices .................................................................................26
Section 8.03.    Waiver; Amendment ..................................................................27
Section 8.04.    Effectiveness; Termination; Survival; Fallaway .............................................27
Section 8.05.    Governing Law .......................................................................28
Section 8.06.    Jurisdiction; Service of Process .......................................................28
Section 8.07.    WAIVER OF JURY TRIAL ...........................................................28
Section 8.08.    Specific Performance ................................................................28
Section 8.09.    Counterparts .........................................................................29
Section 8.10.    Entire Agreement ....................................................................29
Section 8.11.    Severability ..........................................................................29
Section 8.12.    Further Assurances ...................................................................29
Section 8.13.    Aggregation of Shares ...............................................................29
Section 8.14.    Independent Agreement by the Stockholders ...................................30

Schedule 1    List of Stockholders on the Effective Date
Exhibit A    Joinder Agreement
Exhibit B    Competitors

WEIL:\97607817\1\10143.0003

## STOCKHOLDERS AGREEMENT

This STOCKHOLDERS AGREEMENT (this "**Agreement**"), dated as of August 28, 2020, by and among (i) Jason Holdings Inc., a Delaware corporation (the "**Corporation**"), (ii) the Persons identified on Schedule 1 (each, a "**Specified Stockholder**"), (iii) the Persons identified on Schedule 2 and (iv) any other Person who shall at any time be a party to or bound by this Agreement as a result of the execution and delivery to the Corporation of a joinder substantially in the form attached as Exhibit A (a "**Joinder**"), in accordance with the terms hereof (the persons described in clauses (ii), (iii) and (iv), collectively, the "**Stockholders**").

### W I T N E S S E T H:

WHEREAS, on June 24, 2020, the Corporation and certain of its direct and indirect wholly owned subsidiaries (collectively, the "**Debtors**") filed voluntary chapter 11 petitions under title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court Southern District of New York (the "**Bankruptcy Court**") under the caption "In re: Jason Industries, Inc., et al";

WHEREAS, pursuant to the *Joint Prepackaged Chapter 11 Plan of Reorganization of Jason Industries, Inc. and its Affiliated Debtors* (Docket No. 20-22766) (as the same may have been subsequently amended, modified or supplemented, the "**Plan**"), as of the date hereof (the "**Effective Date**"), each of the Specified Stockholders as of the date hereof have been issued Common Stock;

WHEREAS, the Plan provides that any party that is to receive Common Stock thereunder shall be, and without further action by any Person is deemed to be, a party to this Agreement and bound to the terms of this Agreement from and after the Effective Date, even if not a signatory thereto, and all such parties as of the date hereof are listed on Schedule 1 hereto;

WHEREAS, all Persons who are issued Common Stock following the Effective Date or receive Common Stock pursuant to a transfer from an existing holder of Common Stock must become a party to this Agreement by signing a Joinder;

WHEREAS, the parties hereto desire to establish certain rights and obligations with respect to the composition of the Corporation's Board of Directors (the "**Board**" and, each director on such Board, a "**Director**") and other matters relating to the corporate governance of the Corporation; and

WHEREAS, on August 26, 2020, the Bankruptcy Court entered an order confirming the Plan, including this Agreement to read as set forth herein.

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Corporation and each of the other parties hereto hereby agree as follows:

WEIL:\97607817\1\10143.0003

# ARTICLE 1

## DEFINITIONS

Section 1.01.  Definitions.

(a)      As used in this Agreement, the following terms have the following meanings:

"**Affiliate**" means, when used with reference to any Person, any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person and, in respect of any Stockholder, any investment fund, vehicle or holding company of which such Stockholder or any Affiliate of such Stockholder serves as the general partner, managing member or discretionary manager or advisor; provided, however, that limited partners, non-managing members or other similar direct or indirect investors in a Stockholder (in their capacities as such) shall not be deemed to be Affiliates of such Stockholder.

"**beneficial ownership**" or "**beneficially own**" means beneficial ownership as determined pursuant to Rule 13d-3 and Rule 13d-5 under the Exchange Act; provided, however, that beneficial ownership under this Agreement shall exclude any indebtedness convertible into capital stock, unexercised option, warrant or similar right and only refer to shares of outstanding capital stock.

"**Bylaws**" means the Amended and Restated Bylaws of the Corporation, as the same may be amended and/or restated from time to time.

"**Business Day**" means any day except a Saturday, Sunday or other day on which commercial banks in New York City are authorized by Law to close.

"**Capital Stock**" means the capital stock of the Corporation.

"**Certificate of Incorporation**" means the Amended and Restated Certificate of Incorporation of the Corporation, as the same may be amended and/or restated from time to time.

"**Common Stock**" shall mean the common shares, par value $0.01 per share, of the Corporation.

"**Corporate Entity**" means the Corporation and any of its Subsidiaries.

"**Competitor**" means any Person listed on Exhibit B hereto, as the Corporation (upon the determination of the Board) may update or amend from time to time to include any other Person that is a competitor of the Corporation or of any other Corporate Entity; provided, however, that with respect to any Stockholder, the beneficial ownership of securities held for passive investment purposes of a portfolio company engaged in competitive activities shall not be deemed to result in such Stockholder being a Competitor so long as such Stockholder's beneficial ownership (taken together with its Affiliates' and Related Funds' beneficial ownership) does not exceed fifty percent (50%) of the total equity securities of any such portfolio company

WEIL:\97607817\1\10143.0003

(subject to the provisions of Section 7.01); provided, further, that no Specified Stockholder nor any of its Related Funds shall be a Competitor.

"**Convertible Term Loans**" means term loans provided pursuant to the Second Lien Credit Agreement.

"**Corporation Securities**" means any Capital Stock or equity interests of the Corporation, including the Common Stock, and any other security convertible into or exercisable or exchangeable for such Capital Stock or equity interests of the Corporation, including any security, bond, note, indebtedness, warrant, option or other right or instrument, in each case, exercisable for or exchangeable or convertible into such Capital Stock or equity interests.

"**Drag-Along Pro Rata Portion**" means with respect to any Dragged Holder, a number of shares of Common Stock determined by multiplying (1) the number of shares of outstanding Common Stock beneficially owned by the applicable Dragged Holder immediately prior to the Sale Event by (2) a fraction, (i) the numerator of which is the total number of shares of Common Stock proposed to be Transferred by the Drag-Along Sellers in connection with the Sale Event and (ii) the denominator of which is the aggregate number of shares of outstanding Common Stock beneficially owned by all Stockholders immediately prior to the Sale Event.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Governing Documents**" means this Agreement, the Certificate of Incorporation and the Bylaws and any similar organizational document of each Subsidiary of the Corporation.

"**Law**" means any applicable statute, law, rule, regulation, ordinance, code, policy or rule of common law issued, administered or enforced by any governmental authority, or any judicial or administrative interpretation thereof including the rules of any stock exchange.

"**National Securities Exchange**" means The Nasdaq Global Market, The Nasdaq Global Select Market, The New York Stock Exchange or other agreed internationally recognized exchange.

"**Person**" means an individual, corporation, limited liability company, partnership, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"**Public Offering**" means any sale or distribution to the public of Common Stock of the Corporation pursuant to an offering registered under the Securities Act, whether by the Corporation, by Stockholders and/or by any other holders of the Corporation's Common Stock (other than on Form S-4, S-8, or any similar or successor form relating to Capital Stock issuable upon exercise of employee stock options or in connection with any employee benefit or similar plan of the Corporation or in connection with a direct or indirect business combination involving the Corporation and another Person, filed under the Securities Act). For the avoidance of doubt, a Public Offering shall not include sales by Stockholders pursuant to an exemption provided by Rules 144, 144A or Regulation S under the Securities Act.

3

"**Qualified IPO**" means an underwritten Public Offering that provides for at least $40,000,000 in gross proceeds to the Corporation and a price per share of Common Stock at least equal to $10.00 and, immediately after such Public Offering, the Common Stock is quoted or listed for trading on a National Securities Exchange.

"**Registration Rights Agreement**" means the Registration Rights Agreement dated on or around the date of this Agreement, by and among the Corporation and the Stockholders specified therein.

"**Related Fund**" means with respect to any Stockholder, (i) an Affiliate of such Stockholder or (ii) any fund, account or investment vehicle that is controlled, managed, advised or sub-advised by any Stockholder, an Affiliate thereof or the same investment manager, advisor or sub-advisor as the Stockholder or an Affiliate of such investment manager, advisor or sub-advisor.

"**Sale Event**" means: (i) a merger or consolidation of the Corporation with another Person (other than one in which holders of a majority of the Voting Power of the Corporation immediately prior to such merger or consolidation own a majority of the Voting Power of the outstanding equity interests of the surviving or acquiring Person); (ii) a sale, lease, transfer, exclusive license or other disposition of all or substantially all of the assets of the Corporation (other than to an acquirer in which holders of a majority of the Voting Power of the Corporation immediately prior to such merger or consolidation own a majority of the Voting Power of the outstanding equity interests of such acquirer); or (iii) a transaction or series of related transactions in which a Person, or a group of related Persons, in each case which are not the Stockholders, acquires from Stockholders of the Corporation shares of Capital Stock representing more than fifty percent (50%) of the outstanding Voting Power of the Corporation.

"**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of the date hereof, by and among the Debtors (after giving effect to the transactions contemplated by the Plan, the "**Reorganized Debtors**") the lenders from time to time party thereto and Cantor Fitzgerald Securities, as administrative agent and collateral agent, pursuant to which the lenders party thereto were deemed to provide the Reorganized Debtors with convertible term loans in an aggregate principal amount of $50,000,000.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Specified Stockholder A**" means, collectively, any Specified Stockholder that is a fund, account or investment vehicle that is controlled, managed, advised or sub-advised by Credit Suisse Asset Management, LLC and, in each case, any Specified Stockholder that is a Related Fund thereof.

"**Specified Stockholder B**" means, collectively, Pelican Loan Advisors III, LLC and any Specified Stockholder that is a Related Fund thereof.

"**Specified Stockholder C**" means, collectively, AIC Finance Partnership, LP and AIC COP Investments, LLC and, in each case, any Specified Stockholder that is a Related Fund thereof.

4

"**Stockholder**" means at any time, any Person (other than the Corporation) who shall then be a party to or bound by this Agreement, so long as such Person beneficially owns any Capital Stock.

"**Subsidiary**" means, with respect to a Person, any entity required to be consolidated with such Person in such Person's books and records pursuant to generally accepted accounting principles, or any corporation, general or limited partnership, limited liability company, joint venture or other entity in which such Person (a) owns, directly or indirectly, fifty percent (50%) or more of its outstanding voting securities, equity interests, profits interest or capital interest, (b) is entitled to elect at least one-half of the board of directors or similar governing body or (c) in the case of a limited partnership or limited liability company, is a general partner or managing member and has the power to direct the policies, management and affairs of such entity, respectively.

"**Tag-Along Pro Rata Portion**" means with respect to any Tag-Along Offeree, a number of shares of Common Stock determined by multiplying (1) the number of shares of outstanding Common Stock beneficially owned by the applicable Tag-Along Offeree immediately prior to the Tag-Along Transfer by (2) a fraction, (i) the numerator of which is the total number of shares of Common Stock proposed to be Transferred by the Tag-Along Sellers in connection with the Tag-Along Transfer and (ii) the denominator of which is the aggregate number of shares of outstanding Common Stock beneficially owned by all Stockholders immediately prior to the Tag-Along Transfer.

"**Transfer**" means, with respect to any Capital Stock, a transaction or series of related transactions in which a Stockholder (1) pledges, sells, contracts to sell, sells any option or contract to purchase, purchases any option or contract to sell, grants any option, right or warrant to purchase, lend, or otherwise transfers or disposes of, directly or indirectly, any Capital Stock beneficially owned by such Stockholder or any other securities so owned convertible into or exercisable or exchangeable for Capital Stock or (2) enters into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Capital Stock, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Capital Stock or such other securities, in cash or otherwise; provided, however, that subject to customary pledge requirements, a grant of or existence of a security interest or encumbrance over any Capital Stock which is required by any bank or financial institution shall not be deemed to be a Transfer unless and until any enforcement of remedies in respect of such security interest or encumbrance that results in any Person other than such Stockholder becoming the beneficial owner of such Capital Stock.  The terms "**Transferee**", "**Transferor**", "**Transferred**", "**Transferring**" and other forms of the word "**Transfer**" shall have correlative meanings.

"**Voting Power**" means the total number of votes of the Voting Shares.

"**Voting Shares**" means any outstanding shares of Capital Stock entitled to vote for the election of Directors to the Board.

(a)     Each of the following terms is defined in the Section set forth opposite such term:

5

| **Term** | **Section** |
| --- | --- |
| Bankruptcy Code | Preamble |
| Bankruptcy Court | Preamble |
| Board | Preamble |
| Board Observer | 2.03(a) |
| CEO Director | 2.02(b)(i) |
| Corporation | Preamble |
| Confidential Information | 7.01(a)(i) |
| Debtors | Preamble |
| Director | Preamble |
| Drag-Along Buyer | 3.01(a) |
| Drag-Along Notice | 3.01(a) |
| Drag-Along Rights | 3.01(a) |
| Drag-Along Sellers | 3.01(a) |
| Dragged Holders | 3.01(a) |
| Effective Date | Preamble |
| Excluded Issuance | 5.02 |
| Initial Chairperson | 2.01(f) |
| Initial Directors | 2.02 |
| Initial Term Expiration Date | 2.01(f) |
| Issuance Notice | 5.01(a) |
| Joinder | Preamble |
| Preemptive Shares | 5.01(a) |
| Prohibited Transfer | 4.01(h) |
| Proposed Transferee | 6.04(a) |
| Representatives | 7.01(a)(i) |
| Plan | Preamble |
| Sale Event Documents | 3.01(b)(iv) |
| Share Sale | 3.01(b)(ii) |
| Specified Stockholder | Preamble |
| Stockholder | Preamble |
| Stockholder Representative | 3.01(b)(viii) |
| Tag-Along Election Period | 4.01(c) |
| Tag-Along Notice | 4.01(b) |
| Tag-Along Offeree | 4.01(a) |
| Tag-Along Per Share Consideration | 4.01(b) |
| Tag-Along Seller | 4.01(a) |
| Tag-Along Transfer | 4.01(a) |
| Tagging Stockholder | 4.01(c) |
| Termination Event | 8.04(a) |
| Transfer Notice | 6.04(a) |

Section 1.02.  Other Definitional and Interpretative Provisions. The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The captions herein are included for convenience of reference only and shall be ignored in the construction or

6

WEIL:\97607817\1\10143.0003

interpretation hereof.  References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.  "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.  References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.  References to any Law include all rules and regulations promulgated thereunder.  References to any Person include the successors and permitted assigns of that Person.  References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.

## ARTICLE 2

### VOTING AGREEMENT; BOARD OF DIRECTORS; ACTIONS SUBJECT TO BOARD APPROVAL

Section 2.01.   Board of Directors.

(a)      The initial Board shall consist of five (5) Directors and as of the Effective Date, Daniel Collin, Helen Ruth, Mark Blaufuss, James Janik, Brian Kobylinski shall be the initial directors (the "**Initial Directors**"); provided, however, that following the Effective Date, up to two (2) additional directors (each an "**Additional Director**") may be designated for appointment to the Board by the holders of a majority the outstanding Common Stock held by each Specified Stockholder as of the Effective Date by written notice to the Corporation (a "**Director Appointment Notice**") and  (x) effective upon receipt of such Director Appointment Notice, the Board shall be expanded accordingly, (y) the Initial Directors and the Corporation shall take such action as is required to cause each such Additional Directors to be appointed to the Board, including by calling a meeting of the Stockholders or otherwise seeking the consent of the requisite Stockholders to give effect to the same and (z)  each Stockholder agrees to vote, or cause to be voted, all Voting Shares beneficially owned by such Stockholder, or over which such Stockholder otherwise has voting control, in whatever manner as shall be necessary to ensure that, at the next annual or special meeting of Stockholders following receipt by the Corporation of a Director Appointment Notice, the Additional Director or Additional Directors shall be elected to the Board.

(b)      From and after the Effective Date, each Stockholder agrees to vote, or cause to be voted, all Voting Shares beneficially owned by such Stockholder, or over which such Stockholder otherwise has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each annual or special meeting of Stockholders at which an election of Directors is held or pursuant to any written consent of the Stockholders, the following persons shall be elected to the Board, which shall be designated as follows:

7

WEIL:\97607817\1\10143.0003

(i)    the Corporation's Chief Executive Officer (the "**CEO Director**"); provided, however, that if for any reason the CEO Director shall cease to serve as the Chief Executive Officer of the Corporation, then at the request of the Corporation, any Director or any Specified Stockholder, each of the Stockholders shall promptly vote their respective shares: (A) if the CEO Director does not resign from the Board, to remove the former Chief Executive Officer from the Board; and (B) to elect such person's replacement as Chief Executive Officer of the Corporation as the new CEO Director;

(ii)    (A) so long as Specified Stockholder A beneficially owns at least fifteen percent (15%) of the total number of shares of Common Stock issued and outstanding as of the Effective Date, two (2) Directors that are nominated by Specified Stockholder A, (B) so long as Specified Stockholder A beneficially owns at least five percent (5%) but less than fifteen percent (15%) of the total number of shares of Common Stock issued and outstanding as of the Effective Date, one (1) Director that is nominated by Specified Stockholder A or (C) so long as Specified Stockholder A beneficially owns less than five percent (5%) of the total number of shares of Common Stock issued and outstanding as of the Effective Date, no Director may be nominated by Specified Stockholder A pursuant to this Section 2.01(b)(ii);

(iii)    so long as Specified Stockholder B beneficially owns at least fifteen percent (15%) of the total number of shares of Common Stock issued and outstanding as of the Effective Date, two (2) Directors that are nominated by Specified Stockholder B, (B) so long as Specified Stockholder B beneficially owns at least five percent (5%) but less than fifteen percent (15%) of the total number of shares of Common Stock issued and outstanding as of the Effective Date, one (1) Director that is nominated by Specified Stockholder B or (C) so long as Specified Stockholder B beneficially owns less than five percent (5%) of the total number of shares of Common Stock issued and outstanding as of the Effective Date, no Director may be nominated by Specified Stockholder B pursuant to this Section 2.01(b)(iii); and

(iv)    all other Directors shall be elected by the outstanding Common Stock present and voting at a meeting at which a quorum is present in accordance with the Bylaws; provided, however, that, in relation to such other Directors and until such meeting, any vacancy on the Board that arises as a result of the death, disability, retirement, resignation or removal (with or without cause) of such other Directors may be filled in accordance with the Bylaws.

(c)    In furtherance of the foregoing, the Corporation and the Board shall, subject to and consistent with the Board's fiduciary duties and applicable law, take such actions as necessary to cause the foregoing Directors to be nominated and submitted to the Stockholders of the Corporation for election to the Board, or appointed to the Board by the remaining members of the Board, in any annual or special meeting of the Stockholders or any action by written consent to elect Directors in lieu thereof.

(d)    With respect to each Director designated under Section 2.01(b)(ii) and Section 2.01(b)(iii), promptly (and in no event less than three (3) Business Days) following the date upon which the relevant designating party ceases to have the applicable holding requirements as set

8

forth therein to designate such Director to the Board, such designated Director shall tender such Director's resignation as Director (which the Board may choose to waive and have such Director remain on the Board).  If the Board accepts such resignation, the resulting vacancy will henceforth be filled by a the outstanding Common Stock present at a meeting at which quorum is present; provided, however, that until such meeting, such resulting vacancy may be filled in accordance with the Bylaws.  If such Director refuses to resign, then upon the request of a majority of the other Directors, each Stockholder agrees to vote, or cause to be voted, all of its Voting Shares beneficially owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that such Director is removed from the Board, whether at a meeting of the Stockholders or by written consent.

(e)   Each Stockholder agrees to vote, or cause to be voted, all Voting Shares beneficially owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to remove a Director designated under Section 2.01(b)(ii) and Section 2.01(b)(iii) if the Person who designated such Director requests such removal.  The rights to designate members of the Board shall not be transferrable by Specified Stockholder A or Specified Stockholder B; provided, however, that Specified Stockholder A and Specified Stockholder B may transfer all or any of its Board designation rights in connection with a sale of all or substantially all of the Common Stock beneficially held on the Effective Date by Specified Stockholder A or Specified Stockholder B (or pursuant to which all or substantially all of the Common Stock held by such party on the Effective Date would have been transferred but for the exercise of tag-along rights in accordance with Article 4).

(f)   Each Stockholder agrees that:

(i)   following the Effective Date, it shall cause its designated members of the Board to, in accordance with the Bylaws, (A) vote for, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each meeting of the Board at which a chairperson of the Board is selected by the Board or (B) approve, pursuant to any written consent of the Board pursuant to which a chairperson of the Board is selected by the Board, in each case, the appointment of Daniel Collin as the initial chairperson of the Board (the "Initial Chairperson") for a term beginning on the date of such appointment and ending upon the earlier of (x) the date that is two (2) years following the Effective Date and (y) the date that the Initial Chairperson is no longer a Director of the Board (the "Initial Term Expiration Date").

(ii)   following the Initial Term Expiration Date, to the extent that the Initial Chairperson remains a Director of the Board (A) to the extent Specified Stockholder B beneficially owns at least ten percent (10%) of the total number of shares of Common Stock issued and outstanding as of the Effective Date, each Stockholder shall cause its designated members of the Board to, in accordance with the Bylaws, (x) vote for, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each meeting of the Board at which a chairperson of the Board is selected by the Board or (y) approve, pursuant to any written consent of the Board pursuant to which a chairperson of the Board is selected by the Board, in each case, the appointment of the Initial

9

Chairperson as the chairperson of the Board unless the holders of at least sixty-six and two-thirds percent (66.67%) of the outstanding Common Stock approve the appointment of another Director as chairperson of the Board and (B) from and after such time as Specified Stockholder B beneficially owns less than ten percent (10%) of the total number of shares of Common Stock issued and outstanding as of the Effective Date, the chairperson of the Board shall be appointed by a majority of the members of the Board.

(iii)     from and after such time as the Initial Chairperson is no longer a Director of the Board, the chairperson of the Board shall be appointed by a majority of the members of the Board.

Section 2.02.   <u>Vacancies</u>.  If Specified Stockholder A or Specified Stockholder B continue to have a right to designate a Director pursuant to <u>Section 2.01</u> and a vacancy on the Board arises as a result of the death, disability, retirement, resignation or removal (with or without cause) of a Director designated by such Person, the Board shall promptly, by written consent in accordance with the Bylaws or as the first order of business at the first meeting of the Board subsequent to such event, fill such vacancy in accordance with <u>Section 2.01</u> and no action shall be taken by the Board by written consent during the pendency of such designation unless waived by such party.

Section 2.03.   <u>Board Observer Rights</u>.

(a)     Each Specified Stockholder who beneficially owns at least four percent (4%) of the total number of shares of Common Stock issued and outstanding as of the Effective Date shall have the right to designate representatives (each, a "**Board Observer**") who shall be entitled to attend all meetings of the Board (but not meetings of any committees thereof unless specifically invited); <u>provided</u>, <u>however</u>, that each Board Observer shall have no voting rights with respect to actions taken or elected not to be taken by the Board; <u>provided</u> <u>further</u>, that each Board Observer shall at all times, except as otherwise required by law, hold in confidence and trust all information so provided, and each Board Observer, shall execute a confidentiality agreement to such effect in a form reasonably satisfactory to the Corporation; <u>provided</u> <u>further</u>, that a Board Observer shall have no further right to attend meetings of the Board, receive materials provided to the Board or have any other rights as a Board Observer in accordance with this <u>Section 2.03</u> if the relevant Stockholder ceases to beneficially own at least fifty percent (50%) of the number of shares of Common Stock held by such Specified Stockholder as of the Effective Date.

(b)     The Corporation shall provide the Board Observer with copies of all materials provided to the Board including notices, minutes, consents and any and all other materials provided to Directors, at the same time and in the same manner as it provides such materials to the Directors on the Board, except that the Corporation reserves the right to exclude a Board Observer from any meeting or portion thereof or materials relating thereto if the Board convenes an executive session or if the Board determines in good faith that access to such information or attendance at such meeting would reasonably be expected to adversely affect the attorney-client privilege between the Corporation and its counsel.  Any action taken by the Corporation in connection with the foregoing shall have no impact on the validity or any decision made or action taken by the Board.

10

(c)     A Board Observer may be changed at any time upon prior notice to the Corporation by the applicable Specified Stockholder and upon execution by the replacement Board Observer of a confidentiality agreement in form reasonably satisfactory to the Corporation, if requested by the Corporation.  The parties hereto hereby acknowledge and agree that each Board Observer shall not, by virtue of the Board Observer's status as such, owe any fiduciary or other duties to the Stockholders or otherwise have any directorial or other duties or liabilities to the Corporation or its Stockholders.

Section 2.04.   Reimbursement.  The Corporation shall reimburse the Directors of the Board and any Board Observers for all reasonable and documented out-of-pocket expenses incurred by each of them in connection with attending regular and special meetings of the Board and any committee thereof.

Section 2.05.   Other Governing Document Provisions.  Each Stockholder agrees to vote all of its Voting Shares or execute proxies or written consents, as the case may be, and to take all other actions necessary, to ensure that the other Governing Documents (a) do not at any time conflict with, any provision of this Agreement and (b) permit each Stockholder to exercise the express rights to which each such Stockholder is entitled under this Agreement.

Section 2.06.   Directors' and Officers' Insurance.  The Corporation will purchase and will use its commercially reasonably efforts to maintain director and officer liability insurance in such amounts and such limits as reasonably determined by the Board on behalf of any person who is or was a member of the Board against any liability asserted against him or incurred by him in any capacity as such, whether or not the Corporation would have the power to indemnify him against that liability under any of the Governing Documents.

Section 2.07.   No Liability for Board Designees or Board Observers.  No Stockholder, nor any Related Fund of any Stockholder, shall have any liability as a result of designating a Director or Board Observer, for any act or omission by such Director or Board Observer in his or her capacity as a Director of the Corporation or as a Board Observer, as applicable, nor shall any Stockholder or any Related Fund thereof have any liability as a result of voting for any such Director in accordance with the provisions of this Agreement.

Section 2.08.   Board Committees.  Each committee of the Board must include (a) one (1) Director designated by Specified Stockholder A (for so long as Specified Stockholder A has the right to designate at least one (1) Director pursuant to Section 2.01(b)(ii)) and (b) one (1) Director designated by Specified Stockholder B (for so long as Specified Stockholder B has the right to designate at least one (1) Director pursuant to Section 2.01(b)(iii)), in each case, unless such requirement is expressly waived by each of the Directors designated by the applicable designating party or parties; provided, however, that if the purpose of a committee of the Board is to review and approve a related party agreement involving one of the designating parties, such designating party's Directors shall not be represented on such committee.

Section 2.09.   Actions Subject to Stockholder Approval.  The Corporation shall not, and as applicable, shall not cause or permit any of its Subsidiaries to, take any of the following actions:

WEIL:\97607817\1\10143.0003

(a)      amend, restate or waive any provision of the Certificate of Incorporation, the Bylaws or any such similar governing documents of any Subsidiary of the Corporation, in a manner that is materially and disproportionately adverse to the powers, preferences or rights of one or more Stockholders unless approved by such adversely affected Stockholders;

(b)      enter into any recapitalization or reorganization of the Capital Stock unless such recapitalization or reorganization is approved by the holders of a majority of the issued and outstanding Common Stock; or

(c)      enter into any agreement or commitment to do any of the actions contemplated under subsection (b) above unless such agreement or commitment is approved by the holders of a majority of the issued and outstanding Common Stock.

Section 2.10.   Actions Subject to Certain Specified Stockholder Approvals.

(a)      The Corporation shall not, and as applicable, shall not permit any of its Subsidiaries to, take any of the following actions without the prior written consent of each of (i) Specified Stockholder A, (ii) Specified Stockholder B and (iii) Specified Stockholder C, in each case, for so long as such Specified Stockholder owns at least eight percent (8%) of the Common Stock then issued and outstanding:

(A)      conduct a sale or distribution to the public of Common Stock pursuant to an offering registered under the Securities Act, whether by the Corporation, by any of the Stockholders and/or by any other holders of the Capital Stock (other than a Qualified IPO);

(B)      prior to a Qualified IPO, issue any Capital Stock (other than a Qualified IPO);

(C)      enter, amend or renew any agreement or transaction with (i) any Affiliate of the Corporation or (ii) any Person that holds 5% or more of the total Common Stock then outstanding or an Affiliate of such Person, excluding (x) any agreement, amendment or renewal relating to a compensation or benefits arrangement with a director, officer or other employee of the Corporation or any of its Subsidiaries entered into in the ordinary course of business or (y) intercompany agreements among the Corporation and/or its Subsidiaries in the ordinary course of business, provided, however, that such Specified Stockholder's consent shall not be required if the contemplated agreement or transaction subject to approval is one with such Specified Stockholder or any of its Affiliates (other than the Corporation and its Subsidiaries); and provided, further, that, for purposes of this Section 2.10(a)(C), an Affiliate of the Corporation shall not include any Person which is a portfolio company of a Stockholder that is "under common control with" but is not "controlled by" an Affiliate of the Corporation; or

(D)      enter into any agreement or commitment to do any of the foregoing.

(b)      The rights of Specified Stockholder A, Specified Stockholder B and Specified Stockholder C set forth in this Section 2.10 shall not be transferrable.

12

WEIL:\97607817\1\10143.0003

## ARTICLE 3
## DRAG-ALONG RIGHTS

Section 3.01.  Drag-Along Rights.

(a)      If requested by the holders of at least sixty-six and two-thirds percent (66.67%) of the outstanding Common Stock in connection with a Sale Event to an unaffiliated third-party of such Drag-Along Sellers (as defined below), and such Sale Event is approved by the Board if so required by the Governing Documents or applicable Law (the applicable Stockholders entitled to initiate such Sale Event, the "**Drag-Along Sellers**"), the Drag-Along Sellers will have the right, but not the obligation (the "**Drag-Along Rights**"), to require the other Stockholders (the "**Dragged Holders**") to support such Sale Event by delivering, or requesting the Corporation to deliver (and the Corporation shall deliver) written notice thereof pursuant to Section 8.02 below (a "**Drag-Along Notice**") to such other Stockholders.  Such written notice must be delivered at least ten (10) Business Days prior to the closing of the proposed Sale Event and shall contain a general description of the material terms and conditions of the Sale Event, including the identity of the acquirer (the "**Drag-Along Buyer**"), the amount and form of consideration to be paid by the Drag-Along Buyer and the proposed closing date for the Sale Event (which may be an estimated date or range of dates).

(b)      Subject to Section 3.02, if a Drag-Along Notice is delivered by the Corporation or by or on behalf of the Drag-Along Sellers to the Dragged Holders, each of the Dragged Holders shall:

(i)      if such Sale Event requires Stockholder approval, with respect to all Voting Shares beneficially owned by such Dragged Holder, (A) vote (in person, by proxy or by action by written consent, as applicable) all such Voting Shares in favor of and to adopt such Sale Event and vote in opposition to any and all other proposals that would reasonably be expected to delay or impair the ability of the Corporation, any other Corporate Entity or the Drag-Along Sellers to consummate the Sale Event and (B) not raise any objection against such Sale Event or the process pursuant to which it was arranged;

(ii)      if such Sale Event is structured as an acquisition of Capital Stock (a "**Share Sale**"), be obligated to Transfer to the Drag-Along Buyer, at the closing of such Sale Event, all Capital Stock held by such Dragged Holder (or, as applicable, the same proportion of shares of Capital Stock beneficially held by such Dragged Holder as is being sold by the Drag-Along Sellers) on the same terms and conditions as the Drag-Along Sellers;

(iii)      if such Sale Event is structured as a Transfer of assets (including by or through the sale, issuance or other disposition of the outstanding capital stock or other outstanding equity interests of, or reorganization, merger, share exchange, consolidation or other business combination involving, any direct and/or indirect Corporate Entity), approve any subsequent dissolution and liquidation of the Corporation or any of the other Corporate Entities in connection therewith and execute and/or deliver such applicable documents, instruments or agreements related thereto as the Corporation or the Drag-

13

Along Sellers reasonably request; provided, however, that in any liquidation, each Stockholder shall receive on account of its Capital Stock the distributions pursuant to the rights and preferences set forth in the Governing Documents as in effect immediately prior to such Sale Event;

(iv)    execute and deliver any purchase agreement, merger agreement, indemnity agreement, escrow agreement, support agreement, voting agreement, letter of transmittal or other agreements or documents governing or relating to such Sale Event that the Corporation or the Drag-Along Sellers may reasonably request (the "**Sale Event Documents**");

(v)    use commercially reasonable efforts to obtain or make any consents or filings necessary to be obtained or made by such Dragged Holder to effectuate such Sale Event;

(vi)    waive and refrain from exercising any appraisal, dissenters or similar rights with respect to such Sale Event;

(vii)    if the consideration to be paid in exchange for the Capital Stock pursuant to this Article 3 includes any securities and due receipt thereof by any Stockholder would require under applicable Law (x) the registration or qualification of such securities or of any Person as a broker or dealer or agent with respect to such securities; or (y) the provision to any Stockholder of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the Securities Act, agree that the Corporation may cause to be paid to any such Stockholder in lieu thereof, against surrender of the shares which would have otherwise been sold by such Stockholder, an amount in cash equal to the fair value (as determined in good faith by the Board) of the securities which such Stockholder would otherwise receive as of the date of the issuance of such securities in exchange for the shares;

(viii)    in the event that the Drag-Along Sellers, in connection with such Sale Event, appoint a stockholder representative (the "**Stockholder Representative**") with respect to matters affecting the Stockholders under any of the Sale Event Documents following consummation of such Sale Event, (A) consent to (i) the appointment of such Stockholder Representative, (ii) the establishment of any applicable escrow, expense or similar fund in connection with any indemnification or similar obligations, and (iii) the payment of such Stockholder's pro rata portion (from the applicable escrow or expense fund or otherwise) of any and all reasonable fees and expenses to such Stockholder Representative in connection with such Stockholder Representative's services and duties in connection with such Sale Event and its related service as the representative of the Stockholders, and (B) not assert any claim or commence any suit against the Stockholder Representative or any other Stockholder with respect to any action or inaction taken or failed to be taken by the Stockholder Representative in connection with its service as the Stockholder Representative, absent fraud or willful misconduct; and

14

WEIL:\97607817\1\10143.0003

(ix)    take all other necessary or desirable actions reasonably requested by the Drag-Along Sellers and/or the Corporation in connection with the consummation of such Sale Event.

(c)    In the case of a Sale Event involving less than 100% of the then issued and outstanding Capital Stock, each Dragged Holder and each Drag-Along Seller shall Transfer its Drag-Along Pro Rata Portion of Common Stock in such Sale Event.

(d)    At the closing of any Sale Event that is structured as a Share Sale in which the Drag-Along Sellers have exercised their rights under this Article 3, each Dragged Holder shall deliver at such closing, against payment of the purchase price therefor in accordance with the terms of the Sale Event Documents, certificates or other documentation (or other evidence thereof reasonably acceptable to the Drag-Along Buyer) representing such Dragged Holder's Capital Stock to be sold, duly endorsed for transfer or accompanied by duly endorsed stock powers, and such other documents as are deemed reasonably necessary by the Drag-Along Seller or the Corporation for the proper transfer of such Capital Stock on the books of the Corporation.

(e)    Subject to Section 3.01(a), the Corporation shall use its commercially reasonable efforts to cooperate and assist in any proposed Sale Event including using its commercially reasonable efforts to cause its officers, employees, agents, contractors and others under its control to execute such Sale Event Documents or other agreements, documents, applications, authorizations, registration statements and instruments related thereto as the Board may reasonably deem necessary or appropriate in connection with any Sale Event.  Neither the Corporation nor any Drag-Along Sellers shall have any liability if any such Sale Event is not consummated for any reason.

(f)    Transfers of Capital Stock in a Sale Event by a Drag-Along Seller or a Dragged Holder pursuant to Section 3.01 shall not be subject to the transfer restrictions set forth in the Governing Documents, including Section 7.03; provided, however, that such Transfer would not, if consummated, result in any violation of the Securities Act or any state securities laws or regulations, or any other applicable federal or state laws or order of any governmental authority having jurisdiction over the Corporation.

Section 3.02.    Additional Conditions to Drag-Along Rights.  Notwithstanding anything contained in Section 3.01, the obligations of the Dragged Holders and the rights of the Drag-Along Sellers under Section 3.01 are subject to the following conditions:

(a)    if the Drag-Along Buyers in a Sale Event include one or more Affiliates of any Drag-Along Seller, such Sale Event must be approved by the holders of a majority of the shares of outstanding Common Stock not held by any Affiliate of such Person;

(b)    upon the consummation of such Sale Event, (i) all of the Stockholders participating therein will receive the same form and amount of consideration per share of Capital Stock as each other share of Capital Stock of the same class and series; provided, however, that in no event shall any consideration for any services, such as placement or transaction fees, investment banking or investment advisory fees payable to the Drag-Along Sellers or any related Person in connection with such transaction, or any consideration for any additional agreements

15

entered into in connection with such transaction, such as non-competition agreements, be included in such amount of per share consideration; and (ii) if any Stockholders are given an option as to the form and amount of consideration to be received, all Stockholders participating therein will be given the same option; provided, however, that the foregoing conditions shall not be required to the extent that the any Stockholder would receive cash in lieu of securities pursuant to Section 3.01(b)(vii);

(c)        each Dragged Holder shall be obligated to pay only its *pro rata* share of expenses incurred in connection with a consummated Sale Event to the extent such expenses are incurred for the benefit of all Stockholders and are not otherwise paid by the Corporation or another Person; and

(d)        each Stockholder shall: (i) not be required to give any representation or warranty or agree to any covenant or other obligation (including indemnification obligations or restrictive covenants) except for customary "fundamental" representations and warranties, including representations and indemnities concerning such Stockholder's title to the Capital Stock and authority, power and right to enter into and consummate the Transfer (or other Sale Event) without contravention of any Law or agreement, and an indemnity (and then only to the extent the Drag-Along Sellers are also subject to such an indemnity); provided, however, that if the Stockholders are required to provide any representations or indemnities in connection with such Transfer (or other Sale Event), liability for misrepresentation or indemnity shall (as to such Stockholders) be expressly stated to be several but not joint and each Stockholder shall not be liable for more than its *pro rata* share (based on the net proceeds received by it in the Sale Event in respect of its Corporation Securities) of any liability for misrepresentation or indemnity and each Stockholder's aggregate liability shall further be limited to the net proceeds received by such Stockholder in respect of its Capital Stock, except in the case of fraud by such Stockholder; (ii) benefit from all of the same provisions of the definitive agreements as the Drag-Along Sellers; and (iii) be required to bear its proportionate share of any escrows, holdbacks or adjustments in purchase price, which shall not, in each case, exceed the net proceeds received by such Stockholder in the Sale Event in respect of its Corporation Securities.

## ARTICLE 4
## TAG-ALONG RIGHTS

Section 4.01.   Tag-Along Rights.

(a)        Subject to Section 4.01(i), if any Stockholder, together with any of its Affiliates, proposes to Transfer Common Stock representing at least thirty five percent (35%) of the total Common Stock then outstanding (i) in a single transaction or series of related transactions or (ii) as part of the same disposition plan (including if acting in concert with other holders) (such holder or holders acting together, collectively, the "**Tag-Along Seller**" and such transfer, the "**Tag-Along Transfer**"), then each other Stockholder shall have the right to exercise tag-along rights in accordance with the terms and conditions set forth herein (any such Stockholder, a "**Tag-Along Offeree**").

(b)        The Tag-Along Seller shall promptly give notice to the Corporation, and the Corporation shall, to the extent reasonably practicable, promptly give or cause to give notice

16

pursuant to Section 8.02 (the "**Tag-Along Notice**") to each Tag-Along Offeree, at least ten (10) Business Days prior to the consummation of the proposed Tag-Along Transfer.  The Tag-Along Notice shall set forth the number of shares Common Stock proposed to be Transferred, the name of the proposed transferees, the proposed purchase price for each share of such Common Stock (the "**Tag-Along Per Share Consideration**"), and any other material terms and conditions of the Tag-Along Transfer, including the form of the proposed transfer agreement, if any.

(c)      Each Tag-Along Offeree shall have a period of ten (10) Business Days from the date of the Tag-Along Notice within which to elect to sell up to its Tag-Along Pro Rata Portion of Common Stock at a price per share equal to the Tag-Along Per Share Consideration in connection with such Tag-Along Transfer (the "**Tag-Along Election Period**").  Any Tag-Along Offeree may exercise such right by delivery of an irrevocable written notice to the Tag-Along Seller and the Corporation specifying the number of shares of Common Stock such Tag-Along Offeree desires to include in the Tag-Along Transfer (any such Tag-Along Offeree exercising such rights, a "**Tagging Stockholder**") and wire transfer or other instructions for payment of any consideration for the Common Stock.  The Tag-Along Seller shall have the right to sell, pursuant to the Tag-Along Transfer, (x) the number of shares of Common Stock proposed to be Transferred pursuant to the Tag-Along Transfer *minus* (y) the number of shares of Common Stock that the Tagging Stockholders elect to sell pursuant to the Tag-Along Transfer in accordance with this Section 4.01.

(d)      Each Tagging Stockholder shall agree:

(i)      to make the same representations and warranties to the transferees with respect to itself and related items as the Tag-Along Seller makes with respect to itself and related items in connection with the Tag-Along Transfer;

(ii)      to the same covenants, indemnities and agreements with respect to itself and related items as agreed by the Tag-Along Seller with respect to itself and related items in connection with the Tag-Along Transfer; and

(iii)      to the same terms and conditions to the Transfer of Common Stock as the Tag-Along Seller agrees (including bearing their proportionate share of any escrows, holdbacks or adjustments in purchase price);

provided, however, that with respect to the immediately preceding clauses (i) through (iii), (x) all such representations, warranties, covenants, indemnities and agreements shall be made by each Tagging Stockholder and each Tag-Along Seller severally and not jointly and (y) no Tagging Stockholder shall be required to agree to any representations, warranties, indemnities, agreements, terms and conditions that are specific to the Tag-Along Seller.

(e)      If at the end of a forty five (45) day period after the expiration of the Tag-Along Election Period (which forty five (45) day period shall be extended if any of the transactions contemplated by the Tag-Along Transfer are subject to regulatory approval until the expiration of five Business Days after all such approvals have been received, but in no event later than one hundred and twenty (120) days following expiration of the Tag-Along Election Period), the Tag-

17

WEIL:\97607817\1\10143.0003

Along Sellers have not completed the Transfer of all shares of Common Stock proposed to be sold by the Tag-Along Sellers and all Tagging Stockholders on substantially the same terms and conditions set forth in the Tag-Along Notice, the Tag-Along Sellers shall (i) return to each Tagging Stockholder the instruments of transfer, limited power-of-attorney and all certificates and other applicable instruments representing the Common Stock that such Tagging Stockholder delivered for Transfer pursuant to this Article 4 and any other documents in the possession of the Tag-Along Sellers executed by the Tagging Stockholders in connection with the proposed Tag-Along Transfer, and (ii) all the restrictions on Transfer contained in this Agreement or otherwise applicable at such time with respect to such Capital Stock shall continue in effect.

(f)    Promptly after the consummation of the Tag-Along Transfer, the Tag-Along Sellers shall (i) notify the Tagging Stockholders thereof, (ii) remit to the Tagging Stockholders the total consideration for the Capital Stock of the Tagging Stockholders Transferred pursuant thereto less the Tagging Stockholders' *pro rata* share of any escrows, holdbacks or adjustments in purchase price and any transaction expenses as determined in accordance with this Article 4, with the cash portion of the purchase price paid by wire transfer of immediately available funds in accordance with the wire transfer instructions provided by such Tagging Stockholder and (iii) furnish such other evidence of the completion and the date of completion of such transfer and the terms thereof as may be reasonably requested by the Tagging Stockholders.  The Tag-Along Sellers shall promptly remit to the Tagging Stockholders any additional consideration payable upon the release of any escrows, holdbacks or adjustments in purchase price.

(g)    Upon the consummation of such Tag-Along Transfer, (i) all of the Tagging Stockholders participating therein will receive the same form and amount of consideration in respect of each share of Common Stock sold by them in such Tag-Along Transfer; provided, however, that in no event shall any consideration for any services, such as placement or transaction fees, investment banking or investment advisory fees payable to the Tag-Along Sellers, as the case may be, or any related Person in connection with such transaction, or any consideration for any additional agreements entered into in connection with such transaction, such as non-competition agreements, be included in the amount of consideration and (ii) if any Tagging Stockholders are given an option as to the form and amount of consideration to be received, all Tagging Stockholders participating therein will be given the same option.

(h)    If any Stockholder or any of its Affiliates purport to sell any Common Stock in contravention of this Section 4.01 (a "**Prohibited Transfer**"), each other Stockholder who desires to exercise tag-along rights in accordance with the terms and conditions set forth in this Section 4.01 may, in addition to such remedies as may be available by Law, in equity or hereunder, require the Tag-Along Sellers to purchase, pro rata in accordance with their participation in the Prohibited Transfer, from such Stockholder the type and number of shares of Capital Stock that such Stockholder would have been entitled to sell in such Tag-Along Transfer had the Prohibited Transfer been effected in compliance with the terms of this Section 4.01.  The sale will be made on the same terms, including as provided in Section 4.01(g), as applicable, and subject to the same conditions as would have applied had the Stockholder not made the Prohibited Transfer.  Such sale (including the delivery of the purchase price) must be made within ninety (90) days after such Stockholder learns of the Prohibited Transfer.  The Tag-Along Sellers shall also reimburse, pro rata in accordance with their participation in the Prohibited Transfer, each participating Stockholder for any and all reasonable and documented out-of-

18

pocket fees and expenses, including reasonable legal fees and expenses, incurred pursuant to the exercise or the attempted exercise of the Stockholder's rights under this Section 4.01.

(i)      The provisions of this Section 4.01 shall not apply to (i) a transfer as part of a Public Offering for which piggyback registration rights apply in accordance with the Registration Rights Agreement, (ii) a transfer to (A) any Related Fund of a Stockholder, including any fund managed by the investment manager or advisor of a Stockholder or an Affiliate thereof or (B) any partner, stockholder or member of a Stockholder in connection with a distribution (not involving a disposition for value) of Common Stock held by a Stockholder to any such Person or (iii) any transfer pursuant to Article 3.

<div align="center">

**ARTICLE 5**
**PREEMPTIVE RIGHTS**

</div>

Section 5.01.   Preemptive Rights.

(a)      Subject to the terms and conditions of this Article 5 and applicable Law, if the Corporation proposes to offer, sell or issue any Corporation Securities except for any Excluded Issuance (collectively, the "**Preemptive Shares**"), then the Corporation shall give each Stockholder, pursuant to Section 8.02, written notice of such proposed issuance at least ten (10) Business Days prior to the proposed issuance date (an "**Issuance Notice**").  The Issuance Notice shall specify the number of Preemptive Shares and the price (or a good faith estimate or range of estimates of the price if the final price is not then determinable) at which such Preemptive Shares are proposed to be issued and the other material terms and conditions of such Preemptive Shares and of the issuance, including the proposed issuance date.  Each Stockholder shall be entitled to purchase, at the price and on the other terms and conditions specified in the Issuance Notice, up to a number of Preemptive Shares equal to its pro rata portion which shall be calculated as (i) the number of Preemptive Shares proposed to be issued by the Corporation multiplied by (ii) (x) the total number of shares of outstanding Common Stock beneficially owned by such Stockholder immediately prior to the proposed issuance divided by (y) the total number of shares of outstanding Common Stock immediately prior to the proposed issuance; provided, however, that if a range is provided in the Issuance Notice then each Stockholder shall be entitled to condition such participation upon the final price being within such specified price range.  A Stockholder may, in its sole discretion, allocate its right to purchase its portion of the Preemptive Shares among its Related Funds, including any funds managed by such Stockholder or its Affiliates.

(b)      A Stockholder may exercise its right to purchase its pro rata portion of the Preemptive Shares by delivering written notice of its election to purchase such Preemptive Shares at the price and on the terms and conditions specified in the Issuance Notice to the Corporation within five (5) Business Days after receipt of the Issuance Notice.  If, at the end of such five (5) Business Day period, any Stockholder has not exercised its right to purchase any of its pro rata portion of such Preemptive Shares by delivering such notice, such Stockholder shall be deemed to have waived all of its rights under this Article 5 with respect to the purchase of such Preemptive Shares specified in the applicable Issuance Notice.

(c)      Subject to compliance with this Article 5, the Corporation shall have ninety (90) days (or such longer period as is determined to be necessary in the reasonable judgment of the

<div align="center">19</div>

WEIL:\97607817\1\10143.0003

Board, such period to be no longer than one hundred and eighty (180) days after the date of the Issuance Notice to consummate the proposed issuance of any or all of such Preemptive Shares that the applicable Stockholders have elected not to purchase at the same (or higher) price and upon such other terms and conditions that, taken as a whole, are not materially less favorable to the Corporation than those specified in the Issuance Notice; provided, however, that if such issuance is subject to regulatory approval, such ninety (90) day period shall be extended until the expiration of five (5) Business Days after all such approvals have been received, but in no event later than one hundred and eighty (180) days after the date of the Issuance Notice.  If the Board proposes to issue any Preemptive Shares (i) after such ninety (90) day period (or one hundred and eighty (180) day period, if applicable) or (ii) during such ninety (90) day period (or one hundred and eighty (180) day period, if applicable) at a lower price or on such other terms that are, taken as a whole, materially less favorable to the Corporation, then, in either case (i) or (ii), it shall again comply with the procedures set forth in this Article 5.

(d)    The closing of any issuance of Preemptive Shares to the Stockholders pursuant to this Article 5 shall take place at the time and in the manner provided in the Issuance Notice.

Section 5.02.    Excluded Issuances.  The preemptive rights under this Article 5 shall not apply to (each of the following, an "**Excluded Issuance**"):

(i)    issuances or sales of any Corporation Securities in, or in connection with, a bona fide acquisition by the Corporation or any other Corporate Entity of, with or into another Person, excluding any Stockholder Affiliate; provided, however, the foregoing does not include an equity financing transaction to raise funds to finance any such acquisition;

(ii)    issuance of any Corporation Securities in connection with any employee or management equity awards or Corporation Securities issued upon the exercise, conversion or exchange of outstanding Corporation Securities; or

(iii)    issuance of any Corporation Securities upon the conversion of a the Convertible Term Loans.

## ARTICLE 6
## INFORMATION RIGHTS, CONSULTATION RIGHT, AND SALE SUPPORT ARRANGEMENTS

Section 6.01.    Financial Statements and Periodic Reports.

(a)    Subject to Section 7.01, the Corporation shall provide the following information to each Stockholder that is not a Competitor:

(i)    commencing with the fiscal year ended December 31, 2020, within 90 days after the end of each fiscal year, a consolidated balance sheet of the Corporation and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail (together with, in all cases, a management discussion and analysis with

20

WEIL:\97607817\1\10143.0003

respect thereto) and prepared in accordance with GAAP, audited and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing or other independent registered public accounting firm selected by the Corporation, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification (other than related (i) solely to the occurrence of the upcoming maturity date under that certain First Lien Credit Agreement, dated as of the date hereof, by and among the Reorganized Debtors, the lenders from time to time party thereto and Cantor Fitzgerald Securities, as administrative agent and collateral agent, pursuant to which the lenders party thereto were deemed to provide the Reorganized Debtors with term loans in an aggregate principal amount of $75,000,000, that certain ABL Credit Agreement, dated as of the date hereof, by and among the Reorganized Debtors, the lenders from time to time party thereto and Cantor Fitzgerald Securities, as administrative agent and collateral agent, pursuant to which the lenders party thereto were to provide the Reorganized Debtors with revolving loans in an aggregate principal amount up to $76,600,000 or the Second Lien Credit Agreement, in each case, occurring within one year from the date such report is delivered or (ii) any potential inability to satisfy any financial maintenance covenant on a future date or in a future period) or any qualification or exception as to the scope of such audit except for qualifications relating to changes in accounting principles or practices reflecting changes in GAAP and required or approved by such independent certified public accountants; and

(ii)     within 45 days (or 75 days in the case of the first fiscal quarter following the date hereof) after the end of each fiscal quarter of each fiscal year of the Corporation, a consolidated balance sheet of the Corporation and its Subsidiaries as at the end of such fiscal quarter and the related (x) consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (y) consolidated statements of cash flows for such fiscal quarter and the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail (together with, in all cases, a management discussion and analysis with respect thereto) and certified by the chief executive officer, president, vice president, chief financial officer, chief administrative officer, secretary or assistant secretary, treasurer or assistant treasurer, controller or other similar officer of the Corporation as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of the Corporation and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes; and

(iii)    within 35 days (or 45 days in the case of the first three such months following the date hereof) after the end of each of the first two months in any fiscal quarter of the Corporation, an unaudited consolidated balance sheet of the Corporation and its Subsidiaries at the end of such month and the related unaudited consolidated statements of cash flows as of and for such month and the portion of the fiscal year then ended, setting forth in each case, in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail.

21

(b)      The Corporation will hold a quarterly earnings conference call for the Stockholders promptly (but not later than seven (7) Business Days) after distribution of the information required to be provided in Section 6.01(a)(i) and Section 6.01(a)(ii).

Section 6.02.   Information Rights.  With reasonable promptness upon the reasonable request therefor, the Corporation shall provide any Stockholder that is not a Competitor with such other information or documents regarding the operations, business affairs and the financial condition of the Corporation or any other Corporate Entity as any such Stockholder may reasonably request in writing from time to time in good faith, and all such information shall be deemed to be "Confidential Information".  Notwithstanding anything to the contrary in this Section 6.02, neither the Corporation nor any Corporate Entity will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (a) that constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to any Stockholder is prohibited by any applicable Law or (c) that is subject to attorney-client or similar privilege or constitutes attorney work product.

Section 6.03.   Delivery of Information; Confidentiality.

(a)      Documents required to be delivered pursuant to Section 6.01(a) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Corporation causes such documents to be posted or linked from the Corporation's website on the Internet; or (ii) on which such documents are posted on a datasite, if any, to which each Stockholder has access.

(b)      Each Stockholder shall at all times, except as otherwise required by Law (as determined by such Stockholder in good faith and in consultation with its legal counsel), keep confidential all information provided under this Article 6 pursuant to the confidentiality provisions contained in Section 7.01 and all such information shall be deemed to be "Confidential Information".

Section 6.04.   Sale Support Arrangements.

(a)      At any time and from time to time on or following the Effective Date, each Stockholder may, by a notice sent to the Corporation pursuant to Section 8.02 (a "**Transfer Notice**"), inform the Corporation regarding a proposed Transfer by such Stockholder.  Each Transfer Notice shall specify (i) the amount of Common Stock proposed to be Transferred, and (ii) the identity of the proposed transferees (if known) (the "**Proposed Transferee**").

(b)      Upon receipt of a Transfer Notice relating to a proposed Transfer by a Stockholder, and subject to applicable Law, the Corporation shall, and shall cause the other Corporate Entities, to cooperate with such Stockholder and the Proposed Transferee in connection with the proposed Transfer, including to promptly provide, and cause each Corporate Entity to provide to such Stockholder, the Proposed Transferee, their respective counsel, financial advisors, auditors and other authorized representatives reasonable access upon reasonable notice and request and during normal business hours to the financial and operating data and such other information of the Corporation and its Subsidiaries as may reasonably be

22

requested in connection with such Transfer in order to allow the Proposed Transferee and their representatives (each as engaged for the purposes of the relevant transaction) to conduct a reasonable and customary due diligence review; provided, however, that in each case, (x) any information of a confidential nature shall only be made available to the Proposed Transferee upon the execution of customary confidentiality agreements reasonably satisfactory to the Corporation and (y) this Agreement shall not require the Corporation to extend any such cooperation or any Confidential Information to any Proposed Transferee that is a Competitor.

## ARTICLE 7
## CERTAIN COVENANTS AND AGREEMENTS

Section 7.01.  Confidentiality.

(a)     Each Stockholder acknowledges and agrees that without the prior written consent of the Corporation, any information provided to any Stockholder or, as requested in writing by such Stockholder, any of its members, equity holders, partners, managers, directors, officers, employees, representatives, Affiliates, advisors and agents (collectively, "**Representatives**") by the Corporation pursuant to this Agreement, including pursuant to an employee serving as a Director or as a Board Observer or any information rights and sale support rights under Article 6 (collectively, "**Confidential Information**") will be kept confidential, and will not be disclosed to any Person, except that Confidential Information may be disclosed:

(i)     to such Stockholder's Representatives in the normal course of the performance of their duties or to any financial institution providing credit to such Stockholder, so long as such Stockholder directs such Representative to keep such Confidential Information confidential in accordance with the terms of this Agreement;

(ii)     to any limited partner or other investor in such Stockholder, its Affiliates or Related Funds, so long as such Stockholder direct such Person to keep such Confidential Information confidential in accordance with the terms of this Agreement;

(iii)     to the extent required by applicable Law, rule or regulation (including complying with any oral or written questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process to which a Stockholder is subject; provided, however, that such Stockholder agrees to give the Corporation prior notice of such request(s), to the extent practicable, so that the Corporation may seek an appropriate protective order or similar relief (and the Stockholder shall use its commercially reasonable efforts to cooperate with such efforts by the Corporation));

(iv)     to any Person to whom such Stockholder is contemplating a Transfer of Corporation Securities and who is not a Competitor; provided, however, that such potential transferee is advised of the confidential nature of such information and agrees to be bound by confidentiality obligations at least as protective as the provisions hereof;

(v)     to any regulatory authority that requires or requests access to such Confidential Information in connection with the conduct of its ordinary oversight activities; provided, however, that such regulatory authority is advised of the confidential

23

WEIL:\97607817\1\10143.0003

nature of such information; and provided further, that any such request is not directly targeting the Corporation or any Corporate Entity;

(vi)     to the extent related to the tax treatment and tax structure of the transactions contemplated by this Agreement (including all materials of any kind, such as opinions or other tax analyses that the Corporation, its Affiliates or its Representatives have provided to such Stockholder relating to such tax treatment and tax structure); provided, however, that the foregoing does not constitute an authorization to disclose the identity of any existing or future party to the transactions contemplated by this Agreement or their Affiliates or Representatives, or, except to the extent relating to such tax structure or tax treatment, any specific pricing terms or commercial or financial information; or

(vii)    if the prior written consent of the Corporation shall have been obtained.

(b)     Notwithstanding Section 7.01(a):

(i)     "Confidential Information" shall not include information that: (A) is or becomes generally available to the public other than as a result of a disclosure by any Stockholder in violation of Section 7.01(a); (B) was available to any Stockholder on a non-confidential basis prior to its disclosure by the Corporation or its Representatives; (C) becomes available to the Stockholder on a non-confidential basis from a Person other than the Corporation and the Corporate Entities or their respective Representatives who is not known by the Stockholder to have violated a confidentiality agreement with the Corporation or the other Corporate Entities or any of their respective Representatives in respect of such information; or (D) was independently developed by the Stockholder without reference to or use of such information;

(c)     A Stockholder shall not be required to receive Confidential Information and may decline to receive information provided pursuant to Article 6 that constitutes Confidential Information by providing written notice to the Corporation in advance of such materials being delivered.

Section 7.02.   Irrevocable Proxy and Power of Attorney.  Each Stockholder hereby constitutes and appoints as the proxies of such Stockholder and hereby grants a power of attorney to the Corporation and any designee of the Corporation (who may be a Director or an officer of the Corporation), and each of them, with full power of substitution, with respect to the election or removal of Persons as members of the Board in accordance with Article 2 and all matters relating to the Drag-Along Rights pursuant to Article 3, and hereby authorizes each of them to represent and vote, if and only if the Stockholder (a) fails to vote, or (b) attempts to vote (whether by proxy, in person or by written consent), in a manner which is inconsistent with the terms of this Agreement, all of such Stockholder's Voting Shares in accordance with the terms and provisions of this Agreement.  Each of the proxy and power of attorney granted pursuant to the immediately preceding sentence is given in consideration of the agreements and covenants of the Corporation and the Stockholders in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable unless and until this Agreement terminates or expires pursuant to Section 8.04.  Unless and until this Agreement

24

terminates or expires pursuant to Section 8.04, each Stockholder shall not purport to grant any other proxy or power of attorney with respect to any of the Voting Shares, deposit any of its Voting Shares into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any other Person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Voting Shares, in each case, with respect to any of the matters set forth herein.  Notwithstanding the foregoing, the provisions of this Section 7.02 shall not prevent a Stockholder from (x) Transferring its Capital Stock so long as such Transfer complies with the provisions of the Governing Documents, including Section 7.03 or (y) directing a Related Fund of such Stockholder to vote its Voting Shares on its behalf.

Section 7.03.   Transfer Restrictions.

(a)      Other than in compliance with any exercise of Drag-Along Rights pursuant to Article 3, in addition to any other transfer restriction set forth in the Governing Documents, unless permitted by the Board, each Stockholder agrees that it shall not Transfer any of its Common Stock at any time if such Transfer:

(i)       would cause the Corporation to be required to, including as a result of passage of time and giving effect to the exercise, conversion or exchange of all securities convertible into, or exercisable or exchangeable for, shares of Common Stock, file a registration statement under the Exchange Act or be subject to the reporting requirements of the Exchange Act or any similar statute or legislation; provided, however, that the foregoing shall not apply to any Transfer if the Corporation has otherwise become obligated to file reports under Section 13 or Section 15(d) of the Exchange Act;

(ii)      would not comply with U.S. federal or state securities Laws or other applicable securities Law;

(iii)     is to a Person who has not (or will not in connection with such Transfer) become a party to this Agreement by executing and delivering a Joinder (subject to Section 7.03(d) below); or

(iv)      does not otherwise comply with this Agreement.

(b)      No Transfer of Capital Stock to any Person shall be effective unless such Person has complied with this Section 7.03. Any Transfer in violation of this Section 7.03(c) shall be null and void *ab initio*.

(c)      Unless otherwise approved by the Board, no issuance by the Corporation or Transfer of Capital Stock to any Person shall be effective unless such Person has delivered to the Corporation a Joinder, pursuant to which such Person agrees to be bound by the terms and conditions of this Agreement as if an original party hereto.  Any issuance or Transfer in violation of this Section 7.03(d) shall be null and void *ab initio*.

WEIL:\97607817\1\10143.0003

## ARTICLE 8
## MISCELLANEOUS

Section 8.01.   Binding Effect; Assignability; No Third Party Beneficiaries.

(a)      This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors, legal representatives and permitted assigns.  Any Stockholder that ceases to beneficially own any Capital Stock shall cease to be bound by the terms hereof other than such provisions which also survive the termination of this Agreement pursuant to Section 8.04(b).

(b)      Neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by any party hereto pursuant to any Transfer of Capital Stock or otherwise, other than as expressly provided for herein, except that any Person, other than the Corporation or any other Corporate Entity, acquiring Capital Stock that is required or permitted by the terms of this Agreement or any employment agreement or stock purchase, option, stock option or other compensation plan of the Corporation or any other Corporate Entity to become a party hereto shall (unless already bound hereby) execute and deliver to the Corporation a Joinder and shall thenceforth be a "Stockholder", for all purposes under this Agreement.

(c)      Nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the parties hereto, and their respective heirs, successors, legal representatives and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 8.02.   Notices.  All notices, requests and other communications to any party shall be in writing and shall be delivered in person, mailed by certified or registered mail, return receipt requested, or sent by facsimile transmission or email transmission:

if to the Corporation:

Jason Holdings Inc.
Address:      833 East Michigan Street, Suite 900
              Milwaukee, WI 53202
Attn:         General Counsel
Email:        generalcounsel@jasoninc.com

if to any Stockholder, at its address and the address of any representative listed on its signature pages and with a copy to:

Weil, Gotshal & Manges LLP
Address:      767 Fifth Avenue
              New York, New York 10153
Attn:         Ryan Preston Dahl, Esq.
              Mariel E. Cruz, Esq.
Email:        ryan.dahl@weil.com
              mariel.cruz@weil.com

26

WEIL:\97607817\1\10143.0003

All notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 6:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.  Any Person that becomes a Stockholder shall provide its mailing address and e-mail address to the Corporation for purposes of receiving notice under this Agreement.  Any Stockholder may change its address and other notice information by written notice to the Corporation given in accordance with this Section 8.02 and any other party may change its address and other notice information by written notice to the other parties hereto.

Section 8.03.   Waiver; Amendment.

(a)      Except as provided in the next sentence, no provision of this Agreement may be amended, restated or waived in any manner unless approved by (i) the Corporation, and (ii) the holders of a majority of the Voting Power of the Corporation; provided, however, that any amendment, restatement or waiver that, in any manner, would be materially and disproportionately adverse to the powers, preferences or rights of one or more Stockholders in relation to Stockholders holding similar powers, preferences or rights, must be approved by such disproportionately effected Stockholder(s).

(b)      Notwithstanding Section 8.03(a), the addition of new parties to this Agreement in accordance with its terms upon execution of a Joinder as a result of Transfers permitted in accordance with this Agreement shall not be deemed to be an amendment requiring the consent of (i) the Corporation and the holders of a majority of the Voting Power of the Corporation or (ii) any Stockholder.

(c)      Notwithstanding any provisions to the contrary contained herein, any party may waive any rights with respect to which such party is entitled to benefits under this Agreement. No waiver of or consent to any departure from any provision of this Agreement shall be effective unless signed in writing by the party entitled to the benefit thereof.

(d)      Unless expressly specified in the terms of this Agreement, no delay of or omission in the exercise of any right, power or remedy accruing to any party as a result of any breach or default by any other party under this Agreement shall impair any such right, power or remedy, nor shall it be construed as a waiver of or acquiescence in any such breach or default, or of any similar breach or default occurring later; nor shall any such delay, omission nor waiver of any single breach or default be deemed a waiver of any other breach or default occurring before or after that waiver.

Section 8.04.   Effectiveness; Termination; Survival; Fallaway.

(a)      This Agreement shall be effective as of the date hereof and shall continue in effect until the earlier of (i) the closing of a Qualified IPO, (ii) the closing of any other approved Public Offering whereby immediately after such Public Offering the Common Stock is quoted or listed for trading on a National Securities Exchange, (iii) the closing of a Sale Event or (iv) the mutual agreement of (A) the Corporation, (B) the holders of a majority of the Voting Power held by all

27

Stockholders, which majority must include (x) Specified Stockholder A, for as long as Specified Stockholder A has the right to designate at least one director pursuant to Section 2.02 and (y) Specified Stockholder B, for as long as Specified Stockholder B has the right to designate at least one director pursuant to Section 2.02 and (C) the holders of a majority of the Voting Power held by all Stockholders, excluding the Voting Power held by Specified Stockholder A or any of its Affiliates (each a "**Termination Event**").

(b)     Upon the occurrence of a Termination Event, this Agreement shall be terminated and become void and of no effect without liability of any party; provided, however, that no termination under this Agreement shall relieve any Person of liability for breach prior to termination.  The provisions of Section 2.07 and this Article 8 shall survive any termination of this Agreement.

Section 8.05.   Governing Law.  This Agreement and any claim, controversy or dispute arising under or related to this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware without regard to the conflicts of laws rules of such state.

Section 8.06.   Jurisdiction; Service of Process.  The parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the Court of Chancery of the State of Delaware, or to the extent such court does not have subject matter jurisdiction, the United States District Court for the District of Delaware, or to the extent such court also does not have subject matter jurisdiction, another court of the State of Delaware, County of New Castle, so long as one of such courts shall have subject matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware, and each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each party agrees that notice to such party as provided in Section 8.02 shall be deemed effective service of process on such party.

Section 8.07.   WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.08.   Specific Performance.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached.  It is accordingly agreed that, in addition to any other applicable remedies at Law or equity, the parties shall be entitled to an injunction or injunctions, without proof of damages, to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement.  Each party hereto agrees that it will not

28

oppose the granting of an injunction, specific performance or other equitable relief on the basis that (a) the other party has an adequate remedy at Law or (b) an award of specific performance is not an appropriate remedy for any reason at Law or in equity.  Each of the parties hereto hereby waives (x) any defenses in any action for specific performance, including the defense that a remedy at Law would be adequate and (y) any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.

Section 8.09.   Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  For the avoidance of doubt, any party that is to receive Common Stock under the Plan shall be, and without further action by any Person is deemed to be, a party to this Agreement and bound to the terms of this Agreement from and after the Effective Date, even if not a signatory hereto, and this Agreement may be executed without the signatures of any party so effected.  This Agreement and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by facsimile, by electronic mail in "portable document format" (".pdf") form, or any other electronic transmission, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

Section 8.10.   Entire Agreement.  This Agreement and the other Governing Documents constitute the entire agreement among the parties hereto and supersede all prior and contemporaneous agreements and understandings, both oral and written, among the parties hereto with respect to the subject matter hereof and thereof.

Section 8.11.   Severability.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner so that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 8.12.   Further Assurances.  Each party shall cooperate and shall take such further action and shall execute and deliver such further documents as may be reasonably requested by any other party in order to carry out the provisions and purposes of this Agreement.

Section 8.13.   Aggregation of Shares.  All Capital Stock held by a Stockholder and its Affiliates and Related Funds shall be aggregated together for purposes of determining the availability of any rights hereunder.  Upon the request of the Corporation or any transfer agent for the Capital Stock, each Stockholder shall promptly provide to the Corporation or its transfer agent, as applicable, written confirmation (including reasonable supporting documentation) of such Stockholder's then current ownership of its Capital Stock.  In determining the ownership of such Capital Stock for any purposes hereunder, the Corporation shall be entitled to conclusively rely in good faith on (a) the then most current ownership information provided to it by the

29

WEIL:\97607817\1\10143.0003

transfer agent or (b) if there is no such transfer agent, the most current ownership information then in its possession, and, in each case, any such determination made by the Corporation in reliance thereon shall be deemed final and binding on all parties hereto.

Section 8.14.    <u>Independent Agreement by the Stockholders</u>.  The obligations of each Stockholder hereunder are several and not joint with the obligations of any other Stockholder, and, except as expressly set forth herein, no provision of this Agreement is intended to confer any obligations on any Stockholder vis-à-vis any other Stockholder.  Nothing contained herein, and no action taken by any Stockholder pursuant hereto, shall be deemed to constitute the Stockholders as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Stockholders are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated herein.

[*Remainder of Page Intentionally Blank*]

WEIL:\97607817\1\10143.0003

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date above first above written.

**JASON HOLDINGS INC.**

By: _____

    Name:  Kevin Kuznicki

    Title:   Senior Vice President,
             General Counsel and
             Secretary

WEIL:\97607817\1\10143.0003

## SCHEDULE 1

## SPECIFIED STOCKHOLDERS

WEIL:\97607817\1\10143.0003

## SCHEDULE 2

## ADDITIONAL STOCKHOLDERS

WEIL:\97607817\1\10143.0003

## EXHIBIT A

## JOINDER TO STOCKHOLDERS AGREEMENT

This Joinder Agreement (this "**Joinder Agreement**") is made as of the date written below by the undersigned (the "**Joining Party**") in accordance with the Stockholders Agreement dated as of August 28, 2020 (as amended, amended and restated or otherwise modified from time to time, the "**Stockholders Agreement**"), among Jason Holdings Inc. (the "**Corporation**") and Stockholders of the Corporation party thereto, as the same may be amended from time to time. Capitalized terms used, but not defined, herein shall have the meaning ascribed to such terms in the Stockholders Agreement.

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to the Stockholders Agreement as of the date hereof and shall have all of the rights and obligations of a "Stockholder" thereunder as if it had executed the Stockholders Agreement.  The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Stockholders Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date written below.

Date: [●]

**[STOCKHOLDER]**

By: _____

   Name: [●]

   Title: [●]

Notice information pursuant to Section 8.02:

Address: [●]

Attn: [●]

Email: [●]

Fax: [●]

A-1

WEIL:\97607817\1\10143.0003

## EXHIBIT B

## COMPETITORS

| BUSINESS DIVISION | COMPETITOR |
|---|---|
| Osborn | Saint-Gobain |
| | PFERD |
| | Weiler |
| | Kullen |
| | Lessmann |
| | Tanis, Inc. |
| | Mink Bursten (August Mink GmbH & Co. KG) |
| | Union Industrial Brushes |
| | Felton Brushes |
| | Thomas Industrial Rolls, Inc. |
| | Menzerna Polishing Compounds GmbH & Co. KG |
| | C. Hilzinger-Thum GmbH & Co. KG |
| | Divine Brothers Co. |
| | Walter Surface Technology |
| | Mill Rose |
| | 3M |
| | JAZ |
| | Abtex / Malish |
| | NCCM |
| | Marpol |
| | Felton |
| | AKK (Armstrong Kover Kwick) |
| | BRM (Brush Research) |
| | Schaefer / Gronell |
| | NIPB |
| | FKM |
| | Radiac |
| | Luka |
| | Klingspor |
| | United Abrasives / SAIT |
| | Cumi |
| | Tyrolit |
| | Camel Grinding Wheels |
| | Hermes |
| Milsco | Seats, Inc. |
| | Sears Seating |
| | Grammer |
| | Harita Seating Systems, Ltd. |
| | Commercial Vehicle Group (CVG), Inc. |
| | TS Tech CO., Ltd. |

B-1

WEIL:\97607817\1\10143.0003

| | |
|---|---|
| | PPD Group |
| | Shad (NAD, S.L.) |
| | Woodbridge Group |
| | Seat King LLC |
| | Polo Custom Products (motorcycle bags and accessories) |
| | Saddlemen Seats |
| | Mustang Seats |
| | Corbin Seats |
| | KAB suspension seats |
| | United Seating |
| | BE-GE |
| | Star Seating |
| | Pilot |
| | SEAT |
| | Dowco (motorcycle bags and accessories) |
| | Woo Chang |

WEIL:\97607817\1\10143.0003

**Exhibit B-1**

**Redline to Version in the First Amended Plan Supplement**

**STOCKHOLDERS AGREEMENT**

dated as of

[●], August 28, 2020

among

**JASON HOLDINGS INC.**

and

**CERTAIN OTHER PERSONS NAMED HEREIN**

**TABLE OF CONTENTS**

**Page**

ARTICLE 1    DEFINITIONS ............................................................................................2

ARTICLE 1    DEFINITIONS ............................................................................................2

Section 1.01.    Definitions ..............................................................................2
Section 1.01.    Definitions ..............................................................................2
Section 1.02.    Other Definitional and Interpretative Provisions ..................7    **Field Code Changed**
Section 1.02.    Other Definitional and Interpretative Provisions ..................7

ARTICLE 2    VOTING AGREEMENT; BOARD OF DIRECTORS; ACTIONS SUBJECT
TO BOARD APPROVAL ...........................................................................7    **Field Code Changed**

ARTICLE 2    VOTING AGREEMENT; BOARD OF DIRECTORS; ACTIONS SUBJECT
TO BOARD APPROVAL ...........................................................................7

Section 2.01.    Board of Directors ..................................................................7
Section 2.01.    Board of Directors ..................................................................7
Section 2.02.    Vacancies ..............................................................................10
Section 2.02.    Vacancies ..............................................................................10
Section 2.03.    Board Observer Rights .........................................................10
Section 2.03.    Board Observer Rights .........................................................10
Section 2.04.    Reimbursement .....................................................................11
Section 2.04.    Reimbursement .....................................................................11
Section 2.05.    Other Governing Document Provisions .................................11    **Field Code Changed**
Section 2.05.    Other Governing Document Provisions .................................11
Section 2.06.    Directors' and Officers' Insurance .......................................11    **Field Code Changed**
Section 2.06.    Directors' and Officers' Insurance .......................................11
Section 2.07.    No Liability for Board Designees or Board Observers ..........11    **Field Code Changed**
Section 2.07.    No Liability for Board Designees or Board Observers ..........11
Section 2.08.    Board Committees .................................................................11
Section 2.08.    Board Committees .................................................................11
Section 2.09.    Actions Subject to Stockholder Approval .............................11    **Field Code Changed**
Section 2.09.    Actions Subject to Stockholder Approval .............................11
Section 2.10.    Actions Subject to Certain Specified Stockholder Approvals ...................12    **Field Code Changed**
Section 2.10.    Actions Subject to Certain Specified Stockholder Approvals ...................12

ARTICLE 3    DRAG-ALONG RIGHTS ...........................................................................13

ARTICLE 3    DRAG-ALONG RIGHTS ...........................................................................13

Section 3.01.    Drag-Along Rights ...............................................................13
Section 3.01.    Drag-Along Rights ...............................................................13
Section 3.02.    Additional Conditions to Drag-Along Rights .......................15    **Field Code Changed**
Section 3.02.    Additional Conditions to Drag-Along Rights .......................15

WEIL:\97590856\2\10143.0003WEIL:\97607817\1\10143.0003

ARTICLE 4    TAG-ALONG RIGHTS .................................................................................. 16

ARTICLE 4    TAG-ALONG RIGHTS .................................................................................. 16

Section 4.01.    Tag-Along Rights ................................................................................. 16
Section 4.01.    Tag-Along Rights ................................................................................. 16

ARTICLE 5    PREEMPTIVE RIGHTS ................................................................................ 19

ARTICLE 5    PREEMPTIVE RIGHTS ................................................................................ 19

Section 5.01.    Preemptive Rights ............................................................................... 19
Section 5.01.    Preemptive Rights ............................................................................... 19
Section 5.02.    Excluded Issuances ............................................................................. 20
Section 5.02.    Excluded Issuances ............................................................................. 20

ARTICLE 6    INFORMATION RIGHTS, CONSULTATION RIGHT, AND SALE
SUPPORT ARRANGEMENTS .................................................................... 20

ARTICLE 6    INFORMATION RIGHTS, CONSULTATION RIGHT, AND SALE
SUPPORT ARRANGEMENTS .................................................................... 20

Section 6.01.    Financial Statements and Periodic Reports .......................................... 20
Section 6.01.    Financial Statements and Periodic Reports .......................................... 20
Section 6.02.    Information Rights ............................................................................... 21
Section 6.02.    Information Rights ............................................................................... 21
Section 6.03.    Delivery of Information; Confidentiality .............................................. 21
Section 6.03.    Delivery of Information; Confidentiality .............................................. 21
Section 6.04.    Sale Support Arrangements ................................................................. 22
Section 6.04.    Sale Support Arrangements ................................................................. 22

ARTICLE 7    CERTAIN COVENANTS AND AGREEMENTS ........................................ 22

ARTICLE 7    CERTAIN COVENANTS AND AGREEMENTS ........................................ 22

Section 7.01.    Confidentiality .................................................................................... 22
Section 7.01.    Confidentiality .................................................................................... 22
Section 7.02.    Irrevocable Proxy and Power of Attorney ........................................... 24
Section 7.02.    Irrevocable Proxy and Power of Attorney ........................................... 24
Section 7.03.    Transfer Restrictions ........................................................................... 24
Section 7.03.    Transfer Restrictions ........................................................................... 24

ARTICLE 8    MISCELLANEOUS ..................................................................................... 25

ARTICLE 8    MISCELLANEOUS ..................................................................................... 25

Section 8.01.    Binding Effect; Assignability; No Third Party Beneficiaries ............... 25
Section 8.01.    Binding Effect; Assignability; No Third Party Beneficiaries ............... 25

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

WEIL:\97590856\2\10143.0003WEIL:\97607817\1\10143.0003

Section 8.02.    Notices ...............................................................................................26
Section 8.02.    Notices ...............................................................................................26
Section 8.03.    Waiver; Amendment ..........................................................................26
Section 8.03.    Waiver; Amendment ..........................................................................26
Section 8.04.    Effectiveness; Termination; Survival; Fallaway ...............................27
Section 8.04.    Effectiveness; Termination; Survival; Fallaway ...............................27
Section 8.05.    Governing Law ...................................................................................27
Section 8.05.    Governing Law ...................................................................................27
Section 8.06.    Jurisdiction; Service of Process .........................................................27
Section 8.06.    Jurisdiction; Service of Process .........................................................27
Section 8.07.    WAIVER OF JURY TRIAL ..............................................................28
Section 8.07.    WAIVER OF JURY TRIAL ..............................................................28
Section 8.08.    Specific Performance .........................................................................28
Section 8.08.    Specific Performance .........................................................................28
Section 8.09.    Counterparts .......................................................................................28
Section 8.09.    Counterparts .......................................................................................28
Section 8.10.    Entire Agreement ...............................................................................29
Section 8.10.    Entire Agreement ...............................................................................29
Section 8.11.    Severability ........................................................................................29
Section 8.11.    Severability ........................................................................................29
Section 8.12.    Further Assurances .............................................................................29
Section 8.12.    Further Assurances .............................................................................29
Section 8.13.    Aggregation of Shares ........................................................................29
Section 8.13.    Aggregation of Shares ........................................................................29
Section 8.14.    Independent Agreement by the Stockholders .....................................29
Section 8.14.    Independent Agreement by the Stockholders .....................................29

Field Code Changed

Field Code Changed

Field Code Changed

Field Code Changed

Schedule 1    List of Stockholders on the Effective Date
Exhibit A      Joinder Agreement
Exhibit B      Competitors

WEIL:\97590856\2\10143.0003 WEIL:\97607817\1\10143.0003

## STOCKHOLDERS AGREEMENT

This STOCKHOLDERS AGREEMENT (this "**Agreement**"), dated as of [●],August 28, 2020, by and among (i) Jason Holdings Inc., a Delaware corporation (the "**Corporation**"), (ii) the Persons identified on Schedule 1 (each, a "**Specified Stockholder**"), (iii)  the Persons identified on Schedule 2 and (iv) any other Person who shall at any time be a party to or bound by this Agreement as a result of the execution and delivery to the Corporation of a joinder substantially in the form attached as Exhibit A (a "**Joinder**"), in accordance with the terms hereof (the persons described in clauses (ii), (iii) and (iv), collectively, the "**Stockholders**").

### W I T N E S S E T H:

WHEREAS, on June 24, 2020, the Corporation and certain of its direct and indirect wholly owned subsidiaries (collectively, the "**Debtors**") filed voluntary chapter 11 petitions under title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court Southern District of New York (the "**Bankruptcy Court**") under the caption "In re: Jason Industries, Inc., et al";

WHEREAS, pursuant to the *Joint Prepackaged Chapter 11 Plan of Reorganization of Jason Industries, Inc. and its Affiliated Debtors* (Docket No. 20-22766) (as the same may have been subsequently amended, modified or supplemented, the "**Plan**"), as of the date hereof (the "**Effective Date**"), each of the Specified Stockholders as of the date hereof have been issued Common Stock;

WHEREAS, the Plan provides that any party that is to receive Common Stock thereunder shall be, and without further action by any Person is deemed to be, a party to this Agreement and bound to the terms of this Agreement from and after the Effective Date, even if not a signatory thereto, and all such parties as of the date hereof are listed on Schedule 1 hereto;

WHEREAS, all Persons who are issued Common Stock following the Effective Date or receive Common Stock pursuant to a transfer from an existing holder of Common Stock must become a party to this Agreement by signing a Joinder;

WHEREAS, the parties hereto desire to establish certain rights and obligations with respect to the composition of the Corporation's Board of Directors (the "**Board**" and, each director on such Board, a "**Director**") and other matters relating to the corporate governance of the Corporation; and

WHEREAS, on [August 17],26, 2020, the Bankruptcy Court entered an order confirming the Plan, including this Agreement to read as set forth herein.

NOW, THEREFORE, in consideration of the preomises and the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Corporation and each of the other parties hereto hereby agree as follows:

# ARTICLE 1

## DEFINITIONS

Section 1.01.   Definitions.

(a)      As used in this Agreement, the following terms have the following meanings:

"**Affiliate**" means, when used with reference to any Person, any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person and, in respect of any Stockholder, any investment fund, vehicle or holding company of which such Stockholder or any Affiliate of such Stockholder serves as the general partner, managing member or discretionary manager or advisor; provided, however, that limited partners, non-managing members or other similar direct or indirect investors in a Stockholder (in their capacities as such) shall not be deemed to be Affiliates of such Stockholder.

"**beneficial ownership**" or "**beneficially own**" means beneficial ownership as determined pursuant to Rule 13d-3 and Rule 13d-5 under the Exchange Act; provided, however, that beneficial ownership under this Agreement shall exclude any indebtedness convertible into capital stock, unexercised option, warrant or similar right and only refer to shares of outstanding capital stock.

"**Bylaws**" means the Amended and Restated Bylaws of the Corporation, as the same may be amended and/or restated from time to time.

"**Business Day**" means any day except a Saturday, Sunday or other day on which commercial banks in New York City are authorized by Law to close.

"**Capital Stock**" means the capital stock of the Corporation.

"**Certificate of Incorporation**" means the Amended and Restated Certificate of Incorporation of the Corporation, as the same may be amended and/or restated from time to time.

"**Common Stock**" shall mean the common shares, par value $0.01 per share, of the Corporation.

"**Corporate Entity**" means the Corporation and any of its Subsidiaries.

"**Competitor**" means any Person listed on Exhibit B hereto, as the Corporation (upon the determination of the Board) may update or amend from time to time to include any other Person that is a competitor of the Corporation or of any other Corporate Entity; provided, however, that with respect to any Stockholder, the beneficial ownership of securities held for passive investment purposes of a portfolio company engaged in competitive activities shall not be deemed to result in such Stockholder being a Competitor so long as such Stockholder's beneficial ownership (taken together with its Affiliates' and Related Funds' beneficial ownership) does not exceed fifty percent (50%) of the total equity securities of any such portfolio company

WEIL:\97590856\2\10143.0003WEIL:\97607817\1\10143.0003

(subject to the provisions of Section 7.01); provided, further, that no Specified Stockholder nor any of its Related Funds shall be a Competitor.

"**Convertible Term Loans**" means term loans provided pursuant to the Second Lien Credit Agreement.

"**Corporation Securities**" means any Capital Stock or equity interests of the Corporation, including the Common Stock, and any other security convertible into or exercisable or exchangeable for such Capital Stock or equity interests of the Corporation, including any security, bond, note, indebtedness, warrant, option or other right or instrument, in each case, exercisable for or exchangeable or convertible into such Capital Stock or equity interests.

"**Drag-Along Pro Rata Portion**" means with respect to any Dragged Holder, a number of shares of Common Stock determined by multiplying (1) the number of shares of outstanding Common Stock beneficially owned by the applicable Dragged Holder immediately prior to the Sale Event by (2) a fraction, (i) the numerator of which is the total number of shares of Common Stock proposed to be Transferred by the Drag-Along Sellers in connection with the Sale Event and (ii) the denominator of which is the aggregate number of shares of outstanding Common Stock beneficially owned by all Stockholders immediately prior to the Sale Event.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Governing Documents**" means this Agreement, the Certificate of Incorporation and the Bylaws and any similar organizational document of each Subsidiary of the Corporation.

"**Law**" means any applicable statute, law, rule, regulation, ordinance, code, policy or rule of common law issued, administered or enforced by any governmental authority, or any judicial or administrative interpretation thereof including the rules of any stock exchange.

"**National Securities Exchange**" means The Nasdaq Global Market, The Nasdaq Global Select Market, The New York Stock Exchange or other agreed internationally recognized exchange.

"**Person**" means an individual, corporation, limited liability company, partnership, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"**Public Offering**" means any sale or distribution to the public of Common Stock of the Corporation pursuant to an offering registered under the Securities Act, whether by the Corporation, by Stockholders and/or by any other holders of the Corporation's Common Stock (other than on Form S-4, S-8, or any similar or successor form relating to Capital Stock issuable upon exercise of employee stock options or in connection with any employee benefit or similar plan of the Corporation or in connection with a direct or indirect business combination involving the Corporation and another Person, filed under the Securities Act). For the avoidance of doubt, a Public Offering shall not include sales by Stockholders pursuant to an exemption provided by Rules 144, 144A or Regulation S under the Securities Act.

3

"**Qualified IPO**" means an underwritten Public Offering that provides for at least $40,000,000 in gross proceeds to the Corporation and a price per share of Common Stock at least equal to $10.00 and, immediately after such Public Offering, the Common Stock is quoted or listed for trading on a National Securities Exchange.

"**Registration Rights Agreement**" means the Registration Rights Agreement dated on or around the date of this Agreement, by and among the Corporation and the Stockholders specified therein.

"**Related Fund**" means with respect to any Stockholder, (i) an Affiliate of such Stockholder or (ii) any fund, account or investment vehicle that is controlled, managed, advised or sub-advised by any Stockholder, an Affiliate thereof or the same investment manager, advisor or sub-advisor as the Stockholder or an Affiliate of such investment manager, advisor or sub-advisor.

"**Sale Event**" means: (i) a merger or consolidation of the Corporation with another Person (other than one in which holders of a majority of the Voting Power of the Corporation immediately prior to such merger or consolidation own a majority of the Voting Power of the outstanding equity interests of the surviving or acquiring Person); (ii) a sale, lease, transfer, exclusive license or other disposition of all or substantially all of the assets of the Corporation (other than to an acquirer in which holders of a majority of the Voting Power of the Corporation immediately prior to such merger or consolidation own a majority of the Voting Power of the outstanding equity interests of such acquirer); or (iii) a transaction or series of related transactions in which a Person, or a group of related Persons, in each case which are not the Stockholders, acquires from Stockholders of the Corporation shares of Capital Stock representing more than fifty percent (50%) of the outstanding Voting Power of the Corporation.

"**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of the date hereof, by and among the Debtors (after giving effect to the transactions contemplated by the Plan, the "**Reorganized Debtors**") the lenders from time to time party thereto and Cantor Fitzgerald Securities, as administrative agent and collateral agent, pursuant to which the lenders party thereto were deemed to provide the Reorganized Debtors with convertible term loans in an aggregate principal amount of $50,000,000.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Specified Stockholder A**" means, collectively, any Specified Stockholder that is a fund, account or investment vehicle that is controlled, managed, advised or sub-advised by Credit Suisse Asset Management, LLC and, in each case, any Specified Stockholder that is a Related Fund thereof.

"**Specified Stockholder B**" means, collectively, Pelican Loan Advisors III, LLC and any Specified Stockholder that is a Related Fund thereof.

"**Specified Stockholder C**" means, collectively, AIC Finance Partnership, LP and AIC COP Investments, LLC and, in each case, any Specified Stockholder that is a Related Fund thereof.

4

"**Stockholder**" means at any time, any Person (other than the Corporation) who shall then be a party to or bound by this Agreement, so long as such Person beneficially owns any Capital Stock.

"**Subsidiary**" means, with respect to a Person, any entity required to be consolidated with such Person in such Person's books and records pursuant to generally accepted accounting principles, or any corporation, general or limited partnership, limited liability company, joint venture or other entity in which such Person (a) owns, directly or indirectly, fifty percent (50%) or more of its outstanding voting securities, equity interests, profits interest or capital interest, (b) is entitled to elect at least one-half of the board of directors or similar governing body or (c) in the case of a limited partnership or limited liability company, is a general partner or managing member and has the power to direct the policies, management and affairs of such entity, respectively.

"**Tag-Along Pro Rata Portion**" means with respect to any Tag-Along Offeree, a number of shares of Common Stock determined by multiplying (1) the number of shares of outstanding Common Stock beneficially owned by the applicable Tag-Along Offeree immediately prior to the Tag-Along Transfer by (2) a fraction, (i) the numerator of which is the total number of shares of Common Stock proposed to be Transferred by the Tag-Along Sellers in connection with the Tag-Along Transfer and (ii) the denominator of which is the aggregate number of shares of outstanding Common Stock beneficially owned by all Stockholders immediately prior to the Tag-Along Transfer.

"**Transfer**" means, with respect to any Capital Stock, a transaction or series of related transactions in which a Stockholder (1) pledges, sells, contracts to sell, sells any option or contract to purchase, purchases any option or contract to sell, grants any option, right or warrant to purchase, lend, or otherwise transfers or disposes of, directly or indirectly, any Capital Stock beneficially owned by such Stockholder or any other securities so owned convertible into or exercisable or exchangeable for Capital Stock or (2) enters into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Capital Stock, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Capital Stock or such other securities, in cash or otherwise; provided, however, that subject to customary pledge requirements, a grant of or existence of a security interest or encumbrance over any Capital Stock which is required by any bank or financial institution shall not be deemed to be a Transfer unless and until any enforcement of remedies in respect of such security interest or encumbrance that results in any Person other than such Stockholder becoming the beneficial owner of such Capital Stock.  The terms "**Transferee**", "**Transferor**", "**Transferred**", "**Transferring**" and other forms of the word "**Transfer**" shall have correlative meanings.

"**Voting Power**" means the total number of votes of the Voting Shares.

"**Voting Shares**" means any outstanding shares of Capital Stock entitled to vote for the election of Directors to the Board.

(a)    Each of the following terms is defined in the Section set forth opposite such term:

5

| Term | Section |
|------|---------|
| Bankruptcy Code | Preamble |
| Bankruptcy Court | Preamble |
| Board | Preamble |
| Board Observer | 2.03(a) |
| CEO Director | 2.02(b)(i) |
| Corporation | Preamble |
| Confidential Information | 7.01(a)(i) |
| Debtors | Preamble |
| Director | Preamble |
| Drag-Along Buyer | 3.01(a) |
| Drag-Along Notice | 3.01(a) |
| Drag-Along Rights | 3.01(a) |
| Drag-Along Sellers | 3.01(a) |
| Dragged Holders | 3.01(a) |
| Effective Date | Preamble |
| Excluded Issuance | 5.02 |
| Initial Chairperson | 2.01(f) |
| Initial Directors | 2.02 |
| Initial Term Expiration Date | 2.01(f) |
| Issuance Notice | 5.01(a) |
| Joinder | Preamble |
| Preemptive Shares | 5.01(a) |
| Prohibited Transfer | 4.01(h) |
| Proposed Transferee | 6.04(a) |
| Representatives | 7.01(a)(i) |
| Plan | Preamble |
| Sale Event Documents | 3.01(b)(iv) |
| Share Sale | 3.01(b)(ii) |
| Specified Stockholder | Preamble |
| Stockholder | Preamble |
| Stockholder Representative | 3.01(b)(viii) |
| Tag-Along Election Period | 4.01(c) |
| Tag-Along Notice | 4.01(b) |
| Tag-Along Offeree | 4.01(a) |
| Tag-Along Per Share Consideration | 4.01(b) |
| Tag-Along Seller | 4.01(a) |
| Tag-Along Transfer | 4.01(a) |
| Tagging Stockholder | 4.01(c) |
| Termination Event | 8.04(a) |
| Transfer Notice | 6.04(a) |

Section 1.02.  Other Definitional and Interpretative Provisions.  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The captions herein are included for convenience of reference only and shall be ignored in the construction or

6

interpretation hereof.  References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.  "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.  References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.  References to any Law include all rules and regulations promulgated thereunder.  References to any Person include the successors and permitted assigns of that Person.  References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.

## ARTICLE 2

## VOTING AGREEMENT; BOARD OF DIRECTORS; ACTIONS SUBJECT TO BOARD APPROVAL

Section 2.01.   Board of Directors.

(a)      The initial Board shall consist of five (5) Directors and as of the Effective Date, Daniel Collin, Helen Ruth, Mark Blaufuss, James Janik, Brian Kobylinski shall be the initial directors (the "**Initial Directors**"); provided, however, that following the Effective Date, up to two (2) additional directors (each an "**Additional Director**") may be designated for appointment to the Board by the holders of a majority the outstanding Common Stock held by theeach Specified HoldersStockholder as of the Effective Date by written notice to the CompanyCorporation (a "**Director Appointment Notice**") and  (x) effective upon receipt of such Director Appointment Notice, the Board shall be expanded accordingly, (y) the Initial Directors and the CompanyCorporation shall take such action as is required to cause each such Additional Directors to be appointed to the Board, including by calling a meeting of the Stockholders or otherwise seeking the consent of the requisite Stockholders to give effect to the same and (z)  each Stockholder agrees to vote, or cause to be voted, all Voting Shares beneficially owned by such Stockholder, or over which such Stockholder otherwise has voting control, in whatever manner as shall be necessary to ensure that, at the next annual or special meeting of Stockholders following receipt by the CompanyCorporation of a Director Appointment Notice, the Additional Director or Additional Directors shall be elected to the Board.

(b)      From and after the Effective Date, each Stockholder agrees to vote, or cause to be voted, all Voting Shares beneficially owned by such Stockholder, or over which such Stockholder otherwise has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each annual or special meeting of Stockholders at which an

7

election of Directors is held or pursuant to any written consent of the Stockholders, the following persons shall be elected to the Board, which shall be designated as follows:

(i)      the Corporation's Chief Executive Officer (the "**CEO Director**"); provided, however, that if for any reason the CEO Director shall cease to serve as the Chief Executive Officer of the Corporation, then at the request of the Corporation, any Director or any Specified Stockholder, each of the Stockholders shall promptly vote their respective shares: (A) if the CEO Director does not resign from the Board, to remove the former Chief Executive Officer from the Board; and (B) to elect such person's replacement as Chief Executive Officer of the Corporation as the new CEO Director;

(ii)     (A) so long as Specified Stockholder A beneficially owns at least fifteen percent (15%) of the total number of shares of Common Stock issued and outstanding as of the Effective Date, two (2) Directors that are nominated by Specified Stockholder A, (B) so long as Specified Stockholder A beneficially owns at least five percent (5%) but less than fifteen percent (15%) of the total number of shares of Common Stock issued and outstanding as of the Effective Date, one (1) Director that is nominated by Specified Stockholder A or (C) so long as Specified Stockholder A beneficially owns less than five percent (5%) of the total number of shares of Common Stock issued and outstanding as of the Effective Date, no Director may be nominated by Specified Stockholder A pursuant to this Section 2.01(b)(ii);

(iii)    so long as Specified Stockholder B beneficially owns at least fifteen percent (15%) of the total number of shares of Common Stock issued and outstanding as of the Effective Date, two (2) Directors that are nominated by Specified Stockholder B, (B) so long as Specified Stockholder B beneficially owns at least five percent (5%) but less than fifteen percent (15%) of the total number of shares of Common Stock issued and outstanding as of the Effective Date, one (1) Director that is nominated by Specified Stockholder B or (C) so long as Specified Stockholder B beneficially owns less than five percent (5%) of the total number of shares of Common Stock issued and outstanding as of the Effective Date, no Director may be nominated by Specified Stockholder B pursuant to this Section 2.01(b)(iii); and

(iv)     all other Directors shall be elected by the outstanding Common Stock present and voting at a meeting at which a quorum is present in accordance with the Bylaws; provided, however, that, in relation to such other Directors and until such meeting, any vacancy on the Board that arises as a result of the death, disability, retirement, resignation or removal (with or without cause) of such other Directors may be filled in accordance with the Bylaws.

(c)      In furtherance of the foregoing, the Corporation and the Board shall, subject to and consistent with the Board's fiduciary duties and applicable law, take such actions as necessary to cause the foregoing Directors to be nominated and submitted to the Stockholders of the Corporation for election to the Board, or appointed to the Board by the remaining members of the Board, in any annual or special meeting of the Stockholders or any action by written consent to elect Directors in lieu thereof.

8

(d)      With respect to each Director designated under Section 2.01(b)(ii) and Section 2.01(b)(iii), promptly (and in no event less than three (3) Business Days) following the date upon which the relevant designating party ceases to have the applicable holding requirements as set forth therein to designate such Director to the Board, such designated Director shall tender such Director's resignation as Director (which the Board may choose to waive and have such Director remain on the Board). If the Board accepts such resignation, the resulting vacancy will henceforth be filled by a the outstanding Common Stock present at a meeting at which quorum is present; provided, however, that until such meeting, such resulting vacancy may be filled in accordance with the Bylaws. If such Director refuses to resign, then upon the request of a majority of the other Directors, each Stockholder agrees to vote, or cause to be voted, all of its Voting Shares beneficially owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that such Director is removed from the Board, whether at a meeting of the Stockholders or by written consent.

(e)      Each Stockholder agrees to vote, or cause to be voted, all Voting Shares beneficially owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to remove a Director designated under Section 2.01(b)(ii) and Section 2.01(b)(iii) if the Person who designated such Director requests such removal. The rights to designate members of the Board shall not be transferrable by Specified Stockholder A or Specified Stockholder B; provided, however, that Specified Stockholder A and Specified Stockholder B may transfer all or any of its Board designation rights in connection with a sale of all or substantially all of the Common Stock beneficially held on the Effective Date by Specified Stockholder A or Specified Stockholder B (or pursuant to which all or substantially all of the Common Stock held by such party on the Effective Date would have been transferred but for the exercise of tag-along rights in accordance with Article 4).

(f)      Each Stockholder agrees that:

(i)      following the Effective Date, it shall cause its designated members of the Board to, in accordance with the Bylaws, (A) vote for, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each meeting of the Board at which a chairperson of the Board is selected by the Board or (B) approve, pursuant to any written consent of the Board pursuant to which a chairperson of the Board is selected by the Board, in each case, the appointment of Daniel Collin as the initial chairperson of the Board (the "Initial Chairperson") for a term beginning on the date of such appointment and ending upon the earlier of (x) the date that is two (2) years following the Effective Date and (y) the date that the Initial Chairperson is no longer a Director of the Board (the "Initial Term Expiration Date").

(ii)      following the Initial Term Expiration Date, to the extent that the Initial Chairperson remains a Director of the Board (A) to the extent Specified Stockholder B beneficially owns at least ten percent (10%) of the total number of shares of Common Stock issued and outstanding as of the Effective Date, each Stockholder shall cause its designated members of the Board to, in accordance with the Bylaws, (x) vote for, from time to time and at all times, in whatever manner as shall be necessary to ensure that at

9

each meeting of the Board at which a chairperson of the Board is selected by the Board or (y) approve, pursuant to any written consent of the Board pursuant to which a chairperson of the Board is selected by the Board, in each case, the appointment of the Initial Chairperson as the chairperson of the Board unless the holders of at least sixty-six and two-thirds percent (66.67%) of the outstanding Common Stock approve the appointment of another Director as chairperson of the Board and (B) from and after such time as Specified Stockholder B beneficially owns less than ten percent (10%) of the total number of shares of Common Stock issued and outstanding as of the Effective Date, the chairperson of the Board shall be appointed by a majority of the members of the Board.

(iii)    from and after such time as the Initial Chairperson is no longer a Director of the Board, the chairperson of the Board shall be appointed by a majority of the members of the Board.

Section 2.02.   Vacancies.  If Specified Stockholder A or Specified Stockholder B continue to have a right to designate a Director pursuant to Section 2.01 and a vacancy on the Board arises as a result of the death, disability, retirement, resignation or removal (with or without cause) of a Director designated by such Person, the Board shall promptly, by written consent in accordance with the Bylaws or as the first order of business at the first meeting of the Board subsequent to such event, fill such vacancy in accordance with Section 2.01 and no action shall be taken by the Board by written consent during the pendency of such designation unless waived by such party.

Section 2.03.   Board Observer Rights.

(a)    Each Specified Stockholder who beneficially owns at least four percent (4%) of the total number of shares of Common Stock issued and outstanding as of the Effective Date shall have the right to designate representatives (each, a "**Board Observer**") who shall be entitled to attend all meetings of the Board (but not meetings of any committees thereof unless specifically invited); provided, however, that each Board Observer shall have no voting rights with respect to actions taken or elected not to be taken by the Board; provided further, that each Board Observer shall at all times, except as otherwise required by law, hold in confidence and trust all information so provided, and each Board Observer, shall execute a confidentiality agreement to such effect in a form reasonably satisfactory to the Corporation; provided further, that a Board Observer shall have no further right to attend meetings of the Board, receive materials provided to the Board or have any other rights as a Board Observer in accordance with this Section 2.03 if the relevant Stockholder ceases to beneficially own at least fifty percent (50%) of the number of shares of Common Stock held by such Specified Stockholder as of the Effective Date.

(b)    The Corporation shall provide the Board Observer with copies of all materials provided to the Board including notices, minutes, consents and any and all other materials provided to Directors, at the same time and in the same manner as it provides such materials to the Directors on the Board, except that the Corporation reserves the right to exclude a Board Observer from any meeting or portion thereof or materials relating thereto if the Board convenes an executive session or if the Board determines in good faith that access to such information or attendance at such meeting would reasonably be expected to adversely affect the attorney-client

10

privilege between the Corporation and its counsel. Any action taken by the Corporation in connection with the foregoing shall have no impact on the validity or any decision made or action taken by the Board.

(c)    A Board Observer may be changed at any time upon prior notice to the Corporation by the applicable Specified Stockholder and upon execution by the replacement Board Observer of a confidentiality agreement in form reasonably satisfactory to the Corporation, if requested by the Corporation. The parties hereto hereby acknowledge and agree that each Board Observer shall not, by virtue of the Board Observer's status as such, owe any fiduciary or other duties to the Stockholders or otherwise have any directorial or other duties or liabilities to the Corporation or its Stockholders.

Section 2.04.    Reimbursement. The Corporation shall reimburse the Directors of the Board and any Board Observers for all reasonable and documented out-of-pocket expenses incurred by each of them in connection with attending regular and special meetings of the Board and any committee thereof.

Section 2.05.    Other Governing Document Provisions. Each Stockholder agrees to vote all of its Voting Shares or execute proxies or written consents, as the case may be, and to take all other actions necessary, to ensure that the other Governing Documents (a) do not at any time conflict with, any provision of this Agreement and (b) permit each Stockholder to exercise the express rights to which each such Stockholder is entitled under this Agreement.

Section 2.06.    Directors' and Officers' Insurance. The Corporation will purchase and will use its commercially reasonably efforts to maintain director and officer liability insurance in such amounts and such limits as reasonably determined by the Board on behalf of any person who is or was a member of the Board against any liability asserted against him or incurred by him in any capacity as such, whether or not the Corporation would have the power to indemnify him against that liability under any of the Governing Documents.

Section 2.07.    No Liability for Board Designees or Board Observers. No Stockholder, nor any Related Fund of any Stockholder, shall have any liability as a result of designating a Director or Board Observer, for any act or omission by such Director or Board Observer in his or her capacity as a Director of the Corporation or as a Board Observer, as applicable, nor shall any Stockholder or any Related Fund thereof have any liability as a result of voting for any such Director in accordance with the provisions of this Agreement.

Section 2.08.    Board Committees. Each committee of the Board must include (a) one (1) Director designated by Specified Stockholder A (for so long as Specified Stockholder A has the right to designate at least one (1) Director pursuant to Section 2.01(b)(ii)) and (b) one (1) Director designated by Specified Stockholder B (for so long as Specified Stockholder B has the right to designate at least one (1) Director pursuant to Section 2.01(b)(iii)), in each case, unless such requirement is expressly waived by each of the Directors designated by the applicable designating party or parties; provided, however, that if the purpose of a committee of the Board is to review and approve a related party agreement involving one of the designating parties, such designating party's Directors shall not be represented on such committee.

WEIL:\97590856\2\10143.0003WEIL:\97607817\1\10143.0003

Section 2.09.   <u>Actions Subject to Stockholder Approval</u>.  The Corporation shall not, and as applicable, shall not cause or permit any of its Subsidiaries to, take any of the following actions:

(a)      amend, restate or waive any provision of the Certificate of Incorporation, the Bylaws or any such similar governing documents of any Subsidiary of the Corporation, in a manner that is materially and disproportionately adverse to the powers, preferences or rights of one or more Stockholders unless approved by such adversely affected Stockholders;

(b)      enter into any recapitalization or reorganization of the Capital Stock unless such recapitalization or reorganization is approved by the holders of a majority of the issued and outstanding Common Stock; or

(c)      enter into any agreement or commitment to do any of the actions contemplated under subsection (b) above unless such agreement or commitment is approved by the holders of a majority of the issued and outstanding Common Stock.

Section 2.10.   <u>Actions Subject to Certain Specified Stockholder Approvals</u>.

(a)      The Corporation shall not, and as applicable, shall not permit any of its Subsidiaries to, take any of the following actions without the prior written consent of each of (i) Specified Stockholder A, (ii) Specified Stockholder B and (iii) Specified Stockholder C, in each case, for so long as such Specified Stockholder owns at least eight percent (8%) of the Common Stock then issued and outstanding:

(A)      conduct a sale or distribution to the public of Common Stock pursuant to an offering registered under the Securities Act, whether by the Corporation, by any of the Stockholders and/or by any other holders of the Capital Stock (other than a Qualified IPO);

(B)      prior to a Qualified IPO, issue any Capital Stock (other than a Qualified IPO);

(C)      enter, amend or renew any agreement or transaction with (i) any Affiliate of the Corporation or (ii) any Person that holds 5% or more of the total Common Stock then outstanding or an Affiliate of such Person, excluding (x) any agreement, amendment or renewal relating to a compensation or benefits arrangement with a director, officer or other employee of the Corporation or any of its Subsidiaries entered into in the ordinary course of business or (y) intercompany agreements among the Corporation and/or its Subsidiaries in the ordinary course of business, <u>provided</u>, <u>however</u>, that such Specified Stockholder's consent shall not be required if the contemplated agreement or transaction subject to approval is one with such Specified Stockholder or any of its Affiliates (other than the ~~Company~~<span style="color:blue">Corporation</span> and its Subsidiaries); and <u>provided, further</u>, that, for purposes of this <u>Section 2.10(~~d~~<span style="color:blue">a</span>)(C)</u>, an Affiliate of the Corporation shall not include any Person which is a portfolio company of a Stockholder that is "under common control with" but is not "controlled by" an Affiliate of the Corporation; or

(D)      enter into any agreement or commitment to do any of the foregoing.

12

(b)      The rights of Specified Stockholder A, Specified Stockholder B and Specified Stockholder C set forth in this Section 2.10 shall not be transferrable.

## ARTICLE 3
## DRAG-ALONG RIGHTS

Section 3.01.   Drag-Along Rights.

(a)      If requested by the holders of at least sixty-six and two-thirds percent (66.67%) of the outstanding Common Stock in connection with a Sale Event to an unaffiliated third-party of such Drag-Along Sellers (as defined below), and such Sale Event is approved by the Board if so required by the Governing Documents or applicable Law (the applicable Stockholders entitled to initiate such Sale Event, the "**Drag-Along Sellers**"), the Drag-Along Sellers will have the right, but not the obligation (the "**Drag-Along Rights**"), to require the other Stockholders (the "**Dragged Holders**") to support such Sale Event by delivering, or requesting the Corporation to deliver (and the Corporation shall deliver) written notice thereof pursuant to Section 8.02 below (a "**Drag-Along Notice**") to such other Stockholders.  Such written notice must be delivered at least ten (10) Business Days prior to the closing of the proposed Sale Event and shall contain a general description of the material terms and conditions of the Sale Event, including the identity of the acquirer (the "**Drag-Along Buyer**"), the amount and form of consideration to be paid by the Drag-Along Buyer and the proposed closing date for the Sale Event (which may be an estimated date or range of dates).

(b)      Subject to Section 3.02, if a Drag-Along Notice is delivered by the Corporation or by or on behalf of the Drag-Along Sellers to the Dragged Holders, each of the Dragged Holders shall:

(i)      if such Sale Event requires Stockholder approval, with respect to all Voting Shares beneficially owned by such Dragged Holder, (A) vote (in person, by proxy or by action by written consent, as applicable) all such Voting Shares in favor of and to adopt such Sale Event and vote in opposition to any and all other proposals that would reasonably be expected to delay or impair the ability of the Corporation, any other Corporate Entity or the Drag-Along Sellers to consummate the Sale Event and (B) not raise any objection against such Sale Event or the process pursuant to which it was arranged;

(ii)      if such Sale Event is structured as an acquisition of Capital Stock (a "**Share Sale**"), be obligated to Transfer to the Drag-Along Buyer, at the closing of such Sale Event, all Capital Stock held by such Dragged Holder (or, as applicable, the same proportion of shares of Capital Stock beneficially held by such Dragged Holder as is being sold by the Drag-Along Sellers) on the same terms and conditions as the Drag-Along Sellers;

(iii)      if such Sale Event is structured as a Transfer of assets (including by or through the sale, issuance or other disposition of the outstanding capital stock or other outstanding equity interests of, or reorganization, merger, share exchange, consolidation or other business combination involving, any direct and/or indirect Corporate Entity),

13

approve any subsequent dissolution and liquidation of the Corporation or any of the other Corporate Entities in connection therewith and execute and/or deliver such applicable documents, instruments or agreements related thereto as the Corporation or the Drag-Along Sellers reasonably request; provided, however, that in any liquidation, each Stockholder shall receive on account of its Capital Stock the distributions pursuant to the rights and preferences set forth in the Governing Documents as in effect immediately prior to such Sale Event;

(iv)     execute and deliver any purchase agreement, merger agreement, indemnity agreement, escrow agreement, support agreement, voting agreement, letter of transmittal or other agreements or documents governing or relating to such Sale Event that the Corporation or the Drag-Along Sellers may reasonably request (the "**Sale Event Documents**");

(v)     use commercially reasonable efforts to obtain or make any consents or filings necessary to be obtained or made by such Dragged Holder to effectuate such Sale Event;

(vi)     waive and refrain from exercising any appraisal, dissenters or similar rights with respect to such Sale Event;

(vii)     if the consideration to be paid in exchange for the Capital Stock pursuant to this Article 3 includes any securities and due receipt thereof by any Stockholder would require under applicable Law (x) the registration or qualification of such securities or of any Person as a broker or dealer or agent with respect to such securities; or (y) the provision to any Stockholder of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the Securities Act, agree that the Corporation may cause to be paid to any such Stockholder in lieu thereof, against surrender of the shares which would have otherwise been sold by such Stockholder, an amount in cash equal to the fair value (as determined in good faith by the Board) of the securities which such Stockholder would otherwise receive as of the date of the issuance of such securities in exchange for the shares;

(viii)     in the event that the Drag-Along Sellers, in connection with such Sale Event, appoint a stockholder representative (the "**Stockholder Representative**") with respect to matters affecting the Stockholders under any of the Sale Event Documents following consummation of such Sale Event, (A) consent to (i) the appointment of such Stockholder Representative, (ii) the establishment of any applicable escrow, expense or similar fund in connection with any indemnification or similar obligations, and (iii) the payment of such Stockholder's pro rata portion (from the applicable escrow or expense fund or otherwise) of any and all reasonable fees and expenses to such Stockholder Representative in connection with such Stockholder Representative's services and duties in connection with such Sale Event and its related service as the representative of the Stockholders, and (B) not assert any claim or commence any suit against the Stockholder Representative or any other Stockholder with respect to any action or inaction taken or

14

failed to be taken by the Stockholder Representative in connection with its service as the Stockholder Representative, absent fraud or willful misconduct; and

(ix)     take all other necessary or desirable actions reasonably requested by the Drag-Along Sellers and/or the Corporation in connection with the consummation of such Sale Event.

(c)     In the case of a Sale Event involving less than 100% of the then issued and outstanding Capital Stock, each Dragged Holder and each Drag-Along Seller shall Transfer its Drag-Along Pro Rata Portion of Common Stock in such Sale Event.

(d)     At the closing of any Sale Event that is structured as a Share Sale in which the Drag-Along Sellers have exercised their rights under this Article 3, each Dragged Holder shall deliver at such closing, against payment of the purchase price therefor in accordance with the terms of the Sale Event Documents, certificates or other documentation (or other evidence thereof reasonably acceptable to the Drag-Along Buyer) representing such Dragged Holder's Capital Stock to be sold, duly endorsed for transfer or accompanied by duly endorsed stock powers, and such other documents as are deemed reasonably necessary by the Drag-Along Seller or the Corporation for the proper transfer of such Capital Stock on the books of the Corporation.

(e)     Subject to Section 3.01(a), the Corporation shall use its commercially reasonable efforts to cooperate and assist in any proposed Sale Event including using its commercially reasonable efforts to cause its officers, employees, agents, contractors and others under its control to execute such Sale Event Documents or other agreements, documents, applications, authorizations, registration statements and instruments related thereto as the Board may reasonably deem necessary or appropriate in connection with any Sale Event.  Neither the Corporation nor any Drag-Along Sellers shall have any liability if any such Sale Event is not consummated for any reason.

(f)     Transfers of Capital Stock in a Sale Event by a Drag-Along Seller or a Dragged Holder pursuant to Section 3.01 shall not be subject to the transfer restrictions set forth in the Governing Documents, including Section 7.03; provided, however, that such Transfer would not, if consummated, result in any violation of the Securities Act or any state securities laws or regulations, or any other applicable federal or state laws or order of any governmental authority having jurisdiction over the Corporation.

Section 3.02.  Additional Conditions to Drag-Along Rights.  Notwithstanding anything contained in Section 3.01, the obligations of the Dragged Holders and the rights of the Drag-Along Sellers under Section 3.01 are subject to the following conditions:

(a)     if the Drag-Along Buyers in a Sale Event include one or more Affiliates of any Drag-Along Seller, such Sale Event must be approved by the holders of a majority of the shares of outstanding Common Stock not held by any Affiliate of such Person;

(b)     upon the consummation of such Sale Event, (i) all of the Stockholders participating therein will receive the same form and amount of consideration per share of Capital Stock as each other share of Capital Stock of the same class and series; provided, however, that in no event shall any consideration for any services, such as placement or transaction fees,

WEIL:\97590856\2\10143.0003WEIL:\97607817\1\10143.0003

investment banking or investment advisory fees payable to the Drag-Along Sellers or any related Person in connection with such transaction, or any consideration for any additional agreements entered into in connection with such transaction, such as non-competition agreements, be included in such amount of per share consideration; and (ii) if any Stockholders are given an option as to the form and amount of consideration to be received, all Stockholders participating therein will be given the same option; provided, however, that the foregoing conditions shall not be required to the extent that the any Stockholder would receive cash in lieu of securities pursuant to Section 3.01(b)(vii);

(c)        each Dragged Holder shall be obligated to pay only its *pro rata* share of expenses incurred in connection with a consummated Sale Event to the extent such expenses are incurred for the benefit of all Stockholders and are not otherwise paid by the Corporation or another Person; and

(d)        each Stockholder shall: (i) not be required to give any representation or warranty or agree to any covenant or other obligation (including indemnification obligations or restrictive covenants) except for customary "fundamental" representations and warranties, including representations and indemnities concerning such Stockholder's title to the Capital Stock and authority, power and right to enter into and consummate the Transfer (or other Sale Event) without contravention of any Law or agreement, and an indemnity (and then only to the extent the Drag-Along Sellers are also subject to such an indemnity); provided, however, that if the Stockholders are required to provide any representations or indemnities in connection with such Transfer (or other Sale Event), liability for misrepresentation or indemnity shall (as to such Stockholders) be expressly stated to be several but not joint and each Stockholder shall not be liable for more than its *pro rata* share (based on the net proceeds received by it in the Sale Event in respect of its Corporation Securities) of any liability for misrepresentation or indemnity and each Stockholder's aggregate liability shall further be limited to the net proceeds received by such Stockholder in respect of its Capital Stock, except in the case of fraud by such Stockholder; (ii) benefit from all of the same provisions of the definitive agreements as the Drag-Along Sellers; and (iii) be required to bear its proportionate share of any escrows, holdbacks or adjustments in purchase price, which shall not, in each case, exceed the net proceeds received by such Stockholder in the Sale Event in respect of its Corporation Securities.

**ARTICLE 4**
**TAG-ALONG RIGHTS**

Section 4.01.  Tag-Along Rights.

(a)        Subject to Section 4.01(i), if any Stockholder, together with any of its Affiliates, proposes to Transfer Common Stock representing at least thirty five percent (35%) of the total Common Stock then outstanding (i) in a single transaction or series of related transactions or (ii) as part of the same disposition plan (including if acting in concert with other holders) (such holder or holders acting together, collectively, the "**Tag-Along Seller**" and such transfer, the "**Tag-Along Transfer**"), then each other Stockholder shall have the right to exercise tag-along rights in accordance with the terms and conditions set forth herein (any such Stockholder, a "**Tag-Along Offeree**").

16

(b)      The Tag-Along Seller shall promptly give notice to the Corporation, and the Corporation shall, to the extent reasonably practicable, promptly give or cause to give notice pursuant to Section 8.02 (the "**Tag-Along Notice**") to each Tag-Along Offeree, at least ten (10) Business Days prior to the consummation of the proposed Tag-Along Transfer.  The Tag-Along Notice shall set forth the number of shares Common Stock proposed to be Transferred, the name of the proposed transferees, the proposed purchase price for each share of such Common Stock (the "**Tag-Along Per Share Consideration**"), and any other material terms and conditions of the Tag-Along Transfer, including the form of the proposed transfer agreement, if any.

(c)      Each Tag-Along Offeree shall have a period of ten (10) Business Days from the date of the Tag-Along Notice within which to elect to sell up to its Tag-Along Pro Rata Portion of Common Stock at a price per share equal to the Tag-Along Per Share Consideration in connection with such Tag-Along Transfer (the "**Tag-Along Election Period**").  Any Tag-Along Offeree may exercise such right by delivery of an irrevocable written notice to the Tag-Along Seller and the Corporation specifying the number of shares of Common Stock such Tag-Along Offeree desires to include in the Tag-Along Transfer (any such Tag-Along Offeree exercising such rights, a "**Tagging Stockholder**") and wire transfer or other instructions for payment of any consideration for the Common Stock.  The Tag-Along Seller shall have the right to sell, pursuant to the Tag-Along Transfer, (x) the number of shares of Common Stock proposed to be Transferred pursuant to the Tag-Along Transfer *minus* (y) the number of shares of Common Stock that the Tagging Stockholders elect to sell pursuant to the Tag-Along Transfer in accordance with this Section 4.01.

(d)      Each Tagging Stockholder shall agree:

(i)      to make the same representations and warranties to the transferees with respect to itself and related items as the Tag-Along Seller makes with respect to itself and related items in connection with the Tag-Along Transfer;

(ii)      to the same covenants, indemnities and agreements with respect to itself and related items as agreed by the Tag-Along Seller with respect to itself and related items in connection with the Tag-Along Transfer; and

(iii)      to the same terms and conditions to the Transfer of Common Stock as the Tag-Along Seller agrees (including bearing their proportionate share of any escrows, holdbacks or adjustments in purchase price);

provided, however, that with respect to the immediately preceding clauses (i) through (iii), (x) all such representations, warranties, covenants, indemnities and agreements shall be made by each Tagging Stockholder and each Tag-Along Seller severally and not jointly and (y) no Tagging Stockholder shall be required to agree to any representations, warranties, indemnities, agreements, terms and conditions that are specific to the Tag-Along Seller.

(e)      If at the end of a forty five (45) day period after the expiration of the Tag-Along Election Period (which forty five (45) day period shall be extended if any of the transactions contemplated by the Tag-Along Transfer are subject to regulatory approval until the expiration

17

of five Business Days after all such approvals have been received, but in no event later than one hundred and twenty (120) days following expiration of the Tag-Along Election Period), the Tag-Along Sellers have not completed the Transfer of all shares of Common Stock proposed to be sold by the Tag-Along Sellers and all Tagging Stockholders on substantially the same terms and conditions set forth in the Tag-Along Notice, the Tag-Along Sellers shall (i) return to each Tagging Stockholder the instruments of transfer, limited power-of-attorney and all certificates and other applicable instruments representing the Common Stock that such Tagging Stockholder delivered for Transfer pursuant to this Article 4 and any other documents in the possession of the Tag-Along Sellers executed by the Tagging Stockholders in connection with the proposed Tag-Along Transfer, and (ii) all the restrictions on Transfer contained in this Agreement or otherwise applicable at such time with respect to such Capital Stock shall continue in effect.

(f)     Promptly after the consummation of the Tag-Along Transfer, the Tag-Along Sellers shall (i) notify the Tagging Stockholders thereof, (ii) remit to the Tagging Stockholders the total consideration for the Capital Stock of the Tagging Stockholders Transferred pursuant thereto less the Tagging Stockholders' *pro rata* share of any escrows, holdbacks or adjustments in purchase price and any transaction expenses as determined in accordance with this Article 4, with the cash portion of the purchase price paid by wire transfer of immediately available funds in accordance with the wire transfer instructions provided by such Tagging Stockholder and (iii) furnish such other evidence of the completion and the date of completion of such transfer and the terms thereof as may be reasonably requested by the Tagging Stockholders.  The Tag-Along Sellers shall promptly remit to the Tagging Stockholders any additional consideration payable upon the release of any escrows, holdbacks or adjustments in purchase price.

(g)     Upon the consummation of such Tag-Along Transfer, (i) all of the Tagging Stockholders participating therein will receive the same form and amount of consideration in respect of each share of Common Stock sold by them in such Tag-Along Transfer; provided, however, that in no event shall any consideration for any services, such as placement or transaction fees, investment banking or investment advisory fees payable to the Tag-Along Sellers, as the case may be, or any related Person in connection with such transaction, or any consideration for any additional agreements entered into in connection with such transaction, such as non-competition agreements, be included in the amount of consideration and (ii) if any Tagging Stockholders are given an option as to the form and amount of consideration to be received, all Tagging Stockholders participating therein will be given the same option.

(h)     If any Stockholder or any of its Affiliates purport to sell any Common Stock in contravention of this Section 4.01 (a "**Prohibited Transfer**"), each other Stockholder who desires to exercise tag-along rights in accordance with the terms and conditions set forth in this Section 4.01 may, in addition to such remedies as may be available by Law, in equity or hereunder, require the Tag-Along Sellers to purchase, pro rata in accordance with their participation in the Prohibited Transfer, from such Stockholder the type and number of shares of Capital Stock that such Stockholder would have been entitled to sell in such Tag-Along Transfer had the Prohibited Transfer been effected in compliance with the terms of this Section 4.01.  The sale will be made on the same terms, including as provided in Section 4.01(g), as applicable, and subject to the same conditions as would have applied had the Stockholder not made the Prohibited Transfer.  Such sale (including the delivery of the purchase price) must be made within ninety (90) days after such Stockholder learns of the Prohibited Transfer.  The Tag-Along

18

Sellers shall also reimburse, pro rata in accordance with their participation in the Prohibited Transfer, each participating Stockholder for any and all reasonable and documented out-of-pocket fees and expenses, including reasonable legal fees and expenses, incurred pursuant to the exercise or the attempted exercise of the Stockholder's rights under this Section 4.01.

(i)     The provisions of this Section 4.01 shall not apply to (i) a transfer as part of a Public Offering for which piggyback registration rights apply in accordance with the Registration Rights Agreement, (ii) a transfer to (A) any Related Fund of a Stockholder, including any fund managed by the investment manager or advisor of a Stockholder or an Affiliate thereof or (B) any partner, stockholder or member of a Stockholder in connection with a distribution (not involving a disposition for value) of Common Stock held by a Stockholder to any such Person or (iii) any transfer pursuant to Article 3.

## ARTICLE 5
## PREEMPTIVE RIGHTS

Section 5.01.   Preemptive Rights.

(a)     Subject to the terms and conditions of this Article 5 and applicable Law, if the Corporation proposes to offer, sell or issue any Corporation Securities except for any Excluded Issuance (collectively, the "**Preemptive Shares**"), then the Corporation shall give each Stockholder, pursuant to Section 8.02, written notice of such proposed issuance at least ten (10) Business Days prior to the proposed issuance date (an "**Issuance Notice**").  The Issuance Notice shall specify the number of Preemptive Shares and the price (or a good faith estimate or range of estimates of the price if the final price is not then determinable) at which such Preemptive Shares are proposed to be issued and the other material terms and conditions of such Preemptive Shares and of the issuance, including the proposed issuance date.  Each Stockholder shall be entitled to purchase, at the price and on the other terms and conditions specified in the Issuance Notice, up to a number of Preemptive Shares equal to its pro rata portion which shall be calculated as (i) the number of Preemptive Shares proposed to be issued by the Corporation multiplied by (ii) (x) the total number of shares of outstanding Common Stock beneficially owned by such Stockholder immediately prior to the proposed issuance divided by (y) the total number of shares of outstanding Common Stock immediately prior to the proposed issuance; provided, however, that if a range is provided in the Issuance Notice then each Stockholder shall be entitled to condition such participation upon the final price being within such specified price range.  A Stockholder may, in its sole discretion, allocate its right to purchase its portion of the Preemptive Shares among its Related Funds, including any funds managed by such Stockholder or its Affiliates.

(b)     A Stockholder may exercise its right to purchase its pro rata portion of the Preemptive Shares by delivering written notice of its election to purchase such Preemptive Shares at the price and on the terms and conditions specified in the Issuance Notice to the Corporation within five (5) Business Days after receipt of the Issuance Notice.  If, at the end of such five (5) Business Day period, any Stockholder has not exercised its right to purchase any of its pro rata portion of such Preemptive Shares by delivering such notice, such Stockholder shall be deemed to have waived all of its rights under this Article 5 with respect to the purchase of such Preemptive Shares specified in the applicable Issuance Notice.

19

(c)     Subject to compliance with this Article 5, the Corporation shall have ninety (90) days (or such longer period as is determined to be necessary in the reasonable judgment of the Board, such period to be no longer than one hundred and eighty (180) days after the date of the Issuance Notice to consummate the proposed issuance of any or all of such Preemptive Shares that the applicable Stockholders have elected not to purchase at the same (or higher) price and upon such other terms and conditions that, taken as a whole, are not materially less favorable to the Corporation than those specified in the Issuance Notice; provided, however, that if such issuance is subject to regulatory approval, such ninety (90) day period shall be extended until the expiration of five (5) Business Days after all such approvals have been received, but in no event later than one hundred and eighty (180) days after the date of the Issuance Notice.  If the Board proposes to issue any Preemptive Shares (i) after such ninety (90) day period (or one hundred and eighty (180) day period, if applicable) or (ii) during such ninety (90) day period (or one hundred and eighty (180) day period, if applicable) at a lower price or on such other terms that are, taken as a whole, materially less favorable to the Corporation, then, in either case (i) or (ii), it shall again comply with the procedures set forth in this Article 5.

(d)     The closing of any issuance of Preemptive Shares to the Stockholders pursuant to this Article 5 shall take place at the time and in the manner provided in the Issuance Notice.

Section 5.02.   Excluded Issuances.  The preemptive rights under this Article 5 shall not apply to (each of the following, an "**Excluded Issuance**"):

(i)     issuances or sales of any Corporation Securities in, or in connection with, a bona fide acquisition by the Corporation or any other Corporate Entity of, with or into another Person, excluding any Stockholder Affiliate; provided, however, the foregoing does not include an equity financing transaction to raise funds to finance any such acquisition;

(ii)     issuance of any Corporation Securities in connection with any employee or management equity awards or Corporation Securities issued upon the exercise, conversion or exchange of outstanding Corporation Securities; or

(iii)     issuance of any Corporation Securities upon the conversion of a the Convertible Term Loans.

### ARTICLE 6
### INFORMATION RIGHTS, CONSULTATION RIGHT, AND SALE SUPPORT ARRANGEMENTS

Section 6.01.   Financial Statements and Periodic Reports.

(a)     Subject to Section 7.01, the Corporation shall provide the following information to each Stockholder that is not a Competitor:

(i)     commencing with the fiscal year ended December 31, 2020, within 90 days after the end of each fiscal year, a consolidated balance sheet of the Corporation and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year, setting

20

forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail (together with, in all cases, a management discussion and analysis with respect thereto) and prepared in accordance with GAAP, audited and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing or other independent registered public accounting firm selected by the Corporation, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification (other than related (i) solely to the occurrence of the upcoming maturity date under that certain First Lien Credit Agreement, dated as of the date hereof, by and among the Reorganized Debtors, the lenders from time to time party thereto and Cantor Fitzgerald Securities, as administrative agent and collateral agent, pursuant to which the lenders party thereto were deemed to provide the Reorganized Debtors with term loans in an aggregate principal amount of $75,000,000, that certain ABL Credit Agreement, dated as of the date hereof, by and among the Reorganized Debtors, the lenders from time to time party thereto and [●],Cantor Fitzgerald Securities, as administrative agent and collateral agent, pursuant to which the lenders party thereto were to provide the Reorganized Debtors with revolving loans in an aggregate principal amount up to $[●]]$76,600,000 or the Second Lien Credit Agreement, in each case, occurring within one year from the date such report is delivered or (ii) any potential inability to satisfy any financial maintenance covenant on a future date or in a future period) or any qualification or exception as to the scope of such audit except for qualifications relating to changes in accounting principles or practices reflecting changes in GAAP and required or approved by such independent certified public accountants; and

(ii)    within 45 days (or 75 days in the case of the first fiscal quarter following the date hereof) after the end of each fiscal quarter of each fiscal year of the Corporation, a consolidated balance sheet of the Corporation and its Subsidiaries as at the end of such fiscal quarter and the related (x) consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (y) consolidated statements of cash flows for such fiscal quarter and the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail (together with, in all cases, a management discussion and analysis with respect thereto) and certified by the chief executive officer, president, vice president, chief financial officer, chief administrative officer, secretary or assistant secretary, treasurer or assistant treasurer, controller or other similar officer of the Corporation as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of the Corporation and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes; and

(iii)    within 35 days (or 45 days in the case of the first three such months following the date hereof) after the end of each of the first two months in any fiscal quarter of the Corporation, an unaudited consolidated balance sheet of the Corporation and its Subsidiaries at the end of such month and the related unaudited consolidated statements of cash flows as of and for such month and the portion of the fiscal year then ended, setting forth in each case, in comparative form the figures for the corresponding

21

fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail.

(b)        The Corporation will hold a quarterly earnings conference call for the Stockholders promptly (but not later than seven (7) Business Days) after distribution of the information required to be provided in Section 6.01(a)(i) and Section 6.01(a)(ii).

Section 6.02.   Information Rights.  With reasonable promptness upon the reasonable request therefor, the Corporation shall provide any Stockholder that is not a Competitor with such other information or documents regarding the operations, business affairs and the financial condition of the Corporation or any other Corporate Entity as any such Stockholder may reasonably request in writing from time to time in good faith, and all such information shall be deemed to be "Confidential Information".  Notwithstanding anything to the contrary in this Section 6.02, neither the Corporation nor any Corporate Entity will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (a) that constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to any Stockholder is prohibited by any applicable Law or (c) that is subject to attorney-client or similar privilege or constitutes attorney work product.

Section 6.03.   Delivery of Information; Confidentiality.

(a)        Documents required to be delivered pursuant to Section 6.01(a) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Corporation causes such documents to be posted or linked from the Corporation's website on the Internet; or (ii) on which such documents are posted on a datasite, if any, to which each Stockholder has access.

(b)        Each Stockholder shall at all times, except as otherwise required by Law (as determined by such Stockholder in good faith and in consultation with its legal counsel), keep confidential all information provided under this Article 6 pursuant to the confidentiality provisions contained in Section 7.01 and all such information shall be deemed to be "Confidential Information".

Section 6.04.   Sale Support Arrangements.

(a)        At any time and from time to time on or following the Effective Date, each Stockholder may, by a notice sent to the Corporation pursuant to Section 8.02 (a "**Transfer Notice**"), inform the Corporation regarding a proposed Transfer by such Stockholder.  Each Transfer Notice shall specify (i) the amount of Common Stock proposed to be Transferred, and (ii) the identity of the proposed transferees (if known) (the "**Proposed Transferee**").

(b)        Upon receipt of a Transfer Notice relating to a proposed Transfer by a Stockholder, and subject to applicable Law, the Corporation shall, and shall cause the other Corporate Entities, to cooperate with such Stockholder and the Proposed Transferee in connection with the proposed Transfer, including to promptly provide, and cause each Corporate Entity to provide to such Stockholder, the Proposed Transferee, their respective counsel, financial advisors, auditors and other authorized representatives reasonable access upon

<div align="center">22</div>

reasonable notice and request and during normal business hours to the financial and operating data and such other information of the Corporation and its Subsidiaries as may reasonably be requested in connection with such Transfer in order to allow the Proposed Transferee and their representatives (each as engaged for the purposes of the relevant transaction) to conduct a reasonable and customary due diligence review;

(c)(b)   provided, however, that in each case, (x) any information of a confidential nature shall only be made available to the Proposed Transferee upon the execution of customary confidentiality agreements reasonably satisfactory to the Corporation and (y) this Agreement shall not require the Corporation to extend any such cooperation or any Confidential Information to any Proposed Transferee that is a Competitor.

## ARTICLE 7
## CERTAIN COVENANTS AND AGREEMENTS

Section 7.01.  Confidentiality.

(a)      Each Stockholder acknowledges and agrees that without the prior written consent of the Corporation, any information provided to any Stockholder or, as requested in writing by such Stockholder, any of its members, equity holders, partners, managers, directors, officers, employees, representatives, Affiliates, advisors and agents (collectively, "**Representatives**") by the Corporation pursuant to this Agreement, including pursuant to an employee serving as a Director or as a Board Observer or any information rights and sale support rights under Article 6 (collectively, "**Confidential Information**") will be kept confidential, and will not be disclosed to any Person, except that Confidential Information may be disclosed:

(i)      to such Stockholder's Representatives in the normal course of the performance of their duties or to any financial institution providing credit to such Stockholder, so long as such Stockholder directs such Representative to keep such Confidential Information confidential in accordance with the terms of this Agreement;

(ii)      to any limited partner or other investor in such Stockholder, its Affiliates or Related Funds, so long as such Stockholder direct such Person to keep such Confidential Information confidential in accordance with the terms of this Agreement;

(iii)      to the extent required by applicable Law, rule or regulation (including complying with any oral or written questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process to which a Stockholder is subject; provided, however, that such Stockholder agrees to give the Corporation prior notice of such request(s), to the extent practicable, so that the Corporation may seek an appropriate protective order or similar relief (and the Stockholder shall use its commercially reasonable efforts to cooperate with such efforts by the Corporation));

(iv)      to any Person to whom such Stockholder is contemplating a Transfer of Corporation Securities and who is not a Competitor; provided, however, that such potential transferee is advised of the confidential nature of such information and agrees to be bound by confidentiality obligations at least as protective as the provisions hereof;

WEIL:\97590856\2\10143.0003WEIL:\97607817\1\10143.0003

(v)    to any regulatory authority that requires or requests access to such Confidential Information in connection with the conduct of its ordinary oversight activities; provided, however, that such regulatory authority is advised of the confidential nature of such information; and provided further, that any such request is not directly targeting the Corporation or any Corporate Entity;

(vi)    to the extent related to the tax treatment and tax structure of the transactions contemplated by this Agreement (including all materials of any kind, such as opinions or other tax analyses that the Corporation, its Affiliates or its Representatives have provided to such Stockholder relating to such tax treatment and tax structure); provided, however, that the foregoing does not constitute an authorization to disclose the identity of any existing or future party to the transactions contemplated by this Agreement or their Affiliates or Representatives, or, except to the extent relating to such tax structure or tax treatment, any specific pricing terms or commercial or financial information; or

(vii)    if the prior written consent of the Corporation shall have been obtained.

(b)    Notwithstanding Section 7.01(a):

(i)    "Confidential Information" shall not include information that: (A) is or becomes generally available to the public other than as a result of a disclosure by any Stockholder in violation of Section 7.01(a); (B) was available to any Stockholder on a non-confidential basis prior to its disclosure by the Corporation or its Representatives; (C) becomes available to the Stockholder on a non-confidential basis from a Person other than the Corporation and the Corporate Entities or their respective Representatives who is not known by the Stockholder to have violated a confidentiality agreement with the Corporation or the other Corporate Entities or any of their respective Representatives in respect of such information; or (D) was independently developed by the Stockholder without reference to or use of such information;

(c)    A Stockholder shall not be required to receive Confidential Information and may decline to receive information provided pursuant to Article 6 that constitutes Confidential Information by providing written notice to the Corporation in advance of such materials being delivered.

Section 7.02.    Irrevocable Proxy and Power of Attorney.  Each Stockholder hereby constitutes and appoints as the proxies of such Stockholder and hereby grants a power of attorney to the Corporation and any designee of the Corporation (who may be a Director or an officer of the Corporation), and each of them, with full power of substitution, with respect to the election or removal of Persons as members of the Board in accordance with Article 2 and all matters relating to the Drag-Along Rights pursuant to Article 3, and hereby authorizes each of them to represent and vote, if and only if the Stockholder (a) fails to vote, or (b) attempts to vote (whether by proxy, in person or by written consent), in a manner which is inconsistent with the terms of this Agreement, all of such Stockholder's Voting Shares in accordance with the terms and provisions of this Agreement.  Each of the proxy and power of attorney granted pursuant to the immediately preceding sentence is given in consideration of the agreements and covenants of

24

WEIL:\97590856\2\10143.0003WEIL:\97607817\1\10143.0003

the Corporation and the Stockholders in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable unless and until this Agreement terminates or expires pursuant to Section 8.04.  Unless and until this Agreement terminates or expires pursuant to Section 8.04, each Stockholder shall not purport to grant any other proxy or power of attorney with respect to any of the Voting Shares, deposit any of its Voting Shares into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any other Person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Voting Shares, in each case, with respect to any of the matters set forth herein.  Notwithstanding the foregoing, the provisions of this Section 7.02 shall not prevent a Stockholder from (x) Transferring its Capital Stock so long as such Transfer complies with the provisions of the Governing Documents, including Section 7.03 or (y) directing a Related Fund of such Stockholder to vote its Voting Shares on its behalf.

Section 7.03.   Transfer Restrictions.

(a)      Other than in compliance with any exercise of Drag-Along Rights pursuant to Article 3, in addition to any other transfer restriction set forth in the Governing Documents, unless permitted by the Board, each Stockholder agrees that it shall not Transfer any of its Common Stock at any time if such Transfer:

(i)      would cause the Corporation to be required to, including as a result of passage of time and giving effect to the exercise, conversion or exchange of all securities convertible into, or exercisable or exchangeable for, shares of Common Stock, file a registration statement under the Exchange Act or be subject to the reporting requirements of the Exchange Act or any similar statute or legislation; provided, however, that the foregoing shall not apply to any Transfer if the Corporation has otherwise become obligated to file reports under Section 13 or Section 15(d) of the Exchange Act;

(ii)      would not comply with U.S. federal or state securities Laws or other applicable securities Law;

(iii)      is to a Person who has not (or will not in connection with such Transfer) become a party to this Agreement by executing and delivering a Joinder (subject to Section 7.03(d) below); or

(iv)      does not otherwise comply with this Agreement.

(b)      No Transfer of Capital Stock to any Person shall be effective unless such Person has complied with this Section 7.03. Any Transfer in violation of this Section 7.03(c) shall be null and void *ab initio*.

(c)      Unless otherwise approved by the Board, no issuance by the Corporation or Transfer of Capital Stock to any Person shall be effective unless such Person has delivered to the Corporation a Joinder, pursuant to which such Person agrees to be bound by the terms and conditions of this Agreement as if an original party hereto.  Any issuance or Transfer in violation of this Section 7.03(d) shall be null and void *ab initio*.

25

## ARTICLE 8
## MISCELLANEOUS

Section 8.01.  Binding Effect; Assignability; No Third Party Beneficiaries.

(a)      This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors, legal representatives and permitted assigns.  Any Stockholder that ceases to beneficially own any Capital Stock shall cease to be bound by the terms hereof other than such provisions which also survive the termination of this Agreement pursuant to Section 8.04(b).

(b)      Neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by any party hereto pursuant to any Transfer of Capital Stock or otherwise, other than as expressly provided for herein, except that any Person, other than the Corporation or any other Corporate Entity, acquiring Capital Stock that is required or permitted by the terms of this Agreement or any employment agreement or stock purchase, option, stock option or other compensation plan of the Corporation or any other Corporate Entity to become a party hereto shall (unless already bound hereby) execute and deliver to the Corporation a Joinder and shall thenceforth be a "Stockholder", for all purposes under this Agreement.

(c)      Nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the parties hereto, and their respective heirs, successors, legal representatives and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 8.02.  Notices.  All notices, requests and other communications to any party shall be in writing and shall be delivered in person, mailed by certified or registered mail, return receipt requested, or sent by facsimile transmission or email transmission:

if to the Corporation:

Jason Holdings Inc.
Address:        833 East Michigan Street, Suite 900
                Milwaukee, WI 53202
Attn:           [●]General Counsel
Email:          [●]generalcounsel@jasoninc.com

if to any Stockholder, at its address and the address of any representative listed on its signature pages and with a copy to:

Weil, Gotshal & Manges LLP
Address:        767 Fifth Avenue
                New York, New York 10153
Attn:           Ryan Preston Dahl, Esq.
                Mariel E. Cruz, Esq.
Email:          ryan.dahl@weil.com
                mariel.cruz@weil.com

26

All notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 6:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.  Any Person that becomes a Stockholder shall provide its mailing address and e-mail address to the Corporation for purposes of receiving notice under this Agreement.  Any Stockholder may change its address and other notice information by written notice to the Corporation given in accordance with this Section 8.02 and any other party may change its address and other notice information by written notice to the other parties hereto.

Section 8.03.   Waiver; Amendment.

(a)      Except as provided in the next sentence, no provision of this Agreement may be amended, restated or waived in any manner unless approved by (i) the Corporation, and (ii) the holders of a majority of the Voting Power of the Corporation; provided, however, that any amendment, restatement or waiver that, in any manner, would be materially and disproportionately adverse to the powers, preferences or rights of one or more Stockholders in relation to Stockholders holding similar powers, preferences or rights, must be approved by such disproportionately effected Stockholder(s).

(b)      Notwithstanding Section 8.03(a), the addition of new parties to this Agreement in accordance with its terms upon execution of a Joinder as a result of Transfers permitted in accordance with this Agreement shall not be deemed to be an amendment requiring the consent of (i) the Corporation and the holders of a majority of the Voting Power of the Corporation or (ii) any Stockholder.

(c)      Notwithstanding any provisions to the contrary contained herein, any party may waive any rights with respect to which such party is entitled to benefits under this Agreement.  No waiver of or consent to any departure from any provision of this Agreement shall be effective unless signed in writing by the party entitled to the benefit thereof.

(d)      Unless expressly specified in the terms of this Agreement, no delay of or omission in the exercise of any right, power or remedy accruing to any party as a result of any breach or default by any other party under this Agreement shall impair any such right, power or remedy, nor shall it be construed as a waiver of or acquiescence in any such breach or default, or of any similar breach or default occurring later; nor shall any such delay, omission nor waiver of any single breach or default be deemed a waiver of any other breach or default occurring before or after that waiver.

Section 8.04.   Effectiveness; Termination; Survival; Fallaway.

(a)      This Agreement shall be effective as of the date hereof and shall continue in effect until the earlier of (i) the closing of a Qualified IPO, (ii) the closing of any other approved Public Offering whereby immediately after such Public Offering the Common Stock is quoted or listed for trading on a National Securities Exchange, (iii) the closing of a Sale Event or (iv) the mutual agreement of (A) the Corporation, (B) the holders of a majority of the Voting Power held by all

27

Stockholders, which majority must include (x) Specified Stockholder A, for as long as Specified Stockholder A has the right to designate at least one director pursuant to Section 2.02 and (y) Specified Stockholder B, for as long as Specified Stockholder B has the right to designate at least one director pursuant to Section 2.02 and (C) the holders of a majority of the Voting Power held by all Stockholders, excluding the Voting Power held by Specified Stockholder A or any of its Affiliates (each a "**Termination Event**").

(b)     Upon the occurrence of a Termination Event, this Agreement shall be terminated and become void and of no effect without liability of any party; provided, however, that no termination under this Agreement shall relieve any Person of liability for breach prior to termination.  The provisions of Section 2.07 and this Article 8 shall survive any termination of this Agreement.

Section 8.05.   Governing Law.  This Agreement and any claim, controversy or dispute arising under or related to this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware without regard to the conflicts of laws rules of such state.

Section 8.06.   Jurisdiction; Service of Process.  The parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the Court of Chancery of the State of Delaware, or to the extent such court does not have subject matter jurisdiction, the United States District Court for the District of Delaware, or to the extent such court also does not have subject matter jurisdiction, another court of the State of Delaware, County of New Castle, so long as one of such courts shall have subject matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware, and each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each party agrees that notice to such party as provided in Section 8.02 shall be deemed effective service of process on such party.

Section 8.07.   WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.08.   Specific Performance.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached.  It is accordingly agreed that, in addition to any other applicable remedies at Law or equity, the parties shall be entitled to an injunction or injunctions, without proof of damages, to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement.  Each party hereto agrees that it will not

28

oppose the granting of an injunction, specific performance or other equitable relief on the basis that (a) the other party has an adequate remedy at Law or (b) an award of specific performance is not an appropriate remedy for any reason at Law or in equity.  Each of the parties hereto hereby waives (x) any defenses in any action for specific performance, including the defense that a remedy at Law would be adequate and (y) any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.

Section 8.09.  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  For the avoidance of doubt, any party that is to receive Common Stock under the Plan shall be, and without further action by any Person is deemed to be, a party to this Agreement and bound to the terms of this Agreement from and after the Effective Date, even if not a signatory hereto, and this Agreement may be executed without the signatures of any party so effected.  This Agreement and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by facsimile, by electronic mail in "portable document format" (".pdf") form, or any other electronic transmission, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

Section 8.10.  <u>Entire Agreement</u>.  This Agreement and the other Governing Documents constitute the entire agreement among the parties hereto and supersede all prior and contemporaneous agreements and understandings, both oral and written, among the parties hereto with respect to the subject matter hereof and thereof.

Section 8.11.  <u>Severability</u>.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner so that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 8.12.  <u>Further Assurances</u>.  Each party shall cooperate and shall take such further action and shall execute and deliver such further documents as may be reasonably requested by any other party in order to carry out the provisions and purposes of this Agreement.

Section 8.13.  <u>Aggregation of Shares</u>.  All Capital Stock held by a Stockholder and its Affiliates and Related Funds shall be aggregated together for purposes of determining the availability of any rights hereunder.  Upon the request of the Corporation or any transfer agent for the Capital Stock, each Stockholder shall promptly provide to the Corporation or its transfer agent, as applicable, written confirmation (including reasonable supporting documentation) of such Stockholder's then current ownership of its Capital Stock.  In determining the ownership of such Capital Stock for any purposes hereunder, the Corporation shall be entitled to conclusively rely in good faith on (a) the then most current ownership information provided to it by the

29

transfer agent or (b) if there is no such transfer agent, the most current ownership information then in its possession, and, in each case, any such determination made by the Corporation in reliance thereon shall be deemed final and binding on all parties hereto.

Section 8.14.    Independent Agreement by the Stockholders.  The obligations of each Stockholder hereunder are several and not joint with the obligations of any other Stockholder, and, except as expressly set forth herein, no provision of this Agreement is intended to confer any obligations on any Stockholder vis-à-vis any other Stockholder.  Nothing contained herein, and no action taken by any Stockholder pursuant hereto, shall be deemed to constitute the Stockholders as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Stockholders are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated herein.

[*Remainder of Page Intentionally Blank*]

30

WEIL:\97590856\2\10143.0003WEIL:\97607817\1\10143.0003

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date above first above written.

**JASON HOLDINGS INC.**

By:    _____

Name:    ~~Mark Blaufuss~~Kevin Kuznicki

Title:    ~~Director~~Senior Vice President, General Counsel and Secretary

[*Signature Page to Stockholders' Agreement*]

## SCHEDULE 1

## SPECIFIED STOCKHOLDERS[1]

---

[1] Note to Draft: This list shall include all entities that will receive Common Stock on the Effective Date.

WEIL:\97590856\2\10143.0003 WEIL:\9760781\7\1\10143.0003

**SCHEDULE 2**

**ADDITIONAL STOCKHOLDERS**[2]

---

[2] ~~Note to Draft: This list shall include the 2L holders to the extent they receive Common Stock as of the Effective Date.~~

~~WEIL:\97590856\2\10143.0003~~WEIL:\9767817\1\10143.0003

**EXHIBIT A**

**JOINDER TO STOCKHOLDERS AGREEMENT**

This Joinder Agreement (this "**Joinder Agreement**") is made as of the date written below by the undersigned (the "**Joining Party**") in accordance with the Stockholders Agreement dated as of [●]August 28, 2020 (as amended, amended and restated or otherwise modified from time to time, the "**Stockholders Agreement**"), among Jason Holdings Inc. (the "**Corporation**") and Stockholders of the Corporation party thereto, as the same may be amended from time to time.  Capitalized terms used, but not defined, herein shall have the meaning ascribed to such terms in the Stockholders Agreement.

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to the Stockholders Agreement as of the date hereof and shall have all of the rights and obligations of a "Stockholder" thereunder as if it had executed the Stockholders Agreement.  The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Stockholders Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date written below.

Date: [●]

**[STOCKHOLDER]**

By: _____

    Name:  [●]

    Title:  [●]

Notice information pursuant to Section 8.02:

Address:  [●]

Attn:    [●]

Email:   [●]

Fax:    [●]

A-1

**EXHIBIT B**

**COMPETITORS**

| BUSINESS DIVISION | COMPETITOR |
|---|---|
| **Osborn** | Saint-Gobain |
| | PFERD |
| | Weiler |
| | Kullen |
| | Lessmann |
| | Tanis, Inc. |
| | Mink Bursten (August Mink GmbH & Co. KG) |
| | Union Industrial Brushes |
| | Felton Brushes |
| | Thomas Industrial Rolls, Inc. |
| | Menzerna Polishing Compounds GmbH & Co. KG |
| | C. Hilzinger-Thum GmbH & Co. KG |
| | Divine Brothers Co. |
| | Walter Surface Technology |
| | Mill Rose |
| | 3M |
| | JAZ |
| | Abtex / Malish |
| | NCCM |
| | Marpol |
| | Felton |
| | AKK (Armstrong Kover Kwick) |
| | BRM (Brush Research) |
| | Schaefer / Gronell |
| | NIPB |
| | FKM |
| | Radiac |
| | Luka |
| | Klingspor |
| | United Abrasives / SAIT |
| | Cumi |
| | Tyrolit |
| | Camel Grinding Wheels |
| | Hermes |
| **Milsco** | Seats, Inc. |
| | Sears Seating |
| | Grammer |
| | Harita Seating Systems, Ltd. |
| | Commercial Vehicle Group (CVG), Inc. |
| | TS Tech CO., Ltd. |

B-1

| | PPD Group |
| --- | --- |
| | Shad (NAD, S.L.) |
| | Woodbridge Group |
| | Seat King LLC |
| | Polo Custom Products (motorcycle bags and accessories) |
| | Saddlemen Seats |
| | Mustang Seats |
| | Corbin Seats |
| | KAB suspension seats |
| | United Seating |
| | BE-GE |
| | Star Seating |
| | Pilot |
| | SEAT |
| | Dowco (motorcycle bags and accessories) |
| | Woo Chang |

WEIL:\97590856\2\10143.0003WEIL:\97607817\1\10143.0003

## **Exhibit D**

### **New Revolving Exit Facility Credit Agreement**

Certain documents or portions thereof contained in this **Exhibit D** and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The respective rights of the Debtors and the Consenting Creditors are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement and any of the documents and designations contained herein at any time before the Effective Date of the Plan or any such other date as may be provided for in the Plan or an order of the Bankruptcy Court, and filing of the forms of the documents set forth in this Plan Supplement (including this Exhibit D) shall not be deemed as acceptance of such document by any party to the Restructuring Support Agreement or a waiver of any of the rights of any such party under the Restructuring Support Agreement, the Bankruptcy Code or otherwise.

Kirkland Draft 8.27.20
Revised

**Dated August 28, 2020**

**ABL CREDIT AGREEMENT**

among

**JASON GROUP INC.,**
as Borrower,

**THE GUARANTORS PARTY HERETO FROM TIME TO TIME,**

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Administrative Agent,

and

**THE OTHER LENDERS PARTY HERETO FROM TIME TO TIME**

6237404.15

# Table of Contents

**Page**

**Table of Contents**

**Page**

Article I Definitions and Accounting Terms ................................................................................2

    Section 1.01    Defined Terms...............................................................................................2
    Section 1.02    Other Interpretive Provisions ...................................................................50
    Section 1.03    Accounting Terms......................................................................................51
    Section 1.04    Rounding....................................................................................................51
    Section 1.05    References to Agreements, Laws, Etc........................................................52
    Section 1.06    Times of Day.............................................................................................52
    Section 1.07    Timing of Payment or Performance..........................................................52
    Section 1.08    [Reserved]..................................................................................................52
    Section 1.09    Pro Forma Calculations.............................................................................52
    Section 1.10    Exchange Rates; Currency ........................................................................53
    Section 1.11    Certifications.............................................................................................53

Article II Credit Extensions .......................................................................................................53

    Section 2.01    Revolving Loans .......................................................................................53
    Section 2.02    [Reserved] .................................................................................................54
    Section 2.03    Borrowing Procedures and Settlements. ...................................................54
    Section 2.04    Payments; Reductions of Commitments; Prepayments ............................61
    Section 2.05    Promise to Pay; Promissory Notes............................................................65
    Section 2.06    Interest Rates and Letter of Credit Fee:  Rates, Payments, and Calculations. .......65
    Section 2.07    Crediting Payments ...................................................................................67
    Section 2.08    Designated Account ...................................................................................67
    Section 2.09    Maintenance of Loan Account; Statements of Obligations .......................67
    Section 2.10    Fees ...........................................................................................................67
    Section 2.11    Letters of Credit .......................................................................................68
    Section 2.12    LIBOR Option...........................................................................................74
    Section 2.13    Capital Requirements ................................................................................77

Article III Taxes, Increased Costs Protection and Illegality........................................................78

    Section 3.01    Taxes ........................................................................................................78
    Section 3.02    Illegality ...................................................................................................82
    Section 3.03    Inability to Determine Rates .....................................................................82
    Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; LIBOR Rate Loan Reserves ................................................................................................83
    Section 3.05    Funding Losses .........................................................................................84
    Section 3.06    Matters Applicable to All Requests for Compensation.............................84
    Section 3.07    Replacement of Lenders under Certain Circumstances .............................85
    Section 3.08    Survival ....................................................................................................86

Article IV Conditions Precedent to Credit Extensions ................................................................87

    Section 4.01    Conditions to Initial Credit Extension ......................................................87

6237404.15

**Page**

Section 4.02    Conditions to all Credit Extensions .......................................................89

Article V Representations and Warranties...................................................................89

Section 5.01    Existence, Qualification and Power; Compliance with Laws...............89
Section 5.02    Authorization; No Contravention......................................................90
Section 5.03    Governmental Authorization; Other Consents....................................90
Section 5.04    Binding Effect .................................................................................90
Section 5.05    Financial Statements; No Material Adverse Effect...............................90
Section 5.06    Litigation ........................................................................................91
Section 5.07    Ownership of Property; Liens ...........................................................91
Section 5.08    Environmental Matters .....................................................................91
Section 5.09    Taxes ...............................................................................................92
Section 5.10    ERISA Compliance...........................................................................92
Section 5.11    Subsidiaries; Equity Interests...........................................................92
Section 5.12    Margin Regulations; Investment Company Act...................................93
Section 5.13    Disclosure........................................................................................93
Section 5.14    Labor Matters ..................................................................................93
Section 5.15    Intellectual Property; Licenses, Etc...................................................93
Section 5.16    Solvency...........................................................................................94
Section 5.17    [Reserved] .......................................................................................94
Section 5.18    USA Patriot Act; OFAC; Sanctions; Anti-Corruption Laws; Anti-Money
                Laundering Laws...............................................................................94
Section 5.19    Security Documents .........................................................................94
Section 5.20    EEA Financial Institutions ...............................................................95
Section 5.21    Beneficial Ownership Certification.....................................................95
Section 5.22    [Reserved] .......................................................................................95
Section 5.23    Eligible Accounts.............................................................................95
Section 5.24    Eligible Inventory.............................................................................95
Section 5.25    Location of Inventory.......................................................................95
Section 5.26    Inventory Records............................................................................95
Section 5.27    Hedge Agreements...........................................................................95

Article VI Affirmative Covenants ..............................................................................96

Section 6.01    Financial Statements ........................................................................96
Section 6.02    Certificates; Other Information ..........................................................98
Section 6.03    Notices ............................................................................................99
Section 6.04    Payment of Taxes ...........................................................................100
Section 6.05    Preservation of Existence, Etc..........................................................100
Section 6.06    Maintenance of Properties................................................................100
Section 6.07    Insurance ........................................................................................100
Section 6.08    Compliance with Laws.....................................................................101
Section 6.09    Books and Records..........................................................................101
Section 6.10    Inspection Rights.............................................................................101
Section 6.11    Additional Collateral; Additional Guarantors.....................................102
Section 6.12    Compliance with Environmental Laws ...............................................104
Section 6.13    Further Assurances..........................................................................104
Section 6.14    [Reserved]. ......................................................................................105
Section 6.15    Location of Inventory; Chief Executive Office ...................................105

ii

6237404.15

20-22766-rdd   Doc 232   Filed 08/28/20   Entered 08/28/20 14:01:43   Main Document
Pg 387 of 1011

**Page**

| | | |
|---|---|---|
| Section 6.16 | [Reserved] | 105 |
| Section 6.17 | Lender Meetings | 105 |
| Section 6.18 | End of Fiscal Years | 105 |
| Section 6.19 | Lines of Business | 105 |
| Section 6.20 | Post-Closing Covenant | 105 |
| Section 6.21 | OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws | 105 |
| Section 6.22 | Account Control Agreements | 106 |

**Article VII Negative Covenants** ........................................................................106

| | | |
|---|---|---|
| Section 7.01 | Liens | 106 |
| Section 7.02 | Investments | 110 |
| Section 7.03 | Indebtedness | 113 |
| Section 7.04 | Fundamental Changes | 117 |
| Section 7.05 | Dispositions | 118 |
| Section 7.06 | Restricted Payments | 120 |
| Section 7.07 | [Reserved]. | 122 |
| Section 7.08 | Transactions with Affiliates | 122 |
| Section 7.09 | Burdensome Agreements | 123 |
| Section 7.10 | Use of Proceeds | 125 |
| Section 7.11 | [Reserved] | 126 |
| Section 7.12 | Inventory with Bailees | 126 |
| Section 7.13 | Fixed Charge Coverage Ratio | 126 |
| Section 7.14 | [Reserved] | 126 |
| Section 7.15 | Prepayments, Etc. of Indebtedness | 126 |
| Section 7.16 | Permitted Activities | 127 |

**Article VIII Events of Default and Remedies** ....................................................127

| | | |
|---|---|---|
| Section 8.01 | Events of Default | 127 |
| Section 8.02 | Remedies Upon Event of Default | 130 |
| Section 8.03 | [Reserved] | 130 |
| Section 8.04 | Borrower's Right to Cure | 130 |

**Article IX Administrative Agent** ........................................................................131

| | | |
|---|---|---|
| Section 9.01 | Appointment and Authorization of Administrative Agent | 131 |
| Section 9.02 | Delegation of Duties | 132 |
| Section 9.03 | Liability of Administrative Agent | 132 |
| Section 9.04 | Reliance by Administrative Agent | 133 |
| Section 9.05 | Notice of Default or Event of Default | 133 |
| Section 9.06 | Credit Decision | 133 |
| Section 9.07 | Costs and Expenses; Indemnification | 134 |
| Section 9.08 | Administrative Agent in Individual Capacity. | 135 |
| Section 9.09 | Successor Administrative Agent | 135 |
| Section 9.10 | Lender in Individual Capacity | 136 |
| Section 9.11 | Collateral Matters. | 136 |
| Section 9.12 | Restrictions on Actions by Lenders; Sharing of Payments | 138 |
| Section 9.13 | Agency for Perfection | 138 |
| Section 9.14 | Payments by Administrative Agent to the Lenders | 138 |
| Section 9.15 | Concerning the Collateral and Related Loan Documents | 139 |

iii

6237404.15

**Page**

Section 9.16   Field Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information .................................................................................139
Section 9.17   Several Obligations; No Liability ........................................................................140

Article X Miscellaneous ..............................................................................................................140

Section 10.01   Amendments, Etc. ..............................................................................................140
Section 10.02   Notices and Other Communications; Facsimile Copies.....................................143
Section 10.03   No Waiver; Cumulative Remedies.......................................................................145
Section 10.04   Attorney Costs and Expenses ............................................................................145
Section 10.05   Indemnification by the Borrower ........................................................................146
Section 10.06   Payments Set Aside............................................................................................147
Section 10.07   Successors and Assigns......................................................................................148
Section 10.08   Confidentiality ...................................................................................................152
Section 10.09   Setoff..................................................................................................................153
Section 10.10   Interest Rate Limitation......................................................................................153
Section 10.11   Counterparts .......................................................................................................153
Section 10.12   Integration ..........................................................................................................154
Section 10.13   Survival of Representations and Warranties .......................................................154
Section 10.14   Severability ........................................................................................................154
Section 10.15   GOVERNING LAW............................................................................................154
Section 10.16   WAIVER OF RIGHT TO TRIAL BY JURY ......................................................155
Section 10.17   Binding Effect ....................................................................................................155
Section 10.18   USA Patriot Act ..................................................................................................155
Section 10.19   No Advisory or Fiduciary Responsibility ..........................................................156
Section 10.20   Judgment Currency ............................................................................................156
Section 10.21   Intercreditor Agreement .....................................................................................156
Section 10.22   Acknowledgement and Consent to Bail-In of EEA Financial Institutions ..........157
Section 10.23   Certain ERISA Matters. ......................................................................................157
Section 10.24   Acknowledgement Regarding Any Supported QFCs ..........................................159

Article XI Guarantee.....................................................................................................................159

Section 11.01   The Guarantee .....................................................................................................159
Section 11.02   Obligations Unconditional ..................................................................................160
Section 11.03   Reinstatement......................................................................................................161
Section 11.04   Subrogation; Subordination ................................................................................161
Section 11.05   Remedies .............................................................................................................161
Section 11.06   [Reserved] ...........................................................................................................161
Section 11.07   Continuing Guarantee .........................................................................................161
Section 11.08   General Limitation on Guarantee Obligations .....................................................161
Section 11.09   Release of Guarantors .........................................................................................161
Section 11.10   Right of Contribution ..........................................................................................162
Section 11.11   Keepwell .............................................................................................................162
Section 11.12   Independent Obligation.......................................................................................162

6237404.15

**Page**

SCHEDULES

| | |
|---|---|
| 1.01(A) | Administrative Agent's Account |
| 1.01(B) | Authorized Persons |
| 1.01(C) | Designated Account |
| 1.01(D) | Existing Letters of Credit |
| 1.01(E) | Guarantors |
| S2.01 | Commitments |
| 4.01(a) | Collateral Documents |
| 5.07 | Ownership of Property |
| 5.11 | Subsidiaries |
| 5.25 | Locations of Inventory |
| 6.02 | Collateral Reporting |
| 6.20 | Post-Closing Covenants |
| 7.01(b) | Liens |
| 7.02(f) | Investments |
| 7.03(b) | Indebtedness |
| 7.05(v) | Dispositions |
| 7.08(k) | Transactions with Affiliates |
| 7.09(b) | Burdensome Agreements |
| 10.02(a) | Certain Addresses for Notices |

EXHIBITS

*Form of*

| | |
|---|---|
| A | LIBOR Notice |
| B | Borrowing Base Certificate |
| C | Compliance Certificate |
| D | Solvency Certificate |
| E | Assignment and Assumption |
| F | Security Agreement |
| G | Intercompany Note |
| H | United States Tax Compliance Certificate |
| I | Joinder Agreement |

v

6237404.15

**ABL CREDIT AGREEMENT**

This ABL CREDIT AGREEMENT is entered into as of August 28, 2020, among JASON GROUP INC., a Delaware corporation and successor by merger with Old Jason (hereinafter defined) (the "**Company**" and the "**Borrower**"), the Guarantors party hereto from time to time, Wells Fargo Bank, National Association, as Administrative Agent, and each lender from time to time party hereto (collectively, the "**Lenders**" and, individually, a "**Lender**").

**PRELIMINARY STATEMENTS**

On June 24, 2020 (the "**Petition Date**"), Jason Incorporated, a Wisconsin corporation ("**Old Jason**"), Jason Partners Holdings Inc., a Delaware corporation ("**Old Holdings**"), Jason Holding, Inc. I, a Delaware corporation ("**Old Intermediate Holdings**"), the Guarantors and each of the Domestic Subsidiaries of Old Jason (collectively, the "**Debtors**") as debtors and debtors-in-possession, commenced voluntary cases under chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), which cases are being jointly administered under the caption In re: JASON INDUSTRIES, INC., et al. (the "**Chapter 11 Cases**").

The Joint Prepackaged Plan of Reorganization of Jason Industries, Inc. and its Debtor Affiliates pursuant to Chapter 11 of the Bankruptcy Code filed with the Bankruptcy Court on June 20, 2020 Docket No. 22 (the "**Prepackaged Plan**") has been confirmed pursuant to the Confirmation Order (as defined below), and concurrently with the Revolving Loans (as defined below) made hereunder on the Closing Date, the "**Effective Date**" as defined in and under the Prepackaged Plan (the "**Plan Effective Date**") has occurred.

Prior to the Petition Date, certain lenders extended credit to Old Jason, as borrower, pursuant to that certain First Lien Credit Agreement, dated as of June 30, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Pre-Petition First Lien Credit Agreement**") by and among Old Jason, the guarantors party thereto from time to time, the Bank of New York Mellon, as administrative agent, the lenders party thereto from time to time (the "**Pre-Petition First Lien Lenders**") and Deutsche Bank AG New York Branch, as L/C Issuer (as defined therein) and Swing Line Lender (as defined therein).

The Prepackaged Plan provides that, on the Plan Effective Date, each Pre-Petition First Lien Lender under the Pre-Petition First Lien Credit Agreement shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for their First Lien Secured Credit Agreement Claim (as defined in the Prepackaged Plan) its pro rata share of, among other things, (i) the First Lien Term Loans, (ii) the Second Lien Terms Loans and (iii) 100% of the equity of Holdings, subject to dilution in accordance with the terms of the Prepackaged Plan.

After giving effect to the Transactions (herein defined) on the Plan Effective Date, (i) Jason Holdings Inc., a Delaware corporation ("**Holdings**") shall own 100% of the outstanding equity interests in Jason Intermediate Inc., a Delaware corporation ("**Intermediate Holdings**"), which shall hold 100% of the outstanding equity interests in the Company; and (ii) Old Jason shall have merged with and into the Company, with the Company as successor by merger.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

6237404.15

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**Section 1.01** **Defined Terms**.

As used in this Agreement, the following terms shall have the meanings set forth below:

"**ABL Priority Collateral**" means "ABL Priority Collateral" as defined in the Intercreditor Agreement.

"**Acceptable Appraisal**" means, with respect to an appraisal of Inventory, the most recent appraisal of such property received by Administrative Agent (a) from an appraisal company satisfactory to Administrative Agent, (b) the scope and methodology (including, to the extent relevant, any sampling procedure employed by such appraisal company) of which are satisfactory to Administrative Agent, and (c) the results of which are satisfactory to Administrative Agent, in each case, in Administrative Agent's Permitted Discretion.

"**Account**" means an account (as that term is defined in the Uniform Commercial Code).

"**Account Control Agreement**" means any deposit account control agreement, securities account control agreement or similar agreement entered into by a Loan Party, the Administrative Agent and the applicable financial institution, granting to the Administrative Agent, for the benefit of the Secured Parties, a perfected, first-priority Lien and "control" (as defined in the UCC) in the applicable deposit account or securities account of a Loan Party.

"**Account Debtor**" means any Person who is obligated on an Account, chattel paper, or a general intangible.

"**Account Party**" has the meaning set forth in Section 2.11(h).

"**Administrative Agent**" or "**Agent**" means Wells Fargo Bank, National Association, in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"**Administrative Agent's Account**" means the Deposit Account of Administrative Agent identified on Schedule 1.01(A) to this Agreement (or such other Deposit Account of Administrative Agent that has been designated as such, in writing, by Administrative Agent to Borrower and the Lenders).

"**Administrative Agent's Liens**" means the Liens granted by each Loan Party or its Subsidiaries to Administrative Agent under the Loan Documents and securing the Obligations.

"**Administrative Agent's Office**" means the Administrative Agent's address and account as set forth in Section 10.02(a), or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form approved by the Administrative Agent.

"**Advisors**" has the meaning set forth in Section 10.08.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "**Controlling**" and "**Controlled**" have meanings correlative thereto.

2

6237404.15

"**Agent Fee Letter**" means the letter agreement, dated as of the date of this Agreement, between the Borrower and the Administrative Agent.

"**Agent Parties**" has the meaning set forth in Section 10.02(b).

"**Agent-Related Persons**" means the Administrative Agent, together with its Affiliates, officers, directors, employees, partners, agents, advisors and other representatives.

"**Agreement**" means this ABL Credit Agreement, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Agreement Currency**" has the meaning assigned to such term in Section 10.20.

"**Annual Financial Statements**" means the audited consolidated balance sheets of Old Jason as of December 31, 2017, December 31, 2018 and December 31, 2019, and the related consolidated statements of income and statements of cash flows for the Old Jason for the fiscal years then ended.

"**Anti-Corruption Laws**" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery or corruption in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business.

"**Anti-Money Laundering Laws**" means the applicable laws or regulations in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"**Applicable Margin**" means, as of any date of determination, (a) with respect to Base Rate Loans, 2.25%, and (b) with respect to LIBOR Rate Loans, 3.25%.

"**Applicable Unused Line Fee Percentage**" means, as of any date of determination, the applicable percentage set forth in the following table that corresponds to the Average Revolver Usage of Borrower for the most recently completed month; provided, that for the period from the Closing Date through and including April 1, 2021, the Applicable Unused Line Fee Percentage shall be set at the rate in the row styled "Level II":

| Level | Average Revolver Usage | Applicable Unused Line Fee Percentage |
| --- | --- | --- |
| I | ≥ 50% of the Maximum Revolver Amount | 0.375 percentage points |
| II | < 50% of the Maximum Revolver Amount | 0.75 percentage points |

The Applicable Unused Line Fee Percentage shall be re-determined on the first date of each month by Administrative Agent.

"**Application Event**" means the occurrence of (a) a failure by Borrower to repay all of the Obligations in full on the Maturity Date, or (b) an Event of Default and the election by Administrative Agent or the Required Lenders to require that payments and proceeds of Collateral be applied pursuant to Section 2.04(b)(iii).

3

6237404.15

"**Approved Bank**" has the meaning set forth in clause (c) of the definition of "Cash Equivalents."

"**Approved Fund**" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"**Assignee**" has the meaning set forth in Section 10.07(b)(i).

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit E hereto.

"**Assignment Taxes**" has the meaning set forth in Section 3.01(b).

"**Attorney Costs**" means and includes all reasonable and documented fees, out-of-pocket expenses and disbursements of any law firm or other external legal counsel.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Authorized Person**" means any one of the individuals identified as an officer of Borrower on Schedule 1.01(B) to this Agreement, or any other individual identified by Borrower as an authorized person and authenticated through Administrative Agent's electronic platform or portal in accordance with its procedures for such authentication.

"**Availability**" means, as of any date of determination, the amount that Borrower is entitled to borrow as Loans under Section 2.01 (after giving effect to the then outstanding Revolver Usage).

"**Average Revolver Usage**" means, with respect to any period, the sum of the aggregate amount of Revolver Usage for each day in such period (calculated as of the end of each respective day) divided by the number of days in such period.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bank Product**" means any one or more of the following financial products or accommodations extended to any Loan Party by a Bank Product Provider:  (a) credit cards (including commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards")), (b) payment card processing services, (c) debit cards, (d) stored value cards, (e) Cash Management Services, or (f) transactions under Hedge Agreements.

"**Bank Product Agreements**" means those agreements entered into from time to time by any Loan Party with a Bank Product Provider in connection with the obtaining of any of the Bank Products.

"**Bank Product Collateralization**" means providing cash collateral (pursuant to documentation reasonably satisfactory to Administrative Agent) to be held by Administrative Agent for the benefit of the Bank Product Providers (other than the Hedge Providers) in an amount determined by Administrative Agent as sufficient to satisfy the reasonably estimated credit exposure, operational risk or processing risk with respect to the then existing Bank Product Obligations (other than Hedge Obligations).

4

6237404.15

"**Bank Product Obligations**" means (a) all obligations, liabilities, reimbursement obligations, fees, or expenses owing by each Loan Party and its Subsidiaries to any Bank Product Provider pursuant to or evidenced by a Bank Product Agreement and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, (b) all Hedge Obligations, and (c) all amounts that Administrative Agent or any Lender is obligated to pay to a Bank Product Provider as a result of Administrative Agent or such Lender purchasing participations from, or executing guarantees or indemnities or reimbursement obligations to, a Bank Product Provider with respect to the Bank Products provided by such Bank Product Provider to a Loan Party or its Subsidiaries.

"**Bank Product Provider**" means Wells Fargo, a Lender or an Affiliate of Wells Fargo or a Lender at the time it entered into a Bank Product Agreement, whether or not such Person subsequently ceases to become a Lender or an Affiliate of a Lender, including each of the foregoing in its capacity, if applicable, as a Hedge Provider.

"**Bank Product Provider Agreement**" means an agreement in form and substance satisfactory to Administrative Agent, duly executed by the applicable Bank Product Provider, the applicable Loan Parties, and Administrative Agent.

"**Bank Product Reserves**" means, as of any date of determination, those reserves that Administrative Agent deems necessary or appropriate to establish (based upon the Bank Product Providers' determination of the liabilities and obligations of each Loan Party and its Subsidiaries in respect of Bank Product Obligations) in respect of Bank Products then provided or outstanding.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" has the meaning set forth in the preliminary statements to this Agreement.

"**Base Rate**" means the greatest of (a) the Federal Funds Rate *plus* ½%, (b) the LIBOR Rate (which rate shall be calculated based upon an Interest Period of one (1) month and shall be determined on a daily basis), *plus* one percentage point, and (c) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate", with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate (and, if any such announced rate is below zero, then the rate determined pursuant to this clause (b) shall be deemed to be zero).

"**Base Rate Loan**" means each portion of the Loans that bears interest at a rate determined by reference to the Base Rate.

"**Benchmark Replacement**" means the sum of: (a) the alternate benchmark rate (which may include Term SOFR) that has been selected by Administrative Agent and Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to the LIBOR Rate for United States dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as so determined would be less than 0.75%, the Benchmark Replacement shall be deemed to be 0.75% for the purposes of this Agreement.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of the LIBOR Rate with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread

5

adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by Administrative Agent and Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBOR Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBOR Rate with the applicable Unadjusted Benchmark Replacement for United States dollar-denominated syndicated credit facilities at such time.

"**Benchmark Replacement Conforming Changes**" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate", the definition of "Interest Period", timing and frequency of determining rates and making payments of interest and other administrative matters) that Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by Administrative Agent in a manner substantially consistent with market practice (or, if Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if Administrative Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement).

"**Benchmark Replacement Date**" means the earlier to occur of the following events with respect to the LIBOR Rate:

(a)      in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of the LIBOR Rate permanently or indefinitely ceases to provide the LIBOR Rate; or

(b)      in the case of clause (c) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to the LIBOR Rate:

(a)      a public statement or publication of information by or on behalf of the administrator of the LIBOR Rate announcing that such administrator has ceased or will cease to provide the LIBOR Rate, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the LIBOR Rate;

(b)      a public statement or publication of information by the regulatory supervisor for the administrator of the LIBOR Rate, the Federal Reserve System of the United States (or any successor), an insolvency official with jurisdiction over the administrator for the LIBOR Rate, a resolution authority with jurisdiction over the administrator for the LIBOR Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the LIBOR Rate, which states that the administrator of the LIBOR Rate has ceased or will cease to provide the LIBOR Rate permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the LIBOR Rate; or

(c)      a public statement or publication of information by the regulatory supervisor for the administrator of the LIBOR Rate announcing that the LIBOR Rate is no longer representative.

6

6237404.15

"**Benchmark Transition Start Date**" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the ninetieth (90th) day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than ninety (90) days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by Administrative Agent or the Required Lenders, as applicable, by notice to Borrower, Administrative Agent (in the case of such notice by the Required Lenders) and the Lenders.

"**Benchmark Unavailability Period**" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the LIBOR Rate and solely to the extent that the LIBOR Rate has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the LIBOR Rate for all purposes hereunder in accordance with Section 2.12(d)(iii) and (y) ending at the time that a Benchmark Replacement has replaced the LIBOR Rate for all purposes hereunder pursuant to Section 2.12(d)(iii).

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation, which certification shall be substantially similar in form and substance to the form of Certification Regarding Beneficial Owners of Legal Entity Customers published jointly, in May 2018, by the Loan Syndications and Trading Association and Securities Industry and Financial Markets Association.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**BHC Act Affiliate**" of a Person means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such Person.

"**Board of Governors**" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Borrower**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Borrower Materials**" has the meaning set forth in Section 6.01.

"**Borrowing**" means a borrowing consisting of Loans made on the same day by the Lenders (or Administrative Agent on behalf thereof), or by Swing Lender in the case of a Swing Loan, or by Administrative Agent in the case of an Extraordinary Advance.

"**Borrowing Base**" means, as of any date of determination, the result of:

(a)    eighty-five percent (85%) of the amount of Eligible Account, plus

(b)    the lesser of (A) the product of sixty-five percent (65%) multiplied by the value (calculated at the cost on a basis consistent with Borrower's historical accounting practices) of Eligible Inventory at such time, and (B) the product of 85% multiplied by the NOLV identified in the most recent Acceptable Appraisal of Inventory.

7

6237404.15

"**Borrowing Base Certificate**" means a certificate substantially in the form of Exhibit B to this Agreement, which such form of Borrowing Base Certificate may be amended, restated, supplemented or otherwise modified from time to time (including without limitation, changes to the format thereof), as approved by Administrative Agent in Administrative Agent's sole discretion.

"**Business Day**" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the state of New York, except that, if a determination of a Business Day shall relate to a LIBOR Rate Loan, the term "Business Day" also shall exclude any day on which banks are closed for dealings in Dollar deposits in the London interbank market.

"**Canadian Dollars**" means the lawful currency of Canada.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capitalized Leases) by the Borrower and its Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on the consolidated statement of cash flows of the Borrower and its Subsidiaries.

"**Capitalized Leases**" means all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by the Borrower or any Subsidiary:

(a)     Dollars;

(b)     readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of the United States having average maturities of not more than twenty-four (24) months from the date of acquisition thereof; provided that the full faith and credit of the United States is pledged in support thereof;

(c)     time deposits or eurodollar time deposits with, insured certificates of deposit, bankers' acceptances or overnight bank deposits of, or letters of credit issued by, any commercial bank that (i) is a Lender or (ii) (A) is organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development or is the principal banking Subsidiary of a bank holding company organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development and is a member of the Federal Reserve System, and (B) has combined capital and surplus of at least $250,000,000 or $100,000,000 in the case of any non-U.S. bank (any such bank in the foregoing clauses (i) or (ii) being an "**Approved Bank**"), in each case with maturities not exceeding twenty-four (24) months from the date of acquisition thereof;

(d)     commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation (other than structured investment vehicles and other than corporations used in structured financing transactions) and rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than twenty-four (24) months from the date of acquisition thereof;

(e)     marketable short-term money market and similar funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P

8

shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(f)      repurchase obligations for underlying securities of the types described in clauses (b), (c) and (e) above entered into with any Approved Bank;

(g)      securities with average maturities of twenty-four (24) months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h)      Investments (other than in structured investment vehicles and structured financing transactions) with average maturities of twelve (12) months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's;

(i)      securities with maturities of twelve (12) months or less from the date of acquisition backed by standby letters of credit issued by any Approved Bank;

(j)      (i) instruments equivalent to those referred to in clauses (a) through (i) above denominated in Euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction and (ii) in the case of any Foreign Subsidiary, such local currencies in those countries in which such Foreign Subsidiary transacts business from time to time in the ordinary course of business;

(k)      Investments, classified in accordance with GAAP as Current Assets of the Borrower or any Subsidiary, in money market investment programs which are registered under the Investment Company Act of 1940 or which are administered by financial institutions having capital of at least $250,000,000, and, in either case, the portfolios of which are limited such that substantially all of such Investments are of the character, quality and maturity described in clauses (a) through (j) above; and

(l)      investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (k) above.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clauses (a) and (j) above; provided that such amounts are converted into any currency listed in clause (a) or (j) as promptly as practicable and in any event within ten (10) Business Days following the receipt of such amounts.

"**Casualty Event**" means any event that gives rise to the receipt by the Borrower or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**CFC**" means a Subsidiary of the Borrower that is a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"**CFC Holding Company**" means a Domestic Subsidiary of the Borrower that owns no material assets (directly or through one or more disregarded entities) other than the equity (including any debt

9

instrument treated as equity for U.S. federal income tax purposes) of one or more Foreign Subsidiaries that are CFCs.

"**Change in Law**" means the occurrence after the date of this Agreement of: (a) the adoption or effectiveness of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation, judicial ruling, judgment or treaty or in the administration, interpretation, implementation or application by any Governmental Authority of any law, rule, regulation, guideline or treaty, or (c) the making or issuance by any Governmental Authority of any request, rule, guideline or directive, whether or not having the force of law; provided, that notwithstanding anything in this Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith, and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"**Change of Control**" shall be deemed to occur if:

(a)     (i) any person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Closing Date), but excluding (x) any employee benefit plan of such person and its Subsidiaries and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan or (y) any combination of Permitted Holders, shall have, directly or indirectly, acquired beneficial ownership of Equity Interests representing 35% or more of the aggregate voting power represented by the issued and outstanding Equity Interests of Holdings or (ii) during each period of twelve (12) consecutive months, the board of directors of Holdings shall not consist of a majority of the Continuing Directors;

(b)     a "change of control" (or similar event) shall occur in any document pertaining to the First Lien Credit Agreement or the Second Lien Credit Agreement;

(c)     other than as described in Section 7.04(a)(i), Intermediate Holdings shall cease to own, directly or indirectly, 100% of the Equity Interests of the Borrower; or

(d)     other than as described in Section 7.04(a)(i), Holdings shall cease to own, directly or indirectly, 100% of the Equity Interests of Intermediate Holdings.

"**Chapter 11 Cases**" has the meaning set forth in the preliminary statements to this Agreement.

"**Closing Date**" means August 28, 2020.

"**Code**" means the U.S. Internal Revenue Code of 1986, and the United States Treasury Department regulations promulgated thereunder, as amended from time to time (unless as specifically provided otherwise).

"**Collateral**" means the "Collateral" as defined in the Security Agreement and all the "Collateral" or "Pledged Assets" (or equivalent terms) as defined in any other Collateral Document and any other assets pledged pursuant to any Collateral Document (but in any event excluding the Excluded Assets).

"**Collateral Access Agreement**" means a landlord waiver, bailee letter, or acknowledgement agreement of any lessor, warehouseman, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in any Loan Party's or its Subsidiaries' books and records or Inventory, in each case, in form and substance reasonably satisfactory to Administrative Agent.

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

10

6237404.15

(a)    subject to Sections 4.01(a) and 6.20, the Administrative Agent shall have received each Collateral Document required to be delivered (i) on the Closing Date, pursuant to Section 4.01(a)(v) and Section 6.11(c) and (ii) at such time as may be designated therein or herein, pursuant to the Collateral Documents or Section 6.11 or 6.13, duly executed by each Loan Party thereto;

(b)    subject to Sections 4.01(a) and 6.20, all Obligations shall have been unconditionally guaranteed by Holdings, Intermediate Holdings, the Borrower (other than with respect to its direct Obligations as a primary obligor (as opposed to a guarantor) under the Loan Documents) and each Material Domestic Subsidiary (other than any Excluded Subsidiary) including those that are listed on Schedule 1.01(B) hereto (each, a "**Guarantor**");

(c)    the Secured Obligations and the Guaranty shall have been secured pursuant to the Security Agreement by a second-priority security interest (subject to Liens permitted by Section 7.01) in (i) all of the Equity Interests of Intermediate Holdings and the Borrower, (ii) all of the Equity Interests of each Subsidiary that is a wholly owned Domestic Subsidiary (other than a Domestic Subsidiary described in the following clause (iii)) directly owned by the Loan Parties, (iii) the issued and outstanding Equity Interests of each Subsidiary that is a CFC Holding Company, and (iv) the issued and outstanding Equity Interests of each Subsidiary that is a wholly owned Foreign Subsidiary that is directly owned by the Borrower or by any Subsidiary Guarantor, in each case other than any Excluded Assets; provided, however, in the case of (iii) and (iv), such term shall not include the pledge of any stock in a CFC Holding Company or Foreign Subsidiary to the extent such pledge would result in material adverse tax consequences to the Borrower or its Subsidiaries as determined by the Borrower in good faith;

(d)    except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, or under any Collateral Document, the Secured Obligations and the Guaranty shall have been secured by a perfected second-priority security interest (to the extent such security interest may be perfected by delivering certificated securities, filing financing statements under the Uniform Commercial Code or making any necessary filings with respect to the security interest with the United States Patent and Trademark Office or United States Copyright Office or to the extent required in the Security Agreement (or any other Collateral Document)) or by Mortgages referred to in clause (e) below in Collateral of the Borrower and each Guarantor (including accounts, inventory, equipment, investment property, contract rights, applications and registrations of intellectual property filed in the United States, other general intangibles, Material Real Property, intercompany notes and proceeds of the foregoing), in each case, (i) with the priority required by the Collateral Documents and (ii) subject to exceptions and limitations otherwise set forth in this Agreement (for the avoidance of doubt, including the limitations and exceptions set forth in Section 4.01) and the Collateral Documents;

~~(e)~~    the Administrative Agent shall have received (i) counterparts of a Mortgage with respect to each Material Real Property required to be delivered pursuant to Sections 6.11 and 6.13 (the "**Mortgaged Properties**") duly executed and delivered by the applicable Loan Party, (ii) a title insurance policy for such property available in each applicable jurisdiction (the "**Mortgage Policies**") insuring the Lien of each such Mortgage as a valid second-priority Lien on the property described therein, free of any other Liens except as permitted by Section 7.01, together with such endorsements, coinsurance and reinsurance as the Required Lenders may reasonably request, (iii) a completed Life-of-Loan Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto) and, if any improvements on any Mortgaged Property are located within an area designated a "flood hazard area," evidence of such flood insurance as may be required under Section 6.07, (iv) ALTA surveys in

11

form and substance reasonably acceptable to the Required Lenders or such existing surveys together with no-change affidavits sufficient for the title company to remove all standard survey exceptions from the Mortgage Policies and issue the endorsements required in <u>clause (ii)</u> above, (v) copies of any existing abstracts and appraisals and (vi) such legal opinions and other documents as the Required Lenders may reasonably request with respect to any such Mortgaged Property; and

(f)    except to the extent otherwise provided hereunder, including subject to Liens permitted by <u>Section 7.01</u>, or under any Collateral Document, the Secured Obligations and the Guaranty shall have been secured by a perfected first-priority security interest (to the extent such security interest may be perfected by delivering certificated securities, filing financing statements under the Uniform Commercial Code) in ABL Priority Collateral of the Borrower and each Guarantor (including accounts, inventory and proceeds of the foregoing), in each case, (i) with the priority required by the Collateral Documents and (ii) subject to exceptions and limitations otherwise set forth in this Agreement (for the avoidance of doubt, including the limitations and exceptions set forth in <u>Section 4.01</u>) and the Collateral Documents;

<u>provided</u>, <u>however</u>, that (i) the foregoing definition shall not require, and the Loan Documents shall not contain any requirements as to, (A) the creation or perfection of pledges of, security interests in, Mortgages on, or the obtaining of title insurance, surveys, abstracts or appraisals or taking other actions with respect to any Excluded Assets and (B) any other assets that, in the reasonable judgment of the Required Lenders and the Borrower, the cost of creating, perfecting or maintaining such pledges or security interests in such assets or obtaining title insurance, surveys, abstracts or appraisals in respect of such assets shall be excessive in view of the value of such assets or the practical benefit to the Lenders afforded thereby and (ii) the Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in this Agreement and the Collateral Documents.

The Administrative Agent (at the direction of the Required Lenders) may grant extensions of time for the perfection of security interests in, or the delivery of the Mortgages and the obtaining of title insurance and surveys with respect to, particular assets and the delivery of assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) or any other compliance with the requirements of this definition where it reasonably determines, in consultation with the Borrower, that perfection or compliance cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

No actions in any non-U.S. jurisdiction or required by the Laws of any non-U.S. jurisdiction shall be required in order to create any security interests in assets located, titled, registered or filed outside of the U.S. or to perfect such security interests (it being understood that there shall be no security agreements or pledge agreements governed under the Laws of any non-U.S. jurisdiction).

The foregoing definition shall not require landlord waivers, estoppels and collateral access letters.

"**Collateral Documents**" means, collectively, the Security Agreement, the Intercreditor Agreement, the Intellectual Property Security Agreements, any Mortgages, any Account Control Agreements, collateral assignments, Security Agreement Supplements, security agreements, pledge agreements, intellectual property security agreements or other similar agreements delivered to the Administrative Agent pursuant to <u>Section 4.01(a)(v)</u>, <u>6.11</u>, <u>6.13</u> or <u>6.20</u> and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties.

"**Commitment**" means, with respect to each Lender, its Commitment and, with respect to all Lenders, their Commitments, in each case as such Dollar amounts are set forth beside such Lender's name

12

under the applicable heading on Schedule 2.01 to this Agreement or in the Assignment and Acceptance pursuant to which such Lender became a Lender under this Agreement, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 10.07 of this Agreement.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Company**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Company Parties**" means, collectively, the Holdcos, the Borrower and its Subsidiaries, and "**Company Party**" means any one of them.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit C hereto.

"**Confirmation Order**" means an Order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Lenders, confirming the Prepackaged Plan pursuant to section 1129 of the Bankruptcy Court and in accordance with the terms of the Prepackaged Plan, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms of the Prepackaged Plan so long as any such amendment, supplement or modification does not adversely affect the interests of the Lenders.

"**Consolidated EBITDA**" means, for any period, the Consolidated Net Income for such period, *plus*:

    (a)    without duplication and, except with respect to clauses (vii)(B), (x) and (xi) below, to the extent deducted (and not added back or excluded) in arriving at such Consolidated Net Income, the sum of the following amounts for such period with respect to the Borrower and its Subsidiaries:

    (i)    total interest expense determined in accordance with GAAP including, to the extent deducted and not added back in computing Consolidated Net Income, (A) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (B) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers acceptances, (C) non-cash interest payments, (D) the interest component of Capitalized Leases, (E) net payments, if any, pursuant to interest Swap Contracts with respect to Indebtedness, (F) amortization of deferred financing fees, debt issuance costs, commissions and fees, (G) the interest component of any pension or other post-employment benefit expense and (H) commissions, discounts, yield and other fees and, to the extent not reflected in such total interest expense, any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations, and costs of surety bonds in connection with financing activities (whether amortized or immediately expensed),

    (ii)    without duplication, provision for taxes based on income, profits or capital gains of the Borrower and the Subsidiaries, including, without limitation, federal, state, foreign, local, franchise and similar taxes and foreign withholding taxes paid or accrued during such period including penalties and interest related to such taxes or arising from any tax examinations and any tax distributions made pursuant to Section 7.06(h)(iii),

    (iii)    depreciation and amortization (including amortization of intangible assets, deferred financing fees, debt issuance costs, commissions, fees and expenses,

13

6237404.15

bridge, commitment and other financing fees, discounts, yield) and other fees and charges (including amortization of unrecognized prior service costs and actuarial gains and losses related to pensions and other post-employment benefits, of the Borrower and its Subsidiaries),

(iv)    (x) any unusual or non-recurring extraordinary charges for such period (provided, that the aggregate amount of unusual or non-recurring extraordinary charges added back to Consolidated EBITDA pursuant to this clause (a)(iv)(x) shall not exceed 15% of Consolidated EBITDA for such period) and (y) any unusual or non-recurring non-cash charges for such period,

(v)    other non-cash charges, expenses or losses, including, without limitation, any non-cash expense relating to the vesting of warrants (provided that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period),

(vi)    retention, recruiting, relocation and signing bonuses and expenses, stock option and other equity-based compensation expenses, severance costs, stay bonuses, transaction fees and expenses and management fees and expenses, and any one time expense relating to enhanced accounting function or other transaction costs, including those associated with becoming a standalone entity or a public company (including, without duplication, any such payments made in connection with the consummation of the Transactions),

(vii)    (A) the amount of any restructuring charges and related charges, restructuring costs, integration costs, transition costs, consolidation and closing costs for facilities, costs incurred in connection with any non-recurring strategic initiatives, costs incurred in connection with acquisitions and non-recurring intellectual property development after the Closing Date, other business optimization expenses (including costs and expenses relating to business optimization programs and new systems design and implementation costs), project start-up costs and other restructuring charges, accruals or reserves (including restructuring costs related to acquisitions after the Closing Date and to closure/consolidation of facilities, retention charges, systems establishment costs and excess pension charges) and (B) the amount of cost savings, operating expense reductions, other operating improvements and "run rate" synergies projected by the Borrower in good faith to result from actions taken or expected to be taken in connection with the Transactions or any Specified Transaction or the implementation of an operational initiative or operational change after the Closing Date (in each case calculated on a Pro Forma Basis as though such cost savings, operating expense reductions, other operating improvements and synergies had been realized on the first day of such period and as if such cost savings, operating expense reductions, other operating improvements and synergies were realized during the entirety of such period), net of the amount of actual benefits realized during such period from such actions; provided that (w) in no event shall the amount added back pursuant to this clause (vii) exceed $5,000,000 for any Test Period, (x) a duly completed certificate signed by a Responsible Officer of the Borrower shall be delivered to the Administrative Agent together with the Compliance Certificate required to be delivered pursuant to Section 6.02, certifying that such cost savings, operating expense reductions, other operating improvements and synergies are (i) reasonably supportable and quantifiable in the good faith judgment of the Borrower,

14

6237404.15

and (ii) reasonably anticipated to be realized within (I) in the case of any such cost savings, operating expense reductions, other operating improvements and synergies in connection with the Transactions, six (6) months after the Closing Date and (II) in all other cases, six (6) months after the consummation of the Specified Transaction or the implementation of an initiative or change, which is expected to result in such cost savings, expense reductions, other operating improvements or synergies, (y) no cost savings, operating expense reductions and synergies shall be added pursuant to this clause (vii) to the extent duplicative of any expenses or charges otherwise added to Consolidated EBITDA, whether through a *pro forma* adjustment or otherwise, for such period and (z) to the extent that any cost savings, operating expense reductions, other operating improvements and synergies are not associated with the Transactions or a Specified Transaction following the Closing Date, all steps shall have been taken for realizing such savings,

(viii)   [reserved],

(ix)   other accruals, payments and expenses (including rationalization, legal, tax, structuring and other costs and expenses), or any amortization thereof, related to the Transactions (including all Transaction Expenses), acquisitions, Investments, dividends, Dispositions, or any amortization thereof, issuances of Indebtedness or Equity Interests permitted under the Loan Documents or repayment of debt, issuance of equity securities, initial public offering, refinancing transactions or amendment or other modification of any debt instrument (in each case, including any such transaction consummated on the Closing Date and any such transaction undertaken but not completed),

(x)   to the extent not already included in Consolidated Net Income, proceeds of business interruption insurance (to the extent actually received),

(xi)   cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added back,

(xii)   any non-cash increase in expenses (A) resulting from the revaluation of inventory (including any impact of changes to inventory valuation policy methods including changes in capitalization of variances) or other inventory adjustments, or (B) due to purchase accounting associated with the Transactions, or any acquisition constituting an Investment permitted under this Agreement consummated prior to or after the Closing Date,

(xiii)   the amount of any expense or reduction of Consolidated Net Income consisting of Subsidiary income attributable to minority interests or non-controlling interests of third parties in any non-wholly owned Subsidiary, *minus* the amount of dividends or distributions that are paid in cash by such non-wholly owned Subsidiary to such third party; provided that the amount of such cash dividends or distributions deducted pursuant to this clause (xiii) in any Test Period shall not exceed such third party's *pro rata* share of the Consolidated EBITDA (to the extent positive) of such non-wholly owned Subsidiary for such Test Period,

(xiv)   letter of credit fees,

15

6237404.15

(xv)      [reserved],

(xvi)     any Equity Funded Employee Plan Costs,

(xvii)    any net loss from disposed, abandoned or discontinued operations or product lines,

(xviii)   any costs or expenses incurred relating to environmental remediation, litigation or other disputes in respect of events and exposures that occurred prior to the Closing Date, and

(xix)     expenses during such period in connection with earn-outs and other deferred payments in connection with any acquisitions constituting an Investment permitted under this Agreement, to the extent included in the calculation of Consolidated Net Income in accordance with GAAP as an accounting adjustment to the extent that the actual amount payable or paid in respect of such earn-outs or other deferred payments exceeds the liability booked by the applicable Person therefor,

*minus* (b) without duplication and to the extent included in arriving at such Consolidated Net Income, (i) non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period), (ii) any net gain from disposed, abandoned or discontinued operations or product lines and (iii) the amount of any minority interest income consisting of Subsidiary losses attributable to minority interests or non-controlling interests of third parties in any non-wholly owned Subsidiary; provided that:

(A)      to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA (x) currency translation gains and losses related to currency remeasurements of Indebtedness (including the net loss or gain (i) resulting from Swap Contracts for currency exchange risk and (ii) resulting from intercompany indebtedness) and (y) all other foreign currency translation gains or losses to the extent such gains or losses are non-cash items;

(B)      to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any adjustments resulting from the application of FASB Accounting Standards Codification 815 and International Accounting Standard No. 39 and their respective related pronouncements and interpretations; and

(C)      to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any income (loss) for such period attributable to the early extinguishment of (i) Indebtedness, (ii) obligations under any Swap Contracts or (iii) other derivative instruments.

For the avoidance of doubt, Consolidated EBITDA shall be calculated, including *pro forma* adjustments, in accordance with Section 1.09.

"**Consolidated Interest Expense**" shall mean, with respect to any Person for any period, the sum of (1) interest expense (including that attributable to obligations with respect to Capital Leases), net of interest income of such Person and its Subsidiaries with respect to all outstanding Indebtedness of such Person and its Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under hedging agreements, *plus* (2) non-cash interest expense resulting solely from pay in kind interest expense of such Person and its Subsidiaries, but excluding, for the avoidance of doubt, (a) amortization of deferred financing costs, debt issuance costs, commissions, fees and expenses and any other amounts of non-cash interest other

16

6237404.15

than referred to in <u>clause (2)</u> above (including as a result of the effects of acquisition method accounting or pushdown accounting), (b) non-cash interest expense attributable to the movement of the mark-to-market valuation of Indebtedness or obligations under derivative instruments pursuant to FASB Accounting Standards Codification Topic 815—Derivatives and Hedging, (c) any one-time cash costs associated with breakage in respect of hedging agreements for interest rates, (d) any "additional interest" owing pursuant to a registration rights agreement with respect to any securities, (e) any payments with respect to make whole premiums or other breakage costs of any Indebtedness, including, without limitation, any Indebtedness issued in connection with the Transactions, (f) penalties and interest relating to taxes, (g) accretion or accrual of discounted liabilities not constituting Indebtedness, (h) interest expense attributable to a direct or indirect parent entity resulting from pushdown accounting, (i) any expense resulting from the discounting of Indebtedness in connection with the application of recapitalization or purchase accounting, and (j) any interest expense attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential), with respect thereto and with respect to the Transactions, any acquisition or Investment permitted hereunder, all as calculated on a consolidated basis.

"**Consolidated Net Income**" means, for any period, the net income (loss) of the Borrower and the Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; <u>provided</u>, *however*, that, without duplication,

(a)      any after-tax effect of extraordinary items (including gains or losses and all fees and expenses relating thereto) for such period shall be excluded,

(b)      the cumulative effect of a change in accounting principles during such period to the extent included in Consolidated Net Income shall be excluded,

(c)      accruals and reserves that are established or adjusted within twelve (12) months after the Closing Date that are so required to be established or adjusted as a result of the Transactions (or within twelve (12) months after the closing of any acquisition that are so required to be established or adjusted as a result of such acquisition) in accordance with GAAP or changes as a result of adoption or modification of accounting policies in accordance with GAAP shall be excluded,

(d)      any net after-tax effect of gains or losses (*less* all fees, expenses and charges relating thereto) attributable to asset dispositions or abandonments or the sale or other disposition of any Equity Interests of any Person, in each case other than in the ordinary course of business, as determined in good faith by the Borrower, shall be excluded,

(e)      the net income (loss) for such period of any Person that is not a Subsidiary of the Borrower, or that is accounted for by the equity method of accounting, shall be excluded; <u>provided</u> that Consolidated Net Income of the Borrower shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents (or to the extent subsequently converted into cash or Cash Equivalents) to the Borrower or a Subsidiary thereof in respect of such period,

(f)      any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a change in law or regulation, in each case, pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP shall be excluded,

(g)      any non-cash compensation charge or expense, including any such charge or expense arising from the grants of stock appreciation or similar rights, stock options, restricted

17

stock or other rights or equity incentive programs or any other equity-based compensation shall be excluded, and any cash charges associated with the rollover, acceleration or payout of Equity Interests by management of the Borrower or any of its direct or indirect parents in connection with the Transactions or an initial public offering, shall be excluded,

(h)      any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment, Permitted Acquisition or any sale, conveyance, transfer or other disposition of assets permitted under this Agreement, to the extent actually reimbursed, or, so long as the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is (A) not denied by the applicable indemnitor in writing within 180 days of the occurrence of such event and (B) in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365-day period), shall be excluded,

(i)      to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount (A) is not denied by the applicable carrier in writing within 180 days of the occurrence of such event and (B) is in fact reimbursed within 365 days of the date of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within such 365 days), expenses, charges or losses with respect to liability or casualty events or business interruption shall be excluded, and

(j)      the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of the Borrower or is merged into or consolidated with the Borrower or any of its Subsidiaries or such Person's assets are acquired by the Borrower or any of its Subsidiaries shall be excluded (except to the extent required for any calculation of Consolidated EBITDA on a Pro Forma Basis in accordance with Section 1.09).

There shall be excluded from Consolidated Net Income for any period the purchase accounting effects of adjustments in component amounts required or permitted by GAAP (including in the inventory, property and equipment, software, goodwill, intangible assets, in-process research and development, deferred revenue and debt line items thereof) and related authoritative pronouncements (including the effects of such adjustments pushed down to the Borrower and the Subsidiaries), as a result of the Transactions, any acquisition constituting an Investment permitted under this Agreement consummated prior to or after the Closing Date, or the amortization or write-off of any amounts thereof.  For the avoidance of doubt, Consolidated Net Income shall be calculated, including *pro forma* adjustments, in accordance with Section 1.09.

"**Continuing Directors**" means the directors of Holdings on the Closing Date, as elected or appointed after giving effect to the Transactions, directors appointed in accordance with any stockholders agreement entered into by and among Holdings and its stockholders and each other director, if, in each case, such other director's nomination for election to the board of directors of Holdings is recommended by a majority of the then Continuing Directors or such other director receives the vote of, or is appointed or otherwise approved by, prior to a Qualified IPO by the Borrower or a Relevant Public Company, or those Permitted Holders which then hold a majority of the voting Equity Interests in Holdings then held by all Permitted Holders, in each case in his or her election by the holders of Equity Interests in Holdings necessary to elect such director.

18

6237404.15

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" has the meaning set forth in the definition of "Affiliate."

"**Covenant Testing Period**" means a period (a) commencing on the last day of the fiscal month of Borrower most recently ended prior to a Covenant Trigger Event for which Borrower is required to deliver to Administrative Agent monthly, quarterly or annual financial statements pursuant to Section 6.01 to this Agreement, and (b) continuing through and including the first day after such Covenant Trigger Event that Availability has equaled or exceeded the greater of (i) 20% of the Maximum Revolver Amount, and (ii) $6,000,000 for thirty (30) consecutive days.

"**Covenant Trigger Event**" means if at any time Availability is less than the greater of (i) 20% of the Maximum Revolver Amount, and (ii) $6,000,000.

"**Covered Entity**" means any of the following: (a) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (b) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (c) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Covered Party**" has the meaning set forth in Section 17.15.

"**Credit Extension**" means a Borrowing.

"**Cure Amount**" has the meaning set forth in Section 8.04(a).

"**Cure Expiration Date**" has the meaning set forth in Section 8.04(a).

"**Current Assets**" means, with respect to the Borrower and the Subsidiaries on a consolidated basis at any date of determination, all assets (other than cash and Cash Equivalents) that would, in accordance with GAAP, be classified on a consolidated balance sheet of the Borrower and its Subsidiaries as current assets at such date of determination, other than amounts related to current or deferred Taxes based on income or profits (but excluding assets held for sale, loans (permitted) to third parties, pension assets, deferred bank fees and derivative financial instruments).

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtors**" has the meaning set forth in the preliminary statements to this Agreement.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, without cure or waiver hereunder, would be an Event of Default.

"**Default Rate**" means an interest rate equal to (a) the Base Rate *plus* (b) the Applicable Rate, if any, applicable to Base Rate Loans *plus* (c) 2.0% per annum; provided that with respect to a LIBOR Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan *plus* 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

"**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

19

6237404.15

"**Defaulting Lender**" means any Lender whose acts or failure to act, whether directly or indirectly, cause it to meet any part of the definition of Lender Default.

"**Designated Account**" means the Deposit Account of Borrower identified on Schedule 1.01(C) to this Agreement (or such other Deposit Account of Borrower located at Designated Account Bank that has been designated as such, in writing, by Borrower to Administrative Agent).

"**Designated Account Bank**" has the meaning set forth in Schedule D-1 to this Agreement (or such other bank that is located within the United States that has been designated as such, in writing, by Borrower to Administrative Agent).

"**Dilution**" means, as of any date of determination, a percentage, based upon the experience of the immediately prior twelve (12) months, that is the result of dividing the Dollar amount of (a) bad debt write-downs, discounts, advertising allowances, credits, or other dilutive items with respect to Borrower's Accounts during such period, by (b) Borrower's billings with respect to Accounts during such period.

"**Dilution Reserve**" means, as of any date of determination, an amount sufficient to reduce the advance rate against Eligible Accounts by the extent to which Dilution is in excess of 5%.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale or issuance of Equity Interests (other than directors' qualifying shares or other shares required by applicable Law) in a Subsidiary) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Disqualified Competitor**" means such Persons who are competitors of the Borrower and its Subsidiaries that are separately identified in writing by the Borrower to the Administrative Agent from time to time, and any of their Affiliates (other than any such Affiliate that is affiliated with a financial investor in such Person and that is not itself an operating company or otherwise an Affiliate of an operating company so long as such Affiliate is a bona fide Fund) that are either (a) identified in writing by the Borrower to the Administrative Agent from time to time or (b) clearly identifiable on the basis of such Affiliate's name (it being agreed that the Administrative Agent shall be entitled to conclusively rely on such Person's representations in the applicable Assignment and Assumption).

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than (i) solely for Qualified Equity Interests and cash in lieu of fractional shares or (ii) solely at the discretion of the issuer), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable), (b) is redeemable at the option of the holder thereof (other than (i) solely for Qualified Equity Interests and cash in lieu of fractional shares or (ii) as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable), in whole or in part, (c) provides for the scheduled payments of dividends in cash or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Maturity Date at the time of issuance of such Equity Interests; provided that if such Equity Interests are issued pursuant to a plan for the benefit of employees of Holdings (or any direct or indirect parent thereof), the Borrower or the Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because it may be required

20

6237404.15

to be repurchased by the Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"**Distressed Person**" has the meaning set forth in the definition of "Lender-Related Distress Event."

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**Drawing Document**" means any Letter of Credit or other document presented for purposes of drawing under any Letter of Credit, including by electronic transmission such as SWIFT, electronic mail, facsimile or computer generated communication.

"**Early Opt-in Election**" means the occurrence of:

(a) (i) a determination by Administrative Agent or (ii) a notification by the Required Lenders to Administrative Agent (with a copy to Borrower) that the Required Lenders have determined that United States dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in Section 2.12(d)(iii) are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace the LIBOR Rate, and

(b) (i) the election by Administrative Agent or (ii) the election by the Required Lenders to declare that an Early Opt-in Election has occurred and the provision, as applicable, by Administrative Agent of written notice of such election to Borrower and the Lenders or by the Required Lenders of written notice of such election to Administrative Agent.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Accounts**" means those Accounts created by Borrower or a Subsidiary Guarantor in the ordinary course of its business, that arise out of such Borrower's or Subsidiary Guarantors' sale of goods or rendition of services, that comply with each of the representations and warranties respecting Eligible Accounts made in the Loan Documents, and that are not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Administrative Agent in its Permitted Discretion to address the results of any information with respect to the Borrower's or Subsidiary Guarantors' business or assets of which Administrative Agent becomes aware after the Closing Date, including any field examination performed by (or on behalf of) Administrative Agent from time to time after the Closing Date.  In determining the amount to be included, Eligible Accounts shall be calculated net of customer deposits, unapplied cash, taxes, finance

21

charges, service charges, discounts, credits, allowances, and rebates.  Eligible Accounts shall not include the following:

(a)    Accounts that the Account Debtor has failed to pay within ninety (90) days of original invoice date or sixty (60) days of due date,

(b)    Accounts owed by an Account Debtor (or its Affiliates) where 50% or more of all Accounts owed by that Account Debtor (or its Affiliates) are deemed ineligible under clause (a) above,

(c)    Accounts with selling terms of more than sixty (60) days,

(d)    Accounts with respect to which the Account Debtor is an Affiliate of a Loan Party or an employee or agent of a Loan Party or any Affiliate of a Loan Party,

(e)    Accounts (i) arising in a transaction wherein goods are placed on consignment or are sold pursuant to a guaranteed sale, a sale or return, a sale on approval, a bill and hold, or any other terms by reason of which the payment by the Account Debtor may be conditional, or (ii) with respect to which the payment terms are "C.O.D.", cash on delivery or other similar terms,

(f)    Accounts that are not payable in Dollars, Canadian Dollars or Sterling,

(g)    Accounts with respect to which the Account Debtor either (i) does not maintain its chief executive office in the United States, Canada or the United Kingdom, or (ii) is not organized under the laws of the United States, Canada or the United Kingdom or any state or province (or equivalent thereof) thereof, or (iii) is the government of any foreign country or sovereign state, or of any state, province, municipality, or other political subdivision thereof, or of any department, agency, public corporation, or other instrumentality thereof, unless (A) the Account is supported by an irrevocable letter of credit reasonably satisfactory to Administrative Agent (as to form, substance, and issuer or domestic confirming bank) that has been delivered to Administrative Agent and, if requested by Administrative Agent, is directly drawable by Administrative Agent, or (B) the Account is covered by credit insurance in form, substance, and amount, and by an insurer, reasonably satisfactory to Administrative Agent,

(h)    Accounts with respect to which the Account Debtor is either (i) the United States or any department, agency, or instrumentality of the United States (exclusive, however, of Accounts with respect to which Borrower or a Subsidiary Guarantor has complied, to the reasonable satisfaction of Administrative Agent, with the Assignment of Claims Act, 31 USC §3727), or (ii) any state of the United States or any other Governmental Authority,

(i)    Accounts with respect to which the Account Debtor is a creditor of Borrower or a Subsidiary Guarantor, has or has asserted a right of recoupment or setoff, or has disputed its obligation to pay all or any portion of the Account, to the extent of such claim, right of recoupment or setoff, or dispute,

(j)    (i) except as otherwise provided in clauses (ii) and (iii) below, Accounts with respect to an Account Debtor whose Eligible Accounts owing to Borrower or a Subsidiary Guarantor exceeds 10% (such percentage, as applied to a particular Account Debtor, being subject to reduction by Administrative Agent in its Permitted Discretion if the creditworthiness of such Account Debtor deteriorates) of all Eligible Accounts, to the extent of the obligations owing by such Account Debtor in excess of such percentage, (ii) Accounts with respect to which the underlying accounts receivables are in respect of Tooling from any individual Account Debtor to

22

the extent in excess of $500,000; and (iii) Accounts with respect to which the Account Debtor is MTD Products, Harley-Davidson or John Deere and the Eligible Accounts owing to Borrower or a Subsidiary Guarantor exceeds 15% (such percentage, as applied to a particular Account Debtor, being subject to reduction by Administrative Agent in its Permitted Discretion if the creditworthiness of such Account Debtor deteriorates) of all Eligible Accounts, to the extent of the obligations owing by such Account Debtor in excess of such percentage; provided, that in each case, the amount of Eligible Accounts that are excluded because they exceed the foregoing percentage and dollar amount shall be determined by Administrative Agent based on all of the otherwise Eligible Accounts prior to giving effect to any eliminations based upon the foregoing concentration limits,

(k)      Accounts with respect to which the Account Debtor is subject to an Insolvency Proceeding, is not Solvent, has gone out of business, or as to which Borrower or a Subsidiary Guarantor has received notice of an imminent Insolvency Proceeding or a material impairment of the financial condition of such Account Debtor,

(l)      Accounts, the collection of which, Administrative Agent, in its Permitted Discretion, believes to be doubtful, including by reason of the Account Debtor's financial condition,

(m)      Accounts that are not subject to a valid and perfected first priority Administrative Agent's Lien,

(n)      Accounts with respect to which (i) the goods giving rise to such Account have not been shipped and billed to the Account Debtor (except to the extent the applicable Loan Party has not shipped such goods to the Account Debtor but has shipped such goods in accordance with the written instructions of such Account Debtor and such Account Debtor has agreed in writing that such shipment constitutes delivery of such goods by such Loan Party), or (ii) the services giving rise to such Account have not been performed and billed to the Account Debtor,

(o)      Accounts with respect to which the Account Debtor is a Sanctioned Person or Sanctioned Entity,

(p)      Accounts (i) that represent the right to receive progress payments or other advance billings that are due prior to the completion of performance by Borrower or a Subsidiary Guarantor of the subject contract for goods or services, or (ii) that represent credit card sales, or

(q)      Accounts owned by a target acquired in connection with a Permitted Acquisition or Permitted Investment, or Accounts owned by a Person that is joined to this Agreement as a Borrower or a Subsidiary Guarantor pursuant to the provisions of this Agreement, until the completion of a field examination with respect to such Accounts, in each case, satisfactory to Administrative Agent in its Permitted Discretion.

"**Eligible Assignee**" has the meaning set forth in Section 10.07(a)(i).

"**Eligible Inventory**" means Inventory of a Borrower or Subsidiary Guarantor, that complies with each of the representations and warranties respecting Eligible Inventory made in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Administrative Agent in its Permitted Discretion to address the results of any information with respect to the Borrower's or Subsidiary Guarantors' business or assets of which Administrative Agent becomes aware after the Closing Date, including any field examination or appraisal performed or received by Administrative Agent from time to

23

6237404.15

time after the Closing Date.  In determining the amount to be so included, Inventory shall be valued at the lower of cost or market on a basis consistent with Borrower's historical accounting practices.  An item of Inventory shall not be included in Eligible Inventory if:

(a)     Borrower or such Subsidiary Guarantor does not have good, valid, and marketable title thereto,

(b)     Borrower or such Subsidiary Guarantor does not have actual and exclusive possession thereof (either directly or through a bailee or agent of Borrower or such Subsidiary Guarantor),

(c)     it is not located at one of the locations in the continental United States set forth on Schedule 4.25 to this Agreement (as such Schedule 4.25 may be amended from time to time in accordance with Section 5.14) (or in-transit from one such location to another such location),

(d)     it is stored at locations holding less than $100,000 of the aggregate value of such Borrower's or Subsidiary Guarantor's Inventory,

(e)     it is in-transit to or from a location of Borrower or such Subsidiary Guarantor (other than in-transit from one location set forth on Schedule 4.25 to this Agreement to another location set forth on Schedule 4.25 to this Agreement (as such Schedule 4.25 may be amended from time to time in accordance with Section 5.14)),

(f)     it is located on real property leased by Borrower or such Subsidiary Guarantor or in a contract warehouse or with a bailee, in each case, unless either (i) it is subject to a Collateral Access Agreement executed by the lessor or warehouseman, as the case may be, and it is segregated or otherwise separately identifiable from goods of others, if any, stored on the premises, or (ii) Administrative Agent has established a Landlord Reserve with respect to such location,

(g)     it is the subject of a bill of lading or other document of title,

(h)     it is not subject to a valid and perfected first priority Administrative Agent's Lien,

(i)     it consists of goods returned or rejected by a Borrower's customers, to the extent such returned goods cannot be sold to other customers,

(j)     it consists of goods that are obsolete, slow moving, spoiled or are otherwise past the stated expiration, "sell-by" or "use by" date applicable thereto, restrictive or custom items or otherwise is manufactured in accordance with customer-specific requirements, work-in-process, or goods that constitute spare parts, packaging and shipping materials, supplies used or consumed in Borrower's business, bill and hold goods, defective goods, "seconds," or Inventory acquired on consignment,

(k)     it is subject to third party intellectual property, licensing or other proprietary rights, unless Administrative Agent is satisfied that such Inventory can be freely sold by Administrative Agent on and after the occurrence of an Event of a Default despite such third party rights, or

(l)     it was acquired in connection with a Permitted Acquisition or Permitted Investment, or such Inventory is owned by a Person that is joined to this Agreement as a

24

Borrower pursuant to the provisions of this Agreement, until the completion of an Acceptable Appraisal of such Inventory and the completion of a field examination with respect to such Inventory that is satisfactory to Administrative Agent in its Permitted Discretion.

"**EMU Legislation**" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"**Enforcement Qualifications**" has the meaning set forth in <u>Section 5.04</u>.

"**Environment**" means indoor air, ambient air, surface water, groundwater, drinking water, land surface, subsurface strata, and natural resources such as wetlands, flora and fauna.

"**Environmental Laws**" means any applicable Law relating to the prevention of pollution or the protection of the Environment and natural resources, and the protection of human health and safety as it relates to the Environment.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of investigation and remediation, fines, penalties or indemnities), of the Loan Parties or any Subsidiary resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage or treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement to the extent liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Funded Employee Plan Costs**" means cash costs or expenses, incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or stockholders agreement, to the extent funded with cash proceeds contributed to the capital of the Borrower or net cash proceeds of an issuance of Qualified Equity Interests of the Borrower or Equity Interests of any direct or indirect parent of the Borrower (other than any amount designated as a Cure Amount).

"**Equity Interests**" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities); <u>provided</u>, that any instrument evidencing Indebtedness convertible or exchangeable for Equity Interests shall not be deemed to be Equity Interests unless and until such instrument is so converted or exchanged.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is under common control with a Loan Party or any Subsidiary within the meaning of Section 414(b) or (c) of the Code or Section 4001 of ERISA (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code or Section 302 of ERISA).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by a Loan Party, any Subsidiary or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA;

25

6237404.15

(c) a complete or partial withdrawal by a Loan Party, any Subsidiary or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization (within the meaning of Section 4241 of ERISA) or insolvent (within the meaning of Section 4245 of ERISA) or in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (d) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (e) the filing of a notice of intent to terminate, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for, and that could reasonably be expected to result in, the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) with respect to a Pension Plan, the failure to satisfy the minimum funding standard of Section 412 of the Code or Section 302 of ERISA, whether or not waived; (h) a failure by a Loan Party, any Subsidiary or any ERISA Affiliate to make a required contribution to a Multiemployer Plan; (i) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could reasonably be expected to result in liability to a Loan Party or any Subsidiary; or (j) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon a Loan Party, any Subsidiary or any ERISA Affiliate.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Euro**", "**EUR**" and "**€**" mean the lawful currency of the Participating Member States introduced in accordance with the EMU Legislation.

"**Event of Default**" has the meaning set forth in Section 8.01.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded Assets**" means (i) any fee owned real property (other than Material Real Properties) and any leasehold rights and interests in real property (including landlord waivers, estoppels and collateral access letters), (ii) motor vehicles, airplanes and other assets subject to certificates of title, to the extent a Lien therein cannot be perfected by the filing of a UCC financing statement, (iii) [reserved], (iv) governmental licenses, state or local franchises, charters and authorizations and any other property and assets to the extent that the Administrative Agent may not validly possess a security interest therein under, or such security interest is restricted by, applicable Laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or the pledge or creation of a security interest in which would require governmental consent, approval, license or authorization, other than to the extent such prohibition or limitation is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition (but excluding proceeds of any such governmental license), (v) any lease, license, permit or agreement to the extent that, and so long as, a grant of a security interest therein (A) is prohibited by applicable Law other than to the extent such prohibition is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition or (B) to the extent and for so long as it would violate the terms thereof (in each case, after giving effect to the relevant provisions of the UCC or other applicable Laws) or would give rise to a termination right thereunder in favor of a party thereto other than the Borrower or a Guarantor (except to the extent such provision is overridden by the UCC or other applicable Laws), in each case, other than the proceeds thereof and (a) excluding any such agreement that relates to a Permitted Refinancing of any of the foregoing and (b) only to the extent that and for so long as such limitation on such pledge or security interest is otherwise permitted under Section 7.09, (vi) Margin Stock, (vii) Equity Interests and assets of captive insurance Subsidiaries, (viii) assets of non-Loan Party Immaterial Subsidiaries, (ix) Equity Interests in joint ventures and non-wholly owned Subsidiaries, in each case, which cannot be pledged without the consent of a third party (that is not a Loan

26

Party), to the extent such consent has not been obtained (other than to the extent such limitation is rendered ineffective under the UCC or other applicable law), (x) any property subject to a Lien permitted by Section 7.01(u) or (aa) (to the extent relating to a Lien originally incurred pursuant to Section 7.01(u)) to the extent that a grant of a security interest therein would violate or invalidate such underlying obligations or create a right of termination in favor of any other party thereto (other than a Loan Party) or otherwise require consent thereunder (after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law), (xi) letter of credit rights, except to the extent constituting support obligations for other Collateral as to which perfection of the security interest in such other Collateral is accomplished solely by the filing of a UCC financing statement (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement), (xii) any assets to the extent a security interest in such assets could reasonably be expected to result in material adverse tax consequences as reasonably determined by the Borrower, (xiii) [reserved], (xiv) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application (or any registration that issues therefrom) under applicable federal law and (xv) assets where the cost of obtaining a security interest therein exceeds the practical benefit to the Lenders afforded thereby as agreed by the Borrower and the Administrative Agent (at the direction of the Required Lenders) in writing; provided, however, that Excluded Assets shall not include any Proceeds, substitutions or replacements of any Excluded Assets referred to in clauses (i) through (xv) (unless such Proceeds, substitutions or replacements would independently constitute Excluded Assets referred to in clauses (i) through (xv)).  The Borrower shall not be required to take any action under the law of any non-U.S. jurisdiction to create or perfect a security interest in any assets located outside the United States or any other assets that require such action, including any intellectual property registered in any non-U.S. jurisdiction (and no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction shall be required).

"**Excluded Subsidiary**" means (a) any Subsidiary that is not a wholly owned Domestic Subsidiary of the Borrower or a Guarantor, (b) any Subsidiary that is prohibited or restricted by applicable Law or by Contractual Obligations existing on the Closing Date (or, in the case of any newly acquired Subsidiary, in existence at the time of acquisition but not entered into in contemplation thereof) from guaranteeing the Obligations or if guaranteeing the Obligations would require governmental (including regulatory) consent, approval, license or authorization or could result in material adverse tax consequences as reasonably determined by the Borrower, (c) any other Subsidiary with respect to which, in the reasonable judgment of the Borrower and the Required Lenders, the burden or cost of providing a Guarantee shall be excessive in view of the benefits to be obtained by the Lenders therefrom, (d) any not-for-profit Subsidiaries, (e) [reserved], (f) [reserved], (g) any CFC Holding Company, (h) any Domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary that is a CFC, (i) captive insurance Subsidiaries and (j) each other Subsidiary acquired pursuant to a Permitted Acquisition permitted hereunder and financed with assumed secured Indebtedness, and each Subsidiary acquired in such Permitted Acquisition permitted hereunder that guarantees such Indebtedness, in each case to the extent that, and for so long as, the documentation relating to such Indebtedness to which such Subsidiary is a party prohibits such Subsidiary from guaranteeing the Obligations and such prohibition was not created in contemplation of such Permitted Acquisition permitted hereunder.

"**Excluded Swap Obligation**" means, with respect to any Guarantor, any Swap Obligation, if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the

27

6237404.15

Commodity Exchange Act and the regulations thereunder at the time the guarantee of such Guarantor or the grant of the security interest would otherwise have become effective with respect to such Swap Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof).

"**Executive Order**" has the meaning set forth in Section 6.21(a).

"**Excluded Account**" means any (a) deposit accounts specially and exclusively used in the ordinary course of business for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any Loan Party's salaried employees, which accounts are funded only in the ordinary course of business, (b) pension fund accounts, 401(k) accounts and trust accounts and (c) withholding tax and other tax accounts, fiduciary accounts, escrow accounts and other accounts in which any Loan Party holds funds on behalf of any third party.

"**Existing Debt**" means all Indebtedness for borrowed money of the Borrower and its Affiliates under (i) the Pre-Petition First Lien Credit Agreement and (ii) that certain Second Lien Credit Agreement, dated as of June 30, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Pre-Petition Second Lien Credit Agreement**") by and among the Borrower, the guarantors party thereto from time to time, the Bank of New York Mellon (or its successor, if appointed), as administrative agent, and the lenders party thereto from time to time (the "**Pre-Petition Second Lien Lenders**").

"**Existing Letters of Credit**" means any letters of credit outstanding on the Closing Date described in Schedule 1.01(D). Schedule 1.01(D) contains a description of all Existing Letters of Credit and sets forth, with respect to each such Existing Letter of Credit, (i) the name of the issuing lender, (ii) the letter of credit number, (iii) the name(s) of the account party or account parties, (iv) the stated amount (including the currency in which such letter of credit is denominated), (v) the name of the beneficiary and (vi) the expiry date.

"**Extraordinary Advances**" has the meaning set forth in Section 2.03(d)(iii).

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), or any current or future Treasury regulations or other administrative guidance promulgated thereunder, and any intergovernmental agreements implementing the foregoing, and any related fiscal or regulatory legislation, rules or official administrative practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities implementing the foregoing.

"**FCPA**" means the United States Foreign Corrupt Practices Act of 1977, as amended.

"**Federal Funds Effective Rate**" means, for any day, the rate per annum equal to the rates on overnight Federal funds transactions with members of the Federal Reserve System (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time), as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to the Administrative Agent on such day on such transactions as

28

determined by the Administrative Agent from three brokers of recognized standing selected by it; provided further that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"**FIRREA**" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"**First Lien Administrative Agent**" has the meaning assigned to the term "Administrative Agent" under and as defined in the First Lien Credit Agreement and shall include any successor administrative agent under the First Lien Credit Agreement.

"**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of the date hereof, by and among the Borrower, the Holdcos, the other Guarantors from time to time party thereto, the lenders party thereto from time to time and Cantor Fitzgerald Securities, as administrative agent for such lenders.

"**First Lien Loan Documents**" means the "Loan Documents" as defined in the First Lien Credit Agreement.

"**First Lien Obligations**" means the "Obligations" (or any comparable term) as defined in the First Lien Credit Agreement.

"**First Lien Secured Obligations**" means the "First Lien Secured Obligations" as defined in the Intercreditor Agreement.

"**First Lien Term Facility**" means the First Lien Term Loans and commitments in respect thereof.

"**First Lien Term Loans**" means the "Term Loans" (or any comparable term) as defined in the First Lien Credit Agreement.

"**Fixed Charge Coverage Ratio**" means, with respect to any fiscal period and with respect to the Loan Parties determined on a consolidated basis in accordance with GAAP, the ratio of (a) Consolidated EBITDA for such period *minus* Unfinanced Capital Expenditures made (to the extent not already incurred in a prior period) or incurred during such period, to (b) Fixed Charges for such period; provided, that for purposes of calculating the Fixed Charge Coverage Ratio for any period ending prior to the expiration of twelve full calendar months since the Closing Date, Fixed Charges shall be deemed to be Fixed Charges for the period from the Closing Date to and including the date of determination multiplied by a fraction equal to (x) 365 divided by (y) the number of days elapsed from the Closing Date to such date of determination.

For the purposes of calculating Fixed Charge Coverage Ratio for any Reference Period, if at any time during such Reference Period (and after the Closing Date), any Loan Party or any of its Subsidiaries shall have made a Permitted Acquisition, Fixed Charges and Unfinanced Capital Expenditures for such Reference Period shall be calculated after giving *pro forma* effect thereto or in such other manner acceptable to Administrative Agent as if any such Permitted Acquisition occurred on the first day of such Reference Period.

"**Fixed Charges**" means, with respect to any fiscal period and with respect to the Loan Parties determined on a consolidated basis in accordance with GAAP, the sum, without duplication, of (a) Consolidated Interest Expense required to be paid (other than interest paid-in-kind, amortization of financing fees, and other non-cash Consolidated Interest Expense) during such period, (b) scheduled principal payments in respect of Indebtedness that are required to be paid during such period (but excluding mandatory prepayments of Loans or payments due at final maturity) and that were actually paid

29

in cash during such period with respect to Indebtedness for borrowed money, (c) all federal, state, and local income taxes required to be paid during such period, (d) all management, consulting, monitoring, and advisory fees paid to its Affiliates during such period and (e) all Restricted Payments paid (whether in cash or other property, other than common Equity Interests) during such period.

"**Flood Insurance Laws**" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"**Foreign Subsidiary**" means any direct or indirect Subsidiary which is not a Domestic Subsidiary.

"**Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**Funding Date**" means the date on which a Borrowing occurs.

"**Funding Losses**" has the meaning set forth in Section 2.12(b)(ii).

"**GAAP**" means generally accepted accounting principles in the United States of America, as in effect from time to time; provided, however, that, subject to Section 1.03, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof (including through conforming changes made consistent with IFRS) on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof (including through conforming changes made consistent with IFRS), then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national body exercising such powers or functions, such as the European Union or the European Central Bank).

"**Granting Lender**" has the meaning set forth in Section 10.07(h).

"**Guarantee**" means, as to any Person, without duplication, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment or performance of such Indebtedness, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part).  The amount of any Guarantee shall be deemed to be an amount

30

6237404.15

equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning set forth in Section 11.01.

"**Guarantors**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement" and shall include each Holdco, the Borrower (solely with respect to its Secured Obligations other than its direct Secured Obligations as a primary obligor (as opposed to a guarantor) under the Loan Documents) and each Subsidiary of the Borrower that shall have become a Guarantor pursuant to Section 6.11 or 6.20, in any case until released in accordance with the terms hereof, it being understood and agreed that the Borrower in its sole discretion may (with the consent of the Administrative Agent (at the direction of the Required Lenders), such consent not to be unreasonably withheld) cause any Subsidiary that is not a Guarantor to Guarantee the Obligations by causing such Subsidiary to execute a Joinder Agreement, and any such Subsidiary shall be a Guarantor, Loan Party and Subsidiary Guarantor hereunder for all purposes; provided, however, that that Administrative Agent (at the direction of the Required Lenders) may condition its consent by limiting the purposes for which such Subsidiary shall constitute a Loan Party and Subsidiary Guarantor for purposes of Section 7 and related definitions used therein.

"**Guaranty**" means, collectively, the guaranty of the Obligations by the Guarantors pursuant to this Agreement.

"**Hazardous Materials**" means all materials, pollutants, contaminants, chemicals, compounds, constituents, substances or wastes, in any form, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, mold, medical waste, in each case regulated under Environmental Laws.

"**Hedge Agreement**" means a "swap agreement" as that term is defined in Section 101(53B)(A) of the Bankruptcy Code.

"**Hedge Obligations**" means any and all obligations or liabilities, whether absolute or contingent, due or to become due, now existing or hereafter arising, of each Loan Party and its Subsidiaries arising under, owing pursuant to, or existing in respect of Hedge Agreements entered into with one or more of the Hedge Providers.

"**Hedge Provider**" means Wells Fargo or any of its Affiliates or any Person that is a Lender or an Affiliate of a Lender at the time it enters into a Hedge Agreement, whether or not such Person subsequently ceases to be a Lender or an Affiliate of a Lender.

"**Holdcos**" means Holdings and Intermediate Holdings.

"**Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**IFRS**" means international accounting standards as promulgated by the International Accounting Standards Board.

"**Immaterial Subsidiary**" means any Subsidiary that is not a Material Subsidiary.

"**Increased Reporting Event**" means if at any time Availability is less than the greater of (a) 17.5% of the Maximum Revolver Amount, and (b) $5,250,000

31

6237404.15

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following:

(a)      all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)      the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)      net obligations of such Person under any Swap Contract;

(d)      all obligations of such Person to pay the deferred purchase price of property or services;

(e)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)      all Attributable Indebtedness;

(g)      all obligations of such Person in respect of Disqualified Equity Interests if and to the extent that the foregoing would constitute indebtedness or a liability in accordance with GAAP; and

(h)      to the extent not otherwise included above, all Guarantees of such Person in respect of Indebtedness described in clauses (a) through (g) in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall (A) include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Consolidated First Lien Net Debt, (B) in the case of the Borrower and its Subsidiaries, exclude all intercompany Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business and (C) exclude (i) trade accounts and accrued expenses payable in the ordinary course of business, (ii) any earn-out obligation until such obligation is not paid after becoming due and payable, (iii) accruals for payroll and other liabilities accrued in the ordinary course of business and (iv) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of Indebtedness of any Person for purposes of clause (e) that is expressly made non-recourse or limited recourse (limited solely to the assets securing such Indebtedness) to such Person shall be deemed to be equal to the lesser of (x) the aggregate unpaid amount of such Indebtedness and (y) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Liabilities**" has the meaning set forth in Section 10.05.

"**Indemnified Taxes**" means, with respect to Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, all Taxes imposed on or with respect to any payment under any Loan

32

Documents, other than (i) any Taxes imposed on or measured by its net income, however denominated, and franchise (and similar) Taxes imposed on it in lieu of net income Taxes, imposed by a jurisdiction as a result of such recipient being organized in or having its principal office or, in the case of any Lender, applicable Lending Office in such jurisdiction, or as a result of any other present or former connection between such recipient and such jurisdiction, other than any connections arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, receiving payments under, or enforcing, any Loan Document, (ii) any Taxes attributable to the failure of the Administrative Agent or Lender to comply with Section 3.01(e), (iii) any branch profits Taxes imposed by the United States under Section 884(a) of the Code, or any similar Tax, imposed by any jurisdiction described in clause (a), (iv) in the case of a Lender (other than an assignee pursuant to a request by the Borrower under Section 3.07(a)), any U.S. federal withholding Tax that is in effect and would apply to amounts payable hereunder pursuant to a Law in effect at the time such Lender becomes a party to this Agreement, or designates a new Lending Office, except to the extent such Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrower or any Guarantor with respect to such withholding Tax pursuant to Section 3.01, and (v) any withholding Taxes imposed under FATCA.

"**Indemnitees**" has the meaning set forth in Section 10.05.

"**Independent Financial Advisor**" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged and that is independent of the Borrower and its Affiliates.

"**Information**" has the meaning set forth in Section 10.08.

"**Insolvency Proceeding**" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"**Intellectual Property Security Agreement**" has the meaning set forth in the Security Agreement.

"**Intercompany Note**" means a promissory note substantially in the form of Exhibit G.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of the date hereof, by and among the Administrative Agent, the First Lien Administrative Agent, the Second Lien Administrative Agent and the Borrower and Guarantors party thereto.

"**Interest Payment Date**" means, (a) as to any LIBOR Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; provided that if any Interest Period for a LIBOR Rate Loan exceeds three (3) months, the respective dates that fall every three (3) months after the beginning of such Interest Period shall also be Interest Payment Dates and (b) as to any Base Rate Loan, the first day of each calendar month and the Maturity Date.

"**Interest Period**" means, with respect to each LIBOR Rate Loan, a period commencing on the date of the making of such LIBOR Rate Loan (or the continuation of a LIBOR Rate Loan or the conversion of a Base Rate Loan to a LIBOR Rate Loan) and ending 1, 3, or 6 months thereafter; provided, that (a) interest shall accrue at the applicable rate based upon the LIBOR Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (b) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such

33

6237404.15

Interest Period shall end on the next preceding Business Day, (c) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 1, 3 or 6 months after the date on which the Interest Period began, as applicable, and (d) Borrower may not elect an Interest Period which will end after the Maturity Date.

"**Intermediate Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Inventory**" means inventory (as that term is defined in the Uniform Commercial Code).

"**Inventory Reserves**" means, as of any date of determination, (a) Landlord Reserves in respect of Inventory, and (b) those reserves that Administrative Agent deems necessary or appropriate, in its Permitted Discretion and subject to Section 2.01(c), to establish and maintain (including reserves for slow moving Inventory and Inventory shrinkage) with respect to Eligible Inventory or the Maximum Revolver Amount, including based on the results of appraisals.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and its Subsidiaries, intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business) or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made), without adjustment for subsequent increases or decreases in the value of such Investment, less any Returns of the Borrower or a Subsidiary in respect of such Investment.

"**IP Rights**" has the meaning set forth in Section 5.15.

"**ISP**" means, with respect to any Letter of Credit, the International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any version or revision thereof accepted by the Issuing Bank for use.

"**Issuer Document**" means, with respect to any Letter of Credit, a letter of credit application, a letter of credit agreement, or any other document, agreement or instrument entered into (or to be entered into) by Borrower in favor of Issuing Bank and relating to such Letter of Credit.

"**Issuing Bank**" means Wells Fargo or any other Lender that, at the request of Borrower and with the consent of Administrative Agent, agrees, in such Lender's sole discretion, to become an Issuing Bank for the purpose of issuing Letters of Credit pursuant to Section 2.11 of this Agreement, and Issuing Bank shall be a Lender.

"**Joinder Agreement**" means a joinder agreement substantially in the form of Joinder Agreement attached as Exhibit I hereto.

"**Judgment Currency**" has the meaning assigned to such term in Section 10.20.

"**Landlord Reserve**" means, as to each location at which Borrower has Inventory or books and records located and as to which a Collateral Access Agreement has not been received by Administrative

34

6237404.15

Agent within ninety (90) days after the Closing Date, a reserve in an amount equal to three (3) months' rent, storage charges, fees or other amounts under the lease or other applicable agreement relative to such location or, if greater and Administrative Agent so elects, the number of months' rent, storage charges, fess or other amounts for which the landlord, bailee, warehouseman or other property owner will have, under applicable law, a Lien in the Inventory of Borrower to secure the payment of such amounts under the lease or other applicable agreement relative to such location.

"**Laws**" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Lender**" has the meaning set forth in the introductory paragraph to this Agreement and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender."

"**Lender Default**" means a Distressed Person has admitted in writing that it is insolvent or such Distressed Person becomes subject to a Lender-Related Distress Event.

"**Lender Group**" means each of the Lenders (including Issuing Bank and the Swing Lender) and Administrative Agent, or any one or more of them.

"**Lender Group Expenses**" means all (a) costs or expenses (including taxes and insurance premiums) required to be paid by any Loan Party or its Subsidiaries under any of the Loan Documents that are paid, advanced, or incurred by the Lender Group, (b) documented out-of-pocket fees or charges paid or incurred by Administrative Agent in connection with the Lender Group's transactions with each Loan Party and its Subsidiaries under any of the Loan Documents, including, photocopying, notarization, couriers and messengers, telecommunication, public record searches, filing fees, recording fees, publication, real estate surveys, real estate title policies and endorsements, and environmental audits, (c) Administrative Agent's customary fees and charges imposed or incurred in connection with any background checks or OFAC/PEP searches related to any Loan Party or its Subsidiaries, (d) Administrative Agent's customary fees and charges (as adjusted from time to time) with respect to the disbursement of funds (or the receipt of funds) to or for the account of Borrower (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith, (e) customary charges imposed or incurred by Administrative Agent resulting from the dishonor of checks payable by or to any Loan Party, (f) reasonable, documented out-of-pocket costs and expenses paid or incurred by the Lender Group to correct any default or enforce any provision of the Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (g) field examination, appraisal, and valuation fees and expenses of Administrative Agent related to any field examinations, appraisals, or valuation to the extent of the fees and charges (and up to the amount of any limitation) provided in Section 6.10(c) of this Agreement, (h) Administrative Agent's and Lenders' reasonable, documented costs and expenses (including reasonable and documented attorneys' fees and expenses) relative to third party claims or any other lawsuit or adverse proceeding paid or incurred, whether in enforcing or defending the Loan Documents or otherwise in connection with the transactions contemplated by the Loan Documents, Administrative Agent's Liens in and to the Collateral, or the Lender Group's relationship with any Loan Party or any of its Subsidiaries, (i) Administrative Agent's reasonable and documented costs and expenses (including reasonable and documented attorneys' fees and due diligence expenses) incurred in advising, structuring, drafting, reviewing, administering (including travel, meals,

35

6237404.15

and lodging), syndicating (including SyndTrak or other communication costs incurred in connection with a syndication of the loan facilities), or amending, waiving, or modifying the Loan Documents, and (j) Administrative Agent's and each Lender's reasonable and documented costs and expenses (including reasonable and documented attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding concerning any Loan Party or any of its Subsidiaries or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether a lawsuit or other adverse proceeding is brought, or in taking any enforcement action or any Remedial Action with respect to the Collateral.

"**Lender-Related Distress Event**" shall mean, with respect to any Lender or any other Person that directly or indirectly controls such Lender (each, a "**Distressed Person**"), (i) such Distressed Person has become subject to a Bail-in Action and/or (ii) a voluntary or involuntary case with respect to such Distressed Person under any debt relief law, or a custodian, conservator, receiver, or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person, or any Person that directly or indirectly controls such Distressed Person or is subject to a forced liquidation or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any governmental authority having regulatory authority over such Distressed Person to be, insolvent or bankrupt; provided that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Lender or any Person that directly or indirectly controls such Lender by a governmental authority or an instrumentality thereof.

"**Lending Office**" means, as to any Lender, such office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Letter of Credit**" means a letter of credit (as that term is defined in the Uniform Commercial Code) issued by Issuing Bank.

"**Letter of Credit Collateralization**" means either (a) providing cash collateral (pursuant to documentation reasonably satisfactory to Administrative Agent (including that Administrative Agent has a first priority perfected Lien in such cash collateral), including provisions that specify that the Letter of Credit Fees and all commissions, fees, charges and expenses provided for in Section 2.11(k) of this Agreement (including any fronting fees) will continue to accrue while the Letters of Credit are outstanding) to be held by Administrative Agent for the benefit of the Lenders in an amount equal to 105% of the then existing Letter of Credit Usage, (b) delivering to Administrative Agent documentation executed by all beneficiaries under the Letters of Credit, in form and substance reasonably satisfactory to Administrative Agent and Issuing Bank, terminating all of such beneficiaries' rights under the Letters of Credit, or (c) providing Administrative Agent with a standby letter of credit, in form and substance reasonably satisfactory to Administrative Agent, from a commercial bank acceptable to Administrative Agent (in its sole discretion) in an amount equal to 105% of the then existing Letter of Credit Usage (it being understood that the Letter of Credit Fee and all fronting fees set forth in this Agreement will continue to accrue while the Letters of Credit are outstanding and that any such fees that accrue must be an amount that can be drawn under any such standby letter of credit).

"**Letter of Credit Disbursement**" means a payment made by Issuing Bank pursuant to a Letter of Credit.

"**Letter of Credit Exposure**" means, as of any date of determination with respect to any Lender, such Lender's participation in the Letter of Credit Usage pursuant to Section 2.11(e) on such date.

"**Letter of Credit Fee**" has the meaning set forth in Section 2.06(b).

<center>36</center>

6237404.15

"**Letter of Credit Indemnified Costs**" has the meaning set forth in Section 2.11(f).

"**Letter of Credit Related Person**" has the meaning set forth in Section 2.11(f).

"**Letter of Credit Sublimit**" means $7,500,000.

"**Letter of Credit Usage**" means, as of any date of determination, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit, plus (b) the aggregate amount of outstanding reimbursement obligations with respect to Letters of Credit which remain unreimbursed or which have not been paid through a Loan.

"**LIBOR Deadline**" has the meaning set forth in Section 2.12(b)(i).

"**LIBOR Notice**" means a written notice in the form of Exhibit A to this Agreement.

"**LIBOR Option**" has the meaning set forth in Section 2.12(a).

"**LIBOR Rate**" means the rate per annum as published by ICE Benchmark Administration Limited (or any successor page or other commercially available source as Administrative Agent may designate from time to time) as of 11:00 a.m., London time, two (2) Business Days prior to the commencement of the requested Interest Period, for a term, and in an amount, comparable to the Interest Period and the amount of the LIBOR Rate Loan requested (whether as an initial LIBOR Rate Loan or as a continuation of a LIBOR Rate Loan or as a conversion of a Base Rate Loan to a LIBOR Rate Loan) by Borrower in accordance with this Agreement (and, if any such published rate is below 0.75%, then the LIBOR Rate shall be deemed to be 0.75%). Each determination of the LIBOR Rate shall be made by Administrative Agent and shall be conclusive in the absence of manifest error.

"**LIBOR Rate Loan**" means each portion of a Loan that bears interest at a rate determined by reference to the LIBOR Rate.

"**Lien**" means, with respect to any asset, any mortgage, deed of trust, pledge, hypothecation, collateral assignment, security deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest of any kind or nature in respect of such asset (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing).

"**Loan**" means any Revolving Loan, Swing Loan or Extraordinary Advance made (or to be made) hereunder.

"**Loan Account**" has the meaning set forth in Section 2.09.

"**Loan Documents**" means, collectively, (i) this Agreement, (ii) any Notes, (iii) the Collateral Documents, (iv) the Intercreditor Agreement, (v) the Agent Fee Letter, (vi) any Borrowing Base Certificate, (vii) any Issuer Documents, (viii) the Letters of Credit, (ix) any other document or instrument designated by the Borrower and the Administrative Agent as a "Loan Document" and (x) any amendment or joinder to this Agreement.

"**Loan Parties**" means, collectively, the Borrower and each Guarantor.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Master Agreement**" has the meaning set forth in the definition of "Swap Contract."

37

6237404.15

"**Material Adverse Effect**" means any event, change or condition that, individually or in the aggregate, has had, or would reasonably be expected to have a material adverse effect on (i) the business, assets, financial condition or results of operations of the Borrower and its Subsidiaries, taken as a whole, (ii) the ability of the Borrower and the Guarantors (taken as a whole) to perform their payment obligations under any Loan Document to which the Borrower or any of the Loan Parties is a party or (iii) the material rights and remedies of the Administrative Agent and the Lenders under the Loan Documents, taken as a whole, including the legality, validity, binding effect or enforceability of the Loan Documents.

"**Material Domestic Subsidiary**" means, at any date of determination, each of the Borrower's Domestic Subsidiaries that are Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Subsidiaries for such period, in each case determined in accordance with GAAP; provided that if, at any time and from time to time after the Closing Date, Domestic Subsidiaries that are not Guarantors solely because they do not meet the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended fiscal quarter of the Borrower for which financial statements have been delivered pursuant to Section 6.01 or more than 5.0% of the consolidated gross revenues of the Borrower and the Subsidiaries for such Test Period, then the Borrower shall, not later than forty-five (45) days after the date by which financial statements for such quarter or Test Period, as applicable, are required to be delivered pursuant to this Agreement (or such longer period as the Required Lenders may agree in their reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of Section 6.11 applicable to such Subsidiary.

"**Material Foreign Subsidiary**" means, at any date of determination, each of the Borrower's Foreign Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Subsidiaries for such period, in each case determined in accordance with GAAP; provided that if, at any time and from time to time after the Closing Date, Foreign Subsidiaries not meeting the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended fiscal quarter of the Borrower for which financial statements have been delivered pursuant to Section 6.01 or more than 5.0% of the consolidated gross revenues of the Borrower and the Subsidiaries for such Test Period, then the Borrower shall, not later than forty-five (45) days after the date by which financial statements for such quarter or Test Period, as applicable, are required to be delivered pursuant to this Agreement (or such longer period as the Required Lenders may agree in their reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Foreign Subsidiaries as "Material Foreign Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of the definition of "Collateral and Guarantee Requirement."

"**Material Non-Public Information**" means information which is (a) not publicly available, (b) material with respect to Holdings and its Subsidiaries or their respective securities for purposes of United States federal and state securities laws and (c) not of a type that would be publicly disclosed in connection with any issuance by Holdings or any of its Subsidiaries of debt or equity securities issued pursuant to a public offering, a Rule 144A offering or other private placement where assisted by a placement agent.

"**Material Real Property**" means any fee-owned Real Property located in the United States that is owned by any Loan Party and that has a fair market value in excess of $1,250,000 (at the Closing Date or, with respect to Real Property acquired after the Closing Date, at the time of acquisition, in each case, as reasonably estimated by the Borrower in good faith).

"**Material Subsidiary**" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"**Maturity Date**" means the earlier to occur of (a) the fifth anniversary of the Closing Date and (b) sixty (60) days prior to the maturity of the First Lien Obligations and the Second Lien Obligations; provided that, if such day is not a Business Day, the Maturity Date shall be the Business Day immediately succeeding such day.

"**Maximum Rate**" has the meaning set forth in Section 10.10.

"**Maximum Revolver Amount**" means $30,000,000, decreased by the amount of reductions in the Commitments made in accordance with Section 2.04(c).

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgage Policies**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement."

"**Mortgaged Properties**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement."

"**Mortgages**" means collectively, the deeds of trust, trust deeds, hypothecs and mortgages made by the Loan Parties in favor or for the benefit of the Administrative Agent on behalf of the Secured Parties creating and evidencing a Lien on a Mortgaged Property in form and substance reasonably satisfactory to the Administrative Agent, and any other mortgage executed and delivered pursuant to Sections 6.11 and 6.13, in each case, as the same may from time to time be amended, restated, supplemented or otherwise modified.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which a Loan Party, any Subsidiary or any ERISA Affiliate makes or is obligated to make contributions, or has made or been obligated to make contributions.

"**NOLV**" means, as of any date of determination, with respect to Eligible Inventory of any Person, the value of such Eligible Inventory that is estimated to be recoverable in an orderly liquidation of such Eligible Inventory, net of all associated costs and expenses of such liquidation, as determined based upon the most recent Acceptable Appraisal of Inventory; provided that if such Acceptable Appraisal does not provide the costs and expenses of such liquidation on an item by item basis, then costs and expenses of liquidation for each item of Eligible Inventory will be such amount as determined by Administrative Agent in its Permitted Discretion.

"**Non-Consenting Lender**" has the meaning set forth in Section 3.07(d).

"**Non-Defaulting Lender**" means, at any time, a Lender that is not a Defaulting Lender.

"**Note**" has the meaning set forth in Section 2.05(b).

"**Notice of Intent to Cure**" has the meaning set forth in Section 8.04.

"**Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party and its Subsidiaries arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and of their Subsidiaries to the extent they have

39

obligations under the Loan Documents) include (a) the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document, (b) the obligation to pay any applicable fee pursuant to Section 2.10 and (c) the obligation of any Loan Party to reimburse any amount in respect of any of the foregoing that any Lender may elect to pay or advance on behalf of such Loan Party in accordance with the terms of the Loan Documents.

"**OFAC**" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"**Old Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Old Intermediate Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Old Jason**" has the meaning set forth in the preliminary statements to this Agreement.

"**Order**" means any order, writ, judgement, injunction, decree, rule, ruling, directive, stipulation, determination or award made, issued or entered by the Bankruptcy Court or any other Governmental Authority, whether interim or final.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement or limited liability company agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" has the meaning set forth in Section 3.01(b).

"**Overadvance**" means, as of any date of determination, that the Revolver Usage is greater than any of the limitations set forth in Section 2.01 or Section 2.11.

"**Overnight Rate**" means, for any day, the greater of the Federal Funds Effective Rate and an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"**Participant**" has the meaning set forth in Section 10.07(e).

"**Participant Register**" has the meaning set forth in Section 10.07(e).

"**Payment Conditions**" means, at the time of determination with respect to a proposed payment to fund an Investment or Restricted Payment, that:

(a)      no Default or Event of Default then exists or would arise as a result of the consummation of such Investment or Restricted Payment,

(b)      both (A) the Fixed Charge Coverage Ratio of the Loan Parties and their Subsidiaries is equal to or greater than 1.00 to 1.00 for the trailing twelve (12) month period most recently ended for which financial statements are required to have been delivered to Administrative Agent pursuant to Section 6.01 (calculated on a pro forma basis as if such proposed payment is a Fixed Charge made on the last day of such twelve (12) month period (it being understood that such proposed payment shall also be a Fixed Charge made on the last day of such twelve (12) month period for purposes of calculating the Fixed

40

6237404.15

Charge Coverage Ratio under this clause (b) for any subsequent proposed payment to fund an Investment or Restricted Payment)), and (B) Availability (x) at all times during the 30 consecutive days immediately preceding the date of such proposed payment and the consummation of such Investment or Restricted Payment, calculated on a *pro forma basis* as if such proposed payment was made, and the Investment or Restricted Payment was consummated, on the first day of such period, and (y) after giving effect to such proposed Investment or Restricted Payment, in each case, is not less than, the greater of (X) 25% of the Maximum Revolver Amount, and (Y) $7,500,000, and

(c)    Borrower has delivered a certificate to Administrative Agent certifying that all conditions described in clauses (a) and (b) above have been satisfied.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time.

"**Perfection Certificate**" means a certificate substantially in the form of Exhibit II to the Security Agreement or any other form reasonably approved by the Administrative Agent, as the same shall be supplemented from time to time.

"**Permitted Acquisition**" has the meaning set forth in Section 7.02(i).

"**Permitted Discretion**" means the exercise of the Administrative Agent's reasonable credit judgment (from the perspective of a secured asset based lender), exercised in accordance with customary and generally applicable credit practices for similar asset based lending facilities.

"**Permitted Holders**" means each holder of any First Lien Secured Obligations or Second Lien Secured Obligations holding the common equity of Holdings on the Closing Date.

"**Permitted Investment**" has the meaning set forth in Section 7.02.

"**Permitted Protest**" means the right of any Loan Party or any of its Subsidiaries to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment; provided, that (a) a reserve with respect to such obligation is established on such Loan Party's or its Subsidiaries' books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Loan Party or its Subsidiary, as applicable, in good faith, and (c) Administrative Agent is satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Administrative Agent's Liens.

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal, restructuring, replacement or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, restructured, refunded, renewed, replaced or extended except by an amount equal to unpaid accrued interest and premium thereon *plus* other amounts owing or paid related to such Indebtedness, and fees and expenses incurred, in connection with such modification, refinancing, refunding, renewal, restructuring, replacement or extension *plus* an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e), such modification, refinancing, refunding, renewal, replacement or extension has a final

41

maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended, (c) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e) or (f), at the time thereof, no Event of Default shall have occurred and be continuing, (d) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal, replacement or extension is subordinated in right of payment to the Obligations on terms (i) at least as favorable (taken as a whole) (as reasonably determined by the Borrower) to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended or (ii) as otherwise reasonably acceptable to the Administrative Agent, (e) if such Indebtedness being modified, refinanced, replaced, refunded, renewed or extended is Indebtedness permitted pursuant to Sections 7.03(s), 7.03(w), and 7.03(x), (i) to the extent such Indebtedness being modified, refinanced, replaced, refunded, renewed or extended is unsecured or secured by Liens that are subordinated to the Liens securing the Obligations, such modification, refinancing, replacement, refunding, renewal or extension is unsecured or (with respect to refinanced debt secured by Liens that are subordinated to the Liens securing the Obligations) secured by Liens that are subordinated to the Liens securing the Obligations on terms (x) at least as favorable (taken as a whole) (as reasonably determined by the Borrower) to the Lenders as those contained in the documentation (including any intercreditor or similar agreements) governing the Indebtedness being modified, refinanced, replaced, refunded, renewed or extended or (y) otherwise reasonably acceptable to the Administrative Agent and (ii) notwithstanding anything contained in Section 7.03(c), such modification, refinancing, refunding, renewal, replacement or extension is incurred only by one or more Persons who is an obligor of the Indebtedness being modified, refinanced, replaced, refunded, renewed or extended and (f) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is outstanding pursuant to the Second Lien Credit Agreement or any other Second Lien Loan Document, such modification, refinancing, refunding, renewal, replacement or extension does not violate the terms of the Intercreditor Agreement.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning set forth in the preliminary statements to this Agreement.

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established or maintained by any Loan Party or any Subsidiary or, with respect to any such plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA, any ERISA Affiliate.

"**Plan Effective Date**" has the meaning set forth in the preliminary statements to this Agreement.

"**Platform**" has the meaning set forth in Section 6.01(d).

"**Pledged Debt**" has the meaning set forth in the Security Agreement.

"**Prepackaged Plan**" has the meaning set forth in the preliminary statements to this Agreement.

"**Pre-Petition First Lien Credit Agreement**" has the meaning set forth in the preliminary statements to this Agreement.

"**Pre-Petition First Lien Lenders**" has the meaning set forth in the preliminary statements to this Agreement.

"**Proceeding**" has the meaning set forth in Section 10.05.

"**Proceeds**" has the meaning set forth in the Security Agreement.

42

6237404.15

"**Pro Forma Balance Sheet**" has the meaning set forth in Section 5.05(b).

"**Pro Forma Basis**" and "**Pro Forma Effect**" means, with respect to compliance with any test or covenant or calculation of any ratio hereunder, the determination or calculation of such test, covenant or ratio (including in connection with Specified Transactions) in accordance with Section 1.09.

"**Pro Forma Financial Statements**" has the meaning set forth in Section 5.05(b).

"**Pro Rata Share**" means, with respect to each Lender, at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the Revolver Usage attributable to such Lender at such time and the denominator of which is the Maximum Revolver Amount at such time.

"**Projections**" has the meaning set forth in Section 6.01(c).

"**Protective Advances**" has the meaning set forth in Section 2.03(d)(i).

"**Public Lender**" has the meaning set forth in Section 6.01(d).

"**QFC**" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. § 5390(c)(8)(D).

"**QFC Credit Support**" has the meaning set forth in Section 10.24.

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests.

"**Qualified IPO**" means the issuance by the Borrower or any direct or indirect parent of the Borrower of its common Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the U.S. Securities and Exchange Commission in accordance with the Securities Act (whether alone or in connection with a secondary public offering).

"**Quarterly Financial Statements**" means the unaudited consolidated balance sheets and related consolidated statements of income and cash flows of the Old Jason and its Subsidiaries for the fiscal quarter ended closest to June 30, 2020 and each subsequent fiscal quarter of the Company ended at least forty-five (45) days prior to the Closing Date.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned or leased by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures.

"**Receivable Reserves**" means, as of any date of determination, those reserves that Administrative Agent deems necessary or appropriate, in its Permitted Discretion and subject to Section 2.01(c), to establish and maintain (including Landlord Reserves for books and records locations and reserves for rebates, discounts, warranty claims, and returns) with respect to the Eligible Accounts or the Maximum Revolver Amount.

43

"**Register**" has the meaning set forth in Section 10.07(d).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"**Release**" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing or migrating in, into, onto or through the Environment or in an uncontained manner from or through any facility, property or equipment.

"**Relevant Governmental Body**" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"**Relevant Public Company**" means Holdings or any direct or indirect parent thereof that (i) owns, directly or indirectly, 100% of the Equity Interests of Holdings and the Borrower and (ii) is the registrant with respect to a Qualified IPO.

"**Remedial Action**" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the otherwise applicable notice period has been waived by regulation or otherwise by the PBGC.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the Revolver Usage; provided that (i) the portion of the Revolver Usage held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders and (ii) at any time there are two or more Lenders (who are not Affiliates of one another or Defaulting Lenders), "Required Lenders" must include at least two Lenders (who are not Affiliates of one another).

"**Reserves**" means, as of any date of determination, Dilution Reserves, Inventory Reserves, Receivables Reserves, Bank Product Reserves and those other reserves that Administrative Agent deems necessary or appropriate, in its Permitted Discretion and subject to Section 2.01(c), to establish and maintain (including reserves with respect to (a) sums that any Loan Party or its Subsidiaries are required to pay under any Section of this Agreement or any other Loan Document (such as taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay, and (b) amounts owing by any Loan Party or its Subsidiaries to any Person to the extent secured by a Lien on, or trust over, any of the Collateral (other than a Permitted Lien), which Lien or trust, in the Permitted Discretion of Administrative Agent likely would have a priority superior to the Administrative Agent's Liens (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for ad valorem, excise, sales, or other taxes where given priority under applicable law) in and to such item of the Collateral) with respect to the Borrowing Base or the Maximum Revolver Amount.

"**Responsible Officer**" means the chief executive officer, president, vice president, chief financial officer, chief administrative officer, secretary or assistant secretary, treasurer or assistant

<div align="center">44</div>

treasurer, controller or other similar officer of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the Borrower's or a Subsidiary's equity holders, partners or members (or the equivalent Persons thereof).

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of June 5, 2020, by and among the Debtors and the Pre-Petition Lenders party thereto as Consenting Creditors (as defined therein).

"**Returns**" means, with respect to any Investment, any dividends, distributions, interest, fees, premium, return of capital, repayment of principal, income, profits (from a Disposition or otherwise) and other amounts received or realized in respect of such Investment.

"**Revolver Usage**" means, as of any date of determination, the sum of (a) the amount of outstanding Loans (inclusive of Swing Loans and Protective Advances), *plus* (b) the amount of the Letter of Credit Usage.

"**Revolving Loans**" has the meaning set forth in Section 2.1(a).

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Same Day Funds**" means immediately available funds.

"**Sanctioned Entity**" means (a) a country or territory or a government of a country or territory, (b) an agency of the government of a country or territory, (c) an organization directly or indirectly controlled by a country or territory or its government, or (d) a Person resident in or determined to be resident in a country or territory, in each case of clauses (a) through (d) that is a target of comprehensive Sanctions, including a target of any country sanctions program administered and enforced by OFAC (currently countries and territories listed in (a) through (d) are Cuba, Iran, North Korea, Syria, and the Crimea region of Ukraine).

"**Sanctioned Person**" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"**Sanctions**" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by:  (a) the United States of America, including those administered by OFAC, the U.S. Department of State, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (e) any other Governmental Authority with jurisdiction over any member of Lender Group or any Loan Party or any of their respective Subsidiaries or Affiliates.

45

6237404.15

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Second Lien Administrative Agent**" has the meaning assigned to the term "Administrative Agent" under and as defined in the Second Lien Credit Agreement and shall include any successor administrative agent under the Second Lien Credit Agreement.

"**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of the date hereof, by and among the Borrower, the Holdcos, the other Guarantors from time to time party thereto, the lenders party thereto from time to time and Cantor Fitzgerald Securities, as administrative agent for such lenders.

"**Second Lien Loan Documents**" means the "Loan Documents" as defined in the Second Lien Credit Agreement.

"**Second Lien Obligations**" means the "Obligations" (or any comparable term) as defined in the Second Lien Credit Agreement.

"**Second Lien Secured Obligations**" means the "Junior Lien Obligations" as defined in the Intercreditor Agreement.

"**Second Lien Term Facility**" means the Second Lien Term Loans and commitments in respect thereof.

"**Second Lien Term Loans**" means the "Term Loans" (or any comparable term) as defined in the Second Lien Credit Agreement.

"**Secured Obligations**" means, collectively, the Obligations, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise.

"**Secured Parties**" means, collectively, the Administrative Agent, the Lenders, and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.02.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Security Agreement**" means a security agreement substantially in the form of Exhibit F.

"**Security Agreement Supplement**" has the meaning set forth in the Security Agreement.

"**Settlement**" has the meaning set forth in Section 2.03(e)(i).

"**Settlement Date**" has the meaning set forth in Section 2.3(e)(i).

"**SOFR**" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date (i) the sum of the debt (including contingent liabilities) of such Person and its Subsidiaries, taken as a whole, does not exceed the present fair saleable value of the assets of the Person and its Subsidiaries, taken as a whole; (ii) the capital of such Person and its Subsidiaries, taken as a whole, is not unreasonably small in relation to the business of such Person and its Subsidiaries, taken as a whole, contemplated as of the Closing Date; and (iii) such Person and its Subsidiaries, taken as a whole, do not intend to incur, or believe that they will incur, debts (including current obligations) beyond their ability to

46

6237404.15

pay such debt as they mature in the ordinary course of business.  For the purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"**SPC**" has the meaning set forth in Section 10.07(h).

"**Specified Transaction**" means, any Disposition, Investment, prepayment of Indebtedness or Restricted Payment (or declaration of any prepayment or Restricted Payment), that by the terms of this Agreement requires such test to be calculated on a "Pro Forma Basis" or after giving "Pro Forma Effect.".

"**Standard Letter of Credit Practice**" means, for Issuing Bank, any domestic or foreign law or letter of credit practices applicable in the city in which Issuing Bank issued the applicable Letter of Credit or, for its branch or correspondent, such laws and practices applicable in the city in which it has advised, confirmed or negotiated such Letter of Credit, as the case may be, in each case, (a) which letter of credit practices are of banks that regularly issue letters of credit in the particular city, and (b) which laws or letter of credit practices are required or permitted under ISP or UCP, as chosen in the applicable Letter of Credit.

"**Statutory Reserves**" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board of Governors and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the Board).  LIBOR Rate Loans shall be deemed to constitute Eurocurrency Liabilities (as defined in Regulation D of the Board) and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Sterling**" means the lawful currency of the United Kingdom.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (excluding, for the avoidance of doubt, any charitable organizations, and any other Person that meets the requirements of Section 501(c)(3) of the Code) of which (i) a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, (ii) more than half of the issued share capital is at the time beneficially owned or (iii) the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" means any Guarantor other than the Borrower and the Holdcos.

"**Supermajority Lenders**" means, at any time, Revolving Lenders having or holding more than 66 2/3% of the aggregate Revolving Loan Exposure of all Revolving Lenders; provided, that (i) the Revolving Loan Exposure of any Defaulting Lender shall be disregarded in the determination of the Supermajority Lenders, and (ii) at any time there are two or more Revolving Lenders (who are not Affiliates of one another), "Supermajority Lenders" must include at least two Revolving Lenders (who are not Affiliates of one another or Defaulting Lenders).

6237404.15

"**Supported QFC**" has the set forth in Section 10.24.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Swing Lender**" means Wells Fargo or any other Lender that, at the request of Borrower and with the consent of Administrative Agent agrees, in such Lender's sole discretion, to become the Swing Lender under Section 2.03(b).

"**Swing Loan**" has the meaning set forth in Section 2.03(b).

"**Swing Loan Exposure**" means, as of any date of determination with respect to any Lender, such Lender's Pro Rata Share of the Swing Loans on such date.

"**Target Person**" has the meaning set forth in Section 7.02.

"**Tax Distribution**" means any distribution made or permitted to be made pursuant to Section 7.06(h)(iii).

"**Tax Group**" has the meaning set forth in Section 7.06(h)(iii).

"**Taxes**" means all present or future taxes, duties, levies, imposts, assessments, withholdings (including backup withholding) or other similar charges imposed by any Governmental Authority including any interest, penalties and additions to tax applicable thereto.

"**Term SOFR**" means the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"**Test Period**" means, for any date of determination under this Agreement, the twelve (12) consecutive calendar months of the Borrower most recently ended as of such date of determination.

48

6237404.15

"**Threshold Amount**" means $10,000,000.

"**Tooling**" means tooling, including, but not limited to dies, molds, tooling, casting patterns, gauges, jigs, racks and stands for engines, cowls, radome and wheels, jacks, test benches, test equipment, lathes, welders, grinders, presses, punches and hoists and other similar items (whether or not completed or fixed or handheld).

"**Total Assets**" means the total assets of the Borrower and the Subsidiaries on a consolidated basis in accordance with GAAP, as shown on the most recent balance sheet of the Borrower delivered pursuant to Section 6.01(a) or (b) or, for the period prior to the time any such statements are so delivered pursuant to Section 6.01(a) or (b), the Pro Forma Financial Statements.

"**Transaction Expenses**" means any fees or expenses incurred or paid by Holdings, Intermediate Holdings, the Borrower or any of their respective Subsidiaries in connection with the Transactions (including expenses in connection with hedging transactions), this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby.

"**Transactions**" means, collectively, (a) the funding of the Loans issuance of any Letters of Credit on the Closing Date and the execution, delivery and performance of the Loan Documents to be entered into on the Closing Date, (b) the deemed funding of the First Lien Term Loans under the First Lien Credit Agreement on the Closing Date and the execution, delivery and performance of the First Lien Loan Documents to be entered into on the Closing Date, (c) the deemed funding of the Second Lien Term Loans under the Second Lien Credit Agreement on the Closing Date and the execution, delivery and performance of the Second Lien Loan Documents to be entered into on the Closing Date, (d) the extinguishment of the Existing Debt in accordance with the Prepackaged Plan, (e) the restructuring of the Holdcos and certain of their Subsidiaries pursuant to the Prepackaged Plan, the Chapter 11 Cases and any related transactions and (f) the payment of Transaction Expenses earned, due and payable on the Closing Date.

"**Transferred Guarantor**" has the meaning set forth in Section 11.09.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a LIBOR Rate Loan.

"**UCP**" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any version or revision thereof accepted by Issuing Bank for use.

"**Unadjusted Benchmark Replacement**" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"**Unfinanced Capital Expenditures**" means Capital Expenditures (a) not financed with the proceeds of any incurrence of Indebtedness (other than the incurrence of any Revolving Loans), the proceeds of any sale or issuance of Equity Interests or equity contributions, the proceeds of any asset sale (other than the sale of Inventory in the ordinary course of business) or any insurance proceeds, and (b) that are not reimbursed by a third person (excluding any Loan Party or any of its Affiliates) in the period such expenditures are made pursuant to a written agreement.

"**Uniform Commercial Code**" or "**UCC**" means (i) the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or (ii) the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it applies to any item or items of Collateral. References in this Agreement and the other Loan Documents to specific sections of the Uniform Commercial Code are based on the Uniform Commercial Code as in effect in the State of New York on the Closing Date.  In the event such Uniform Commercial Code is amended or another Uniform

49

6237404.15

Commercial Code described in <u>clause (ii)</u> is applicable, such Section reference shall be deemed to be references to the comparable Section in such amended or other Uniform Commercial Code.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" has the meaning set forth in <u>Section 3.01(e)(ii)(C)</u>.

"**USA Patriot Act**" means the USA PATRIOT ACT (Title III of Pub. Law 107-56 (signed into law October 26, 2001) (as amended from time to time)).

"**U.S. Special Resolution Regimes**" has the meaning set forth in <u>Section 10.24</u>.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness.

"**Wells Fargo**" means Wells Fargo Bank, National Association, a national banking association.

"**Write-Down and Conversion Powers**" means with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

"**wholly owned**" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

**Section 1.02    Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(c)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(d)    The term "including" is by way of example and not limitation.

(e)    The word "or" is not exclusive.

(f)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

6237404.15

(g)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(h)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(i)    For purposes of determining compliance with any Section of Article VII at any time, in the event that any Lien (other than Liens securing Indebtedness of the types described in clauses (v) through (z) of the proviso appearing in the last paragraph of Section 7.03, which shall at all times be deemed to be incurred in reliance on the applicable express exception therefor in Section 7.01), Investment, Disposition, Restricted Payment, Affiliate transaction, Contractual Obligation or prepayment of Indebtedness meets the criteria of one or more than one of the categories of transactions permitted pursuant to any clause of such Sections, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time.

(j)    All references to "knowledge" of any Loan Party or a Subsidiary of Holdings means the actual knowledge of a Responsible Officer.

(k)    The words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(l)    All references to any Person shall be constructed to include such Person's successors and assigns (subject to any restriction on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(m)    The word "will" shall be construed to have the same meaning and effect as the word "shall."

**Section 1.03    Accounting Terms**.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.  Notwithstanding any other provision contained herein, (a) any lease that is treated as an operating lease for purposes of GAAP as of the Closing Date shall not be treated as Indebtedness, Attributable Indebtedness or as a Capitalized Lease and shall continue to be treated as an operating lease (and any future lease, if it were in effect on the Closing Date, that would be treated as an operating lease for purposes of GAAP as of the Closing Date shall be treated as an operating lease), in each case for purposes of this Agreement, notwithstanding any actual or proposed change in GAAP after the Closing Date and (b) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to (i) Statement of Financial Accounting Standards 141R or ASC 805 (or any other financial accounting standard having a similar result or effect) or (ii) any election under Financial Accounting Standards Codification No. 825—Financial Instruments, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of a Holdco, the Borrower or any Subsidiary at "fair value" as defined therein.

**Section 1.04    Rounding**.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under

51

this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

Section 1.05    **References to Agreements, Laws, Etc**.  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, refinancings, restatements, renewals, restructurings, extensions, supplements and other modifications thereto, but only to the extent that such amendments, refinancings, restatements, renewals, restructurings, extensions, supplements and other modifications are not prohibited by the Loan Documents; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06    **Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.07    **Timing of Payment or Performance**.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day.

Section 1.08    **[Reserved]**.

Section 1.09    **Pro Forma Calculations**.  (a)  Notwithstanding anything to the contrary herein, financial ratios and tests, including the Fixed Charge Coverage Ratio shall be calculated in the manner prescribed by this Section 1.09; provided that notwithstanding anything to the contrary in Section 1.09(b), (c) or (d), when calculating the Fixed Charge Coverage Ratio for purposes of determining actual monthly compliance with the financial covenant pursuant to Section 7.13 (and not compliance on a Pro Forma Basis for purposes of testing the permissibility of a transaction hereunder), the events described in this Section 1.09 that occurred subsequent to the end of the applicable Test Period shall not be given *pro forma* effect.  In addition, whenever a financial ratio or test is to be calculated on a pro forma basis, the reference to the "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which internal financial statements of Holdings are available (as determined in good faith by the Borrower); provided that, the provisions of this sentence shall not apply for purposes of calculating the Fixed Charge Coverage Ratio for purposes of determining actual monthly compliance with Section 7.13 (and not compliance on a Pro Forma Basis for purposes of testing the permissibility of a transaction hereunder), which shall be based on the financial statements delivered pursuant to Section 6.01(a) or (b), as applicable, for the relevant Test Period.

(b)  For purposes of calculating any financial ratio or test, Specified Transactions (with any incurrence or repayment of any Indebtedness in connection therewith to be subject to Section 1.09(d)) that have been made (i) during the applicable Test Period and (ii) if applicable as described in Section 1.09(a), subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio or test is made shall be calculated on a *pro forma* basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day (or, in case of the determination of Total Assets, the last day) of the applicable Test Period.  If since the beginning of any applicable Test Period any Person that subsequently became a Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Subsidiaries since the beginning of such Test Period shall have made any Specified Transaction that would have required

52

6237404.15

adjustment pursuant to this Section 1.09, then such financial ratio or test (or Total Assets) shall be calculated to give *pro forma* effect thereto in accordance with this Section 1.09.

(c) [reserved].

(d) In the event that the Borrower or any Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Indebtedness included in the calculations of any financial ratio or test (in each case, other than Indebtedness incurred or repaid under any revolving credit facility), (i) during the applicable Test Period or (ii) subject to Section 1.09(a) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving *pro forma* effect to such incurrence or repayment of Indebtedness, to the extent required, as if the same had occurred on the last day of the applicable Test Period.

Section 1.10   **Exchange Rates; Currency**.  (a) For purposes of determining compliance with Article VII with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Investment is incurred (so long as such Indebtedness or Investment, at the time incurred, made or acquired, was permitted hereunder).

(b) Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect the (i) adoption of the Euro by any member state of the European Union and any relevant market conventions or practices relating to the Euro or (ii) a change in currency of any other country and any relevant market conventions or practices relating to the change in currency.

Section 1.11   **Certifications**.   All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such person in his or her capacity solely as an officer or a representative of such Loan Party, on such Loan Party's behalf and not in such Person's individual capacity.

## ARTICLE II
## CREDIT EXTENSIONS

Section 2.01   **Revolving Loans**.

(a)   Subject to the terms and conditions of this Agreement, and during the term of this Agreement, each Lender agrees (severally, not jointly or jointly and severally) to make revolving Loans ("**Revolving Loans**") to Borrower in an amount at any one time outstanding not to exceed *the lesser of*:

(i)   such Lender's Commitment, or

(ii)   such Lender's Pro Rata Share of an amount equal to *the lesser of*:

(A)   the amount equal to (1) the Maximum Revolver Amount, *less* (2) the sum of (y) the Letter of Credit Usage at such time, *plus* (z) the principal amount of Swing Loans outstanding at such time, and

(B)   the amount equal to (1) the Borrowing Base as of such date (based upon the most recent Borrowing Base Certificate delivered by Borrower to Administrative Agent, as adjusted for Reserves established by Administrative Agent in accordance with Section 2.01(c)), *less* (2)

53

6237404.15

the sum of (x) the Letter of Credit Usage at such time, *plus* (y) the principal amount of Swing Loans outstanding at such time.

(b)        Amounts borrowed pursuant to this Section 2.01 may be repaid and, subject to the terms and conditions of this Agreement, reborrowed at any time during the term of this Agreement. The outstanding principal amount of the Revolving Loans, together with interest accrued and unpaid thereon, shall constitute Obligations and shall be due and payable on the Maturity Date or, if earlier, on the date on which they otherwise become due and payable pursuant to the terms of this Agreement.

(c)        Anything to the contrary in this Section 2.01 notwithstanding, Administrative Agent shall have the right (but not the obligation) at any time, in the exercise of its Permitted Discretion, to establish and increase or decrease Reserves and against the Borrowing Base or the Maximum Revolver Amount.  The amount of any Reserve established by Administrative Agent, and any changes to the eligibility criteria set forth in the definitions of Eligible Accounts and Eligible Inventory shall have a reasonable relationship to the event, condition, other circumstance, or fact that is the basis for such reserve or change in eligibility and shall not be duplicative of any other reserve established and currently maintained or eligibility criteria.  Upon notice of or establishment or increase in Reserves, Administrative Agent agrees to make itself available to discuss the Reserve or increase, and Borrower may take such action as may be required so that the event, condition, circumstance, or fact that is the basis for such reserve or increase no longer exists, in a manner and to the extent reasonably satisfactory to Administrative Agent in the exercise of its Permitted Discretion.  In no event shall such notice and opportunity limit the right of Administrative Agent to establish or change such Reserve, unless Administrative Agent shall have determined, in its Permitted Discretion, that the event, condition, other circumstance, or fact that was the basis for such Reserve or such change no longer exists or has otherwise been adequately addressed by Borrower.

**Section 2.02**      **[Reserved]**.

**Section 2.03**      **Borrowing Procedures and Settlements.**

(a)        **Procedure for Borrowing Revolving Loans**.  Each Borrowing shall be made by a written request by an Authorized Person delivered to Administrative Agent (which may be delivered through Administrative Agent's electronic platform or portal) and received by Administrative Agent no later than 12:00 p.m. (i) on the Business Day that is the requested Funding Date in the case of a request for a Swing Loan, (ii) on the Business Day that is one (1) Business Day prior to the requested Funding Date in the case of a request for a Base Rate Loan, and (iii) on the Business Day that is three (3) Business Days prior to the requested Funding Date in the case of all other requests, specifying (A) the amount of such Borrowing, and (B) the requested Funding Date (which shall be a Business Day); provided, that Administrative Agent may, in its sole discretion, elect to accept as timely requests that are received later than 12:00 p.m. on the applicable Business Day.  All Borrowing requests which are not made on-line via Administrative Agent's electronic platform or portal shall be subject to (and unless Administrative Agent elects otherwise in the exercise of its sole discretion, such Borrowings shall not be made until the completion of) Administrative Agent's authentication process (with results satisfactory to Administrative Agent) prior to the funding of any such requested Revolving Loan.

(b)        **Making of Swing Loans**.  In the case of a Revolving Loan and so long as any of (i) the aggregate amount of Swing Loans made since the last Settlement Date, *minus* all payments or other amounts applied to Swing Loans since the last Settlement Date, *plus* the amount of the requested Swing Loan does not exceed $3,000,000, or (ii) Swing Lender, in its sole discretion, agrees to make a Swing Loan notwithstanding the foregoing limitation, Swing Lender shall make a Revolving Loan (any such Revolving Loan made by Swing Lender pursuant to this Section 2.03(b) being referred to as a **"Swing Loan"** and all such Revolving Loans being referred to as "**Swing Loans**") available to Borrower on the

Funding Date applicable thereto by transferring immediately available funds in the amount of such Borrowing to the Designated Account. Each Swing Loan shall be deemed to be a Revolving Loan hereunder and shall be subject to all the terms and conditions (including Article IV) applicable to other Revolving Loans, except that all payments (including interest) on any Swing Loan shall be payable to Swing Lender solely for its own account. Subject to the provisions of Section 2.03(d)(ii), Swing Lender shall not make and shall not be obligated to make any Swing Loan if Swing Lender has actual knowledge that (i) one or more of the applicable conditions precedent set forth in Article IV will not be satisfied on the requested Funding Date for the applicable Borrowing, or (ii) the requested Borrowing would exceed the Availability on such Funding Date. Swing Lender shall not otherwise be required to determine whether the applicable conditions precedent set forth in Article IV have been satisfied on the Funding Date applicable thereto prior to making any Swing Loan. The Swing Loans shall be secured by Administrative Agent's Liens, constitute Revolving Loans and Obligations, and bear interest at the rate applicable from time to time to Revolving Loans that are Base Rate Loans.

(c)    **Making of Revolving Loans**.

(i)    In the event that Swing Lender is not obligated to make a Swing Loan, then after receipt of a request for a Borrowing pursuant to Section 2.03(a)(i), Administrative Agent shall notify the Lenders by telecopy, telephone, email, or other electronic form of transmission, of the requested Borrowing; such notification to be sent on the Business Day that is (A) in the case of a Base Rate Loan, at least one (1) Business Day prior to the requested Funding Date, or (B) in the case of a LIBOR Rate Loan, prior to 11:00 a.m. at least three (3) Business Days prior to the requested Funding Date. If Administrative Agent has notified the Lenders of a requested Borrowing on the Business Day that is one (1) Business Day prior to the Funding Date, then each Lender shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Administrative Agent in immediately available funds, to Administrative Agent's Account, not later than 10:00 a.m. on the Business Day that is the requested Funding Date. After Administrative Agent's receipt of the proceeds of such Revolving Loans from the Lenders, Administrative Agent shall make the proceeds thereof available to Borrower on the applicable Funding Date by transferring immediately available funds equal to such proceeds received by Administrative Agent to the Designated Account; provided, that subject to the provisions of Section 2.03(d)(ii), no Lender shall have an obligation to make any Revolving Loan, if (1) one or more of the applicable conditions precedent set forth in Article IV will not be satisfied on the requested Funding Date for the applicable Borrowing unless such condition has been waived, or (2) the requested Borrowing would exceed the Availability on such Funding Date.

(ii)    Unless Administrative Agent receives notice from a Lender prior to 9:30 a.m. on the Business Day that is the requested Funding Date relative to a requested Borrowing as to which Administrative Agent has notified the Lenders of a requested Borrowing that such Lender will not make available as and when required hereunder to Administrative Agent for the account of Borrower the amount of that Lender's Pro Rata Share of the Borrowing, Administrative Agent may assume that each Lender has made or will make such amount available to Administrative Agent in immediately available funds on the Funding Date and Administrative Agent may (but shall not be so required), in reliance upon such assumption, make available to Borrower a corresponding amount. If, on the requested Funding Date, any Lender shall not have remitted the full amount that it is required to make available to Administrative Agent in immediately available funds and if Administrative Agent has made available to Borrower such amount on the requested Funding Date, then such Lender shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Administrative Agent in immediately available funds, to Administrative Agent's Account, no later than 10:00 a.m. on the Business Day that is the first Business Day after the requested Funding Date (in which case, the interest accrued on such Lender's portion of such Borrowing for the Funding Date shall be for Administrative Agent's separate account). If any Lender shall not remit the full amount that it is required to make available to

55

6237404.15

Administrative Agent in immediately available funds as and when required hereby and if Administrative Agent has made available to Borrower such amount, then that Lender shall be obligated to immediately remit such amount to Administrative Agent, together with interest at the Defaulting Lender Rate for each day until the date on which such amount is so remitted.  A notice submitted by Administrative Agent to any Lender with respect to amounts owing under this Section 2.03(c)(ii) shall be conclusive, absent manifest error.  If the amount that a Lender is required to remit is made available to Administrative Agent, then such payment to Administrative Agent shall constitute such Lender's Revolving Loan for all purposes of this Agreement.  If such amount is not made available to Administrative Agent on the Business Day following the Funding Date, Administrative Agent will notify Borrower of such failure to fund and, upon demand by Administrative Agent, Borrower shall pay such amount to Administrative Agent for Administrative Agent's account, together with interest thereon for each day elapsed since the date of such Borrowing, at a rate per annum equal to the interest rate applicable at the time to the Revolving Loans composing such Borrowing.

(d)       **Protective Advances and Optional Overadvances**.

(i)       Any contrary provision of this Agreement or any other Loan Document notwithstanding (but subject to Section 2.03(d)(iv)), at any time (A) after the occurrence and during the continuance of a Default or an Event of Default, or (B) that any of the other applicable conditions precedent set forth in Article IV are not satisfied, Administrative Agent hereby is authorized by Borrower and the Lenders, from time to time, in Administrative Agent's sole discretion, to make Revolving Loans to, or for the benefit of, Borrower, on behalf of the Revolving Lenders, that Administrative Agent, in its Permitted Discretion, deems necessary or desirable (1) to preserve or protect the Collateral, or any portion thereof, or (2) to enhance the likelihood of repayment of the Obligations (other than the Bank Product Obligations) (the Revolving Loans described in this Section 2.03(d)(i) shall be referred to as "**Protective Advances**");  provided, that, notwithstanding the foregoing, the aggregate amount of all Protective Advances outstanding at any one time shall not exceed 10% of the Borrowing Base.

(ii)      Any contrary provision of this Agreement or any other Loan Document notwithstanding, the Lenders hereby authorize Administrative Agent or Swing Lender, as applicable, and either Administrative Agent or Swing Lender, as applicable, may, but is not obligated to, knowingly and intentionally, continue to make Revolving Loans (including Swing Loans) to Borrower notwithstanding that an Overadvance exists or would be created thereby, so long as (A) after giving effect to such Revolving Loans, the outstanding Revolver Usage does not exceed the Borrowing Base by more than 10% of the Borrowing Base, and (B) subject to Section 2.03(d)(iv) below, after giving effect to such Revolving Loans, the outstanding Revolver Usage (except for and excluding amounts charged to the Loan Account for interest, fees, or Lender Group Expenses) does not exceed the Maximum Revolver Amount. In the event Administrative Agent obtains actual knowledge that the Revolver Usage exceeds the amounts permitted by this Section 2.03(d), regardless of the amount of, or reason for, such excess, Administrative Agent shall notify the Lenders as soon as practicable (and prior to making any (or any additional) intentional Overadvances (except for and excluding amounts charged to the Loan Account for interest, fees, or Lender Group Expenses) unless Administrative Agent determines that prior notice would result in imminent harm to the Collateral or its value, in which case Administrative Agent may make such Overadvances and provide notice as promptly as practicable thereafter), and the Lenders with Revolver Commitments thereupon shall, together with Administrative Agent, jointly determine the terms of arrangements that shall be implemented with Borrower intended to reduce, within a reasonable time, the outstanding principal amount of the Revolving Loans to Borrower to an amount permitted by the preceding sentence.  In such circumstances, if any Lender with a Revolver Commitment objects to the proposed terms of reduction or repayment of any Overadvance, the terms of reduction or repayment thereof shall be implemented according to the determination of the Required Lenders.  The foregoing

56

provisions are meant for the benefit of the Lenders and Administrative Agent and are not meant for the benefit of Borrower, which shall continue to be bound by the provisions of Section 2.04(e)(1).

(iii)     Each Protective Advance and each Overadvance (each, an "**Extraordinary Advance**") shall be deemed to be a Revolving Loan hereunder, except that no Extraordinary Advance shall be eligible to be a LIBOR Rate Loan.  Prior to Settlement of any Extraordinary Advance, all payments with respect thereto, including interest thereon, shall be payable to Administrative Agent solely for its own account.  Each Revolving Lender shall be obligated to settle with Administrative Agent as provided in Section 2.03(e) (or Section 2.03(g), as applicable) for the amount of such Lender's Pro Rata Share of any Extraordinary Advance.  The Extraordinary Advances shall be repayable on demand, secured by Administrative Agent's Liens, constitute Obligations hereunder, and bear interest at the rate applicable from time to time to Revolving Loans that are Base Rate Loans.  The provisions of this Section 2.03(d) are for the exclusive benefit of Administrative Agent, Swing Lender, and the Lenders and are not intended to benefit Borrower (or any other Loan Party) in any way.

(iv)     Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, no Extraordinary Advance may be made by Administrative Agent if such Extraordinary Advance would cause the aggregate Revolver Usage to exceed the Maximum Revolver Amount or any Lender's Pro Rata Share of the Revolver Usage to exceed such Lender's Revolver Commitments; provided that Administrative Agent may make Extraordinary Advances in excess of the foregoing limitations so long as such Extraordinary Advances that cause the aggregate Revolver Usage to exceed the Maximum Revolver Amount or a Lender's Pro Rata Share of the Revolver Usage to exceed such Lender's Revolver Commitments are for Administrative Agent's sole and separate account and not for the account of any Lender.  No Lender shall have an obligation to settle with Administrative Agent for such Extraordinary Advances that cause the aggregate Revolver Usage to exceed the Maximum Revolver Amount or a Lender's Pro Rata Share of the Revolver Usage to exceed such Lender's Revolver Commitments as provided in Section 2.03(e) (or Section 2.03(g), as applicable).

(e)     **Settlement**.  It is agreed that each Lender's funded portion of the Revolving Loans is intended by the Lenders to equal, at all times, such Lender's Pro Rata Share of the outstanding Revolving Loans.  Such agreement notwithstanding, Administrative Agent, Swing Lender, and the other Lenders agree (which agreement shall not be for the benefit of Borrower) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among the Lenders as to the Revolving Loans (including Swing Loans and Extraordinary Advances) shall take place on a periodic basis in accordance with the following provisions:

(i)     Administrative Agent shall request settlement ("**Settlement**") with the Lenders on a weekly basis, or on a more frequent basis if so determined by Administrative Agent in its sole discretion (1) on behalf of Swing Lender, with respect to the outstanding Swing Loans, (2) for itself, with respect to the outstanding Extraordinary Advances, and (3) with respect to any Loan Party's or any of their Subsidiaries' payments or other amounts received, as to each by notifying the Lenders by telecopy, telephone, or other similar form of transmission, of such requested Settlement, no later than 2:00 p.m. on the Business Day immediately prior to the date of such requested Settlement (the date of such requested Settlement being the "**Settlement Date**").  Such notice of a Settlement Date shall include a summary statement of the amount of outstanding Revolving Loans (including Swing Loans and Extraordinary Advances) for the period since the prior Settlement Date.  Subject to the terms and conditions contained herein (including Section 2.03(g)):  (y) if the amount of the Revolving Loans (including Swing Loans and Extraordinary Advances) made by a Lender that is not a Defaulting Lender exceeds such Lender's Pro Rata Share of the Revolving Loans (including Swing Loans and Extraordinary Advances) as of a Settlement Date, then Administrative Agent shall, by no later than 12:00 p.m. on the Settlement Date, transfer in immediately available funds to a Deposit Account of such Lender (as such

57

6237404.15

Lender may designate), an amount such that each such Lender shall, upon receipt of such amount, have as of the Settlement Date, its Pro Rata Share of the Revolving Loans (including Swing Loans and Extraordinary Advances), and (z) if the amount of the Revolving Loans (including Swing Loans and Extraordinary Advances) made by a Lender is less than such Lender's Pro Rata Share of the Revolving Loans (including Swing Loans and Extraordinary Advances) as of a Settlement Date, such Lender shall no later than 12:00 p.m. on the Settlement Date transfer in immediately available funds to Administrative Agent's Account, an amount such that each such Lender shall, upon transfer of such amount, have as of the Settlement Date, its Pro Rata Share of the Revolving Loans (including Swing Loans and Extraordinary Advances).  Such amounts made available to Administrative Agent under clause (z) of the immediately preceding sentence shall be applied against the amounts of the applicable Swing Loans or Extraordinary Advances and, together with the portion of such Swing Loans or Extraordinary Advances representing Swing Lender's Pro Rata Share thereof, shall constitute Revolving Loans of such Lenders. If any such amount is not made available to Administrative Agent by any Lender on the Settlement Date applicable thereto to the extent required by the terms hereof, Administrative Agent shall be entitled to recover for its account such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate.

(ii)      In determining whether a Lender's balance of the Revolving Loans (including Swing Loans and Extraordinary Advances) is less than, equal to, or greater than such Lender's Pro Rata Share of the Revolving Loans (including Swing Loans and Extraordinary Advances) as of a Settlement Date, Administrative Agent shall, as part of the relevant Settlement, apply to such balance the portion of payments actually received in good funds by Administrative Agent with respect to principal, interest, fees payable by Borrower and allocable to the Lenders hereunder, and proceeds of Collateral.

(iii)     Between Settlement Dates, Administrative Agent, to the extent Extraordinary Advances or Swing Loans are outstanding, may pay over to Administrative Agent or Swing Lender, as applicable, any payments or other amounts received by Administrative Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the Revolving Loans, for application to the Extraordinary Advances or Swing Loans.  Between Settlement Dates, Administrative Agent, to the extent no Extraordinary Advances or Swing Loans are outstanding, may pay over to Swing Lender any payments or other amounts received by Administrative Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the Revolving Loans, for application to Swing Lender's Pro Rata Share of the Revolving Loans.  If, as of any Settlement Date, payments or other amounts of the Loan Parties or their Subsidiaries received since the then immediately preceding Settlement Date have been applied to Swing Lender's Pro Rata Share of the Revolving Loans other than to Swing Loans, as provided for in the previous sentence, Swing Lender shall pay to Administrative Agent for the accounts of the Lenders, and Administrative Agent shall pay to the Lenders (other than a Defaulting Lender if Administrative Agent has implemented the provisions of Section 2.03(g)), to be applied to the outstanding Revolving Loans of such Lenders, an amount such that each such Lender shall, upon receipt of such amount, have, as of such Settlement Date, its Pro Rata Share of the Revolving Loans.  During the period between Settlement Dates, Swing Lender with respect to Swing Loans, Administrative Agent with respect to Extraordinary Advances, and each Lender with respect to the Revolving Loans other than Swing Loans and Extraordinary Advances, shall be entitled to interest at the applicable rate or rates payable under this Agreement on the daily amount of funds employed by Swing Lender, Administrative Agent, or the Lenders, as applicable.

(iv)      Anything in this Section 2.03(e) to the contrary notwithstanding, in the event that a Lender is a Defaulting Lender, Administrative Agent shall be entitled to refrain from remitting settlement amounts to the Defaulting Lender and, instead, shall be entitled to elect to implement the provisions set forth in Section 2.03(g).

<div align="center">58</div>

(f)  **Notation**.  Consistent with Section 10.07(d), Administrative Agent, as a non-fiduciary agent for Borrower, shall maintain a register showing the principal amount and stated interest of the Revolving Loans (and portion of the Revolving Loan, as applicable), owing to each Lender, including the Swing Loans owing to Swing Lender, and Extraordinary Advances owing to Administrative Agent, and the interests therein of each Lender, from time to time and such register shall, absent manifest error, conclusively be presumed to be correct and accurate.

(g)  **Defaulting Lenders**.

(i)  Notwithstanding the provisions of Section 2.04(b)(iii), Administrative Agent shall not be obligated to transfer to a Defaulting Lender any payments made by Borrower to Administrative Agent for the Defaulting Lender's benefit or any proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, Administrative Agent shall transfer any such payments (A) first, to Administrative Agent to the extent of any Extraordinary Advances that were made by Administrative Agent and that were required to be, but were not, paid by Defaulting Lender, (B) second, to Swing Lender to the extent of any Swing Loans that were made by Swing Lender and that were required to be, but were not, paid by the Defaulting Lender, (C) third, to Issuing Bank, to the extent of the portion of a Letter of Credit Disbursement that was required to be, but was not, paid by the Defaulting Lender, (D) fourth, to each Non-Defaulting Lender ratably in accordance with their Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of a Revolving Loan (or other funding obligation) was funded by such other Non-Defaulting Lender), (E) fifth, in Administrative Agent's sole discretion, to a suspense account maintained by Administrative Agent, the proceeds of which shall be retained by Administrative Agent and may be made available to be re-advanced to or for the benefit of Borrower (upon the request of Borrower and subject to the conditions set forth in Section 4.02) as if such Defaulting Lender had made its portion of Revolving Loans (or other funding obligations) hereunder, and (F) sixth, from and after the date on which all other Obligations have been paid in full, to such Defaulting Lender in accordance with tier (L) of Section 2.04(b)(iii).  Subject to the foregoing, Administrative Agent may hold and, in its discretion, re-lend to Borrower for the account of such Defaulting Lender the amount of all such payments received and retained by Administrative Agent for the account of such Defaulting Lender. Solely for the purposes of voting or consenting to matters with respect to the Loan Documents (including the calculation of Pro Rata Share in connection therewith) and for the purpose of calculating the fee payable under Section 2.10(b), such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero; provided, that the foregoing shall not apply to any of the matters governed by Section 10.01(a) through (c).  The provisions of this Section 2.03(g) shall remain effective with respect to such Defaulting Lender until the earlier of (y) the date on which all of the Non-Defaulting Lenders, Administrative Agent, Issuing Bank, and Borrower shall have waived, in writing, the application of this Section 2.03(g) to such Defaulting Lender, or (z) the date on which such Defaulting Lender makes payment of all amounts that it was obligated to fund hereunder, pays to Administrative Agent all amounts owing by Defaulting Lender in respect of the amounts that it was obligated to fund hereunder, and, if requested by Administrative Agent, provides adequate assurance of its ability to perform its future obligations hereunder (on which earlier date, so long as no Event of Default has occurred and is continuing, any remaining cash collateral held by Administrative Agent pursuant to Section 2.03(g)(ii) shall be released to Borrower).  The operation of this Section 2.03(g) shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by Borrower of its duties and obligations hereunder to Administrative Agent, Issuing Bank, or to the Lenders other than such Defaulting Lender.  Any failure by a Defaulting Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle Borrower, at their option, upon written notice to Administrative Agent, to arrange for a substitute Lender to assume the Commitment of such Defaulting

59

Lender, such substitute Lender to be reasonably acceptable to Administrative Agent.  In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Acceptance in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being paid its share of the outstanding Obligations (other than Bank Product Obligations, but including (1) all interest, fees, and other amounts that may be due and payable in respect thereof, and (2) an assumption of its Pro Rata Share of its participation in the Letters of Credit); provided, that any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Lender Groups' or Borrower's rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund.  In the event of a direct conflict between the priority provisions of this Section 2.03(g) and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.03(g) shall control and govern.

(ii)    If any Swing Loan or Letter of Credit is outstanding at the time that a Lender becomes a Defaulting Lender then:

(A)    such Defaulting Lender's Swing Loan Exposure and Letter of Credit Exposure shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Pro Rata Shares but only to the extent (x) the sum of all Non-Defaulting Lenders' Pro Rata Share of Revolver Usage plus such Defaulting Lender's Swing Loan Exposure and Letter of Credit Exposure does not exceed the total of all Non-Defaulting Lenders' Revolver Commitments and (y) the conditions set forth in Section 4.02 are satisfied at such time;

(B)    if the reallocation described in clause (A) above cannot, or can only partially, be effected, Borrower shall within one (1) Business Day following notice by the Administrative Agent (x) first, prepay such Defaulting Lender's Swing Loan Exposure (after giving effect to any partial reallocation pursuant to clause (A) above), and (y) second, cash collateralize such Defaulting Lender's Letter of Credit Exposure (after giving effect to any partial reallocation pursuant to clause (A) above), pursuant to a cash collateral agreement to be entered into in form and substance reasonably satisfactory to the Administrative Agent, for so long as such Letter of Credit Exposure is outstanding; provided, that Borrower shall not be obligated to cash collateralize any Defaulting Lender's Letter of Credit Exposure if such Defaulting Lender is also Issuing Bank;

(C)    if Borrower cash collateralizes any portion of such Defaulting Lender's Letter of Credit Exposure pursuant to this Section 2.03(g)(ii), Borrower shall not be required to pay any Letter of Credit Fees to Administrative Agent for the account of such Defaulting Lender pursuant to Section 2.06(b) with respect to such cash collateralized portion of such Defaulting Lender's Letter of Credit Exposure during the period such Letter of Credit Exposure is cash collateralized;

(D)    to the extent the Letter of Credit Exposure of the Non-Defaulting Lenders is reallocated pursuant to this Section 2.03(g)(ii), then the Letter of Credit Fees payable to the Non-Defaulting Lenders pursuant to Section 2.06(b) shall be adjusted in accordance with such Non-Defaulting Lenders' Letter of Credit Exposure;

(E)    to the extent any Defaulting Lender's Letter of Credit Exposure is neither cash collateralized nor reallocated pursuant to this Section 2.03(g)(ii), then, without prejudice to any rights or remedies of Issuing Bank or any Lender hereunder, all Letter of Credit Fees that would have otherwise been payable to such Defaulting Lender under Section 2.06(b) with respect to such portion of

60

6237404.15

such Letter of Credit Exposure shall instead be payable to Issuing Bank until such portion of such Defaulting Lender's Letter of Credit Exposure is cash collateralized or reallocated;

(F)    so long as any Lender is a Defaulting Lender, the Swing Lender shall not be required to make any Swing Loan and Issuing Bank shall not be required to issue, amend, or increase any Letter of Credit, in each case, to the extent (x) the Defaulting Lender's Pro Rata Share of such Swing Loans or Letter of Credit cannot be reallocated pursuant to this Section 2.03(g)(ii), or (y) the Swing Lender or Issuing Bank, as applicable, has not otherwise entered into arrangements reasonably satisfactory to the Swing Lender or Issuing Bank, as applicable, and Borrower to eliminate the Swing Lender's or Issuing Bank's risk with respect to the Defaulting Lender's participation in Swing Loans or Letters of Credit; and

(G)    Administrative Agent may release any cash collateral provided by Borrower pursuant to this Section 2.03(g)(ii) to Issuing Bank and Issuing Bank may apply any such cash collateral to the payment of such Defaulting Lender's Pro Rata Share of any Letter of Credit Disbursement that is not reimbursed by Borrower pursuant to Section 2.11(d).  Subject to Section 10.14, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(h)    **Independent Obligations**.  All Revolving Loans (other than Swing Loans and Extraordinary Advances) shall be made by the Lenders contemporaneously and in accordance with their Pro Rata Shares.  It is understood that (i) no Lender shall be responsible for any failure by any other Lender to perform its obligation to make any Revolving Loan (or other extension of credit) hereunder, nor shall any Commitment of any Lender be increased or decreased as a result of any failure by any other Lender to perform its obligations hereunder, and (ii) no failure by any Lender to perform its obligations hereunder shall excuse any other Lender from its obligations hereunder.

**Section 2.04    Payments; Reductions of Commitments; Prepayments.**

(a)    **Payments by Borrower**.

(i)    Except as otherwise expressly provided herein, all payments by Borrower shall be made to Administrative Agent's Account for the account of the Lender Group and shall be made in immediately available funds, no later than 1:30 p.m. on the date specified herein; provided that, for the avoidance of doubt, any payments deposited into a Controlled Account shall be deemed not to be received by Administrative Agent on any Business Day unless immediately available funds have been credited to Administrative Agent's Account prior to 1:30 p.m. on such Business Day.  Any payment received by Administrative Agent in immediately available funds in Administrative Agent's Account later than 1:30 p.m. shall be deemed to have been received (unless Administrative Agent, in its sole discretion, elects to credit it on the date received) on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(ii)    Unless Administrative Agent receives notice from Borrower prior to the date on which any payment is due to the Lenders that Borrower will not make such payment in full as and when required, Administrative Agent may assume that Borrower has made (or will make) such payment in full to Administrative Agent on such date in immediately available funds and Administrative Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent Borrower does not make such payment in full to Administrative Agent on the date when due, each Lender severally shall repay to Administrative Agent on demand such amount distributed to such Lender, together with interest

61

thereon at the Defaulting Lender Rate for each day from the date such amount is distributed to such Lender until the date repaid.

(b)      **Apportionment and Application**.

(i)      So long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, all principal and interest payments received by Administrative Agent shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the Obligations to which such payments relate held by each Lender) and all payments of fees and expenses received by Administrative Agent (other than fees or expenses that are for Administrative Agent's separate account or for the separate account of Issuing Bank) shall be apportioned ratably among the Lenders having a Pro Rata Share of the type of Commitment or Obligation to which a particular fee or expense relates.

(ii)      Subject to Section 2.04(b)(v), Section 2.04(d)(ii), and Section 2.04(e), all payments to be made hereunder by Borrower shall be remitted to Administrative Agent and all such payments, and all proceeds of Collateral received by Administrative Agent, shall be applied, so long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, to reduce the balance of the Loans outstanding and, thereafter, to Borrower (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

(iii)      At any time that an Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, all payments remitted to Administrative Agent and all proceeds of Collateral received by Administrative Agent shall be applied as follows:

(A)      first, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to Administrative Agent under the Loan Documents and to pay interest and principal on Extraordinary Advances that are held solely by Administrative Agent pursuant to the terms of Section 2.04(d)(iv), until paid in full,

(B)      second, to pay any fees or premiums then due to Administrative Agent under the Loan Documents, until paid in full,

(C)      third, to pay interest due in respect of all Protective Advances, until paid in full,

(D)      fourth, to pay the principal of all Protective Advances, until paid in full,

(E)      fifth, ratably, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to any of the Lenders under the Loan Documents, until paid in full,

(F)      sixth, ratably, to pay any fees or premiums then due to any of the Lenders under the Loan Documents, until paid in full,

(G)      seventh, to pay interest accrued in respect of the Swing Loans, until paid in full,

(H)      eighth, to pay the principal of all Swing Loans, until paid in full,

62

6237404.15

(I)      ninth, ratably, to pay interest accrued in respect of the Loans (other than Protective Advances and Swing Loans), until paid in full,

(J)      tenth, ratably

i.      ratably, to pay the principal of all Loans (other than Protective Advances and Swing Loans), until paid in full,

ii.      to Administrative Agent, to be held by Administrative Agent, for the benefit of Issuing Bank (and for the ratable benefit of each of the Lenders that have an obligation to pay to Administrative Agent, for the account of Issuing Bank, a share of each Letter of Credit Disbursement), as cash collateral in an amount up to 105% of the Letter of Credit Usage (to the extent permitted by applicable law, such cash collateral shall be applied to the reimbursement of any Letter of Credit Disbursement as and when such disbursement occurs and, if a Letter of Credit expires undrawn, the cash collateral held by Administrative Agent in respect of such Letter of Credit shall, to the extent permitted by applicable law, be reapplied pursuant to this Section 2.04(b)(iii), beginning with tier (A) hereof),

iii.      ratably, up to the amount (after taking into account any amounts previously paid pursuant to this clause iii. during the continuation of the applicable Application Event) of the most recently established Bank Product Reserve, which amount was established prior to the occurrence of, and not in contemplation of, the subject Application Event, to (y) the Bank Product Providers based upon amounts then certified by each applicable Bank Product Provider to Administrative Agent (in form and substance satisfactory to Administrative Agent) to be due and payable to such Bank Product Provider on account of Bank Product Obligations (but not in excess of the Bank Product Reserve established for the Bank Product Obligations of such Bank Product Provider), and (z) with any balance to be paid to Administrative Agent, to be held by Administrative Agent, for the ratable benefit of the Bank Product Providers, as cash collateral (which cash collateral may be released by Administrative Agent to the applicable Bank Product Provider and applied by such Bank Product Provider to the payment or reimbursement of any amounts due and payable with respect to Bank Product Obligations owed to the applicable Bank Product Provider as and when such amounts first become due and payable and, if and at such time as all such Bank Product Obligations are paid or otherwise satisfied in full, the cash collateral held by Administrative Agent in respect of such Bank Product Obligations shall be reapplied pursuant to this Section 2.04(b)(iii), beginning with tier (A) hereof),

(K)      eleventh, to pay any other Obligations other than Obligations owed to Defaulting Lenders (including being paid, ratably, to the Bank Product Providers on account of all amounts then due and payable in respect of Bank Product Obligations), with any balance to be paid to Administrative Agent, to be held by Administrative Agent, for the ratable benefit of the Bank Product Providers, as cash collateral (which cash collateral may be released by Administrative Agent to the applicable Bank Product Provider and applied by such Bank Product Provider to the payment or reimbursement of any amounts due and payable with respect to Bank Product Obligations owed to the applicable Bank Product Provider as and when such amounts first become due and payable and, if and at such time as all such Bank Product Obligations are paid or otherwise satisfied in full, the cash collateral held by Administrative Agent in respect of such Bank Product Obligations shall be reapplied pursuant to this Section 2.04(b)(iii), beginning with tier (A) hereof),

(L)      twelfth, ratably to pay any Obligations owed to Defaulting Lenders; and

63

6237404.15

(M)      thirteenth, to Borrower (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

(iv)      Administrative Agent promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from each Lender in writing, such funds as it may be entitled to receive, subject to a Settlement delay as provided in Section 2.03(e).

(v)      In each instance, so long as no Application Event has occurred and is continuing, Section 2.04(b)(ii) shall not apply to any payment made by Borrower to Administrative Agent and specified by Borrower to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement or any other Loan Document.

(vi)      For purposes of Section 2.04(b)(iii), "paid in full" of a type of Obligation means payment in cash or immediately available funds of all amounts owing on account of such type of Obligation, including interest accrued after the commencement of any Insolvency Proceeding, default interest, interest on interest, and expense reimbursements, irrespective of whether any of the foregoing would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(vii)      In the event of a direct conflict between the priority provisions of this Section 2.04 and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, if the conflict relates to the provisions of Section 2.03(g) and this Section 2.04, then the provisions of Section 2.03(g) shall control and govern, and if otherwise, then the terms and provisions of this Section 2.04 shall control and govern.

(c)      **Reduction of Commitments**.  The Commitments shall terminate on the Maturity Date or earlier termination thereof pursuant to the terms of this Agreement.  Borrower may reduce the Commitments, without premium or penalty, to an amount (which may be zero) not less than the sum of (A) the Revolver Usage as of such date, *plus* (B) the principal amount of all Loans not yet made as to which a request has been given by Borrower under Section 2.03(a), *plus* (C) the amount of all Letters of Credit not yet issued as to which a request has been given by Borrower pursuant to Section 2.11(a).  Each such reduction shall be in an amount which is not less than $1,000,000 (unless the Commitments are being reduced to zero and the amount of the Commitments in effect immediately prior to such reduction are less than $1,000,000), shall be made by providing not less than ten (10) Business Days prior written notice to Administrative Agent, and shall be irrevocable.  The Commitments, once reduced, may not be increased.  Each such reduction of the Commitments shall reduce the Commitments of each Lender proportionately in accordance with its ratable share thereof.  In connection with any reduction in the Commitments prior to the Maturity Date, if any Loan Party or any of its Subsidiaries owns any Margin Stock, Borrower shall deliver to Administrative Agent an updated Form U-1 (with sufficient additional originals thereof for each Lender), duly executed and delivered by the Borrower, together with such other documentation as Administrative Agent shall reasonably request, in order to enable Administrative Agent and the Lenders to comply with any of the requirements under Regulations T, U or X of the Federal Reserve Board.

(d)      **Optional Prepayments**.  Borrower may prepay the principal of any Loan at any time in whole or in part, without premium or penalty.

(e)      **Mandatory Prepayments**.  If, at any time, (A) the Revolver Usage on such date exceeds (B) the lesser of (x) the Borrowing Base reflected in the Borrowing Base Certificate most recently delivered by Borrower to Administrative Agent, or (y) the Maximum Revolver Amount, in all cases as adjusted for Reserves established by Administrative Agent in accordance with Section 2.01(c),

64

6237404.15

then Borrower shall immediately prepay the Obligations in accordance with Section 2.04(f) in an aggregate amount equal to the amount of such excess.

(f)   **Application of Payments**.  Each prepayment pursuant to Section 2.04(e) shall, (1) so long as no Application Event shall have occurred and be continuing, be applied, *first*, to the outstanding principal amount of the Loans until paid in full, and *second*, to cash collateralize the Letters of Credit in an amount equal to 105% of the then outstanding Letter of Credit Usage, and (2) if an Application Event shall have occurred and be continuing, be applied in the manner set forth in Section 2.04(b)(iii).

Section 2.05   **Promise to Pay; Promissory Notes.**

(a)   Borrower agrees to pay the Lender Group Expenses on the earlier of (i) the first day of the month following the date on which the applicable Lender Group Expenses were first incurred, or (ii) the date on which demand therefor is made by Administrative Agent (it being acknowledged and agreed that any charging of such costs, expenses or Lender Group Expenses to the Loan Account pursuant to the provisions of Section 2.06(d) shall be deemed to constitute a demand for payment thereof for the purposes of this subclause (ii)).  Borrower promises to pay all of the Obligations (including principal, interest, premiums, if any, fees, costs, and expenses (including Lender Group Expenses)) in full on the Maturity Date or, if earlier, on the date on which the Obligations (other than the Bank Product Obligations) become due and payable pursuant to the terms of this Agreement.  Borrower agrees that its obligations contained in the first sentence of this Section 2.05(a) shall survive payment or satisfaction in full of all other Obligations.

(b)   Any Lender may request that any portion of its Commitments or the Loans made by it be evidenced by one or more promissory notes in form and substance satisfactory to the Administrative Agent (each, a "**Note**").  In such event, Borrower shall execute and deliver to such Lender the requested promissory notes payable to the order of such Lender in a form furnished by Administrative Agent and reasonably satisfactory to Borrower.  Thereafter, the portion of the Commitments and Loans evidenced by such promissory notes and interest thereon shall at all times be represented by one or more promissory notes in such form payable to the order of the payee named therein.

Section 2.06   **Interest Rates and Letter of Credit Fee:  Rates, Payments, and Calculations.**

(a)   **Interest Rates**.  Except as provided in Section 2.06(c) and Section 2.12(d), all Obligations (except for undrawn Letters of Credit) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest as follows:

(i)   if the relevant Obligation is a LIBOR Rate Loan, at a *per annum* rate equal to the LIBOR Rate *plus* the Applicable Margin for LIBOR Rate Loans, and

(ii)   otherwise, at a *per annum* rate equal to the Base Rate *plus* the Applicable Margin for Base Rate Loans.

(b)   **Letter of Credit Fee**.  Borrower shall pay Administrative Agent (for the ratable benefit of the Lenders), a Letter of Credit fee (the "**Letter of Credit Fee**") (which fee shall be in addition to the fronting fees and commissions, other fees, charges and expenses set forth in Section 2.11(k)) that shall accrue at a *per annum* rate equal to the product of (i) Applicable Margin for LIBOR Rate Loans *times* (ii) the average amount of the Letter of Credit Usage during the immediately preceding quarter (or if an Event of Default has occurred, month).

6237404.15

(c)       **Default Rate**.  (i) Automatically upon the occurrence and during the continuation of an Event of Default under Section 8.01(f) and (ii) upon the occurrence and during the continuation of any other Event of Default (other than an Event of Default under Section 8.01(f)), at the direction of Administrative Agent or the Required Lenders, and upon written notice by Administrative Agent to Borrower of such direction (provided, that such notice shall not be required for any Event of Default under Section 8.01), (A) all Loans and all Obligations (except for undrawn Letters of Credit) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest at a *per annum* rate equal to two (2) percentage points above the per annum rate otherwise applicable thereunder, and (B) the Letter of Credit Fee shall be increased to two (2) percentage points above the *per annum* rate otherwise applicable hereunder.

(d)       **Payment**.  Except to the extent provided to the contrary in Section 2.10, Section 2.11(k) or Section 2.12(a), (i) all interest and all other fees payable hereunder or under any of the other Loan Documents (other than Letter of Credit Fees) shall be due and payable, in arrears, on the first day of each month, (ii) all Letter of Credit Fees payable hereunder, and all fronting fees and all commissions, other fees, charges and expenses provided for in Section 2.11(k) shall be due and payable, in arrears, on the first Business Day of each month, and (iii) all costs and expenses payable hereunder or under any of the other Loan Documents, and all other Lender Group Expenses shall be due and payable on (x) with respect to Lender Group Expenses outstanding as of the Closing Date, the Closing Date, and (y) otherwise, the earlier of (A) the first day of the month following the date on which the applicable costs, expenses, or Lender Group Expenses were first incurred, or (B) the date on which demand therefor is made by Administrative Agent (it being acknowledged and agreed that any charging of such costs, expenses or Lender Group Expenses to the Loan Account pursuant to the provisions of the following sentence shall be deemed to constitute a demand for payment thereof for the purposes of this subclause (y)).  Borrower hereby authorizes Administrative Agent, from time to time without prior notice to Borrower, to charge to the Loan Account (A) on the first Business Day of each month, all Letter of Credit Fees accrued or chargeable hereunder during the prior month, (B) as and when incurred or accrued, all fees and costs provided for in Section 2.10(a) or (c), (C) on the first day of each month, the Unused Line Fee accrued during the prior month pursuant to Section 2.10(b), (D) as and when due and payable, all other fees payable hereunder or under any of the other Loan Documents, (E) on the Closing Date and thereafter as and when incurred or accrued, all other Lender Group Expenses, and (F) as and when due and payable all other payment obligations payable under any Loan Document or any Bank Product Agreement (including any amounts due and payable to the Bank Product Providers in respect of Bank Products).  All amounts (including interest, fees, costs, expenses, Lender Group Expenses, or other amounts payable hereunder or under any other Loan Document or under any Bank Product Agreement) charged to the Loan Account shall thereupon constitute Revolving Loans hereunder, shall constitute Obligations hereunder, and shall initially accrue interest at the rate then applicable to Revolving Loans that are Base Rate Loans (unless and until converted into LIBOR Rate Loans in accordance with the terms of this Agreement).

(e)       **Computation**.  All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360 day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.  In the event the Base Rate is changed from time to time hereafter, the rates of interest hereunder based upon the Base Rate automatically and immediately shall be increased or decreased by an amount equal to such change in the Base Rate.

(f)       **Intent to Limit Charges to Maximum Lawful Rate**.  In no event shall the interest rate or rates payable under this Agreement, *plus* any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  Borrower and the Lender Group, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within

66

it; provided, that anything contained herein to the contrary notwithstanding, if such rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, Borrower is and shall be liable only for the payment of such maximum amount as is allowed by law, and payment received from Borrower in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

Section 2.07   **Crediting Payments**. The receipt of any payment item by Administrative Agent shall not be required to be considered a payment on account unless such payment item is a wire transfer of immediately available funds made to Administrative Agent's Account or unless and until such payment item is honored when presented for payment.  Should any payment item not be honored when presented for payment, then Borrower shall be deemed not to have made such payment.  Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Administrative Agent only if it is received into Administrative Agent's Account on a Business Day on or before 1:30 p.m.  If any payment item is received into Administrative Agent's Account on a non-Business Day or after 1:30 p.m. on a Business Day (unless Administrative Agent, in its sole discretion, elects to credit it on the date received), it shall be deemed to have been received by Administrative Agent as of the opening of business on the immediately following Business Day.

Section 2.08   **Designated Account**.  Administrative Agent is authorized to make the Revolving Loans, and Issuing Bank is authorized to issue the Letters of Credit, under this Agreement based upon telephonic or other instructions received from anyone purporting to be an Authorized Person or, without instructions, if pursuant to Section 2.06(d).  Borrower agrees to establish and maintain the Designated Account with the Designated Account Bank for the purpose of receiving the proceeds of the Revolving Loans requested by Borrower and made by Administrative Agent or the Lenders hereunder.  Unless otherwise agreed by Administrative Agent and Borrower, any Revolving Loan or Swing Loan requested by Borrower and made by Administrative Agent or the Lenders hereunder shall be made to the Designated Account.

Section 2.09   **Maintenance of Loan Account; Statements of Obligations.**  Administrative Agent shall maintain an account on its books in the name of Borrower (the "**Loan Account**") on which Borrower will be charged with all Revolving Loans (including Extraordinary Advances and Swing Loans) made by Administrative Agent, Swing Lender, or the Lenders to Borrower or for Borrower's account, the Letters of Credit issued or arranged by Issuing Bank for Borrower's account, and with all other payment Obligations hereunder or under the other Loan Documents, including, accrued interest, fees and expenses, and Lender Group Expenses.  In accordance with Section 2.07, the Loan Account will be credited with all payments received by Administrative Agent from Borrower or for Borrower's account.  Administrative Agent shall make available to Borrower monthly statements regarding the Loan Account, including the principal amount of the Revolving Loans, interest accrued hereunder, fees accrued or charged hereunder or under the other Loan Documents, and a summary itemization of all charges and expenses constituting Lender Group Expenses accrued hereunder or under the other Loan Documents, and each such statement, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrower and the Lender Group unless, within thirty (30) days after Administrative Agent first makes such a statement available to Borrower, Borrower shall deliver to Administrative Agent written objection thereto describing the error or errors contained in such statement.

Section 2.10   **Fees**.

(a)   **Administrative Agent Fees**.  Borrower shall pay to Administrative Agent, for the account of Administrative Agent, as and when due and payable under the terms of the Fee Letter, the fees set forth in the Fee Letter.

67

6237404.15

(b)    **Unused Line Fee**.  Borrower shall pay to Administrative Agent, for the ratable account of the Lenders, an unused line fee (the "**Unused Line Fee**") in an amount equal to the Applicable Unused Line Fee Percentage *per annum* times the result of (i) the aggregate amount of the Commitments, less (ii) the Average Revolver Usage during the immediately preceding month (or portion thereof), which Unused Line Fee shall be due and payable, in arrears, on the first day of each month prior to the date on which the Obligations are paid in full and on the date on which the Obligations are paid in full.

(c)    **Field Examination and Other Fees**.  Subject to any limitations set forth in Section 6.10(c), Borrower shall pay to Administrative Agent, field examination, appraisal, and valuation fees and charges, as and when incurred or chargeable, as follows (i) a fee of $1,000 per day, per examiner, *plus* out-of-pocket expenses (including travel, meals, and lodging) for each field examination of any Loan Party or its Subsidiaries performed by or on behalf of Administrative Agent, and (ii) the fees, charges or expenses paid or incurred by Administrative Agent if it elects to employ the services of one or more third Persons to appraise the Collateral, or any portion thereof, or to assess any Loan Party's or its Subsidiaries' business valuation.

**Section 2.11    Letters of Credit**.

(a)  Subject to the terms and conditions of this Agreement, upon the request of Borrower made in accordance herewith, and prior to the Maturity Date, Issuing Bank agrees to issue a requested standby Letter of Credit or a sight commercial Letter of Credit for the account of Borrower.  By submitting a request to Issuing Bank for the issuance of a Letter of Credit, Borrower shall be deemed to have requested that Issuing Bank issue the requested Letter of Credit.  Each request for the issuance of a Letter of Credit, or the amendment or extension of any outstanding Letter of Credit, shall be (i) irrevocable and made in writing by an Authorized Person, (ii) delivered to Administrative Agent and Issuing Bank via telefacsimile or other electronic method of transmission reasonably acceptable to Administrative Agent and Issuing Bank and reasonably in advance of the requested date of issuance, amendment, or extension, and (iii) subject to Issuing Bank's authentication procedures with results satisfactory to Issuing Bank.  Each such request shall be in form and substance reasonably satisfactory to Administrative Agent and Issuing Bank and (i) shall specify (A) the amount of such Letter of Credit, (B) the date of issuance, amendment, or extension of such Letter of Credit, (C) the proposed expiration date of such Letter of Credit, (D) the name and address of the beneficiary of the Letter of Credit, and (E) such other information (including, the conditions to drawing, and, in the case of an amendment or extension, identification of the Letter of Credit to be so amended or extended) as shall be necessary to prepare, amend, or extend such Letter of Credit, and (ii) shall be accompanied by such Issuer Documents as Administrative Agent or Issuing Bank may request or require, to the extent that such requests or requirements are consistent with the Issuer Documents that Issuing Bank generally requests for Letters of Credit in similar circumstances.  Issuing Bank's records of the content of any such request will be conclusive.  Anything contained herein to the contrary notwithstanding, Issuing Bank may, but shall not be obligated to, issue a Letter of Credit that supports the obligations of a Loan Party or one of its Subsidiaries in respect of (x) a lease of real property, or (y) an employment contract.

(b) Issuing Bank shall have no obligation to issue a Letter of Credit if any of the following would result after giving effect to the requested issuance:

(i)    the Letter of Credit Usage would exceed the Letter of Credit Sublimit, or

(ii)    the Letter of Credit Usage would exceed the Maximum Revolver Amount *less* the outstanding amount of Loans (including Swing Loans), or

(iii)    the Letter of Credit Usage would exceed the Borrowing Base at such time *less* the outstanding principal balance of the Loans (inclusive of Swing Loans) at such time.

68

6237404.15

(c)  In the event there is a Defaulting Lender as of the date of any request for the issuance of a Letter of Credit, Issuing Bank shall not be required to issue or arrange for such Letter of Credit to the extent (i) the Defaulting Lender's Letter of Credit Exposure with respect to such Letter of Credit may not be reallocated pursuant to Section 2.03(g)(ii), or (ii) Issuing Bank has not otherwise entered into arrangements reasonably satisfactory to it and Borrower to eliminate Issuing Bank's risk with respect to the participation in such Letter of Credit of the Defaulting Lender, which arrangements may include Borrower cash collateralizing such Defaulting Lender's Letter of Credit Exposure in accordance with Section 2.03(g)(ii).  Additionally, Issuing Bank shall have no obligation to issue or extend a Letter of Credit if (A) any order, judgment, or decree of any Governmental Authority or arbitrator shall, by its terms, purport to enjoin or restrain Issuing Bank from issuing such Letter of Credit, or any law applicable to Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over Issuing Bank shall prohibit or request that Issuing Bank refrain from the issuance of letters of credit generally or such Letter of Credit in particular, (B) the issuance of such Letter of Credit would violate one or more policies of Issuing Bank applicable to letters of credit generally, or (C) if amounts demanded to be paid under any Letter of Credit will not or may not be in United States Dollars.

(d)  Any Issuing Bank (other than Wells Fargo or any of its Affiliates) shall notify Administrative Agent in writing no later than the Business Day prior to the Business Day on which such Issuing Bank issues any Letter of Credit.  In addition, each Issuing Bank (other than Wells Fargo or any of its Affiliates) shall, on the first Business Day of each week, submit to Administrative Agent a report detailing the daily undrawn amount of each Letter of Credit issued by such Issuing Bank during the prior calendar week.  Borrower and the Lender Group hereby acknowledge and agree that all Existing Letters of Credit shall constitute Letters of Credit under this Agreement on and after the Closing Date with the same effect as if such Existing Letters of Credit were issued by Issuing Bank at the request of Borrower on the Closing Date.  Each Letter of Credit shall be in form and substance reasonably acceptable to Issuing Bank, including the requirement that the amounts payable thereunder must be payable in Dollars. If Issuing Bank makes a payment under a Letter of Credit, Borrower shall pay to Administrative Agent an amount equal to the applicable Letter of Credit Disbursement on the Business Day such Letter of Credit Disbursement is made and, in the absence of such payment, the amount of the Letter of Credit Disbursement immediately and automatically shall be deemed to be a Loan hereunder (notwithstanding any failure to satisfy any condition precedent set forth in Article IV) and, initially, shall bear interest at the rate then applicable to Loans that are Base Rate Loans. If a Letter of Credit Disbursement is deemed to be a Loan hereunder, Borrower's obligation to pay the amount of such Letter of Credit Disbursement to Issuing Bank shall be automatically converted into an obligation to pay the resulting Loan.  Promptly following receipt by Administrative Agent of any payment from Borrower pursuant to this paragraph, Administrative Agent shall distribute such payment to Issuing Bank or, to the extent that Lenders have made payments pursuant to Section 2.11(e) to reimburse Issuing Bank, then to such Lenders and Issuing Bank as their interests may appear.

(e)  Promptly following receipt of a notice of a Letter of Credit Disbursement pursuant to Section 2.11(d), each Lender agrees to fund its Pro Rata Share of any Loan deemed made pursuant to Section 2.11(d) on the same terms and conditions as if Borrower had requested the amount thereof as a Loan and Administrative Agent shall promptly pay to Issuing Bank the amounts so received by it from the Lenders.  By the issuance of a Letter of Credit (or an amendment or extension of a Letter of Credit) and without any further action on the part of Issuing Bank or the Lenders, Issuing Bank shall be deemed to have granted to each Lender, and each Lender shall be deemed to have purchased, a participation in each Letter of Credit issued by Issuing Bank, in an amount equal to its Pro Rata Share of such Letter of Credit, and each such Lender agrees to pay to Administrative Agent, for the account of Issuing Bank, such Lender's Pro Rata Share of any Letter of Credit Disbursement made by Issuing Bank under the applicable Letter of Credit.  In consideration and in furtherance of the foregoing, each Lender hereby

69

6237404.15

absolutely and unconditionally agrees to pay to Administrative Agent, for the account of Issuing Bank, such Lender's Pro Rata Share of each Letter of Credit Disbursement made by Issuing Bank and not reimbursed by Borrower on the date due as provided in Section 2.11(d), or of any reimbursement payment that is required to be refunded (or that Administrative Agent or Issuing Bank elects, based upon the advice of counsel, to refund) to Borrower for any reason.  Each Lender acknowledges and agrees that its obligation to deliver to Administrative Agent, for the account of Issuing Bank, an amount equal to its respective Pro Rata Share of each Letter of Credit Disbursement pursuant to this Section 2.11(e) shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of an Event of Default or Default or the failure to satisfy any condition set forth in Article IV.  If any such Lender fails to make available to Administrative Agent the amount of such Lender's Pro Rata Share of a Letter of Credit Disbursement as provided in this Section, such Lender shall be deemed to be a Defaulting Lender and Administrative Agent (for the account of Issuing Bank) shall be entitled to recover such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

(f)  Borrower agrees to indemnify, defend and hold harmless each member of the Lender Group (including Issuing Bank and its branches, Affiliates, and correspondents) and each such Person's respective directors, officers, employees, attorneys and agents (each, including Issuing Bank, a "**Letter of Credit Related Person**") (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), which may be incurred by or awarded against any Letter of Credit Related Person (other than Taxes, which shall be governed by Article III) (the "**Letter of Credit Indemnified Costs**"), and which arise out of or in connection with, or as a result of this Agreement, any Letter of Credit, any Issuer Document, or any Drawing Document referred to in or related to any Letter of Credit, or any action or proceeding arising out of any of the foregoing (whether administrative, judicial or in connection with arbitration); in each case, including that resulting from the Letter of Credit Related Person's own negligence; provided, that such indemnity shall not be available to any Letter of Credit Related Person claiming indemnification to the extent that such Letter of Credit Indemnified Costs may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of the Letter of Credit Related Person claiming indemnity.  This indemnification provision shall survive termination of this Agreement and all Letters of Credit.

(g)  The liability of Issuing Bank (or any other Letter of Credit Related Person) under, in connection with or arising out of any Letter of Credit (or pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by Borrower that are caused directly by Issuing Bank's gross negligence or willful misconduct in (i) honoring a presentation under a Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such Letter of Credit, (ii) failing to honor a presentation under a Letter of Credit that strictly complies with the terms and conditions of such Letter of Credit, or (iii) retaining Drawing Documents presented under a Letter of Credit.  Borrower's aggregate remedies against Issuing Bank and any Letter of Credit Related Person for wrongfully honoring a presentation under any Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by Borrower to Issuing Bank in respect of the honored presentation in connection with such Letter of Credit under Section 2.11(d), *plus* interest at the rate then applicable to Base Rate Loans hereunder.  Borrower shall take action to avoid and mitigate the amount of any damages claimed against Issuing Bank or any other Letter of Credit Related Person, including by enforcing its rights against the beneficiaries of the Letters of Credit.  Any claim by Borrower under or in connection with any Letter of Credit shall be reduced by an amount equal to the sum of (x) the amount (if any) saved by Borrower as a result of the breach or alleged

70

6237404.15

wrongful conduct complained of, and (y) the amount (if any) of the loss that would have been avoided had Borrower taken all reasonable steps to mitigate any loss, and in case of a claim of wrongful dishonor, by specifically and timely authorizing Issuing Bank to effect a cure.

(h)  Borrower is responsible for the final text of the Letter of Credit as issued by Issuing Bank, irrespective of any assistance Issuing Bank may provide such as drafting or recommending text or by Issuing Bank's use or refusal to use text submitted by Borrower. Borrower understands that the final form of any Letter of Credit may be subject to such revisions and changes as are deemed necessary or appropriate by Issuing Bank, and Borrower hereby consents to such revisions and changes not materially different from the application executed in connection therewith.  Borrower is solely responsible for the suitability of the Letter of Credit for Borrower's purposes.  If Borrower requests Issuing Bank to issue a Letter of Credit for an affiliated or unaffiliated third party (an "**Account Party**"), (i) such Account Party shall have no rights against Issuing Bank; (ii) Borrower shall be responsible for the application and obligations under this Agreement; and (iii) communications (including notices) related to the respective Letter of Credit shall be among Issuing Bank and Borrower.  Borrower will examine the copy of the Letter of Credit and any other documents sent by Issuing Bank in connection therewith and shall promptly notify Issuing Bank (not later than three (3) Business Days following Borrower's receipt of documents from Issuing Bank) of any non-compliance with Borrower's instructions and of any discrepancy in any document under any presentment or other irregularity.  Borrower understands and agree that Issuing Bank is not required to extend the expiration date of any Letter of Credit for any reason. With respect to any Letter of Credit containing an "automatic amendment" to extend the expiration date of such Letter of Credit, Issuing Bank, in its sole and absolute discretion, may give notice of non-extension of such Letter of Credit and, if Borrower does not at any time want the then current expiration date of such Letter of Credit to be extended, Borrower will so notify Administrative Agent and Issuing Bank at least thirty (30) calendar days before Issuing Bank is required to notify the beneficiary of such Letter of Credit or any advising bank of such non-extension pursuant to the terms of such Letter of Credit.

(i)  Borrower's reimbursement and payment obligations under this Section 2.11 are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever; provided, that subject to Section 2.11(g) above, the foregoing shall not release Issuing Bank from such liability to Borrower as may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction against Issuing Bank following reimbursement or payment of the obligations and liabilities, including reimbursement and other payment obligations, of Borrower to Issuing Bank arising under, or in connection with, this Section 2.11 or any Letter of Credit.

(j)  Without limiting any other provision of this Agreement, Issuing Bank and each other Letter of Credit Related Person (if applicable) shall not be responsible to Borrower for, and Issuing Bank's rights and remedies against Borrower and the obligation of Borrower to reimburse Issuing Bank for each drawing under each Letter of Credit shall not be impaired by:

(i)  honor of a presentation under any Letter of Credit that on its face substantially complies with the terms and conditions of such Letter of Credit, even if the Letter of Credit requires strict compliance by the beneficiary;

(ii)  honor of a presentation of any Drawing Document that appears on its face to have been signed, presented or issued (A) by any purported successor or transferee of any beneficiary or other Person required to sign, present or issue such Drawing Document or (B) under a new name of the beneficiary;

71

6237404.15

(iii)　　acceptance as a draft of any written or electronic demand or request for payment under a Letter of Credit, even if nonnegotiable or not in the form of a draft or notwithstanding any requirement that such draft, demand or request bear any or adequate reference to the Letter of Credit;

(iv)　　the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness or legal effect of any Drawing Document (other than Issuing Bank's determination that such Drawing Document appears on its face substantially to comply with the terms and conditions of the Letter of Credit);

(v)　　acting upon any instruction or request relative to a Letter of Credit or requested Letter of Credit that Issuing Bank in good faith believes to have been given by a Person authorized to give such instruction or request;

(vi)　　any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation or any delay in giving or failing to give notice to Borrower;

(vii)　　any acts, omissions or fraud by, or the insolvency of, any beneficiary, any nominated person or entity or any other Person or any breach of contract between any beneficiary and Borrower or any of the parties to the underlying transaction to which the Letter of Credit relates;

(viii)　　assertion or waiver of any provision of the ISP or UCP that primarily benefits an issuer of a letter of credit, including any requirement that any Drawing Document be presented to it at a particular hour or place;

(ix)　　payment to any presenting bank (designated or permitted by the terms of the applicable Letter of Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under Standard Letter of Credit Practice applicable to it;

(x)　　acting or failing to act as required or permitted under Standard Letter of Credit Practice applicable to where Issuing Bank has issued, confirmed, advised or negotiated such Letter of Credit, as the case may be;

(xi)　　honor of a presentation after the expiration date of any Letter of Credit notwithstanding that a presentation was made prior to such expiration date and dishonored by Issuing Bank if subsequently Issuing Bank or any court or other finder of fact determines such presentation should have been honored;

(xii)　　dishonor of any presentation that does not strictly comply or that is fraudulent, forged or otherwise not entitled to honor; or

(xiii)　　honor of a presentation that is subsequently determined by Issuing Bank to have been made in violation of international, federal, state or local restrictions on the transaction of business with certain prohibited Persons.

(k) Borrower shall pay immediately upon demand to Administrative Agent for the account of Issuing Bank as non-refundable fees, commissions, and charges (it being acknowledged and agreed that any charging of such fees, commissions, and charges to the Loan Account pursuant to the provisions of Section 2.06(d) shall be deemed to constitute a demand for payment thereof for the purposes of this Section 2.11(k)): (i) a fronting fee which shall be imposed by Issuing Bank equal to .125% per annum times the average amount of the Letter of Credit Usage during the immediately preceding month (or portion thereof), plus (ii) any and all other customary commissions, fees and charges then in effect

72

6237404.15

imposed by, and any and all expenses incurred by, Issuing Bank, or by any adviser, confirming institution or entity or other nominated person, relating to Letters of Credit, at the time of issuance of any Letter of Credit and upon the occurrence of any other activity with respect to any Letter of Credit (including transfers, assignments of proceeds, amendments, drawings, extensions or cancellations).

(l)  If by reason of (x) any Change in Law, or (y) compliance by Issuing Bank or any other member of the Lender Group with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Board of Governors as from time to time in effect (and any successor thereto):

(i)    any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any Letter of Credit issued or caused to be issued hereunder or hereby, or any Loans or obligations to make Loans hereunder or hereby, or

(ii)    there shall be imposed on Issuing Bank or any other member of the Lender Group any other condition regarding any Letter of Credit, Loans, or obligations to make Loans hereunder,

and the result of the foregoing is to increase, directly or indirectly, the cost to Issuing Bank or any other member of the Lender Group of issuing, making, participating in, or maintaining any Letter of Credit or to reduce the amount receivable in respect thereof, then, and in any such case, Administrative Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify Borrower, and Borrower shall pay within thirty (30) days after demand therefor, such amounts as Administrative Agent may specify to be necessary to compensate Issuing Bank or any other member of the Lender Group for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the rate then applicable to Base Rate Loans hereunder; provided, that (A) Borrower shall not be required to provide any compensation pursuant to this Section 2.11(l) for any such amounts incurred more than 180 days prior to the date on which the demand for payment of such amounts is first made to Borrower, and (B) if an event or circumstance giving rise to such amounts is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  The determination by Administrative Agent of any amount due pursuant to this Section 2.11(l), as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

(m) Each standby Letter of Credit shall expire not later than the date that is twelve (12) months after the date of the issuance of such Letter of Credit; provided, that any standby Letter of Credit may provide for the automatic extension thereof for any number of additional periods each of up to one year in duration; provided further, that with respect to any Letter of Credit which extends beyond the Maturity Date, Letter of Credit Collateralization shall be provided therefor on or before the date that is five (5) Business Days prior to the Maturity Date.  Each commercial Letter of Credit shall expire on the earlier of (i) 120 days after the date of the issuance of such commercial Letter of Credit and (ii) five (5) Business Days prior to the Maturity Date.

(n) If (i) any Event of Default shall occur and be continuing, or (ii) Availability shall at any time be less than zero, then on the Business Day following the date when the Borrower receives notice from Administrative Agent or the Required Lenders (or, if the maturity of the Obligations has been accelerated, Lenders with Letter of Credit Exposure representing greater than 50% of the total Letter of Credit Exposure) demanding Letter of Credit Collateralization pursuant to this Section 2.11(n) upon such demand, Borrower shall provide Letter of Credit Collateralization with respect to the then existing Letter of Credit Usage.  If Borrower is required to provide Letter of Credit Collateralization hereunder as a result

73

of the occurrence of an Event of Default, any cash collateral held by Administrative Agent as a result of such Letter of Credit Collateralization shall be returned by Administrative Agent to Borrower promptly, but in no event later than seven (7) Business Days, after such Event of Default has been waived in accordance with this Agreement.  If Borrower fails to provide Letter of Credit Collateralization as required by this Section 2.11(n), the Lenders may (and, upon direction of Administrative Agent, shall) advance, as Loans the amount of the cash collateral required pursuant to the Letter of Credit Collateralization provision so that the then existing Letter of Credit Usage is cash collateralized in accordance with the Letter of Credit Collateralization provision (whether or not the Commitments have terminated, an Overadvance exists or the conditions in Article IV are satisfied).

(o) Unless otherwise expressly agreed by Issuing Bank and Borrower when a Letter of Credit is issued (including any such agreement applicable to an Existing Letter of Credit), (i) the rules of the ISP shall apply to each standby Letter of Credit, and (ii) the rules of the UCP shall apply to each commercial Letter of Credit.

(p) Issuing Bank shall be deemed to have acted with due diligence and reasonable care if Issuing Bank's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement.

(q) In the event of a direct conflict between the provisions of this Section 2.11 and any provision contained in any Issuer Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.11 shall control and govern.

(r) The provisions of this Section 2.11 shall survive the termination of this Agreement and the repayment in full of the Obligations with respect to any Letters of Credit that remain outstanding.

(s) At Borrower's costs and expense, Borrower shall execute and deliver to Issuing Bank such additional certificates, instruments and/or documents and take such additional action as may be reasonably requested by Issuing Bank to enable Issuing Bank to issue any Letter of Credit pursuant to this Agreement and related Issuer Document, to protect, exercise and/or enforce Issuing Banks' rights and interests under this Agreement or to give effect to the terms and provisions of this Agreement or any Issuer Document.  Borrower irrevocably appoints Issuing Bank as its attorney-in-fact and authorizes Issuing Bank, without notice to Borrower, to execute and deliver ancillary documents and letters customary in the letter of credit business that may include but are not limited to advisements, indemnities, checks, bills of exchange and issuance documents.  The power of attorney granted by the Borrower is limited solely to such actions related to the issuance, confirmation or amendment of any Letter of Credit and to ancillary documents or letters customary in the letter of credit business.  This appointment is coupled with an interest.

Section 2.12    **LIBOR Option**.

(a)      **Interest and Interest Payment Dates**.  In lieu of having interest charged at the rate based upon the Base Rate, Borrower shall have the option, subject to Section 2.12(b) below (the "**LIBOR Option**") to have interest on all or a portion of the Revolving Loans be charged (whether at the time when made (unless otherwise provided herein), upon conversion from a Base Rate Loan to a LIBOR Rate Loan, or upon continuation of a LIBOR Rate Loan as a LIBOR Rate Loan) at a rate of interest based upon the LIBOR Rate.  Interest on LIBOR Rate Loans shall be payable on the earliest of (i) the last day of the Interest Period applicable thereto; provided, that subject to the following clauses (ii) and (iii), in the case of any Interest Period greater than three (3) months in duration, interest shall be payable at three (3)

74

month intervals after the commencement of the applicable Interest Period and on the last day of such Interest Period), (ii) the date on which all or any portion of the Obligations are accelerated pursuant to the terms hereof, or (iii) the date on which this Agreement is terminated pursuant to the terms hereof.  On the last day of each applicable Interest Period, unless Borrower has properly exercised the LIBOR Option with respect thereto, the interest rate applicable to such LIBOR Rate Loan automatically shall convert to the rate of interest then applicable to Base Rate Loans of the same type hereunder.  At any time that an Event of Default has occurred and is continuing, Borrower no longer shall have the option to request that Revolving Loans bear interest at a rate based upon the LIBOR Rate.

(b)     **LIBOR Election**.

(i)     Borrower may, at any time and from time to time, so long as no Event of Default has occurred and is continuing, elect to exercise the LIBOR Option by notifying Administrative Agent prior to 11:00 a.m. at least three (3) Business Days prior to the commencement of the proposed Interest Period (the "**LIBOR Deadline**").  Notice of Borrower's election of the LIBOR Option for a permitted portion of the Revolving Loans and an Interest Period pursuant to this Section shall be made by delivery to Administrative Agent of a LIBOR Notice received by Administrative Agent before the LIBOR Deadline.  Promptly upon its receipt of each such LIBOR Notice, Administrative Agent shall provide a copy thereof to each of the affected Lenders.

(ii)     Each LIBOR Notice shall be irrevocable and binding on Borrower.  In connection with each LIBOR Rate Loan, Borrower shall indemnify, defend, and hold Administrative Agent and the Lenders harmless against any loss, cost, or expense actually incurred by Administrative Agent or any Lender as a result of (A) the payment or required assignment of any principal of any LIBOR Rate Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (B) the conversion of any LIBOR Rate Loan other than on the last day of the Interest Period applicable thereto, or (C) the failure to borrow, convert, continue or prepay any LIBOR Rate Loan on the date specified in any LIBOR Notice delivered pursuant hereto (such losses, costs, or expenses, "**Funding Losses**").  A certificate of Administrative Agent or a Lender delivered to Borrower setting forth in reasonable detail any amount or amounts that Administrative Agent or such Lender is entitled to receive pursuant to this Section 2.12 shall be conclusive absent manifest error.  Borrower shall pay such amount to Administrative Agent or the Lender, as applicable, within thirty (30) days of the date of its receipt of such certificate.  If a payment of a LIBOR Rate Loan on a day other than the last day of the applicable Interest Period would result in a Funding Loss, Administrative Agent may, in its sole discretion at the request of Borrower, hold the amount of such payment as cash collateral in support of the Obligations until the last day of such Interest Period and apply such amounts to the payment of the applicable LIBOR Rate Loan on such last day, it being agreed that Administrative Agent has no obligation to so defer the application of payments to any LIBOR Rate Loan and that, in the event that Administrative Agent does not defer such application, Borrower shall be obligated to pay any resulting Funding Losses.

(iii)     Unless Administrative Agent, in its sole discretion, agrees otherwise, Borrower shall have not more than five (5) LIBOR Rate Loans in effect at any given time.  Borrower may only exercise the LIBOR Option for proposed LIBOR Rate Loans of at least $1,000,000.

(c)     **Conversion; Prepayment**.  Borrower may convert LIBOR Rate Loans to Base Rate Loans or prepay LIBOR Rate Loans at any time; provided, that in the event that LIBOR Rate Loans are converted or prepaid on any date that is not the last day of the Interest Period applicable thereto, including as a result of any prepayment through the required application by Administrative Agent of any payments or proceeds of Collateral in accordance with Section 2.04(b) or for any other reason, including early termination of the term of this Agreement or acceleration of all or any portion of the Obligations

75

pursuant to the terms hereof, Borrower shall indemnify, defend, and hold Administrative Agent and the Lenders and their Participants harmless against any and all Funding Losses in accordance with Section 2.12(b)(ii).

        (d)      **Special Provisions Applicable to LIBOR Rate**.

        (i)      The LIBOR Rate may be adjusted by Administrative Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any eurodollar deposits or increased costs (other than Taxes which shall be governed by Article III), in each case, due to changes in applicable law occurring subsequent to the commencement of the then applicable Interest Period, including any Changes in Law and changes in the reserve requirements imposed by the Board of Governors, which additional or increased costs would increase the cost of funding or maintaining loans bearing interest at the LIBOR Rate.  In any such event, the affected Lender shall give Borrower and Administrative Agent notice of such a determination and adjustment and Administrative Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Borrower may, by notice to such affected Lender (A) require such Lender to furnish to Borrower a statement setting forth in reasonable detail the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (B) repay the LIBOR Rate Loans of such Lender with respect to which such adjustment is made (together with any amounts due under Section 2.12(b)(ii)).

        (ii)      Subject to the provisions set forth in Section 2.12(d)(iii) below, in the event that any change in market conditions or any Change in Law shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain LIBOR Rate Loans or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to Administrative Agent and Borrower and Administrative Agent promptly shall transmit the notice to each other Lender and (y) in the case of any LIBOR Rate Loans of such Lender that are outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such LIBOR Rate Loans, and interest upon the LIBOR Rate Loans of such Lender thereafter shall accrue interest at the rate then applicable to Base Rate Loans, and (z) Borrower shall not be entitled to elect the LIBOR Option until such Lender determines that it would no longer be unlawful or impractical to do so.

        (iii)      Effect of Benchmark Transition Event.

        (A)      Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, Administrative Agent and Borrower may amend this Agreement to replace the LIBOR Rate with a Benchmark Replacement.  Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after Administrative Agent has posted such proposed amendment to all Lenders and Borrower so long as Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders.  Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to Administrative Agent written notice that such Required Lenders accept such amendment.  No replacement of the LIBOR Rate with a Benchmark Replacement pursuant to this Section 2.12(d)(iii) will occur prior to the applicable Benchmark Transition Start Date.

        (B)      Benchmark Replacement Conforming Changes. In connection with the implementation of a Benchmark Replacement, Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark

<div align="center">76</div>

6237404.15

Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(C)     Notices;    Standards    for    Decisions    and    Determinations. Administrative Agent will promptly notify Borrower and the Lenders of (1) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (2) the implementation of any Benchmark Replacement, (3) the effectiveness of any Benchmark Replacement Conforming Changes and (4) the commencement or conclusion of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by Administrative Agent or Lenders pursuant to this Section 2.12(d)(iii) including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.12(d)(iii).

(D)     Benchmark Unavailability Period. Upon Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, Borrower may revoke any request for a LIBOR Borrowing of, conversion to or continuation of LIBOR Rate Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During any Benchmark Unavailability Period, the component of Base Rate based upon the LIBOR Rate will not be used in any determination of the Base Rate.

(e)     **No Requirement of Matched Funding**.  Anything to the contrary contained herein notwithstanding, neither Administrative Agent, nor any Lender, nor any of their Participants, is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Rate.

    **Section 2.13    Capital Requirements**.

(a)     If, after the date hereof, Issuing Bank or any Lender determines that (i) any Change in Law regarding capital, liquidity or reserve requirements for banks or bank holding companies, or (ii) compliance by Issuing Bank or such Lender, or their respective parent bank holding companies, with any guideline, request or directive of any Governmental Authority regarding capital adequacy or liquidity requirements (whether or not having the force of law), has the effect of reducing the return on Issuing Bank's, such Lender's, or such holding companies' capital or liquidity as a consequence of Issuing Bank's or such Lender's commitments, Loans, participations or other obligations hereunder to a level below that which Issuing Bank, such Lender, or such holding companies could have achieved but for such Change in Law or compliance (taking into consideration Issuing Bank's, such Lender's, or such holding companies' then existing policies with respect to capital adequacy or liquidity requirements and assuming the full utilization of such entity's capital) by any amount deemed by Issuing Bank or such Lender to be material, then Issuing Bank or such Lender may notify Borrower and Administrative Agent thereof.   Following receipt of such notice, Borrower agrees to pay Issuing Bank or such Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable within thirty (30) days after presentation by Issuing Bank or such Lender of a statement in the amount and setting forth in reasonable detail Issuing Bank's or such Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error).  In determining such amount, Issuing Bank or such Lender may use any reasonable averaging and attribution methods.  Failure or delay on the part of Issuing Bank or any Lender to demand compensation pursuant to this Section shall not constitute a waiver of Issuing Bank's or such Lender's

77

6237404.15

right to demand such compensation; <u>provided</u>, that Borrower shall not be required to compensate Issuing Bank or a Lender pursuant to this Section for any reductions in return incurred more than 180 days prior to the date that Issuing Bank or such Lender notifies Borrower of such Change in Law giving rise to such reductions and of such Lender's intention to claim compensation therefor; <u>provided</u> <u>further</u>, that if such claim arises by reason of the Change in Law that is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(b)        If Issuing Bank or any Lender requests additional or increased costs referred to in <u>Section 2.11(l)</u> or <u>Section 2.12(d)(i)</u> or amounts under <u>Section 2.13(a)</u> or sends a notice under <u>Section 2.12(d)(ii)</u> relative to changed circumstances (such Issuing Bank or Lender, an "**Affected Lender**"), then, at the request of Borrower, such Affected Lender shall use reasonable efforts to promptly designate a different one of its lending offices or to assign its rights and obligations hereunder to another of its offices or branches, if (i) in the reasonable judgment of such Affected Lender, such designation or assignment would eliminate or reduce amounts payable pursuant to <u>Section 2.11(l)</u>, <u>Section 2.12(d)(i)</u> or <u>Section 2.13(a)</u>, as applicable, or would eliminate the illegality or impracticality of funding or maintaining LIBOR Rate Loans, and (ii) in the reasonable judgment of such Affected Lender, such designation or assignment would not subject it to any material unreimbursed cost or expense and would not otherwise be materially disadvantageous to it.  Borrower agrees to pay all reasonable out-of-pocket costs and expenses incurred by such Affected Lender in connection with any such designation or assignment.  If, after such reasonable efforts, such Affected Lender does not so designate a different one of its lending offices or assign its rights to another of its offices or branches so as to eliminate Borrower's obligation to pay any future amounts to such Affected Lender pursuant to <u>Section 2.11(l)</u>, <u>Section 2.12(d)(i)</u> or <u>Section 2.13(a)</u>, as applicable, or to enable Borrower to obtain LIBOR Rate Loans, then Borrower (without prejudice to any amounts then due to such Affected Lender under <u>Section 2.11(l)</u>, <u>Section 2.12(d)(i)</u> or <u>Section 2.13(a)</u>, as applicable) may, unless prior to the effective date of any such assignment the Affected Lender withdraws its request for such additional amounts under <u>Section 2.11(l)</u>, <u>Section 2.12(d)(i)</u> or <u>Section 2.13(a)</u>, as applicable, or indicates that it is no longer unlawful or impractical to fund or maintain LIBOR Rate Loans, may designate a different Issuing Bank or substitute a Lender or prospective Lender, in each case, reasonably acceptable to Administrative Agent to purchase the Obligations owed to such Affected Lender and such Affected Lender's commitments hereunder (a "**Replacement Lender**"), and if such Replacement Lender agrees to such purchase, such Affected Lender shall assign to the Replacement Lender its Obligations and commitments, and upon such purchase by the Replacement Lender, which such Replacement Lender shall be deemed to be "Issuing Bank" or a "Lender" (as the case may be) for purposes of this Agreement and such Affected Lender shall cease to be "Issuing Bank" or a "Lender" (as the case may be) for purposes of this Agreement.

(c)        Notwithstanding anything herein to the contrary, the protection of <u>Sections 2.11(l)</u>, <u>2.12(d)</u>, and <u>2.13</u> shall be available to Issuing Bank and each Lender (as applicable) regardless of any possible contention of the invalidity or inapplicability of the law, rule, regulation, judicial ruling, judgment, guideline, treaty or other change or condition which shall have occurred or been imposed, so long as it shall be customary for issuing banks or lenders affected thereby to comply therewith.  Notwithstanding any other provision herein, neither Issuing Bank nor any Lender shall demand compensation pursuant to this <u>Section 2.13</u> if it shall not at the time be the general policy or practice of Issuing Bank or such Lender (as the case may be) to demand such compensation in similar circumstances under comparable provisions of other credit agreements, if any.

## ARTICLE III
### TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

**Section 3.01**     <u>Taxes</u>.  (a)  Except as provided in this <u>Section 3.01</u>, any and all payments made by or on account of the Borrower or any Guarantor under any Loan Document shall be made free and

<div align="center">78</div>

6237404.15

clear of and without deduction for any Taxes, except to the extent required by any Laws.  If the Borrower, any Guarantor or other applicable withholding agent shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Loan Document to the Administrative Agent or any Lender, (i) if the Tax in question is an Indemnified Tax or Other Tax, the sum payable by the Borrower or any Guarantor shall be increased as necessary so that after all required deductions for Indemnified Taxes or Other Taxes have been made (including deductions applicable to additional sums payable under this Section 3.01), each Lender (or, in the case of a payment made to the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions for Indemnified Taxes or Other Taxes been made, (ii) the applicable withholding agent shall make such deductions, (iii) the applicable withholding agent shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Laws, and (iv) within 30 days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), if the Borrower or any Guarantor is the applicable withholding agent, it shall furnish to the Administrative Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof or other evidence acceptable to the Administrative Agent or Lender.

(b)  In addition, the Borrower agrees to pay any and all present or future stamp, court or documentary Taxes and any other excise, property, intangible or mortgage recording Taxes, imposed by any Governmental Authority, which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document excluding, in each case, any such Tax imposed as a result of the Administrative Agent's or any Lender's Assignment and Assumption, grant of a participation, transfer or assignment to or designation of a new applicable Lending Office or other office for receiving payments under any Loan Document (collectively, "**Assignment Taxes**") if such Assignment Tax is imposed as a result of a present or former connection of the assignor or assignee with the jurisdiction imposing such Assignment Tax (other than any connection arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, receiving payments under, and/or enforcing or receiving or perfecting a security interest under any Loan Document), except for Assignment Taxes resulting from assignment or participation that is requested or required in writing by the Borrower (all such non-excluded taxes described in this Section 3.01(b) being hereinafter referred to as "**Other Taxes**").

(c)  The Borrower and each Guarantor agree to indemnify the Administrative Agent and each Lender, within ten (10) days after demand therefor, for (i) the full amount of Indemnified Taxes and Other Taxes paid or payable by the Administrative Agent or such Lender (including Indemnified Taxes or Other Taxes imposed on or attributable to amounts payable under this Section 3.01) and (ii) any expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the Governmental Authority.  A certificate as to the amount of such payment or liability prepared in good faith and delivered by the Administrative Agent or Lender (or by the Administrative on behalf of such Lender), accompanied by a written statement thereof setting forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) the basis and calculation of such amounts shall be conclusive absent manifest error.

(d)  Indemnification by the Lenders.   Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.07(e) relating to the maintenance of a Participant Register and (iii) any Taxes excluded from the definition of Indemnified Taxes that are attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising

79

6237404.15

therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)  Each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Law or reasonably requested by the Borrower or the Administrative Agent certifying as to any entitlement of such Lender to an exemption from, or reduction in, any applicable withholding Tax with respect to any payments to be made to such Lender or Agent under the Loan Documents.  Each such Lender and the Administrative Agent shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documentation required below in this Section 3.01(e)) obsolete, expired or inaccurate in any material respect, deliver promptly and on or before the date such documentation expires, becomes obsolete or inaccurate to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and the Administrative Agent in writing of its inability to do so.  In addition, each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with such other documentation prescribed by Law or reasonably requested by the Borrower or Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether such Lender or Administrative Agent is subject to backup withholding or information reporting requirements. Notwithstanding any other provision of this Section 3.01(e), a Lender or the Administrative Agent shall not be required to deliver any form pursuant to this Section 3.01(e) that such Lender or the Administrative is not legally eligible to deliver.  Without limiting the foregoing:

(i)  Each Lender that is a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) two (2) properly completed and duly signed original copies of Internal Revenue Service Form W-9 certifying that such Lender is exempt from federal backup withholding.

(ii)  Each Lender that is not a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(A)  two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN (or any successor forms) claiming eligibility for the benefits of an income tax treaty to which the United States is a party,

(B)  two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)  in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (A) a certificate substantially in the form of Exhibit H hereto (any such certificate a "**United States Tax Compliance**

80

**Certificate**") and (B) two (2) properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN (or any successor forms),

(D)      to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or has sold a participation), Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, Form W-8BEN, United States Tax Compliance Certificate, Form W-9, Form W-8IMY or any other required information from each beneficial owner, as applicable (provided that, if the Lender is a partnership (and not a participating Lender) and if one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

(E)      two properly completed and duly signed original copies of any other form prescribed by applicable U.S. federal income tax laws (including the Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, United States federal withholding tax on any payments to such Lender under the Loan Documents.

(iii)      If the Administrative Agent is a "United States person" (as defined in Section 7701(a)(30) of the Code), it shall deliver to the Borrower two (2) properly completed and duly signed original copies of Internal Revenue Service Form W-9 with respect to fees received on its own behalf, certifying that the Administrative Agent is exempt from federal backup withholding.

(iv)      If the Administrative Agent is not a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower two (2) properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI with respect to fees received on its own behalf.

(v)      If a payment made to a Lender or Agent under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender or such Agent were to fail to comply with the applicable reporting requirements of FATCA, such Lender or such Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by Laws and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Laws and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender or such Agent has or has not complied with such Person's obligations under FATCA and, if necessary, to determine the amount to deduct and withhold from such payment.  Solely for purposes of this Section 3.01(e)(v), "FATCA" shall include any amendments made to FATCA after the Closing Date.

(f) The Administrative Agent or any Lender claiming any additional amounts payable pursuant to this Section 3.01 shall use its commercially reasonable efforts (subject to such Lender's or Administrative Agent's overall internal policies of general application and legal and regulatory restrictions) to mitigate or reduce the additional amounts payable, which commercially reasonable efforts may include a change in the jurisdiction of its Lending Office (or any other measures reasonably requested by the Borrower) if such a change or other measures would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender.

81

6237404.15

(g) If any Lender or Agent determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Indemnified Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by a Loan Party pursuant to this Section 3.01, it shall promptly remit such refund to such Loan Party (but only to the extent of indemnification or additional amounts paid by the Loan Party under this Section 3.01 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including any Taxes) of the Lender or Administrative Agent, as the case may be, and without interest (other than any interest paid by the relevant taxing authority with respect to such refund net of any Taxes payable by the Administrative Agent or any Lender on such interest); provided that the Loan Parties, upon the request of the Lender or Administrative Agent, as the case may be, agree promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant taxing authority) to such party in the event such party is required to repay such refund to the relevant taxing authority. This Section 3.01 shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to Taxes that it deems confidential) to any Loan Party or any other person.

Section 3.02    **Illegality**.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund LIBOR Rate Loans, or to determine or charge interest rates based upon the LIBOR Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, in each case after the Closing Date then, on written notice thereof by such Lender to the Borrower and the Administrative Agent, any obligation of such Lender to make or continue LIBOR Rate Loans or to convert Base Rate Loans to LIBOR Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower shall promptly following written demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all applicable LIBOR Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBOR Rate Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such LIBOR Rate Loans.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment or conversion under Section 3.05.  Each Lender agrees to use commercially reasonable efforts (subject to such Lender's overall internal policies of general application and legal and regulatory restrictions) to designate a different Lending Office if such designation will avoid the need for such notice, will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender.

Section 3.03    **Inability to Determine Rates**. If the Administrative Agent or the Required Lenders determine after the Closing Date that for any reason adequate and reasonable means do not exist for determining the applicable LIBOR Rate for any requested Interest Period with respect to a proposed LIBOR Rate Loan, or that the LIBOR Rate for any requested Interest Period with respect to a proposed LIBOR Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that Dollar deposits are not being offered to banks in the London interbank eurodollar, or other applicable, market for the applicable amount and the Interest Period of such LIBOR Rate Loan, the Administrative Agent will promptly so notify the Borrower in writing and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain LIBOR Rate Loans or to convert Base Rate Loans to LIBOR Rate Loans shall be suspended and (y) in the event of a determination described in the preceding sentence with respect to the LIBOR Rate component of the Base Rate, the utilization of the LIBOR Rate component in determining the Base Rate shall be suspended, in each case, until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the

82

6237404.15

Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of such LIBOR Rate Loans or, failing that, will be deemed to have converted such request, if applicable, into a request for a Borrowing of Base Rate Loans in the amount specified therein.

**Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; LIBOR Rate Loan Reserves**.  (a)  If any Lender reasonably determines that as a result of the introduction of or any change in or in the interpretation of any Law, in each case after the Closing Date, or such Lender's compliance therewith, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any LIBOR Rate Loans, or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.04(a) any such increased costs or reduction in amount resulting from (i) Indemnified Taxes or Other Taxes indemnified pursuant to Section 3.01, or any Taxes excluded from the definition of (x) "Indemnified Taxes" or (y) "Other Taxes" or (ii) reserve requirements contemplated by Section 3.04(c)) and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining the LIBOR Rate Loan (or of maintaining its obligations to make any Loan), or to reduce the amount of any sum received or receivable by such Lender, then from time to time within fifteen (15) Business Days after written demand by such Lender setting forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) such increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.  Notwithstanding anything herein to the contrary, for all purposes under this Agreement, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change in Law, regardless of the date enacted, adopted or issued.

(b)  If any Lender determines that the introduction of any Law regarding capital adequacy or liquidity requirements or any change therein or in the interpretation thereof, in each case after the Closing Date, or compliance by such Lender (or its Lending Office) therewith, has the effect of reducing the rate of return on the capital of such Lender or any company controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and such Lender's desired return on capital), then from time to time promptly following written demand of such Lender setting forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction within fifteen (15) Business Days after receipt of such demand.  Notwithstanding anything herein to the contrary, for all purposes under this Agreement, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change in Law, regardless of the date enacted, adopted or issued.

(c)  The Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including LIBOR funds or deposits, additional interest on the unpaid principal amount of each applicable LIBOR Rate Loan of the Borrower equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined

83

6237404.15

by such Lender in good faith, which determination shall be conclusive in the absence of manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the funding of any LIBOR Rate Loans of the Borrower, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such Loan, provided the Borrower shall have received at least fifteen (15) Business Days' prior written notice (with a copy to the Administrative Agent) of such additional interest or cost from such Lender.  If a Lender fails to give notice fifteen (15) Business Days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable fifteen (15) Business Days from receipt of such notice.

(d) Failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation.

(e) If any Lender requests compensation under this Section 3.04, then such Lender will, if requested by the Borrower, use commercially reasonable efforts (subject to such Lender's overall internal policies of general application and legal and regulatory restrictions) to designate another Lending Office for any Loan affected by such event; provided that such efforts are made on terms that, in the commercially reasonable judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no material economic, legal or regulatory disadvantage and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender; provided, further, that nothing in this Section 3.04(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.04(a), (b), (c) or (d).

**Section 3.05    Funding Losses**.  Promptly following written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense (excluding loss of anticipated profits and calculated without giving effect to any interest rate floor) actually incurred by it as a result of:

(a) any continuation, conversion, payment or prepayment of any LIBOR Rate Loan of the Borrower on a day other than the last day of the Interest Period for such Loan; or

(b) any failure by the Borrower to prepay, borrow, continue or convert any LIBOR Rate Loan of the Borrower on the date or in the amount notified by the Borrower;

including any loss or expense (excluding loss of anticipated profits) arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each LIBOR Rate Loan made by it at the LIBOR Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such LIBOR Rate Loan was in fact so funded.

**Section 3.06    Matters Applicable to All Requests for Compensation**.  (a)  Administrative Agent or any Lender claiming compensation under this Article III shall deliver a certificate to the

84

Borrower setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error.  In determining such amount, the Administrative Agent or such Lender may use any reasonable and customary averaging and attribution methods.

(b) With respect to any Lender's claim for compensation under Section 3.02, 3.03 or 3.04, the Borrower shall not be required to compensate such Lender for any amount incurred if such Lender notifies the Borrower of the event that gives rise to such claim more than 180 days after such event; provided, that if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  If any Lender requests compensation by the Borrower under Section 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another applicable LIBOR Rate Loan, or, if applicable, to convert Base Rate Loans into LIBOR Rate Loan, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(c) shall be applicable); provided that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c) If the obligation of any Lender to make or continue any LIBOR Rate Loan, or to convert Base Rate Loans into LIBOR Rate Loans shall be suspended pursuant to Section 3.06(b) hereof, such Lender's applicable LIBOR Rate Loans shall be automatically converted into Base Rate Loans (or, if such conversion is not possible, repaid) on the last day(s) of the then current Interest Period(s) for such LIBOR Rate Loans (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to such conversion no longer exist:

(i)      to the extent that such Lender's LIBOR Rate Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's applicable LIBOR Rate Loans shall be applied instead to its Base Rate Loans; and

(ii)      all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as LIBOR Rate Loans shall be made or continued instead as Base Rate Loans (if possible), and all Base Rate Loans of such Lender that would otherwise be converted into LIBOR Rate Loans shall remain as Base Rate Loans.

(d) If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of any of such Lender's LIBOR Rate Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when LIBOR Rate Loans made by other Lenders are outstanding, if applicable, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding LIBOR Rate Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding LIBOR Rate Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Revolving Loans.

**Section 3.07   Replacement of Lenders under Certain Circumstances**.  (a)  If at any time (i) the Borrower becomes obligated to pay additional amounts or indemnity payments described in Section 3.01 or 3.04 as a result of any condition described in such Sections or any Lender ceases to make any LIBOR Rate Loans as a result of any condition described in Section 3.02 or 3.04 or requires the Borrower to pay additional amounts as a result thereof, (ii) any Lender becomes a Defaulting Lender or (iii) any Lender becomes a Non-Consenting Lender, then the Borrower may, on five (5) Business Days' prior written notice to the Administrative Agent and such Lender, (x) replace such Lender by causing

85

6237404.15

such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.07(b) (so long as the assignment fee is paid by the Borrower in such instance) all of its rights and obligations under this Agreement to one or more Eligible Assignees; provided that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person; provided, further, that (A) in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments and (B) in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to, and shall be sufficient (together with all other consenting Lenders) to cause the adoption of, the applicable departure, waiver or amendment of the Loan Documents; or (y) in the case of a Lender, repay (in Dollars) all Obligations of the Borrower due and owing to such Lender relating to the Loans held by such Lender as of such termination date; provided that in the case of any such termination of a Non-Consenting Lender such termination shall be sufficient (together with all other consenting Lenders after giving effect hereto) to cause the adoption of the applicable departure, waiver or amendment of the Loan Documents.

(b)    Any Lender being replaced pursuant to Section 3.07(a) above shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's applicable outstanding Loans, and (ii) deliver any Notes evidencing such Loans to the Borrower or the Administrative Agent.  Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's outstanding Loans, (B) all obligations of the Borrower owing to the assigning Lender relating to the Loans so assigned shall be paid in full by the assignee Lender to such assigning Lender concurrently with such Assignment and Assumption and (C) upon such payment and, if so requested by the assignee Lender, delivery to the assignee Lender of the appropriate Note or Notes executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender.  In connection with any such replacement, if any such Lender does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within five (5) Business Days of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Lender, then such Lender shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Lender and the Administrative Agent shall be entitled (but not obligated) to execute and deliver such Assignment and Assumption and/or such other documentation on behalf of such Lender.

(c)  [Reserved].

(d)  In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each affected Lender in accordance with the terms of Section 10.01 or all the Lenders and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

Section 3.08    Survival.  All the Loan Parties' obligations under this Article III shall survive repayment of all other Obligations hereunder.

86

**ARTICLE IV**
**CONDITIONS PRECEDENT TO CREDIT EXTENSIONS**

**Section 4.01**    **Conditions to Initial Credit Extension**.  The obligation of each Lender to make a Credit Extension hereunder on the Closing Date is subject to satisfaction (or waiver) of the following conditions precedent:

(a)  The Administrative Agent's receipt of the following, each of which shall be original, .pdf or facsimile copies or delivered by other electronic method (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party each in form and substance reasonably satisfactory to the Required Lenders:

(i)    [reserved],

(ii)    executed counterparts of this Agreement;

(iii)    a Note executed by the Borrower in favor of each Lender that has requested a Note at least two (2) Business Days in advance of the Closing Date;

(iv)    a copy of the Organization Documents in relation to each Loan Party;

(v)    the Agent Fee Letter, the Security Agreement, the Intercreditor Agreement, each other Collateral Document and each other document set forth on Schedule 4.01(a) required to be executed on the Closing Date as indicated on such schedule, duly executed by each Loan Party thereto, together with:

(A)    [reserved]; and

(B)    proper financing statements (Form UCC-1 or the equivalent) naming each Loan Party for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary to perfect the security interests purported to be created by the foregoing Security Agreement;

(vi)    such certificates of good standing (to the extent such concept exists) from the applicable secretary of state of the state of organization of each Loan Party, certificates of resolutions or other corporate or limited liability company action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party and resolutions of the board of directors, board of managers or members of each Loan Party (in each case, as appropriate or applicable) as the Required Lenders may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date;

(vii)    an opinion from (x) Kirkland & Ellis LLP, counsel to the Loan Parties and (y) the general counsel, or other appropriate attorney, of the Borrower with respect to any Loan Party covering opinions not included in the opinion provided pursuant to the foregoing clause (x) as to certain customary organizational items (including, for the avoidance of doubt, that the entry by such Loan Party into the Loan Documents to which it is a party does not conflict with such Loan Party's Organizational Documents and the requirements of Laws), in each case in form and substance reasonably satisfactory to the Required Lenders;

87

6237404.15

(viii)   a solvency certificate from the chief financial officer, chief accounting officer or other officer with equivalent duties of the Borrower (immediately after giving effect to the Transactions) substantially in the form attached hereto as Exhibit D;

(ix)   a completed Borrowing Base Certificate with respect to the Borrowing Base as of July 31, 2020; and

(b) All fees and expenses required to be paid hereunder (and, with respect to expenses, invoiced at least three (3) Business Days before the Closing Date) shall have been paid, including fees pursuant to any Agent Fee Letter, the fees of Otterbourg P.C., as counsel to the Administrative Agent, and all reasonable out-of-pocket expenses payable on the Closing Date.

(c) Prior to or substantially concurrently with the initial Borrowing on the Closing Date, (i) all Existing Debt shall have been extinguished in accordance with the Prepackaged Plan; (ii) the Loan Parties shall have entered into, and provided executed copies of, the First Lien Loan Documents providing for the First Lien Term Loans in an aggregate principal amount equal to $76,600,000, and (iii) the Loan Parties shall have entered into, and provided executed copies of, the Second Lien Loan Documents providing for the Second Lien Term Loans in an aggregate principal amount equal to $50,000,000, in the case of clause (ii) and (iii) above, in form and substance reasonably satisfactory to the Required Lenders.

(d) Since the Petition Date, other than by virtue of the Chapter 11 Cases, the events and conditions related, resulting from, and/or leading up thereto and the effects thereon and any action required to be taken under the Loan Documents, there shall not have occurred any development or event, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(e) No Default or Event of Default shall exist or would result from the consummation of the Transactions.

(f) The Administrative Agent shall have received the Annual Financial Statements and the Quarterly Financial Statements (it being understood the Administrative Agent hereby acknowledges receipt thereof).

(g) The Lenders shall have received the Pro Forma Financial Statements.

(h) The Administrative Agent shall have received at least three (3) Business Days prior to the Closing Date all documentation and other information about the Borrower and the Guarantors required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act that has been requested by the Administrative Agent in writing at least ten (10) days prior to the Closing Date.

(i) The representations and warranties of each Loan Party set forth in Article V and in each other Loan Document shall be true and correct in all material respects on and as of the Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; provided that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

6237404.15

(j)   The sum of (i) Availability and (ii) unrestricted cash and Cash Equivalents of the Loan Parties, in each case after giving effect to the initial extensions of credit under this Agreement, the payment of all fees and expenses required to be paid by Borrower on the Closing Date under this Agreement or the other Loan Documents and consummation of the Transactions, shall be not less than $15,000,000, of which not more than $5,000,000 may be unrestricted cash and Cash Equivalents;

(k)   Upon consummation of the Transactions, the Lenders shall own at last 90% of the common equity of Holdings (subject to dilution pursuant to any warrants issued pursuant to the Warrant Agreement (as defined in the Prepackaged Plan) and any management incentive plan.

(l)   The Bankruptcy Court shall have entered the Confirmation Order, which order shall (i) approve, among other things, the Transactions, (ii) be in form and substance reasonably acceptable to the Required Lenders and consistent in all respects with the Restructuring Support Agreement, (iii) not be subject to any stay or be reversed, vacated, amended or otherwise modified in any respect and (iv) all covenants and conditions of the Prepackaged Plan (other than the effectiveness of this Agreement, the First Lien Credit Agreement and the Second Lien Credit Agreement) shall have been satisfied or waived in accordance with the terms thereof.

(m) The Restructuring Support Agreement shall not have been terminated and remains in full force and effect.

Without limiting the generality of the provisions of Section 9.06, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**Section 4.02   Conditions to all Credit Extensions**.   The obligation of each Lender to make a Credit Extension hereunder at any time is subject to satisfaction (or waiver) of the following conditions precedent:

(a)   The representations and warranties of each Loan Party set forth in Article V and in each other Loan Document shall be true and correct in all material respects on and as of the date of such extension of credit with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; provided that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(b)   No Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof.

<div align="center">

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES**

</div>

Each Holdco, the Borrower and each of the Subsidiary Guarantors party hereto represent and warrant to the Administrative Agent and the Lenders on the Closing Date that:

**Section 5.01   Existence, Qualification and Power; Compliance with Laws**.   Each Loan Party and each Subsidiary that is a Material Subsidiary (a) is a Person duly organized, incorporated or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation,

<div align="center">89</div>

6237404.15

organization or formation to the extent such concept exists in such jurisdiction, (b) has all requisite organizational power and authority to, in the case of the Loan Parties, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (where relevant) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, orders, writs and injunctions and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case, referred to in clauses (c), (d) or (e), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 5.02   **Authorization; No Contravention**.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the Transactions, (a) have been duly authorized by all necessary corporate or other organizational action, and (b) do not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by Section 7.01), or require any payment to be made under (x) any Contractual Obligation to which such Person is a party or by which it or any of its property or assets is bound or (y) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any Law; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clauses (ii) and (iii), to the extent that such violation, conflict, breach, contravention or payment could not reasonably be expected to have a Material Adverse Effect.

Section 5.03   **Governmental Authorization; Other Consents**.  No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) approval, consent, exemption, authorization, or other action by, or notice to, or filing necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties (or release existing Liens) under applicable U.S. law, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement) and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect.

Section 5.04   **Binding Effect**.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is a party thereto.  This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is a party thereto in accordance with its terms, except as such enforceability may be limited by (i) Debtor Relief Laws and by general principles of equity, (ii) the need for filings and registrations necessary to create or perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties and (iii) the effect of foreign Laws, rules and regulations as they relate to the granting of security interests in assets of, pledges of Equity Interests in or Indebtedness owed by Foreign Subsidiaries (clauses (i), (ii) and (iii), the "**Enforcement Qualifications**").

Section 5.05   **Financial Statements; No Material Adverse Effect**.  (a)  The Annual Financial Statements and the Quarterly Financial Statements fairly present in all material respects the financial condition of the Company and its Subsidiaries as of the dates thereof and their results of operations for the

90

6237404.15

period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (A) except as otherwise expressly noted therein and (B) subject, in the case of the Quarterly Financial Statements, to changes resulting from normal year-end adjustments and the absence of footnotes.

(b) The unaudited *pro forma* consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as of the last day of the twelve (12)-month period ending on the last day of the most recently completed four (4)-fiscal quarter period ended at least forty-five (45) days (or 105 days if such four (4)-fiscal quarter period is the end of the Company's fiscal year) prior to the Closing Date, prepared after giving effect to the Transactions as if the Transactions had occurred as of such date (including the notes thereto) (the "**Pro Forma Balance Sheet**") and the unaudited *pro forma* consolidated statement of income of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries for the twelve (12)-month period ended at least forty-five (45) days (or 105 days if such four (4)-fiscal quarter period is the end of the Company's fiscal year) prior to the Closing Date, prepared after giving effect to the Transactions as if the Transactions had occurred at the beginning of such period and any other adjustments reasonably acceptable to the Required Lenders (together with the Pro Forma Balance Sheet, the "**Pro Forma Financial Statements**"), copies of which have heretofore been furnished to the Administrative Agent, have been prepared based on the Annual Financial Statements and the Quarterly Financial Statements and have been prepared in good faith, based on assumptions believed by the Borrower to be reasonable as of the date of delivery thereof and adjustment as agreed by the Borrower, and present fairly in all material respects on a *pro forma* basis the estimated financial position of the Borrower and its Subsidiaries as at the Closing Date and their estimated results of operations for the period covered thereby; provided that no such *pro forma* financial statement shall be required to include adjustments for purchase accounting (including adjustments of the type contemplated by Financial Account Standards Board Accounting Standards Codification 805, Business Combinations (formerly SFAS 141R)).

(c) Since the Closing Date, there has been no event, circumstance or change, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

**Section 5.06      Litigation**.  There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any Subsidiary or against any of their properties or revenues that have a reasonable likelihood of adverse determination and such determination, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**Section 5.07      Ownership of Property; Liens**.  The Borrower and each of its Subsidiaries has good record title to, or valid leasehold interests in, or easements or other limited property interests in, all Real Property necessary in the ordinary conduct of its business, free and clear of all Liens, except (a) as set forth on Schedule 5.07, (b) minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes, (c) Liens permitted by Section 7.01 and (d) where the failure to have such title could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 5.08      Environmental Matters**.  Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)      Each Loan Party and its respective properties and operations are and have been in compliance with all Environmental Laws, which includes obtaining and maintaining all applicable Environmental Permits required under such Environmental Laws to carry on the business of the Loan Parties;

91

6237404.15

(b)      the Loan Parties have not received any written notice that alleges any of them is in violation of or potentially liable under any Environmental Laws, and none of the Loan Parties nor any of the Real Property is the subject of any claims, investigations, liens, demands, or judicial, administrative or arbitral proceedings pending or, to the knowledge of the Borrower, threatened in writing, under any Environmental Law or to revoke or modify any Environmental Permit held by any of the Loan Parties;

(c)      there has been no Release of Hazardous Materials on, at, under or from any Real Property or facilities owned, operated or leased by any of the Loan Parties, or, to the knowledge of the Borrower, Real Property formerly owned, operated or leased by any Loan Party or arising out of the conduct of the Loan Parties that could reasonably be expected to require investigation, remedial activity or corrective action or cleanup or could reasonably be expected to result in the Borrower or any of its Subsidiaries incurring liability under any Environmental Laws; and

(d)      there are no facts, circumstances or conditions arising out of or relating to the operations of the Loan Parties or Real Property or facilities owned, operated or leased by any of the Loan Parties or, to the knowledge of the Borrower, Real Property or facilities formerly owned, operated or leased by the Loan Parties that could reasonably be expected to result in the Borrower or any of its Subsidiaries incurring liability under any Environmental Laws.

The representations and warranties contained in this Section 5.08 are the sole and exclusive representations and warranties of the Borrower, the Holdcos and the Subsidiary Guarantors with respect to matters arising under or relating to Environmental Laws, Environmental Permits, Environmental Liabilities or Hazardous Materials.

Section 5.09      **Taxes**.  Except as otherwise permitted under Section 6.04, each of the Loan Parties and their Subsidiaries have timely filed all federal and all material state and local tax returns required to be filed, and have paid all Taxes levied or imposed upon them or their properties, income, profits or assets, that are due and payable (including in their capacity as a withholding agent).  To the knowledge of the Loan Parties, there is no proposed Tax deficiency or assessment that, if made would, individually or in the aggregate reasonably be expected to result in liability in excess of $250,000 or which is subject to a Permitted Protest.

Section 5.10      **ERISA Compliance**.  (a)  Except as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with its terms, the applicable provisions of ERISA, the Code and other Federal or state Laws.

(b)  (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) neither any Loan Party, Subsidiary nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due but not delinquent under Section 4007 of ERISA); (iii) neither any Loan Party, Subsidiary nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (iv) neither any Loan Party, Subsidiary nor any ERISA Affiliate has engaged in a transaction that could reasonably be expected to be subject to Sections 4069 or 4212(c) of ERISA; except, with respect to each of the foregoing clauses of this Section 5.10(b), as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.11      **Subsidiaries; Equity Interests**.  As of the Closing Date (after giving effect to the Transactions), no Loan Party has any Subsidiaries other than those specifically disclosed on Schedule

<div align="center">92</div>

6237404.15

5.11, and all of the outstanding Equity Interests owned by the Loan Parties (or a Subsidiary of any Loan Party) in such Subsidiaries have been validly issued and are fully paid and all Equity Interests owned by a Loan Party (or a Subsidiary of any Loan Party) in such Subsidiaries are owned free and clear of all Liens except (i) those created under the Collateral Documents, under the First Lien Loan Documents (which Liens shall be subject to the Intercreditor Agreement) or under the Second Lien Loan Documents (which Liens shall be subject to the Intercreditor Agreement) and (ii) any Lien that is permitted under Section 7.01. As of the Closing Date, Schedules 1 and 9 of the Perfection Certificate (a) set forth the name and jurisdiction of each Domestic Subsidiary that is a Loan Party, (b) set forth the ownership interest of the Borrower and any other Subsidiary thereof in each Subsidiary, including the percentage of such ownership and (c) identify each Subsidiary that is a Subsidiary the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

Section 5.12    **Margin Regulations; Investment Company Act**. (a) The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation T, U or X of the Board of Governors of the United States Federal Reserve System.

(b) None of the Holdcos, the Borrower or any of the Subsidiaries is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 5.13    **Disclosure**. No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party (other than projected financial information, *pro forma* financial information, budgets, estimates and information of a general economic or industry nature) to Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were made, not materially misleading. With respect to projected financial information and *pro forma* financial information, the Borrower represents that such information was prepared in good faith based upon assumptions believed to be reasonable at the time furnished, it being understood that such projected financial information and *pro forma* financial information are not to be viewed as facts or as a guarantee of performance or achievement of any particular results and that actual results may vary from such forecasts and that such variations may be material and that no assurance can be given that the projected results will be realized.

Section 5.14    **Labor Matters**. Except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against the Borrower or any of its Subsidiaries pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of the Borrower or any of its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with such matters; and (c) all payments due from the Borrower or any of its Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant party.

Section 5.15    **Intellectual Property; Licenses, Etc**. Each of the Borrower and the Subsidiaries owns, licenses, possesses or otherwise has the right to use all of the trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, technology, software, know-how database rights, design rights and other intellectual property rights (collectively, "**IP Rights**") that are reasonably necessary for the operation of its businesses as currently conducted, except to the extent the failure to own, license, possess or otherwise have the right to use such IP Rights, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. To the knowledge of the Borrower, the Borrower and the Subsidiaries' present business operations do not infringe upon any IP

93

6237404.15

Rights held by any Person except for such infringements, individually or in the aggregate, which could not reasonably be expected to have a Material Adverse Effect.  No claim or litigation regarding IP Rights is pending or, to the knowledge of the Borrower, threatened, against any Loan Party or any of the Subsidiaries, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

As of the Closing Date, all registrations material to the Loan Parties' business under the name of each Loan Party listed on Schedule 11 of the Perfection Certificate are valid and in full force and effect.

**Section 5.16    Solvency**.  On the Closing Date, after giving effect to the Transactions, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

**Section 5.17    [Reserved]**.

**Section 5.18    USA Patriot Act; OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws**.

(a)  To the extent applicable, each Loan Party is in compliance, in all respects, with the (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) the USA Patriot Act.

(b)  No Loan Party or any of its Subsidiaries is in violation of any Sanctions.  No Loan Party nor any of its Subsidiaries nor, to the knowledge of such Loan Party, any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (i) is a Sanctioned Person or a Sanctioned Entity, (ii) has any assets located in Sanctioned Entities, or (iii) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  Each of the Loan Parties and its Subsidiaries has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Loan Parties and its Subsidiaries, and to the knowledge of each such Loan Party, each director, officer, employee, and agent of each such Loan Party and each such Subsidiary, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  No proceeds of any Loan made or Letter of Credit issued hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law or Anti-Money Laundering Law by any Lender, Bank Product Provider, or other individual or entity participating in any transaction.

**Section 5.19    Security Documents**.  Except as otherwise contemplated hereby or under any other Loan Documents, the provisions of the Collateral Documents are effective to create in favor of the Administrative Agent for the benefit of the Secured Parties legal, valid and enforceable Liens on, and security interests in, the Collateral and, (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable Laws (which filings or recordings shall be made to the extent required by any Collateral Document) and (ii) upon the taking of possession or control by the Administrative Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent required by any Collateral Document), such Collateral Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral, in each case subject to no Liens other than the applicable Liens permitted under the Loan Documents, a legal, valid, enforceable and perfected Lien (if and to the extent perfection may be achieved by the filings and/or other actions required to be taken hereby or by the applicable Collateral Documents) on all right,

94

title and interest of the respective Loan Parties in the Collateral described therein subject to the Enforcement Qualifications and Liens permitted by Section 7.01.

Notwithstanding anything herein (including this Section 5.19) or in any other Loan Document to the contrary, neither the Borrower nor any other Loan Party makes any representation or warranty as to (A) the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest (other than with respect to those pledges and security interests made under the Laws of the jurisdiction of formation of the applicable Foreign Subsidiary) in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of the Administrative Agent or any Lender with respect thereto, in each case under foreign Law, (B) the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest to the extent such pledge, security interest, perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or (C) on the Closing Date and until required pursuant to Section 6.11, 6.13 or 4.01(a)(v), the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or enforceability of any pledge or security interest to the extent not required on the Closing Date pursuant to Section 4.01(a)(v).

Section 5.20   **EEA Financial Institutions**. None of the Holdcos, the Borrower or any Subsidiary thereof is an EEA Financial Institution.

Section 5.21   **Beneficial Ownership Certification**.  As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

Section 5.22   **[Reserved]**.

Section 5.23   **Eligible Accounts**.  As to each Account that is identified by Borrower as an Eligible Account in a Borrowing Base Certificate submitted to Administrative Agent, such Account is (a) a bona fide existing payment obligation of the applicable Account Debtor created by the sale and delivery of Inventory or the rendition of services to such Account Debtor in the ordinary course of a Borrower's business, (b) owed to a Borrower without any known defenses, disputes, offsets, counterclaims, or rights of return or cancellation, and (c) not excluded as ineligible by virtue of one or more of the excluding criteria (other than any Administrative Agent-discretionary criteria) set forth in the definition of Eligible Accounts.

Section 5.24   **Eligible Inventory**.  As to each item of Inventory that is identified by Borrower as Eligible Inventory in a Borrowing Base Certificate submitted to Administrative Agent, such Inventory is (a) of good and merchantable quality, free from known defects, and (b) not excluded as ineligible by virtue of one or more of the excluding criteria (other than any Administrative Agent-discretionary criteria) set forth in the definition of Eligible Inventory.

Section 5.25   **Location of Inventory**. Except as set forth in Schedule 5.25, Inventory of Borrower and its Subsidiaries with fair market value in excess of $500,000 is not stored with a bailee, warehouseman, or similar party and is located only at, or in-transit between, the locations identified on Schedule 5.25 to this Agreement (as such Schedule may be updated pursuant to Section 6.15).

Section 5.26   **Inventory Records**.  Each Loan Party keeps correct and accurate records itemizing and describing the type, quality, and quantity of its and its Subsidiaries' Inventory and the book value thereof.

Section 5.27   **Hedge Agreements**. On each date that any Hedge Agreement is executed by any Hedge Provider, Borrower and each other Loan Party satisfy all eligibility, suitability and other

95

requirements under the Commodity Exchange Act (7 U.S.C. § 1, et seq., as in effect from time to time) and the Commodity Futures Trading Commission regulations.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Loan or other Obligation (other than contingent obligations not yet due and owing as to which no claim has been asserted), hereunder which is accrued and payable which remains unpaid or unsatisfied, then from and after the Closing Date, Holdings and Intermediate Holdings (solely in the case of Sections 6.01, 6.02, 6.04, 6.05, 6.06, 6.08, 6.09, 6.10, 6.11, 6.13, 6.19, 6.20 and 6.21) and the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of its respective Subsidiaries to:

**Section 6.01**    **Financial Statements**.  (a)  Commencing with the fiscal year ended December 31, 2020, deliver to the Administrative Agent for prompt further distribution to each Lender, within ninety (90) days after the end of each fiscal year, a consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail (together with, in all cases, a management discussion and analysis with respect thereto) and prepared in accordance with GAAP, audited and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing or other independent registered public accounting firm approved by the Required Lenders (such consent not to be unreasonably withheld, delayed or conditioned), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification (other than related (i) solely to the occurrence of the Maturity Date or the upcoming maturity date under the First Lien Credit Agreement or the Second Lien Credit Agreement, in each case, occurring within one year from the date such report is delivered or (ii) any potential inability to satisfy any financial maintenance covenant on a future date or in a future period) or any qualification or exception as to the scope of such audit except for qualifications relating to changes in accounting principles or practices reflecting changes in GAAP and required or approved by such independent certified public accountants;

(b) Deliver to the Administrative Agent for prompt further distribution to each Lender, within forty-five (45) days (or seventy-five (75) days in the case of the first fiscal quarter following the Closing Date) after the end of each fiscal quarter of each fiscal year of Holdings, a consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as at the end of such fiscal quarter and the related (x) consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (y) consolidated statements of cash flows for such fiscal quarter and the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail together with, in all cases, a management discussion and analysis with respect thereto) and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes; and

(c) Deliver to the Administrative Agent, for prompt further distribution to each Lender, within thirty-five (35) days (or forty-five (45) days in the case of the first three (3) such months following the Closing Date) after the end of (i) the period beginning on the Closing Date through September 30, 2020 and (ii) thereafter, each of the first two (2) months in any fiscal quarter of Holdings, an unaudited consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries at the

96

6237404.15

end of such month and the related unaudited consolidated statements of cash flows as of and for such month and the portion of the fiscal year then ended, setting forth in each case, in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail; and

(d) Deliver to the Administrative Agent for prompt further distribution to each Lender, no later than ninety (90) days after the end of the fiscal year ending December 31, 2020 and each subsequent fiscal year, a reasonably detailed consolidated budget for the following fiscal year on a quarterly basis (including a projected consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as of the end of the following fiscal year, the related consolidated statements of projected cash flow and projected income and a summary of the material underlying assumptions applicable thereto) (collectively, the "**Projections**").

Notwithstanding the foregoing, the obligations in Sections 6.01(a) and (b) may be satisfied with respect to financial information of Holdings, Intermediate Holdings, the Borrower and the Subsidiaries by furnishing (I) the applicable financial statements of Holdings (or any direct or indirect parent, as applicable, of Holdings) or (II) the Form 10-K or 10-Q of Holdings (or any direct or indirect parent of Holdings), as applicable filed with the SEC; provided that, with respect to clauses (I) and (II), (i) to the extent such information relates to a parent of Holdings, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent, on the one hand, and the information relating to Holdings, Intermediate Holdings, the Borrower and the Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under Section 6.01(a), such materials are accompanied by a report and opinion of Deloitte & Touche LLP or any other independent registered public accounting firm of nationally recognized standing or other independent registered public accounting firm approved by the Required Lenders (such consent not to be unreasonably withheld, delayed or conditioned), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going-concern" or like qualification (other than related (i) solely to the occurrence of the Maturity Date or the upcoming maturity date under the First Lien Credit Agreement or the Second Lien Credit Agreement, in each case, occurring within one year from the date such report is delivered or (ii) any potential inability to satisfy any financial maintenance covenant on a future date or in a future period) or exception or any qualification or exception as to the scope of such audit except for qualifications relating to changes in accounting principles or practices reflecting changes in GAAP and required or approved by such independent certified public accountants.

Any financial statement required to be delivered pursuant to Section 6.01(a) or 6.01(b) shall not be required to include purchase accounting adjustments relating to the Transactions or any Permitted Acquisition to the extent it is not practicable to include them.

Documents required to be delivered pursuant to Sections 6.01 and 6.02(a) through (d) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower (or any direct or indirect parent of the Borrower) posts such documents, or provides a link thereto on the website on the Internet at the website address listed on Schedule 10.02(a); or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that (x) promptly following such posting, the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender and (y) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents. Each

6237404.15

Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower under this Agreement (collectively, "**Borrower Materials**") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive Material Non-Public Information and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC**,**" the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any Material Non-Public Information (although it may be sensitive and proprietary) (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.08); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information." Notwithstanding the foregoing, the Borrower shall be under no obligation to mark any Borrower Materials "PUBLIC".

Section 6.02   **Certificates; Other Information**.   Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)      concurrently the delivery of the financial statements referred to in Sections 6.01(a), (b) and (c), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower;

(b)      promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which Holdings, Intermediate Holdings, the Borrower or any Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 6.02;

(c)      promptly after the furnishing thereof, copies of any material written notices received by any Loan Party (other than in the ordinary course of business) or material statements or material reports furnished to any holder of debt securities (other than in connection with any board observer rights) of any Loan Party or of any of its Subsidiaries pursuant to the terms of any First Lien Loan Document or Second Lien Loan Document and, in each case, not otherwise required to be furnished to the Lenders pursuant to any other clause of Section 6.01, 6.02 or 6.03;

(d)      together with the delivery of each Compliance Certificate pursuant to Section 6.02(a), (i) in the case of annual Compliance Certificates only, a report setting forth the legal name and the jurisdiction of formation of each Loan Party and the location of the chief executive office of each Loan Party on the Perfection Certificate or confirming that there has been no change in such information since the Closing Date or

98

6237404.15

the date of the last such report; and (ii) a list of each Subsidiary of the Borrower that identifies each Subsidiary as of the date of delivery of such Compliance Certificate (to the extent that there have been any changes in the identity or status as a Subsidiary of any such Subsidiaries since the Closing Date or the most recent list provided);

(e)    each of the reports set forth on Schedule 6.02 to this Agreement at the times specified therein, and agree to use commercially reasonable efforts in cooperation with Administrative Agent to facilitate and implement a system of electronic collateral reporting in order to provide electronic reporting of each of the items set forth on such Schedule.  Borrower and Administrative Agent hereby agree that the delivery of the Borrowing Base Certificate through the Administrative Agent's electronic platform or portal, subject to Administrative Agent's authentication process, by such other electronic method as may be approved by Administrative Agent from time to time in its sole discretion, or by such other electronic input of information necessary to calculate the Borrowing Bases as may be approved by Administrative Agent from time to time in its sole discretion, shall in each case be deemed to satisfy the obligation of Borrower to deliver such Borrowing Base Certificate, with the same legal effect as if such Borrowing Base Certificate had been manually executed by Borrower and delivered to Administrative Agent; and

(f)    promptly, such additional information regarding the business, legal, financial or corporate affairs of the Loan Parties or any of their respective Subsidiaries, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request.

In no event shall the requirements set forth in Section 6.02(f) require Holdings, Intermediate Holdings, the Borrower or any of its Subsidiaries to provide any such information which (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or (iii) is subject to attorney-client or similar privilege or constitutes attorney work-product.

**Section 6.03    Notices.**  Promptly (and in the case of clause (a) below, not later within three (3) Business Days) after a Responsible Officer of the Borrower or any Subsidiary Guarantor has obtained knowledge thereof, notify the Administrative Agent:

(a)    Of the occurrence of any Default or Event of Default;

(b)    of the occurrence of an ERISA Event which could reasonably be expected to result in a Material Adverse Effect;

(c)    of the filing or commencement of, or any threat or notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority against the Borrower or any of its Subsidiaries that would reasonably be expected to result in a Material Adverse Effect;

(d)    of the occurrence of any other matter or development that has had or could reasonably be expected to have a Material Adverse Effect; and

(e)    of any change in the information provided in any certification regarding beneficial ownership as required by 31 C.F.R. § 1010.230 that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification.

99

6237404.15

Each notice pursuant to this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of the Borrower delivered to the Administrative Agent for prompt further distribution to each Lender (x) that such notice is being delivered pursuant to Section 6.03(a), (b), (c) or (d) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

Section 6.04    **Payment of Taxes**.  Pay, discharge or otherwise satisfy as the same shall become due and payable in the normal conduct of its business, all its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (a) any such Tax is the subject of a Permitted Protest or (b) Taxes in not in excess of $100,000 outstanding at any time.

Section 6.05    **Preservation of Existence, Etc**.  (a)  Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization; and

(b) take all reasonable action to maintain all rights, privileges (including its good standing where applicable in the relevant jurisdiction), permits, authorizations, licenses and franchises necessary or desirable in the normal conduct of its business;

except, in the case of Section 6.05(a) (other than with respect to the Borrower) or this Section 6.05(b), to the extent (i) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (ii) pursuant to any merger, consolidation, liquidation, dissolution or Disposition permitted by Article VII.

Section 6.06    **Maintenance of Properties**.  Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and fire, casualty or condemnation excepted.

Section 6.07    **Insurance**.

(a) Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Subsidiaries) as are customarily carried under similar circumstances by such other Persons.  Not later than thirty (30) days after the Closing Date (or the date any such insurance is obtained, in the case of insurance obtained after the Closing Date) (in each case, or such later date as the Required Lenders may agree in its sole discretion), each such policy of insurance (other than director and officer insurance and worker's compensation insurance) shall as appropriate (i) name the Administrative Agent as additional insured thereunder or (ii) in the case of each casualty insurance policy, contain a lender loss payable clause or endorsement that names the Administrative Agent, on behalf of the Lenders, as lender loss payee or mortgagee, as applicable, thereunder.  If the improvements on any Mortgaged Property are at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then, to the extent required by applicable Flood Insurance Laws, the Borrower shall, or shall cause each Loan Party to, (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount reasonably satisfactory to the Required Lenders and otherwise sufficient to comply with all applicable rules and

100

regulations promulgated pursuant to the Flood Insurance Laws and (ii) upon the reasonable request of the Administrative Agent at the direction of the Required Lenders (not to exceed one time per fiscal year, unless an Event of Default has occurred and is continuing) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Required Lenders.

(b)  Give Administrative Agent prompt notice of any loss exceeding $500,000 covered by the casualty or business interruption insurance of any Loan Party or its Subsidiaries.  Upon the occurrence and during the continuance of an Event of Default, Administrative Agent shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

**Section 6.08**    **Compliance with Laws**.  Comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except if the failure to comply therewith could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 6.09**    **Books and Records**.  (a) Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP and which reflect all material financial transactions and matters involving the assets and business of the Borrower or a Subsidiary, as the case may be (it being understood and agreed that certain Foreign Subsidiaries maintain individual books and records in conformity with generally accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder) and (b) use commercially reasonable efforts in cooperation with Administrative Agent to facilitate and implement a system of electronic collateral reporting in order to provide electronic reporting of each of the items set forth on such Schedule. Borrower and Administrative Agent hereby agree that the delivery of the Borrowing Base Certificate through the Administrative Agent's electronic platform or portal, subject to Administrative Agent's authentication process, by such other electronic method as may be approved by Administrative Agent from time to time in its sole discretion, or by such other electronic input of information necessary to calculate the Borrowing Bases as may be approved by Administrative Agent from time to time in its sole discretion, shall in each case be deemed to satisfy the obligation of Borrower to deliver such Borrowing Base Certificate, with the same legal effect as if such Borrowing Base Certificate had been manually executed by Borrower and delivered to Administrative Agent.

**Section 6.10**    **Inspection Rights**.

(a)    Permit Administrative Agent, any Lender, and each of their respective duly authorized representatives or agents to visit any of its properties and inspect any of its assets or books and records, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees (provided, that an authorized representative of a Borrower shall be allowed to be present) at such reasonable times and intervals as Administrative Agent or any Lender, as applicable, may designate and, so long as no Default or Event of Default has occurred and is continuing, with reasonable prior written notice to Borrower and during regular business hours, at Borrower's expense in accordance with the provisions of the Agent Fee Letter, subject to the limitations set forth below in Section 6.10(c).

(b)    Permit Administrative Agent and each of its duly authorized representatives or agents to conduct field examinations, appraisals or valuations at such reasonable times and intervals as Administrative Agent may designate, at Borrower's expense in accordance with the provisions of the Agent Fee Letter, subject to the limitations set forth below in Section 6.10(c).

101

6237404.15

(c)      So long as no Event of Default shall have occurred and be continuing during a calendar year, Borrower shall not be obligated to reimburse Administrative Agent for more than two (2) field examinations in such calendar year (increasing to three (3) field examinations if an Increased Reporting Event has occurred during such calendar year), and one (1) inventory appraisal in such calendar year (increasing to two (2) inventory appraisals if an Increased Reporting Event has occurred during such calendar year), in each case, except for field examinations and appraisals conducted in connection with a proposed Permitted Acquisition (whether or not consummated). Borrower shall permit the Administrative Agent to conduct additional field examinations and appraisals at its own expense.

Notwithstanding anything to the contrary in this Section 6.10, none of Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (c) is subject to attorney-client or similar privilege or constitutes attorney work product.

**Section 6.11     Additional Collateral; Additional Guarantors**.  At the Borrower's expense, subject to the terms, conditions and provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(a)      Upon the formation or acquisition of any new direct or indirect wholly owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) by any Loan Party or the designation in accordance with Section 6.14 of any existing direct or indirect wholly owned Material Domestic Subsidiary as a Subsidiary (in each case, other than an Excluded Subsidiary) or any Subsidiary becoming a wholly owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) or any Excluded Subsidiary ceasing to be an Excluded Subsidiary:

(i)      within forty-five (45) days after such formation, acquisition, designation or occurrence or such longer period as the Required Lenders may agree in writing in their discretion:

(A)      cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Administrative Agent, a Joinder Agreement to become a Guarantor under this Agreement, Security Agreement Supplements, Intellectual Property Security Agreements, and other security agreements and documents as reasonably requested by and in form and substance reasonably satisfactory to the Required Lenders (consistent with the Security Agreement, Intellectual Property Security Agreements and other security agreements in effect on the Closing Date), in each case granting Liens required by the Collateral and Guarantee Requirement;

(B)      cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement (and the parent of each such Domestic Subsidiary that is the Borrower or a Guarantor) to deliver any and all certificates representing Equity Interests (to the extent certificated) and intercompany notes constituting negotiable instruments (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer

102

6237404.15

executed in blank and instruments evidencing Indebtedness held by such Material Domestic Subsidiary and required to be delivered pursuant to the Collateral and Guarantee Requirement endorsed in blank to the Administrative Agent;

(C)     take and cause such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement and each direct or indirect parent of such Material Domestic Subsidiary to take whatever action (including the recording of Mortgages, filing of UCC financing statements and delivery of stock and membership interest certificates) as may be necessary in the reasonable opinion of the Administrative Agent (at the direction of the Required Lenders) to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and perfected Liens to the extent required by the Collateral and Guarantee Requirement, and to otherwise comply with the requirements of the Collateral and Guarantee Requirement;

(D)     if requested by the Administrative Agent or the Required Lenders, deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the Lenders, of counsel for the Loan Parties reasonably acceptable to the Required Lenders as to such matters set forth in this Section 6.11(a) as the Required Lenders may reasonably request (or otherwise consistent with the opinions delivered on the Closing Date);

(ii)     as promptly as practicable after the request therefor by the Administrative Agent, deliver to the Administrative Agent with respect to each Material Real Property, any existing title reports, abstracts or environmental assessment reports, to the extent available and in the possession or control of a Loan Party; provided, however, that there shall be no obligation to deliver to the Administrative Agent any environmental assessment report whose disclosure to the Administrative Agent would require the consent of a Person other than a Loan Party or one of its Subsidiaries, where, despite the commercially reasonable efforts of the Borrower to obtain such consent, such consent cannot be obtained; and

(iii)     if reasonably requested by the Administrative Agent or the Required Lenders, deliver to the Administrative Agent any other items necessary from time to time to satisfy the Collateral and Guarantee Requirement with respect to perfection and existence of security interests with respect to property of any Guarantor (and the direct parent of each such Guarantor) acquired after the Closing Date and subject to the Collateral and Guarantee Requirement, but not specifically covered by preceding clauses (i), (ii) or (iii) or Section 6.11(b) below.

(b)     Not later than 120 days (or such longer period as the Required Lenders may agree in writing in their discretion) after (i) any Material Real Property is acquired by a Loan Party after the Closing Date or (ii) an entity becomes a Loan Party if such entity owns Material Real Property at the time it becomes a Loan Party, cause such Material Real Property, if such property is required to be provided as Collateral pursuant to the Collateral and Guarantee Requirement but is not automatically subject to a Lien pursuant to pre-existing Collateral Documents, to be subject to a Lien and Mortgage in favor of the Administrative Agent for the benefit of the Secured Parties and take, or cause the relevant Loan Party to take, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect or record such Lien, in each case to the extent required by, and subject to the limitations and exceptions of, the Collateral and Guarantee Requirement and to otherwise comply with the requirements of the Collateral and Guarantee Requirement.

103

6237404.15

(c)     Each Domestic Subsidiary required to be designated as a "Material Domestic Subsidiary" pursuant to the proviso in the definition of "Material Domestic Subsidiary" shall have taken all actions to comply with the provisions of Section 6.11 within the timeframe required by the definition of "Material Domestic Subsidiary".

Notwithstanding anything to the contrary contained in this Agreement (including this Section 6.11 and Section 6.13) or in any other Loan Document, (x) Administrative Agent shall not accept delivery of any Mortgage from any Loan Party unless each of the Lenders has received forty-five (45) days prior written notice thereof and Administrative Agent has received confirmation from each Lender that such Lender has completed its flood insurance diligence, has received copies of all flood insurance documentation and has confirmed that flood insurance compliance has been completed as required by the Flood Laws or as otherwise satisfactory to such Lender and (y) Administrative Agent shall not accept delivery of any joinder to any Loan Document with respect to any Subsidiary of any Loan Party that is not a Loan Party, if such Subsidiary that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation unless such Subsidiary has delivered a Beneficial Ownership Certification in relation to such Subsidiary and Administrative Agent has completed its Patriot Act searches, OFAC/PEP searches and customary individual background checks for such Subsidiary, the results of which shall be satisfactory to Administrative Agent.

Section 6.12    **Compliance with Environmental Laws**.  Except, in each case, to the extent that the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, comply, and take all commercially reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply, with all Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and occupancy of its properties; and, in each case to the extent the Loan Parties are required to do so by Environmental Laws, conduct any investigation, remedial or other corrective action necessary to address Hazardous Materials at any property or facility in accordance with Environmental Laws.  If an Event of Default arising out of an Environmental Liability has occurred and is continuing, within sixty (60) days of receiving a written request by the Administrative Agent (at the direction of the Required Lenders), the Borrower will provide the Administrative Agent with an environmental assessment report regarding the scope of the Environmental Liability and the likely cost of mitigating such Environmental Liability, prepared at Borrower's sole cost and expense and by an environmental consultant reasonably acceptable to the Required Lenders.  If such report is not timely provided, the Administrative Agent may have them prepared by an environmental consultant of its choosing, at Borrower's sole cost and expense.

Section 6.13    **Further Assurances**.  Promptly upon reasonable request by the Administrative Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as are necessary or that the Administrative Agent may reasonably request from time to time in order to carry out more effectively the purposes of this Agreement and the Collateral Documents, to the extent required pursuant to the Collateral and Guarantee Requirement and subject in all respects to the limitations therein. If the Administrative Agent or the Required Lenders reasonably determine that it is required by applicable Law to have appraisals prepared in respect of the Real Property of any Loan Party subject to a mortgage constituting Collateral, the Borrower shall promptly provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA.

Section 6.14    **[Reserved]**.

Section 6.15    **Location of Inventory; Chief Executive Office**.  Keep (a) their Inventory with fair market value in excess of $500,000 only at the locations identified on Schedule 5.25 to this

104

6237404.15

Agreement (provided that Borrower may amend Schedule 5.25 to this Agreement so long as such amendment occurs by written notice to Administrative Agent not less than ten (10) days prior to the date on which such Inventory is moved to such new location and so long as Administrative Agent has consented to such amendment and such new location is within the continental United States), and (b) their respective chief executive offices only at the locations identified on Schedule 7 to the Guaranty and Security Agreement.   Each Loan Party will, and will cause each of its Subsidiaries to, use their commercially reasonable efforts to obtain Collateral Access Agreements for each of the locations identified on Schedule 7 to the Guaranty and Security Agreement and Schedule 5.25 to this Agreement.

**Section 6.16    [Reserved]**.

**Section 6.17    Lender Meetings**.  To the extent requested by the Administrative Agent or the Required Lenders, participate in a meeting (which may be in the form of a conference call) (including a customary question and answer session) with the Administrative Agent and Lenders once during each fiscal quarter to be held at such time as may be agreed to by the Borrower and the Administrative Agent at the direction of the Required Lenders, but in any event within fifteen (15) Business Days of each date that financial statements are required to be delivered pursuant to Section 6.01(b).

**Section 6.18    End of Fiscal Years**.  For financial reporting purposes, cause its fiscal year to end on December 31 (other than any Subsidiary acquired after the Closing Date); provided, however, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Required Lenders, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

**Section 6.19    Lines of Business**. Holdings, Intermediate Holdings, the Borrower and the Subsidiaries, taken as a whole, will not engage in any material line of business substantially different from those lines of business conducted by Holdings, Intermediate Holdings, the Borrower and the Subsidiaries on the Closing Date or any business reasonably related, complementary, corollary, synergistic or ancillary thereto (including related, complementary, synergistic or ancillary technologies) or reasonable extensions thereof.

**Section 6.20    Post-Closing Covenant**. Holdings agrees that it will deliver, or will cause to be delivered, to the Administrative Agent, in form and substance reasonably satisfactory to the Required Lenders, the items described on Schedule 6.20(a) hereof by the times specified with respect to such items, or such later time as the Required Lenders may agree in their reasonable discretion.

**Section 6.21    OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws**. Each Loan Party will, and will cause each of its Subsidiaries to, comply with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Loan Parties and its Subsidiaries shall implement and maintain in effect policies and procedures reasonably designed to ensure compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

**Section 6.22    Account Control Agreements**.  With respect to each deposit account, securities account or other similar account established prior to or on the Closing Date, deliver an Account Control Agreement with respect to each such account (other than any Excluded Accounts) within thirty (30) days after the Closing Date or such later date as the Required Lenders may agree in their sole discretion. With respect to each deposit account, securities account or other similar account (other than any Excluded Accounts) established following the Closing Date, deliver on the date thirty (30) days following the establishment thereof (or such later date agreed to by the Required Lenders in their sole discretion), an Account Control Agreement with respect to each such account.  The Administrative Agent's rights with respect to each account subject to an Account Control Agreement shall be governed by such Account

105

6237404.15

Control Agreement. Following the Closing Date, the Borrower shall give the Administrative Agent prompt written notice of the opening of any deposit, securities or other similar account by any Loan Party.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Loan or other Obligation hereunder (other than contingent obligations not yet due and owing as to which no claim has been asserted), then from and after the Closing Date, the Borrower (and, with respect to Section 7.14 only, the Holdcos) shall not and shall not permit any of its Subsidiaries to, directly or indirectly:

**Section 7.01**    **Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens (i) created pursuant to any Loan Document and (ii) on the Collateral securing other Secured Obligations;

(b)    Liens existing on the Closing Date and listed in Schedule 7.01(b) and any modifications, replacements, renewals, restructurings, refinancings or extensions thereof; provided that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under Section 7.03 and (B) proceeds and products thereof and (ii) the replacement, renewal, extension or refinancing of the obligations secured or benefitted by such Liens, to the extent constituting Indebtedness, is permitted by Section 7.03;

(c)    Liens for taxes, assessments or governmental charges that (i) are not overdue for a period of more than any applicable grace period related thereto or (ii) that are the subject of a Permitted Protest;

(d)    statutory or common law Liens of landlords, sub-landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens, so long as, in each case, such Liens secure amounts not overdue for a period of more than thirty (30) days or if more than thirty (30) days overdue, are unfiled and no other action has been taken to enforce such Liens or that are subject to a Permitted Protest;

(e)    (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Subsidiaries;

(f)    pledges or deposits to secure the performance of bids, trade contracts, utilities, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

106

6237404.15

20-22766-rdd   Doc 232   Filed 08/28/20   Entered 08/28/20 14:01:43   Main Document
Pg 496 of 1011

(g)      covenants, conditions, easements, rights-of-way, building codes, restrictions (including zoning restrictions), encroachments, licenses, protrusions and other similar encumbrances and minor title defects, in each case affecting Real Property and that do not in the aggregate materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole, and any exceptions on any title insurance policies issued in connection with such Real property;

(h)      Liens (i) securing judgments or orders for the payment of money not constituting an Event of Default under Section 8.01(h) and (iii) arising out of notices of *lis pendens* and associated rights related to litigation being contested in good faith by appropriate proceedings for which adequate reserves have been made;

(i)      leases, licenses, subleases or sublicenses (including licenses and sublicenses of software and other intellectual property rights) and terminations thereof, in each case either granted to others with respect to intellectual property that is not material to the business of the Borrower and Subsidiaries or in the ordinary course of business, which (i) do not interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, (ii) do not secure any Indebtedness and (iii) are permitted by Section 7.05;

(j)      Liens in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(k)      Liens (i) of a collection bank arising under Section 4-208 of the Uniform Commercial Code on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business, (iii) in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions, and (iv) that are contractual rights of setoff or rights of pledge relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(l)      Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Sections 7.02(g), (i) and (n) or to the extent related to any of the foregoing, Section 7.02(s), to be applied against the purchase price for such Investment, and (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(m)      Liens (i) in favor of the Borrower or any Subsidiary Guarantor and (ii) in favor of a Subsidiary that is not a Loan Party on assets of a Subsidiary that is not a Loan Party securing Indebtedness permitted under Section 7.03;

(n)      any interest or title of a lessor, sub-lessor, licensor or sub-licensor under leases, subleases, licenses or sublicenses entered into by the Borrower or any of its

107

6237404.15

Subsidiaries in the ordinary course of business or with respect to intellectual property that is not material to the business of the Borrower and its Subsidiaries;

(o)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business permitted by this Agreement;

(p)     Liens deemed to exist in connection with Investments in repurchase agreements under Section 7.02;

(q)     Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(r)     Liens that are contractual rights of setoff or rights of pledge (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any of its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(s)     Liens solely on any cash earnest money deposits made by the Borrower or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(t)     ground leases in respect of Real Property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(u)     Liens to secure Indebtedness permitted under Section 7.03(e); provided that (i) such Liens are created within 270 days of the acquisition, construction, repair, lease or improvement of the property subject to such Liens, (ii) such Liens do not at any time encumber property (except for replacements, additions, accessions and proceeds to such property) other than the property financed by such Indebtedness and the proceeds and products thereof and customary security deposits and (iii) with respect to Capitalized Leases, such Liens do not at any time extend to or cover any assets (except for replacements, additions and accessions to such assets) other than the assets subject to such Capitalized Leases and the proceeds and products thereof and customary security deposits; provided that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(v)     Liens on property of any Subsidiary that is not a Loan Party, which Liens secure Indebtedness of any Subsidiary that is not a Loan Party permitted under Section 7.03;

(w)     Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Subsidiary (other than by designation as a Subsidiary pursuant to Section 6.14) (other than Liens on the Equity Interests of any Person that becomes a Subsidiary to the extent such Equity Interests are

108

6237404.15

owned by the Borrower or another Subsidiary), in each case, securing Indebtedness permitted pursuant to Section 7.03(g),

(x)      (i) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business complies, and (ii) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any Real Property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole;

(y)      Liens arising from precautionary Uniform Commercial Code financing statement or similar filings;

(z)      Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(aa)      the modification, replacement, renewal or extension of any Lien permitted by Sections 7.01(b), (u) and (w); provided that (i) the Lien does not extend to any additional property, other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien and (B) proceeds and products thereof, and (ii) the renewal, extension, restructuring or refinancing of the obligations secured or benefited by such Liens is permitted by Section 7.03 (to the extent constituting Indebtedness);

(bb)      Liens with respect to property or assets of the Borrower or any of its Subsidiaries securing obligations, other than Indebtedness for borrowed money, in an aggregate principal amount outstanding at any time not to exceed $5,000,000, in each case determined as of the date of incurrence;

(cc)      [reserved];

(dd)      [reserved];

(ee)      Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(ff)      deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

(gg)      [reserved];

(hh)      [reserved];

(ii)      Liens on property of any Foreign Subsidiary securing Indebtedness of such Foreign Subsidiary permitted under Section 7.03;

109

(jj)     Subject to the Intercreditor Agreement, Liens on the Collateral securing (i)(A) Indebtedness incurred pursuant to Section 7.03(w) and (B) related Second Lien Secured Obligations under the Second Lien Loan Documents governing such Indebtedness and (ii)(A) Indebtedness incurred pursuant to Section 7.03(x) and (B) related First Lien Secured Obligations under the First Lien Loan Documents governing such Indebtedness;

(kk)     [reserved];

(ll)     in the case of any non-wholly owned Subsidiary, any put and call arrangements or restrictions on disposition related to its Equity Interests set forth in its organizational documents or any related joint venture or similar agreement;

(mm)     Liens securing Swap Contracts so long as the value of the property securing such Swap Contracts does not exceed $2,500,000 at any time;

(nn)     Liens on property incurred pursuant to any sale-leaseback transaction permitted hereunder and general intangibles related thereto;

(oo)     [reserved]; and

(pp)     Liens arising by operation of law in the United States under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods.

Section 7.02     **Investments**.   Make or hold any Investments, except the following (each, a "**Permitted Investment**"):

(a)     Investments by the Borrower or any of its Subsidiaries in assets that were cash or Cash Equivalents when such Investment was made;

(b)     loans or advances to officers, directors and employees of any Loan Party (or any direct or indirect parent thereof) or any of its Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests of Holdings or any direct or indirect parent thereof or to permit the payment of taxes with respect thereto; provided that, to the extent such loans or advances are made in cash, the amount of such loans and advances used to acquire such Equity Interests shall be contributed to the Borrower in cash as common equity; provided, further, that the aggregate principal amount outstanding at any time under this clause (ii) shall not exceed $3,750,000, and (iii) for any other purposes not described in the foregoing clauses (i) and (ii); provided that the aggregate principal amount outstanding at any time under this clause (iii) shall not exceed $1,250,000;

(c)     Investments (i) by the Borrower or any Subsidiary in any Loan Party (other than a Holdco), (ii) by any Subsidiary that is not a Loan Party in any other Subsidiary that is not a Loan Party and (iii) so long as the Payment Conditions are satisfied, by any Loan Party in any Subsidiary that is not a Loan Party; provided that (A) no such Investments made pursuant to clause (iii) in the form of intercompany loans shall be evidenced by a promissory note unless any such promissory note constituting a negotiable instrument is pledged to the Administrative Agent in accordance with the terms of the Security Agreement, (B) any Investments in the form of intercompany loans

110

6237404.15

constituting Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be unsecured and subordinated to the Obligations on terms consistent with the subordination provisions of the Intercompany Note and (C) the aggregate amount of Investments made pursuant to clause (iii) shall not exceed $20,000,000 at any time outstanding;

(d)        Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e)        Investments (excluding loans and advances made in lieu of Restricted Payments pursuant to and limited by Section 7.02(m) below) consisting of transactions permitted under Sections 7.01, 7.03 (other than 7.03(c) and (d)), 7.04 (other than 7.04(c)(ii) or (e)), 7.05 (other than 7.05(d)(ii) or 7.05(e)), 7.06 (other than 7.06(d)) and 7.13, respectively;

(f)        Investments (i) existing or contemplated on the Closing Date or made pursuant to legally binding written contracts in existence on the Closing Date, in each case set forth on Schedule 7.02(f) and any modification, replacement, renewal, reinvestment or extension thereof and (ii) existing on the Closing Date by the Borrower or any Subsidiary in the Borrower or any other Subsidiary and any modification, renewal or extension thereof; provided that (x) the amount of the original Investment is not increased except by the terms of such Investment or as otherwise permitted by this Section 7.02 and (y) any Investment in the form of Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be subject to subordination terms substantially consistent with the terms of the Intercompany Note;

(g)        Investments in Swap Contracts permitted under Section 7.03;

(h)        promissory notes, securities and other non-cash consideration received in connection with Dispositions permitted by Section 7.05;

(i)        any acquisition of all or substantially all the assets of a Person or any Equity Interests in a Person that becomes a Subsidiary or division or line of business of a Person (or any subsequent Investment made in a Person, division or line of business previously acquired in a Permitted Acquisition), in a single transaction or series of related transactions; provided, that:  (i) the Payment Conditions are satisfied; (ii) no Event of Default exists on the date that the Borrower or the applicable Subsidiary enters into a binding agreement with respect to such acquisition and, immediately after giving effect to such acquisition; (iii) any acquired or newly formed Subsidiary shall not be liable for any Indebtedness except for Indebtedness otherwise permitted by Section 7.03; (iv) to the extent required by the Collateral and Guarantee Requirement, (A) the property, assets and businesses acquired in such purchase or other acquisition shall constitute Collateral and (B) any such newly created or acquired Subsidiary (other than an Excluded Subsidiary) shall become a Guarantor, in each case, in accordance with Section 6.11; and (v) the aggregate amount of Investments by Loan Parties pursuant to this Section 7.02(i) in assets (other than Equity Interests) that are not (or do not become at the time of such acquisition) directly owned by a Loan Party or in Equity Interests of Persons that do not become Loan Parties shall not exceed, when taken together with the

111

aggregate amount of all Investments made pursuant to Section 7.02(c)(iii), $20,000,000 (any such acquisition, a "**Permitted Acquisition**");

(j)       Investments made in connection with the Transactions;

(k)       Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(l)       Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(m)       loans and advances to any direct or indirect parent of the Borrower, in lieu of and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof) Restricted Payments to the extent permitted to be made to such parent in accordance with Section 7.06(h), such Investment being treated for purposes of the applicable clause of Section 7.06, including any limitations, as if a Restricted Payment had been made pursuant to such clause;

(n)       so long as the Payment Conditions are satisfied, Investments (including Permitted Acquisitions) in an aggregate amount pursuant to this Section 7.02(n) (valued at the time of the making thereof, and without giving effect to any write-downs or write-offs thereof) at any time not to exceed $12,500,000;

(o)       so long as the Payment Conditions are satisfied, Investments made in respect of joint ventures or other similar agreements or partnership not to exceed $10,000,000;

(p)       Investments in any Person to which the Borrower or any Subsidiary outsources operational activities or otherwise related to the outsourcing of operational activities in the ordinary course of business in an aggregate amount not to exceed $2,500,000;

(q)       advances of payroll payments to employees in the ordinary course of business;

(r)       (i) Investments made in the ordinary course of business in connection with obtaining, maintaining or renewing client contracts and loans or advances made to distributors and suppliers in the ordinary course of business and (ii) Investments to the extent that payment for such Investments is made solely with Equity Interests of Holdings permitted to be issued hereunder (or any direct or indirect parent of the Borrower);

(s)       Investments of a Subsidiary acquired after the Closing Date in accordance with Section 7.02 or of a Person merged or amalgamated or consolidated into the Borrower or merged, amalgamated or consolidated with a Subsidiary in accordance with Section 7.04 after the Closing Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger,

112

6237404.15

amalgamation or consolidation and were in existence on the date of such acquisition, merger or consolidation; provided that this clause (s) is intended solely to grandfather such Investments as are indirectly acquired as a result of an acquisition of a Person otherwise permitted hereunder and any consideration paid in connection with such acquisition that may be allocable to such Investments that consist of Subsidiaries that are not Loan Parties must be permitted by, and be taken into account in computing compliance with, any basket amounts or limitations applicable to such acquisition hereunder;

(t)       Investments made by a Subsidiary that is not a Loan Party to the extent such Investments are financed with the proceeds received by such Subsidiary from an Investment in such Subsidiary by a Loan Party permitted under this Section 7.02;

(u)       [reserved];

(v)       [reserved];

(w)       Investments in deposit accounts, securities accounts and commodities accounts maintained by the Borrower or such Subsidiary, as the case may be;

(x)       Investments constituting any part of a reorganization and other activities related to tax planning; provided that (i) no Event of Default shall have occurred and be continuing and (ii) any security interests granted to the Administrative Agent for the benefit of the Secured Parties in the Collateral pursuant to the Collateral Documents shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, consolidation, dissolution or liquidation) and all actions required to maintain said perfected status have been or will promptly be taken; and

(y)       contributions of the Equity Interests of any Subsidiary that is not a Loan Party to any other Subsidiary that is not a Loan Party to the extent necessary in connection with any intercompany reorganization and/or other activities related to tax planning; provided that no Event of Default shall have occurred and be continuing.

To the extent an Investment is permitted to be made by a Loan Party directly in any Subsidiary or any other Person who is not a Loan Party (each such person, a "**Target Person**") under any provision of this Section 7.02, such Investment may be made by advance, contribution or distribution by a Loan Party to a Subsidiary, or a Holdco, and further contemporaneously advanced or contributed to a Subsidiary for purposes of making the relevant Investment in the Target Person without constituting an Investment for purposes of Section 7.02 (it being understood that such Investment must satisfy the requirements of, and shall count towards any thresholds in, a provision of this Section 7.02 as if made by the applicable Loan Party directly to the Target Person).

Section 7.03     **Indebtedness**. Create, incur, assume or suffer to exist any Indebtedness, except:

(a)  Indebtedness of any Loan Party under the Loan Documents;

(b)  Indebtedness outstanding on the Closing Date and listed on Schedule 7.03(b) and any Permitted Refinancing thereof; provided that all such Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be unsecured and subordinated to the Obligations pursuant to an Intercompany Note;

113

6237404.15

(c) Guarantees by the Borrower and any Subsidiary in respect of Indebtedness of the Borrower or any Subsidiary otherwise permitted hereunder; provided that (A) no Guarantee by any Subsidiary of any Indebtedness that is secured by a Lien on the Collateral shall be permitted unless such guaranteeing party shall have also provided a Guarantee of the Obligations on the terms set forth herein, (B) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guarantee of the Obligations on terms at least as favorable (as reasonably determined by the Borrower) to the Lenders as those contained in the subordination of such Indebtedness and (C) any Guarantee by a Subsidiary that is not a Loan Party of any Indebtedness under Section 7.03(g) or (m) (or any Permitted Refinancing in respect thereof) shall only be permitted if such Guarantee meets the requirements of clauses (s), (g) or (m), as the case may be, of this Section 7.03;

(d) Indebtedness of the Borrower or any Subsidiary owing to any Loan Party or any other Subsidiary (or issued or transferred to any direct or indirect parent of a Loan Party which is substantially contemporaneously transferred to a Loan Party or any Subsidiary of a Loan Party) to the extent constituting an Investment permitted by Section 7.02; provided that (x) no such Indebtedness owed to a Loan Party shall be evidenced by a promissory note unless such promissory note constitutes a negotiable instrument and is pledged to the Administrative Agent in accordance with the terms of the Security Agreement and (y) with respect to Indebtedness of any Loan Party owed to a Subsidiary that is not a Loan Party, all such Indebtedness shall be unsecured and subordinated to the Obligations pursuant to subordination terms substantially consistent with the terms of the Intercompany Note;

(e) (i) Attributable Indebtedness and other Indebtedness (including Capitalized Leases) financing an acquisition, construction, repair, replacement, lease or improvement of a fixed or capital asset incurred by the Borrower or any Subsidiary prior to or within 270 days after the acquisition, lease or improvement of the applicable asset and any Permitted Refinancing thereof in an aggregate amount not to exceed $7,500,000, determined at the time of incurrence (together with any Permitted Refinancings thereof) at any time outstanding and (ii) Attributable Indebtedness arising out of sale-leaseback transactions permitted by Section 7.05(m) and any Permitted Refinancing of such Attributable Indebtedness;

(f) Indebtedness in respect of Swap Contracts designed to hedge against the Borrower's or any Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes and Guarantees thereof;

(g) Indebtedness of the Borrower or any Subsidiary (i) assumed in connection with any Permitted Acquisition (provided that such Indebtedness is not created or incurred in contemplation of such Permitted Acquisition) or (ii) incurred to finance any Permitted Acquisition; provided that (A) the aggregate amount of Indebtedness assumed and/or incurred pursuant to this clause (g) shall not exceed $25,000,000 and (B) after giving Pro Forma Effect to the incurrence of such Indebtedness (x) at any time when the financial covenant contained in Section 7.11 of the First Lien Term Loan Credit Agreement is not in effect, the Consolidated First Lien Net Leverage Ratio (as defined in the First Lien Term Loan Credit Agreement) does not exceed 8.20:1.00 or (y) the Consolidated First Lien Net Leverage Ratio does not exceed the Consolidated First Lien Net Leverage Ratio as of the last day of the most recently ended Test Period;

(h) Indebtedness representing deferred compensation to employees of the Borrower or any of its Subsidiaries incurred in the ordinary course of business;

(i) Indebtedness consisting of promissory notes issued by the Borrower or any of its Subsidiaries to current or former officers, managers, consultants, directors and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of the

114

6237404.15

Borrower or any direct or indirect parent of the Borrower permitted by Section 7.06; provided that such Indebtedness shall be subordinated in right of payment to the Obligations on terms reasonably satisfactory to the Required Lenders;

(j) Indebtedness incurred by the Borrower or any of its Subsidiaries in a Permitted Acquisition, any other Investment permitted hereunder (including through a merger) or any Disposition permitted hereunder, in each case, constituting indemnification obligations or obligations in respect of purchase price (including earnouts) or other similar adjustments;

(k) Indebtedness consisting of obligations of the Borrower or any of its Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with the Transactions, and Permitted Acquisitions or any other Investment permitted hereunder;

(l) Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantees thereof or the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished in the ordinary course of business;

(m) Indebtedness in an aggregate principal amount that at the time of, and after giving effect to, the incurrence thereof, would not exceed $7,500,000 determined at the time of incurrence;

(n) Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(o) Indebtedness incurred by the Borrower or any of its Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers' compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims;

(p) obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of its Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(q) [reserved];

(r) [reserved];

(s) [reserved];

(t) [reserved];

(u) Indebtedness incurred by a Foreign Subsidiary which, when aggregated with the principal amount of all other Indebtedness incurred pursuant to this Section 7.03(u) and then outstanding for all such Persons taken together (and any Permitted Refinancing of the foregoing, to the extent assumed or incurred by a Subsidiary that is not a Loan Party), does not exceed $25,000,000;

(v) [reserved];

115

6237404.15

(w) (i) Indebtedness under the Second Lien Credit Agreement in an aggregate principal amount not to exceed $50,000,000 and (ii) any Permitted Refinancing in respect of any of the foregoing Indebtedness in accordance with the terms of the Intercreditor Agreement;

(x)  (i) Indebtedness under the First Lien Credit Agreement in an aggregate principal amount not to exceed $76,600,000 and (ii) any Permitted Refinancing in respect of any of the foregoing Indebtedness in accordance with the terms of the Intercreditor Agreement;

(y) [reserved];

(z) [reserved]; and

(aa) all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in Sections 7.03(a) through Section 7.03(aa);

provided, however, that all Indebtedness permitted by this Section 7.03 which is permitted to be secured pursuant to Section 7.01 and is secured by the Collateral shall be subject to the following: (1) in the case of the Indebtedness described in Section 7.03(w), all such Indebtedness incurred on the Closing Date shall constitute "Junior Lien Obligations" under (and as defined in) the Intercreditor Agreement and the Junior Lien Administrative Agent acting on behalf of the holders of such Indebtedness shall have become party to the Intercreditor Agreement on the Closing Date; and (2) in the case of the Indebtedness described in Section 7.03(x), all such Indebtedness incurred on the Closing Date shall constitute "First Lien Obligations" under (and as defined in) the Intercreditor Agreement and the First Lien Administrative Agent acting on behalf of the holders of such Indebtedness shall have become party to the Intercreditor Agreement on the Closing Date.

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased, plus the aggregate amount of fees, underwriting discounts, premiums (including tender premiums) and other costs and expenses (including original issue discount) incurred in connection with such refinancing.

The accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 7.03.  The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

For purposes of determining compliance with this Section 7.03, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Indebtedness described in Sections 7.03(a) through 7.03(aa), Holdings shall, in its sole discretion, classify and reclassify or later divide, classify or reclassify such item of Indebtedness (or any portion thereof) and will only be required

116

6237404.15

to include the amount and type of such Indebtedness in one or more of the above clauses; provided that (w) all Indebtedness outstanding under the Loan Documents will at all times be deemed to be outstanding in reliance only on the exception in Section 7.03(a), (x) the First Lien Term Facility and any Permitted Refinancing in respect of the foregoing will at all times be deemed to be outstanding in reliance only on the exception in Section 7.03(x) and (y) the Second Lien Term Facility and any Permitted Refinancing in respect of the foregoing will at all times be deemed to be outstanding in reliance only on the exception in Section 7.03(w).

Section 7.04   **Fundamental Changes**.   Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of related transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person (other than as part of the Transactions), except that:

(a)   (i) Any Loan Party (other than Holdings or the Borrower) and any Subsidiary may merge, amalgamate or consolidate with the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction); provided that the Borrower shall be the continuing or surviving Person and (ii) any Subsidiary may merge with one or more other Subsidiaries; provided that when any Person that is a Loan Party is merging with a Subsidiary that is not a Loan Party, the Loan Party shall be the continuing or surviving Person or the surviving entity shall substantially concurrently become a Loan Party; provided, further, that any security interests granted to the Administrative Agent for the benefit of the Secured Parties in the Collateral pursuant to the Collateral Documents shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, consolidation, dissolution or liquidation) and all actions required to maintain said perfected status have been or will promptly be taken, in each case, as required by Sections 6.11 or 6.13 to the extent required pursuant to the Collateral and Guarantee Requirement;

(b)   (i) any Subsidiary that is not a Loan Party may merge, amalgamate or consolidate with or into any other Subsidiary that is not a Loan Party, (ii) any Subsidiary may liquidate or dissolve and (iii) any Subsidiary may change its legal form if, with respect to clauses (ii) and (iii), the Borrower determines in good faith that such action is in the best interest of the Borrower and its Subsidiaries and is not materially disadvantageous to the Lenders (it being understood that in the case of any change in legal form, a Subsidiary that is a Guarantor will remain a Guarantor unless such Guarantor is otherwise permitted to cease being a Guarantor hereunder);

(c)   any Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Subsidiary; provided that if the transferor in such a transaction is a Guarantor, then (i) the transferee must be a Subsidiary Guarantor or the Borrower or (ii) to the extent constituting an Investment, such Investment must be a Permitted Investment in or Indebtedness of a Subsidiary which is not a Loan Party in accordance with Sections 7.02 (other than Section 7.02(e) or 7.02(h)) and 7.03, respectively;

(d)   [reserved];

(e)   so long as no Event of Default has occurred and is continuing or would result therefrom (in the case of a merger involving a Loan Party), any Subsidiary may merge or consolidate with any other Person in order to effect an Investment permitted pursuant to Section 7.02; provided that the continuing or surviving Person shall be a

117

6237404.15

Subsidiary, which together with each of such surviving Person's Subsidiaries that are Subsidiaries, shall have complied with the requirements of Section 6.11 or 6.13 to the extent required pursuant to the Collateral and Guarantee Requirement;

(f)    [reserved]; and

(g)    so long as no Event of Default has occurred and is continuing or would result therefrom, a merger, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 7.05 or a Restricted Payment permitted pursuant to Section 7.06.

Section 7.05    **Dispositions**.  Make any Disposition, except:

(a)    Dispositions of obsolete, worn out, used or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Borrower or any of its Subsidiaries;

(b)    Dispositions of inventory in the ordinary course of business or consistent with past practice, goods held for sale in the ordinary course of business and immaterial assets (including allowing any registrations or any applications for registration of any immaterial intellectual property to lapse or go abandoned in the ordinary course of business) and termination of leases and licenses in the ordinary course of business;

(c)    Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)    Dispositions of property to the Borrower or any Subsidiary; provided that if the transferor of such property is a Loan Party, (i) the transferee thereof must be a Loan Party (other than a Holdco) or (ii) if such transaction constitutes an Investment, such transaction is permitted under Section 7.02 other than Section 7.02(e);

(e)    to the extent constituting Dispositions, transactions permitted by (i) Section 7.01 (other than Section 7.01(i) and (l)(ii)), (ii) Section 7.02 (other than 7.02(e) or (h)), (iii) Section 7.04 (other than 7.04(g)) and (iv) Section 7.06 (other than 7.06(d));

(f)    Dispositions to consummate the Transactions;

(g)    Dispositions of cash and Cash Equivalents in a manner that is not prohibited by this Agreement;

(h)    leases, subleases, licenses or sublicenses (including licenses and sublicenses of software or other intellectual property rights) and terminations thereof, in each case in the ordinary course of business, and which do not materially interfere with the business of the Borrower and its Subsidiaries (taken as a whole) and (ii) Dispositions of intellectual property (including inbound licenses) that is no longer material to the business of the Borrower and its Subsidiaries;

118

6237404.15

(i)      transfers of property subject to Casualty Events;

(j)      Dispositions of property (other than sales or dispositions of Accounts in connection with securitization or factoring arrangements); provided that (i) at the time of such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Default has occurred and is continuing), no Event of Default shall have occurred and be continuing or would result from such Disposition, (ii) with respect to Dispositions pursuant to this Section 7.05(j) for an aggregate purchase price for all such Dispositions in excess of $5,000,000 in any fiscal year, the Borrower or any of its Subsidiaries shall receive not less than 75% of such consideration in the form of cash or Cash Equivalents (in each case, free and clear of all Liens at the time received, other than non-consensual Liens permitted by Section 7.01 and Liens permitted by Sections 7.01(a), (f), (k), (l), (m), (n), (p), (q), (r)(i), (r)(ii), (s), (jj) and (kk) (only to the extent the Obligations are secured by such cash and Cash Equivalents)); provided, however, that for the purposes of this clause (ii), the following shall be deemed to be cash: (A) any liabilities (as shown on the Borrower's most recent balance sheet provided hereunder or in the footnotes thereto) of the Borrower or such Subsidiary, other than liabilities that are by their terms subordinated to the payment in cash of the Obligations, that are assumed by the transferee with respect to the applicable Disposition and for which the Borrower and all of its Subsidiaries shall have been validly released by all applicable creditors in writing, (B) any securities received by the Borrower or the applicable Subsidiary from such transferee that are converted by the Borrower or such Subsidiary into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of the applicable Disposition, and (C) aggregate non-cash consideration received by the Borrower or the applicable Subsidiary having an aggregate fair market value (determined as of the closing of the applicable Disposition for which such non-cash consideration is received) not to exceed the $6,250,000 at any time and (iii) the Borrower or the applicable Subsidiary complies with the applicable provision of Section 2.04;

(k)      Dispositions of non-core assets acquired in connection with Permitted Acquisitions or other Investments; provided that (i) the aggregate amount of such sales shall not exceed 25% of the fair market value of the acquired entity or business and (ii) each such sale is in an arm's-length transaction and the Borrower or the respective Subsidiary receives at least fair market value in exchange therefor;

(l)      Dispositions or discounts without recourse of accounts receivable in connection with the compromise or collection thereof in the ordinary course of business;

(m)      Dispositions of property pursuant to sale-leaseback transactions;

(n)      any swap of assets in exchange for services or other assets in the ordinary course of business of comparable or greater value or usefulness to the business of the Borrower and its Subsidiaries as a whole, as determined in good faith by the management of the Borrower;

(o)      [reserved];

(p)      Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

119

(q)     the unwinding or settlement of any Swap Contract;

(r)     the lapse or abandonment in the ordinary course of business of any registrations or applications for registration of any immaterial IP Rights;

(s)     [reserved];

(t)     [reserved];

(u)     Dispositions of non-Collateral assets in an aggregate amount not to exceed, over the life of this Agreement, $2,500,000; and

(v)     Dispositions pursuant to agreements, instruments or arrangements in existence on the Closing Date and set forth on Schedule 7.05(v);

provided that any Disposition of any property pursuant to this Section 7.05 (except pursuant to Sections 7.05(a), (b), (d), (e), (f), (h), (i), (l), (p), (q) and (r) and except for Dispositions from a Loan Party to any other Loan Party) shall be for no less than the fair market value of such property at the time of such Disposition as determined by the Borrower in good faith.  To the extent any Collateral is Disposed of as permitted by this Section 7.05 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

Section 7.06   **Restricted Payments**.  Declare or make, directly or indirectly, any Restricted Payment, except:

(a)     each Subsidiary may make Restricted Payments to the Borrower, and other Subsidiaries of the Borrower (and, in the case of a Restricted Payment by a non-wholly owned Subsidiary, to the Borrower and any other Subsidiary and to each other owner of Equity Interests of such Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(b)     the Borrower and each Subsidiary may declare and make dividend payments or other Restricted Payments payable solely in the Equity Interests of such Person (and, in the case of such a Restricted Payment by a non-wholly owned Subsidiary, to the Borrower and any other Subsidiary and to each other owner of Equity Interests of such Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(c)     [reserved];

(d)     to the extent constituting Restricted Payments, the Borrower (or any direct or indirect parent thereof) and its Subsidiaries may enter into and consummate transactions permitted by any provision of Section 7.02 (other than 7.02(e) and 7.02(m)), 7.04 (other than 7.04(g)), 7.05 (other than 7.05(e)(iv) and 7.05(g)) or 7.08 (other than 7.08(f), 7.08(g), 7.08(h), and 7.08(m));

(e)     repurchases of Equity Interests in the Borrower or any Subsidiary deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(f)     [reserved]:

120

6237404.15

(g)     [reserved];

(h)     so long as the Payment Conditions are satisfied, the Borrower may make Restricted Payments to any direct or indirect parent of Holdings;

(i)     to pay its operating costs and expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), incurred in the ordinary course of business and attributable to the ownership or operations of the Borrower and its Subsidiaries, Transaction Expenses and any indemnification claims made by directors or officers of such parent attributable to the ownership or operations of the Borrower and its Subsidiaries;

(ii)     the proceeds of which shall be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) ordinary course franchise or similar Taxes, other fees and expenses required to maintain its (or any of its direct or indirect parents') corporate existence; and

(iii)     for any taxable period in which the Borrower and/or any of its Subsidiaries is a member of a consolidated, combined or similar income tax group of which a direct or indirect parent of the Borrower is the common parent (a "**Tax Group**"), to pay the portion of any federal, foreign, state and/or local income taxes of such Tax Group that are attributable to the taxable income of the Borrower and/or its Subsidiaries provided that, for each taxable period, the amount of such payments made in respect of such taxable period in the aggregate shall not exceed the amount that the Borrower and its Subsidiaries would have been required to pay as a stand-alone consolidated, combined or similar income tax group (any amount permitted to be paid under this Section 7.06(h)(iii), a "**Tax Distribution**");

(i)     payments made or expected to be made by a Holdco, Borrower or any of the Subsidiaries (or Restricted Payments to allow any direct or indirect parent thereof to make payments) in respect of withholding or similar Taxes payable by or with respect to any future, present or former employee, director, manager or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) and any repurchases of Equity Interests in consideration of such payments including deemed repurchases, in each case, in connection with the exercise of stock options;

(j)     after a Qualified IPO by the Borrower or a Relevant Public Company, (i) any Restricted Payment by the Borrower to pay listing fees and other costs and expenses attributable to the Borrower or such Relevant Public Company being a publicly traded company which are reasonable and customary and (ii) additional Restricted Payments in an aggregate amount per annum not to exceed an amount equal to 6.0% of the net proceeds received by (or contributed to) the Borrower from such Qualified IPO; and

(k)     the Borrower or any of the Subsidiaries may pay (or to make Restricted Payments to allow any direct or indirect parent thereof to pay) cash in lieu of fractional Equity Interests in connection with (x) any dividend, split or combination thereof or (y) any Permitted Acquisition.

121

**Section 7.07** **[Reserved]**.

**Section 7.08** **Transactions with Affiliates**. Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, in each case involving aggregate payments or consideration in excess of $1,000,000, other than:

(a) transactions among the Borrower and its Subsidiaries or any entity that becomes a Subsidiary as a result of such transaction;

(b) on terms substantially as favorable to the Borrower or such Subsidiary as would be obtainable by the Borrower or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(c) the Transactions and the payment of fees and expenses (including Transaction Expenses) as part of or in connection with the Transactions;

(d) the issuance of Equity Interests to any officer, director, employee or consultant of the Borrower or any of its Subsidiaries in connection with the Transactions;

(e) [reserved];

(f) Restricted Payments permitted under Section 7.06;

(g) loans and other Investments among Holdings, Intermediate Holdings, the Borrower and its Subsidiaries and joint ventures (to the extent any such Subsidiary that is not a Subsidiary or any such joint venture is only an Affiliate as a result of Investments by the Holdcos, the Borrower and/or its Subsidiaries in such Subsidiary or joint venture) to the extent otherwise permitted under Section 7.02;

(h) transactions by the Borrower and its Subsidiaries permitted under an express provision (including any exceptions thereto) of this Article VII;

(i) employment and severance arrangements between the Borrower and its Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee benefit plans and arrangements in the ordinary course of business;

(j) the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers, employees and consultants of the Borrower and its Subsidiaries (or any direct or indirect parent of the Borrower) in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and its Subsidiaries;

(k) transactions pursuant to agreements, instruments or arrangements in existence on the Closing Date and set forth on Schedule 7.08(k) or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect;

(l) [reserved];

122

6237404.15

(m)    payments by the Borrower or any of its Subsidiaries pursuant to any tax sharing agreements with any direct or indirect parent of the Borrower to the extent attributable to the ownership or operation of the Borrower and the Subsidiaries, but only to the extent permitted by Section 7.06(h)(iii);

(n)    the issuance or transfer of Equity Interests (other than Disqualified Equity Interests) of Holdings to any Permitted Holder or to any former, current or future director, manager, officer, employee or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees, distributes or Affiliate of any of the foregoing) of the Borrower, any of its Subsidiaries or any direct or indirect parent thereof;

(o)    transactions with customers, clients, joint venture partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and the Subsidiaries, in the reasonable determination of the board of directors or the senior management of the Borrower, or are on terms at least as favorable (as reasonably determined by the Borrower) as might reasonably have been obtained at such time from an unaffiliated party;

(p)    the Transactions;

(q)    the payment of reasonable out-of-pocket costs and expenses and indemnities pursuant to the stockholders agreement or the registration and participation rights agreement entered into on the Closing Date in connection therewith;

(r)    transactions in which the Borrower or any of the Subsidiaries, as the case may be, deliver to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Borrower or such Subsidiary from a financial point of view or meets the requirements of Section 7.08(b); and

(s)    payments to or from, and transactions with, joint ventures (to the extent any such joint venture is only an Affiliate as a result of Investments by the Borrower and the Subsidiaries in such joint venture) in the ordinary course of business to the extent otherwise permitted under Section 7.02.

Section 7.09    **Burdensome Agreements**.    Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that limits the ability of:

(a)    any Subsidiary that is not a Guarantor to make Restricted Payments to the Borrower or any Guarantor; or

(b)    any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Lenders with respect to the Facilities and the Obligations;

provided that the foregoing Sections 7.09(a) and (b) shall not apply to Contractual Obligations which:

(i)    (x) exist on the Closing Date and (to the extent not otherwise permitted by this Section 7.09) are listed on Schedule 7.09(b) and (y) to the extent Contractual Obligations permitted by clause (x) are set forth in an agreement evidencing Indebtedness, are set forth in any agreement evidencing any permitted modification,

123

6237404.15

replacement, renewal, extension or refinancing of such Indebtedness so long as such modification, replacement, renewal, extension or refinancing (taken as a whole) does not materially expand the scope of such Contractual Obligation (as reasonably determined by the Borrower);

(ii)     are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Subsidiary; provided, further, that this clause (ii) shall not apply to Contractual Obligations that are binding on a Person that becomes a Subsidiary pursuant to Section 6.14;

(iii)     represent Indebtedness of a Subsidiary which is not a Loan Party which is permitted by Section 7.03 and which does not apply to any Loan Party;

(iv)     are customary restrictions (as reasonably determined by the Borrower) that arise in connection with (x) any Lien permitted by Sections 7.01(a), (b), (f), (i), (j)(i), (k), (l), (p), (q), (r)(i), (r)(ii), (s), (u), (v), (w), (z), (aa), (ee), (ii), (jj), and (kk) and relate to the property subject to such Lien or (y) arise in connection with any Disposition permitted by Section 7.04 or 7.05 and relate solely to the assets or Person subject to such Disposition;

(v)     are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 7.02 and applicable solely to such joint venture and its equity entered into in the ordinary course of business;

(vi)     are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 7.03 but solely to the extent any negative pledge relates to (i) the property financed by such Indebtedness and the proceeds, accessions and products thereof or (ii) the property secured by such Indebtedness and the proceeds, accessions and products thereof so long as the agreements governing such Indebtedness permit the Liens securing the Obligations;

(vii)     are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the property interest, rights or the assets subject thereto;

(viii)     comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Sections 7.03(b), (e), (g), (n)(i), (u), (w) and (x) and to the extent that such restrictions apply only to the property or assets securing such Indebtedness or, in the case of Section 7.03(g) or (u), to the Subsidiaries incurring or guaranteeing such Indebtedness;

(ix)     are customary provisions restricting subletting, transfer or assignment of any lease governing a leasehold interest of the Borrower or any Subsidiary;

(x)     are customary provisions restricting assignment or transfer of any agreement entered into in the ordinary course of business;

(xi)     are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

124

6237404.15

(xii) arise in connection with cash or other deposits permitted under Sections 7.01 and 7.02 and limited to such cash or deposit;

(xiii) comprise restrictions imposed by any agreement governing Indebtedness entered into on or after the Closing Date and permitted under Section 7.03 that are, taken as a whole, in the good faith judgment of the Borrower, either (a) no more restrictive than the restrictions contained in this Agreement or (b) no more restrictive with respect to the Borrower or any Subsidiary than customary market terms for Indebtedness of such type, so long as the Borrower shall have determined in good faith that such restrictions pursuant to this clause (b) will not affect its obligation or ability to make any payments required hereunder;

(xiv) are restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(xv) are restrictions regarding licensing or sublicensing by the Borrower and its Subsidiaries of intellectual property (including customary restrictions on assignment contained in license or sublicense agreements) entered into in the ordinary course of business;

(xvi) are restrictions contained in the Second Lien Loan Documents and documents otherwise governing Indebtedness permitted pursuant to Section 7.03(w);

(xvii) are restrictions on cash earnest money deposits in favor of sellers in connection with acquisitions not prohibited hereunder; and

(xviii) are restrictions contained in the First Lien Loan Documents and documents otherwise governing Indebtedness permitted pursuant to Section 7.03(x).

**Section 7.10** **Use of Proceeds**. Each Loan Party will not, and will not permit any of its Subsidiaries to, use the proceeds of any Loan made hereunder for any purpose other than (a) on the Closing Date, (i) to repay, in full, the outstanding principal, accrued interest, and accrued fees and expenses owing under or in connection with the Existing Credit Facility, (ii) to pay a portion of the consideration payable in connection with the consummation of the Transaction, and (iii) to pay the fees, costs, and expenses incurred in connection with this Agreement, the other Loan Documents, and the transactions contemplated hereby and thereby, in each case, as set forth in the Flow of Funds Agreement, and (b) thereafter, consistent with the terms and conditions hereof, for their lawful and permitted purposes; provided that (x) no part of the proceeds of the Loans will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors, (y) no part of the proceeds of any Loan or Letter of Credit will be used, directly or, knowingly (after due care and inquiry), indirectly, to make any payments to a Sanctioned Entity or a Sanctioned Person, to fund any investments, loans or contributions in, or otherwise make such proceeds available to, a Sanctioned Entity or a Sanctioned Person, to fund any operations, activities or business of a Sanctioned Entity or a Sanctioned Person, or in any other manner that would result in a violation of Sanctions by any Person, and (z) that no part of the proceeds of any Loan or Letter of Credit will be used, directly or, knowingly (after due care and inquiry), indirectly, in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws.

**Section 7.11** **[Reserved]**.

125

6237404.15

**Section 7.12** **Inventory with Bailees**.   Borrower will not, and will not permit any of its Subsidiaries to, store its Inventory at any time with a bailee, warehouseman, or similar party except as set forth on Schedule 5.25.

**Section 7.13** **Fixed Charge Coverage Ratio**.   Borrower covenants and agrees that, until the termination of all of the Commitments and the payment in full of the Obligations, the Loan Parties will maintain a Fixed Charge Coverage Ratio, calculated for each twelve (12) month period ending on the first day of any Covenant Testing Period and the last day of each fiscal month occurring until the end of any Covenant Testing Period (including the last day thereof), in each case of at least 1.00 to 1.00.

**Section 7.14** **[Reserved]**.

**Section 7.15** **Prepayments, Etc. of Indebtedness**.

(a) Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner (it being understood that payments of regularly scheduled principal, interest and mandatory prepayments and "AHYDO" payments and, subject to no Event of Default then existing or resulting therefrom, in connection with the amendment of the Second Lien Credit Agreement, the payment of related fees (other than in connection with any amendment that reduces or forgives the commitments, outstanding principal amount or effective yield of such Second Lien Credit Agreement) shall be permitted) any (i) Indebtedness subordinated in right of payment incurred under Section 7.03, or (ii) any other Indebtedness for borrowed money of a Loan Party that is (x) subordinated in right of payment to the Obligations expressly by its terms or (y) is secured on a junior lien basis to the Liens securing the Obligations, except (i) the refinancing thereof with any Indebtedness (to the extent such Indebtedness constitutes a Permitted Refinancing and, if such Indebtedness was originally incurred under Section 7.03(g), is permitted pursuant to Section 7.03(g)), to the extent not required to prepay any Loans pursuant to Section 2.04, (ii) the conversion or exchange of the Second Lien Obligations to Equity Interests (other than Disqualified Equity Interests) of Holdings or any of its direct or indirect parents, (iii) the prepayment of Indebtedness of the Borrower or any Subsidiary to the Borrower or any Subsidiary, subject to the subordination provisions applicable to any such Indebtedness, (iv) prepayments of principal of and any required premium on loans under the Second Lien Credit Agreement (or any comparable provision of a Permitted Refinancing thereof) in connection with the removal of a lender pursuant to Section 3.07 of the Second Lien Credit Agreement (or any comparable provision of a Permitted Refinancing thereof or the payment of any fees in connection with amendments thereto) and (v) prepayments of principal of and any required premium on loans under the Second Lien Credit Agreement (or any comparable provision of a Permitted Refinancing thereof) in connection with the removal of a lender pursuant to Section 3.07 of the Second Lien Credit Agreement (or any comparable provision of a Permitted Refinancing thereof or the payment of any fees in connection with amendments thereto).

(b) Amend, modify or change any term or condition of any Indebtedness (x) in the case of the Indebtedness under the First Lien Credit Agreement and any other First Lien Secured Obligations (and any Permitted Refinancing in respect of the foregoing) in violation of the Intercreditor Agreement, (y) in the case of the Indebtedness under the Second Lien Credit Agreement and any other Second Lien Secured Obligations (and any Permitted Refinancing in respect of the foregoing), in violation of the Intercreditor Agreement or the definition of "Permitted Refinancing" and (z) in the case of any other Indebtedness in excess of the Threshold Amount in a manner adverse to the Lenders.

Notwithstanding anything to the contrary in any Loan Document, the Borrower may make regularly scheduled payments of interest and fees on the First Lien Term Facility or the Second Lien Term Facility, and may make any payments required by the terms of such Indebtedness in order to avoid the application of Section 163(e)(5) of the Code to such Indebtedness.

6237404.15

**Section 7.16** **Permitted Activities**.  With respect to a Holdco, engage in any material operating or business activities; provided that the following and any activities incidental thereto shall be permitted in any event: (i) (a) in the case of Intermediate Holdings, its ownership of the Equity Interests of the Borrower and activities incidental thereto, including payment of dividends and other amounts in respect of its Equity Interests and (b) in the case of Holdings, its ownership of the Equity Interests of Intermediate Holdings and activities incidental thereto, including payment of dividends and other amounts in respect of its Equity Interests, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations with respect to the Loan Documents, the First Lien Loan Documents, the Second Lien Loan Documents and any other documents governing Indebtedness permitted to be incurred by the Borrower or a Subsidiary pursuant to Section 7.03, (iv) any public offering of its common stock or any other issuance or sale of its Equity Interests, (v)(1) Guaranteed Obligations in respect of Indebtedness of, the Borrower and its Subsidiaries permitted under Section 7.03, including any Permitted Refinancing thereof and (2) guaranties of other obligations not constituting Indebtedness incurred by, the Borrower or any of the Subsidiaries, (vi) if applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings, Intermediate Holdings and the Borrower, (vii) holding any cash or property (but not operating any property), (viii) [reserved], (ix) providing indemnification to officers and directors and (x) any activities incidental or reasonably related to the foregoing.  No Holdco shall incur any Liens on Equity Interests of Intermediate Holdings or the Borrower, other than non-consensual Liens and those for the benefit of the First Lien Secured Obligations, First Lien Secured Obligations (subject at all times to the Intercreditor Agreement) and the Second Lien Secured Obligations (subject at all times to the Intercreditor Agreement).  Holdings shall not own any Equity Interests other than those of Intermediate Holdings, and Intermediate Holdings shall not own any Equity Interests other than those of the Borrower.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**Section 8.01**   **Events of Default**.  Any of the following from and after the Closing Date shall constitute an event of default (an "**Event of Default**"):

(a)   *Non-Payment*.  Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within three (3) Business Days after the same becomes due, any interest on any Loan, any fees or other amounts payable hereunder or with respect to any other Loan Document; or

(b)   *Specific Covenants*.  The Borrower, any Subsidiary or, in the case of Section 7.16, a Holdco, fails to perform or observe (i) any term, covenant or agreement contained in any of Section 6.02(e), 6.03(a), 6.05(a) (solely with respect to the Borrower), 6.07, 6.10, 6.20(b), 6.21, 6.22 or Article VII of this Agreement or Sections 3.03(f) through (m) of the Security Agreement; provided that the covenant in Section 7.13 is subject to cure pursuant to Section 8.04; or (ii) any term, covenant or agreement contained in any of Section 6.01 or 6.02 (other than Section 6.02(e) which is subject to clause (i) above) and such failure shall continue for a period of five (5) Business Days or (iii) any term, covenant or agreement contained in any of Section 6.11 or 6.13 and such failure shall continue for a period of fifteen (15) days; or

(c)   *Other Defaults*.  Any Holdco, the Borrower or any Subsidiary fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a), (b) or (d)) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after (i) a Responsible Officer of any Loan

127

Party obtaining knowledge thereof or (ii) receipt by the Borrower of written notice thereof from the Administrative Agent; or

(d)      *Representations and Warranties*.   Any representation, warranty, certification or statement of fact made or deemed made by any Loan Party herein or in any other Loan Document, or any certification in any document required to be delivered in connection herewith or therewith shall be incorrect in any material respect (or, in the case of any representation and warranty qualified by materiality, in all respects) when made or deemed made; or

(e)      *Cross-Default*.  Any Loan Party or any Subsidiary (A) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder, but including Indebtedness outstanding under the First Lien Loan Documents and Second Lien Loan Documents) having an aggregate outstanding principal amount of not less than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness referenced in clause (A) above, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any default thereunder by any Loan Party), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause (after delivery of any notice if required and after giving effect to any waiver, amendment, cure or grace period), with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that this clause (B) shall not apply to (i) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder, (ii) any Indebtedness if (x) the sole remedy of the holder thereof in the event of the non-payment of such Indebtedness or the non-payment or non-performance of obligations related thereto or (y) the sole rights of the holder(s) thereof is to elect, in each case, to convert such Indebtedness into Qualified Equity Interests and cash in lieu of fractional shares and (iii) in the case of Indebtedness which the holder thereof may elect to convert into Qualified Equity Interests, such Indebtedness from and after the date, if any, on which such conversion has been effected; provided, further, that such failure is unremedied or is not waived by the holders of such Indebtedness prior to any acceleration of the Loans pursuant to Section 8.02; or

(f)      *Insolvency Proceedings, Etc*.   Other than with respect to any dissolutions otherwise permitted hereunder, any Loan Party or any Material Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes a general assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or substantially all of its property

128

6237404.15

is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) consecutive calendar days, or an order for relief is entered in any such proceeding; or

(g)   [reserved]; or

(h)   *Judgments*.  There is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by either (i) independent third-party insurance as to which the insurer does not deny coverage or (ii) another creditworthy (as reasonably determined by the Required Lenders) indemnitor); and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days; or

(i)   *Invalidity of Loan Documents*.  Any material provision of the Loan Documents, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05) or as a result of acts or omissions by the Administrative Agent or any Lender due to such person's gross negligence or willful misconduct which do not arise from a breach by a Loan Party of its obligations under the Loan Documents or the satisfaction in full of all the Obligations (other than contingent obligations as to which no claim has been asserted), ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document or the validity or priority of a Lien as required by the Collateral Documents on a material portion of the Collateral; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations (other than in accordance with its terms)), or purports in writing to revoke or rescind any Loan Document (other than in accordance with its terms); or

(j)   *Change of Control*.  There occurs any Change of Control; or

(k)   *Collateral Documents*.  Any Collateral Document after delivery thereof pursuant to Sections 4.01, 6.11 or 6.13 shall for any reason (other than pursuant to the terms thereof including as a result of a transaction not prohibited under this Agreement) cease to create a valid and perfected Lien, with the priority required by the Collateral Documents on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01 or any Loan Party contests in writing the validity or priority of a Lien, (i) except to the extent that any such perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities or negotiable instruments pledged under the Collateral Documents or take other required actions required to be taken by the Administrative Agent under the Loan Documents, in each case, which does not arise from a breach by a Loan Party of its obligations under the Loan Documents, and (ii) except as to Collateral consisting of Real Property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

(l)   *ERISA*.  (i) An ERISA Event occurs which has resulted or could, individually or in the aggregate, reasonably be expected to result in a Material Adverse

129

Effect, or (ii) a Loan Party, any Subsidiary or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan and a Material Adverse Effect could, individually or in the aggregate, reasonably be expected to result.

**Section 8.02** **Remedies Upon Event of Default**.  (a)  If any Event of Default occurs and is continuing, the Administrative Agent may, at the request of the Required Lenders, take any or all of the following actions:

(i)  declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower (to the extent permitted by applicable law); and

(ii)  declare the Commitments terminated, whereupon the Commitments shall immediately be terminated together with (i) any obligation of any Lender to make Revolving Loans, (ii) the obligation of the Swing Lender to make Swing Loans, and (iii) the obligation of Issuing Bank to issue Letters of Credit; and

(iii)  exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

provided that upon the occurrence of an Event of Default pursuant to Section 8.01(f), the Commitments shall automatically terminate and the unpaid principal amount of all outstanding Loans and all interest, fees, premiums and all other Obligations automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.

**Section 8.03** **[Reserved]**.

**Section 8.04** **Borrower's Right to Cure**.  Notwithstanding anything to the contrary contained in Section 8.01 or Section 8.02:

(a)  For the purpose of determining whether an Event of Default under Section 7.13 has occurred, the Borrower may on one or more occasions designate any portion of the net cash proceeds from a sale or issuance of Qualified Equity Interests of the Borrower or any cash contribution to the common capital of the Borrower (the "**Cure Amount**") as an increase to Consolidated EBITDA for the applicable fiscal quarter; provided that (A) such amounts to be designated (i) are actually received by the Borrower after the first day of the applicable fiscal quarter and on or prior to the tenth (10th) Business Day after the date on which financial statements are required to be delivered with respect to such fiscal quarter (the "**Cure Expiration Date**") and (ii) do not exceed the aggregate amount necessary to cure any Event of Default under Section 7.13 as of such date and (B) the Borrower shall have provided notice (the "**Notice of Intent to Cure**") to the Administrative Agent that such amounts are designated as a "Cure Amount".  The Cure Amount shall be added to Consolidated EBITDA for the applicable fiscal quarter and included when calculating Consolidated EBITDA for each Test Period that includes such fiscal quarter.

(b)  The parties hereby acknowledge that this Section 8.04 may not be relied on for purposes of calculating any financial ratios other than for determining actual compliance with Section 7.13 and shall not result in any adjustment to any amounts

130

hereunder (including the amount of Indebtedness, Total Assets or Indebtedness hereunder (directly or by way of netting) and shall not be included for purposes of determining pricing, mandatory prepayments, financial ratio-based conditions and the availability or amount permitted pursuant to any covenant under Article VII) with respect to the quarter with respect to which such Cure Amount was made other than the amount of the Consolidated EBITDA referred to in Section 8.04(a) above.

(c)       In furtherance of Section 8.04(a) above, (i) upon actual receipt and designation of the Cure Amount by the Borrower, the covenant under Section 7.13 shall be deemed retroactively cured with the same effect as though there had been no failure to comply with the covenant under such Section 7.13 and any Event of Default or potential Event of Default under Section 7.13 shall be deemed not to have occurred for purposes of the Loan Documents, and (ii) after delivery of an applicable Notice of Intent to Cure, neither the Administrative Agent nor any Lender may exercise any rights or remedies under Section 8.02 (or under any other Loan Document) on the basis of any actual or purported Event of Default under Section 7.13 until and unless the Cure Expiration Date has occurred without the Cure Amount having been received. Notwithstanding the foregoing, no Credit Extension shall be made until receipt by the Borrower of the Cure Amount or waiver of the Event of Default.

(d)       (i) In each period of four (4) consecutive fiscal quarters, there shall be at least two (2) fiscal quarters in which no cure right set forth in this Section 8.04 is exercised and (ii) there shall be no *pro forma* reduction in Indebtedness (directly or by way of netting) with the Cure Amount for determining compliance with Section 7.13 for the fiscal quarter with respect to which such Cure Amount was made.

(e)       There can be no more than five (5) fiscal quarters in which the cure rights set forth in this Section 8.04 are exercised during the term of this Agreement.

## ARTICLE IX
## ADMINISTRATIVE AGENT

**Section 9.01    Appointment and Authorization of Administrative Agent**.   Each Lender hereby designates and appoints Wells Fargo as its agent under this Agreement and the other Loan Documents and each Lender hereby irrevocably authorizes (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to designate, appoint, and authorize) Administrative Agent to execute and deliver each of the other Loan Documents on its behalf and to take such other action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to Administrative Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto.  Administrative Agent agrees to act as agent for and on behalf of the Lenders (and the Bank Product Providers) on the conditions contained in this Article IX.  Any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document notwithstanding, Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein or in the other Loan Documents, nor shall Administrative Agent have or be deemed to have any fiduciary relationship with any Lender (or Bank Product Provider), and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Administrative Agent.  Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement or the other Loan Documents with reference to Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom, and is intended to

131

6237404.15

create or reflect only a representative relationship between independent contracting parties.  Each Lender hereby further authorizes (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Administrative Agent to act as the secured party under each of the Loan Documents that create a Lien on any item of Collateral.  Except as expressly otherwise provided in this Agreement, Administrative Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that Administrative Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Loan Documents.  Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to Administrative Agent, Lenders agree that Administrative Agent shall have the right to exercise the following powers as long as this Agreement remains in effect:  (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, payments and proceeds of Collateral, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, or to take any other action with respect to any Collateral or Loan Documents which may be necessary to perfect, and maintain perfected, the security interests and Liens upon Collateral pursuant to the Loan Documents, (c) make Revolving Loans, for itself or on behalf of Lenders, as provided in the Loan Documents, (d) exclusively receive, apply, and distribute payments and proceeds of the Collateral as provided in the Loan Documents, (e) open and maintain such bank accounts and cash management arrangements as Administrative Agent deems necessary and appropriate in accordance with the Loan Documents for the foregoing purposes, (f) perform, exercise, and enforce any and all other rights and remedies of the Lender Group with respect to any Loan Party or its Subsidiaries, the Obligations, the Collateral, or otherwise related to any of same as provided in the Loan Documents, and (g) incur and pay such Lender Group Expenses as Administrative Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents.

Section 9.02    **Delegation of Duties**.  Administrative Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Administrative Agent shall not be responsible for the negligence or misconduct of any agent or attorney in fact that it selects as long as such selection was made without gross negligence or willful misconduct.

Section 9.03    **Liability of Administrative Agent**.  None of the Administrative Agent-Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders (or Bank Product Providers) for any recital, statement, representation or warranty made by any Loan Party or any of its Subsidiaries or Affiliates, or any officer or director thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by Administrative Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of any Loan Party or its Subsidiaries or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Administrative Agent-Related Person shall be under any obligation to any Lenders (or Bank Product Providers) to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the books and records or properties of any Loan Party or its Subsidiaries.  No Administrative Agent-Related Person shall have any liability to any Lender, and Loan Party or any of their respective Affiliates if any request for a Loan, Letter of Credit or other extension of credit was not authorized by the applicable Borrower. Administrative Agent shall not be required to take any action that, in its opinion or in the opinion of its

132

counsel, may expose it to liability or that is contrary to any Loan Document or applicable law or regulation.

**Section 9.04**   **Reliance by Administrative Agent**.  Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, telefacsimile or other electronic method of transmission, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to Borrower or counsel to any Lender), independent accountants and other experts selected by Administrative Agent.  Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless Administrative Agent shall first receive such advice or concurrence of the Lenders as it deems appropriate and until such instructions are received, Administrative Agent shall act, or refrain from acting, as it deems advisable.  If Administrative Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders (and, if it so elects, the Bank Product Providers) against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders (and Bank Product Providers).

**Section 9.05**   **Notice of Default or Event of Default**.  Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to Administrative Agent for the account of the Lenders and, except with respect to Events of Default of which Administrative Agent has actual knowledge, unless Administrative Agent shall have received written notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of Default, and stating that such notice is a "notice of default."  Administrative Agent promptly will notify the Lenders of its receipt of any such notice or of any Event of Default of which Administrative Agent has actual knowledge.  If any Lender obtains actual knowledge of any Event of Default, such Lender promptly shall notify the other Lenders and Administrative Agent of such Event of Default.  Each Lender shall be solely responsible for giving any notices to its Participants, if any.  Subject to Section 9.04, Administrative Agent shall take such action with respect to such Default or Event of Default as may be requested by the Required Lenders in accordance with this Article IX; provided, that unless and until Administrative Agent has received any such request, Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

**Section 9.06**   **Credit Decision**.  Each Lender (and Bank Product Provider) acknowledges that none of the Administrative Agent-Related Persons has made any representation or warranty to it, and that no act by Administrative Agent hereinafter taken, including any review of the affairs of any Loan Party and its Subsidiaries or Affiliates, shall be deemed to constitute any representation or warranty by any Administrative Agent-Related Person to any Lender (or Bank Product Provider).  Each Lender represents (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to represent) to Administrative Agent that it has, independently and without reliance upon any Administrative Agent-Related Person and based on such due diligence, documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of Borrower or any other Person party to a Loan Document, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to Borrower.  Each Lender also represents (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to represent) that it will, independently and without reliance upon any

133

6237404.15

Administrative Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of Borrower or any other Person party to a Loan Document.  Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by Administrative Agent, Administrative Agent shall not have any duty or responsibility to provide any Lender (or Bank Product Provider) with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of Borrower or any other Person party to a Loan Document that may come into the possession of any of the Administrative Agent-Related Persons.  Each Lender acknowledges (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that Administrative Agent does not have any duty or responsibility, either initially or on a continuing basis (except to the extent, if any, that is expressly specified herein) to provide such Lender (or Bank Product Provider) with any credit or other information with respect to Borrower, its Affiliates or any of their respective business, legal, financial or other affairs, and irrespective of whether such information came into Administrative Agent's or its Affiliates' or representatives' possession before or after the date on which such Lender became a party to this Agreement (or such Bank Product Provider entered into a Bank Product Agreement).

Section 9.07   **Costs and Expenses; Indemnification**.  Administrative Agent may incur and pay Lender Group Expenses to the extent Administrative Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, attorneys' fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral, whether or not Borrower are obligated to reimburse Administrative Agent or Lenders for such expenses pursuant to this Agreement or otherwise.  Administrative Agent is authorized and directed to deduct and retain sufficient amounts from payments or proceeds of the Collateral received by Administrative Agent to reimburse Administrative Agent for such out-of-pocket costs and expenses prior to the distribution of any amounts to Lenders (or Bank Product Providers).  In the event Administrative Agent is not reimbursed for such costs and expenses by the Loan Parties and their Subsidiaries, each Lender hereby agrees that it is and shall be obligated to pay to Administrative Agent such Lender's ratable share thereof.  Whether or not the transactions contemplated hereby are consummated, each of the Lenders, on a ratable basis, shall indemnify and defend the Administrative Agent-Related Persons (to the extent not reimbursed by or on behalf of Borrower and without limiting the obligation of Borrower to do so) from and against any and all Indemnified Liabilities; provided, that no Lender shall be liable for the payment to any Administrative Agent-Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct nor shall any Lender be liable for the obligations of any Defaulting Lender in failing to make a Revolving Loan or other extension of credit hereunder.  Without limitation of the foregoing, each Lender shall reimburse Administrative Agent upon demand for such Lender's ratable share of any costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement or any other Loan Document to the extent that Administrative Agent is not reimbursed for such expenses by or on behalf of Borrower.  The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of Administrative Agent.

Section 9.08   **Administrative Agent in Individual Capacity**.  Wells Fargo and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, provide Bank Products

134

to, acquire Equity Interests in, and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with any Loan Party and its Subsidiaries and Affiliates and any other Person party to any Loan Document as though Wells Fargo were not Administrative Agent hereunder, and, in each case, without notice to or consent of the other members of the Lender Group.  The other members of the Lender Group acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, pursuant to such activities, Wells Fargo or its Affiliates may receive information regarding a Loan Party or its Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of such Loan Party or such other Person and that prohibit the disclosure of such information to the Lenders (or Bank Product Providers), and the Lenders acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver Administrative Agent will use its reasonable best efforts to obtain), Administrative Agent shall not be under any obligation to provide such information to them.  The terms "Lender" and "Lenders" include Wells Fargo in its individual capacity.

Section 9.09    **Successor Administrative Agent**.    Administrative Agent may resign as Administrative Agent upon thirty (30) days (ten (10) days if an Event of Default has occurred and is continuing) prior written notice to the Lenders (unless such notice is waived by the Required Lenders) and Borrower (unless such notice is waived by Borrower or a Default or Event of Default has occurred and is continuing) and without any notice to the Bank Product Providers.  If Administrative Agent resigns under this Agreement, the Required Lenders shall be entitled, with (so long as no Event of Default has occurred and is continuing) the consent of Borrower (such consent not to be unreasonably withheld, delayed, or conditioned), appoint a successor Administrative Agent for the Lenders (and the Bank Product Providers).  If, at the time that Administrative Agent's resignation is effective, it is acting as Issuing Bank or the Swing Lender, such resignation shall also operate to effectuate its resignation as Issuing Bank or the Swing Lender, as applicable, and it shall automatically be relieved of any further obligation to issue Letters of Credit, or to make Swing Loans.  If no successor Administrative Agent is appointed prior to the effective date of the resignation of Administrative Agent, Administrative Agent may appoint, after consulting with the Lenders and Borrower, a successor Administrative Agent.  If Administrative Agent has materially breached or failed to perform any material provision of this Agreement or of applicable law, the Required Lenders may agree in writing to remove and replace Administrative Agent with a successor Administrative Agent from among the Lenders with (so long as no Event of Default has occurred and is continuing) the consent of Borrower (such consent not to be unreasonably withheld, delayed, or conditioned).  In any such event, upon the acceptance of its appointment as successor Administrative Agent hereunder, such successor Administrative Agent shall succeed to all the rights, powers, and duties of the retiring Administrative Agent and the term "Administrative Agent" shall mean such successor Administrative Agent and the retiring Administrative Agent's appointment, powers, and duties as Administrative Agent shall be terminated.  After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this Article IX shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement.  If no successor Administrative Agent has accepted appointment as Administrative Agent by the date which is thirty (30) days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of Administrative Agent hereunder until such time, if any, as the Lenders appoint a successor Administrative Agent as provided for above.

Section 9.10    **Lender in Individual Capacity**.  Any Lender and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, provide Bank Products to, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with any Loan Party and its Subsidiaries and Affiliates and any other Person party to any Loan Documents as though such Lender were not a Lender hereunder without notice

135

6237404.15

to or consent of the other members of the Lender Group (or the Bank Product Providers).  The other members of the Lender Group acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, pursuant to such activities, such Lender and its respective Affiliates may receive information regarding a Loan Party or its Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of such Loan Party or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver such Lender will use its reasonable best efforts to obtain), such Lender shall not be under any obligation to provide such information to them.

### Section 9.11    Collateral Matters.

(a)      The Lenders hereby irrevocably authorize (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Administrative Agent to release any Lien on any Collateral (i) upon the termination of the Commitments and payment and satisfaction in full by the Loan Parties and their Subsidiaries of all of the Obligations, (ii) constituting property being sold or disposed of if a release is required or desirable in connection therewith and if Borrower certifies to Administrative Agent that the sale or disposition is permitted under Section 7.05 (and Administrative Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property in which no Loan Party or any of its Subsidiaries owned any interest at the time Administrative Agent's Lien was granted nor at any time thereafter, (iv) constituting property leased or licensed to a Loan Party or its Subsidiaries under a lease or license that has expired or is terminated in a transaction permitted under this Agreement, or (v) in connection with a credit bid or purchase authorized under this Section 9.11.  The Loan Parties and the Lenders hereby irrevocably authorize (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Administrative Agent, based upon the instruction of the Required Lenders, to (a) consent to the sale of, credit bid, or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, (b) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale or other disposition thereof conducted under the provisions of the Code, including pursuant to Sections 9-610 or 9-620 of the Code, or (c) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any other sale or foreclosure conducted or consented to by Administrative Agent in accordance with applicable law in any judicial action or proceeding or by the exercise of any legal or equitable remedy.  In connection with any such credit bid or purchase, (i) the Obligations owed to the Lenders and the Bank Product Providers shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not impair or unduly delay the ability of Administrative Agent to credit bid or purchase at such sale or other disposition of the Collateral and, if such contingent or unliquidated claims cannot be estimated without impairing or unduly delaying the ability of Administrative Agent to credit bid at such sale or other disposition, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the Collateral that is the subject of such credit bid or purchase) and the Lenders and the Bank Product Providers whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the Collateral that is the subject of such credit bid or purchase (or in the Equity Interests of the any entities that are used to consummate such credit bid or purchase), and (ii) Administrative Agent, based upon the instruction of the Required Lenders, may accept non-cash consideration, including debt and equity securities issued by any entities used to consummate such credit bid or purchase and in connection therewith Administrative Agent may reduce the Obligations owed to the Lenders and the Bank Product Providers (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate

136

6237404.15

amount of Obligations so credit bid) based upon the value of such non-cash consideration; provided, that Bank Product Obligations not entitled to the application set forth in Section 2.4(b)(iii)(J) shall not be entitled to be, and shall not be, credit bid, or used in the calculation of the ratable interest of the Lenders and Bank Product Providers in the Obligations which are credit bid.   Except as provided above, Administrative Agent will not execute and deliver a release of any Lien on any Collateral without the prior written authorization of (y) if the release is of all or substantially all of the Collateral, all of the Lenders (without requiring the authorization of the Bank Product Providers), or (z) otherwise, the Required Lenders (without requiring the authorization of the Bank Product Providers).  Upon request by Administrative Agent or Borrower at any time, the Lenders will (and if so requested, the Bank Product Providers will) confirm in writing Administrative Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this Section 9.11; provided, that (1) anything to the contrary contained in any of the Loan Documents notwithstanding, Administrative Agent shall not be required to execute any document or take any action necessary to evidence such release on terms that, in Administrative Agent's opinion, could expose Administrative Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly released) upon (or obligations of Borrower in respect of) any and all interests retained by Borrower, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral.  Each Lender further hereby irrevocably authorizes (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to irrevocably authorize) Administrative Agent, at its option and in its sole discretion, to subordinate (by contract or otherwise) any Lien granted to or held by Administrative Agent on any property under any Loan Document (a) to the holder of any Permitted Lien on such property if such Permitted Lien secures purchase money Indebtedness (including Capitalized Lease Obligations) which constitute Indebtedness permitted to be incurred by the Borrower or a Subsidiary pursuant to Section 7.03 and (b) to the extent Administrative Agent has the authority under this Section 9.11 to release its Lien on such property.  Notwithstanding the provisions of this Section 9.11, the Administrative Agent shall be authorized, without the consent of any Lender and without the requirement that an asset sale consisting of the sale, transfer or other disposition having occurred, to release any security interest in any building, structure or improvement located in an area determined by the Federal Emergency Management Agency to have special flood hazards.

(b)     Administrative Agent shall have no obligation whatsoever to any of the Lenders (or the Bank Product Providers) (i) to verify or assure that the Collateral exists or is owned by a Loan Party or any of its Subsidiaries or is cared for, protected, or insured or has been encumbered, (ii) to verify or assure that Administrative Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, (iii) to verify or assure that any particular items of Collateral meet the eligibility criteria applicable in respect thereof, (iv) to impose, maintain, increase, reduce, implement, or eliminate any particular reserve hereunder or to determine whether the amount of any reserve is appropriate or not, or (v) to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Administrative Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, Administrative Agent may act in any manner it may deem appropriate, in its sole discretion given Administrative Agent's own interest in the Collateral in its capacity as one of the Lenders and that Administrative Agent shall have no other duty or liability whatsoever to any Lender (or Bank Product Provider) as to any of the foregoing, except as otherwise expressly provided herein.

**Section 9.12     Restrictions on Actions by Lenders; Sharing of Payments**.

6237404.15

(a)       Each of the Lenders agrees that it shall not, without the express written consent of Administrative Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of Administrative Agent, set off against the Obligations, any amounts owing by such Lender to any Loan Party or its Subsidiaries or any deposit accounts of any Loan Party or its Subsidiaries now or hereafter maintained with such Lender.  Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by Administrative Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against Borrower or any Guarantor or to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)       If, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from Administrative Agent pursuant to the terms of this Agreement, or (ii) payments from Administrative Agent in excess of such Lender's Pro Rata Share of all such distributions by Administrative Agent, such Lender promptly shall (A) turn the same over to Administrative Agent, in kind, and with such endorsements as may be required to negotiate the same to Administrative Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (B) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their Pro Rata Shares; provided, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

**Section 9.13    Agency for Perfection**.  Administrative Agent hereby appoints each other Lender (and each Bank Product Provider) as its Administrative Agent (and each Lender hereby accepts (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to accept) such appointment) for the purpose of perfecting Administrative Agent's Liens in assets which, in accordance with Article 8 or Article 9, as applicable, of the Code can be perfected by possession or control.  Should any Lender obtain possession or control of any such Collateral, such Lender shall notify Administrative Agent thereof, and, promptly upon Administrative Agent's request therefor shall deliver possession or control of such Collateral to Administrative Agent or in accordance with Administrative Agent's instructions.

**Section 9.14    Payments by Administrative Agent to the Lenders**.  All payments to be made by Administrative Agent to the Lenders (or Bank Product Providers) shall be made by bank wire transfer of immediately available funds pursuant to such wire transfer instructions as each party may designate for itself by written notice to Administrative Agent.  Concurrently with each such payment, Administrative Agent shall identify whether such payment (or any portion thereof) represents principal, premium, fees, or interest of the Obligations.

**Section 9.15    Concerning the Collateral and Related Loan Documents**.  Each member of the Lender Group authorizes and directs Administrative Agent to enter into this Agreement and the other Loan Documents.  Each member of the Lender Group agrees (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to agree) that any action taken by Administrative Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by Administrative Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders (and such Bank Product Provider).

138

6237404.15

**Section 9.16    Field Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information**.  By becoming a party to this Agreement, each Lender:

(c)    is deemed to have requested that Administrative Agent furnish such Lender, promptly after it becomes available, a copy of each field examination report respecting any Loan Party or its Subsidiaries (each, a "**Report**") prepared by or at the request of Administrative Agent, and Administrative Agent shall so furnish each Lender with such Reports,

(d)    expressly agrees and acknowledges that Administrative Agent does not (i) make any representation or warranty as to the accuracy of any Report, and (ii) shall not be liable for any information contained in any Report,

(e)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that Administrative Agent or other party performing any field examination will inspect only specific information regarding the Loan Parties and their Subsidiaries and will rely significantly upon Borrower's and its Subsidiaries' books and records, as well as on representations of Borrower's personnel,

(f)    agrees to keep all Reports and other material, non-public information regarding the Loan Parties and their Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 10.08, and

(g)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees:  (i) to hold Administrative Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of Borrower, and (ii) to pay and protect, and indemnify, defend and hold Administrative Agent, and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorneys' fees and costs) incurred by Administrative Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

In addition to the foregoing,  (x) any Lender may from time to time request of Administrative Agent in writing that Administrative Agent provide to such Lender a copy of any report or document provided by any Loan Party or its Subsidiaries to Administrative Agent that has not been contemporaneously provided by such Loan Party or such Subsidiary to such Lender, and, upon receipt of such request, Administrative Agent promptly shall provide a copy of same to such Lender, (y) to the extent that Administrative Agent is entitled, under any provision of the Loan Documents, to request additional reports or information from any Loan Party or its Subsidiaries, any Lender may, from time to time, reasonably request Administrative Agent to exercise such right as specified in such Lender's notice to Administrative Agent, whereupon Administrative Agent promptly shall request of Borrower the additional reports or information reasonably specified by such Lender, and, upon receipt thereof from such Loan Party or such Subsidiary, Administrative Agent promptly shall provide a copy of same to such Lender, and (z) any time that Administrative Agent renders to Borrower a statement regarding the Loan Account, Administrative Agent shall send a copy of such statement to each Lender.

**Section 9.17    Several Obligations; No Liability**.  Notwithstanding that certain of the Loan Documents now or hereafter may have been or will be executed only by or in favor of Administrative Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of

139

6237404.15

Administrative Agent (if any) to make any credit available hereunder shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis, according to their respective Commitments, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount of their respective Commitments.  Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lender.  Each Lender shall be solely responsible for notifying its Participants of any matters relating to the Loan Documents to the extent any such notice may be required, and no Lender shall have any obligation, duty, or liability to any Participant of any other Lender.  Except as provided in Section 9.07, no member of the Lender Group shall have any liability for the acts of any other member of the Lender Group.  No Lender shall be responsible to Borrower or any other Person for any failure by any other Lender (or Bank Product Provider) to fulfill its obligations to make credit available hereunder, nor to advance for such Lender (or Bank Product Provider) or on its behalf, nor to take any other action on behalf of such Lender (or Bank Product Provider) hereunder or in connection with the financing contemplated herein,

## ARTICLE X
## MISCELLANEOUS

**Section 10.01   Amendments, Etc**.   Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (or by the Administrative Agent with the consent of the Required Lenders) (other than with respect to any amendment or waiver contemplated in Sections 10.01(a) through (j) below, which shall only require the consent of the Lenders expressly set forth therein and not Required Lenders) (or by the Administrative Agent with the consent of the Required Lenders) and the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that, no such amendment, waiver or consent shall:

> (a)      increase the amount of or extend the expiration date of any Commitment of any Lender or amend, modify, or eliminate the last sentence of Section 2.4(c)(i);

> (b)      postpone any date scheduled for any payment of principal (including final maturity), interest or fees hereunder without the written consent of each Lender directly and adversely affected thereby (it being understood that the waiver (or amendment to the terms) of any mandatory prepayment of the Loans or any obligation of the Borrower to pay interest at the Default Rate, any Default or Event of Default or mandatory prepayment shall not constitute such a postponement of any date scheduled for the payment of principal or interest;

> (c)      reduce or forgive the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (iii) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document (or extend the timing of payments of such fees or other amounts) without the written consent of each Lender directly and adversely affected thereby (it being understood that the waiver of (or amendment to the terms of) any obligation of the Borrower to pay interest at the Default Rate, any mandatory prepayment of the Loans or any Default or Event of Default shall not constitute such a reduction);

> (d)      change any provision of Section 2.04, 2.06 or 8.03 or the definition of "Pro Rata Share" in any manner that would alter the *pro rata* sharing or order of

140

6237404.15

payments or other amounts required thereby, without the written consent of each Lender directly and adversely affected thereby;

(e)     change any provision of (i) this Section 10.01 or (ii) the definition of "Required Lenders" or any other provision specifying the number of Lenders or portion of the Loans required to take any action under the Loan Documents to reduce the percentage set forth therein, without the written consent of each Lender directly and adversely affected thereby;

(f)     other than in connection with a transaction permitted under Section 7.04 or 7.05, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(g)     other than in connection with a transaction permitted under Section 7.04 or 7.05, release all or substantially all of the aggregate value of the Guarantees, without the written consent of each Lender; or

provided, further, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, adversely affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document; (ii) only the consent of the parties to the Agent Fee Letter shall be required to amend, modify or supplement the terms thereof; (iii) Section 10.07(h) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; (iv) no Lender consent is required to effect any amendment expressly contemplated by Section 6.18; (v) no amendment, waiver, modification, elimination, or consent shall amend, without written consent of Administrative Agent, Borrower and the Supermajority Lenders, modify, or eliminate the definition of Borrowing Base or any of the defined terms (including the definitions of Eligible Accounts and Eligible Inventory) that are used in such definition to the extent that any such change results in more credit being made available to Borrowers based upon the Borrowing Base, but not otherwise, or the definition of Maximum Revolver Amount; (vi) no amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of this Agreement or the other Loan Documents pertaining to Issuing Bank, or any other rights or duties of Issuing Bank under this Agreement or the other Loan Documents, without the written consent of Issuing Bank, Administrative Agent, Borrower, and the Required Lenders; and (vii) no amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of this Agreement or the other Loan Documents pertaining to Swing Lender, or any other rights or duties of Swing Lender under this Agreement or the other Loan Documents, without the written consent of Swing Lender, Administrative Agent, Borrower, and the Required Lenders.

Notwithstanding anything to the contrary contained herein, (i) any amendment, modification, elimination, waiver, consent, termination, or release of, or with respect to, any provision of this Agreement or any other Loan Document that relates only to the relationship of the Lender Group among themselves, and that does not affect the rights or obligations of any Loan Party, shall not require consent by or the agreement of any Loan Party, (ii) any amendment, waiver, modification, elimination, or consent of or with respect to any provision of this Agreement or any other Loan Document may be entered into without the consent of, or over the objection of, any Defaulting Lender and (iii) any amendment contemplated by Section 2.12(d)(iii) of this Agreement in connection with a Benchmark Transition Event or an Early Opt-in Election shall be effective as contemplated by such Section 2.12(d)(iii) hereof.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected

141

6237404.15

with the consent of the applicable Lenders other than Defaulting Lenders), except (x) in respect of an amendment, waiver or consent under Section 10.01(a) or (b) and (y) any waiver, amendment or modification requiring the consent of all Lenders or each directly and adversely affected Lender that by its terms materially and adversely affects any Defaulting Lender to a greater extent than other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding the foregoing, no Lender consent is required for the Administrative Agent (but the Administrative Agent may seek such consent) to enter into or to effect any amendment, modification or supplement to any Intercreditor Agreement or arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral for the purpose of adding the holders of such Indebtedness (or their Representative) as a party thereto and otherwise causing such Indebtedness to be subject thereto, in each case as contemplated by the terms of such Intercreditor Agreement or arrangement permitted under this Agreement, as applicable (it being understood that any such amendment or supplement may make such other changes to the applicable Intercreditor Agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and provided that such other changes are not adverse, in any material respect (taken as a whole), to the interests of the Lenders); provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent.

Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Revolving Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

Notwithstanding anything to the contrary contained in this Section 10.01, guarantees, collateral security documents and related documents executed by the Loan Parties or the Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel or (ii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

Notwithstanding anything to the contrary contained in Section 10.01, if at any time after the Closing Date, the Borrower shall have identified in good faith an obvious error or any error or omission of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.  The Administrative Agent shall be entitled to a certificate of a Responsible Officer of the Borrower stating that any such amendment is authorized and permitted by the terms of the Loan Document.

**Section 10.02   Notices and Other Communications; Facsimile Copies**.

(a)  Notices; Effectiveness; Electronic Communications.

(i)     *Notices Generally*.   Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section

<center>142</center>

6237404.15

10.02(a)(ii)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

        (A)      if to:

        (1)      the Administrative Agent, to:

Wells Fargo Bank, National Association
Attention:
E-mail:

with a copy (which shall not constitute notice) to:

Otterbourg PC
230 Park Avenue
New York, NY 10169
Attn:  Thomas P. Duignan

        (2)      if to the Borrower to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02(a); and

        (B)      if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in Section 10.02(a)(ii) shall be effective as provided in such Section 10.02(a)(ii).

        (ii)      *Electronic* Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications

143

6237404.15

posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(b) *The Platform*.   THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."   THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.   NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.   In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Loan Parties, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of the Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party (or its representatives); provided, however, that in no event shall any Person have any liability to any other Person hereunder for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages); provided that nothing in this sentence shall limit any Loan Party's indemnification obligations set forth herein.

(c) *Change of Address, Etc*.   Each of the Borrower and the Administrative Agent may change its address, electronic mail address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto.   Each other Lender may change its address, electronic mail address, facsimile or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.   In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to the Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain Material Non-Public Information.

(d) *Reliance by Administrative Agent and Lenders*.   The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.   The Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in accordance with Section 10.05 hereof.

**Section 10.03   No Waiver; Cumulative Remedies**.   No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy,

144

6237404.15

power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) [reserved], (c) any Lender from exercising setoff rights in accordance with Section 10.09 (subject to the terms of Section 2.04) or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.04, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**Section 10.04   Attorney Costs and Expenses**.  The Borrower agrees to pay or reimburse the Administrative Agent, the Lenders and their respective Affiliates for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication, execution and delivery of this Agreement and the other Loan Documents, and to pay or reimburse the Administrative Agent, the Lenders and their respective Affiliates for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the administration of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including, in each case, all Attorney Costs, which shall be limited to counsel to the Administrative Agent and its Affiliates, one counsel to the Lenders and their respective Affiliates, taken as a whole, and, if reasonably necessary, one local counsel in each relevant jurisdiction material to the interests of the Lenders, taken as a whole and to pay or reimburse the Administrative Agent and the Lenders for all reasonable and documented out-of-pocket costs, charges and expenses incurred in connection with the enforcement or protection of any rights or remedies under this Agreement or the other Loan Documents (including all such costs, charges and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all respective Attorney Costs, which shall be limited to Attorney Costs of counsel to the Administrative Agent and its Affiliates, one counsel to the Lenders and their Affiliates, taken as a whole, and, if reasonably necessary, one local counsel in each relevant jurisdiction material to the interests of the Lenders taken as a whole and, solely in the case of an actual conflict of interest, one additional counsel in each relevant jurisdiction to each group of similarly situated affected parties). The agreements in this Section 10.04 shall survive repayment of all Obligations. All amounts due under this Section 10.04 shall be paid within thirty (30) days following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail (provided that the Lender need not be required to disclose any confidential information or to the extent prohibited by law or regulation); provided that, with respect to the Closing Date, all amounts due under this Section 10.04 shall be paid on the Closing Date solely to the extent invoiced to the Borrower within two (2) Business Days of the Closing Date. If any Loan Party fails to pay when due any costs, charges, expenses or other amounts

145

6237404.15

payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its discretion following five (5) Business Days' prior written notice to the Borrower. For the avoidance of doubt, this Section 10.04 shall not apply to Taxes, except any Taxes that represent costs and expenses arising from any non-Tax claim.

**Section 10.05    Indemnification by the Borrower**.    The Borrower shall indemnify and hold harmless the Administrative Agent, each Agent-Related Person, Lender and their respective Affiliates and controlling Persons, and their respective officers, directors, employees, partners, agents, advisors and other representatives of each of the foregoing and their respective successors (collectively the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses, charges and disbursements (including Attorney Costs but limited in the case of legal fees and expenses to the reasonable and documented out-of-pocket fees, disbursements and other charges of counsel to Administrative Agent and its Affiliates, one counsel to all other Indemnitees taken as a whole, and, if reasonably necessary, one local counsel for all Indemnitees taken as a whole in each relevant jurisdiction that is material to the interests of the Lenders, and in the case of an actual or potential conflict of interest, one additional counsel in each relevant jurisdiction to each group of similarly situated affected Indemnitees ), joint or several, of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Loan or the use or proposed use of the proceeds therefrom, (c) any actual or alleged presence or Release of Hazardous Materials at, in, on, under or from any property or facility currently or formerly owned, leased or operated by the Loan Parties or any Subsidiary, or any Environmental Liability or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (a "**Proceeding**") and regardless of whether any Indemnitee is a party thereto or whether or not such Proceeding is brought by the Borrower or any other person and, in each case, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee (all of the foregoing, collectively, the "**Indemnified Liabilities**"); provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses, charges or disbursements resulted from (x) the gross negligence or willful misconduct of such Indemnitee or of any of its controlled Affiliates or their respective directors, officers, employees, partners, advisors or other representatives, as determined by a final non-appealable judgment of a court of competent jurisdiction, (y) any dispute solely among Indemnitees other than any claims by or against an Indemnitee in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under this Agreement and other than any claims arising out of any act or omission of any Holdco, the Borrower or any of their Affiliates or (z) settlements effected without the Borrower's prior written consent (such consent not to be unreasonably withheld, delayed or conditioned), but if settled with the Borrower's written consent, or if there is a final judgment against an Indemnitee in any such Proceeding, the Borrower shall indemnify and hold harmless such Indemnitee to the extent and the manner set forth above. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through electronic, telecommunications or other information transmission systems, including, without limitation, SyndTrak, IntraLinks, the internet, email or similar electronic transmission systems in connection with this Agreement, in each case, except to the extent any such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee (or its controlling Persons, controlled Affiliates or their respective directors, officers, employees, partners, advisors or other representatives), nor shall any Indemnitee, Loan Party or any Subsidiary have any liability for any special, punitive, indirect or consequential damages

146

6237404.15

relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date); it being agreed that this sentence shall not limit the indemnification obligations of any Holdco or any Subsidiary (including, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party and for any out-of-pocket expenses). In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, any Subsidiary of any Loan Party, its directors, equity holders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents are consummated. All amounts due under this Section 10.05 shall be paid within thirty (30) days after written demand therefor (together with reasonable backup documentation supporting such reimbursement request); provided, however, that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification rights with respect to such payment pursuant to the express terms of clauses (x) through (z) above. The agreements in this Section 10.05 shall survive the resignation or removal of the Administrative Agent, the replacement of any Lender, and the repayment, satisfaction or discharge of all the other Obligations. For the avoidance of doubt, this Section 10.05 shall not apply to Taxes, except any Taxes that represent liabilities, obligations, losses, damages, penalties, claims, demands, actions, prepayments, suits, costs, expenses, charges and disbursements arising from any non-Tax claims.

To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under this Section 10.05 or Section 10.04 to be paid by it to the Administrative Agent (or any sub-agent thereof), or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), or such Related Party, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity.

**Section 10.06    Payments Set Aside**.  To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, *plus* interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**Section 10.07    Successors and Assigns**.  (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Administrative Agent (at the direction of the Required Lenders) and each Lender (except as permitted by Section 7.04)

147

and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Assignee pursuant to an assignment made in accordance with the provisions of Section 10.07(b) (such an assignee, an "**Eligible Assignee**"), or (ii) by way of participation in accordance with the provisions of Section 10.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(g) or (iv) to an SPC in accordance with the provisions of Section 10.07(h) (and any other attempted assignment or transfer by any party hereto shall be null and void); provided, however, that notwithstanding the foregoing, no Lender may assign or transfer by participation any of its rights or obligations hereunder to (i) any Person that is a Defaulting Lender, (ii) a natural Person, (iii) a Disqualified Competitor and (iv) Holdings, the Borrower or any of their respective Subsidiaries or Affiliates). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) (i) Subject to the conditions set forth in Section 10.07(b)(ii) below and the proviso to Section 10.07(a), any Lender may at any time assign to one or more assignees (each, an "**Assignee**") all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

(A)      the Borrower; provided that no consent of the Borrower shall be required for (i) an assignment of all or a portion of the Revolving Loans to a Lender or to an Affiliate of a Lender or an Approved Fund thereof and (ii) after the occurrence and during the continuance of an Event of Default, an assignment to any Assignee; provided, further, that the Borrower shall be deemed to have consented to any such assignment unless it shall have objected thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof; and

(B)      the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Revolving Loan to a Lender, an Affiliate of a Lender or an Approved Fund.

Notwithstanding the foregoing or anything to the contrary set forth herein, to the extent any Lender is required to assign any portion of its Loans and other rights, duties and obligations hereunder in order to comply with applicable Laws, such assignment may be made by such Lender without the consent of the Borrower, the Administrative Agent, or any other party hereto so long as such Lender complies with the requirements of Section 10.07(b)(ii).

(ii)      Assignments shall be subject to the following additional conditions:

(A)      except in the case of an assignment of the entire remaining amount of the assigning Lender's Loans, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, and shall be in increments of an amount of $1,000,000, in excess thereof unless each of the Borrower and the Administrative Agent otherwise consents; provided that concurrent assignments to any Lender and its Affiliates or Approved Funds and concurrent assignments from any Lender and its Affiliates or Approved Funds to a single Assignee (or to an Assignee and its Affiliates or Approved Funds) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

148

6237404.15

(B)      the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); provided that only one such fee shall be payable in the event of simultaneous assignments to or from two (2) or more Approved Funds;

(C)      if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire; and

(D)      the Assignee shall execute and deliver to the Administrative Agent and the Borrower the forms described in Sections 3.01(e) and 3.01(f) applicable to it.

In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable *pro rata* share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full Pro Rata Share of all Loans. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(c)  Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d), from and after the effective date specified in each Assignment and Assumption, the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment). Upon request, and the surrender by the assigning Lender of its Note, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.07(c) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(e).

(d)  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it, and a register for the recordation of the names and addresses of the Lenders and principal amounts (and related interest amounts) of the Loans owing to each Lender pursuant to the terms hereof from time to time (the "**Register**"). Upon its receipt of, and consent to, a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 10.07(b)(ii)(B) above, if applicable, and, if required,

149

the written consent of the Administrative Agent and/or the Borrower to such assignment and any applicable tax forms, the Administrative Agent shall (i) accept such Assignment and Assumption and (ii) promptly record the information contained therein in the Register.  No assignment shall be effective unless it has been recorded in the Register as provided in this Section 10.07(d).  The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and, with respect to itself, any Lender, at any reasonable time and from time to time upon reasonable prior notice, provided that the information contained in the Register which is shared with each Lender (other than the Administrative Agent and its affiliates) shall be limited to the entries with respect to such Lender including the principal amount of and stated interest on the Revolving Loans owing to such Lender.  This Section 10.07(d) and Section 2.11 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

(e)  Any Lender may at any time (other than to a natural person, a Defaulting Lender, a Holdco, the Borrower, or any Disqualified Competitor) sell participations to any Person (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (a) through (i) of the first proviso to Section 10.01 that requires the affirmative vote of such Lender.  Subject to Section 10.07(f), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations of such Sections and Section 3.07, including Section 3.01(e), and it being understood that the documentation required under Section 3.01(e) shall be delivered solely to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(c).  To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.04 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is reasonably necessary to establish that such Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The Participant Register shall be conclusive, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(f)  A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the

150

participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's consent or except to the extent such entitlement to a greater payment results from a change in any Law after the sale of the participation takes place.

(g)  Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any central bank having jurisdiction over such Lender; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)  Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof and (iii) such SPC and the applicable Loan or any applicable part thereof, shall be appropriately reflected in the Participant Register.  Each party hereto hereby agrees that (i) an SPC shall be entitled to the benefit of Sections 3.01, 3.04 and 3.05 (subject to the requirements and the limitations of such Sections and Section 3.07, including Section 3.01(e), and it being understood that the documentation required under Section 3.01(e) shall be delivered solely to the participating Lender), but neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement except, in the case of Section 3.01 and 3.04, unless such entitlement to a greater payment results from a change in any Law after the grant to the SPC takes place, (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(i)  Notwithstanding anything to the contrary contained herein, without the consent of the Borrower or the Administrative Agent, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; provided that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(j)  [Reserved].

**Section 10.08  Confidentiality**.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its

6237404.15

Affiliates and its Affiliates' managers, administrators, directors, officers, employees, trustees, partners, investors, funding sources, investment advisors and agents, including accountants, legal counsel and other advisors (collectively "**Advisors**") on a "need to know basis" (provided that (i) the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and agree or otherwise have an obligation to keep such Information confidential and (ii) the Administrative Agent or Lender, as applicable, shall be responsible for the compliance of its Affiliates and such Affiliates' Advisors with this paragraph); (b) to the extent required or requested by, or upon the good faith determination by counsel that such information should be disclosed in light of ongoing oversight or review of such Person, by any Governmental Authority or self-regulatory authority having or asserting jurisdiction over such Person (including any Governmental Authority regulating any Lender or its Affiliates), provided that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation; (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, provided that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation; (d) to any other party to this Agreement; (e) to (i) any pledgee referred to in Section 10.07(g), (ii) subject to an agreement containing provisions at least as restrictive as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Borrower), any direct or indirect contractual counterparty to a Swap Contract, Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in any of its rights or obligations under this Agreement (other than any Disqualified Competitor or Person whom the Borrower has affirmatively denied to provide consent to assignment in accordance with Section 10.07(b)(i)(A))); or (iii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder (other than any Disqualified Competitor or Person whom the Borrower has affirmatively denied to provide consent to assignment in accordance with Section 10.07(b)(i)(A)); (f) with the prior written consent of the Borrower; (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.08 or other obligation of confidentiality owed to the Borrower or its Affiliates or becomes available to the Administrative Agent, any Lender, or any of their respective Affiliates on a non-confidential basis from a source other than a Loan Party or their respective related parties (so long as such source is not known (after due inquiry) to the Administrative Agent, such Lender, or any of their respective Affiliates to be bound by confidentiality obligations to any Loan Party or its Affiliates); (h) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to Loan Parties and their Subsidiaries received by it from such Lender) or to the CUSIP Service Bureau or any similar organization; (i) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of its rights hereunder or thereunder; (j) to the extent such information is independently developed by the Administrative Agent, any Lender, or any of their respective Affiliates; or (k) for purposes of establishing a due diligence defense. In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and publicly available information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Administrative Agent and the Lenders in connection with the administration, settlement and management of this Agreement, the other Loan Documents and the Credit Extensions. For the purposes of this Section 10.08, "**Information**" means all information received from the Loan Parties relating to any Loan Party, its Affiliates or its Affiliates' directors, officers, employees, trustees, investment advisors or agents, other than any such information that is publicly available to Administrative Agent, or any Lender prior to disclosure by any Loan Party other than as a result of a breach of this Section 10.08 or any other confidentiality obligation owed to any Loan Party or their Affiliates.

152

6237404.15

**Section 10.09    Setoff**.  In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates (and the Administrative Agent, in respect of any unpaid fees, costs and expenses payable hereunder) is authorized at any time and from time to time, without prior notice to the Borrower, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and each of its Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) (other than escrow, payroll, petty cash, trust and tax accounts) at any time held by, and other Indebtedness at any time owing by, such Lender and its Affiliates or the Administrative Agent to or for the credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations owing to such Lender and its Affiliates or the Administrative Agent hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not the Administrative Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit of other obligations; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.17 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender; provided that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of the Administrative Agent and each Lender under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent and such Lender may have at Law.

**Section 10.10    Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**").  If Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**Section 10.11    Counterparts**.  This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by facsimile, Docusign or other electronic transmission of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document.  The Administrative Agent may also require that any such documents and signatures delivered by facsimile, Docusign or other electronic transmission be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile, Docusign or other electronic transmission.

**Section 10.12    Integration**.  This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  Subject to Section 10.21, in

153

6237404.15

the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; provided that the inclusion of supplemental rights or remedies in favor of the Administrative Agent or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement.  Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

Section 10.13   **Survival of Representations and Warranties**.   All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.14   **Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions; provided, that the Lenders shall charge no fee in connection with any such amendment.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Without limiting the foregoing provisions of this Section 10.14, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 10.15   **GOVERNING LAW**.  (a)  THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b) ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY (BOROUGH OF MANHATTAN) OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, OR ANY APPELLATE COURT FROM ANY THEREOF, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY, THE ADMINISTRATIVE AGENT AND EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS AND AGREES THAT IT WILL NOT COMMENCE OR SUPPORT ANY SUCH ACTION OR PROCEEDING IN ANOTHER JURISDICTION.   EACH LOAN PARTY, THE ADMINISTRATIVE AGENT AND EACH LENDER IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN

154

6237404.15

DOCUMENTS IN THE MANNER PROVIDED FOR NOTICES (OTHER THAN FACSIMILE) IN SECTION 10.02.  NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.16    **WAIVER OF RIGHT TO TRIAL BY JURY**.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).    EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.16.

Section 10.17    **Binding Effect**.    This Agreement shall become effective when it shall have been executed and delivered by the Loan Parties and each other party hereto and the Administrative Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Loan Parties, the Administrative Agent and each Lender and their respective successors and assigns, in each case in accordance with Section 10.07 (if applicable) and except that no Loan Party shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders except as permitted by Section 7.04.

Section 10.18    **USA Patriot Act**.    Each Lender that is subject to the USA Patriot Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name, address and tax identification number of such Loan Party and other information regarding such Loan Party that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the USA Patriot Act.  This notice is given in accordance with the requirements of the USA Patriot Act and is effective as to the Lenders and the Administrative Agent.  The Borrower shall, promptly following a reasonable request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

Section 10.19    **No Advisory or Fiduciary Responsibility**.    In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent are arm's-length commercial transactions between the Loan Parties and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (B) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent and each Lender each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for each Loan Party or any of their respective

155

6237404.15

Affiliates, or any other Person and (B) neither the Administrative Agent nor any Lender has any obligation to the Loan Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and neither the Administrative Agent nor any other Arranger nor any Lender has any obligation to disclose any of such interests to the Loan Parties or any of their respective Affiliates.  To the fullest extent permitted by law, each Loan Party hereby waives and releases any claims that it may have against the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.20   **Judgment Currency**.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable law).

Section 10.21   **Intercreditor Agreement**.  Each Lender hereunder (a) acknowledges that it has received a copy of the Intercreditor Agreement, (b) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement and (c) authorizes and instructs the Administrative Agent to enter into the Intercreditor Agreement as Administrative Agent and on behalf of such Lender.  The foregoing provisions are intended as an inducement to the lenders under the First Lien Loan Documents, the Junior Lien Loan Documents and the Loan Documents to extend credit to the Loan Parties and such lenders are intended third party beneficiaries of such provisions.  In the event of any conflict or inconsistency between the provisions of any Intercreditor Agreement and this Agreement, the provisions of such Intercreditor Agreement shall control.

Section 10.22   **Acknowledgement and Consent to Bail-In of EEA Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution; and

(b) the effects of any Bail-In Action on any such liability, including, if applicable:

156

6237404.15

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

**Section 10.23    Certain ERISA Matters.**

(a)  Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans,

(ii)      the transaction exemption set forth in one or more prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time ("PTEs"), such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement,

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement, or

(iv)      such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)  In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party

157

hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

(i)      none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii)      the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii)      the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv)      the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans and this Agreement is a fiduciary under ERISA or the US Internal Revenue Code, or both, with respect to the Loans and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)      no fee or other compensation is being paid directly to the Administrative Agent or any its Affiliates for investment advice (as opposed to other services) in connection with the Loans or this Agreement.

(c) The Administrative Agent hereby inform the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans and this Agreement, (ii) may recognize a gain if it extended the Loans for an amount less than the amount being paid for an interest in the Loans by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

**Section 10.24   Acknowledgement Regarding Any Supported QFCs**.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedge Agreements or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any

6237404.15

Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States): In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States.  In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.  Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

## ARTICLE XI
## GUARANTEE

Section 11.01  **The Guarantee**.  Each Guarantor hereby jointly and severally with the other Guarantors guarantees, as a primary obligor and not as a surety to each Secured Party and their respective permitted successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of (i) the Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code and (ii) any other Debtor Relief Laws) on the Loans made by the Lenders to, and the Notes held by each Lender of, the Borrower, and all other Secured Obligations from time to time owing to the Secured Parties by any Loan Party under any Loan Document strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"); provided, however, that Guaranteed Obligations shall exclude all Excluded Swap Obligations.  The Guarantors hereby jointly and severally agree that if the Borrower or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Section 11.02  **Obligations Unconditional**.  The obligations of the Guarantors under Section 11.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrower under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full).  Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

<div align="center">159</div>

(a)    at any time or from time to time, without notice to the Guarantors, to the extent permitted by Law, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b)    any of the acts mentioned in any of the provisions of this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted (including incurring any increase or decrease in the principal amount of the Guaranteed Obligations or the rate of interest or the fees thereon);

(c)    the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or except as permitted pursuant to Section 11.09, any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d)    any Lien or security interest granted to, or in favor of, any Lender or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(e)    the release of any other Guarantor pursuant to Section 11.09.

The Guarantors hereby expressly waive (to the fullest extent permitted by Law) diligence, presentment, demand of payment, protest and, to the extent permitted by Law, all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations.  The Guarantors waive, to the extent permitted by Law, any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee.  This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrower or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto.  This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

**Section 11.03    Reinstatement**.  The obligations of the Guarantors under this Article XI shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

160

6237404.15

**Section 11.04  Subrogation; Subordination**.  Each Guarantor hereby agrees that until the payment in full in cash and satisfaction in full of all Guaranteed Obligations (other than contingent obligations not yet due and owing) it shall subordinate any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 11.01, whether by subrogation or otherwise, against the Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.

**Section 11.05  Remedies**.  The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrower under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 8.02 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.02) for purposes of Section 11.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 11.01.

**Section 11.06  [Reserved]**.

**Section 11.07  Continuing Guarantee**.  The guarantee in this Article XI is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

**Section 11.08  General Limitation on Guarantee Obligations**.  In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other Law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 11.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 11.09, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount (after giving effect to the liability under this Guaranty and the right of contribution established in Section 11.10, but before giving effect to any other guarantee (including any guarantee of the First Lien Obligations and/ or the Second Lien Obligations)) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

**Section 11.09  Release of Guarantors**.  If, in compliance with the terms and provisions of the Loan Documents, (i) all or substantially all of the Equity Interests of any Subsidiary Guarantor are sold or otherwise transferred to a Person or Persons none of which is a Loan Party in a transaction permitted hereunder or (ii) any Subsidiary Guarantor ceases to be a Subsidiary or becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder (any such Subsidiary Guarantor, and any Subsidiary Guarantor referred to in clause (i), a "**Transferred Guarantor**"), such Transferred Guarantor shall, upon the consummation of such sale or transfer or other transaction (but subject to the proviso below), be automatically released from its obligations under this Agreement (including under Section 10.05 hereof) and the other Loan Documents, including its obligations to pledge and grant any Collateral owned by it pursuant to any Collateral Document and, in the case of a sale of all or substantially all of the Equity Interests of the Transferred Guarantor, the pledge of such Equity Interests to the Administrative Agent pursuant to the Collateral Documents shall be automatically released, and, so long as the Borrower shall have provided the Administrative Agent such certifications or documents as Administrative Agent shall reasonably request, the Administrative Agent shall take such actions as are reasonably requested by the Borrower or such Guarantor to effect each release described in this Section 11.09 in accordance with the relevant provisions of the Collateral Documents; provided, however, that the release of any Subsidiary Guarantor from its obligations under this Agreement and the other Loan Documents if such Subsidiary

161

Guarantor becomes an Excluded Subsidiary of the type described in clause (a) of the definition thereof shall only be permitted if at the time such Subsidiary Guarantor becomes an Excluded Subsidiary of such type (1) no Default or Event of Default shall have occurred and be outstanding, (2) after giving *pro forma* effect to such release and the consummation of the transaction that causes such Person to be an Excluded Subsidiary of such type, the Borrower is deemed to have made a new Investment in such Person for purposes of Section 7.02 (as if such Person were then newly acquired) and such Investment is permitted pursuant to Section 7.02 (other than Section 7.02(f)) at such time and (3) a Responsible Officer of the Borrower certifies to the Administrative Agent compliance with preceding clauses (1) and (2); provided, further, that no such release shall occur if such Subsidiary Guarantor continues to be a guarantor in respect of the First Lien Obligations, the Second Lien Obligations or any Permitted Refinancing in respect of any of the foregoing.

When all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied (other than contingent obligations as to which no claim has been asserted), this Agreement and the Guarantees made herein shall terminate with respect to all Obligations, except with respect to Obligations that expressly survive such repayment pursuant to the terms of this Agreement.

Section 11.10    **Right of Contribution**.  Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment.  Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 11.04.  The provisions of this Section 11.10 shall in no respect limit the obligations and liabilities of any Guarantor to the Administrative Agent and the Lenders, and each Subsidiary Guarantor shall remain liable to the Administrative Agent and the Lenders for the full amount guaranteed by such Guarantor hereunder.

Section 11.11    **Keepwell**.    Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Guaranty in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 11.11 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 11.11, or otherwise under this Guarantee, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Guarantor under this Section 11.11 shall remain in full force and effect until all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied.  Each Qualified ECP Guarantor intends that this Section 11.11 constitute, and this Section 11.11 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 11.12    **Independent Obligation**.   The obligations of each Guarantor hereunder are independent of the obligations of any other Guarantor, any other party or any Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not action is brought against any other guarantor, any other party or any Borrower and whether or not any other guarantor, any other party or any Borrower be joined in any such action or actions. Each Guarantor waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof.  Any payment by the Borrower or other circumstance which operates to toll any statute of limitations as to the Borrower shall operate to toll the statute of limitations as to the Guarantors.

[Signature Pages Follow]

162

**Exhibit D-1**

**Redline to Version in the First Amended Plan Supplement**

***POSTING VERSION***Kirkland Draft 8.27.20 Revised

**Dated ~~[●],~~ August 28, 2020**

**ABL CREDIT AGREEMENT**

~~$30,000,000~~

among

**JASON GROUP INC.,**
as Borrower,

**THE GUARANTORS PARTY HERETO FROM TIME TO TIME,**

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Administrative Agent,

and

**THE OTHER LENDERS PARTY HERETO FROM TIME TO TIME**[1]

---

[1] ~~NTD: The Agreement remains subject to ongoing negotiation, review and comment in all respects.~~

6237404.~~5~~15

# Table of Contents

**Page**

## Table of Contents

**Page**

Article I Definitions and Accounting Terms..................................................................................2

    Section 1.01    Defined Terms .................................................................................2
    Section 1.02    Other Interpretive Provisions ......................................................50
    Section 1.03    Accounting Terms .......................................................................51
    Section 1.04    Rounding ......................................................................................51
    Section 1.05    References to Agreements, Laws, Etc. ..........................................52
    Section 1.06    Times of Day ................................................................................52
    Section 1.07    Timing of Payment or Performance .............................................52
    Section 1.08    [Reserved]. ...................................................................................52
    Section 1.09    Pro Forma Calculations ................................................................52
    Section 1.10    Exchange Rates; Currency ...........................................................53
    Section 1.11    Certifications ................................................................................53

Article II Credit Extensions ........................................................................................................53

    Section 2.01    Revolving Loans ..........................................................................53
    Section 2.02    [Reserved] ....................................................................................54
    Section 2.03    Borrowing Procedures and Settlements. .......................................54
    Section 2.04    Payments; Reductions of Commitments; Prepayments....................61
    Section 2.05    Promise to Pay; Promissory Notes ...............................................65
    Section 2.06    Interest Rates and Letter of Credit Fee:  Rates, Payments, and Calculations........65
    Section 2.07    Crediting Payments ......................................................................67
    Section 2.08    Designated Account ......................................................................67
    Section 2.09    Maintenance of Loan Account; Statements of Obligations.................67
    Section 2.10    Fees...............................................................................................67
    Section 2.11    Letters of Credit ...........................................................................68
    Section 2.12    LIBOR Option...............................................................................74
    Section 2.13    Capital Requirements ...................................................................77
    ~~Section 2.14    [Reserved]~~ ...................................................................................~~76~~
    ~~Section 2.15    [Reserved]~~ ...................................................................................~~76~~
    ~~Section 2.16    [Reserved].~~ ..................................................................................~~76~~
    ~~Section 2.17    [Reserved]~~ ...................................................................................~~76~~
    ~~Section 2.18    [Reserved]~~ ...................................................................................~~76~~

Article III Taxes, Increased Costs Protection and Illegality .......................................................78

    Section 3.01    Taxes ............................................................................................78
    Section 3.02    Illegality .......................................................................................82
    Section 3.03    Inability to Determine Rates.........................................................82
    Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; LIBOR Rate Loan Reserves ............................................................................................83
    Section 3.05    Funding Losses.............................................................................84
    Section 3.06    Matters Applicable to All Requests for Compensation ...................84

i

**Page**

Section 3.07   Replacement of Lenders under Certain Circumstances.......................................85
Section 3.08   Survival ............................................................................................................86

Article IV Conditions Precedent to Credit Extensions ...............................................................87

Section 4.01   Conditions to Initial Credit Extension....................................................................87
Section 4.02   Conditions to all Credit Extensions.......................................................................89

Article V Representations and Warranties....................................................................................89

Section 5.01   Existence, Qualification and Power; Compliance with Laws ...............................89
Section 5.02   Authorization; No Contravention...........................................................................90
Section 5.03   Governmental Authorization; Other Consents .......................................................90
Section 5.04   Binding Effect .......................................................................................................90
Section 5.05   Financial Statements; No Material Adverse Effect ...............................................90
Section 5.06   Litigation ...............................................................................................................91
Section 5.07   Ownership of Property; Liens ...............................................................................91
Section 5.08   Environmental Matters ..........................................................................................91
Section 5.09   Taxes .....................................................................................................................92
Section 5.10   ERISA Compliance ...............................................................................................92
Section 5.11   Subsidiaries; Equity Interests ...............................................................................92
Section 5.12   Margin Regulations; Investment Company Act .....................................................93
Section 5.13   Disclosure .............................................................................................................93
Section 5.14   Labor Matters ........................................................................................................93
Section 5.15   Intellectual Property; Licenses, Etc.......................................................................93
Section 5.16   Solvency ................................................................................................................94
Section 5.17   [Reserved] .............................................................................................................94
Section 5.18   USA Patriot Act; OFAC; Sanctions; Anti-Corruption Laws; Anti-Money
              Laundering Laws.....................................................................................................94
Section 5.19   Security Documents ..............................................................................................94
Section 5.20   EEA Financial Institutions ....................................................................................95
Section 5.21   Beneficial Ownership Certification........................................................................95
Section 5.22   Leases[Reserved] ..................................................................................................95
Section 5.23   Eligible Accounts ..................................................................................................95
Section 5.24   Eligible InventorInventory ...................................................................................95
Section 5.25   Location of Inventory.............................................................................................95
Section 5.26   Inventory Records .................................................................................................95
Section 5.27   Hedge Agreements ................................................................................................95

Article VI Affirmative Covenants.................................................................................................96

Section 6.01   Financial Statements..............................................................................................96
Section 6.02   Certificates; Other Information .............................................................................98
Section 6.03   Notices...................................................................................................................99
Section 6.04   Payment of Taxes .................................................................................................100
Section 6.05   Preservation of Existence, Etc.............................................................................100
Section 6.06   Maintenance of Properties....................................................................................100
Section 6.07   Insurance ..............................................................................................................100
Section 6.08   Compliance with Laws..........................................................................................101
Section 6.09   Books and Records................................................................................................101
Section 6.10   Inspection Rights..................................................................................................101

6237404.15

**Page**

Section 6.11    Additional Collateral; Additional Guarantors .................................................. 102
Section 6.12    Compliance with Environmental Laws ............................................................ 104
Section 6.13    Further Assurances ......................................................................................... 104
Section 6.14    [Reserved]. ..................................................................................................... 105
Section 6.15    Location of Inventory; Chief Executive Office................................................ 105
Section 6.16    [Reserved] ...................................................................................................... 105
Section 6.17    Lender Meetings ............................................................................................. 105
Section 6.18    End of Fiscal Years ........................................................................................ 105
Section 6.19    Lines of Business ............................................................................................ 105
Section 6.20    Post-Closing Covenant ................................................................................... 105
Section 6.21    OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws Corruption Laws; Anti-Mon
Section 6.22    Account Control Agreements........................................................................... 106
Section 6.23    Disclosure Updates ........................................................................................ 103

Article VII Negative Covenants..................................................................................................106

Section 7.01    Liens................................................................................................................ 106
Section 7.02    Investments...................................................................................................... 110
Section 7.03    Indebtedness .................................................................................................... 113
Section 7.04    Fundamental Changes ..................................................................................... 117
Section 7.05    Dispositions..................................................................................................... 118
Section 7.06    Restricted Payments ........................................................................................ 120
Section 7.07    [Reserved]. ...................................................................................................... 122
Section 7.08    Transactions with Affiliates ............................................................................ 122
Section 7.09    Burdensome Agreements ................................................................................. 123
Section 7.10    Use of Proceeds............................................................................................... 125
Section 7.11    Limitation on Issuance of Equity Interests[Reserved] ..................................... 126
Section 7.12    Inventory with Bailees..................................................................................... 126
Section 7.13    Fixed Charge Coverage Ratio ......................................................................... 126
Section 7.14    [Reserved] ....................................................................................................... 126
Section 7.15    Prepayments, Etc. of Indebtedness.................................................................. 126
Section 7.16    Permitted Activities......................................................................................... 127

Article VIII Events of Default and Remedies ............................................................................ 127

Section 8.01    Events of Default............................................................................................. 127
Section 8.02    Remedies Upon Event of Default..................................................................... 130
Section 8.03    [Reserved] ....................................................................................................... 130
Section 8.04    Borrower's Right to Cure ................................................................................. 130

Article IX Administrative Agent.................................................................................................. 131

Section 9.01    Appointment and Authorization of Administrative Agent................................. 131
Section 9.02    Delegation of Duties........................................................................................ 132
Section 9.03    Liability of Administrative Agent ..................................................................... 132
Section 9.04    Reliance by Administrative Agent .................................................................... 133
Section 9.05    Notice of Default or Event of Default .............................................................. 133
Section 9.06    Credit Decision................................................................................................ 133
Section 9.07    Costs and Expenses; Indemnification................................................................ 134
Section 9.08    Administrative Agent in Individual Capacity.................................................... 135
Section 9.09    Successor Administrative Agent ....................................................................... 135

6237404.15

**Page**

Section 9.10   Lender in Individual Capacity ................................................................ 136
Section 9.11   Collateral Matters. ........................................................................ 136
Section 9.12   Restrictions on Actions by Lenders; Sharing of Payments ................................ 138
Section 9.13   Agency for Perfection ...................................................................... 138
Section 9.14   Payments by Administrative Agent to the Lenders .......................................... 138
Section 9.15   Concerning the Collateral and Related Loan Documents ..................................... 139
Section 9.16   Field Examination Reports; Confidentiality; Disclaimers by Lenders; Other
               Reports and Information .................................................................... 139
Section 9.17   Several Obligations; No Liability .......................................................... 140

Article X Miscellaneous ...................................................................................... 140

Section 10.01   Amendments, Etc. .......................................................................... 140
Section 10.02   Notices and Other Communications; Facsimile Copies ...................................... 143
Section 10.03   No Waiver; Cumulative Remedies .......................................................... 145
Section 10.04   Attorney Costs and Expenses .............................................................. 145
Section 10.05   Indemnification by the Borrower ......................................................... 146
Section 10.06   Payments Set Aside ...................................................................... 147
Section 10.07   Successors and Assigns .................................................................. 148
Section 10.08   Confidentiality ......................................................................... 152
Section 10.09   Setoff .................................................................................. 153
Section 10.10   Interest Rate Limitation ................................................................ 153
Section 10.11   Counterparts ............................................................................ 153
Section 10.12   Integration ............................................................................. 154
Section 10.13   Survival of Representations and Warranties .............................................. 154
Section 10.14   Severability ............................................................................ 154
Section 10.15   GOVERNING LAW ........................................................................... 154
Section 10.16   WAIVER OF RIGHT TO TRIAL BY JURY ........................................................ 155
Section 10.17   Binding Effect .......................................................................... 155
Section 10.18   USA Patriot Act ......................................................................... 155
Section 10.19   No Advisory or Fiduciary Responsibility ................................................. 156
Section 10.20   Judgment Currency ....................................................................... 156
Section 10.21   Intercreditor Agreement ................................................................. 156
Section 10.22   Acknowledgement and Consent to Bail-In of EEA Financial Institutions ............... 157
Section 10.23   Certain ERISA Matters. .................................................................. 157
Section 10.24   Acknowledgement Regarding Any Supported QFCs ............................................ 159

Article XI Guarantee ......................................................................................... 159

Section 11.01   The Guarantee ........................................................................... 159
Section 11.02   Obligations Unconditional ............................................................... 160
Section 11.03   Reinstatement ........................................................................... 161
Section 11.04   Subrogation; Subordination .............................................................. 161
Section 11.05   Remedies ................................................................................ 161
Section 11.06   [Reserved] .............................................................................. 161
Section 11.07   Continuing Guarantee .................................................................... 161
Section 11.08   General Limitation on Guarantee Obligations ............................................. 161
Section 11.09   Release of Guarantors ................................................................... 161
Section 11.10   Right of Contribution ................................................................... 162
Section 11.11   Keepwell ................................................................................ 162

iv

**Page**

Section 11.12    Independent Obligation ........................................................................................ 162

6237404.15

**Page**

SCHEDULES

| | | |
|---|---|---|
| 1.01(A) | Administrative Agent's Account | |
| 1.01(B) | Authorized Persons | |
| 1.01(C) | Designated Account | |
| 1.01(D) | Existing Letters of Credit | |
| 1.01(E) | Guarantors | |
| S2.01 | Commitments | |
| 4.01(a) | Collateral Documents | |
| 5.07 | Ownership of Property | |
| 5.11 | Subsidiaries | |
| 5.~~[__]~~ | ~~Location~~.25 Locations of Inventory | |
| 5.~~[__]~~ | ~~Financial Statements, Reports, Certificates~~ | |
| ~~5.[__]~~6.02 | Collateral Reporting | |
| 6.20 | Post-Closing Covenants | |
| 7.01(b) | Liens | |
| 7.02(f) | Investments | |
| 7.03(b) | Indebtedness | |
| 7.05(v) | Dispositions | |
| 7.08(k) | Transactions with Affiliates | |
| 7.09(b) | Burdensome Agreements | |
| 10.02(a) | Certain Addresses for Notices | |

EXHIBITS

*Form of*

| | |
|---|---|
| A | LIBOR Notice |
| B | Borrowing Base Certificate |
| C | Compliance Certificate |
| D | Solvency Certificate |
| E | Assignment and Assumption |
| F | Security Agreement |
| G | Intercompany Note |
| H | United States Tax Compliance Certificate |
| I | Joinder Agreement |

vi

6237404.15

## ABL CREDIT AGREEMENT

This ABL CREDIT AGREEMENT is entered into as of [●],August 28, 2020, among JASON GROUP INC., a Delaware corporation and successor by merger with Old Jason (hereinafter defined) (the "**Company**" and the "**Borrower**"), the Guarantors party hereto from time to time, Wells Fargo Bank, National Association, as Administrative Agent, and each lender from time to time party hereto (collectively, the "**Lenders**" and, individually, a "**Lender**").

## PRELIMINARY STATEMENTS

On June [●],24, 2020 (the "**Petition Date**"), Jason Incorporated, a Wisconsin corporation ("**Old Jason**"), Jason Partners Holdings Inc., a Delaware corporation ("**Old Holdings**"), Jason Holding, Inc. I, a Delaware corporation ("**Old Intermediate Holdings**"), the Guarantors and each of the Domestic Subsidiaries of Old Jason (collectively, the "**Debtors**") as debtors and debtors-in-possession, commenced voluntary cases under chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), which cases are being jointly administered under the caption [●]In re: JASON INDUSTRIES, INC., et al. (the "**Chapter 11 Cases**").

The Joint Prepackaged Plan of Reorganization of Jason Industries, Inc. and its Debtor Affiliates pursuant to Chapter 11 Plan of [●]the Bankruptcy Code filed with the Bankruptcy Court on [●]June 20, 2020 Docket No. [●]22 (the "**Prepackaged Plan**") has been confirmed pursuant to the Confirmation Order (as defined below), and concurrently with the Revolving Loans (as defined below) made hereunder on the Closing Date, the "**Effective Date**" as defined in and under the Prepackaged Plan (the "**Plan Effective Date**") has occurred.

Prior to the Petition Date, certain lenders extended credit to Old Jason, as borrower, pursuant to that certain First Lien Credit Agreement, dated as of June 30, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Pre-Petition First Lien Credit Agreement**") by and among Old Jason, the guarantors party thereto from time to time, the Bank of New York Mellon, as administrative agent, the lenders party thereto from time to time (the "**Pre-Petition First Lien Lenders**") and Deutsche Bank AG New York Branch, as L/C Issuer (as defined therein) and Swing Line Lender (as defined therein).

The Prepackaged Plan provides that, on the Plan Effective Date, each Pre-Petition First Lien Lender under the Pre-Petition First Lien Credit Agreement shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for their First Lien Secured Credit Agreement Claim (as defined in the Prepackaged Plan) its pro rata share of, among other things, (i) the First Lien Term Loans, (ii) the Second Lien Terms Loans and (iii) 100% of the equity of Holdings, subject to dilution in accordance with the terms of the Prepackaged Plan.

After giving effect to the Transactions (herein defined) on the Plan Effective Date, (i) Jason Holdings Inc., a Delaware corporation ("**Holdings**") shall own 100% of the outstanding equity interests in Jason Intermediate Inc., a Delaware corporation ("**Intermediate Holdings**"), which shall hold 100% of the outstanding equity interests in the Company; and (ii) Old Jason shall have merged with and into the Company, with the Company as successor by merger.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

6237404.15

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**Section 1.01**    **Defined Terms**.

As used in this Agreement, the following terms shall have the meanings set forth below:

"**ABL Priority Collateral**" means "[_____]""ABL Priority Collateral" as defined in the Intercreditor Agreement.

"**Acceptable Appraisal**" means, with respect to an appraisal of Inventory, the most recent appraisal of such property received by Administrative Agent (a) from an appraisal company satisfactory to Administrative Agent, (b) the scope and methodology (including, to the extent relevant, any sampling procedure employed by such appraisal company) of which are satisfactory to Administrative Agent, and (c) the results of which are satisfactory to Administrative Agent, in each case, in Administrative Agent's Permitted Discretion.

"**Account**" means an account (as that term is defined in the Uniform Commercial Code).

"**Account Control Agreement**" means any deposit account control agreement, securities account control agreement or similar agreement entered into by a Loan Party, the Administrative Agent and the applicable financial institution, granting to the Administrative Agent, for the benefit of the Secured Parties, a perfected, first-priority Lien and "control" (as defined in the UCC) in the applicable deposit account or securities account of a Loan Party.

"**Account Debtor**" means any Person who is obligated on an Account, chattel paper, or a general intangible.

"**Account Party**" has the meaning set forth in Section 2.11(h).

"**Administrative Agent**" or "**Agent**" means Wells Fargo Bank, National Association, in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"**Administrative Agent's Account**" means the Deposit Account of Administrative Agent identified on Schedule 1.01(A) to this Agreement (or such other Deposit Account of Administrative Agent that has been designated as such, in writing, by Administrative Agent to Borrower and the Lenders).

"**Administrative Agent's Liens**" means the Liens granted by each Loan Party or its Subsidiaries to Administrative Agent under the Loan Documents and securing the Obligations.

"**Administrative Agent's Office**" means the Administrative Agent's address and account as set forth in Section 10.02(a), or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form approved by the Administrative Agent.

"**Advisors**" has the meaning set forth in Section 10.08.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "**Controlling**" and "**Controlled**" have meanings correlative thereto.

2

6237404.15

"**Agent Fee Letter**" means the letter agreement, dated as of the date of this Agreement, between the Borrower and the Administrative Agent.

"**Agent Parties**" has the meaning set forth in Section 10.02(b).

"**Agent-Related Persons**" means the Administrative Agent, together with its Affiliates, officers, directors, employees, partners, agents, advisors and other representatives.

"**Agreement**" means this ABL Credit Agreement, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Agreement Currency**" has the meaning assigned to such term in Section 10.20.

"**Annual Financial Statements**" means the audited consolidated balance sheets of Old Jason as of December 31, 2017, December 31, 2018 and December 31, 2019, and the related consolidated statements of income and statements of cash flows for the Old Jason for the fiscal years then ended.

"**Anti-Corruption Laws**" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery or corruption in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business.

"**Anti-Money Laundering Laws**" means the applicable laws or regulations in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"**Applicable Margin**" means, as of any date of determination, (a) with respect to Base Rate Loans, 4̶2.25%, and (b) with respect to LIBOR Rate Loans, 3.25%.

"**Applicable Unused Line Fee Percentage**" means, as of any date of determination, the applicable percentage set forth in the following table that corresponds to the Average Revolver Usage of Borrower for the most recently completed month ̶a̶s̶ ̶d̶e̶t̶e̶r̶m̶i̶n̶e̶d̶ ̶b̶y̶ ̶A̶d̶m̶i̶n̶i̶s̶t̶r̶a̶t̶i̶v̶e̶ ̶A̶g̶e̶n̶t̶ ̶i̶n̶ ̶i̶t̶s̶ ̶P̶e̶r̶m̶i̶t̶t̶e̶d̶ ̶D̶i̶s̶c̶r̶e̶t̶i̶o̶n̶; provided, that for the period from the Closing Date through and including April 1, 2021, the Applicable Unused Line Fee Percentage shall be set at the rate in the row styled "Level II"̶;̶ ̶p̶r̶o̶v̶i̶d̶e̶d̶ ̶f̶u̶r̶t̶h̶e̶r̶,̶ ̶t̶h̶a̶t̶ ̶a̶n̶y̶ ̶t̶i̶m̶e̶ ̶a̶n̶ ̶E̶v̶e̶n̶t̶ ̶o̶f̶ ̶D̶e̶f̶a̶u̶l̶t̶ ̶h̶a̶s̶ ̶o̶c̶c̶u̶r̶r̶e̶d̶ ̶a̶n̶d̶ ̶i̶s̶ ̶c̶o̶n̶t̶i̶n̶u̶i̶n̶g̶,̶ ̶t̶h̶e̶ ̶A̶p̶p̶l̶i̶c̶a̶b̶l̶e̶ ̶U̶n̶u̶s̶e̶d̶ ̶L̶i̶n̶e̶ ̶F̶e̶e̶ ̶P̶e̶r̶c̶e̶n̶t̶a̶g̶e̶ ̶s̶h̶a̶l̶l̶ ̶b̶e̶ ̶s̶e̶t̶ ̶a̶t̶ ̶t̶h̶e̶ ̶m̶a̶r̶g̶i̶n̶ ̶i̶n̶ ̶t̶h̶e̶ ̶r̶o̶w̶ ̶s̶t̶y̶l̶e̶d̶ ̶"̶L̶e̶v̶e̶l̶ ̶I̶I̶"̶:̶":

| Level | Average Revolver Usage | Applicable Unused Line Fee Percentage |
|-------|------------------------|----------------------------------------|
| I | ≥ $̶50% of the Maximum Revolver Amount | 0.375 percentage points |
| II | < 50% of the Maximum Revolver Amount | 0.75 percentage points |

The Applicable Unused Line Fee Percentage shall be re-determined on the first date of each month by Administrative Agent.

"**Application Event**" means the occurrence of (a) a failure by Borrower to repay all of the Obligations in full on the Maturity Date, or (b) an Event of Default and the election by Administrative

3

Agent or the Required Lenders to require that payments and proceeds of Collateral be applied pursuant to Section 2.04(b)(iii).

"**Approved Bank**" has the meaning set forth in clause (c) of the definition of "Cash Equivalents."

"**Approved Fund**" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"**Assignee**" has the meaning set forth in Section 10.07(b)(i).

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit E hereto.²².

"**Assignment Taxes**" has the meaning set forth in Section 3.01(b).

"**Attorney Costs**" means and includes all reasonable and documented fees, out-of-pocket expenses and disbursements of any law firm or other external legal counsel.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Authorized Person**" means any one of the individuals identified as an officer of Borrower on Schedule 1.01(B) to this Agreement, or any other individual identified by Borrower as an authorized person and authenticated through Administrative Agent's electronic platform or portal in accordance with its procedures for such authentication.

"**Availability**" means, as of any date of determination, the amount that Borrower is entitled to borrow as Loans under Section 2.01 (after giving effect to the then outstanding Revolver Usage).

"**Average Revolver Usage**" means, with respect to any period, the sum of the aggregate amount of Revolver Usage for each day in such period (calculated as of the end of each respective day) divided by the number of days in such period.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bank Product**" means any one or more of the following financial products or accommodations extended to any Loan Party by a Bank Product Provider:  (a) credit cards (including commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards")), (b) payment card processing services, (c) debit cards, (d) stored value cards, (e) Cash Management Services, or (f) transactions under Hedge Agreements.

"**Bank Product Agreements**" means those agreements entered into from time to time by any Loan Party with a Bank Product Provider in connection with the obtaining of any of the Bank Products.

"**Bank Product Collateralization**" means providing cash collateral (pursuant to documentation reasonably satisfactory to Administrative Agent) to be held by Administrative Agent for the benefit of the Bank Product Providers (other than the Hedge Providers) in an amount determined by Administrative

4

6237404.15

Agent as sufficient to satisfy the reasonably estimated credit exposure, operational risk or processing risk with respect to the then existing Bank Product Obligations (other than Hedge Obligations).

"**Bank Product Obligations**" means (a) all obligations, liabilities, reimbursement obligations, fees, or expenses owing by each Loan Party and its Subsidiaries to any Bank Product Provider pursuant to or evidenced by a Bank Product Agreement and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, (b) all Hedge Obligations, and (c) all amounts that Administrative Agent or any Lender is obligated to pay to a Bank Product Provider as a result of Administrative Agent or such Lender purchasing participations from, or executing guarantees or indemnities or reimbursement obligations to, a Bank Product Provider with respect to the Bank Products provided by such Bank Product Provider to a Loan Party or its Subsidiaries.

"**Bank Product Provider**" means Wells Fargo ~~or any of its Affiliates~~, a Lender or an Affiliate of Wells Fargo or a Lender at the time it entered into a Bank Product Agreement, whether or not such Person subsequently ceases to become a Lender or an Affiliate of a Lender, including each of the foregoing in its capacity, if applicable, as a Hedge Provider.

"**Bank Product Provider Agreement**" means an agreement in form and substance satisfactory to Administrative Agent, duly executed by the applicable Bank Product Provider, the applicable Loan Parties, and Administrative Agent.

"**Bank Product Reserves**" means, as of any date of determination, those reserves that Administrative Agent deems necessary or appropriate to establish (based upon the Bank Product Providers' determination of the liabilities and obligations of each Loan Party and its Subsidiaries in respect of Bank Product Obligations) in respect of Bank Products then provided or outstanding.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" has the meaning set forth in the preliminary statements to this Agreement.

"**Base Rate**" means the greatest of (a) the Federal Funds Rate *plus* ½%, (b) the LIBOR Rate (which rate shall be calculated based upon an Interest Period of one (1) month and shall be determined on a daily basis), *plus* one percentage point, and (c) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate", with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate (and, if any such announced rate is below zero, then the rate determined pursuant to this clause (b) shall be deemed to be zero).

"**Base Rate Loan**" means each portion of the Loans that bears interest at a rate determined by reference to the Base Rate.

"**Benchmark Replacement**" means the sum of: (a) the alternate benchmark rate (which may include Term SOFR) that has been selected by Administrative Agent and Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to the LIBOR Rate for United States dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as so determined would be less than 0.75%, the Benchmark Replacement shall be deemed to be 0.75% for the purposes of this Agreement.

5

6237404.15

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of the LIBOR Rate with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by Administrative Agent and Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBOR Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBOR Rate with the applicable Unadjusted Benchmark Replacement for United States dollar-denominated syndicated credit facilities at such time.

"**Benchmark Replacement Conforming Changes**" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate", the definition of "Interest Period", timing and frequency of determining rates and making payments of interest and other administrative matters) that Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by Administrative Agent in a manner substantially consistent with market practice (or, if Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if Administrative Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement).

"**Benchmark Replacement Date**" means the earlier to occur of the following events with respect to the LIBOR Rate:

(a)      in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of the LIBOR Rate permanently or indefinitely ceases to provide the LIBOR Rate; or

(b)      in the case of clause (c) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to the LIBOR Rate:

(a)      a public statement or publication of information by or on behalf of the administrator of the LIBOR Rate announcing that such administrator has ceased or will cease to provide the LIBOR Rate, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the LIBOR Rate;

(b)      a public statement or publication of information by the regulatory supervisor for the administrator of the LIBOR Rate, the Federal Reserve System of the United States (or any successor), an insolvency official with jurisdiction over the administrator for the LIBOR Rate, a resolution authority with jurisdiction over the administrator for the LIBOR Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the LIBOR Rate, which states that the administrator of the LIBOR Rate has ceased or will cease to provide the LIBOR Rate permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the LIBOR Rate; or

6

6237404.15

(c)      a public statement or publication of information by the regulatory supervisor for the administrator of the LIBOR Rate announcing that the LIBOR Rate is no longer representative.

"**Benchmark Transition Start Date**" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the ninetieth (90th) day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than ninety (90) days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by Administrative Agent or the Required Lenders, as applicable, by notice to Borrower, Administrative Agent (in the case of such notice by the Required Lenders) and the Lenders.

"**Benchmark Unavailability Period**" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the LIBOR Rate and solely to the extent that the LIBOR Rate has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the LIBOR Rate for all purposes hereunder in accordance with Section 2.12(d)(iii) and (y) ending at the time that a Benchmark Replacement has replaced the LIBOR Rate for all purposes hereunder pursuant to Section 2.12(d)(iii).

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation, which certification shall be substantially similar in form and substance to the form of Certification Regarding Beneficial Owners of Legal Entity Customers published jointly, in May 2018, by the Loan Syndications and Trading Association and Securities Industry and Financial Markets Association.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**BHC Act Affiliate**" of a Person means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such Person.

"**Board of Governors**" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Borrower**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Borrower Materials**" has the meaning set forth in Section 6.01.

"**Borrowing**" means a borrowing consisting of Loans made on the same day by the Lenders (or Administrative Agent on behalf thereof), or by Swing Lender in the case of a Swing Loan, or by Administrative Agent in the case of an Extraordinary Advance.

"**Borrowing Base**" means, as of any date of determination, the result of:

(a)      eighty-five percent (85%) of the amount of Eligible ~~Accounts, *less* the amount, if any, of the Dilution Reserve~~Account, plus

(b)      the lesser of (A) the product of sixty-five percent (65%) multiplied by the value (calculated at the cost on a basis consistent with Borrower's historical accounting practices) of

7

6237404.15

Eligible Inventory at such time, and (B) the product of 85% multiplied by the NOLV identified in the most recent Acceptable Appraisal of Inventory.

"**Borrowing Base Certificate**" means a certificate substantially in the form of Exhibit B to this Agreement, which such form of Borrowing Base Certificate may be amended, restated, supplemented or otherwise modified from time to time (including without limitation, changes to the format thereof), as approved by Administrative Agent in Administrative Agent's sole discretion.

"**Business Day**" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the state of New York, except that, if a determination of a Business Day shall relate to a LIBOR Rate Loan, the term "Business Day" also shall exclude any day on which banks are closed for dealings in Dollar deposits in the London interbank market.

"**Canadian Dollars**" means the lawful currency of Canada.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capitalized Leases) by the Borrower and its Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on the consolidated statement of cash flows of the Borrower and its Subsidiaries.

"**Capitalized Leases**" means all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by the Borrower or any Subsidiary:

(a)    Dollars;

(b)    readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of the United States having average maturities of not more than twenty-four (24) months from the date of acquisition thereof; provided that the full faith and credit of the United States is pledged in support thereof;

(c)    time deposits or eurodollar time deposits with, insured certificates of deposit, bankers' acceptances or overnight bank deposits of, or letters of credit issued by, any commercial bank that (i) is a Lender or (ii) (A) is organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development or is the principal banking Subsidiary of a bank holding company organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development and is a member of the Federal Reserve System, and (B) has combined capital and surplus of at least $250,000,000 or $100,000,000 in the case of any non-U.S. bank (any such bank in the foregoing clauses (i) or (ii) being an "**Approved Bank**"), in each case with maturities not exceeding twenty-four (24) months from the date of acquisition thereof;

(d)    commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation (other than structured investment vehicles and other than corporations used in structured financing transactions) and rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than twenty-four (24) months from the date of acquisition thereof;

8

6237404.15

(e)      marketable short-term money market and similar funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(f)      repurchase obligations for underlying securities of the types described in clauses (b), (c) and (e) above entered into with any Approved Bank;

(g)      securities with average maturities of twenty-four (24) months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h)      Investments (other than in structured investment vehicles and structured financing transactions) with average maturities of twelve (12) months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's;

(i)      securities with maturities of twelve (12) months or less from the date of acquisition backed by standby letters of credit issued by any Approved Bank;

(j)      (i) instruments equivalent to those referred to in clauses (a) through (i) above denominated in Euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction and (ii) in the case of any Foreign Subsidiary, such local currencies in those countries in which such Foreign Subsidiary transacts business from time to time in the ordinary course of business;

(k)      Investments, classified in accordance with GAAP as Current Assets of the Borrower or any Subsidiary, in money market investment programs which are registered under the Investment Company Act of 1940 or which are administered by financial institutions having capital of at least $250,000,000, and, in either case, the portfolios of which are limited such that substantially all of such Investments are of the character, quality and maturity described in clauses (a) through (j) above; and

(l)      investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (k) above.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clauses (a) and (j) above; provided that such amounts are converted into any currency listed in clause (a) or (j) as promptly as practicable and in any event within ten (10) Business Days following the receipt of such amounts.

"**Casualty Event**" means any event that gives rise to the receipt by the Borrower or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**CFC**" means a Subsidiary of the Borrower that is a "controlled foreign corporation" within the meaning of Section 957 of the Code.

9

6237404.15

"**CFC Holding Company**" means a Domestic Subsidiary of the Borrower that owns no material assets (directly or through one or more disregarded entities) other than the equity (including any debt instrument treated as equity for U.S. federal income tax purposes) of one or more Foreign Subsidiaries that are CFCs.

"**Change in Law**" means the occurrence after the date of this Agreement of: (a) the adoption or effectiveness of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation, judicial ruling, judgment or treaty or in the administration, interpretation, implementation or application by any Governmental Authority of any law, rule, regulation, guideline or treaty, or (c) the making or issuance by any Governmental Authority of any request, rule, guideline or directive, whether or not having the force of law; provided, that notwithstanding anything in this Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith, and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"**Change of Control**" shall be deemed to occur if:

(a)     (i) any person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Closing Date), but excluding (x) any employee benefit plan of such person and its Subsidiaries and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan or (y) any combination of Permitted Holders, shall have, directly or indirectly, acquired beneficial ownership of Equity Interests representing 35% or more of the aggregate voting power represented by the issued and outstanding Equity Interests of Holdings or (ii) during each period of twelve (12) consecutive months, the board of directors of Holdings shall not consist of a majority of the Continuing Directors;

(b)     a "change of control" (or similar event) shall occur in any document pertaining to the First Lien Credit Agreement or the Second Lien Credit Agreement;

(c)     other than as described in Section 7.04(a)(i), Intermediate Holdings shall cease to own, directly or indirectly, 100% of the Equity Interests of the Borrower; or

(d)     other than as described in Section 7.04(a)(i), Holdings shall cease to own, directly or indirectly, 100% of the Equity Interests of Intermediate Holdings.

"**Chapter 11 Cases**" has the meaning set forth in the preliminary statements to this Agreement.

"**Closing Date**" means [●],August 28, 2020.

"**Code**" means the U.S. Internal Revenue Code of 1986, and the United States Treasury Department regulations promulgated thereunder, as amended from time to time (unless as specifically provided otherwise).

"**Collateral**" means the "Collateral" as defined in the Security Agreement and all the "Collateral" or "Pledged Assets" (or equivalent terms) as defined in any other Collateral Document and any other assets pledged pursuant to any Collateral Document (but in any event excluding the Excluded Assets).

"**Collateral Access Agreement**" means a landlord waiver, bailee letter, or acknowledgement agreement of any lessor, warehouseman, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in any Loan Party's or its Subsidiaries' books and records or Inventory, in each case, in form and substance reasonably satisfactory to Administrative Agent.

10

6237404.15

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(a)      subject to Sections 4.01(a) and 6.20, the Administrative Agent shall have received each Collateral Document required to be delivered (i) on the Closing Date, pursuant to Section 4.01(a)(v) and Section 6.11(c) and (ii) at such time as may be designated therein or herein, pursuant to the Collateral Documents or Section 6.11 or 6.13, duly executed by each Loan Party thereto;

(b)      subject to Sections 4.01(a) and 6.20, all Obligations shall have been unconditionally guaranteed by Holdings, Intermediate Holdings, the Borrower (other than with respect to its direct Obligations as a primary obligor (as opposed to a guarantor) under the Loan Documents) and each Material Domestic Subsidiary (other than any Excluded Subsidiary) including those that are listed on Schedule 1.01(B) hereto (each, a "**Guarantor**");

(c)      the Secured Obligations and the Guaranty shall have been secured pursuant to the Security Agreement by a second-priority security interest (subject to Liens permitted by Section 7.01) in (i) all of the Equity Interests of ~~Holdings,~~ Intermediate Holdings and the Borrower, (ii) all of the Equity Interests of each Subsidiary that is a wholly owned Domestic Subsidiary (other than a Domestic Subsidiary described in the following clause (iii)) directly owned by the Loan Parties, (iii) the issued and outstanding Equity Interests of each Subsidiary that is a CFC Holding Company, and (iv) the issued and outstanding Equity Interests of each Subsidiary that is a wholly owned Foreign Subsidiary that is directly owned by the Borrower or by any Subsidiary Guarantor, in each case other than any Excluded Assets; provided, however, in the case of (iii) and (iv), such term shall not include the pledge of any stock in a CFC Holding Company or Foreign Subsidiary to the extent such pledge would result in material adverse tax consequences to the Borrower or its Subsidiaries as determined by the Borrower in good faith~~);~~.

(d)      except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, or under any Collateral Document, the Secured Obligations and the Guaranty shall have been secured by a perfected ~~third~~second-priority security interest (to the extent such security interest may be perfected by delivering certificated securities, filing financing statements under the Uniform Commercial Code or making any necessary filings with respect to the security interest with the United States Patent and Trademark Office or United States Copyright Office or to the extent required in the Security Agreement (or any other Collateral Document)) or by Mortgages referred to in clause (e) below in Collateral of the Borrower and each Guarantor (including accounts, inventory, equipment, investment property, contract rights, applications and registrations of intellectual property filed in the United States, other general intangibles, Material Re~~lease~~l Property, intercompany notes and proceeds of the foregoing), in each case, (i) with the priority required by the Collateral Documents and (ii) subject to exceptions and limitations otherwise set forth in this Agreement (for the avoidance of doubt, including the limitations and exceptions set forth in Section 4.01) and the Collateral Documents;

~~(e)~~      the Administrative Agent shall have received (i) counterparts of a Mortgage with respect to each Material Real Property required to be delivered pursuant to Sections 6.11 and 6.13 (the "**Mortgaged Properties**") duly executed and delivered by the applicable Loan Party, (ii) a title insurance policy for such property available in each applicable jurisdiction (the "**Mortgage Policies**") insuring the Lien of each such Mortgage as a valid second-priority Lien on the property described therein, free of any other Liens except as permitted by Section 7.01, together with such endorsements, coinsurance and reinsurance as the Required Lenders may reasonably request, (iii) a completed Life-of-Loan Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto) and, if

11

any improvements on any Mortgaged Property are located within an area designated a "flood hazard area," evidence of such flood insurance as may be required under Section 6.07, (iv) ALTA surveys in form and substance reasonably acceptable to the Required Lenders or such existing surveys together with no-change affidavits sufficient for the title company to remove all standard survey exceptions from the Mortgage Policies and issue the endorsements required in clause (ii) above, (v) copies of any existing abstracts and appraisals and (vi) such legal opinions and other documents as the Required Lenders may reasonably request with respect to any such Mortgaged Property; and

(f)      except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, or under any Collateral Document, the Secured Obligations and the Guaranty shall have been secured by a perfected first-priority security interest (to the extent such security interest may be perfected by delivering certificated securities, filing financing statements under the Uniform Commercial Code) in ABL Priority Collateral of the Borrower and each Guarantor (including accounts, inventory and proceeds of the foregoing), in each case, (i) with the priority required by the Collateral Documents and (ii) subject to exceptions and limitations otherwise set forth in this Agreement (for the avoidance of doubt, including the limitations and exceptions set forth in Section 4.01) and the Collateral Documents;

provided, however, that (i) the foregoing definition shall not require, and the Loan Documents shall not contain any requirements as to, (A) the creation or perfection of pledges of, security interests in, Mortgages on, or the obtaining of title insurance, surveys, abstracts or appraisals or taking other actions with respect to any Excluded Assets and (B) any other assets that, in the reasonable judgment of the Required Lenders and the Borrower, the cost of creating, perfecting or maintaining such pledges or security interests in such assets or obtaining title insurance, surveys, abstracts or appraisals in respect of such assets shall be excessive in view of the value of such assets or the practical benefit to the Lenders afforded thereby and (ii) the Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in this Agreement and the Collateral Documents.

The Administrative Agent (at the direction of the Required Lenders) may grant extensions of time for the perfection of security interests in, or the delivery of the Mortgages and the obtaining of title insurance and surveys with respect to, particular assets and the delivery of assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) or any other compliance with the requirements of this definition where it reasonably determines, in consultation with the Borrower, that perfection or compliance cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

No actions in any non-U.S. jurisdiction or required by the Laws of any non-U.S. jurisdiction shall be required in order to create any security interests in assets located, titled, registered or filed outside of the U.S. or to perfect such security interests (it being understood that there shall be no security agreements or pledge agreements governed under the Laws of any non-U.S. jurisdiction).

The foregoing definition shall not require landlord waivers, estoppels and collateral access letters.

"**Collateral Documents**" means, collectively, the Security Agreement, the Intercreditor Agreement, the Intellectual Property Security Agreements, any Mortgages, any Account Control Agreements, collateral assignments, Security Agreement Supplements, security agreements, pledge agreements, intellectual property security agreements or other similar agreements delivered to the Administrative Agent pursuant to Section 4.01(a)(v), 6.11, 6.13 or 6.20 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties.

12

6237404.15

"**Commitment**" means, with respect to each Lender, its Commitment and, with respect to all Lenders, their Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule 2.01 to this Agreement or in the Assignment and Acceptance pursuant to which such Lender became a Lender under this Agreement, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 10.07 of this Agreement.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Company**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Company Parties**" means, collectively, the Holdcos, the Borrower and its Subsidiaries, and "**Company Party**" means any one of them.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit C hereto.

"**Confirmation Order**" means an Order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Lenders, confirming the Prepackaged Plan pursuant to section 1129 of the Bankruptcy Court and in accordance with the terms of the Prepackaged Plan, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms of the Prepackaged Plan so long as any such amendment, supplement or modification does not adversely affect the interests of the Lenders.

"**Consolidated EBITDA**" means, for any period, the Consolidated Net Income for such period, *plus*:

(a)    without duplication and, except with respect to clauses (vii)(B), (x) and (xi) below, to the extent deducted (and not added back or excluded) in arriving at such Consolidated Net Income, the sum of the following amounts for such period with respect to the Borrower and its Subsidiaries:

(i)    total interest expense determined in accordance with GAAP (including, to the extent deducted and not added back in computing Consolidated Net Income, (A) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (B) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers acceptances, (C) non-cash interest payments, (D) the interest component of Capitalized Leases, (E) net payments, if any, pursuant to interest Swap Contracts with respect to Indebtedness, (F) amortization of deferred financing fees, debt issuance costs, commissions and fees, (G) the interest component of any pension or other post-employment benefit expense and (H) commissions, discounts, yield and other fees and, to the extent not reflected in such total interest expense, any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations, and costs of surety bonds in connection with financing activities (whether amortized or immediately expensed),

(ii)    without duplication, provision for taxes based on income, profits or capital gains of the Borrower and the Subsidiaries, including, without limitation, federal, state, foreign, local, franchise and similar taxes and foreign withholding taxes paid or accrued during such period including penalties and interest related to such taxes or arising from any tax examinations and any tax distributions made pursuant to Section 7.06(h)(iii),

13

(iii)      depreciation and amortization (including amortization of intangible assets, deferred financing fees, debt issuance costs, commissions, fees and expenses, bridge, commitment and other financing fees, discounts, yield) and other fees and charges (including amortization of unrecognized prior service costs and actuarial gains and losses related to pensions and other post-employment benefits, of the Borrower and its Subsidiaries),

(iv)      (A)x) any unusual or non--recurring ~~non-cash~~extraordinary charges, ~~expenses or losses, and (B) other non-recurring charges, expenses or losses,~~ for such period (provided, that ~~in no event shall~~ the aggregate amount of unusual or non-recurring extraordinary charges added back to Consolidated EBITDA pursuant to this clause (~~B~~)a)(iv)(x) shall not exceed $~~[_____]~~ ~~for any Test Period;~~15% of Consolidated EBITDA for such period) and (y) any unusual or non-recurring non-cash charges for such period,

(v)      other non-cash charges, expenses or losses, including, without limitation, any non-cash expense relating to the vesting of warrants (provided that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period),

(vi)      retention, recruiting, relocation and signing bonuses and expenses, stock option and other equity-based compensation expenses, severance costs, stay bonuses, transaction fees and expenses and management fees and expenses, and any one time expense relating to enhanced accounting function or other transaction costs, including those associated with becoming a standalone entity or a public company (including, without duplication, any such payments made in connection with the consummation of the Transactions),

(vii)      (A) the amount of any restructuring charges and related charges, restructuring costs, integration costs, transition costs, consolidation and closing costs for facilities, costs incurred in connection with any non-recurring strategic initiatives, costs incurred in connection with acquisitions and non-recurring intellectual property development after the Closing Date, other business optimization expenses (including costs and expenses relating to business optimization programs and new systems design and implementation costs), project start-up costs and other restructuring charges, accruals or reserves (including restructuring costs related to acquisitions after the Closing Date and to closure/consolidation of facilities, retention charges, systems establishment costs and excess pension charges) and (B) the amount of cost savings, operating expense reductions, other operating improvements and "run rate" synergies projected by the Borrower in good faith to result from actions taken or expected to be taken in connection with the Transactions or any Specified Transaction or the implementation of an operational initiative or operational change after the Closing Date (in each case calculated on a Pro Forma Basis as though such cost savings, operating expense reductions, other operating improvements and synergies had been realized on the first day of such period and as if such cost savings, operating expense reductions, other operating improvements and synergies were realized during the entirety of such period), net of the amount of actual benefits realized during such period from such actions; provided that (w) in no event shall the amount added back pursuant to this clause (vii) exceed $5,000,000 for any Test Period, (x) a duly completed certificate signed by a Responsible Officer of the Borrower shall be

14

delivered to the Administrative Agent together with the Compliance Certificate required to be delivered pursuant to Section 6.02, certifying that such cost savings, operating expense reductions, other operating improvements and synergies are (i) reasonably supportable and quantifiable in the good faith judgment of the Borrower, and (ii) reasonably anticipated to be realized within (I) in the case of any such cost savings, operating expense reductions, other operating improvements and synergies in connection with the Transactions, six (6) months after the Closing Date and (II) in all other cases, six (6) months after the consummation of the Specified Transaction or the implementation of an initiative or change, which is expected to result in such cost savings, expense reductions, other operating improvements or synergies, (y) no cost savings, operating expense reductions and synergies shall be added pursuant to this clause (vii) to the extent duplicative of any expenses or charges otherwise added to Consolidated EBITDA, whether through a *pro forma* adjustment or otherwise, for such period and (z) to the extent that any cost savings, operating expense reductions, other operating improvements and synergies are not associated with the Transactions or a Specified Transaction following the Closing Date, all steps shall have been taken for realizing such savings,

(viii)    [reserved],

(ix)    other accruals, payments and expenses (including rationalization, legal, tax, structuring and other costs and expenses), or any amortization thereof, related to the Transactions (including all Transaction Expenses), acquisitions, Investments, dividends, Dispositions, or any amortization thereof, issuances of Indebtedness or Equity Interests permitted under the Loan Documents or repayment of debt, issuance of equity securities, initial public offering, refinancing transactions or amendment or other modification of any debt instrument (in each case, including any such transaction consummated on the Closing Date and any such transaction undertaken but not completed),

(x)    to the extent not already included in Consolidated Net Income, proceeds of business interruption insurance (to the extent actually received),

(xi)    cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added back,

(xii)    any non-cash increase in expenses (A) resulting from the revaluation of inventory (including any impact of changes to inventory valuation policy methods including changes in capitalization of variances) or other inventory adjustments, or (B) due to purchase accounting associated with the Transactions, or any acquisition constituting an Investment permitted under this Agreement consummated prior to or after the Closing Date,

(xiii)    the amount of any expense or reduction of Consolidated Net Income consisting of Subsidiary income attributable to minority interests or non-controlling interests of third parties in any non-wholly owned Subsidiary, *minus* the amount of dividends or distributions that are paid in cash by such non-wholly owned Subsidiary to such third party; provided that the amount of such cash dividends or distributions deducted pursuant to this clause (xiii) in any Test Period shall not exceed such third

15

party's *pro rata* share of the Consolidated EBITDA (to the extent positive) of such non-wholly owned Subsidiary for such Test Period,

(xiv)   letter of credit fees,

(xv)   [reserved],

(xvi)   any Equity Funded Employee Plan Costs,

(xvii)   any net loss from disposed, abandoned or discontinued operations or product lines,

(xviii)   any costs or expenses incurred relating to environmental remediation, litigation or other disputes in respect of events and exposures that occurred prior to the Closing Date, and

(xix)   expenses during such period in connection with earn-outs and other deferred payments in connection with any acquisitions constituting an Investment permitted under this Agreement, to the extent included in the calculation of Consolidated Net Income in accordance with GAAP as an accounting adjustment to the extent that the actual amount payable or paid in respect of such earn-outs or other deferred payments exceeds the liability booked by the applicable Person therefor,

*minus* (b) without duplication and to the extent included in arriving at such Consolidated Net Income, (i) non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period), (ii) any net gain from disposed, abandoned or discontinued operations or product lines and (iii) the amount of any minority interest income consisting of Subsidiary losses attributable to minority interests or non-controlling interests of third parties in any non-wholly owned Subsidiary; <u>provided</u> that:

(A)   to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA (x) currency translation gains and losses related to currency remeasurements of Indebtedness (including the net loss or gain (i) resulting from Swap Contracts for currency exchange risk and (ii) resulting from intercompany indebtedness) and (y) all other foreign currency translation gains or losses to the extent such gains or losses are non-cash items;

(B)   to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any adjustments resulting from the application of FASB Accounting Standards Codification 815 and International Accounting Standard No. 39 and their respective related pronouncements and interpretations; and

(C)   to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any income (loss) for such period attributable to the early extinguishment of (i) Indebtedness, (ii) obligations under any Swap Contracts or (iii) other derivative instruments.

For the avoidance of doubt, Consolidated EBITDA shall be calculated, including *pro forma* adjustments, in accordance with <u>Section 1.09</u>.

"**Consolidated Interest Expense**" shall mean, with respect to any Person for any period, the sum of (1) interest expense (including that attributable to obligations with respect to Capital Leases), net of interest income of such Person and its Subsidiaries with respect to all outstanding Indebtedness of such

16

Person and its Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under hedging agreements, *plus* (2) non-cash interest expense resulting solely from pay in kind interest expense of such Person and its Subsidiaries, but excluding, for the avoidance of doubt, (a) amortization of deferred financing costs, debt issuance costs, commissions, fees and expenses and any other amounts of non-cash interest other than referred to in clause (2) above (including as a result of the effects of acquisition method accounting or pushdown accounting), (b) non-cash interest expense attributable to the movement of the mark-to-market valuation of Indebtedness or obligations under derivative instruments pursuant to FASB Accounting Standards Codification Topic 815—Derivatives and Hedging, (c) any one-time cash costs associated with breakage in respect of hedging agreements for interest rates, (d) any "additional interest" owing pursuant to a registration rights agreement with respect to any securities, (fe) any payments with respect to make whole premiums or other breakage costs of any Indebtedness, including, without limitation, any Indebtedness issued in connection with the Transactions, (gf) penalties and interest relating to taxes, (hg) accretion or accrual of discounted liabilities not constituting Indebtedness, (ih) interest expense attributable to a direct or indirect parent entity resulting from pushdown accounting, (ji) any expense resulting from the discounting of Indebtedness in connection with the application of recapitalization or purchase accounting, and (kj) any interest expense attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential), with respect thereto and with respect to the Transactions, any acquisition or Investment permitted hereunder, all as calculated on a consolidated basis.

"**Consolidated Net Income**" means, for any period, the net income (loss) of the Borrower and the Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; provided, *however*, that, without duplication,

(a)     any after-tax effect of extraordinary items (including gains or losses and all fees and expenses relating thereto) for such period shall be excluded,

(b)     the cumulative effect of a change in accounting principles during such period to the extent included in Consolidated Net Income shall be excluded,

(c)     accruals and reserves that are established or adjusted within twelve (12) months after the Closing Date that are so required to be established or adjusted as a result of the Transactions (or within twelve (12) months after the closing of any acquisition that are so required to be established or adjusted as a result of such acquisition) in accordance with GAAP or changes as a result of adoption or modification of accounting policies in accordance with GAAP shall be excluded,

(d)     any net after-tax effect of gains or losses (*less* all fees, expenses and charges relating thereto) attributable to asset dispositions or abandonments or the sale or other disposition of any Equity Interests of any Person, in each case other than in the ordinary course of business, as determined in good faith by the Borrower, shall be excluded,

(e)     the net income (loss) for such period of any Person that is not a Subsidiary of the Borrower, or that is accounted for by the equity method of accounting, shall be excluded; provided that Consolidated Net Income of the Borrower shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents (or to the extent subsequently converted into cash or Cash Equivalents) to the Borrower or a Subsidiary thereof in respect of such period,

(f)     any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a change in law or regulation, in each

17

case, pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP shall be excluded,

(g)      any non-cash compensation charge or expense, including any such charge or expense arising from the grants of stock appreciation or similar rights, stock options, restricted stock or other rights or equity incentive programs or any other equity-based compensation shall be excluded, and any cash charges associated with the rollover, acceleration or payout of Equity Interests by management of the Borrower or any of its direct or indirect parents in connection with the Transactions or an initial public offering, shall be excluded,

(h)      any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment, Permitted Acquisition or any sale, conveyance, transfer or other disposition of assets permitted under this Agreement, to the extent actually reimbursed, or, so long as the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is (A) not denied by the applicable indemnitor in writing within 180 days of the occurrence of such event and (B) in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365-day period), shall be excluded,

(i)      to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount (A) is not denied by the applicable carrier in writing within 180 days of the occurrence of such event and (B) is in fact reimbursed within 365 days of the date of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within such 365 days), expenses, charges or losses with respect to liability or casualty events or business interruption shall be excluded, and

(j)      the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of the Borrower or is merged into or consolidated with the Borrower or any of its Subsidiaries or such Person's assets are acquired by the Borrower or any of its Subsidiaries shall be excluded (except to the extent required for any calculation of Consolidated EBITDA on a Pro Forma Basis in accordance with Section 1.09).

There shall be excluded from Consolidated Net Income for any period the purchase accounting effects of adjustments in component amounts required or permitted by GAAP (including in the inventory, property and equipment, software, goodwill, intangible assets, in-process research and development, deferred revenue and debt line items thereof) and related authoritative pronouncements (including the effects of such adjustments pushed down to the Borrower and the Subsidiaries), as a result of the Transactions, any acquisition constituting an Investment permitted under this Agreement consummated prior to or after the Closing Date, or the amortization or write-off of any amounts thereof.  For the avoidance of doubt, Consolidated Net Income shall be calculated, including *pro forma* adjustments, in accordance with Section 1.09.

"**Continuing Directors**" means the directors of Holdings on the Closing Date, as elected or appointed after giving effect to the Transactions, directors appointed in accordance with any stockholders agreement entered into by and among Holdings and its stockholders and each other director, if, in each case, such other director's nomination for election to the board of directors of Holdings is recommended by a majority of the then Continuing Directors or such other director receives the vote of, or is appointed or otherwise approved by, prior to a Qualified IPO by the Borrower or a Relevant Public Company, or those Permitted Holders which then hold a majority of the voting Equity Interests in Holdings then held

18

6237404.15

by all Permitted Holders, in each case in his or her election by the holders of Equity Interests in Holdings necessary to elect such director.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" has the meaning set forth in the definition of "Affiliate."

"**Covenant Testing Period**" means a period (a) commencing on the last day of the fiscal month of Borrower most recently ended prior to a Covenant Trigger Event for which Borrower is required to deliver to Administrative Agent monthly, quarterly or annual financial statements pursuant to Section 6.01 to this Agreement, and (b) continuing through and including the first day after such Covenant Trigger Event that Availability has equaled or exceeded the greater of (i) ~~17.5~~20% of the Maximum Revolver Amount, and (ii) $~~5,250~~6,000,000 for thirty (30) consecutive days.

"**Covenant Trigger Event**" means if at any time Availability is less than the greater of (i) ~~17.5~~20% of the Maximum Revolver Amount, and (ii) $~~5,250~~6,000,000.

"**Covered Entity**" means any of the following: (a) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (b) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (c) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Covered Party**" has the meaning set forth in Section 17.15.

"**Credit Extension**" means a Borrowing.

"**Cure Amount**" has the meaning set forth in Section 8.04(a).

"**Cure Expiration Date**" has the meaning set forth in Section 8.04(a).

"**Current Assets**" means, with respect to the Borrower and the Subsidiaries on a consolidated basis at any date of determination, all assets (other than cash and Cash Equivalents) that would, in accordance with GAAP, be classified on a consolidated balance sheet of the Borrower and its Subsidiaries as current assets at such date of determination, other than amounts related to current or deferred Taxes based on income or profits (but excluding assets held for sale, loans (permitted) to third parties, pension assets, deferred bank fees and derivative financial instruments).

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtors**" has the meaning set forth in the preliminary statements to this Agreement.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, without cure or waiver hereunder, would be an Event of Default.

"**Default Rate**" means an interest rate equal to (a) the Base Rate *plus* (b) the Applicable Rate, if any, applicable to Base Rate Loans *plus* (c) 2.0% per annum; <u>provided</u> that with respect to a LIBOR Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan *plus* 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

19

6237404.15

"**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"**Defaulting Lender**" means any Lender whose acts or failure to act, whether directly or indirectly, cause it to meet any part of the definition of Lender Default.

"**Designated Account**" means the Deposit Account of Borrower identified on Schedule 1.01(C) to this Agreement (or such other Deposit Account of Borrower located at Designated Account Bank that has been designated as such, in writing, by Borrower to Administrative Agent).

"**Designated Account Bank**" has the meaning set forth in Schedule D-1 to this Agreement (or such other bank that is located within the United States that has been designated as such, in writing, by Borrower to Administrative Agent).

"**Dilution**" means, as of any date of determination, a percentage, based upon the experience of the immediately prior twelve (12) months, that is the result of dividing the Dollar amount of (a) bad debt write-downs, discounts, advertising allowances, credits, or other dilutive items with respect to Borrower's Accounts during such period, by (b) Borrower's billings with respect to Accounts during such period.

"**Dilution Reserve**" means, as of any date of determination, an amount sufficient to reduce the advance rate against Eligible Accounts by the extent to which Dilution is in excess of 5%.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale or issuance of Equity Interests (other than directors' qualifying shares or other shares required by applicable Law) in a Subsidiary) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Disqualified Competitor**" means such Persons who are competitors of the Borrower and its Subsidiaries that are separately identified in writing by the Borrower to the Administrative Agent from time to time, and any of their Affiliates (other than any such Affiliate that is affiliated with a financial investor in such Person and that is not itself an operating company or otherwise an Affiliate of an operating company so long as such Affiliate is a bona fide Fund) that are either (a) identified in writing by the Borrower to the Administrative Agent from time to time or (b) clearly identifiable on the basis of such Affiliate's name (it being agreed that the Administrative Agent shall be entitled to conclusively rely on such Person's representations in the applicable Assignment and Assumption).

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than (i) solely for Qualified Equity Interests and cash in lieu of fractional shares or (ii) solely at the discretion of the issuer), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable), (b) is redeemable at the option of the holder thereof (other than (i) solely for Qualified Equity Interests and cash in lieu of fractional shares or (ii) as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable), in whole or in part, (c) provides for the scheduled payments of dividends in cash or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Maturity Date at the time of issuance of such Equity Interests; provided that if such Equity Interests are issued pursuant to a plan for the benefit of employees of Holdings (or any

20

6237404.15

direct or indirect parent thereof), the Borrower or the Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by the Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"**Disqualified Competitor**" means such Persons who are competitors of the Borrower and its Subsidiaries that are separately identified in writing by the Borrower to the Administrative Agent from time to time, and any of their Affiliates (other than any such Affiliate that is affiliated with a financial investor in such Person and that is not itself an operating company or otherwise an Affiliate of an operating company so long as such Affiliate is a bona fide Fund) that are either (a) identified in writing by the Borrower to the Administrative Agent from time to time or (b) clearly identifiable on the basis of such Affiliate's name (it being agreed that the Administrative Agent shall be entitled to conclusively rely on such Person's representations in the applicable Assignment and Assumption).

"**Distressed Person**" has the meaning set forth in the definition of "Lender-Related Distress Event."

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**Drawing Document**" means any Letter of Credit or other document presented for purposes of drawing under any Letter of Credit, including by electronic transmission such as SWIFT, electronic mail, facsimile or computer generated communication.

"**Early Opt-in Election**" means the occurrence of:

(a) (i) a determination by Administrative Agent or (ii) a notification by the Required Lenders to Administrative Agent (with a copy to Borrower) that the Required Lenders have determined that United States dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in Section 2.12(d)(iii) are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace the LIBOR Rate, and

(b) (i) the election by Administrative Agent or (ii) the election by the Required Lenders to declare that an Early Opt-in Election has occurred and the provision, as applicable, by Administrative Agent of written notice of such election to Borrower and the Lenders or by the Required Lenders of written notice of such election to Administrative Agent.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

21

6237404.15

"**Eligible Accounts**" means those Accounts created by Borrower or a Subsidiary Guarantor in the ordinary course of its business, that arise out of such Borrower's or Subsidiary Guarantors' sale of goods or rendition of services, that comply with each of the representations and warranties respecting Eligible Accounts made in the Loan Documents, and that are not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Administrative Agent in its Permitted Discretion to address the results of any information with respect to the Borrower's or Subsidiary Guarantors' business or assets of which Administrative Agent becomes aware after the Closing Date, including any field examination performed by (or on behalf of) Administrative Agent from time to time after the Closing Date.   In determining the amount to be included, Eligible Accounts shall be calculated net of customer deposits, unapplied cash, taxes, finance charges, service charges, discounts, credits, allowances, and rebates.   Eligible Accounts shall not include the following:

(a)      Accounts that the Account Debtor has failed to pay within ninety (90) days of original invoice date or sixty (60) days of due date,

(b)      Accounts owed by an Account Debtor (or its Affiliates) where 50% or more of all Accounts owed by that Account Debtor (or its Affiliates) are deemed ineligible under clause (a) above,

(c)      Accounts with selling terms of more than sixty (60) days,

(d)      Accounts with respect to which the Account Debtor is an Affiliate of a Loan Party or an employee or agent of a Loan Party or any Affiliate of a Loan Party,

(e)      Accounts (i) arising in a transaction wherein goods are placed on consignment or are sold pursuant to a guaranteed sale, a sale or return, a sale on approval, a bill and hold, or any other terms by reason of which the payment by the Account Debtor may be conditional, or (ii) with respect to which the payment terms are "C.O.D.", cash on delivery or other similar terms,

(f)      Accounts that are not payable in Dollars, Canadian Dollars or Sterling,

(g)      Accounts with respect to which the Account Debtor either (i) does not maintain its chief executive office in the United States or, Canada or the United Kingdom, or (ii) is not organized under the laws of the United States or, Canada or the United Kingdom or any state or province (or equivalent thereof) thereof, or (iii) is the government of any foreign country or sovereign state, or of any state, province, municipality, or other political subdivision thereof, or of any department, agency, public corporation, or other instrumentality thereof, unless (A) the Account is supported by an irrevocable letter of credit reasonably satisfactory to Administrative Agent (as to form, substance, and issuer or domestic confirming bank) that has been delivered to Administrative Agent and, if requested by Administrative Agent, is directly drawable by Administrative Agent, or (B) the Account is covered by credit insurance in form, substance, and amount, and by an insurer, reasonably satisfactory to Administrative Agent,

(h)      Accounts with respect to which the Account Debtor is either (i) the United States or any department, agency, or instrumentality of the United States (exclusive, however, of Accounts with respect to which Borrower or a Subsidiary Guarantor has complied, to the reasonable satisfaction of Administrative Agent, with the Assignment of Claims Act, 31 USC §3727), or (ii) any state of the United States or any other Governmental Authority,

(i)      Accounts with respect to which the Account Debtor is a creditor of Borrower or a Subsidiary Guarantor, has or has asserted a right of recoupment or setoff, or has disputed its

22

obligation to pay all or any portion of the Account, to the extent of such claim, right of recoupment or setoff, or dispute,

(j)        (i) except as otherwise provided in clauses (ii) and (iii) below, Accounts with respect to an Account Debtor whose Eligible Accounts owing to Borrower or a Subsidiary Guarantor exceeds 10% (such percentage, as applied to a particular Account Debtor, being subject to reduction by Administrative Agent in its Permitted Discretion if the creditworthiness of such Account Debtor deteriorates) of all Eligible Accounts, to the extent of the obligations owing by such Account Debtor in excess of such percentage, (ii) Accounts with respect to which [A/R Tooling] is thethe underlying accounts receivables are in respect of Tooling from any individual Account Debtor to the extent in excess of $500,000; and (iii) Accounts with respect to which the Account Debtor is MTD Products, Harley-Davidson or John Deere and the Eligible Accounts owing to Borrower or a Subsidiary Guarantor exceeds 15% (such percentage, as applied to a particular Account Debtor, being subject to reduction by Administrative Agent in its Permitted Discretion if the creditworthiness of such Account Debtor deteriorates) of all Eligible Accounts, to the extent of the obligations owing by such Account Debtor in excess of such percentage; provided, that in each case, the amount of Eligible Accounts that are excluded because they exceed the foregoing percentage and dollar amount shall be determined by Administrative Agent based on all of the otherwise Eligible Accounts prior to giving effect to any eliminations based upon the foregoing concentration limits,

(k)        Accounts with respect to which the Account Debtor is subject to an Insolvency Proceeding, is not Solvent, has gone out of business, or as to which Borrower or a Subsidiary Guarantor has received notice of an imminent Insolvency Proceeding or a material impairment of the financial condition of such Account Debtor,

(l)        Accounts, the collection of which, Administrative Agent, in its Permitted Discretion, believes to be doubtful, including by reason of the Account Debtor's financial condition,

(m)        Accounts that are not subject to a valid and perfected first priority Administrative Agent's Lien,

(n)        Accounts with respect to which (i) the goods giving rise to such Account have not been shipped and billed to the Account Debtor, (except to the extent the applicable Loan Party has not shipped such goods to the Account Debtor but has shipped such goods in accordance with the written instructions of such Account Debtor and such Account Debtor has agreed in writing that such shipment constitutes delivery of such goods by such Loan Party), or (ii) the services giving rise to such Account have not been performed and billed to the Account Debtor,

(o)        Accounts with respect to which the Account Debtor is a Sanctioned Person or Sanctioned Entity,

(p)        Accounts (i) that represent the right to receive progress payments or other advance billings that are due prior to the completion of performance by Borrower or a Subsidiary Guarantor of the subject contract for goods or services, or (ii) that represent credit card sales, or

(q)        Accounts owned by a target acquired in connection with a Permitted Acquisition or Permitted Investment, or Accounts owned by a Person that is joined to this Agreement as a Borrower or a Subsidiary Guarantor pursuant to the provisions of this Agreement, until the

23

completion of a field examination with respect to such Accounts, in each case, satisfactory to Administrative Agent in its Permitted Discretion.

"**Eligible Assignee**" has the meaning set forth in Section 10.07(a)(i).

"**Eligible Inventory**" means Inventory of a Borrower or Subsidiary Guarantor, that complies with each of the representations and warranties respecting Eligible Inventory made in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Administrative Agent in its Permitted Discretion to address the results of any information with respect to the Borrower's or Subsidiary Guarantors' business or assets of which Administrative Agent becomes aware after the Closing Date, including any field examination or appraisal performed or received by Administrative Agent from time to time after the Closing Date.  In determining the amount to be so included, Inventory shall be valued at the lower of cost or market on a basis consistent with Borrower's historical accounting practices.  An item of Inventory shall not be included in Eligible Inventory if:

(a)    Borrower or such Subsidiary Guarantor does not have good, valid, and marketable title thereto,

(b)    Borrower or such Subsidiary Guarantor does not have actual and exclusive possession thereof (either directly or through a bailee or agent of Borrower or such Subsidiary Guarantor),

(c)    it is not located at one of the locations in the continental United States set forth on Schedule 4.25 to this Agreement (as such Schedule 4.25 may be amended from time to time in accordance with Section 5.14) (or in-transit from one such location to another such location),

(d)    it is stored at locations holding less than $100,000 of the aggregate value of such Borrower's or Subsidiary Guarantor's Inventory,

(e)    it is in-transit to or from a location of Borrower or such Subsidiary Guarantor (other than in-transit from one location set forth on Schedule 4.25 to this Agreement to another location set forth on Schedule 4.25 to this Agreement (as such Schedule 4.25 may be amended from time to time in accordance with Section 5.14)),

(f)    it is located on real property leased by Borrower or such Subsidiary Guarantor or in a contract warehouse or with a bailee, in each case, unless either (i) it is subject to a Collateral Access Agreement executed by the lessor or warehouseman, as the case may be, and it is segregated or otherwise separately identifiable from goods of others, if any, stored on the premises, or (ii) Administrative Agent has established a Landlord Reserve with respect to such location,

(g)    it is the subject of a bill of lading or other document of title,

(h)    it is not subject to a valid and perfected first priority Administrative Agent's Lien,

(i)    it consists of goods returned or rejected by a Borrower's customers, to the extent such returned goods cannot be sold to other customers,

(j)    it consists of goods that are obsolete, slow moving, spoiled or are otherwise past the stated expiration, "sell-by" or "use by" date applicable thereto, restrictive or custom items or otherwise is manufactured in accordance with customer-specific requirements, work-in-process,

24

6237404.15

or goods that constitute spare parts, packaging and shipping materials, supplies used or consumed in Borrower's business, bill and hold goods, defective goods, "seconds," or Inventory acquired on consignment,

(k)    it is subject to third party intellectual property, licensing or other proprietary rights, unless Administrative Agent is satisfied that such Inventory can be freely sold by Administrative Agent on and after the occurrence of an Event of a Default despite such third party rights, or

(l)    it was acquired in connection with a Permitted Acquisition or Permitted Investment, or such Inventory is owned by a Person that is joined to this Agreement as a Borrower pursuant to the provisions of this Agreement, until the completion of an Acceptable Appraisal of such Inventory and the completion of a field examination with respect to such Inventory that is satisfactory to Administrative Agent in its Permitted Discretion.

"**EMU Legislation**" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"**Enforcement Qualifications**" has the meaning set forth in <u>Section 5.04</u>.

"**Environment**" means indoor air, ambient air, surface water, groundwater, drinking water, land surface, subsurface strata, and natural resources such as wetlands, flora and fauna.

"**Environmental Laws**" means any applicable Law relating to the prevention of pollution or the protection of the Environment and natural resources, and the protection of human health and safety as it relates to the Environment.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of investigation and remediation, fines, penalties or indemnities), of the Loan Parties or any Subsidiary resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage or treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement to the extent liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Funded Employee Plan Costs**" means cash costs or expenses, incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or stockhareholders agreement, to the extent funded with cash proceeds contributed to the capital of the Borrower or net cash proceeds of an issuance of Qualified Equity Interests of the Borrower or Equity Interests of any direct or indirect parent of the Borrower (other than any amount designated as a Cure Amount).

"**Equity Interests**" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities); <u>provided</u>, that any instrument evidencing Indebtedness convertible or exchangeable for Equity Interests shall not be deemed to be Equity Interests unless and until such instrument is so converted or exchanged.

25

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is under common control with a Loan Party or any Subsidiary within the meaning of Section 414(b) or (c) of the Code or Section 4001 of ERISA (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code or Section 302 of ERISA).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by a Loan Party, any Subsidiary or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by a Loan Party, any Subsidiary or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization (within the meaning of Section 4241 of ERISA) or insolvent (within the meaning of Section 4245 of ERISA) or in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (d) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (e) the filing of a notice of intent to terminate, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for, and that could reasonably be expected to result in, the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) with respect to a Pension Plan, the failure to satisfy the minimum funding standard of Section 412 of the Code or Section 302 of ERISA, whether or not waived; (h) a failure by a Loan Party, any Subsidiary or any ERISA Affiliate to make a required contribution to a Multiemployer Plan; (i) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could reasonably be expected to result in liability to a Loan Party or any Subsidiary; or (j) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon a Loan Party, any Subsidiary or any ERISA Affiliate.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Euro**", "**EUR**" and "**€**" mean the lawful currency of the Participating Member States introduced in accordance with the EMU Legislation.

"**Event of Default**" has the meaning set forth in Section 8.01.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded Assets**" means (i) any fee owned real property (other than Material Real Propertyies) and any leasehold rights and interests in real property (including landlord waivers, estoppels and collateral access letters), (ii) motor vehicles, airplanes and other assets subject to certificates of title, to the extent a Lien therein cannot be perfected by the filing of a UCC financing statement, (iii) [reserved], (iv) governmental licenses, state or local franchises, charters and authorizations and any other property and assets to the extent that the Administrative Agent may not validly possess a security interest therein under, or such security interest is restricted by, applicable Laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or the pledge or creation of a security interest in which would require governmental consent, approval, license or authorization, other than to the extent such prohibition or limitation is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition (but excluding proceeds of any such governmental license), (v) any lease, license, permit or agreement to the extent that, and so long as, a grant of a security interest therein

26

(A) is prohibited by applicable Law other than to the extent such prohibition is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition or (B) to the extent and for so long as it would violate the terms thereof (in each case, after giving effect to the relevant provisions of the UCC or other applicable Laws) or would give rise to a termination right thereunder in favor of a party thereto other than the Borrower or a Guarantor (except to the extent such provision is overridden by the UCC or other applicable Laws), in each case, other than the proceeds thereof and (a) excluding any such agreement that relates to a Permitted Refinancing of any of the foregoing and (b) only to the extent that and for so long as such limitation on such pledge or security interest is otherwise permitted under Section 7.09, (vi) Margin Stock, (vii) Equity Interests and assets of captive insurance Subsidiaries, (viii) assets of non-Loan Party Immaterial Subsidiaries, (ix) Equity Interests in joint ventures and non-wholly owned Subsidiaries, in each case, which cannot be pledged without the consent of a third party (that is not a Loan Party), to the extent such consent has not been obtained (other than to the extent such limitation is rendered ineffective under the UCC or other applicable law), (x) any property subject to a Lien permitted by Section 7.01(u) or (aa) (to the extent relating to a Lien originally incurred pursuant to Section 7.01(u)) to the extent that a grant of a security interest therein would violate or invalidate such underlying obligations or create a right of termination in favor of any other party thereto (other than a Loan Party) or otherwise require consent thereunder (after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law), (xi) letter of credit rights, except to the extent constituting support obligations for other Collateral as to which perfection of the security interest in such other Collateral is accomplished solely by the filing of a UCC financing statement (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement), (xii) any assets to the extent a security interest in such assets could reasonably be expected to result in material adverse tax consequences as reasonably determined by the Borrower, (xiii) [reserved], (xiv) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application (or any registration that issues therefrom) under applicable federal law and (xv) assets where the cost of obtaining a security interest therein exceeds the practical benefit to the Lenders afforded thereby as agreed by the Borrower and the Administrative Agent (at the direction of the Required Lenders) in writing; provided, however, that Excluded Assets shall not include any Proceeds, substitutions or replacements of any Excluded Assets referred to in clauses (i) through (xv) (unless such Proceeds, substitutions or replacements would independently constitute Excluded Assets referred to in clauses (i) through (xv)).  The Borrower shall not be required to take any action under the law of any non-U.S. jurisdiction to create or perfect a security interest in any assets located outside the United States or any other assets that require such action, including any intellectual property registered in any non-U.S. jurisdiction (and no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction shall be required).

"**Excluded Subsidiary**" means (a) any Subsidiary that is not a wholly owned Domestic Subsidiary of the Borrower or a Guarantor, (b) any Subsidiary that is prohibited or restricted by applicable Law or by Contractual Obligations existing on the Closing Date (or, in the case of any newly acquired Subsidiary, in existence at the time of acquisition but not entered into in contemplation thereof) from guaranteeing the Obligations or if guaranteeing the Obligations would require governmental (including regulatory) consent, approval, license or authorization or could result in material adverse tax consequences as reasonably determined by the Borrower, (c) any other Subsidiary with respect to which, in the reasonable judgment of the Borrower and the Required Lenders, the burden or cost of providing a Guarantee shall be excessive in view of the benefits to be obtained by the Lenders therefrom, (d) any not-for-profit Subsidiaries, (e) [reserved], (f) [reserved], (g) any CFC Holding Company, (h) any Domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary that is a CFC, (i) captive insurance Subsidiaries and (j) each other Subsidiary acquired pursuant to a Permitted Acquisition permitted hereunder and financed with assumed secured Indebtedness, and each Subsidiary acquired in such

27

6237404.15

Permitted Acquisition permitted hereunder that guarantees such Indebtedness, in each case to the extent that, and for so long as, the documentation relating to such Indebtedness to which such Subsidiary is a party prohibits such Subsidiary from guaranteeing the Obligations and such prohibition was not created in contemplation of such Permitted Acquisition permitted hereunder.

"**Excluded Swap Obligation**" means, with respect to any Guarantor, any Swap Obligation, if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of such Guarantor or the grant of the security interest would otherwise have become effective with respect to such Swap Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof).

"**Executive Order**" has the meaning set forth in Section 6.21(a).

"**Excluded Account**" means any (a) deposit accounts specially and exclusively used in the ordinary course of business for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any Loan Party's salaried employees, which accounts are funded only in the ordinary course of business, (b) pension fund accounts, 401(k) accounts and trust accounts and (c) withholding tax and other tax accounts, fiduciary accounts, escrow accounts and other accounts in which any Loan Party holds funds on behalf of any third party.

"**Existing Debt**" means all Indebtedness for borrowed money of the Borrower and its Affiliates under (i) the Pre-Petition First Lien Credit Agreement and (ii) that certain Second Lien Credit Agreement, dated as of June 30, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Pre-Petition Second Lien Credit Agreement**") by and among the Borrower, the guarantors party thereto from time to time, the Bank of New York Mellon (or its successor, if appointed), as administrative agent, and the lenders party thereto from time to time (the "**Pre-Petition Second Lien Lenders**").

"**Existing Letters of Credit**" means any letters of credit outstanding on the Closing Date described in Schedule 1.01(D).  Schedule 1.01(D) contains a description of all Existing Letters of Credit and sets forth, with respect to each such Existing Letter of Credit, (i) the name of the issuing lender, (ii) the letter of credit number, (iii) the name(s) of the account party or account parties, (iv) the stated amount (including the currency in which such letter of credit is denominated), (v) the name of the beneficiary and (vi) the expiry date.

"**Extraordinary Advances**" has the meaning set forth in Section 2.03(d)(iii).

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), or any current or future Treasury regulations or other administrative guidance promulgated thereunder, and any intergovernmental agreements implementing the foregoing., and any related fiscal or regulatory legislation, rules or official administrative practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities implementing the foregoing.

28

6237404.15

"**FCPA**" means the United States Foreign Corrupt Practices Act of 1977, as amended.

"**Federal Funds Effective Rate**" means, for any day, the rate per annum equal to the rates on overnight Federal funds transactions with members of the Federal Reserve System (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time), as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent from three brokers of recognized standing selected by it; provided further that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"**FIRREA**" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"**First Lien Administrative Agent**" has the meaning assigned to the term "Administrative Agent" under and as defined in the First Lien Credit Agreement and shall include any successor administrative agent under the First Lien Credit Agreement.

"**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of the date hereof, by and among the Borrower, the Holdcos, the other Guarantors from time to time party thereto, the lenders party thereto from time to time and Cantor Fitzgerald Securities, as administrative agent for such lenders.

"**First Lien Loan Documents**" means the "Loan Documents" as defined in the First Lien Credit Agreement.

"**First Lien Obligations**" means the "Obligations" (or any comparable term) as defined in the First Lien Credit Agreement.

"**First Lien Secured Obligations**" means the "First Lien Secured Obligations" as defined in the Intercreditor Agreement.

"**First Lien Term Facility**" means the First Lien Term Loans and commitments in respect thereof.

"**First Lien Term Loans**" means the "Term Loans" (or any comparable term) as defined in the First Lien Credit Agreement.

"**Fixed Charge Coverage Ratio**" means, with respect to any fiscal period and with respect to the Loan Parties determined on a consolidated basis in accordance with GAAP, the ratio of (a) Consolidated EBITDA for such period *minus* Unfinanced Capital Expenditures made (to the extent not already incurred in a prior period) or incurred during such period, to (b) Fixed Charges for such period; provided, that for purposes of calculating the Fixed Charge Coverage Ratio for any period ending prior to the expiration of twelve full calendar months since the Closing Date, Fixed Charges shall be deemed to be Fixed Charges for the period from the Closing Date to and including the date of determination multiplied by a fraction equal to (x) 365 divided by (y) the number of days elapsed from the Closing Date to such date of determination.

[For the purposes of calculating Fixed Charge Coverage Ratio for any Reference Period, if at any time during such Reference Period (and after the Closing Date), any Loan Party or any of its Subsidiaries

29

shall have made a ~~[Permitted Acquisition],~~. Fixed Charges and Unfinanced Capital Expenditures for such Reference Period shall be calculated after giving *pro forma* effect thereto or in such other manner acceptable to Administrative Agent as if any such ~~[Permitted Acquisition]~~ occurred on the first day of such Reference Period~~]~~.

"**Fixed Charges**" means, with respect to any fiscal period and with respect to the Loan Parties determined on a consolidated basis in accordance with GAAP, the sum, without duplication, of (a) Consolidated Interest Expense required to be paid (other than interest paid-in-kind, amortization of financing fees, and other non-cash Consolidated Interest Expense) during such period, (b) scheduled principal payments in respect of Indebtedness that are required to be paid during such period (~~including any required payments or~~ but excluding mandatory prepayments ~~from excess~~ of Loans or payments due at final maturity) and that were actually paid in cash ~~flow~~ during such period~~)~~, with respect to Indebtedness for borrowed money, (c) all federal, state, and local income taxes required to be paid during such period, (d) all management, consulting, monitoring, and advisory fees paid to its Affiliates during such period~~,~~ and (e) all Restricted Payments paid (whether in cash or other property, other than common Equity Interests) during such period~~, and (f) to the extent not otherwise deducted from Consolidated EBITDA for such period, all payments required to be made during such period in respect of any funding deficiency or funding shortfall with respect to any Pension Plan or for any Withdrawal Liability~~.

"**Flood Insurance Laws**" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"**Foreign Subsidiary**" means any direct or indirect Subsidiary which is not a Domestic Subsidiary.

"**Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**Funding Date**" means the date on which a Borrowing occurs.

"**Funding Losses**" has the meaning set forth in Section 2.12(b)(ii).

"**GAAP**" means generally accepted accounting principles in the United States of America, as in effect from time to time; provided, however, that, subject to Section 1.03, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof (including through conforming changes made consistent with IFRS) on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof (including through conforming changes made consistent with IFRS), then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national body exercising such powers or functions, such as the European Union or the European Central Bank).

30

"**Granting Lender**" has the meaning set forth in Section 10.07(h).

"**Guarantee**" means, as to any Person, without duplication, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment or performance of such Indebtedness, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning set forth in Section 11.01.

"**Guarantors**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement" and shall include each Holdco, the Borrower (solely with respect to its Secured Obligations other than its direct Secured Obligations as a primary obligor (as opposed to a guarantor) under the Loan Documents) and each Subsidiary of the Borrower that shall have become a Guarantor pursuant to Section 6.11 or 6.20, in any case until released in accordance with the terms hereof, it being understood and agreed that the Borrower in its sole discretion may (with the consent of the Administrative Agent (at the direction of the Required Lenders), such consent not to be unreasonably withheld) cause any Subsidiary that is not a Guarantor to Guarantee the Obligations by causing such Subsidiary to execute a Joinder Agreement, and any such Subsidiary shall be a Guarantor, Loan Party and Subsidiary Guarantor hereunder for all purposes; provided, however, that that Administrative Agent (at the direction of the Required Lenders) may condition its consent by limiting the purposes for which such Subsidiary shall constitute a Loan Party and Subsidiary Guarantor for purposes of Section 7 and related definitions used therein.

"**Guaranty**" means, collectively, the guaranty of the Obligations by the Guarantors pursuant to this Agreement.

"**Hazardous Materials**" means all materials, pollutants, contaminants, chemicals, compounds, constituents, substances or wastes, in any form, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, mold, medical waste, in each case regulated under Environmental Laws.

"**Hedge Agreement**" means a "swap agreement" as that term is defined in Section 101(53B)(A) of the Bankruptcy Code.

"**Hedge Obligations**" means any and all obligations or liabilities, whether absolute or contingent, due or to become due, now existing or hereafter arising, of each Loan Party and its Subsidiaries arising under, owing pursuant to, or existing in respect of Hedge Agreements entered into with one or more of the Hedge Providers.

"**Hedge Provider**" means Wells Fargo or any of its Affiliates or any Person that is a Lender or an Affiliate of a Lender at the time it enters into a Hedge Agreement, whether or not such Person subsequently ceases to be a Lender or an Affiliate of a Lender.

31

6237404.15

"**Holdcos**" means Holdings and Intermediate Holdings.

"**Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**IFRS**" means international accounting standards as promulgated by the International Accounting Standards Board.

"**Immaterial Subsidiary**" means any Subsidiary that is not a Material Subsidiary.

"**Increased Reporting Event**" means if at any time Availability is less than the greater of (a) 17.5% of the Maximum Revolver Amount, and (b) $5,250,000

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)    net obligations of such Person under any Swap Contract;

(d)    all obligations of such Person to pay the deferred purchase price of property or services;

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness;

(g)    all obligations of such Person in respect of Disqualified Equity Interests if and to the extent that the foregoing would constitute indebtedness or a liability in accordance with GAAP; and

(h)    to the extent not otherwise included above, all Guarantees of such Person in respect of Indebtedness described in clauses (a) through (g) in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall (A) include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Consolidated First Lien Net Debt, (B) in the case of the Borrower and its Subsidiaries, exclude all intercompany Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business and (C) exclude (i) trade accounts and accrued expenses payable in the ordinary course of business, (ii) any earn-out obligation until such obligation is not paid after becoming due and payable, (iii) accruals for payroll and other liabilities accrued in the ordinary course of business and (iv) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap

32

6237404.15

Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (e) that is expressly made non-recourse or limited recourse (limited solely to the assets securing such Indebtedness) to such Person shall be deemed to be equal to the lesser of (x) the aggregate unpaid amount of such Indebtedness and (y) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Liabilities**" has the meaning set forth in Section 10.05.

"**Indemnified Taxes**" means, with respect to Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, all Taxes imposed on or with respect to any payment under any Loan Documents, other than (i) any Taxes imposed on or measured by its net income, however denominated, and franchise (and similar) Taxes imposed on it in lieu of net income Taxes, imposed by a jurisdiction as a result of such recipient being organized in or having its principal office or, in the case of any Lender, applicable Lending Office in such jurisdiction, or as a result of any other present or former connection between such recipient and such jurisdiction, other than any connections arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, receiving payments under, or enforcing, any Loan Document, (ii) any Taxes attributable to the failure of the Administrative Agent or Lender to comply with Section 3.01(e), (iii) any branch profits Taxes imposed by the United States under Section 884(a) of the Code, or any similar Tax, imposed by any jurisdiction described in clause (a), (iv) in the case of a Lender (other than an assignee pursuant to a request by the Borrower under Section 3.07(a)), any U.S. federal withholding Tax that is in effect and would apply to amounts payable hereunder pursuant to a Law in effect at the time such Lender becomes a party to this Agreement, or designates a new Lending Office, except to the extent such Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrower or any Guarantor with respect to such withholding Tax pursuant to Section 3.01, and (v) any U.S. federal withholding Taxes imposed under FATCA.

"**Indemnitees**" has the meaning set forth in Section 10.05.

"**Independent Financial Advisor**" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged and that is independent of the Borrower and its Affiliates.

"**Information**" has the meaning set forth in Section 10.08.

"**Insolvency Proceeding**" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"**Intellectual Property Security Agreement**" has the meaning set forth in the Security Agreement.

"**Intercompany Note**" means a promissory note substantially in the form of Exhibit G.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of the date hereof, by and among the Administrative Agent, the First Lien Administrative Agent, the Second Lien Administrative Agent and the Borrower and Guarantors party thereto.

"**Interest Payment Date**" means, (a) as to any LIBOR Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; provided that if any Interest Period for a LIBOR

33

6237404.15

Rate Loan exceeds three (3) months, the respective dates that fall every three (3) months after the beginning of such Interest Period shall also be Interest Payment Dates and (b) as to any Base Rate Loan, the first day of each calendar month and the Maturity Date.

"**Interest Period**" means, with respect to each LIBOR Rate Loan, a period commencing on the date of the making of such LIBOR Rate Loan (or the continuation of a LIBOR Rate Loan or the conversion of a Base Rate Loan to a LIBOR Rate Loan) and ending 1, 3, or 6 months thereafter; provided, that (a) interest shall accrue at the applicable rate based upon the LIBOR Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (b) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (c) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 1, 3 or 6 months after the date on which the Interest Period began, as applicable, and (d) Borrower may not elect an Interest Period which will end after the Maturity Date.

"**Intermediate Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Inventory**" means inventory (as that term is defined in the Uniform Commercial Code).

"**Inventory Reserves**" means, as of any date of determination, (a) Landlord Reserves in respect of Inventory, and (b) those reserves that Administrative Agent deems necessary or appropriate, in its Permitted Discretion and subject to Section 2.01(c), to establish and maintain (including reserves for slow moving Inventory and Inventory shrinkage) with respect to Eligible Inventory or the Maximum Revolver Amount, including based on the results of appraisals.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and its Subsidiaries, intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business) or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made), without adjustment for subsequent increases or decreases in the value of such Investment, less any Returns of the Borrower or a Subsidiary in respect of such Investment.

"**IP Rights**" has the meaning set forth in Section 5.15.

"**ISP**" means, with respect to any Letter of Credit, the International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any version or revision thereof accepted by the Issuing Bank for use.

"**Issuer Document**" means, with respect to any Letter of Credit, a letter of credit application, a letter of credit agreement, or any other document, agreement or instrument entered into (or to be entered into) by Borrower in favor of Issuing Bank and relating to such Letter of Credit.

34

"**Issuing Bank**" means Wells Fargo or any other Lender that, at the request of Borrower and with the consent of Administrative Agent, agrees, in such Lender's sole discretion, to become an Issuing Bank for the purpose of issuing Letters of Credit pursuant to Section 2.11 of this Agreement, and Issuing Bank shall be a Lender.

"**Joinder Agreement**" means a joinder agreement substantially in the form of Joinder Agreement attached as Exhibit I hereto.

"**Judgment Currency**" has the meaning assigned to such term in Section 10.20.

"**Landlord Reserve**" means, as to each location at which Borrower has Inventory or books and records located and as to which a Collateral Access Agreement has not been received by Administrative Agent within ninety (90) days after the Closing Date, a reserve in an amount equal to three (3) months' rent, storage charges, fees or other amounts under the lease or other applicable agreement relative to such location or, if greater and Administrative Agent so elects, the number of months' rent, storage charges, fess or other amounts for which the landlord, bailee, warehouseman or other property owner will have, under applicable law, a Lien in the Inventory of Borrower to secure the payment of such amounts under the lease or other applicable agreement relative to such location.

"**Laws**" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Lender**" has the meaning set forth in the introductory paragraph to this Agreement and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender."

"**Lender Default**" means a Distressed Person has admitted in writing that it is insolvent or such Distressed Person becomes subject to a Lender-Related Distress Event.

"**Lender Group**" means each of the Lenders (including Issuing Bank and the Swing Lender) and Administrative Agent, or any one or more of them.

"**Lender Group Expenses**" means all (a) costs or expenses (including taxes and insurance premiums) required to be paid by any Loan Party or its Subsidiaries under any of the Loan Documents that are paid, advanced, or incurred by the Lender Group, (b) documented out-of-pocket fees or charges paid or incurred by Administrative Agent in connection with the Lender Group's transactions with each Loan Party and its Subsidiaries under any of the Loan Documents, including, photocopying, notarization, couriers and messengers, telecommunication, public record searches, filing fees, recording fees, publication, real estate surveys, real estate title policies and endorsements, and environmental audits, (c) Administrative Agent's customary fees and charges imposed or incurred in connection with any background checks or OFAC/PEP searches related to any Loan Party or its Subsidiaries, (d) Administrative Agent's customary fees and charges (as adjusted from time to time) with respect to the disbursement of funds (or the receipt of funds) to or for the account of Borrower (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith, (e) customary charges imposed or incurred by Administrative Agent resulting from the dishonor of checks payable by or to any Loan Party, (f) reasonable, documented out-of-pocket costs and expenses paid or incurred by the Lender Group to correct any default or enforce any provision of the Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any

35

6237404.15

portion thereof, irrespective of whether a sale is consummated, (g) field examination, appraisal, and valuation fees and expenses of Administrative Agent related to any field examinations, appraisals, or valuation to the extent of the fees and charges (and up to the amount of any limitation) provided in Section 6.10(c) of this Agreement, (h) Administrative Agent's and Lenders' reasonable, documented costs and expenses (including reasonable and documented attorneys' fees and expenses) relative to third party claims or any other lawsuit or adverse proceeding paid or incurred, whether in enforcing or defending the Loan Documents or otherwise in connection with the transactions contemplated by the Loan Documents, Administrative Agent's Liens in and to the Collateral, or the Lender Group's relationship with any Loan Party or any of its Subsidiaries, (i) Administrative Agent's reasonable and documented costs and expenses (including reasonable and documented attorneys' fees and due diligence expenses) incurred in advising, structuring, drafting, reviewing, administering (including travel, meals, and lodging), syndicating (including SyndTrak or other communication costs incurred in connection with a syndication of the loan facilities), or amending, waiving, or modifying the Loan Documents, and (j) Administrative Agent's and each Lender's reasonable and documented costs and expenses (including reasonable and documented attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding concerning any Loan Party or any of its Subsidiaries or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether a lawsuit or other adverse proceeding is brought, or in taking any enforcement action or any Remedial Action with respect to the Collateral.

"**Lender-Related Distress Event**" shall mean, with respect to any Lender or any other Person that directly or indirectly controls such Lender (each, a "**Distressed Person**"), (i) such Distressed Person has become subject to a Bail-in Action and/or (ii) a voluntary or involuntary case with respect to such Distressed Person under any debt relief law, or a custodian, conservator, receiver, or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person, or any Person that directly or indirectly controls such Distressed Person or is subject to a forced liquidation or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any governmental authority having regulatory authority over such Distressed Person to be, insolvent or bankrupt; provided that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Lender or any Person that directly or indirectly controls such Lender by a governmental authority or an instrumentality thereof.

"**Lending Office**" means, as to any Lender, such office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Letter of Credit**" means a letter of credit (as that term is defined in the Uniform Commercial Code) issued by Issuing Bank.

"**Letter of Credit Collateralization**" means either (a) providing cash collateral (pursuant to documentation reasonably satisfactory to Administrative Agent (including that Administrative Agent has a first priority perfected Lien in such cash collateral), including provisions that specify that the Letter of Credit Fees and all commissions, fees, charges and expenses provided for in Section 2.11(k) of this Agreement (including any fronting fees) will continue to accrue while the Letters of Credit are outstanding) to be held by Administrative Agent for the benefit of the Lenders in an amount equal to 105% of the then existing Letter of Credit Usage, (b) delivering to Administrative Agent documentation executed by all beneficiaries under the Letters of Credit, in form and substance reasonably satisfactory to Administrative Agent and Issuing Bank, terminating all of such beneficiaries' rights under the Letters of Credit, or (c) providing Administrative Agent with a standby letter of credit, in form and substance reasonably satisfactory to Administrative Agent, from a commercial bank acceptable to Administrative

36

Agent (in its sole discretion) in an amount equal to 105% of the then existing Letter of Credit Usage (it being understood that the Letter of Credit Fee and all fronting fees set forth in this Agreement will continue to accrue while the Letters of Credit are outstanding and that any such fees that accrue must be an amount that can be drawn under any such standby letter of credit).

"**Letter of Credit Disbursement**" means a payment made by Issuing Bank pursuant to a Letter of Credit.

"**Letter of Credit Exposure**" means, as of any date of determination with respect to any Lender, such Lender's participation in the Letter of Credit Usage pursuant to Section 2.11(e) on such date.

"**Letter of Credit Fee**" has the meaning set forth in Section 2.06(b).

"**Letter of Credit Indemnified Costs**" has the meaning set forth in Section 2.11(f).

"**Letter of Credit Related Person**" has the meaning set forth in Section 2.11(f).

"**Letter of Credit Sublimit**" means $~~5,000~~7,500,000.

"**Letter of Credit Usage**" means, as of any date of determination, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit, plus (b) the aggregate amount of outstanding reimbursement obligations with respect to Letters of Credit which remain unreimbursed or which have not been paid through a Loan.

"**LIBOR Deadline**" has the meaning set forth in Section 2.12(b)(i).

"**LIBOR Notice**" means a written notice in the form of Exhibit A to this Agreement.

"**LIBOR Option**" has the meaning set forth in Section 2.12(a).

"**LIBOR Rate**" means the rate per annum as published by ICE Benchmark Administration Limited (or any successor page or other commercially available source as Administrative Agent may designate from time to time) as of 11:00 a.m., London time, two (2) Business Days prior to the commencement of the requested Interest Period, for a term, and in an amount, comparable to the Interest Period and the amount of the LIBOR Rate Loan requested (whether as an initial LIBOR Rate Loan or as a continuation of a LIBOR Rate Loan or as a conversion of a Base Rate Loan to a LIBOR Rate Loan) by Borrower in accordance with this Agreement (and, if any such published rate is below 0.75%, then the LIBOR Rate shall be deemed to be 0.75%).  Each determination of the LIBOR Rate shall be made by Administrative Agent and shall be conclusive in the absence of manifest error.

"**LIBOR Rate Loan**" means each portion of a Loan that bears interest at a rate determined by reference to the LIBOR Rate.

"**Lien**" means, with respect to any asset, any mortgage, deed of trust, pledge, hypothecation, collateral assignment, security deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest of any kind or nature in respect of such asset (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing).

"**Loan**" means any Revolving Loan, Swing Loan or Extraordinary Advance made (or to be made) hereunder.

"**Loan Account**" has the meaning set forth in Section 2.09.

37

6237404.15

"**Loan Documents**" means, collectively, (i) this Agreement, (ii) any Notes, (iii) the Collateral Documents, (iv) the Intercreditor Agreement, (v) the Agent Fee Letter, (vi) any Borrowing Base Certificate, (vii) any Issuer Documents, (viii) the Letters of Credit, (ix) any other document or instrument designated by the Borrower and the Administrative Agent as a "Loan Document" and (x) any amendment or joinder to this Agreement.

"**Loan Parties**" means, collectively, the Borrower and each Guarantor.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Master Agreement**" has the meaning set forth in the definition of "Swap Contract."

"**Material Adverse Effect**" means any event, change or condition that, individually or in the aggregate, has had, or would reasonably be expected to have a material adverse effect on (i) the business, assets, financial condition or results of operations of the Borrower and its Subsidiaries, taken as a whole, (ii) the ability of the Borrower and the Guarantors (taken as a whole) to perform their payment obligations under any Loan Document to which the Borrower or any of the Loan Parties is a party or (iii) the material rights and remedies of the Administrative Agent and the Lenders under the Loan Documents, taken as a whole, including the legality, validity, binding effect or enforceability of the Loan Documents.

"**Material Domestic Subsidiary**" means, at any date of determination, each of the Borrower's Domestic Subsidiaries that are Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Subsidiaries for such period, in each case determined in accordance with GAAP; provided that if, at any time and from time to time after the Closing Date, Domestic Subsidiaries that are not Guarantors solely because they do not meet the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended fiscal quarter of the Borrower for which financial statements have been delivered pursuant to Section 6.01 or more than 5.0% of the consolidated gross revenues of the Borrower and the Subsidiaries for such Test Period, then the Borrower shall, not later than forty-five (45) days after the date by which financial statements for such quarter or Test Period, as applicable, are required to be delivered pursuant to this Agreement (or such longer period as the Required Lenders may agree in their reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of Section 6.11 applicable to such Subsidiary.

"**Material Foreign Subsidiary**" means, at any date of determination, each of the Borrower's Foreign Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Subsidiaries for such period, in each case determined in accordance with GAAP; provided that if, at any time and from time to time after the Closing Date, Foreign Subsidiaries not meeting the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended fiscal quarter of the Borrower for which financial statements have been delivered pursuant to Section 6.01 or more than 5.0% of the consolidated gross revenues of the Borrower and the Subsidiaries for such Test Period, then the Borrower shall, not later than forty-five (45) days after the date by which financial statements for such quarter or Test Period, as applicable, are required to be delivered pursuant to this Agreement (or such longer period as the Required Lenders may agree in their reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Foreign Subsidiaries as "Material

38

6237404.15

Foreign Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of the definition of "Collateral and Guarantee Requirement."

"**Material Non-Public Information**" means information which is (a) not publicly available, (b) material with respect to Holdings and its Subsidiaries or their respective securities for purposes of United States federal and state securities laws and (c) not of a type that would be publicly disclosed in connection with any issuance by Holdings or any of its Subsidiaries of debt or equity securities issued pursuant to a public offering, a Rule 144A offering or other private placement where assisted by a placement agent.

"**Material Real Property**" means any fee-owned Real Property located in the United States that is owned by any Loan Party and that has a fair market value in excess of $1,250,000 (at the Closing Date or, with respect to Real Property acquired after the Closing Date, at the time of acquisition, in each case, as reasonably estimated by the Borrower in good faith).

"**Material Subsidiary**" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"**Maturity Date**" means the earlier to occur of (a) the ~~third~~fifth anniversary of the Closing Date and (b) sixty (60) days prior to the maturity of the First Lien Obligations and the Second Lien Obligations; provided that, if such day is not a Business Day, the Maturity Date shall be the Business Day immediately succeeding such day.

"**Maximum Rate**" has the meaning set forth in Section 10.10.

"**Maximum Revolver Amount**" means $30,000,000, decreased by the amount of reductions in the Commitments made in accordance with Section 2.04(c).

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgage Policies**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement."

"**Mortgaged Properties**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement."

"**Mortgages**" means collectively, the deeds of trust, trust deeds, hypothecs and mortgages made by the Loan Parties in favor or for the benefit of the Administrative Agent on behalf of the Secured Parties creating and evidencing a Lien on a Mortgaged Property in form and substance reasonably satisfactory to the Administrative Agent, and any other mortgage executed and delivered pursuant to Sections 6.11 and 6.13, in each case, as the same may from time to time be amended, restated, supplemented or otherwise modified.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which a Loan Party, any Subsidiary or any ERISA Affiliate makes or is obligated to make contributions, or has made or been obligated to make contributions.

"**NOLV**" means, as of any date of determination, with respect to Eligible Inventory of any Person, the value of such Eligible Inventory that is estimated to be recoverable in an orderly liquidation of such Eligible Inventory, net of all associated costs and expenses of such liquidation, as determined based upon the most recent Acceptable Appraisal of Inventory; provided that if such Acceptable Appraisal does not provide the costs and expenses of such liquidation on an item by item basis, then costs and expenses of liquidation for each item of Eligible Inventory will be such amount as determined by Administrative Agent in its Permitted Discretion.

"**Non-Consenting Lender**" has the meaning set forth in Section 3.07(d).

39

6237404.15

"**Non-Defaulting Lender**" means, at any time, a Lender that is not a Defaulting Lender.

"**Note**" has the meaning set forth in Section 2.05(b).

"**Notice of Intent to Cure**" has the meaning set forth in Section 8.04.

"**Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party and its Subsidiaries arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and of their Subsidiaries to the extent they have obligations under the Loan Documents) include (a) the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document, (b) the obligation to pay any applicable fee pursuant to Section 2.10 and (c) the obligation of any Loan Party to reimburse any amount in respect of any of the foregoing that any Lender may elect to pay or advance on behalf of such Loan Party in accordance with the terms of the Loan Documents.

"**OFAC**" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"**Old Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Old Intermediate Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Old Jason**" has the meaning set forth in the preliminary statements to this Agreement.

"**Order**" means any order, writ, judgement, injunction, decree, rule, ruling, directive, stipulation, determination or award made, issued or entered by the Bankruptcy Court or any other Governmental Authority, whether interim or final.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement or limited liability company agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" has the meaning set forth in Section 3.01(b).

"**Overadvance**" means, as of any date of determination, that the Revolver Usage is greater than any of the limitations set forth in Section 2.01 or Section 2.11.

"**Overnight Rate**" means, for any day, the greater of the Federal Funds Effective Rate and an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"**Participant**" has the meaning set forth in Section 10.07(e).

40

6237404.15

"**Participant Register**" has the meaning set forth in Section 10.07(e).

"**Payment Conditions**" means, at the time of determination with respect to a proposed payment to fund ~~a Specified Transaction~~an Investment or Restricted Payment, that:

(a)     no Default or Event of Default then exists or would arise as a result of the consummation of such ~~Specified Transaction,~~Investment or Restricted Payment,

(b)     both (A) the Fixed Charge Coverage Ratio of the Loan Parties and their Subsidiaries is equal to or greater than 1.00 to 1.00 for the trailing twelve (12) month period most recently ended for which financial statements are required to have been delivered to Administrative Agent pursuant to Section 6.01 (calculated on a pro forma basis as if such proposed payment is a Fixed Charge made on the last day of such twelve (12) month period (it being understood that such proposed payment shall also be a Fixed Charge made on the last day of such twelve (12) month period for purposes of calculating the Fixed Charge Coverage Ratio under this clause (b) for any subsequent proposed payment to fund ~~a Specified Transaction~~an Investment or Restricted Payment)), and (B) Availability (x) at all times during the 30 consecutive days immediately preceding the date of such proposed payment and the consummation of such ~~Specified Transaction~~Investment or Restricted Payment, calculated on a *pro forma basis* as if such proposed payment was made, and the ~~Specified Transaction~~Investment or Restricted Payment was consummated, on the first day of such period, and (y) after giving effect to such proposed ~~payment and Specified Transaction~~Investment or Restricted Payment, in each case, is not less than, the greater of (X) 25% of the Maximum Revolver Amount, and (Y) $7,500,000, and

(c)     Borrower has delivered a certificate to Administrative Agent certifying that all conditions described in clauses (a) and (b) above have been satisfied.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time.

"**Perfection Certificate**" means a certificate substantially in the form of Exhibit II to the Security Agreement or any other form reasonably approved by the Administrative Agent, as the same shall be supplemented from time to time.

"**Permitted Acquisition**" has the meaning set forth in Section 7.02(i).

"**Permitted Discretion**" means ~~a determination made in~~ the exercise of the Administrative Agent's reasonable credit judgment (from the perspective of a secured asset- based lender~~) business judgment.~~), exercised in accordance with customary and generally applicable credit practices for similar asset based lending facilities.

"**Permitted Holders**" means each holder of any First Lien Secured Obligations or Second Lien Secured Obligations holding the common equity of Holdings on the Closing Date.

"**Permitted Investment**" has the meaning set forth in Section 7.02.

"**Permitted Protest**" means the right of any Loan Party or any of its Subsidiaries to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment; provided, that (a) a reserve with respect to

41

such obligation is established on such Loan Party's or its Subsidiaries' books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Loan Party or its Subsidiary, as applicable, in good faith, and (c) Administrative Agent is satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Administrative Agent's Liens.

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal, restructuring, replacement or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, restructured, refunded, renewed, replaced or extended except by an amount equal to unpaid accrued interest and premium thereon *plus* other amounts owing or paid related to such Indebtedness, and fees and expenses incurred, in connection with such modification, refinancing, refunding, renewal, restructuring, replacement or extension *plus* an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e), such modification, refinancing, refunding, renewal, replacement or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended, (c) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e) or (f), at the time thereof, no Event of Default shall have occurred and be continuing, (d) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal, replacement or extension is subordinated in right of payment to the Obligations on terms (i) at least as favorable (taken as a whole) (as reasonably determined by the Borrower) to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended or (ii) as otherwise reasonably acceptable to the Administrative Agent, (e) if such Indebtedness being modified, refinanced, replaced, refunded, renewed or extended is Indebtedness permitted pursuant to Sections 7.03(s), 7.03(w), and 7.03(x), (i) to the extent such Indebtedness being modified, refinanced, replaced, refunded, renewed or extended is unsecured or secured by Liens that are subordinated to the Liens securing the Obligations, such modification, refinancing, replacement, refunding, renewal or extension is unsecured or (with respect to refinanced debt secured by Liens that are subordinated to the Liens securing the Obligations) secured by Liens that are subordinated to the Liens securing the Obligations on terms (x) at least as favorable (taken as a whole) (as reasonably determined by the Borrower) to the Lenders as those contained in the documentation (including any intercreditor or similar agreements) governing the Indebtedness being modified, refinanced, replaced, refunded, renewed or extended or (y) otherwise reasonably acceptable to the Administrative Agent and (ii) notwithstanding anything contained in Section 7.03(c), such modification, refinancing, refunding, renewal, replacement or extension is incurred only by one or more Persons who is an obligor of the Indebtedness being modified, refinanced, replaced, refunded, renewed or extended and (f) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is outstanding pursuant to the Second Lien Credit Agreement or any other Second Lien Loan Document, such modification, refinancing, refunding, renewal, replacement or extension does not violate the terms of the Intercreditor Agreement.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning set forth in the preliminary statements to this Agreement.

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established or maintained by any Loan Party or any Subsidiary or, with respect to any such plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA, any ERISA Affiliate.

42

"**Plan Effective Date**" has the meaning set forth in the preliminary statements to this Agreement.

"**Platform**" has the meaning set forth in Section 6.01(d).

"**Pledged Debt**" has the meaning set forth in the Security Agreement.

"**Pledged Equity**" has the meaning set forth in the Security Agreement.

"**Prepackaged Plan**" has the meaning set forth in the preliminary statements to this Agreement.

"**Pre-Petition First Lien Credit Agreement**" has the meaning set forth in the preliminary statements to this Agreement.

"**Pre-Petition First Lien Lenders**" has the meaning set forth in the preliminary statements to this Agreement.

"**Proceeding**" has the meaning set forth in Section 10.05.

"**Proceeds**" has the meaning set forth in the Security Agreement.

"**Pro Forma Balance Sheet**" has the meaning set forth in Section 5.05(b).

"**Pro Forma Basis**" and "**Pro Forma Effect**" means, with respect to compliance with any test or covenant or calculation of any ratio hereunder, the determination or calculation of such test, covenant or ratio (including in connection with Specified Transactions) in accordance with Section 1.09.

"**Pro Forma Financial Statements**" has the meaning set forth in Section 5.05(b).

"**Pro Rata Share**" means, with respect to each Lender, at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the Revolver Usage attributable to such Lender at such time and the denominator of which is the Maximum Revolver Amount at such time.

"**Projections**" has the meaning set forth in Section 6.01(c).

"**Protective Advances**" has the meaning set forth in Section 2.03(d)(i).

"**Public Lender**" has the meaning set forth in Section 6.01(d).

"**QFC**" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. § 5390(c)(8)(D).

"**QFC Credit Support**" has the meaning set forth in Section 10.24.

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests.

"**Qualified IPO**" means the issuance by the Borrower or any direct or indirect parent of the Borrower of its common Equity Interests in an underwritten primary public offering (other than a public

43

offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the U.S. Securities and Exchange Commission in accordance with the Securities Act (whether alone or in connection with a secondary public offering).

"**Quarterly Financial Statements**" means the unaudited consolidated balance sheets and related consolidated statements of income and cash flows of the Old Jason and its Subsidiaries for the fiscal quarter ended closest to June 30, 2020 and each subsequent fiscal quarter of the Company ended at least forty-five (45) days prior to the Closing Date.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned or leased by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures.

"**Receivable Reserves**" means, as of any date of determination, those reserves that Administrative Agent deems necessary or appropriate, in its Permitted Discretion and subject to Section 2.01(c), to establish and maintain (including Landlord Reserves for books and records locations and reserves for rebates, discounts, warranty claims, and returns) with respect to the Eligible Accounts or the Maximum Revolver Amount.

"**Register**" has the meaning set forth in Section 10.07(d).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"**Release**" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing or migrating in, into, onto or through the Environment or in an uncontained manner from or through any facility, property or equipment.

"**Relevant Governmental Body**" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"**Relevant Public Company**" means Holdings or any direct or indirect parent thereof that (i) owns, directly or indirectly, 100% of the Equity Interests of Holdings and the Borrower and (ii) is the registrant with respect to a Qualified IPO.

"**Remedial Action**" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the otherwise applicable notice period has been waived by regulation or otherwise by the PBGC.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the Revolver Usage; provided that (i) the portion of the Revolver Usage held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders and (ii)

44

6237404.15

at any time there are two or more Lenders (who are not Affiliates of one another or Defaulting Lenders), "Required Lenders" must include at least two Lenders (who are not Affiliates of one another).

"**Reserves**" means, as of any date of determination, Dilution Reserves, Inventory Reserves, Receivables Reserves, Bank Product Reserves and those other reserves that Administrative Agent deems necessary or appropriate, in its Permitted Discretion and subject to Section 2.01(c), to establish and maintain (including reserves with respect to (a) sums that any Loan Party or its Subsidiaries are required to pay under any Section of this Agreement or any other Loan Document (such as taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay, and (b) amounts owing by any Loan Party or its Subsidiaries to any Person to the extent secured by a Lien on, or trust over, any of the Collateral (other than a [Permitted Lien]),)., which Lien or trust, in the Permitted Discretion of Administrative Agent likely would have a priority superior to the Administrative Agent's Liens (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for ad valorem, excise, sales, or other taxes where given priority under applicable law) in and to such item of the Collateral) with respect to the Borrowing Base or the Maximum Revolver Amount.

"**Responsible Officer**" means the chief executive officer, president, vice president, chief financial officer, chief administrative officer, secretary or assistant secretary, treasurer or assistant treasurer, controller or other similar officer of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the Borrower's or a Subsidiary's equity holders, partners or members (or the equivalent Persons thereof).

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of June 5, 2020, by and among the Debtors and the Pre-Petition Lenders party thereto as Consenting Creditors (as defined therein).

"**Returns**" means, with respect to any Investment, any dividends, distributions, interest, fees, premium, return of capital, repayment of principal, income, profits (from a Disposition or otherwise) and other amounts received or realized in respect of such Investment.

"**Revolver Usage**" means, as of any date of determination, the sum of (a) the amount of outstanding Loans (inclusive of Swing Loans and Protective Advances), *plus* (b) the amount of the Letter of Credit Usage.

"**Revolving Loans**" has the meaning set forth in Section 2.1(a).

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Same Day Funds**" means immediately available funds.

"**Sanctioned Entity**" means (a) a country or territory or a government of a country or territory, (b) an agency of the government of a country or territory, (c) an organization directly or indirectly controlled by a country or territory or its government, or (d) a Person resident in or determined to be resident in a country or territory, in each case of clauses (a) through (d) that is a target of comprehensive

6237404.15

Sanctions, including a target of any country sanctions program administered and enforced by OFAC. (currently countries and territories listed in (a) through (d) are Cuba, Iran, North Korea, Syria, and the Crimea region of Ukraine).

"**Sanctioned Person**" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"**Sanctions**" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by:  (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (e) any other Governmental Authority with jurisdiction over any member of Lender Group or any Loan Party or any of their respective Subsidiaries or Affiliates.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Second Lien Administrative Agent**" has the meaning assigned to the term "Administrative Agent" under and as defined in the Second Lien Credit Agreement and shall include any successor administrative agent under the Second Lien Credit Agreement.

"**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of the date hereof, by and among the Borrower, the Holdcos, the other Guarantors from time to time party thereto, the lenders party thereto from time to time and Cantor Fitzgerald Securities, as administrative agent for such lenders.

"**Second Lien Loan Documents**" means the "Loan Documents" as defined in the Second Lien Credit Agreement.

"**Second Lien Obligations**" means the "Obligations" (or any comparable term) as defined in the Second Lien Credit Agreement.

"**Second Lien Secured Obligations**" means the "SecondJunior Lien Secured Obligations" as defined in the Intercreditor Agreement.

"**Second Lien Term Facility**" means the Second Lien Term Loans and commitments in respect thereof.

"**Second Lien Term Loans**" means the "Term Loans" (or any comparable term) as defined in the Second Lien Credit Agreement.

"**Secured Obligations**" means, collectively, the Obligations, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise.

"**Secured Parties**" means, collectively, the Administrative Agent, the Lenders, and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.02.

46

6237404.15

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Security Agreement**" means a security agreement substantially in the form of Exhibit F.

"**Security Agreement Supplement**" has the meaning set forth in the Security Agreement.

"**Settlement**" has the meaning set forth in Section 2.03(e)(i).

"**Settlement Date**" has the meaning set forth in Section 2.3(e)(i).

"**SOFR**" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date (i) the sum of the debt (including contingent liabilities) of such Person and its Subsidiaries, taken as a whole, does not exceed the present fair saleable value of the assets of the Person and its Subsidiaries, taken as a whole; (ii) the capital of such Person and its Subsidiaries, taken as a whole, is not unreasonably small in relation to the business of such Person and its Subsidiaries, taken as a whole, contemplated as of the Closing Date; and (iii) such Person and its Subsidiaries, taken as a whole, do not intend to incur, or believe that they will incur, debts (including current obligations) beyond their ability to pay such debt as they mature in the ordinary course of business.  For the purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"**SPC**" has the meaning set forth in Section 10.07(h).

"**Specified Transaction**" means, any Disposition, Investment, prepayment of Indebtedness or Restricted Payment (or declaration of any prepayment or Restricted Payment), that by the terms of this Agreement requires such test to be calculated on a "Pro Forma Basis" or after giving "Pro Forma Effect.".

"**Standard Letter of Credit Practice**" means, for Issuing Bank, any domestic or foreign law or letter of credit practices applicable in the city in which Issuing Bank issued the applicable Letter of Credit or, for its branch or correspondent, such laws and practices applicable in the city in which it has advised, confirmed or negotiated such Letter of Credit, as the case may be, in each case, (a) which letter of credit practices are of banks that regularly issue letters of credit in the particular city, and (b) which laws or letter of credit practices are required or permitted under ISP or UCP, as chosen in the applicable Letter of Credit.

"**Statutory Reserves**" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board of Governors and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the Board).  LIBOR Rate Loans shall be deemed to constitute Eurocurrency Liabilities (as defined in Regulation D of the Board) and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Sterling**" means the lawful currency of the United Kingdom.

47

6237404.15

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (excluding, for the avoidance of doubt, any charitable organizations, and any other Person that meets the requirements of Section 501(c)(3) of the Code) of which (i) a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, (ii) more than half of the issued share capital is at the time beneficially owned or (iii) the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" means any Guarantor other than the Borrower and the Holdcos.

"**Supermajority Lenders**" means, at any time, Revolving Lenders having or holding more than 66 2/3% of the aggregate Revolving Loan Exposure of all Revolving Lenders; provided, that (i) the Revolving Loan Exposure of any Defaulting Lender shall be disregarded in the determination of the Supermajority Lenders, and (ii) at any time there are two or more Revolving Lenders (who are not Affiliates of one another), "Supermajority Lenders" must include at least two Revolving Lenders (who are not Affiliates of one another or Defaulting Lenders).

"**Supported QFC**" has the set forth in Section 10.24.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Swing Lender**" means Wells Fargo or any other Lender that, at the request of Borrower and with the consent of Administrative Agent agrees, in such Lender's sole discretion, to become the Swing Lender under Section 2.03(b).

48

6237404.15

"**Swing Loan**" has the meaning set forth in Section 2.03(b).

"**Swing Loan Exposure**" means, as of any date of determination with respect to any Lender, such Lender's Pro Rata Share of the Swing Loans on such date.

"**Target Person**" has the meaning set forth in Section 7.02.

"**Tax Distribution**" means any distribution made or permitted to be made pursuant to Section 7.06(h)(iii).

"**Tax Group**" has the meaning set forth in Section 7.06(h)(iii).

"**Taxes**" means all present or future taxes, duties, levies, imposts, assessments, withholdings (including backup withholding) or other similar charges imposed by any Governmental Authority including any interest, penalties and additions to tax applicable thereto.

"**Term SOFR**" means the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"**Test Period**" means, for any date of determination under this Agreement, the twelve (12) consecutive calendar months of the Borrower most recently ended as of such date of determination.

"**Threshold Amount**" means $10,000,000.

"**Tooling**" means tooling, including, but not limited to dies, molds, tooling, casting patterns, gauges, jigs, racks and stands for engines, cowls, radome and wheels, jacks, test benches, test equipment, lathes, welders, grinders, presses, punches and hoists and other similar items (whether or not completed or fixed or handheld).

"**Total Assets**" means the total assets of the Borrower and the Subsidiaries on a consolidated basis in accordance with GAAP, as shown on the most recent balance sheet of the Borrower delivered pursuant to Section 6.01(a) or (b) or, for the period prior to the time any such statements are so delivered pursuant to Section 6.01(a) or (b), the Pro Forma Financial Statements.

"**Transaction Expenses**" means any fees or expenses incurred or paid by Holdings, Intermediate Holdings, the Borrower or any of their respective Subsidiaries in connection with the Transactions (including expenses in connection with hedging transactions), this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby.

"**Transactions**" means, collectively, (a) the funding of the Loans issuance of any Letters of Credit on the Closing Date and the execution, delivery and performance of the Loan Documents to be entered into on the Closing Date, (b) the deemed funding of the First Lien Term Loans under the First Lien Credit Agreement on the Closing Date and the execution, delivery and performance of the First Lien Loan Documents to be entered into on the Closing Date, (c) the deemed funding of the Second Lien Term Loans under the Second Lien Credit Agreement on the Closing Date and the execution, delivery and performance of the Second Lien Loan Documents to be entered into on the Closing Date, (d) the extinguishment of the Existing Debt in accordance with the Prepackaged Plan, (e) the restructuring of the Holdcos and certain of their Subsidiaries pursuant to the Prepackaged Plan, the Chapter 11 Cases and any related transactions and (f) the payment of Transaction Expenses earned, due and payable on the Closing Date.

"**Transferred Guarantor**" has the meaning set forth in Section 11.09.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a LIBOR Rate Loan.

49

6237404.15

"**UCP**" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any version or revision thereof accepted by Issuing Bank for use.

"**Unadjusted Benchmark Replacement**" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"**Unfinanced Capital Expenditures**" means Capital Expenditures (a) not financed with the proceeds of any incurrence of Indebtedness (other than the incurrence of any Revolving Loans), the proceeds of any sale or issuance of Equity Interests or equity contributions, the proceeds of any asset sale (other than the sale of Inventory in the ordinary course of business) or any insurance proceeds, and (b) that are not reimbursed by a third person (excluding any Loan Party or any of its Affiliates) in the period such expenditures are made pursuant to a written agreement.

"**Uniform Commercial Code**" or "**UCC**" means (i) the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or (ii) the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it applies to any item or items of Collateral. References in this Agreement and the other Loan Documents to specific sections of the Uniform Commercial Code are based on the Uniform Commercial Code as in effect in the State of New York on the Closing Date.  In the event such Uniform Commercial Code is amended or another Uniform Commercial Code described in clause (ii) is applicable, such Section reference shall be deemed to be references to the comparable Section in such amended or other Uniform Commercial Code.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" has the meaning set forth in Section 3.01(e)(ii)(C).

"**USA Patriot Act**" means the USA PATRIOT ACT (Title III of Pub. Law 107-56 (signed into law October 26, 2001) (as amended from time to time).)).

"**U.S. Special Resolution Regimes**" has the meaning set forth in Section 10.24.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness.

"**Wells Fargo**" means Wells Fargo Bank, National Association, a national banking association.

"~~**Withdrawal Liability**~~" ~~means liability with respect to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.~~

"**Write-Down and Conversion Powers**" means with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

"**wholly owned**" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

50

6237404.15

**Section 1.02    Other Interpretive Provisions**.   With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(c)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(d)    The term "including" is by way of example and not limitation.

(e)    The word "or" is not exclusive.

(f)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(g)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(h)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(i)    For purposes of determining compliance with any Section of Article VII at any time, in the event that any Lien (other than Liens securing Indebtedness of the types described in clauses (v) through (z) of the proviso appearing in the last paragraph of Section 7.03, which shall at all times be deemed to be incurred in reliance on the applicable express exception therefor in Section 7.01), Investment, Disposition, Restricted Payment, Affiliate transaction, Contractual Obligation or prepayment of Indebtedness meets the criteria of one or more than one of the categories of transactions permitted pursuant to any clause of such Sections, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time.

(j)    All references to "knowledge" of any Loan Party or a Subsidiary of Holdings means the actual knowledge of a Responsible Officer.

(k)    The words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(l)    All references to any Person shall be constructed to include such Person's successors and assigns (subject to any restriction on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(m)    The word "will" shall be construed to have the same meaning and effect as the word "shall."

51

6237404.15

~~(n)      All references to any Lender "making" or "funding" a Loan or a Loan being "made" or "funded" (or any similar concept) by a Lender shall, for all purposes hereunder, be a reference to the deemed making or funding of such Loan by such Lender or such Loan being deemed made or funded (or any similar concept) by such Lender.~~

Section 1.03    **Accounting Terms**.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.  Notwithstanding any other provision contained herein, (a) any lease that is treated as an operating lease for purposes of GAAP as of the Closing Date shall not be treated as Indebtedness, Attributable Indebtedness or as a Capitalized Lease and shall continue to be treated as an operating lease (and any future lease, if it were in effect on the Closing Date, that would be treated as an operating lease for purposes of GAAP as of the Closing Date shall be treated as an operating lease), in each case for purposes of this Agreement, notwithstanding any actual or proposed change in GAAP after the Closing Date and (b) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to (i) Statement of Financial Accounting Standards 141R or ASC 805 (or any other financial accounting standard having a similar result or effect) or (ii) any election under Financial Accounting Standards Codification No. 825—Financial Instruments, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of a Holdco, the Borrower or any Subsidiary at "fair value" as defined therein.

Section 1.04    **Rounding**.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

Section 1.05    **References to Agreements, Laws, Etc**.  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, refinancings, restatements, renewals, restructurings, extensions, supplements and other modifications thereto, but only to the extent that such amendments, refinancings, restatements, renewals, restructurings, extensions, supplements and other modifications are not prohibited by the Loan Documents; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06    **Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.07    **Timing of Payment or Performance**.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day.

Section 1.08    **[Reserved]**.

Section 1.09    **Pro Forma Calculations**.  (a)  Notwithstanding anything to the contrary herein, financial ratios and tests, including the Fixed Charge Coverage Ratio shall be calculated in the manner prescribed by this Section 1.09; provided that notwithstanding anything to the contrary in Section 1.09(b), (c) or (d), when calculating the Fixed Charge Coverage Ratio for purposes of determining actual monthly

52

compliance with the financial covenant pursuant to Section 7.13 (and not compliance on a Pro Forma Basis for purposes of testing the permissibility of a transaction hereunder), the events described in this Section 1.09 that occurred subsequent to the end of the applicable Test Period shall not be given *pro forma* effect.  In addition, whenever a financial ratio or test is to be calculated on a pro forma basis, the reference to the "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which internal financial statements of Holdings are available (as determined in good faith by the Borrower); provided that, the provisions of this sentence shall not apply for purposes of calculating the Fixed Charge Coverage Ratio for purposes of determining actual monthly compliance with Section 7.13 (and not compliance on a Pro Forma Basis for purposes of testing the permissibility of a transaction hereunder), which shall be based on the financial statements delivered pursuant to Section 6.01(a) or (b), as applicable, for the relevant Test Period.

(b) For purposes of calculating any financial ratio or test, Specified Transactions (with any incurrence or repayment of any Indebtedness in connection therewith to be subject to Section 1.09(d)) that have been made (i) during the applicable Test Period and (ii) if applicable as described in Section 1.09(a), subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio or test is made shall be calculated on a *pro forma* basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day (or, in case of the determination of Total Assets, the last day) of the applicable Test Period.  If since the beginning of any applicable Test Period any Person that subsequently became a Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Subsidiaries since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.09, then such financial ratio or test (or Total Assets) shall be calculated to give *pro forma* effect thereto in accordance with this Section 1.09.

(c) [reserved].

(d) In the event that the Borrower or any Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Indebtedness included in the calculations of any financial ratio or test (in each case, other than Indebtedness incurred or repaid under any revolving credit facility), (i) during the applicable Test Period or (ii) subject to Section 1.09(a) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving *pro forma* effect to such incurrence or repayment of Indebtedness, to the extent required, as if the same had occurred on the last day of the applicable Test Period.

**Section 1.10    Exchange Rates; Currency**.  (a) For purposes of determining compliance with Article VII with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Investment is incurred (so long as such Indebtedness or Investment, at the time incurred, made or acquired, was permitted hereunder).

(b) Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect the (i) adoption of the Euro by any member state of the European Union and any relevant market conventions or practices relating to the Euro or (ii) a change in currency of any other country and any relevant market conventions or practices relating to the change in currency.

**Section 1.11    Certifications**.   All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such person in his or her capacity solely as an officer or a

53

6237404.15

representative of such Loan Party, on such Loan Party's behalf and not in such Person's individual capacity.

## ARTICLE II
## CREDIT EXTENSIONS

**Section 2.01    Revolving Loans**.

(a)    Subject to the terms and conditions of this Agreement, and during the term of this Agreement, each Lender agrees (severally, not jointly or jointly and severally) to make revolving Loans ("**Revolving Loans**") to Borrower in an amount at any one time outstanding not to exceed *the lesser of*:

(i)    such Lender's Commitment, or

(ii)    such Lender's Pro Rata Share of an amount equal to *the lesser of*:

(A)    the amount equal to (1) the Maximum Revolver Amount, *less* (2) the sum of (y) the Letter of Credit Usage at such time, *plus* (z) the principal amount of Swing Loans outstanding at such time, and

(B)    the amount equal to (1) the Borrowing Base as of such date (based upon the most recent Borrowing Base Certificate delivered by Borrower to Administrative Agent, as adjusted for Reserves established by Administrative Agent in accordance with Section 2.01(c)), *less* (2) the sum of (x) the Letter of Credit Usage at such time, *plus* (y) the principal amount of Swing Loans outstanding at such time.

(b)    Amounts borrowed pursuant to this Section 2.01 may be repaid and, subject to the terms and conditions of this Agreement, reborrowed at any time during the term of this Agreement. The outstanding principal amount of the Revolving Loans, together with interest accrued and unpaid thereon, shall constitute Obligations and shall be due and payable on the Maturity Date or, if earlier, on the date on which they otherwise become due and payable pursuant to the terms of this Agreement.

(c)    Anything to the contrary in this Section 2.01 notwithstanding, Administrative Agent shall have the right (but not the obligation) at any time, in the exercise of its Permitted Discretion, to establish and increase or decrease Reserves and against the Borrowing Base or the Maximum Revolver Amount.  The amount of any Reserve established by Administrative Agent, and any changes to the eligibility criteria set forth in the definitions of Eligible Accounts and Eligible Inventory shall have a reasonable relationship to the event, condition, other circumstance, or fact that is the basis for such reserve or change in eligibility and shall not be duplicative of any other reserve established and currently maintained or eligibility criteria.  Upon notice of or establishment or increase in Reserves, Administrative Agent agrees to make itself available to discuss the Reserve or increase, and Borrower may take such action as may be required so that the event, condition, circumstance, or fact that is the basis for such reserve or increase no longer exists, in a manner and to the extent reasonably satisfactory to Administrative Agent in the exercise of its Permitted Discretion.  In no event shall such notice and opportunity limit the right of Administrative Agent to establish or change such Reserve, unless Administrative Agent shall have determined, in its Permitted Discretion, that the event, condition, other circumstance, or fact that was the basis for such Reserve or such change no longer exists or has otherwise been adequately addressed by Borrower.

**Section 2.02    [Reserved]**.

**Section 2.03    Borrowing Procedures and Settlements.**

54

6237404.15

(a)    **Procedure for Borrowing Revolving Loans**.  Each Borrowing shall be made by a written request by an Authorized Person delivered to Administrative Agent (which may be delivered through Administrative Agent's electronic platform or portal) and received by Administrative Agent no later than ~~11~~12:00 ~~a~~p.m. (i) on the Business Day that is the requested Funding Date in the case of a request for a Swing Loan, (ii) on the Business Day that is one (1) Business Day prior to the requested Funding Date in the case of a request for a Base Rate Loan, and (iii) on the Business Day that is three (3) Business Days prior to the requested Funding Date in the case of all other requests, specifying (A) the amount of such Borrowing, and (B) the requested Funding Date (which shall be a Business Day); provided, that Administrative Agent may, in its sole discretion, elect to accept as timely requests that are received later than ~~11~~12:00 ~~a~~p.m. on the applicable Business Day.  All Borrowing requests which are not made on-line via Administrative Agent's electronic platform or portal shall be subject to (and unless Administrative Agent elects otherwise in the exercise of its sole discretion, such Borrowings shall not be made until the completion of) Administrative Agent's authentication process (with results satisfactory to Administrative Agent) prior to the funding of any such requested Revolving Loan.

(b)    **Making of Swing Loans**.  In the case of a Revolving Loan and so long as any of (i) the aggregate amount of Swing Loans made since the last Settlement Date, *minus* all payments or other amounts applied to Swing Loans since the last Settlement Date, *plus* the amount of the requested Swing Loan does not exceed $3,000,000, or (ii) Swing Lender, in its sole discretion, agrees to make a Swing Loan notwithstanding the foregoing limitation, Swing Lender shall make a Revolving Loan (any such Revolving Loan made by Swing Lender pursuant to this Section 2.03(b) being referred to as a **"Swing Loan"** and all such Revolving Loans being referred to as "**Swing Loans**") available to Borrower on the Funding Date applicable thereto by transferring immediately available funds in the amount of such Borrowing to the Designated Account.  Each Swing Loan shall be deemed to be a Revolving Loan hereunder and shall be subject to all the terms and conditions (including Article IV) applicable to other Revolving Loans, except that all payments (including interest) on any Swing Loan shall be payable to Swing Lender solely for its own account.  Subject to the provisions of Section 2.03(d)(ii), Swing Lender shall not make and shall not be obligated to make any Swing Loan if Swing Lender has actual knowledge that (i) one or more of the applicable conditions precedent set forth in Article IV will not be satisfied on the requested Funding Date for the applicable Borrowing, or (ii) the requested Borrowing would exceed the Availability on such Funding Date.  Swing Lender shall not otherwise be required to determine whether the applicable conditions precedent set forth in Article IV have been satisfied on the Funding Date applicable thereto prior to making any Swing Loan.  The Swing Loans shall be secured by Administrative Agent's Liens, constitute Revolving Loans and Obligations, and bear interest at the rate applicable from time to time to Revolving Loans that are Base Rate Loans.

(c)    **Making of Revolving Loans**.

(i)    In the event that Swing Lender is not obligated to make a Swing Loan, then after receipt of a request for a Borrowing pursuant to Section 2.03(a)(i), Administrative Agent shall notify the Lenders by telecopy, telephone, email, or other electronic form of transmission, of the requested Borrowing; such notification to be sent on the Business Day that is (A) in the case of a Base Rate Loan, at least one (1) Business Day prior to the requested Funding Date, or (B) in the case of a LIBOR Rate Loan, prior to 11:00 a.m. at least three (3) Business Days prior to the requested Funding Date.  If Administrative Agent has notified the Lenders of a requested Borrowing on the Business Day that is one (1) Business Day prior to the Funding Date, then each Lender shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Administrative Agent in immediately available funds, to Administrative Agent's Account, not later than 10:00 a.m. on the Business Day that is the requested Funding Date.  After Administrative Agent's receipt of the proceeds of such Revolving Loans from the Lenders, Administrative Agent shall make the proceeds thereof available to Borrower on the applicable Funding Date by transferring immediately available funds equal to such proceeds received

55

6237404.15

by Administrative Agent to the Designated Account; <u>provided</u>, that subject to the provisions of <u>Section 2.03(d)(ii)</u>, no Lender shall have an obligation to make any Revolving Loan, if (1) one or more of the applicable conditions precedent set forth in <u>Article IV</u> will not be satisfied on the requested Funding Date for the applicable Borrowing unless such condition has been waived, or (2) the requested Borrowing would exceed the Availability on such Funding Date.

(ii)    Unless Administrative Agent receives notice from a Lender prior to 9:30 a.m. on the Business Day that is the requested Funding Date relative to a requested Borrowing as to which Administrative Agent has notified the Lenders of a requested Borrowing that such Lender will not make available as and when required hereunder to Administrative Agent for the account of Borrower the amount of that Lender's Pro Rata Share of the Borrowing, Administrative Agent may assume that each Lender has made or will make such amount available to Administrative Agent in immediately available funds on the Funding Date and Administrative Agent may (but shall not be so required), in reliance upon such assumption, make available to Borrower a corresponding amount.  If, on the requested Funding Date, any Lender shall not have remitted the full amount that it is required to make available to Administrative Agent in immediately available funds and if Administrative Agent has made available to Borrower such amount on the requested Funding Date, then such Lender shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Administrative Agent in immediately available funds, to Administrative Agent's Account, no later than 10:00 a.m. on the Business Day that is the first Business Day after the requested Funding Date (in which case, the interest accrued on such Lender's portion of such Borrowing for the Funding Date shall be for Administrative Agent's separate account).  If any Lender shall not remit the full amount that it is required to make available to Administrative Agent in immediately available funds as and when required hereby and if Administrative Agent has made available to Borrower such amount, then that Lender shall be obligated to immediately remit such amount to Administrative Agent, together with interest at the Defaulting Lender Rate for each day until the date on which such amount is so remitted.  A notice submitted by Administrative Agent to any Lender with respect to amounts owing under this <u>Section 2.03(c)(ii)</u> shall be conclusive, absent manifest error.  If the amount that a Lender is required to remit is made available to Administrative Agent, then such payment to Administrative Agent shall constitute such Lender's Revolving Loan for all purposes of this Agreement.  If such amount is not made available to Administrative Agent on the Business Day following the Funding Date, Administrative Agent will notify Borrower of such failure to fund and, upon demand by Administrative Agent, Borrower shall pay such amount to Administrative Agent for Administrative Agent's account, together with interest thereon for each day elapsed since the date of such Borrowing, at a rate per annum equal to the interest rate applicable at the time to the Revolving Loans composing such Borrowing.

(d)    **Protective Advances and Optional Overadvances**.

(i)    Any contrary provision of this Agreement or any other Loan Document notwithstanding (but subject to <u>Section 2.03(d)(iv)</u>), at any time (A) after the occurrence and during the continuance of a Default or an Event of Default, or (B) that any of the other applicable conditions precedent set forth in <u>Article IV</u> are not satisfied, Administrative Agent hereby is authorized by Borrower and the Lenders, from time to time, in Administrative Agent's sole discretion, to make Revolving Loans to, or for the benefit of, Borrower, on behalf of the Revolving Lenders, that Administrative Agent, in its Permitted Discretion, deems necessary or desirable (1) to preserve or protect the Collateral, or any portion thereof, or (2) to enhance the likelihood of repayment of the Obligations (other than the Bank Product Obligations) (the Revolving Loans described in this <u>Section 2.03(d)(i)</u> shall be referred to as "**Protective Advances**~~").~~"); provided, that, notwithstanding the foregoing, the aggregate amount of all Protective Advances outstanding at any one time shall not exceed 10% of the Borrowing Base.

56

6237404.15

(ii)        Any contrary provision of this Agreement or any other Loan Document notwithstanding, the Lenders hereby authorize Administrative Agent or Swing Lender, as applicable, and either Administrative Agent or Swing Lender, as applicable, may, but is not obligated to, knowingly and intentionally, continue to make Revolving Loans (including Swing Loans) to Borrower notwithstanding that an Overadvance exists or would be created thereby, so long as (A) after giving effect to such Revolving Loans, the outstanding Revolver Usage does not exceed the Borrowing Base by more than 10% of the Borrowing Base, and (B) subject to Section 2.03(d)(iv) below, after giving effect to such Revolving Loans, the outstanding Revolver Usage (except for and excluding amounts charged to the Loan Account for interest, fees, or Lender Group Expenses) does not exceed the Maximum Revolver Amount. In the event Administrative Agent obtains actual knowledge that the Revolver Usage exceeds the amounts permitted by this Section 2.03(d), regardless of the amount of, or reason for, such excess, Administrative Agent shall notify the Lenders as soon as practicable (and prior to making any (or any additional) intentional Overadvances (except for and excluding amounts charged to the Loan Account for interest, fees, or Lender Group Expenses) unless Administrative Agent determines that prior notice would result in imminent harm to the Collateral or its value, in which case Administrative Agent may make such Overadvances and provide notice as promptly as practicable thereafter), and the Lenders with Revolver Commitments thereupon shall, together with Administrative Agent, jointly determine the terms of arrangements that shall be implemented with Borrower intended to reduce, within a reasonable time, the outstanding principal amount of the Revolving Loans to Borrower to an amount permitted by the preceding sentence.  In such circumstances, if any Lender with a Revolver Commitment objects to the proposed terms of reduction or repayment of any Overadvance, the terms of reduction or repayment thereof shall be implemented according to the determination of the Required Lenders.  The foregoing provisions are meant for the benefit of the Lenders and Administrative Agent and are not meant for the benefit of Borrower, which shall continue to be bound by the provisions of Section 2.04(e)(1).

(iii)        Each  Protective  Advance  and  each  Overadvance  (each,  an "**Extraordinary Advance**") shall be deemed to be a Revolving Loan hereunder, except that no Extraordinary Advance shall be eligible to be a LIBOR Rate Loan.  Prior to Settlement of any Extraordinary Advance, all payments with respect thereto, including interest thereon, shall be payable to Administrative Agent solely for its own account. Each Revolving Lender shall be obligated to settle with Administrative Agent as provided in Section 2.03(e) (or Section 2.03(g), as applicable) for the amount of such Lender's Pro Rata Share of any Extraordinary Advance.  The Extraordinary Advances shall be repayable on demand, secured by Administrative Agent's Liens, constitute Obligations hereunder, and bear interest at the rate applicable from time to time to Revolving Loans that are Base Rate Loans.  The provisions of this Section 2.03(d) are for the exclusive benefit of Administrative Agent, Swing Lender, and the Lenders and are not intended to benefit Borrower (or any other Loan Party) in any way.

(iv)        Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, no Extraordinary Advance may be made by Administrative Agent if such Extraordinary Advance would cause the aggregate Revolver Usage to exceed the Maximum Revolver Amount or any Lender's Pro Rata Share of the Revolver Usage to exceed such Lender's Revolver Commitments; provided that Administrative Agent may make Extraordinary Advances in excess of the foregoing limitations so long as such Extraordinary Advances that cause the aggregate Revolver Usage to exceed the Maximum Revolver Amount or a Lender's Pro Rata Share of the Revolver Usage to exceed such Lender's Revolver Commitments are for Administrative Agent's sole and separate account and not for the account of any Lender.  No Lender shall have an obligation to settle with Administrative Agent for such Extraordinary Advances that cause the aggregate Revolver Usage to exceed the Maximum Revolver Amount or a Lender's Pro Rata Share of the Revolver Usage to exceed such Lender's Revolver Commitments as provided in Section 2.03(e) (or Section 2.03(g), as applicable).

6237404.15

(e)      **Settlement**.  It is agreed that each Lender's funded portion of the Revolving Loans is intended by the Lenders to equal, at all times, such Lender's Pro Rata Share of the outstanding Revolving Loans.  Such agreement notwithstanding, Administrative Agent, Swing Lender, and the other Lenders agree (which agreement shall not be for the benefit of Borrower) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among the Lenders as to the Revolving Loans (including Swing Loans and Extraordinary Advances) shall take place on a periodic basis in accordance with the following provisions:

(i)      Administrative Agent shall request settlement ("**Settlement**") with the Lenders on a weekly basis, or on a more frequent basis if so determined by Administrative Agent in its sole discretion (1) on behalf of Swing Lender, with respect to the outstanding Swing Loans, (2) for itself, with respect to the outstanding Extraordinary Advances, and (3) with respect to any Loan Party's or any of their Subsidiaries' payments or other amounts received, as to each by notifying the Lenders by telecopy, telephone, or other similar form of transmission, of such requested Settlement, no later than 2:00 p.m. on the Business Day immediately prior to the date of such requested Settlement (the date of such requested Settlement being the "**Settlement Date**").  Such notice of a Settlement Date shall include a summary statement of the amount of outstanding Revolving Loans (including Swing Loans and Extraordinary Advances) for the period since the prior Settlement Date.  Subject to the terms and conditions contained herein (including Section 2.03(g)):  (y) if the amount of the Revolving Loans (including Swing Loans and Extraordinary Advances) made by a Lender that is not a Defaulting Lender exceeds such Lender's Pro Rata Share of the Revolving Loans (including Swing Loans and Extraordinary Advances) as of a Settlement Date, then Administrative Agent shall, by no later than 12:00 p.m. on the Settlement Date, transfer in immediately available funds to a Deposit Account of such Lender (as such Lender may designate), an amount such that each such Lender shall, upon receipt of such amount, have as of the Settlement Date, its Pro Rata Share of the Revolving Loans (including Swing Loans and Extraordinary Advances), and (z) if the amount of the Revolving Loans (including Swing Loans and Extraordinary Advances) made by a Lender is less than such Lender's Pro Rata Share of the Revolving Loans (including Swing Loans and Extraordinary Advances) as of a Settlement Date, such Lender shall no later than 12:00 p.m. on the Settlement Date transfer in immediately available funds to Administrative Agent's Account, an amount such that each such Lender shall, upon transfer of such amount, have as of the Settlement Date, its Pro Rata Share of the Revolving Loans (including Swing Loans and Extraordinary Advances).  Such amounts made available to Administrative Agent under clause (z) of the immediately preceding sentence shall be applied against the amounts of the applicable Swing Loans or Extraordinary Advances and, together with the portion of such Swing Loans or Extraordinary Advances representing Swing Lender's Pro Rata Share thereof, shall constitute Revolving Loans of such Lenders. If any such amount is not made available to Administrative Agent by any Lender on the Settlement Date applicable thereto to the extent required by the terms hereof, Administrative Agent shall be entitled to recover for its account such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate.

(ii)      In determining whether a Lender's balance of the Revolving Loans (including Swing Loans and Extraordinary Advances) is less than, equal to, or greater than such Lender's Pro Rata Share of the Revolving Loans (including Swing Loans and Extraordinary Advances) as of a Settlement Date, Administrative Agent shall, as part of the relevant Settlement, apply to such balance the portion of payments actually received in good funds by Administrative Agent with respect to principal, interest, fees payable by Borrower and allocable to the Lenders hereunder, and proceeds of Collateral.

(iii)      Between Settlement Dates, Administrative Agent, to the extent Extraordinary Advances or Swing Loans are outstanding, may pay over to Administrative Agent or Swing Lender, as applicable, any payments or other amounts received by Administrative Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the Revolving Loans,

58

6237404.15

for application to the Extraordinary Advances or Swing Loans.   Between Settlement Dates, Administrative Agent, to the extent no Extraordinary Advances or Swing Loans are outstanding, may pay over to Swing Lender any payments or other amounts received by Administrative Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the Revolving Loans, for application to Swing Lender's Pro Rata Share of the Revolving Loans.  If, as of any Settlement Date, payments or other amounts of the Loan Parties or their Subsidiaries received since the then immediately preceding Settlement Date have been applied to Swing Lender's Pro Rata Share of the Revolving Loans other than to Swing Loans, as provided for in the previous sentence, Swing Lender shall pay to Administrative Agent for the accounts of the Lenders, and Administrative Agent shall pay to the Lenders (other than a Defaulting Lender if Administrative Agent has implemented the provisions of Section 2.03(g)), to be applied to the outstanding Revolving Loans of such Lenders, an amount such that each such Lender shall, upon receipt of such amount, have, as of such Settlement Date, its Pro Rata Share of the Revolving Loans.  During the period between Settlement Dates, Swing Lender with respect to Swing Loans, Administrative Agent with respect to Extraordinary Advances, and each Lender with respect to the Revolving Loans other than Swing Loans and Extraordinary Advances, shall be entitled to interest at the applicable rate or rates payable under this Agreement on the daily amount of funds employed by Swing Lender, Administrative Agent, or the Lenders, as applicable.

(iv)      Anything in this Section 2.03(e) to the contrary notwithstanding, in the event that a Lender is a Defaulting Lender, Administrative Agent shall be entitled to refrain from remitting settlement amounts to the Defaulting Lender and, instead, shall be entitled to elect to implement the provisions set forth in Section 2.03(g).

(f)      **Notation**.  Consistent with Section 10.07(d), Administrative Agent, as a non-fiduciary agent for Borrower, shall maintain a register showing the principal amount and stated interest of the Revolving Loans (and portion of the Revolving Loan, as applicable), owing to each Lender, including the Swing Loans owing to Swing Lender, and Extraordinary Advances owing to Administrative Agent, and the interests therein of each Lender, from time to time and such register shall, absent manifest error, conclusively be presumed to be correct and accurate.

(g)      **Defaulting Lenders**.

(i)      Notwithstanding the provisions of Section 2.04(b)(iii), Administrative Agent shall not be obligated to transfer to a Defaulting Lender any payments made by Borrower to Administrative Agent for the Defaulting Lender's benefit or any proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, Administrative Agent shall transfer any such payments (A) first, to Administrative Agent to the extent of any Extraordinary Advances that were made by Administrative Agent and that were required to be, but were not, paid by Defaulting Lender, (B) second, to Swing Lender to the extent of any Swing Loans that were made by Swing Lender and that were required to be, but were not, paid by the Defaulting Lender, (C) third, to Issuing Bank, to the extent of the portion of a Letter of Credit Disbursement that was required to be, but was not, paid by the Defaulting Lender, (D) fourth, to each Non-Defaulting Lender ratably in accordance with their Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of a Revolving Loan (or other funding obligation) was funded by such other Non-Defaulting Lender), (E) fifth, in Administrative Agent's sole discretion, to a suspense account maintained by Administrative Agent, the proceeds of which shall be retained by Administrative Agent and may be made available to be re-advanced to or for the benefit of Borrower (upon the request of Borrower and subject to the conditions set forth in Section 4.02) as if such Defaulting Lender had made its portion of Revolving Loans (or other funding obligations) hereunder, and (F) sixth, from and after the date on which all other Obligations have been paid in full, to such Defaulting Lender in accordance with tier (L) of Section 2.04(b)(iii).  Subject to the foregoing, Administrative Agent may hold

59

and, in its discretion, re-lend to Borrower for the account of such Defaulting Lender the amount of all such payments received and retained by Administrative Agent for the account of such Defaulting Lender. Solely for the purposes of voting or consenting to matters with respect to the Loan Documents (including the calculation of Pro Rata Share in connection therewith) and for the purpose of calculating the fee payable under Section 2.10(b), such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero; provided, that the foregoing shall not apply to any of the matters governed by Section 10.01[( )](a) through [( )].(c). The provisions of this Section 2.03(g) shall remain effective with respect to such Defaulting Lender until the earlier of (y) the date on which all of the Non-Defaulting Lenders, Administrative Agent, Issuing Bank, and Borrower shall have waived, in writing, the application of this Section 2.03(g) to such Defaulting Lender, or (z) the date on which such Defaulting Lender makes payment of all amounts that it was obligated to fund hereunder, pays to Administrative Agent all amounts owing by Defaulting Lender in respect of the amounts that it was obligated to fund hereunder, and, if requested by Administrative Agent, provides adequate assurance of its ability to perform its future obligations hereunder (on which earlier date, so long as no Event of Default has occurred and is continuing, any remaining cash collateral held by Administrative Agent pursuant to Section 2.03(g)(ii) shall be released to Borrower). The operation of this Section 2.03(g) shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by Borrower of its duties and obligations hereunder to Administrative Agent, Issuing Bank, or to the Lenders other than such Defaulting Lender. Any failure by a Defaulting Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle Borrower, at their option, upon written notice to Administrative Agent, to arrange for a substitute Lender to assume the Commitment of such Defaulting Lender, such substitute Lender to be reasonably acceptable to Administrative Agent. In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Acceptance in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being paid its share of the outstanding Obligations (other than Bank Product Obligations, but including (1) all interest, fees, and other amounts that may be due and payable in respect thereof, and (2) an assumption of its Pro Rata Share of its participation in the Letters of Credit); provided, that any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Lender Groups' or Borrower's rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund. In the event of a direct conflict between the priority provisions of this Section 2.03(g) and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.03(g) shall control and govern.

(ii)    If any Swing Loan or Letter of Credit is outstanding at the time that a Lender becomes a Defaulting Lender then:

(A)    such Defaulting Lender's Swing Loan Exposure and Letter of Credit Exposure shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Pro Rata Shares but only to the extent (x) the sum of all Non-Defaulting Lenders' Pro Rata Share of Revolver Usage plus such Defaulting Lender's Swing Loan Exposure and Letter of Credit Exposure does not exceed the total of all Non-Defaulting Lenders' Revolver Commitments and (y) the conditions set forth in Section 4.02 are satisfied at such time;

(B)    if the reallocation described in clause (A) above cannot, or can only partially, be effected, Borrower shall within one (1) Business Day following notice by the

60

6237404.15

Administrative Agent (x) first, prepay such Defaulting Lender's Swing Loan Exposure (after giving effect to any partial reallocation pursuant to clause (A) above), and (y) second, cash collateralize such Defaulting Lender's Letter of Credit Exposure (after giving effect to any partial reallocation pursuant to clause (A) above), pursuant to a cash collateral agreement to be entered into in form and substance reasonably satisfactory to the Administrative Agent, for so long as such Letter of Credit Exposure is outstanding; provided, that Borrower shall not be obligated to cash collateralize any Defaulting Lender's Letter of Credit Exposure if such Defaulting Lender is also Issuing Bank;

(C)    if Borrower cash collateralizes any portion of such Defaulting Lender's Letter of Credit Exposure pursuant to this Section 2.03(g)(ii), Borrower shall not be required to pay any Letter of Credit Fees to Administrative Agent for the account of such Defaulting Lender pursuant to Section 2.06(b) with respect to such cash collateralized portion of such Defaulting Lender's Letter of Credit Exposure during the period such Letter of Credit Exposure is cash collateralized;

(D)    to the extent the Letter of Credit Exposure of the Non-Defaulting Lenders is reallocated pursuant to this Section 2.03(g)(ii), then the Letter of Credit Fees payable to the Non-Defaulting Lenders pursuant to Section 2.06(b) shall be adjusted in accordance with such Non-Defaulting Lenders' Letter of Credit Exposure;

(E)    to the extent any Defaulting Lender's Letter of Credit Exposure is neither cash collateralized nor reallocated pursuant to this Section 2.03(g)(ii), then, without prejudice to any rights or remedies of Issuing Bank or any Lender hereunder, all Letter of Credit Fees that would have otherwise been payable to such Defaulting Lender under Section 2.06(b) with respect to such portion of such Letter of Credit Exposure shall instead be payable to Issuing Bank until such portion of such Defaulting Lender's Letter of Credit Exposure is cash collateralized or reallocated;

(F)    so long as any Lender is a Defaulting Lender, the Swing Lender shall not be required to make any Swing Loan and Issuing Bank shall not be required to issue, amend, or increase any Letter of Credit, in each case, to the extent (x) the Defaulting Lender's Pro Rata Share of such Swing Loans or Letter of Credit cannot be reallocated pursuant to this Section 2.03(g)(ii), or (y) the Swing Lender or Issuing Bank, as applicable, has not otherwise entered into arrangements reasonably satisfactory to the Swing Lender or Issuing Bank, as applicable, and Borrower to eliminate the Swing Lender's or Issuing Bank's risk with respect to the Defaulting Lender's participation in Swing Loans or Letters of Credit; and

(G)    Administrative Agent may release any cash collateral provided by Borrower pursuant to this Section 2.03(g)(ii) to Issuing Bank and Issuing Bank may apply any such cash collateral to the payment of such Defaulting Lender's Pro Rata Share of any Letter of Credit Disbursement that is not reimbursed by Borrower pursuant to Section 2.11(d).  Subject to Section 10.14, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(h)    **Independent Obligations**.  All Revolving Loans (other than Swing Loans and Extraordinary Advances) shall be made by the Lenders contemporaneously and in accordance with their Pro Rata Shares.  It is understood that (i) no Lender shall be responsible for any failure by any other Lender to perform its obligation to make any Revolving Loan (or other extension of credit) hereunder, nor shall any Commitment of any Lender be increased or decreased as a result of any failure by any other Lender to perform its obligations hereunder, and (ii) no failure by any Lender to perform its obligations hereunder shall excuse any other Lender from its obligations hereunder.

61

6237404.15

**Section 2.04**      **Payments; Reductions of Commitments; Prepayments.**

(a)      **Payments by Borrower**.

(i)      Except as otherwise expressly provided herein, all payments by Borrower shall be made to Administrative Agent's Account for the account of the Lender Group and shall be made in immediately available funds, no later than 1:30 p.m. on the date specified herein; provided that, for the avoidance of doubt, any payments deposited into a Controlled Account shall be deemed not to be received by Administrative Agent on any Business Day unless immediately available funds have been credited to Administrative Agent's Account prior to 1:30 p.m. on such Business Day.  Any payment received by Administrative Agent in immediately available funds in Administrative Agent's Account later than 1:30 p.m. shall be deemed to have been received (unless Administrative Agent, in its sole discretion, elects to credit it on the date received) on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(ii)      Unless Administrative Agent receives notice from Borrower prior to the date on which any payment is due to the Lenders that Borrower will not make such payment in full as and when required, Administrative Agent may assume that Borrower has made (or will make) such payment in full to Administrative Agent on such date in immediately available funds and Administrative Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent Borrower does not make such payment in full to Administrative Agent on the date when due, each Lender severally shall repay to Administrative Agent on demand such amount distributed to such Lender, together with interest thereon at the Defaulting Lender Rate for each day from the date such amount is distributed to such Lender until the date repaid.

(b)      **Apportionment and Application**.

(i)      So long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, all principal and interest payments received by Administrative Agent shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the Obligations to which such payments relate held by each Lender) and all payments of fees and expenses received by Administrative Agent (other than fees or expenses that are for Administrative Agent's separate account or for the separate account of Issuing Bank) shall be apportioned ratably among the Lenders having a Pro Rata Share of the type of Commitment or Obligation to which a particular fee or expense relates.

(ii)      Subject to Section 2.04(b)(v), Section 2.04(d)(ii), and Section 2.04(e), all payments to be made hereunder by Borrower shall be remitted to Administrative Agent and all such payments, and all proceeds of Collateral received by Administrative Agent, shall be applied, so long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, to reduce the balance of the Loans outstanding and, thereafter, to Borrower (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

(iii)      At any time that an Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, all payments remitted to Administrative Agent and all proceeds of Collateral received by Administrative Agent shall be applied as follows:

(A)      first, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to Administrative Agent under the Loan Documents

62

6237404.15

and to pay interest and principal on Extraordinary Advances that are held solely by Administrative Agent pursuant to the terms of Section 2.04(d)(iv), until paid in full,

    (B)  second, to pay any fees or premiums then due to Administrative Agent under the Loan Documents, until paid in full,

    (C)  third, to pay interest due in respect of all Protective Advances, until paid in full,

    (D)  fourth, to pay the principal of all Protective Advances, until paid in full,

    (E)  fifth, ratably, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to any of the Lenders under the Loan Documents, until paid in full,

    (F)  sixth, ratably, to pay any fees or premiums then due to any of the Lenders under the Loan Documents, until paid in full,

    (G)  seventh, to pay interest accrued in respect of the Swing Loans, until paid in full,

    (H)  eighth, to pay the principal of all Swing Loans, until paid in full,

    (I)  ninth, ratably, to pay interest accrued in respect of the Loans (other than Protective Advances and Swing Loans), until paid in full,

    (J)  tenth, ratably

     i.  ratably, to pay the principal of all Loans (other than Protective Advances and Swing Loans), until paid in full,

     ii.  to Administrative Agent, to be held by Administrative Agent, for the benefit of Issuing Bank (and for the ratable benefit of each of the Lenders that have an obligation to pay to Administrative Agent, for the account of Issuing Bank, a share of each Letter of Credit Disbursement), as cash collateral in an amount up to 105% of the Letter of Credit Usage (to the extent permitted by applicable law, such cash collateral shall be applied to the reimbursement of any Letter of Credit Disbursement as and when such disbursement occurs and, if a Letter of Credit expires undrawn, the cash collateral held by Administrative Agent in respect of such Letter of Credit shall, to the extent permitted by applicable law, be reapplied pursuant to this Section 2.04(b)(iii), beginning with tier (A) hereof),

     iii.  ratably, up to the amount (after taking into account any amounts previously paid pursuant to this clause iii. during the continuation of the applicable Application Event) of the most recently established Bank Product Reserve, which amount was established prior to the occurrence of, and not in contemplation of, the subject Application Event, to (y) the Bank Product Providers based upon amounts then certified by each applicable Bank Product Provider to Administrative Agent (in form and substance satisfactory to Administrative Agent) to be due and payable to such Bank Product Provider on account of Bank Product Obligations (but not in excess of the Bank Product Reserve established for the Bank Product Obligations of such Bank Product Provider), and (z) with any balance to be paid to Administrative Agent, to be held by Administrative Agent, for the ratable benefit of the Bank Product Providers, as cash collateral (which cash collateral may be released by

6237404.15

Administrative Agent to the applicable Bank Product Provider and applied by such Bank Product Provider to the payment or reimbursement of any amounts due and payable with respect to Bank Product Obligations owed to the applicable Bank Product Provider as and when such amounts first become due and payable and, if and at such time as all such Bank Product Obligations are paid or otherwise satisfied in full, the cash collateral held by Administrative Agent in respect of such Bank Product Obligations shall be reapplied pursuant to this Section 2.04(b)(iii), beginning with tier (A) hereof,).

       (K)    eleventh, to pay any other Obligations other than Obligations owed to Defaulting Lenders (including being paid, ratably, to the Bank Product Providers on account of all amounts then due and payable in respect of Bank Product Obligations,)., with any balance to be paid to Administrative Agent, to be held by Administrative Agent, for the ratable benefit of the Bank Product Providers, as cash collateral (which cash collateral may be released by Administrative Agent to the applicable Bank Product Provider and applied by such Bank Product Provider to the payment or reimbursement of any amounts due and payable with respect to Bank Product Obligations owed to the applicable Bank Product Provider as and when such amounts first become due and payable and, if and at such time as all such Bank Product Obligations are paid or otherwise satisfied in full, the cash collateral held by Administrative Agent in respect of such Bank Product Obligations shall be reapplied pursuant to this Section 2.04(b)(iii), beginning with tier (A) hereof),

       (L)    twelfth, ratably to pay any Obligations owed to Defaulting Lenders; and

       (M)    thirteenth, to Borrower (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

       (iv)    Administrative Agent promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from each Lender in writing, such funds as it may be entitled to receive, subject to a Settlement delay as provided in Section 2.03(e).

       (v)    In each instance, so long as no Application Event has occurred and is continuing, Section 2.04(b)(ii) shall not apply to any payment made by Borrower to Administrative Agent and specified by Borrower to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement or any other Loan Document.

       (vi)    For purposes of Section 2.04(b)(iii), "paid in full" of a type of Obligation means payment in cash or immediately available funds of all amounts owing on account of such type of Obligation, including interest accrued after the commencement of any Insolvency Proceeding, default interest, interest on interest, and expense reimbursements, irrespective of whether any of the foregoing would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

       (vii)    In the event of a direct conflict between the priority provisions of this Section 2.04 and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, if the conflict relates to the provisions of Section 2.03(g) and this Section 2.04, then the provisions of Section 2.03(g) shall control and govern, and if otherwise, then the terms and provisions of this Section 2.04 shall control and govern.

       (c)    **Reduction of Commitments**.  The Commitments shall terminate on the Maturity Date or earlier termination thereof pursuant to the terms of this Agreement.  Borrower may reduce the Commitments, without premium or penalty, to an amount (which may be zero) not less than the sum of (A) the Revolver Usage as of such date, *plus* (B) the principal amount of all Loans not yet made as to

64

which a request has been given by Borrower under Section 2.03(a), *plus* (C) the amount of all Letters of Credit not yet issued as to which a request has been given by Borrower pursuant to Section 2.11(a). Each such reduction shall be in an amount which is not less than $1,000,000 (unless the Commitments are being reduced to zero and the amount of the Commitments in effect immediately prior to such reduction are less than $1,000,000), shall be made by providing not less than ten (10) Business Days prior written notice to Administrative Agent, and shall be irrevocable. The Commitments, once reduced, may not be increased. Each such reduction of the Commitments shall reduce the Commitments of each Lender proportionately in accordance with its ratable share thereof. In connection with any reduction in the Commitments prior to the Maturity Date, if any Loan Party or any of its Subsidiaries owns any Margin Stock, Borrower shall deliver to Administrative Agent an updated Form U-1 (with sufficient additional originals thereof for each Lender), duly executed and delivered by the Borrower, together with such other documentation as Administrative Agent shall reasonably request, in order to enable Administrative Agent and the Lenders to comply with any of the requirements under Regulations T, U or X of the Federal Reserve Board.

(d)     **Optional Prepayments**. Borrower may prepay the principal of any Loan at any time in whole or in part, without premium or penalty.

(e)     **Mandatory Prepayments**. If, at any time, (A) the Revolver Usage on such date exceeds (B) the lesser of (x) the Borrowing Base reflected in the Borrowing Base Certificate most recently delivered by Borrower to Administrative Agent, or (y) the Maximum Revolver Amount, in all cases as adjusted for Reserves established by Administrative Agent in accordance with Section 2.01(c), then Borrower shall immediately prepay the Obligations in accordance with Section 2.04(f) in an aggregate amount equal to the amount of such excess.

(f)     **Application of Payments**. Each prepayment pursuant to Section 2.04(e) shall, (1) so long as no Application Event shall have occurred and be continuing, be applied, *first*, to the outstanding principal amount of the Loans until paid in full, and *second*, to cash collateralize the Letters of Credit in an amount equal to 105% of the then outstanding Letter of Credit Usage, and (2) if an Application Event shall have occurred and be continuing, be applied in the manner set forth in Section 2.04(b)(iii).

**Section 2.05     Promise to Pay; Promissory Notes.**

(a)     Borrower agrees to pay the Lender Group Expenses on the earlier of (i) the first day of the month following the date on which the applicable Lender Group Expenses were first incurred, or (ii) the date on which demand therefor is made by Administrative Agent (it being acknowledged and agreed that any charging of such costs, expenses or Lender Group Expenses to the Loan Account pursuant to the provisions of Section 2.06(d) shall be deemed to constitute a demand for payment thereof for the purposes of this subclause (ii)). Borrower promises to pay all of the Obligations (including principal, interest, premiums, if any, fees, costs, and expenses (including Lender Group Expenses)) in full on the Maturity Date or, if earlier, on the date on which the Obligations (other than the Bank Product Obligations) become due and payable pursuant to the terms of this Agreement. Borrower agrees that its obligations contained in the first sentence of this Section 2.05(a) shall survive payment or satisfaction in full of all other Obligations.

(b)     Any Lender may request that any portion of its Commitments or the Loans made by it be evidenced by one or more promissory notes in form and substance satisfactory to the Administrative Agent (each, a "**Note**"). In such event, Borrower shall execute and deliver to such Lender the requested promissory notes payable to the order of such Lender in a form furnished by Administrative Agent and reasonably satisfactory to Borrower. Thereafter, the portion of the Commitments and Loans

65

6237404.15

evidenced by such promissory notes and interest thereon shall at all times be represented by one or more promissory notes in such form payable to the order of the payee named therein.

### Section 2.06    Interest Rates and Letter of Credit Fee:  Rates, Payments, and Calculations.

(a)    **Interest Rates**.  Except as provided in Section 2.06(c) and Section 2.12(d), all Obligations (except for undrawn Letters of Credit) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest as follows:

(i)    if the relevant Obligation is a LIBOR Rate Loan, at a *per annum* rate equal to the LIBOR Rate *plus* the Applicable Margin for LIBOR Rate Loans, and

(ii)    otherwise, at a *per annum* rate equal to the Base Rate *plus* the Applicable Margin for Base Rate Loans.

(b)    **Letter of Credit Fee**.  Borrower shall pay Administrative Agent (for the ratable benefit of the Lenders), a Letter of Credit fee (the "**Letter of Credit Fee**") (which fee shall be in addition to the fronting fees and commissions, other fees, charges and expenses set forth in Section 2.11(k)) that shall accrue at a *per annum* rate equal to the product of (i) Applicable Margin for LIBOR Rate Loans *plus 0.75% times* (ii) the average amount of the Letter of Credit Usage during the immediately preceding quarter (or if an Event of Default has occurred, month).

(c)    **Default Rate**.  (i) Automatically upon the occurrence and during the continuation of an Event of Default under Section 8.01(f) and (ii) upon the occurrence and during the continuation of any other Event of Default (other than an Event of Default under Section 8.01(f)), at the direction of Administrative Agent or the Required Lenders, and upon written notice by Administrative Agent to Borrower of such direction (provided, that such notice shall not be required for any Event of Default under Section 8.01), (A) all Loans and all Obligations (except for undrawn Letters of Credit) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest at a *per annum* rate equal to two (2) percentage points above the per annum rate otherwise applicable thereunder, and (B) the Letter of Credit Fee shall be increased to two (2) percentage points above the *per annum* rate otherwise applicable hereunder.

(d)    **Payment**.  Except to the extent provided to the contrary in Section 2.10, Section 2.11(k) or Section 2.12(a), (i) all interest and all other fees payable hereunder or under any of the other Loan Documents (other than Letter of Credit Fees) shall be due and payable, in arrears, on the first day of each month, (ii) all Letter of Credit Fees payable hereunder, and all fronting fees and all commissions, other fees, charges and expenses provided for in Section 2.11(k) shall be due and payable, in arrears, on the first Business Day of each month, and (iii) all costs and expenses payable hereunder or under any of the other Loan Documents, and all other Lender Group Expenses shall be due and payable on (x) with respect to Lender Group Expenses outstanding as of the Closing Date, the Closing Date, and (y) otherwise, the earlier of (A) the first day of the month following the date on which the applicable costs, expenses, or Lender Group Expenses were first incurred, or (B) the date on which demand therefor is made by Administrative Agent (it being acknowledged and agreed that any charging of such costs, expenses or Lender Group Expenses to the Loan Account pursuant to the provisions of the following sentence shall be deemed to constitute a demand for payment thereof for the purposes of this subclause (y)).  Borrower hereby authorizes Administrative Agent, from time to time without prior notice to Borrower, to charge to the Loan Account (A) on the first Business Day of each month, all Letter of Credit Fees accrued or chargeable hereunder during the prior month, (B) as and when incurred or accrued, all fees and costs provided for in Section 2.10(a) or (c), (C) on the first day of each month, the Unused Line Fee accrued during the prior month pursuant to Section 2.10(b), (D) as and when due and payable, all

66

6237404.15

other fees payable hereunder or under any of the other Loan Documents, (E) on the Closing Date and thereafter as and when incurred or accrued, all other Lender Group Expenses, and (F) as and when due and payable all other payment obligations payable under any Loan Document or any Bank Product Agreement (including any amounts due and payable to the Bank Product Providers in respect of Bank Products). All amounts (including interest, fees, costs, expenses, Lender Group Expenses, or other amounts payable hereunder or under any other Loan Document or under any Bank Product Agreement) charged to the Loan Account shall thereupon constitute Revolving Loans hereunder, shall constitute Obligations hereunder, and shall initially accrue interest at the rate then applicable to Revolving Loans that are Base Rate Loans (unless and until converted into LIBOR Rate Loans in accordance with the terms of this Agreement).

(e)  **Computation**. All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360 day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue. In the event the Base Rate is changed from time to time hereafter, the rates of interest hereunder based upon the Base Rate automatically and immediately shall be increased or decreased by an amount equal to such change in the Base Rate.

(f)  **Intent to Limit Charges to Maximum Lawful Rate**. In no event shall the interest rate or rates payable under this Agreement, *plus* any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Borrower and the Lender Group, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, that anything contained herein to the contrary notwithstanding, if such rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, Borrower is and shall be liable only for the payment of such maximum amount as is allowed by law, and payment received from Borrower in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

**Section 2.07**   **Crediting Payments**. The receipt of any payment item by Administrative Agent shall not be required to be considered a payment on account unless such payment item is a wire transfer of immediately available funds made to Administrative Agent's Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Borrower shall be deemed not to have made such payment. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Administrative Agent only if it is received into Administrative Agent's Account on a Business Day on or before 1:30 p.m. If any payment item is received into Administrative Agent's Account on a non-Business Day or after 1:30 p.m. on a Business Day (unless Administrative Agent, in its sole discretion, elects to credit it on the date received), it shall be deemed to have been received by Administrative Agent as of the opening of business on the immediately following Business Day.

**Section 2.08**   **Designated Account**. Administrative Agent is authorized to make the Revolving Loans, and Issuing Bank is authorized to issue the Letters of Credit, under this Agreement based upon telephonic or other instructions received from anyone purporting to be an Authorized Person or, without instructions, if pursuant to Section 2.06(d). Borrower agrees to establish and maintain the Designated Account with the Designated Account Bank for the purpose of receiving the proceeds of the Revolving Loans requested by Borrower and made by Administrative Agent or the Lenders hereunder. Unless otherwise agreed by Administrative Agent and Borrower, any Revolving Loan or Swing Loan requested by Borrower and made by Administrative Agent or the Lenders hereunder shall be made to the Designated Account.

**Section 2.09**   **Maintenance of Loan Account; Statements of Obligations.** Administrative Agent shall maintain an account on its books in the name of Borrower (the "**Loan Account**") on which

67

6237404.15

Borrower will be charged with all Revolving Loans (including Extraordinary Advances and Swing Loans) made by Administrative Agent, Swing Lender, or the Lenders to Borrower or for Borrower's account, the Letters of Credit issued or arranged by Issuing Bank for Borrower's account, and with all other payment Obligations hereunder or under the other Loan Documents, including, accrued interest, fees and expenses, and Lender Group Expenses.  In accordance with Section 2.07, the Loan Account will be credited with all payments received by Administrative Agent from Borrower or for Borrower's account.  Administrative Agent shall make available to Borrower monthly statements regarding the Loan Account, including the principal amount of the Revolving Loans, interest accrued hereunder, fees accrued or charged hereunder or under the other Loan Documents, and a summary itemization of all charges and expenses constituting Lender Group Expenses accrued hereunder or under the other Loan Documents, and each such statement, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrower and the Lender Group unless, within thirty (30) days after Administrative Agent first makes such a statement available to Borrower, Borrower shall deliver to Administrative Agent written objection thereto describing the error or errors contained in such statement.

Section 2.10    **Fees**.

(a)    **Administrative Agent Fees**.  Borrower shall pay to Administrative Agent, for the account of Administrative Agent, as and when due and payable under the terms of the Fee Letter, the fees set forth in the Fee Letter.

(b)    **Unused Line Fee**.  Borrower shall pay to Administrative Agent, for the ratable account of the Lenders, an unused line fee (the "**Unused Line Fee**") in an amount equal to the Applicable Unused Line Fee Percentage *per annum* times the result of (i) the aggregate amount of the Commitments, less (ii) the Average Revolver Usage during the immediately preceding month (or portion thereof), which Unused Line Fee shall be due and payable, in arrears, on the first day of each month prior to the date on which the Obligations are paid in full and on the date on which the Obligations are paid in full.

(c)    **Field Examination and Other Fees**.  Subject to any limitations set forth in Section 6.10(c), Borrower shall pay to Administrative Agent, field examination, appraisal, and valuation fees and charges, as and when incurred or chargeable, as follows (i) a fee of $1,000 per day, per examiner, *plus* out-of-pocket expenses (including travel, meals, and lodging) for each field examination of any Loan Party or its Subsidiaries performed by or on behalf of Administrative Agent, and (ii) the fees, charges or expenses paid or incurred by Administrative Agent if it elects to employ the services of one or more third Persons to appraise the Collateral, or any portion thereof, or to assess any Loan Party's or its Subsidiaries' business valuation.

Section 2.11    **Letters of Credit**.

(a)  Subject to the terms and conditions of this Agreement, upon the request of Borrower made in accordance herewith, and prior to the Maturity Date, Issuing Bank agrees to issue a requested standby Letter of Credit or a sight commercial Letter of Credit for the account of Borrower.  By submitting a request to Issuing Bank for the issuance of a Letter of Credit, Borrower shall be deemed to have requested that Issuing Bank issue the requested Letter of Credit.  Each request for the issuance of a Letter of Credit, or the amendment or extension of any outstanding Letter of Credit, shall be (i) irrevocable and made in writing by an Authorized Person, (ii) delivered to Administrative Agent and Issuing Bank via telefacsimile or other electronic method of transmission reasonably acceptable to Administrative Agent and Issuing Bank and reasonably in advance of the requested date of issuance, amendment, or extension, and (iii) subject to Issuing Bank's authentication procedures with results satisfactory to Issuing Bank.  Each such request shall be in form and substance reasonably satisfactory to Administrative Agent and Issuing Bank and (i) shall specify (A) the amount of such Letter of Credit, (B) the date of issuance, amendment, or extension of such Letter of Credit, (C) the proposed expiration date

68

of such Letter of Credit, (D) the name and address of the beneficiary of the Letter of Credit, and (E) such other information (including, the conditions to drawing, and, in the case of an amendment or extension, identification of the Letter of Credit to be so amended or extended) as shall be necessary to prepare, amend, or extend such Letter of Credit, and (ii) shall be accompanied by such Issuer Documents as Administrative Agent or Issuing Bank may request or require, to the extent that such requests or requirements are consistent with the Issuer Documents that Issuing Bank generally requests for Letters of Credit in similar circumstances. Issuing Bank's records of the content of any such request will be conclusive. Anything contained herein to the contrary notwithstanding, Issuing Bank may, but shall not be obligated to, issue a Letter of Credit that supports the obligations of a Loan Party or one of its Subsidiaries in respect of (x) a lease of real property, or (y) an employment contract.

(b) Issuing Bank shall have no obligation to issue a Letter of Credit if any of the following would result after giving effect to the requested issuance:

(i)     the Letter of Credit Usage would exceed the Letter of Credit Sublimit, or

(ii)    the Letter of Credit Usage would exceed the Maximum Revolver Amount *less* the outstanding amount of Loans (including Swing Loans), or

(iii)   the Letter of Credit Usage would exceed the Borrowing Base at such time *less* the outstanding principal balance of the Loans (inclusive of Swing Loans) at such time.

(c) In the event there is a Defaulting Lender as of the date of any request for the issuance of a Letter of Credit, Issuing Bank shall not be required to issue or arrange for such Letter of Credit to the extent (i) the Defaulting Lender's Letter of Credit Exposure with respect to such Letter of Credit may not be reallocated pursuant to Section 2.03(g)(ii), or (ii) Issuing Bank has not otherwise entered into arrangements reasonably satisfactory to it and Borrower to eliminate Issuing Bank's risk with respect to the participation in such Letter of Credit of the Defaulting Lender, which arrangements may include Borrower cash collateralizing such Defaulting Lender's Letter of Credit Exposure in accordance with Section 2.03(g)(ii). Additionally, Issuing Bank shall have no obligation to issue or extend a Letter of Credit if (A) any order, judgment, or decree of any Governmental Authority or arbitrator shall, by its terms, purport to enjoin or restrain Issuing Bank from issuing such Letter of Credit, or any law applicable to Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over Issuing Bank shall prohibit or request that Issuing Bank refrain from the issuance of letters of credit generally or such Letter of Credit in particular, (B) the issuance of such Letter of Credit would violate one or more policies of Issuing Bank applicable to letters of credit generally, or (C) if amounts demanded to be paid under any Letter of Credit will not or may not be in United States Dollars.

(d) Any Issuing Bank (other than Wells Fargo or any of its Affiliates) shall notify Administrative Agent in writing no later than the Business Day prior to the Business Day on which such Issuing Bank issues any Letter of Credit. In addition, each Issuing Bank (other than Wells Fargo or any of its Affiliates) shall, on the first Business Day of each week, submit to Administrative Agent a report detailing the daily undrawn amount of each Letter of Credit issued by such Issuing Bank during the prior calendar week. Borrower and the Lender Group hereby acknowledge and agree that all Existing Letters of Credit shall constitute Letters of Credit under this Agreement on and after the Closing Date with the same effect as if such Existing Letters of Credit were issued by Issuing Bank at the request of Borrower on the Closing Date. Each Letter of Credit shall be in form and substance reasonably acceptable to Issuing Bank, including the requirement that the amounts payable thereunder must be payable in Dollars. If Issuing Bank makes a payment under a Letter of Credit, Borrower shall pay to Administrative Agent an amount equal to the applicable Letter of Credit Disbursement on the Business Day such Letter of Credit

69

6237404.15

Disbursement is made and, in the absence of such payment, the amount of the Letter of Credit Disbursement immediately and automatically shall be deemed to be a Loan hereunder (notwithstanding any failure to satisfy any condition precedent set forth in Article IV) and, initially, shall bear interest at the rate then applicable to Loans that are Base Rate Loans. If a Letter of Credit Disbursement is deemed to be a Loan hereunder, Borrower's obligation to pay the amount of such Letter of Credit Disbursement to Issuing Bank shall be automatically converted into an obligation to pay the resulting Loan.  Promptly following receipt by Administrative Agent of any payment from Borrower pursuant to this paragraph, Administrative Agent shall distribute such payment to Issuing Bank or, to the extent that Lenders have made payments pursuant to Section 2.11(e) to reimburse Issuing Bank, then to such Lenders and Issuing Bank as their interests may appear.

(e)  Promptly following receipt of a notice of a Letter of Credit Disbursement pursuant to Section 2.11(d), each Lender agrees to fund its Pro Rata Share of any Loan deemed made pursuant to Section 2.11(d) on the same terms and conditions as if Borrower had requested the amount thereof as a Loan and Administrative Agent shall promptly pay to Issuing Bank the amounts so received by it from the Lenders.  By the issuance of a Letter of Credit (or an amendment or extension of a Letter of Credit) and without any further action on the part of Issuing Bank or the Lenders, Issuing Bank shall be deemed to have granted to each Lender, and each Lender shall be deemed to have purchased, a participation in each Letter of Credit issued by Issuing Bank, in an amount equal to its Pro Rata Share of such Letter of Credit, and each such Lender agrees to pay to Administrative Agent, for the account of Issuing Bank, such Lender's Pro Rata Share of any Letter of Credit Disbursement made by Issuing Bank under the applicable Letter of Credit.  In consideration and in furtherance of the foregoing, each Lender hereby absolutely and unconditionally agrees to pay to Administrative Agent, for the account of Issuing Bank, such Lender's Pro Rata Share of each Letter of Credit Disbursement made by Issuing Bank and not reimbursed by Borrower on the date due as provided in Section 2.11(d), or of any reimbursement payment that is required to be refunded (or that Administrative Agent or Issuing Bank elects, based upon the advice of counsel, to refund) to Borrower for any reason.  Each Lender acknowledges and agrees that its obligation to deliver to Administrative Agent, for the account of Issuing Bank, an amount equal to its respective Pro Rata Share of each Letter of Credit Disbursement pursuant to this Section 2.11(e) shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of an Event of Default or Default or the failure to satisfy any condition set forth in Article IV.  If any such Lender fails to make available to Administrative Agent the amount of such Lender's Pro Rata Share of a Letter of Credit Disbursement as provided in this Section, such Lender shall be deemed to be a Defaulting Lender and Administrative Agent (for the account of Issuing Bank) shall be entitled to recover such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

(f)  Borrower agrees to indemnify, defend and hold harmless each member of the Lender Group (including Issuing Bank and its branches, Affiliates, and correspondents) and each such Person's respective directors, officers, employees, attorneys and agents (each, including Issuing Bank, a "**Letter of Credit Related Person**") (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), which may be incurred by or awarded against any Letter of Credit Related Person (other than Taxes, which shall be governed by Article III) (the "**Letter of Credit Indemnified Costs**"), and which arise out of or in connection with, or as a result of this Agreement, any Letter of Credit, any Issuer Document, or any Drawing Document referred to in or related to any Letter of Credit, or any action or proceeding arising out of any of the foregoing (whether administrative, judicial or in connection with arbitration); in each case, including that resulting from the Letter of Credit Related Person's own negligence; provided, that

70

6237404.15

such indemnity shall not be available to any Letter of Credit Related Person claiming indemnification to the extent that such Letter of Credit Indemnified Costs may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of the Letter of Credit Related Person claiming indemnity.   This indemnification provision shall survive termination of this Agreement and all Letters of Credit.

(g) The liability of Issuing Bank (or any other Letter of Credit Related Person) under, in connection with or arising out of any Letter of Credit (or pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by Borrower that are caused directly by Issuing Bank's gross negligence or willful misconduct in (i) honoring a presentation under a Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such Letter of Credit, (ii) failing to honor a presentation under a Letter of Credit that strictly complies with the terms and conditions of such Letter of Credit, or (iii) retaining Drawing Documents presented under a Letter of Credit.   Borrower's aggregate remedies against Issuing Bank and any Letter of Credit Related Person for wrongfully honoring a presentation under any Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by Borrower to Issuing Bank in respect of the honored presentation in connection with such Letter of Credit under Section 2.11(d), *plus* interest at the rate then applicable to Base Rate Loans hereunder.   Borrower shall take action to avoid and mitigate the amount of any damages claimed against Issuing Bank or any other Letter of Credit Related Person, including by enforcing its rights against the beneficiaries of the Letters of Credit.   Any claim by Borrower under or in connection with any Letter of Credit shall be reduced by an amount equal to the sum of (x) the amount (if any) saved by Borrower as a result of the breach or alleged wrongful conduct complained of, and (y) the amount (if any) of the loss that would have been avoided had Borrower taken all reasonable steps to mitigate any loss, and in case of a claim of wrongful dishonor, by specifically and timely authorizing Issuing Bank to effect a cure.

(h) Borrower is responsible for the final text of the Letter of Credit as issued by Issuing Bank, irrespective of any assistance Issuing Bank may provide such as drafting or recommending text or by Issuing Bank's use or refusal to use text submitted by Borrower. Borrower understands that the final form of any Letter of Credit may be subject to such revisions and changes as are deemed necessary or appropriate by Issuing Bank, and Borrower hereby consents to such revisions and changes not materially different from the application executed in connection therewith.   Borrower is solely responsible for the suitability of the Letter of Credit for Borrower's purposes.   If Borrower requests Issuing Bank to issue a Letter of Credit for an affiliated or unaffiliated third party (an "**Account Party**"), (i) such Account Party shall have no rights against Issuing Bank; (ii) Borrower shall be responsible for the application and obligations under this Agreement; and (iii) communications (including notices) related to the respective Letter of Credit shall be among Issuing Bank and Borrower.   Borrower will examine the copy of the Letter of Credit and any other documents sent by Issuing Bank in connection therewith and shall promptly notify Issuing Bank (not later than three (3) Business Days following Borrower's receipt of documents from Issuing Bank) of any non-compliance with Borrower's instructions and of any discrepancy in any document under any presentment or other irregularity.   Borrower understands and agree that Issuing Bank is not required to extend the expiration date of any Letter of Credit for any reason. With respect to any Letter of Credit containing an "automatic amendment" to extend the expiration date of such Letter of Credit, Issuing Bank, in its sole and absolute discretion, may give notice of non-extension of such Letter of Credit and, if Borrower does not at any time want the then current expiration date of such Letter of Credit to be extended, Borrower will so notify Administrative Agent and Issuing Bank at least thirty (30) calendar days before Issuing Bank is required to notify the beneficiary of such Letter of Credit or any advising bank of such non-extension pursuant to the terms of such Letter of Credit.

(i) Borrower's reimbursement and payment obligations under this Section 2.11 are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of

71

6237404.15

this Agreement under any and all circumstances whatsoever; provided, that subject to Section 2.11(g) above, the foregoing shall not release Issuing Bank from such liability to Borrower as may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction against Issuing Bank following reimbursement or payment of the obligations and liabilities, including reimbursement and other payment obligations, of Borrower to Issuing Bank arising under, or in connection with, this Section 2.11 or any Letter of Credit.

(j)    Without limiting any other provision of this Agreement, Issuing Bank and each other Letter of Credit Related Person (if applicable) shall not be responsible to Borrower for, and Issuing Bank's rights and remedies against Borrower and the obligation of Borrower to reimburse Issuing Bank for each drawing under each Letter of Credit shall not be impaired by:

(i)    honor of a presentation under any Letter of Credit that on its face substantially complies with the terms and conditions of such Letter of Credit, even if the Letter of Credit requires strict compliance by the beneficiary;

(ii)    honor of a presentation of any Drawing Document that appears on its face to have been signed, presented or issued (A) by any purported successor or transferee of any beneficiary or other Person required to sign, present or issue such Drawing Document or (B) under a new name of the beneficiary;

(iii)    acceptance as a draft of any written or electronic demand or request for payment under a Letter of Credit, even if nonnegotiable or not in the form of a draft or notwithstanding any requirement that such draft, demand or request bear any or adequate reference to the Letter of Credit;

(iv)    the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness or legal effect of any Drawing Document (other than Issuing Bank's determination that such Drawing Document appears on its face substantially to comply with the terms and conditions of the Letter of Credit);

(v)    acting upon any instruction or request relative to a Letter of Credit or requested Letter of Credit that Issuing Bank in good faith believes to have been given by a Person authorized to give such instruction or request;

(vi)    any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation or any delay in giving or failing to give notice to Borrower;

(vii)    any acts, omissions or fraud by, or the insolvency of, any beneficiary, any nominated person or entity or any other Person or any breach of contract between any beneficiary and Borrower or any of the parties to the underlying transaction to which the Letter of Credit relates;

(viii)    assertion or waiver of any provision of the ISP or UCP that primarily benefits an issuer of a letter of credit, including any requirement that any Drawing Document be presented to it at a particular hour or place;

(ix)    payment to any presenting bank (designated or permitted by the terms of the applicable Letter of Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under Standard Letter of Credit Practice applicable to it;

72

6237404.15

(x)      acting or failing to act as required or permitted under Standard Letter of Credit Practice applicable to where Issuing Bank has issued, confirmed, advised or negotiated such Letter of Credit, as the case may be;

(xi)      honor of a presentation after the expiration date of any Letter of Credit notwithstanding that a presentation was made prior to such expiration date and dishonored by Issuing Bank if subsequently Issuing Bank or any court or other finder of fact determines such presentation should have been honored;

(xii)      dishonor of any presentation that does not strictly comply or that is fraudulent, forged or otherwise not entitled to honor; or

(xiii)      honor of a presentation that is subsequently determined by Issuing Bank to have been made in violation of international, federal, state or local restrictions on the transaction of business with certain prohibited Persons.

(k) Borrower shall pay immediately upon demand to Administrative Agent for the account of Issuing Bank as non-refundable fees, commissions, and charges (it being acknowledged and agreed that any charging of such fees, commissions, and charges to the Loan Account pursuant to the provisions of Section 2.06(d) shall be deemed to constitute a demand for payment thereof for the purposes of this Section 2.11(k)):  (i) a fronting fee which shall be imposed by Issuing Bank equal to [.125%]% per annum times the average amount of the Letter of Credit Usage during the immediately preceding month (or portion thereof), *plus* (ii) any and all other customary commissions, fees and charges then in effect imposed by, and any and all expenses incurred by, Issuing Bank, or by any adviser, confirming institution or entity or other nominated person, relating to Letters of Credit, at the time of issuance of any Letter of Credit and upon the occurrence of any other activity with respect to any Letter of Credit (including transfers, assignments of proceeds, amendments, drawings, extensions or cancellations).

(l)  If by reason of (x) any Change in Law, or (y) compliance by Issuing Bank or any other member of the Lender Group with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Board of Governors as from time to time in effect (and any successor thereto):

(i)      any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any Letter of Credit issued or caused to be issued hereunder or hereby, or any Loans or obligations to make Loans hereunder or hereby, or

(ii)      there shall be imposed on Issuing Bank or any other member of the Lender Group any other condition regarding any Letter of Credit, Loans, or obligations to make Loans hereunder,

and the result of the foregoing is to increase, directly or indirectly, the cost to Issuing Bank or any other member of the Lender Group of issuing, making, participating in, or maintaining any Letter of Credit or to reduce the amount receivable in respect thereof, then, and in any such case, Administrative Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify Borrower, and Borrower shall pay within thirty (30) days after demand therefor, such amounts as Administrative Agent may specify to be necessary to compensate Issuing Bank or any other member of the Lender Group for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the rate then applicable to Base Rate Loans hereunder; provided, that (A) Borrower shall not be required to provide any compensation pursuant to this Section 2.11(l) for any such amounts incurred more than 180 days prior to the date on which the demand for payment of such amounts is first made to Borrower, and (B) if an event or circumstance

73

6237404.15

giving rise to such amounts is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  The determination by Administrative Agent of any amount due pursuant to this Section 2.11(l), as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

(m) Each standby Letter of Credit shall expire not later than the date that is twelve (12) months after the date of the issuance of such Letter of Credit; provided, that any standby Letter of Credit may provide for the automatic extension thereof for any number of additional periods each of up to one year in duration; provided further, that with respect to any Letter of Credit which extends beyond the Maturity Date, Letter of Credit Collateralization shall be provided therefor on or before the date that is five (5) Business Days prior to the Maturity Date.  Each commercial Letter of Credit shall expire on the earlier of (i) 120 days after the date of the issuance of such commercial Letter of Credit and (ii) five (5) Business Days prior to the Maturity Date.

(n) If (i) any Event of Default shall occur and be continuing, or (ii) Availability shall at any time be less than zero, then on the Business Day following the date when the Borrower receives notice from Administrative Agent or the Required Lenders (or, if the maturity of the Obligations has been accelerated, Lenders with Letter of Credit Exposure representing greater than 50% of the total Letter of Credit Exposure) demanding Letter of Credit Collateralization pursuant to this Section 2.11(n) upon such demand, Borrower shall provide Letter of Credit Collateralization with respect to the then existing Letter of Credit Usage.  If Borrower is required to provide Letter of Credit Collateralization hereunder as a result of the occurrence of an Event of Default, any cash collateral held by Administrative Agent as a result of such Letter of Credit Collateralization shall be returned by Administrative Agent to Borrower promptly, but in no event later than seven (7) Business Days, after such Event of Default has been waived in accordance with this Agreement.  If Borrower fails to provide Letter of Credit Collateralization as required by this Section 2.11(n), the Lenders may (and, upon direction of Administrative Agent, shall) advance, as Loans the amount of the cash collateral required pursuant to the Letter of Credit Collateralization provision so that the then existing Letter of Credit Usage is cash collateralized in accordance with the Letter of Credit Collateralization provision (whether or not the Commitments have terminated, an Overadvance exists or the conditions in Article IV are satisfied).

(o) Unless otherwise expressly agreed by Issuing Bank and Borrower when a Letter of Credit is issued (including any such agreement applicable to an Existing Letter of Credit), (i) the rules of the ISP shall apply to each standby Letter of Credit, and (ii) the rules of the UCP shall apply to each commercial Letter of Credit.

(p) Issuing Bank shall be deemed to have acted with due diligence and reasonable care if Issuing Bank's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement.

(q) In the event of a direct conflict between the provisions of this Section 2.11 and any provision contained in any Issuer Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.11 shall control and govern.

(r) The provisions of this Section 2.11 shall survive the termination of this Agreement and the repayment in full of the Obligations with respect to any Letters of Credit that remain outstanding.

74

6237404.15

(s)  At Borrower's costs and expense, Borrower shall execute and deliver to Issuing Bank such additional certificates, instruments and/or documents and take such additional action as may be reasonably requested by Issuing Bank to enable Issuing Bank to issue any Letter of Credit pursuant to this Agreement and related Issuer Document, to protect, exercise and/or enforce Issuing Banks' rights and interests under this Agreement or to give effect to the terms and provisions of this Agreement or any Issuer Document.  Borrower irrevocably appoints Issuing Bank as its attorney-in-fact and authorizes Issuing Bank, without notice to Borrower, to execute and deliver ancillary documents and letters customary in the letter of credit business that may include but are not limited to advisements, indemnities, checks, bills of exchange and issuance documents.  The power of attorney granted by the Borrower is limited solely to such actions related to the issuance, confirmation or amendment of any Letter of Credit and to ancillary documents or letters customary in the letter of credit business.  This appointment is coupled with an interest.

**Section 2.12   LIBOR Option**.

(a)   **Interest and Interest Payment Dates**.  In lieu of having interest charged at the rate based upon the Base Rate, Borrower shall have the option, subject to Section 2.12(b) below (the "**LIBOR Option**") to have interest on all or a portion of the Revolving Loans be charged (whether at the time when made (unless otherwise provided herein), upon conversion from a Base Rate Loan to a LIBOR Rate Loan, or upon continuation of a LIBOR Rate Loan as a LIBOR Rate Loan) at a rate of interest based upon the LIBOR Rate.  Interest on LIBOR Rate Loans shall be payable on the earliest of (i) the last day of the Interest Period applicable thereto; provided, that subject to the following clauses (ii) and (iii), in the case of any Interest Period greater than three (3) months in duration, interest shall be payable at three (3) month intervals after the commencement of the applicable Interest Period and on the last day of such Interest Period), (ii) the date on which all or any portion of the Obligations are accelerated pursuant to the terms hereof, or (iii) the date on which this Agreement is terminated pursuant to the terms hereof.  On the last day of each applicable Interest Period, unless Borrower has properly exercised the LIBOR Option with respect thereto, the interest rate applicable to such LIBOR Rate Loan automatically shall convert to the rate of interest then applicable to Base Rate Loans of the same type hereunder.  At any time that an Event of Default has occurred and is continuing, Borrower no longer shall have the option to request that Revolving Loans bear interest at a rate based upon the LIBOR Rate.

(b)   **LIBOR Election**.

(i)   Borrower may, at any time and from time to time, so long as no Event of Default has occurred and is continuing, elect to exercise the LIBOR Option by notifying Administrative Agent prior to 11:00 a.m. at least three (3) Business Days prior to the commencement of the proposed Interest Period (the "**LIBOR Deadline**").  Notice of Borrower's election of the LIBOR Option for a permitted portion of the Revolving Loans and an Interest Period pursuant to this Section shall be made by delivery to Administrative Agent of a LIBOR Notice received by Administrative Agent before the LIBOR Deadline.  Promptly upon its receipt of each such LIBOR Notice, Administrative Agent shall provide a copy thereof to each of the affected Lenders.

(ii)   Each LIBOR Notice shall be irrevocable and binding on Borrower.  In connection with each LIBOR Rate Loan, Borrower shall indemnify, defend, and hold Administrative Agent and the Lenders harmless against any loss, cost, or expense actually incurred by Administrative Agent or any Lender as a result of (A) the payment or required assignment of any principal of any LIBOR Rate Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (B) the conversion of any LIBOR Rate Loan other than on the last day of the Interest Period applicable thereto, or (C) the failure to borrow, convert, continue or prepay any LIBOR Rate Loan on the date specified in any LIBOR Notice delivered pursuant hereto (such losses, costs, or expenses,

75

6237404.15

"**Funding Losses**").  A certificate of Administrative Agent or a Lender delivered to Borrower setting forth in reasonable detail any amount or amounts that Administrative Agent or such Lender is entitled to receive pursuant to this Section 2.12 shall be conclusive absent manifest error.  Borrower shall pay such amount to Administrative Agent or the Lender, as applicable, within thirty (30) days of the date of its receipt of such certificate.  If a payment of a LIBOR Rate Loan on a day other than the last day of the applicable Interest Period would result in a Funding Loss, Administrative Agent may, in its sole discretion at the request of Borrower, hold the amount of such payment as cash collateral in support of the Obligations until the last day of such Interest Period and apply such amounts to the payment of the applicable LIBOR Rate Loan on such last day, it being agreed that Administrative Agent has no obligation to so defer the application of payments to any LIBOR Rate Loan and that, in the event that Administrative Agent does not defer such application, Borrower shall be obligated to pay any resulting Funding Losses.

(iii)      Unless Administrative Agent, in its sole discretion, agrees otherwise, Borrower shall have not more than five (5) LIBOR Rate Loans in effect at any given time.  Borrower may only exercise the LIBOR Option for proposed LIBOR Rate Loans of at least $1,000,000.

(c)      **Conversion; Prepayment**.  Borrower may convert LIBOR Rate Loans to Base Rate Loans or prepay LIBOR Rate Loans at any time; provided, that in the event that LIBOR Rate Loans are converted or prepaid on any date that is not the last day of the Interest Period applicable thereto, including as a result of any prepayment through the required application by Administrative Agent of any payments or proceeds of Collateral in accordance with Section 2.04(b) or for any other reason, including early termination of the term of this Agreement or acceleration of all or any portion of the Obligations pursuant to the terms hereof, Borrower shall indemnify, defend, and hold Administrative Agent and the Lenders and their Participants harmless against any and all Funding Losses in accordance with Section 2.12(b)(ii).

(d)      **Special Provisions Applicable to LIBOR Rate**.

(i)      The LIBOR Rate may be adjusted by Administrative Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any eurodollar deposits or increased costs (other than Taxes which shall be governed by Article III), in each case, due to changes in applicable law occurring subsequent to the commencement of the then applicable Interest Period, including any Changes in Law and changes in the reserve requirements imposed by the Board of Governors, which additional or increased costs would increase the cost of funding or maintaining loans bearing interest at the LIBOR Rate.  In any such event, the affected Lender shall give Borrower and Administrative Agent notice of such a determination and adjustment and Administrative Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Borrower may, by notice to such affected Lender (A) require such Lender to furnish to Borrower a statement setting forth in reasonable detail the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (B) repay the LIBOR Rate Loans of such Lender with respect to which such adjustment is made (together with any amounts due under Section 2.12(b)(ii)).

(ii)      Subject to the provisions set forth in Section 2.12(d)(iii) below, in the event that any change in market conditions or any Change in Law shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain LIBOR Rate Loans or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to Administrative Agent and Borrower and Administrative Agent promptly shall transmit the notice to each other Lender and (y) in the case of any LIBOR Rate Loans of such Lender that are outstanding, the date

76

6237404.15

specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such LIBOR Rate Loans, and interest upon the LIBOR Rate Loans of such Lender thereafter shall accrue interest at the rate then applicable to Base Rate Loans, and (z) Borrower shall not be entitled to elect the LIBOR Option until such Lender determines that it would no longer be unlawful or impractical to do so.

(iii)        Effect of Benchmark Transition Event.

(A)        Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, Administrative Agent and Borrower may amend this Agreement to replace the LIBOR Rate with a Benchmark Replacement.  Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after Administrative Agent has posted such proposed amendment to all Lenders and Borrower so long as Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders.  Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to Administrative Agent written notice that such Required Lenders accept such amendment.   No replacement of the LIBOR Rate with a Benchmark Replacement pursuant to this Section 2.12(d)(iii) will occur prior to the applicable Benchmark Transition Start Date.

(B)        Benchmark Replacement Conforming Changes. In connection with the implementation of a Benchmark Replacement, Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(C)        Notices; Standards for Decisions and Determinations. Administrative Agent will promptly notify Borrower and the Lenders of (1) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (2) the implementation of any Benchmark Replacement, (3) the effectiveness of any Benchmark Replacement Conforming Changes and (4) the commencement or conclusion of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by Administrative Agent or Lenders pursuant to this Section 2.12(d)(iii) including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.12(d)(iii).

(D)        Benchmark Unavailability Period. Upon Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, Borrower may revoke any request for a LIBOR Borrowing of, conversion to or continuation of LIBOR Rate Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During any Benchmark Unavailability Period, the component of Base Rate based upon the LIBOR Rate will not be used in any determination of the Base Rate.

(e)        **No Requirement of Matched Funding**.  Anything to the contrary contained herein notwithstanding, neither Administrative Agent, nor any Lender, nor any of their Participants, is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Rate.

77

6237404.15

**Section 2.13     Capital Requirements**.

(a)      If, after the date hereof, Issuing Bank or any Lender determines that (i) any Change in Law regarding capital, liquidity or reserve requirements for banks or bank holding companies, or (ii) compliance by Issuing Bank or such Lender, or their respective parent bank holding companies, with any guideline, request or directive of any Governmental Authority regarding capital adequacy or liquidity requirements (whether or not having the force of law), has the effect of reducing the return on Issuing Bank's, such Lender's, or such holding companies' capital or liquidity as a consequence of Issuing Bank's or such Lender's commitments, Loans, participations or other obligations hereunder to a level below that which Issuing Bank, such Lender, or such holding companies could have achieved but for such Change in Law or compliance (taking into consideration Issuing Bank's, such Lender's, or such holding companies' then existing policies with respect to capital adequacy or liquidity requirements and assuming the full utilization of such entity's capital) by any amount deemed by Issuing Bank or such Lender to be material, then Issuing Bank or such Lender may notify Borrower and Administrative Agent thereof.  Following receipt of such notice, Borrower agrees to pay Issuing Bank or such Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable within thirty (30) days after presentation by Issuing Bank or such Lender of a statement in the amount and setting forth in reasonable detail Issuing Bank's or such Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error).  In determining such amount, Issuing Bank or such Lender may use any reasonable averaging and attribution methods.  Failure or delay on the part of Issuing Bank or any Lender to demand compensation pursuant to this Section shall not constitute a waiver of Issuing Bank's or such Lender's right to demand such compensation; provided, that Borrower shall not be required to compensate Issuing Bank or a Lender pursuant to this Section for any reductions in return incurred more than 180 days prior to the date that Issuing Bank or such Lender notifies Borrower of such Change in Law giving rise to such reductions and of such Lender's intention to claim compensation therefor; provided further, that if such claim arises by reason of the Change in Law that is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(b)      If Issuing Bank or any Lender requests additional or increased costs referred to in Section 2.11(l) or Section 2.12(d)(i) or amounts under Section 2.13(a) or sends a notice under Section 2.12(d)(ii) relative to changed circumstances (such Issuing Bank or Lender, an "**Affected Lender**"), then, at the request of Borrower, such Affected Lender shall use reasonable efforts to promptly designate a different one of its lending offices or to assign its rights and obligations hereunder to another of its offices or branches, if (i) in the reasonable judgment of such Affected Lender, such designation or assignment would eliminate or reduce amounts payable pursuant to Section 2.11(l), Section 2.12(d)(i) or Section 2.13(a), as applicable, or would eliminate the illegality or impracticality of funding or maintaining LIBOR Rate Loans, and (ii) in the reasonable judgment of such Affected Lender, such designation or assignment would not subject it to any material unreimbursed cost or expense and would not otherwise be materially disadvantageous to it.  Borrower agrees to pay all reasonable out-of-pocket costs and expenses incurred by such Affected Lender in connection with any such designation or assignment.  If, after such reasonable efforts, such Affected Lender does not so designate a different one of its lending offices or assign its rights to another of its offices or branches so as to eliminate Borrower's obligation to pay any future amounts to such Affected Lender pursuant to Section 2.11(l), Section 2.12(d)(i) or Section 2.13(a), as applicable, or to enable Borrower to obtain LIBOR Rate Loans, then Borrower (without prejudice to any amounts then due to such Affected Lender under Section 2.11(l), Section 2.12(d)(i) or Section 2.13(a), as applicable) may, unless prior to the effective date of any such assignment the Affected Lender withdraws its request for such additional amounts under Section 2.11(l), Section 2.12(d)(i) or Section 2.13(a), as applicable, or indicates that it is no longer unlawful or impractical to fund or maintain LIBOR Rate Loans, may designate a different Issuing Bank or substitute a Lender or prospective Lender, in each case, reasonably acceptable to Administrative Agent to purchase the Obligations owed to such Affected

78

Lender and such Affected Lender's commitments hereunder (a "**Replacement Lender**"), and if such Replacement Lender agrees to such purchase, such Affected Lender shall assign to the Replacement Lender its Obligations and commitments, and upon such purchase by the Replacement Lender, which such Replacement Lender shall be deemed to be "Issuing Bank" or a "Lender" (as the case may be) for purposes of this Agreement and such Affected Lender shall cease to be "Issuing Bank" or a "Lender" (as the case may be) for purposes of this Agreement.

(c)      Notwithstanding anything herein to the contrary, the protection of Sections 2.11(l), 2.12(d), and 2.13 shall be available to Issuing Bank and each Lender (as applicable) regardless of any possible contention of the invalidity or inapplicability of the law, rule, regulation, judicial ruling, judgment, guideline, treaty or other change or condition which shall have occurred or been imposed, so long as it shall be customary for issuing banks or lenders affected thereby to comply therewith. Notwithstanding any other provision herein, neither Issuing Bank nor any Lender shall demand compensation pursuant to this Section 2.13 if it shall not at the time be the general policy or practice of Issuing Bank or such Lender (as the case may be) to demand such compensation in similar circumstances under comparable provisions of other credit agreements, if any.

~~Section 2.14      [Reserved].~~

~~Section 2.15      [Reserved].~~

~~Section 2.16      [Reserved]~~.

~~Section 2.17      [Reserved].~~

~~Section 2.18      [Reserved].~~

## ARTICLE III
## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

**Section 3.01      Taxes**.  (a)  Except as provided in this Section 3.01, any and all payments made by or on account of the Borrower or any Guarantor under any Loan Document shall be made free and clear of and without deduction for any Taxes, except to the extent required by any Laws.  If the Borrower, any Guarantor or other applicable withholding agent shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Loan Document to the Administrative Agent or any Lender, (i) if the Tax in question is an Indemnified Tax or Other Tax, the sum payable by the Borrower or any Guarantor shall be increased as necessary so that after all required deductions for Indemnified Taxes or Other Taxes have been made (including deductions applicable to additional sums payable under this Section 3.01), each Lender (or, in the case of a payment made to the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions for Indemnified Taxes or Other Taxes been made, (ii) the applicable withholding agent shall make such deductions, (iii) the applicable withholding agent shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Laws, and (iv) within 30 days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), if the Borrower or any Guarantor is the applicable withholding agent, it shall furnish to the Administrative Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof or other evidence acceptable to the Administrative Agent or Lender.

(b)  In addition, the Borrower agrees to pay any and all present or future stamp, court or documentary Taxes and any other excise, property, intangible or mortgage recording Taxes, imposed by any Governmental Authority, which arise from any payment made under any Loan Document or from the

6237404.15

execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document excluding, in each case, any such Tax imposed as a result of the Administrative Agent's or any Lender's Assignment and Assumption, grant of a participation, transfer or assignment to or designation of a new applicable Lending Office or other office for receiving payments under any Loan Document (collectively, "**Assignment Taxes**") if such Assignment Tax is imposed as a result of a present or former connection of the assignor or assignee with the jurisdiction imposing such Assignment Tax (other than any connection arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, receiving payments under, and/or enforcing or receiving or perfecting a security interest under any Loan Document), except for Assignment Taxes resulting from assignment or participation that is requested or required in writing by the Borrower (all such non-excluded taxes described in this Section 3.01(b) being hereinafter referred to as "**Other Taxes**").

(c) The Borrower and each Guarantor agree to indemnify the Administrative Agent and each Lender, within ten (10) days after demand therefor, for (i) the full amount of Indemnified Taxes and Other Taxes paid or payable by the Administrative Agent or such Lender (including Indemnified Taxes or Other Taxes imposed on or attributable to amounts payable under this Section 3.01) and (ii) any expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the Governmental Authority. A certificate as to the amount of such payment or liability prepared in good faith and delivered by the Administrative Agent or Lender (or by the Administrative on behalf of such Lender), accompanied by a written statement thereof setting forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) the basis and calculation of such amounts shall be conclusive absent manifest error.

(d) Indemnification by the Lenders. Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.07(e) relating to the maintenance of a Participant Register and (iii) any Taxes excluded from the definition of Indemnified Taxes that are attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e) Each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Law or reasonably requested by the Borrower or the Administrative Agent certifying as to any entitlement of such Lender to an exemption from, or reduction in, any applicable withholding Tax with respect to any payments to be made to such Lender or Agent under the Loan Documents. Each such Lender and the Administrative Agent shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documentation required below in this Section 3.01(e)) obsolete, expired or inaccurate in any material respect, deliver promptly and on or before the date such documentation expires, becomes obsolete or inaccurate to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and the Administrative Agent

80

in writing of its inability to do so.  In addition, each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with such other documentation prescribed by Law or reasonably requested by the Borrower or Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether such Lender or Administrative Agent is subject to backup withholding or information reporting requirements. Notwithstanding any other provision of this Section 3.01(e), a Lender or the Administrative Agent shall not be required to deliver any form pursuant to this Section 3.01(e) that such Lender or the Administrative is not legally eligible to deliver.  Without limiting the foregoing:

(i)       Each Lender that is a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) two (2) properly completed and duly signed original copies of Internal Revenue Service Form W-9 certifying that such Lender is exempt from federal backup withholding.

(ii)      Each Lender that is not a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(A)      two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN (or any successor forms) claiming eligibility for the benefits of an income tax treaty to which the United States is a party,

(B)      two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)      in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (A) a certificate substantially in the form of Exhibit H hereto (any such certificate a "**United States Tax Compliance Certificate**") and (B) two (2) properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN (or any successor forms),

(D)      to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or has sold a participation), Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, Form W-8BEN, United States Tax Compliance Certificate, Form W-9, Form W-8IMY or any other required information from each beneficial owner, as applicable (provided that, if the Lender is a partnership (and not a participating Lender) and if one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

(E)      two properly completed and duly signed original copies of any other form prescribed by applicable U.S. federal income tax laws (including the Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, United States federal withholding tax on any payments to such Lender under the Loan Documents.

81

(iii)    If the Administrative Agent is a "United States person" (as defined in Section 7701(a)(30) of the Code), it shall deliver to the Borrower two (2) properly completed and duly signed original copies of Internal Revenue Service Form W-9 with respect to fees received on its own behalf, certifying that the Administrative Agent is exempt from federal backup withholding.

(iv)    If the Administrative Agent is not a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower two (2) properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI with respect to fees received on its own behalf.

(v)    If a payment made to a Lender or Agent under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender or such Agent were to fail to comply with the applicable reporting requirements of FATCA, such Lender or such Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by Laws and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Laws and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender or such Agent has or has not complied with such Person's obligations under FATCA and, if necessary, to determine the amount to deduct and withhold from such payment.  Solely for purposes of this Section 3.01(e)(v), "FATCA" shall include any amendments made to FATCA after the Closing Date.

(f)    The Administrative Agent or any Lender claiming any additional amounts payable pursuant to this Section 3.01 shall use its commercially reasonable efforts (subject to such Lender's or Administrative Agent's overall internal policies of general application and legal and regulatory restrictions) to mitigate or reduce the additional amounts payable, which commercially reasonable efforts may include a change in the jurisdiction of its Lending Office (or any other measures reasonably requested by the Borrower) if such a change or other measures would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender.

(g)    If any Lender or Agent determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Indemnified Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by a Loan Party pursuant to this Section 3.01, it shall promptly remit such refund to such Loan Party (but only to the extent of indemnification or additional amounts paid by the Loan Party under this Section 3.01 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including any Taxes) of the Lender or Administrative Agent, as the case may be, and without interest (other than any interest paid by the relevant taxing authority with respect to such refund net of any Taxes payable by the Administrative Agent or any Lender on such interest); provided that the Loan Parties, upon the request of the Lender or Administrative Agent, as the case may be, agree promptly to return such refund (*plus* any penalties, interest or other charges imposed by the relevant taxing authority) to such party in the event such party is required to repay such refund to the relevant taxing authority.  This Section 3.01 shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to Taxes that it deems confidential) to any Loan Party or any other person.

Section 3.02    **Illegality**.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund LIBOR Rate Loans, or to determine or charge interest rates based upon the LIBOR Rate, or any Governmental Authority has imposed material restrictions on the authority of

82

such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, in each case after the Closing Date then, on written notice thereof by such Lender to the Borrower and the Administrative Agent, any obligation of such Lender to make or continue LIBOR Rate Loans or to convert Base Rate Loans to LIBOR Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower shall promptly following written demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all applicable LIBOR Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBOR Rate Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such LIBOR Rate Loans.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment or conversion under Section 3.05.  Each Lender agrees to use commercially reasonable efforts (subject to such Lender's overall internal policies of general application and legal and regulatory restrictions) to designate a different Lending Office if such designation will avoid the need for such notice, will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender.

**Section 3.03**     **Inability to Determine Rates**. If the Administrative Agent or the Required Lenders determine after the Closing Date that for any reason adequate and reasonable means do not exist for determining the applicable LIBOR Rate for any requested Interest Period with respect to a proposed LIBOR Rate Loan, or that the LIBOR Rate for any requested Interest Period with respect to a proposed LIBOR Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that Dollar deposits are not being offered to banks in the London interbank eurodollar, or other applicable, market for the applicable amount and the Interest Period of such LIBOR Rate Loan, the Administrative Agent will promptly so notify the Borrower in writing and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain LIBOR Rate Loans or to convert Base Rate Loans to LIBOR Rate Loans shall be suspended and (y) in the event of a determination described in the preceding sentence with respect to the LIBOR Rate component of the Base Rate, the utilization of the LIBOR Rate component in determining the Base Rate shall be suspended, in each case, until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of such LIBOR Rate Loans or, failing that, will be deemed to have converted such request, if applicable, into a request for a Borrowing of Base Rate Loans in the amount specified therein.

**Section 3.04**     **Increased Cost and Reduced Return; Capital Adequacy; LIBOR Rate Loan Reserves**.  (a)  If any Lender reasonably determines that as a result of the introduction of or any change in or in the interpretation of any Law, in each case after the Closing Date, or such Lender's compliance therewith, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any LIBOR Rate Loans, or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.04(a) any such increased costs or reduction in amount resulting from (i) Indemnified Taxes or Other Taxes indemnified pursuant to Section 3.01, or any Taxes excluded from the definition of (x) "Indemnified Taxes" or (y) "Other Taxes" or (ii) reserve requirements contemplated by Section 3.04(c)) and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining the LIBOR Rate Loan (or of maintaining its obligations to make any Loan), or to reduce the amount of any sum received or receivable by such Lender, then from time to time within fifteen (15) Business Days after written demand by such Lender setting forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) such increased costs (with a copy of such demand to the Administrative Agent given in accordance with

83

6237404.15

Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.  Notwithstanding anything herein to the contrary, for all purposes under this Agreement, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change in Law, regardless of the date enacted, adopted or issued.

(b)  If any Lender determines that the introduction of any Law regarding capital adequacy or liquidity requirements or any change therein or in the interpretation thereof, in each case after the Closing Date, or compliance by such Lender (or its Lending Office) therewith, has the effect of reducing the rate of return on the capital of such Lender or any company controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and such Lender's desired return on capital), then from time to time promptly following written demand of such Lender setting forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction within fifteen (15) Business Days after receipt of such demand.  Notwithstanding anything herein to the contrary, for all purposes under this Agreement, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change in Law, regardless of the date enacted, adopted or issued.

(c)  The Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including LIBOR funds or deposits, additional interest on the unpaid principal amount of each applicable LIBOR Rate Loan of the Borrower equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive in the absence of manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the funding of any LIBOR Rate Loans of the Borrower, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such Loan, provided the Borrower shall have received at least fifteen (15) Business Days' prior written notice (with a copy to the Administrative Agent) of such additional interest or cost from such Lender.  If a Lender fails to give notice fifteen (15) Business Days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable fifteen (15) Business Days from receipt of such notice.

(d)  Failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation.

(e)  If any Lender requests compensation under this Section 3.04, then such Lender will, if requested by the Borrower, use commercially reasonable efforts (subject to such Lender's overall internal policies of general application and legal and regulatory restrictions) to designate another Lending

84

Office for any Loan affected by such event; <u>provided</u> that such efforts are made on terms that, in the commercially reasonable judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no material economic, legal or regulatory disadvantage and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender; <u>provided, further</u>, that nothing in this <u>Section 3.04(e)</u> shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to <u>Section 3.04(a)</u>, <u>(b)</u>, <u>(c)</u> or <u>(d)</u>.

Section 3.05    **Funding Losses**.    Promptly following written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail (<u>provided</u> that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense (excluding loss of anticipated profits and calculated without giving effect to any interest rate floor) actually incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any LIBOR Rate Loan of the Borrower on a day other than the last day of the Interest Period for such Loan; or

(b)    any failure by the Borrower to prepay, borrow, continue or convert any LIBOR Rate Loan of the Borrower on the date or in the amount notified by the Borrower;

including any loss or expense (excluding loss of anticipated profits) arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

For purposes of calculating amounts payable by the Borrower to the Lenders under this <u>Section 3.05</u>, each Lender shall be deemed to have funded each LIBOR Rate Loan made by it at the LIBOR Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such LIBOR Rate Loan was in fact so funded.

Section 3.06    **Matters Applicable to All Requests for Compensation**.    (a)    Administrative Agent or any Lender claiming compensation under this <u>Article III</u> shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error.    In determining such amount, the Administrative Agent or such Lender may use any reasonable and customary averaging and attribution methods.

(b)    With respect to any Lender's claim for compensation under <u>Section 3.02</u>, <u>3.03</u> or <u>3.04</u>, the Borrower shall not be required to compensate such Lender for any amount incurred if such Lender notifies the Borrower of the event that gives rise to such claim more than 180 days after such event; <u>provided</u>, that if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.    If any Lender requests compensation by the Borrower under <u>Section 3.04</u>, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another applicable LIBOR Rate Loan, or, if applicable, to convert Base Rate Loans into LIBOR Rate Loan, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of <u>Section 3.06(c)</u> shall be applicable); <u>provided</u> that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)    If the obligation of any Lender to make or continue any LIBOR Rate Loan, or to convert Base Rate Loans into LIBOR Rate Loans shall be suspended pursuant to <u>Section 3.06(b)</u> hereof, such Lender's applicable LIBOR Rate Loans shall be automatically converted into Base Rate Loans (or, if

85

such conversion is not possible, repaid) on the last day(s) of the then current Interest Period(s) for such LIBOR Rate Loans (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to such conversion no longer exist:

(i)        to the extent that such Lender's LIBOR Rate Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's applicable LIBOR Rate Loans shall be applied instead to its Base Rate Loans; and

(ii)       all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as LIBOR Rate Loans shall be made or continued instead as Base Rate Loans (if possible), and all Base Rate Loans of such Lender that would otherwise be converted into LIBOR Rate Loans shall remain as Base Rate Loans.

(d) If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of any of such Lender's LIBOR Rate Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when LIBOR Rate Loans made by other Lenders are outstanding, if applicable, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding LIBOR Rate Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding LIBOR Rate Loans and by such Lender are held *pro rata* (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Revolving Loans.

**Section 3.07    Replacement of Lenders under Certain Circumstances**.  (a)  If at any time (i) the Borrower becomes obligated to pay additional amounts or indemnity payments described in Section 3.01 or 3.04 as a result of any condition described in such Sections or any Lender ceases to make any LIBOR Rate Loans as a result of any condition described in Section 3.02 or 3.04 or requires the Borrower to pay additional amounts as a result thereof, (ii) any Lender becomes a Defaulting Lender or (iii) any Lender becomes a Non-Consenting Lender, then the Borrower may, on five (5) Business Days' prior written notice to the Administrative Agent and such Lender, (x) replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.07(b) (so long as the assignment fee is paid by the Borrower in such instance) all of its rights and obligations under this Agreement to one or more Eligible Assignees; provided that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person; provided, further, that (A) in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments and (B) in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to, and shall be sufficient (together with all other consenting Lenders) to cause the adoption of, the applicable departure, waiver or amendment of the Loan Documents; or (y) in the case of a Lender, repay (in Dollars) all Obligations of the Borrower due and owing to such Lender relating to the Loans held by such Lender as of such termination date; provided that in the case of any such termination of a Non-Consenting Lender such termination shall be sufficient (together with all other consenting Lenders after giving effect hereto) to cause the adoption of the applicable departure, waiver or amendment of the Loan Documents.

(b)        Any Lender being replaced pursuant to Section 3.07(a) above shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's applicable outstanding Loans, and (ii) deliver any Notes evidencing such Loans to the Borrower or the Administrative Agent.  Pursuant

86

to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's outstanding Loans, (B) all obligations of the Borrower owing to the assigning Lender relating to the Loans so assigned shall be paid in full by the assignee Lender to such assigning Lender concurrently with such Assignment and Assumption and (C) upon such payment and, if so requested by the assignee Lender, delivery to the assignee Lender of the appropriate Note or Notes executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender.  In connection with any such replacement, if any such Lender does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within five (5) Business Days of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Lender, then such Lender shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Lender and the Administrative Agent shall be entitled (but not obligated) to execute and deliver such Assignment and Assumption and/or such other documentation on behalf of such Lender.

(c)  [Reserved].

(d)  In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each affected Lender in accordance with the terms of Section 10.01 or all the Lenders and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

Section 3.08    **Survival**.  All the Loan Parties' obligations under this Article III shall survive repayment of all other Obligations hereunder.

## ARTICLE IV
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01    **Conditions to Initial Credit Extension**.  The obligation of each Lender to make a Credit Extension hereunder on the Closing Date is subject to satisfaction (or waiver) of the following conditions precedent:

(a)  The Administrative Agent's receipt of the following, each of which shall be original, .pdf or facsimile copies or delivered by other electronic method (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party each in form and substance reasonably satisfactory to the Required Lenders:

(i)    [reserved],

(ii)    executed counterparts of this Agreement;

(iii)    a Note executed by the Borrower in favor of each Lender that has requested a Note at least two (2) Business Days in advance of the Closing Date;

(iv)    a copy of the Organization Documents in relation to each Loan Party;

(v)    the Agent Fee Letter, the Security Agreement, the Intercreditor Agreement, each other Collateral Document and each other document set forth on Schedule 4.01(a)

87

required to be executed on the Closing Date as indicated on such schedule, duly executed by each Loan Party thereto, together with:

(A) [reserved]; and

(B) proper financing statements (Form UCC-1 or the equivalent) naming each Loan Party for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary to perfect the security interests purported to be created by the foregoing Security Agreement;

(vi) such certificates of good standing (to the extent such concept exists) from the applicable secretary of state of the state of organization of each Loan Party, certificates of resolutions or other corporate or limited liability company action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party and resolutions of the board of directors, board of managers or members of each Loan Party (in each case, as appropriate or applicable) as the Required Lenders may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date;

(vii) an opinion from (x) Kirkland & Ellis LLP, counsel to the Loan Parties and (y) the general counsel, or other appropriate attorney, of the Borrower with respect to any Loan Party covering opinions not included in the opinion provided pursuant to the foregoing clause (x) as to certain customary organizational items (including, for the avoidance of doubt, that the entry by such Loan Party into the Loan Documents to which it is a party does not conflict with such Loan Party's Organizational Documents and the requirements of Laws), in each case in form and substance reasonably satisfactory to the Required Lenders;

(viii) a solvency certificate from the chief financial officer, chief accounting officer or other officer with equivalent duties of the Borrower (immediately after giving effect to the Transactions) substantially in the form attached hereto as Exhibit D;

(ix) a completed Borrowing Base Certificate with respect to the Borrowing Base as of July 31, 2020; and

(b) All fees and expenses required to be paid hereunder (and, with respect to expenses, invoiced at least three (3) Business Days before the Closing Date) shall have been paid, including fees pursuant to any Agent Fee Letter, the fees of Otterbourg P.C., as counsel to the Administrative Agent, and all reasonable out-of-pocket expenses payable on the Closing Date.

(c) Prior to or substantially concurrently with the initial Borrowing on the Closing Date, (i) all Existing Debt shall have been extinguished in accordance with the Prepackaged Plan; (ii) the Loan Parties shall have entered into, and provided executed copies of, the First Lien Loan Documents providing for the First Lien Term Loans in an aggregate principal amount equal to $~~75,000~~76,600,000, and (iii) the Loan Parties shall have entered into, and provided executed copies of, the Second Lien Loan Documents providing for the Second Lien Term Loans in an aggregate principal amount equal to $50,000,000, in the case of clause (ii) and (iii) above, in form and substance reasonably satisfactory to the Required Lenders.

(d) Since the Petition Date, other than by virtue of the Chapter 11 Cases, the events and conditions related, resulting from, and/or leading up thereto and the effects thereon and any action required to be taken under the Loan Documents, there shall not have occurred any development or event,

88

6237404.15

either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(e)  No Default or Event of Default shall exist or would result from the consummation of the Transactions.

(f)  The Administrative Agent shall have received the Annual Financial Statements and the Quarterly Financial Statements (it being understood the Administrative Agent hereby acknowledges receipt thereof).

(g)  The Lenders shall have received the Pro Forma Financial Statements.

(h)  The Administrative Agent shall have received at least three (3) Business Days prior to the Closing Date all documentation and other information about the Borrower and the Guarantors required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act that has been requested by the Administrative Agent in writing at least ten (10) days prior to the Closing Date.

(i)  The representations and warranties of each Loan Party set forth in Article V and in each other Loan Document shall be true and correct in all material respects on and as of the Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; provided that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(j)  The sum of (i) Availability and (ii) unrestricted cash and Cash Equivalents of the Loan Parties, in each case after giving effect to the initial extensions of credit under this Agreement, the payment of all fees and expenses required to be paid by Borrower on the Closing Date under this Agreement or the other Loan Documents and consummation of the Transactions, shall be not less than $~~25,000,000~~15,000,000, of which not more than $5,000,000 may be unrestricted cash and Cash Equivalents;

(k)  Upon consummation of the Transactions, the Lenders shall own at last 90% of the common equity of Holdings (subject to dilution pursuant to any warrants issued pursuant to the Warrant Agreement (as defined in the Prepackaged Plan) and any management incentive plan.

(l)  The Bankruptcy Court shall have entered the Confirmation Order, which order shall (i) approve, among other things, the Transactions, (ii) be in form and substance reasonably acceptable to the Required Lenders and consistent in all respects with the Restructuring Support Agreement, (iii) not be subject to any stay or be reversed, vacated, amended or otherwise modified in any respect and (iv) all covenants and conditions of the Prepackaged Plan (other than the effectiveness of this Agreement, the First Lien Credit Agreement and the Second Lien Credit Agreement) shall have been satisfied or waived in accordance with the terms thereof.

(m) The Restructuring Support Agreement shall not have been terminated and remains in full force and effect.

Without limiting the generality of the provisions of Section 9.06, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or

6237404.15

other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**Section 4.02     Conditions to all Credit Extensions**.  The obligation of each Lender to make a Credit Extension hereunder at any time is subject to satisfaction (or waiver) of the following conditions precedent:

(a) The representations and warranties of each Loan Party set forth in Article V and in each other Loan Document shall be true and correct in all material respects on and as of the date of such extension of credit with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; provided that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(b) No Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof.

<div align="center">

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES**

</div>

Each Holdco, the Borrower and each of the Subsidiary Guarantors party hereto represent and warrant to the Administrative Agent and the Lenders on the Closing Date that:

**Section 5.01     Existence, Qualification and Power; Compliance with Laws**.  Each Loan Party and each Subsidiary that is a Material Subsidiary (a) is a Person duly organized, incorporated or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation, organization or formation to the extent such concept exists in such jurisdiction, (b) has all requisite organizational power and authority to, in the case of the Loan Parties, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (where relevant) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, orders, writs and injunctions and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case, referred to in clauses (c), (d) or (e), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**Section 5.02     Authorization; No Contravention**.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the Transactions, (a) have been duly authorized by all necessary corporate or other organizational action, and (b) do not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by Section 7.01), or require any payment to be made under (x) any Contractual Obligation to which such Person is a party or by which it or any of its property or assets is bound or (y) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any Law; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clauses (ii) and (iii), to the extent that such violation, conflict, breach, contravention or payment could not reasonably be expected to have a Material Adverse Effect.

**Section 5.03     Governmental Authorization; Other Consents**.  No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental

<div align="center">90</div>

6237404.15

Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) approval, consent, exemption, authorization, or other action by, or notice to, or filing necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties (or release existing Liens) under applicable U.S. law, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement) and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect.

Section 5.04   **Binding Effect**.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is a party thereto.  This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is a party thereto in accordance with its terms, except as such enforceability may be limited by (i) Debtor Relief Laws and by general principles of equity, (ii) the need for filings and registrations necessary to create or perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties and (iii) the effect of foreign Laws, rules and regulations as they relate to the granting of security interests in assets of, pledges of Equity Interests in or Indebtedness owed by Foreign Subsidiaries (clauses (i), (ii) and (iii), the "**Enforcement Qualifications**").

Section 5.05   **Financial Statements; No Material Adverse Effect**.  (a)  The Annual Financial Statements and the Quarterly Financial Statements fairly present in all material respects the financial condition of the Company and its Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (A) except as otherwise expressly noted therein and (B) subject, in the case of the Quarterly Financial Statements, to changes resulting from normal year-end adjustments and the absence of footnotes.

(b) The unaudited *pro forma* consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as of the last day of the twelve (12)-month period ending on the last day of the most recently completed four (4)-fiscal quarter period ended at least forty-five (45) days (or 105 days if such four (4)-fiscal quarter period is the end of the Company's fiscal year) prior to the Closing Date, prepared after giving effect to the Transactions as if the Transactions had occurred as of such date (including the notes thereto) (the "**Pro Forma Balance Sheet**") and the unaudited *pro forma* consolidated statement of income of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries for the twelve (12)-month period ended at least forty-five (45) days (or 105 days if such four (4)-fiscal quarter period is the end of the Company's fiscal year) prior to the Closing Date, prepared after giving effect to the Transactions as if the Transactions had occurred at the beginning of such period and any other adjustments reasonably acceptable to the Required Lenders (together with the Pro Forma Balance Sheet, the "**Pro Forma Financial Statements**"), copies of which have heretofore been furnished to the Administrative Agent, have been prepared based on the Annual Financial Statements and the Quarterly Financial Statements and have been prepared in good faith, based on assumptions believed by the Borrower to be reasonable as of the date of delivery thereof and adjustment as agreed by the Borrower, and present fairly in all material respects on a *pro forma* basis the estimated financial position of the Borrower and its Subsidiaries as at the Closing Date and their estimated results of operations for the period covered thereby; provided that no such *pro forma* financial statement shall be required to include adjustments for purchase accounting (including adjustments of the type contemplated by Financial

91

Account Standards Board Accounting Standards Codification 805, Business Combinations (formerly SFAS 141R)).

(c) Since the Closing Date, there has been no event, circumstance or change, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

**Section 5.06** **Litigation**.  There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any Subsidiary or against any of their properties or revenues that have a reasonable likelihood of adverse determination and such determination, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**Section 5.07** **Ownership of Property; Liens**.  The Borrower and each of its Subsidiaries has good record title to, or valid leasehold interests in, or easements or other limited property interests in, all Real Property necessary in the ordinary conduct of its business, free and clear of all Liens, except (a) as set forth on Schedule 5.07, (b) minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes, (c) Liens permitted by Section 7.01 and (d) where the failure to have such title could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 5.08** **Environmental Matters**.  Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a) Each Loan Party and its respective properties and operations are and have been in compliance with all Environmental Laws, which includes obtaining and maintaining all applicable Environmental Permits required under such Environmental Laws to carry on the business of the Loan Parties;

(b) the Loan Parties have not received any written notice that alleges any of them is in violation of or potentially liable under any Environmental Laws, and none of the Loan Parties nor any of the Real Property is the subject of any claims, investigations, liens, demands, or judicial, administrative or arbitral proceedings pending or, to the knowledge of the Borrower, threatened in writing, under any Environmental Law or to revoke or modify any Environmental Permit held by any of the Loan Parties;

(c) there has been no Release of Hazardous Materials on, at, under or from any Real Property or facilities owned, operated or leased by any of the Loan Parties, or, to the knowledge of the Borrower, Real Property formerly owned, operated or leased by any Loan Party or arising out of the conduct of the Loan Parties that could reasonably be expected to require investigation, remedial activity or corrective action or cleanup or could reasonably be expected to result in the Borrower or any of its Subsidiaries incurring liability under any Environmental Laws; and

(d) there are no facts, circumstances or conditions arising out of or relating to the operations of the Loan Parties or Real Property or facilities owned, operated or leased by any of the Loan Parties or, to the knowledge of the Borrower, Real Property or facilities formerly owned, operated or leased by the Loan Parties that could reasonably be expected to result in the Borrower or any of its Subsidiaries incurring liability under any Environmental Laws.

92

6237404.15

The representations and warranties contained in this Section 5.08 are the sole and exclusive representations and warranties of the Borrower, the Holdcos and the Subsidiary Guarantors with respect to matters arising under or relating to Environmental Laws, Environmental Permits, Environmental Liabilities or Hazardous Materials.

Section 5.09    Taxes.    Except as otherwise permitted under Section 6.04, each of the Loan Parties and their Subsidiaries have timely filed all federal and all material state and local tax returns required to be filed, and have paid all Taxes levied or imposed upon them or their properties, income, profits or assets, that are due and payable (including in their capacity as a withholding agent).  To the knowledge of the Loan Parties, there is no proposed Tax deficiency or assessment against the Loan Parties or their Subsidiaries that, if made would, individually or in the aggregate, $100 reasonably be expected to result in liability in excess of $250,000 or which is subject to a Permitted Protest.

Section 5.10    ERISA Compliance.    (a)  Except as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with its terms, the applicable provisions of ERISA, the Code and other Federal or state Laws.

(b)  (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) neither any Loan Party, Subsidiary nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due but not delinquent under Section 4007 of ERISA); (iii) neither any Loan Party, Subsidiary nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (iv) neither any Loan Party, Subsidiary nor any ERISA Affiliate has engaged in a transaction that could reasonably be expected to be subject to Sections 4069 or 4212(c) of ERISA; except, with respect to each of the foregoing clauses of this Section 5.10(b), as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.11    Subsidiaries; Equity Interests.    As of the Closing Date (after giving effect to the Transactions), no Loan Party has any Subsidiaries other than those specifically disclosed on Schedule 5.11, and all of the outstanding Equity Interests owned by the Loan Parties (or a Subsidiary of any Loan Party) in such Subsidiaries have been validly issued and are fully paid and all Equity Interests owned by a Loan Party (or a Subsidiary of any Loan Party) in such Subsidiaries are owned free and clear of all Liens except (i) those created under the Collateral Documents, under the First Lien Loan Documents (which Liens shall be subject to the Intercreditor Agreement) or under the Second Lien Loan Documents (which Liens shall be subject to the Intercreditor Agreement) and (ii) any Lien that is permitted under Section 7.01.  As of the Closing Date, Schedules 1 and 9 of the Perfection Certificate (a) set forth the name and jurisdiction of each Domestic Subsidiary that is a Loan Party, (b) set forth the ownership interest of the Borrower and any other Subsidiary thereof in each Subsidiary, including the percentage of such ownership and (c) identify each Subsidiary that is a Subsidiary the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

Section 5.12    Margin Regulations; Investment Company Act.    (a)  The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation T, U or X of the Board of Governors of the United States Federal Reserve System.

(b)  None of the Holdcos, the Borrower or any of the Subsidiaries is or is required to be registered as an "investment company" under the Investment Company Act of 1940.  No Loan Party or any of its Subsidiaries is subject to regulation under any federal or state statute or regulation which may

93

~~limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.~~

**Section 5.13    Disclosure**.    No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party (other than projected financial information, *pro forma* financial information, budgets, estimates and information of a general economic or industry nature) to Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were made, not materially misleading.  With respect to projected financial information and *pro forma* financial information, the Borrower represents that such information was prepared in good faith based upon assumptions believed to be reasonable at the time furnished, it being understood that such projected financial information and *pro forma* financial information are not to be viewed as facts or as a guarantee of performance or achievement of any particular results and that actual results may vary from such forecasts and that such variations may be material and that no assurance can be given that the projected results will be realized.

**Section 5.14    Labor Matters**.    Except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against the Borrower or any of its Subsidiaries pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of the Borrower or any of its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with such matters; <u>and </u>(c) all payments due from the Borrower or any of its Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant party~~, and (d) no Loan Party nor its Subsidiaries has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or similar state law, which remains unpaid or unsatisfied~~.

**Section 5.15    Intellectual Property; Licenses, Etc**.    Each of the Borrower and the Subsidiaries owns, licenses, possesses or otherwise has the right to use all of the trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, technology, software, know-how database rights, design rights and other intellectual property rights (collectively, "**IP Rights**") that are reasonably necessary for the operation of its businesses as currently conducted, except to the extent the failure to own, license, possess or otherwise have the right to use such IP Rights, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  To the knowledge of the Borrower, the Borrower and the Subsidiaries' present business operations do not infringe upon any IP Rights held by any Person except for such infringements, individually or in the aggregate, which could not reasonably be expected to have a Material Adverse Effect.  No claim or litigation regarding IP Rights is pending or, to the knowledge of the Borrower, threatened, against any Loan Party or any of the Subsidiaries, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

As of the Closing Date, all registrations material to the Loan Parties' business under the name of each Loan Party listed on Schedule 11 of the Perfection Certificate are valid and in full force and effect.

**Section 5.16    Solvency**.    On the Closing Date, after giving effect to the Transactions, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

**Section 5.17    [Reserved]**.

**Section 5.18    USA Patriot Act; OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws**.

94

6237404.15

(a)  To the extent applicable, each Loan Party is in compliance, in all ~~material~~ respects, with the (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) the USA Patriot Act.

(b)  No Loan Party or any of its Subsidiaries is in violation of any Sanctions.  No Loan Party nor any of its Subsidiaries nor, to the knowledge of such Loan Party, any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (i) is a Sanctioned Person or a Sanctioned Entity, (ii) has any assets located in Sanctioned Entities, or (iii) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  Each of the Loan Parties and its Subsidiaries has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Loan Parties and its Subsidiaries, and to the knowledge of each such Loan Party, each director, officer, employee, and agent ~~and Affiliate~~ of each such Loan Party and each such Subsidiary, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  No proceeds of any Loan made or Letter of Credit issued hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law or Anti-Money Laundering Law by any ~~Person (including any~~ Lender, Bank Product Provider, or other individual or entity participating in any transaction~~)~~..

**Section 5.19    Security Documents**.  Except as otherwise contemplated hereby or under any other Loan Documents, the provisions of the Collateral Documents are effective to create in favor of the Administrative Agent for the benefit of the Secured Parties legal, valid and enforceable Liens on, and security interests in, the Collateral and, (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable Laws (which filings or recordings shall be made to the extent required by any Collateral Document) and (ii) upon the taking of possession or control by the Administrative Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent required by any Collateral Document), such Collateral Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral, in each case subject to no Liens other than the applicable Liens permitted under the Loan Documents, a legal, valid, enforceable and perfected Lien (if and to the extent perfection may be achieved by the filings and/or other actions required to be taken hereby or by the applicable Collateral Documents) on all right, title and interest of the respective Loan Parties in the Collateral described therein subject to the Enforcement Qualifications and Liens permitted by Section 7.01.

Notwithstanding anything herein (including this Section 5.19) or in any other Loan Document to the contrary, neither the Borrower nor any other Loan Party makes any representation or warranty as to (A) the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest (other than with respect to those pledges and security interests made under the Laws of the jurisdiction of formation of the applicable Foreign Subsidiary) in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of the Administrative Agent or any Lender with respect thereto, in each case under foreign Law, (B) the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest to the extent such pledge, security interest, perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or (C) on the Closing Date and until required pursuant to Section 6.11, 6.13 or 4.01(a)(v), the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or enforceability of any pledge or security interest to the extent not required on the Closing Date pursuant to Section 4.01(a)(v).

95

6237404.15

**Section 5.20      EEA Financial Institutions**. None of the Holdcos, the Borrower or any Subsidiary thereof is an EEA Financial Institution.

**Section 5.21      Beneficial Ownership Certification**.  As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

~~**Section 5.22     Leases.  Each Loan Party and its Subsidiaries enjoy peaceful and undisturbed possession under all leases material to their business and to which they are parties or under which they are operating, and, subject to Permitted Protests, all of such material leases are valid and subsisting and no material default by the applicable Loan Party or its Subsidiaries exists under any of them.**~~

~~Section 5.23~~Section 5.22       [Reserved].

~~Section 5.24~~Section 5.23       **Eligible Accounts**.  As to each Account that is identified by Borrower as an Eligible Account in a Borrowing Base Certificate submitted to Administrative Agent, such Account is (a) a bona fide existing payment obligation of the applicable Account Debtor created by the sale and delivery of Inventory or the rendition of services to such Account Debtor in the ordinary course of a Borrower's business, (b) owed to a Borrower without any known defenses, disputes, offsets, counterclaims, or rights of return or cancellation, and (c) not excluded as ineligible by virtue of one or more of the excluding criteria (other than any Administrative Agent-discretionary criteria) set forth in the definition of Eligible Accounts.

~~Section 5.25~~Section 5.24       **Eligible Inventory**.  As to each item of Inventory that is identified by Borrower as Eligible Inventory in a Borrowing Base Certificate submitted to Administrative Agent, such Inventory is (a) of good and merchantable quality, free from known defects, and (b) not excluded as ineligible by virtue of one or more of the excluding criteria (other than any Administrative Agent-discretionary criteria) set forth in the definition of Eligible Inventory.

~~Section 5.26~~Section 5.25       **Location of Inventory**. Except as set forth in Schedule 5.25, ~~the~~ Inventory of Borrower and its Subsidiaries with fair market value in excess of $500,000 is not stored with a bailee, warehouseman, or similar party and is located only at, or in-transit between, the locations identified on Schedule 5.25 to this Agreement (as such Schedule may be updated pursuant to Section 6.15).

~~Section 5.27~~Section 5.26       **Inventory Records**.  Each Loan Party keeps correct and accurate records itemizing and describing the type, quality, and quantity of its and its Subsidiaries' Inventory and the book value thereof.

~~Section 5.28~~Section 5.27       **Hedge Agreements**.  On each date that any Hedge Agreement is executed by any Hedge Provider, Borrower and each other Loan Party satisfy all eligibility, suitability and other requirements under the Commodity Exchange Act (7 U.S.C. § 1, et seq., as in effect from time to time) and the Commodity Futures Trading Commission regulations.

<div align="center">

**ARTICLE VI**
**AFFIRMATIVE COVENANTS**

</div>

So long as any Lender shall have any Loan or other Obligation (other than contingent obligations not yet due and owing as to which no claim has been asserted), hereunder which is accrued and payable which remains unpaid or unsatisfied, then from and after the Closing Date, Holdings and Intermediate Holdings (solely in the case of Sections 6.01, 6.02, 6.04, 6.05, 6.06, 6.08, 6.09, 6.10, 6.11, 6.13, 6.19,

<div align="center">96</div>

6237404.15

6.20 and 6.21) and the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of its respective Subsidiaries to:

**Section 6.01    Financial Statements**.  (a)  Commencing with the fiscal year ended December 31, 2020, deliver to the Administrative Agent for prompt further distribution to each Lender, within ninety (90) days after the end of each fiscal year, a consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail (together with, in all cases, a management discussion and analysis with respect thereto) and prepared in accordance with GAAP, audited and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing or other independent registered public accounting firm approved by the Required Lenders (such consent not to be unreasonably withheld, delayed or conditioned), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification (other than related (i) solely to the occurrence of the Maturity Date or the upcoming maturity date under the First Lien Credit Agreement or the Second Lien Credit Agreement, in each case, occurring within one year from the date such report is delivered or (ii) any potential inability to satisfy any financial maintenance covenant on a future date or in a future period) or any qualification or exception as to the scope of such audit except for qualifications relating to changes in accounting principles or practices reflecting changes in GAAP and required or approved by such independent certified public accountants;

(b) Deliver to the Administrative Agent for prompt further distribution to each Lender, within forty-five (45) days (or seventy-five (75) days in the case of the first fiscal quarter following the Closing Date) after the end of each fiscal quarter of each fiscal year of Holdings, a consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as at the end of such fiscal quarter and the related (x) consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (y) consolidated statements of cash flows for such fiscal quarter and the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail together with, in all cases, a management discussion and analysis with respect thereto) and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes; and

(c) Deliver to the Administrative Agent, for prompt further distribution to each Lender, within thirty-five (35) days (or forty-five (45) days in the case of the first three (3) such months following the Closing Date) after the end of (i) the period beginning on the Closing Date through September 30, 2020 and (ii) thereafter, each of the first two (2) months in any fiscal quarter of Holdings, an unaudited consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries at the end of such month and the related unaudited consolidated statements of cash flows as of and for such month and the portion of the fiscal year then ended, setting forth in each case, in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail; and

(d) Deliver to the Administrative Agent for prompt further distribution to each Lender, no later than ninety (90) days after the end of the fiscal year ending December 31, 2020 and each subsequent fiscal year, a reasonably detailed consolidated budget for the following fiscal year on a quarterly basis (including a projected consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as of the end of the following fiscal year, the related consolidated

97

statements of projected cash flow and projected income and a summary of the material underlying assumptions applicable thereto) (collectively, the "**Projections**").

Notwithstanding the foregoing, the obligations in Sections 6.01(a) and (b) may be satisfied with respect to financial information of Holdings, Intermediate Holdings, the Borrower and the Subsidiaries by furnishing (I) the applicable financial statements of Holdings (or any direct or indirect parent, as applicable, of Holdings) or (II) the Form 10-K or 10-Q of Holdings (or any direct or indirect parent of Holdings), as applicable filed with the SEC; provided that, with respect to clauses (I) and (II), (i) to the extent such information relates to a parent of Holdings, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent, on the one hand, and the information relating to Holdings, Intermediate Holdings, the Borrower and the Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under Section 6.01(a), such materials are accompanied by a report and opinion of Deloitte & Touche LLP or any other independent registered public accounting firm of nationally recognized standing or other independent registered public accounting firm approved by the Required Lenders (such consent not to be unreasonably withheld, delayed or conditioned), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going-concern" or like qualification (other than related (i) solely to the occurrence of the Maturity Date or the upcoming maturity date under the First Lien Credit Agreement or the Second Lien Credit Agreement, in each case, occurring within one year from the date such report is delivered or (ii) any potential inability to satisfy any financial maintenance covenant on a future date or in a future period) or exception or any qualification or exception as to the scope of such audit except for qualifications relating to changes in accounting principles or practices reflecting changes in GAAP and required or approved by such independent certified public accountants.

Any financial statement required to be delivered pursuant to Section 6.01(a) or 6.01(b) shall not be required to include purchase accounting adjustments relating to the Transactions or any Permitted Acquisition to the extent it is not practicable to include them.

Documents required to be delivered pursuant to Sections 6.01 and 6.02(a) through (d) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower (or any direct or indirect parent of the Borrower) posts such documents, or provides a link thereto on the website on the Internet at the website address listed on Schedule 10.02(a); or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that (x) promptly following such posting, the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender and (y) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower under this Agreement (collectively, "**Borrower Materials**") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive Material Non-Public Information and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC"

6237404.15

shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC**,**" the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any Material Non-Public Information (although it may be sensitive and proprietary) (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.08); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information." Notwithstanding the foregoing, the Borrower shall be under no obligation to mark any Borrower Materials "PUBLIC".

Section 6.02    **Certificates; Other Information**.    Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    concurrently the delivery of the financial statements referred to in Sections 6.01(a), (b) and (b̶c), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower;

(b)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which Holdings, Intermediate Holdings, the Borrower or any Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 6.02;

(c)    promptly after the furnishing thereof, copies of any material written notices received by any Loan Party (other than in the ordinary course of business) or material statements or material reports furnished to any holder of debt securities (other than in connection with any board observer rights) of any Loan Party or of any of its Subsidiaries pursuant to the terms of any First Lien Loan Document or Second Lien Loan Document and, in each case, not otherwise required to be furnished to the Lenders pursuant to any other clause of Section 6.01, 6.02 or 6.03;

(d)    together with the delivery of each Compliance Certificate pursuant to Section 6.02(a), (i) in the case of annual Compliance Certificates only, a report setting forth the legal name and the jurisdiction of formation of each Loan Party and the location of the chief executive office of each Loan Party on the Perfection Certificate or confirming that there has been no change in such information since the Closing Date or the date of the last such report; and (ii) a list of each Subsidiary of the Borrower that identifies each Subsidiary as of the date of delivery of such Compliance Certificate (to the extent that there have been any changes in the identity or status as a Subsidiary of any such Subsidiaries since the Closing Date or the most recent list provided);

(e)    ~~Deliver to Administrative Agent (and if so requested by Administrative Agent, with copies for each Lender)~~ each of the reports set forth on Schedule 6.02 to this Agreement at the times specified therein, and agree to use commercially reasonable efforts in cooperation with Administrative Agent to facilitate and implement a system of electronic collateral reporting in order to provide electronic reporting of each of the items set forth on such Schedule.  Borrower and Administrative Agent hereby agree that the delivery of the Borrowing Base Certificate through the Administrative Agent's

99

electronic platform or portal, subject to Administrative Agent's authentication process, by such other electronic method as may be approved by Administrative Agent from time to time in its sole discretion, or by such other electronic input of information necessary to calculate the Borrowing Bases as may be approved by Administrative Agent from time to time in its sole discretion, shall in each case be deemed to satisfy the obligation of Borrower to deliver such Borrowing Base Certificate, with the same legal effect as if such Borrowing Base Certificate had been manually executed by Borrower and delivered to Administrative Agent; and

(f)     promptly, such additional information regarding the business, legal, financial or corporate affairs of the Loan Parties or any of their respective Subsidiaries, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request.

In no event shall the requirements set forth in Section 6.02(f) require Holdings, Intermediate Holdings, the Borrower or any of its Subsidiaries to provide any such information which (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or (iii) is subject to attorney-client or similar privilege or constitutes attorney work-product.

**Section 6.03     Notices**.  Promptly (and in the case of clause (a) below, not later within three (3) Business Days) after a Responsible Officer of the Borrower or any Subsidiary Guarantor has obtained knowledge thereof, notify the Administrative Agent:

(a)     Of the occurrence of any Default or Event of Default;

(b)     of the occurrence of an ERISA Event which could reasonably be expected to result in a Material Adverse Effect;

(c)     of the filing or commencement of, or any threat or notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority against the Borrower or any of its Subsidiaries that would reasonably be expected to result in a Material Adverse Effect;

(d)     of the occurrence of any other matter or development that has had or could reasonably be expected to have a Material Adverse Effect; and

(e)     of any change in the information provided in any certification regarding beneficial ownership as required by 31 C.F.R. § 1010.230 that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification.

Each notice pursuant to this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of the Borrower delivered to the Administrative Agent for prompt further distribution to each Lender (x) that such notice is being delivered pursuant to Section 6.03(a), (b), (c) or (d) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

**Section 6.04     Payment of Taxes**.  Pay, discharge or otherwise satisfy as the same shall become due and payable in the normal conduct of its business, all its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (a) any such Tax is the subject of a Permitted Protest or (b) Taxes in not in excess of $100,000 outstanding at any time.

100

6237404.15

**Section 6.05** **Preservation of Existence, Etc**. (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization; and

(b) take all reasonable action to maintain all rights, privileges (including its good standing where applicable in the relevant jurisdiction), permits, authorizations, licenses and franchises necessary or desirable in the normal conduct of its business;

except, in the case of Section 6.05(a) (other than with respect to the Borrower) or this Section 6.05(b), to the extent (i) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (ii) pursuant to any merger, consolidation, liquidation, dissolution or Disposition permitted by Article VII.

**Section 6.06** **Maintenance of Properties**. Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and fire, casualty or condemnation excepted.

**Section 6.07** **Insurance**.

(a) Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Subsidiaries) as are customarily carried under similar circumstances by such other Persons. Not later than thirty (30) days after the Closing Date (or the date any such insurance is obtained, in the case of insurance obtained after the Closing Date) (in each case, or such later date as the Required Lenders may agree in its sole discretion), each such policy of insurance (other than director and officer insurance and worker's compensation insurance) shall as appropriate (i) name the Administrative Agent as additional insured thereunder or (ii) in the case of each casualty insurance policy, contain a lender loss payable clause or endorsement that names the Administrative Agent, on behalf of the Lenders, as lender loss payee or mortgagee, as applicable, thereunder. If the improvements on any Mortgaged Property are at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then, to the extent required by applicable Flood Insurance Laws, the Borrower shall, or shall cause each Loan Party to, (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount reasonably satisfactory to the Required Lenders and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) upon the reasonable request of the Administrative Agent at the direction of the Required Lenders (not to exceed one time per fiscal year, unless an Event of Default has occurred and is continuing) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Required Lenders.

(b) ~~Borrower shall give~~Give Administrative Agent prompt notice of any loss exceeding $500,000 covered by the casualty or business interruption insurance of any Loan Party or its Subsidiaries. Upon the occurrence and during the continuance of an Event of Default, Administrative Agent shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents

101

6237404.15

that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

**Section 6.08    Compliance with Laws**.  Comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except if the failure to comply therewith could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 6.09    Books and Records**.  (a) Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP and which reflect all material financial transactions and matters involving the assets and business of the Borrower or a Subsidiary, as the case may be (it being understood and agreed that certain Foreign Subsidiaries maintain individual books and records in conformity with generally accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder) and (b) use commercially reasonable efforts in cooperation with Administrative Agent to facilitate and implement a system of electronic collateral reporting in order to provide electronic reporting of each of the items set forth on such Schedule. Borrower and Administrative Agent hereby agree that the delivery of the Borrowing Base Certificate through the Administrative Agent's electronic platform or portal, subject to Administrative Agent's authentication process, by such other electronic method as may be approved by Administrative Agent from time to time in its sole discretion, or by such other electronic input of information necessary to calculate the Borrowing Bases as may be approved by Administrative Agent from time to time in its sole discretion, shall in each case be deemed to satisfy the obligation of Borrower to deliver such Borrowing Base Certificate, with the same legal effect as if such Borrowing Base Certificate had been manually executed by Borrower and delivered to Administrative Agent.

**Section 6.10    Inspection Rights**.

(a)    ~~Each Loan Party will, and will cause each of its Subsidiaries to, permit~~Permit Administrative Agent, any Lender, and each of their respective duly authorized representatives or agents to visit any of its properties and inspect any of its assets or books and records, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees (provided, that an authorized representative of a Borrower shall be allowed to be present) at such reasonable times and intervals as Administrative Agent or any Lender, as applicable, may designate and, so long as no Default or Event of Default has occurred and is continuing, with reasonable prior written notice to Borrower and during regular business hours, at Borrower's expense in accordance with the provisions of the Agent Fee Letter, subject to the limitations set forth below in Section 6.10(c).

(b)    ~~Each Loan Party will, and will cause each of its Subsidiaries to, permit~~Permit Administrative Agent and each of its duly authorized representatives or agents to conduct field examinations, appraisals or valuations at such reasonable times and intervals as Administrative Agent may designate, at Borrower's expense in accordance with the provisions of the Agent Fee Letter, subject to the limitations set forth below in Section 6.10(c).

(c)    So long as no Event of Default shall have occurred and be continuing during a calendar year, Borrower shall not be obligated to reimburse Administrative Agent for more than two (2) field examinations in such calendar year (increasing to three (3) field examinations if an Increased Reporting Event has occurred during such calendar year), and one (1) inventory appraisal in such calendar year (increasing to two (2) inventory appraisals if an Increased Reporting Event has occurred during such calendar year), in each case, except for field examinations and appraisals conducted in connection with a

102

proposed Permitted Acquisition (whether or not consummated). Borrower shall permit the Administrative Agent to conduct additional field examinations and appraisals at its own expense.

Notwithstanding anything to the contrary in this Section 6.10, none of Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (c) is subject to attorney-client or similar privilege or constitutes attorney work product.

**Section 6.11    Additional Collateral; Additional Guarantors**.    At the Borrower's expense, subject to the terms, conditions and provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(a)    Upon the formation or acquisition of any new direct or indirect wholly owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) by any Loan Party or the designation in accordance with Section 6.14 of any existing direct or indirect wholly owned Material Domestic Subsidiary as a Subsidiary (in each case, other than an Excluded Subsidiary) or any Subsidiary becoming a wholly owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) or any Excluded Subsidiary ceasing to be an Excluded Subsidiary:

(i)    within forty-five (45) days after such formation, acquisition, designation or occurrence or such longer period as the Required Lenders may agree in writing in their discretion:

(A)    cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Administrative Agent, a Joinder Agreement to become a Guarantor under this Agreement, Security Agreement Supplements, Intellectual Property Security Agreements, and other security agreements and documents as reasonably requested by and in form and substance reasonably satisfactory to the Required Lenders (consistent with the Security Agreement, Intellectual Property Security Agreements and other security agreements in effect on the Closing Date), in each case granting Liens required by the Collateral and Guarantee Requirement;

(B)    cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement (and the parent of each such Domestic Subsidiary that is the Borrower or a Guarantor) to deliver any and all certificates representing Equity Interests (to the extent certificated) and intercompany notes constituting negotiable instruments (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and instruments evidencing Indebtedness held by such Material Domestic Subsidiary and required to be delivered pursuant to the Collateral and Guarantee Requirement endorsed in blank to the Administrative Agent;

(C)    take and cause such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement

<div align="center">103</div>

and each direct or indirect parent of such Material Domestic Subsidiary to take whatever action (including the recording of Mortgages, filing of UCC financing statements and delivery of stock and membership interest certificates) as may be necessary in the reasonable opinion of the Administrative Agent (at the direction of the Required Lenders) to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and perfected Liens to the extent required by the Collateral and Guarantee Requirement, and to otherwise comply with the requirements of the Collateral and Guarantee Requirement;

(D)     if requested by the Administrative Agent or the Required Lenders, deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the Lenders, of counsel for the Loan Parties reasonably acceptable to the Required Lenders as to such matters set forth in this Section 6.11(a) as the Required Lenders may reasonably request (or otherwise consistent with the opinions delivered on the Closing Date);

(ii)     as promptly as practicable after the request therefor by the Administrative Agent, deliver to the Administrative Agent with respect to each Material Real Property, any existing title reports, abstracts or environmental assessment reports, to the extent available and in the possession or control of a Loan Party; provided, however, that there shall be no obligation to deliver to the Administrative Agent any environmental assessment report whose disclosure to the Administrative Agent would require the consent of a Person other than a Loan Party or one of its Subsidiaries, where, despite the commercially reasonable efforts of the Borrower to obtain such consent, such consent cannot be obtained; and

(iii)     if reasonably requested by the Administrative Agent or the Required Lenders, deliver to the Administrative Agent any other items necessary from time to time to satisfy the Collateral and Guarantee Requirement with respect to perfection and existence of security interests with respect to property of any Guarantor (and the direct parent of each such Guarantor) acquired after the Closing Date and subject to the Collateral and Guarantee Requirement, but not specifically covered by preceding clauses (i), (ii) or (iii) or Section 6.11(b) below.

(b)     Not later than 120 days (or such longer period as the Required Lenders may agree in writing in their discretion) after (i) any Material Real Property is acquired by a Loan Party after the Closing Date or (ii) an entity becomes a Loan Party if such entity owns Material Real Property at the time it becomes a Loan Party, cause such Material Real Property, if such property is required to be provided as Collateral pursuant to the Collateral and Guarantee Requirement but is not automatically subject to a Lien pursuant to pre-existing Collateral Documents, to be subject to a Lien and Mortgage in favor of the Administrative Agent for the benefit of the Secured Parties and take, or cause the relevant Loan Party to take, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect or record such Lien, in each case to the extent required by, and subject to the limitations and exceptions of, the Collateral and Guarantee Requirement and to otherwise comply with the requirements of the Collateral and Guarantee Requirement.

(c)     Each Domestic Subsidiary required to be designated as a "Material Domestic Subsidiary" pursuant to the proviso in the definition of "Material Domestic Subsidiary" shall have taken all actions to comply with the provisions of Section 6.11 within the timeframe required by the definition of "Material Domestic Subsidiary".

104

Notwithstanding anything to the contrary contained in this Agreement (including this Section 6.11 and Section 6.13) or in any other Loan Document, (x) Administrative Agent shall not accept delivery of any Mortgage from any Loan Party unless each of the Lenders has received forty-five (45) days prior written notice thereof and Administrative Agent has received confirmation from each Lender that such Lender has completed its flood insurance diligence, has received copies of all flood insurance documentation and has confirmed that flood insurance compliance has been completed as required by the Flood Laws or as otherwise satisfactory to such Lender and (y) Administrative Agent shall not accept delivery of any joinder to any Loan Document with respect to any Subsidiary of any Loan Party that is not a Loan Party, if such Subsidiary that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation unless such Subsidiary has delivered a Beneficial Ownership Certification in relation to such Subsidiary and Administrative Agent has completed its Patriot Act searches, OFAC/PEP searches and customary individual background checks for such Subsidiary, the results of which shall be satisfactory to Administrative Agent.

Section 6.12    **Compliance with Environmental Laws**.  Except, in each case, to the extent that the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, comply, and take all commercially reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply, with all Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and occupancy of its properties; and, in each case to the extent the Loan Parties are required to do so by Environmental Laws, conduct any investigation, remedial or other corrective action necessary to address Hazardous Materials at any property or facility in accordance with Environmental Laws.  If an Event of Default arising out of an Environmental Liability has occurred and is continuing, within sixty (60) days of receiving a written request by the Administrative Agent (at the direction of the Required Lenders), the Borrower will provide the Administrative Agent with an environmental assessment report regarding the scope of the Environmental Liability and the likely cost of mitigating such Environmental Liability, prepared at Borrower's sole cost and expense and by an environmental consultant reasonably acceptable to the Required Lenders.  If such report is not timely provided, the Administrative Agent may have them prepared by an environmental consultant of its choosing, at Borrower's sole cost and expense.

Section 6.13    **Further Assurances**.  Promptly upon reasonable request by the Administrative Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as are necessary or that the Administrative Agent may reasonably request from time to time in order to carry out more effectively the purposes of this Agreement and the Collateral Documents, to the extent required pursuant to the Collateral and Guarantee Requirement and subject in all respects to the limitations therein. If the Administrative Agent or the Required Lenders reasonably determine that it is required by applicable Law to have appraisals prepared in respect of the Real Property of any Loan Party subject to a mortgage constituting Collateral, the Borrower shall promptly provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA.

Section 6.14    **[Reserved]**.

Section 6.15    **Location of Inventory; Chief Executive Office**.  ~~Each Loan Party will, and will cause each of its Subsidiaries to, keep~~<u>Keep</u> (a) their Inventory <u>with fair market value in excess of $500,000</u> only at the locations identified on Schedule 5.25 to this Agreement (provided that Borrower may amend Schedule 5.25 to this Agreement so long as such amendment occurs by written notice to Administrative Agent not less than ten (10) days prior to the date on which such Inventory is moved to such new location and so long as Administrative Agent has consented to such amendment and such new location is within the continental United States), and (b) their respective chief executive offices only at

6237404.15

the locations identified on Schedule 7 to the Guaranty and Security Agreement.  Each Loan Party will, and will cause each of its Subsidiaries to, use their commercially reasonable efforts to obtain Collateral Access Agreements for each of the locations identified on Schedule 7 to the Guaranty and Security Agreement and Schedule 5.25 to this Agreement.

Section 6.16    **[Reserved]**.

Section 6.17    **Lender Meetings**.  To the extent requested by the Administrative Agent or the Required Lenders, participate in a meeting (which may be in the form of a conference call) (including a customary question and answer session) with the Administrative Agent and Lenders once during each fiscal quarter to be held at such time as may be agreed to by the Borrower and the Administrative Agent at the direction of the Required Lenders, but in any event within fifteen (15) Business Days of each date that financial statements are required to be delivered pursuant to Section 6.01(b).

Section 6.18    **End of Fiscal Years**.  For financial reporting purposes, cause its fiscal year to end on December 31 (other than any Subsidiary acquired after the Closing Date); provided, however, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Required Lenders, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

Section 6.19    **Lines of Business**. Holdings, Intermediate Holdings, the Borrower and the Subsidiaries, taken as a whole, will not engage in any material line of business substantially different from those lines of business conducted by Holdings, Intermediate Holdings, the Borrower and the Subsidiaries on the Closing Date or any business reasonably related, complementary, corollary, synergistic or ancillary thereto (including related, complementary, synergistic or ancillary technologies) or reasonable extensions thereof.

Section 6.20    **Post-Closing Covenant**. Holdings agrees that it will deliver, or will cause to be delivered, to the Administrative Agent, in form and substance reasonably satisfactory to the Required Lenders, the items described on Schedule 6.20(a) hereof by the times specified with respect to such items, or such later time as the Required Lenders may agree in their reasonable discretion.

Section 6.21    **OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws**. Each Loan Party will, and will cause each of its Subsidiaries to, comply with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Loan Parties and its Subsidiaries shall implement and maintain in effect policies and procedures reasonably designed to ensure compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

Section 6.22    **Account Control Agreements**.  With respect to each deposit account, securities account or other similar account established prior to or on the Closing Date, deliver an Account Control Agreement with respect to each such account (other than any Excluded Accounts) within thirty (30) days after the Closing Date or such later date as the Required Lenders may agree in their sole discretion. With respect to each deposit account, securities account or other similar account (other than any Excluded Accounts) established following the Closing Date, deliver on the date thirty (30) days following the establishment thereof (or such later date agreed to by the Required Lenders in their sole discretion), an Account Control Agreement with respect to each such account.  The Administrative Agent's rights with respect to each account subject to an Account Control Agreement shall be governed by such Account Control Agreement. Following the Closing Date, the Borrower shall give the Administrative Agent prompt written notice of the opening of any deposit, securities or other similar account by any Loan Party.

106

6237404.15

~~Section 6.23   Disclosure Updates.   Each Loan Party will, promptly and in no event later than five (5) Business Days after obtaining knowledge thereof, notify Administrative Agent if any written information, exhibit, or report furnished to Administrative Agent or the Lenders contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made.   The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto.~~

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Loan or other Obligation hereunder (other than contingent obligations not yet due and owing as to which no claim has been asserted), then from and after the Closing Date, the Borrower (and, with respect to Section 7.14 only, the Holdcos) shall not and shall not permit any of its Subsidiaries to, directly or indirectly:

**Section 7.01   Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens (i) created pursuant to any Loan Document and (ii) on the Collateral securing other Secured Obligations;

(b)    Liens existing on the Closing Date and listed in Schedule 7.01(b) and any modifications, replacements, renewals, restructurings, refinancings or extensions thereof; provided that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under Section 7.03 and (B) proceeds and products thereof and (ii) the replacement, renewal, extension or refinancing of the obligations secured or benefitted by such Liens, to the extent constituting Indebtedness, is permitted by Section 7.03;

(c)    Liens for taxes, assessments or governmental charges that (i) are not overdue for a period of more than any applicable grace period related thereto or (ii) that are the subject of a Permitted Protest;

(d)    statutory or common law Liens of landlords, sub-landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens, so long as, in each case, such Liens secure amounts not overdue for a period of more than thirty (30) days or if more than thirty (30) days overdue, are unfiled and no other action has been taken to enforce such Liens or that are subject to a Permitted Protest;

(e)    (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Subsidiaries;

107

6237404.15

(f)      pledges or deposits to secure the performance of bids, trade contracts, utilities, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(g)      covenants, conditions, easements, rights-of-way, building codes, restrictions (including zoning restrictions), encroachments, licenses, protrusions and other similar encumbrances and minor title defects, in each case affecting Real Property and that do not in the aggregate materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole, and any exceptions on any title insurance policies issued in connection with such Real property;

(h)      Liens (i) securing judgments or orders for the payment of money not constituting an Event of Default under Section 8.01(h) and (iii) arising out of notices of *lis pendens* and associated rights related to litigation being contested in good faith by appropriate proceedings for which adequate reserves have been made;

(i)      leases, licenses, subleases or sublicenses (including licenses and sublicenses of software and other intellectual property rights) and terminations thereof, in each case either granted to others with respect to intellectual property that is not material to the business of the Borrower and Subsidiaries or in the ordinary course of business, which (i) do not interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, (ii) do not secure any Indebtedness and (iii) are permitted by Section 7.05;

(j)      Liens in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(k)      Liens (i) of a collection bank arising under Section 4-208 of the Uniform Commercial Code on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business, (iii) in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions, and (iv) that are contractual rights of setoff or rights of pledge relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(l)      Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Sections 7.02(g), (i) and (n) or to the extent related to any of the foregoing, Section 7.02(s), to be applied against the purchase price for such Investment, and (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

108

(m)      Liens (i) in favor of the Borrower or any Subsidiary Guarantor and (ii) in favor of a Subsidiary that is not a Loan Party on assets of a Subsidiary that is not a Loan Party securing Indebtedness permitted under Section 7.03;

(n)      any interest or title of a lessor, sub-lessor, licensor or sub-licensor under leases, subleases, licenses or sublicenses entered into by the Borrower or any of its Subsidiaries in the ordinary course of business or with respect to intellectual property that is not material to the business of the Borrower and its Subsidiaries;

(o)      Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business permitted by this Agreement;

(p)      Liens deemed to exist in connection with Investments in repurchase agreements under Section 7.02;

(q)      Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(r)      Liens that are contractual rights of setoff or rights of pledge (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any of its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(s)      Liens solely on any cash earnest money deposits made by the Borrower or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(t)      ground leases in respect of Real Property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(u)      Liens to secure Indebtedness permitted under Section 7.03(e); provided that (i) such Liens are created within 270 days of the acquisition, construction, repair, lease or improvement of the property subject to such Liens, (ii) such Liens do not at any time encumber property (except for replacements, additions, accessions and proceeds to such property) other than the property financed by such Indebtedness and the proceeds and products thereof and customary security deposits and (iii) with respect to Capitalized Leases, such Liens do not at any time extend to or cover any assets (except for replacements, additions and accessions to such assets) other than the assets subject to such Capitalized Leases and the proceeds and products thereof and customary security deposits; provided that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(v)      Liens on property of any Subsidiary that is not a Loan Party, which Liens secure Indebtedness of any Subsidiary that is not a Loan Party permitted under Section 7.03;

109

6237404.15

(w)      Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Subsidiary (other than by designation as a Subsidiary pursuant to Section 6.14) (other than Liens on the Equity Interests of any Person that becomes a Subsidiary to the extent such Equity Interests are owned by the Borrower or another Subsidiary), in each case, securing Indebtedness permitted pursuant to Section 7.03(g),

(x)      (i) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business complies, and (ii) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any Real Property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole;

(y)      Liens arising from precautionary Uniform Commercial Code financing statement or similar filings;

(z)      Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(aa)     the modification, replacement, renewal or extension of any Lien permitted by Sections 7.01(b), (u) and (w); provided that (i) the Lien does not extend to any additional property, other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien and (B) proceeds and products thereof, and (ii) the renewal, extension, restructuring or refinancing of the obligations secured or benefited by such Liens is permitted by Section 7.03 (to the extent constituting Indebtedness);

(bb)     Liens with respect to property or assets of the Borrower or any of its Subsidiaries securing obligations, other than Indebtedness for borrowed money, in an aggregate principal amount outstanding at any time not to exceed $5,000,000, in each case determined as of the date of incurrence;

(cc)     [reserved];

(dd)     [reserved];

(ee)     Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(ff)     deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

(gg)     [reserved];

(hh)     [reserved];

110

6237404.15

(ii)    Liens on property of any Foreign Subsidiary securing Indebtedness of such Foreign Subsidiary permitted under Section 7.03;

(jj)    Subject to the Intercreditor Agreement, Liens on the Collateral securing (i)(A) Indebtedness incurred pursuant to Section 7.03(w) and (B) related Second Lien Secured Obligations under the Second Lien Loan Documents governing such Indebtedness and (ii)(A) Indebtedness incurred pursuant to Section 7.03(x) and (B) related First Lien Secured Obligations under the First Lien Loan Documents governing such Indebtedness;

(kk)    [reserved];

(ll)    in the case of any non-wholly owned Subsidiary, any put and call arrangements or restrictions on disposition related to its Equity Interests set forth in its organizational documents or any related joint venture or similar agreement;

(mm)    Liens securing Swap Contracts so long as the value of the property securing such Swap Contracts does not exceed $2,500,000 at any time;

(nn)    Liens on property incurred pursuant to any sale-leaseback transaction permitted hereunder and general intangibles related thereto;

(oo)    [reserved]; and

(pp)    Liens arising by operation of law in the United States under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods.

Section 7.02    **Investments**.    Make or hold any Investments, except the following (each, a "**Permitted Investment**"):

(a)    Investments by the Borrower or any of its Subsidiaries in assets that were cash or Cash Equivalents when such Investment was made;

(b)    loans or advances to officers, directors and employees of any Loan Party (or any direct or indirect parent thereof) or any of its Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests of Holdings or any direct or indirect parent thereof or to permit the payment of taxes with respect thereto; provided that, to the extent such loans or advances are made in cash, the amount of such loans and advances used to acquire such Equity Interests shall be contributed to the Borrower in cash as common equity; provided, further, that the aggregate principal amount outstanding at any time under this clause (ii) shall not exceed $3,750,000, and (iii) for any other purposes not described in the foregoing clauses (i) and (ii); provided that the aggregate principal amount outstanding at any time under this clause (iii) shall not exceed $1,250,000;

(c)    Investments (i) by the Borrower or any Subsidiary in any Loan Party (other than a Holdco), (ii) by any Subsidiary that is not a Loan Party in any other Subsidiary that is not a Loan Party and (iii) so long as the Payment Conditions are satisfied, by any Loan Party in any Subsidiary that is not a Loan Party; provided that (A) no such Investments made pursuant to clause (iii) in the form of intercompany loans shall be evidenced by a promissory note unless any such promissory note constituting a

111

negotiable instrument is pledged to the Administrative Agent in accordance with the terms of the Security Agreement, (B) any Investments in the form of intercompany loans constituting Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be unsecured and subordinated to the Obligations on terms consistent with the subordination provisions of the Intercompany Note and (C) the aggregate amount of Investments made pursuant to clause (iii) shall not exceed $20,000,000 at any time outstanding;

(d)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e)      Investments (excluding loans and advances made in lieu of Restricted Payments pursuant to and limited by Section 7.02(m) below) consisting of transactions permitted under Sections 7.01, 7.03 (other than 7.03(c) and (d)), 7.04 (other than 7.04(c)(ii) or (e)), 7.05 (other than 7.05(d)(ii) or 7.05(e)), 7.06 (other than 7.06(d)) and 7.13, respectively;

(f)      Investments (i) existing or contemplated on the Closing Date or made pursuant to legally binding written contracts in existence on the Closing Date, in each case set forth on Schedule 7.02(f) and any modification, replacement, renewal, reinvestment or extension thereof and (ii) existing on the Closing Date by the Borrower or any Subsidiary in the Borrower or any other Subsidiary and any modification, renewal or extension thereof; provided that (x) the amount of the original Investment is not increased except by the terms of such Investment or as otherwise permitted by this Section 7.02 and (y) any Investment in the form of Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be subject to subordination terms substantially consistent with the terms of the Intercompany Note;

(g)      Investments in Swap Contracts permitted under Section 7.03;

(h)      promissory notes, securities and other non-cash consideration received in connection with Dispositions permitted by Section 7.05;

(i)      any acquisition of all or substantially all the assets of a Person or any Equity Interests in a Person that becomes a Subsidiary or division or line of business of a Person (or any subsequent Investment made in a Person, division or line of business previously acquired in a Permitted Acquisition), in a single transaction or series of related transactions; provided, that:  (i) the Payment Conditions are satisfied; (ii) no Event of Default exists on the date that the Borrower or the applicable Subsidiary enters into a binding agreement with respect to such acquisition and, immediately after giving effect to such acquisition; (iii) any acquired or newly formed Subsidiary shall not be liable for any Indebtedness except for Indebtedness otherwise permitted by Section 7.03; (iv) to the extent required by the Collateral and Guarantee Requirement, (A) the property, assets and businesses acquired in such purchase or other acquisition shall constitute Collateral and (B) any such newly created or acquired Subsidiary (other than an Excluded Subsidiary) shall become a Guarantor, in each case, in accordance with Section 6.11; and (v) the aggregate amount of Investments by Loan Parties pursuant to this Section 7.02(i) in assets (other than Equity Interests) that are not (or do not become

112

at the time of such acquisition) directly owned by a Loan Party or in Equity Interests of Persons that do not become Loan Parties shall not exceed, when taken together with the aggregate amount of all Investments made pursuant to Section 7.02(c)(iii), $20,000,000 (any such acquisition, a "**Permitted Acquisition**");

(j)      Investments made in connection with the Transactions;

(k)      Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(l)      Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(m)      loans and advances to any direct or indirect parent of the Borrower, in lieu of and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof) Restricted Payments to the extent permitted to be made to such parent in accordance with Section 7.06(h), such Investment being treated for purposes of the applicable clause of Section 7.06, including any limitations, as if a Restricted Payment had been made pursuant to such clause;

(n)      so long as the Payment Conditions are satisfied, Investments (including Permitted Acquisitions) in an aggregate amount pursuant to this Section 7.02(n) (valued at the time of the making thereof, and without giving effect to any write-downs or write-offs thereof) at any time not to exceed $12,500,000;

(o)      so long as the Payment Conditions are satisfied, Investments made in respect of joint ventures or other similar agreements or partnership not to exceed $10,000,000;

(p)      Investments in any Person to which the Borrower or any Subsidiary outsources operational activities or otherwise related to the outsourcing of operational activities in the ordinary course of business in an aggregate amount not to exceed $2,500,000;

(q)      advances of payroll payments to employees in the ordinary course of business;

(r)      (i) Investments made in the ordinary course of business in connection with obtaining, maintaining or renewing client contracts and loans or advances made to distributors and suppliers in the ordinary course of business and (ii) Investments to the extent that payment for such Investments is made solely with Equity Interests of Holdings permitted to be issued hereunder (or any direct or indirect parent of the Borrower);

(s)      Investments of a Subsidiary acquired after the Closing Date in accordance with Section 7.02 or of a Person merged or amalgamated or consolidated into the Borrower or merged, amalgamated or consolidated with a Subsidiary in

113

6237404.15

accordance with Section 7.04 after the Closing Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger or consolidation; provided that this clause (s) is intended solely to grandfather such Investments as are indirectly acquired as a result of an acquisition of a Person otherwise permitted hereunder and any consideration paid in connection with such acquisition that may be allocable to such Investments that consist of Subsidiaries that are not Loan Parties must be permitted by, and be taken into account in computing compliance with, any basket amounts or limitations applicable to such acquisition hereunder;

(t)        Investments made by a Subsidiary that is not a Loan Party to the extent such Investments are financed with the proceeds received by such Subsidiary from an Investment in such Subsidiary by a Loan Party permitted under this Section 7.02;

(u)        [reserved];

(v)        [reserved];

(w)        Investments in deposit accounts, securities accounts and commodities accounts maintained by the Borrower or such Subsidiary, as the case may be;

(x)        Investments constituting any part of a reorganization and other activities related to tax planning; provided that (i) no Event of Default shall have occurred and be continuing and (ii) any security interests granted to the Administrative Agent for the benefit of the Secured Parties in the Collateral pursuant to the Collateral Documents shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, consolidation, dissolution or liquidation) and all actions required to maintain said perfected status have been or will promptly be taken; and

(y)        contributions of the Equity Interests of any Subsidiary that is not a Loan Party to any other Subsidiary that is not a Loan Party to the extent necessary in connection with any intercompany reorganization and/or other activities related to tax planning; provided that no Event of Default shall have occurred and be continuing.

To the extent an Investment is permitted to be made by a Loan Party directly in any Subsidiary or any other Person who is not a Loan Party (each such person, a "**Target Person**") under any provision of this Section 7.02, such Investment may be made by advance, contribution or distribution by a Loan Party to a Subsidiary, or a Holdco, and further contemporaneously advanced or contributed to a Subsidiary for purposes of making the relevant Investment in the Target Person without constituting an Investment for purposes of Section 7.02 (it being understood that such Investment must satisfy the requirements of, and shall count towards any thresholds in, a provision of this Section 7.02 as if made by the applicable Loan Party directly to the Target Person).

Section 7.03    **Indebtedness**.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)  Indebtedness of any Loan Party under the Loan Documents;

(b)  Indebtedness outstanding on the Closing Date and listed on Schedule 7.03(b) and any Permitted Refinancing thereof; provided that all such Indebtedness of any Loan Party owed to any

114

6237404.15

Subsidiary that is not a Loan Party shall be unsecured and subordinated to the Obligations pursuant to an Intercompany Note;

(c) Guarantees by the Borrower and any Subsidiary in respect of Indebtedness of the Borrower or any Subsidiary otherwise permitted hereunder; provided that (A) no Guarantee by any Subsidiary of any Indebtedness that is secured by a Lien on the Collateral shall be permitted unless such guaranteeing party shall have also provided a Guarantee of the Obligations on the terms set forth herein, (B) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guarantee of the Obligations on terms at least as favorable (as reasonably determined by the Borrower) to the Lenders as those contained in the subordination of such Indebtedness and (C) any Guarantee by a Subsidiary that is not a Loan Party of any Indebtedness under Section 7.03(g) or (m) (or any Permitted Refinancing in respect thereof) shall only be permitted if such Guarantee meets the requirements of clauses (s), (g) or (m), as the case may be, of this Section 7.03;

(d) Indebtedness of the Borrower or any Subsidiary owing to any Loan Party or any other Subsidiary (or issued or transferred to any direct or indirect parent of a Loan Party which is substantially contemporaneously transferred to a Loan Party or any Subsidiary of a Loan Party) to the extent constituting an Investment permitted by Section 7.02; provided that (x) no such Indebtedness owed to a Loan Party shall be evidenced by a promissory note unless such promissory note constitutes a negotiable instrument and is pledged to the Administrative Agent in accordance with the terms of the Security Agreement and (y) with respect to Indebtedness of any Loan Party owed to a Subsidiary that is not a Loan Party, all such Indebtedness shall be unsecured and subordinated to the Obligations pursuant to subordination terms substantially consistent with the terms of the Intercompany Note;

(e) (i) Attributable Indebtedness and other Indebtedness (including Capitalized Leases) financing an acquisition, construction, repair, replacement, lease or improvement of a fixed or capital asset incurred by the Borrower or any Subsidiary prior to or within 270 days after the acquisition, lease or improvement of the applicable asset and any Permitted Refinancing thereof in an aggregate amount not to exceed $7,500,000, determined at the time of incurrence (together with any Permitted Refinancings thereof) at any time outstanding and (ii) Attributable Indebtedness arising out of sale-leaseback transactions permitted by Section 7.05(m) and any Permitted Refinancing of such Attributable Indebtedness;

(f) Indebtedness in respect of Swap Contracts designed to hedge against the Borrower's or any Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes and Guarantees thereof;

(g)     Indebtedness of the Borrower or any Subsidiary (i) assumed in connection with any Permitted Acquisition (provided that such Indebtedness is not created or incurred in contemplation of such Permitted Acquisition) or (ii) incurred to finance any Permitted Acquisition; provided that (A) the aggregate amount of Indebtedness assumed and/or incurred pursuant to this clause (g) shall not exceed $25,000,000 and (B) after giving Pro Forma Effect to the incurrence of such Indebtedness (x) at any time when the financial covenant contained in Section 7.~~13~~11 of the First Lien Term Loan Credit Agreement is not in effect, the ~~[Consolidated First Lien Net Leverage Ratio] does not exceed [●]:1.00 or (y) the [Consolidated First Lien Net Leverage Ratio]~~ (as defined in the First Lien Term Loan Credit Agreement) does not exceed 8.20:1.00 or (y) the Consolidated First Lien Net Leverage Ratio does not exceed the ~~[Consolidated First Lien Net Leverage Ratio]~~ as of the last day of the most recently ended Test Period~~.~~;

(h) Indebtedness representing deferred compensation to employees of the Borrower or any of its Subsidiaries incurred in the ordinary course of business;

115

(i) Indebtedness consisting of promissory notes issued by the Borrower or any of its Subsidiaries to current or former officers, managers, consultants, directors and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of the Borrower or any direct or indirect parent of the Borrower permitted by Section 7.06; provided that such Indebtedness shall be subordinated in right of payment to the Obligations on terms reasonably satisfactory to the Required Lenders;

(j) Indebtedness incurred by the Borrower or any of its Subsidiaries in a Permitted Acquisition, any other Investment permitted hereunder (including through a merger) or any Disposition permitted hereunder, in each case, constituting indemnification obligations or obligations in respect of purchase price (including earnouts) or other similar adjustments;

(k) Indebtedness consisting of obligations of the Borrower or any of its Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with the Transactions, and Permitted Acquisitions or any other Investment permitted hereunder;

(l) Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantees thereof or the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished in the ordinary course of business;

(m) Indebtedness in an aggregate principal amount that at the time of, and after giving effect to, the incurrence thereof, would not exceed $7,500,000 determined at the time of incurrence;

(n) Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(o) Indebtedness incurred by the Borrower or any of its Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers' compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims;

(p) obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of its Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(q) [reserved];

(r) [reserved];

(s) [reserved];

(t) [reserved];

(u) Indebtedness incurred by a Foreign Subsidiary which, when aggregated with the principal amount of all other Indebtedness incurred pursuant to this Section 7.03(u) and then outstanding

116

6237404.15

for all such Persons taken together (and any Permitted Refinancing of the foregoing, to the extent assumed or incurred by a Subsidiary that is not a Loan Party), does not exceed $25,000,000;

(v)   [reserved];

(w) (i) Indebtedness under the Second Lien Credit Agreement in an aggregate principal amount not to exceed $50,000,000 and (ii) any Permitted Refinancing in respect of any of the foregoing Indebtedness in accordance with the terms of the Intercreditor Agreement;

(x)   (i) Indebtedness under the First Lien Credit Agreement in an aggregate principal amount not to exceed $~~75,000~~76,600,000 and (ii) any Permitted Refinancing in respect of any of the foregoing Indebtedness in accordance with the terms of the Intercreditor Agreement;

(y)   [reserved];

(z)   [reserved]; and

(aa) all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in Sections 7.03(a) through Section 7.03(aa);

provided, however, that all Indebtedness permitted by this Section 7.03 which is permitted to be secured pursuant to Section 7.01 and is secured by the Collateral shall be subject to the following: (1) in the case of the Indebtedness described in Section 7.03(w), all such Indebtedness incurred on the Closing Date shall constitute [~~"Second~~"Junior Lien ~~Credit Agreement Secured~~ Obligations~~"]~~" under (and as defined in) the Intercreditor Agreement and the ~~Second~~Junior Lien Administrative Agent acting on behalf of the holders of such Indebtedness shall have become party to the Intercreditor Agreement on the Closing Date; and (2) in the case of the Indebtedness described in Section 7.03(x), all such Indebtedness incurred on the Closing Date shall constitute [~~"~~"First Lien ~~Credit Agreement Secured~~ Obligations~~"]~~" under (and as defined in) the Intercreditor Agreement and the First Lien Administrative Agent acting on behalf of the holders of such Indebtedness shall have become party to the Intercreditor Agreement on the Closing Date.

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased, plus the aggregate amount of fees, underwriting discounts, premiums (including tender premiums) and other costs and expenses (including original issue discount) incurred in connection with such refinancing.

The accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 7.03.  The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

117

For purposes of determining compliance with this Section 7.03, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Indebtedness described in Sections 7.03(a) through 7.03(aa), Holdings shall, in its sole discretion, classify and reclassify or later divide, classify or reclassify such item of Indebtedness (or any portion thereof) and will only be required to include the amount and type of such Indebtedness in one or more of the above clauses; provided that (w) all Indebtedness outstanding under the Loan Documents will at all times be deemed to be outstanding in reliance only on the exception in Section 7.03(a), (x) the First Lien Term Facility and any Permitted Refinancing in respect of the foregoing will at all times be deemed to be outstanding in reliance only on the exception in Section 7.03(x) and (y) the Second Lien Term Facility and any Permitted Refinancing in respect of the foregoing will at all times be deemed to be outstanding in reliance only on the exception in Section 7.03(w).

**Section 7.04    Fundamental Changes**.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of related transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person (other than as part of the Transactions), except that:

(a)    (i) Any Loan Party (other than Holdings or the Borrower) and any Subsidiary may merge, amalgamate or consolidate with the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction); provided that the Borrower shall be the continuing or surviving Person and (ii) any Subsidiary may merge with one or more other Subsidiaries; provided that when any Person that is a Loan Party is merging with a Subsidiary that is not a Loan Party, the Loan Party shall be the continuing or surviving Person or the surviving entity shall substantially concurrently become a Loan Party; provided, further, that any security interests granted to the Administrative Agent for the benefit of the Secured Parties in the Collateral pursuant to the Collateral Documents shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, consolidation, dissolution or liquidation) and all actions required to maintain said perfected status have been or will promptly be taken, in each case, as required by Sections 6.11 or 6.13 to the extent required pursuant to the Collateral and Guarantee Requirement;

(b)    (i) any Subsidiary that is not a Loan Party may merge, amalgamate or consolidate with or into any other Subsidiary that is not a Loan Party, (ii) any Subsidiary may liquidate or dissolve and (iii) any Subsidiary may change its legal form if, with respect to clauses (ii) and (iii), the Borrower determines in good faith that such action is in the best interest of the Borrower and its Subsidiaries and is not materially disadvantageous to the Lenders (it being understood that in the case of any change in legal form, a Subsidiary that is a Guarantor will remain a Guarantor unless such Guarantor is otherwise permitted to cease being a Guarantor hereunder);

(c)    any Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Subsidiary; provided that if the transferor in such a transaction is a Guarantor, then (i) the transferee must be a Subsidiary Guarantor or the Borrower or (ii) to the extent constituting an Investment, such Investment must be a Permitted Investment in or Indebtedness of a Subsidiary which is not a Loan Party in accordance with Sections 7.02 (other than Section 7.02(e) or 7.02(h)) and 7.03, respectively;

(d)    [reserved];

118

(e)      so long as no Event of Default has occurred and is continuing or would result therefrom (in the case of a merger involving a Loan Party), any Subsidiary may merge or consolidate with any other Person in order to effect an Investment permitted pursuant to Section 7.02; provided that the continuing or surviving Person shall be a Subsidiary, which together with each of such surviving Person's Subsidiaries that are Subsidiaries, shall have complied with the requirements of Section 6.11 or 6.13 to the extent required pursuant to the Collateral and Guarantee Requirement;

(f)      [reserved]; and

(g)      so long as no Event of Default has occurred and is continuing or would result therefrom, a merger, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 7.05 or a Restricted Payment permitted pursuant to Section 7.06.

Section 7.05    **Dispositions**.  Make any Disposition, except:

(a)      Dispositions of obsolete, worn out, used or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Borrower or any of its Subsidiaries;

(b)      Dispositions of inventory in the ordinary course of business or consistent with past practice, goods held for sale in the ordinary course of business and immaterial assets (including allowing any registrations or any applications for registration of any immaterial intellectual property to lapse or go abandoned in the ordinary course of business) and termination of leases and licenses in the ordinary course of business;

(c)      Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)      Dispositions of property to the Borrower or any Subsidiary; provided that if the transferor of such property is a Loan Party, (i) the transferee thereof must be a Loan Party (other than a Holdco) or (ii) if such transaction constitutes an Investment, such transaction is permitted under Section 7.02 other than Section 7.02(e);

(e)      to the extent constituting Dispositions, transactions permitted by (i) Section 7.01 (other than Section 7.01(i) and (l)(ii)), (ii) Section 7.02 (other than 7.02(e) or (h)), (iii) Section 7.04 (other than 7.04(g)) and (iv) Section 7.06 (other than 7.06(d));

(f)      Dispositions to consummate the Transactions;

(g)      Dispositions of cash and Cash Equivalents in a manner that is not prohibited by this Agreement;

(h)      leases, subleases, licenses or sublicenses (including licenses and sublicenses of software or other intellectual property rights) and terminations thereof, in each case in the ordinary course of business, and which do not materially interfere with

119

6237404.15

the business of the Borrower and its Subsidiaries (taken as a whole) and (ii) Dispositions of intellectual property (including inbound licenses) that is no longer material to the business of the Borrower and its Subsidiaries;

(i)      transfers of property subject to Casualty Events;

(j)      Dispositions of property (other than sales or dispositions of Accounts in connection with securitization or factoring arrangements); provided that (i) at the time of such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Default has occurred and is continuing), no Event of Default shall have occurred and be continuing or would result from such Disposition, (ii) with respect to Dispositions pursuant to this Section 7.05(j) for an aggregate purchase price for all such Dispositions in excess of $5,000,000 in any fiscal year, the Borrower or any of its Subsidiaries shall receive not less than 75% of such consideration in the form of cash or Cash Equivalents (in each case, free and clear of all Liens at the time received, other than non-consensual Liens permitted by Section 7.01 and Liens permitted by Sections 7.01(a), (f), (k), (l), (m), (n), (p), (q), (r)(i), (r)(ii), (s), (jj) and (kk) (only to the extent the Obligations are secured by such cash and Cash Equivalents)); provided, however, that for the purposes of this clause (ii), the following shall be deemed to be cash: (A) any liabilities (as shown on the Borrower's most recent balance sheet provided hereunder or in the footnotes thereto) of the Borrower or such Subsidiary, other than liabilities that are by their terms subordinated to the payment in cash of the Obligations, that are assumed by the transferee with respect to the applicable Disposition and for which the Borrower and all of its Subsidiaries shall have been validly released by all applicable creditors in writing, (B) any securities received by the Borrower or the applicable Subsidiary from such transferee that are converted by the Borrower or such Subsidiary into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of the applicable Disposition, and (C) aggregate non-cash consideration received by the Borrower or the applicable Subsidiary having an aggregate fair market value (determined as of the closing of the applicable Disposition for which such non-cash consideration is received) not to exceed the $6,250,000 at any time and (iii) the Borrower or the applicable Subsidiary complies with the applicable provision of Section 2.04;

(k)      Dispositions of non-core assets acquired in connection with Permitted Acquisitions or other Investments; provided that (i) the aggregate amount of such sales shall not exceed 25% of the fair market value of the acquired entity or business and (ii) each such sale is in an arm's-length transaction and the Borrower or the respective Subsidiary receives at least fair market value in exchange therefor;

(l)      Dispositions or discounts without recourse of accounts receivable in connection with the compromise or collection thereof in the ordinary course of business;

(m)      Dispositions of property pursuant to sale-leaseback transactions;

(n)      any swap of assets in exchange for services or other assets in the ordinary course of business of comparable or greater value or usefulness to the business of the Borrower and its Subsidiaries as a whole, as determined in good faith by the management of the Borrower;

(o)      [reserved];

120

6237404.15

(p)      Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(q)      the unwinding or settlement of any Swap Contract;

(r)      the lapse or abandonment in the ordinary course of business of any registrations or applications for registration of any immaterial IP Rights;

(s)      [reserved];

(t)      [reserved];

(u)      Dispositions of non-Collateral assets in an aggregate amount not to exceed, over the life of this Agreement, $2,500,000; and

(v)      Dispositions pursuant to agreements, instruments or arrangements in existence on the Closing Date and set forth on Schedule 7.05(v);

provided that any Disposition of any property pursuant to this Section 7.05 (except pursuant to Sections 7.05(a), (b), (d), (e), (f), (h), (i), (l), (p), (q) and (r) and except for Dispositions from a Loan Party to any other Loan Party) shall be for no less than the fair market value of such property at the time of such Disposition as determined by the Borrower in good faith.  To the extent any Collateral is Disposed of as permitted by this Section 7.05 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

Section 7.06      **Restricted Payments**.  Declare or make, directly or indirectly, any Restricted Payment, except:

(a)      each Subsidiary may make Restricted Payments to the Borrower, and other Subsidiaries of the Borrower (and, in the case of a Restricted Payment by a non-wholly owned Subsidiary, to the Borrower and any other Subsidiary and to each other owner of Equity Interests of such Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(b)      the Borrower and each Subsidiary may declare and make dividend payments or other Restricted Payments payable solely in the Equity Interests of such Person (and, in the case of such a Restricted Payment by a non-wholly owned Subsidiary, to the Borrower and any other Subsidiary and to each other owner of Equity Interests of such Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(c)      [reserved];

(d)      to the extent constituting Restricted Payments, the Borrower (or any direct or indirect parent thereof) and its Subsidiaries may enter into and consummate transactions permitted by any provision of Section 7.02 (other than 7.02(e) and 7.02(m)), 7.04 (other than 7.04(g)), 7.05 (other than 7.05(e)(iv) and 7.05(g)) or 7.08 (other than 7.08(f), 7.08(g), 7.08(h), and 7.08(m));

121

(e)      repurchases of Equity Interests in the Borrower or any Subsidiary deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(f)      [reserved]:

(g)      [reserved];

(h)      so long as the Payment Conditions are satisfied, the Borrower may make Restricted Payments to any direct or indirect parent of Holdings;

(i)      to pay its operating costs and expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), incurred in the ordinary course of business and attributable to the ownership or operations of the Borrower and its Subsidiaries, Transaction Expenses and any indemnification claims made by directors or officers of such parent attributable to the ownership or operations of the Borrower and its Subsidiaries;

(ii)      the proceeds of which shall be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) ordinary course franchise or similar Taxes, other fees and expenses required to maintain its (or any of its direct or indirect parents') corporate existence; and

(iii)      for any taxable period in which the Borrower and/or any of its Subsidiaries is a member of a consolidated, combined or similar income tax group of which a direct or indirect parent of the Borrower is the common parent (a "**Tax Group**"), to pay the portion of any federal, foreign, state and/or local income taxes of such Tax Group that are attributable to the taxable income of the Borrower and/or its Subsidiaries provided that, for each taxable period, the amount of such payments made in respect of such taxable period in the aggregate shall not exceed the amount that the Borrower and its Subsidiaries would have been required to pay as a stand-alone consolidated, combined or similar income tax group (any amount permitted to be paid under this Section 7.06(h)(iii), a "**Tax Distribution**");

(i)      payments made or expected to be made by a Holdco, Borrower or any of the Subsidiaries (or Restricted Payments to allow any direct or indirect parent thereof to make payments) in respect of withholding or similar Taxes payable by or with respect to any future, present or former employee, director, manager or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) and any repurchases of Equity Interests in consideration of such payments including deemed repurchases, in each case, in connection with the exercise of stock options;

(j)      [after a Qualified IPO by the Borrower or a Relevant Public Company, (i) any Restricted Payment by the Borrower to pay listing fees and other costs and expenses attributable to the Borrower or such Relevant Public Company being a publicly traded company which are reasonable and customary and (ii) additional Restricted Payments in an aggregate amount per annum not to exceed an amount equal to 6.0% of the net proceeds received by (or contributed to) the Borrower from such Qualified IPO]; and

122

6237404.15

(k)      the Borrower or any of the Subsidiaries may pay (or to make Restricted Payments to allow any direct or indirect parent thereof to pay) cash in lieu of fractional Equity Interests in connection with (x) any dividend, split or combination thereof or (y) any Permitted Acquisition; and.

(l)      [reserved].

Section 7.07    **[Reserved]**.

Section 7.08    **Transactions with Affiliates**.  Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, in each case involving aggregate payments or consideration in excess of $1,000,000, other than:

(a)      transactions among the Borrower and its Subsidiaries or any entity that becomes a Subsidiary as a result of such transaction;

(b)      on terms substantially as favorable to the Borrower or such Subsidiary as would be obtainable by the Borrower or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(c)      the Transactions and the payment of fees and expenses (including Transaction Expenses) as part of or in connection with the Transactions;

(d)      the issuance of Equity Interests to any officer, director, employee or consultant of the Borrower or any of its Subsidiaries in connection with the Transactions;

(e)      [reserved];

(f)      Restricted Payments permitted under Section 7.06;

(g)      loans and other Investments among Holdings, Intermediate Holdings, the Borrower and its Subsidiaries and joint ventures (to the extent any such Subsidiary that is not a Subsidiary or any such joint venture is only an Affiliate as a result of Investments by the Holdcos, the Borrower and/or its Subsidiaries in such Subsidiary or joint venture) to the extent otherwise permitted under Section 7.02;

(h)      transactions by the Borrower and its Subsidiaries permitted under an express provision (including any exceptions thereto) of this Article VII;

(i)      employment and severance arrangements between the Borrower and its Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee benefit plans and arrangements in the ordinary course of business;

(j)      the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers, employees and consultants of the Borrower and its Subsidiaries (or any direct or indirect parent of the Borrower) in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and its Subsidiaries;

123

6237404.15

(k)    transactions pursuant to agreements, instruments or arrangements in existence on the Closing Date and set forth on Schedule 7.08(k) or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect;

(l)    [reserved];

(m)    payments by the Borrower or any of its Subsidiaries pursuant to any tax sharing agreements with any direct or indirect parent of the Borrower to the extent attributable to the ownership or operation of the Borrower and the Subsidiaries, but only to the extent permitted by Section 7.06(h)(iii);

(n)    the issuance or transfer of Equity Interests (other than Disqualified Equity Interests) of Holdings to any Permitted Holder or to any former, current or future director, manager, officer, employee or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees, distributes or Affiliate of any of the foregoing) of the Borrower, any of its Subsidiaries or any direct or indirect parent thereof;

(o)    transactions with customers, clients, joint venture partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and the Subsidiaries, in the reasonable determination of the board of directors or the senior management of the Borrower, or are on terms at least as favorable (as reasonably determined by the Borrower) as might reasonably have been obtained at such time from an unaffiliated party;

(p)    the Transactions;

(q)    the payment of reasonable out-of-pocket costs and expenses and indemnities pursuant to the stockholders agreement or the registration and participation rights agreement entered into on the Closing Date in connection therewith;

(r)    transactions in which the Borrower or any of the Subsidiaries, as the case may be, deliver to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Borrower or such Subsidiary from a financial point of view or meets the requirements of Section 7.08(b); and

(s)    payments to or from, and transactions with, joint ventures (to the extent any such joint venture is only an Affiliate as a result of Investments by the Borrower and the Subsidiaries in such joint venture) in the ordinary course of business to the extent otherwise permitted under Section 7.02.

Section 7.09    **Burdensome Agreements**.    Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that limits the ability of:

(a)    any Subsidiary that is not a Guarantor to make Restricted Payments to the Borrower or any Guarantor; or

(b)    any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Lenders with respect to the Facilities and the Obligations;

124

6237404.15

provided that the foregoing Sections 7.09(a) and (b) shall not apply to Contractual Obligations which:

(i)      (x) exist on the Closing Date and (to the extent not otherwise permitted by this Section 7.09) are listed on Schedule 7.09(b) and (y) to the extent Contractual Obligations permitted by clause (x) are set forth in an agreement evidencing Indebtedness, are set forth in any agreement evidencing any permitted modification, replacement, renewal, extension or refinancing of such Indebtedness so long as such modification, replacement, renewal, extension or refinancing (taken as a whole) does not materially expand the scope of such Contractual Obligation (as reasonably determined by the Borrower);

(ii)      are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Subsidiary; provided, further, that this clause (ii) shall not apply to Contractual Obligations that are binding on a Person that becomes a Subsidiary pursuant to Section 6.14;

(iii)      represent Indebtedness of a Subsidiary which is not a Loan Party which is permitted by Section 7.03 and which does not apply to any Loan Party;

(iv)      are customary restrictions (as reasonably determined by the Borrower) that arise in connection with (x) any Lien permitted by Sections 7.01(a), (b), (f), (i), (j)(i), (k), (l), (p), (q), (r)(i), (r)(ii), (s), (u), (v), (w), (z), (aa), (ee), (ii), (jj), and (kk) and relate to the property subject to such Lien or (y) arise in connection with any Disposition permitted by Section 7.04 or 7.05 and relate solely to the assets or Person subject to such Disposition;

(v)      are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 7.02 and applicable solely to such joint venture and its equity entered into in the ordinary course of business;

(vi)      are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 7.03 but solely to the extent any negative pledge relates to (i) the property financed by such Indebtedness and the proceeds, accessions and products thereof or (ii) the property secured by such Indebtedness and the proceeds, accessions and products thereof so long as the agreements governing such Indebtedness permit the Liens securing the Obligations;

(vii)      are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the property interest, rights or the assets subject thereto;

(viii)      comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Sections 7.03(b), (e), (g), (n)(i), (u), (w) and (x) and to the extent that such restrictions apply only to the property or assets securing such Indebtedness or, in the case of Section 7.03(g) or (u), to the Subsidiaries incurring or guaranteeing such Indebtedness;

(ix)      are customary provisions restricting subletting, transfer or assignment of any lease governing a leasehold interest of the Borrower or any Subsidiary;

125

(x)     are customary provisions restricting assignment or transfer of any agreement entered into in the ordinary course of business;

(xi)     are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(xii)     arise in connection with cash or other deposits permitted under Sections 7.01 and 7.02 and limited to such cash or deposit;

(xiii)     comprise restrictions imposed by any agreement governing Indebtedness entered into on or after the Closing Date and permitted under Section 7.03 that are, taken as a whole, in the good faith judgment of the Borrower, either (a) no more restrictive than the restrictions contained in this Agreement or (b) no more restrictive with respect to the Borrower or any Subsidiary than customary market terms for Indebtedness of such type, so long as the Borrower shall have determined in good faith that such restrictions pursuant to this clause (b) will not affect its obligation or ability to make any payments required hereunder;

(xiv)     are restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(xv)     are restrictions regarding licensing or sublicensing by the Borrower and its Subsidiaries of intellectual property (including customary restrictions on assignment contained in license or sublicense agreements) entered into in the ordinary course of business;

(xvi)     are restrictions contained in the Second Lien Loan Documents and documents otherwise governing Indebtedness permitted pursuant to Section 7.03(w);

(xvii)     are restrictions on cash earnest money deposits in favor of sellers in connection with acquisitions not prohibited hereunder; and

(xviii)     are restrictions contained in the First Lien Loan Documents and documents otherwise governing Indebtedness permitted pursuant to Section 7.03(x).

**Section 7.10     Use of Proceeds**. Each Loan Party will not, and will not permit any of its Subsidiaries to, use the proceeds of any Loan made hereunder for any purpose other than (a) on the Closing Date, (i) to repay, in full, the outstanding principal, accrued interest, and accrued fees and expenses owing under or in connection with the Existing Credit Facility, (ii) to pay a portion of the consideration payable in connection with the consummation of the Transaction, and (iii) to pay the fees, costs, and expenses incurred in connection with this Agreement, the other Loan Documents, and the transactions contemplated hereby and thereby, in each case, as set forth in the Flow of Funds Agreement, and (b) thereafter, consistent with the terms and conditions hereof, for their lawful and permitted purposes; provided that (x) no part of the proceeds of the Loans will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors, (y) no part of the proceeds of any Loan or Letter of Credit will be used, directly or, knowingly (after due care and inquiry), indirectly, to make any payments to a Sanctioned Entity or a Sanctioned Person, to fund any investments, loans or contributions in, or otherwise make such proceeds available to, a Sanctioned Entity or a Sanctioned Person, to fund any operations, activities or business of a Sanctioned Entity or a Sanctioned Person, or in any other manner that would result in a violation of Sanctions by any Person,

126

6237404.15

and (z) that no part of the proceeds of any Loan or Letter of Credit will be used, directly or, knowingly (after due care and inquiry), indirectly, in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws.

Section 7.11    Limitation on Issuance of Equity Interests.  Except for the issuance or sale of Qualified Equity Interests by a Holdco, each Loan Party will not, and will not permit any of its Subsidiaries to, issue or sell any of its Equity Interests.

Section 7.12Section 7.11    [Reserved].

Section 7.13Section 7.12    **Inventory with Bailees**.  Borrower will not, and will not permit any of its Subsidiaries to, store its Inventory at any time with a bailee, warehouseman, or similar party except as set forth on Schedule 5.25.

Section 7.14Section 7.13    **Fixed Charge Coverage Ratio**.  Borrower covenants and agrees that, until the termination of all of the Commitments and the payment in full of the Obligations, the Loan Parties will maintain a Fixed Charge Coverage Ratio, calculated for each twelve (12) month period ending on the first day of any Covenant Testing Period and the last day of each fiscal month occurring until the end of any Covenant Testing Period (including the last day thereof), in each case of at least 1.00 to 1.00.

Section 7.15Section 7.14    **[Reserved]**.

Section 7.16Section 7.15    **Prepayments, Etc. of Indebtedness**.

(a) Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner (it being understood that payments of regularly scheduled principal, interest and mandatory prepayments and "AHYDO" payments and, subject to no Event of Default then existing or resulting therefrom, in connection with the amendment of the Second Lien Credit Agreement, the payment of related fees (other than in connection with any amendment that reduces or forgives the commitments, outstanding principal amount or effective yield of such Second Lien Credit Agreement) shall be permitted) any (i) Indebtedness subordinated in right of payment incurred under Section 7.03, or (ii) any other Indebtedness for borrowed money of a Loan Party that is (x) subordinated in right of payment to the Obligations expressly by its terms or (y) is secured on a junior lien basis to the Liens securing the Obligations, except (i) the refinancing thereof with any Indebtedness (to the extent such Indebtedness constitutes a Permitted Refinancing and, if such Indebtedness was originally incurred under Section 7.03(g), is permitted pursuant to Section 7.03(g)), to the extent not required to prepay any Loans pursuant to Section 2.04, (ii) the conversion or exchange of the Second Lien Obligations to Equity Interests (other than Disqualified Equity Interests) of Holdings or any of its direct or indirect parents, (iii) the prepayment of Indebtedness of the Borrower or any Subsidiary to the Borrower or any Subsidiary, subject to the subordination provisions applicable to any such Indebtedness, (iv) prepayments of principal of and any required premium on loans under the Second Lien Credit Agreement (or any comparable provision of a Permitted Refinancing thereof) in connection with the removal of a lender pursuant to Section 3.07 of the Second Lien Credit Agreement (or any comparable provision of a Permitted Refinancing thereof or the payment of any fees in connection with amendments thereto) and (v) prepayments of principal of and any required premium on loans under the Second Lien Credit Agreement (or any comparable provision of a Permitted Refinancing thereof) in connection with the removal of a lender pursuant to Section 3.07 of the Second Lien Credit Agreement (or any comparable provision of a Permitted Refinancing thereof or the payment of any fees in connection with amendments thereto).

127

(b) Amend, modify or change any term or condition of any Indebtedness (x) in the case of the Indebtedness under the First Lien Credit Agreement and any other First Lien Secured Obligations (and any Permitted Refinancing in respect of the foregoing) in violation of the Intercreditor Agreement, (y) in the case of the Indebtedness under the Second Lien Credit Agreement and any other Second Lien Secured Obligations (and any Permitted Refinancing in respect of the foregoing), in violation of the Intercreditor Agreement or the definition of "Permitted Refinancing" and (z) in the case of any other Indebtedness in excess of the Threshold Amount in a manner adverse to the Lenders.

Notwithstanding anything to the contrary in any Loan Document, the Borrower may make regularly scheduled payments of interest and fees on the First Lien Term Facility or the Second Lien Term Facility, and may make any payments required by the terms of such Indebtedness in order to avoid the application of Section 163(e)(5) of the Code to such Indebtedness.

~~Section 7.17~~Section 7.16     **Permitted Activities**.  With respect to a Holdco, engage in any material operating or business activities; _provided_ that the following and any activities incidental thereto shall be permitted in any event: (i) (a) in the case of Intermediate Holdings, its ownership of the Equity Interests of the Borrower and activities incidental thereto, including payment of dividends and other amounts in respect of its Equity Interests and (b) in the case of Holdings, its ownership of the Equity Interests of Intermediate Holdings and activities incidental thereto, including payment of dividends and other amounts in respect of its Equity Interests, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations with respect to the Loan Documents, the First Lien Loan Documents, the Second Lien Loan Documents and any other documents governing Indebtedness permitted to be incurred by the Borrower or a Subsidiary pursuant to Section 7.03, (iv) any public offering of its common stock or any other issuance or sale of its Equity Interests, (v)(1) Guaranteed Obligations in respect of Indebtedness of, the Borrower and its Subsidiaries permitted under Section 7.03, including any Permitted Refinancing thereof and (2) guaranties of other obligations not constituting Indebtedness incurred by, the Borrower or any of the Subsidiaries, (vi) if applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings, Intermediate Holdings and the Borrower, (vii) holding any cash or property (but not operating any property), (viii) [reserved], (ix) providing indemnification to officers and directors and (x) any activities incidental or reasonably related to the foregoing.  No Holdco shall incur any Liens on Equity Interests of Intermediate Holdings or the Borrower, other than non-consensual Liens and those for the benefit of the First Lien Secured Obligations, First Lien Secured Obligations (subject at all times to the Intercreditor Agreement) and the Second Lien Secured Obligations (subject at all times to the Intercreditor Agreement).  Holdings shall not own any Equity Interests other than those of Intermediate Holdings, and Intermediate Holdings shall not own any Equity Interests other than those of the Borrower.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**Section 8.01     Events of Default**.  Any of the following from and after the Closing Date shall constitute an event of default (an "**Event of Default**"):

(a)     _Non-Payment_.  Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within three (3) Business Days after the same becomes due, any interest on any Loan, any fees or other amounts payable hereunder or with respect to any other Loan Document; or

(b)     _Specific Covenants_.  The Borrower, any Subsidiary or, in the case of Section 7.16, a Holdco, fails to perform or observe (i) any term, covenant or agreement contained in any of Section 6.~~01, 6.~~02~~,~~(e), 6.03(a~~) or~~), 6.05(a) (solely with respect to the

128

Borrower), 6.07, 6.10, 6.11, 6.13, 6.20(b), 6.21, 6.22 or 6.23 or Article VII of this Agreement or Sections 3.03(f) through (m) of the Security Agreement; *provided* that the covenant in Section 7.13 is subject to cure pursuant to Section 8.04; or (ii) any term, covenant or agreement contained in any of Section 6.01 or 6.02 (other than Section 6.02(e) which is subject to clause (i) above) and such failure shall continue for a period of five (5) Business Days or (iii) any term, covenant or agreement contained in any of Section 6.11 or 6.13 and such failure shall continue for a period of fifteen (15) days; or

(c)     *Other Defaults*.  Any Holdco, the Borrower or any Subsidiary fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a), (b) or (d)) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after (i) a Responsible Officer of any Loan Party obtaining knowledge thereof or (ii) receipt by the Borrower of written notice thereof from the Administrative Agent; or

(d)     *Representations and Warranties*.   Any representation, warranty, certification or statement of fact made or deemed made by any Loan Party herein or in any other Loan Document, or any certification in any document required to be delivered in connection herewith or therewith shall be incorrect in any material respect (or, in the case of any representation and warranty qualified by materiality, in all respects) when made or deemed made; or

(e)     *Cross-Default*.  Any Loan Party or any Subsidiary (A) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder, but including Indebtedness outstanding under the First Lien Loan Documents and Second Lien Loan Documents) having an aggregate outstanding principal amount of not less than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness referenced in clause (A) above, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any default thereunder by any Loan Party), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause (after delivery of any notice if required and after giving effect to any waiver, amendment, cure or grace period), with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that this clause (B) shall not apply to (i) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder, (ii) any Indebtedness if (x) the sole remedy of the holder thereof in the event of the non-payment of such Indebtedness or the non-payment or non-performance of obligations related thereto or (y) the sole rights of the holder(s) thereof is to elect, in each case, to convert such Indebtedness into Qualified Equity Interests and cash in lieu of fractional shares and (iii) in the case of Indebtedness which the holder thereof may elect to convert into Qualified Equity Interests, such Indebtedness from and after the date, if any, on which such conversion has been effected; *provided*, *further*, that such failure is unremedied or is not waived by the holders of such Indebtedness prior to any acceleration of the Loans pursuant to Section 8.02; or

129

6237404.15

(f)     *Insolvency Proceedings, Etc*.   ~~Any~~Other than with respect to any dissolutions otherwise permitted hereunder, any Loan Party or any Material Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes a general assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or substantially all of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) consecutive calendar days, or an order for relief is entered in any such proceeding; or

(g)     [reserved]; or

(h)     *Judgments*.   There is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by either (i) independent third-party insurance as to which the insurer does not deny coverage or (ii) another creditworthy (as reasonably determined by the Required Lenders) indemnitor); and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of ~~thirty (30~~sixty (60) consecutive days; or

(i)     *Invalidity of Loan Documents*.   Any material provision of the Loan Documents, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05) or as a result of acts or omissions by the Administrative Agent or any Lender due to such person's gross negligence or willful misconduct which do not arise from a breach by a Loan Party of its obligations under the Loan Documents or the satisfaction in full of all the Obligations (other than contingent obligations as to which no claim has been asserted), ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document or the validity or priority of a Lien as required by the Collateral Documents on a material portion of the Collateral; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations (other than in accordance with its terms)), or purports in writing to revoke or rescind any Loan Document (other than in accordance with its terms); or

(j)     *Change of Control*.   There occurs any Change of Control; or

(k)     *Collateral Documents*.   Any Collateral Document after delivery thereof pursuant to Sections 4.01, 6.11 or 6.13 shall for any reason (other than pursuant to the terms thereof including as a result of a transaction not prohibited under this Agreement) cease to create a valid and perfected Lien, with the priority required by the Collateral Documents on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01 or any Loan Party contests in writing the validity or priority of a Lien, (i) except to the extent that any such perfection or priority is not required pursuant to the Collateral and Guarantee

130

Requirement or results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities or negotiable instruments pledged under the Collateral Documents or take other required actions required to be taken by the Administrative Agent under the Loan Documents, in each case, which does not arise from a breach by a Loan Party of its obligations under the Loan Documents, and (ii) except as to Collateral consisting of Real Property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

(l)      *ERISA*.   (i) An ERISA Event occurs which has resulted or could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, or (ii) a Loan Party, any Subsidiary or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan and a Material Adverse Effect could, individually or in the aggregate, reasonably be expected to result.

**Section 8.02      Remedies Upon Event of Default**.   (a)  If any Event of Default occurs and is continuing, the Administrative Agent may, at the request of the Required Lenders, take any or all of the following actions:

(i)      declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower (to the extent permitted by applicable law); and

(ii)      declare the Commitments terminated, whereupon the Commitments shall immediately be terminated together with (i) any obligation of any Lender to make Revolving Loans, (ii) the obligation of the Swing Lender to make Swing Loans, and (iii) the obligation of Issuing Bank to issue Letters of Credit; and

(iii)      exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

provided that upon the occurrence of an Event of Default pursuant to Section 8.01(f), the Commitments shall automatically terminate and the unpaid principal amount of all outstanding Loans and all interest, fees, premiums and all other Obligations automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.

**Section 8.03      [Reserved]**.

**Section 8.04      Borrower's Right to Cure**.   Notwithstanding anything to the contrary contained in Section 8.01 or Section 8.02:

(a)      For the purpose of determining whether an Event of Default under Section 7.13 has occurred, the Borrower may on one or more occasions designate any portion of the net cash proceeds from a sale or issuance of Qualified Equity Interests of the Borrower or any cash contribution to the common capital of the Borrower (the "**Cure Amount**") as an increase to Consolidated EBITDA for the applicable fiscal quarter; provided that (A) such amounts to be designated (i) are actually received by the Borrower after the first day of the applicable fiscal quarter and on or prior to the tenth (10th) Business Day after the date on which financial statements are required to be

131

6237404.15

delivered with respect to such fiscal quarter (the "**Cure Expiration Date**") and (ii) do not exceed the aggregate amount necessary to cure any Event of Default under Section 7.13 as of such date and (B) the Borrower shall have provided notice (the "**Notice of Intent to Cure**") to the Administrative Agent that such amounts are designated as a "Cure Amount".  The Cure Amount shall be added to Consolidated EBITDA for the applicable fiscal quarter and included when calculating Consolidated EBITDA for each Test Period that includes such fiscal quarter.

(b)        The parties hereby acknowledge that this Section 8.04 may not be relied on for purposes of calculating any financial ratios other than for determining actual compliance with Section 7.13 and shall not result in any adjustment to any amounts hereunder (including the amount of Indebtedness, Total Assets or Indebtedness hereunder (directly or by way of netting) and shall not be included for purposes of determining pricing, mandatory prepayments, financial ratio-based conditions and the availability or amount permitted pursuant to any covenant under Article VII) with respect to the quarter with respect to which such Cure Amount was made other than the amount of the Consolidated EBITDA referred to in Section 8.04(a) above.

(c)        In furtherance of Section 8.04(a) above, (i) upon actual receipt and designation of the Cure Amount by the Borrower, the covenant under Section 7.13 shall be deemed retroactively cured with the same effect as though there had been no failure to comply with the covenant under such Section 7.13 and any Event of Default or potential Event of Default under Section 7.13 shall be deemed not to have occurred for purposes of the Loan Documents, and (ii) after delivery of an applicable Notice of Intent to Cure, neither the Administrative Agent nor any Lender may exercise any rights or remedies under Section 8.02 (or under any other Loan Document) on the basis of any actual or purported Event of Default under Section 7.13 until and unless the Cure Expiration Date has occurred without the Cure Amount having been received. Notwithstanding the foregoing, no Credit Extension shall be made until receipt by the Borrower of the Cure Amount or waiver of the Event of Default.

(d)        (i) In each period of four (4) consecutive fiscal quarters, there shall be at least two (2) fiscal quarters in which no cure right set forth in this Section 8.04 is exercised and (ii) there shall be no *pro forma* reduction in Indebtedness (directly or by way of netting) with the Cure Amount for determining compliance with Section 7.13 for the fiscal quarter with respect to which such Cure Amount was made.

(e)        There can be no more than five (5) fiscal quarters in which the cure rights set forth in this Section 8.04 are exercised during the term of this Agreement.

## ARTICLE IX
## ADMINISTRATIVE AGENT

**Section 9.01    Appointment and Authorization of Administrative Agent**.    Each Lender hereby designates and appoints Wells Fargo as its agent under this Agreement and the other Loan Documents and each Lender hereby irrevocably authorizes (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to designate, appoint, and authorize) Administrative Agent to execute and deliver each of the other Loan Documents on its behalf and to take such other action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to Administrative Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably

132

6237404.15

incidental thereto.  Administrative Agent agrees to act as agent for and on behalf of the Lenders (and the Bank Product Providers) on the conditions contained in this Article IX.  Any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document notwithstanding, Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein or in the other Loan Documents, nor shall Administrative Agent have or be deemed to have any fiduciary relationship with any Lender (or Bank Product Provider), and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Administrative Agent.  Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement or the other Loan Documents with reference to Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only a representative relationship between independent contracting parties.  Each Lender hereby further authorizes (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Administrative Agent to act as the secured party under each of the Loan Documents that create a Lien on any item of Collateral.  Except as expressly otherwise provided in this Agreement, Administrative Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that Administrative Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Loan Documents.  Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to Administrative Agent, Lenders agree that Administrative Agent shall have the right to exercise the following powers as long as this Agreement remains in effect:  (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, payments and proceeds of Collateral, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, or to take any other action with respect to any Collateral or Loan Documents which may be necessary to perfect, and maintain perfected, the security interests and Liens upon Collateral pursuant to the Loan Documents, (c) make Revolving Loans, for itself or on behalf of Lenders, as provided in the Loan Documents, (d) exclusively receive, apply, and distribute payments and proceeds of the Collateral as provided in the Loan Documents, (e) open and maintain such bank accounts and cash management arrangements as Administrative Agent deems necessary and appropriate in accordance with the Loan Documents for the foregoing purposes, (f) perform, exercise, and enforce any and all other rights and remedies of the Lender Group with respect to any Loan Party or its Subsidiaries, the Obligations, the Collateral, or otherwise related to any of same as provided in the Loan Documents, and (g) incur and pay such Lender Group Expenses as Administrative Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents.

Section 9.02    **Delegation of Duties**.  Administrative Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Administrative Agent shall not be responsible for the negligence or misconduct of any agent or attorney in fact that it selects as long as such selection was made without gross negligence or willful misconduct.

Section 9.03    **Liability of Administrative Agent**.  None of the Administrative Agent-Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders (or Bank Product Providers) for any recital, statement, representation or warranty made by any Loan Party or any of its Subsidiaries or Affiliates, or any officer or director thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document

133

6237404.15

referred to or provided for in, or received by Administrative Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of any Loan Party or its Subsidiaries or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Administrative Agent-Related Person shall be under any obligation to any Lenders (or Bank Product Providers) to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the books and records or properties of any Loan Party or its Subsidiaries.  No Administrative Agent-Related Person shall have any liability to any Lender, and Loan Party or any of their respective Affiliates if any request for a Loan, Letter of Credit or other extension of credit was not authorized by the applicable Borrower. Administrative Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose it to liability or that is contrary to any Loan Document or applicable law or regulation.

Section 9.04   **Reliance by Administrative Agent**.  Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, telefacsimile or other electronic method of transmission, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to Borrower or counsel to any Lender), independent accountants and other experts selected by Administrative Agent.  Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless Administrative Agent shall first receive such advice or concurrence of the Lenders as it deems appropriate and until such instructions are received, Administrative Agent shall act, or refrain from acting, as it deems advisable.  If Administrative Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders (and, if it so elects, the Bank Product Providers) against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders (and Bank Product Providers).

Section 9.05   **Notice of Default or Event of Default**.  Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to Administrative Agent for the account of the Lenders and, except with respect to Events of Default of which Administrative Agent has actual knowledge, unless Administrative Agent shall have received written notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of Default, and stating that such notice is a "notice of default."  Administrative Agent promptly will notify the Lenders of its receipt of any such notice or of any Event of Default of which Administrative Agent has actual knowledge.  If any Lender obtains actual knowledge of any Event of Default, such Lender promptly shall notify the other Lenders and Administrative Agent of such Event of Default.  Each Lender shall be solely responsible for giving any notices to its Participants, if any.  Subject to Section 9.04, Administrative Agent shall take such action with respect to such Default or Event of Default as may be requested by the Required Lenders in accordance with this Article IX; provided, that unless and until Administrative Agent has received any such request, Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

Section 9.06   **Credit Decision**.  Each Lender (and Bank Product Provider) acknowledges that none of the Administrative Agent-Related Persons has made any representation or warranty to it, and that no act by Administrative Agent hereinafter taken, including any review of the affairs of any Loan Party

134

6237404.15

and its Subsidiaries or Affiliates, shall be deemed to constitute any representation or warranty by any Administrative Agent-Related Person to any Lender (or Bank Product Provider).  Each Lender represents (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to represent) to Administrative Agent that it has, independently and without reliance upon any Administrative Agent-Related Person and based on such due diligence, documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of Borrower or any other Person party to a Loan Document, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to Borrower.  Each Lender also represents (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to represent) that it will, independently and without reliance upon any Administrative Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of Borrower or any other Person party to a Loan Document.  Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by Administrative Agent, Administrative Agent shall not have any duty or responsibility to provide any Lender (or Bank Product Provider) with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of Borrower or any other Person party to a Loan Document that may come into the possession of any of the Administrative Agent-Related Persons.  Each Lender acknowledges (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that Administrative Agent does not have any duty or responsibility, either initially or on a continuing basis (except to the extent, if any, that is expressly specified herein) to provide such Lender (or Bank Product Provider) with any credit or other information with respect to Borrower, its Affiliates or any of their respective business, legal, financial or other affairs, and irrespective of whether such information came into Administrative Agent's or its Affiliates' or representatives' possession before or after the date on which such Lender became a party to this Agreement (or such Bank Product Provider entered into a Bank Product Agreement).

**Section 9.07    Costs and Expenses; Indemnification**.  Administrative Agent may incur and pay Lender Group Expenses to the extent Administrative Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, attorneys' fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral, whether or not Borrower are obligated to reimburse Administrative Agent or Lenders for such expenses pursuant to this Agreement or otherwise.  Administrative Agent is authorized and directed to deduct and retain sufficient amounts from payments or proceeds of the Collateral received by Administrative Agent to reimburse Administrative Agent for such out-of-pocket costs and expenses prior to the distribution of any amounts to Lenders (or Bank Product Providers).  In the event Administrative Agent is not reimbursed for such costs and expenses by the Loan Parties and their Subsidiaries, each Lender hereby agrees that it is and shall be obligated to pay to Administrative Agent such Lender's ratable share thereof.  Whether or not the transactions contemplated hereby are consummated, each of the Lenders, on a ratable basis, shall indemnify and defend the Administrative Agent-Related Persons (to the extent not reimbursed by or on behalf of Borrower and without limiting the obligation of Borrower to do so) from and against any and all Indemnified Liabilities; provided, that no Lender shall be liable for the payment to any Administrative Agent-Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct nor shall any Lender be liable for the obligations of any Defaulting Lender in failing to make a Revolving Loan or other extension of credit hereunder.  Without limitation of the foregoing, each Lender shall reimburse Administrative Agent

135

6237404.15

upon demand for such Lender's ratable share of any costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement or any other Loan Document to the extent that Administrative Agent is not reimbursed for such expenses by or on behalf of Borrower.  The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of Administrative Agent.

Section 9.08   **Administrative Agent in Individual Capacity**.  Wells Fargo and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, provide Bank Products to, acquire Equity Interests in, and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with any Loan Party and its Subsidiaries and Affiliates and any other Person party to any Loan Document as though Wells Fargo were not Administrative Agent hereunder, and, in each case, without notice to or consent of the other members of the Lender Group.  The other members of the Lender Group acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, pursuant to such activities, Wells Fargo or its Affiliates may receive information regarding a Loan Party or its Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of such Loan Party or such other Person and that prohibit the disclosure of such information to the Lenders (or Bank Product Providers), and the Lenders acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver Administrative Agent will use its reasonable best efforts to obtain), Administrative Agent shall not be under any obligation to provide such information to them.  The terms "Lender" and "Lenders" include Wells Fargo in its individual capacity.

Section 9.09   **Successor Administrative Agent**.   Administrative Agent may resign as Administrative Agent upon thirty (30) days (ten (10) days if an Event of Default has occurred and is continuing) prior written notice to the Lenders (unless such notice is waived by the Required Lenders) and Borrower (unless such notice is waived by Borrower or a Default or Event of Default has occurred and is continuing) and without any notice to the Bank Product Providers.  If Administrative Agent resigns under this Agreement, the Required Lenders shall be entitled, with (so long as no Event of Default has occurred and is continuing) the consent of Borrower (such consent not to be unreasonably withheld, delayed, or conditioned), appoint a successor Administrative Agent for the Lenders (and the Bank Product Providers).  If, at the time that Administrative Agent's resignation is effective, it is acting as Issuing Bank or the Swing Lender, such resignation shall also operate to effectuate its resignation as Issuing Bank or the Swing Lender, as applicable, and it shall automatically be relieved of any further obligation to issue Letters of Credit, or to make Swing Loans.  If no successor Administrative Agent is appointed prior to the effective date of the resignation of Administrative Agent, Administrative Agent may appoint, after consulting with the Lenders and Borrower, a successor Administrative Agent.  If Administrative Agent has materially breached or failed to perform any material provision of this Agreement or of applicable law, the Required Lenders may agree in writing to remove and replace Administrative Agent with a successor Administrative Agent from among the Lenders with (so long as no Event of Default has occurred and is continuing) the consent of Borrower (such consent not to be unreasonably withheld, delayed, or conditioned).   In any such event, upon the acceptance of its appointment as successor Administrative Agent hereunder, such successor Administrative Agent shall succeed to all the rights, powers, and duties of the retiring Administrative Agent and the term "Administrative Agent" shall mean such successor Administrative Agent and the retiring Administrative Agent's appointment, powers, and duties as Administrative Agent shall be terminated.  After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this Article IX shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement.  If no

136

successor Administrative Agent has accepted appointment as Administrative Agent by the date which is thirty (30) days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of Administrative Agent hereunder until such time, if any, as the Lenders appoint a successor Administrative Agent as provided for above.

Section 9.10   **Lender in Individual Capacity**.  Any Lender and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, provide Bank Products to, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with any Loan Party and its Subsidiaries and Affiliates and any other Person party to any Loan Documents as though such Lender were not a Lender hereunder without notice to or consent of the other members of the Lender Group (or the Bank Product Providers).  The other members of the Lender Group acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, pursuant to such activities, such Lender and its respective Affiliates may receive information regarding a Loan Party or its Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of such Loan Party or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver such Lender will use its reasonable best efforts to obtain), such Lender shall not be under any obligation to provide such information to them.

Section 9.11   **Collateral Matters.**

(a)   The Lenders hereby irrevocably authorize (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Administrative Agent to release any Lien on any Collateral (i) upon the termination of the Commitments and payment and satisfaction in full by the Loan Parties and their Subsidiaries of all of the Obligations, (ii) constituting property being sold or disposed of if a release is required or desirable in connection therewith and if Borrower certifies to Administrative Agent that the sale or disposition is permitted under Section 7.05 (and Administrative Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property in which no Loan Party or any of its Subsidiaries owned any interest at the time Administrative Agent's Lien was granted nor at any time thereafter, (iv) constituting property leased or licensed to a Loan Party or its Subsidiaries under a lease or license that has expired or is terminated in a transaction permitted under this Agreement, or (v) in connection with a credit bid or purchase authorized under this Section 9.11.  The Loan Parties and the Lenders hereby irrevocably authorize (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Administrative Agent, based upon the instruction of the Required Lenders, to (a) consent to the sale of, credit bid, or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, (b) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale or other disposition thereof conducted under the provisions of the Code, including pursuant to Sections 9-610 or 9-620 of the Code, or (c) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any other sale or foreclosure conducted or consented to by Administrative Agent in accordance with applicable law in any judicial action or proceeding or by the exercise of any legal or equitable remedy.  In connection with any such credit bid or purchase, (i) the Obligations owed to the Lenders and the Bank Product Providers shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not impair or unduly delay the ability of Administrative Agent to credit bid or purchase at such sale or other disposition of the Collateral and, if such contingent or unliquidated claims cannot be estimated without

137

impairing or unduly delaying the ability of Administrative Agent to credit bid at such sale or other disposition, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the Collateral that is the subject of such credit bid or purchase) and the Lenders and the Bank Product Providers whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the Collateral that is the subject of such credit bid or purchase (or in the Equity Interests of the any entities that are used to consummate such credit bid or purchase), and (ii) Administrative Agent, based upon the instruction of the Required Lenders, may accept non-cash consideration, including debt and equity securities issued by any entities used to consummate such credit bid or purchase and in connection therewith Administrative Agent may reduce the Obligations owed to the Lenders and the Bank Product Providers (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) based upon the value of such non-cash consideration; provided, that Bank Product Obligations not entitled to the application set forth in Section 2.4(b)(iii)(J) shall not be entitled to be, and shall not be, credit bid, or used in the calculation of the ratable interest of the Lenders and Bank Product Providers in the Obligations which are credit bid.  Except as provided above, Administrative Agent will not execute and deliver a release of any Lien on any Collateral without the prior written authorization of (y) if the release is of all or substantially all of the Collateral, all of the Lenders (without requiring the authorization of the Bank Product Providers), or (z) otherwise, the Required Lenders (without requiring the authorization of the Bank Product Providers).  Upon request by Administrative Agent or Borrower at any time, the Lenders will (and if so requested, the Bank Product Providers will) confirm in writing Administrative Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this Section 9.11; provided, that (1) anything to the contrary contained in any of the Loan Documents notwithstanding, Administrative Agent shall not be required to execute any document or take any action necessary to evidence such release on terms that, in Administrative Agent's opinion, could expose Administrative Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly released) upon (or obligations of Borrower in respect of) any and all interests retained by Borrower, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral.  Each Lender further hereby irrevocably authorizes (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to irrevocably authorize) Administrative Agent, at its option and in its sole discretion, to subordinate (by contract or otherwise) any Lien granted to or held by Administrative Agent on any property under any Loan Document (a) to the holder of any Permitted Lien on such property if such Permitted Lien secures purchase money Indebtedness (including Capitalized Lease Obligations) which constitute ~~Permitted~~ Indebtedness permitted to be incurred by the Borrower or a Subsidiary pursuant to Section 7.03 and (b) to the extent Administrative Agent has the authority under this Section 9.11 to release its Lien on such property. Notwithstanding the provisions of this Section 9.11, the Administrative Agent shall be authorized, without the consent of any Lender and without the requirement that an asset sale consisting of the sale, transfer or other disposition having occurred, to release any security interest in any building, structure or improvement located in an area determined by the Federal Emergency Management Agency to have special flood hazards.

(b)    Administrative Agent shall have no obligation whatsoever to any of the Lenders (or the Bank Product Providers) (i) to verify or assure that the Collateral exists or is owned by a Loan Party or any of its Subsidiaries or is cared for, protected, or insured or has been encumbered, (ii) to verify or assure that Administrative Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, (iii) ~~[~~to verify or assure that any particular items of Collateral meet the eligibility criteria applicable in respect thereof~~,]~~, (iv) to impose, maintain, increase, reduce, implement, or eliminate any particular reserve hereunder or to determine whether the amount of any reserve is appropriate or not, or (v) to exercise at all or in any particular

138

manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Administrative Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, Administrative Agent may act in any manner it may deem appropriate, in its sole discretion given Administrative Agent's own interest in the Collateral in its capacity as one of the Lenders and that Administrative Agent shall have no other duty or liability whatsoever to any Lender (or Bank Product Provider) as to any of the foregoing, except as otherwise expressly provided herein.

**Section 9.12      Restrictions on Actions by Lenders; Sharing of Payments**.

(a)      Each of the Lenders agrees that it shall not, without the express written consent of Administrative Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of Administrative Agent, set off against the Obligations, any amounts owing by such Lender to any Loan Party or its Subsidiaries or any deposit accounts of any Loan Party or its Subsidiaries now or hereafter maintained with such Lender.  Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by Administrative Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against Borrower or any Guarantor or to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)      If, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from Administrative Agent pursuant to the terms of this Agreement, or (ii) payments from Administrative Agent in excess of such Lender's Pro Rata Share of all such distributions by Administrative Agent, such Lender promptly shall (A) turn the same over to Administrative Agent, in kind, and with such endorsements as may be required to negotiate the same to Administrative Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (B) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their Pro Rata Shares; provided, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

**Section 9.13      Agency for Perfection**.   Administrative Agent hereby appoints each other Lender (and each Bank Product Provider) as its Administrative Agent (and each Lender hereby accepts (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to accept) such appointment) for the purpose of perfecting Administrative Agent's Liens in assets which, in accordance with Article 8 or Article 9, as applicable, of the Code can be perfected by possession or control.  Should any Lender obtain possession or control of any such Collateral, such Lender shall notify Administrative Agent thereof, and, promptly upon Administrative Agent's request therefor shall deliver possession or control of such Collateral to Administrative Agent or in accordance with Administrative Agent's instructions.

**Section 9.14      Payments by Administrative Agent to the Lenders**.   All payments to be made by Administrative Agent to the Lenders (or Bank Product Providers) shall be made by bank wire transfer of immediately available funds pursuant to such wire transfer instructions as each party may designate for itself by written notice to Administrative Agent.  Concurrently with each such payment, Administrative

139

6237404.15

Agent shall identify whether such payment (or any portion thereof) represents principal, premium, fees, or interest of the Obligations.

**Section 9.15     Concerning the Collateral and Related Loan Documents**.   Each member of the Lender Group authorizes and directs Administrative Agent to enter into this Agreement and the other Loan Documents.   Each member of the Lender Group agrees (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to agree) that any action taken by Administrative Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by Administrative Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders (and such Bank Product Provider).

**Section 9.16     Field Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information**.   By becoming a party to this Agreement, each Lender:

(c)     is deemed to have requested that Administrative Agent furnish such Lender, promptly after it becomes available, a copy of each field examination report respecting any Loan Party or its Subsidiaries (each, a "**Report**") prepared by or at the request of Administrative Agent, and Administrative Agent shall so furnish each Lender with such Reports,

(d)     expressly agrees and acknowledges that Administrative Agent does not (i) make any representation or warranty as to the accuracy of any Report, and (ii) shall not be liable for any information contained in any Report,

(e)     expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that Administrative Agent or other party performing any field examination will inspect only specific information regarding the Loan Parties and their Subsidiaries and will rely significantly upon Borrower's and its Subsidiaries' books and records, as well as on representations of Borrower's personnel,

(f)     agrees to keep all Reports and other material, non-public information regarding the Loan Parties and their Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 10.08, and

(g)     without limiting the generality of any other indemnification provision contained in this Agreement, agrees:  (i) to hold Administrative Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of Borrower, and (ii) to pay and protect, and indemnify, defend and hold Administrative Agent, and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorneys' fees and costs) incurred by Administrative Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

In addition to the foregoing,  (x) any Lender may from time to time request of Administrative Agent in writing that Administrative Agent provide to such Lender a copy of any report or document provided by any Loan Party or its Subsidiaries to Administrative Agent that has not been contemporaneously provided by such Loan Party or such Subsidiary to such Lender, and, upon receipt of such request, Administrative Agent promptly shall provide a copy of same to such Lender, (y) to the extent that Administrative Agent is entitled, under any provision of the Loan Documents, to request

140

6237404.15

additional reports or information from any Loan Party or its Subsidiaries, any Lender may, from time to time, reasonably request Administrative Agent to exercise such right as specified in such Lender's notice to Administrative Agent, whereupon Administrative Agent promptly shall request of Borrower the additional reports or information reasonably specified by such Lender, and, upon receipt thereof from such Loan Party or such Subsidiary, Administrative Agent promptly shall provide a copy of same to such Lender, and (z) any time that Administrative Agent renders to Borrower a statement regarding the Loan Account, Administrative Agent shall send a copy of such statement to each Lender.

Section 9.17    **Several Obligations; No Liability**.    Notwithstanding that certain of the Loan Documents now or hereafter may have been or will be executed only by or in favor of Administrative Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of Administrative Agent (if any) to make any credit available hereunder shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis, according to their respective Commitments, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount of their respective Commitments.    Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lender.    Each Lender shall be solely responsible for notifying its Participants of any matters relating to the Loan Documents to the extent any such notice may be required, and no Lender shall have any obligation, duty, or liability to any Participant of any other Lender.    Except as provided in Section 9.07, no member of the Lender Group shall have any liability for the acts of any other member of the Lender Group.    No Lender shall be responsible to Borrower or any other Person for any failure by any other Lender (or Bank Product Provider) to fulfill its obligations to make credit available hereunder, nor to advance for such Lender (or Bank Product Provider) or on its behalf, nor to take any other action on behalf of such Lender (or Bank Product Provider) hereunder or in connection with the financing contemplated herein,

## ARTICLE X
## MISCELLANEOUS

Section 10.01    **Amendments, Etc**.    Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (or by the Administrative Agent with the consent of the Required Lenders) (other than with respect to any amendment or waiver contemplated in Sections 10.01(a) through (j) below, which shall only require the consent of the Lenders expressly set forth therein and not Required Lenders) (or by the Administrative Agent with the consent of the Required Lenders) and the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that, no such amendment, waiver or consent shall:

(a)    increase the amount of or extend the expiration date of any Commitment of any Lender or amend, modify, or eliminate the last sentence of Section 2.4(c)(i);

(b)    postpone any date scheduled for any payment of principal (including final maturity), interest or fees hereunder without the written consent of each Lender directly and adversely affected thereby (it being understood that the waiver (or amendment to the terms) of any mandatory prepayment of the Loans or any obligation of the Borrower to pay interest at the Default Rate, any Default or Event of Default or mandatory prepayment shall not constitute such a postponement of any date scheduled for the payment of principal or interest;

141

6237404.15

(c)      reduce or forgive the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (iii) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document (or extend the timing of payments of such fees or other amounts) without the written consent of each Lender directly and adversely affected thereby (it being understood that the waiver of (or amendment to the terms of) any obligation of the Borrower to pay interest at the Default Rate, any mandatory prepayment of the Loans or any Default or Event of Default shall not constitute such a reduction);

(d)      change any provision of Section 2.04, 2.06 or 8.03 or the definition of "Pro Rata Share" in any manner that would alter the *pro rata* sharing or order of payments or other amounts required thereby, without the written consent of each Lender directly and adversely affected thereby;

(e)      change any provision of (i) this Section 10.01 or (ii) the definition of "Required Lenders" or any other provision specifying the number of Lenders or portion of the Loans required to take any action under the Loan Documents to reduce the percentage set forth therein, without the written consent of each Lender directly and adversely affected thereby;

(f)      other than in connection with a transaction permitted under Section 7.04 or 7.05, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(g)      other than in connection with a transaction permitted under Section 7.04 or 7.05, release all or substantially all of the aggregate value of the Guarantees, without the written consent of each Lender; or

provided, further, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, adversely affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document; (ii) only the consent of the parties to the Agent Fee Letter shall be required to amend, modify or supplement the terms thereof; (iii) Section 10.07(h) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; (iv) no Lender consent is required to effect any amendment expressly contemplated by Section 6.18; (v) no amendment, waiver, modification, elimination, or consent shall amend, without written consent of Administrative Agent, Borrower and the Supermajority Lenders, modify, or eliminate the definition of Borrowing Base or any of the defined terms (including the definitions of Eligible Accounts and Eligible Inventory) that are used in such definition to the extent that any such change results in more credit being made available to Borrowers based upon the Borrowing Base, but not otherwise, or the definition of Maximum Revolver Amount; (vi) no amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of this Agreement or the other Loan Documents pertaining to Issuing Bank, or any other rights or duties of Issuing Bank under this Agreement or the other Loan Documents, without the written consent of Issuing Bank, Administrative Agent, Borrower, and the Required Lenders; and (vii) no amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of this Agreement or the other Loan Documents pertaining to Swing Lender, or any other rights or duties of Swing Lender under this Agreement or the other Loan Documents, without the written consent of Swing Lender, Administrative Agent, Borrower, and the Required Lenders.

6237404.15

Notwithstanding anything to the contrary contained herein, (i) any amendment, modification, elimination, waiver, consent, termination, or release of, or with respect to, any provision of this Agreement or any other Loan Document that relates only to the relationship of the Lender Group among themselves, and that does not affect the rights or obligations of any Loan Party, shall not require consent by or the agreement of any Loan Party, (ii) any amendment, waiver, modification, elimination, or consent of or with respect to any provision of this Agreement or any other Loan Document may be entered into without the consent of, or over the objection of, any Defaulting Lender and (iii) any amendment contemplated by Section 2.12(d)(iii) of this Agreement in connection with a Benchmark Transition Event or an Early Opt-in Election shall be effective as contemplated by such Section 2.12(d)(iii) hereof.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except (x) in respect of an amendment, waiver or consent under Section 10.01(a) or (b) and (y) any waiver, amendment or modification requiring the consent of all Lenders or each directly and adversely affected Lender that by its terms materially and adversely affects any Defaulting Lender to a greater extent than other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding the foregoing, no Lender consent is required for the Administrative Agent (but the Administrative Agent may seek such consent) to enter into or to effect any amendment, modification or supplement to any Intercreditor Agreement or arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral for the purpose of adding the holders of such Indebtedness (or their Representative) as a party thereto and otherwise causing such Indebtedness to be subject thereto, in each case as contemplated by the terms of such Intercreditor Agreement or arrangement permitted under this Agreement, as applicable (it being understood that any such amendment or supplement may make such other changes to the applicable Intercreditor Agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and provided that such other changes are not adverse, in any material respect (taken as a whole), to the interests of the Lenders); provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent.

Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Revolving Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

Notwithstanding anything to the contrary contained in this Section 10.01, guarantees, collateral security documents and related documents executed by the Loan Parties or the Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel or (ii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

Notwithstanding anything to the contrary contained in Section 10.01, if at any time after the Closing Date, the Borrower shall have identified in good faith an obvious error or any error or omission

143

6237404.15

of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.  The Administrative Agent shall be entitled to a certificate of a Responsible Officer of the Borrower stating that any such amendment is authorized and permitted by the terms of the Loan Document.

Section 10.02   **Notices and Other Communications; Facsimile Copies**.

(a)  Notices; Effectiveness; Electronic Communications.

(i)   *Notices Generally*.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 10.02(a)(ii)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(A)     if to:

(1)     the Administrative Agent, to:

Wells Fargo Bank, National Association
Attention:
E-mail:

with a copy (which shall not constitute notice) to:

Otterbourg PC
230 Park Avenue
New York, NY 10169
Attn:  Thomas P. Duignan

(2)     if to the Borrower to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02(a); and

(B)     if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in Section 10.02(a)(ii) shall be effective as provided in such Section 10.02(a)(ii).

(ii)   *Electronic* Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and

144

6237404.15

Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, <u>provided</u> that the foregoing shall not apply to notices to any Lender pursuant to <u>Article II</u> if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, <u>provided</u> that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), <u>provided</u> that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing <u>clause (i)</u> of notification that such notice or communication is available and identifying the website address therefor.

(b) *The Platform*.    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."   THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Loan Parties, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of the Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party (or its representatives); <u>provided</u>, <u>however</u>, that in no event shall any Person have any liability to any other Person hereunder for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages); <u>provided</u> that nothing in this sentence shall limit any Loan Party's indemnification obligations set forth herein.

(c) *Change of Address, Etc*.  Each of the Borrower and the Administrative Agent may change its address, electronic mail address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, electronic mail address, facsimile or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to the Borrower Materials that are not made available

145

6237404.15

through the "Public Side Information" portion of the Platform and that may contain Material Non-Public Information.

(d) *Reliance by Administrative Agent and Lenders*.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in accordance with Section 10.05 hereof.

**Section 10.03  No Waiver; Cumulative Remedies**.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) [reserved], (c) any Lender from exercising setoff rights in accordance with Section 10.09 (subject to the terms of Section 2.04) or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.04, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**Section 10.04  Attorney Costs and Expenses**.  The Borrower agrees to pay or reimburse the Administrative Agent, the Lenders and their respective Affiliates for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication, execution and delivery of this Agreement and the other Loan Documents, and to pay or reimburse the Administrative Agent, the Lenders and their respective Affiliates for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the administration of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including, in each case, all Attorney Costs, which shall be limited to counsel to the Administrative Agent and its Affiliates, one counsel to the Lenders and their respective Affiliates, taken as a whole, and, if reasonably necessary, one local counsel in each relevant jurisdiction material to the interests of the Lenders, taken as a whole and to pay or reimburse the Administrative Agent and the Lenders for all reasonable and documented out-of-pocket costs, charges and expenses incurred in connection with the enforcement or protection of any

6237404.15

rights or remedies under this Agreement or the other Loan Documents (including all such costs, charges and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all respective Attorney Costs, which shall be limited to Attorney Costs of counsel to the Administrative Agent and its Affiliates, one counsel to the Lenders and their Affiliates, taken as a whole, and, if reasonably necessary, one local counsel in each relevant jurisdiction material to the interests of the Lenders taken as a whole and, solely in the case of an actual conflict of interest, one additional counsel in each relevant jurisdiction to each group of similarly situated affected parties). The agreements in this Section 10.04 shall survive repayment of all Obligations. All amounts due under this Section 10.04 shall be paid within thirty (30) days following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail (provided that the Lender need not be required to disclose any confidential information or to the extent prohibited by law or regulation); provided that, with respect to the Closing Date, all amounts due under this Section 10.04 shall be paid on the Closing Date solely to the extent invoiced to the Borrower within two (2) Business Days of the Closing Date. If any Loan Party fails to pay when due any costs, charges, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its discretion following five (5) Business Days' prior written notice to the Borrower. For the avoidance of doubt, this Section 10.04 shall not apply to Taxes, except any Taxes that represent costs and expenses arising from any non-Tax claim.

**Section 10.05   Indemnification by the Borrower**.   The Borrower shall indemnify and hold harmless the Administrative Agent, each Agent-Related Person, Lender and their respective Affiliates and controlling Persons, and their respective officers, directors, employees, partners, agents, advisors and other representatives of each of the foregoing and their respective successors (collectively the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses, charges and disbursements (including Attorney Costs but limited in the case of legal fees and expenses to the reasonable and documented out-of-pocket fees, disbursements and other charges of counsel to Administrative Agent and its Affiliates, one counsel to all other Indemnitees taken as a whole, and, if reasonably necessary, one local counsel for all Indemnitees taken as a whole in each relevant jurisdiction that is material to the interests of the Lenders, and in the case of an actual or potential conflict of interest, one additional counsel in each relevant jurisdiction to each group of similarly situated affected Indemnitees ), joint or several, of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Loan or the use or proposed use of the proceeds therefrom, (c) any actual or alleged presence or Release of Hazardous Materials at, in, on, under or from any property or facility currently or formerly owned, leased or operated by the Loan Parties or any Subsidiary, or any Environmental Liability or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (a "**Proceeding**") and regardless of whether any Indemnitee is a party thereto or whether or not such Proceeding is brought by the Borrower or any other person and, in each case, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee (all of the foregoing, collectively, the "**Indemnified Liabilities**"); provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses, charges or disbursements resulted from (x) the gross negligence or willful misconduct of such Indemnitee or of any of its controlled Affiliates or their respective directors, officers, employees, partners, advisors or other representatives, as determined by a final non-appealable judgment of a court of competent jurisdiction, (y) any dispute solely among Indemnitees other than any claims by or against an Indemnitee in its capacity or in fulfilling its role as an

147

6237404.15

administrative agent or arranger or any similar role under this Agreement and other than any claims arising out of any act or omission of any Holdco, the Borrower or any of their Affiliates or (z) settlements effected without the Borrower's prior written consent (such consent not to be unreasonably withheld, delayed or conditioned), but if settled with the Borrower's written consent, or if there is a final judgment against an Indemnitee in any such Proceeding, the Borrower shall indemnify and hold harmless such Indemnitee to the extent and the manner set forth above. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through electronic, telecommunications or other information transmission systems, including, without limitation, SyndTrak, IntraLinks, the internet, email or similar electronic transmission systems in connection with this Agreement, in each case, except to the extent any such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee (or its controlling Persons, controlled Affiliates or their respective directors, officers, employees, partners, advisors or other representatives), nor shall any Indemnitee, Loan Party or any Subsidiary have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date); it being agreed that this sentence shall not limit the indemnification obligations of any Holdco or any Subsidiary (including, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party and for any out-of-pocket expenses). In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, any Subsidiary of any Loan Party, its directors, equity holders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents are consummated. All amounts due under this Section 10.05 shall be paid within thirty (30) days after written demand therefor (together with reasonable backup documentation supporting such reimbursement request); provided, however, that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification rights with respect to such payment pursuant to the express terms of clauses (x) through (z) above. The agreements in this Section 10.05 shall survive the resignation or removal of the Administrative Agent, the replacement of any Lender, and the repayment, satisfaction or discharge of all the other Obligations. For the avoidance of doubt, this Section 10.05 shall not apply to Taxes, except any Taxes that represent liabilities, obligations, losses, damages, penalties, claims, demands, actions, prepayments, suits, costs, expenses, charges and disbursements arising from any non-Tax claims.

To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under this Section 10.05 or Section 10.04 to be paid by it to the Administrative Agent (or any sub-agent thereof), or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), or such Related Party, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity.

**Section 10.06   Payments Set Aside**.  To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be

148

6237404.15

repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, *plus* interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**Section 10.07    Successors and Assigns**.  (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Administrative Agent (at the direction of the Required Lenders) and each Lender (except as permitted by Section 7.04) and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Assignee pursuant to an assignment made in accordance with the provisions of Section 10.07(b) (such an assignee, an "**Eligible Assignee**"), or (ii) by way of participation in accordance with the provisions of Section 10.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(g) or (iv) to an SPC in accordance with the provisions of Section 10.07(h) (and any other attempted assignment or transfer by any party hereto shall be null and void); provided, however, that notwithstanding the foregoing, no Lender may assign or transfer by participation any of its rights or obligations hereunder to (i) any Person that is a Defaulting Lender, (ii) a natural Person, (iii) a Disqualified Competitor and (iv)  Holdings, the Borrower or any of their respective Subsidiaries or Affiliates).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  (i) Subject to the conditions set forth in Section 10.07(b)(ii) below and the proviso to Section 10.07(a), any Lender may at any time assign to one or more assignees (each, an "**Assignee**") all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

> (A)    the Borrower; provided that no consent of the Borrower shall be required for (i) an assignment of all or a portion of the Revolving Loans to a Lender or to an Affiliate of a Lender or an Approved Fund thereof and (ii) after the occurrence and during the continuance of an Event of Default, an assignment to any Assignee; provided, *further*, that the Borrower shall be deemed to have consented to any such assignment unless it shall have objected thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof; and

> (B)    the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Revolving Loan to a Lender, an Affiliate of a Lender or an Approved Fund.

Notwithstanding the foregoing or anything to the contrary set forth herein, to the extent any Lender is required to assign any portion of its Loans and other rights, duties and obligations hereunder in order to comply with applicable Laws, such assignment may be made by such Lender without the consent

149

6237404.15

of the Borrower, the Administrative Agent, or any other party hereto so long as such Lender complies with the requirements of Section 10.07(b)(ii).

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment of the entire remaining amount of the assigning Lender's Loans, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, and shall be in increments of an amount of $1,000,000, in excess thereof unless each of the Borrower and the Administrative Agent otherwise consents; provided that concurrent assignments to any Lender and its Affiliates or Approved Funds and concurrent assignments from any Lender and its Affiliates or Approved Funds to a single Assignee (or to an Assignee and its Affiliates or Approved Funds) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(B)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); provided that only one such fee shall be payable in the event of simultaneous assignments to or from two (2) or more Approved Funds;

(C)     if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire; and

(D)     the Assignee shall execute and deliver to the Administrative Agent and the Borrower the forms described in Sections 3.01(e) and 3.01(f) applicable to it.

In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable *pro rata* share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full Pro Rata Share of all Loans. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(c) Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d), from and after the effective date specified in each Assignment and Assumption, the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such

150

6237404.15

Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, and the surrender by the assigning Lender of its Note, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.07(c) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(e).

(d)  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it, and a register for the recordation of the names and addresses of the Lenders and principal amounts (and related interest amounts) of the Loans owing to each Lender pursuant to the terms hereof from time to time (the "**Register**").  Upon its receipt of, and consent to, a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 10.07(b)(ii)(B) above, if applicable, and, if required, the written consent of the Administrative Agent and/or the Borrower to such assignment and any applicable tax forms, the Administrative Agent shall (i) accept such Assignment and Assumption and (ii) promptly record the information contained therein in the Register.  No assignment shall be effective unless it has been recorded in the Register as provided in this Section 10.07(d).  The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and, with respect to itself, any Lender, at any reasonable time and from time to time upon reasonable prior notice, provided that the information contained in the Register which is shared with each Lender (other than the Administrative Agent and its affiliates) shall be limited to the entries with respect to such Lender including the principal amount of and stated interest on the Revolving Loans owing to such Lender.  This Section 10.07(d) and Section 2.11 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

(e)  Any Lender may at any time (other than to a natural person, a Defaulting Lender, a Holdco, the Borrower, or any Disqualified Competitor) sell participations to any Person (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (a) through (i) of the first proviso to Section 10.01 that requires the affirmative vote of such Lender.  Subject to Section 10.07(f), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations of such Sections and Section 3.07, including Section 3.01(e), and it being understood that the documentation required under Section 3.01(e) shall be delivered solely to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(c).  To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits

151

of Section 10.09 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.04 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is reasonably necessary to establish that such Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The Participant Register shall be conclusive, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(f)  A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's consent or except to the extent such entitlement to a greater payment results from a change in any Law after the sale of the participation takes place.

(g)  Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any central bank having jurisdiction over such Lender; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)  Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof and (iii) such SPC and the applicable Loan or any applicable part thereof, shall be appropriately reflected in the Participant Register.  Each party hereto hereby agrees that (i) an SPC shall be entitled to the benefit of Sections 3.01, 3.04 and 3.05 (subject to the requirements and the limitations of such Sections and Section 3.07, including Section 3.01(e), and it being understood that the documentation required under Section 3.01(e) shall be delivered solely to the participating Lender), but neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement except, in the case of Section 3.01 and 3.04, unless such entitlement to a greater payment results from a change in any Law after the grant to the SPC takes place, (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

152

6237404.15

(i)   Notwithstanding anything to the contrary contained herein, without the consent of the Borrower or the Administrative Agent, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; provided that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(j)   [Reserved].

**Section 10.08    Confidentiality**.   Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its Affiliates and its Affiliates' managers, administrators, directors, officers, employees, trustees, partners, investors, funding sources, investment advisors and agents, including accountants, legal counsel and other advisors (collectively "**Advisors**") on a "need to know basis" (provided that (i) the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and agree or otherwise have an obligation to keep such Information confidential and (ii) the Administrative Agent or Lender, as applicable, shall be responsible for the compliance of its Affiliates and such Affiliates' Advisors with this paragraph); (b) to the extent required or requested by, or upon the good faith determination by counsel that such information should be disclosed in light of ongoing oversight or review of such Person, by any Governmental Authority or self-regulatory authority having or asserting jurisdiction over such Person (including any Governmental Authority regulating any Lender or its Affiliates), provided that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation; (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, provided that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation; (d) to any other party to this Agreement; (e) to (i) any pledgee referred to in Section 10.07(g), (ii) subject to an agreement containing provisions at least as restrictive as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Borrower), any direct or indirect contractual counterparty to a Swap Contract, Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in any of its rights or obligations under this Agreement (other than any Disqualified Competitor or Person whom the Borrower has affirmatively denied to provide consent to assignment in accordance with Section 10.07(b)(i)(A))); or (iii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder (other than any Disqualified Competitor or Person whom the Borrower has affirmatively denied to provide consent to assignment in accordance with Section 10.07(b)(i)(A)); (f) with the prior written consent of the Borrower; (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.08 or other obligation of confidentiality owed to the Borrower or its Affiliates or becomes available to the Administrative Agent, any Lender, or any of their respective Affiliates on a non-confidential basis from a source other than a Loan Party or their respective related parties (so long as such source is not known (after due inquiry) to the Administrative Agent, such Lender, or any of their respective Affiliates to be bound by confidentiality obligations to any Loan Party or its Affiliates); (h) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to Loan Parties and their Subsidiaries received by it from such Lender) or to the CUSIP Service Bureau or

153

6237404.15

any similar organization; (i) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of its rights hereunder or thereunder; (j) to the extent such information is independently developed by the Administrative Agent, any Lender, or any of their respective Affiliates; or (k) for purposes of establishing a due diligence defense.  In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and publicly available information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Administrative Agent and the Lenders in connection with the administration, settlement and management of this Agreement, the other Loan Documents and the Credit Extensions.  For the purposes of this Section 10.08, "**Information**" means all information received from the Loan Parties relating to any Loan Party, its Affiliates or its Affiliates' directors, officers, employees, trustees, investment advisors or agents, other than any such information that is publicly available to Administrative Agent, or any Lender prior to disclosure by any Loan Party other than as a result of a breach of this Section 10.08 or any other confidentiality obligation owed to any Loan Party or their Affiliates.

Section 10.09    **Setoff**.  In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates (and the Administrative Agent, in respect of any unpaid fees, costs and expenses payable hereunder) is authorized at any time and from time to time, without prior notice to the Borrower, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and each of its Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) (other than escrow, payroll, petty cash, trust and tax accounts) at any time held by, and other Indebtedness at any time owing by, such Lender and its Affiliates or the Administrative Agent to or for the credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations owing to such Lender and its Affiliates or the Administrative Agent hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not the Administrative Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit of other obligations; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.17 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender; provided that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of the Administrative Agent and each Lender under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent and such Lender may have at Law.

Section 10.10    **Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**").  If Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate,

154

6237404.15

allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**Section 10.11   Counterparts**.   This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.   Delivery by facsimile, Docusign or other electronic transmission of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document.   The Administrative Agent may also require that any such documents and signatures delivered by facsimile, Docusign or other electronic transmission be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile, Docusign or other electronic transmission.

**Section 10.12   Integration**.   This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.   Subject to Section 10.21, in the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; provided that the inclusion of supplemental rights or remedies in favor of the Administrative Agent or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement.   Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

**Section 10.13   Survival of Representations and Warranties**.   All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.   Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

**Section 10.14   Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions; provided, that the Lenders shall charge no fee in connection with any such amendment. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 10.14, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

**Section 10.15   GOVERNING LAW**. (a)  THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b) ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE

155

6237404.15

DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY (BOROUGH OF MANHATTAN) OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, OR ANY APPELLATE COURT FROM ANY THEREOF, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY, THE ADMINISTRATIVE AGENT AND EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS AND AGREES THAT IT WILL NOT COMMENCE OR SUPPORT ANY SUCH ACTION OR PROCEEDING IN ANOTHER JURISDICTION.    EACH LOAN PARTY, THE ADMINISTRATIVE AGENT AND EACH LENDER IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS IN THE MANNER PROVIDED FOR NOTICES (OTHER THAN FACSIMILE) IN SECTION 10.02.    NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.16    **WAIVER OF RIGHT TO TRIAL BY JURY**.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).    EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.16.

Section 10.17    **Binding Effect**.    This Agreement shall become effective when it shall have been executed and delivered by the Loan Parties and each other party hereto and the Administrative Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Loan Parties, the Administrative Agent and each Lender and their respective successors and assigns, in each case in accordance with Section 10.07 (if applicable) and except that no Loan Party shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders except as permitted by Section 7.04.

Section 10.18    **USA Patriot Act**.    Each Lender that is subject to the USA Patriot Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name, address and tax identification number of such Loan Party and other information regarding such Loan Party that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the USA Patriot Act.    This notice is given in accordance with the requirements of the USA Patriot Act and is

156

6237404.15

effective as to the Lenders and the Administrative Agent.  The Borrower shall, promptly following a reasonable request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

Section 10.19   **No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent are arm's-length commercial transactions between the Loan Parties and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (B) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent and each Lender each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for each Loan Party or any of their respective Affiliates, or any other Person and (B) neither the Administrative Agent nor any Lender has any obligation to the Loan Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and neither the Administrative Agent nor any other Arranger nor any Lender has any obligation to disclose any of such interests to the Loan Parties or any of their respective Affiliates.  To the fullest extent permitted by law, each Loan Party hereby waives and releases any claims that it may have against the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.20   **Judgment Currency**.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable law).

Section 10.21   **Intercreditor Agreement**.  Each Lender hereunder (a) acknowledges that it has received a copy of the Intercreditor Agreement, (b) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement and (c) authorizes and instructs the Administrative Agent to enter into the Intercreditor Agreement as Administrative Agent and on behalf of

157

6237404.15

such Lender.  The foregoing provisions are intended as an inducement to the lenders under the First Lien Loan Documents, the ~~Second~~Junior Lien Loan Documents and the Loan Documents to extend credit to the Loan Parties and such lenders are intended third party beneficiaries of such provisions.  In the event of any conflict or inconsistency between the provisions of any Intercreditor Agreement and this Agreement, the provisions of such Intercreditor Agreement shall control.

**Section 10.22   Acknowledgement and Consent to Bail-In of EEA Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution; and

(b) the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

**Section 10.23   Certain ERISA Matters.**

(a) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans,

(ii)      the transaction exemption set forth in one or more prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time ("PTEs"), such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement,

158

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)  In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

(i)    none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans and this Agreement is a fiduciary under ERISA or the US Internal Revenue Code, or both, with respect to the Loans and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)    no fee or other compensation is being paid directly to the Administrative Agent or any its Affiliates for investment advice (as opposed to other services) in connection with the Loans or this Agreement.

(c)  The Administrative Agent hereby inform the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or

159

6237404.15

other payments with respect to the Loans and this Agreement, (ii) may recognize a gain if it extended the Loans for an amount less than the amount being paid for an interest in the Loans by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

Section 10.24    **Acknowledgement Regarding Any Supported QFCs**.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedge Agreements or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States): In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States.  In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.  Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

<div align="center">

**ARTICLE XI**
**GUARANTEE**

</div>

Section 11.01    **The Guarantee**.  Each Guarantor hereby jointly and severally with the other Guarantors guarantees, as a primary obligor and not as a surety to each Secured Party and their respective permitted successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of (i) the Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code and (ii) any other Debtor Relief Laws) on the Loans made by the Lenders to, and the Notes held by each Lender of, the Borrower, and all other Secured Obligations from time to time owing to the Secured Parties by any Loan Party under any Loan Document strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"); provided, however, that Guaranteed Obligations shall exclude all Excluded Swap Obligations.  The Guarantors hereby jointly and severally agree that if the Borrower or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will

<div align="center">

160

</div>

6237404.15

promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Section 11.02   **Obligations Unconditional**.   The obligations of the Guarantors under Section 11.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrower under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full).   Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(a)    at any time or from time to time, without notice to the Guarantors, to the extent permitted by Law, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b)    any of the acts mentioned in any of the provisions of this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted (including incurring any increase or decrease in the principal amount of the Guaranteed Obligations or the rate of interest or the fees thereon);

(c)    the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or except as permitted pursuant to Section 11.09, any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d)    any Lien or security interest granted to, or in favor of, any Lender or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(e)    the release of any other Guarantor pursuant to Section 11.09.

The Guarantors hereby expressly waive (to the fullest extent permitted by Law) diligence, presentment, demand of payment, protest and, to the extent permitted by Law, all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations.   The Guarantors waive, to the extent permitted by Law, any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee.   This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed

161

6237404.15

Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrower or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto.  This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

Section 11.03   **Reinstatement**.  The obligations of the Guarantors under this Article XI shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 11.04   **Subrogation; Subordination**.  Each Guarantor hereby agrees that until the payment in full in cash and satisfaction in full of all Guaranteed Obligations (other than contingent obligations not yet due and owing) it shall subordinate any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 11.01, whether by subrogation or otherwise, against the Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.

Section 11.05   **Remedies**.  The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrower under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 8.02 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.02) for purposes of Section 11.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 11.01.

Section 11.06   **[Reserved]**.

Section 11.07   **Continuing Guarantee**.  The guarantee in this Article XI is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 11.08   **General Limitation on Guarantee Obligations**.  In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other Law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 11.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 11.09, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount (after giving effect to the liability under this Guaranty and the right of contribution established in Section 11.10, but before giving effect to any other guarantee (including any guarantee of the First Lien Obligations and/ or the Second Lien Obligations)) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 11.09   **Release of Guarantors**.  If, in compliance with the terms and provisions of the Loan Documents, (i) all or substantially all of the Equity Interests of any Subsidiary Guarantor are sold or

162

6237404.15

otherwise transferred to a Person or Persons none of which is a Loan Party in a transaction permitted hereunder or (ii) any Subsidiary Guarantor ceases to be a Subsidiary or becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder (any such Subsidiary Guarantor, and any Subsidiary Guarantor referred to in clause (i), a "**Transferred Guarantor**"), such Transferred Guarantor shall, upon the consummation of such sale or transfer or other transaction (but subject to the proviso below), be automatically released from its obligations under this Agreement (including under Section 10.05 hereof) and the other Loan Documents, including its obligations to pledge and grant any Collateral owned by it pursuant to any Collateral Document and, in the case of a sale of all or substantially all of the Equity Interests of the Transferred Guarantor, the pledge of such Equity Interests to the Administrative Agent pursuant to the Collateral Documents shall be automatically released, and, so long as the Borrower shall have provided the Administrative Agent such certifications or documents as Administrative Agent shall reasonably request, the Administrative Agent shall take such actions as are reasonably requested by the Borrower or such Guarantor to effect each release described in this Section 11.09 in accordance with the relevant provisions of the Collateral Documents; provided, however, that the release of any Subsidiary Guarantor from its obligations under this Agreement and the other Loan Documents if such Subsidiary Guarantor becomes an Excluded Subsidiary of the type described in clause (a) of the definition thereof shall only be permitted if at the time such Subsidiary Guarantor becomes an Excluded Subsidiary of such type (1) no Default or Event of Default shall have occurred and be outstanding, (2) after giving *pro forma* effect to such release and the consummation of the transaction that causes such Person to be an Excluded Subsidiary of such type, the Borrower is deemed to have made a new Investment in such Person for purposes of Section 7.02 (as if such Person were then newly acquired) and such Investment is permitted pursuant to Section 7.02 (other than Section 7.02(f)) at such time and (3) a Responsible Officer of the Borrower certifies to the Administrative Agent compliance with preceding clauses (1) and (2); provided, further, that no such release shall occur if such Subsidiary Guarantor continues to be a guarantor in respect of the First Lien Obligations, the Second Lien Obligations or any Permitted Refinancing in respect of any of the foregoing.

When all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied (other than contingent obligations as to which no claim has been asserted), this Agreement and the Guarantees made herein shall terminate with respect to all Obligations, except with respect to Obligations that expressly survive such repayment pursuant to the terms of this Agreement.

**Section 11.10   Right of Contribution**. Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment. Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 11.04. The provisions of this Section 11.10 shall in no respect limit the obligations and liabilities of any Guarantor to the Administrative Agent and the Lenders, and each Subsidiary Guarantor shall remain liable to the Administrative Agent and the Lenders for the full amount guaranteed by such Guarantor hereunder.

**Section 11.11   Keepwell**.   Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Guaranty in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 11.11 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 11.11, or otherwise under this Guarantee, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section 11.11 shall remain in full force and effect until all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied. Each Qualified ECP Guarantor intends that this Section 11.11 constitute, and this Section 11.11

163

6237404.15

shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**Section 11.12   Independent Obligation**.   The obligations of each Guarantor hereunder are independent of the obligations of any other Guarantor, any other party or any Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not action is brought against any other guarantor, any other party or any Borrower and whether or not any other guarantor, any other party or any Borrower be joined in any such action or actions.  Each Guarantor waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof.  Any payment by the Borrower or other circumstance which operates to toll any statute of limitations as to the Borrower shall operate to toll the statute of limitations as to the Guarantors.

<div align="center">[Signature Pages Follow]</div>

<div align="center">164</div>

6237404.15

## Exhibit E

### New Junior Lien Convertible Credit Agreement

Certain documents or portions thereof contained in this **Exhibit E** and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The respective rights of the Debtors and the Consenting Creditors are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement and any of the documents and designations contained herein at any time before the Effective Date of the Plan or any such other date as may be provided for in the Plan or an order of the Bankruptcy Court, and filing of the forms of the documents set forth in this Plan Supplement (including this Exhibit E) shall not be deemed as acceptance of such document by any party to the Restructuring Support Agreement or a waiver of any of the rights of any such party under the Restructuring Support Agreement, the Bankruptcy Code or otherwise.

**Dated August 28, 2020**

**SECOND LIEN CREDIT AGREEMENT**

$50,000,000

among

**JASON GROUP INC.,**
as Borrower,

**THE GUARANTORS PARTY HERETO FROM TIME TO TIME,**

**CANTOR FITZGERALD SECURITIES,**
as Administrative Agent,

and

**THE OTHER LENDERS PARTY HERETO FROM TIME TO TIME**

WEIL:\97566320\8\10143.0003

# Table of Contents

**Page**

Article I Definitions and Accounting Terms....................................................................................................1

Section 1.01      Defined Terms ....................................................................................................1
Section 1.02      Other Interpretive Provisions.............................................................................36
Section 1.03      Accounting Terms .............................................................................................37
Section 1.04      Rounding ...........................................................................................................38
Section 1.05      References to Agreements, Laws, Etc. ..............................................................38
Section 1.06      Times of Day .....................................................................................................38
Section 1.07      Timing of Payment or Performance ..................................................................38
Section 1.08      [Reserved].........................................................................................................38
Section 1.09      Pro Forma Calculations ....................................................................................38
Section 1.10      Exchange Rates; Currency.................................................................................39
Section 1.11      Certifications .....................................................................................................39

Article II Credit Extensions ...........................................................................................................39

Section 2.01      The Loans ..........................................................................................................39
Section 2.02      Conversions and Continuations of Loans..........................................................40
Section 2.03      [Reserved]..........................................................................................................40
Section 2.04      Conversion..........................................................................................................40
Section 2.05      Prepayments ......................................................................................................41
Section 2.06      [Reserved]..........................................................................................................44
Section 2.07      Repayment of Loans...........................................................................................44
Section 2.08      Interest ...............................................................................................................44
Section 2.09      Fees.....................................................................................................................45
Section 2.10      Computation of Interest and Fees .....................................................................45
Section 2.11      Evidence of Indebtedness ..................................................................................46
Section 2.12      Payments Generally............................................................................................46
Section 2.13      Sharing of Payments ..........................................................................................48
Section 2.14      [Reserved]..........................................................................................................48
Section 2.15      [Reserved]..........................................................................................................48
Section 2.16      [Reserved]..........................................................................................................48
Section 2.17      Defaulting Lenders ............................................................................................48

Article III Taxes, Increased Costs Protection and Illegality .........................................................51

Section 3.01      Taxes ..................................................................................................................51
Section 3.02      Illegality..............................................................................................................54
Section 3.03      Inability to Determine Rates...............................................................................55
Section 3.04      Increased Cost and Reduced Return; Capital Adequacy; Eurocurrency Rate Loan
                  Reserves..............................................................................................................55
Section 3.05      Funding Losses...................................................................................................57
Section 3.06      Matters Applicable to All Requests for Compensation .....................................57
Section 3.07      Replacement of Lenders under Certain Circumstances......................................58
Section 3.08      Survival ..............................................................................................................59

Article IV Conditions Precedent to Credit Extensions ..................................................................59

Section 4.01      Conditions to Initial Credit Extension ...............................................................59

Article V Representations and Warranties......................................................................................61

Section 5.01      Existence, Qualification and Power; Compliance with Laws............................61
Section 5.02      Authorization; No Contravention .......................................................................61

**Page**

Section 5.03    Governmental Authorization; Other Consents ................................................62
Section 5.04    Binding Effect ...............................................................................................62
Section 5.05    Financial Statements; No Material Adverse Effect .......................................62
Section 5.06    Litigation ......................................................................................................63
Section 5.07    Ownership of Property; Liens.........................................................................63
Section 5.08    Environmental Matters ..................................................................................63
Section 5.09    Taxes .............................................................................................................64
Section 5.10    ERISA Compliance .......................................................................................64
Section 5.11    Subsidiaries; Equity Interests .......................................................................64
Section 5.12    Margin Regulations; Investment Company Act ............................................64
Section 5.13    Disclosure .....................................................................................................65
Section 5.14    Labor Matters ...............................................................................................65
Section 5.15    Intellectual Property; Licenses, Etc ..............................................................65
Section 5.16    Solvency .......................................................................................................65
Section 5.17    [Reserved].....................................................................................................65
Section 5.18    USA Patriot Act; OFAC; FCPA....................................................................65
Section 5.19    Security Documents.......................................................................................66
Section 5.20    EEA Financial Institutions.............................................................................66
Section 5.21    Beneficial Ownership Certification..............................................................66

Article VI Affirmative Covenants ..............................................................................................66

Section 6.01    Financial Statements......................................................................................67
Section 6.02    Certificates; Other Information ......................................................................69
Section 6.03    Notices...........................................................................................................69
Section 6.04    Payment of Taxes ..........................................................................................70
Section 6.05    Preservation of Existence, Etc.......................................................................70
Section 6.06    Maintenance of Properties..............................................................................70
Section 6.07    Maintenance of Insurance...............................................................................70
Section 6.08    Compliance with Laws ...................................................................................71
Section 6.09    Books and Records ........................................................................................71
Section 6.10    Inspection Rights ...........................................................................................71
Section 6.11    Additional Collateral; Additional Guarantors................................................72
Section 6.12    Compliance with Environmental Laws ..........................................................73
Section 6.13    Further Assurances ........................................................................................74
Section 6.14    [Reserved].....................................................................................................74
Section 6.15    Ratings...........................................................................................................74
Section 6.16    Use of Proceeds .............................................................................................74
Section 6.17    Lender Meetings.............................................................................................74
Section 6.18    End of Fiscal Years ........................................................................................74
Section 6.19    Lines of Business...........................................................................................74
Section 6.20    Post-Closing Covenant ..................................................................................74
Section 6.21    Anti-Terrorism Law; Anti-Money Laundering; Embargoed Persons...............75
Section 6.22    Account Control Agreements. ........................................................................75

Article VII Negative Covenants...................................................................................................75

Section 7.01    Liens ..............................................................................................................76
Section 7.02    Investments....................................................................................................79
Section 7.03    Indebtedness ..................................................................................................83
Section 7.04    Fundamental Changes.....................................................................................86
Section 7.05    Dispositions ...................................................................................................87

WEIL:\97566320\8\10143.0003

**Page**

Section 7.06    Restricted Payments ...............................................................................89
Section 7.07    [Reserved]...........................................................................................90
Section 7.08    Transactions with Affiliates.................................................................90
Section 7.09    Burdensome Agreements......................................................................92
Section 7.10    Maximum Capital Expenditures ..........................................................94
Section 7.11    Consolidated First Lien Net Leverage Ratio .......................................94
Section 7.12    Interest Coverage Ratio .......................................................................95
Section 7.13    Prepayments, Etc. of Indebtedness ......................................................95
Section 7.14    Permitted Activities .............................................................................95

Article VIII Events of Default and Remedies..................................................................96

Section 8.01    Events of Default .................................................................................96
Section 8.02    Remedies Upon Event of Default ........................................................98
Section 8.03    Application of Funds ............................................................................99
Section 8.04    Borrower's Right to Cure ....................................................................99

Article IX Administrative Agent ....................................................................................100

Section 9.01    Appointment and Authority................................................................100
Section 9.02    Rights as a Lender ..............................................................................101
Section 9.03    Exculpatory Provisions......................................................................101
Section 9.04    Reliance by Administrative Agent......................................................103
Section 9.05    Delegation of Duties...........................................................................104
Section 9.06    Resignation of Administrative Agent .................................................104
Section 9.07    Non-Reliance on Administrative Agent and Other Lenders...............104
Section 9.08    No Other Duties, Etc. .........................................................................105
Section 9.09    Administrative Agent May File Proofs of Claim................................105
Section 9.10    Collateral and Guaranty Matters.......................................................105
Section 9.11    [Reserved]...........................................................................................107
Section 9.12    Withholding Tax Indemnity ...............................................................107
Section 9.13    Non-U.S. Administrative Agent Tax Matters .....................................107

Article X Miscellaneous ................................................................................................108

Section 10.01    Amendments, Etc. .............................................................................108
Section 10.02    Notices and Other Communications; Facsimile Copies ...................110
Section 10.03    No Waiver; Cumulative Remedies .....................................................112
Section 10.04    Attorney Costs and Expenses .............................................................112
Section 10.05    Indemnification by the Borrower .......................................................113
Section 10.06    Payments Set Aside ...........................................................................114
Section 10.07    Successors and Assigns ......................................................................115
Section 10.08    Confidentiality....................................................................................119
Section 10.09    Setoff ..................................................................................................119
Section 10.10    Interest Rate Limitation .....................................................................120
Section 10.11    Counterparts .......................................................................................120
Section 10.12    Integration...........................................................................................120
Section 10.13    Survival of Representations and Warranties......................................121
Section 10.14    Severability.........................................................................................121
Section 10.15    GOVERNING LAW ...........................................................................121
Section 10.16    WAIVER OF RIGHT TO TRIAL BY JURY .............................................121
Section 10.17    Binding Effect ....................................................................................122
Section 10.18    USA Patriot Act..................................................................................122

WEIL:\97566320\8\10143.0003

**Page**

Section 10.19   No Advisory or Fiduciary Responsibility........................................................................122
Section 10.20   Judgment Currency.............................................................................................................122
Section 10.21   Intercreditor Agreement ....................................................................................................123
Section 10.22   Acknowledgement and Consent to Bail-In of EEA Financial Institutions. .....................123
Section 10.23   Certain ERISA Matters......................................................................................................123

Article XI Guarantee.............................................................................................................................125

Section 11.01   The Guarantee ...................................................................................................................125
Section 11.02   Obligations Unconditional.................................................................................................126
Section 11.03   Reinstatement ....................................................................................................................127
Section 11.04   Subrogation; Subordination...............................................................................................127
Section 11.05   Remedies ...........................................................................................................................127
Section 11.06   [Reserved]..........................................................................................................................127
Section 11.07   Continuing Guarantee .......................................................................................................127
Section 11.08   General Limitation on Guarantee Obligations...................................................................127
Section 11.09   Release of Guarantors........................................................................................................128
Section 11.10   Right of Contribution ........................................................................................................128
Section 11.11   Keepwell............................................................................................................................128
Section 11.12   Independent Obligation .....................................................................................................129

SCHEDULES

| | |
|---|---|
| 1.01(B) | Guarantors |
| 2.01 | Term Loans |
| 2.03 | Existing Letters of Credit |
| 4.01(a) | Collateral Documents |
| 5.07 | Ownership of Property |
| 5.11 | Subsidiaries |
| 6.20 | Post-Closing Covenants |
| 7.01(b) | Liens |
| 7.02(f) | Investments |
| 7.03(b) | Indebtedness |
| 7.05(v) | Dispositions |
| 7.08(k) | Transactions with Affiliates |
| 7.09(b) | Burdensome Agreements |
| 10.02(a) | Certain Addresses for Notices |

EXHIBITS

*Form of*

| | |
|---|---|
| A | Committed Loan Notice |
| B | Note |

WEIL:\97566320\8\10143.0003

**Page**

| | | |
|---|---|---|
| C | Compliance Certificate | |
| D | Solvency Certificate | |
| E | Assignment and Assumption | |
| G | Intercompany Note | |
| H | United States Tax Compliance Certificate | |
| I | Joinder Agreement | |

WEIL:\97566320\8\10143.0003

## SECOND LIEN CREDIT AGREEMENT

This SECOND LIEN CREDIT AGREEMENT is entered into as of August 28, 2020, among JASON GROUP INC., a Delaware corporation and successor by merger with Old Jason (hereinafter defined) (the "**Company**" and the "**Borrower**"), the Guarantors party hereto from time to time, CANTOR FITZGERALD SECURITIES, as Administrative Agent, and each lender from time to time party hereto (collectively, the "**Lenders**" and, individually, a "**Lender**").

### PRELIMINARY STATEMENTS

On June 24, 2020 (the "**Petition Date**"), Jason Incorporated, a Wisconsin corporation ("**Old Jason**"), Jason Partners Holdings Inc., a Delaware corporation ("**Old Holdings**"), Jason Holding, Inc. I, a Delaware corporation ("**Old Intermediate Holdings**"), the Guarantors and each of the Domestic Subsidiaries of Old Jason (collectively, the "**Debtors**") as debtors and debtors-in-possession, commenced voluntary cases under chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), which cases are being jointly administered under the caption In re: JASON INDUSTRIES, INC. *et al.* (the "**Chapter 11 Cases**").

The Joint Prepackaged Plan of Reorganization of Jason Industries, Inc. and its Debtor Affiliates pursuant to Chapter 11 of the Bankruptcy Code filed with the Bankruptcy Court on June 20, 2020 Docket No. 22 (the "**Prepackaged Plan**") has been confirmed pursuant to the Confirmation Order (as defined below), and concurrently with the Term Loans (as defined below) deemed made hereunder, the "Effective Date" as defined in and under the Prepackaged Plan (the "**Plan Effective Date**") has occurred.

Prior to the Petition Date, certain lenders extended credit to Old Jason, as borrower, pursuant to that certain First Lien Credit Agreement, dated as of June 30, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Pre-Petition First Lien Credit Agreement**") by and among Old Jason, the guarantors party thereto from time to time, the Bank of New York Mellon, as administrative agent, the lenders party thereto from time to time (the "**Pre-Petition First Lien Lenders**") and Deutsche Bank AG New York Branch, as L/C Issuer (as defined therein) and Swing Line Lender (as defined therein).

The Prepackaged Plan provides that, on the Plan Effective Date, each Pre-Petition First Lien Lender under the Pre-Petition First Lien Credit Agreement shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for their First Lien Secured Credit Agreement Claim (as defined in the Prepackaged Plan) its pro rata share of, among other things, (i) the Term Loans, (ii) the First Lien Terms Loans and (iii) 100% of the equity of Holdings, subject to dilution in accordance with the terms of the Prepackaged Plan.

After giving effect to the Transactions (herein defined) on the Plan Effective Date, (i) Jason Holdings Inc., a Delaware corporation ("**Holdings**") shall own 100% of the outstanding equity interests in Jason Intermediate Inc., a Delaware corporation ("**Intermediate Holdings**"), which shall hold 100% of the outstanding equity interests in the Company; and (ii) Old Jason shall have merged with and into the Company, with the Company as successor by merger.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

### ARTICLE I
### DEFINITIONS AND ACCOUNTING TERMS

**Section 1.01**    <u>**Defined Terms**</u>.

As used in this Agreement, the following terms shall have the meanings set forth below:

"**ABL Agent**" has the meaning assigned to the term "Administrative Agent" under and as defined in the ABL Credit Agreement and shall include any successor administrative agent under the ABL Credit Agreement.

"**ABL Credit Agreement**" means that certain ABL Credit Agreement, dated as of the date hereof, by and among the Borrower, the Holdcos, the other Guarantors from time to time party thereto, the lenders party thereto from time to time and Wells Fargo Bank, National Association, as the ABL Agent.

"**ABL Loan Documents**" means the "Loan Documents" as defined in the ABL Credit Agreement.

"**ABL Obligations**" means the "Obligations" (or any comparable term) as defined in the ABL Credit Agreement.

"**ABL Priority Collateral**" has the meaning assigned to such term in the Intercreditor Agreement.

"**ABL Secured Obligations**" means the "Secured Obligations" as defined in the ABL Credit Agreement.

"**ABL Facility**" means the ABL Loans and commitments in respect thereof.

"**ABL Loans**" means the "Loans" as defined in the ABL Credit Agreement.

"**Account Control Agreement**" means, subject to the Intercreditor Agreement, any deposit account control agreement, securities account control agreement or similar agreement entered into by a Loan Party, the Administrative Agent and the applicable financial institution, granting to the Administrative Agent, for the benefit of the Secured Parties, a perfected, Lien and, subject to the Intercreditor Agreement, "control" (as defined in the UCC) in the applicable deposit account or securities account of a Loan Party.

"**Administrative Agent**" means Cantor Fitzgerald Securities, in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"**Administrative Agent's Office**" means the Administrative Agent's address and account as set forth in Section 10.02(a), or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form approved by the Administrative Agent.

"**Advisors**" has the meaning set forth in Section 10.08.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Agent Fee Letter**" means the letter agreement, dated as of the date of this Agreement, between the Borrower and the Administrative Agent.

"**Agent Parties**" has the meaning set forth in Section 10.02(b).

"**Agent-Related Persons**" means the Administrative Agent, together with its Affiliates, officers, directors, employees, partners, agents, advisors and other representatives.

"**Aggregate Accrual**" has the meaning set forth in Section 10.24.

2

"**Agreement**" means this Second Lien Credit Agreement, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Agreement Currency**" has the meaning assigned to such term in Section 10.20.

"**AHYDO Payment**" has the meaning set forth in Section 10.24.

"**Annual Financial Statements**" means the audited consolidated balance sheets of Old Jason as of December 31, 2017, December 31, 2018 and December 31, 2019, and the related consolidated statements of income and statements of cash flows for the Old Jason for the fiscal years then ended.

"**Anti-Terrorism Law**" has the meaning set forth in Section 6.21(a).

"**Applicable Rate**" means a percentage per annum equal to (i) for Eurocurrency Rate Loans, 10.00% and (ii) for Base Rate Loans, 9.00%; and

"**Approved Bank**" has the meaning set forth in clause (c) of the definition of "Cash Equivalents."

"**Approved Fund**" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"**Assignee**" has the meaning set forth in Section 10.07(b)(i).

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit E hereto."

"**Assignment Taxes**" has the meaning set forth in Section 3.01(b).

"**Attorney Costs**" means and includes all reasonable and documented fees, out-of-pocket expenses and disbursements of any law firm or other external legal counsel.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Available Cash**" means at any time, (a) (i) the aggregate amount of unrestricted cash and Cash Equivalents of the Loan Parties and their Domestic Subsidiaries at such time plus (ii) the amount of cash and Cash Equivalents of the Loan Parties and their Domestic Subsidiaries that is restricted in favor of the ABL Facility, the First Lien Credit Agreement and/or this Agreement, minus, to the extent included in clause (a), (b) the aggregate amount of any cash or Cash Equivalents (i) set aside to pay royalty obligations, working capital obligations, suspense payments, severance taxes, payroll, payroll taxes, other taxes, employee wage and benefit payments and trust and fiduciary obligations for which a Loan Party or any Subsidiary thereof has issued checks or has initiated wires or ACH transfers (or, in the Borrower's discretion, will issue checks or initiate wires or ACH transfers within five Business Days) in order to pay such amounts, (ii) in respect of other amounts for which a Loan Party or any Subsidiary thereof has issued checks or has initiated wires or ACH transfers but have not yet been subtracted from the balance in the relevant account of such Loan Party or relevant Subsidiary, (iii) constituting purchase price deposits or amounts subject to other contractual or legal requirements to deposit money to be held by an unaffiliated third party, (iv) constituting deposits from unaffiliated third parties that are subject to return pursuant to binding agreements with such third parties, or (v) held in escrow.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the

3

WEIL:\97566320\8\10143.0003

implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" has the meaning set forth in the preliminary statements to this Agreement.

"**Base Rate**" means for any day a fluctuating rate per annum equal to the highest of (i) the Federal Funds Effective Rate plus 1/2 of 1%, (ii) the rate quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent) and (iii) the rate per annum determined in the manner set forth in clause (ii) of the definition of Eurocurrency Rate plus 1%; provided that, notwithstanding the foregoing, in no event shall the Base Rate applicable to the Term Loans at any time be less than 2.00% per annum. Any change in the Base Rate due to a change in such rate announced by the Administrative Agent or in the Federal Funds Effective Rate shall take effect at the opening of business on the day specified in the announcement of such change.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation, which certification shall be substantially similar in form and substance to the form of Certification Regarding Beneficial Owners of Legal Entity Customers published jointly, in May 2018, by the Loan Syndications and Trading Association and Securities Industry and Financial Markets Association.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Board**" has the meaning set forth in the definition of "Statutory Reserves."

"**Borrower**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Borrower Materials**" has the meaning set forth in Section 6.01.

"**Borrowing**" means a borrowing consisting of Term Loans of the same Type and Class and, in the case of Eurocurrency Rate Loans, having the same Interest Period, made by each of the Lenders pursuant to Section 2.01.

"**Business Day**" means (i) any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of New York, and (ii) if such day relates to any Eurocurrency Rate Loan, any such day that is also a London Banking Day.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capitalized Leases) by the Borrower and its Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on the consolidated statement of cash flows of the Borrower and its Subsidiaries.

4

"**Capitalized Leases**" means all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; *provided* that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"**Carry Over Amount**" has the meaning set forth in Section 7.10.

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by the Borrower or any Subsidiary:

(a)    Dollars;

(b)    readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of the United States having average maturities of not more than 24 months from the date of acquisition thereof; *provided* that the full faith and credit of the United States is pledged in support thereof;

(c)    time deposits or eurodollar time deposits with, insured certificates of deposit, bankers' acceptances or overnight bank deposits of, or letters of credit issued by, any commercial bank that (i) is a Lender or (ii) (A) is organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development or is the principal banking Subsidiary of a bank holding company organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development and is a member of the Federal Reserve System, and (B) has combined capital and surplus of at least $250,000,000 or $100,000,000 in the case of any non-U.S. bank (any such bank in the foregoing clauses (i) or (ii) being an "**Approved Bank**"), in each case with maturities not exceeding 24 months from the date of acquisition thereof;

(d)    commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation (other than structured investment vehicles and other than corporations used in structured financing transactions) and rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 24 months from the date of acquisition thereof;

(e)    marketable short-term money market and similar funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(f)    repurchase obligations for underlying securities of the types described in clauses (b), (c) and (e) above entered into with any Approved Bank;

(g)    securities with average maturities of 24 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h)    Investments (other than in structured investment vehicles and structured financing transactions) with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's;

(i)    securities with maturities of 12 months or less from the date of acquisition backed by standby letters of credit issued by any Approved Bank;

5

(j)        (i) instruments equivalent to those referred to in clauses (a) through (i) above denominated in Euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction and (ii) in the case of any Foreign Subsidiary, such local currencies in those countries in which such Foreign Subsidiary transacts business from time to time in the ordinary course of business;

(k)        Investments, classified in accordance with GAAP as Current Assets of the Borrower or any Subsidiary, in money market investment programs which are registered under the Investment Company Act of 1940 or which are administered by financial institutions having capital of at least $250,000,000, and, in either case, the portfolios of which are limited such that substantially all of such Investments are of the character, quality and maturity described in clauses (a) through (j) above; and

(l)        investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (k) above.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clauses (a) and (j) above; *provided* that such amounts are converted into any currency listed in clause (a) or (j) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

"**Cash Election**" has the meaning set forth in Section 2.08(c).

"**Casualty Event**" means any event that gives rise to the receipt by the Borrower or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**CFC**" means a Subsidiary of the Borrower that is a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"**CFC Holding Company**" means a Domestic Subsidiary of the Borrower that owns no material assets (directly or through one or more disregarded entities) other than the equity (including any debt instrument treated as equity for U.S. federal income tax purposes) of one or more Foreign Subsidiaries that are CFCs.

"**Change of Control**" shall be deemed to occur if:

(a)        (i) any person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Closing Date), but excluding (x) any employee benefit plan of such person and its Subsidiaries and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan or (y) any combination of Permitted Holders, shall have, directly or indirectly, acquired beneficial ownership of Equity Interests representing 35% or more of the aggregate voting power represented by the issued and outstanding Equity Interests of Holdings or (ii) during each period of 12 consecutive months, the board of directors of Holdings shall not consist of a majority of the Continuing Directors;

(b)        a "change of control" (or similar event) shall occur in any document pertaining to the ABL Credit Agreement or the First Lien Credit Agreement;

(c)        other than as described in Section 7.04(a)(i), Intermediate Holdings shall cease to own, directly or indirectly, 100% of the Equity Interests of the Borrower; or

(d)        other than as described in Section 7.04(a)(i), Holdings shall cease to own, directly or indirectly, 100% of the Equity Interests of Intermediate Holdings.

6

WEIL:\97566320\8\10143.0003

"**Chapter 11 Cases**" has the meaning set forth in the preliminary statements to this Agreement.

"**Closing Date**" means August 28, 2020.

"**Code**" means the U.S. Internal Revenue Code of 1986, and the United States Treasury Department regulations promulgated thereunder, as amended from time to time (unless as specifically provided otherwise).

"**Collateral**" means the "Collateral" as defined in the Security Agreement and all the "Collateral" or "Pledged Assets" (or equivalent terms) as defined in any other Collateral Document and any other assets pledged pursuant to any Collateral Document (but in any event excluding the Excluded Assets).

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(a)      subject to Sections 4.01(a) and 6.20, the Administrative Agent shall have received each Collateral Document required to be delivered (i) on the Closing Date, pursuant to Section 4.01(a)(v) and Section 6.11(c) and (ii) at such time as may be designated therein or herein, pursuant to the Collateral Documents or Section 6.11 or 6.13, duly executed by each Loan Party thereto;

(b)      subject to Sections 4.01(a) and 6.20, all Obligations shall have been unconditionally guaranteed by Holdings, Intermediate Holdings, the Borrower (other than with respect to its direct Obligations as a primary obligor (as opposed to a guarantor) under the Loan Documents) and each Material Domestic Subsidiary (other than any Excluded Subsidiary) including those that are listed on Schedule 1.01(B) hereto (each, a "**Guarantor**");

(c)      the Secured Obligations and the Guaranty shall have been secured pursuant to the Security Agreement by a first-priority security interest (subject to Liens permitted by Section 7.01) in (i) all of the Equity Interests of Intermediate Holdings and the Borrower, (ii) all of the Equity Interests of each Subsidiary that is a wholly owned Domestic Subsidiary (other than a Domestic Subsidiary described in the following clause (iii)) directly owned by the Loan Parties, (iii) the issued and outstanding Equity Interests of each Subsidiary that is a CFC Holding Company, and (iv) the issued and outstanding Equity Interests of each Subsidiary that is a wholly owned Foreign Subsidiary that is directly owned by the Borrower or by any Subsidiary Guarantor, in each case other than any Excluded Assets; *provided*, *however*, in the case of (iii) and (iv), such term shall not include the pledge of any stock in a CFC Holding Company or Foreign Subsidiary to the extent such pledge would result in material adverse tax consequences to the Borrower or its Subsidiaries as determined by the Borrower in good faith;

(d)      except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, or under any Collateral Document, the Secured Obligations and the Guaranty shall have been secured by a perfected first-priority security interest (to the extent such security interest may be perfected by delivering certificated securities, filing financing statements under the Uniform Commercial Code or making any necessary filings with respect to the security interest with the United States Patent and Trademark Office or United States Copyright Office or to the extent required in the Security Agreement (or any other Collateral Document)) or by Mortgages referred to in clause (e) below in Collateral of the Borrower and each Guarantor (including accounts, inventory, equipment, investment property, contract rights, applications and registrations of intellectual property filed in the United States, other general intangibles, Material Real Property, intercompany notes and proceeds of the foregoing), in each case, (i) with the priority required by the Collateral Documents and (ii) subject to exceptions and limitations otherwise set forth in this Agreement (for the avoidance of doubt, including the limitations and exceptions set forth in Section 4.01) and the Collateral Documents; and

(e)      the Administrative Agent shall have received (i) counterparts of a Mortgage with respect to each Material Real Property required to be delivered pursuant to Sections 6.11 and 6.13 (the "**Mortgaged Properties**") duly executed and delivered by the applicable Loan Party, (ii) a title

7

insurance policy for such property available in each applicable jurisdiction (the "**Mortgage Policies**") insuring the Lien of each such Mortgage as a valid first-priority Lien on the property described therein, free of any other Liens except as permitted by Section 7.01, together with such endorsements, coinsurance and reinsurance as the Required Lenders may reasonably request, (iii) a completed Life-of-Loan Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto) and, if any improvements on any Mortgaged Property are located within an area designated a "**flood hazard area,**" evidence of such flood insurance as may be required under Section 6.07, (iv) ALTA surveys in form and substance reasonably acceptable to the Required Lenders or such existing surveys together with no-change affidavits sufficient for the title company to remove all standard survey exceptions from the Mortgage Policies and issue the endorsements required in clause (ii) above, (v) copies of any existing abstracts and appraisals and (vi) such legal opinions and other documents as the Required Lenders may reasonably request with respect to any such Mortgaged Property; and

(f)       except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, or under any Collateral Document, the Secured Obligations and the Guaranty shall have been secured by a perfected second-priority security interest (to the extent such security interest may be perfected by delivering certificated securities, filing financing statements under the Uniform Commercial Code) in ABL Priority Collateral of the Borrower and each Guarantor (including accounts, inventory and proceeds of the foregoing), in each case, (i) with the priority required by the Collateral Documents and (ii) subject to exceptions and limitations otherwise set forth in this Agreement (for the avoidance of doubt, including the limitations and exceptions set forth in Section 4.01) and the Collateral Documents;

*provided*, *however*, that (i) the foregoing definition shall not require, and the Loan Documents shall not contain any requirements as to, (A) the creation or perfection of pledges of, security interests in, Mortgages on, or the obtaining of title insurance, surveys, abstracts or appraisals or taking other actions with respect to any Excluded Assets and (B) any other assets that, in the reasonable judgment of the Required Lenders and the Borrower, the cost of creating, perfecting or maintaining such pledges or security interests in such assets or obtaining title insurance, surveys, abstracts or appraisals in respect of such assets shall be excessive in view of the value of such assets or the practical benefit to the Lenders afforded thereby and (ii) the Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in this Agreement and the Collateral Documents.

The Administrative Agent (at the direction of the Required Lenders) may grant extensions of time for the perfection of security interests in, or the delivery of the Mortgages and the obtaining of title insurance and surveys with respect to, particular assets and the delivery of assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) or any other compliance with the requirements of this definition where it reasonably determines, in consultation with the Borrower, that perfection or compliance cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

No actions in any non-U.S. jurisdiction or required by the Laws of any non-U.S. jurisdiction shall be required in order to create any security interests in assets located, titled, registered or filed outside of the U.S. or to perfect such security interests (it being understood that there shall be no security agreements or pledge agreements governed under the Laws of any non-U.S. jurisdiction).

The foregoing definition shall not require landlord waivers, estoppels and collateral access letters.

"**Collateral Documents**" means, collectively, the Security Agreement, the Intercreditor Agreement, the Intellectual Property Security Agreements, any Mortgages, any Account Control Agreements, collateral assignments, Security Agreement Supplements, security agreements, pledge agreements, intellectual property security agreements or other similar agreements delivered to the Administrative Agent pursuant to Section

8

4.01(a)(v), 6.11, 6.13 or 6.20 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties.

"**Committed Loan Notice**" means a written notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other or (c) a continuation of Eurocurrency Rate Loans pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit A hereto.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Common Shares**" means shares of common stock, par value $.01 per share, of Holdings, as they exist on the Plan Effective Date, or any other Equity Interests of Holdings into which the Common Shares shall be reclassified or changed.

"**Company**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Company Parties**" means, collectively, the Holdcos, the Borrower and its Subsidiaries, and "**Company Party**" means any one of them.

"**Compensation Period**" has the meaning set forth in Section 2.12(c)(ii).

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit C hereto.

"**Confirmation Order**" means an Order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Lenders, confirming the Prepackaged Plan pursuant to section 1129 of the Bankruptcy Court and in accordance with the terms of the Prepackaged Plan, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms of the Prepackaged Plan so long as any such amendment, supplement or modification does not adversely affect the interests of the Lenders.

"**Consolidated EBITDA**" means, for any period, the Consolidated Net Income for such period, *plus*:

(a)     without duplication and, except with respect to clauses (vii)(B), (x) and (xi) below, to the extent deducted (and not added back or excluded) in arriving at such Consolidated Net Income, the sum of the following amounts for such period with respect to the Borrower and its Subsidiaries:

(i)     total interest expense determined in accordance with GAAP (including, to the extent deducted and not added back in computing Consolidated Net Income, (A) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (B) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers acceptances, (C) non-cash interest payments, (D) the interest component of Capitalized Leases, (E) net payments, if any, pursuant to interest Swap Contracts with respect to Indebtedness, (F) amortization of deferred financing fees, debt issuance costs, commissions and fees, (G) the interest component of any pension or other post-employment benefit expense and (H) commissions, discounts, yield and other fees and, to the extent not reflected in such total interest expense, any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations, and costs of surety bonds in connection with financing activities (whether amortized or immediately expensed),

(ii)     without duplication, provision for taxes based on income, profits or capital gains of the Borrower and the Subsidiaries, including, without limitation, federal, state, foreign, local, franchise and similar taxes and foreign withholding taxes paid or accrued during such period including penalties and interest related to such taxes or arising from any tax examinations and any tax distributions made pursuant to Section 7.06(h)(iii),

9

(iii)    depreciation and amortization (including amortization of intangible assets, deferred financing fees, debt issuance costs, commissions, fees and expenses, bridge, commitment and other financing fees, discounts, yield) and other fees and charges (including amortization of unrecognized prior service costs and actuarial gains and losses related to pensions and other post-employment benefits, of the Borrower and its Subsidiaries),

(iv)    (x) any unusual or non-recurring extraordinary charges for such period (provided, that the aggregate amount of unusual or non-recurring extraordinary charges added back to Consolidated EBITDA pursuant to this clause (a)(iv)(x) shall not exceed 15% of Consolidated EBITDA for such period) and (y) any unusual or non-recurring non-cash charges for such period,

(v)    other non-cash charges, expenses or losses, including, without limitation, any non-cash expense relating to the vesting of warrants (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period),

(vi)    retention, recruiting, relocation and signing bonuses and expenses, stock option and other equity-based compensation expenses, severance costs, stay bonuses, transaction fees and expenses and management fees and expenses, and any one time expense relating to enhanced accounting function or other transaction costs, including those associated with becoming a standalone entity or a public company (including, without duplication, any such payments made in connection with the consummation of the Transactions),

(vii)    (A) the amount of any restructuring charges and related charges, restructuring costs, integration costs, transition costs, consolidation and closing costs for facilities, costs incurred in connection with any non-recurring strategic initiatives, costs incurred in connection with acquisitions and non-recurring intellectual property development after the Closing Date, other business optimization expenses (including costs and expenses relating to business optimization programs and new systems design and implementation costs), project start-up costs and other restructuring charges, accruals or reserves (including restructuring costs related to acquisitions after the Closing Date and to closure/consolidation of facilities, retention charges, systems establishment costs and excess pension charges) and (B) the amount of cost savings, operating expense reductions, other operating improvements and "run rate" synergies projected by the Borrower in good faith to result from actions taken or expected to be taken in connection with the Transactions or any Specified Transaction or the implementation of an operational initiative or operational change after the Closing Date (in each case calculated on a Pro Forma Basis as though such cost savings, operating expense reductions, other operating improvements and synergies had been realized on the first day of such period and as if such cost savings, operating expense reductions, other operating improvements and synergies were realized during the entirety of such period), net of the amount of actual benefits realized during such period from such actions; *provided* that (w) in no event shall the amount added back pursuant to this clause (vii) exceed $5,000,000 for any Test Period, (x) a duly completed certificate signed by a Responsible Officer of the Borrower shall be delivered to the Administrative Agent together with the Compliance Certificate required to be delivered pursuant to Section 6.02, certifying that such cost savings, operating expense reductions, other operating improvements and synergies are (i) reasonably supportable and quantifiable in the good faith judgment of the Borrower, and (ii) reasonably anticipated to be realized within (I) in the case of any such cost savings, operating expense reductions,

10

other operating improvements and synergies in connection with the Transactions, 6 months after the Closing Date and (II) in all other cases, 6 months after the consummation of the Specified Transaction or the implementation of an initiative or change, which is expected to result in such cost savings, expense reductions, other operating improvements or synergies, (y) no cost savings, operating expense reductions and synergies shall be added pursuant to this clause (vii) to the extent duplicative of any expenses or charges otherwise added to Consolidated EBITDA, whether through a *pro forma* adjustment or otherwise, for such period and (z) to the extent that any cost savings, operating expense reductions, other operating improvements and synergies are not associated with the Transactions or a Specified Transaction following the Closing Date, all steps shall have been taken for realizing such savings,

(viii)   [reserved],

(ix)   other accruals, payments and expenses (including rationalization, legal, tax, structuring and other costs and expenses), or any amortization thereof, related to the Transactions (including all Transaction Expenses), acquisitions, Investments, dividends, Dispositions, or any amortization thereof, issuances of Indebtedness or Equity Interests permitted under the Loan Documents or repayment of debt, issuance of equity securities, initial public offering, refinancing transactions or amendment or other modification of any debt instrument (in each case, including any such transaction consummated on the Closing Date and any such transaction undertaken but not completed),

(x)   to the extent not already included in Consolidated Net Income, proceeds of business interruption insurance (to the extent actually received),

(xi)   cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added back,

(xii)   any non-cash increase in expenses (A) resulting from the revaluation of inventory (including any impact of changes to inventory valuation policy methods including changes in capitalization of variances) or other inventory adjustments, or (B) due to purchase accounting associated with the Transactions, or any acquisition constituting an Investment permitted under this Agreement consummated prior to or after the Closing Date,

(xiii)   the amount of any expense or reduction of Consolidated Net Income consisting of Subsidiary income attributable to minority interests or non-controlling interests of third parties in any non-wholly owned Subsidiary, *minus* the amount of dividends or distributions that are paid in cash by such non-wholly owned Subsidiary to such third party; *provided* that the amount of such cash dividends or distributions deducted pursuant to this clause (xiii) in any Test Period shall not exceed such third party's *pro rata* share of the Consolidated EBITDA (to the extent positive) of such non-wholly owned Subsidiary for such Test Period,

(xiv)   letter of credit fees,

(xv)   [reserved],

(xvi)   any Equity Funded Employee Plan Costs,

(xvii)   any net loss from disposed, abandoned or discontinued operations or product lines,

11

(xviii)   any costs or expenses incurred relating to environmental remediation, litigation or other disputes in respect of events and exposures that occurred prior to the Closing Date, and

(xix)   expenses during such period in connection with earn-outs and other deferred payments in connection with any acquisitions constituting an Investment permitted under this Agreement, to the extent included in the calculation of Consolidated Net Income in accordance with GAAP as an accounting adjustment to the extent that the actual amount payable or paid in respect of such earn-outs or other deferred payments exceeds the liability booked by the applicable Person therefor,

*minus* (b) without duplication and to the extent included in arriving at such Consolidated Net Income, (i) non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period), (ii) any net gain from disposed, abandoned or discontinued operations or product lines and (iii) the amount of any minority interest income consisting of Subsidiary losses attributable to minority interests or non-controlling interests of third parties in any non-wholly owned Subsidiary; *provided* that:

(A)   to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA (x) currency translation gains and losses related to currency remeasurements of Indebtedness (including the net loss or gain (i) resulting from Swap Contracts for currency exchange risk and (ii) resulting from intercompany indebtedness) and (y) all other foreign currency translation gains or losses to the extent such gains or losses are non-cash items;

(B)   to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any adjustments resulting from the application of FASB Accounting Standards Codification 815 and International Accounting Standard No. 39 and their respective related pronouncements and interpretations; and

(C)   to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any income (loss) for such period attributable to the early extinguishment of (i) Indebtedness, (ii) obligations under any Swap Contracts or (iii) other derivative instruments.

Notwithstanding anything to the contrary contained herein, for purposes of determining Consolidated EBITDA under this Agreement for any period that includes the fiscal quarter ended (i) September 30, 2020 Consolidated EBITDA for the fiscal quarter ended September 30, 2020 shall be deemed to be the greater of (a) Consolidated EBITDA calculated in accordance with the terms of this Agreement for such fiscal quarter and (b) $2,000,000 and (ii) December 31, 2020, Consolidated EBITDA for the fiscal quarter ended December 31, 2020 shall be deemed to be the greater of (a) Consolidated EBITDA calculated in accordance with the terms of this Agreement for such fiscal quarter and (b) $2,000,000.  For the avoidance of doubt, Consolidated EBITDA shall be calculated, including pro forma adjustments, in accordance with Section 1.09.

"**Consolidated First Lien Net Debt**" means, as of any date of determination, the aggregate principal amount of Indebtedness of the Borrower and its Subsidiaries outstanding on such date, in an amount that would be reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with the Transactions or any acquisition constituting an Investment permitted under this Agreement) consisting of Indebtedness for borrowed money, purchase money debt and Attributable Indebtedness and debt obligations evidenced by promissory notes or similar instruments that is secured by a Lien on any asset or property of the Borrower or any Subsidiary, including Indebtedness under the ABL Credit Agreement, but excluding any such Indebtedness in which the applicable Liens are expressly subordinated or junior to the Liens securing the First Lien Obligations (other than as between the Liens securing the ABL

12

Obligations and the Liens securing the First Lien Obligations in accordance with the Intercreditor Agreement) *minus* the aggregate amount of cash and Cash Equivalents included on the consolidated balance sheet of the Borrower and the Subsidiaries as of such date, free and clear of all Liens (other than Liens permitted by Section 7.01); *provided* that Consolidated First Lien Net Debt shall not include Indebtedness in respect of letters of credit, except to the extent of unreimbursed amounts thereunder; *provided* that any unreimbursed amount under commercial letters of credit shall not be counted as Consolidated First Lien Net Debt until three Business Days after such amount is drawn.  For the avoidance of doubt, it is understood that obligations under Swap Contracts and Treasury Services Agreements do not constitute Consolidated First Lien Net Debt.

"**Consolidated First Lien Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated First Lien Net Debt as of the last day of such Test Period to (b) Consolidated EBITDA for such Test Period.

"**Consolidated Interest Expense**" shall mean, with respect to any Person for any period, the sum of (1) interest expense (including that attributable to obligations with respect to Capital Leases), net of interest income of such Person and its Subsidiaries with respect to all outstanding Indebtedness of such Person and its Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under hedging agreements, *plus* (2) non-cash interest expense resulting solely from pay in kind interest expense of such Person and its Subsidiaries, but excluding, for the avoidance of doubt, (a) amortization of deferred financing costs, debt issuance costs, commissions, fees and expenses and any other amounts of non-cash interest other than referred to in clause (2) above (including as a result of the effects of acquisition method accounting or pushdown accounting), (b) non-cash interest expense attributable to the movement of the mark-to-market valuation of Indebtedness or obligations under derivative instruments pursuant to FASB Accounting Standards Codification Topic 815—Derivatives and Hedging, (c) any one-time cash costs associated with breakage in respect of hedging agreements for interest rates, (d) any "additional interest" owing pursuant to a registration rights agreement with respect to any securities, (e) any payments with respect to make whole premiums or other breakage costs of any Indebtedness, including, without limitation, any Indebtedness issued in connection with the Transactions, (f) penalties and interest relating to taxes, (g) accretion or accrual of discounted liabilities not constituting Indebtedness, (h) interest expense attributable to a direct or indirect parent entity resulting from pushdown accounting, (i) any expense resulting from the discounting of Indebtedness in connection with the application of recapitalization or purchase accounting, and (j) any interest expense attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential), with respect thereto and with respect to the Transactions, any acquisition or Investment permitted hereunder, all as calculated on a consolidated basis.

"**Consolidated Net Income**" means, for any period, the net income (loss) of the Borrower and the Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; *provided*, *however*, that, without duplication,

> (a)     any after-tax effect of extraordinary items (including gains or losses and all fees and expenses relating thereto) for such period shall be excluded,

> (b)     the cumulative effect of a change in accounting principles during such period to the extent included in Consolidated Net Income shall be excluded,

> (c)     accruals and reserves that are established or adjusted within 12 months after the Closing Date that are so required to be established or adjusted as a result of the Transactions (or within 12 months after the closing of any acquisition that are so required to be established or adjusted as a result of such acquisition) in accordance with GAAP or changes as a result of adoption or modification of accounting policies in accordance with GAAP shall be excluded,

> (d)     any net after-tax effect of gains or losses (*less* all fees, expenses and charges relating thereto) attributable to asset dispositions or abandonments or the sale or other disposition of any

13

WEIL:\97566320\8\10143.0003

Equity Interests of any Person, in each case other than in the ordinary course of business, as determined in good faith by the Borrower, shall be excluded,

(e)      the net income (loss) for such period of any Person that is not a Subsidiary of the Borrower, or that is accounted for by the equity method of accounting, shall be excluded; *provided* that Consolidated Net Income of the Borrower shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents (or to the extent subsequently converted into cash or Cash Equivalents) to the Borrower or a Subsidiary thereof in respect of such period,

(f)      any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a change in law or regulation, in each case, pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP shall be excluded,

(g)      any non-cash compensation charge or expense, including any such charge or expense arising from the grants of stock appreciation or similar rights, stock options, restricted stock or other rights or equity incentive programs or any other equity-based compensation shall be excluded, and any cash charges associated with the rollover, acceleration or payout of Equity Interests by management of the Borrower or any of its direct or indirect parents in connection with the Transactions or an initial public offering, shall be excluded,

(h)      any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment, Permitted Acquisition or any sale, conveyance, transfer or other disposition of assets permitted under this Agreement, to the extent actually reimbursed, or, so long as the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is (A) not denied by the applicable indemnitor in writing within 180 days of the occurrence of such event and (B) in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365-day period), shall be excluded,

(i)      to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount (A) is not denied by the applicable carrier in writing within 180 days of the occurrence of such event and (B) is in fact reimbursed within 365 days of the date of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within such 365 days), expenses, charges or losses with respect to liability or casualty events or business interruption shall be excluded, and

(j)      the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of the Borrower or is merged into or consolidated with the Borrower or any of its Subsidiaries or such Person's assets are acquired by the Borrower or any of its Subsidiaries shall be excluded (except to the extent required for any calculation of Consolidated EBITDA on a Pro Forma Basis in accordance with Section 1.09).

There shall be excluded from Consolidated Net Income for any period the purchase accounting effects of adjustments in component amounts required or permitted by GAAP (including in the inventory, property and equipment, software, goodwill, intangible assets, in-process research and development, deferred revenue and debt line items thereof) and related authoritative pronouncements (including the effects of such adjustments pushed down to the Borrower and the Subsidiaries), as a result of the Transactions, any acquisition constituting an Investment permitted under this Agreement consummated prior to or after the Closing Date, or the amortization or write-off of any amounts thereof.  For the avoidance of doubt, Consolidated Net Income shall be calculated, including *pro forma* adjustments, in accordance with Section 1.09.

14

WEIL:\97566320\8\10143.0003

"**Consolidated Net Sales**" means, for any period, the net sales of the Borrower and the Subsidiaries in the ordinary course of business calculated in accordance with GAAP.

"**Continuing Directors**" means the directors of Holdings on the Closing Date, as elected or appointed after giving effect to the Transactions, directors appointed in accordance with any stockholders agreement entered into by and among Holdings and its stockholders and each other director, if, in each case, such other director's nomination for election to the board of directors of Holdings is recommended by a majority of the then Continuing Directors or such other director receives the vote of, or is appointed or otherwise approved by, prior to a Qualified IPO by the Borrower or a Relevant Public Company, or those Permitted Holders which then hold a majority of the voting Equity Interests in Holdings then held by all Permitted Holders, in each case in his or her election by the holders of Equity Interests in Holdings necessary to elect such director.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" has the meaning set forth in the definition of "Affiliate."

"**Conversion**" has the meaning set forth in Section 2.04(a).

"**Conversion Effective Date**" has the meaning set forth in Section 2.04(b).

"**Conversion Notice**" has the meaning set forth in Section 2.04(b).

"**Credit Extension**" means a Borrowing.

"**Cure Amount**" has the meaning set forth in Section 8.04(a).

"**Cure Expiration Date**" has the meaning set forth in Section 8.04(a).

"**Current Assets**" means, with respect to the Borrower and the Subsidiaries on a consolidated basis at any date of determination, all assets (other than cash and Cash Equivalents) that would, in accordance with GAAP, be classified on a consolidated balance sheet of the Borrower and its Subsidiaries as current assets at such date of determination, other than amounts related to current or deferred Taxes based on income or profits (but excluding assets held for sale, loans (permitted) to third parties, pension assets, deferred bank fees and derivative financial instruments).

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtors**" has the meaning set forth in the preliminary statements to this Agreement.

"**Declined Proceeds**" has the meaning set forth in Section 2.05(b)(viii).

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, without cure or waiver hereunder, would be an Event of Default.

"**Default Rate**" means an interest rate equal to (a) the Base Rate *plus* (b) the Applicable Rate, if any, applicable to Base Rate Loans *plus* (c) 2.0% per annum; *provided* that with respect to a Eurocurrency Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan *plus* 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

"**Defaulting Lender**" means any Lender whose acts or failure to act, whether directly or indirectly, cause it to meet any part of the definition of Lender Default.

15

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale or issuance of Equity Interests (other than directors' qualifying shares or other shares required by applicable Law) in a Subsidiary) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Disqualified Competitor**" means such Persons who are competitors of the Borrower and its Subsidiaries that are separately identified in writing by the Borrower to the Administrative Agent from time to time, and any of their Affiliates (other than any such Affiliate that is affiliated with a financial investor in such Person and that is not itself an operating company or otherwise an Affiliate of an operating company so long as such Affiliate is a bona fide Fund) that are either (a) identified in writing by the Borrower to the Administrative Agent from time to time or (b) clearly identifiable on the basis of such Affiliate's name (it being agreed that the Administrative Agent shall be entitled to conclusively rely on such Person's representations in the applicable Assignment and Assumption).

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than (i) solely for Qualified Equity Interests and cash in lieu of fractional shares or (ii) solely at the discretion of the issuer), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable), (b) is redeemable at the option of the holder thereof (other than (i) solely for Qualified Equity Interests and cash in lieu of fractional shares or (ii) as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable), in whole or in part, (c) provides for the scheduled payments of dividends in cash or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 91 days after the Maturity Date at the time of issuance of such Equity Interests; *provided* that if such Equity Interests are issued pursuant to a plan for the benefit of employees of Holdings (or any direct or indirect parent thereof), the Borrower or the Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by the Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"**Distressed Person**" has the meaning set forth in the definition of "Lender-Related Distress Event."

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

16

"**Eligible Assignee**" has the meaning set forth in Section 10.07(a)(i).

"**Embargoed Person**" has the meaning set forth in Section 6.21(c).

"**EMU Legislation**" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"**Enforcement Qualifications**" has the meaning set forth in Section 5.04.

"**Environment**" means indoor air, ambient air, surface water, groundwater, drinking water, land surface, subsurface strata, and natural resources such as wetlands, flora and fauna.

"**Environmental Laws**" means any applicable Law relating to the prevention of pollution or the protection of the Environment and natural resources, and the protection of human health and safety as it relates to the Environment.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of investigation and remediation, fines, penalties or indemnities), of the Loan Parties or any Subsidiary resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage or treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement to the extent liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Funded Employee Plan Costs**" means cash costs or expenses, incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or stockholder agreement, to the extent funded with cash proceeds contributed to the capital of the Borrower or net cash proceeds of an issuance of Qualified Equity Interests of the Borrower or Equity Interests of any direct or indirect parent of the Borrower (other than any amount designated as a Cure Amount).

"**Equity Interests**" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities); *provided*, that any instrument evidencing Indebtedness convertible or exchangeable for Equity Interests shall not be deemed to be Equity Interests unless and until such instrument is so converted or exchanged.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is under common control with a Loan Party or any Subsidiary within the meaning of Section 414(b) or (c) of the Code or Section 4001 of ERISA (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code or Section 302 of ERISA).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by a Loan Party, any Subsidiary or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by a Loan Party, any Subsidiary or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization (within the meaning of Section 4241 of ERISA) or insolvent (within the meaning of Section 4245 of ERISA) or in "endangered" or "critical" status (within the

17

meaning of Section 432 of the Code or Section 305 of ERISA); (d) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (e) the filing of a notice of intent to terminate, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for, and that could reasonably be expected to result in, the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) with respect to a Pension Plan, the failure to satisfy the minimum funding standard of Section 412 of the Code or Section 302 of ERISA, whether or not waived; (h) a failure by a Loan Party, any Subsidiary or any ERISA Affiliate to make a required contribution to a Multiemployer Plan; (i) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could reasonably be expected to result in liability to a Loan Party or any Subsidiary; or (j) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon a Loan Party, any Subsidiary or any ERISA Affiliate.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Euro**", "**EUR**" and "**€**" mean the lawful currency of the Participating Member States introduced in accordance with the EMU Legislation.

"**Eurocurrency Rate**" means:

(a)    for any Interest Period with respect to a Eurocurrency Rate Loan, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the commencement of such Interest Period by reference to the interest settlement rates for deposits in Dollars (as published by Reuters on page LIBOR01 of the Reuters Screen or the applicable Markit desktop) (as set forth by (i) the Intercontinental Exchange Group, or (ii) any publicly available successor service or entity that has been authorized by the U.K. Financial Conduct Authority to administer the London Interbank Offered Rate for a period equal to such Interest Period), and

(b)    for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on such date by reference to the interest settlement rates for deposits in Dollars (as published by Reuters on page LIBOR01 of the Reuters Screen or the applicable Markit desktop) from time to time with a term of one month (as set forth by (i) the Intercontinental Exchange Group, or (ii) any publicly available successor service or entity that has been authorized by the U.K. Financial Conduct Authority to administer the London Interbank Offered Rate),

in the case of clauses (a) and (b) above, multiplied by Statutory Reserves, provided that, in the case of clauses (a) and (b) above, the Eurocurrency Rate with respect to Term Loans, shall not be less than 1.00% per annum; *provided further* that, subject to clauses (i) and (ii) of immediately succeeding sentence, if the Administrative Agent is unable to determine the Eurocurrency Rate for the relevant interest period under clause (a) or (b), the Administrative Agent shall use the Eurocurrency Rate for the immediately preceding interest period. Notwithstanding the foregoing:

(i)    subject to clause (ii) below, if on the relevant Eurocurrency determination date the relevant London interbank offered rate for U.S. dollar deposits has been discontinued, then the Administrative Agent shall use (a) an industry-accepted successor rate to the relevant London interbank offered rate for U.S. dollar deposits or (b) if no such industry-accepted successor rate exists, the most comparable substitute or successor rate to the relevant London interbank offered rate for U.S. dollar deposits, in each case as determined by the Required Lenders; and

(ii)    upon approval of such rate by the Required Lenders, the Borrower, the Administrative Agent and the Required Lenders agree to enter into any amendments to this Agreement that are necessary to implement such rate.

18

The Administrative Agent shall be held harmless for any acts or omissions in connection with the calculation of the Eurocurrency Rate in accordance with clauses (i) and (ii) of the preceding sentence.

"**Eurocurrency Rate Loan**" means a Loan that bears interest at a rate based on clause (a) of the definition of "Eurocurrency Rate."

"**Event of Default**" has the meaning set forth in Section 8.01.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded Assets**" means (i) any fee owned real property (other than Material Real Properties) and any leasehold rights and interests in real property (including landlord waivers, estoppels and collateral access letters), (ii) motor vehicles, airplanes and other assets subject to certificates of title, to the extent a Lien therein cannot be perfected by the filing of a UCC financing statement, (iii) [reserved], (iv) governmental licenses, state or local franchises, charters and authorizations and any other property and assets to the extent that the Administrative Agent may not validly possess a security interest therein under, or such security interest is restricted by, applicable Laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or the pledge or creation of a security interest in which would require governmental consent, approval, license or authorization, other than to the extent such prohibition or limitation is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition (but excluding proceeds of any such governmental license), (v) any lease, license, permit or agreement to the extent that, and so long as, a grant of a security interest therein (A) is prohibited by applicable Law other than to the extent such prohibition is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition or (B) to the extent and for so long as it would violate the terms thereof (in each case, after giving effect to the relevant provisions of the UCC or other applicable Laws) or would give rise to a termination right thereunder in favor of a party thereto other than the Borrower or a Guarantor (except to the extent such provision is overridden by the UCC or other applicable Laws), in each case, other than the proceeds thereof and (a) excluding any such agreement that relates to a Permitted Refinancing of any of the foregoing and (b) only to the extent that and for so long as such limitation on such pledge or security interest is otherwise permitted under Section 7.09, (vi) Margin Stock, (vii) Equity Interests and assets of captive insurance Subsidiaries, (viii) assets of non-Loan Party Immaterial Subsidiaries, (ix) Equity Interests in joint ventures and non-wholly owned Subsidiaries, in each case, which cannot be pledged without the consent of a third party (that is not a Loan Party), to the extent such consent has not been obtained (other than to the extent such limitation is rendered ineffective under the UCC or other applicable law), (x) any property subject to a Lien permitted by Section 7.01(u) or (aa) (to the extent relating to a Lien originally incurred pursuant to Section 7.01(u)) to the extent that a grant of a security interest therein would violate or invalidate such underlying obligations or create a right of termination in favor of any other party thereto (other than a Loan Party) or otherwise require consent thereunder (after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law), (xi) letter of credit rights, except to the extent constituting support obligations for other Collateral as to which perfection of the security interest in such other Collateral is accomplished solely by the filing of a UCC financing statement (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement), (xii) any assets to the extent a security interest in such assets could reasonably be expected to result in material adverse tax consequences as reasonably determined by the Borrower, (xiii) [reserved], (xiv) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application (or any registration that issues therefrom) under applicable federal law and (xv) assets where the cost of obtaining a security interest therein exceeds the practical benefit to the Lenders afforded thereby as agreed by the Borrower and the Administrative Agent (at the direction of the Required Lenders) in writing; *provided*, *however*, that Excluded Assets shall not include any Proceeds, substitutions or replacements of any Excluded Assets referred to in clauses (i) through (xv) (unless such Proceeds, substitutions or replacements would independently constitute Excluded Assets referred to in clauses (i) through (xv)).  The Borrower shall not be required to take any action under the law of any non-U.S. jurisdiction to create or perfect a security interest in any assets located outside the United States or

19

any other assets that require such action, including any intellectual property registered in any non-U.S. jurisdiction (and no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction shall be required).

"**Excluded Subsidiary**" means (a) any Subsidiary that is not a wholly owned Domestic Subsidiary of the Borrower or a Guarantor, (b) any Subsidiary that is prohibited or restricted by applicable Law or by Contractual Obligations existing on the Closing Date (or, in the case of any newly acquired Subsidiary, in existence at the time of acquisition but not entered into in contemplation thereof) from guaranteeing the Obligations or if guaranteeing the Obligations would require governmental (including regulatory) consent, approval, license or authorization or could result in material adverse tax consequences as reasonably determined by the Borrower, (c) any other Subsidiary with respect to which, in the reasonable judgment of the Borrower and the Required Lenders, the burden or cost of providing a Guarantee shall be excessive in view of the benefits to be obtained by the Lenders therefrom, (d) any not-for-profit Subsidiaries, (e) [reserved], (f) [reserved], (g) any CFC Holding Company, (h) any Domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary that is a CFC, (i) captive insurance Subsidiaries and (j) each other Subsidiary acquired pursuant to a Permitted Acquisition permitted hereunder and financed with assumed secured Indebtedness, and each Subsidiary acquired in such Permitted Acquisition permitted hereunder that guarantees such Indebtedness, in each case to the extent that, and for so long as, the documentation relating to such Indebtedness to which such Subsidiary is a party prohibits such Subsidiary from guaranteeing the Obligations and such prohibition was not created in contemplation of such Permitted Acquisition permitted hereunder.

"**Excluded Swap Obligation**" means, with respect to any Guarantor, any Swap Obligation, if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of such Guarantor or the grant of the security interest would otherwise have become effective with respect to such Swap Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof).

"**Executive Order**" has the meaning set forth in Section 6.21(a).

"**Excluded Account**" means any (a) deposit accounts specially and exclusively used in the ordinary course of business for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any Loan Party's salaried employees, which accounts are funded only in the ordinary course of business, (b) pension fund accounts, 401(k) accounts and trust accounts and (c) withholding tax and other tax accounts, fiduciary accounts, escrow accounts and other accounts in which any Loan Party holds funds on behalf of any third party.

"**Existing Debt**" means all Indebtedness for borrowed money of the Borrower and its Affiliates under (i) the Pre-Petition First Lien Credit Agreement and (ii) that certain Second Lien Credit Agreement, dated as of June 30, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Pre-Petition Second Lien Credit Agreement**") by and among the Borrower, the guarantors party thereto from time to time, the Bank of New York Mellon (or its successor, if appointed), as administrative agent, and the lenders party thereto from time to time (the "**Pre-Petition Second Lien Lenders**").

"**Existing Letters of Credit**" means any letters of credit outstanding on the Closing Date described in Schedule 2.03.  Schedule 2.03 contains a description of all Existing Letters of Credit and sets forth, with respect to each such Existing Letter of Credit, (i) the name of the issuing lender, (ii) the letter of credit number,

20

(iii) the name(s) of the account party or account parties, (iv) the stated amount (including the currency in which such letter of credit is denominated), (v) the name of the beneficiary and (vi) the expiry date.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), or any current or future Treasury regulations or other administrative guidance promulgated thereunder, and any intergovernmental agreements implementing the foregoing , and any related fiscal or regulatory legislation, rules or official administrative practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities implementing the foregoing..

"**FCPA**" means the United States Foreign Corrupt Practices Act of 1977, as amended.

"**Federal Funds Effective Rate**" means, for any day, the rate per annum equal to the rates on overnight Federal funds transactions with members of the Federal Reserve System (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time), as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent from three brokers of recognized standing selected by it; provided further that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"**FIRREA**" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"**First Lien Administrative Agent**" has the meaning assigned to the term "Administrative Agent" under and as defined in the First Lien Credit Agreement and shall include any successor administrative agent under the First Lien Credit Agreement.

"**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of the date hereof, by and among the Borrower, the Holdcos, the other Guarantors from time to time party thereto, the lenders party thereto from time to time and Cantor Fitzgerald Securities, as administrative agent for such lenders.

"**First Lien Loan Documents**" means the "Loan Documents" as defined in the First Lien Credit Agreement.

"**First Lien Obligations**" means the "Obligations" (or any comparable term) as defined in the First Lien Credit Agreement.

"**First Lien Secured Obligations**" means the "First Lien Obligations" as defined in the Intercreditor Agreement.

"**First Lien Term Facility**" means the First Lien Term Loans and commitments in respect thereof.

"**First Lien Term Loans**" means the "Term Loans" (or any comparable term) as defined in the First Lien Credit Agreement.

"**Fitch**" means Fitch Ratings, Inc.

"**Flood Insurance Laws**" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as

21

now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"**Foreign Casualty Event**" has the meaning set forth in Section 2.05(b)(vi).

"**Foreign Disposition**" has the meaning set forth in Section 2.05(b)(vi).

"**Foreign Subsidiary**" means any direct or indirect Subsidiary which is not a Domestic Subsidiary.

"**Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**GAAP**" means generally accepted accounting principles in the United States of America, as in effect from time to time; *provided*, *however*, that, subject to Section 1.03, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof (including through conforming changes made consistent with IFRS) on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof (including through conforming changes made consistent with IFRS), then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national body exercising such powers or functions, such as the European Union or the European Central Bank).

"**Granting Lender**" has the meaning set forth in Section 10.07(h).

"**Guarantee**" means, as to any Person, without duplication, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment or performance of such Indebtedness, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning set forth in Section 11.01.

"**Guarantors**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement" and shall include each Holdco, the Borrower (solely with respect to its Secured Obligations other than its direct Secured Obligations as a primary obligor (as opposed to a guarantor) under the Loan Documents) and each Subsidiary of the Borrower that shall have become a Guarantor pursuant to Section 6.11 or 6.20, in any case until released in accordance with the terms hereof,  it being understood and agreed that the Borrower in its sole discretion may (with the consent of the Administrative Agent (at the direction of the Required Lenders), such consent not to be unreasonably withheld) cause any Subsidiary that is not a Guarantor to Guarantee the Obligations by causing such Subsidiary to execute a Joinder Agreement, and any such Subsidiary shall be a

22

Guarantor, Loan Party and Subsidiary Guarantor hereunder for all purposes; *provided*, *however*, that that Administrative Agent (at the direction of the Required Lenders) may condition its consent by limiting the purposes for which such Subsidiary shall constitute a Loan Party and Subsidiary Guarantor for purposes of Section 7 and related definitions used therein.

"**Guaranty**" means, collectively, the guaranty of the Obligations by the Guarantors pursuant to this Agreement.

"**Hazardous Materials**" means all materials, pollutants, contaminants, chemicals, compounds, constituents, substances or wastes, in any form, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, mold, medical waste, in each case regulated under Environmental Laws.

"**Holdcos**" means Holdings and Intermediate Holdings.

"**Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**IFRS**" means international accounting standards as promulgated by the International Accounting Standards Board.

"**Immaterial Subsidiary**" means any Subsidiary that is not a Material Subsidiary.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following:

       (a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

       (b)     the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

       (c)     net obligations of such Person under any Swap Contract;

       (d)     all obligations of such Person to pay the deferred purchase price of property or services;

       (e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

       (f)     all Attributable Indebtedness;

       (g)     all obligations of such Person in respect of Disqualified Equity Interests if and to the extent that the foregoing would constitute indebtedness or a liability in accordance with GAAP; and

       (h)     to the extent not otherwise included above, all Guarantees of such Person in respect of Indebtedness described in clauses (a) through (g) in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall (A) include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Consolidated First Lien Net Debt, (B) in the case of the Borrower and its Subsidiaries, exclude all intercompany Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of

23

terms) and made in the ordinary course of business and (C) exclude (i) trade accounts and accrued expenses payable in the ordinary course of business, (ii) any earn-out obligation until such obligation is not paid after becoming due and payable, (iii) accruals for payroll and other liabilities accrued in the ordinary course of business and (iv) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (e) that is expressly made non-recourse or limited recourse (limited solely to the assets securing such Indebtedness) to such Person shall be deemed to be equal to the lesser of (x) the aggregate unpaid amount of such Indebtedness and (y) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Liabilities**" has the meaning set forth in Section 10.05.

"**Indemnified Taxes**" means, with respect to any Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, all Taxes imposed on or with respect to any payment under any Loan Documents, other than (i) any Taxes imposed on or measured by its net income, however denominated, and franchise (and similar) Taxes imposed on it in lieu of net income Taxes, imposed by a jurisdiction as a result of such recipient being organized in or having its principal office or, in the case of any Lender, applicable Lending Office in such jurisdiction, or as a result of any other present or former connection between such recipient and such jurisdiction, other than any connections arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, receiving payments under, or enforcing, any Loan Document, (ii) any Taxes attributable to the failure of the Administrative Agent or Lender to comply with Section 3.01(e), (iii) any branch profits Taxes imposed by the United States under Section 884(a) of the Code, or any similar Tax, imposed by any  jurisdiction described in clause (a), (iv) in the case of a Lender (other than an assignee pursuant to a request by the Borrower under Section 3.07(a)), any U.S. federal withholding Tax that is in effect and would apply to amounts payable hereunder pursuant to a Law in effect at the time such Lender becomes a party to this Agreement, or designates a new Lending Office, except to the extent such Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrower or any Guarantor with respect to such withholding Tax pursuant to Section 3.01, and (v) any withholding Taxes imposed under FATCA.

"**Indemnitees**" has the meaning set forth in Section 10.05.

"**Independent Financial Advisor**" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged and that is independent of the Borrower and its Affiliates.

"**Information**" has the meaning set forth in Section 10.08.

"**Intellectual Property Security Agreement**" has the meaning set forth in the Security Agreement.

"**Intercompany Note**" means a promissory note substantially in the form of Exhibit G.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of the date hereof, by and among the Administrative Agent, as second lien credit agreement administrative agent, the ABL Agent, the First Lien Administrative Agent, as first lien credit agreement administrative agent and the Borrower and Guarantors party thereto.

"**Interest Coverage Ratio**" shall mean as of any date of determination with respect to any Person, the ratio of (i) Consolidated EBITDA of such Person for the Test Period most recently ended on or prior to such date of determination to (ii) the sum of (x) solely to the extent paid in cash during the applicable period, Consolidated Interest Expense of such Person for the Test Period most recently ended on or prior to such date of determination plus (y) all regularly scheduled cash dividend payments (excluding items eliminated in

24

consolidation) on any series of Disqualified Equity Interests made during such period, in each case on a Pro Forma Basis.

"**Interest Payment Date**" means, (a) as to any Eurocurrency Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; *provided* that if any Interest Period for a Eurocurrency Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date.

"**Interest Period**" means, as to each Eurocurrency Rate Loan, the period commencing on the date such Eurocurrency Rate Loan is disbursed or converted to or continued as a Eurocurrency Rate Loan and ending on the date one, two, three or six months thereafter or to the extent agreed by each Lender of such Eurocurrency Rate Loan, 12 months or less than one month (but other than a one week period unless consented to by, the Administrative Agent), thereafter, as selected by the Borrower in its Committed Loan Notice; *provided* that:

> (a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

> (b)     any Interest Period (other than an Interest Period having a duration of less than one month) that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

> (c)     no Interest Period shall extend beyond the Maturity Date.

"**Intermediate Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and its Subsidiaries, intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business) or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made), without adjustment for subsequent increases or decreases in the value of such Investment, less any Returns of the Borrower or a Subsidiary in respect of such Investment.

"**IP Rights**" has the meaning set forth in Section 5.15.

"**Joinder Agreement**" means a joinder agreement substantially in the form of Joinder Agreement attached as Exhibit I hereto.

"**Judgment Currency**" has the meaning assigned to such term in Section 10.20.

"**Laws**" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

WEIL:\97566320\8\10143.0003

"**Lender**" has the meaning set forth in the introductory paragraph to this Agreement and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender."

"**Lender Default**" means a Distressed Person has admitted in writing that it is insolvent or such Distressed Person becomes subject to a Lender-Related Distress Event.

"**Lender-Related Distress Event**" shall mean, with respect to any Lender or any other Person that directly or indirectly controls such Lender (each, a "**Distressed Person**"), (i) such Distressed Person has become subject to a Bail-in Action and/or (ii) a voluntary or involuntary case with respect to such Distressed Person under any debt relief law, or a custodian, conservator, receiver, or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person, or any Person that directly or indirectly controls such Distressed Person or is subject to a forced liquidation or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any governmental authority having regulatory authority over such Distressed Person to be, insolvent or bankrupt; *provided* that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Lender or any Person that directly or indirectly controls such Lender by a governmental authority or an instrumentality thereof.

"**Lending Office**" means, as to any Lender, such office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Lien**" means, with respect to any asset, any mortgage, deed of trust, pledge, hypothecation, collateral assignment, security deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest of any kind or nature in respect of such asset (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing).

"**Loan**" means an extension of credit under Article II by a Lender to the Borrower in the form of a Term Loan.

"**Loan Documents**" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Collateral Documents, (iv) the Intercreditor Agreement, (v) the Agent Fee Letter, (vi) any other document or instrument designated by the Borrower and the Administrative Agent as a "Loan Document" and (vii) any amendment or joinder to this Agreement.

"**Loan Parties**" means, collectively, the Borrower and each Guarantor.

"**London Banking Day**" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"**Make-Whole Amount**" means, as of any date of determination, an amount in cash equal to all interest that would have been paid on the Term Loans that are repaid or prepaid, from the date of repayment or prepayment (including following acceleration of the Term Loans) through and including the third anniversary of the Closing Date calculated on the basis of the interest rate with respect to the Term Loans that is in effect on the date of such repayment or prepayment, discounted to the date of repayment or prepayment on a quarterly basis (assuming a 365-day year and actual days elapsed) at a rate equal to the sum of the treasury rate plus 0.50%; provided, that following any acceleration, the Make-Whole Amount shall be reduced by the amount of any interest (other than interest payable at the Default Rate) accruing after the date of such acceleration that is actually paid in cash to the Lenders. The Borrower shall calculate the Make-Whole Amount in good faith.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Master Agreement**" has the meaning set forth in the definition of "Swap Contract."

26

"**Material Adverse Effect**" means any event, change or condition that, individually or in the aggregate, has had, or would reasonably be expected to have a material adverse effect on (i) the business, assets, financial condition or results of operations of the Borrower and its Subsidiaries, taken as a whole, (ii) the ability of the Borrower and the Guarantors (taken as a whole) to perform their payment obligations under any Loan Document to which the Borrower or any of the Loan Parties is a party or (iii) the material rights and remedies of the Administrative Agent and the Lenders under the Loan Documents, taken as a whole, including the legality, validity, binding effect or enforceability of the Loan Documents.

"**Material Domestic Subsidiary**" means, at any date of determination, each of the Borrower's Domestic Subsidiaries that are Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Subsidiaries for such period, in each case determined in accordance with GAAP; *provided* that if, at any time and from time to time after the Closing Date, Domestic Subsidiaries that are not Guarantors solely because they do not meet the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended fiscal quarter of the Borrower for which financial statements have been delivered pursuant to Section 6.01 or more than 5.0% of the consolidated gross revenues of the Borrower and the Subsidiaries for such Test Period, then the Borrower shall, not later than 45 days after the date by which financial statements for such quarter or Test Period, as applicable, are required to be delivered pursuant to this Agreement (or such longer period as the Required Lenders may agree in their reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of Section 6.11 applicable to such Subsidiary.

"**Material Foreign Subsidiary**" means, at any date of determination, each of the Borrower's Foreign Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Subsidiaries for such period, in each case determined in accordance with GAAP; *provided* that if, at any time and from time to time after the Closing Date, Foreign Subsidiaries not meeting the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended fiscal quarter of the Borrower for which financial statements have been delivered pursuant to Section 6.01 or more than 5.0% of the consolidated gross revenues of the Borrower and the Subsidiaries for such Test Period, then the Borrower shall, not later than 45 days after the date by which financial statements for such quarter or Test Period, as applicable, are required to be delivered pursuant to this Agreement (or such longer period as the Required Lenders may agree in their reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Foreign Subsidiaries as "Material Foreign Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of the definition of "Collateral and Guarantee Requirement."

"**Material Non-Public Information**" means information which is (a) not publicly available, (b) material with respect to Holdings and its Subsidiaries or their respective securities for purposes of United States federal and state securities laws and (c) not of a type that would be publicly disclosed in connection with any issuance by Holdings or any of its Subsidiaries of debt or equity securities issued pursuant to a public offering, a Rule 144A offering or other private placement where assisted by a placement agent.

"**Material Real Property**" means any fee-owned Real Property located in the United States that is owned by any Loan Party and that has a fair market value in excess of $1,250,000 (at the Closing Date or, with respect to Real Property acquired after the Closing Date, at the time of acquisition, in each case, as reasonably estimated by the Borrower in good faith).

"**Material Subsidiary**" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

27

WEIL:\97566320\8\10143.0003

"**Maturity Date**" means the date that is six months after the fifth anniversary of the Closing Date; *provided* that, if such day is not a Business Day, the Maturity Date shall be the Business Day immediately succeeding such day.

"**Maximum Accrual**" has the meaning set forth in Section 10.24.

"**Maximum Capital Expenditures Amount**" has the meaning set forth in Section 7.10.

"**Maximum Rate**" has the meaning set forth in Section 10.10.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgage Policies**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement."

"**Mortgaged Properties**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement."

"**Mortgages**" means collectively, the deeds of trust, trust deeds, hypothecs and mortgages made by the Loan Parties in favor or for the benefit of the Administrative Agent on behalf of the Secured Parties creating and evidencing a Lien on a Mortgaged Property in form and substance reasonably satisfactory to the Administrative Agent, and any other mortgage executed and delivered pursuant to Sections 6.11 and 6.13, in each case, as the same may from time to time be amended, restated, supplemented or otherwise modified.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which a Loan Party, any Subsidiary or any ERISA Affiliate makes or is obligated to make contributions, or has made or been obligated to make contributions.

"**Net Proceeds**" means:

(a)     100% of the cash proceeds actually received by the Borrower or any of the Subsidiaries (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards, but in each case only as and when received) from any Disposition or Casualty Event, net of (i) attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees and expenses actually incurred in connection therewith, (ii) the principal amount of any Indebtedness that is secured by a Lien (other than a Lien that ranks *pari passu* with or is subordinated to the Liens securing the Obligations) on the asset subject to such Disposition or Casualty Event and that is required to be repaid in connection with such Disposition or Casualty Event (other than Indebtedness under the Loan Documents), together with any applicable premium, penalty, interest and breakage costs, (iii) in the case of any Disposition or Casualty Event by a non-wholly owned Subsidiary, the *pro rata* portion of the Net Proceeds thereof (calculated without regard to this clause (iii)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a wholly owned Subsidiary as a result thereof, (iv) Taxes or Tax Distributions paid or reasonably estimated to be payable or, without duplication, permitted to be paid as a result thereof (including any income or withholding Taxes imposed on any repatriation of such proceeds to the Borrower), (v) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) above) (x) related to any of the applicable assets and (y) retained by the Borrower or any of the Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Proceeds of such Disposition or Casualty Event occurring on the date of such reduction) and (vi) any funded escrow established pursuant to the

28

WEIL:\97566320\8\10143.0003

documents evidencing any such sale or disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or disposition (*provided* that to the extent that any amounts are released from such escrow to the Borrower or a Subsidiary, such amounts net of any related expenses shall constitute Net Proceeds); and

(b)  100% of the cash proceeds from the incurrence, issuance or sale by the Borrower or any of the Subsidiaries of any Indebtedness, net of all taxes paid or reasonably estimated to be payable as a result thereof and fees (including investment banking fees and discounts), commissions, costs and other expenses, in each case incurred in connection with such incurrence, issuance or sale.

For purposes of calculating the amount of Net Proceeds, fees, commissions and other costs and expenses payable to the Borrower shall be disregarded.

"**Non-Consenting Lender**" has the meaning set forth in Section 3.07(d).

"**Non-Defaulting Lender**" means, at any time, a Lender that is not a Defaulting Lender.

"**Note**" means a promissory note of the Borrower payable to any Lender or its registered assigns, in substantially the form of Exhibit B hereto, evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Term Loans made by such Lender.

"**Notice of Intent to Cure**" has the meaning set forth in Section 8.04.

"**Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party and its Subsidiaries arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and of their Subsidiaries to the extent they have obligations under the Loan Documents) include (a) the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document, (b) the obligation to pay any applicable fee pursuant to Section 2.09(b) and (c) the obligation of any Loan Party to reimburse any amount in respect of any of the foregoing that any Lender may elect to pay or advance on behalf of such Loan Party in accordance with the terms of the Loan Documents.

"**OFAC**" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"**OID**" means original issue discount.

"**Old Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Old Intermediate Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Old Jason**" has the meaning set forth in the preliminary statements to this Agreement.

"**Order**": means any order, writ, judgement, injunction, decree, rule, ruling, directive, stipulation, determination or award made, issued or entered by the Bankruptcy Court or any other Governmental Authority, whether interim or final.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement or limited liability company agreement; and (c) with respect to any

29

partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" has the meaning set forth in Section 3.01(b).

"**Outstanding Amount**" means, with respect to the Term Loans, the outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Term Loans.

"**Overnight Rate**" means, for any day, the greater of the Federal Funds Effective Rate and an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"**Participant**" has the meaning set forth in Section 10.07(e).

"**Participant Register**" has the meaning set forth in Section 10.07(e).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time.

"**Perfection Certificate**" means a certificate substantially in the form of Exhibit II to the Security Agreement or any other form reasonably approved by the Required Lenders, as the same shall be supplemented from time to time.

"**Permitted Acquisition**" has the meaning set forth in Section 7.02(i).

"**Permitted Holders**" means each of Lenders and the First Lien Credit Agreement Lenders holding the common equity of Holdings on the Closing Date.

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal, restructuring, replacement or extension of any Indebtedness of such Person; *provided* that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, restructured, refunded, renewed, replaced or extended except by an amount equal to unpaid accrued interest and premium thereon *plus* other amounts owing or paid related to such Indebtedness, and fees and expenses incurred, in connection with such modification, refinancing, refunding, renewal, restructuring, replacement or extension *plus* an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e), such modification, refinancing, refunding, renewal, replacement or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended, (c) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e) or (f), at the time thereof, no Event of Default shall have occurred and be continuing, (d) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal, replacement or extension is subordinated in right of payment to the Obligations on terms (i) at least as favorable (taken as a whole) (as reasonably determined by the Borrower) to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended or (ii) as otherwise reasonably acceptable to the Administrative Agent, (e) if such Indebtedness being modified, refinanced,

30

replaced, refunded, renewed or extended is Indebtedness permitted pursuant to Sections 7.03(s), 7.03(w), and 7.03(x), (i) to the extent such Indebtedness being modified, refinanced, replaced, refunded, renewed or extended is unsecured or secured by Liens that are subordinated to the Liens securing the Obligations, such modification, refinancing, replacement, refunding, renewal or extension is unsecured or (with respect to refinanced debt secured by Liens that are subordinated to the Liens securing the Obligations) secured by Liens that are subordinated to the Liens securing the Obligations on terms (x) at least as favorable (taken as a whole) (as reasonably determined by the Borrower) to the Lenders as those contained in the documentation (including any intercreditor or similar agreements) governing the Indebtedness being modified, refinanced, replaced, refunded, renewed or extended or (y) otherwise reasonably acceptable to the Administrative Agent and (ii) notwithstanding anything contained in Section 7.03(c), such modification, refinancing, refunding, renewal, replacement or extension is incurred only by one or more Persons who is an obligor of the Indebtedness being modified, refinanced, replaced, refunded, renewed or extended and (f) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is outstanding pursuant to the First Lien Credit Agreement or any other First Lien Loan Document, such modification, refinancing, refunding, renewal, replacement or extension does not violate the terms of the Intercreditor Agreement.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning set forth in the preliminary statements to this Agreement.

"**PIK Election**" has the meaning set forth in Section 2.08(c).

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established or maintained by any Loan Party or any Subsidiary or, with respect to any such plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA, any ERISA Affiliate.

"**Plan Effective Date**" has the meaning set forth in the preliminary statements to this Agreement.

"**Platform**" has the meaning set forth in Section 6.01(d).

"**Pledged Debt**" has the meaning set forth in the Security Agreement.

"**Pledged Equity**" has the meaning set forth in the Security Agreement.

"**Prepackaged Plan**" has the meaning set forth in the preliminary statements to this Agreement.

"**Pre-Petition First Lien Credit Agreement**" has the meaning set forth in the preliminary statements to this Agreement.

"**Pre-Petition First Lien Lenders**" has the meaning set forth in the preliminary statements to this Agreement.

"**Proceeding**" has the meaning set forth in Section 10.05.

"**Proceeds**" has the meaning set forth in the Security Agreement.

"**Pro Forma Balance Sheet**" has the meaning set forth in Section 5.05(b).

"**Pro Forma Basis**" and "**Pro Forma Effect**" means, with respect to compliance with any test or covenant or calculation of any ratio hereunder, the determination or calculation of such test, covenant or ratio (including in connection with Specified Transactions) in accordance with Section 1.09.

"**Pro Forma Financial Statements**" has the meaning set forth in Section 5.05(b).

31

WEIL:\97566320\8\10143.0003

"**Pro Rata Share**" means, with respect to each Lender, at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the Outstanding Amount of the Term Loans of such Lender at such time and the denominator of which is the Total Outstandings at such time.

"**Projections**" has the meaning set forth in Section 6.01(c).

"**Public Lender**" has the meaning set forth in Section 6.01(d).

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests.

"**Qualified IPO**" means the issuance by the Borrower or any direct or indirect parent of the Borrower of its common Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the U.S. Securities and Exchange Commission in accordance with the Securities Act (whether alone or in connection with a secondary public offering).

"**Quarterly Financial Statements**" means the unaudited consolidated balance sheets and related consolidated statements of income and cash flows of the Old Jason and its Subsidiaries for the fiscal quarter ended closest to June 30, 2020 and each subsequent fiscal quarter of the Company ended at least 45 days prior to the Closing Date.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned or leased by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures.

"**Register**" has the meaning set forth in Section 10.07(d).

"**Rejection Notice**" has the meaning set forth in Section 2.05(b)(viii).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"**Release**" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing or migrating in, into, onto or through the Environment or in an uncontained manner from or through any facility, property or equipment.

"**Relevant Public Company**" means Holdings or any direct or indirect parent thereof that (i) owns, directly or indirectly, 100% of the Equity Interests of Holdings and the Borrower and (ii) is the registrant with respect to a Qualified IPO.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the otherwise applicable notice period has been waived by regulation or otherwise by the PBGC.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the Total Outstandings; *provided* that the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

32

"**Responsible Officer**" means the chief executive officer, president, vice president, chief financial officer, chief administrative officer, secretary or assistant secretary, treasurer or assistant treasurer, controller or other similar officer of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the Borrower's or a Subsidiary's equity holders, partners or members (or the equivalent Persons thereof).

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of June 5, 2020, by and among the Debtors and the Pre-Petition Lenders party thereto as Consenting Creditors (as defined therein).

"**Returns**" means, with respect to any Investment, any dividends, distributions, interest, fees, premium, return of capital, repayment of principal, income, profits (from a Disposition or otherwise) and other amounts received or realized in respect of such Investment.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Same Day Funds**" means immediately available funds.

"**Sanctions**" means all economic sanctions and regulations maintained by OFAC.

"**Sanctioned Person**" means any Person located, organized, or resident in Crimea, Cuba, Iran, North Korea, or Syria, and any Person named on any OFAC sanctions list, including OFAC's Specially Designated Nationals List, the Sectoral Sanctions Identifications List, and the Foreign Sanctions Evaders List.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Second Lien Secured Obligations**" means the "Junior Lien Obligations" as defined in the Intercreditor Agreement.

"**Secured Obligations**" means, collectively, the Obligations, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise.

"**Secured Parties**" means, collectively, the Administrative Agent, the Lenders, and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.05.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Security Agreement**" means a security agreement substantially in the form of Exhibit F.

"**Security Agreement Supplement**" has the meaning set forth in the Security Agreement.

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date (i) the sum of the debt (including contingent liabilities) of such Person and its Subsidiaries, taken as a whole, does not exceed the present fair saleable value of the assets of the Person and its Subsidiaries, taken as a whole; (ii) the capital of such Person and its Subsidiaries, taken as a whole, is not unreasonably small in relation to the business of such Person and its Subsidiaries, taken as a whole, contemplated as of the Closing

33

WEIL:\97566320\8\10143.0003

Date; and (iii) such Person and its Subsidiaries, taken as a whole, do not intend to incur, or believe that they will incur, debts (including current obligations) beyond their ability to pay such debt as they mature in the ordinary course of business. For the purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"**SPC**" has the meaning set forth in <u>Section 10.07(h)</u>.

"**Specified Transaction**" means any Investment that results in a Person becoming a Subsidiary, any Permitted Acquisition or any Disposition that results in a Subsidiary ceasing to be a Subsidiary of the Borrower, any Investment constituting an acquisition of assets constituting a business unit, line of business or division of, or all or substantially all of the Equity Interests of, another Person or any Disposition of a business unit, line of business or division of the Borrower or a Subsidiary, in each case whether by merger, consolidation, amalgamation or otherwise, or any incurrence or repayment of Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility or line of credit for working capital purposes) or Restricted Payment, that by the terms of this Agreement requires such test to be calculated on a "Pro Forma Basis" or after giving "Pro Forma Effect."

"**Statutory Reserves**" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board of Governors of the Federal Reserve System of the United States (the "**Board**") and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the Board). Eurocurrency Rate Loans shall be deemed to constitute Eurocurrency Liabilities (as defined in Regulation D of the Board) and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (excluding, for the avoidance of doubt, any charitable organizations, and any other Person that meets the requirements of Section 501(c)(3) of the Code) of which (i) a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, (ii) more than half of the issued share capital is at the time beneficially owned or (iii) the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" means any Guarantor other than the Borrower and the Holdcos.

"**Supermajority Lenders**" means, as of any date of determination, Lenders having more than 66.7% of the Total Outstandings; *provided* that the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Supermajority Lenders.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not

34

any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Target Person**" has the meaning set forth in Section 7.02.

"**Tax Distribution**" means any distribution made or permitted to be made pursuant to Section 7.06(h)(iii).

"**Tax Group**" has the meaning set forth in Section 7.06(h)(iii).

"**Taxes**" means all present or future taxes, duties, levies, imposts, assessments, withholdings (including backup withholding) or other similar charges imposed by any Governmental Authority including any interest, penalties and additions to tax applicable thereto.

"**Term Facility**" means the Term Loans and commitments in respect thereof.

"**Term Loan**" means the term loan deemed made by the Lenders on the Closing Date to the Borrower pursuant to Section 2.01. As of the Closing Date, the aggregate amount of the Term Loans is $50,000,000.

"**Term Loan Priority Collateral**" has the meaning assigned to such term in the Intercreditor Agreement.

"**Test Period**" means, for any date of determination under this Agreement, the four consecutive fiscal quarters of the Borrower most recently ended as of such date of determination.

"**Threshold Amount**" means $11,000,000.

"**Total Assets**" means the total assets of the Borrower and the Subsidiaries on a consolidated basis in accordance with GAAP, as shown on the most recent balance sheet of the Borrower delivered pursuant to Section 6.01(a) or (b) or, for the period prior to the time any such statements are so delivered pursuant to Section 6.01(a) or (b), the Pro Forma Financial Statements.

"**Total Outstandings**" means the aggregate Outstanding Amount of all Loans.

"**Transaction Expenses**" means any fees or expenses incurred or paid by Holdings, Intermediate Holdings, the Borrower or any of their respective Subsidiaries in connection with the Transactions (including expenses in connection with hedging transactions), this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby.

"**Transactions**" means, collectively, (a) the deemed funding of the Term Loans on the Closing Date and the execution, delivery and performance of the Loan Documents to be entered into on the Closing Date,

WEIL:\97566320\8\10143.0003

(b) the funding of any ABL Loans on the Closing Date, issuance of any Letters of Credit (as defined in the ABL Credit Agreement) and the execution, delivery and performance of the ABL Loan Documents to be entered into on the Closing Date, (c) the deemed funding of the First Lien Term Loans under the First Lien Credit Agreement on the Closing Date and the execution, delivery and performance of the First Lien Loan Documents to be entered into on the Closing Date, (d) the extinguishment of the Existing Debt in accordance with the Prepackaged Plan, (e) the restructuring of the Holdcos and certain of their Subsidiaries pursuant to the Prepackaged Plan, the Chapter 11 Cases and any related transactions and (f) the payment of Transaction Expenses earned, due and payable on the Closing Date.

"**Transferred Guarantor**" has the meaning set forth in <u>Section 11.09</u>.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a Eurocurrency Rate Loan.

"**Uniform Commercial Code**" or "**UCC**" means (i) the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or (ii) the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it applies to any item or items of Collateral.  References in this Agreement and the other Loan Documents to specific sections of the Uniform Commercial Code are based on the Uniform Commercial Code as in effect in the State of New York on the Closing Date.  In the event such Uniform Commercial Code is amended or another Uniform Commercial Code described in clause (ii) is applicable, such Section reference shall be deemed to be references to the comparable Section in such amended or other Uniform Commercial Code.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" has the meaning set forth in <u>Section 3.01(e)(ii)(C)</u>.

"**USA Patriot Act**" means the USA PATRIOT ACT (Title III of Pub. Law 107-56 (signed into law October 26, 2001) (as amended from time to time).

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness.

"**Write-Down and Conversion Powers**" means with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

"**wholly owned**" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

**Section 1.02    Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

36

WEIL:\97566320\8\10143.0003

(c)     Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(d)     The term "including" is by way of example and not limitation.

(e)     The word "or" is not exclusive.

(f)     The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(g)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(h)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(i)     For purposes of determining compliance with any Section of Article VII at any time, in the event that any Lien (other than Liens securing Indebtedness of the types described in clauses (v) through (z) of the proviso appearing in the last paragraph of Section 7.03, which shall at all times be deemed to be incurred in reliance on the applicable express exception therefor in Section 7.01), Investment, Disposition, Restricted Payment, Affiliate transaction, Contractual Obligation or prepayment of Indebtedness meets the criteria of one or more than one of the categories of transactions permitted pursuant to any clause of such Sections, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time.

(j)     All references to "knowledge" of any Loan Party or a Subsidiary of Holdings means the actual knowledge of a Responsible Officer.

(k)     The words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(l)     All references to any Person shall be constructed to include such Person's successors and assigns (subject to any restriction on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(m)     The word "will" shall be construed to have the same meaning and effect as the word "shall."

(n)     All references to any Lender "making" or "funding" a Term Loan or a Term Loan being "made" or "funded" (or any similar concept) by a Lender shall, for all purposes hereunder, be a reference to the deemed making or funding of such Loan by such Lender or such Loan being deemed made or funded (or any similar concept) by such Lender.

**Section 1.03    Accounting Terms**.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.  Notwithstanding any other provision

<div align="center">37</div>

contained herein, (a) any lease that is treated as an operating lease for purposes of GAAP as of the Closing Date shall not be treated as Indebtedness, Attributable Indebtedness or as a Capitalized Lease and shall continue to be treated as an operating lease (and any future lease, if it were in effect on the Closing Date, that would be treated as an operating lease for purposes of GAAP as of the Closing Date shall be treated as an operating lease), in each case for purposes of this Agreement, notwithstanding any actual or proposed change in GAAP after the Closing Date and (b) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to (i) Statement of Financial Accounting Standards 141R or ASC 805 (or any other financial accounting standard having a similar result or effect) or (ii) any election under Financial Accounting Standards Codification No. 825—Financial Instruments, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of a Holdco, the Borrower or any Subsidiary at "fair value" as defined therein.

**Section 1.04    Rounding**.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

**Section 1.05    References to Agreements, Laws, Etc**.  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, refinancings, restatements, renewals, restructurings, extensions, supplements and other modifications thereto, but only to the extent that such amendments, refinancings, restatements, renewals, restructurings, extensions, supplements and other modifications are not prohibited by the Loan Documents; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

**Section 1.06    Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**Section 1.07    Timing of Payment or Performance**.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day.

**Section 1.08    [Reserved].**

**Section 1.09    Pro Forma Calculations**.  (a)  Notwithstanding anything to the contrary herein, financial ratios and tests, including the Interest Coverage Ratio and the Consolidated First Lien Net Leverage Ratio shall be calculated in the manner prescribed by this Section 1.09; *provided* that notwithstanding anything to the contrary in Section 1.09(b), (c) or (d), when calculating the Interest Coverage Ratio  or Consolidated First Lien Net Leverage Ratio for purposes of determining actual quarterly compliance with the financial covenants pursuant to Section 7.11 or Section 7.12, as applicable (and not compliance on a Pro Forma Basis for purposes of testing the permissibility of a transaction hereunder), the events described in this Section 1.09 that occurred subsequent to the end of the applicable Test Period shall not be given *pro forma* effect.  In addition, whenever a financial ratio or test is to be calculated on a *pro forma* basis, the reference to the "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which internal financial statements of Holdings are available (as determined in good faith by the Borrower); *provided* that, the provisions of this sentence shall not apply for purposes of calculating the Interest Coverage Ratio or the Consolidated First Lien Net Leverage Ratio for purposes of determining actual quarterly compliance with Section 7.11 or Section 7.12, as applicable (and not compliance on a Pro Forma Basis for purposes of testing the permissibility of a transaction hereunder), which

38

shall be based on the financial statements delivered pursuant to Section 6.01(a) or (b), as applicable, for the relevant Test Period.

(b)        For purposes of calculating any financial ratio or test, Specified Transactions (with any incurrence or repayment of any Indebtedness in connection therewith to be subject to Section 1.09(d)) that have been made (i) during the applicable Test Period and (ii) if applicable as described in Section 1.09(a), subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio or test is made shall be calculated on a *pro forma* basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day (or, in case of the determination of Total Assets, the last day) of the applicable Test Period.  If since the beginning of any applicable Test Period any Person that subsequently became a Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Subsidiaries since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.09, then such financial ratio or test (or Total Assets) shall be calculated to give *pro forma* effect thereto in accordance with this Section 1.09.

(c)        [reserved].

(d)        In the event that the Borrower or any Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Indebtedness included in the calculations of any financial ratio or test (in each case, other than Indebtedness incurred or repaid under any revolving credit facility), (i)  during the applicable Test Period or (ii) subject to Section 1.09(a) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving *pro forma* effect to such incurrence or repayment of Indebtedness, to the extent required, as if the same had occurred on the last day of the applicable Test Period.

**Section 1.10    Exchange Rates; Currency**.  (a)  For purposes of determining compliance with Article VII with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Investment is incurred (so long as such Indebtedness or Investment, at the time incurred, made or acquired, was permitted hereunder).

(b) Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect the (i) adoption of the Euro by any member state of the European Union and any relevant market conventions or practices relating to the Euro or (ii) a change in currency of any other country and any relevant market conventions or practices relating to the change in currency.

**Section 1.11    Certifications**.    All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such person in his or her capacity solely as an officer or a representative of such Loan Party, on such Loan Party's behalf and not in such Person's individual capacity.

**ARTICLE II**
**CREDIT EXTENSIONS**

**Section 2.01    The Loans**.  Subject to the terms and conditions expressly set forth herein, each Lender, pursuant to the terms of the Prepackaged Plan, exchanged or otherwise agreed to deem satisfied a portion of the obligations held by it under the Pre-Petition First Lien Credit Agreement for an outstanding Term Loan under this Agreement in the amount set forth opposite such Lender's name on Schedule 2.01.

39

WEIL:\97566320\8\10143.0003

Amounts borrowed under this Section 2.01 and repaid or prepaid may not be re-borrowed.  On the Closing Date, the Term Loans shall be Eurocurrency Rate Loans with an Interest Period of one months.

**Section 2.02**    **Conversions and Continuations of Loans**.  (a)  Each conversion of Term Loans from one Type to the other and each continuation of Eurocurrency Rate Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent.  Each such notice must be received by the Administrative Agent not later than (1) 12:00 noon New York City time three Business Days prior to the requested date of any continuation of Eurocurrency Rate Loans or any conversion of Base Rate Loans to Eurocurrency Rate Loans, and (2) 10:00 a.m. New York City time one Business Day prior to the requested date of the conversion of any Eurocurrency Rate Loans to Base Rate Loans.  Each notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery (including via email) to the Administrative Agent of a written Committed Loan Notice (and will not be effective until so confirmed), appropriately completed and signed by a Responsible Officer of the Borrower.  Except as otherwise provided in Section 2.14, each conversion to or continuation of Eurocurrency Rate Loans shall be in a minimum principal amount of $500,000, or a whole multiple of $100,000 in excess thereof or such other multiple as the Required Lenders may agree from time to time.  Except as provided herein, conversion to Base Rate Loans shall be in a minimum principal amount of $250,000 or a whole multiple of $100,000 in excess thereof.  Each Committed Loan Notice shall specify (i) whether the Borrower is requesting a conversion of Term Loans from one Type to the other or a continuation of Eurocurrency Rate Loans, (ii) the requested date of the conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be converted or continued, (iv) the Type of Loans to which existing Term Loans are to be converted and (v) if applicable, the duration of the Interest Period with respect thereto.  If the Borrower fails to specify a Type of Loan in a Committed Loan Notice or fails to give a timely notice requesting a conversion or continuation, then the applicable Term Loans shall be converted to Base Rate Loans.  Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurocurrency Rate Loans.  If the Borrower requests a conversion to or continuation of Eurocurrency Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month.

(b)    Following receipt of a Committed Loan Notice, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans or continuation described in Section 2.02(a).

(c)    Except as otherwise provided herein, a Eurocurrency Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurocurrency Rate Loan unless the Borrower pays the amount due, if any, under Section 3.05 in connection therewith.  During the occurrence and continuation of an Event of Default, the Administrative Agent (at the direction of the Required Lenders) may require that no Loans may be converted to or continued as Eurocurrency Rate Loans and/or that any outstanding Eurocurrency Rate Loans be converted to Base Rate Loans.

(d)    The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurocurrency Rate Loans upon determination of such interest rate. The determination of the Eurocurrency Rate by the Administrative Agent shall be conclusive in the absence of manifest error.

(e)    After giving effect to the initial Borrowing, all conversions of Term Loans from one Type to the other, and all continuations of Term Loans as the same Type, there shall not be more than 3 (or such greater amount as may be agreed by the Administrative Agent in its sole discretion) Interest Periods in effect.

**Section 2.03**    **[Reserved].**

**Section 2.04**    **Conversion**.

40

(a)      At any time on or after the first anniversary of the Closing Date but prior to the fourth anniversary of the Closing Date, and before such time as all principal and accrued and unpaid interest owing under this Agreement is paid in full and no Obligations remain outstanding pursuant to this Agreement, Supermajority Lenders (or, at any time on or after the fourth anniversary of the Closing Date and before such time as all principal and accrued and unpaid interest owing under this Agreement is paid in full and no Obligations remain outstanding pursuant to this Agreement, Required Lenders), shall have the right, at the option of Supermajority Lenders (or Required Lenders, as applicable), to convert the outstanding Obligations under the Loan Documents into Common Shares equal to the then outstanding Obligations under this Agreement divided by $13.50 (the **"Conversion"**).

(b)      The Supermajority Lenders (or Required Lenders, as applicable), will provide notice to Holdings of the Conversion (the "**Conversion Notice**"), and such Conversion Notice will set forth the date of the Conversion (the "**Conversion Effective Date**"), which Conversion Date shall not be earlier than the fifth Business Day following the date the Conversion Notice is delivered to Holdings.

(c)      Obligations shall automatically convert into Common Shares upon the Conversion Effective Date. Common Shares issued upon the Conversion Effective Date shall be issued in the applicable Lender's name unless a Lender requests the Common Shares to be issued in a name other than the Lender's name by written notice to Holdings at least three Business Days prior to the Conversion Effective Date. The Lender or its applicable designee shall be deemed a stockholder of record on the Conversion Effective Date.

(d)      Upon the Conversion, Holdings shall pay any documentary, stamp or similar issue or transfer tax due in the issue of Common Shares. However, the Lender shall pay any such tax which is due because the Lender requests the Common Shares to be issued in a name other than the Lender's name.

(e)      Holdings shall at all times reserve, out of its authorized but unissued Common Shares, a sufficient number of Common Shares to permit the conversion of all outstanding Obligations for Common Shares. No fractional Common Shares shall be issued upon conversion of Obligations, with any fractional share of Common Shares that would have been issuable upon the conversion of any Obligations rounded up to the nearest whole share of Common Shares.

(f)      Holdings covenants that all Common Shares delivered upon Conversion shall be newly issued shares or treasury shares, shall be duly authorized, validly issued, fully paid and nonassessable and shall be free from preemptive rights and free of any lien or adverse claim.

(g)      Holdings will endeavor promptly to comply with all federal and state securities laws regulating the offer and delivery of Common Shares upon Conversion, if any, and will list or cause to be approved for listing or included for quotation, as the case may be, such Common Shares on each national securities exchange or in the over-the-counter market or such other market, if any, on which the Common Shares are then listed or quoted.

(h)      Upon delivery of the Common Shares on the Conversion Effective Date, the Obligations shall automatically be extinguished and discharged for all purposes and each Lender shall cease to have any rights hereunder except the right to receive the Common Shares.

**Section 2.05    Prepayments**.

(a)      *Optional*.   (i) Subject to the Intercreditor Agreement, the Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay the Term Loans in whole or in part without premium or penalty (except as expressly set forth in Section 2.09(b)); *provided* that (1) such notice must be received by the Administrative Agent not later than 11:00 a.m. New York City time (A) three Business Days prior to any date of prepayment of Eurocurrency Rate Loans and (B) one Business Day prior to the date of prepayment of Base Rate Loans; (2) any prepayment of Eurocurrency Rate Loans

41

shall be in a minimum principal amount of $500,000, or a whole multiple of $100,000 in excess thereof; and (3) any prepayment of Base Rate Loans shall be in a minimum principal amount of $250,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment.  The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such prepayment.  If such notice is given by the Borrower, unless rescinded pursuant to clause (iii) below, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05.

(ii)      [Reserved].

(iii)      Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.05(a)(i) by notice to the Administrative Agent if such prepayment would have resulted from a refinancing of all or any portion of the Term Loans or occurrence of another event, which refinancing or event shall not be consummated or shall otherwise be delayed.

(iv)      Voluntary prepayments of any Term Loans permitted hereunder shall be applied ratably to the Term Loans then outstanding and shall be paid to the Lenders in accordance with their respective Pro Rata Shares of such prepayment).

(v)      [Reserved].

(vi)      In connection with any prepayment pursuant to this Section 2.05(a) consummated prior to the fourth anniversary of the Closing Date, the Borrower shall pay to each Lender the applicable fee required by Section 2.09(b).

(b)      **Mandatory**.

(i)      [reserved].

(ii)      Subject to the Intercreditor Agreement, if (1) the Borrower or any Subsidiary of the Borrower Disposes of any property or assets (other than any Disposition of any property or assets permitted by Sections 7.05(a), (b), (c), (d), (e), (f), (g), (h), (i), (l), (m) (except as set forth in the proviso thereof and except to the extent such property is subject to a Mortgage), (n), (p), (q), (r) and (u)), or (2) any Casualty Event occurs, which results in the realization or receipt by the Borrower or Subsidiary of Net Proceeds, subject to Section 2.05(b)(vi), the Borrower shall cause to be prepaid on or prior to the date which is 5 Business Days after the date of the realization or receipt by the Borrower or any Subsidiary of such Net Proceeds, an aggregate principal amount of Term Loans in an amount equal to 100% of all such Net Proceeds; *provided* that (A) if at any time such prepayment would be required hereunder with respect to any ABL Priority Collateral at any time when any ABL Credit Agreement is in effect, the Net Proceeds of any such Disposition or Casualty Event that relate or are attributable to any such ABL Priority Collateral shall not be required to be applied to the prepayment of the Term Loans hereunder to the extent such Net Proceeds are required to prepay or repay the ABL Loans in order to remain in compliance with the "Borrowing Base" (as defined in the ABL Credit Agreement) under the ABL Credit Agreement (or any documentation governing any ABL Loans) and (B) if at any time such prepayment would be required hereunder with respect to any Term Loan Priority Collateral at any time when the First Lien Credit Agreement is in effect, the Net Proceeds of any such Disposition or Casualty Event that relate or are attributable to any such Term Loan Priority Collateral shall be first applied to the First Lien Obligations to the extent required under the First Lien Credit Agreement.

42

(iii)    Subject to the Intercreditor Agreement, if the Borrower or any Subsidiary incurs or issues any Indebtedness after the Closing Date not permitted to be incurred or issued pursuant to Section 7.03, the Borrower shall cause to be prepaid an aggregate principal amount of Term Loans in an amount equal to 100% of all Net Proceeds received therefrom on or prior to the date which is five Business Days after the receipt by the Borrower or such Subsidiary of such Net Proceeds.  In connection with any prepayment under this Section 2.05(b)(iii) is consummated in respect of all or any portion of the Term Loans on or prior to the third anniversary of the Closing Date, the Borrower shall pay to each Lender the applicable fee required by Section 2.09(b).

(iv)    [reserved].

(v)    [reserved].

(vi)    Notwithstanding any other provisions of this Section 2.05, (i) to the extent that the repatriation to the United States of any or all of the Net Proceeds of any Disposition by a Foreign Subsidiary ("**Foreign Disposition**") or the Net Proceeds of any Casualty Event incurred by a Foreign Subsidiary ("**Foreign Casualty Event**") would be (x) prohibited or delayed by applicable local law or (y) restricted by applicable material constituent documents, including as a result of minority ownership (so long as such restrictions were not implemented for the purpose of avoiding such mandatory prepayment requirements), an amount equal to the Net Proceeds that would be so affected were the Borrower to attempt to repatriate such cash will not be required to be applied to repay Term Loans at the times provided in this Section 2.05 so long, but only so long, as the applicable local law or applicable material constituent documents would not otherwise permit repatriation to the United States (Holdings, Intermediate Holdings, the Borrower and its Subsidiaries hereby agree to use all commercially reasonable efforts to overcome or eliminate any such restrictions on repatriation, even if the Borrower does not intend to actually repatriate such cash, so that an amount equal to the full amount of such Net Proceeds will otherwise be subject to repayment under this Section 2.05), and if within one year following the date on which the respective prepayment would otherwise have been required such repatriation of any of such affected Net Proceeds is permissible under the applicable local law or applicable material constituent documents, even if such cash is not actually repatriated at such time, an amount equal to the amount of the Net Proceeds will be promptly (and in any event not later than five Business Days) applied (net of an amount equal to the additional taxes of the Borrower, its Subsidiaries and the direct and indirect holders of Equity Interests in the Borrower that would be payable or reserved against and any additional costs that would be incurred as a result of a repatriation, whether or not a repatriation actually occurs) by the Borrower to the repayment of the Term Loans pursuant to this Section 2.05 and (ii) to the extent that the Borrower has determined in good faith that repatriation of any of or all the Net Proceeds of any Foreign Disposition or Foreign Casualty Event would have adverse tax cost consequences (including the imposition of withholding Taxes) with respect to such Net Proceeds, an amount equal to such Net Proceeds that would be so affected will not be subject to repayment under this Section 2.05; *provided*, that in the case of each of clauses (i) and (ii), such nonpayment shall not constitute an Event of Default (and such amounts shall be available for working capital purposes of the Borrower and the Subsidiaries, subject to the prepayment provisions in this Section 2.05(b)(vi)).  For the avoidance of doubt, nothing in this Section 2.05 shall require the Borrower to cause any amounts to be repatriated to the United States (whether or not such amounts are used in or excluded from the determination of the amount of any mandatory prepayments hereunder).

(vii)    Each prepayment of Term Loans pursuant to this Section 2.05(b) shall be applied ratably to the Term Loans then outstanding and shall be paid to the Lenders in accordance with their respective Pro Rata Shares of such prepayment.

(viii)    The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made by the Borrower pursuant to clauses (i), (ii) and (iii) of this Section 2.05(b) at least three Business Days prior to the date of such prepayment.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the aggregate amount of such prepayment to be made by the Borrower.  The Administrative Agent will promptly notify each

43

Lender of the contents of the Borrower's prepayment notice and of such Lender's Pro Rata Share of the prepayment.  Each Lender may reject all or a portion of its Pro Rata Share of any mandatory prepayment (such declined amounts, the "**Declined Proceeds**") of Term Loans required to be made pursuant to clauses (i), (ii) and (iii) of this Section 2.05(b) by providing written notice (each, a "**Rejection Notice**") to the Administrative Agent and the Borrower no later than 5:00 p.m. New York City time one Business Day after the date of such Lender's receipt of notice from the Administrative Agent regarding such prepayment; *provided*, *however*, in no event may the a Lender reject a prepayment that represents a refinancing of the Total Outstandings.  Each Rejection Notice from a given Lender shall specify the principal amount of the mandatory repayment of Term Loans to be rejected by such Lender.  If a Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Term Loans to be rejected, any such failure will be deemed an acceptance of such mandatory prepayment of Term Loans.  To the extent the Lenders elect to decline their Pro Rata Share of such Declined Proceeds, any Declined Proceeds remaining thereafter shall be retained by the Borrower.

(c)     *Interest, Funding Losses, Etc*.  All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a Eurocurrency Rate Loan on a date prior to the last day of an Interest Period therefor, any amounts owing in respect of such Eurocurrency Rate Loan pursuant to Section 3.05.

**Section 2.06      [Reserved].**

**Section 2.07      Repayment of Loans**. So long as the Conversion shall not have occurred, the Borrower shall repay to the Administrative Agent for the ratable account of the Lenders on the Maturity Date for the Term Loans, the aggregate principal amount of all Term Loans outstanding on such date.

**Section 2.08      Interest**.  (a)  Subject to the provisions of Section 2.08(b), (i) each Eurocurrency Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurocurrency Rate, for such Interest Period *plus* the Applicable Rate and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate *plus* the Applicable Rate;.

(b)     During the continuance of an Event of Default, at the election of the Required Lenders, the Borrower shall pay interest on the Total Outstandings and any other overdue amounts owing by it hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued and unpaid interest on such amounts (including interest on past due interest) shall be due and payable upon written demand.

(c)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto, on the Maturity Date and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law; provided that, the Borrower may, in its sole discretion, by delivering a written notice thereof to the Administrative Agent by 11:00 a.m. at least three (3) Business Days prior to the commencement of the applicable Interest Period with respect to any Term Loan (or such later time as the Required Lenders may agree), elect: (i) to pay a portion of the Applicable Rate equal to (and not less than or greater than) (A) 9.0% in the case of Eurocurrency Rate Loans and (B) 8.0% in the case of Base Rate Loans of such interest in kind by adding such amounts so elected to the aggregate outstanding principal balance of the Term Loans (such election, a "**PIK Election**") or (b) to pay all of the Applicable Rate in cash (such election, a "**Cash Election**"), provided, further, that, other than at the election of the Required Lenders during the continuance of an Event of Default (which election shall govern and control over any election by the Borrower), absent a written notification to the Administrative Agent that the Borrower has chosen to make a Cash Election in accordance with this Section 2.08(c) with respect to any Interest Period, the Borrower shall be deemed to have delivered a written notice of PIK Election with respect to such Interest Period concurrently with the delivery of the Committed Loan Notice applicable thereto in the maximum

44

WEIL:\97566320\8\10143.0003

principal amount of the Term Loans that are subject to such Committed Loan Notice.  The Borrower hereby makes a PIK Election for the period beginning on the Closing Date until the first Interest Payment Date.

**Section 2.09**     **Fees**.

(a)     The Borrower shall pay to the Administrative Agent such fees (including, but not limited to, administrative agent fees) as shall have been separately agreed upon in writing, including in the Agent Fee Letter, in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the Administrative Agent).

(b)     *Prepayment Premium*. (i) In the event that, prior to the third anniversary of the Closing Date, (A) the Borrower prepays any Term Loans pursuant to Section 2.05(a), (B) the Borrower prepays or refinances any Term Loans pursuant to Section 2.05(b)(iii) or (C) the outstanding principal amount of the Term Loans shall become due pursuant to Section 8.02, in each case, the Borrower shall pay to the Administrative Agent, for the ratable account of each of the Lenders, a premium of (x) 5.00% of the aggregate principal amount of the Term Loans so prepaid, refinanced or accelerated prior to the second anniversary of the Closing Date *plus* the Make-Whole Amount, (y) 5.00% of the aggregate principal amount of the Term Loans so prepaid, refinanced or accelerated on or after the second anniversary of the Closing Date but prior to the third anniversary of the Closing Date or (z) 2.00% of the aggregate principal amount of the Term Loans so prepaid, refinanced or accelerated on or after the third anniversary of the Closing Date but prior to the fourth anniversary of the Closing Date. It is agreed, for the avoidance of doubt, that no prepayment premium shall be payable on or after the fourth anniversary of the Closing Date. All such amounts payable pursuant to this Section 2.09(b) shall be due and payable on the date of the applicable prepayment, refinancing or acceleration.

(c)     THE LOAN PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE AMOUNTS SPECIFIED IN SECTION 2.09(b) IN CONNECTION WITH ANY ACCELERATION, IN EACH CASE, TO THE MAXIMUM EXTENT SUCH WAIVER IS PERMITTED UNDER APPLICABLE LAW. The Loan Parties expressly agree that (i) the amounts specified in Section 2.09(b) are reasonable and the product of an arm's length transaction between sophisticated business people, ably represented by counsel, (ii) the amounts specified in Section 2.09(b) shall be payable notwithstanding the then prevailing market rates at the time payment is made, (iii) there has been a course of conduct between Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay the amounts specified in Section 2.09(b), (iv) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this provision, (v) their agreement to pay the amounts specified in Section 2.09(b) is a material inducement to the Lenders to accept the Term Loans pursuant to the Prepackaged Plan, and (vi) the amounts specified in Section 2.09(b) represent a good faith, reasonable estimate and calculation of the lost profits or damages of the Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to the Lenders or profits lost by the Lenders as a result of any early optional repayment, mandatory prepayment or early repayment due to acceleration of the Term Loans, as the case may be.

**Section 2.10**     **Computation of Interest and Fees**.  All computations of interest for Base Rate Loans when the Base Rate is determined in accordance with clause (b) of the definition thereof shall be made on the basis of a year of 365 days, or 366 days, as applicable, and actual days elapsed. All other computations

45

WEIL:\97566320\8\10143.0003

of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11    **Evidence of Indebtedness**.  (a)  The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for this purpose as a non-fiduciary agent for the Borrower, in each case in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be *prima facie* evidence absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender, the Borrower shall execute and deliver to such Lender a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b)    [Reserved].

(c)    Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.11(a), and by each Lender in its account or accounts pursuant to Section 2.11(a) shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

Section 2.12    **Payments Generally**.  (a)  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office in Dollars and in Same Day Funds not later than 2:00 p.m. New York City time on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share provided for under this Agreement) of such payment in like funds as received by wire transfer to such Lender's applicable Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. New York City time shall in each case be deemed received (in the Administrative Agent's sole discretion) on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)    Except as otherwise provided herein, if any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; *provided* that, if such extension would cause payment of interest on or principal of Eurocurrency Rate Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

(c)    Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder, that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that

46

the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto.  If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then:

(i)      if the Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in Same Day Funds at the applicable Overnight Rate from time to time in effect; and

(ii)      if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Same Day Funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "**Compensation Period**") at a rate per annum equal to the applicable Overnight Rate from time to time in effect.  When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing.  If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing.  Nothing herein shall be deemed to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(c) shall be conclusive, absent manifest error.

(d)      [Reserved].

(e)      [Reserved].

(f)      [Reserved].

(g)      Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03.  If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may (to the fullest extent permitted by mandatory provisions of applicable Law), but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the Outstanding Amount of all Loans outstanding at such time in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

(h)      Amounts to be applied to the prepayment of Term Loans in connection with any mandatory prepayments by the Borrower of the Term Loans pursuant to Section 2.05(b) shall be applied, as applicable, on a *pro rata* basis to the then outstanding Term Loans being prepaid irrespective of whether such outstanding Term Loans are Base Rate Loans or Eurocurrency Rate Loans; *provided* that if no Lenders exercise the right to waive a given mandatory prepayment of the Term Loans pursuant to Section

47

2.05(b)(viii), then, with respect to such mandatory prepayment, the amount of such mandatory prepayment shall be applied first to reduce outstanding Base Rate Loans. Any amounts remaining after each such application shall be applied to prepay Eurocurrency Rate Loans.

**Section 2.13**     **Sharing of Payments**. If, other than as provided elsewhere herein, any Lender shall obtain on account of the Loans made by it, any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase (in Dollars) from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, *pro rata* with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon. For the avoidance of doubt, the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement as in effect from time to time (including the application of funds arising from the existence of a Defaulting Lender) or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder. The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation. The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.13 and will in each case notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

**Section 2.14**     **[Reserved]**.

**Section 2.15**     **[Reserved]**.

**Section 2.16**     **[Reserved]**.

**Section 2.17**     **Defaulting Lenders**.

(a)     *Adjustments*.     Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law, such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.01.

(b)     *Defaulting Lender Cure*. If the Borrower and the Administrative Agent, agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will cease to be a Defaulting Lender.

**Section 2.18**     **Effect of Benchmark Transition Event**.

48

(a)      *Benchmark Replacement*.  Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent (with the consent of the Required Lenders) and the Borrower may amend this Agreement to replace the Eurocurrency Rate with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders accept such amendment. No replacement of Eurocurrency Rate with a Benchmark Replacement pursuant to this Section 2.18 will occur prior to the applicable Benchmark Transition Start Date.

(b)      *Benchmark Replacement Conforming Changes*.   In connection with the implementation of a Benchmark Replacement, the Administrative Agent will join with the Borrower in any amendment implementing have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement except as may be required by the definition of Benchmark Replacement Conforming Changes; provided that the Administrative Agent shall not be obligated to enter into any such amendment that might expose it to personal liability and in the event of any ambiguity shall be entitled to seek the consent of the Required Lenders and shall have no liability to any Person for any delay caused by such consent.

(c)      *Notices, Standards for Decisions and Determinations*.  Each Lender will promptly notify the Borrower, the Administrative Agent and the other Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Lenders pursuant to this Section 2.18, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.18.

(d)      *Benchmark Unavailability Period*.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During any Benchmark Unavailability Period, the component of Base Rate based upon Eurocurrency Rate will not be used in any determination of Base Rate.

(e)      *Certain Defined Terms*.  As used in this Section 2.18:

"**Benchmark Replacement**" means the sum of: (a) the alternate benchmark rate (which may include Term SOFR) that has been selected by the Required Lenders and the Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to Eurocurrency Rate for U.S. dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; *provided* that, if the Benchmark Replacement as so determined

49

would be less than zero, the Benchmark Replacement will be deemed to be zero for the purposes of this Agreement.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of Eurocurrency Rate with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Required Lenders and the Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of Eurocurrency Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of Eurocurrency Rate with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time.

"**Benchmark Replacement Conforming Changes**" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Borrower determines in good faith may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Borrower or the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Borrower and Required Lenders determine that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Borrower determines in good faith is reasonably necessary in connection with the administration of this Agreement).

"**Benchmark Replacement Date**" means the earlier to occur of the following events with respect to Eurocurrency Rate:

(1)   in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of Eurocurrency Rate permanently or indefinitely ceases to provide Eurocurrency Rate; or

(2)   in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to Eurocurrency Rate:

(1)   a public statement or publication of information by or on behalf of the administrator of Eurocurrency Rate announcing that such administrator has ceased or will cease to provide Eurocurrency Rate, permanently or indefinitely, *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide Eurocurrency Rate;

(2)   a public statement or publication of information by the regulatory supervisor for the administrator of Eurocurrency Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for Eurocurrency Rate, a resolution authority with jurisdiction over the administrator for Eurocurrency Rate or a court or an entity with similar insolvency or resolution authority over the administrator for Eurocurrency Rate, which states that the administrator of Eurocurrency Rate has ceased or will cease to provide Eurocurrency Rate permanently or indefinitely, *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide Eurocurrency Rate; or

(3)   a public statement or publication of information by the regulatory supervisor for the administrator of Eurocurrency Rate announcing that Eurocurrency Rate is no longer representative.

50

"**Benchmark Transition Start Date**" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the [90th] day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than [90] days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Required Lenders, as applicable, by notice to the Borrower, the Administrative Agent and the Lenders.

"**Benchmark Unavailability Period**" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to Eurocurrency Rate and solely to the extent that Eurocurrency Rate has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced Eurocurrency Rate for all purposes hereunder in accordance with Section 2.18 and (y) ending at the time that a Benchmark Replacement has replaced Eurocurrency Rate for all purposes hereunder pursuant to Section 2.18.

"**Early Opt-in Election**" means the occurrence of:

(1)     a notification by the Required Lenders to the Administrative Agent (with a copy to the Borrower) that the Required Lenders have determined that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in this Section 2.18, are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace Eurocurrency Rate, and

(2)     the election by the Required Lenders to declare that an Early Opt-in Election has occurred and the provision by the Required Lenders of written notice of such election to the Administrative Agent (with a copy to the Borrower).

"**Federal Reserve Bank of New York's Website**" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"**Relevant Governmental Body**" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"**SOFR**" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"**Term SOFR**" means the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"**Unadjusted Benchmark Replacement**" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

## ARTICLE III
### TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

**Section 3.01     Taxes**.  (a)  Except as provided in this Section 3.01, any and all payments made by or on account of the Borrower or any Guarantor under any Loan Document shall be made free and clear of and without deduction for any Taxes, except to the extent required by any Laws.  If the Borrower, any Guarantor or other applicable withholding agent shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Loan Document to the Administrative Agent or any Lender, (i) if the Tax in question is an Indemnified Tax or Other Tax, the sum payable by the Borrower or any Guarantor shall be increased as necessary so that after all required deductions for Indemnified Taxes or Other Taxes have been

51

made (including deductions applicable to additional sums payable under this Section 3.01), each Lender (or, in the case of a payment made to the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions for Indemnified Taxes or Other Taxes been made, (ii) the applicable withholding agent shall make such deductions, (iii) the applicable withholding agent shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Laws, and (iv) within 30 days after the date of such payment (or, if receipts or evidence are not available within 30 days, as soon as possible thereafter), if the Borrower or any Guarantor is the applicable withholding agent, it shall furnish to the Administrative Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof or other evidence acceptable to the Administrative Agent or Lender.

(b)      In addition, the Borrower agrees to pay any and all present or future stamp, court or documentary Taxes and any other excise, property, intangible or mortgage recording Taxes, imposed by any Governmental Authority, which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document excluding, in each case, any such Tax imposed as a result of the Administrative Agent's or any Lender's Assignment and Assumption, grant of a participation, transfer or assignment to or designation of a new applicable Lending Office or other office for receiving payments under any Loan Document (collectively, "**Assignment Taxes**") if such Assignment Tax is imposed as a result of a present or former connection of the assignor or assignee with the jurisdiction imposing such Assignment Tax (other than any connection arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, receiving payments under, and/or enforcing or receiving or perfecting a security interest under any Loan Document), except for Assignment Taxes resulting from assignment or participation that is requested or required in writing by the Borrower (all such non-excluded taxes described in this Section 3.01(b) being hereinafter referred to as "**Other Taxes**").

(c)      The Borrower and each Guarantor agree to indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for (i) the full amount of Indemnified Taxes and Other Taxes paid or payable by the Administrative Agent or such Lender (including Indemnified Taxes or Other Taxes imposed on or attributable to amounts payable under this Section 3.01) and (ii) any expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the Governmental Authority.  A certificate as to the amount of such payment or liability prepared in good faith and delivered by the Administrative Agent or Lender (or by the Administrative on behalf of such Lender), accompanied by a written statement thereof setting forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) the basis and calculation of such amounts shall be conclusive absent manifest error.

(d)      Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.07(e) relating to the maintenance of a Participant Register and (iii) any Taxes excluded from the definition of Indemnified Taxes that are attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

WEIL:\97566320\8\10143.0003

(e)     Each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Law or reasonably requested by the Borrower or the Administrative Agent certifying as to any entitlement of such Lender to an exemption from, or reduction in, any applicable withholding Tax with respect to any payments to be made to such Lender or Agent under the Loan Documents.  Each such Lender and the Administrative Agent shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documentation required below in this Section 3.01(e)) obsolete, expired or inaccurate in any material respect, deliver promptly and on or before the date such documentation expires, becomes obsolete or inaccurate to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and the Administrative Agent in writing of its inability to do so.  In addition, each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with such other documentation prescribed by Law or reasonably requested by the Borrower or Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether such Lender or Administrative Agent is subject to backup withholding or information reporting requirements.  Notwithstanding any other provision of this Section 3.01(e), a Lender or the Administrative Agent shall not be required to deliver any form pursuant to this Section 3.01(e) that such Lender or the Administrative is not legally eligible to deliver.  Without limiting the foregoing:

(i)     Each Lender that is a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) two properly completed and duly signed original copies of Internal Revenue Service Form W-9 certifying that such Lender is exempt from federal backup withholding.

(ii)     Each Lender that is not a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(A)     two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN (or any successor forms) claiming eligibility for the benefits of an income tax treaty to which the United States is a party,

(B)     two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)     in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (A) a certificate substantially in the form of Exhibit H hereto (any such certificate a "**United States Tax Compliance Certificate**") and (B) two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN (or any successor forms),

(D)     to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or has sold a participation), Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, Form W-8BEN, United States Tax Compliance Certificate, Form W-9, Form W-8IMY or any other required information from each beneficial owner, as applicable (*provided* that, if the Lender is a partnership (and not a participating Lender) and if one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

53

WEIL:\97566320\8\10143.0003

(E)      two properly completed and duly signed original copies of any other form prescribed by applicable U.S. federal income tax laws (including the Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, United States federal withholding tax on any payments to such Lender under the Loan Documents.

(iii)      If the Administrative Agent is a "United States person" (as defined in Section 7701(a)(30) of the Code), it shall deliver to the Borrower two properly completed and duly signed original copies of Internal Revenue Service Form W-9 with respect to fees received on its own behalf, certifying that the Administrative Agent is exempt from federal backup withholding.

(iv)      If the Administrative Agent is not a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI with respect to fees received on its own behalf.

(v)      If a payment made to a Lender or the Administrative Agent under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender or the Administrative Agent were to fail to comply with the applicable reporting requirements of FATCA, such Lender or the Administrative Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by Laws and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Laws and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender or the Administrative Agent has or has not complied with such Person's obligations under FATCA and, if necessary, to determine the amount to deduct and withhold from such payment.  Solely for purposes of this Section 3.01(e)(v), "FATCA" shall include any amendments made to FATCA after the Closing Date.

(f)      The Administrative Agent or any Lender claiming any additional amounts payable pursuant to this Section 3.01 shall use its commercially reasonable efforts (subject to such Lender's or Administrative Agent's overall internal policies of general application and legal and regulatory restrictions) to mitigate or reduce the additional amounts payable, which commercially reasonable efforts may include a change in the jurisdiction of its Lending Office (or any other measures reasonably requested by the Borrower) if such a change or other measures would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender.

(g)      If any Lender or Agent determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Indemnified Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by a Loan Party pursuant to this Section 3.01, it shall promptly remit such refund to such Loan Party (but only to the extent of indemnification or additional amounts paid by the Loan Party under this Section 3.01 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including any Taxes) of the Lender or Administrative Agent, as the case may be, and without interest (other than any interest paid by the relevant taxing authority with respect to such refund net of any Taxes payable by the Administrative Agent or any Lender on such interest); *provided* that the Loan Parties, upon the request of the Lender or Administrative Agent, as the case may be, agree promptly to return such refund (*plus* any penalties, interest or other charges imposed by the relevant taxing authority) to such party in the event such party is required to repay such refund to the relevant taxing authority.  This Section 3.01 shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to Taxes that it deems confidential) to any Loan Party or any other person.

**Section 3.02      Illegality**.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Eurocurrency Rate Loans, or to determine or charge interest rates based upon the

54

Eurocurrency Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, in each case after the Closing Date then, on written notice thereof by such Lender to the Borrower and the Administrative Agent, any obligation of such Lender to make or continue Eurocurrency Rate Loans or to convert Base Rate Loans to Eurocurrency Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower shall promptly following written demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all applicable Eurocurrency Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Rate Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurocurrency Rate Loans.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment or conversion under Section 3.05.  Each Lender agrees to use commercially reasonable efforts (subject to such Lender's overall internal policies of general application and legal and regulatory restrictions) to designate a different Lending Office if such designation will avoid the need for such notice, will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender.

**Section 3.03** **Inability to Determine Rates**. If the Administrative Agent or the Required Lenders determine after the Closing Date that for any reason adequate and reasonable means do not exist for determining the applicable Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan, or that the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that Dollar deposits are not being offered to banks in the London interbank eurodollar, or other applicable, market for the applicable amount and the Interest Period of such Eurocurrency Rate Loan, the Administrative Agent will promptly so notify the Borrower in writing and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Eurocurrency Rate Loans or to convert Base Rate Loans to Eurocurrency Rate Loans shall be suspended and (y) in the event of a determination described in the preceding sentence with respect to the Eurocurrency Rate component of the Base Rate, the utilization of the Eurocurrency Rate component in determining the Base Rate shall be suspended, in each case, until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of such Eurocurrency Rate Loans or, failing that, will be deemed to have converted such request, if applicable, into a request for a Borrowing of Base Rate Loans in the amount specified therein.

**Section 3.04** **Increased Cost and Reduced Return; Capital Adequacy; Eurocurrency Rate Loan Reserves**.  (a) If any Lender reasonably determines that as a result of the introduction of or any change in or in the interpretation of any Law, in each case after the Closing Date, or such Lender's compliance therewith, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any Eurocurrency Rate Loans, or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.04(a) any such increased costs or reduction in amount resulting from (i) Indemnified Taxes or Other Taxes indemnified pursuant to Section 3.01, or any Taxes excluded from the definition of (x) "Indemnified Taxes" or (y) "Other Taxes" or (ii) reserve requirements contemplated by Section 3.04(c)) and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining the Eurocurrency Rate Loan (or of maintaining its obligations to make any Loan), or to reduce the amount of any sum received or receivable by such Lender, then from time to time within 15 Business Days after written demand by such Lender setting forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) such increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction. Notwithstanding anything herein to the contrary, for all purposes under this Agreement, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or

55

issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change in Law, regardless of the date enacted, adopted or issued.

(b)        If any Lender determines that the introduction of any Law regarding capital adequacy or liquidity requirements or any change therein or in the interpretation thereof, in each case after the Closing Date, or compliance by such Lender (or its Lending Office) therewith, has the effect of reducing the rate of return on the capital of such Lender or any company controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and such Lender's desired return on capital), then from time to time promptly following written demand of such Lender setting forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction within 15 Business Days after receipt of such demand. Notwithstanding anything herein to the contrary, for all purposes under this Agreement, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change in Law, regardless of the date enacted, adopted or issued.

(c)        The Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits, additional interest on the unpaid principal amount of each applicable Eurocurrency Rate Loan of the Borrower equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive in the absence of manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the the funding of any Eurocurrency Rate Loans of the Borrower, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such Loan, *provided* the Borrower shall have received at least 15 Business Days' prior written notice (with a copy to the Administrative Agent) of such additional interest or cost from such Lender. If a Lender fails to give notice 15 Business Days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable 15 Business Days from receipt of such notice.

(d)        Failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation.

(e)        If any Lender requests compensation under this Section 3.04, then such Lender will, if requested by the Borrower, use commercially reasonable efforts (subject to such Lender's overall internal policies of general application and legal and regulatory restrictions) to designate another Lending Office for any Loan affected by such event; *provided* that such efforts are made on terms that, in the commercially reasonable judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no material economic, legal or regulatory disadvantage and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender; *provided*, *further*, that nothing in this Section 3.04(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.04(a), (b), (c) or (d).

WEIL:\97566320\8\10143.0003

**Section 3.05**     <u>Funding Losses</u>.  Promptly following written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense (excluding loss of anticipated profits and calculated without giving effect to any interest rate floor) actually incurred by it as a result of:

(a)     any continuation, conversion, payment or prepayment of any Eurocurrency Rate Loan of the Borrower on a day other than the last day of the Interest Period for such Loan; or

(b)     any failure by the Borrower to prepay, borrow, continue or convert any Eurocurrency Rate Loan of the Borrower on the date or in the amount notified by the Borrower;

including any loss or expense (excluding loss of anticipated profits) arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

For purposes of calculating amounts payable by the Borrower to the Lenders under this <u>Section 3.05</u>, each Lender shall be deemed to have funded each Eurocurrency Rate Loan made by it at the Eurocurrency Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Eurocurrency Rate Loan was in fact so funded.

**Section 3.06**     <u>Matters Applicable to All Requests for Compensation</u>.  (a)  The Administrative Agent or any Lender claiming compensation under this <u>Article III</u> shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error.  In determining such amount, the Administrative Agent or such Lender may use any reasonable and customary averaging and attribution methods.

(b)     With respect to any Lender's claim for compensation under <u>Section 3.02</u>, <u>3.03</u> or <u>3.04</u>, the Borrower shall not be required to compensate such Lender for any amount incurred if such Lender notifies the Borrower of the event that gives rise to such claim more than 180 days after such event; *provided*, that if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  If any Lender requests compensation by the Borrower under <u>Section 3.04</u>, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another applicable Eurocurrency Rate Loan, or, if applicable, to convert Base Rate Loans into Eurocurrency Rate Loan, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of <u>Section 3.06(c)</u> shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)     If the obligation of any Lender to make or continue any Eurocurrency Rate Loan, or to convert Base Rate Loans into Eurocurrency Rate Loans shall be suspended pursuant to <u>Section 3.06(b)</u> hereof, such Lender's applicable Eurocurrency Rate Loans shall be automatically converted into Base Rate Loans (or, if such conversion is not possible, repaid) on the last day(s) of the then current Interest Period(s) for such Eurocurrency Rate Loans (or, in the case of an immediate conversion required by <u>Section 3.02</u>, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in <u>Section 3.02</u>, <u>3.03</u> or <u>3.04</u> hereof that gave rise to such conversion no longer exist:

(i)     to the extent that such Lender's Eurocurrency Rate Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's applicable Eurocurrency Rate Loans shall be applied instead to its Base Rate Loans; and

57

(ii)    all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as Eurocurrency Rate Loans shall be made or continued instead as Base Rate Loans (if possible), and all Base Rate Loans of such Lender that would otherwise be converted into Eurocurrency Rate Loans shall remain as Base Rate Loans.

(d)    If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of any of such Lender's Eurocurrency Rate Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurocurrency Rate Loans made by other Lenders are outstanding, if applicable, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurocurrency Rate Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurocurrency Rate Loans and by such Lender are held *pro rata* (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Term Loans.

**Section 3.07    Replacement of Lenders under Certain Circumstances**.  (a)  If at any time (i) the Borrower becomes obligated to pay additional amounts or indemnity payments described in Section 3.01 or 3.04 as a result of any condition described in such Sections or any Lender ceases to make any Eurocurrency Rate Loans as a result of any condition described in Section 3.02 or 3.04 or requires the Borrower to pay additional amounts as a result thereof, (ii) any Lender becomes a Defaulting Lender or (iii) any Lender becomes a Non-Consenting Lender, then the Borrower may, on five (5) Business Days' prior written notice to the Administrative Agent and such Lender, (x) replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.07(b) (so long as the assignment fee is paid by the Borrower in such instance) all of its rights and obligations under this Agreement to one or more Eligible Assignees; *provided* that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person; *provided*, *further*, that (A) in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments and (B) in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to, and shall be sufficient (together with all other consenting Lenders) to cause the adoption of, the applicable departure, waiver or amendment of the Loan Documents; or (y) in the case of a Lender, repay (in Dollars) all Obligations of the Borrower due and owing to such Lender relating to the Loans held by such Lender as of such termination date; *provided* that in the case of any such termination of a Non-Consenting Lender such termination shall be sufficient (together with all other consenting Lenders after giving effect hereto) to cause the adoption of the applicable departure, waiver or amendment of the Loan Documents.

(b)    Any Lender being replaced pursuant to Section 3.07(a) above shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's applicable outstanding Loans, and (ii) deliver any Notes evidencing such Loans to the Borrower or the Administrative Agent.  Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's outstanding Loans, (B) all obligations of the Borrower owing to the assigning Lender relating to the Loans so assigned shall be paid in full by the assignee Lender to such assigning Lender concurrently with such Assignment and Assumption and (C) upon such payment and, if so requested by the assignee Lender, delivery to the assignee Lender of the appropriate Note or Notes executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender.  In connection with any such replacement, if any such Lender does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within five Business Days of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Lender, then such Lender shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Lender

58

and the Administrative Agent shall be entitled (but not obligated) to execute and deliver such Assignment and Assumption and/or such other documentation on behalf of such Lender.

(c)    [Reserved].

(d)    In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each affected Lender in accordance with the terms of Section 10.01 or all the Lenders and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

**Section 3.08    Survival**.    All the Loan Parties' obligations under this Article III shall survive repayment of all other Obligations hereunder.

## ARTICLE IV
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

**Section 4.01    Conditions to Initial Credit Extension**.    The obligation of each Lender to make a Credit Extension hereunder on the Closing Date is subject to satisfaction (or waiver) of the following conditions precedent:

(a)    The Administrative Agent's receipt of the following, each of which shall be original, .pdf or facsimile copies or delivered by other electronic method (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party each in form and substance reasonably satisfactory to the Required Lenders:

(i)    [reserved];

(ii)    executed counterparts of this Agreement;

(iii)    a Note executed by the Borrower in favor of each Lender that has requested a Note at least two Business Days in advance of the Closing Date;

(iv)    a copy of the Organization Documents in relation to each Loan Party;

(v)    the Security Agreement, the Intercreditor Agreement, each  other Collateral Document and each other document set forth on Schedule 4.01(a) required to be executed on the Closing Date as indicated on such schedule, duly executed by each Loan Party thereto, together with:

(A)    subject to Section 6.20, certificates, if any, representing the Pledged Equity referred to therein accompanied by undated stock powers executed in blank and instruments, if any, evidencing the Pledged Debt endorsed in blank; and

(B)    proper financing statements (Form UCC-1 or the equivalent) naming each Loan Party for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary to perfect the security interests purported to be created by the foregoing Security Agreement;

(vi)    such certificates of good standing (to the extent such concept exists) from the applicable secretary of state of the state of organization of each Loan Party, certificates of resolutions or other corporate or limited liability company action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party and resolutions of the board of directors, board of managers or

59

members of each Loan Party (in each case, as appropriate or applicable) as the Required Lenders may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date;

(vii)    an opinion from (x) Kirkland & Ellis LLP, counsel to the Loan Parties and (y) the general counsel, or other appropriate attorney, of the Borrower with respect to any Loan Party covering opinions not included in the opinion provided pursuant to the foregoing clause (x) as to certain customary organizational items (including, for the avoidance of doubt, that the entry by such Loan Party into the Loan Documents to which it is a party does not conflict with such Loan Party's Organizational Documents and the requirements of Laws), in each case in form and substance reasonably satisfactory to the Required Lenders; and

(viii)    a solvency certificate from the chief financial officer, chief accounting officer or other officer with equivalent duties of the Borrower (immediately after giving effect to the Transactions) substantially in the form attached hereto as Exhibit D.

(b)    All fees and expenses required to be paid hereunder (and, with respect to expenses, invoiced at least three Business Days before the Closing Date) shall have been paid, including fees pursuant to any Agent Fee Letter, the fees of Weil, Gotshal & Manges LLP, as counsel to the Lenders, Shipman & Goodwin LLP, as counsel to the Administrative Agent, and all reasonable out-of-pocket expenses payable on the Closing Date.

(c)    Prior to or substantially concurrently with the initial Borrowing on the Closing Date, (i) all Existing Debt shall have been extinguished in accordance with the Prepackaged Plan; (ii) the Loan Parties shall have entered into, and provided executed copies of, the ABL Loan Documents providing for the ABL Loans (A) with availability as of the Closing Date of at least $20,000,000 after giving effect to any amount of Existing Letters of Credit backstopped or otherwise included in such ABL Loan Documents and (B) with aggregate commitments of not less than $30,000,000 and (iii) the Loan Parties shall have entered into, and provided executed copies of, the First Lien Loan Documents providing for the First Lien Term Loans in an aggregate principal amount equal to $76,600,000, in the case of clause (ii) and (iii) above, in form and substance reasonably satisfactory to the Required Lenders.

(d)    Since the Petition Date, other than by virtue of the Chapter 11 Cases, the events and conditions related, resulting from, and/or leading up thereto and the effects thereon and any action required to be taken under the Loan Documents, there shall not have occurred any development or event, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(e)    No Default or Event of Default shall exist or would result from the consummation of the Transactions.

(f)    The Administrative Agent shall have received the Annual Financial Statements and the Quarterly Financial Statements (it being understood the Administrative Agent hereby acknowledges receipt thereof).

(g)    The Lenders shall have received the Pro Forma Financial Statements.

(h)    The Administrative Agent shall have received at least three Business Days prior to the Closing Date all documentation and other information about the Borrower and the Guarantors required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act that has been requested by the Administrative Agent in writing at least 10 days prior to the Closing Date.

60

(i)        The representations and warranties of each Loan Party set forth in <u>Article V</u> and in each other Loan Document shall be true and correct in all material respects on and as of the Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; *provided* that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(j)        At all times prior to the Closing Date, the Borrower shall have used commercially reasonable efforts to obtain ratings for the Term Facility from at least two of Moody's, S&P and Fitch.

(k)        Upon consummation of the Transactions, the Lenders shall own at last 90% of the common equity of Holdings (subject to dilution pursuant to any warrants issued pursuant to the Warrant Agreement (as defined in the Prepackaged Plan) and any management incentive plan.

(l)        The Bankruptcy Court shall have entered the Confirmation Order, which order shall (a) approve, among other things, the Transactions, (b) be in form and substance reasonably acceptable to the Required Lenders and consistent in all respects with the Restructuring Support Agreement, (c) not be subject to any stay or be reversed, vacated, amended or otherwise modified in any respect and (d) all covenants and conditions of the Prepackaged Plan (other than the effectiveness of this Agreement, the First Lien Credit Agreement and the ABL Credit Agreement) shall have been satisfied or waived in accordance with the terms thereof.

(m)        The Restructuring Support Agreement shall not have been terminated and remains in full force and effect.

Without limiting the generality of the provisions of <u>Section 9.03(e)</u>, for purposes of determining compliance with the conditions specified in this <u>Section 4.01</u>, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Each Holdco, the Borrower and each of the Subsidiary Guarantors party hereto represent and warrant to the Administrative Agent and the Lenders on the Closing Date that:

**Section 5.01    Existence, Qualification and Power; Compliance with Laws**.  Each Loan Party and each Subsidiary that is a Material Subsidiary (a) is a Person duly organized, incorporated or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation, organization or formation to the extent such concept exists in such jurisdiction, (b) has all requisite organizational power and authority to, in the case of the Loan Parties, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (where relevant) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, orders, writs and injunctions and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case, referred to in clauses (c), (d) or (e), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**Section 5.02    Authorization; No Contravention**.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the Transactions, (a) have been duly authorized by all necessary corporate or other organizational action, and (b)

61

do not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by Section 7.01), or require any payment to be made under (x) any Contractual Obligation to which such Person is a party or by which it or any of its property or assets is bound or (y) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any Law; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clauses (ii) and (iii), to the extent that such violation, conflict, breach, contravention or payment could not reasonably be expected to have a Material Adverse Effect.

Section 5.03    **Governmental Authorization; Other Consents**.  No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) approval, consent, exemption, authorization, or other action by, or notice to, or filing necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties (or release existing Liens) under applicable U.S. law, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement) and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect.

Section 5.04    **Binding Effect**.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is a party thereto.  This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is a party thereto in accordance with its terms, except as such enforceability may be limited by (i) Debtor Relief Laws and by general principles of equity, (ii)  the need for filings and registrations necessary to create or perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties and (iii) the effect of foreign Laws, rules and regulations as they relate to the granting of security interests in assets of, pledges of Equity Interests in or Indebtedness owed by Foreign Subsidiaries (clauses (i), (ii) and (iii), the "**Enforcement Qualifications**").

Section 5.05    **Financial Statements; No Material Adverse Effect**.  (a)  The Annual Financial Statements and the Quarterly Financial Statements fairly present in all material respects the financial condition of the Company and its Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (A) except as otherwise expressly noted therein and (B) subject, in the case of the Quarterly Financial Statements, to changes resulting from normal year-end adjustments and the absence of footnotes.

(b)    The unaudited *pro forma* consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as of the last day of the 12-month period ending on the last day of the most recently completed four-fiscal quarter period ended at least 45 days (or 105 days if such four-fiscal quarter period is the end of the Company's fiscal year) prior to the Closing Date, prepared after giving effect to the Transactions as if the Transactions had occurred as of such date (including the notes thereto) (the "**Pro Forma Balance Sheet**") and the unaudited *pro forma* consolidated statement of income of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries for the 12-month period ended at least 45 days (or 105 days if such four-fiscal quarter period is the end of the Company's fiscal year) prior to the Closing Date, prepared after giving effect to the Transactions as if the Transactions had occurred at the beginning of such period and any other adjustments reasonably acceptable to the Required Lenders (together with the Pro Forma Balance Sheet, the "**Pro Forma Financial Statements**"), copies of which have heretofore been furnished to the Administrative Agent, have been prepared based on the Annual Financial

<div align="center">62</div>

Statements and the Quarterly Financial Statements and have been prepared in good faith, based on assumptions believed by the Borrower to be reasonable as of the date of delivery thereof and adjustment as agreed by the Borrower, and present fairly in all material respects on a *pro forma* basis the estimated financial position of the Borrower and its Subsidiaries as at the Closing Date and their estimated results of operations for the period covered thereby; *provided* that no such *pro forma* financial statement shall be required to include adjustments for purchase accounting (including adjustments of the type contemplated by Financial Account Standards Board Accounting Standards Codification 805, Business Combinations (formerly SFAS 141R)).

(c)     Since the Closing Date, there has been no event, circumstance or change, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

**Section 5.06     Litigation**.  There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any Subsidiary or against any of their properties or revenues that have a reasonable likelihood of adverse determination and such determination, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**Section 5.07     Ownership of Property; Liens**.  The Borrower and each of its Subsidiaries has good record title to, or valid leasehold interests in, or easements or other limited property interests in, all Real Property necessary in the ordinary conduct of its business, free and clear of all Liens, except (a) as set forth on Schedule 5.07, (b) minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes, (c) Liens permitted by Section 7.01 and (d) where the failure to have such title could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 5.08     Environmental Matters**.  Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)     Each Loan Party and its respective properties and operations are and have been in compliance with all Environmental Laws, which includes obtaining and maintaining all applicable Environmental Permits required under such Environmental Laws to carry on the business of the Loan Parties;

(b)     the Loan Parties have not received any written notice that alleges any of them is in violation of or potentially liable under any Environmental Laws, and none of the Loan Parties nor any of the Real Property is the subject of any claims, investigations, liens, demands, or judicial, administrative or arbitral proceedings pending or, to the knowledge of the Borrower, threatened in writing, under any Environmental Law or to revoke or modify any Environmental Permit held by any of the Loan Parties;

(c)     there has been no Release of Hazardous Materials on, at, under or from any Real Property or facilities owned, operated or leased by any of the Loan Parties, or, to the knowledge of the Borrower, Real Property formerly owned, operated or leased by any Loan Party or arising out of the conduct of the Loan Parties that could reasonably be expected to require investigation, remedial activity or corrective action or cleanup or could reasonably be expected to result in the Borrower or any of its Subsidiaries incurring liability under any Environmental Laws; and

(d)     there are no facts, circumstances or conditions arising out of or relating to the operations of the Loan Parties or Real Property or facilities owned, operated or leased by any of the Loan Parties or, to the knowledge of the Borrower, Real Property or facilities formerly owned, operated or leased by the Loan Parties that could reasonably be expected to

63

result in the Borrower or any of its Subsidiaries incurring liability under any Environmental Laws.

The representations and warranties contained in this Section 5.08 are the sole and exclusive representations and warranties of the Borrower, the Holdcos and the Subsidiary Guarantors with respect to matters arising under or relating to Environmental Laws, Environmental Permits, Environmental Liabilities or Hazardous Materials.

Section 5.09   **Taxes**.  Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each of the Loan Parties and their Subsidiaries have timely filed all tax returns required to be filed, and have paid all Taxes levied or imposed upon them or their properties, income, profits or assets, that are due and payable (including in their capacity as a withholding agent), except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.  To the knowledge of the Loan Parties, there is no proposed Tax deficiency or assessment against the Loan Parties or their Subsidiaries that, if made would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 5.10   **ERISA Compliance**.  (a)  Except as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with its terms, the applicable provisions of ERISA, the Code and other Federal or state Laws.

(b)   (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) neither any Loan Party, Subsidiary nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due but not delinquent under Section 4007 of ERISA); (iii) neither any Loan Party, Subsidiary nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (iv) neither any Loan Party, Subsidiary nor any ERISA Affiliate has engaged in a transaction that could reasonably be expected to be subject to Sections 4069 or 4212(c) of ERISA; except, with respect to each of the foregoing clauses of this Section 5.10(b), as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.11   **Subsidiaries; Equity Interests**.  As of the Closing Date (after giving effect to the Transactions), no Loan Party has any Subsidiaries other than those specifically disclosed on Schedule 5.11, and all of the outstanding Equity Interests owned by the Loan Parties (or a Subsidiary of any Loan Party) in such  Subsidiaries have been validly issued and are fully paid and all Equity Interests owned by a Loan Party (or a Subsidiary of any Loan Party) in such Subsidiaries are owned free and clear of all Liens except (i) those created under the Collateral Documents, under the ABL Loan Documents (which Liens shall be subject to the Intercreditor Agreement) or under the First Lien Loan Documents (which Liens shall be subject to the Intercreditor Agreement) and (ii) any Lien that is permitted under Section 7.01.  As of the Closing Date, Schedules 1 and 9 of the Perfection Certificate (a) set forth the name and jurisdiction of each Domestic Subsidiary that is a Loan Party, (b) set forth the ownership interest of the Borrower and any other Subsidiary thereof in each Subsidiary, including the percentage of such ownership and (c) identify each Subsidiary that is a Subsidiary the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

Section 5.12   **Margin Regulations; Investment Company Act**.  (a)  The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation T, U or X of the Board of Governors of the United States Federal Reserve System.

(b)   None of the Holdcos, the Borrower or any of the Subsidiaries is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

WEIL:\97566320\8\10143.0003

**Section 5.13**    **Disclosure**.  No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party (other than projected financial information, *pro forma* financial information, budgets, estimates and information of a general economic or industry nature) to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were made, not materially misleading.  With respect to projected financial information and *pro forma* financial information, the Borrower represents that such information was prepared in good faith based upon assumptions believed to be reasonable at the time furnished, it being understood that such projected financial information and *pro forma* financial information are not to be viewed as facts or as a guarantee of performance or achievement of any particular results and that actual results may vary from such forecasts and that such variations may be material and that no assurance can be given that the projected results will be realized.

**Section 5.14**    **Labor Matters**.  Except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against the Borrower or any of its Subsidiaries pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of the Borrower or any of its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with such matters; and (c) all payments due from the Borrower or any of its Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant party.

**Section 5.15**    **Intellectual Property; Licenses, Etc**.  Each of the Borrower and the Subsidiaries owns, licenses, possesses or otherwise has the right to use all of the trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, technology, software, know-how database rights, design rights and other intellectual property rights (collectively, "**IP Rights**") that are reasonably necessary for the operation of its businesses as currently conducted, except to the extent the failure to own, license, possess or otherwise have the right to use such IP Rights, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  To the knowledge of the Borrower, the Borrower and the Subsidiaries' present business operations do not infringe upon any IP Rights held by any Person except for such infringements, individually or in the aggregate, which could not reasonably be expected to have a Material Adverse Effect.  No claim or litigation regarding IP Rights is pending or, to the knowledge of the Borrower, threatened, against any Loan Party or any of the Subsidiaries, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

As of the Closing Date, all registrations material to the Loan Parties' business under the name of each Loan Party listed on Schedule 11 of the Perfection Certificate are valid and in full force and effect.

**Section 5.16**    **Solvency**.  On the Closing Date, after giving effect to the Transactions, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

**Section 5.17**    **[Reserved]**.

**Section 5.18**    **USA Patriot Act; OFAC; FCPA**.  (a)  To the extent applicable, each Loan Party and any Subsidiary is, and for the past five years has been, in compliance with (i) the Trading with the Enemy Act, as amended, and Sanctions, (ii) the USA Patriot Act and (iii) the FCPA.

(b)    No Loan Party, no Subsidiary and no director, officer, employee, agent or any other Person acting for or on behalf of any of the foregoing is a Sanctioned Person; and no Loan Party and no Subsidiary will use the proceeds of the Loans or otherwise make available, directly or indirectly, such proceeds to a Sanctioned Person.

(c)    No part of the proceeds of the Loans will be used, directly or indirectly by any Loan Party or any Subsidiary for any payments to or for the benefit of any governmental official or

WEIL:\97566320\8\10143.0003

employee, political party, official of a political party, candidate for political office, public international organization official or employee or anyone else acting in an official capacity, in order to obtain, retain or direct business, influence any act or decision or the omission of any act or decision, or obtain any improper advantage, in violation of the FCPA.

(d)       Each Loan Party and each Subsidiary is subject to policies, procedures and internal controls designed to reasonably ensure compliance with Sanctions, the FCPA and all other applicable anti-bribery laws.

**Section 5.19      Security Documents**.  Except as otherwise contemplated hereby or under any other Loan Documents, the provisions of the Collateral Documents are effective to create in favor of the Administrative Agent for the benefit of the Secured Parties legal, valid and enforceable Liens on, and security interests in, the Collateral and, (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable Laws (which filings or recordings shall be made to the extent required by any Collateral Document) and (ii) upon the taking of possession or control by the Administrative Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent required by any Collateral Document), such Collateral Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral, in each case subject to no Liens other than the applicable Liens permitted under the Loan Documents, a legal, valid, enforceable and perfected Lien (if and to the extent perfection may be achieved by the filings and/or other actions required to be taken hereby or by the applicable Collateral Documents) on all right, title and interest of the respective Loan Parties in the Collateral described therein subject to the Enforcement Qualifications and Liens permitted by Section 7.01.

Notwithstanding anything herein (including this Section 5.19) or in any other Loan Document to the contrary, neither the Borrower nor any other Loan Party makes any representation or warranty as to (A) the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest (other than with respect to those pledges and security interests made under the Laws of the jurisdiction of formation of the applicable Foreign Subsidiary) in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of the Administrative Agent or any Lender with respect thereto, in each case under foreign Law, (B) the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest to the extent such pledge, security interest, perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or (C) on the Closing Date and until required pursuant to Section 6.11, 6.13 or 4.01(a)(v), the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or enforceability of any pledge or security interest to the extent not required on the Closing Date pursuant to Section 4.01(a)(v).

**Section 5.20      EEA Financial Institutions**. None of the Holdcos, the Borrower or any Subsidiary thereof is an EEA Financial Institution.

**Section 5.21      Beneficial Ownership Certification**.  As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

<div align="center">

**ARTICLE VI**
**AFFIRMATIVE COVENANTS**

</div>

So long as any Lender shall have any Loan or other Obligation (other than contingent obligations not yet due and owing as to which no claim has been asserted) hereunder which is accrued and payable which remains unpaid or unsatisfied or the Conversion shall not have occurred, then from and after the Closing Date, Holdings and Intermediate Holdings (solely in the case of Sections 6.01, 6.02, 6.04, 6.05, 6.06, 6.08, 6.09, 6.10, 6.11, 6.13, 6.19, 6.20 and 6.21) and the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of its respective Subsidiaries to:

<div align="center">66</div>

**Section 6.01**    <u>**Financial Statements**</u>.  (a)  Commencing with the fiscal year ended December 31, 2020, deliver to the Administrative Agent for prompt further distribution to each Lender, within 90 days after the end of each fiscal year, a consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail (together with, in all cases, a management discussion and analysis with respect thereto) and prepared in accordance with GAAP, audited and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing or other independent registered public accounting firm approved by the Required Lenders (such consent not to be unreasonably withheld, delayed or conditioned), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification (other than related (i) solely to the occurrence of the Maturity Date or the upcoming maturity date under the ABL Credit Agreement or the First Lien Credit Agreement, in each case, occurring within one year from the date such report is delivered or (ii) any potential inability to satisfy any financial maintenance covenant on a future date or in a future period) or any qualification or exception as to the scope of such audit except for qualifications relating to changes in accounting principles or practices reflecting changes in GAAP and required or approved by such independent certified public accountants;

(b)    Deliver to the Administrative Agent for prompt further distribution to each Lender, within 45 days (or 75 days in the case of the first full fiscal quarter following the Closing Date) after the end of each fiscal quarter of each fiscal year of Holdings, a consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as at the end of such fiscal quarter and the related (x) consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (y) consolidated statements of cash flows for such fiscal quarter and the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail (together with, in all cases, a management discussion and analysis with respect thereto) and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes; and

(c)    Deliver to the Administrative Agent, for prompt further distribution to each Lender, within 35 days (or 45 days in the case of the first three such months following the Closing Date) after the end of (i) the period beginning on the Closing Date through September 30, 2020 and (ii) thereafter, each of the first two months in any fiscal quarter of Holdings, an unaudited consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries at the end of such month and the related unaudited consolidated statements of cash flows as of and for such month and the portion of the fiscal year then ended, setting forth in each case, in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail; and

(d)    Deliver to the Administrative Agent for prompt further distribution to each Lender, no later than 90 days after the end of the fiscal year ending December 31, 2020 and each subsequent fiscal year, a reasonably detailed consolidated budget for the following fiscal year on a quarterly basis (including a projected consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as of the end of the following fiscal year, the related consolidated statements of projected cash flow and projected income and a summary of the material underlying assumptions applicable thereto) (collectively, the "**Projections**").

Notwithstanding the foregoing, the obligations in <u>Sections 6.01(a)</u> and <u>(b)</u> may be satisfied with respect to financial information of Holdings, Intermediate Holdings, the Borrower and the Subsidiaries by furnishing (I) the applicable financial statements of Holdings (or any direct or indirect parent, as applicable, of Holdings) or (II) the Form 10-K or 10-Q of Holdings (or any direct or indirect parent of Holdings), as

67

WEIL:\97566320\8\10143.0003

applicable filed with the SEC; *provided* that, with respect to clauses (I) and (II), (i) to the extent such information relates to a parent of Holdings, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent, on the one hand, and the information relating to Holdings, Intermediate Holdings, the Borrower and the Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under Section 6.01(a), such materials are accompanied by a report and opinion of Deloitte & Touche LLP or any other independent registered public accounting firm of nationally recognized standing or other independent registered public accounting firm approved by the Required Lenders (such consent not to be unreasonably withheld, delayed or conditioned), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going-concern" or like qualification (other than related (i) solely to the occurrence of the Maturity Date or the upcoming maturity date under the ABL Credit Agreement or the First Lien Credit Agreement, in each case, occurring within one year from the date such report is delivered or (ii) any potential inability to satisfy any financial maintenance covenant on a future date or in a future period) or exception or any qualification or exception as to the scope of such audit except for qualifications relating to changes in accounting principles or practices reflecting changes in GAAP and required or approved by such independent certified public accountants.

Any financial statement required to be delivered pursuant to Section 6.01(a) or 6.01(b) shall not be required to include purchase accounting adjustments relating to the Transactions or any Permitted Acquisition to the extent it is not practicable to include them.

Documents required to be delivered pursuant to Sections 6.01 and 6.02(a) through (d) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower (or any direct or indirect parent of the Borrower) posts such documents, or provides a link thereto on the website on the Internet at the website address listed on Schedule 10.02(a); or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that (x) promptly following such posting, the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender and (y) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "**Borrower Materials**") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive Material Non-Public Information and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC**,**" the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any Material Non-Public Information (although it may be sensitive and proprietary) (*provided*, *however*, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.08); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."  Notwithstanding the foregoing, the Borrower shall be under no obligation to mark any Borrower Materials "PUBLIC".

WEIL:\97566320\8\10143.0003

**Section 6.02** **Certificates; Other Information**.  Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    concurrently the delivery of the financial statements referred to in Sections 6.01(a) and (b), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower;

(b)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which Holdings, Intermediate Holdings, the Borrower or any Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 6.02;

(c)    promptly after the furnishing thereof, copies of any material written notices received by any Loan Party (other than in the ordinary course of business) or material statements or material reports furnished to any holder of debt securities (other than in connection with any board observer rights) of any Loan Party or of any of its Subsidiaries pursuant to the terms of any ABL Loan Document or First Lien Loan Document and, in each case, not otherwise required to be furnished to the Lenders pursuant to any other clause of Section 6.01, 6.02 or 6.03;

(d)    together with the delivery of each Compliance Certificate pursuant to Section 6.02(a), (i) in the case of annual Compliance Certificates only, a report setting forth the legal name and the jurisdiction of formation of each Loan Party and the location of the chief executive office of each Loan Party on the Perfection Certificate or confirming that there has been no change in such information since the Closing Date or the date of the last such report; (ii) a description of each event, condition or circumstance during the last fiscal quarter or fiscal year covered by such Compliance Certificate requiring a mandatory prepayment under Section 2.05(b) (to the extent notice of such event has not been previously furnished to the Administrative Agent) and (iii) a list of each Subsidiary of the Borrower that identifies each Subsidiary as of the date of delivery of such Compliance Certificate (to the extent that there have been any changes in the identity or status as a Subsidiary of any such Subsidiaries since the Closing Date or the most recent list provided);

(e)    [reserved]; and

(f)    promptly, such additional information regarding the business, legal, financial or corporate affairs of the Loan Parties or any of their respective Subsidiaries, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request.

In no event shall the requirements set forth in Section 6.02(f) require Holdings, Intermediate Holdings, the Borrower or any of its Subsidiaries to provide any such information which (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or (iii) is subject to attorney-client or similar privilege or constitutes attorney work-product.

**Section 6.03** **Notices**.  Promptly (and in the case of clause (a) below, not later within three (3) Business Days) after a Responsible Officer of the Borrower or any Subsidiary Guarantor has obtained knowledge thereof, notify the Administrative Agent:

69

(a)      Of the occurrence of any Default or Event of Default;

(b)      of the occurrence of an ERISA Event which could reasonably be expected to result in a Material Adverse Effect;

(c)      of the filing or commencement of, or any threat or notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority against the Borrower or any of its Subsidiaries that would reasonably be expected to result in a Material Adverse Effect;

(d)      of the occurrence of any other matter or development that has had or could reasonably be expected to have a Material Adverse Effect; and

(e)      of any change in the information provided in any certification regarding beneficial ownership as required by 31 C.F.R. § 1010.230 that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification.

Each notice pursuant to this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of the Borrower delivered to the Administrative Agent for prompt further distribution to each Lender (x) that such notice is being delivered pursuant to Section 6.03(a), (b), (c) or (d) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

Section 6.04    **Payment of Taxes**.  Pay, discharge or otherwise satisfy as the same shall become due and payable in the normal conduct of its business, all its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (a) any such Tax is being contested in good faith and by appropriate proceedings for which appropriate reserves have been established in accordance with GAAP or (b) the failure to pay or discharge the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.05    **Preservation of Existence, Etc**.  (a)  Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization; and

(b)      take all reasonable action to maintain all rights, privileges (including its good standing where applicable in the relevant jurisdiction), permits, authorizations, licenses and franchises necessary or desirable in the normal conduct of its business;

except, in the case of Section 6.05(a) (other than with respect to the Borrower) or this Section 6.05(b), to the extent (i) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (ii) pursuant to any merger, consolidation, liquidation, dissolution or Disposition permitted by Article VII.

Section 6.06    **Maintenance of Properties**.  Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and fire, casualty or condemnation excepted.

Section 6.07    **Maintenance of Insurance**.    (a) Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Subsidiaries) as are customarily carried under similar circumstances by such other Persons.  Not later than 30 days after the Closing Date (or

70

WEIL:\97566320\8\10143.0003

the date any such insurance is obtained, in the case of insurance obtained after the Closing Date) (in each case, or such later date as the Required Lenders may agree in their sole discretion), each such policy of insurance (other than business interruption insurance (if any), director and officer insurance and worker's compensation insurance) shall as appropriate (i) name the Administrative Agent as additional insured thereunder or (ii) in the case of each casualty insurance policy, contain a lender loss payable clause or endorsement that names the Administrative Agent, on behalf of the Lenders, as lender loss payee or mortgagee thereunder.  If the improvements on any Mortgaged Property are at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then, to the extent required by applicable Flood Insurance Laws, the Borrower shall, or shall cause each Loan Party to, (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount reasonably satisfactory to the Required Lenders and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) upon the reasonable request of the Administrative Agent at the direction of the Required Lenders (not to exceed one time per fiscal year, unless an Event of Default has occurred and is continuing) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Required Lenders.

(b) Give the Administrative Agent prompt notice of any loss exceeding $500,000 covered by the casualty or business interruption insurance of any Loan Party or its Subsidiaries.  Upon the occurrence and during the continuance of an Event of Default and subject to the Intercreditor Agreement, the Administrative Agent (at the direction of the Required Lenders) shall have the sole right (but not the obligation) to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

**Section 6.08   Compliance with Laws**.  Comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except if the failure to comply therewith could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 6.09   Books and Records**.  Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP and which reflect all material financial transactions and matters involving the assets and business of the Borrower or a Subsidiary, as the case may be (it being understood and agreed that certain Foreign Subsidiaries maintain individual books and records in conformity with generally accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder).

**Section 6.10   Inspection Rights**.  Permit representatives and independent contractors of the Administrative Agent (on its own behalf or acting on behalf of the Lenders) to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that, only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.10 and the Administrative Agent shall not exercise such rights more often than one time during any calendar year and such time shall be at the Borrower's expense; *provided*, *further*, that during the continuation of an Event of Default, the Administrative Agent (or any of its respective representatives or independent contractors), on behalf of the Lenders, may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.

71

Notwithstanding anything to the contrary in this Section 6.10, none of Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (c) is subject to attorney-client or similar privilege or constitutes attorney work product.

**Section 6.11    Additional Collateral; Additional Guarantors**.    At the Borrower's expense, subject to the terms, conditions and provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(a)    Upon the formation or acquisition of any new direct or indirect wholly owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) by any Loan Party or the designation in accordance with Section 6.14 of any existing direct or indirect wholly owned Material Domestic Subsidiary as a Subsidiary (in each case, other than an Excluded Subsidiary) or any Subsidiary becoming a wholly owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) or any Excluded Subsidiary ceasing to be an Excluded Subsidiary:

(i)    within 45 days after such formation, acquisition, designation or occurrence or such longer period as the Required Lenders may agree in writing in their discretion:

(A)    cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Administrative Agent,  a Joinder Agreement to become a Guarantor under this Agreement, Security Agreement Supplements, Intellectual Property Security Agreements, and other security agreements and documents as reasonably requested by and in form and substance reasonably satisfactory to the Required Lenders (consistent with the Security Agreement, Intellectual Property Security Agreements and other security agreements in effect on the Closing Date), in each case granting Liens required by the Collateral and Guarantee Requirement;

(B)    cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement (and the parent of each such Domestic Subsidiary that is the Borrower or a Guarantor) to deliver any and all certificates representing Equity Interests (to the extent certificated) and intercompany notes constituting negotiable instruments (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and instruments evidencing Indebtedness held by such Material Domestic Subsidiary and required to be delivered pursuant to the Collateral and Guarantee Requirement endorsed in blank to the Administrative Agent;

(C)    take and cause such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement and each direct or indirect parent of such Material Domestic Subsidiary to take whatever action (including the recording of Mortgages, the filing of UCC financing statements and delivery of stock and membership interest certificates) as may be necessary in the reasonable opinion of the Administrative Agent (at the direction of the Required Lenders) to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and

72

perfected Liens to the extent required by the Collateral and Guarantee Requirement, and to otherwise comply with the requirements of the Collateral and Guarantee Requirement;

(D)      if requested by the Administrative Agent or the Required Lenders, deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the Lenders, of counsel for the Loan Parties reasonably acceptable to the Required Lenders as to such matters set forth in this Section 6.11(a) as the Required Lenders may reasonably request (or otherwise consistent with the opinions delivered on the Closing Date);

(ii)      as promptly as practicable after the request therefor by the Administrative Agent, deliver to the Administrative Agent with respect to each Material Real Property, any existing title reports, abstracts or environmental assessment reports, to the extent available and in the possession or control of a Loan Party; *provided*, *however*, that there shall be no obligation to deliver to the Administrative Agent any environmental assessment report whose disclosure to the Administrative Agent would require the consent of a Person other than a Loan Party or one of its Subsidiaries, where, despite the commercially reasonable efforts of the Borrower to obtain such consent, such consent cannot be obtained; and

(iii)      if reasonably requested by the Administrative Agent or the Required Lenders, deliver to the Administrative Agent any other items necessary from time to time to satisfy the Collateral and Guarantee Requirement with respect to perfection and existence of security interests with respect to property of any Guarantor (and the direct parent of each such Guarantor) acquired after the Closing Date and subject to the Collateral and Guarantee Requirement, but not specifically covered by preceding clauses (i), (ii) or (iii) or Section 6.11(b) below.

(b)      Not later than 120 days (or such longer period as the Required Lenders may agree in writing in their discretion) after (i) any Material Real Property is acquired by a Loan Party after the Closing Date or (ii) an entity becomes a Loan Party if such entity owns Material Real Property at the time it becomes a Loan Party, cause such Material Real Property, if such property is required to be provided as Collateral pursuant to the Collateral and Guarantee Requirement but is not automatically subject to a Lien pursuant to pre-existing Collateral Documents, to be subject to a Lien and Mortgage in favor of the Administrative Agent for the benefit of the Secured Parties and take, or cause the relevant Loan Party to take, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect or record such Lien, in each case to the extent required by, and subject to the limitations and exceptions of, the Collateral and Guarantee Requirement and to otherwise comply with the requirements of the Collateral and Guarantee Requirement.

(c)      Each Domestic Subsidiary required to be designated as a "Material Domestic Subsidiary" pursuant to the proviso in the definition of "Material Domestic Subsidiary" shall have taken all actions to comply with the provisions of Section 6.11 within the timeframe required by the definition of "Material Domestic Subsidiary".

**Section 6.12      Compliance with Environmental Laws**.  Except, in each case, to the extent that the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, comply, and take all commercially reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply, with all Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and occupancy of its properties; and, in each case to the extent the Loan Parties are required to do so by Environmental Laws, conduct any investigation, remedial or other corrective action necessary to address Hazardous Materials at any property or facility in

73

WEIL:\97566320\8\10143.0003

accordance with Environmental Laws.  If an Event of Default arising out of an Environmental Liability has occurred and is continuing, within 60 days of receiving a written request by the Administrative Agent (at the direction of the Required Lenders), the Borrower will provide the Administrative Agent with an environmental assessment report regarding the scope of the Environmental Liability and the likely cost of mitigating such Environmental Liability, prepared at Borrower's sole cost and expense and by an environmental consultant reasonably acceptable to the Required Lenders.  If such report is not timely provided, the Administrative Agent may have them prepared by an environmental consultant of its choosing, at Borrower's sole cost and expense.

**Section 6.13**   **Further Assurances**.  Promptly upon reasonable request by the Administrative Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as are necessary or that the Administrative Agent may reasonably request from time to time in order to carry out more effectively the purposes of this Agreement and the Collateral Documents, to the extent required pursuant to the Collateral and Guarantee Requirement and subject in all respects to the limitations therein.  If the Administrative Agent or the Required Lenders reasonably determine that it is required by applicable Law to have appraisals prepared in respect of the Real Property of any Loan Party subject to a mortgage constituting Collateral, the Borrower shall promptly provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA.

**Section 6.14**   **[Reserved]**.

**Section 6.15**   **Ratings**.  If the Borrower has not obtained the ratings contemplated by Section 4.01(j) on or before the Closing Date, the Borrower shall, within 30 days of the Closing Date (or such later date as the Administrative Agent at the direction of the Required Lenders may agree), obtain ratings for the this Agreement and the First Lien Credit Agreement by at least two (2) of Moody's, S&P and Fitch. After the Borrower obtains the ratings contemplated by the foregoing sentence, the Borrower shall maintain a rating (but not any specific rating) in respect of this Agreement from at least two (2) of Moody's, S&P and Fitch.

**Section 6.16**   **Use of Proceeds**.  Use the proceeds of the Term Loans to finance a portion of the Transactions pursuant to the Prepackaged Plan.

**Section 6.17**   **Lender Meetings**.  To the extent requested by the Administrative Agent or the Required Lenders, participate in a meeting (which may be in the form of a conference call) (including a customary question and answer session) with the Administrative Agent and Lenders once during each fiscal quarter to be held at such time as may be agreed to by the Borrower and the Administrative Agent at the direction of the Required Lenders, but in any event within 15 Business Days of each date that financial statements are required to be delivered pursuant to Section 6.01(b).

**Section 6.18**   **End of Fiscal Years**.  For financial reporting purposes, cause its fiscal year to end on December 31 (other than any Subsidiary acquired after the Closing Date); *provided*, *however*, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Required Lenders, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

**Section 6.19**   **Lines of Business**.  Holdings, Intermediate Holdings, the Borrower and the Subsidiaries, taken as a whole, will not engage in any material line of business substantially different from those lines of business conducted by Holdings, Intermediate Holdings, the Borrower and the Subsidiaries on the Closing Date or any business reasonably related, complementary, corollary, synergistic or ancillary thereto (including related, complementary, synergistic or ancillary technologies) or reasonable extensions thereof.

**Section 6.20**   **Post-Closing Covenant**.  Holdings agrees that it will deliver, or will cause to be delivered, to the Administrative Agent, in form and substance reasonably satisfactory to the Required Lenders,

74

the items described on Schedule 6.20(a) hereof by the times specified with respect to such items, or such later time as the Required Lenders may agree in their reasonable discretion.

**Section 6.21   Anti-Terrorism Law; Anti-Money Laundering; Embargoed Persons**.   (a) Conduct its business in such manner so as to not, directly or indirectly, (i) deal in, or otherwise engage in any transaction relating to, a Sanctioned Person or any property or interests in property blocked pursuant to Executive Order No. 13224 on Terrorist Financing effective September 24, 2001 (the "**Executive Order**") or any other law or regulation with respect to exports, terrorism or money laundering ("**Anti-Terrorism Law**"), or (ii) engage in or conspire to engage in any transaction that violates, or attempts to violate, any Anti-Terrorism Law or Sanctions.

(a)   Repay the Loans exclusively with funds that are not derived from any unlawful activity such that the result of any such repayment would not cause the making of the Loans to be in material violation of any applicable Law.

(b)   (x) Use funds or properties of Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries to repay the Loans only to the extent it does not constitute property of, or is beneficially owned directly or indirectly by, a Sanctioned Person or any Person subject trade restrictions under United States law ("**Embargoed Person**") that is identified on (1) the "List of Specially Designated Nationals and Blocked Persons" maintained by OFAC and/or on any other similar list maintained by OFAC pursuant to any authorizing statute including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Order or any applicable Law promulgated thereunder, with the result that the investment in Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries (whether directly or indirectly) is prohibited by any applicable Law, or the Loans made by the Lenders would be in violation of any applicable Law, or (2) the Executive Order or Sanctions, any related enabling legislation or any other similar Executive Orders or (y) to the knowledge of the Borrower, any Embargoed Person to have any direct or indirect interest, in Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries, with the result that the investment in Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries (whether directly or indirectly) is prohibited by any applicable Law or the Loans are in violation of any applicable Law.

**Section 6.22   Account Control Agreements**.   With respect to each deposit account, securities account or other similar account established prior to or on the Closing Date, deliver an Account Control Agreement with respect to each such account (other than any Excluded Accounts) within 30 days after the Closing Date or such later date as the Required Lenders may agree in their sole discretion. With respect to each deposit account, securities account or other similar account (other than any Excluded Accounts) established following the Closing Date, deliver on the date thirty (30) days following the establishment thereof (or such later date agreed to by the Required Lenders in their sole discretion), an Account Control Agreement with respect to each such account. The Administrative Agent's rights with respect to each account subject to an Account Control Agreement shall be governed by such Account Control Agreement. Following the Closing Date, the Borrower shall give the Administrative Agent prompt written notice of the opening of any deposit, securities or other similar account by any Loan Party.

### ARTICLE VII
### NEGATIVE COVENANTS

So long as any Lender shall have any Loan or other Obligation hereunder (other than contingent obligations not yet due and owing as to which no claim has been asserted) or the Conversion shall not have occurred, then from and after the Closing Date, the Borrower (and, with respect to Section 7.14 only, the Holdcos) shall not and shall not permit any of its Subsidiaries to, directly or indirectly:

75

**Section 7.01** <u>Liens</u>.   Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)   Liens (i) created pursuant to any Loan Document and (ii) on the Collateral securing other Secured Obligations;

(b)   Liens existing on the Closing Date and listed in <u>Schedule 7.01(b)</u> and any modifications, replacements, renewals, restructurings, refinancings or extensions thereof; *provided* that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under <u>Section 7.03</u> and (B) proceeds and products thereof and (ii) the replacement, renewal, extension or refinancing of the obligations secured or benefitted by such Liens, to the extent constituting Indebtedness, is permitted by <u>Section 7.03</u>;

(c)   Liens for taxes, assessments or governmental charges that are not overdue for a period of more than any applicable grace period related thereto or (i) that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP to the extent required by GAAP or (ii) the failure to pay of discharge the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(d)   statutory or common law Liens of landlords, sub-landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens, so long as, in each case, such Liens secure amounts not overdue for a period of more than 30 days or if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Liens or that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e)   (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Subsidiaries;

(f)   pledges or deposits to secure the performance of bids, trade contracts, utilities, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(g)   covenants, conditions, easements, rights-of-way, building codes, restrictions (including zoning restrictions), encroachments, licenses, protrusions and other similar encumbrances and minor title defects, in each case affecting Real Property and that do not in the aggregate materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole, and any exceptions on the Mortgage Policies issued in connection with the Mortgaged Properties;

(h)   Liens (i) securing judgments or orders for the payment of money not constituting an Event of Default under <u>Section 8.01(h)</u>, and (ii) notices of *lis pendens* and

76

WEIL:\97566320\8\10143.0003

associated rights related to litigation being contested in good faith by appropriate proceedings for which adequate reserves have been made;

(i)  leases, licenses, subleases or sublicenses (including licenses and sublicenses of software and other intellectual property rights) and terminations thereof, in each case either granted to others with respect to intellectual property that is not material to the business of the Borrower and Subsidiaries or in the ordinary course of business, which (i) do not interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, (ii) do not secure any Indebtedness and (iii) are permitted by Section 7.05;

(j)  Liens in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(k)  Liens (i) of a collection bank arising under Section 4-208 of the Uniform Commercial Code on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business, (iii) in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions, and (iv) that are contractual rights of setoff or rights of pledge relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(l)  Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Sections 7.02(g), (i) and (n) or to the extent related to any of the foregoing, Section 7.02(s), to be applied against the purchase price for such Investment, and (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(m)  Liens (i) in favor of the Borrower or any Subsidiary Guarantor and (ii) in favor of a Subsidiary that is not a Loan Party on assets of a Subsidiary that is not a Loan Party securing Indebtedness permitted under Section 7.03;

(n)  any interest or title of a lessor, sub-lessor, licensor or sub-licensor under leases, subleases, licenses or sublicenses entered into by the Borrower or any of its Subsidiaries in the ordinary course of business or with respect to intellectual property that is not material to the business of the Borrower and its Subsidiaries;

(o)  Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business permitted by this Agreement;

(p)  Liens deemed to exist in connection with Investments in repurchase agreements under Section 7.02;

(q)  Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

77

(r)     Liens that are contractual rights of setoff or rights of pledge (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any of its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(s)     Liens solely on any cash earnest money deposits made by the Borrower or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(t)     ground leases in respect of Real Property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(u)     Liens to secure Indebtedness permitted under Section 7.03(e); *provided* that (i) such Liens are created within 270 days of the acquisition, construction, repair, lease or improvement of the property subject to such Liens, (ii) such Liens do not at any time encumber property (except for replacements, additions, accessions and proceeds to such property) other than the property financed by such Indebtedness and the proceeds and products thereof and customary security deposits and (iii) with respect to Capitalized Leases, such Liens do not at any time extend to or cover any assets (except for replacements, additions and accessions to such assets) other than the assets subject to such Capitalized Leases and the proceeds and products thereof and customary security deposits; *provided* that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(v)     Liens on property of any Subsidiary that is not a Loan Party, which Liens secure Indebtedness of any Subsidiary that is not a Loan Party permitted under Section 7.03;

(w)     Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Subsidiary (other than by designation as a Subsidiary pursuant to Section 6.14) (other than Liens on the Equity Interests of any Person that becomes a Subsidiary to the extent such Equity Interests are owned by the Borrower or another Subsidiary), in each case, securing Indebtedness permitted pursuant to Section 7.03(g),

(x)     (i) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business complies, and (ii) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any Real Property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole;

(y)     Liens arising from precautionary Uniform Commercial Code financing statement or similar filings;

(z)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(aa)     the modification, replacement, renewal or extension of any Lien permitted by Sections 7.01(b), (u) and (w); *provided* that (i) the Lien does not extend to any additional property, other than (A) after-acquired property that is affixed or incorporated into the

78

property covered by such Lien and (B) proceeds and products thereof, and (ii) the renewal, extension, restructuring or refinancing of the obligations secured or benefited by such Liens is permitted by Section 7.03 (to the extent constituting Indebtedness);

(bb)    Liens with respect to property or assets of the Borrower or any of its Subsidiaries securing obligations, other than Indebtedness for borrowed money, in an aggregate principal amount outstanding at any time not to exceed $5,500,000, in each case determined as of the date of incurrence;

(cc)    [reserved];

(dd)    [reserved];

(ee)    Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(ff)    deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

(gg)    [reserved];

(hh)    [reserved];

(ii)    Liens on property of any Foreign Subsidiary securing Indebtedness of such Foreign Subsidiary permitted under Section 7.03;

(jj)    Subject to the Intercreditor Agreement, Liens on the Collateral securing (i)(A) Indebtedness incurred pursuant to Section 7.03(w) and (B) related First Lien Secured Obligations under the First Lien Loan Documents governing such Indebtedness and (ii)(A) Indebtedness incurred pursuant to Section 7.03(x) and (b) related to ABL Secured Obligations under the ABL Loan Documents governing such Indebtedness;

(kk)    [reserved];

(ll)    in the case of any non-wholly owned Subsidiary, any put and call arrangements or restrictions on disposition related to its Equity Interests set forth in its organizational documents or any related joint venture or similar agreement;

(mm)    Liens securing Swap Contracts so long as the value of the property securing such Swap Contracts does not exceed $2,750,000 at any time;

(nn)    Liens on property incurred pursuant to any sale-leaseback transaction permitted hereunder and general intangibles related thereto;

(oo)    [reserved]; and

(pp)    Liens arising by operation of law in the United States under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods.

Section 7.02    **Investments**.  Make or hold any Investments, except:

79

(a)     Investments by the Borrower or any of its Subsidiaries in assets that were cash or Cash Equivalents when such Investment was made;

(b)     loans or advances to officers, directors and employees of any Loan Party (or any direct or indirect parent thereof) or any of its Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests of Holdings or any direct or indirect parent thereof or to permit the payment of taxes with respect thereto; *provided* that, to the extent such loans or advances are made in cash, the amount of such loans and advances used to acquire such Equity Interests shall be contributed to the Borrower in cash as common equity; *provided*, *further*, that the aggregate principal amount outstanding at any time under this clause (ii) shall not exceed $4,125,000, and (iii) for any other purposes not described in the foregoing clauses (i) and (ii); *provided* that the aggregate principal amount outstanding at any time under this clause (iii) shall not exceed $1,375,000;

(c)     Investments (i) by the Borrower or any Subsidiary in any Loan Party (other than a Holdco), (ii) by any Subsidiary that is not a Loan Party in any other Subsidiary that is not a Loan Party and (iii) by any Loan Party in any Subsidiary that is not a Loan Party; *provided* that (A) no such Investments made pursuant to clause (iii) in the form of intercompany loans shall be evidenced by a promissory note unless any such promissory note constituting a negotiable instrument is pledged to the Administrative Agent in accordance with the terms of the Security Agreement, (B) any Investments in the form of intercompany loans constituting Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be unsecured and subordinated to the Obligations on terms consistent with the subordination provisions of the Intercompany Note and (C) the aggregate amount of Investments made pursuant to clause (iii) shall not exceed $22,000,000 at any time outstanding;

(d)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e)     Investments (excluding loans and advances made in lieu of Restricted Payments pursuant to and limited by Section 7.02(m) below) consisting of transactions permitted under Sections 7.01, 7.03 (other than 7.03(c) and (d)), 7.04 (other than 7.04(c)(ii) or (e)), 7.05 (other than 7.05(d)(ii) or 7.05(e)), 7.06 (other than 7.06(d)) and 7.13, respectively;

(f)     Investments (i) existing or contemplated on the Closing Date or made pursuant to legally binding written contracts in existence on the Closing Date, in each case set forth on Schedule 7.02(f) and any modification, replacement, renewal, reinvestment or extension thereof and (ii) existing on the Closing Date by the Borrower or any Subsidiary in the Borrower or any other Subsidiary and any modification, renewal or extension thereof; *provided* that (x) the amount of the original Investment is not increased except by the terms of such Investment or as otherwise permitted by this Section 7.02 and (y) any Investment in the form of Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be subject to subordination terms substantially consistent with the terms of the Intercompany Note;

(g)     Investments in Swap Contracts permitted under Section 7.03;

80

WEIL:\97566320\8\10143.0003

(h)      promissory notes, securities and other non-cash consideration received in connection with Dispositions permitted by Section 7.05;

(i)      any acquisition of all or substantially all the assets of a Person or any Equity Interests in a Person that becomes a Subsidiary or division or line of business of a Person (or any subsequent Investment made in a Person, division or line of business previously acquired in a Permitted Acquisition), in a single transaction or series of related transactions, if no Event of Default exists on the date that the Borrower or the applicable Subsidiary enters into a binding agreement with respect to such acquisition and, immediately after giving effect to such acquisition, (i) any acquired or newly formed Subsidiary shall not be liable for any Indebtedness except for Indebtedness otherwise permitted by Section 7.03; (ii) to the extent required by the Collateral and Guarantee Requirement, (A) the property, assets and businesses acquired in such purchase or other acquisition shall constitute Collateral and (B) any such newly created or acquired Subsidiary (other than an Excluded Subsidiary) shall become a Guarantor, in each case, in accordance with Section 6.11; and (iii) the aggregate amount of Investments by Loan Parties pursuant to this Section 7.02(i) in assets (other than Equity Interests) that are not (or do not become at the time of such acquisition) directly owned by a Loan Party or in Equity Interests of Persons that do not become Loan Parties shall not exceed, when taken together with the aggregate amount of all Investments made pursuant to Section 7.02(c)(iii), $22,000,000 (any such acquisition, a "**Permitted Acquisition**");

(j)      Investments made in connection with the Transactions;

(k)      Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(l)      Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(m)      loans and advances to any direct or indirect parent of the Borrower, in lieu of and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof) Restricted Payments to the extent permitted to be made to such parent in accordance with Section 7.06(h), such Investment being treated for purposes of the applicable clause of Section 7.06, including any limitations, as if a Restricted Payment had been made pursuant to such clause;

(n)      Investments (including Permitted Acquisitions) in an aggregate amount pursuant to this Section 7.02(n) (valued at the time of the making thereof, and without giving effect to any write-downs or write-offs thereof) at any time not to exceed $13,750,000;

(o)      Investments made in respect of joint ventures or other similar agreements or partnership not to exceed $11,000,000;

(p)      Investments in any Person to which the Borrower or any Subsidiary outsources operational activities or otherwise related to the outsourcing of operational activities in the ordinary course of business in an aggregate amount not to exceed $2,750,000;

81

(q)      advances of payroll payments to employees in the ordinary course of business;

(r)      (i) Investments made in the ordinary course of business in connection with obtaining, maintaining or renewing client contracts and loans or advances made to distributors and suppliers in the ordinary course of business and (ii) Investments to the extent that payment for such Investments is made solely with Equity Interests of Holdings permitted to be issued hereunder (or any direct or indirect parent of the Borrower);

(s)      Investments of a Subsidiary acquired after the Closing Date in accordance with Section 7.02 or of a Person merged or amalgamated or consolidated into the Borrower or merged, amalgamated or consolidated with a Subsidiary in accordance with Section 7.04 after the Closing Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger or consolidation; *provided* that this clause (s) is intended solely to grandfather such Investments as are indirectly acquired as a result of an acquisition of a Person otherwise permitted hereunder and any consideration paid in connection with such acquisition that may be allocable to such Investments that consist of Subsidiaries that are not Loan Parties must be permitted by, and be taken into account in computing compliance with, any basket amounts or limitations applicable to such acquisition hereunder;

(t)      Investments made by a Subsidiary that is not a Loan Party to the extent such Investments are financed with the proceeds received by such Subsidiary from an Investment in such Subsidiary by a Loan Party permitted under this Section 7.02;

(u)      [reserved];

(v)      [reserved];

(w)      Investments in deposit accounts, securities accounts and commodities accounts maintained by the Borrower or such Subsidiary, as the case may be;

(x)      Investments constituting any part of a reorganization and other activities related to tax planning; *provided* that (i) no Event of Default shall have occurred and be continuing and (ii) any security interests granted to the Administrative Agent for the benefit of the Secured Parties in the Collateral pursuant to the Collateral Documents shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, consolidation, dissolution or liquidation) and all actions required to maintain said perfected status have been or will promptly be taken; and

(y)      contributions of the Equity Interests of any Subsidiary that is not a Loan Party to any other Subsidiary that is not a Loan Party to the extent necessary in connection with any intercompany reorganization and/or other activities related to tax planning; *provided* that no Event of Default shall have occurred and be continuing.

To the extent an Investment is permitted to be made by a Loan Party directly in any Subsidiary or any other Person who is not a Loan Party (each such person, a "**Target Person**") under any provision of this Section 7.02, such Investment may be made by advance, contribution or distribution by a Loan Party to a Subsidiary, or a Holdco, and further contemporaneously advanced or contributed to a Subsidiary for purposes of making the relevant Investment in the Target Person without constituting an Investment for purposes of Section 7.02 (it being understood that such Investment must satisfy the requirements of, and shall count

82

towards any thresholds in, a provision of this Section 7.02 as if made by the applicable Loan Party directly to the Target Person).

**Section 7.03**    **Indebtedness**.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness of any Loan Party under the Loan Documents;

(b)    Indebtedness outstanding on the Closing Date and listed on Schedule 7.03(b) and any Permitted Refinancing thereof; *provided* that all such Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be unsecured and subordinated to the Obligations pursuant to an Intercompany Note;

(c)    Guarantees by the Borrower and any Subsidiary in respect of Indebtedness of the Borrower or any Subsidiary otherwise permitted hereunder; *provided* that (A) no Guarantee by any Subsidiary of any Indebtedness that is secured by a Lien on the Collateral shall be permitted unless such guaranteeing party shall have also provided a Guarantee of the Obligations on the terms set forth herein, (B) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guarantee of the Obligations on terms at least as favorable (as reasonably determined by the Borrower) to the Lenders as those contained in the subordination of such Indebtedness and (C) any Guarantee by a Subsidiary that is not a Loan Party of any Indebtedness under Section 7.03(g) or (m) (or any Permitted Refinancing in respect thereof) shall only be permitted if such Guarantee meets the requirements of clauses (s), (g) or (m), as the case may be, of this Section 7.03;

(d)    Indebtedness of the Borrower or any Subsidiary owing to any Loan Party or any other Subsidiary (or issued or transferred to any direct or indirect parent of a Loan Party which is substantially contemporaneously transferred to a Loan Party or any Subsidiary of a Loan Party) to the extent constituting an Investment permitted by Section 7.02; *provided* that (x) no such Indebtedness owed to a Loan Party shall be evidenced by a promissory note unless such promissory note constitutes a negotiable instrument and is pledged to the Administrative Agent in accordance with the terms of the Security Agreement and (y) with respect to Indebtedness of any Loan Party owed to a Subsidiary that is not a Loan Party, all such Indebtedness shall be unsecured and subordinated to the Obligations pursuant to subordination terms substantially consistent with the terms of the Intercompany Note;

(e)    (i) Attributable Indebtedness and other Indebtedness (including Capitalized Leases) financing an acquisition, construction, repair, replacement, lease or improvement of a fixed or capital asset incurred by the Borrower or any Subsidiary prior to or within 270 days after the acquisition, lease or improvement of the applicable asset and any Permitted Refinancing thereof in an aggregate amount not to exceed $8,250,000, determined at the time of incurrence (together with any Permitted Refinancings thereof) at any time outstanding and (ii) Attributable Indebtedness arising out of sale-leaseback transactions permitted by Section 7.05(m) and any Permitted Refinancing of such Attributable Indebtedness;

(f)    Indebtedness in respect of Swap Contracts designed to hedge against the Borrower's or any Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes and Guarantees thereof;

(g)    Indebtedness of the Borrower or any Subsidiary (i) assumed in connection with any Permitted Acquisition (provided that such Indebtedness is not created or incurred in contemplation of such Permitted Acquisition) or (ii) incurred to finance any Permitted Acquisition; provided that (A) the aggregate amount of Indebtedness assumed and/or incurred pursuant to this clause (g) shall not exceed $27,500,000 and (B) after giving Pro Forma Effect to the incurrence of such Indebtedness (x) at any time when the financial covenant contained in Section 7.11 is not in effect, the Consolidated First Lien Net Leverage Ratio does not exceed 9.02:1.00 or (y) the Consolidated First Lien Net Leverage Ratio does not

83

exceed the Consolidated First Lien Net Leverage Ratio as of the last day of the most recently ended Test Period;

(h)        Indebtedness representing deferred compensation to employees of the Borrower or any of its Subsidiaries incurred in the ordinary course of business;

(i)        Indebtedness consisting of promissory notes issued by the Borrower or any of its Subsidiaries to current or former officers, managers, consultants, directors and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of the Borrower or any direct or indirect parent of the Borrower permitted by Section 7.06; *provided* that such Indebtedness shall be subordinated in right of payment to the Obligations on terms reasonably satisfactory to the Required Lenders;

(j)        Indebtedness incurred by the Borrower or any of its Subsidiaries in a Permitted Acquisition, any other Investment permitted hereunder (including through a merger) or any Disposition permitted hereunder, in each case, constituting indemnification obligations or obligations in respect of purchase price (including earnouts) or other similar adjustments;

(k)        Indebtedness consisting of obligations of the Borrower or any of its Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with the Transactions, and Permitted Acquisitions or any other Investment permitted hereunder;

(l)        Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantees thereof or the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished in the ordinary course of business;

(m)        Indebtedness in an aggregate principal amount that at the time of, and after giving effect to, the incurrence thereof, would not exceed $8,250,000 determined at the time of incurrence;

(n)        Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(o)        Indebtedness incurred by the Borrower or any of its Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers' compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims;

(p)        obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of its Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(q)        [reserved];

(r)        [reserved];

(s)        [reserved];

(t)        [reserved];

84

WEIL:\97566320\8\10143.0003

(u)      Indebtedness incurred by a Foreign Subsidiary which, when aggregated with the principal amount of all other Indebtedness incurred pursuant to this Section 7.03(u) and then outstanding for all such Persons taken together (and any Permitted Refinancing of the foregoing, to the extent assumed or incurred by a Subsidiary that is not a Loan Party), does not exceed $27,500,000;

(v)      [reserved];

(w)      (i) Indebtedness under the First Lien Credit Agreement in an aggregate principal amount not to exceed $76,600,000 and (ii) any Permitted Refinancing in respect of any of the foregoing Indebtedness in accordance with the terms of the Intercreditor Agreement;

(x)      (i) Indebtedness under the ABL Credit Agreement in an aggregate principal amount not to exceed $30,000,000 and (ii) any Permitted Refinancing in respect of any of the foregoing Indebtedness in accordance with the terms of the Intercreditor Agreement;

(y)      [reserved];

(z)      [reserved]; and

(aa)      all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in Sections 7.03(a) through Section 7.03(aa);

*provided*, *however*, that all Indebtedness permitted by this Section 7.03 which is permitted to be secured pursuant to Section 7.01 and is secured by the Collateral shall be subject to the following: (1) in the case of the Indebtedness described in Section 7.03(w), all such Indebtedness incurred on the Closing Date shall constitute "First Lien Obligations" under (and as defined in) the Intercreditor Agreement and the First Lien Administrative Agent acting on behalf of the holders of such Indebtedness shall have become party to the Intercreditor Agreement on the Closing Date; (2) in the case of the Indebtedness described in Section 7.03(x), all such Indebtedness incurred on the Closing Date shall constitute "ABL Obligations" under (and as defined in) the Intercreditor Agreement and the ABL Agent acting on behalf of the holders of such Indebtedness shall have become party to the Intercreditor Agreement on the Closing Date;

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased, *plus* the aggregate amount of fees, underwriting discounts, premiums (including tender premiums) and other costs and expenses (including OID) incurred in connection with such refinancing.

The accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 7.03.  The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

85

For purposes of determining compliance with this Section 7.03, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Indebtedness described in Sections 7.03(a) through 7.03(aa), Holdings shall, in its sole discretion, classify and reclassify or later divide, classify or reclassify such item of Indebtedness (or any portion thereof) and will only be required to include the amount and type of such Indebtedness in one or more of the above clauses; *provided* that (w) all Indebtedness outstanding under the Loan Documents will at all times be deemed to be outstanding in reliance only on the exception in Section 7.03(a), (x) the ABL Credit Agreement and any Permitted Refinancing in respect of the foregoing will at all times be deemed to be outstanding in reliance only on the exception in Section 7.03(x) and (y) the First Lien Term Facility and any Permitted Refinancing in respect of the foregoing will at all times be deemed to be outstanding in reliance only on the exception in Section 7.03(w).

**Section 7.04     Fundamental Changes**. Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of related transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person (other than as part of the Transactions), except that:

(a)     (i) Any Loan Party (other than Holdings or the Borrower) and any Subsidiary may merge, amalgamate or consolidate with the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction); provided that the Borrower shall be the continuing or surviving Person and (ii) any Subsidiary may merge with one or more other Subsidiaries; provided that when any Person that is a Loan Party is merging with a Subsidiary that is not a Loan Party, the Loan Party shall be the continuing or surviving Person or the surviving entity shall substantially concurrently become a Loan Party; provided, further, that any security interests granted to the Administrative Agent for the benefit of the Secured Parties in the Collateral pursuant to the Collateral Documents shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, consolidation, dissolution or liquidation) and all actions required to maintain said perfected status have been or will promptly be taken, in each case, as required by Sections 6.11 or 6.13 to the extent required pursuant to the Collateral and Guarantee Requirement;

(b)     (i) any Subsidiary that is not a Loan Party may merge, amalgamate or consolidate with or into any other Subsidiary that is not a Loan Party, (ii) any Subsidiary may liquidate or dissolve and (iii) any Subsidiary may change its legal form if, with respect to clauses (ii) and (iii), the Borrower determines in good faith that such action is in the best interest of the Borrower and its Subsidiaries and is not materially disadvantageous to the Lenders (it being understood that in the case of any change in legal form, a Subsidiary that is a Guarantor will remain a Guarantor unless such Guarantor is otherwise permitted to cease being a Guarantor hereunder);

(c)     any Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Subsidiary; *provided* that if the transferor in such a transaction is a Guarantor, then (i) the transferee must be a Subsidiary Guarantor or the Borrower or (ii) to the extent constituting an Investment, such Investment must be a permitted Investment in or Indebtedness of a Subsidiary which is not a Loan Party in accordance with Sections 7.02 (other than Section 7.02(e) or 7.02(h)) and 7.03, respectively;

(d)     [reserved];

(e)     so long as no Event of Default has occurred and is continuing or would result therefrom (in the case of a merger involving a Loan Party), any Subsidiary may merge or consolidate with any other Person in order to effect an Investment permitted pursuant to

86

Section 7.02; *provided* that the continuing or surviving Person shall be a Subsidiary, which together with each of such surviving Person's Subsidiaries that are Subsidiaries, shall have complied with the requirements of Section 6.11 or 6.13 to the extent required pursuant to the Collateral and Guarantee Requirement;

(f)        [reserved]; and

(g)        so long as no Event of Default has occurred and is continuing or would result therefrom, a merger, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 7.05 or a Restricted Payment permitted pursuant to Section 7.06.

**Section 7.05    Dispositions**.  Make any Disposition, except:

(a)        Dispositions of obsolete, worn out, used or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Borrower or any of its Subsidiaries;

(b)        Dispositions of inventory in the ordinary course of business or consistent with past practice, goods held for sale in the ordinary course of business and immaterial assets (including allowing any registrations or any applications for registration of any immaterial intellectual property to lapse or go abandoned in the ordinary course of business) and termination of leases and licenses in the ordinary course of business;

(c)        Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)        Dispositions of property to the Borrower or any Subsidiary; *provided* that if the transferor of such property is a Loan Party, (i) the transferee thereof must be a Loan Party (other than a Holdco) or (ii) if such transaction constitutes an Investment, such transaction is permitted under Section 7.02 other than Section 7.02(e);

(e)        to the extent constituting Dispositions, transactions permitted by (i) Section 7.01 (other than Section 7.01(i) and (l)(ii)), (ii) Section 7.02 (other than 7.02(e) or (h)), (iii) Section 7.04 (other than 7.04(g)) and (iv) Section 7.06 (other than 7.06(d));

(f)        Dispositions to consummate the Transactions;

(g)        Dispositions of cash and Cash Equivalents;

(h)        leases, subleases, licenses or sublicenses (including licenses and sublicenses of software or other intellectual property rights) and terminations thereof, in each case in the ordinary course of business, and which do not materially interfere with the business of the Borrower and its Subsidiaries (taken as a whole) and (ii) Dispositions of intellectual property (including inbound licenses) that is no longer material to the business of the Borrower and its Subsidiaries;

(i)        transfers of property subject to Casualty Events;

(j)        Dispositions of property; *provided* that (i) at the time of such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered

87

into at a time when no Default has occurred and is continuing), no Event of Default shall have occurred and be continuing or would result from such Disposition, (ii) with respect to Dispositions pursuant to this Section 7.05(j) for an aggregate purchase price for all such Dispositions in excess of $5,000,000 in any fiscal year, the Borrower or any of its Subsidiaries shall receive not less than 75% of such consideration in the form of cash or Cash Equivalents (in each case, free and clear of all Liens at the time received, other than non-consensual Liens permitted by Section 7.01 and Liens permitted by Sections 7.01(a), (f), (k), (l), (m), (n), (p), (q), (r)(i), (r)(ii), (s), (jj) and (kk) (only to the extent the Obligations are secured by such cash and Cash Equivalents)); *provided*, *however*, that for the purposes of this clause (ii), the following shall be deemed to be cash: (A) any liabilities (as shown on the Borrower's most recent balance sheet provided hereunder or in the footnotes thereto) of the Borrower or such Subsidiary, other than liabilities that are by their terms subordinated to the payment in cash of the Obligations, that are assumed by the transferee with respect to the applicable Disposition and for which the Borrower and all of its Subsidiaries shall have been validly released by all applicable creditors in writing, (B) any securities received by the Borrower or the applicable Subsidiary from such transferee that are converted by the Borrower or such Subsidiary into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of the applicable Disposition, and (C) aggregate non-cash consideration received by the Borrower or the applicable Subsidiary having an aggregate fair market value (determined as of the closing of the applicable Disposition for which such non-cash consideration is received) not to exceed the $6,875,000 at any time and (iii) the Borrower or the applicable Subsidiary complies with the applicable provision of Section 2.05(b);

(k)      Dispositions of non-core assets acquired in connection with Permitted Acquisitions or other Investments; *provided* that (i) the aggregate amount of such sales shall not exceed 25% of the fair market value of the acquired entity or business and (ii) each such sale is in an arm's-length transaction and the Borrower or the respective Subsidiary receives at least fair market value in exchange therefor;

(l)      Dispositions or discounts without recourse of accounts receivable in connection with the compromise or collection thereof in the ordinary course of business;

(m)      Dispositions of property pursuant to sale-leaseback transactions; *provided* that any Net Proceeds from such Disposition shall be applied to prepay Loans in accordance with Section 2.05(b)(ii);

(n)      any swap of assets in exchange for services or other assets in the ordinary course of business of comparable or greater value or usefulness to the business of the Borrower and its Subsidiaries as a whole, as determined in good faith by the management of the Borrower;

(o)      [reserved];

(p)      Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(q)      the unwinding or settlement of any Swap Contract;

(r)      the lapse or abandonment in the ordinary course of business of any registrations or applications for registration of any immaterial IP Rights;

88

(s)        [reserved];

(t)        [reserved];

(u)        Dispositions of non-Collateral assets in an aggregate amount not to exceed, over the life of this Agreement, $2,750,000; and

(v)        Dispositions pursuant to agreements, instruments or arrangements in existence on the Closing Date and set forth on Schedule 7.05(v);

*provided* that any Disposition of any property pursuant to this Section 7.05 (except pursuant to Sections 7.05(a), (b), (d), (e), (f), (h), (i), (l), (p), (q) and (r) and except for Dispositions from a Loan Party to any other Loan Party) shall be for no less than the fair market value of such property at the time of such Disposition as determined by the Borrower in good faith.  To the extent any Collateral is Disposed of as permitted by this Section 7.05 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

Section 7.06    **Restricted Payments**.   Declare or make, directly or indirectly, any Restricted Payment, except:

(a)        each Subsidiary may make Restricted Payments to the Borrower, and other Subsidiaries of the Borrower (and, in the case of a Restricted Payment by a non-wholly owned Subsidiary, to the Borrower and any other Subsidiary and to each other owner of Equity Interests of such Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(b)        the Borrower and each Subsidiary may declare and make dividend payments or other Restricted Payments payable solely in the Equity Interests of such Person (and, in the case of such a Restricted Payment by a non-wholly owned Subsidiary, to the Borrower and any other Subsidiary and to each other owner of Equity Interests of such Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(c)        [reserved];

(d)        to the extent constituting Restricted Payments, the Borrower (or any direct or indirect parent thereof) and its Subsidiaries may enter into and consummate transactions permitted by any provision of Section 7.02 (other than 7.02(e) and 7.02(m)), 7.04 (other than 7.04(g)), 7.05 (other than 7.05(e)(iv) and 7.05(g)) or 7.08 (other than 7.08(f), 7.08(g), 7.08(h), and 7.08(m));

(e)        repurchases of Equity Interests in the Borrower or any Subsidiary deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(f)        [reserved]:

(g)        [reserved];

(h)        the Borrower may make Restricted Payments to any direct or indirect parent of the Borrower:

89

WEIL:\97566320\8\10143.0003

(i)      to pay its operating costs and expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), incurred in the ordinary course of business and attributable to the ownership or operations of the Borrower and its Subsidiaries, Transaction Expenses and any indemnification claims made by directors or officers of such parent attributable to the ownership or operations of the Borrower and its Subsidiaries;

(ii)      the proceeds of which shall be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) ordinary course franchise or similar Taxes, other fees and expenses required to maintain its (or any of its direct or indirect parents') corporate existence; and

(iii)      for any taxable period in which the Borrower and/or any of its Subsidiaries is a member of a consolidated, combined or similar income tax group of which a direct or indirect parent of the Borrower is the common parent (a "**Tax Group**"), to pay the portion of any federal, foreign, state and/or local income taxes of such Tax Group that are attributable to the taxable income of the Borrower and/or its Subsidiaries *provided* that, for each taxable period, the amount of such payments made in respect of such taxable period in the aggregate shall not exceed the amount that the Borrower and its Subsidiaries would have been required to pay as a stand-alone consolidated, combined or similar income tax group (any amount permitted to be paid under this Section 7.06(h)(iii), a "**Tax Distribution**");

(i)      payments made or expected to be made by a Holdco, Borrower or any of the Subsidiaries (or Restricted Payments to allow any direct or indirect parent thereof to make payments) in respect of withholding or similar Taxes payable by or with respect to any future, present or former employee, director, manager or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) and any repurchases of Equity Interests in consideration of such payments including deemed repurchases, in each case, in connection with the exercise of stock options;

(j)      after a Qualified IPO by the Borrower or a Relevant Public Company, (i) any Restricted Payment by the Borrower to pay listing fees and other costs and expenses attributable to the Borrower or such Relevant Public Company being a publicly traded company which are reasonable and customary and (ii) additional Restricted Payments in an aggregate amount per annum not to exceed an amount equal to 6.0% of the net proceeds received by (or contributed to) the Borrower from such Qualified IPO;

(k)      the Borrower or any of the Subsidiaries may pay (or to make Restricted Payments to allow any direct or indirect parent thereof to pay) cash in lieu of fractional Equity Interests in connection with (x) any dividend, split or combination thereof or (y) any Permitted Acquisition; and

(l)      amounts necessary to ensure that the Borrower may make any AHYDO Payments required under Section 10.24.

**Section 7.07**      **[Reserved]**.

**Section 7.08**      **Transactions with Affiliates**.   Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, in each case involving aggregate payments or consideration in excess of $1,100,000, other than:

WEIL:\97566320\8\10143.0003

(a)     transactions among the Borrower and its Subsidiaries or any entity that becomes a Subsidiary as a result of such transaction;

(b)     on terms substantially as favorable to the Borrower or such Subsidiary as would be obtainable by the Borrower or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(c)     the Transactions and the payment of fees and expenses (including Transaction Expenses) as part of or in connection with the Transactions;

(d)     the issuance of Equity Interests to any officer, director, employee or consultant of the Borrower or any of its Subsidiaries in connection with the Transactions;

(e)     [reserved];

(f)     Restricted Payments permitted under Section 7.06;

(g)     loans and other Investments among Holdings, Intermediate Holdings, the Borrower and its Subsidiaries and joint ventures (to the extent any such Subsidiary that is not a Subsidiary or any such joint venture is only an Affiliate as a result of Investments by the Holdcos, the Borrower and/or its Subsidiaries in such Subsidiary or joint venture) to the extent otherwise permitted under Section 7.02;

(h)     transactions by the Borrower and its Subsidiaries permitted under an express provision (including any exceptions thereto) of this Article VII;

(i)     employment and severance arrangements between the Borrower and its Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee benefit plans and arrangements in the ordinary course of business;

(j)     the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers, employees and consultants of the Borrower and its Subsidiaries (or any direct or indirect parent of the Borrower) in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and its Subsidiaries;

(k)     transactions pursuant to agreements, instruments or arrangements in existence on the Closing Date and set forth on Schedule 7.08(k) or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect;

(l)     [reserved];

(m)     payments by the Borrower or any of its Subsidiaries pursuant to any tax sharing agreements with any direct or indirect parent of the Borrower to the extent attributable to the ownership or operation of the Borrower and the Subsidiaries, but only to the extent permitted by Section 7.06(h)(iii);

(n)     the issuance or transfer of Equity Interests (other than Disqualified Equity Interests) of Holdings to any Permitted Holder or to any former, current or future director, manager, officer, employee or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees, distributes or Affiliate of any of the foregoing) of the Borrower, any of its Subsidiaries or any direct or indirect parent thereof;

91

(o)      transactions with customers, clients, joint venture partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and the Subsidiaries, in the reasonable determination of the board of directors or the senior management of the Borrower, or are on terms at least as favorable (as reasonably determined by the Borrower) as might reasonably have been obtained at such time from an unaffiliated party;

(p)      the Transactions;

(q)      the payment of reasonable out-of-pocket costs and expenses and indemnities pursuant to the stockholders agreement or the registration and participation rights agreement entered into on the Closing Date in connection therewith;

(r)      transactions in which the Borrower or any of the Subsidiaries, as the case may be, deliver to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Borrower or such Subsidiary from a financial point of view or meets the requirements of Section 7.08(b); and

(s)      payments to or from, and transactions with, joint ventures (to the extent any such joint venture is only an Affiliate as a result of Investments by the Borrower and the Subsidiaries in such joint venture) in the ordinary course of business to the extent otherwise permitted under Section 7.02.

**Section 7.09      Burdensome Agreements**.  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that limits the ability of:

(a)      any Subsidiary that is not a Guarantor to make Restricted Payments to the Borrower or any Guarantor; or

(b)      any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Lenders with respect to the Term Facility and the Obligations;

*provided* that the foregoing Sections 7.09(a) and (b) shall not apply to Contractual Obligations which:

(i)      (x) exist on the Closing Date and (to the extent not otherwise permitted by this Section 7.09) are listed on Schedule 7.09(b) and (y) to the extent Contractual Obligations permitted by clause (x) are set forth in an agreement evidencing Indebtedness, are set forth in any agreement evidencing any permitted modification, replacement, renewal, extension or refinancing of such Indebtedness so long as such modification, replacement, renewal, extension or refinancing (taken as a whole) does not materially expand the scope of such Contractual Obligation (as reasonably determined by the Borrower);

(ii)      are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Subsidiary; *provided*, *further*, that this clause (ii) shall not apply to Contractual Obligations that are binding on a Person that becomes a Subsidiary pursuant to Section 6.14;

(iii)      represent Indebtedness of a Subsidiary which is not a Loan Party which is permitted by Section 7.03 and which does not apply to any Loan Party;

92

(iv)     are customary restrictions (as reasonably determined by the Borrower) that arise in connection with (x) any Lien permitted by Sections 7.01(a), (b), (f), (i), (j)(i), (k), (l), (p), (q), (r)(i), (r)(ii), (s), (u), (v), (w), (z), (aa), (ee), (ii), (jj), and (kk) and relate to the property subject to such Lien or (y) arise in connection with any Disposition permitted by Section 7.04 or 7.05 and relate solely to the assets or Person subject to such Disposition;

(v)     are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 7.02 and applicable solely to such joint venture and its equity entered into in the ordinary course of business;

(vi)     are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 7.03 but solely to the extent any negative pledge relates to (i) the property financed by such Indebtedness and the proceeds, accessions and products thereof or (ii) the property secured by such Indebtedness and the proceeds, accessions and products thereof so long as the agreements governing such Indebtedness permit the Liens securing the Obligations;

(vii)     are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the property interest, rights or the assets subject thereto;

(viii)     comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Sections 7.03(b), (e), (g), (n)(i), (u), (w) and (x) and to the extent that such restrictions apply only to the property or assets securing such Indebtedness or, in the case of Section 7.03(g) or (u), to the Subsidiaries incurring or guaranteeing such Indebtedness;

(ix)     are customary provisions restricting subletting, transfer or assignment of any lease governing a leasehold interest of the Borrower or any Subsidiary;

(x)     are customary provisions restricting assignment or transfer of any agreement entered into in the ordinary course of business;

(xi)     are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(xii)     arise in connection with cash or other deposits permitted under Sections 7.01 and 7.02 and limited to such cash or deposit;

(xiii)     comprise restrictions imposed by any agreement governing Indebtedness entered into on or after the Closing Date and permitted under Section 7.03 that are, taken as a whole, in the good faith judgment of the Borrower, either (a) no more restrictive than the restrictions contained in this Agreement or (b) no more restrictive with respect to the Borrower or any Subsidiary than customary market terms for Indebtedness of such type, so long as the Borrower shall have determined in good faith that such restrictions pursuant to this clause (b) will not affect its obligation or ability to make any payments required hereunder;

(xiv)     are restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

93

(xv)    are restrictions regarding licensing or sublicensing by the Borrower and its Subsidiaries of intellectual property (including customary restrictions on assignment contained in license or sublicense agreements) entered into in the ordinary course of business;

(xvi)    are restrictions contained in the First Lien Loan Documents and documents otherwise governing Indebtedness permitted pursuant to Section 7.03(w);

(xvii)    are restrictions on cash earnest money deposits in favor of sellers in connection with acquisitions not prohibited hereunder; and

(xviii)    are restrictions contained in the ABL Loan Documents and documents otherwise governing Indebtedness permitted pursuant to Section 7.03(x).

**Section 7.10    Maximum Capital Expenditures**. Permit the aggregate amount of Capital Expenditures made by the Borrower and its Subsidiaries in any fiscal year to exceed the amount provided in the table set forth below for such fiscal year (the "**Maximum Capital Expenditures Amount**"); provided that the Maximum Capital Expenditures Amount for any fiscal year may, at the election of the Borrower, be increased by an amount equal to 100% of the excess, if any, of the Maximum Capital Expenditures Amount for the previous fiscal year over the actual amount of Capital Expenditures made during such Fiscal Year (the "**Carry Over Amount**"). For purposes of determining compliance with this Section 7.10, (x) the amount of Capital Expenditures in any fiscal year shall (i) first be applied toward the Maximum Capital Expenditures Amount allocated to such fiscal year (without giving effect to any Carry Over Amount from the prior fiscal year) then (ii) from the Carry Over Amount available in such fiscal year until it has been fully utilized.

| Fiscal Year | Maximum Net Capital Expenditures Amount |
|---|---|
| 2021 | $15,620,000 |
| 2022 | $10,560,000 |
| 2023 | Greater of (i) $11,330,000 and (ii) 3.03% of Consolidated Net Sales |
| 2024 | Greater of (i) $11,660,000 and (ii) 3.03% of Consolidated Net Sales |
| 2025 | Greater of (i) $13,200,000 and (ii) 3.03% of Consolidated Net Sales |

**Section 7.11    Consolidated First Lien Net Leverage Ratio**.  Permit the Consolidated First Lien Net Leverage Ratio as of the last day of any Test Period ending on or after December 31, 2021 and set forth below to be greater than the ratio set forth below opposite such last day of a Test Period below.

| Test Period Ended | Consolidated First Lien Net Leverage Ratio |
|---|---|
| June 30, 2021 | 7.15:1.00 |
| September 30, 2021 | 5.78:1.00 |
| December 31, 2021 | 4.68:1.00 |
| March 31, 2022 | 4.68:1.00 |
| June 30, 2022 | 4.68:1.00 |
| September 30, 2022 | 4.68:1.00 |
| December 31, 2022 | 3.03:1.00 |
| March 31, 2023 | 3.03:1.00 |
| June 30, 2023 | 3.03:1.00 |
| September 30, 2023 | 3.03:1.00 |

94

| Test Period Ended | Consolidated First Lien Net Leverage Ratio |
|---|---|
| December 31, 2023 and thereafter | 1.93:1.00 |

**Section 7.12** **Interest Coverage Ratio**. Permit the Interest Coverage Ratio as of the last day of any Test Period ending on or after December 31, 2021 and set forth below to be less than the ratio set forth below opposite such last day of a Test Period below.

| Test Period Ended | Interest Coverage Ratio |
|---|---|
| June 30, 2021 | 0.90:1.00 |
| September 30, 2021 | 1.13:1.00 |
| December 31, 2021 | 1.13:1.00 |
| March 31, 2022 | 1.13:1.00 |
| June 30, 2022 | 1.13:1.00 |
| September 30, 2022 | 1.13:1.00 |
| December 31, 2022 | 1.58:1.00 |
| March 31, 2023 | 1.58:1.00 |
| June 30, 2023 | 1.58:1.00 |
| September 30, 2023 | 1.58:1.00 |
| December 31, 2023 and thereafter | 2.25:1.00 |

**Section 7.13** **Prepayments, Etc. of Indebtedness**.

(a) Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any (i) Indebtedness subordinated in right of payment incurred under Section 7.03, or (ii) any other Indebtedness for borrowed money of a Loan Party that is (x) subordinated in right of payment to the Obligations expressly by its terms or (y) is secured on a junior lien basis to the Liens securing the Obligations, except (i) the refinancing thereof with any Indebtedness (to the extent such Indebtedness constitutes a Permitted Refinancing and, if such Indebtedness was originally incurred under Section 7.03(g), is permitted pursuant to Section 7.03(g)), to the extent not required to prepay any Loans pursuant to Section 2.05(b) and (ii) the prepayment of Indebtedness of the Borrower or any Subsidiary to the Borrower or any Subsidiary, subject to the subordination provisions applicable to any such Indebtedness.

(b) Amend, modify or change any term or condition of any Indebtedness (x) in the case of the Indebtedness under the ABL Credit Agreement and any other ABL Secured Obligations (and any Permitted Refinancing in respect of the foregoing) in violation of the Intercreditor Agreement, (y) in the case of the Indebtedness under the First Lien Credit Agreement and any other First Lien Secured Obligations (and any Permitted Refinancing in respect of the foregoing), in violation of the Intercreditor Agreement or the definition of "Permitted Refinancing" and (z) in the case of any other Indebtedness in excess of the Threshold Amount in a manner adverse to the Lenders.

Notwithstanding anything to the contrary in any Loan Document, the Borrower may make regularly scheduled payments of interest and fees on the ABL Facility or the First Lien Term Facility, and may make any payments required by the terms of such Indebtedness in order to avoid the application of Section 163(e)(5) of the Code to such Indebtedness.

**Section 7.14** **Permitted Activities**. With respect to a Holdco, engage in any material operating or business activities; *provided* that the following and any activities incidental thereto shall be permitted in any event: (i) (a) in the case of Intermediate Holdings, its ownership of the Equity Interests of the Borrower and activities incidental thereto, including payment of dividends and other amounts in respect of its Equity Interests and (b) in the case of Holdings, its ownership of the Equity Interests of Intermediate Holdings and

95

activities incidental thereto, including payment of dividends and other amounts in respect of its Equity Interests, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations with respect to the Loan Documents, the ABL Loan Documents, the First Lien Loan Documents and any other documents governing Indebtedness permitted to be incurred by the Borrower or a Subsidiary pursuant to Section 7.03, (iv) any public offering of its common stock or any other issuance or sale of its Equity Interests, (v)(1) Guaranteed Obligations in respect of Indebtedness of, the Borrower and its Subsidiaries permitted under Section 7.03, including any Permitted Refinancing thereof and (2) guaranties of other obligations not constituting Indebtedness incurred by, the Borrower or any of the Subsidiaries, (vi) if applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings, Intermediate Holdings and the Borrower, (vii) holding any cash or property (but not operating any property), (viii) [reserved], (ix) providing indemnification to officers and directors and (x) any activities incidental or reasonably related to the foregoing.  No Holdco shall incur any Liens on Equity Interests of Intermediate Holdings or the Borrower, other than non-consensual Liens and those for the benefit of the Second Lien Secured Obligations, ABL Secured Obligations (subject at all times to the Intercreditor Agreement) and the First Lien Secured Obligations (subject at all times to the Intercreditor Agreement).  Holdings shall not own any Equity Interests other than those of Intermediate Holdings, and Intermediate Holdings shall not own any Equity Interests other than those of the Borrower.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**Section 8.01    Events of Default**.  Any of the following from and after the Closing Date shall constitute an event of default (an "**Event of Default**"):

(a)    *Non-Payment*.  Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within three Business Days after the same becomes due, any interest on any Loan, any fees or other amounts payable hereunder or with respect to any other Loan Document; or

(b)    *Specific Covenants*.  The Borrower, any Subsidiary or, in the case of Section 7.14, a Holdco, fails to perform or observe any term, covenant or agreement contained in any of Section 6.03(a) or 6.05(a) (solely with respect to the Borrower), 6.20(b) or 6.22 or Article VII; *provided* that the covenants in Section 7.11 and Section 7.12 are subject to cure pursuant to Section 8.04; or

(c)    *Other Defaults*.  Any Holdco, the Borrower or any Subsidiary fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a), (b) or (d)) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days after (i) a Responsible Officer of any Loan Party obtaining knowledge thereof or (ii) receipt by the Borrower of written notice thereof from the Administrative Agent; or

(d)    *Representations and Warranties*.  Any representation, warranty, certification or statement of fact made or deemed made by any Loan Party herein or in any other Loan Document, or any certification in any document required to be delivered in connection herewith or therewith shall be incorrect in any material respect (or, in the case of any representation and warranty qualified by materiality, in all respects) when made or deemed made; or

(e)    *Cross-Default*.  Any Loan Party or any Subsidiary (A) fails to make any payment whether at scheduled maturity or upon acceleration in respect of any Indebtedness under the ABL Loan Documents and First Lien Loan Documents, (B) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required

96

prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder, under the ABL Loan Documents and/or under the First Lien Loan Documents) having an aggregate outstanding principal amount of not less than the Threshold Amount, or (C) fails to observe or perform any other agreement or condition relating to any such Indebtedness referenced in clause (B) above, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any default thereunder by any Loan Party), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause (after delivery of any notice if required and after giving effect to any waiver, amendment, cure or grace period), with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that this clause (C) shall not apply to (i) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder, (ii) any Indebtedness if (x) the sole remedy of the holder thereof in the event of the non-payment of such Indebtedness or the non-payment or non-performance of obligations related thereto or (y) the sole rights of the holder(s) thereof is to elect, in each case, to convert such Indebtedness into Qualified Equity Interests and cash in lieu of fractional shares and (iii) in the case of Indebtedness which the holder thereof may elect to convert into Qualified Equity Interests, such Indebtedness from and after the date, if any, on which such conversion has been effected; *provided*, *further*, that such failure is unremedied or is not waived by the holders of such Indebtedness prior to any acceleration of the Loans pursuant to Section 8.02; or

(f)    *Insolvency Proceedings, Etc*.  Other than with respect to any dissolutions otherwise permitted hereunder, any Loan Party or any Material Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes a general assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for 60 calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or substantially all of its property is instituted without the consent of such Person and continues undismissed or unstayed for 60 consecutive calendar days, or an order for relief is entered in any such proceeding; or

(g)    [Reserved]; or

(h)    *Judgments*.  There is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by either (i) independent third-party insurance as to which the insurer does not deny coverage or (ii) another creditworthy (as reasonably determined by the Required Lenders) indemnitor); and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of 60 consecutive days; or

(i)    *Invalidity of Loan Documents*.  Any material provision of the Loan Documents, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted

97

WEIL:\97566320\8\10143.0003

under Section 7.04 or 7.05) or as a result of acts or omissions by the Administrative Agent or any Lender  due to such person's gross negligence or willful misconduct which do not arise from a breach by a Loan Party of its obligations under the Loan Documents, the satisfaction in full of all the Obligations (other than contingent obligations as to which no claim has been asserted) or the Conversion, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document or the validity or priority of a Lien as required by the Collateral Documents on a material portion of the Collateral; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations (other than in accordance with its terms) or the Conversion (other than in accordance with the terms of this Agreement), or purports in writing to revoke or rescind any Loan Document (other than in accordance with its terms); or

(j)      *Change of Control*.  There occurs any Change of Control; or

(k)      *Collateral Documents*.  Any Collateral Document after delivery thereof pursuant to Sections 4.01, 6.11 or 6.13 shall for any reason (other than pursuant to the terms thereof including as a result of a transaction not prohibited under this Agreement) cease to create a valid and perfected Lien, with the priority required by the Collateral Documents on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01 or any Loan Party contests in writing the validity or priority of a Lien, (i) except to the extent that any such perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities or negotiable instruments pledged under the Collateral Documents or take other required actions required to be taken by the Administrative Agent under the Loan Documents, in each case, which does not arise from a breach by a Loan Party of its obligations under the Loan Documents, and (ii) except as to Collateral consisting of Real Property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

(l)      *ERISA*.   (i) An ERISA Event occurs which has resulted or could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, or (ii) a Loan Party, any Subsidiary or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan and a Material Adverse Effect could, individually or in the aggregate, reasonably be expected to result.

**Section 8.02    Remedies Upon Event of Default**.  (a)  If any Event of Default occurs and is continuing, the Administrative Agent may, at the request of the Required Lenders, take any or all of the following actions:

(i)      [reserved];

(ii)      declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower (to the extent permitted by applicable law); and

(iii)      exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

98

*provided* that upon the occurrence of an Event of Default pursuant to Section 8.01(f), the unpaid principal amount of all outstanding Loans and all interest, fees, premiums and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.

**Section 8.03    Application of Funds**.  After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order (to the fullest extent permitted by mandatory provisions of applicable Law):

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to the Administrative Agent in its capacity as such hereunder;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders hereunder (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and any Secured Obligations constituting fees and premiums, ratably among the Secured Parties in proportion to the respective amounts described in this clause Third payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

*Fifth*, to the payment of all other Secured Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

*Last*, the balance, if any, after all of the Secured Obligations then earned, due and payable have been paid in full, to the Borrower or as otherwise required by Law.

**Section 8.04    Borrower's Right to Cure**.  Notwithstanding anything to the contrary contained in Section 8.01 or Section 8.02:

(a)    For the purpose of determining whether an Event of Default under Section 7.11 and/or Section 7.12 has occurred, the Borrower may on one or more occasions designate any portion of the net cash proceeds from a sale or issuance of Qualified Equity Interests of the Borrower or any cash contribution to the common capital of the Borrower (the "**Cure Amount**") as an increase to Consolidated EBITDA for the applicable fiscal quarter; *provided* that (A) such amounts to be designated (i) are actually received by the Borrower after the first day of the applicable fiscal quarter and on or prior to the tenth Business Day after the date on which financial statements are required to be delivered with respect to such fiscal quarter (the "**Cure Expiration Date**") and (ii) do not exceed the aggregate amount necessary to cure any Event of Default under Section 7.11 and/or Section 7.12 as of such date and (B) the Borrower shall have provided notice (the "**Notice of Intent to Cure**") to the Administrative Agent that such amounts are designated as a "Cure Amount".  The Cure Amount shall be added to Consolidated EBITDA for the applicable fiscal quarter and included when calculating Consolidated EBITDA for each Test Period that includes such fiscal quarter.

99

(b)    The parties hereby acknowledge that this Section 8.04 may not be relied on for purposes of calculating any financial ratios other than for determining actual compliance with Section 7.11 and/or Section 7.12 and shall not result in any adjustment to any amounts hereunder (including the amount of Indebtedness, Total Assets, Consolidated First Lien Net Debt, Consolidated Interest Expense or any other calculation of net leverage or Indebtedness hereunder (directly or by way of netting) and shall not be included for purposes of determining pricing, mandatory prepayments, financial ratio-based conditions and the availability or amount permitted pursuant to any covenant under Article VII) with respect to the quarter with respect to which such Cure Amount was made other than the amount of the Consolidated EBITDA referred to in Section 8.04(a) above.

(c)    In furtherance of Section 8.04(a) above, (i) upon actual receipt and designation of the Cure Amount by the Borrower, the covenant under Section 7.11 and/or Section 7.12  shall be deemed retroactively cured with the same effect as though there had been no failure to comply with the covenant under such Section 7.11 and/or Section 7.12 and any Event of Default or potential Event of Default under Section 7.11 and/or Section 7.12 shall be deemed not to have occurred for purposes of the Loan Documents, and (ii) after delivery of an applicable Notice of Intent to Cure, neither the Administrative Agent nor any Lender may exercise any rights or remedies under Section 8.02 (or under any other Loan Document) on the basis of any actual or purported Event of Default under Section 7.11 and/or Section 7.12 until and unless the Cure Expiration Date has occurred without the Cure Amount having been received.  Notwithstanding the foregoing, no Credit Extension shall be made until receipt by the Borrower of the Cure Amount or waiver of the Event of Default.

(d)    (i) In each period of four consecutive fiscal quarters, there shall be at least two fiscal quarters in which no cure right set forth in this Section 8.04 is exercised and (ii) there shall be no *pro forma* reduction in Indebtedness (directly or by way of netting) with the Cure Amount for determining compliance with Section 7.11 and/or Section 7.12 for the fiscal quarter with respect to which such Cure Amount was made.

(e)    There can be no more than five fiscal quarters in which the cure rights set forth in this Section 8.04 are exercised during the term of this Agreement.

## ARTICLE IX
## ADMINISTRATIVE AGENT

**Section 9.01    Appointment and Authority**. (a)  Each of the Lenders hereby irrevocably appoints Cantor Fitzgerald Securities to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental or related thereto.  The provisions of this Article IX (other than Sections 9.01, 9.06 and 9.09 through and including 9.12) are solely for the benefit of the Administrative Agent and the Lenders, and no Loan Party has rights as a third party beneficiary of any of such provisions.

(b)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article IX and

100

Article X (including the second paragraph of Section 10.05), as though such co- agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents as if set forth in full herein with respect thereto.  Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent to (i) execute any and all documents (including releases) with respect to the Collateral (including each Intercreditor Agreement and any amendment, supplement, modification or joinder with respect thereto) and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by the Administrative Agent shall bind the Lenders and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender. The rights, privileges and immunities of the Administrative Agent in this Agreement shall be automatically incorporated by reference into each Collateral Document, whether or not expressly stated therein.

**Section 9.02**   **Rights as a Lender**.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

**Section 9.03**   **Exculpatory Provisions**.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

   (a)      shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

   (b)      shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) including instructions by e-mail from the Required Lenders or counsel to the Required Lenders (which on the date hereof is Weil, Gotshal & Manges LLP; *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may (i) expose it to liability or that is contrary to any Loan Document or applicable law or (ii) be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; *provided*, *further*, that prior to taking any action, the Administrative Agent may require an indemnity (such indemnity to be satisfactory to the Administrative Agent in all respects) from the Required Lenders or Lenders, as applicable, against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any action;

   (c)      shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity;

101

(d)    shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and nonappealable judgment.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice describing such Default is given to the Administrative Agent by the Borrower or a Lender;

(e)    shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent;

(f)    shall not be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on or the payment of taxes with respect to any of the Collateral.  The actions described in items (i) through (iii) shall be the sole responsibility of the Borrower;

(g)    shall not be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Administrative Agent has been advised of the likelihood of such loss or damage and regardless of the form of action;

(h)    shall not be liable for any error of judgment made in good faith by a responsible officer of the Administrative Agent unless it shall be proved that the Administrative Agent was negligent in ascertaining the pertinent facts;

(i)    shall not be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as Administrative Agent;

(j)    shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or the other Loan Documents arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; business interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action; and

(k)    shall not have any obligation to file financing statements, amendments to financing statements, or continuation statements, or to perfect or maintain the perfection of

102

the Administrative Agent's Lien on the Collateral, other than, in each case, as instructed by the Required Lenders or the foregoing's counsel, together with the form of such financing statement to be filed..

In addition, any assignor of a Loan or seller of a participation hereunder shall be entitled to rely conclusively on a representation of the assignee Lender or Participant in the relevant assignment or participation agreement, as applicable, that such assignee or purchaser is not a Disqualified Competitor; *provided* that such representation shall only be required to be made if the list of Disqualified Competitors is made to all Lenders and such assignees.  The Administrative Agent shall not have any responsibility or liability for monitoring the list or identities of, or enforcing provisions relating to, Disqualified Competitors.

Notwithstanding anything herein to the contrary or in any of the other Loan Documents, in each instance where the Loan Documents confer discretionary rights or powers upon the Administrative Agent which may be exercised or refrained from being exercised herein or in any of the Loan Documents, the Administrative Agent shall not be required to take any action in the absence of direction from the Required Lenders (accompanied by indemnity, if requested by the Administrative Agent in its discretion), and shall have the absolute right, in its sole discretion, to consult with, or seek the affirmative or negative vote from the Required Lenders or, if otherwise applicable, the Lenders, and it may do so pursuant to a negative notice, negative consent or otherwise.

Delivery of any reports, information and documents to the Administrative Agent is for informational purposes only and the Administrative Agent's receipt of such shall not constitute actual or constructive notice of any information contained therein or determinable from information contained therein, including the Borrower's compliance with any of its covenants hereunder.

No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby shall require the Administrative Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers.

The Administrative Agent has accepted and is bound by the Loan Documents executed by the Administrative Agent as of the Closing Date and, as directed in writing by the Required Lenders, the Administrative Agent shall execute additional Loan Documents delivered to it after the Closing Date; *provided, however,* that such additional Loan Documents do not adversely affect the rights, privileges, benefits and immunities of the Administrative Agent.  The Administrative Agent will not otherwise be bound by, or be held obligated by, the provisions of any credit agreement, indenture or other agreement governing the Obligations (other than this Agreement and the other Loan Documents to which the Administrative Agent is a party).

For the avoidance of doubt the Borrower, the Guarantors and the Lenders hereby agree that the Administrative Agent shall be under no obligation to make any determination, demand or request, grant or withhold any approval or consent or deliver any notice pursuant to the defined terms "Additional Refinancing Lender", "Collateral and Guarantee Requirement", "Excluded Assets", "Excluded Subsidiary", "Guarantors", "Material Domestic Subsidiary, "Material Foreign Subsidiary", "Mortgages", "Intercreditor Agreement", "Permitted Refinancing", and pursuant to Sections 2.03(b) and (g), 2.14, 2.15, 2.16, 5.05(b), 6.01(a) and (d), 6.07, 6.11, 6.12, 6.18, 7.03(g) and (i), 8.01(h), 9.02(d) and (e) and 10.01 without the written direction of Required Lenders or Lenders, as applicable.

**Section 9.04    Reliance by Administrative Agent**.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it in good faith to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it in good faith to have been made by the proper Person, and shall not

103

incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**Section 9.05** **Delegation of Duties**.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article IX shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**Section 9.06** **Resignation of Administrative Agent**.  The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower.  If the Administrative Agent is a Defaulting Lender, the Borrower may remove such Defaulting Lender from such role upon 15 days' notice to the Lenders.  Upon receipt of any such notice of resignation or removal of the Administrative Agent by the Borrower, the Required Lenders shall have the right, with the consent of the Borrower at all times other than upon the occurrence and during the continuation of an Event of Default (which consent of the Borrower shall not be unreasonably withheld, conditioned or delayed), to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above (including consent of the Borrower); *provided* that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section 9.06.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.06).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Sections 10.04 and 10.05 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

**Section 9.07** **Non-Reliance on Administrative Agent and Other Lenders**.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other

104

WEIL:\97566320\8\10143.0003

Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Each Lender, by delivering its signature page to this Agreement or an Assignment and Assumption, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by the Administrative Agent, Required Lenders or Lenders, as applicable on the Closing Date.

Section 9.08    No Other Duties, Etc.  Anything herein to the contrary notwithstanding, the Administrative Agent, shall not have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder.

Section 9.09    Administrative Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) at the direction of the Required Lenders shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.03(h), 2.03(i), 2.09, 10.04 and 10.05) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09, 10.04 and 10.05.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

Section 9.10    Collateral and Guaranty Matters.  Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Collateral Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Administrative Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to the occurrence and continuance of an

105

WEIL:\97566320\8\10143.0003

Event of Default, to take any action with respect to any Collateral or Collateral Documents which may be necessary to create, perfect and maintain perfected security interests in and liens upon the Collateral granted pursuant to the Collateral Documents.  Each of the Lenders irrevocably authorizes the Administrative Agent, at its option, and in its sole discretion:

      (a)      to enter into and sign for and on behalf of the Lenders as Secured Parties the Collateral Documents for the benefit of the Lenders and the other Secured Parties;

      (b)      to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon payment in full of all Obligations (other than contingent obligations for which no claim has been made), (ii) upon the Conversion, (iii) at the time the property subject to such Lien is Disposed or to be Disposed as part of or in connection with any Disposition permitted hereunder or under any other Loan Document (including any Disposition of Equity Interests of a Subsidiary that is not a Loan Party to another Subsidiary that is not a Loan Party in connection with an Investment permitted under Section 7.02(y)), (iv) subject to Section 10.01, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders or (v) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to Section 9.10(d);

      (c)      to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted to be senior to the Liens securing the Secured Obligations pursuant to Sections 7.01(b), (u), (w) (with respect to assumed Indebtedness), (aa) (with respect to Sections 7.01(b), (u), (w) (as to assumed Indebtedness) and (bb); and

      (d)      to release any Subsidiary Guarantor from its obligations under this Agreement if such Person ceases to be a Subsidiary or becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.10.  In each case as specified in this Section 9.10, the Administrative Agent will (and each Lender irrevocably authorizes the Administrative Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

Beyond the exercise of reasonable care in the custody of the Collateral in its possession, the Administrative Agent will not have any duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto.  The Administrative Agent will be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and the Administrative Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Administrative Agent in good faith.

The Administrative Agent will not  be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Administrative Agent, as determined by a court of competent jurisdiction in a final, nonappealable order,

WEIL:\97566320\8\10143.0003

for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any grantor to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.  The Administrative Agent hereby disclaims any representation or warranty to the present and future holders of the Obligations concerning the perfection of the Liens granted hereunder or in the value of any of the Collateral.

In the event that the Administrative Agent is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in the Administrative Agent's sole discretion may cause the Administrative Agent to be considered an "owner or operator" under any environmental laws or otherwise cause the Administrative Agent to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, the Administrative Agent reserves the right, instead of taking such action, either to resign as Administrative Agent or to arrange for the transfer of the title or control of the asset to a court appointed receiver.  The Administrative Agent will not be liable to any person for any environmental liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Administrative Agent's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any hazardous materials into the environment.

**Section 9.11    [Reserved].**

**Section 9.12    Withholding Tax Indemnity**.  To the extent required by any applicable Laws (as determined in good faith by the Administrative Agent), the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  If the Internal Revenue Service or any other authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of, withholding Tax ineffective or if any payment has been made by the Administrative Agent to any Lender without applicable withholding tax being deducted from such payment), such Lender shall, within 10 days after written demand therefor, indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrower pursuant to Section 3.01 and 3.04 and without limiting or expanding the obligation of the Borrower to do so) for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise, together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.12.  The agreements in this Section 9.12 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other Obligations.

**Section 9.13    Non-U.S. Administrative Agent Tax Matters**.

If legally entitled to do so, any successor or supplemental Administrative Agent that is not a United States person under Section 7701(a)(30) of the Code, shall deliver to the Borrower two duly completed copies of Internal Revenue Service Form W-8IMY certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of a trade or business in the United States and that it is using such form as evidence of its agreement with the Borrower to be treated as a United States person with respect to such payments (and the Borrower and the Administrative Agent agree to so treat the Administrative Agent as a United States person with respect to such payments as contemplated by Treasury Regulation Section 1.1441-1(b)(2)(iv)(A)), with the effect that the Borrower can make such payments

107

to the Administrative Agent without deduction or withholding of any Taxes imposed by Section 1441 of the Code.

## ARTICLE X
## MISCELLANEOUS

**Section 10.01**    **Amendments, Etc**.  Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (or by the Administrative Agent with the consent of the Required Lenders) (other than with respect to any amendment or waiver contemplated in Sections 10.01(a) through (j) below, which shall only require the consent of the Lenders expressly set forth therein and not Required Lenders) (or by the Administrative Agent with the consent of the Required Lenders) and the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that, no such amendment, waiver or consent shall:

(a)    [reserved];

(b)    postpone any date scheduled for any payment of principal (including final maturity), interest or fees under Section 2.07, 2.08 or 2.09, respectively, without the written consent of each Lender directly and adversely affected thereby (it being understood that the waiver (or amendment to the terms) of any mandatory prepayment of the Loans or any obligation of the Borrower to pay interest at the Default Rate, any Default or Event of Default or mandatory prepayment shall not constitute such a postponement of any date scheduled for the payment of principal or interest and it further being understood that any change to the definition of "Consolidated First Lien Net Leverage Ratio" or the component definitions thereof shall not constitute a postponement of such scheduled payment);

(c)    reduce or forgive the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (iii) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document (or extend the timing of payments of such fees or other amounts) without the written consent of each Lender directly and adversely affected thereby (it being understood that the waiver of (or amendment to the terms of) any obligation of the Borrower to pay interest at the Default Rate, any mandatory prepayment of the Loans or any Default or Event of Default shall not constitute such a reduction);

(d)    change any provision of Section 2.12(a), 2.13 or 8.03 or the definition of "Pro Rata Share" in any manner that would alter the *pro rata* sharing or order of payments or other amounts required thereby, without the written consent of each Lender directly and adversely affected thereby;

(e)    change any provision of (i) this Section 10.01 or (ii) the definition of "Required Lenders" or any other provision specifying the number of Lenders or portion of the Loans required to take any action under the Loan Documents to reduce the percentage set forth therein, without the written consent of each Lender directly and adversely affected thereby;

(f)    other than in connection with a transaction permitted under Section 7.04 or 7.05, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

108

(g)      other than in connection with a transaction permitted under Section 7.04 or 7.05, release all or substantially all of the aggregate value of the Guarantees, without the written consent of each Lender; or

(h)      change Section 2.04 in any manner without the written consent of each Lender;

*provided*, *further*, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, adversely affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document; (ii) only the consent of the parties to the Agent Fee Letter shall be required to amend, modify or supplement the terms thereof; (iii) Section 10.07(h) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; (iv)  no Lender consent is required to effect any amendment expressly contemplated by Section 6.18 and (v) this Agreement may be amended in the manner prescribed in Section 2.18.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except (x) in respect of an amendment, waiver or consent under Section 10.01(a) or (b) and (y) any waiver, amendment or modification requiring the consent of all Lenders or each directly and adversely affected Lender that by its terms materially and adversely affects any Defaulting Lender to a greater extent than other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding the foregoing, no Lender consent is required for the Administrative Agent (but the Administrative Agent may seek such consent) to enter into or to effect any amendment, modification or supplement to any Intercreditor Agreement or arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral for the purpose of adding the holders of such Indebtedness (or their Representative) as a party thereto and otherwise causing such Indebtedness to be subject thereto, in each case as contemplated by the terms of such Intercreditor Agreement or arrangement permitted under this Agreement, as applicable (it being understood that any such amendment or supplement may make such other changes to the applicable Intercreditor Agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and *provided* that such other changes are not adverse, in any material respect (taken as a whole), to the interests of the Lenders); *provided*, *further*, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent.

Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

Notwithstanding anything to the contrary contained in this Section 10.01, guarantees, collateral security documents and related documents executed by the Loan Parties or the Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel or (ii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

109

Notwithstanding anything to the contrary contained in Section 10.01, if at any time after the Closing Date, the Borrower shall have identified in good faith an obvious error or any error or omission of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders within five Business Days following receipt of notice thereof. The Administrative Agent shall be entitled to a certificate of a Responsible Officer of the Borrower stating that any such amendment is authorized and permitted by the terms of the Loan Document.

### Section 10.02    Notices and Other Communications; Facsimile Copies.

(a)    Notices; Effectiveness; Electronic Communications.

(i)    *Notices Generally*.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 10.02(a)(ii)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(A)    if to:

(1)    the Administrative Agent, to:

Cantor Fitzgerald Securities
as Second Lien Term Agent
1801 N. Military Trail, Suite 202
Boca Raton, FL 33431
Telecopier: (646) 219-1180
Attention: N. Horning (Jason)
E-mail: NHorning@cantor.com

and

Cantor Fitzgerald Securities
as Second Lien Term Agent
900 West Trade Street, Suite 725
Charlotte, NC 28202
Phone: (704) 374-0574
Telecopier: (646) 390-1764
Attention: B. Young (Jason)
E-mail: BYoung@cantor.com

with a copy (which shall not constitute notice) to:

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attn: N. Plotkin (Jason)

; and

110

WEIL:\97566320\8\10143.0003

(2)     if to the Borrower to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02(a); and

(B)     if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in Section 10.02(a)(ii) shall be effective as provided in such Section 10.02(a)(ii).

(ii)     *Electronic* Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(b)     *The Platform.*  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."   THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Loan Parties, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of the Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party (or its representatives); *provided*, *however*, that in no event shall any Person have any liability to any other Person hereunder for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages); *provided* that nothing in this sentence shall limit any Loan Party's indemnification obligations set forth herein.

111

WEIL:\97566320\8\10143.0003

(c)     *Change of Address, Etc*.  Each of the Borrower and the Administrative Agent may change its address, electronic mail address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, electronic mail address, facsimile or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to the Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain Material Non-Public Information.

(d)     *Reliance by Administrative Agent and Lenders*.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in accordance with Section 10.05 hereof.

**Section 10.03   No Waiver; Cumulative Remedies**.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Lenders; *provided*, *however*, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) [reserved], (c) any Lender from exercising setoff rights in accordance with Section 10.09 (subject to the terms of Section 2.13) or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; *provided*, *further*, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**Section 10.04   Attorney Costs and Expenses**.  The Borrower agrees to pay or reimburse the Administrative Agent, the Lenders and their respective Affiliates for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication, execution and delivery of this Agreement and the other Loan Documents, and  to pay or reimburse the Administrative Agent, the Lenders and their respective Affiliates for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the administration of this Agreement and the other Loan Documents and any

112

amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including, in each case, all Attorney Costs, which shall be limited to counsel to the Administrative Agent and its Affiliates, one counsel to the Lenders and their respective Affiliates, taken as a whole, and, if reasonably necessary, one local counsel in each relevant jurisdiction material to the interests of the Lenders, taken as a whole  and to pay or reimburse the Administrative Agent and the Lenders for all reasonable and documented out-of-pocket costs, charges and expenses incurred in connection with the enforcement or protection of any rights or remedies under this Agreement or the other Loan Documents (including all such costs, charges and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all respective Attorney Costs, which shall be limited to Attorney Costs of counsel to the Administrative Agent and its Affiliates, one counsel to the Lenders and their Affiliates, taken as a whole, and, if reasonably necessary, one local counsel in each relevant jurisdiction material to the interests of the Lenders taken as a whole and, solely in the case of an actual conflict of interest, one additional counsel in each relevant jurisdiction to each group of similarly situated affected parties). The agreements in this Section 10.04 shall survive repayment of all Obligations. All amounts due under this Section 10.04 shall be paid within 30 days following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail (provided that the Lender need not be required to disclose any confidential information or to the extent prohibited by law or regulation); provided that, with respect to the Closing Date, all amounts due under this Section 10.04 shall be paid on the Closing Date solely to the extent invoiced to the Borrower within two Business Days of the Closing Date. If any Loan Party fails to pay when due any costs, charges, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its discretion following five Business Days' prior written notice to the Borrower. For the avoidance of doubt, this Section 10.04 shall not apply to Taxes, except any Taxes that represent costs and expenses arising from any non-Tax claim.

Section 10.05  **Indemnification by the Borrower**.  The Borrower shall indemnify and hold harmless the Administrative Agent, each Agent-Related Person, Lender and their respective Affiliates and controlling Persons, and their respective officers, directors, employees, partners, agents, advisors and other representatives of each of the foregoing and their respective successors (collectively the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses, charges and disbursements (including Attorney Costs but limited in the case of legal fees and expenses to the reasonable and documented out-of-pocket fees, disbursements and other charges of counsel to Administrative Agent and its Affiliates, one counsel to all other Indemnitees taken as a whole, and, if reasonably necessary, one local counsel for all Indemnitees taken as a whole in each relevant jurisdiction that is material to the interests of the Lenders, and in the case of an actual or potential conflict of interest, one additional counsel in each relevant jurisdiction to each group of similarly situated affected Indemnitees ), joint or several, of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Loan or the use or proposed use of the proceeds therefrom, (c) any actual or alleged presence or Release of Hazardous Materials at, in, on, under or from any property or facility currently or formerly owned, leased or operated by the Loan Parties or any Subsidiary, or any Environmental Liability or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (a "**Proceeding**") and regardless of whether any Indemnitee is a party thereto or whether or not such Proceeding is brought by the Borrower or any other person and, in each case, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee (all of the foregoing, collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses, charges or disbursements resulted from (x) the gross negligence or willful misconduct of such Indemnitee or of any of its

113

controlled Affiliates or their respective directors, officers, employees, partners, advisors or other representatives, as determined by a final non-appealable judgment of a court of competent jurisdiction, (y) any dispute solely among Indemnitees other than any claims by or against an Indemnitee in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under this Agreement and other than any claims arising out of any act or omission of any Holdco, the Borrower or any of their Affiliates or (z) settlements effected without the Borrower's prior written consent (such consent not to be unreasonably withheld, delayed or conditioned), but if settled with the Borrower's written consent, or if there is a final judgment against an Indemnitee in any such Proceeding, the Borrower shall indemnify and hold harmless such Indemnitee to the extent and the manner set forth above. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through electronic, telecommunications or other information transmission systems, including, without limitation, SyndTrak, IntraLinks, the internet, email or similar electronic transmission systems in connection with this Agreement, in each case, except to the extent any such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee (or its controlling Persons, controlled Affiliates or their respective directors, officers, employees, partners, advisors or other representatives), nor shall any Indemnitee, Loan Party or any Subsidiary have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date); it being agreed that this sentence shall not limit the indemnification obligations of any Holdco or any Subsidiary (including, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party and for any out-of-pocket expenses). In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, any Subsidiary of any Loan Party, its directors, equity holders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents are consummated. All amounts due under this Section 10.05 shall be paid within thirty (30) days after written demand therefor (together with reasonable backup documentation supporting such reimbursement request); *provided, however*, that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification rights with respect to such payment pursuant to the express terms of clauses (x) through (z) above. The agreements in this Section 10.05 shall survive the resignation or removal of the Administrative Agent, the replacement of any Lender, and the repayment, satisfaction or discharge of all the other Obligations. For the avoidance of doubt, this Section 10.05 shall not apply to Taxes, except any Taxes that represent liabilities, obligations, losses, damages, penalties, claims, demands, actions, prepayments, suits, costs, expenses, charges and disbursements arising from any non-Tax claims.

To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under this Section 10.05 or Section 10.04 to be paid by it to the Administrative Agent (or any sub-agent thereof), or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), or such Related Party, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity. The obligations of the Lenders under this paragraph are subject to the provisions of Section 2.12(e).

**Section 10.06   Payments Set Aside**.   To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and

114

WEIL:\97566320\8\10143.0003

continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, *plus* interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations or the Conversion, as applicable, and the termination of this Agreement.

**Section 10.07**   **Successors and Assigns**.  (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Administrative Agent (at the direction of the Required Lenders) and each Lender (except as permitted by Section 7.04) and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Assignee pursuant to an assignment made in accordance with the provisions of Section 10.07(b) (such an assignee, an "**Eligible Assignee**"), or (ii) by way of participation in accordance with the provisions of Section 10.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(g) or (iv) to an SPC in accordance with the provisions of Section 10.07(h) (and any other attempted assignment or transfer by any party hereto shall be null and void); *provided*, *however*, that notwithstanding the foregoing, no Lender may assign or transfer by participation any of its rights or obligations hereunder to (i) any Person that is a Defaulting Lender, (ii) a natural Person, (iii) a Disqualified Competitor and (iv)  Holdings, the Borrower or any of their respective Subsidiaries).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      (i) Subject to the conditions set forth in Section 10.07(b)(ii) below and the proviso to Section 10.07(a), any Lender may at any time assign to one or more assignees (each, an "**Assignee**") all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

(A)      the Borrower; *provided* that no consent of the Borrower shall be required for (i) an assignment of all or a portion of the Term Loans to a Lender or to an Affiliate of a Lender or an Approved Fund thereof and (ii) after the occurrence and during the continuance of an Event of Default, an assignment to any Assignee; *provided*, *further*, that the Borrower shall be deemed to have consented to any such assignment unless it shall have objected thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof; and

(B)      the Administrative Agent; *provided* that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Term Loan to a Lender, an Affiliate of a Lender or an Approved Fund.

Notwithstanding the foregoing or anything to the contrary set forth herein, to the extent any Lender is required to assign any portion of its Loans and other rights, duties and obligations hereunder in order to comply with applicable Laws, such assignment may be made by such Lender without the consent of the Borrower, the Administrative Agent, or any other party hereto so long as such Lender complies with the requirements of Section 10.07(b)(ii).

(ii)      Assignments shall be subject to the following additional conditions:

(A)      except in the case of an assignment of the entire remaining amount of the assigning Lender's Loans, the amount of the Loans of the assigning Lender subject to

115

each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, and shall be in increments of an amount of $1,000,000, in excess thereof unless each of the Borrower and the Administrative Agent otherwise consents; *provided* that concurrent assignments to any Lender and its Affiliates or Approved Funds and concurrent assignments from any Lender and its Affiliates or Approved Funds to a single Assignee (or to an Assignee and its Affiliates or Approved Funds) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(B)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); provided that only one such fee shall be payable in the event of simultaneous assignments to or from two or more Approved Funds;

(C)     the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire; and

(D)     the Assignee shall execute and deliver to the Administrative Agent and the Borrower the forms described in Sections 3.01(e) and 3.01(f) applicable to it.

In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable *pro rata* share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full Pro Rata Share of all Loans.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(c)     Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d), from and after the effective date specified in each Assignment and Assumption, (1) the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and (2) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, and the surrender by the assigning Lender of its Note, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.07(c) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(e).

116

(d)        The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it, and a register for the recordation of the names and addresses of the Lenders and principal amounts (and related interest amounts) of the Loans owing to each Lender pursuant to the terms hereof from time to time (the "**Register**").   Upon its receipt of, and consent to, a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 10.07(b)(ii)(B) above, if applicable, and, if required, the written consent of the Administrative Agent and/or the Borrower to such assignment and any applicable tax forms, the Administrative Agent shall (i) accept such Assignment and Assumption and (ii) promptly record the information contained therein in the Register.  No assignment shall be effective unless it has been recorded in the Register as provided in this Section 10.07(d).  The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and, with respect to itself, any Lender, at any reasonable time and from time to time upon reasonable prior notice, *provided* that the information contained in the Register which is shared with each Lender (other than the Administrative Agent and its affiliates) shall be limited to the entries with respect to such Lender including the principal amount of and stated interest on the Term Loans owing to such Lender. This Section 10.07(d) and Section 2.11 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

(e)        Any Lender may at any time (other than to a natural person, a Defaulting Lender, a Holdco, the Borrower, or any Disqualified Competitor) sell participations to any Person (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (a) through (i) of the first proviso to Section 10.01 that requires the affirmative vote of such Lender.  Subject to Section 10.07(f), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations of such Sections and Section 3.07, including Section 3.01(e), and it being understood that the documentation required under Section 3.01(e) shall be delivered solely to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(c).  To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.13 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is reasonably necessary to establish that such Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The Participant Register shall be conclusive, and such Lender shall treat each Person whose name is recorded in the

117

WEIL:\97566320\8\10143.0003

Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(f)     A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's consent or except to the extent such entitlement to a greater payment results from a change in any Law after the sale of the participation takes place.

(g)     Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any central bank having jurisdiction over such Lender; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)     Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof and (iii) such SPC and the applicable Loan or any applicable part thereof, shall be appropriately reflected in the Participant Register.   Each party hereto hereby agrees that (i) an SPC shall be entitled to the benefit of Sections 3.01, 3.04 and 3.05 (subject to the requirements and the limitations of such Sections and Section 3.07, including Section 3.01(e), and it being understood that the documentation required under Section 3.01(e) shall be delivered solely to the participating Lender), but neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement except, in the case of Section 3.01 and 3.04, unless such entitlement to a greater payment results from a change in any Law after the grant to the SPC takes place, (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.   Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(i)     Notwithstanding anything to the contrary contained herein, without the consent of the Borrower or the Administrative Agent, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

118

WEIL:\97566320\8\10143.0003

**Section 10.08   Confidentiality**.   Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its Affiliates and its Affiliates' managers, administrators, directors, officers, employees, trustees, partners, investors, funding sources, investment advisors and agents, including accountants, legal counsel and other advisors (collectively "**Advisors**") on a "need to know basis" (*provided* that (i) the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and agree or otherwise have an obligation to keep such Information confidential and (ii) the Administrative Agent or Lender, as applicable, shall be responsible for the compliance of its Affiliates and such Affiliates' Advisors with this paragraph); (b) to the extent required or requested by, or upon the good faith determination by counsel that such information should be disclosed in light of ongoing oversight or review of such Person, by any Governmental Authority or self-regulatory authority having or asserting jurisdiction over such Person (including any Governmental Authority regulating any Lender or its Affiliates), *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation; (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation; (d) to any other party to this Agreement; (e) to (i) any pledgee referred to in Section 10.07(g), (ii) subject to an agreement containing provisions at least as restrictive as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Borrower), any direct or indirect contractual counterparty to a Swap Contract, Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in any of its rights or obligations under this Agreement (other than any Disqualified Competitor or Person whom the Borrower has affirmatively denied to provide consent to assignment in accordance with Section 10.07(b)(i)(A))); or (iii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder (other than any Disqualified Competitor or Person whom the Borrower has affirmatively denied to provide consent to assignment in accordance with Section 10.07(b)(i)(A)); (f) with the prior written consent of the Borrower; (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.08 or other obligation of confidentiality owed to the Borrower or its Affiliates or becomes available to the Administrative Agent, any Lender, or any of their respective Affiliates on a non-confidential basis from a source other than a Loan Party or their respective related parties (so long as such source is not known (after due inquiry) to the Administrative Agent, such Lender, or any of their respective Affiliates to be bound by confidentiality obligations to any Loan Party or its Affiliates); (h) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to Loan Parties and their Subsidiaries received by it from such Lender) or to the CUSIP Service Bureau or any similar organization;  (i) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of its rights hereunder or thereunder; (j) to the extent such information is independently developed by the Administrative Agent, any Lender, or any of their respective Affiliates; or (k) for purposes of establishing a due diligence defense.   In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and publicly available information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Administrative Agent and the Lenders in connection with the administration, settlement and management of this Agreement, the other Loan Documents and the Credit Extensions.  For the purposes of this Section 10.08, "**Information**" means all information received from the Loan Parties relating to any Loan Party, its Affiliates or its Affiliates' directors, officers, employees, trustees, investment advisors or agents, other than any such information that is publicly available to the Administrative Agent, or any Lender prior to disclosure by any Loan Party other than as a result of a breach of this Section 10.08 or any other confidentiality obligation owed to any Loan Party or their Affiliates.

**Section 10.09   Setoff**.   In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates (and the

119

WEIL:\97566320\8\10143.0003

Administrative Agent, in respect of any unpaid fees, costs and expenses payable hereunder) is authorized at any time and from time to time, without prior notice to the Borrower, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and each of its Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) (other than escrow, payroll, petty cash, trust and tax accounts) at any time held by, and other Indebtedness at any time owing by, such Lender and its Affiliates or the Administrative Agent to or for the credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations owing to such Lender and its Affiliates or the Administrative Agent hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not the Administrative Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit of other obligations; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.17 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of the Administrative Agent and each Lender under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent and such Lender may have at Law.

**Section 10.10    Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**").   If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**Section 10.11    Counterparts**.  This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by facsimile, Docusign or other electronic transmission of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document.  The Administrative Agent may also require that any such documents and signatures delivered by facsimile, Docusign or other electronic transmission be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile, Docusign or other electronic transmission.

**Section 10.12    Integration**.  This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  Subject to Section 10.21, in the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; *provided* that the inclusion of supplemental rights or remedies in favor of the Administrative Agent or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

120

WEIL:\97566320\8\10143.0003

**Section 10.13   Survival of Representations and Warranties**.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.   Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or the Conversion has not occurred.

**Section 10.14   Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions; *provided*, that the Lenders shall charge no fee in connection with any such amendment.   The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.   Without limiting the foregoing provisions of this Section 10.14, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

**Section 10.15   GOVERNING LAW**.  (a)   THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)   ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY (BOROUGH OF MANHATTAN) OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, OR ANY APPELLATE COURT FROM ANY THEREOF, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY, THE ADMINISTRATIVE AGENT AND EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS AND AGREES THAT IT WILL NOT COMMENCE OR SUPPORT ANY SUCH ACTION OR PROCEEDING IN ANOTHER JURISDICTION.   EACH LOAN PARTY, THE ADMINISTRATIVE AGENT AND EACH LENDER IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.   EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS IN THE MANNER PROVIDED FOR NOTICES (OTHER THAN FACSIMILE) IN SECTION 10.02. NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

**Section 10.16   WAIVER OF RIGHT TO TRIAL BY JURY**.   EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER

WEIL:\97566320\8\10143.0003

BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.16.

Section 10.17    **Binding Effect**.  This Agreement shall become effective when it shall have been executed and delivered by the Loan Parties and each other party hereto and the Administrative Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Loan Parties, the Administrative Agent and each Lender and their respective successors and assigns, in each case in accordance with Section 10.07 (if applicable) and except that no Loan Party shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders except as permitted by Section 7.04.

Section 10.18    **USA Patriot Act**.  Each Lender that is subject to the USA Patriot Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name, address and tax identification number of such Loan Party and other information regarding such Loan Party that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the USA Patriot Act.  This notice is given in accordance with the requirements of the USA Patriot Act and is effective as to the Lenders and the Administrative Agent.  The Borrower shall, promptly following a reasonable request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

Section 10.19    **No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent are arm's-length commercial transactions between the Loan Parties and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (B) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent and each Lender each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for each Loan Party or any of their respective Affiliates, or any other Person and (B) neither the Administrative Agent nor any Lender has any obligation to the Loan Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and neither the Administrative Agent nor any other Arranger nor any Lender has any obligation to disclose any of such interests to the Loan Parties or any of their respective Affiliates.  To the fullest extent permitted by law, each Loan Party hereby waives and releases any claims that it may have against the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.20    **Judgment Currency**.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day

122

preceding that on which final judgment is given.  The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable law).

Section 10.21   **Intercreditor Agreement**.  Each Lender hereunder (a) acknowledges that it has received a copy of the Intercreditor Agreement, (b) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement and (c) authorizes and instructs the Administrative Agent to enter into the Intercreditor Agreement as Administrative Agent and on behalf of such Lender.  The foregoing provisions are intended as an inducement to the lenders under the ABL Loan Documents, the First Lien Loan Documents and the Loan Documents to extend credit to the Loan Parties and such lenders are intended third party beneficiaries of such provisions.  In the event of any conflict or inconsistency between the provisions of any Intercreditor Agreement and this Agreement, the provisions of such Intercreditor Agreement shall control.

Section 10.22   **Acknowledgement and Consent to Bail-In of EEA Financial Institutions.**  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)       the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution; and

(b)       the effects of any Bail-In Action on any such liability, including, if applicable:

(i)       a reduction in full or in part or cancellation of any such liability;

(ii)       a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)       the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 10.23   **Certain ERISA Matters.**

(a)       Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the

123

WEIL:\97566320\8\10143.0003

date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans,

(ii)      the transaction exemption set forth in one or more prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time ("PTEs"), such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement,

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement, or

(iv)      such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)      In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

(i)      none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii)      the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii)      the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

124

(iv)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans and this Agreement is a fiduciary under ERISA or the US Internal Revenue Code, or both, with respect to the Loans and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)     no fee or other compensation is being paid directly to the Administrative Agent or any its Affiliates for investment advice (as opposed to other services) in connection with the Loans or this Agreement.

(c)     The Administrative Agent hereby inform the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans and this Agreement, (ii) may recognize a gain if it extended the Loans for an amount less than the amount being paid for an interest in the Loans by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

**Section 10.24   AHYDO Payments.** Notwithstanding anything in this Agreement or in any other related document to the contrary, if a Loan shall remain outstanding after the fifth (5th) anniversary of the initial issuance thereof and the aggregate amount that would be includible in the gross income of a Lender with respect to a Loan (within the meaning of Section 163(i) of the Code) for the periods ending on or before any Interest Payment Date that occurs after such fifth (5th) anniversary (the "**Aggregate Accrual**") would otherwise exceed an amount equal to the sum of (i) the aggregate amount of interest to be paid (within the meaning of Section 163(i) of the Code) under such Loan on or before such Interest Payment Date, and (ii) the product of (A) the issue price (as defined in Section 1273(b) of the Code) of such Loan and (B) the yield to maturity (interpreted in accordance with Section 163(i) of the code) of such Loan (such sum, the "**Maximum Accrual**"), then the Borrower shall pay on each applicable Interest Payment Date occurring after such fifth (5th) anniversary that portion of the outstanding principal amount of such Loan necessary to prevent such Loan from constituting an "applicable high yield discount obligation" within the meaning of Section 163(i) of the Code, up to an amount equal to the excess, if any, of the Aggregate Accrual over the Maximum Accrual (each such payment, the "**AHYDO Payment**") and the amount of such AHYDO Payment and any interest thereon shall be treated for U.S. federal income tax purposes as an amount of interest to be paid (within the meaning of Section 163(i)(2)(B)(i) of the Code) under such Loan.  This provision is intended to prevent the Loans from being classified as "applicable high yield discount obligations," as defined in Section 163(i) of the Code, and shall be interpreted consistently therewith.  For purposes of this paragraph, the term "Lender" will include any successor to a Lender.

### ARTICLE XI
### GUARANTEE

**Section 11.01   The Guarantee**.   Each Guarantor hereby jointly and severally with the other Guarantors guarantees, as a primary obligor and not as a surety to each Secured Party and their respective permitted successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of (i) the Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code and (ii) any other Debtor Relief Laws) on the Loans made by the Lenders to, and the Notes held by each Lender of, the

125

Borrower, and all other Secured Obligations from time to time owing to the Secured Parties by any Loan Party under any Loan Document strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"); *provided*, *however*, that Guaranteed Obligations shall exclude all Excluded Swap Obligations.  The Guarantors hereby jointly and severally agree that if the Borrower or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

**Section 11.02   Obligations Unconditional**.  The obligations of the Guarantors under Section 11.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrower under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full).  Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(a)      at any time or from time to time, without notice to the Guarantors, to the extent permitted by Law, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b)      any of the acts mentioned in any of the provisions of this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted (including incurring any increase or decrease in the principal amount of the Guaranteed Obligations or the rate of interest or the fees thereon);

(c)      the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or except as permitted pursuant to Section 11.09, any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d)      any Lien or security interest granted to, or in favor of, any Lender or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(e)      the release of any other Guarantor pursuant to Section 11.09.

The Guarantors hereby expressly waive (to the fullest extent permitted by Law) diligence, presentment, demand of payment, protest and, to the extent permitted by Law, all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations.  The Guarantors waive, to the extent permitted by Law, any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this

126

Guarantee, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrower or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

Section 11.03   **Reinstatement**. The obligations of the Guarantors under this Article XI shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 11.04   **Subrogation; Subordination**. Each Guarantor hereby agrees that until the payment in full in cash and satisfaction in full of all Guaranteed Obligations (other than contingent obligations not yet due and owing) it shall subordinate any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 11.01, whether by subrogation or otherwise, against the Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.

Section 11.05   **Remedies**. The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrower under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 8.02 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.02) for purposes of Section 11.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 11.01.

Section 11.06   **[Reserved]**.

Section 11.07   **Continuing Guarantee**. The guarantee in this Article XI is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 11.08   **General Limitation on Guarantee Obligations**. In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other Law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 11.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 11.09, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount (after giving effect to the liability under this Guaranty and the right of contribution established in Section 11.10, but before giving effect to any other guarantee (including any guarantee of the ABL Obligations and/ or the First Lien Obligations)) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

127

**Section 11.09** **Release of Guarantors**.  If, in compliance with the terms and provisions of the Loan Documents, (i) all or substantially all of the Equity Interests of any Subsidiary Guarantor are sold or otherwise transferred to a Person or Persons none of which is a Loan Party in a transaction permitted hereunder or (ii) any Subsidiary Guarantor ceases to be a Subsidiary or becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder (any such Subsidiary Guarantor, and any Subsidiary Guarantor referred to in clause (i), a "**Transferred Guarantor**"), such Transferred Guarantor shall, upon the consummation of such sale or transfer or other transaction (but subject to the proviso below), be automatically released from its obligations under this Agreement (including under Section 10.05 hereof) and the other Loan Documents, including its obligations to pledge and grant any Collateral owned by it pursuant to any Collateral Document and, in the case of a sale of all or substantially all of the Equity Interests of the Transferred Guarantor, the pledge of such Equity Interests to the Administrative Agent pursuant to the Collateral Documents shall be automatically released, and, so long as the Borrower shall have provided the Administrative Agent such certifications or documents as the Administrative Agent shall reasonably request, the Administrative Agent shall take such actions as are reasonably requested by the Borrower or such Guarantor to effect each release described in this Section 11.09 in accordance with the relevant provisions of the Collateral Documents; *provided*, *however*, that the release of any Subsidiary Guarantor from its obligations under this Agreement and the other Loan Documents if such Subsidiary Guarantor becomes an Excluded Subsidiary of the type described in clause (a) of the definition thereof shall only be permitted if at the time such Subsidiary Guarantor becomes an Excluded Subsidiary of such type (1) no Default or Event of Default shall have occurred and be outstanding, (2) after giving *pro forma* effect to such release and the consummation of the transaction that causes such Person to be an Excluded Subsidiary of such type, the Borrower is deemed to have made a new Investment in such Person for purposes of Section 7.02 (as if such Person were then newly acquired) and such Investment is permitted pursuant to Section 7.02 (other than Section 7.02(f)) at such time and (3) a Responsible Officer of the Borrower certifies to the Administrative Agent compliance with preceding clauses (1) and (2); *provided*, *further*, that no such release shall occur if such Subsidiary Guarantor continues to be a guarantor in respect of the ABL Obligations, the First Lien Obligations or any Permitted Refinancing in respect of any of the foregoing.

When all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied (other than contingent obligations as to which no claim has been asserted), this Agreement and the Guarantees made herein shall terminate with respect to all Obligations, except with respect to Obligations that expressly survive such repayment pursuant to the terms of this Agreement.

**Section 11.10** **Right of Contribution**.  Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment.  Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 11.04.  The provisions of this Section 11.10 shall in no respect limit the obligations and liabilities of any Guarantor to the Administrative Agent and the Lenders, and each Subsidiary Guarantor shall remain liable to the Administrative Agent and the Lenders for the full amount guaranteed by such Guarantor hereunder.

**Section 11.11** **Keepwell**.  Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Guaranty in respect of Swap Obligations (*provided*, *however*, that each Qualified ECP Guarantor shall only be liable under this Section 11.11 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 11.11, or otherwise under this Guarantee, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Guarantor under this Section 11.11 shall remain in full force and effect until all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied.  Each Qualified ECP Guarantor intends that this Section 11.11 constitute, and this Section 11.11 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

128

**Section 11.12** **Independent Obligation**.   The obligations of each Guarantor hereunder are independent of the obligations of any other Guarantor, any other party or any Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not action is brought against any other guarantor, any other party or any Borrower and whether or not any other guarantor, any other party or any Borrower be joined in any such action or actions.   Each Guarantor waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof. Any payment by the Borrower or other circumstance which operates to toll any statute of limitations as to the Borrower shall operate to toll the statute of limitations as to the Guarantors.

[Signature Pages Follow]

129

**<u>Exhibit E-1</u>**

**Redline to Version in the First Amended Plan Supplement**

Weil Draft 7/28/2020 / Subject to Negotiation

**Dated [●],August 28, 2020**

**SECOND LIEN CREDIT AGREEMENT**

$50,000,000

among

**JASON GROUP INC.,**
as Borrower,

**THE GUARANTORS PARTY HERETO FROM TIME TO TIME,**

**CANTOR FITZGERALD SECURITIES,**
as Administrative Agent,

and

**THE OTHER LENDERS PARTY HERETO FROM TIME TO TIME**

# Table of Contents

**Page**

Article I Definitions and Accounting Terms.................................................................................1

Section 1.01      Defined Terms ...............................................................................................1
Section 1.02      Other Interpretive Provisions.......................................................................36
Section 1.03      Accounting Terms .........................................................................................37
Section 1.04      Rounding .......................................................................................................37
Section 1.05      References to Agreements, Laws, Etc. ..........................................................37
Section 1.06      Times of Day .................................................................................................37
Section 1.07      Timing of Payment or Performance ..............................................................37
Section 1.08      [Reserved].....................................................................................................38
Section 1.09      Pro Forma Calculations ...............................................................................38
Section 1.10      Exchange Rates; Currency............................................................................38
Section 1.11      Certifications .................................................................................................39

Article II Credit Extensions .......................................................................................................39

Section 2.01      The Loans ......................................................................................................39
Section 2.02      Conversions and Continuations of Loans .....................................................39
Section 2.03      [Reserved].....................................................................................................40
Section 2.04      Conversion.....................................................................................................40
Section 2.05      Prepayments ..................................................................................................41
Section 2.06      [Reserved].....................................................................................................43
Section 2.07      Repayment of Loans......................................................................................43
Section 2.08      Interest ...........................................................................................................43
Section 2.09      Fees................................................................................................................44
Section 2.10      Computation of Interest and Fees .................................................................45
Section 2.11      Evidence of Indebtedness .............................................................................45
Section 2.12      Payments Generally.......................................................................................46
Section 2.13      Sharing of Payments .....................................................................................47
Section 2.14      [Reserved].....................................................................................................48
Section 2.15      [Reserved].....................................................................................................48
Section 2.16      [Reserved].....................................................................................................48
Section 2.17      Defaulting Lenders ........................................................................................48

Article III Taxes, Increased Costs Protection and Illegality .....................................................51

Section 3.01      Taxes .............................................................................................................51
Section 3.02      Illegality.........................................................................................................54
Section 3.03      Inability to Determine Rates..........................................................................54
Section 3.04      Increased Cost and Reduced Return; Capital Adequacy; Eurocurrency Rate Loan
                  Reserves.........................................................................................................55
Section 3.05      Funding Losses..............................................................................................56
Section 3.06      Matters Applicable to All Requests for Compensation .................................56
Section 3.07      Replacement of Lenders under Certain Circumstances.................................57
Section 3.08      Survival .........................................................................................................58

Article IV Conditions Precedent to Credit Extensions ..............................................................58

Section 4.01      Conditions to Initial Credit Extension ..........................................................58

Article V Representations and Warranties.................................................................................61

Section 5.01      Existence, Qualification and Power; Compliance with Laws.........................61
Section 5.02      Authorization; No Contravention ..................................................................61

**Page**

Section 5.03    Governmental Authorization; Other Consents ..................................................61
Section 5.04    Binding Effect ..................................................................................................61
Section 5.05    Financial Statements; No Material Adverse Effect ..........................................62
Section 5.06    Litigation ..........................................................................................................62
Section 5.07    Ownership of Property; Liens............................................................................62
Section 5.08    Environmental Matters ......................................................................................62
Section 5.09    Taxes .................................................................................................................63
Section 5.10    ERISA Compliance ...........................................................................................63
Section 5.11    Subsidiaries; Equity Interests ...........................................................................64
Section 5.12    Margin Regulations; Investment Company Act ...............................................64
Section 5.13    Disclosure .........................................................................................................64
Section 5.14    Labor Matters ...................................................................................................64
Section 5.15    Intellectual Property; Licenses, Etc ..................................................................64
Section 5.16    Solvency ...........................................................................................................65
Section 5.17    [Reserved]..........................................................................................................65
Section 5.18    USA Patriot Act; OFAC; FCPA........................................................................65
Section 5.19    Security Documents...........................................................................................65
Section 5.20    EEA Financial Institutions................................................................................66
Section 5.21    Beneficial Ownership Certification.. .................................................................66

Article VI Affirmative Covenants ...........................................................................................66

Section 6.01    Financial Statements..........................................................................................66
Section 6.02    Certificates; Other Information .........................................................................68
Section 6.03    Notices...............................................................................................................69
Section 6.04    Payment of Taxes ..............................................................................................69
Section 6.05    Preservation of Existence, Etc. .........................................................................69
Section 6.06    Maintenance of Properties .................................................................................70
Section 6.07    Maintenance of Insurance ..................................................................................70
Section 6.08    Compliance with Laws ......................................................................................70
Section 6.09    Books and Records ............................................................................................70
Section 6.10    Inspection Rights ...............................................................................................70
Section 6.11    Additional Collateral; Additional Guarantors....................................................71
Section 6.12    Compliance with Environmental Laws ..............................................................73
Section 6.13    Further Assurances ............................................................................................73
Section 6.14    [Reserved]..........................................................................................................73
Section 6.15    Ratings...............................................................................................................73
Section 6.16    Use of Proceeds .................................................................................................73
Section 6.17    Lender Meetings.................................................................................................73
Section 6.18    End of Fiscal Years ...........................................................................................73
Section 6.19    Lines of Business...............................................................................................74
Section 6.20    Post-Closing Covenant ......................................................................................74
Section 6.21    Anti-Terrorism Law; Anti-Money Laundering; Embargoed Persons................74
Section 6.22    Account Control Agreements. ............................................................................74

Article VII Negative Covenants................................................................................................75

Section 7.01    Liens ..................................................................................................................75
Section 7.02    Investments........................................................................................................79
Section 7.03    Indebtedness ......................................................................................................82
Section 7.04    Fundamental Changes........................................................................................85
Section 7.05    Dispositions .......................................................................................................86

**Page**

Section 7.06    Restricted Payments ...................................................................................88
Section 7.07    [Reserved]..................................................................................................90
Section 7.08    Transactions with Affiliates........................................................................90
Section 7.09    Burdensome Agreements.............................................................................91
Section 7.10    Maximum Capital Expenditures..................................................................93
Section 7.11    Consolidated First Lien Net Leverage Ratio ...............................................94
Section 7.12    Interest Coverage Ratio ..............................................................................94
Section 7.13    Prepayments, Etc. of Indebtedness .............................................................94
Section 7.14    Permitted Activities ....................................................................................95

Article VIII Events of Default and Remedies.........................................................................95

Section 8.01    Events of Default ........................................................................................95
Section 8.02    Remedies Upon Event of Default ................................................................98
Section 8.03    Application of Funds ...................................................................................98
Section 8.04    Borrower's Right to Cure ............................................................................98

Article IX Administrative Agent ............................................................................................99

Section 9.01    Appointment and Authority.........................................................................99
Section 9.02    Rights as a Lender .....................................................................................100
Section 9.03    Exculpatory Provisions..............................................................................100
Section 9.04    Reliance by Administrative Agent..............................................................103
Section 9.05    Delegation of Duties..................................................................................103
Section 9.06    Resignation of Administrative Agent .........................................................103
Section 9.07    Non-Reliance on Administrative Agent and Other Lenders..........................104
Section 9.08    No Other Duties, Etc. ................................................................................104
Section 9.09    Administrative Agent May File Proofs of Claim..........................................104
Section 9.10    Collateral and Guaranty Matters.................................................................105
Section 9.11    [Reserved]..................................................................................................106
Section 9.12    Withholding Tax Indemnity .......................................................................106
Section 9.13    Non-U.S. Administrative Agent Tax Matters ..............................................107

Article X Miscellaneous .......................................................................................................107

Section 10.01    Amendments, Etc. ....................................................................................107
Section 10.02    Notices and Other Communications; Facsimile Copies ..............................109
Section 10.03    No Waiver; Cumulative Remedies .............................................................111
Section 10.04    Attorney Costs and Expenses ....................................................................112
Section 10.05    Indemnification by the Borrower ...............................................................112
Section 10.06    Payments Set Aside ..................................................................................114
Section 10.07    Successors and Assigns .............................................................................114
Section 10.08    Confidentiality..........................................................................................118
Section 10.09    Setoff .......................................................................................................119
Section 10.10    Interest Rate Limitation ............................................................................119
Section 10.11    Counterparts .............................................................................................119
Section 10.12    Integration................................................................................................120
Section 10.13    Survival of Representations and Warranties................................................120
Section 10.14    Severability...............................................................................................120
Section 10.15    GOVERNING LAW ..................................................................................120
Section 10.16    WAIVER OF RIGHT TO TRIAL BY JURY ..............................................121
Section 10.17    Binding Effect ..........................................................................................121
Section 10.18    USA Patriot Act........................................................................................121

**Page**

Section 10.19    No Advisory or Fiduciary Responsibility.........................................................121
Section 10.20    Judgment Currency.........................................................................................122
Section 10.21    Intercreditor Agreement .................................................................................122
Section 10.22    Acknowledgement and Consent to Bail-In of EEA Financial Institutions. .....................122
Section 10.23    Certain ERISA Matters...................................................................................123

Article XI Guarantee..............................................................................................................125

Section 11.01    The Guarantee ................................................................................................125
Section 11.02    Obligations Unconditional..............................................................................125
Section 11.03    Reinstatement .................................................................................................126
Section 11.04    Subrogation; Subordination............................................................................126
Section 11.05    Remedies ........................................................................................................126
Section 11.06    [Reserved].......................................................................................................126
Section 11.07    Continuing Guarantee.....................................................................................126
Section 11.08    General Limitation on Guarantee Obligations.................................................126
Section 11.09    Release of Guarantors.....................................................................................127
Section 11.10    Right of Contribution .....................................................................................127
Section 11.11    Keepwell.........................................................................................................127
Section 11.12    Independent Obligation ..................................................................................128

SCHEDULES

| | |
|---|---|
| 1.01(B) | Guarantors |
| 2.01 | Term Loans |
| 2.03 | Existing Letters of Credit |
| 4.01(a) | Collateral Documents |
| 5.07 | Ownership of Property |
| 5.11 | Subsidiaries |
| 6.20 | Post-Closing Covenants |
| 7.01(b) | Liens |
| 7.02(f) | Investments |
| 7.03(b) | Indebtedness |
| 7.05(v) | Dispositions |
| 7.08(k) | Transactions with Affiliates |
| 7.09(b) | Burdensome Agreements |
| 10.02(a) | Certain Addresses for Notices |

EXHIBITS

*Form of*

| | |
|---|---|
| A | Committed Loan Notice |
| B | Note |

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

**Page**

C            Compliance Certificate
D            Solvency Certificate
E            Assignment and Assumption
G            Intercompany Note
H            United States Tax Compliance Certificate
I            Joinder Agreement

**SECOND LIEN CREDIT AGREEMENT**

This SECOND LIEN CREDIT AGREEMENT is entered into as of [●],August 28, 2020, among JASON GROUP INC., a Delaware corporation and successor by merger with Old Jason (hereinafter defined) (the "**Company**" and the "**Borrower**"), the Guarantors party hereto from time to time, [CANTOR FITZGERALD SECURITIES], as Administrative Agent, and each lender from time to time party hereto (collectively, the "**Lenders**" and, individually, a "**Lender**").

**PRELIMINARY STATEMENTS**

On June [●],24, 2020 (the "**Petition Date**"), Jason Incorporated, a Wisconsin corporation ("**Old Jason**"), Jason Partners Holdings Inc., a Delaware corporation ("**Old Holdings**"), Jason Holding, Inc. I, a Delaware corporation ("**Old Intermediate Holdings**"), the Guarantors and each of the Domestic Subsidiaries of Old Jason (collectively, the "**Debtors**") as debtors and debtors-in-possession, commenced voluntary cases under chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), which cases are being jointly administered under the caption [●]In re: JASON INDUSTRIES, INC. *et al.* (the "**Chapter 11 Cases**").

The Joint Prepackaged Plan of Reorganization of Jason Industries, Inc. and its Debtor Affiliates pursuant to Chapter 11 Plan of [●]the Bankruptcy Code filed with the Bankruptcy Court on [●]June 20, 2020 Docket No. [●]22 (the "**Prepackaged Plan**") has been confirmed pursuant to the Confirmation Order (as defined below), and concurrently with the Term Loans (as defined below) deemed made hereunder, the "Effective Date" as defined in and under the Prepackaged Plan (the "**Plan Effective Date**") has occurred.

Prior to the Petition Date, certain lenders extended credit to Old Jason, as borrower, pursuant to that certain First Lien Credit Agreement, dated as of June 30, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Pre-Petition First Lien Credit Agreement**") by and among Old Jason, the guarantors party thereto from time to time, the Bank of New York Mellon, as administrative agent, the lenders party thereto from time to time (the "**Pre-Petition First Lien Lenders**") and Deutsche Bank AG New York Branch, as L/C Issuer (as defined therein) and Swing Line Lender (as defined therein).

The Prepackaged Plan provides that, on the Plan Effective Date, each Pre-Petition First Lien Lender under the Pre-Petition First Lien Credit Agreement shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for their First Lien Secured Credit Agreement Claim (as defined in the Prepackaged Plan) its pro rata share of, among other things, (i) the Term Loans, (ii) the First Lien Terms Loans and (iii) 100% of the equity of Holdings, subject to dilution in accordance with the terms of the Prepackaged Plan.

After giving effect to the Transactions (herein defined) on the Plan Effective Date, (i) Jason Holdings Inc., a Delaware corporation ("**Holdings**") shall own 100% of the outstanding equity interests in Jason Intermediate Inc., a Delaware corporation ("**Intermediate Holdings**"), which shall hold 100% of the outstanding equity interests in the Company; and (ii) Old Jason shall have merged with and into the Company, with the Company as successor by merger.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

**ARTICLE I**
**DEFINITIONS AND ACCOUNTING TERMS**

**Section 1.01**    **Defined Terms**.

As used in this Agreement, the following terms shall have the meanings set forth below:

["**ABL Agent**" has the meaning assigned to the term "Administrative Agent" under and as defined in the ABL Credit Agreement and shall include any successor administrative agent under the ABL Credit Agreement.].

"ABL Credit Agreement" means [●].

["**ABL Credit Agreement**" means that certain ABL Credit Agreement, dated as of the date hereof, by and among the Borrower, the Holdcos, the other Guarantors from time to time party thereto, the lenders party thereto from time to time and Wells Fargo Bank, National Association, as the ABL Agent.

"**ABL Loan Documents**" means the "Loan Documents" as defined in the ABL Credit Agreement.].

["**ABL Obligations**" means the "Obligations" (or any comparable term) as defined in the ABL Credit Agreement.].

"**ABL Priority Collateral**" has the meaning assigned to such term in the Intercreditor Agreement.

["**ABL Secured Obligations**" means the "Secured Obligations" as defined in the ABL Credit Agreement.].

"**ABL Facility**" means the ABL Loans and commitments in respect thereof.

"**ABL Loans**" means the "Loans" as defined in the ABL Credit Agreement.

"**Account Control Agreement**" means, subject to the Intercreditor Agreement, any deposit account control agreement, securities account control agreement or similar agreement entered into by a Loan Party, the Administrative Agent and the applicable financial institution, granting to the Administrative Agent, for the benefit of the Secured Parties, a perfected, Lien and, subject to the Intercreditor Agreement, "control" (as defined in the UCC) in the applicable deposit account or securities account of a Loan Party.

"**Administrative Agent**" means [Cantor Fitzgerald Securities], in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"**Administrative Agent's Office**" means the Administrative Agent's address and account as set forth in Section 10.02(a), or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form suppliedapproved by the Administrative Agent.

"**Advisors**" has the meaning set forth in Section 10.08.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Agent Fee Letter**" means the letter agreement, dated as of the date of this Agreement, between the Borrower and the Administrative Agent.

"**Agent Parties**" has the meaning set forth in Section 10.02(b).

"**Agent-Related Persons**" means the AgentsAdministrative Agent, together with their respectiveits Affiliates, officers, directors, employees, partners, agents, advisors and other representatives.

"**Aggregate Accrual**" has the meaning set forth in Section 10.24.

2

"**Agreement**" means this Second Lien Credit Agreement, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Agreement Currency**" has the meaning assigned to such term in Section 10.20.

"**AHYDO Payment**" has the meaning set forth in Section 10.24.

"**Annual Financial Statements**" means the audited consolidated balance sheets of Old Jason as of December 31, 2017, December 31, 2018 and December 31, 2019, and the related consolidated statements of income and statements of cash flows for the Old Jason for the fiscal years then ended.

"**Anti-Terrorism Law**" has the meaning set forth in Section 6.21(a).

"**Applicable Rate**" means a percentage per annum equal to (i) for Eurocurrency Rate Loans, 10.00% and (ii) for Base Rate Loans, 9.00%; and

"**Approved Bank**" has the meaning set forth in clause (c) of the definition of "Cash Equivalents."

"**Approved Fund**" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"**Assignee**" has the meaning set forth in Section 10.07(b)(i).

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit E hereto."

"**Assignment Taxes**" has the meaning set forth in Section 3.01(b).

"**Attorney Costs**" means and includes all reasonable and documented fees, out-of-pocket expenses and disbursements of any law firm or other external legal counsel.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

["**Available Cash**" means at any time, (a) (i) the aggregate amount of unrestricted cash and Cash Equivalents of the Loan Parties and their Domestic Subsidiaries at such time plus (ii) the amount of cash and Cash Equivalents of the Loan Parties and their Domestic Subsidiaries that is restricted in favor of the ABL Facility, the First Lien Credit Agreement and/or this Agreement, minus, to the extent included in clause (a), (b) the aggregate amount of any cash or Cash Equivalents (i) set aside to pay royalty obligations, working capital obligations, suspense payments, severance taxes, payroll, payroll taxes, other taxes, employee wage and benefit payments and trust and fiduciary obligations for which a Loan Party or any Subsidiary thereof has issued checks or has initiated wires or ACH transfers (or, in the Borrower's discretion, will issue checks or initiate wires or ACH transfers within five Business Days) in order to pay such amounts, (ii) in respect of other amounts for which a Loan Party or any Subsidiary thereof has issued checks or has initiated wires or ACH transfers but have not yet been subtracted from the balance in the relevant account of such Loan Party or relevant Subsidiary, (iii) constituting purchase price deposits or amounts subject to other contractual or legal requirements to deposit money to be held by an unaffiliated third party, (iv) constituting deposits from unaffiliated third parties that are subject to return pursuant to binding agreements with such third parties, or (v) held in escrow.].

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the

3

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" has the meaning set forth in the preliminary statements to this Agreement.

"**Base Rate**" means for any day a fluctuating rate per annum equal to the highest of (i) the Federal Funds Effective Rate plus 1/2 of 1%, (ii) the rate ~~of~~ quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest ~~in effect for such day as announced from time to time by~~ rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent ~~as its "prime rate" at its principal office in New York City~~) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent) and (iii) the rate per annum determined in the manner set forth in clause (ii) of the definition of Eurocurrency Rate plus 1%; provided that, notwithstanding the foregoing, in no event shall the Base Rate applicable to the Term Loans at any time be less than 2.00% per annum. Any change in the Base Rate due to a change in such rate announced by the Administrative Agent or in the Federal Funds Effective Rate shall take effect at the opening of business on the day specified in the announcement of such change.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation, which certification shall be substantially similar in form and substance to the form of Certification Regarding Beneficial Owners of Legal Entity Customers published jointly, in May 2018, by the Loan Syndications and Trading Association and Securities Industry and Financial Markets Association.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Board**" has the meaning set forth in the definition of "Statutory Reserves."

"**Borrower**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Borrower Materials**" has the meaning set forth in Section 6.01.

"**Borrowing**" means a borrowing consisting of Term Loans of the same Type and Class and, in the case of Eurocurrency Rate Loans, having the same Interest Period, made by each of the Lenders pursuant to Section 2.01.

"**Business Day**" means (i) any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of New York, and (ii) if such day relates to any Eurocurrency Rate Loan, any such day that is also a London Banking Day.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capitalized Leases) by the Borrower and its Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on the consolidated statement of cash flows of the Borrower and its Subsidiaries.

4

"**Capitalized Leases**" means all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; *provided* that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"**Carry Over Amount**" has the meaning set forth in Section 7.10.

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by the Borrower or any Subsidiary:

(a)    Dollars;

(b)    readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of the United States having average maturities of not more than 24 months from the date of acquisition thereof; *provided* that the full faith and credit of the United States is pledged in support thereof;

(c)    time deposits or eurodollar time deposits with, insured certificates of deposit, bankers' acceptances or overnight bank deposits of, or letters of credit issued by, any commercial bank that (i) is a Lender or (ii) (A) is organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development or is the principal banking Subsidiary of a bank holding company organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development and is a member of the Federal Reserve System, and (B) has combined capital and surplus of at least $250,000,000 or $100,000,000 in the case of any non-U.S. bank (any such bank in the foregoing clauses (i) or (ii) being an "**Approved Bank**"), in each case with maturities not exceeding 24 months from the date of acquisition thereof;

(d)    commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation (other than structured investment vehicles and other than corporations used in structured financing transactions) and rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 24 months from the date of acquisition thereof;

(e)    marketable short-term money market and similar funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(f)    repurchase obligations for underlying securities of the types described in clauses (b), (c) and (e) above entered into with any Approved Bank;

(g)    securities with average maturities of 24 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h)    Investments (other than in structured investment vehicles and structured financing transactions) with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's;

(i)    securities with maturities of 12 months or less from the date of acquisition backed by standby letters of credit issued by any Approved Bank;

5

(j)        (i) instruments equivalent to those referred to in clauses (a) through (i) above denominated in Euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction and (ii) in the case of any Foreign Subsidiary, such local currencies in those countries in which such Foreign Subsidiary transacts business from time to time in the ordinary course of business;

(k)        Investments, classified in accordance with GAAP as Current Assets of the Borrower or any Subsidiary, in money market investment programs which are registered under the Investment Company Act of 1940 or which are administered by financial institutions having capital of at least $250,000,000, and, in either case, the portfolios of which are limited such that substantially all of such Investments are of the character, quality and maturity described in clauses (a) through (j) above; and

(l)        investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (k) above.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clauses (a) and (j) above; *provided* that such amounts are converted into any currency listed in clause (a) or (j) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

"**Cash Election**" has the meaning set forth in Section 2.08(c).

"**Casualty Event**" means any event that gives rise to the receipt by the Borrower or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**CFC**" means a Subsidiary of the Borrower that is a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"**CFC Holding Company**" means a Domestic Subsidiary of the Borrower that owns no material assets (directly or through one or more disregarded entities) other than the equity (including any debt instrument treated as equity for U.S. federal income tax purposes) of one or more Foreign Subsidiaries that are CFCs.

"**Change of Control**" shall be deemed to occur if:

(a)        (i) any person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Closing Date), but excluding (x) any employee benefit plan of such person and its Subsidiaries and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan or (y) any combination of Permitted Holders, shall have, directly or indirectly, acquired beneficial ownership of Equity Interests representing 35% or more of the aggregate voting power represented by the issued and outstanding Equity Interests of Holdings or (ii) during each period of 12 consecutive months, the board of directors of Holdings shall not consist of a majority of the Continuing Directors;

(b)        a "change of control" (or similar event) shall occur in any document pertaining to the ABL Credit Agreement or the First Lien Credit Agreement;

(c)        other than as described in Section 7.04(a)(i), Intermediate Holdings shall cease to own, directly or indirectly, 100% of the Equity Interests of the Borrower; or

(d)        other than as described in Section 7.04(a)(i), Holdings shall cease to own, directly or indirectly, 100% of the Equity Interests of Intermediate Holdings.

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

"**Chapter 11 Cases**" has the meaning set forth in the preliminary statements to this Agreement.

"**Closing Date**" means [●],August 28, 2020.

"**Code**" means the U.S. Internal Revenue Code of 1986, and the United States Treasury Department regulations promulgated thereunder, as amended from time to time (unless as specifically provided otherwise).

"**Collateral**" means the "Collateral" as defined in the Security Agreement and all the "Collateral" or "Pledged Assets" (or equivalent terms) as defined in any other Collateral Document and any other assets pledged pursuant to any Collateral Document (but in any event excluding the Excluded Assets).

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(a)      subject to Sections 4.01(a) and 6.20, the Administrative Agent shall have received each Collateral Document required to be delivered (i) on the Closing Date, pursuant to Section 4.01(a)(v) and Section 6.11(c) and (ii) at such time as may be designated therein or herein, pursuant to the Collateral Documents or Section 6.11 or 6.13, duly executed by each Loan Party thereto;

(b)      subject to Sections 4.01(a) and 6.20, all Obligations shall have been unconditionally guaranteed by Holdings, Intermediate Holdings, the Borrower (other than with respect to its direct Obligations as a primary obligor (as opposed to a guarantor) under the Loan Documents) and each Material Domestic Subsidiary (other than any Excluded Subsidiary) including those that are listed on Schedule 1.01(B) hereto (each, a "**Guarantor**");

(c)      the Secured Obligations and the Guaranty shall have been secured pursuant to the Security Agreement by a first-priority security interest (subject to Liens permitted by Section 7.01) in (i) all of the Equity Interests of ~~Holdings,~~ Intermediate Holdings and the Borrower, (ii) all of the Equity Interests of each Subsidiary that is a wholly owned Domestic Subsidiary (other than a Domestic Subsidiary described in the following clause (iii)) directly owned by the Loan Parties, (iii) the issued and outstanding Equity Interests of each Subsidiary that is a CFC Holding Company, and (iv) the issued and outstanding Equity Interests of each Subsidiary that is a wholly owned Foreign Subsidiary that is directly owned by the Borrower or by any Subsidiary Guarantor, in each case other than any Excluded Assets; *provided*, *however*, in the case of (iii) and (iv), such term shall not include the pledge of any stock in a CFC Holding Company or Foreign Subsidiary to the extent such pledge would result in material adverse tax consequences to the Borrower or its Subsidiaries as determined by the Borrower in good faith ~~and in consultation with the Administrative Agent)~~;

(d)      except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, or under any Collateral Document, the Secured Obligations and the Guaranty shall have been secured by a perfected first-priority security interest (to the extent such security interest may be perfected by delivering certificated securities, filing financing statements under the Uniform Commercial Code or making any necessary filings with respect to the security interest with the United States Patent and Trademark Office or United States Copyright Office or to the extent required in the Security Agreement (or any other Collateral Document)) or by Mortgages referred to in clause (e) below in Collateral of the Borrower and each Guarantor (including accounts, inventory, equipment, investment property, contract rights, applications and registrations of intellectual property filed in the United States, other general intangibles, Material Real Property, intercompany notes and proceeds of the foregoing), in each case, (i) with the priority required by the Collateral Documents and (ii) subject to exceptions and limitations otherwise set forth in this Agreement (for the avoidance of doubt, including the limitations and exceptions set forth in Section 4.01) and the Collateral Documents; and

(e)      the Administrative Agent shall have received (i) counterparts of a Mortgage with respect to each Material Real Property required to be delivered pursuant to Sections 6.11 and 6.13 (the "**Mortgaged Properties**") duly executed and delivered by the applicable Loan Party, (ii) a title

7

insurance policy for such property available in each applicable jurisdiction (the "**Mortgage Policies**") insuring the Lien of each such Mortgage as a valid first-priority Lien on the property described therein, free of any other Liens except as permitted by Section 7.01, together with such endorsements, coinsurance and reinsurance as the ~~Administrative Agent~~Required Lenders may reasonably request, (iii) a completed Life-of-Loan Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto) and, if any improvements on any Mortgaged Property are located within an area designated a "**flood hazard area,**" evidence of such flood insurance as may be required under Section 6.07, (iv) ALTA surveys in form and substance reasonably acceptable to the ~~Administrative Agent~~Required Lenders or such existing surveys together with no-change affidavits sufficient for the title company to remove all standard survey exceptions from the Mortgage Policies and issue the endorsements required in clause (ii) above, (v) copies of any existing abstracts and appraisals and (vi) such legal opinions and other documents as the ~~Administrative Agent~~Required Lenders may reasonably request with respect to any such Mortgaged Property; and

(f)    except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, or under any Collateral Document, the Secured Obligations and the Guaranty shall have been secured by a perfected second-priority security interest (to the extent such security interest may be perfected by delivering certificated securities, filing financing statements under the Uniform Commercial Code) in ABL Priority Collateral of the Borrower and each Guarantor (including accounts, inventory and proceeds of the foregoing), in each case, (i) with the priority required by the Collateral Documents and (ii) subject to exceptions and limitations otherwise set forth in this Agreement (for the avoidance of doubt, including the limitations and exceptions set forth in Section 4.01) and the Collateral Documents;

*provided*, *however*, that (i) the foregoing definition shall not require, and the Loan Documents shall not contain any requirements as to, (A) the creation or perfection of pledges of, security interests in, Mortgages on, or the obtaining of title insurance, surveys, abstracts or appraisals or taking other actions with respect to any Excluded Assets and (B) any other assets that, in the reasonable judgment of the ~~Administrative Agent~~Required Lenders and the Borrower, the cost of creating, perfecting or maintaining such pledges or security interests in such assets or obtaining title insurance, surveys, abstracts or appraisals in respect of such assets shall be excessive in view of the value of such assets or the practical benefit to the Lenders afforded thereby and (ii) the Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in this Agreement and the Collateral Documents.

The Administrative Agent (at the direction of the Required Lenders) may grant extensions of time for the perfection of security interests in, or the delivery of the Mortgages and the obtaining of title insurance and surveys with respect to, particular assets and the delivery of assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) or any other compliance with the requirements of this definition where it reasonably determines, in consultation with the Borrower, that perfection or compliance cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

No actions in any non-U.S. jurisdiction or required by the Laws of any non-U.S. jurisdiction shall be required in order to create any security interests in assets located, titled, registered or filed outside of the U.S. or to perfect such security interests (it being understood that there shall be no security agreements or pledge agreements governed under the Laws of any non-U.S. jurisdiction).

The foregoing definition shall not require landlord waivers, estoppels and collateral access letters.

"**Collateral Documents**" means, collectively, the Security Agreement, the Intercreditor Agreement, the Intellectual Property Security Agreements, ~~the~~any Mortgages, any Account Control Agreements, collateral assignments, Security Agreement Supplements, security agreements, pledge agreements, intellectual property

8

security agreements or other similar agreements delivered to the Administrative Agent pursuant to Section 4.01(a)(v), 6.11, 6.13 or 6.20 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties.

"**Committed Loan Notice**" means a written notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other or (c) a continuation of Eurocurrency Rate Loans pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit A hereto.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Common Shares**" means shares of common stock, par value $[●]$.01 per shares, of Holdings, as they exist on the Plan Effective Date, or any other Equity Interests of Holdings into which the Common Shares shall be reclassified or changed.

"**Company**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Company Parties**" means, collectively, the Holdcos, the Borrower and its Subsidiaries, and "**Company Party**" means any one of them.

"**Compensation Period**" has the meaning set forth in Section 2.12(c)(ii).

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit C hereto.

["""**Confirmation Order**" means an Order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Lenders, confirming the Prepackaged Plan pursuant to section 1129 of the Bankruptcy Court and in accordance with the terms of the Prepackaged Plan, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms of the Prepackaged Plan so long as any such amendment, supplement or modification does not adversely affect the interests of the Lenders.]¹.

"**Consolidated EBITDA**" means, for any period, the Consolidated Net Income for such period, *plus*:

> (a)  without duplication and, except with respect to clauses (vii)(B), (x) and (xi) below, to the extent deducted (and not added back or excluded) in arriving at such Consolidated Net Income, the sum of the following amounts for such period with respect to the Borrower and its Subsidiaries:
>
> > (i)  total interest expense determined in accordance with GAAP (including, to the extent deducted and not added back in computing Consolidated Net Income, (A) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (B) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers acceptances, (C) non-cash interest payments, (D) the interest component of Capitalized Leases, (E) net payments, if any, pursuant to interest Swap Contracts with respect to Indebtedness, (F) amortization of deferred financing fees, debt issuance costs, commissions and fees, (G) the interest component of any pension or other post-employment benefit expense and (H) commissions, discounts, yield and other fees and, to the extent not reflected in such total interest expense, any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations, and costs of surety bonds in connection with financing activities (whether amortized or immediately expensed),
> >
> > (ii)  without duplication, provision for taxes based on income, profits or capital gains of the Borrower and the Subsidiaries, including, without limitation, federal, state, foreign, local, franchise and similar taxes and foreign withholding taxes paid or

---

¹ NTD: Under review.

9

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

accrued during such period including penalties and interest related to such taxes or arising from any tax examinations and any tax distributions made pursuant to Section 7.06(h)(iii),

(iii)    depreciation and amortization (including amortization of intangible assets, deferred financing fees, debt issuance costs, commissions, fees and expenses, bridge, commitment and other financing fees, discounts, yield) and other fees and charges (including amortization of unrecognized prior service costs and actuarial gains and losses related to pensions and other post-employment benefits, of the Borrower and its Subsidiaries),

(iv)    unusual or non-recurring charges, expenses or losses,

(iv)    (x) any unusual or non-recurring extraordinary charges for such period (provided, that the aggregate amount of unusual or non-recurring extraordinary charges added back to Consolidated EBITDA pursuant to this clause (a)(iv)(x) shall not exceed 15% of Consolidated EBITDA for such period) and (y) any unusual or non-recurring non-cash charges for such period,

(v)    other non-cash charges, expenses or losses, including, without limitation, any non-cash expense relating to the vesting of warrants (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period),

(vi)    retention, recruiting, relocation and signing bonuses and expenses, stock option and other equity-based compensation expenses, severance costs, stay bonuses, transaction fees and expenses and management fees and expenses, and any one time expense relating to enhanced accounting function or other transaction costs, including those associated with becoming a standalone entity or a public company (including, without duplication, any such payments made in connection with the consummation of the Transactions),

(vii)    (A) the amount of any restructuring charges and related charges, restructuring costs, integration costs, transition costs, consolidation and closing costs for facilities, costs incurred in connection with any non-recurring strategic initiatives, costs incurred in connection with acquisitions and non-recurring intellectual property development after the Closing Date, other business optimization expenses (including costs and expenses relating to business optimization programs and new systems design and implementation costs), project start-up costs and other restructuring charges, accruals or reserves (including restructuring costs related to acquisitions after the Closing Date and to closure/consolidation of facilities, retention charges, systems establishment costs and excess pension charges) and (B) the amount of cost savings, operating expense reductions, other operating improvements and "run rate" synergies projected by the Borrower in good faith to result from actions taken or expected to be taken in connection with the Transactions or any Specified Transaction or the implementation of an operational initiative or operational change after the Closing Date (in each case calculated on a Pro Forma Basis as though such cost savings, operating expense reductions, other operating improvements and synergies had been realized on the first day of such period and as if such cost savings, operating expense reductions, other operating improvements and synergies were realized during the entirety of such period), net of the amount of actual benefits realized during such period from such actions; *provided* that (w) in no event shall the amount added back pursuant to this clause (vii) exceed $5,000,000 for any Test Period, (x) a duly completed certificate signed by a Responsible Officer of the Borrower shall be delivered to the Administrative Agent together with the Compliance Certificate required to

10

be delivered pursuant to Section 6.02, certifying that such cost savings, operating expense reductions, other operating improvements and synergies are (i) reasonably supportable and quantifiable in the good faith judgment of the Borrower, and (ii) reasonably anticipated to be realized within (I) in the case of any such cost savings, operating expense reductions, other operating improvements and synergies in connection with the Transactions, 6 months after the Closing Date and (II) in all other cases, 6 months after the consummation of the Specified Transaction or the implementation of an initiative or change, which is expected to result in such cost savings, expense reductions, other operating improvements or synergies, (y) no cost savings, operating expense reductions and synergies shall be added pursuant to this clause (vii) to the extent duplicative of any expenses or charges otherwise added to Consolidated EBITDA, whether through a *pro forma* adjustment or otherwise, for such period and (z) to the extent that any cost savings, operating expense reductions, other operating improvements and synergies are not associated with the Transactions or a Specified Transaction following the Closing Date, all steps shall have been taken for realizing such savings,

(viii)    [reserved],

(ix)    other accruals, payments and expenses (including rationalization, legal, tax, structuring and other costs and expenses), or any amortization thereof, related to the Transactions (including all Transaction Expenses), acquisitions, Investments, dividends, Dispositions, or any amortization thereof, issuances of Indebtedness or Equity Interests permitted under the Loan Documents or repayment of debt, issuance of equity securities, initial public offering, refinancing transactions or amendment or other modification of any debt instrument (in each case, including any such transaction consummated on the Closing Date and any such transaction undertaken but not completed),

(x)    to the extent not already included in Consolidated Net Income, proceeds of business interruption insurance (to the extent actually received),

(xi)    cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added back,

(xii)    any non-cash increase in expenses (A) resulting from the revaluation of inventory (including any impact of changes to inventory valuation policy methods including changes in capitalization of variances) or other inventory adjustments, or (B) due to purchase accounting associated with the Transactions, or any acquisition constituting an Investment permitted under this Agreement consummated prior to or after the Closing Date,

(xiii)    the amount of any expense or reduction of Consolidated Net Income consisting of Subsidiary income attributable to minority interests or non-controlling interests of third parties in any non-wholly owned Subsidiary, *minus* the amount of dividends or distributions that are paid in cash by such non-wholly owned Subsidiary to such third party; *provided* that the amount of such cash dividends or distributions deducted pursuant to this clause (xiii) in any Test Period shall not exceed such third party's *pro rata* share of the Consolidated EBITDA (to the extent positive) of such non-wholly owned Subsidiary for such Test Period,

(xiv)    letter of credit fees,

(xv)    [reserved],

11

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

(xvi)     any Equity Funded Employee Plan Costs,

(xvii)    any net loss from disposed, abandoned or discontinued operations or product lines,

(xviii)   any costs or expenses incurred relating to environmental remediation, litigation or other disputes in respect of events and exposures that occurred prior to the Closing Date, and

(xix)     expenses during such period in connection with earn-outs and other deferred payments in connection with any acquisitions constituting an Investment permitted under this Agreement, to the extent included in the calculation of Consolidated Net Income in accordance with GAAP as an accounting adjustment to the extent that the actual amount payable or paid in respect of such earn-outs or other deferred payments exceeds the liability booked by the applicable Person therefor,

*minus* (b) without duplication and to the extent included in arriving at such Consolidated Net Income, (i) non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period), (ii) any net gain from disposed, abandoned or discontinued operations or product lines and (iii) the amount of any minority interest income consisting of Subsidiary losses attributable to minority interests or non-controlling interests of third parties in any non-wholly owned Subsidiary; *provided* that:

(A)      to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA (x) currency translation gains and losses related to currency remeasurements of Indebtedness (including the net loss or gain (i) resulting from Swap Contracts for currency exchange risk and (ii) resulting from intercompany indebtedness) and (y) all other foreign currency translation gains or losses to the extent such gains or losses are non-cash items;

(B)      to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any adjustments resulting from the application of FASB Accounting Standards Codification 815 and International Accounting Standard No. 39 and their respective related pronouncements and interpretations; and

(C)      to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any income (loss) for such period attributable to the early extinguishment of (i) Indebtedness, (ii) obligations under any Swap Contracts or (iii) other derivative instruments.

Notwithstanding anything to the contrary contained herein, for purposes of determining Consolidated EBITDA under this Agreement for any period that includes the fiscal quarter ended (i) September 30, 2020 Consolidated EBITDA for the fiscal quarter ended September 30, 2020 shall be deemed to be the greater of (a) Consolidated EBITDA calculated in accordance with the terms of this Agreement for such fiscal quarter and (b) $2,000,000 and (ii) December 31, 2020, Consolidated EBITDA for the fiscal quarter ended December 31, 2020 shall be deemed to be the greater of (a) Consolidated EBITDA calculated in accordance with the terms of this Agreement for such fiscal quarter and (b) $2,000,000.  For the avoidance of doubt, Consolidated EBITDA shall be calculated, including pro forma adjustments, in accordance with Section 1.09.

"**Consolidated First Lien Net Debt**" means, as of any date of determination, the aggregate principal amount of Indebtedness of the Borrower and its Subsidiaries outstanding on such date, in an amount that would be reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with the Transactions or any acquisition constituting an Investment permitted under

12

this Agreement) consisting of Indebtedness for borrowed money, purchase money debt and Attributable Indebtedness and debt obligations evidenced by promissory notes or similar instruments that is secured by a Lien on any asset or property of the Borrower or any Subsidiary, including Indebtedness under the ABL Credit Agreement, but excluding any such Indebtedness in which the applicable Liens are expressly subordinated or junior to the Liens securing the First Lien Obligations (other than as between the Liens securing the ABL Obligations and the Liens securing the First Lien Obligations in accordance with the Intercreditor Agreement) *minus* the aggregate amount of cash and Cash Equivalents included on the consolidated balance sheet of the Borrower and the Subsidiaries as of such date, free and clear of all Liens (other than Liens permitted by Section 7.01); *provided* that Consolidated First Lien Net Debt shall not include Indebtedness in respect of letters of credit, except to the extent of unreimbursed amounts thereunder; *provided* that any unreimbursed amount under commercial letters of credit shall not be counted as Consolidated First Lien Net Debt until three Business Days after such amount is drawn.  For the avoidance of doubt, it is understood that obligations under Swap Contracts and Treasury Services Agreements do not constitute Consolidated First Lien Net Debt.

"**Consolidated First Lien Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated First Lien Net Debt as of the last day of such Test Period to (b) Consolidated EBITDA for such Test Period.

"**Consolidated Interest Expense**" shall mean, with respect to any Person for any period, the sum of (1) interest expense (including that attributable to obligations with respect to Capital Leases), net of interest income of such Person and its Subsidiaries with respect to all outstanding Indebtedness of such Person and its Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under hedging agreements, *plus* (2) non-cash interest expense resulting solely from pay in kind interest expense of such Person and its Subsidiaries, but excluding, for the avoidance of doubt, (a) amortization of deferred financing costs, debt issuance costs, commissions, fees and expenses and any other amounts of non-cash interest other than referred to in clause (2) above (including as a result of the effects of acquisition method accounting or pushdown accounting), (b) non-cash interest expense attributable to the movement of the mark-to-market valuation of Indebtedness or obligations under derivative instruments pursuant to FASB Accounting Standards Codification Topic 815—Derivatives and Hedging, (c) any one-time cash costs associated with breakage in respect of hedging agreements for interest rates, (d) any "additional interest" owing pursuant to a registration rights agreement with respect to any securities, (fe) any payments with respect to make whole premiums or other breakage costs of any Indebtedness, including, without limitation, any Indebtedness issued in connection with the Transactions, (gf) penalties and interest relating to taxes, (hg) accretion or accrual of discounted liabilities not constituting Indebtedness, (ih) interest expense attributable to a direct or indirect parent entity resulting from pushdown accounting, (ji) any expense resulting from the discounting of Indebtedness in connection with the application of recapitalization or purchase accounting, and (kj) any interest expense attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential), with respect thereto and with respect to the Transactions, any acquisition or Investment permitted hereunder, all as calculated on a consolidated basis.

"**Consolidated Net Income**" means, for any period, the net income (loss) of the Borrower and the Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; *provided*, *however*, that, without duplication,

> (a)    any after-tax effect of extraordinary items (including gains or losses and all fees and expenses relating thereto) for such period shall be excluded,

> (b)    the cumulative effect of a change in accounting principles during such period to the extent included in Consolidated Net Income shall be excluded,

> (c)    accruals and reserves that are established or adjusted within 12 months after the Closing Date that are so required to be established or adjusted as a result of the Transactions (or within 12 months after the closing of any acquisition that are so required to be established or adjusted

13

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

as a result of such acquisition) in accordance with GAAP or changes as a result of adoption or modification of accounting policies in accordance with GAAP shall be excluded,

(d)      any net after-tax effect of gains or losses (*less* all fees, expenses and charges relating thereto) attributable to asset dispositions or abandonments or the sale or other disposition of any Equity Interests of any Person, in each case other than in the ordinary course of business, as determined in good faith by the Borrower, shall be excluded,

(e)      the net income (loss) for such period of any Person that is not a Subsidiary of the Borrower, or that is accounted for by the equity method of accounting, shall be excluded; *provided* that Consolidated Net Income of the Borrower shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents (or to the extent subsequently converted into cash or Cash Equivalents) to the Borrower or a Subsidiary thereof in respect of such period,

(f)      any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a change in law or regulation, in each case, pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP shall be excluded,

(g)      any non-cash compensation charge or expense, including any such charge or expense arising from the grants of stock appreciation or similar rights, stock options, restricted stock or other rights or equity incentive programs or any other equity-based compensation shall be excluded, and any cash charges associated with the rollover, acceleration or payout of Equity Interests by management of the Borrower or any of its direct or indirect parents in connection with the Transactions or an initial public offering, shall be excluded,

(h)      any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment, Permitted Acquisition or any sale, conveyance, transfer or other disposition of assets permitted under this Agreement, to the extent actually reimbursed, or, so long as the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is (A) not denied by the applicable indemnitor in writing within 180 days of the occurrence of such event and (B) in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365-day period), shall be excluded,

(i)      to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount (A) is not denied by the applicable carrier in writing within 180 days of the occurrence of such event and (B) is in fact reimbursed within 365 days of the date of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within such 365 days), expenses, charges or losses with respect to liability or casualty events or business interruption shall be excluded, and

(j)      the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of the Borrower or is merged into or consolidated with the Borrower or any of its Subsidiaries or such Person's assets are acquired by the Borrower or any of its Subsidiaries shall be excluded (except to the extent required for any calculation of Consolidated EBITDA on a Pro Forma Basis in accordance with Section 1.09).

There shall be excluded from Consolidated Net Income for any period the purchase accounting effects of adjustments in component amounts required or permitted by GAAP (including in the inventory, property and equipment, software, goodwill, intangible assets, in-process research and development, deferred revenue

14

and debt line items thereof) and related authoritative pronouncements (including the effects of such adjustments pushed down to the Borrower and the Subsidiaries), as a result of the Transactions, any acquisition constituting an Investment permitted under this Agreement consummated prior to or after the Closing Date, or the amortization or write-off of any amounts thereof.  For the avoidance of doubt, Consolidated Net Income shall be calculated, including *pro forma* adjustments, in accordance with Section 1.09.

"**Consolidated Net Sales**" means, for any period, the net sales of the Borrower and the Subsidiaries in the ordinary course of business calculated in accordance with GAAP.

"**Continuing Directors**" means the directors of Holdings on the Closing Date, as elected or appointed after giving effect to the Transactions, directors appointed in accordance with any stockholders agreement entered into by and among Holdings and its stockholders and each other director, if, in each case, such other director's nomination for election to the board of directors of Holdings is recommended by a majority of the then Continuing Directors or such other director receives the vote of, or is appointed or otherwise approved by, prior to a Qualified IPO by the Borrower or a Relevant Public Company, or those Permitted Holders which then hold a majority of the voting Equity Interests in Holdings then held by all Permitted Holders, in each case in his or her election by the holders of Equity Interests in Holdings necessary to elect such director.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" has the meaning set forth in the definition of "Affiliate."

"**Conversion**" has the meaning set forth in Section 2.04(a).

"**Conversion Effective Date**" has the meaning set forth in Section 2.04(b).

"**Conversion Notice**" has the meaning set forth in Section 2.04(b).

"**Credit Extension**" means a Borrowing.

"**Cure Amount**" has the meaning set forth in Section 8.04(a).

"**Cure Expiration Date**" has the meaning set forth in Section 8.04(a).

"**Current Assets**" means, with respect to the Borrower and the Subsidiaries on a consolidated basis at any date of determination, all assets (other than cash and Cash Equivalents) that would, in accordance with GAAP, be classified on a consolidated balance sheet of the Borrower and its Subsidiaries as current assets at such date of determination, other than amounts related to current or deferred Taxes based on income or profits (but excluding assets held for sale, loans (permitted) to third parties, pension assets, deferred bank fees and derivative financial instruments).

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtors**" has the meaning set forth in the preliminary statements to this Agreement.

"**Declined Proceeds**" has the meaning set forth in Section 2.05(b)(viii).

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, without cure or waiver hereunder, would be an Event of Default.

"**Default Rate**" means an interest rate equal to (a) the Base Rate *plus* (b) the Applicable Rate, if any, applicable to Base Rate Loans *plus* (c) 2.0% per annum; *provided* that with respect to a Eurocurrency Rate

15

Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan *plus* 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

"**Defaulting Lender**" means any Lender whose acts or failure to act, whether directly or indirectly, cause it to meet any part of the definition of Lender Default.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale or issuance of Equity Interests (other than directors' qualifying shares or other shares required by applicable Law) in a Subsidiary) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Disqualified Competitor**" means such Persons who are competitors of the Borrower and its Subsidiaries that are separately identified in writing by the Borrower to the Administrative Agent from time to time, and any of their Affiliates (other than any such Affiliate that is affiliated with a financial investor in such Person and that is not itself an operating company or otherwise an Affiliate of an operating company so long as such Affiliate is a bona fide Fund) that are either (a) identified in writing by the Borrower to the Administrative Agent from time to time or (b) clearly identifiable on the basis of such Affiliate's name (it being agreed that the Administrative Agent shall be entitled to conclusively rely on such Person's representations in the applicable Assignment and Assumption).

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than (i) solely for Qualified Equity Interests and cash in lieu of fractional shares or (ii) solely at the discretion of the issuer), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable), (b) is redeemable at the option of the holder thereof (other than (i) solely for Qualified Equity Interests and cash in lieu of fractional shares or (ii) as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale or similar event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable), in whole or in part, (c) provides for the scheduled payments of dividends in cash or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 91 days after the Maturity Date at the time of issuance of such Equity Interests; *provided* that if such Equity Interests are issued pursuant to a plan for the benefit of employees of Holdings (or any direct or indirect parent thereof), the Borrower or the Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by the Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"**Disqualified Competitor**" means such Persons who are competitors of the Borrower and its Subsidiaries that are separately identified in writing by the Borrower to the Administrative Agent from time to time, and any of their Affiliates (other than any such Affiliate that is affiliated with a financial investor in such Person and that is not itself an operating company or otherwise an Affiliate of an operating company so long as such Affiliate is a bona fide Fund) that are either (a) identified in writing by the Borrower to the Administrative Agent from time to time or (b) clearly identifiable on the basis of such Affiliate's name.

"**Distressed Person**" has the meaning set forth in the definition of "Lender-Related Distress Event."

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

16

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" has the meaning set forth in Section 10.07(a)(i).

"**Embargoed Person**" has the meaning set forth in Section 6.21(c).

"**EMU Legislation**" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"**Enforcement Qualifications**" has the meaning set forth in Section 5.04.

"**Environment**" means indoor air, ambient air, surface water, groundwater, drinking water, land surface, subsurface strata, and natural resources such as wetlands, flora and fauna.

"**Environmental Laws**" means any applicable Law relating to the prevention of pollution or the protection of the Environment and natural resources, and the protection of human health and safety as it relates to the Environment.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of investigation and remediation, fines, penalties or indemnities), of the Loan Parties or any Subsidiary resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage or treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement to the extent liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Funded Employee Plan Costs**" means cash costs or expenses, incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or stockhareholder agreement, to the extent funded with cash proceeds contributed to the capital of the Borrower or net cash proceeds of an issuance of Qualified Equity Interests of the Borrower or Equity Interests of any direct or indirect parent of the Borrower (other than any amount designated as a Cure Amount).

"**Equity Interests**" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities); *provided*, that any instrument evidencing Indebtedness convertible or exchangeable for Equity Interests shall not be deemed to be Equity Interests unless and until such instrument is so converted or exchanged.

17

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is under common control with a Loan Party or any Subsidiary within the meaning of Section 414(b) or (c) of the Code or Section 4001 of ERISA (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code or Section 302 of ERISA).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by a Loan Party, any Subsidiary or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by a Loan Party, any Subsidiary or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization (within the meaning of Section 4241 of ERISA) or insolvent (within the meaning of Section 4245 of ERISA) or in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (d) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (e) the filing of a notice of intent to terminate, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for, and that could reasonably be expected to result in, the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) with respect to a Pension Plan, the failure to satisfy the minimum funding standard of Section 412 of the Code or Section 302 of ERISA, whether or not waived; (h) a failure by a Loan Party, any Subsidiary or any ERISA Affiliate to make a required contribution to a Multiemployer Plan; (i) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could reasonably be expected to result in liability to a Loan Party or any Subsidiary; or (j) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon a Loan Party, any Subsidiary or any ERISA Affiliate.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Euro**", "**EUR**" and "**€**" mean the lawful currency of the Participating Member States introduced in accordance with the EMU Legislation.

"**Eurocurrency Rate**" means:

(a)    for any Interest Period with respect to a Eurocurrency Rate Loan, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the commencement of such Interest Period by reference to the interest settlement rates for deposits in Dollars (as published by Reuters on page LIBOR01 of the Reuters Screen or the applicable Markit desktop) (as set forth by (i) the Intercontinental Exchange Group, or (ii) any publicly available successor service or entity that has been authorized by the U.K. Financial Conduct Authority to administer the London Interbank Offered Rate for a period equal to such Interest Period), and

(b)    for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on such date by reference to the interest settlement rates for deposits in Dollars (as published by Reuters on page LIBOR01 of the Reuters Screen or the applicable Markit desktop) from time to time with a term of one month (as set forth by (i) the Intercontinental Exchange Group, or (ii) any publicly available successor service or entity that has been authorized by the U.K. Financial Conduct Authority to administer the London Interbank Offered Rate),

in the case of clauses (a) and (b) above, multiplied by Statutory Reserves, provided that, in the case of clauses (a) and (b) above, the Eurocurrency Rate with respect to Term Loans, shall not be less than 1.00% per annum;

18

*provided further* that, subject to clauses (i) and (ii) of immediately succeeding sentence, if the Administrative Agent is unable to determine the Eurocurrency Rate for the relevant interest period under clause (a) or (b), the Administrative Agent shall use the Eurocurrency Rate for the immediately preceding interest period. Notwithstanding the foregoing:

(i)     subject to clause (ii) below, if on the relevant Eurocurrency determination date the relevant London interbank offered rate for U.S. dollar deposits has been discontinued, then the Administrative Agent shall use (a) an industry-accepted successor rate to the relevant London interbank offered rate for U.S. dollar deposits or (b) if no such industry-accepted successor rate exists, the most comparable substitute or successor rate to the relevant London interbank offered rate for U.S. dollar deposits, in each case as determined by ~~a financial agent (which may be an affiliate of the Administrative Agent) appointed by the Administrative Agent~~the Required Lenders; and

(ii)    ~~if the financial agent has determined a substitute or successor rate, the Administrative Agent shall notify the Borrower and the Lenders of such rate and,~~ upon approval of such rate by the Required Lenders, the Borrower, the Administrative Agent and the Required Lenders agree to enter into any amendments to this Agreement that are necessary to implement such rate.

The Administrative Agent ~~and financial agent~~ shall be held harmless for any acts or omissions in connection with the calculation of the Eurocurrency Rate in accordance with clauses (i) and (ii) of the preceding sentence.

"**Eurocurrency Rate Loan**" means a Loan that bears interest at a rate based on clause (a) of the definition of "Eurocurrency Rate."

"**Event of Default**" has the meaning set forth in Section 8.01.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded Assets**" means (i) any fee owned real property (other than Material Real Properties) and any leasehold rights and interests in real property (including landlord waivers, estoppels and collateral access letters), (ii) motor vehicles, airplanes and other assets subject to certificates of title, to the extent a Lien therein cannot be perfected by the filing of a UCC financing statement, (iii) [reserved], (iv) governmental licenses, state or local franchises, charters and authorizations and any other property and assets to the extent that the Administrative Agent may not validly possess a security interest therein under, or such security interest is restricted by, applicable Laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or the pledge or creation of a security interest in which would require governmental consent, approval, license or authorization, other than to the extent such prohibition or limitation is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition (but excluding proceeds of any such governmental license), (v) any lease, license, permit or agreement to the extent that, and so long as, a grant of a security interest therein (A) is prohibited by applicable Law other than to the extent such prohibition is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition or (B) to the extent and for so long as it would violate the terms thereof (in each case, after giving effect to the relevant provisions of the UCC or other applicable Laws) or would give rise to a termination right thereunder in favor of a party thereto other than the Borrower or a Guarantor (except to the extent such provision is overridden by the UCC or other applicable Laws), in each case, other than the proceeds thereof and (a) excluding any such agreement that relates to a Permitted Refinancing of any of the foregoing and (b) only to the extent that and for so long as such limitation on such pledge or security interest is otherwise permitted under Section 7.09, (vi) Margin Stock, (vii) Equity Interests and assets of captive insurance Subsidiaries, (viii) assets of non-Loan Party Immaterial Subsidiaries, (ix) Equity Interests in joint ventures and non-wholly owned Subsidiaries, in each case, which cannot be pledged without the consent of a third party (that is not a Loan Party), to the extent such consent has not been obtained (other than to the extent such limitation is rendered ineffective under the UCC or other applicable law), (x) any property subject to a Lien permitted by Section 7.01(u) or (aa) (to the extent relating to a Lien originally incurred pursuant to Section 7.01(u)) to the extent that a grant of a security interest therein would violate or invalidate such underlying obligations or create a right of

19

termination in favor of any other party thereto (other than a Loan Party) or otherwise require consent thereunder (after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law), (xi) letter of credit rights, except to the extent constituting support obligations for other Collateral as to which perfection of the security interest in such other Collateral is accomplished solely by the filing of a UCC financing statement (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement), (xii) any assets to the extent a security interest in such assets could reasonably be expected to result in material adverse tax consequences as reasonably determined by the Borrower, (xiii) [reserved], (xiv) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application (or any registration that issues therefrom) under applicable federal law and (xv) assets where the cost of obtaining a security interest therein exceeds the practical benefit to the Lenders afforded thereby as agreed by the Borrower and the Administrative Agent (at the direction of the Required Lenders) in writing; *provided*, *however*, that Excluded Assets shall not include any Proceeds, substitutions or replacements of any Excluded Assets referred to in clauses (i) through (xv) (unless such Proceeds, substitutions or replacements would independently constitute Excluded Assets referred to in clauses (i) through (xv)).  The Borrower shall not be required to take any action under the law of any non-U.S. jurisdiction to create or perfect a security interest in any assets located outside the United States or any other assets that require such action, including any intellectual property registered in any non-U.S. jurisdiction (and no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction shall be required).

"**Excluded Subsidiary**" means (a) any Subsidiary that is not a wholly owned Domestic Subsidiary of the Borrower or a Guarantor, (b) any Subsidiary that is prohibited or restricted by applicable Law or by Contractual Obligations existing on the Closing Date (or, in the case of any newly acquired Subsidiary, in existence at the time of acquisition but not entered into in contemplation thereof) from guaranteeing the Obligations or if guaranteeing the Obligations would require governmental (including regulatory) consent, approval, license or authorization or could result in material adverse tax consequences as reasonably determined by the Borrower, (c) any other Subsidiary with respect to which, in the reasonable judgment of the Borrower and the ~~Administrative Agent~~Required Lenders, the burden or cost of providing a Guarantee shall be excessive in view of the benefits to be obtained by the Lenders therefrom, (d) any not-for-profit Subsidiaries, (e) [reserved], (f) [reserved], (g) any CFC Holding Company, (h) any Domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary that is a CFC, (i) captive insurance Subsidiaries and (j) each other Subsidiary acquired pursuant to a Permitted Acquisition permitted hereunder and financed with assumed secured Indebtedness, and each Subsidiary acquired in such Permitted Acquisition permitted hereunder that guarantees such Indebtedness, in each case to the extent that, and for so long as, the documentation relating to such Indebtedness to which such Subsidiary is a party prohibits such Subsidiary from guaranteeing the Obligations and such prohibition was not created in contemplation of such Permitted Acquisition permitted hereunder.

"**Excluded Swap Obligation**" means, with respect to any Guarantor, any Swap Obligation, if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of such Guarantor or the grant of the security interest would otherwise have become effective with respect to such Swap Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof).

"**Executive Order**" has the meaning set forth in Section 6.21(a).

<p style="text-align:center">20</p>

"**Excluded Account**" means any (a) deposit accounts specially and exclusively used in the ordinary course of business for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any Loan Party's salaried employees, which accounts are funded only in the ordinary course of business, (b) pension fund accounts, 401(k) accounts and trust accounts and (c) withholding tax and other tax accounts, fiduciary accounts, escrow accounts and other accounts in which any Loan Party holds funds on behalf of any third party.

"**Existing Debt**" means all Indebtedness for borrowed money of the Borrower and its Affiliates under (i) the Pre-Petition First Lien Credit Agreement and (ii) that certain Second Lien Credit Agreement, dated as of June 30, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Pre-Petition Second Lien Credit Agreement**") by and among the Borrower, the guarantors party thereto from time to time, the Bank of New York Mellon (or its successor, if appointed), as administrative agent, and the lenders party thereto from time to time (the "**Pre-Petition Second Lien Lenders**").

"**Existing Letters of Credit**" means any letters of credit outstanding on the Closing Date described in Schedule 2.03. Schedule 2.03 contains a description of all Existing Letters of Credit and sets forth, with respect to each such Existing Letter of Credit, (i) the name of the issuing lender, (ii) the letter of credit number, (iii) the name(s) of the account party or account parties, (iv) the stated amount (including the currency in which such letter of credit is denominated), (v) the name of the beneficiary and (vi) the expiry date.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), or any current or future Treasury regulations or other administrative guidance promulgated thereunder, and any intergovernmental agreements implementing the foregoing. , and any related fiscal or regulatory legislation, rules or official administrative practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities implementing the foregoing..

"**FCPA**" means the United States Foreign Corrupt Practices Act of 1977, as amended.

"**Federal Funds Effective Rate**" means, for any day, the rate per annum equal to the rates on overnight Federal funds transactions with members of the Federal Reserve System (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time), as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent from three brokers of recognized standing selected by it; provided further that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"**Fee Letters**" means [●].

"**FIRREA**" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"**First Lien Administrative Agent**" has the meaning assigned to the term "Administrative Agent" under and as defined in the First Lien Credit Agreement and shall include any successor administrative agent under the FirstLienFirst Lien Credit Agreement.

"**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as foof the date hereof, by and among the Borrower, the Holdcos, the other Guarantors from time to time party thereto, the lenders party thereto from time to time and [●],Cantor Fitzgerald Securities, as administrative agent for such lenders.

21

"**First Lien Loan Documents**" means the "Loan Documents" as defined in the First Lien Credit Agreement.

"**First Lien Obligations**" means the "Obligations" (or any comparable term) as defined in the First Lien Credit Agreement.

"**First Lien Secured Obligations**" means the "First Lien ~~Secured~~ Obligations" as defined in the Intercreditor Agreement.

"**First Lien Term Facility**" means the First Lien Term Loans and commitments in respect thereof.

"**First Lien Term Loans**" means the "Term Loans" (or any comparable term) as defined in the First Lien Credit Agreement.

"**Fitch**" means Fitch Ratings, Inc.

"**Flood Insurance Laws**" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"**Foreign Casualty Event**" has the meaning set forth in Section 2.05(b)(vi).

"**Foreign Disposition**" has the meaning set forth in Section 2.05(b)(vi).

"**Foreign Subsidiary**" means any direct or indirect Subsidiary which is not a Domestic Subsidiary.

"**Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**GAAP**" means generally accepted accounting principles in the United States of America, as in effect from time to time; *provided*, *however*, that, subject to Section 1.03, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof (including through conforming changes made consistent with IFRS) on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof (including through conforming changes made consistent with IFRS), then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national body exercising such powers or functions, such as the European Union or the European Central Bank).

"**Granting Lender**" has the meaning set forth in Section 10.07(h).

"**Guarantee**" means, as to any Person, without duplication, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment or performance of such Indebtedness, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash

22

flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning set forth in Section 11.01.

"**Guarantors**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement" and shall include each Holdco, the Borrower (solely with respect to its Secured Obligations other than its direct Secured Obligations as a primary obligor (as opposed to a guarantor) under the Loan Documents) and each Subsidiary of the Borrower that shall have become a Guarantor pursuant to Section 6.11 or 6.20, in any case until released in accordance with the terms hereof,  it being understood and agreed that the Borrower in its sole discretion may (with the consent of the Administrative Agent, (at the direction of the Required Lenders), such consent not to be unreasonably withheld) cause any Subsidiary that is not a Guarantor to Guarantee the Obligations by causing such Subsidiary to execute a Joinder Agreement, and any such Subsidiary shall be a Guarantor, Loan Party and Subsidiary Guarantor hereunder for all purposes; *provided*, *however*, that that Administrative Agent (at the direction of the Required Lenders) may condition its consent by limiting the purposes for which such Subsidiary shall constitute a Loan Party and Subsidiary Guarantor for purposes of Section 7 and related definitions used therein.

"**Guaranty**" means, collectively, the guaranty of the Obligations by the Guarantors pursuant to this Agreement.

"**Hazardous Materials**" means all materials, pollutants, contaminants, chemicals, compounds, constituents, substances or wastes, in any form, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, mold, medical waste, in each case regulated under Environmental Laws.

"**Holdcos**" means Holdings and Intermediate Holdings.

"**Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**IFRS**" means international accounting standards as promulgated by the International Accounting Standards Board.

"**Immaterial Subsidiary**" means any Subsidiary that is not a Material Subsidiary.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following:

(a)        all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)        the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances, bank guarantees, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)        net obligations of such Person under any Swap Contract;

(d)        all obligations of such Person to pay the deferred purchase price of property or services;

(e)        indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or

23

other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)        all Attributable Indebtedness;

(g)        all obligations of such Person in respect of Disqualified Equity Interests if and to the extent that the foregoing would constitute indebtedness or a liability in accordance with GAAP; and

(h)        to the extent not otherwise included above, all Guarantees of such Person in respect of Indebtedness described in clauses (a) through (g) in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall (A) include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Consolidated First Lien Net Debt, (B) in the case of the Borrower and its Subsidiaries, exclude all intercompany Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business and (C) exclude (i) trade accounts and accrued expenses payable in the ordinary course of business, (ii) any earn-out obligation until such obligation is not paid after becoming due and payable, (iii) accruals for payroll and other liabilities accrued in the ordinary course of business and (iv) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of Indebtedness of any Person for purposes of clause (e) that is expressly made non-recourse or limited recourse (limited solely to the assets securing such Indebtedness) to such Person shall be deemed to be equal to the lesser of (x) the aggregate unpaid amount of such Indebtedness and (y) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Liabilities**" has the meaning set forth in Section 10.05.

"**Indemnified Taxes**" means, with respect to any Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, all Taxes imposed on or with respect to any payment under any Loan Documents, other than (i) any Taxes imposed on or measured by its net income, however denominated, and franchise (and similar) Taxes imposed on it in lieu of net income Taxes, imposed by a jurisdiction as a result of such recipient being organized in or having its principal office or, in the case of any Lender, applicable Lending Office in such jurisdiction, or as a result of any other present or former connection between such recipient and such jurisdiction, other than any connections arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, receiving payments under, or enforcing, any Loan Document, (ii) any Taxes attributable to the failure of ~~such~~the Administrative Agent or Lender to comply with Section 3.01(e), (iii) any branch profits Taxes imposed by the United States under Section 884(a) of the Code, or any similar Tax, imposed by any  jurisdiction described in clause (a), (iv) in the case of a Lender (other than an assignee pursuant to a request by the Borrower under Section 3.07(a)), any U.S. federal withholding Tax that is in effect and would apply to amounts payable hereunder pursuant to a Law in effect at the time such Lender becomes a party to this Agreement, or designates a new Lending Office, except to the extent such Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrower or any Guarantor with respect to such withholding Tax pursuant to Section 3.01, and (v) any ~~U.S. federal~~ withholding Taxes imposed under FATCA.

"**Indemnitees**" has the meaning set forth in Section 10.05.

"**Independent Financial Advisor**" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged and that is independent of the Borrower and its Affiliates.

24

"**Information**" has the meaning set forth in Section 10.08.

"**Intellectual Property Security Agreement**" has the meaning set forth in the Security Agreement.

"**Intercompany Note**" means a promissory note substantially in the form of Exhibit G.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of the date hereof, by and among the Administrative Agent, as second lien credit agreement administrative agent, the ABL Agent, the First Lien Administrative Agent, as first lien credit agreement administrative agent and the Borrower and Guarantors party thereto.

"**Interest Coverage Ratio**" shall mean as of any date of determination with respect to any Person, the ratio of (i) Consolidated EBITDA of such Person for the Test Period most recently ended on or prior to such date of determination to (ii) the sum of (x) solely to the extent paid in cash during the applicable period, Consolidated Interest Expense of such Person for the Test Period most recently ended on or prior to such date of determination plus (y) all regularly scheduled cash dividend payments (excluding items eliminated in consolidation) on any series of Disqualified Equity Interests made during such period, in each case on a Pro Forma Basis.

"**Interest Payment Date**" means, (a) as to any Eurocurrency Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; *provided* that if any Interest Period for a Eurocurrency Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date.

"**Interest Period**" means, as to each Eurocurrency Rate Loan, the period commencing on the date such Eurocurrency Rate Loan is disbursed or converted to or continued as a Eurocurrency Rate Loan and ending on the date one, two, three or six months thereafter or to the extent agreed by each Lender of such Eurocurrency Rate Loan, 12 months or less than one month (but other than a one week period unless consented to by, the Administrative Agent), thereafter, as selected by the Borrower in its Committed Loan Notice; *provided* that:

(a) any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b) any Interest Period (other than an Interest Period having a duration of less than one month) that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c) no Interest Period shall extend beyond the Maturity Date.

"**Intermediate Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and its Subsidiaries, intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business) or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made), without adjustment for subsequent increases or

25

decreases in the value of such Investment, less any Returns of the Borrower or a Subsidiary in respect of such Investment.

"**IP Rights**" has the meaning set forth in Section 5.15.

"**Joinder Agreement**" means a joinder agreement substantially in the form of Joinder Agreement attached as Exhibit I hereto or in such other form agreed by the Administrative Agent.

"**Judgment Currency**" has the meaning assigned to such term in Section 10.20.

"**Laws**" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Lender**" has the meaning set forth in the introductory paragraph to this Agreement and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender."

"**Lender Default**" means a Distressed Person has admitted in writing that it is insolvent or such Distressed Person becomes subject to a Lender-Related Distress Event.

"**Lender-Related Distress Event**" shall mean, with respect to any Lender or any other Person that directly or indirectly controls such Lender (each, a "**Distressed Person**"), (i) such Distressed Person has become subject to a Bail-in Action and/or (ii) a voluntary or involuntary case with respect to such Distressed Person under any debt relief law, or a custodian, conservator, receiver, or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person, or any Person that directly or indirectly controls such Distressed Person or is subject to a forced liquidation or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any governmental authority having regulatory authority over such Distressed Person to be, insolvent or bankrupt; *provided* that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Lender or any Person that directly or indirectly controls such Lender by a governmental authority or an instrumentality thereof.

"**Lending Office**" means, as to any Lender, such office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Lien**" means, with respect to any asset, any mortgage, deed of trust, pledge, hypothecation, collateral assignment, security deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest of any kind or nature in respect of such asset (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing).

"**Loan**" means an extension of credit under Article II by a Lender to the Borrower in the form of a Term Loan.

"**Loan Documents**" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Collateral Documents, (iv) the Intercreditor Agreement, (v) the Agent Fee Letter, (vi) any other document or instrument designated by the Borrower and the Administrative Agent as a "Loan Document" and (vii) any amendment or joinder to this Agreement.

"**Loan Parties**" means, collectively, the Borrower and each Guarantor.

"**London Banking Day**" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

26

"**Make-Whole Amount**" means, as of any date of determination, an amount in cash equal to all interest that would have been paid on the Term Loans that are repaid or prepaid, from the date of repayment or prepayment (including following acceleration of the Term Loans) through and including the third anniversary of the Closing Date calculated on the basis of the interest rate with respect to the Term Loans that is in effect on the date of such repayment or prepayment, discounted to the date of repayment or prepayment on a quarterly basis (assuming a 365-day year and actual days elapsed) at a rate equal to the sum of the treasury rate plus 0.50%; provided, that following any acceleration, the Make-Whole Amount shall be reduced by the amount of any interest (other than interest payable at the Default Rate) accruing after the date of such acceleration that is actually paid in cash to the Lenders. The Borrower shall calculate the Make-Whole Amount in good faith.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Master Agreement**" has the meaning set forth in the definition of "Swap Contract."

"**Material Adverse Effect**" means any event, change or condition that, individually or in the aggregate, has had, or would reasonably be expected to have a material adverse effect on (i) the business, assets, financial condition or results of operations of the Borrower and its Subsidiaries, taken as a whole, (ii) the ability of the Borrower and the Guarantors (taken as a whole) to perform their payment obligations under any Loan Document to which the Borrower or any of the Loan Parties is a party or (iii) the material rights and remedies of the Administrative Agent and the Lenders under the Loan Documents, taken as a whole, including the legality, validity, binding effect or enforceability of the Loan Documents.

"**Material Domestic Subsidiary**" means, at any date of determination, each of the Borrower's Domestic Subsidiaries that are Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Subsidiaries for such period, in each case determined in accordance with GAAP; *provided* that if, at any time and from time to time after the Closing Date, Domestic Subsidiaries that are not Guarantors solely because they do not meet the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended fiscal quarter of the Borrower for which financial statements have been delivered pursuant to Section 6.01 or more than 5.0% of the consolidated gross revenues of the Borrower and the Subsidiaries for such Test Period, then the Borrower shall, not later than 45 days after the date by which financial statements for such quarter or Test Period, as applicable, are required to be delivered pursuant to this Agreement (or such longer period as the ~~Administrative Agent~~Required Lenders may agree in ~~its~~their reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of Section 6.11 applicable to such Subsidiary.

"**Material Foreign Subsidiary**" means, at any date of determination, each of the Borrower's Foreign Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Subsidiaries for such period, in each case determined in accordance with GAAP; *provided* that if, at any time and from time to time after the Closing Date, Foreign Subsidiaries not meeting the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended fiscal quarter of the Borrower for which financial statements have been delivered pursuant to Section 6.01 or more than 5.0% of the consolidated gross revenues of the Borrower and the Subsidiaries for such Test Period, then the Borrower shall, not later than 45 days after the date by which financial statements for such quarter or Test Period, as applicable, are required to be delivered pursuant to this Agreement (or such longer period as the ~~Administrative Agent~~Required Lenders may agree in ~~its~~their reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Foreign Subsidiaries as "Material Foreign Subsidiaries" to the

27

extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of the definition of "Collateral and Guarantee Requirement."

"**Material Non-Public Information**" means information which is (a) not publicly available, (b) material with respect to Holdings and its Subsidiaries or their respective securities for purposes of United States federal and state securities laws and (c) not of a type that would be publicly disclosed in connection with any issuance by Holdings or any of its Subsidiaries of debt or equity securities issued pursuant to a public offering, a Rule 144A offering or other private placement where assisted by a placement agent.

"**Material Real Property**" means any fee-owned Real Property located in the United States that is owned by any Loan Party and that has a fair market value in excess of $1,250,000 (at the Closing Date or, with respect to Real Property acquired after the Closing Date, at the time of acquisition, in each case, as reasonably estimated by the Borrower in good faith).

"**Material Subsidiary**" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"**Maturity Date**" means the date that is six months after the fifth anniversary of the Closing Date; *provided* that, if such day is not a Business Day, the Maturity Date shall be the Business Day immediately succeeding such day.

"**Maximum Accrual**" has the meaning set forth in Section 10.24.

"**Maximum Capital Expenditures Amount**" has the meaning set forth in Section 7.10.

"**Maximum Rate**" has the meaning set forth in Section 10.10.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgage Policies**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement."

"**Mortgaged Properties**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement."

"**Mortgages**" means collectively, the deeds of trust, trust deeds, hypothecs and mortgages made by the Loan Parties in favor or for the benefit of the Administrative Agent on behalf of the Secured Parties creating and evidencing a Lien on a Mortgaged Property in form and substance reasonably satisfactory to the Administrative Agent, and any other mortgage executed and delivered pursuant to Sections 6.11 and 6.13, in each case, as the same may from time to time be amended, restated, supplemented or otherwise modified.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which a Loan Party, any Subsidiary or any ERISA Affiliate makes or is obligated to make contributions, or has made or been obligated to make contributions.

"**Net Proceeds**" means:

(a)        100% of the cash proceeds actually received by the Borrower or any of the Subsidiaries (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards, but in each case only as and when received) from any Disposition or Casualty Event, net of (i) attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees and expenses actually incurred in connection therewith, (ii) the principal amount of any Indebtedness that is secured by a Lien (other than a Lien that ranks *pari passu* with or is subordinated to the Liens securing the Obligations) on the asset subject to such Disposition or Casualty Event and that is required to be repaid in connection with such Disposition or Casualty Event

28

(other than Indebtedness under the Loan Documents), together with any applicable premium, penalty, interest and breakage costs, (iii) in the case of any Disposition or Casualty Event by a non-wholly owned Subsidiary, the *pro rata* portion of the Net Proceeds thereof (calculated without regard to this clause (iii)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a wholly owned Subsidiary as a result thereof, (iv) Taxes or Tax Distributions paid or reasonably estimated to be payable or, without duplication, permitted to be paid as a result thereof (including any income or withholding Taxes imposed on any repatriation of such proceeds to the Borrower), (v) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) above) (x) related to any of the applicable assets and (y) retained by the Borrower or any of the Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Proceeds of such Disposition or Casualty Event occurring on the date of such reduction) and (vi) any funded escrow established pursuant to the documents evidencing any such sale or disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or disposition (*provided* that to the extent that any amounts are released from such escrow to the Borrower or a Subsidiary, such amounts net of any related expenses shall constitute Net Proceeds); and

(b)     100% of the cash proceeds from the incurrence, issuance or sale by the Borrower or any of the Subsidiaries of any Indebtedness, net of all taxes paid or reasonably estimated to be payable as a result thereof and fees (including investment banking fees and discounts), commissions, costs and other expenses, in each case incurred in connection with such incurrence, issuance or sale.

For purposes of calculating the amount of Net Proceeds, fees, commissions and other costs and expenses payable to the Borrower shall be disregarded.

"**Non-Consenting Lender**" has the meaning set forth in Section 3.07(d).

"**Non-Defaulting Lender**" means, at any time, a Lender that is not a Defaulting Lender.

"**Note**" means a promissory note of the Borrower payable to any Lender or its registered assigns, in substantially the form of Exhibit B hereto, evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Term Loans made by such Lender.

"**Notice of Intent to Cure**" has the meaning set forth in Section 8.04.

"**Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party and its Subsidiaries arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and of their Subsidiaries to the extent they have obligations under the Loan Documents) include (a) the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document, (b) the obligation to pay any applicable fee pursuant to Section 2.09(b) and (c) the obligation of any Loan Party to reimburse any amount in respect of any of the foregoing that any Lender may elect to pay or advance on behalf of such Loan Party in accordance with the terms of the Loan Documents.

"**OFAC**" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"**OID**" means original issue discount.

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

"**Old Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Old Intermediate Holdings**" has the meaning set forth in the preliminary statements to this Agreement.

"**Old Jason**" has the meaning set forth in the preliminary statements to this Agreement.

"**Order**": means any order, writ, judgement, injunction, decree, rule, ruling, directive, stipulation, determination or award made, issued or entered by the Bankruptcy Court or any other Governmental Authority, whether interim or final.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement or limited liability company agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" has the meaning set forth in Section 3.01(b).

"**Outstanding Amount**" means, with respect to the Term Loans, the outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Term Loans.

"**Overnight Rate**" means, for any day, the greater of the Federal Funds Effective Rate and an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"**Participant**" has the meaning set forth in Section 10.07(e).

"**Participant Register**" has the meaning set forth in Section 10.07(e).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time.

"**Perfection Certificate**" means a certificate substantially in the form of Exhibit II to the Security Agreement or any other form reasonably approved by the ~~Administrative Agent~~Required Lenders, as the same shall be supplemented from time to time.

"**Permitted Acquisition**" has the meaning set forth in Section 7.02(i).

["**Permitted Holders**" means each of Lenders and the First Lien Credit Agreement Lenders holding the common equity of Holdings on the Closing Date~~.~~].

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal, restructuring, replacement or extension of any Indebtedness of such Person; *provided* that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, restructured, refunded, renewed, replaced or extended except by an amount equal to unpaid accrued interest and premium thereon *plus* other amounts owing or paid related to such Indebtedness, and fees and expenses incurred, in connection with such

30

modification, refinancing, refunding, renewal, restructuring, replacement or extension *plus* an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e), such modification, refinancing, refunding, renewal, replacement or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended, (c) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e) or (f), at the time thereof, no Event of Default shall have occurred and be continuing, (d) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal, replacement or extension is subordinated in right of payment to the Obligations on terms (i) at least as favorable (taken as a whole) (as reasonably determined by the Borrower) to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended or (ii) as otherwise reasonably acceptable to the Administrative Agent, (e) if such Indebtedness being modified, refinanced, replaced, refunded, renewed or extended is Indebtedness permitted pursuant to Sections 7.03(s), 7.03(w), and 7.03(x), (i) to the extent such Indebtedness being modified, refinanced, replaced, refunded, renewed or extended is unsecured or secured by Liens that are subordinated to the Liens securing the Obligations, such modification, refinancing, replacement, refunding, renewal or extension is unsecured or (with respect to refinanced debt secured by Liens that are subordinated to the Liens securing the Obligations) secured by Liens that are subordinated to the Liens securing the Obligations on terms (x) at least as favorable (taken as a whole) (as reasonably determined by the Borrower) to the Lenders as those contained in the documentation (including any intercreditor or similar agreements) governing the Indebtedness being modified, refinanced, replaced, refunded, renewed or extended or (y) otherwise reasonably acceptable to the Administrative Agent and (ii) notwithstanding anything contained in Section 7.03(c), such modification, refinancing, refunding, renewal, replacement or extension is incurred only by one or more Persons who is an obligor of the Indebtedness being modified, refinanced, replaced, refunded, renewed or extended and (f) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is outstanding pursuant to the First Lien Credit Agreement or any other First Lien Loan Document, such modification, refinancing, refunding, renewal, replacement or extension does not violate the terms of the Intercreditor Agreement.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning set forth in the preliminary statements to this Agreement.

"**PIK Election**" has the meaning set forth in Section 2.08(c).

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established or maintained by any Loan Party or any Subsidiary or, with respect to any such plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA, any ERISA Affiliate.

"**Plan Effective Date**" has the meaning set forth in the preliminary statements to this Agreement.

"**Platform**" has the meaning set forth in Section 6.01(d).

"**Pledged Debt**" has the meaning set forth in the Security Agreement.

"**Pledged Equity**" has the meaning set forth in the Security Agreement.

"**Prepackaged Plan**" has the meaning set forth in the preliminary statements to this Agreement.

"**Pre-Petition First Lien Credit Agreement**" has the meaning set forth in the preliminary statements to this Agreement.

"**Pre-Petition First Lien Lenders**" has the meaning set forth in the preliminary statements to this Agreement.

31

"**Proceeding**" has the meaning set forth in Section 10.05.

"**Proceeds**" has the meaning set forth in the Security Agreement.

"**Pro Forma Balance Sheet**" has the meaning set forth in Section 5.05(b).

"**Pro Forma Basis**" and "**Pro Forma Effect**" means, with respect to compliance with any test or covenant or calculation of any ratio hereunder, the determination or calculation of such test, covenant or ratio (including in connection with Specified Transactions) in accordance with Section 1.09.

"**Pro Forma Financial Statements**" has the meaning set forth in Section 5.05(b).

"**Pro Rata Share**" means, with respect to each Lender, at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the Outstanding Amount of the Term Loans of such Lender at such time and the denominator of which is the Total Outstandings at such time.

"**Projections**" has the meaning set forth in Section 6.01(c).

"**Public Lender**" has the meaning set forth in Section 6.01(d).

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests.

"**Qualified IPO**" means the issuance by the Borrower or any direct or indirect parent of the Borrower of its common Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the U.S. Securities and Exchange Commission in accordance with the Securities Act (whether alone or in connection with a secondary public offering).

"**Quarterly Financial Statements**" means the unaudited consolidated balance sheets and related consolidated statements of income and cash flows of the Old Jason and its Subsidiaries for the fiscal quarter ended closest to June 30, 2020 and each subsequent fiscal quarter of the Company ended at least 45 days prior to the Closing Date.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned or leased by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures.

"**Register**" has the meaning set forth in Section 10.07(d).

"**Rejection Notice**" has the meaning set forth in Section 2.05(b)(viii).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"**Release**" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing or migrating in, into, onto or through the Environment or in an uncontained manner from or through any facility, property or equipment.

32

"**Relevant Public Company**" means Holdings or any direct or indirect parent thereof that (i) owns, directly or indirectly, 100% of the Equity Interests of Holdings and the Borrower and (ii) is the registrant with respect to a Qualified IPO.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the otherwise applicable notice period has been waived by regulation or otherwise by the PBGC.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the Total Outstandings; *provided* that the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Responsible Officer**" means the chief executive officer, president, vice president, chief financial officer, chief administrative officer, secretary or assistant secretary, treasurer or assistant treasurer, controller or other similar officer of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the Borrower's or a Subsidiary's equity holders, partners or members (or the equivalent Persons thereof).

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of June 5, 2020, by and among the Debtors and the Pre-Petition Lenders party thereto as Consenting Creditors (as defined therein).

"**Returns**" means, with respect to any Investment, any dividends, distributions, interest, fees, premium, return of capital, repayment of principal, income, profits (from a Disposition or otherwise) and other amounts received or realized in respect of such Investment.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Same Day Funds**" means immediately available funds.

"**Sanctions**" means all economic sanctions and regulations maintained by OFAC.

"**Sanctioned Person**" means any Person located, organized, or resident in Crimea, Cuba, Iran, North Korea, or Syria, and any Person named on any OFAC sanctions list, including OFAC's Specially Designated Nationals List, the Sectoral Sanctions Identifications List, and the Foreign Sanctions Evaders List.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

["**Second Lien Secured Obligations**" means the "~~Second~~Junior Lien ~~Secured~~ Obligations" as defined in the Intercreditor Agreement~~.~~].

"**Secured Obligations**" means, collectively, the Obligations, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise.

"**Secured Parties**" means, collectively, the Administrative Agent, the Lenders, and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.05.

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Security Agreement**" means a security agreement substantially in the form of Exhibit F.

"**Security Agreement Supplement**" has the meaning set forth in the Security Agreement.

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date (i) the sum of the debt (including contingent liabilities) of such Person and its Subsidiaries, taken as a whole, does not exceed the present fair saleable value of the assets of the Person and its Subsidiaries, taken as a whole; (ii) the capital of such Person and its Subsidiaries, taken as a whole, is not unreasonably small in relation to the business of such Person and its Subsidiaries, taken as a whole, contemplated as of the Closing Date; and (iii) such Person and its Subsidiaries, taken as a whole, do not intend to incur, or believe that they will incur, debts (including current obligations) beyond their ability to pay such debt as they mature in the ordinary course of business.  For the purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"**SPC**" has the meaning set forth in Section 10.07(h).

"**Specified Transaction**" means any Investment that results in a Person becoming a Subsidiary, any Permitted Acquisition or any Disposition that results in a Subsidiary ceasing to be a Subsidiary of the Borrower, any Investment constituting an acquisition of assets constituting a business unit, line of business or division of, or all or substantially all of the Equity Interests of, another Person or any Disposition of a business unit, line of business or division of the Borrower or a Subsidiary, in each case whether by merger, consolidation, amalgamation or otherwise, or any incurrence or repayment of Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility or line of credit for working capital purposes) or Restricted Payment, that by the terms of this Agreement requires such test to be calculated on a "Pro Forma Basis" or after giving "Pro Forma Effect."

"**Statutory Reserves**" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board of Governors of the Federal Reserve System of the United States (the "**Board**") and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the Board).  Eurocurrency Rate Loans shall be deemed to constitute Eurocurrency Liabilities (as defined in Regulation D of the Board) and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (excluding, for the avoidance of doubt, any charitable organizations, and any other Person that meets the requirements of Section 501(c)(3) of the Code) of which (i) a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, (ii) more than half of the issued share capital is at the time beneficially owned or (iii) the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" means any Guarantor other than the Borrower and the Holdcos.

34

"**Supermajority Lenders**" means, as of any date of determination, Lenders having more than 66.7% of the Total Outstandings; *provided* that the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of ~~Required~~Supermajority Lenders.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Target Person**" has the meaning set forth in Section 7.02.

"**Tax Distribution**" means any distribution made or permitted to be made pursuant to Section 7.06(h)(iii).

"**Tax Group**" has the meaning set forth in Section 7.06(h)(iii).

"**Taxes**" means all present or future taxes, duties, levies, imposts, assessments, withholdings (including backup withholding) or other similar charges imposed by any Governmental Authority including any interest, penalties and additions to tax applicable thereto.

"**Term Facility**" means the Term Loans and commitments in respect thereof~~."~~.

"**Term Loan**" means the term loan deemed made by the Lenders on the Closing Date to the Borrower pursuant to Section 2.01. As of the Closing Date, the aggregate amount of the Term Loans is $50,000,000.

"**Term Loan Priority Collateral**" has the meaning assigned to such term in the Intercreditor Agreement.

"**Test Period**" means, for any date of determination under this Agreement, the four consecutive fiscal quarters of the Borrower most recently ended as of such date of determination.

"**Threshold Amount**" means $11,000,000.

35

"**Total Assets**" means the total assets of the Borrower and the Subsidiaries on a consolidated basis in accordance with GAAP, as shown on the most recent balance sheet of the Borrower delivered pursuant to Section 6.01(a) or (b) or, for the period prior to the time any such statements are so delivered pursuant to Section 6.01(a) or (b), the Pro Forma Financial Statements.

"**Total Outstandings**" means the aggregate Outstanding Amount of all Loans.

"**Transaction Expenses**" means any fees or expenses incurred or paid by Holdings, Intermediate Holdings, the Borrower or any of their respective Subsidiaries in connection with the Transactions (including expenses in connection with hedging transactions), this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby.

"**Transactions**" means, collectively, (a) the deemed funding of the Term Loans on the Closing Date and the execution, delivery and performance of the Loan Documents to be entered into on the Closing Date, (b) the funding of any ABL Loans on the Closing Date, issuance of any Letters of Credit (as defined in the ABL Credit Agreement) and the execution, delivery and performance of the ABL Loan Documents to be entered into on the Closing Date, (c) the deemed funding of the First Lien Term Loans under the First Lien Credit Agreement on the Closing Date and the execution, delivery and performance of the First Lien Loan Documents to be entered into on the Closing Date, (ed) the extinguishment of the Existing Debt in accordance with the Prepackaged Plan, (fe) the restructuring of the Holdcos and certain of their Subsidiaries pursuant to the Prepackaged Plan, the Chapter 11 Cases and any related transactions and (gf) the payment of Transaction Expenses earned, due and payable on the Closing Date.

"**Transferred Guarantor**" has the meaning set forth in Section 11.09.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a Eurocurrency Rate Loan.

"**Uniform Commercial Code**" or "**UCC**" means (i) the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or (ii) the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it applies to any item or items of Collateral. References in this Agreement and the other Loan Documents to specific sections of the Uniform Commercial Code are based on the Uniform Commercial Code as in effect in the State of New York on the Closing Date. In the event such Uniform Commercial Code is amended or another Uniform Commercial Code described in clause (ii) is applicable, such Section reference shall be deemed to be references to the comparable Section in such amended or other Uniform Commercial Code.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" has the meaning set forth in Section 3.01(e)(ii)(C).

"**USA Patriot Act**" means the USA PATRIOT ACT (Title III of Pub. Law 107-56 (signed into law October 26, 2001) (as amended from time to time).

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness.

"**Write-Down and Conversion Powers**" means with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

36

"**wholly owned**" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

**Section 1.02** **Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a) The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b) The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(c) Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(d) The term "including" is by way of example and not limitation.

(e) The word "or" is not exclusive.

(f) The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(g) In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(h) Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(i) For purposes of determining compliance with any Section of Article VII at any time, in the event that any Lien (other than Liens securing Indebtedness of the types described in clauses (v) through (z) of the proviso appearing in the last paragraph of Section 7.03, which shall at all times be deemed to be incurred in reliance on the applicable express exception therefor in Section 7.01), Investment, Disposition, Restricted Payment, Affiliate transaction, Contractual Obligation or prepayment of Indebtedness meets the criteria of one or more than one of the categories of transactions permitted pursuant to any clause of such Sections, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses as determined by the Borrower in its sole discretion at such time.

(j) All references to "knowledge" of any Loan Party or a Subsidiary of Holdings means the actual knowledge of a Responsible Officer.

(k) The words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(l) All references to any Person shall be constructed to include such Person's successors and assigns (subject to any restriction on assignment set forth herein) and, in the

37

case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(m)    The word "will" shall be construed to have the same meaning and effect as the word "shall."

(n)    All references to any Lender "making" or "funding" a Term Loan or a Term Loan being "made" or "funded" (or any similar concept) by a Lender shall, for all purposes hereunder, be a reference to the deemed making or funding of such Loan by such Lender or such Loan being deemed made or funded (or any similar concept) by such Lender.

**Section 1.03    Accounting Terms**.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.  Notwithstanding any other provision contained herein, (a) any lease that is treated as an operating lease for purposes of GAAP as of the Closing Date shall not be treated as Indebtedness, Attributable Indebtedness or as a Capitalized Lease and shall continue to be treated as an operating lease (and any future lease, if it were in effect on the Closing Date, that would be treated as an operating lease for purposes of GAAP as of the Closing Date shall be treated as an operating lease), in each case for purposes of this Agreement, notwithstanding any actual or proposed change in GAAP after the Closing Date and (b) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to (i) Statement of Financial Accounting Standards 141R or ASC 805 (or any other financial accounting standard having a similar result or effect) or (ii) any election under Financial Accounting Standards Codification No. 825—Financial Instruments, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of a Holdco, the Borrower or any Subsidiary at "fair value" as defined therein.

**Section 1.04    Rounding**.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

**Section 1.05    References to Agreements, Laws, Etc**.  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, refinancings, restatements, renewals, restructurings, extensions, supplements and other modifications thereto, but only to the extent that such amendments, refinancings, restatements, renewals, restructurings, extensions, supplements and other modifications are not prohibited by the Loan Documents; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

**Section 1.06    Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**Section 1.07    Timing of Payment or Performance**.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day.

**Section 1.08    [Reserved].**

38

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

**Section 1.09    Pro Forma Calculations**.  (a)  Notwithstanding anything to the contrary herein, financial ratios and tests, including the Interest Coverage Ratio and the Consolidated First Lien Net Leverage Ratio shall be calculated in the manner prescribed by this Section 1.09; *provided* that notwithstanding anything to the contrary in Section 1.09(b), (c) or (d), when calculating the Interest Coverage Ratio  or Consolidated First Lien Net Leverage Ratio for purposes of determining actual quarterly compliance with the financial covenants pursuant to Section 7.11 or Section 7.12, as applicable (and not compliance on a Pro Forma Basis for purposes of testing the permissibility of a transaction hereunder), the events described in this Section 1.09 that occurred subsequent to the end of the applicable Test Period shall not be given *pro forma* effect.  In addition, whenever a financial ratio or test is to be calculated on a *pro forma* basis, the reference to the "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which internal financial statements of Holdings are available (as determined in good faith by the Borrower); *provided* that, the provisions of this sentence shall not apply for purposes of calculating the Interest Coverage Ratio or the Consolidated First Lien Net Leverage Ratio for purposes of determining actual quarterly compliance with Section 7.11 or Section 7.12, as applicable (and not compliance on a Pro Forma Basis for purposes of testing the permissibility of a transaction hereunder), which shall be based on the financial statements delivered pursuant to Section 6.01(a) or (b), as applicable, for the relevant Test Period.

(b)    For purposes of calculating any financial ratio or test, Specified Transactions (with any incurrence or repayment of any Indebtedness in connection therewith to be subject to Section 1.09(d)) that have been made (i) during the applicable Test Period and (ii) if applicable as described in Section 1.09(a), subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio or test is made shall be calculated on a *pro forma* basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day (or, in case of the determination of Total Assets, the last day) of the applicable Test Period.  If since the beginning of any applicable Test Period any Person that subsequently became a Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Subsidiaries since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.09, then such financial ratio or test (or Total Assets) shall be calculated to give *pro forma* effect thereto in accordance with this Section 1.09.

(c)    [reserved].

(d)    In the event that the Borrower or any Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Indebtedness included in the calculations of any financial ratio or test (in each case, other than Indebtedness incurred or repaid under any revolving credit facility), (i)  during the applicable Test Period or (ii) subject to Section 1.09(a) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving *pro forma* effect to such incurrence or repayment of Indebtedness, to the extent required, as if the same had occurred on the last day of the applicable Test Period.

**Section 1.10    Exchange Rates; Currency**.  (a)  For purposes of determining compliance with Article VII with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Investment is incurred (so long as such Indebtedness or Investment, at the time incurred, made or acquired, was permitted hereunder).

(b) Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect the (i) adoption of the Euro by any member state of the European Union and any relevant market conventions or practices relating to the Euro or (ii) a change in currency of any other country and any relevant market conventions or practices relating to the change in currency.

39

**Section 1.11    Certifications**.    All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such person in his or her capacity solely as an officer or a representative of such Loan Party, on such Loan Party's behalf and not in such Person's individual capacity.

## ARTICLE II
## CREDIT EXTENSIONS

**Section 2.01    The Loans**.    Subject to the terms and conditions expressly set forth herein, each Lender, pursuant to the terms of the Prepackaged Plan, exchanged or otherwise agreed to deem satisfied a portion of the obligations held by it under the Pre-Petition First Lien Credit Agreement for an outstanding Term Loan under this Agreement in the amount set forth opposite such Lender's name on Schedule 2.01. Amounts borrowed under this Section 2.01 and repaid or prepaid may not be re-borrowed.  On the Closing Date, the Term Loans shall be [Eurocurrency] Rate Loans with an Interest Period of [threeone months].

**Section 2.02    Conversions and Continuations of Loans**.    (a)  Each conversion of Term Loans from one Type to the other and each continuation of Eurocurrency Rate Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent, which may be given by telephone..  Each such notice must be received by the Administrative Agent not later than (1) 12:00 noon New York City time three Business Days prior to the requested date of any continuation of Eurocurrency Rate Loans or any conversion of Base Rate Loans to Eurocurrency Rate Loans, and (2) 10:00 a.m. New York City time one Business Day prior to the requested date of the conversion of any Eurocurrency Rate Loans to Base Rate Loans.  Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery (including via email) to the Administrative Agent of a written Committed Loan Notice (and will not be effective until so confirmed), appropriately completed and signed by a Responsible Officer of the Borrower. Except as otherwise provided in Section 2.14, each conversion to or continuation of Eurocurrency Rate Loans shall be in a minimum principal amount of $500,000, or a whole multiple of $100,000 in excess thereof or such other multiple as the Administrative AgentRequired Lenders may agree from time to time.  Except as provided herein, conversion to Base Rate Loans shall be in a minimum principal amount of $250,000 or a whole multiple of $100,000 in excess thereof.  Each Committed Loan Notice (whether telephonic or written) shall specify (i) whether the Borrower is requesting a conversion of Term Loans from one Type to the other or a continuation of Eurocurrency Rate Loans, (ii) the requested date of the conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be converted or continued, (iv) the Type of Loans to which existing Term Loans are to be converted and (v) if applicable, the duration of the Interest Period with respect thereto.  If the Borrower fails to specify a Type of Loan in a Committed Loan Notice or fails to give a timely notice requesting a conversion or continuation, then the applicable Term Loans shall be converted to Base Rate Loans.  Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurocurrency Rate Loans. If the Borrower requests a conversion to or continuation of Eurocurrency Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month.

(b)    Following receipt of a Committed Loan Notice, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans or continuation described in Section 2.02(a).

(c)    Except as otherwise provided herein, a Eurocurrency Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurocurrency Rate Loan unless the Borrower pays the amount due, if any, under Section 3.05 in connection therewith.  During the occurrence and continuation of an Event of Default, the Administrative Agent or(at the direction of the Required Lenders) may require that no Loans may be converted to or continued as Eurocurrency Rate Loans and/or that any outstanding Eurocurrency Rate Loans be converted to Base Rate Loans.

(d)     The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurocurrency Rate Loans upon determination of such interest rate.  The determination of the Eurocurrency Rate by the Administrative Agent shall be conclusive in the absence of manifest error.

(e)     After giving effect to the initial Borrowing, all conversions of Term Loans from one Type to the other, and all continuations of Term Loans as the same Type, there shall not be more than [●]3 (or such greater amount as may be agreed by the Administrative Agent in its sole discretion) Interest Periods in effect.

**Section 2.03**     **[Reserved].**

**Section 2.04**     **Conversion**.

(a)     At any time on or after the first anniversary of the Closing Date but prior to the fourth anniversary of the Closing Date, and before such time as all principal and accrued and unpaid interest owing under this Agreement is paid in full and no Obligations remain outstanding pursuant to this Agreement, Supermajority Lenders (or, at any time on or after the fourth anniversary of the Closing Date and before such time as all principal and accrued and unpaid interest owing under this Agreement is paid in full and no Obligations remain outstanding pursuant to this Agreement, Required Lenders), shall have the right, at the option of Supermajority Lenders (or Required Lenders, as applicable), to convert the outstanding Obligations under the Loan Documents into Common Shares equal to the then outstanding Obligations under this Agreement divided by [●]2$13.50 (the **"Conversion"**).

(b)     The Supermajority Lenders (or Required Lenders, as applicable), will provide notice to Holdings of the Conversion (the "**Conversion Notice**"), and such Conversion Notice will set forth the date of the Conversion (the "**Conversion Effective Date**"), which Conversion Date shall not be earlier than the fifth Business Day following the date the Conversion Notice is delivered to Holdings.

(c)     [Obligations shall automatically convert into Common Shares upon the Conversion Effective Date. Common Shares issued upon the Conversion Effective Date shall be issued in the applicable Lender's name unless a Lender requests the Common Shares to be issued in a name other than the Lender's name by written notice to Holdings at least three Business Days prior to the Conversion Effective Date. The Lender or its applicable designee shall be deemed a stockholder of record on the Conversion Effective Date. ]3

(d)     Upon the Conversion, Holdings shall pay any documentary, stamp or similar issue or transfer tax due in the issue of Common Shares. However, the Lender shall pay any such tax which is due because the Lender requests the Common Shares to be issued in a name other than the Lender's name.

(e)      Holdings shall at all times reserve, out of its authorized but unissued Common Shares, a sufficient number of Common Shares to permit the conversion of all outstanding Obligations for Common Shares. No fractional Common Shares shall be issued upon conversion of Obligations, with any fractional share of Common Shares that would have been issuable upon the conversion of any Obligations rounded up to the nearest whole share of Common Shares.

(f)     Holdings covenants that all Common Shares delivered upon Conversion shall be newly issued shares or treasury shares, shall be duly authorized, validly issued, fully paid and nonassessable and shall be free from preemptive rights and free of any lien or adverse claim.

---

[2] NTD: Conversion price to come.

[3] NTD: Specific requirements of underlying governing agreement for Holding under review.

41

(g)      Holdings will endeavor promptly to comply with all federal and state securities laws regulating the offer and delivery of Common Shares upon Conversion, if any, and will list or cause to be approved for listing or included for quotation, as the case may be, such Common Shares on each national securities exchange or in the over-the-counter market or such other market, if any, on which the Common Shares are then listed or quoted.

(h)      Upon delivery of the Common Shares on the Conversion Effective Date, the Obligations shall automatically be extinguished and discharged for all purposes and each Lender shall cease to have any rights hereunder except the right to receive the Common Shares.

**Section 2.05    Prepayments**.

(a)      *Optional*.  (i) Subject to the Intercreditor Agreement, the Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay the Term Loans in whole or in part without premium or penalty (except as expressly set forth in Section 2.09(b)); *provided* that (1) such notice must be received by the Administrative Agent not later than 11:00 a.m. New York City time (A) three Business Days prior to any date of prepayment of Eurocurrency Rate Loans and (B) one Business Day prior to the date of prepayment of Base Rate Loans; (2) any prepayment of Eurocurrency Rate Loans shall be in a minimum principal amount of $500,000, or a whole multiple of $100,000 in excess thereof; and (3) any prepayment of Base Rate Loans shall be in a minimum principal amount of $250,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment.  The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such prepayment.  If such notice is given by the Borrower, unless rescinded pursuant to clause (iii) below, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a ~~Eurocurrency Rate~~ Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05.

(ii)      [Reserved].

(iii)      Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.05(a)(i) by notice to the Administrative Agent if such prepayment would have resulted from a refinancing of all or any portion of the ~~applicable Class~~Term Loans or occurrence of another event, which refinancing or event shall not be consummated or shall otherwise be delayed.

(iv)      Voluntary prepayments of any Term Loans permitted hereunder shall be applied ratably to the Term Loans then outstanding and shall be paid to the Lenders in accordance with their respective Pro Rata Shares of such prepayment).

(v)      [Reserved].

(vi)      In connection with any prepayment pursuant to this Section 2.05(a) consummated prior to the fourth anniversary of the Closing Date, the Borrower shall pay to each Lender the applicable fee required by Section 2.09(b).

(b)      **Mandatory**.

(i)      [reserved].

(ii)      Subject to the Intercreditor Agreement, if (1) the Borrower or any Subsidiary of the Borrower Disposes of any property or assets (other than any Disposition of any property or assets

42

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

permitted by Sections 7.05(a), (b), (c), (d), (e), (f), (g), (h), (i), (l), (m) (except as set forth in the proviso thereof and except to the extent such property is subject to a Mortgage), (n), (p), (q), (r) and (u)), or (2) any Casualty Event occurs, which results in the realization or receipt by the Borrower or Subsidiary of Net Proceeds, subject to Section 2.05(b)(vi), the Borrower shall cause to be prepaid on or prior to the date which is 5 Business Days after the date of the realization or receipt by the Borrower or any Subsidiary of such Net Proceeds, an aggregate principal amount of Term Loans in an amount equal to 100% of all such Net Proceeds; *provided* that (A) if at any time such prepayment would be required hereunder with respect to any ABL Priority Collateral at any time when any ABL Credit Agreement is in effect, the Net Proceeds of any such Disposition or Casualty Event that relate or are attributable to any such ABL Priority Collateral shall not be required to be applied to the prepayment of the Term Loans hereunder to the extent such Net Proceeds are required to prepay or repay the ABL Loans in order to remain in compliance with the "Borrowing Base" (as defined in the ABL Credit Agreement) under the ABL Credit Agreement (or any documentation governing any ABL Loans) and (B) if at any time such prepayment would be required hereunder with respect to any Term Loan Priority Collateral at any time when the First Lien Credit Agreement is in effect, the Net Proceeds of any such Disposition or Casualty Event that relate or are attributable to any such Term Loan Priority Collateral shall be first applied to the First Lien Obligations to the extent required under the First Lien Credit Agreement.

(iii)      Subject to the Intercreditor Agreement, if the Borrower or any Subsidiary incurs or issues any Indebtedness after the Closing Date not permitted to be incurred or issued pursuant to Section 7.03, the Borrower shall cause to be prepaid an aggregate principal amount of Term Loans in an amount equal to 100% of all Net Proceeds received therefrom on or prior to the date which is five Business Days after the receipt by the Borrower or such Subsidiary of such Net Proceeds.  In connection with any prepayment under this Section 2.05(b)(iii) is consummated in respect of all or any portion of the Term Loans on or prior to the third anniversary of the Closing Date, the Borrower shall pay to each Lender the applicable fee required by Section 2.09(b).

(iv)      [reserved].

(v)      [reserved].

(vi)      Notwithstanding any other provisions of this Section 2.05, (i) to the extent that the repatriation to the United States of any or all of the Net Proceeds of any Disposition by a Foreign Subsidiary ("**Foreign Disposition**") or the Net Proceeds of any Casualty Event incurred by a Foreign Subsidiary ("**Foreign Casualty Event**") would be (x) prohibited or delayed by applicable local law or (y) restricted by applicable material constituent documents, including as a result of minority ownership (so long as such restrictions were not implemented for the purpose of avoiding such mandatory prepayment requirements), an amount equal to the Net Proceeds that would be so affected were the Borrower to attempt to repatriate such cash will not be required to be applied to repay Term Loans at the times provided in this Section 2.05 so long, but only so long, as the applicable local law or applicable material constituent documents would not otherwise permit repatriation to the United States (Holdings, Intermediate Holdings, the Borrower and its Subsidiaries hereby agree to use all commercially reasonable efforts to overcome or eliminate any such restrictions on repatriation, even if the Borrower does not intend to actually repatriate such cash, so that an amount equal to the full amount of such Net Proceeds will otherwise be subject to repayment under this Section 2.05), and if within one year following the date on which the respective prepayment would otherwise have been required such repatriation of any of such affected Net Proceeds is permissible under the applicable local law or applicable material constituent documents, even if such cash is not actually repatriated at such time, an amount equal to the amount of the Net Proceeds will be promptly (and in any event not later than five Business Days) applied (net of an amount equal to the additional taxes of the Borrower, its Subsidiaries and the direct and indirect holders of Equity Interests in the Borrower that would be payable or reserved against and any additional costs that would be incurred as a result of a repatriation, whether or not a repatriation actually occurs) by the Borrower to the repayment of the Term Loans pursuant to this Section 2.05 and (ii) to the extent that the Borrower has determined in good faith that repatriation of any of or all the Net Proceeds of any Foreign Disposition or Foreign Casualty Event would have adverse tax cost consequences (including the

43

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

imposition of withholding Taxes) with respect to such Net Proceeds, an amount equal to such Net Proceeds that would be so affected will not be subject to repayment under this Section 2.05; *provided*, that in the case of each of clauses (i) and (ii), such nonpayment shall not constitute an Event of Default (and such amounts shall be available for working capital purposes of the Borrower and the Subsidiaries, subject to the prepayment provisions in this Section 2.05(b)(vi)).  For the avoidance of doubt, nothing in this Section 2.05 shall require the Borrower to cause any amounts to be repatriated to the United States (whether or not such amounts are used in or excluded from the determination of the amount of any mandatory prepayments hereunder).

(vii)     Each prepayment of Term Loans pursuant to this Section 2.05(b) shall be applied ratably to the Term Loans then outstanding and shall be paid to the Lenders in accordance with their respective Pro Rata Shares of such prepayment.

(viii)    The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made by the Borrower pursuant to clauses (i), (ii) and (iii) of this Section 2.05(b) at least three Business Days prior to the date of such prepayment.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the aggregate amount of such prepayment to be made by the Borrower.  The Administrative Agent will promptly notify each Lender of the contents of the Borrower's prepayment notice and of such Lender's Pro Rata Share of the prepayment.  Each Lender may reject all or a portion of its Pro Rata Share of any mandatory prepayment (such declined amounts, the "**Declined Proceeds**") of Term Loans required to be made pursuant to clauses (i), (ii) and (iii) of this Section 2.05(b) by providing written notice (each, a "**Rejection Notice**") to the Administrative Agent and the Borrower no later than 5:00 p.m. New York City time one Business Day after the date of such Lender's receipt of notice from the Administrative Agent regarding such prepayment; *provided*, *however*, in no event may the a Lender reject a prepayment that represents a refinancing of the Total Outstandings.  Each Rejection Notice from a given Lender shall specify the principal amount of the mandatory repayment of Term Loans to be rejected by such Lender.  If a Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Term Loans to be rejected, any such failure will be deemed an acceptance of such mandatory prepayment of Term Loans.  To the extent the Lenders elect to decline their Pro Rata Share of such Declined Proceeds, any Declined Proceeds remaining thereafter shall be retained by the Borrower.

(c)     *Interest, Funding Losses, Etc*.  All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a Eurocurrency Rate Loan on a date prior to the last day of an Interest Period therefor, any amounts owing in respect of such Eurocurrency Rate Loan pursuant to Section 3.05.

**Section 2.06     [Reserved].**

**Section 2.07     Repayment of Loans**.  So long as the Conversion shall not have occurred, the Borrower shall repay to the Administrative Agent for the ratable account of the Lenders on the Maturity Date for the Term Loans, the aggregate principal amount of all Term Loans outstanding on such date.

**Section 2.08     Interest**.  (a)  Subject to the provisions of Section 2.08(b), (i) each Eurocurrency Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurocurrency Rate, for such Interest Period *plus* the Applicable Rate and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate *plus* the Applicable Rate;.

(b)     During the continuance of an Event of Default, at the election of the Required Lenders, the Borrower shall pay interest on the Total Outstandings and any other overdue amounts owing by it hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued and unpaid interest on such amounts (including interest on past due interest) shall be due and payable upon written demand.

44

(c)	Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto, on the Maturity Date and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law; provided that, the Borrower may, in its sole discretion, by delivering a written notice thereof to the Administrative Agent by 11:00 a.m. at least [●]three (3) Business Days prior to the commencement of the applicable Interest Period with respect to any Term Loan, (or such later time as the Required Lenders may agree), elect (such election, a "PIK Election"): (i) to pay a portion of the Applicable Rate equal to (iand not less than or greater than) (A) 9.0% in the case of Eurocurrency Rate Loans and (iiB) 8.0% in the case of Base Rate Loans. of such interest in kind by adding such amounts so elected to the aggregate outstanding principal balance of the Term Loans, (such election, a "PIK Election") or (b) to pay all of the Applicable Rate in cash (such election, a "Cash Election"), provided, further, that, other than at the election of the Required Lenders during the continuance of an Event of Default, (which election shall govern and control over any election by the Borrower), absent a written notification to the Administrative Agent that the Borrower has chosen not to make a PIKCash Election (which notice shall be delivered no later than [●] a.m. [●] Business Days before the relevant Interest Period (or such later time as the Administrative Agent may agree))in accordance with this Section 2.08(c) with respect to any Interest Period, the Borrower shall be deemed to have delivered a written notice of PIK Election with respect to such Interest Period concurrently with the delivery of the Committed Loan Notice applicable thereto in the maximum principal amount permitted therebyof the Term Loans that are subject to such Committed Loan Notice.  The Borrower hereby makes a PIK Election for the period beginning on the Closing Date until the first Interest Payment Date.

Section 2.09	**Fees**.

(a)	The Borrower shall pay to the Administrative Agent such fees (including, but not limited to, administrative agent fees) as shall have been separately agreed upon in writing, including in the Agent Fee Letters, in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the Administrative Agent).

(b)	*Prepayment Premium*. (i) In the event that, prior to the third anniversary of the Closing Date, (A) the Borrower prepays any Term Loans pursuant to Section 2.05(a), (B) the Borrower prepays or refinances any Term Loans pursuant to Section 2.05(b)(iii) or (C) the outstanding principal amount of the Term Loans shall become due pursuant to Section 8.02, in each case, the Borrower shall pay to the Administrative Agent, for the ratable account of each of the Lenders, a premium of (x) 5.00% of the aggregate principal amount of the Term Loans so prepaid, refinanced or accelerated prior to the second anniversary of the Closing Date *plus* the Make-Whole Amount, (y) 5.00% of the aggregate principal amount of the Term Loans so prepaid, refinanced or accelerated on or after the second anniversary of the Closing Date but prior to the third anniversary of the Closing Date or (z) 2.00% of the aggregate principal amount of the Term Loans so prepaid, refinanced or accelerated on or after the third anniversary of the Closing Date but prior to the fourth anniversary of the Closing Date. It is agreed, for the avoidance of doubt, that no prepayment premium shall be payable on or after the fourth anniversary of the Closing Date. All such amounts payable pursuant to this Section 2.09(b) shall be due and payable on the date of the applicable prepayment, refinancing or acceleration.

(c)	THE LOAN PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE AMOUNTS SPECIFIED IN SECTION 2.09(b) IN CONNECTION WITH ANY ACCELERATION, IN EACH CASE, TO THE MAXIMUM EXTENT SUCH WAIVER IS PERMITTED UNDER APPLICABLE LAW.

45

The Loan Parties expressly agree that (i) the amounts specified in Section 2.09(b) are reasonable and the product of an arm's length transaction between sophisticated business people, ably represented by counsel, (ii) the amounts specified in Section 2.09(b) shall be payable notwithstanding the then prevailing market rates at the time payment is made, (iii) there has been a course of conduct between Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay the amounts specified in Section 2.09(b), (iv) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this provision, (v) their agreement to pay the amounts specified in Section 2.09(b) is a material inducement to the Lenders to accept the Term Loans pursuant to the Prepackaged Plan, and (vi) the amounts specified in Section 2.09(b) represent a good faith, reasonable estimate and calculation of the lost profits or damages of the Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to the Lenders or profits lost by the Lenders as a result of any early optional repayment, mandatory prepayment or early repayment due to acceleration of the Term Loans, as the case may be.

**Section 2.10    Computation of Interest and Fees**.  All computations of interest for Base Rate Loans when the Base Rate is determined in accordance with clause (b) of the definition thereof shall be made on the basis of a year of 365 days, or 366 days, as applicable, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**Section 2.11    Evidence of Indebtedness**.  (a)  The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for this purpose as a non-fiduciary agent for the Borrower, in each case in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be *prima facie* evidence absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender ~~made through the Administrative Agent~~, the Borrower shall execute and deliver to such Lender ~~(through the Administrative Agent)~~ a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b)    [Reserved].

(c)    Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.11(a), and by each Lender in its account or accounts pursuant to Section 2.11(a) shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

~~WEIL:\97566320\4\10143.0003~~WEIL:\97566320\8\10143.0003

**Section 2.12** **Payments Generally**. (a) All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office in Dollars and in Same Day Funds not later than 2:00 p.m. New York City time on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share provided for under this Agreement) of such payment in like funds as received by wire transfer to such Lender's applicable Lending Office. All payments received by the Administrative Agent after 2:00 p.m. New York City time shall in each case be deemed received (in the Administrative Agent's sole discretion) on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b) Except as otherwise provided herein, if any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; *provided* that, if such extension would cause payment of interest on or principal of Eurocurrency Rate Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

(c) Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder, that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto. If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then:

(i) if the Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in Same Day Funds at the applicable Overnight Rate from time to time in effect; and

(ii) if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Same Day Funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "**Compensation Period**") at a rate per annum equal to the applicable Overnight Rate from time to time in effect. When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing. If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing. Nothing herein shall be deemed to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(c) shall be conclusive, absent manifest error.

(d) [Reserved].

(e) [Reserved].

47

(f)      [Reserved].

(g)      Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03.  If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may (to the fullest extent permitted by mandatory provisions of applicable Law), but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the Outstanding Amount of all Loans outstanding at such time in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

(h)      Amounts to be applied to the prepayment of Term Loans in connection with any mandatory prepayments by the Borrower of the Term Loans pursuant to Section 2.05(b) shall be applied, as applicable, on a *pro rata* basis to the then outstanding Term Loans being prepaid irrespective of whether such outstanding Term Loans are Base Rate Loans or Eurocurrency Rate Loans; *provided* that if no Lenders exercise the right to waive a given mandatory prepayment of the Term Loans pursuant to Section 2.05(b)(viii), then, with respect to such mandatory prepayment, the amount of such mandatory prepayment shall be applied first to reduce outstanding Base Rate Loans.  Any amounts remaining after each such application shall be applied to prepay Eurocurrency Rate Loans.

**Section 2.13      Sharing of Payments**.  If, other than as provided elsewhere herein, any Lender shall obtain on account of the Loans made by it, any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase (in Dollars) from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, *pro rata* with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon.  For the avoidance of doubt, the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement as in effect from time to time (including the application of funds arising from the existence of a Defaulting Lender) or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder.  The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.13 and will in each case notify the Lenders following any such purchases or repayments.  Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

48

**Section 2.14**    [Reserved].

**Section 2.15**    [Reserved].

**Section 2.16**    [Reserved].

**Section 2.17**    **Defaulting Lenders**.

(a)    *Adjustments*.    Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law, such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.01.

(b)    *Defaulting Lender Cure*.    If the Borrower and the Administrative Agent, agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will cease to be a Defaulting Lender.

**Section 2.18**    **Effect of Benchmark Transition Event**.

(a)    *Benchmark Replacement*.    Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent (with the consent of the Required Lenders) and the Borrower may amend this Agreement to replace the Eurocurrency Rate with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders accept such amendment. No replacement of Eurocurrency Rate with a Benchmark Replacement pursuant to this Section 2.18 will occur prior to the applicable Benchmark Transition Start Date.

(b)    *Benchmark Replacement Conforming Changes*.    In connection with the implementation of a Benchmark Replacement, the Administrative Agent will join with the Borrower in any amendment implementing have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement except as may be required by the definition of Benchmark Replacement Conforming Changes; provided that the Administrative Agent shall not be obligated to enter into any such amendment that might expose it to personal liability and in the event of any ambiguity shall be entitled to seek the consent of the Required Lenders and shall have no liability to any Person for any delay caused by such consent.

(c)    *Notices, Standards for Decisions and Determinations*.    Each Lender will promptly notify the Borrower, the Administrative Agent and the other Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Lenders pursuant to this Section 2.18, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to

49

take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.18.

(d)    *Benchmark Unavailability Period*.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During any Benchmark Unavailability Period, the component of Base Rate based upon Eurocurrency Rate will not be used in any determination of Base Rate.

(e)    *Certain Defined Terms*.  As used in this Section 2.18:

"**Benchmark Replacement**" means the sum of: (a) the alternate benchmark rate (which may include Term SOFR) that has been selected by the Required Lenders and the Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to Eurocurrency Rate for U.S. dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; *provided* that, if the Benchmark Replacement as so determined would be less than zero, the Benchmark Replacement will be deemed to be zero for the purposes of this Agreement.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of Eurocurrency Rate with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Required Lenders and the Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of Eurocurrency Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of Eurocurrency Rate with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time.

"**Benchmark Replacement Conforming Changes**" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Borrower determines in good faith may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Borrower or the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Borrower and Required Lenders determine that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Borrower determines in good faith is reasonably necessary in connection with the administration of this Agreement).

"**Benchmark Replacement Date**" means the earlier to occur of the following events with respect to Eurocurrency Rate:

(1)    in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of Eurocurrency Rate permanently or indefinitely ceases to provide Eurocurrency Rate; or

(2)    in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

50

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to Eurocurrency Rate:

(1)      a public statement or publication of information by or on behalf of the administrator of Eurocurrency Rate announcing that such administrator has ceased or will cease to provide Eurocurrency Rate, permanently or indefinitely, *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide Eurocurrency Rate;

(2)      a public statement or publication of information by the regulatory supervisor for the administrator of Eurocurrency Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for Eurocurrency Rate, a resolution authority with jurisdiction over the administrator for Eurocurrency Rate or a court or an entity with similar insolvency or resolution authority over the administrator for Eurocurrency Rate, which states that the administrator of Eurocurrency Rate has ceased or will cease to provide Eurocurrency Rate permanently or indefinitely, *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide Eurocurrency Rate; or

(3)      a public statement or publication of information by the regulatory supervisor for the administrator of Eurocurrency Rate announcing that Eurocurrency Rate is no longer representative.

"**Benchmark Transition Start Date**" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the [90th] day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than [90] days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Required Lenders, as applicable, by notice to the Borrower, the Administrative Agent and the Lenders.

"**Benchmark Unavailability Period**" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to Eurocurrency Rate and solely to the extent that Eurocurrency Rate has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced Eurocurrency Rate for all purposes hereunder in accordance with Section 2.18 and (y) ending at the time that a Benchmark Replacement has replaced Eurocurrency Rate for all purposes hereunder pursuant to Section 2.18.

"**Early Opt-in Election**" means the occurrence of:

(1)      a notification by the Required Lenders to the Administrative Agent (with a copy to the Borrower) that the Required Lenders have determined that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in this Section 2.18, are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace Eurocurrency Rate, and

(2)      the election by the Required Lenders to declare that an Early Opt-in Election has occurred and the provision by the Required Lenders of written notice of such election to the Administrative Agent (with a copy to the Borrower).

"**Federal Reserve Bank of New York's Website**" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"**Relevant Governmental Body**" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

51

"**SOFR**" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"**Term SOFR**" means the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"**Unadjusted Benchmark Replacement**" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

## ARTICLE III
## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

**Section 3.01    Taxes**.  (a)  Except as provided in this Section 3.01, any and all payments made by or on account of the Borrower or any Guarantor under any Loan Document shall be made free and clear of and without deduction for any Taxes, except to the extent required by any Laws.  If the Borrower, any Guarantor or other applicable withholding agent shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Loan Document to anythe Administrative Agent or any Lender, (i) if the Tax in question is an Indemnified Tax or Other Tax, the sum payable by the Borrower or any Guarantor shall be increased as necessary so that after all required deductions for Indemnified Taxes or Other Taxes have been made (including deductions applicable to additional sums payable under this Section 3.01), each Lender (or, in the case of a payment made to anthe Administrative Agent for its own account, suchthe Administrative Agent) receives an amount equal to the sum it would have received had no such deductions for Indemnified Taxes or Other Taxes been made, (ii)  the applicable withholding agent shall make such deductions, (iii) the applicable withholding agent shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Laws, and (iv) within 30 days after the date of such payment (or, if receipts or evidence are not available within 30 days, as soon as possible thereafter), if the Borrower or any Guarantor is the applicable withholding agent, it shall furnish to suchthe Administrative Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof or other evidence acceptable to suchthe Administrative Agent or Lender.

(b)    In addition, the Borrower agrees to pay any and all present or future stamp, court or documentary Taxes and any other excise, property, intangible or mortgage recording Taxes, imposed by any Governmental Authority, which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document excluding, in each case, any such Tax imposed as a result of an Agent orthe Administrative Agent's or any Lender's Assignment and Assumption, grant of a participation, transfer or assignment to or designation of a new applicable Lending Office or other office for receiving payments under any Loan Document (collectively, "**Assignment Taxes**") if such Assignment Tax is imposed as a result of a present or former connection of the assignor or assignee with the jurisdiction imposing such Assignment Tax (other than any connection arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, receiving payments under, and/or enforcing or receiving or perfecting a security interest under any Loan Document), except for Assignment Taxes resulting from assignment or participation that is requested or required in writing by the Borrower (all such non-excluded taxes described in this Section 3.01(b) being hereinafter referred to as "**Other Taxes**").

(c)    The Borrower and each Guarantor agree to indemnify eachthe Administrative Agent and each Lender, within 10 days after demand therefor, for (i) the full amount of Indemnified Taxes and Other Taxes paid or payable by suchthe Administrative Agent or such Lender (including Indemnified Taxes or Other Taxes imposed on or attributable to amounts payable under this Section 3.01) and (ii) any expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the Governmental Authority.  A certificate as to the amount of such payment or liability prepared in good faith and delivered by suchthe Administrative Agent or Lender (or by an Agentthe Administrative on behalf of such Lender), accompanied by a written statement thereof setting forth in reasonable detail (provided

52

that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) the basis and calculation of such amounts shall be conclusive absent manifest error.

(d)     Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.07(e) relating to the maintenance of a Participant Register and (iii) any Taxes excluded from the definition of Indemnified Taxes that are attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)     Each Lender and Agent shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Law or reasonably requested by the Borrower or the Administrative Agent certifying as to any entitlement of such Lender to an exemption from, or reduction in, any applicable withholding Tax with respect to any payments to be made to such Lender or Agent under the Loan Documents.  Each such Lender and the Administrative Agent shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documentation required below in this Section 3.01(e)) obsolete, expired or inaccurate in any material respect, deliver promptly and on or before the date such documentation expires, becomes obsolete or inaccurate to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and the Administrative Agent in writing of its inability to do so.  In addition, each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with such other documentation prescribed by Law or reasonably requested by the Borrower or Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether such Lender or Administrative Agent is subject to backup withholding or information reporting requirements.  Notwithstanding any other provision of this Section 3.01(e), a Lender or an the Administrative Agent shall not be required to deliver any form pursuant to this Section 3.01(e) that such Lender or such Agent the Administrative is not legally eligible to deliver.  Without limiting the foregoing:

(i)     Each Lender that is a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) two properly completed and duly signed original copies of Internal Revenue Service Form W-9 certifying that such Lender is exempt from federal backup withholding.

(ii)     Each Lender that is not a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(A)     two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN (or any successor forms) claiming eligibility for the benefits of an income tax treaty to which the United States is a party,

53

(B)    two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)    in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (A) a certificate substantially in the form of Exhibit H hereto (any such certificate a "**United States Tax Compliance Certificate**") and (B) two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN (or any successor forms),

(D)    to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or has sold a participation), Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, Form W-8BEN, United States Tax Compliance Certificate, Form W-9, Form W-8IMY or any other required information from each beneficial owner, as applicable (*provided* that, if the Lender is a partnership (and not a participating Lender) and if one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

(E)    two properly completed and duly signed original copies of any other form prescribed by applicable U.S. federal income tax laws (including the Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, United States federal withholding tax on any payments to such Lender under the Loan Documents.

(iii)    ~~Each~~If the Administrative Agent ~~that~~ is a "United States person" (as defined in Section 7701(a)(30) of the Code~~)~~), it shall deliver to the Borrower ~~and the Administrative Agent~~ two properly completed and duly signed original copies of Internal Revenue Service Form W-9 with respect to fees received on its own behalf, certifying that ~~such~~the Administrative Agent is exempt from federal backup withholding.

(iv)    ~~Each~~If the Administrative Agent ~~that~~ is not a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower ~~and the Administrative Agent~~ two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI with respect to fees received on its own behalf.

(v)    If a payment made to a Lender or the Administrative Agent under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender or the Administrative Agent were to fail to comply with the applicable reporting requirements of FATCA, such Lender or the Administrative Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by Laws and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Laws and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender or the Administrative Agent has or has not complied with such Person's obligations under FATCA and, if necessary, to determine the amount to deduct and withhold from such payment.  Solely for purposes of this Section 3.01(e)(v), "FATCA" shall include any amendments made to FATCA after the Closing Date.

(f)    ~~Any~~The Administrative Agent or any Lender ~~or Agent~~ claiming any additional amounts payable pursuant to this Section 3.01 shall use its commercially reasonable efforts (subject to such Lender's or Administrative Agent's overall internal policies of general application and legal and regulatory restrictions) to mitigate or reduce the additional amounts payable, which commercially reasonable efforts may include a change in the jurisdiction of its Lending Office (or any other measures reasonably requested by the Borrower) if such a change or other measures would reduce any such additional amounts (or any

54

similar amount that may thereafter accrue) and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender.

(g)      If any Lender or Agent determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Indemnified Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by a Loan Party pursuant to this Section 3.01, it shall promptly remit such refund to such Loan Party (but only to the extent of indemnification or additional amounts paid by the Loan Party under this Section 3.01 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including any Taxes) of the Lender or Administrative Agent, as the case may be, and without interest (other than any interest paid by the relevant taxing authority with respect to such refund net of any Taxes payable by ~~any~~the Administrative Agent or any Lender on such interest); *provided* that the Loan Parties, upon the request of the Lender or Administrative Agent, as the case may be, agree promptly to return such refund (*plus* any penalties, interest or other charges imposed by the relevant taxing authority) to such party in the event such party is required to repay such refund to the relevant taxing authority.  This Section 3.01 shall not be construed to require ~~any~~the Administrative Agent or any Lender to make available its tax returns (or any other information relating to Taxes that it deems confidential) to any Loan Party or any other person.

**Section 3.02**     **Illegality**.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Eurocurrency Rate Loans, or to determine or charge interest rates based upon the Eurocurrency Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, in each case after the Closing Date then, on written notice thereof by such Lender to the Borrower ~~through~~and the Administrative Agent, any obligation of such Lender to make or continue Eurocurrency Rate Loans or to convert Base Rate Loans to Eurocurrency Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower shall promptly following written demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all applicable Eurocurrency Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Rate Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurocurrency Rate Loans.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment or conversion under Section 3.05.  Each Lender agrees to use commercially reasonable efforts (subject to such Lender's overall internal policies of general application and legal and regulatory restrictions) to designate a different Lending Office if such designation will avoid the need for such notice, will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender.

**Section 3.03**     **Inability to Determine Rates**. If the Administrative Agent or the Required Lenders determine after the Closing Date that for any reason adequate and reasonable means do not exist for determining the applicable Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan, or that the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that Dollar deposits are not being offered to banks in the London interbank eurodollar, or other applicable, market for the applicable amount and the Interest Period of such Eurocurrency Rate Loan, the Administrative Agent will promptly so notify the Borrower in writing and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Eurocurrency Rate Loans or to convert Base Rate Loans to Eurocurrency Rate Loans shall be suspended and (y) in the event of a determination described in the preceding sentence with respect to the Eurocurrency Rate component of the Base Rate, the utilization of the Eurocurrency Rate component in determining the Base Rate shall be suspended, in each case, until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of

55

such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of such Eurocurrency Rate Loans or, failing that, will be deemed to have converted such request, if applicable, into a request for a Borrowing of Base Rate Loans in the amount specified therein.

**Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; Eurocurrency Rate Loan Reserves**.  (a)  If any Lender reasonably determines that as a result of the introduction of or any change in or in the interpretation of any Law, in each case after the Closing Date, or such Lender's compliance therewith, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any Eurocurrency Rate Loans, or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.04(a) any such increased costs or reduction in amount resulting from (i) Indemnified Taxes or Other Taxes indemnified pursuant to Section 3.01, or any Taxes excluded from the definition of (x) "Indemnified Taxes" or (y) "Other Taxes" or (ii) reserve requirements contemplated by Section 3.04(c)) and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining the Eurocurrency Rate Loan (or of maintaining its obligations to make any Loan), or to reduce the amount of any sum received or receivable by such Lender, then from time to time within 15 Business Days after written demand by such Lender setting forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) such increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction. Notwithstanding anything herein to the contrary, for all purposes under this Agreement, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change in Law, regardless of the date enacted, adopted or issued.

(b)    If any Lender determines that the introduction of any Law regarding capital adequacy or liquidity requirements or any change therein or in the interpretation thereof, in each case after the Closing Date, or compliance by such Lender (or its Lending Office) therewith, has the effect of reducing the rate of return on the capital of such Lender or any company controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and such Lender's desired return on capital), then from time to time promptly following written demand of such Lender setting forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction within 15 Business Days after receipt of such demand. Notwithstanding anything herein to the contrary, for all purposes under this Agreement, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change in Law, regardless of the date enacted, adopted or issued.

(c)    The Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits, additional interest on the unpaid principal amount of each applicable Eurocurrency Rate Loan of the Borrower equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive in the absence of manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the the funding of any Eurocurrency Rate Loans of the Borrower, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs

56

allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such Loan, *provided* the Borrower shall have received at least 15 Business Days' prior written notice (with a copy to the Administrative Agent) of such additional interest or cost from such Lender. If a Lender fails to give notice 15 Business Days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable 15 Business Days from receipt of such notice.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation.

(e)     If any Lender requests compensation under this Section 3.04, then such Lender will, if requested by the Borrower, use commercially reasonable efforts (subject to such Lender's overall internal policies of general application and legal and regulatory restrictions) to designate another Lending Office for any Loan affected by such event; *provided* that such efforts are made on terms that, in the commercially reasonable judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no material economic, legal or regulatory disadvantage and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender; *provided*, *further*, that nothing in this Section 3.04(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.04(a), (b), (c) or (d).

Section 3.05     **Funding Losses**.  Promptly following written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail (provided that the Lender need not be required to disclose any price sensitive or confidential information or to the extent prohibited by law or regulation) the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense (excluding loss of anticipated profits and calculated without giving effect to any interest rate floor) actually incurred by it as a result of:

(a)     any continuation, conversion, payment or prepayment of any Eurocurrency Rate Loan of the Borrower on a day other than the last day of the Interest Period for such Loan; or

(b)     any failure by the Borrower to prepay, borrow, continue or convert any Eurocurrency Rate Loan of the Borrower on the date or in the amount notified by the Borrower;

including any loss or expense (excluding loss of anticipated profits) arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Eurocurrency Rate Loan made by it at the Eurocurrency Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Eurocurrency Rate Loan was in fact so funded.

Section 3.06     **Matters Applicable to All Requests for Compensation**.     (a)     ~~Any~~The Administrative Agent or any Lender claiming compensation under this Article III shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error.  In determining such amount, ~~such~~the Administrative Agent or such Lender may use any reasonable and customary averaging and attribution methods.

(b)     With respect to any Lender's claim for compensation under Section 3.02, 3.03 or 3.04, the Borrower shall not be required to compensate such Lender for any amount incurred if such Lender notifies the Borrower of the event that gives rise to such claim more than 180 days after such event; *provided*, that if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  If any Lender requests

57

compensation by the Borrower under Section 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another applicable Eurocurrency Rate Loan, or, if applicable, to convert Base Rate Loans into Eurocurrency Rate Loan, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(c) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)     If the obligation of any Lender to make or continue any Eurocurrency Rate Loan, or to convert Base Rate Loans into Eurocurrency Rate Loans shall be suspended pursuant to Section 3.06(b) hereof, such Lender's applicable Eurocurrency Rate Loans shall be automatically converted into Base Rate Loans (or, if such conversion is not possible, repaid) on the last day(s) of the then current Interest Period(s) for such Eurocurrency Rate Loans (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to such conversion no longer exist:

(i)     to the extent that such Lender's Eurocurrency Rate Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's applicable Eurocurrency Rate Loans shall be applied instead to its Base Rate Loans; and

(ii)     all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as Eurocurrency Rate Loans shall be made or continued instead as Base Rate Loans (if possible), and all Base Rate Loans of such Lender that would otherwise be converted into Eurocurrency Rate Loans shall remain as Base Rate Loans.

(d)     If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of any of such Lender's Eurocurrency Rate Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurocurrency Rate Loans made by other Lenders are outstanding, if applicable, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurocurrency Rate Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurocurrency Rate Loans and by such Lender are held *pro rata* (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Term Loans.

**Section 3.07     Replacement of Lenders under Certain Circumstances**.  (a)  If at any time (i) the Borrower becomes obligated to pay additional amounts or indemnity payments described in Section 3.01 or 3.04 as a result of any condition described in such Sections or any Lender ceases to make any Eurocurrency Rate Loans as a result of any condition described in Section 3.02 or 3.04 or requires the Borrower to pay additional amounts as a result thereof, (ii) any Lender becomes a Defaulting Lender or (iii) any Lender becomes a Non-Consenting Lender, then the Borrower may, on five (5) Business Days' prior written notice to the Administrative Agent and such Lender, (x) replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.07(b) (so long as the assignment fee is paid by the Borrower in such instance) all of its rights and obligations under this Agreement to one or more Eligible Assignees; *provided* that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person; *provided*, *further*, that (A) in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments and (B) in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to, and shall be sufficient (together with all other consenting Lenders) to cause the adoption of, the applicable departure, waiver or amendment of the Loan Documents; or (y) in the case of a Lender, repay (in Dollars) all Obligations of the Borrower due and owing to such Lender relating to the Loans held by such Lender as of such termination date; *provided* that in the case of any such termination of

58

a Non-Consenting Lender such termination shall be sufficient (together with all other consenting Lenders after giving effect hereto) to cause the adoption of the applicable departure, waiver or amendment of the Loan Documents.

(b)    Any Lender being replaced pursuant to Section 3.07(a) above shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's applicable outstanding Loans, and (ii) deliver any Notes evidencing such Loans to the Borrower or the Administrative Agent.  Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's outstanding Loans, (B) all obligations of the Borrower owing to the assigning Lender relating to the Loans so assigned shall be paid in full by the assignee Lender to such assigning Lender concurrently with such Assignment and Assumption and (C) upon such payment and, if so requested by the assignee Lender, delivery to the assignee Lender of the appropriate Note or Notes executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender.  In connection with any such replacement, if any such Lender does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within five Business Days of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Lender, then such Lender shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Lender and the Administrative Agent shall be entitled (but not obligated) to execute and deliver such Assignment and Assumption and/or such other documentation on behalf of such Lender.

(c)    [Reserved].

(d)    In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each affected Lender in accordance with the terms of Section 10.01 or all the Lenders and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

Section 3.08    **Survival**.  All the Loan Parties' obligations under this Article III shall survive repayment of all other Obligations hereunder.

## ARTICLE IV
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01    **Conditions to Initial Credit Extension**.  The obligation of each Lender to make a Credit Extension hereunder on the Closing Date is subject to satisfaction (or waiver) of the following conditions precedent:

(a)    The Administrative Agent's receipt of the following, each of which shall be original, .pdf or facsimile copies or delivered by other electronic method (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party each in form and substance reasonably satisfactory to the ~~Administrative Agent and the~~ Required Lenders:

(i)    ~~a Committed Loan Notice in accordance with the requirements hereof;~~

(i)    [reserved];

(ii)    executed counterparts of this Agreement;

(iii)    a Note executed by the Borrower in favor of each Lender that has requested a Note at least two Business Days in advance of the Closing Date;

(iv)    a copy of the Organization Documents in relation to each Loan Party;

(v)    the Security Agreement, the Intercreditor Agreement, each other Collateral Document and each other document set forth on Schedule 4.01(a) required to be executed on the Closing Date as indicated on such schedule, duly executed by each Loan Party thereto, together with:

(A)    subject to Section 6.20, certificates, if any, representing the Pledged Equity referred to therein accompanied by undated stock powers executed in blank and instruments, if any, evidencing the Pledged Debt endorsed in blank; and

(B)    proper financing statements (Form UCC-1 or the equivalent) naming each Loan Party for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary to perfect the security interests purported to be created by the foregoing Security Agreement;

(vi)    such certificates of good standing (to the extent such concept exists) from the applicable secretary of state of the state of organization of each Loan Party, certificates of resolutions or other corporate or limited liability company action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party and resolutions of the board of directors, board of managers or members of each Loan Party (in each case, as appropriate or applicable) as the Administrative AgentRequired Lenders may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date;

(vii)    an opinion from (x) Kirkland & Ellis LLP, counsel to the Loan Parties, and (y) [●], localthe general counsel, or other appropriate attorney, of the Borrower with respect to any Loan Party covering opinions not included in Nevada, and (z) [●], local counsel in Pennsylvania,the opinion provided pursuant to the foregoing clause (x) as to certain customary organizational items (including, for the avoidance of doubt, that the entry by such Loan Party into the Loan Documents to which it is a party does not conflict with such Loan Party's Organizational Documents and the requirements of Laws), in each case in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders; and

(viii)    a solvency certificate from the chief financial officer, chief accounting officer or other officer with equivalent duties of the Borrower (immediately after giving effect to the Transactions) substantially in the form attached hereto as Exhibit D.

(b)    All fees and expenses required to be paid hereunder (and, with respect to expenses, invoiced at least three Business Days before the Closing Date) shall have been paid, including fees pursuant to any Agent Fee Letter, the fees of Weil, Gotshal & Manges LLP, as counsel to the Lenders, Shipman & Goodwin LLP, as counsel to the Administrative Agent, and all reasonable out-of-pocket expenses payable on the Closing Date.

(c)    Prior to or substantially concurrently with the initial Borrowing on the Closing Date, (i) all Existing Debt shall have been extinguished in accordance with the Prepackaged Plan; (ii) the Loan Parties shall have entered into, and provided executed copies of, the ABL Loan Documents providing for the ABL Loans (A) with availability as of the Closing Date of at least $20,000,000 after giving effect to any amount of Existing Letters of Credit backstopped or otherwise included in such ABL Loan Documents and (B) with aggregate commitments of not less than $30,000,000 and (iii) the Loan Parties shall have entered into, and provided executed copies of, the First Lien Loan Documents providing for the First Lien Term Loans in an aggregate principal amount equal to $75,00076,600,000, in the case of clause (ii) and (iii) above, in form and substance reasonably satisfactory to the Required Lenders.

60

(d)      Since the Petition Date, other than by virtue of the Chapter 11 Cases, the events and conditions related, resulting from, and/or leading up thereto and the effects thereon and any action required to be taken under the Loan Documents, there shall not have occurred any development or event, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(e)      No Default or Event of Default shall exist or would result from the consummation of the Transactions.

(f)      The Administrative Agent shall have received the Annual Financial Statements and the Quarterly Financial Statements (it being understood the Administrative Agent hereby acknowledges receipt thereof).

(g)      The Lenders shall have received the Pro Forma Financial Statements.

(h)      The Administrative Agent shall have received at least three Business Days prior to the Closing Date all documentation and other information about the Borrower and the Guarantors required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act that has been requested by the Administrative Agent in writing at least 10 days prior to the Closing Date.

(i)      The representations and warranties of each Loan Party set forth in Article V and in each other Loan Document shall be true and correct in all material respects on and as of the Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; *provided* that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(j)      At all times prior to the Closing Date, the Borrower shall have used commercially reasonable efforts to obtain ratings for the Term Facility from at least two of Moody's, S&P and Fitch.

(k)      Upon consummation of the Transactions, the Lenders shall own at last 90% of the common equity of Holdings (subject to dilution pursuant to any warrants issued pursuant to the Warrant Agreement (as defined in the Prepackaged Plan) and any management incentive plan.

(l)      The Bankruptcy Court shall have entered the Confirmation Order, which order shall (a) approve, among other things, the Transactions, (b) be in form and substance reasonably acceptable to the Required Lenders and consistent in all respects with the Restructuring Support Agreement, (c) not be subject to any stay or be reversed, vacated, amended or otherwise modified in any respect and (d) all covenants and conditions of the Prepackaged Plan (other than the effectiveness of this Agreement, the First Lien Credit Agreement and the ABL Credit Agreement) shall have been satisfied or waived in accordance with the terms thereof.

(m)      The Restructuring Support Agreement shall not have been terminated and remains in full force and effect.

Without limiting the generality of the provisions of Section 9.03(e), for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

61

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Each Holdco, the Borrower and each of the Subsidiary Guarantors party hereto represent and warrant to the Administrative Agent and the Lenders on the Closing Date that:

**Section 5.01     Existence, Qualification and Power; Compliance with Laws**.  Each Loan Party and each Subsidiary that is a Material Subsidiary (a) is a Person duly organized, incorporated or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation, organization or formation to the extent such concept exists in such jurisdiction, (b) has all requisite organizational power and authority to, in the case of the Loan Parties, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (where relevant) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, orders, writs and injunctions and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case, referred to in clauses (c), (d) or (e), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**Section 5.02     Authorization; No Contravention**.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the Transactions, (a) have been duly authorized by all necessary corporate or other organizational action, and (b) do not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by Section 7.01), or require any payment to be made under (x) any Contractual Obligation to which such Person is a party or by which it or any of its property or assets is bound or (y) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any Law; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clauses (ii) and (iii), to the extent that such violation, conflict, breach, contravention or payment could not reasonably be expected to have a Material Adverse Effect.

**Section 5.03     Governmental Authorization; Other Consents**.  No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) approval, consent, exemption, authorization, or other action by, or notice to, or filing necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties (or release existing Liens) under applicable U.S. law, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement) and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect.

**Section 5.04     Binding Effect**.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is a party thereto.  This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is a party thereto in accordance with its terms, except as such enforceability may be limited by (i) Debtor Relief Laws and by general principles of equity, (ii)  the need for filings and registrations necessary to create or perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties and (iii) the effect of foreign Laws, rules and regulations as they relate to the granting of security interests in assets

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

of, pledges of Equity Interests in or Indebtedness owed by Foreign Subsidiaries (clauses (i), (ii) and (iii), the "**Enforcement Qualifications**").

**Section 5.05     Financial Statements; No Material Adverse Effect**.  (a)  The Annual Financial Statements and the Quarterly Financial Statements fairly present in all material respects the financial condition of the Company and its Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (A) except as otherwise expressly noted therein and (B) subject, in the case of the Quarterly Financial Statements, to changes resulting from normal year-end adjustments and the absence of footnotes.

(b)     The unaudited *pro forma* consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as of the last day of the 12-month period ending on the last day of the most recently completed four-fiscal quarter period ended at least 45 days (or 105 days if such four-fiscal quarter period is the end of the Company's fiscal year) prior to the Closing Date, prepared after giving effect to the Transactions as if the Transactions had occurred as of such date (including the notes thereto) (the "**Pro Forma Balance Sheet**") and the unaudited *pro forma* consolidated statement of income of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries for the 12-month period ended at least 45 days (or 105 days if such four-fiscal quarter period is the end of the Company's fiscal year) prior to the Closing Date, prepared after giving effect to the Transactions as if the Transactions had occurred at the beginning of such period and any other adjustments reasonably acceptable to the ~~Administrative Agent~~Required Lenders (together with the Pro Forma Balance Sheet, the "**Pro Forma Financial Statements**"), copies of which have heretofore been furnished to the Administrative Agent, have been prepared based on the Annual Financial Statements and the Quarterly Financial Statements and have been prepared in good faith, based on assumptions believed by the Borrower to be reasonable as of the date of delivery thereof and adjustment as agreed by the Borrower, and present fairly in all material respects on a *pro forma* basis the estimated financial position of the Borrower and its Subsidiaries as at the Closing Date and their estimated results of operations for the period covered thereby; *provided* that no such *pro forma* financial statement shall be required to include adjustments for purchase accounting (including adjustments of the type contemplated by Financial Account Standards Board Accounting Standards Codification 805, Business Combinations (formerly SFAS 141R)).

(c)     Since the Closing Date, there has been no event, circumstance or change, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

**Section 5.06     Litigation**.  There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any Subsidiary or against any of their properties or revenues that have a reasonable likelihood of adverse determination and such determination, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**Section 5.07     Ownership of Property; Liens**.  The Borrower and each of its Subsidiaries has good record title to, or valid leasehold interests in, or easements or other limited property interests in, all Real Property necessary in the ordinary conduct of its business, free and clear of all Liens, except (a) as set forth on Schedule 5.07, (b) minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes, (c) Liens permitted by Section 7.01 and (d) where the failure to have such title could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 5.08     Environmental Matters**.  Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)     Each Loan Party and its respective properties and operations are and have been in compliance with all Environmental Laws, which includes obtaining and maintaining

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

all applicable Environmental Permits required under such Environmental Laws to carry on the business of the Loan Parties;

(b)     the Loan Parties have not received any written notice that alleges any of them is in violation of or potentially liable under any Environmental Laws, and none of the Loan Parties nor any of the Real Property is the subject of any claims, investigations, liens, demands, or judicial, administrative or arbitral proceedings pending or, to the knowledge of the Borrower, threatened in writing, under any Environmental Law or to revoke or modify any Environmental Permit held by any of the Loan Parties;

(c)     there has been no Release of Hazardous Materials on, at, under or from any Real Property or facilities owned, operated or leased by any of the Loan Parties, or, to the knowledge of the Borrower, Real Property formerly owned, operated or leased by any Loan Party or arising out of the conduct of the Loan Parties that could reasonably be expected to require investigation, remedial activity or corrective action or cleanup or could reasonably be expected to result in the Borrower or any of its Subsidiaries incurring liability under any Environmental Laws; and

(d)     there are no facts, circumstances or conditions arising out of or relating to the operations of the Loan Parties or Real Property or facilities owned, operated or leased by any of the Loan Parties or, to the knowledge of the Borrower, Real Property or facilities formerly owned, operated or leased by the Loan Parties that could reasonably be expected to result in the Borrower or any of its Subsidiaries incurring liability under any Environmental Laws.

The representations and warranties contained in this Section 5.08 are the sole and exclusive representations and warranties of the Borrower, the Holdcos and the Subsidiary Guarantors with respect to matters arising under or relating to Environmental Laws, Environmental Permits, Environmental Liabilities or Hazardous Materials.

Section 5.09   **Taxes**.   Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each of the Loan Parties and their Subsidiaries have timely filed all tax returns required to be filed, and have paid all Taxes levied or imposed upon them or their properties, income, profits or assets, that are due and payable (including in their capacity as a withholding agent), except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.  To the knowledge of the Loan Parties, there is no proposed Tax deficiency or assessment against the Loan Parties or their Subsidiaries that, if made would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 5.10   **ERISA Compliance**.   (a)   Except as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with its terms, the applicable provisions of ERISA, the Code and other Federal or state Laws.

(b)     (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) neither any Loan Party, Subsidiary nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due but not delinquent under Section 4007 of ERISA); (iii) neither any Loan Party, Subsidiary nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (iv) neither any Loan Party, Subsidiary nor any ERISA Affiliate has engaged in a transaction that could reasonably be expected to be subject to Sections 4069 or 4212(c) of ERISA; except, with respect to each of the foregoing clauses of this Section 5.10(b), as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

64

**Section 5.11**    **Subsidiaries; Equity Interests**.  As of the Closing Date (after giving effect to the Transactions), no Loan Party has any Subsidiaries other than those specifically disclosed on Schedule 5.11, and all of the outstanding Equity Interests owned by the Loan Parties (or a Subsidiary of any Loan Party) in such  Subsidiaries have been validly issued and are fully paid and all Equity Interests owned by a Loan Party (or a Subsidiary of any Loan Party) in such Subsidiaries are owned free and clear of all Liens except (i) those created under the Collateral Documents, under the ABL Loan Documents (which Liens shall be subject to the Intercreditor Agreement) or under the First Lien Loan Documents (which Liens shall be subject to the Intercreditor Agreement) and (ii) any Lien that is permitted under Section 7.01.  As of the Closing Date, Schedules 1 and 9 of the Perfection Certificate (a) set forth the name and jurisdiction of each Domestic Subsidiary that is a Loan Party, (b) set forth the ownership interest of the Borrower and any other Subsidiary thereof in each Subsidiary, including the percentage of such ownership and (c) identify each Subsidiary that is a Subsidiary the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

**Section 5.12**    **Margin Regulations; Investment Company Act**.  (a)  The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation T, U or X of the Board of Governors of the United States Federal Reserve System.

(b)    None of the Holdcos, the Borrower or any of the Subsidiaries is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**Section 5.13**    **Disclosure**.  No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party (other than projected financial information, *pro forma* financial information, budgets, estimates and information of a general economic or industry nature) to ~~any~~the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were made, not materially misleading.  With respect to projected financial information and *pro forma* financial information, the Borrower represents that such information was prepared in good faith based upon assumptions believed to be reasonable at the time furnished, it being understood that such projected financial information and *pro forma* financial information are not to be viewed as facts or as a guarantee of performance or achievement of any particular results and that actual results may vary from such forecasts and that such variations may be material and that no assurance can be given that the projected results will be realized.

**Section 5.14**    **Labor Matters**.  Except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against the Borrower or any of its Subsidiaries pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of the Borrower or any of its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with such matters; and (c) all payments due from the Borrower or any of its Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant party.

**Section 5.15**    **Intellectual Property; Licenses, Etc**.  Each of the Borrower and the Subsidiaries owns, licenses, possesses or otherwise has the right to use all of the trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, technology, software, know-how database rights, design rights and other intellectual property rights (collectively, "**IP Rights**") that are reasonably necessary for the operation of its businesses as currently conducted, except to the extent the failure to own, license, possess or otherwise have the right to use such IP Rights, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  To the knowledge of the Borrower, the Borrower and the Subsidiaries' present business operations do not infringe upon any IP Rights held by any Person except for

65

such infringements, individually or in the aggregate, which could not reasonably be expected to have a Material Adverse Effect.  No claim or litigation regarding IP Rights is pending or, to the knowledge of the Borrower, threatened, against any Loan Party or any of the Subsidiaries, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

As of the Closing Date, all registrations material to the Loan Parties' business under the name of each Loan Party listed on Schedule 11 of the Perfection Certificate are valid and in full force and effect.

**Section 5.16**    **Solvency**.  On the Closing Date, after giving effect to the Transactions, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

**Section 5.17**    **[Reserved]**.

**Section 5.18**    **USA Patriot Act; OFAC; FCPA**.  (a)  To the extent applicable, each Loan Party and any Subsidiary is, and for the past five years has been, in compliance with (i) the Trading with the Enemy Act, as amended, and Sanctions, (ii) the USA Patriot Act and (iii) the FCPA.

(b)    No Loan Party, no Subsidiary and no director, officer, employee, agent or any other Person acting for or on behalf of any of the foregoing is a Sanctioned Person; and no Loan Party and no Subsidiary will use the proceeds of the Loans or otherwise make available, directly or indirectly, such proceeds to a Sanctioned Person.

(c)    No part of the proceeds of the Loans will be used, directly or indirectly by any Loan Party or any Subsidiary for any payments to or for the benefit of any governmental official or employee, political party, official of a political party, candidate for political office, public international organization official or employee or anyone else acting in an official capacity, in order to obtain, retain or direct business, influence any act or decision or the omission of any act or decision, or obtain any improper advantage, in violation of the FCPA.

(d)    Each Loan Party and each Subsidiary is subject to policies, procedures and internal controls designed to reasonably ensure compliance with Sanctions, the FCPA and all other applicable anti-bribery laws.

**Section 5.19**    **Security Documents**.  Except as otherwise contemplated hereby or under any other Loan Documents, the provisions of the Collateral Documents are effective to create in favor of the Administrative Agent for the benefit of the Secured Parties legal, valid and enforceable Liens on, and security interests in, the Collateral and, (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable Laws (which filings or recordings shall be made to the extent required by any Collateral Document) and (ii) upon the taking of possession or control by the Administrative Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent required by any Collateral Document), such Collateral Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral, in each case subject to no Liens other than the applicable Liens permitted under the Loan Documents, a legal, valid, enforceable and perfected Lien (if and to the extent perfection may be achieved by the filings and/or other actions required to be taken hereby or by the applicable Collateral Documents) on all right, title and interest of the respective Loan Parties in the Collateral described therein subject to the Enforcement Qualifications and Liens permitted by Section 7.01.

Notwithstanding anything herein (including this Section 5.19) or in any other Loan Document to the contrary, neither the Borrower nor any other Loan Party makes any representation or warranty as to (A) the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest (other than with respect to those pledges and security interests made under the Laws of the jurisdiction of formation of the applicable Foreign Subsidiary) in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of the Administrative Agent or any Lender with respect thereto, in each case under foreign

66

Law, (B) the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest to the extent such pledge, security interest, perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or (C) on the Closing Date and until required pursuant to Section 6.11, 6.13 or 4.01(a)(v), the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or enforceability of any pledge or security interest to the extent not required on the Closing Date pursuant to Section 4.01(a)(v).

**Section 5.20     EEA Financial Institutions**. None of the Holdcos, the Borrower or any Subsidiary thereof is an EEA Financial Institution.

**Section 5.21     Beneficial Ownership Certification**.   As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

<div align="center">

**ARTICLE VI**
**AFFIRMATIVE COVENANTS**

</div>

So long as any Lender shall have any Loan or other Obligation (other than contingent obligations not yet due and owing as to which no claim has been asserted) hereunder which is accrued and payable ~~and~~which remains unpaid or unsatisfied or the Conversion shall not have occurred, then from and after the Closing Date, Holdings and Intermediate Holdings (solely in the case of Sections 6.01, 6.02, 6.04, 6.05, 6.06, 6.08, 6.09, 6.10, 6.11, 6.13, 6.19, 6.20 and 6.21) and the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of its respective Subsidiaries to:

**Section 6.01     Financial Statements**.  (a)  Commencing with the fiscal year ended December 31, 2020, deliver to the Administrative Agent for prompt further distribution to each Lender, within 90 days after the end of each fiscal year, a consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail (together with, in all cases, a management discussion and analysis with respect thereto) and prepared in accordance with GAAP, audited and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing or other independent registered public accounting firm approved by the ~~Administrative Agent~~Required Lenders (such consent not to be unreasonably withheld, delayed or conditioned), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification (other than related (i) solely to the occurrence of the Maturity Date or the upcoming maturity date under the ABL Credit Agreement or the First Lien Credit Agreement, in each case, occurring within one year from the date such report is delivered or (ii) any potential inability to satisfy any financial maintenance covenant on a future date or in a future period) or any qualification or exception as to the scope of such audit except for qualifications relating to changes in accounting principles or practices reflecting changes in GAAP and required or approved by such independent certified public accountants;

(b)     Deliver to the Administrative Agent for prompt further distribution to each Lender, ~~(i)~~ within ~~35~~45 days (or 75 days in the case of the first full fiscal quarter following the Closing Date) after the end of each fiscal quarter of each fiscal year of Holdings, a consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as at the end of such fiscal quarter and the related (x) consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (y) consolidated statements of cash flows for such fiscal quarter and the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail *(together with, in all cases, a management discussion and analysis with respect thereto)* and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes~~, and (ii) within 45 days (or 75 days in the case of the first fiscal quarter following the~~

<div align="center">67</div>

~~Closing Date) after the end of each fiscal quarter of each fiscal year of Holdings, management discussion and analysis with respect to the information delivered pursuant to the foregoing clause (i);~~; and

(c)      Deliver to the Administrative Agent, for prompt further distribution to each Lender, within 35 days (or 45 days in the case of the first three such months following the Closing Date) after the end of (i) the period beginning on the Closing Date through September 30, 2020 and (ii) thereafter, each of the first two months in any fiscal quarter of Holdings, an unaudited consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries at the end of such month and the related unaudited consolidated statements of cash flows as of and for such month and the portion of the fiscal year then ended, setting forth in each case, in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail; and

(d)      Deliver to the Administrative Agent for prompt further distribution to each Lender, no later than 90 days after the end of the fiscal year ending December 31, 2020 and each subsequent fiscal year, a reasonably detailed consolidated budget for the following fiscal year on a quarterly basis (including a projected consolidated balance sheet of Holdings, Intermediate Holdings, the Borrower and its Subsidiaries as of the end of the following fiscal year, the related consolidated statements of projected cash flow and projected income and a summary of the material underlying assumptions applicable thereto) (collectively, the "**Projections**").

Notwithstanding the foregoing, the obligations in Sections 6.01(a) and (b) may be satisfied with respect to financial information of Holdings, Intermediate Holdings, the Borrower and the Subsidiaries by furnishing (I) the applicable financial statements of Holdings (or any direct or indirect parent, as applicable, of Holdings) or (II) the Form 10-K or 10-Q of Holdings (or any direct or indirect parent of Holdings), as applicable filed with the SEC; *provided* that, with respect to clauses (I) and (II), (i) to the extent such information relates to a parent of Holdings, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent, on the one hand, and the information relating to Holdings, Intermediate Holdings, the Borrower and the Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under Section 6.01(a), such materials are accompanied by a report and opinion of Deloitte & Touche LLP or any other independent registered public accounting firm of nationally recognized standing or other independent registered public accounting firm approved by the ~~Administrative Agent~~Required Lenders (such consent not to be unreasonably withheld, delayed or conditioned), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going-concern" or like qualification (other than related (i) solely to the occurrence of the Maturity Date or the upcoming maturity date under the ABL Credit Agreement or the First Lien Credit Agreement, in each case, occurring within one year from the date such report is delivered or (ii) any potential inability to satisfy any financial maintenance covenant on a future date or in a future period) or exception or any qualification or exception as to the scope of such audit except for qualifications relating to changes in accounting principles or practices reflecting changes in GAAP and required or approved by such independent certified public accountants.

Any financial statement required to be delivered pursuant to Section 6.01(a) or 6.01(b) shall not be required to include purchase accounting adjustments relating to the Transactions or any Permitted Acquisition to the extent it is not practicable to include them.

Documents required to be delivered pursuant to Sections 6.01 and 6.02(a) through (d) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower (or any direct or indirect parent of the Borrower) posts such documents, or provides a link thereto on the website on the Internet at the website address listed on Schedule 10.02(a); or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that (x) ~~upon written request by the Administrative Agent~~ promptly following such posting, the Borrower shall deliver paper copies of such documents to the

68

Administrative Agent for further distribution to each Lender ~~until a written request to cease delivering paper copies is given by the Administrative Agent~~ and (y) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "**Borrower Materials**") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive Material Non-Public Information and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC**,**" the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any Material Non-Public Information (although it may be sensitive and proprietary) (*provided*, *however*, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.08); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."  Notwithstanding the foregoing, the Borrower shall be under no obligation to mark any Borrower Materials "PUBLIC".

Section 6.02    **Certificates; Other Information**.  Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    concurrently the delivery of the financial statements referred to in Sections 6.01(a) and (b), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower;

(b)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which Holdings, Intermediate Holdings, the Borrower or any Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 6.02;

(c)    promptly after the furnishing thereof, copies of any material written notices received by any Loan Party (other than in the ordinary course of business) or material statements or material reports furnished to any holder of debt securities (other than in connection with any board observer rights) of any Loan Party or of any of its Subsidiaries pursuant to the terms of any ABL Loan Document or First Lien Loan Document and, in each case, not otherwise required to be furnished to the Lenders pursuant to any other clause of Section 6.01, 6.02 or 6.03;

(d)    together with the delivery of each Compliance Certificate pursuant to Section 6.02(a), (i) in the case of annual Compliance Certificates only, a report setting forth the legal name and the jurisdiction of formation of each Loan Party and the location of the chief executive office of each Loan Party on the Perfection Certificate or confirming that

69

there has been no change in such information since the Closing Date or the date of the last such report; (ii) a description of each event, condition or circumstance during the last fiscal quarter or fiscal year covered by such Compliance Certificate requiring a mandatory prepayment under Section 2.05(b) (to the extent notice of such event has not been previously furnished to the Administrative Agent) and (iii) a list of each Subsidiary of the Borrower that identifies each Subsidiary as of the date of delivery of such Compliance Certificate (to the extent that there have been any changes in the identity or status as a Subsidiary of any such Subsidiaries since the Closing Date or the most recent list provided);

(e)     [reserved]; and

(f)     promptly, such additional information regarding the business, legal, financial or corporate affairs of the Loan Parties or any of their respective Subsidiaries, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request.

In no event shall the requirements set forth in Section 6.02(f) require Holdings, Intermediate Holdings, the Borrower or any of its Subsidiaries to provide any such information which (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or (iii) is subject to attorney-client or similar privilege or constitutes attorney work-product.

**Section 6.03     Notices**.  Promptly (and in the case of clause (a) below, not later within three (3) Business Days) after a Responsible Officer of the Borrower or any Subsidiary Guarantor has obtained knowledge thereof, notify the Administrative Agent:

(a)     Of the occurrence of any Default or Event of Default;

(b)     of the occurrence of an ERISA Event which could reasonably be expected to result in a Material Adverse Effect;

(c)     of the filing or commencement of, or any threat or notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority against the Borrower or any of its Subsidiaries that would reasonably be expected to result in a Material Adverse Effect;

(d)     of the occurrence of any other matter or development that has had or could reasonably be expected to have a Material Adverse Effect; and

(e)     of any change in the information provided in any certification regarding beneficial ownership as required by 31 C.F.R. § 1010.230 that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification.

Each notice pursuant to this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of the Borrower delivered to the Administrative Agent for prompt further distribution to each Lender (x) that such notice is being delivered pursuant to Section 6.03(a), (b), (c) or (d) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

**Section 6.04     Payment of Taxes**.  Pay, discharge or otherwise satisfy as the same shall become due and payable in the normal conduct of its business, all its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (a) any such Tax is being contested in good faith and by appropriate proceedings for which appropriate reserves

70

have been established in accordance with GAAP or (b) the failure to pay or discharge the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.05   **Preservation of Existence, Etc**.  (a)  Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization; and

(b)   take all reasonable action to maintain all rights, privileges (including its good standing where applicable in the relevant jurisdiction), permits, authorizations, licenses and franchises necessary or desirable in the normal conduct of its business;

except, in the case of Section 6.05(a) (other than with respect to the Borrower) or this Section 6.05(b), to the extent (i) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (ii) pursuant to any merger, consolidation, liquidation, dissolution or Disposition permitted by Article VII.

Section 6.06   **Maintenance of Properties**.  Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and fire, casualty or condemnation excepted.

Section 6.07   **Maintenance of Insurance**.   (a) Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Subsidiaries) as are customarily carried under similar circumstances by such other Persons.  Not later than 30 days after the Closing Date (or the date any such insurance is obtained, in the case of insurance obtained after the Closing Date) (in each case, or such later date as the ~~Administrative Agent~~Required Lenders may agree in ~~its~~their sole discretion), each such policy of insurance (other than business interruption insurance (if any), director and officer insurance and worker's compensation insurance) shall as appropriate (i) name the Administrative Agent as additional insured thereunder or (ii) in the case of each casualty insurance policy, contain a lender loss payable clause or endorsement that names the Administrative Agent, on behalf of the Lenders, as lender loss payee or mortgagee thereunder.  If the improvements on any Mortgaged Property are at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then, to the extent required by applicable Flood Insurance Laws, the Borrower shall, or shall cause each Loan Party to, (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount reasonably satisfactory to the ~~Administrative Agent~~Required Lenders and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) upon the reasonable request of the Administrative Agent at the direction of the Required Lenders (not to exceed one time per fiscal year, unless an Event of Default has occurred and is continuing) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the ~~Administrative Agent~~Required Lenders.

(b) Give the Administrative Agent prompt notice of any loss exceeding $500,000 covered by the casualty or business interruption insurance of any Loan Party or its Subsidiaries.  Upon the occurrence and during the continuance of an Event of Default and subject to the Intercreditor Agreement, the Administrative Agent (at the direction of the Required Lenders) shall have the sole right (but not the obligation) to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

71

**Section 6.08** **Compliance with Laws**.  Comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except if the failure to comply therewith could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 6.09** **Books and Records**.  Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP and which reflect all material financial transactions and matters involving the assets and business of the Borrower or a Subsidiary, as the case may be (it being understood and agreed that certain Foreign Subsidiaries maintain individual books and records in conformity with generally accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder).

**Section 6.10** **Inspection Rights**.  Permit representatives and independent contractors of the Administrative Agent (on its own behalf or acting on behalf of the Lenders) to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that, only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.10 and the Administrative Agent shall not exercise such rights more often than one time during any calendar year and such time shall be at the Borrower's expense; *provided*, *further*, that during the continuation of an Event of Default, the Administrative Agent (or any of its respective representatives or independent contractors), on behalf of the Lenders, may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.

Notwithstanding anything to the contrary in this Section 6.10, none of Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (c) is subject to attorney-client or similar privilege or constitutes attorney work product.

**Section 6.11** **Additional Collateral; Additional Guarantors**.  At the Borrower's expense, subject to the terms, conditions and provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(a)     Upon the formation or acquisition of any new direct or indirect wholly owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) by any Loan Party or the designation in accordance with Section 6.14 of any existing direct or indirect wholly owned Material Domestic Subsidiary as a Subsidiary (in each case, other than an Excluded Subsidiary) or any Subsidiary becoming a wholly owned Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) or any Excluded Subsidiary ceasing to be an Excluded Subsidiary:

(i)     within 45 days after such formation, acquisition, designation or occurrence or such longer period as the ~~Administrative Agent~~Required Lenders may agree in writing in ~~its~~their discretion:

72

(A)    cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Administrative Agent,  a Joinder Agreement to become a Guarantor under this Agreement, Security Agreement Supplements, Intellectual Property Security Agreements, and other security agreements and documents as reasonably requested by and in form and substance reasonably satisfactory to the ~~Administrative Agent~~Required Lenders (consistent with the ~~Mortgages,~~ Security Agreement, Intellectual Property Security Agreements and other security agreements in effect on the Closing Date), in each case granting Liens required by the Collateral and Guarantee Requirement;

(B)    cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement (and the parent of each such Domestic Subsidiary that is the Borrower or a Guarantor) to deliver any and all certificates representing Equity Interests (to the extent certificated) and intercompany notes constituting negotiable instruments (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and instruments evidencing Indebtedness held by such Material Domestic Subsidiary and required to be delivered pursuant to the Collateral and Guarantee Requirement ~~i~~endorsed in blank to the Administrative Agent;

(C)    take and cause such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement and each direct or indirect parent of such Material Domestic Subsidiary to take whatever action (including the recording of Mortgages, the filing of UCC financing statements and delivery of stock and membership interest certificates) as may be necessary in the reasonable opinion of the Administrative Agent (at the direction of the Required Lenders) to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and perfected Liens to the extent required by the Collateral and Guarantee Requirement, and to otherwise comply with the requirements of the Collateral and Guarantee Requirement;

(D)    if requested by the Administrative Agent or the Required Lenders, deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the Lenders, of counsel for the Loan Parties reasonably acceptable to the ~~Administrative Agent~~Required Lenders as to such matters set forth in this Section 6.11(a) as the ~~Administrative Agent~~Required Lenders may reasonably request~~;~~ (or otherwise consistent with the opinions delivered on the Closing Date);

(ii)    as promptly as practicable after the request therefor by the Administrative Agent, deliver to the Administrative Agent with respect to each Material Real Property, any existing title reports, abstracts or environmental assessment reports, to the extent available and in the possession or control of a Loan Party; *provided*, *however*, that there shall be no obligation to deliver to the Administrative Agent any environmental assessment report whose disclosure to the Administrative Agent would require the consent of a Person other than a Loan Party or one of its Subsidiaries, where, despite the commercially reasonable efforts of the Borrower to obtain such consent, such consent cannot be obtained; and

(iii)    if reasonably requested by the Administrative Agent or the Required Lenders, deliver to the Administrative Agent any other items necessary from time to time to satisfy the Collateral and Guarantee Requirement with respect to perfection and existence of security interests with respect to property of any Guarantor (and the direct parent of each such Guarantor) acquired after the Closing Date and subject to the Collateral and Guarantee

73

Requirement, but not specifically covered by preceding clauses (i), (ii) or (iii) or Section 6.11(b) below.

(b)        Not later than 120 days (or such longer period as the ~~Administrative Agent~~Required Lenders may agree in writing in ~~its~~their discretion) after (i) any Material Real Property is acquired by a Loan Party after the Closing Date or (ii) an entity becomes a Loan Party if such entity owns Material Real Property at the time it becomes a Loan Party, cause such Material Real Property, if such property is required to be provided as Collateral pursuant to the Collateral and Guarantee Requirement but is not automatically subject to a Lien pursuant to pre-existing Collateral Documents, to be subject to a Lien and Mortgage in favor of the Administrative Agent for the benefit of the Secured Parties and take, or cause the relevant Loan Party to take, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect or record such Lien, in each case to the extent required by, and subject to the limitations and exceptions of, the Collateral and Guarantee Requirement and to otherwise comply with the requirements of the Collateral and Guarantee Requirement.

(c)        Each Domestic Subsidiary required to be designated as a "Material Domestic Subsidiary" pursuant to the proviso in the definition of "Material Domestic Subsidiary" shall have taken all actions to comply with the provisions of Section 6.11 within the timeframe required by the definition of "Material Domestic Subsidiary".

**Section 6.12    Compliance with Environmental Laws**.  Except, in each case, to the extent that the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, comply, and take all commercially reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply, with all Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and occupancy of its properties; and, in each case to the extent the Loan Parties are required to do so by Environmental Laws, conduct any investigation, remedial or other corrective action necessary to address Hazardous Materials at any property or facility in accordance with Environmental Laws.  If an Event of Default arising out of an Environmental Liability has occurred and is continuing, within 60 days of receiving a written request by the Administrative Agent~~,~~ (at the direction of the Required Lenders), the Borrower will provide the Administrative Agent with an environmental assessment report regarding the scope of the Environmental Liability and the likely cost of mitigating such Environmental Liability, prepared at Borrower's sole cost and expense and by an environmental consultant reasonably acceptable to the ~~Administrative Agent.~~Required Lenders.  If such report is not timely provided, the Administrative Agent may have them prepared by an environmental consultant of its choosing, at Borrower's sole cost and expense.

**Section 6.13    Further Assurances**.  Promptly upon reasonable request by the Administrative Agent (i) correct any ~~mutually identified~~ material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as are necessary or that the Administrative Agent may reasonably request from time to time in order to carry out more effectively the purposes of this Agreement and the Collateral Documents, to the extent required pursuant to the Collateral and Guarantee Requirement and subject in all respects to the limitations therein.  If the Administrative Agent or the Required Lenders reasonably determine~~s~~ that it is required by applicable Law to have appraisals prepared in respect of the Real Property of any Loan Party subject to a mortgage constituting Collateral, the Borrower shall promptly provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA.

**Section 6.14    [Reserved].**

74

**Section 6.15      Ratings**.  If the Borrower has not obtained the ratings contemplated by Section 4.01(j) on or before the Closing Date, the Borrower shall, within 30 days of the Closing Date (or such later date as the Administrative Agent at the direction of the Required Lenders may agree), obtain ratings for the this Agreement and the First Lien Credit Agreement by at least two (2) of Moody's, S&P and Fitch. After the Borrower obtains the ratings contemplated by the foregoing sentence, the Borrower shall maintain a rating (but not any specific rating) in respect of this Agreement from at least two (2) of Moody's, S&P and Fitch.

**Section 6.16      Use of Proceeds**.  Use the proceeds of the Term Loans to finance a portion of the Transactions pursuant to the Prepackaged Plan.

**Section 6.17      Lender Meetings**.  To the extent requested by the Administrative Agent or the Required Lenders, participate in a meeting (which may be in the form of a conference call) (including a customary question and answer session) with the Administrative Agent and Lenders once during each fiscal quarter to be held at such time as may be agreed to by the Borrower and the Administrative Agent at the direction of the Required Lenders, but in any event within 15 Business Days of each date that financial statements are required to be delivered pursuant to Section 6.01(b).

**Section 6.18      End of Fiscal Years**.  For financial reporting purposes, cause its fiscal year to end on December 31 (other than any Subsidiary acquired after the Closing Date); *provided*, *however*, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the ~~Administrative Agent~~Required Lenders, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

**Section 6.19      Lines of Business**. Holdings, Intermediate Holdings, the Borrower and the Subsidiaries, taken as a whole, will not engage in any material line of business substantially different from those lines of business conducted by Holdings, Intermediate Holdings, the Borrower and the Subsidiaries on the Closing Date or any business reasonably related, complementary, corollary, synergistic or ancillary thereto (including related, complementary, synergistic or ancillary technologies) or reasonable extensions thereof.

**Section 6.20      Post-Closing Covenant**. Holdings agrees that it will deliver, or will cause to be delivered, to the Administrative Agent, in form and substance reasonably satisfactory to the ~~Administrative Agent~~Required Lenders, the items described on Schedule 6.20(a) hereof by the times specified with respect to such items, or such later time as the ~~Administrative Agent~~Required Lenders may agree in ~~its~~their reasonable discretion.

**Section 6.21      Anti-Terrorism Law; Anti-Money Laundering; Embargoed Persons**.      (a) Conduct its business in such manner so as to not, directly or indirectly, (i) deal in, or otherwise engage in any transaction relating to, a Sanctioned Person or any property or interests in property blocked pursuant to Executive Order No. 13224 on Terrorist Financing effective September 24, 2001 (the "**Executive Order**") or any other law or regulation with respect to exports, terrorism or money laundering ("**Anti-Terrorism Law**"), or (ii) engage in or conspire to engage in any transaction that violates, or attempts to violate, any Anti-Terrorism Law or Sanctions.

(a)      Repay the Loans exclusively with funds that are not derived from any unlawful activity such that the result of any such repayment would not cause the making of the Loans to be in material violation of any applicable Law.

(b)      (x) Use funds or properties of Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries to repay the Loans only to the extent it does not constitute property of, or is beneficially owned directly or indirectly by, a Sanctioned Person or any Person subject trade restrictions under United States law ("**Embargoed Person**") that is identified on (1) the "List of Specially Designated Nationals and Blocked Persons" maintained by OFAC and/or on any other similar list maintained by OFAC pursuant to any authorizing statute including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any

75

Executive Order or any applicable Law promulgated thereunder, with the result that the investment in Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries (whether directly or indirectly) is prohibited by any applicable Law, or the Loans made by the Lenders would be in violation of any applicable Law, or (2) the Executive Order or Sanctions, any related enabling legislation or any other similar Executive Orders or (y) to the knowledge of the Borrower, any Embargoed Person to have any direct or indirect interest, in Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries, with the result that the investment in Holdings, Intermediate Holdings, the Borrower or any of the Subsidiaries (whether directly or indirectly) is prohibited by any applicable Law or the Loans are in violation of any applicable Law.

Section 6.22   Account Control Agreements.  With respect to each deposit account, securities account or other similar account established prior to or on the Closing Date, deliver an Account Control Agreement with respect to each such account (other than any Excluded Accounts) within 30 days after the Closing Date or such later date as the ~~Administrative Agent~~Required Lenders may agree in ~~its~~their sole discretion. With respect to each deposit account, securities account or other similar account (other than any Excluded Accounts) established following the Closing Date, deliver on the date thirty (30) days following the establishment thereof (or such later date agreed to by the ~~Administrative Agent~~Required Lenders in ~~its~~their sole discretion), an Account Control Agreement with respect to each such account. The Administrative Agent's rights with respect to each account subject to an Account Control Agreement shall be governed by such Account Control Agreement. Following the Closing Date, the Borrower shall give the Administrative Agent prompt written notice of the opening of any deposit, securities or other similar account by any Loan Party.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Loan or other Obligation hereunder (other than contingent obligations not yet due and owing as to which no claim has been asserted) or the Conversion shall not have occurred, then from and after the Closing Date, the Borrower (and, with respect to Section 7.14 only, the Holdcos) shall not and shall not permit any of its Subsidiaries to, directly or indirectly:

Section 7.01   Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)   Liens (i) created pursuant to any Loan Document and (ii) on the Collateral securing other Secured Obligations;

(b)   Liens existing on the Closing Date and listed in Schedule 7.01(b) and any modifications, replacements, renewals, restructurings, refinancings or extensions thereof; *provided* that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under Section 7.03 and (B) proceeds and products thereof and (ii) the replacement, renewal, extension or refinancing of the obligations secured or benefitted by such Liens, to the extent constituting Indebtedness, is permitted by Section 7.03;

(c)   Liens for taxes, assessments or governmental charges that are not overdue for a period of more than any applicable grace period related thereto or (i) that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP to the extent required by GAAP or (ii) the failure to pay of discharge the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

76

(d)      statutory or common law Liens of landlords, sub-landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens, so long as, in each case, such Liens secure amounts not overdue for a period of more than 30 days or if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Liens or that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e)      (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Subsidiaries;

(f)      pledges or deposits to secure the performance of bids, trade contracts, utilities, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(g)      covenants, conditions, easements, rights-of-way, building codes, restrictions (including zoning restrictions), encroachments, licenses, protrusions and other similar encumbrances and minor title defects, in each case affecting Real Property and that do not in the aggregate materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole, and any exceptions on the Mortgage Policies issued in connection with the Mortgaged Properties;

(h)      Liens (i) securing judgments or orders for the payment of money not constituting an Event of Default under Section 8.01(h), ~~(ii) arising out of judgments or awards against the Borrower or any Subsidiary with respect to which an appeal or other proceeding for review is then being pursued and (iii~~and (ii) notices of *lis pendens* and associated rights related to litigation being contested in good faith by appropriate proceedings for which adequate reserves have been made;

(i)      leases, licenses, subleases or sublicenses (including licenses and sublicenses of software and other intellectual property rights) and terminations thereof, in each case either granted to others with respect to intellectual property that is not material to the business of the Borrower and Subsidiaries or in the ordinary course of business, which (i) do not interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, (ii) do not secure any Indebtedness and (iii) are permitted by Section 7.05;

(j)      Liens ~~(i)~~ in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business ~~or (ii) on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such person to facilitate the purchase, shipment or storage of such inventory or other goods in the ordinary course of business~~;

(k)      Liens (i) of a collection bank arising under Section 4-208 of the Uniform Commercial Code on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of

77

business, (iii) in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions, and (iv) that are contractual rights of setoff or rights of pledge relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(l)        Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Sections 7.02(g), (i) and (n) or to the extent related to any of the foregoing, Section 7.02(s), to be applied against the purchase price for such Investment, and (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(m)       Liens (i) in favor of the Borrower or any Subsidiary Guarantor and (ii) in favor of a Subsidiary that is not a Loan Party on assets of a Subsidiary that is not a Loan Party securing Indebtedness permitted under Section 7.03;

(n)        any interest or title of a lessor, sub-lessor, licensor or sub-licensor under leases, subleases, licenses or sublicenses entered into by the Borrower or any of its Subsidiaries in the ordinary course of business or with respect to intellectual property that is not material to the business of the Borrower and its Subsidiaries;

(o)        Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business permitted by this Agreement;

(p)        Liens deemed to exist in connection with Investments in repurchase agreements under Section 7.02;

(q)        Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(r)        Liens that are contractual rights of setoff or rights of pledge (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any of its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(s)        Liens solely on any cash earnest money deposits made by the Borrower or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(t)        ground leases in respect of Real Property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

<div align="center">78</div>

(u)      Liens to secure Indebtedness permitted under Section 7.03(e); *provided* that (i) such Liens are created within 270 days of the acquisition, construction, repair, lease or improvement of the property subject to such Liens, (ii) such Liens do not at any time encumber property (except for replacements, additions, accessions and proceeds to such property) other than the property financed by such Indebtedness and the proceeds and products thereof and customary security deposits and (iii) with respect to Capitalized Leases, such Liens do not at any time extend to or cover any assets (except for replacements, additions and accessions to such assets) other than the assets subject to such Capitalized Leases and the proceeds and products thereof and customary security deposits; *provided* that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(v)      Liens on property of any Subsidiary that is not a Loan Party, which Liens secure Indebtedness of any Subsidiary that is not a Loan Party permitted under Section 7.03;

(w)      Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Subsidiary (other than by designation as a Subsidiary pursuant to Section 6.14) (other than Liens on the Equity Interests of any Person that becomes a Subsidiary to the extent such Equity Interests are owned by the Borrower or another Subsidiary), in each case, securing Indebtedness permitted pursuant to Section 7.03(g),

(x)      (i) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business complies, and (ii) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any Real Property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole;

(y)      Liens arising from precautionary Uniform Commercial Code financing statement or similar filings;

(z)      Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(aa)     the modification, replacement, renewal or extension of any Lien permitted by Sections 7.01(b), (u) and (w); *provided* that (i) the Lien does not extend to any additional property, other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien and (B) proceeds and products thereof, and (ii) the renewal, extension, restructuring or refinancing of the obligations secured or benefited by such Liens is permitted by Section 7.03 (to the extent constituting Indebtedness);

(bb)     Liens with respect to property or assets of the Borrower or any of its Subsidiaries securing obligations, other than Indebtedness for borrowed money, in an aggregate principal amount outstanding at any time not to exceed $5,500,000, in each case determined as of the date of incurrence;

(cc)     [reserved];

(dd)     [reserved];

(ee)     Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or

79

banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(ff)    deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

(gg)    [reserved];

(hh)    [reserved];

(ii)    Liens on property of any Foreign Subsidiary securing Indebtedness of such Foreign Subsidiary permitted under Section 7.03;

(jj)    Subject to the Intercreditor Agreement, Liens on the Collateral securing (i)(A) Indebtedness incurred pursuant to Section 7.03(w) and (B) related First Lien Secured Obligations under the First Lien Loan Documents governing such Indebtedness and (ii)(A) Indebtedness incurred pursuant to Section 7.03(x) and (b) related to ABL Secured Obligations under the ABL Loan Documents governing such Indebtedness;

(kk)    [reserved];

(ll)    in the case of any non-wholly owned Subsidiary, any put and call arrangements or restrictions on disposition related to its Equity Interests set forth in its organizational documents or any related joint venture or similar agreement;

(mm)    Liens securing Swap Contracts so long as the value of the property securing such Swap Contracts does not exceed $2,750,000 at any time;

(nn)    Liens on property incurred pursuant to any sale-leaseback transaction permitted hereunder and general intangibles related thereto;

(oo)    [reserved]; and

(pp)    Liens arising by operation of law in the United States under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods.

Section 7.02    **Investments**.  Make or hold any Investments, except:

(a)    Investments by the Borrower or any of its Subsidiaries in assets that were cash or Cash Equivalents when such Investment was made;

(b)    loans or advances to officers, directors and employees of any Loan Party (or any direct or indirect parent thereof) or any of its Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests of Holdings or any direct or indirect parent thereof or to permit the payment of taxes with respect thereto; *provided* that, to the extent such loans or advances are made in cash, the amount of such loans and advances used to acquire such Equity Interests shall be contributed to the Borrower in cash as common equity; *provided*, *further*, that the aggregate principal amount outstanding at any time under this clause (ii) shall not exceed $4,125,000, and (iii) for any other purposes not described in the foregoing clauses (i) and (ii); *provided* that the aggregate principal amount outstanding at any time under this clause (iii) shall not exceed $1,375,000;

80

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

(c)        Investments (i) by the Borrower or any Subsidiary in any Loan Party (other than a Holdco), (ii) by any Subsidiary that is not a Loan Party in any other Subsidiary that is not a Loan Party and (iii) by any Loan Party in any Subsidiary that is not a Loan Party; *provided* that (A) no such Investments made pursuant to clause (iii) in the form of intercompany loans shall be evidenced by a promissory note unless any such promissory note constituting a negotiable instrument is pledged to the Administrative Agent in accordance with the terms of the Security Agreement, (B) any Investments in the form of intercompany loans constituting Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be unsecured and subordinated to the Obligations on terms consistent with the subordination provisions of the Intercompany Note and (C) the aggregate amount of Investments made pursuant to clause (iii) shall not exceed $22,000,000 at any time outstanding;

(d)        Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e)        Investments (excluding loans and advances made in lieu of Restricted Payments pursuant to and limited by Section 7.02(m) below) consisting of transactions permitted under Sections 7.01, 7.03 (other than 7.03(c) and (d)), 7.04 (other than 7.04(c)(ii) or (e)), 7.05 (other than 7.05(d)(ii) or 7.05(e)), 7.06 (other than 7.06(d)) and 7.13, respectively;

(f)        Investments (i) existing or contemplated on the Closing Date or made pursuant to legally binding written contracts in existence on the Closing Date, in each case set forth on Schedule 7.02(f) and any modification, replacement, renewal, reinvestment or extension thereof and (ii) existing on the Closing Date by the Borrower or any Subsidiary in the Borrower or any other Subsidiary and any modification, renewal or extension thereof; *provided* that (x) the amount of the original Investment is not increased except by the terms of such Investment or as otherwise permitted by this Section 7.02 and (y) any Investment in the form of Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be subject to subordination terms substantially consistent with the terms of the Intercompany Note;

(g)        Investments in Swap Contracts permitted under Section 7.03;

(h)        promissory notes, securities and other non-cash consideration received in connection with Dispositions permitted by Section 7.05;

(i)        any acquisition of all or substantially all the assets of a Person or any Equity Interests in a Person that becomes a Subsidiary or division or line of business of a Person (or any subsequent Investment made in a Person, division or line of business previously acquired in a Permitted Acquisition), in a single transaction or series of related transactions, if no Event of Default exists on the date that the Borrower or the applicable Subsidiary enters into a binding agreement with respect to such acquisition and, immediately after giving effect to such acquisition, (i) any acquired or newly formed Subsidiary shall not be liable for any Indebtedness except for Indebtedness otherwise permitted by Section 7.03; (ii) to the extent required by the Collateral and Guarantee Requirement, (A) the property, assets and businesses acquired in such purchase or other acquisition shall constitute Collateral and (B) any such newly created or acquired Subsidiary (other than an Excluded Subsidiary) shall become a Guarantor, in each case, in accordance with Section 6.11; and

81

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

(iii) the aggregate amount of Investments by Loan Parties pursuant to this Section 7.02(i) in assets (other than Equity Interests) that are not (or do not become at the time of such acquisition) directly owned by a Loan Party or in Equity Interests of Persons that do not become Loan Parties shall not exceed, when taken together with the aggregate amount of all Investments made pursuant to Section 7.02(c)(iii), $22,000,000 (any such acquisition, a "**Permitted Acquisition**");

(j)        Investments made in connection with the Transactions;

(k)        Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(l)        Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(m)        loans and advances to any direct or indirect parent of the Borrower, in lieu of and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof) Restricted Payments to the extent permitted to be made to such parent in accordance with Section 7.06(h), such Investment being treated for purposes of the applicable clause of Section 7.06, including any limitations, as if a Restricted Payment had been made pursuant to such clause;

(n)        Investments (including Permitted Acquisitions) in an aggregate amount pursuant to this Section 7.02(n) (valued at the time of the making thereof, and without giving effect to any write-downs or write-offs thereof) at any time not to exceed $13,750,000;

(o)        Investments made in respect of joint ventures or other similar agreements or partnership not to exceed $11,000,000;

(p)        Investments in any Person to which the Borrower or any Subsidiary outsources operational activities or otherwise related to the outsourcing of operational activities in the ordinary course of business in an aggregate amount not to exceed $2,750,000;

(q)        advances of payroll payments to employees in the ordinary course of business;

(r)        (i) Investments made in the ordinary course of business in connection with obtaining, maintaining or renewing client contracts and loans or advances made to distributors and suppliers in the ordinary course of business and (ii) Investments to the extent that payment for such Investments is made solely with Equity Interests of Holdings permitted to be issued hereunder (or any direct or indirect parent of the Borrower);

(s)        Investments of a Subsidiary acquired after the Closing Date in accordance with Section 7.02 or of a Person merged or amalgamated or consolidated into the Borrower or merged, amalgamated or consolidated with a Subsidiary in accordance with Section 7.04 after the Closing Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger or consolidation; *provided* that this clause

82

(s) is intended solely to grandfather such Investments as are indirectly acquired as a result of an acquisition of a Person otherwise permitted hereunder and any consideration paid in connection with such acquisition that may be allocable to such Investments that consist of Subsidiaries that are not Loan Parties must be permitted by, and be taken into account in computing compliance with, any basket amounts or limitations applicable to such acquisition hereunder;

(t)        [reserved]

(t)        Investments made by a Subsidiary that is not a Loan Party to the extent such Investments are financed with the proceeds received by such Subsidiary from an Investment in such Subsidiary by a Loan Party permitted under this Section 7.02;

(u)        [reserved];

(v)        [reserved];

(w)        Investments in deposit accounts, securities accounts and commodities accounts maintained by the Borrower or such Subsidiary, as the case may be;

(x)        Investments constituting any part of a reorganization and other activities related to tax planning; *provided* that (i) no Event of Default shall have occurred and be continuing and (ii) any security interests granted to the Administrative Agent for the benefit of the Secured Parties in the Collateral pursuant to the Collateral Documents shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, consolidation, dissolution or liquidation) and all actions required to maintain said perfected status have been or will promptly be taken; and

(y)        contributions of the Equity Interests of any Subsidiary that is not a Loan Party to any other Subsidiary that is not a Loan Party to the extent necessary in connection with any intercompany reorganization and/or other activities related to tax planning; *provided* that no Event of Default shall have occurred and be continuing.

To the extent an Investment is permitted to be made by a Loan Party directly in any Subsidiary or any other Person who is not a Loan Party (each such person, a "**Target Person**") under any provision of this Section 7.02, such Investment may be made by advance, contribution or distribution by a Loan Party to a Subsidiary, or a Holdco, and further contemporaneously advanced or contributed to a Subsidiary for purposes of making the relevant Investment in the Target Person without constituting an Investment for purposes of Section 7.02 (it being understood that such Investment must satisfy the requirements of, and shall count towards any thresholds in, a provision of this Section 7.02 as if made by the applicable Loan Party directly to the Target Person).

**Section 7.03     Indebtedness**.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)        Indebtedness of any Loan Party under the Loan Documents;

(b)        Indebtedness outstanding on the Closing Date and listed on Schedule 7.03(b) and any Permitted Refinancing thereof; *provided* that all such Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be unsecured and subordinated to the Obligations pursuant to an Intercompany Note;

(c)        Guarantees by the Borrower and any Subsidiary in respect of Indebtedness of the Borrower or any Subsidiary otherwise permitted hereunder; *provided* that (A) no Guarantee by any

83

Subsidiary of any Indebtedness that is secured by a Lien on the Collateral shall be permitted unless such guaranteeing party shall have also provided a Guarantee of the Obligations on the terms set forth herein, (B) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guarantee of the Obligations on terms at least as favorable (as reasonably determined by the Borrower) to the Lenders as those contained in the subordination of such Indebtedness and (C) any Guarantee by a Subsidiary that is not a Loan Party of any Indebtedness under Section 7.03(g) or (m) (or any Permitted Refinancing in respect thereof) shall only be permitted if such Guarantee meets the requirements of clauses (s), (g) or (m), as the case may be, of this Section 7.03;

(d)     Indebtedness of the Borrower or any Subsidiary owing to any Loan Party or any other Subsidiary (or issued or transferred to any direct or indirect parent of a Loan Party which is substantially contemporaneously transferred to a Loan Party or any Subsidiary of a Loan Party) to the extent constituting an Investment permitted by Section 7.02; *provided* that (x) no such Indebtedness owed to a Loan Party shall be evidenced by a promissory note unless such promissory note constitutes a negotiable instrument and is pledged to the Administrative Agent in accordance with the terms of the Security Agreement and (y) with respect to Indebtedness of any Loan Party owed to a Subsidiary that is not a Loan Party, all such Indebtedness shall be unsecured and subordinated to the Obligations pursuant to subordination terms substantially consistent with the terms of the Intercompany Note;

(e)     (i) Attributable Indebtedness and other Indebtedness (including Capitalized Leases) financing an acquisition, construction, repair, replacement, lease or improvement of a fixed or capital asset incurred by the Borrower or any Subsidiary prior to or within 270 days after the acquisition, lease or improvement of the applicable asset and any Permitted Refinancing thereof in an aggregate amount not to exceed $8,250,000, determined at the time of incurrence (together with any Permitted Refinancings thereof) at any time outstanding and (ii) Attributable Indebtedness arising out of sale-leaseback transactions permitted by Section 7.05(m) and any Permitted Refinancing of such Attributable Indebtedness;

(f)     Indebtedness in respect of Swap Contracts designed to hedge against the Borrower's or any Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes and Guarantees thereof;

(g)     Indebtedness of the Borrower or any Subsidiary (i) assumed in connection with any Permitted Acquisition (provided that such Indebtedness is not created or incurred in contemplation of such Permitted Acquisition) in an or (ii) incurred to finance any Permitted Acquisition; provided that (A) the aggregate amount of Indebtedness assumed and/or incurred pursuant to this clause (g) shall not to exceed $27,500,000 and (B) after giving Pro Forma Effect to the incurrence of such Indebtedness (x) at any time when the financial covenant contained in Section 7.11 is not in effect, the Consolidated First Lien Net Leverage Ratio does not exceed 9.02:1.00 or (y) the Consolidated First Lien Net Leverage Ratio does not exceed the Consolidated First Lien Net Leverage Ratio as of the last day of the most recently ended Test Period;

(h)     Indebtedness representing deferred compensation to employees of the Borrower or any of its Subsidiaries incurred in the ordinary course of business;

(i)     Indebtedness consisting of promissory notes issued by the Borrower or any of its Subsidiaries to current or former officers, managers, consultants, directors and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of the Borrower or any direct or indirect parent of the Borrower permitted by Section 7.06; *provided* that such Indebtedness shall be subordinated in right of payment to the Obligations on terms reasonably satisfactory to the Administrative AgentRequired Lenders;

(j)     Indebtedness incurred by the Borrower or any of its Subsidiaries in a Permitted Acquisition, any other Investment permitted hereunder (including through a merger) or any Disposition

84

permitted hereunder, in each case, constituting indemnification obligations or obligations in respect of purchase price (including earnouts) or other similar adjustments;

(k)        Indebtedness consisting of obligations of the Borrower or any of its Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with the Transactions, and Permitted Acquisitions or any other Investment permitted hereunder;

(l)        Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantees thereof or the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished in the ordinary course of business;

(m)        Indebtedness in an aggregate principal amount that at the time of, and after giving effect to, the incurrence thereof, would not exceed $8,250,000 determined at the time of incurrence;

(n)        Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(o)        Indebtedness incurred by the Borrower or any of its Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers' compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims;

(p)        obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of its Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(q)        [reserved];

(r)        [reserved];

(s)        [reserved];

(t)        [reserved];

(u)        Indebtedness incurred by a Foreign Subsidiary which, when aggregated with the principal amount of all other Indebtedness incurred pursuant to this Section 7.03(u) and then outstanding for all such Persons taken together (and any Permitted Refinancing of the foregoing, to the extent assumed or incurred by a Subsidiary that is not a Loan Party), does not exceed $27,500,000;

(v)        [reserved];

(w)        (i) Indebtedness under the First Lien Credit Agreement in an aggregate principal amount not to exceed $75,00076,600,000 and (ii) any Permitted Refinancing in respect of any of the foregoing Indebtedness in accordance with the terms of the Intercreditor Agreement;

(x)        (i) Indebtedness under the ABL Credit Agreement in an aggregate principal amount not to exceed $30,000,000 and (ii) any Permitted Refinancing in respect of any of the foregoing Indebtedness in accordance with the terms of the Intercreditor Agreement;

<div align="center">85</div>

(y)      [reserved];

(z)      [reserved]; and

(aa)      all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in Sections 7.03(a) through Section 7.03(aa);

*provided*, *however*, that all Indebtedness permitted by this Section 7.03 which is permitted to be secured pursuant to Section 7.01 and is secured by the Collateral shall be subject to the following: (1) in the case of the Indebtedness described in Section 7.03(w), all such Indebtedness incurred on the Closing Date shall constitute ["""First Lien ~~Credit Agreement Secured~~ Obligations"]" under (and as defined in) the Intercreditor Agreement and the First Lien Administrative Agent acting on behalf of the holders of such Indebtedness shall have become party to the Intercreditor Agreement on the Closing Date; (2) in the case of the Indebtedness described in Section 7.03(x), all such Indebtedness incurred on the Closing Date shall constitute ["""ABL ~~Credit Agreement Secured~~ Obligations"]" under (and as defined in) the Intercreditor Agreement and the ABL Agent acting on behalf of the holders of such Indebtedness shall have become party to the Intercreditor Agreement on the Closing Date;

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased, *plus* the aggregate amount of fees, underwriting discounts, premiums (including tender premiums) and other costs and expenses (including OID) incurred in connection with such refinancing.

The accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 7.03. The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

For purposes of determining compliance with this Section 7.03, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Indebtedness described in Sections 7.03(a) through 7.03(aa), Holdings shall, in its sole discretion, classify and reclassify or later divide, classify or reclassify such item of Indebtedness (or any portion thereof) and will only be required to include the amount and type of such Indebtedness in one or more of the above clauses; *provided* that (w) all Indebtedness outstanding under the Loan Documents will at all times be deemed to be outstanding in reliance only on the exception in Section 7.03(a), (x) the ABL Credit Agreement and any Permitted Refinancing in respect of the foregoing will at all times be deemed to be outstanding in reliance only on the exception in Section 7.03(x) and (y) the First Lien Term Facility and any Permitted Refinancing in respect of the foregoing will at all times be deemed to be outstanding in reliance only on the exception in Section 7.03(w).

**Section 7.04      Fundamental Changes**. Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of related transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person (other than as part of the Transactions), except that:

86

(a)      (i) Any Loan Party (other than Holdings or the Borrower) and any Subsidiary may merge, amalgamate or consolidate with (i) the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction); provided that the Borrower shall be the continuing or surviving Person orand (ii) any Subsidiary may merge with one or more other Subsidiaries; provided that when any Person that is a Loan Party is merging with a Subsidiary that is not a Loan Party, the Loan Party shall be the continuing or surviving Person or the surviving entity shall substantially concurrently become a Loan Party; provided, further, that any security interests granted to the Administrative Agent for the benefit of the Secured Parties in the Collateral pursuant to the Collateral Documents shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, consolidation, dissolution or liquidation) and all actions required to maintain said perfected status have been or will promptly be taken, in each case, as required by Sections 6.11 or 6.13 to the extent required pursuant to the Collateral and Guarantee Requirement;

(b)      (i) any Subsidiary that is not a Loan Party may merge, amalgamate or consolidate with or into any other Subsidiary that is not a Loan Party, (ii) any Subsidiary may liquidate or dissolve and (iii) any Subsidiary may change its legal form if, with respect to clauses (ii) and (iii), the Borrower determines in good faith that such action is in the best interest of the Borrower and its Subsidiaries and is not materially disadvantageous to the Lenders (it being understood that in the case of any change in legal form, a Subsidiary that is a Guarantor will remain a Guarantor unless such Guarantor is otherwise permitted to cease being a Guarantor hereunder);

(c)      any Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Subsidiary; *provided* that if the transferor in such a transaction is a Guarantor, then (i) the transferee must be a Subsidiary Guarantor or the Borrower or (ii) to the extent constituting an Investment, such Investment must be a permitted Investment in or Indebtedness of a Subsidiary which is not a Loan Party in accordance with Sections 7.02 (other than Section 7.02(e) or 7.02(h)) and 7.03, respectively;

(d)      [reserved];

(e)      so long as no Event of Default has occurred and is continuing or would result therefrom (in the case of a merger involving a Loan Party), any Subsidiary may merge or consolidate with any other Person in order to effect an Investment permitted pursuant to Section 7.02; *provided* that the continuing or surviving Person shall be a Subsidiary, which together with each of such surviving Person's Subsidiaries that are Subsidiaries, shall have complied with the requirements of Section 6.11 or 6.13 to the extent required pursuant to the Collateral and Guarantee Requirement;

(f)      [reserved]; and

(g)      so long as no Event of Default has occurred and is continuing or would result therefrom, a merger, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 7.05 or a Restricted Payment permitted pursuant to Section 7.06.

**Section 7.05    Dispositions**.  Make any Disposition, except:

(a)      Dispositions of obsolete, worn out, used or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property

87

no longer used or useful in the conduct of the business of the Borrower or any of its Subsidiaries;

(b)      Dispositions of inventory in the ordinary course of business or consistent with past practice, goods held for sale in the ordinary course of business and immaterial assets (including allowing any registrations or any applications for registration of any immaterial intellectual property to lapse or go abandoned in the ordinary course of business) and termination of leases and licenses in the ordinary course of business;

(c)      Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)      Dispositions of property to the Borrower or any Subsidiary; *provided* that if the transferor of such property is a Loan Party, (i) the transferee thereof must be a Loan Party (other than a Holdco) or (ii) if such transaction constitutes an Investment, such transaction is permitted under Section 7.02 other than Section 7.02(e);

(e)      to the extent constituting Dispositions, transactions permitted by (i) Section 7.01 (other than Section 7.01(i) and (l)(ii)), (ii) Section 7.02 (other than 7.02(e) or (h)), (iii) Section 7.04 (other than 7.04(g)) and (iv) Section 7.06 (other than 7.06(d));

(f)      Dispositions to consummate the Transactions;

(g)      Dispositions of cash and Cash Equivalents;

(h)      leases, subleases, licenses or sublicenses (including licenses and sublicenses of software or other intellectual property rights) and terminations thereof, in each case in the ordinary course of business, and which do not materially interfere with the business of the Borrower and its Subsidiaries (taken as a whole) and (ii) Dispositions of intellectual property (including inbound licenses) that is no longer material to the business of the Borrower and its Subsidiaries;

(i)      transfers of property subject to Casualty Events;

(j)      Dispositions of property; *provided* that (i) at the time of such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Default has occurred and is continuing), no Event of Default shall have occurred and be continuing or would result from such Disposition, (ii) with respect to Dispositions pursuant to this Section 7.05(j) for an aggregate purchase price for all such Dispositions in excess of $5,000,000 in any fiscal year, the Borrower or any of its Subsidiaries shall receive not less than 75% of such consideration in the form of cash or Cash Equivalents (in each case, free and clear of all Liens at the time received, other than non-consensual Liens permitted by Section 7.01 and Liens permitted by Sections 7.01(a), (f), (k), (l), (m), (n), (p), (q), (r)(i), (r)(ii), (s), (jj) and (kk) (only to the extent the Obligations are secured by such cash and Cash Equivalents)); *provided*, *however*, that for the purposes of this clause (ii), the following shall be deemed to be cash: (A) any liabilities (as shown on the Borrower's most recent balance sheet provided hereunder or in the footnotes thereto) of the Borrower or such Subsidiary, other than liabilities that are by their terms subordinated to the payment in cash of the Obligations, that are assumed by the transferee with respect to the applicable Disposition and for which the Borrower and all of its Subsidiaries shall have been validly released by all applicable creditors in writing, (B) any securities received by the Borrower or the applicable Subsidiary from such transferee that are converted by the

88

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

Borrower or such Subsidiary into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of the applicable Disposition, and (C) aggregate non-cash consideration received by the Borrower or the applicable Subsidiary having an aggregate fair market value (determined as of the closing of the applicable Disposition for which such non-cash consideration is received) not to exceed the $6,875,000 at any time and (iii) the Borrower or the applicable Subsidiary complies with the applicable provision of Section 2.05(b);

(k)      Dispositions of non-core assets acquired in connection with Permitted Acquisitions or other Investments; *provided* that (i) the aggregate amount of such sales shall not exceed 12.525% of the fair market value of the acquired entity or business and (ii) each such sale is in an arm's-length transaction and the Borrower or the respective Subsidiary receives at least fair market value in exchange therefor;

(l)      Dispositions or discounts without recourse of accounts receivable in connection with the compromise or collection thereof in the ordinary course of business;

(m)      Dispositions of property pursuant to sale-leaseback transactions; *provided* that any Net Proceeds from such Disposition shall be applied to prepay Loans in accordance with Section 2.05(b)(ii);

(n)      any swap of assets in exchange for services or other assets in the ordinary course of business of comparable or greater value or usefulness to the business of the Borrower and its Subsidiaries as a whole, as determined in good faith by the management of the Borrower;

(o)      [reserved];

(p)      Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(q)      the unwinding or settlement of any Swap Contract;

(r)      the lapse or abandonment in the ordinary course of business of any registrations or applications for registration of any immaterial IP Rights;

(s)      [reserved];

(t)      [reserved];

(u)      Dispositions of non-Collateral assets in an aggregate amount not to exceed, over the life of this Agreement, $2,750,000; and

(v)      Dispositions pursuant to agreements, instruments or arrangements in existence on the Closing Date and set forth on Schedule 7.05(v);

*provided* that any Disposition of any property pursuant to this Section 7.05 (except pursuant to Sections 7.05(a), (b), (d), (e), (f), (h), (i), (l), (p), (q) and (r) and except for Dispositions from a Loan Party to any other Loan Party) shall be for no less than the fair market value of such property at the time of such Disposition as determined by the Borrower in good faith.  To the extent any Collateral is Disposed of as permitted by this Section 7.05 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens

89

created by the Loan Documents, and the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

      **Section 7.06**    **Restricted Payments**.  Declare or make, directly or indirectly, any Restricted Payment, except:

      (a)     each Subsidiary may make Restricted Payments to the Borrower, and other Subsidiaries of the Borrower (and, in the case of a Restricted Payment by a non-wholly owned Subsidiary, to the Borrower and any other Subsidiary and to each other owner of Equity Interests of such Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

      (b)     the Borrower and each Subsidiary may declare and make dividend payments or other Restricted Payments payable solely in the Equity Interests of such Person (and, in the case of such a Restricted Payment by a non-wholly owned Subsidiary, to the Borrower and any other Subsidiary and to each other owner of Equity Interests of such Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

      (c)     [reserved];

      (d)     to the extent constituting Restricted Payments, the Borrower (or any direct or indirect parent thereof) and its Subsidiaries may enter into and consummate transactions permitted by any provision of Section 7.02 (other than 7.02(e) and 7.02(m)), 7.04 (other than 7.04(g)), 7.05 (other than 7.05(e)(iv) and 7.05(g)) or 7.08 (other than 7.08(f), 7.08(g), 7.08(h), and 7.08(m));

      (e)     repurchases of Equity Interests in the Borrower or any Subsidiary deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

      (f)     [reserved]:

      (g)     [reserved];

      (h)     the Borrower may make Restricted Payments to any direct or indirect parent of the Borrower:

      (i)     to pay its operating costs and expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), incurred in the ordinary course of business and attributable to the ownership or operations of the Borrower and its Subsidiaries, Transaction Expenses and any indemnification claims made by directors or officers of such parent attributable to the ownership or operations of the Borrower and its Subsidiaries;

      (ii)     the proceeds of which shall be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) ordinary course franchise or similar Taxes, other fees and expenses required to maintain its (or any of its direct or indirect parents') corporate existence; and

      (iii)     for any taxable period in which the Borrower and/or any of its Subsidiaries is a member of a consolidated, combined or similar income tax group of which a direct or indirect parent of the Borrower is the common parent (a "**Tax Group**"), to pay the portion of

90

any federal, foreign, state and/or local income taxes of such Tax Group that are attributable to the taxable income of the Borrower and/or its Subsidiaries *provided* that, for each taxable period, the amount of such payments made in respect of such taxable period in the aggregate shall not exceed the amount that the Borrower and its Subsidiaries would have been required to pay as a stand-alone consolidated, combined or similar income tax group (any amount permitted to be paid under this Section 7.06(h)(iii), a "**Tax Distribution**");

(i)    payments made or expected to be made by a Holdco, Borrower or any of the Subsidiaries (or Restricted Payments to allow any direct or indirect parent thereof to make payments) in respect of withholding or similar Taxes payable by or with respect to any future, present or former employee, director, manager or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) and any repurchases of Equity Interests in consideration of such payments including deemed repurchases, in each case, in connection with the exercise of stock options;

(j)    [after a Qualified IPO by the Borrower or a Relevant Public Company, (i) any Restricted Payment by the Borrower to pay listing fees and other costs and expenses attributable to the Borrower or such Relevant Public Company being a publicly traded company which are reasonable and customary and (ii) additional Restricted Payments in an aggregate amount per annum not to exceed an amount equal to 6.0% of the net proceeds received by (or contributed to) the Borrower from such Qualified IPO][4];

(k)    the Borrower or any of the Subsidiaries may pay (or to make Restricted Payments to allow any direct or indirect parent thereof to pay) cash in lieu of fractional Equity Interests in connection with (x) any dividend, split or combination thereof or (y) any Permitted Acquisition; and

(l)    amounts necessary to ensure that the Borrower may make any AHYDO Payments required under Section 10.24.

**Section 7.07    [Reserved]**.

**Section 7.08    Transactions with Affiliates**.    Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, in each case involving aggregate payments or consideration in excess of $1,100,000, other than:

(a)    transactions among the Borrower and its Subsidiaries or any entity that becomes a Subsidiary as a result of such transaction;

(b)    on terms substantially as favorable to the Borrower or such Subsidiary as would be obtainable by the Borrower or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(c)    the Transactions and the payment of fees and expenses (including Transaction Expenses) as part of or in connection with the Transactions;

(d)    the issuance of Equity Interests to any officer, director, employee or consultant of the Borrower or any of its Subsidiaries in connection with the Transactions;

(e)    [reserved];

---

[4] NTD: to be discussed

91

(f)        Restricted Payments permitted under Section 7.06;

(g)        loans and other Investments among Holdings, Intermediate Holdings, the Borrower and its Subsidiaries and joint ventures (to the extent any such Subsidiary that is not a Subsidiary or any such joint venture is only an Affiliate as a result of Investments by the Holdcos, the Borrower and/or its Subsidiaries in such Subsidiary or joint venture) to the extent otherwise permitted under Section 7.02;

(h)        transactions by the Borrower and its Subsidiaries permitted under an express provision (including any exceptions thereto) of this Article VII;

(i)        employment and severance arrangements between the Borrower and its Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee benefit plans and arrangements in the ordinary course of business;

(j)        the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers, employees and consultants of the Borrower and its Subsidiaries (or any direct or indirect parent of the Borrower) in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and its Subsidiaries;

(k)        transactions pursuant to agreements, instruments or arrangements in existence on the Closing Date and set forth on Schedule 7.08(k) or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect;

(l)        [reserved];

(m)        payments by the Borrower or any of its Subsidiaries pursuant to any tax sharing agreements with any direct or indirect parent of the Borrower to the extent attributable to the ownership or operation of the Borrower and the Subsidiaries, but only to the extent permitted by Section 7.06(h)(iii);

(n)        the issuance or transfer of Equity Interests (other than Disqualified Equity Interests) of Holdings to any Permitted Holder or to any former, current or future director, manager, officer, employee or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees, distributes or Affiliate of any of the foregoing) of the Borrower, any of its Subsidiaries or any direct or indirect parent thereof;

(o)        transactions with customers, clients, joint venture partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and the Subsidiaries, in the reasonable determination of the board of directors or the senior management of the Borrower, or are on terms at least as favorable (as reasonably determined by the Borrower) as might reasonably have been obtained at such time from an unaffiliated party;

(p)        the Transactions;

(q)        the payment of reasonable out-of-pocket costs and expenses and indemnities pursuant to the stockholders agreement or the registration and participation rights agreement entered into on the Closing Date in connection therewith;

92

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

(r)      transactions in which the Borrower or any of the Subsidiaries, as the case may be, deliver to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Borrower or such Subsidiary from a financial point of view or meets the requirements of Section 7.08(b); and

(s)      payments to or from, and transactions with, joint ventures (to the extent any such joint venture is only an Affiliate as a result of Investments by the Borrower and the Subsidiaries in such joint venture) in the ordinary course of business to the extent otherwise permitted under Section 7.02.

**Section 7.09      Burdensome Agreements**.  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that limits the ability of:

(a)      any Subsidiary that is not a Guarantor to make Restricted Payments to the Borrower or any Guarantor; or

(b)      any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Lenders with respect to the Term Facility and the Obligations;

*provided* that the foregoing Sections 7.09(a) and (b) shall not apply to Contractual Obligations which:

(i)      (x) exist on the Closing Date and (to the extent not otherwise permitted by this Section 7.09) are listed on Schedule 7.09(b) and (y) to the extent Contractual Obligations permitted by clause (x) are set forth in an agreement evidencing Indebtedness, are set forth in any agreement evidencing any permitted modification, replacement, renewal, extension or refinancing of such Indebtedness so long as such modification, replacement, renewal, extension or refinancing (taken as a whole) does not materially expand the scope of such Contractual Obligation (as reasonably determined by the Borrower);

(ii)      are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Subsidiary; *provided*, *further*, that this clause (ii) shall not apply to Contractual Obligations that are binding on a Person that becomes a Subsidiary pursuant to Section 6.14;

(iii)      represent Indebtedness of a Subsidiary which is not a Loan Party which is permitted by Section 7.03 and which does not apply to any Loan Party;

(iv)      are customary restrictions (as reasonably determined by the Borrower) that arise in connection with (x) any Lien permitted by Sections 7.01(a), (b), (f), (i), (j)(i), (k), (l), (p), (q), (r)(i), (r)(ii), (s), (u), (v), (w), (z), (aa), (ee), (ii), (jj), and (kk) and relate to the property subject to such Lien or (y) arise in connection with any Disposition permitted by Section 7.04 or 7.05 and relate solely to the assets or Person subject to such Disposition;

(v)      are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 7.02 and applicable solely to such joint venture and its equity entered into in the ordinary course of business;

(vi)      are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 7.03 but solely to the extent any negative pledge relates to (i) the property financed by such Indebtedness and the proceeds, accessions and products thereof or (ii) the property secured by such Indebtedness and the proceeds, accessions and

93

products thereof so long as the agreements governing such Indebtedness permit the Liens securing the Obligations;

(vii)     are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the property interest, rights or the assets subject thereto;

(viii)    comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Sections 7.03(b), (e), (g), (n)(i), (u), (w) and (x) and to the extent that such restrictions apply only to the property or assets securing such Indebtedness or, in the case of Section 7.03(g) or (u), to the Subsidiaries incurring or guaranteeing such Indebtedness;

(ix)     are customary provisions restricting subletting, transfer or assignment of any lease governing a leasehold interest of the Borrower or any Subsidiary;

(x)     are customary provisions restricting assignment or transfer of any agreement entered into in the ordinary course of business;

(xi)     are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(xii)     arise in connection with cash or other deposits permitted under Sections 7.01 and 7.02 and limited to such cash or deposit;

(xiii)    comprise restrictions imposed by any agreement governing Indebtedness entered into on or after the Closing Date and permitted under Section 7.03 that are, taken as a whole, in the good faith judgment of the Borrower, either (a) no more restrictive than the restrictions contained in this Agreement or (b) no more restrictive with respect to the Borrower or any Subsidiary than customary market terms for Indebtedness of such type, so long as the Borrower shall have determined in good faith that such restrictions pursuant to this clause (b) will not affect its obligation or ability to make any payments required hereunder;

(xiv)    are restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(xv)     are restrictions regarding licensing or sublicensing by the Borrower and its Subsidiaries of intellectual property (including customary restrictions on assignment contained in license or sublicense agreements) entered into in the ordinary course of business;

(xvi)    are restrictions contained in the First Lien Loan Documents and documents otherwise governing Indebtedness permitted pursuant to Section 7.03(w);

(xvii)    are restrictions on cash earnest money deposits in favor of sellers in connection with acquisitions not prohibited hereunder; and

(xviii) are restrictions contained in the ABL Loan Documents and documents otherwise governing Indebtedness permitted pursuant to Section 7.03(x).

94

**Section 7.10    Maximum Capital Expenditures**.[5] Permit the aggregate amount of Capital Expenditures made by the Borrower and its Subsidiaries in any fiscal year to exceed the amount provided in the table set forth below for such fiscal year (the "**Maximum Capital Expenditures Amount**"); provided that the Maximum Capital Expenditures Amount for any fiscal year may, at the election of the Borrower, be increased by an amount equal to 100% of the excess, if any, of the Maximum Capital Expenditures Amount for the previous fiscal year over the actual amount of Capital Expenditures made during such Fiscal Year (the "**Carry Over Amount**"). For purposes of determining compliance with this Section 7.10, (x) the amount of Capital Expenditures in any fiscal year shall (i) first be applied toward the Maximum Capital Expenditures Amount allocated to such fiscal year (without giving effect to any Carry Over Amount from the prior fiscal year) then (ii) from the Carry Over Amount available in such fiscal year until it has been fully utilized.

| Fiscal Year | Maximum Net Capital Expenditures Amount |
|---|---|
| 2021 | [$$15,6200,000] |
| 2022 | [$$10,5600,000] |
| 2023 | [$11,300,000]Greater of (i) $11,330,000 and (ii) 3.03% of Consolidated Net Sales |
| 2024 | [$11,600,000]Greater of (i) $11,660,000 and (ii) 3.03% of Consolidated Net Sales |
| 2025 | [$12,000,000]Greater of (i) $13,200,000 and (ii) 3.03% of Consolidated Net Sales |

**Section 7.11    Consolidated First Lien Net Leverage Ratio**.  Permit the Consolidated First Lien Net Leverage Ratio as of the last day of any Test Period ending on or after December 31, 2021 and set forth below to be greater than the ratio set forth below opposite such last day of a Test Period below.

| Test Period Ended[6] | Consolidated First Lien Net Leverage Ratio |
|---|---|
| June 30, 2021 | 7.15:1.00 |
| September 30, 2021 | 5.78:1.00 |
| December 31, 2021 | [4.2568:1.00] |
| March 31, 2022 | [4.2568:1.00] |
| June 30, 2022 | [4.2568:1.00] |
| September 30, 2022 | [4.2568:1.00] |
| December 31, 2022 | [3.0003:1.00] |
| March 31, 2023 | [3.0003:1.00] |
| June 30, 2023 | [3.0003:1.00] |
| September 30, 2023 | [3.0003:1.00] |
| December 31, 2023 and thereafter | [2.251.93:1.00] |

**Section 7.12    Interest Coverage Ratio**. Permit the Interest Coverage Ratio as of the last day of any Test Period ending on or after December 31, 2021 and set forth below to be less than the ratio set forth below opposite such last day of a Test Period below.

---

[5] NTD: Levels under review.

[6] NTD: Levels under review.

95

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

| Test Period Ended[7] | Interest Coverage Ratio |
|---|---|
| June 30, 2021 | 0.90:1.00 |
| September 30, 2021 | 1.13:1.00 |
| December 31, 2021 | [1.~~25~~13:1.00] |
| March 31, 2022 | [1.~~25~~13:1.00] |
| June 30, 2022 | [1.~~25~~13:1.00] |
| September 30, 2022 | [1.~~25~~13:1.00] |
| December 31, 2022 | [1.~~50~~58:1.00] |
| March 31, 2023 | [1.~~50~~58:1.00] |
| June 30, 2023 | [1.~~50~~58:1.00] |
| September 30, 2023 | [1.~~50~~58:1.00] |
| December 31, 2023 and thereafter | [2.~~00~~25:1.00] |

**Section 7.13     Prepayments, Etc. of Indebtedness**.

(a)     Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any (i) Indebtedness subordinated in right of payment incurred under Section 7.03, or (ii) any other Indebtedness for borrowed money of a Loan Party that is (x) subordinated in right of payment to the Obligations expressly by its terms or (y) is secured on a junior lien basis to the Liens securing the Obligations, except (i) the refinancing thereof with any Indebtedness (to the extent such Indebtedness constitutes a Permitted Refinancing and, if such Indebtedness was originally incurred under Section 7.03(g), is permitted pursuant to Section 7.03(g)), to the extent not required to prepay any Loans pursuant to Section 2.05(b) and (ii) the prepayment of Indebtedness of the Borrower or any Subsidiary to the Borrower or any Subsidiary, subject to the subordination provisions applicable to any such Indebtedness.

(b)     Amend, modify or change any term or condition of any Indebtedness (x) in the case of the Indebtedness under the ABL Credit Agreement and any other ABL Secured Obligations (and any Permitted Refinancing in respect of the foregoing) in violation of the Intercreditor Agreement, (y) in the case of the Indebtedness under the First Lien Credit Agreement and any other First Lien Secured Obligations (and any Permitted Refinancing in respect of the foregoing), in violation of the Intercreditor Agreement or the definition of "Permitted Refinancing" and (z) in the case of any other Indebtedness in excess of the Threshold Amount in a manner adverse to the Lenders.

Notwithstanding anything to the contrary in any Loan Document, the Borrower may make regularly scheduled payments of interest and fees on the ABL Facility or the First Lien Term Facility, and may make any payments required by the terms of such Indebtedness in order to avoid the application of Section 163(e)(5) of the Code to such Indebtedness.

**Section 7.14     Permitted Activities**.  With respect to a Holdco, engage in any material operating or business activities; *provided* that the following and any activities incidental thereto shall be permitted in any event: (i) (a) in the case of Intermediate Holdings, its ownership of the Equity Interests of the Borrower and activities incidental thereto, including payment of dividends and other amounts in respect of its Equity Interests and (b) in the case of Holdings, its ownership of the Equity Interests of Intermediate Holdings and activities incidental thereto, including payment of dividends and other amounts in respect of its Equity Interests, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations with respect to the Loan Documents, the ABL Loan Documents, the First Lien Loan Documents and any other documents governing Indebtedness permitted to be incurred by the Borrower or a Subsidiary pursuant to Section 7.03, (iv) any public offering of

---

[7] ~~NTD: Levels under review.~~

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

its common stock or any other issuance or sale of its Equity Interests, (v)(1) Guaranteed Obligations in respect of Indebtedness of, the Borrower and its Subsidiaries permitted under Section 7.03, including any Permitted Refinancing thereof and (2) guaranties of other obligations not constituting Indebtedness incurred by, the Borrower or any of the Subsidiaries, (vi) if applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings, Intermediate Holdings and the Borrower, (vii) holding any cash or property (but not operating any property), (viii) [reserved], (ix) providing indemnification to officers and directors and (x) any activities incidental or reasonably related to the foregoing.  No Holdco shall incur any Liens on Equity Interests of Intermediate Holdings or the Borrower, other than non-consensual Liens and those for the benefit of the Second Lien Secured Obligations, ABL Secured Obligations (subject at all times to the Intercreditor Agreement) and the First Lien Secured Obligations (subject at all times to the Intercreditor Agreement).  Holdings shall not own any Equity Interests other than those of Intermediate Holdings, and Intermediate Holdings shall not own any Equity Interests other than those of the Borrower.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**Section 8.01    Events of Default**.  Any of the following from and after the Closing Date shall constitute an event of default (an "**Event of Default**"):

(a)    *Non-Payment*.  Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within three Business Days after the same becomes due, any interest on any Loan, any fees or other amounts payable hereunder or with respect to any other Loan Document; or

(b)    *Specific Covenants*.  The Borrower, any Subsidiary or, in the case of Section 7.14, a Holdco, fails to perform or observe any term, covenant or agreement contained in any of Section 6.03(a) or 6.05(a) (solely with respect to the Borrower), 6.20(b) or 6.22 or Article VII; *provided* that the covenants in Section 7.11 and Section 7.12 are subject to cure pursuant to Section 8.04; or

(c)    *Other Defaults*.  Any Holdco, the Borrower or any Subsidiary fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a), (b) or (d)) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days after (i) a Responsible Officer of any Loan Party obtaining knowledge thereof or (ii) receipt by the Borrower of written notice thereof from the Administrative Agent; or

(d)    *Representations and Warranties*.  Any representation, warranty, certification or statement of fact made or deemed made by any Loan Party herein or in any other Loan Document, or any certification in any document required to be delivered in connection herewith or therewith shall be incorrect in any material respect (or, in the case of any representation and warranty qualified by materiality, in all respects) when made or deemed made; or

(e)    *Cross-Default*.  Any Loan Party or any Subsidiary (A) fails to make any payment whether at scheduled maturity or upon acceleration in respect of any Indebtedness under the ABL Loan Documents and First Lien Loan Documents, (B) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder, under the ABL Loan Documents and/or under the First Lien Loan Documents) having an aggregate outstanding principal amount of not less than the Threshold Amount, or (C) fails to observe or perform any other agreement or condition relating to any such Indebtedness referenced in clause (B) above, or any other event occurs (other than, with

97

respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any default thereunder by any Loan Party), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause (after delivery of any notice if required and after giving effect to any waiver, amendment, cure or grace period), with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that this clause (C) shall not apply to (i) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder, (ii) any Indebtedness if (x) the sole remedy of the holder thereof in the event of the non-payment of such Indebtedness or the non-payment or non-performance of obligations related thereto or (y) the sole rights of the holder(s) thereof is to elect, in each case, to convert such Indebtedness into Qualified Equity Interests and cash in lieu of fractional shares and (iii) in the case of Indebtedness which the holder thereof may elect to convert into Qualified Equity Interests, such Indebtedness from and after the date, if any, on which such conversion has been effected; *provided*, *further*, that such failure is unremedied or is not waived by the holders of such Indebtedness prior to any acceleration of the Loans pursuant to Section 8.02; or

(f)     *Insolvency Proceedings, Etc*.  Other than with respect to any dissolutions otherwise permitted hereunder, any Loan Party or any Material Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes a general assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for 60 calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or substantially all of its property is instituted without the consent of such Person and continues undismissed or unstayed for 60 consecutive calendar days, or an order for relief is entered in any such proceeding; or

(g)     [Reserved]; or

(h)     *Judgments*.  There is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by either (i) independent third-party insurance as to which the insurer does not deny coverage or (ii) another creditworthy (as reasonably determined by the ~~Administrative Agent~~Required Lenders) indemnitor); and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of 60 consecutive days; or

(i)     *Invalidity of Loan Documents*.  Any material provision of the Loan Documents, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05) or as a result of acts or omissions by the Administrative Agent or any Lender due to such person's gross negligence or willful misconduct which do not arise from a breach by a Loan Party of its obligations under the Loan Documents, the satisfaction in full of all the Obligations (other than contingent obligations as to which no claim has been asserted) or the Conversion, ceases to be in full force and effect; or any Loan Party contests

98

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

in writing the validity or enforceability of any provision of any Loan Document or the validity or priority of a Lien as required by the Collateral Documents on a material portion of the Collateral; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations (other than in accordance with its terms) or the Conversion (other than in accordance with the terms of this Agreement), or purports in writing to revoke or rescind any Loan Document (other than in accordance with its terms); or

(j)      *Change of Control*.  There occurs any Change of Control; or

(k)      *Collateral Documents*.  Any Collateral Document after delivery thereof pursuant to Sections 4.01, 6.11 or 6.13 shall for any reason (other than pursuant to the terms thereof including as a result of a transaction not prohibited under this Agreement) cease to create a valid and perfected Lien, with the priority required by the Collateral Documents on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01 or any Loan Party contests in writing the validity or priority of a Lien, (i) except to the extent that any such perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities or negotiable instruments pledged under the Collateral Documents or take other required actions required to be taken by the Administrative Agent under the Loan Documents, in each case, which does not arise from a breach by a Loan Party of its obligations under the Loan Documents, and (ii) except as to Collateral consisting of Real Property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

(l)      *ERISA*.   (i) An ERISA Event occurs which has resulted or could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, or (ii) a Loan Party, any Subsidiary or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan and a Material Adverse Effect could, individually or in the aggregate, reasonably be expected to result.

**Section 8.02      Remedies Upon Event of Default**.   (a)  If any Event of Default occurs and is continuing, the Administrative Agent may and, at the request of the Required Lenders shall, take any or all of the following actions:

(i)      [reserved];

(ii)      declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower (to the extent permitted by applicable law); and

(iii)      exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that upon the occurrence of an Event of Default pursuant to Section 8.01(f), the unpaid principal amount of all outstanding Loans and all interest, fees, premiums and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.

99

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

**Section 8.03**    **Application of Funds**.  After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order (to the fullest extent permitted by mandatory provisions of applicable Law):

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to ~~each~~the Administrative Agent in its capacity as such hereunder;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders hereunder (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and any Secured Obligations constituting fees and premiums, ratably among the Secured Parties in proportion to the respective amounts described in this clause Third payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

*Fifth*, to the payment of all other Secured Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

*Last*, the balance, if any, after all of the Secured Obligations then earned, due and payable have been paid in full, to the Borrower or as otherwise required by Law.

**Section 8.04**    **Borrower's Right to Cure**.  Notwithstanding anything to the contrary contained in Section 8.01 or Section 8.02:

(a)    For the purpose of determining whether an Event of Default under Section 7.11 and/or Section 7.12 has occurred, the Borrower may on one or more occasions designate any portion of the net cash proceeds from a sale or issuance of Qualified Equity Interests of the Borrower or any cash contribution to the common capital of the Borrower (the "**Cure Amount**") as an increase to Consolidated EBITDA for the applicable fiscal quarter; *provided* that (A) such amounts to be designated (i) are actually received by the Borrower after the first day of the applicable fiscal quarter and on or prior to the tenth Business Day after the date on which financial statements are required to be delivered with respect to such fiscal quarter (the "**Cure Expiration Date**") and (ii) do not exceed the aggregate amount necessary to cure any Event of Default under Section 7.11 and/or Section 7.12 as of such date and (B) the Borrower shall have provided notice (the "**Notice of Intent to Cure**") to the Administrative Agent that such amounts are designated as a "Cure Amount".  The Cure Amount shall be added to Consolidated EBITDA for the applicable fiscal quarter and included when calculating Consolidated EBITDA for each Test Period that includes such fiscal quarter.

(b)    The parties hereby acknowledge that this Section 8.04 may not be relied on for purposes of calculating any financial ratios other than for determining actual compliance with Section 7.11 and/or Section 7.12 and shall not result in any adjustment to any amounts hereunder (including the amount of Indebtedness, Total Assets, Consolidated First Lien Net Debt, Consolidated Interest Expense or any other calculation of net leverage or Indebtedness hereunder (directly or by way of netting) and shall not be included for purposes of

100

determining pricing, mandatory prepayments, financial ratio-based conditions and the availability or amount permitted pursuant to any covenant under Article VII) with respect to the quarter with respect to which such Cure Amount was made other than the amount of the Consolidated EBITDA referred to in Section 8.04(a) above.

(c)    In furtherance of Section 8.04(a) above, (i) upon actual receipt and designation of the Cure Amount by the Borrower, the covenant under Section 7.11 and/or Section 7.12 shall be deemed retroactively cured with the same effect as though there had been no failure to comply with the covenant under such Section 7.11 and/or Section 7.12 and any Event of Default or potential Event of Default under Section 7.11 and/or Section 7.12 shall be deemed not to have occurred for purposes of the Loan Documents, and (ii) after delivery of an applicable Notice of Intent to Cure, neither the Administrative Agent nor any Lender may exercise any rights or remedies under Section 8.02 (or under any other Loan Document) on the basis of any actual or purported Event of Default under Section 7.11 and/or Section 7.12 until and unless the Cure Expiration Date has occurred without the Cure Amount having been received.  Notwithstanding the foregoing, no Credit Extension shall be made until receipt by the Borrower of the Cure Amount or waiver of the Event of Default.

(d)    (i) In each period of four consecutive fiscal quarters, there shall be at least two fiscal quarters in which no cure right set forth in this Section 8.04 is exercised and (ii) there shall be no *pro forma* reduction in Indebtedness (directly or by way of netting) with the Cure Amount for determining compliance with Section 7.11 and/or Section 7.12 for the fiscal quarter with respect to which such Cure Amount was made.

(e)    There can be no more than five fiscal quarters in which the cure rights set forth in this Section 8.04 are exercised during the term of this Agreement.

## ARTICLE IX
## ADMINISTRATIVE AGENT

**Section 9.01    Appointment and Authority**.  (a)  Each of the Lenders hereby irrevocably appoints [●]Cantor Fitzgerald Securities to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental or related thereto.  The provisions of this Article IX (other than Sections 9.01, 9.06 and 9.09 through and including 9.12) are solely for the benefit of the Administrative Agent and the Lenders, and no Loan Party has rights as a third party beneficiary of any of such provisions.

(b)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article IX and Article X (including the second paragraph of Section 10.05), as though such co- agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents as if set forth in full herein with respect thereto.  Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent to (i) execute any and all documents (including releases) with respect to the Collateral (including each Intercreditor Agreement and any amendment, supplement, modification or joinder with respect thereto) and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with

101

the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by ~~any~~the Administrative Agent shall bind the Lenders and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender. The rights, privileges and immunities of the Administrative Agent in this Agreement shall be automatically incorporated by reference into each Collateral Document, whether or not expressly stated therein.

**Section 9.02**    **Rights as a Lender**.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

**Section 9.03**    **Exculpatory Provisions**.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents~~);~~) including instructions by e-mail from the Required Lenders or counsel to the Required Lenders (which on the date hereof is Weil, Gotshal & Manges LLP; *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may (i) expose it to liability or that is contrary to any Loan Document or applicable law or (ii) be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; *provided*, *further*, that prior to taking any action, the Administrative Agent may require an indemnity (such indemnity to be ~~reasonably~~ satisfactory to the Administrative Agent in all respects) from the Required Lenders or Lenders, as applicable, against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any action;

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity;

(d)    shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and nonappealable judgment.  The Administrative Agent

102

shall be deemed not to have knowledge of any Default unless and until written notice describing such Default is given to the Administrative Agent by the Borrower or a Lender;

(e)    shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent;

(f)    shall not be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on or the payment of taxes with respect to any of the Collateral.  The actions described in items (i) through (iii) shall be the sole responsibility of the Borrower;

(g)    shall not be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Administrative Agent has been advised of the likelihood of such loss or damage and regardless of the form of action;

(h)    shall not be liable for any error of judgment made in good faith by a responsible officer of the Administrative Agent unless it shall be proved that the Administrative Agent was negligent in ascertaining the pertinent facts;

(i)    shall not be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as Administrative Agent; and

(j)    shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or the other Loan Documents arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; business interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action.; and

(k)    shall not have any obligation to file financing statements, amendments to financing statements, or continuation statements, or to perfect or maintain the perfection of the Administrative Agent's Lien on the Collateral, other than, in each case, as instructed by the Required Lenders or the foregoing's counsel, together with the form of such financing statement to be filed..

In addition, any assignor of a Loan or seller of a participation hereunder shall be entitled to rely conclusively on a representation of the assignee Lender or Participant in the relevant assignment or

103

participation agreement, as applicable, that such assignee or purchaser is not a Disqualified Competitor; *provided* that such representation shall only be required to be made if the list of Disqualified Competitors is made to all Lenders and such assignees.  The Administrative Agent shall not have any responsibility or liability for monitoring the list or identities of, or enforcing provisions relating to, Disqualified Competitors.

Notwithstanding anything herein to the contrary or in any of the other Loan Documents, in each instance where the Loan Documents confer discretionary rights or powers upon the Administrative Agent which may be exercised or refrained from being exercised herein or in any of the Loan Documents, the Administrative Agent shall not be required to take any action in the absence of direction from the Required Lenders (accompanied by indemnity, if requested by the Administrative Agent in its discretion), and shall have the absolute right, in its sole discretion, to consult with, or seek the affirmative or negative vote from the Required Lenders or, if otherwise applicable, the Lenders, and it may do so pursuant to a negative notice, negative consent or otherwise.

Delivery of any reports, information and documents to the Administrative Agent is for informational purposes only and the Administrative Agent's receipt of such shall not constitute actual or constructive notice of any information contained therein or determinable from information contained therein, including the Borrower's compliance with any of its covenants hereunder.

No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby shall require the Administrative Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers.

The Administrative Agent has accepted and is bound by the Loan Documents executed by the Administrative Agent as of the Closing Date and, as directed in writing by the Required Lenders, the Administrative Agent shall execute additional Loan Documents delivered to it after the Closing Date; *provided, however,* that such additional Loan Documents do not adversely affect the rights, privileges, benefits and immunities of the Administrative Agent.  The Administrative Agent will not otherwise be bound by, or be held obligated by, the provisions of any credit agreement, indenture or other agreement governing the Obligations (other than this Agreement and the other Loan Documents to which the Administrative Agent is a party).

For the avoidance of doubt the Borrower, the Guarantors and the Lenders hereby agree that the Administrative Agent shall be under no obligation to make any determination, demand or request, grant or withhold any approval or consent or deliver any notice pursuant to the defined terms "Additional Refinancing Lender", "Collateral and Guarantee Requirement", "Excluded Assets", "Excluded Subsidiary", "Guarantors", "Material Domestic Subsidiary, "Material Foreign Subsidiary",  "Mortgages", "Intercreditor Agreement", "Permitted Refinancing", and pursuant to Sections 2.03(b) and (g), 2.14, 2.15, 2.16, 5.05(b), 6.01(a) and (d), 6.07, 6.11, 6.12, 6.18, 7.03(g) and (i), 8.01(h), 9.02(d) and (e) and 10.01 without the written direction of Required Lenders or Lenders, as applicable.

**Section 9.04    Reliance by Administrative Agent**.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it in good faith to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it in good faith to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts

104

selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**Section 9.05     Delegation of Duties**.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent ~~(including, without limitation, the Former Agent)~~.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this <u>Article IX</u> shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**Section 9.06     Resignation of Administrative Agent**.  The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower.  If the Administrative Agent is a Defaulting Lender, the Borrower may remove such Defaulting Lender from such role upon 15 days' notice to the Lenders.  Upon receipt of any such notice of resignation or removal of the Administrative Agent by the Borrower, the Required Lenders shall have the right, with the consent of the Borrower at all times other than upon the occurrence and during the continuation of an Event of Default (which consent of the Borrower shall not be unreasonably withheld, conditioned or delayed), to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above (including consent of the Borrower); *provided* that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this <u>Section 9.06</u>.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this <u>Section 9.06</u>).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this <u>Article IX</u> and <u>Sections</u> <u>10.04</u> and <u>10.05</u> shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

**Section 9.07     Non-Reliance on Administrative Agent and Other Lenders**.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative ~~Agent, the Former~~ Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action

105

under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Each Lender, by delivering its signature page to this Agreement or an Assignment and Assumption, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by the Administrative Agent, Required Lenders or Lenders, as applicable on the Closing Date.

Section 9.08   **No Other Duties, Etc**.   Anything herein to the contrary notwithstanding, the Administrative Agent, shall not have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder.

Section 9.09   **Administrative Agent May File Proofs of Claim**.   In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) at the direction of the Required Lenders shall be entitled and empowered, by intervention in such proceeding or otherwise:

> (a)   to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.03(h), 2.03(i), 2.09, 10.04 and 10.05) allowed in such judicial proceeding; and

> (b)   to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09, 10.04 and 10.05.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

Section 9.10   **Collateral and Guaranty Matters**.   Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Collateral Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Administrative Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to the occurrence and continuance of an Event of Default, to take any action with respect to any Collateral or Collateral Documents which may be necessary to create, perfect and maintain perfected security interests in and liens upon the Collateral granted pursuant to the Collateral Documents. Each of the Lenders irrevocably authorizes the Administrative Agent, at its option, and in its sole discretion:

      (a)      to enter into and sign for and on behalf of the Lenders as Secured Parties the Collateral Documents for the benefit of the Lenders and the other Secured Parties;

      (b)      to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon payment in full of all Obligations (other than contingent obligations for which no claim has been made), (ii) upon the Conversion, (iii) at the time the property subject to such Lien is Disposed or to be Disposed as part of or in connection with any Disposition permitted hereunder or under any other Loan Document (including any Disposition of Equity Interests of a Subsidiary that is not a Loan Party to another Subsidiary that is not a Loan Party in connection with an Investment permitted under Section 7.02(y)), (iv) subject to Section 10.01, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders or (v) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to Section 9.10(d);

      (c)      to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted to be senior to the Liens securing the Secured Obligations pursuant to Sections 7.01(b), (u), (w) (with respect to assumed Indebtedness), (aa) (with respect to Sections 7.01(b), (u), (w) (as to assumed Indebtedness) and (bb); and

      (d)      to release any Subsidiary Guarantor from its obligations under this Agreement if such Person ceases to be a Subsidiary or becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.10. In each case as specified in this Section 9.10, the Administrative Agent will (and each Lender irrevocably authorizes the Administrative Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

Beyond the exercise of reasonable care in the custody of the Collateral in its possession, the Administrative Agent will not have any duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto. The Administrative Agent will be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and the Administrative Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Administrative Agent in good faith.

The Administrative Agent will not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Administrative Agent, as determined by a court of competent jurisdiction in a final, nonappealable order, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any grantor to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Administrative Agent hereby disclaims any representation or warranty to the present and future holders of the Obligations concerning the perfection of the Liens granted hereunder or in the value of any of the Collateral.

107

In the event that the Administrative Agent is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in the Administrative Agent's sole discretion may cause the Administrative Agent to be considered an "owner or operator" under any environmental laws or otherwise cause the Administrative Agent to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, the Administrative Agent reserves the right, instead of taking such action, either to resign as Administrative Agent or to arrange for the transfer of the title or control of the asset to a court appointed receiver.  The Administrative Agent will not be liable to any person for any environmental liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Administrative Agent's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any hazardous materials into the environment.

**Section 9.11    [Reserved].**

**Section 9.12    Withholding Tax Indemnity**.  To the extent required by any applicable Laws (as determined in good faith by the Administrative Agent), the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  If the Internal Revenue Service or any other authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of, withholding Tax ineffective or if any payment has been made by the Administrative Agent to any Lender without applicable withholding tax being deducted from such payment), such Lender shall, within 10 days after written demand therefor, indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrower pursuant to Section 3.01 and 3.04 and without limiting or expanding the obligation of the Borrower to do so) for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise, together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.12.  The agreements in this Section 9.12 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other Obligations.

**Section 9.13    Non-U.S. Administrative Agent Tax Matters**.

If legally entitled to do so, any successor or supplemental Administrative Agent that is not a United States person under Section 7701(a)(30) of the Code, shall deliver to the Borrower two duly completed copies of Internal Revenue Service Form W-8IMY certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of a trade or business in the United States and that it is using such form as evidence of its agreement with the Borrower to be treated as a United States person with respect to such payments (and the Borrower and the Administrative Agent agree to so treat the Administrative Agent as a United States person with respect to such payments as contemplated by Treasury Regulation Section 1.1441-1(b)(2)(iv)(A)), with the effect that the Borrower can make such payments to the Administrative Agent without deduction or withholding of any Taxes imposed by Section 1441 of the Code.

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

## ARTICLE X
## MISCELLANEOUS

**Section 10.01**  **Amendments, Etc**. Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (or by the Administrative Agent with the consent of the Required Lenders) (other than with respect to any amendment or waiver contemplated in Sections 10.01(a) through (j) below, which shall only require the consent of the Lenders expressly set forth therein and not Required Lenders) (or by the Administrative Agent with the consent of the Required Lenders) and the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that, no such amendment, waiver or consent shall:

(a)     [reserved];

(b)     postpone any date scheduled for any payment of principal (including final maturity), interest or fees under Section 2.07, 2.08 or 2.09, respectively, without the written consent of each Lender directly and adversely affected thereby (it being understood that the waiver (or amendment to the terms) of any mandatory prepayment of the Loans or any obligation of the Borrower to pay interest at the Default Rate, any Default or Event of Default or mandatory prepayment shall not constitute such a postponement of any date scheduled for the payment of principal or interest and it further being understood that any change to the definition of "Consolidated First Lien Net Leverage Ratio" or the component definitions thereof shall not constitute a postponement of such scheduled payment);

(c)     reduce or forgive the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (iii) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document (or extend the timing of payments of such fees or other amounts) without the written consent of each Lender directly and adversely affected thereby (it being understood that the waiver of (or amendment to the terms of) any obligation of the Borrower to pay interest at the Default Rate, any mandatory prepayment of the Loans or any Default or Event of Default shall not constitute such a reduction);

(d)     change any provision of Section 2.12(a), 2.13 or 8.03 or the definition of "Pro Rata Share" in any manner that would alter the *pro rata* sharing or order of payments or other amounts required thereby, without the written consent of each Lender directly and adversely affected thereby;

(e)     change any provision of (i) this Section 10.01 or (ii) the definition of "Required Lenders" or any other provision specifying the number of Lenders or portion of the Loans required to take any action under the Loan Documents to reduce the percentage set forth therein, without the written consent of each Lender directly and adversely affected thereby;

(f)     other than in connection with a transaction permitted under Section 7.04 or 7.05, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(g)     other than in connection with a transaction permitted under Section 7.04 or 7.05, release all or substantially all of the aggregate value of the Guarantees, without the written consent of each Lender; or

109

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

(h)      change Section 2.04 in any manner without the written consent of each Lender;

*provided*, *further*, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, adversely affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document; (ii) only the consent of the parties to the Agent Fee Letter shall be required to amend, modify or supplement the terms thereof; (iii) Section 10.07(h) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; and (iv) no Lender consent is required to effect any amendment expressly contemplated by Section 6.18. and (v) this Agreement may be amended in the manner prescribed in Section 2.18.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except (x) in respect of an amendment, waiver or consent under Section 10.01(a) or (b) and (y) any waiver, amendment or modification requiring the consent of all Lenders or each directly and adversely affected Lender that by its terms materially and adversely affects any Defaulting Lender to a greater extent than other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding the foregoing, no Lender consent is required for the Administrative Agent (but the Administrative Agent may seek such consent) to enter into or to effect any amendment, modification or supplement to any Intercreditor Agreement or arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral for the purpose of adding the holders of such Indebtedness (or their Representative) as a party thereto and otherwise causing such Indebtedness to be subject thereto, in each case as contemplated by the terms of such Intercreditor Agreement or arrangement permitted under this Agreement, as applicable (it being understood that any such amendment or supplement may make such other changes to the applicable Intercreditor Agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and *provided* that such other changes are not adverse, in any material respect (taken as a whole), to the interests of the Lenders); *provided*, *further*, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent.

Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

Notwithstanding anything to the contrary contained in this Section 10.01, guarantees, collateral security documents and related documents executed by the Loan Parties or the Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel or (ii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

Notwithstanding anything to the contrary contained in Section 10.01, if at any time after the Closing Date, the Administrative Agent and the Borrower shall have jointly identified in good faith an obvious error or any error or omission of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall

110

become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders within five Business Days following receipt of notice thereof. The Administrative Agent shall be entitled to a certificate of a Responsible Officer of the Borrower stating that any such amendment is authorized and permitted by the terms of the Loan Document.

<div align="center">

**Section 10.02    Notices and Other Communications; Facsimile Copies**.

</div>

(a)        Notices; Effectiveness; Electronic Communications.

(i)        *Notices Generally*.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 10.02(a)(ii)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(A)        if to:

(1)        the Administrative Agent, to:



Cantor Fitzgerald Securities
as Second Lien Term Agent
1801 N. Military Trail, Suite 202
Boca Raton, FL 33431
Telecopier: (646) 219-1180
Attention: N. Horning (Jason)
E-mail: NHorning@cantor.com

and

Cantor Fitzgerald Securities
as Second Lien Term Agent
900 West Trade Street, Suite 725
Charlotte, NC 28202
Phone: (704) 374-0574
Telecopier: (646) 390-1764
Attention: B. Young (Jason)
E-mail: BYoung@cantor.com

with a copy (which shall not constitute notice) to:

[●]
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attn: N. Plotkin (Jason)

; and

<div align="center">

111

</div>

(2)     if to the Borrower to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02(a); and

(B)     if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in Section 10.02(a)(ii) shall be effective as provided in such Section 10.02(a)(ii).

(ii)     *Electronic* Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(b)     *The Platform.*  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Loan Parties, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of the Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Agent Party (or its representatives); *provided*, *however*, that in no event shall any Person have any liability to any other Person hereunder for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages); *provided* that nothing in this sentence shall limit any Loan Party's indemnification obligations set forth herein.

112

(c)      *Change of Address, Etc*.  Each of the Borrower and the Administrative Agent may change its address, electronic mail address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, electronic mail address, facsimile or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to the Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain Material Non-Public Information.

(d)      *Reliance by Administrative Agent and Lenders*.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in accordance with Section 10.05 hereof.  ~~All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.~~

**Section 10.03   No Waiver; Cumulative Remedies**.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Lenders; *provided*, *however*, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) [reserved], (c) any Lender from exercising setoff rights in accordance with Section 10.09 (subject to the terms of Section 2.13) or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; *provided*, *further*, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**Section 10.04   Attorney Costs and Expenses**.  The Borrower agrees to pay or reimburse the Administrative Agent, the Lenders and their respective Affiliates for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication, execution and delivery of this Agreement and the other Loan Documents, and  to pay or reimburse the Administrative Agent,

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

the Lenders and their respective Affiliates for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the administration of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including, in each case, all Attorney Costs, which shall be limited to counsel to the Administrative Agent and its Affiliates, one counsel to the Lenders and their respective Affiliates, taken as a whole, and, if reasonably necessary, one local counsel in each relevant jurisdiction material to the interests of the Lenders, taken as a whole  and to pay or reimburse the Administrative Agent and the Lenders for all reasonable and documented out-of-pocket costs, charges and expenses incurred in connection with the enforcement or protection of any rights or remedies under this Agreement or the other Loan Documents (including all such costs, charges and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all respective Attorney Costs, which shall be limited to Attorney Costs of counsel to the Administrative Agent and its Affiliates, one counsel to the Lenders and their Affiliates, taken as a whole, and, if reasonably necessary, one local counsel in each relevant jurisdiction material to the interests of the Lenders taken as a whole and, solely in the case of an actual conflict of interest, one additional counsel in each relevant jurisdiction to each group of similarly situated affected parties). The agreements in this <u>Section 10.04</u> shall survive repayment of all Obligations. All amounts due under this <u>Section 10.04</u> shall be paid within 30 days following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail (provided that the Lender need not be required to disclose any confidential information or to the extent prohibited by law or regulation); provided that, with respect to the Closing Date, all amounts due under this <u>Section 10.04</u> shall be paid on the Closing Date solely to the extent invoiced to the Borrower within two Business Days of the Closing Date. If any Loan Party fails to pay when due any costs, charges, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its discretion following five Business Days' prior written notice to the Borrower. For the avoidance of doubt, this <u>Section 10.04</u> shall not apply to Taxes, except any Taxes that represent costs and expenses arising from any non-Tax claim.

**Section 10.05   <u>Indemnification by the Borrower</u>**.   The Borrower shall indemnify and hold harmless ~~each~~the Administrative Agent, each Agent-Related Person, Lender and their respective Affiliates and controlling Persons, and their respective officers, directors, employees, partners, agents, advisors and other representatives of each of the foregoing and their respective successors (collectively the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses, charges and disbursements (including Attorney Costs but limited in the case of legal fees and expenses to the reasonable and documented out-of-pocket fees, disbursements and other charges of counsel to Administrative Agent and its Affiliates, one counsel to all other Indemnitees taken as a whole, and, if reasonably necessary, one local counsel for all Indemnitees taken as a whole in each relevant jurisdiction that is material to the interests of the Lenders, and in the case of an actual or potential conflict of interest, one additional counsel in each relevant jurisdiction to each group of similarly situated affected Indemnitees ), joint or several, of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Loan or the use or proposed use of the proceeds therefrom, (c) any actual or alleged presence or Release of Hazardous Materials at, in, on, under or from any property or facility currently or formerly owned, leased or operated by the Loan Parties or any Subsidiary, or any Environmental Liability or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (a "**Proceeding**") and regardless of whether any Indemnitee is a party thereto or whether or not such Proceeding is brought by the Borrower or any other person and, in each case, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee (all of the foregoing, collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations,

<div align="center">114</div>

losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses, charges or disbursements resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any of its controlled Affiliates or their respective directors, officers, employees, partners, advisors or other representatives, as determined by a final non-appealable judgment of a court of competent jurisdiction, (y) any dispute solely among Indemnitees other than any claims by or against an Indemnitee in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under this Agreement and other than any claims arising out of any act or omission of any Holdco, the Borrower or any of their Affiliates or (z) settlements effected without the Borrower's prior written consent (such consent not to be unreasonably withheld, delayed or conditioned), but if settled with the Borrower's written consent, or if there is a final judgment against an Indemnitee in any such Proceeding, the Borrower shall indemnify and hold harmless such Indemnitee to the extent and the manner set forth above. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through electronic, telecommunications or other information transmission systems, including, without limitation, SyndTrak, IntraLinks, the internet, email or similar electronic transmission systems in connection with this Agreement, in each case, except to the extent any such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee (or its controlling Persons, controlled Affiliates or their respective directors, officers, employees, partners, advisors or other representatives), nor shall any Indemnitee, Loan Party or any Subsidiary have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date); it being agreed that this sentence shall not limit the indemnification obligations of any Holdco or any Subsidiary (including, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party and for any out-of-pocket expenses). In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, any Subsidiary of any Loan Party, its directors, equity holders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents are consummated. All amounts due under this Section 10.05 shall be paid within thirty (30) days after written demand therefor (together with reasonable backup documentation supporting such reimbursement request); *provided, however*, that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification rights with respect to such payment pursuant to the express terms of clauses (x) through (z) above. The agreements in this Section 10.05 shall survive the resignation or removal of the Administrative Agent, the replacement of any Lender, and the repayment, satisfaction or discharge of all the other Obligations. For the avoidance of doubt, this Section 10.05 shall not apply to Taxes, except any Taxes that represent liabilities, obligations, losses, damages, penalties, claims, demands, actions, prepayments, suits, costs, expenses, charges and disbursements arising from any non-Tax claims.

To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under this Section 10.05 or Section 10.04 to be paid by it to the Administrative Agent (or any sub-agent thereof), or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), or such Related Party, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity. The obligations of the Lenders under this paragraph are subject to the provisions of Section 2.12(e).

**Section 10.06    Payments Set Aside**.  To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or

115

any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, *plus* interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations or the Conversion, as applicable, and the termination of this Agreement.

Section 10.07 **Successors and Assigns**. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Administrative Agent (at the direction of the Required Lenders) and each Lender (except as permitted by Section 7.04) and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Assignee pursuant to an assignment made in accordance with the provisions of Section 10.07(b) (such an assignee, an "**Eligible Assignee**"), or (ii) by way of participation in accordance with the provisions of Section 10.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(g) or (iv) to an SPC in accordance with the provisions of Section 10.07(h) (and any other attempted assignment or transfer by any party hereto shall be null and void); *provided*, *however*, that notwithstanding the foregoing, no Lender may assign or transfer by participation any of its rights or obligations hereunder to (i) any Person that is a Defaulting Lender, (ii) a natural Person, (iii) a Disqualified Competitor and (iv) Holdings, the Borrower or any of their respective Subsidiaries ). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) (i) Subject to the conditions set forth in Section 10.07(b)(ii) below and the proviso to Section 10.07(a), any Lender may at any time assign to one or more assignees (each, an "**Assignee**") all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

(A) the Borrower; *provided* that no consent of the Borrower shall be required for (i) an assignment of all or a portion of the Term Loans to a Lender or to an Affiliate of a Lender or an Approved Fund thereof and (ii) after the occurrence and during the continuance of an Event of Default, an assignment to any Assignee; *provided*, *further*, that the Borrower shall be deemed to have consented to any such assignment unless it shall have objected thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof; and

(B) the Administrative Agent; *provided* that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Term Loan to a Lender, an Affiliate of a Lender or an Approved Fund.

Notwithstanding the foregoing or anything to the contrary set forth herein, to the extent any Lender is required to assign any portion of its Loans and other rights, duties and obligations hereunder in order to comply with applicable Laws, such assignment may be made by such Lender without the consent of the Borrower, the Administrative Agent, or any other party hereto so long as such Lender complies with the requirements of Section 10.07(b)(ii).

(ii) Assignments shall be subject to the following additional conditions:

116

(A)      except in the case of an assignment of the entire remaining amount of the assigning Lender's Loans, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, and shall be in increments of an amount of $1,000,000, in excess thereof unless each of the Borrower and the Administrative Agent otherwise consents; *provided* that concurrent assignments to any Lender and its Affiliates or Approved Funds and concurrent assignments from any Lender and its Affiliates or Approved Funds to a single Assignee (or to an Assignee and its Affiliates or Approved Funds) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(B)      the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); provided that only one such fee shall be payable in the event of simultaneous assignments to or from two or more Approved Funds;

(C)      the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire; and

(D)      the Assignee shall execute and deliver to the Administrative Agent and the Borrower the forms described in Sections 3.01(e) and 3.01(f) applicable to it.

In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable *pro rata* share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full Pro Rata Share of all Loans.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(c)      Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d), from and after the effective date specified in each Assignment and Assumption, (1) the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and (2) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, and the surrender by the assigning Lender of its Note, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.07(c) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(e).

117

(d)      The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it, and a register for the recordation of the names and addresses of the Lenders and principal amounts (and related interest amounts) of the Loans owing to each Lender pursuant to the terms hereof from time to time (the "**Register**").   Upon its receipt of, and consent to, a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 10.07(b)(ii)(B) above, if applicable, and, if required, the written consent of the Administrative Agent and/or the Borrower to such assignment and any applicable tax forms, the Administrative Agent shall (i) accept such Assignment and Assumption and (ii) promptly record the information contained therein in the Register.  No assignment shall be effective unless it has been recorded in the Register as provided in this Section 10.07(d).  The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and, with respect to itself, any Lender, at any reasonable time and from time to time upon reasonable prior notice, *provided* that the information contained in the Register which is shared with each Lender (other than the Administrative Agent and its affiliates) shall be limited to the entries with respect to such Lender including the principal amount of and stated interest on the Term Loans owing to such Lender.  This Section 10.07(d) and Section 2.11 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

(e)      Any Lender may at any time (other than to a natural person, a Defaulting Lender, a Holdco, the Borrower, or any Disqualified Competitor) sell participations to any Person (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (a) through (i) of the first proviso to Section 10.01 that requires the affirmative vote of such Lender.  Subject to Section 10.07(f), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations of such Sections and Section 3.07, including Section 3.01(e), and it being understood that the documentation required under Section 3.01(e) shall be delivered solely to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(c).  To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.13 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is reasonably necessary to establish that such Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The Participant Register shall be conclusive, and such Lender shall treat each Person whose name is recorded in the

118

Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(f)        A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's consent or except to the extent such entitlement to a greater payment results from a change in any Law after the sale of the participation takes place.

(g)        Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any central bank having jurisdiction over such Lender; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)        Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof and (iii) such SPC and the applicable Loan or any applicable part thereof, shall be appropriately reflected in the Participant Register.  Each party hereto hereby agrees that (i) an SPC shall be entitled to the benefit of Sections 3.01, 3.04 and 3.05 (subject to the requirements and the limitations of such Sections and Section 3.07, including Section 3.01(e), and it being understood that the documentation required under Section 3.01(e) shall be delivered solely to the participating Lender), but neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement except, in the case of Section 3.01 and 3.04, unless such entitlement to a greater payment results from a change in any Law after the grant to the SPC takes place, (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(i)        Notwithstanding anything to the contrary contained herein, without the consent of the Borrower or the Administrative Agent, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

119

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

**Section 10.08    Confidentiality**.    Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its Affiliates and its Affiliates' managers, administrators, directors, officers, employees, trustees, partners, investors, funding sources, investment advisors and agents, including accountants, legal counsel and other advisors (collectively "**Advisors**") on a "need to know basis" (*provided* that (i) the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and agree or otherwise have an obligation to keep such Information confidential and (ii) ~~such~~the Administrative Agent or Lender, as applicable, shall be responsible for the compliance of its Affiliates and such Affiliates' Advisors with this paragraph); (b) to the extent required or requested by, or upon the good faith determination by counsel that such information should be disclosed in light of ongoing oversight or review of such Person, by any Governmental Authority or self-regulatory authority having or asserting jurisdiction over such Person (including any Governmental Authority regulating any Lender or its Affiliates), *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation; (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation; (d) to any other party to this Agreement; (e) to (i) any pledgee referred to in Section 10.07(g), (ii) subject to an agreement containing provisions at least as restrictive as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Borrower), any direct or indirect contractual counterparty to a Swap Contract, Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in any of its rights or obligations under this Agreement (other than any Disqualified Competitor or Person whom the Borrower has affirmatively denied to provide consent to assignment in accordance with Section 10.07(b)(i)(A))); or (iii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder (other than any Disqualified Competitor or Person whom the Borrower has affirmatively denied to provide consent to assignment in accordance with Section 10.07(b)(i)(A)); (f) with the prior written consent of the Borrower; (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.08 or other obligation of confidentiality owed to the Borrower or its Affiliates or becomes available to the Administrative Agent, any Lender, or any of their respective Affiliates on a non-confidential basis from a source other than a Loan Party or their respective related parties (so long as such source is not known (after due inquiry) to the Administrative Agent, such Lender, or any of their respective Affiliates to be bound by confidentiality obligations to any Loan Party or its Affiliates); (h) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to Loan Parties and their Subsidiaries received by it from such Lender) or to the CUSIP Service Bureau or any similar organization;  (i) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of its rights hereunder or thereunder; (j) to the extent such information is independently developed by the Administrative Agent, any Lender, or any of their respective Affiliates; or  (k) for purposes of establishing a due diligence defense.    In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and publicly available information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Administrative Agent and the Lenders in connection with the administration, settlement and management of this Agreement, the other Loan Documents and the Credit Extensions.  For the purposes of this Section 10.08, "**Information**" means all information received from the Loan Parties relating to any Loan Party, its Affiliates or its Affiliates' directors, officers, employees, trustees, investment advisors or agents, other than any such information that is publicly available to ~~any~~the Administrative Agent, or any Lender prior to disclosure by any Loan Party other than as a result of a breach of this Section 10.08 or any other confidentiality obligation owed to any Loan Party or their Affiliates.

**Section 10.09    Setoff**.    In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates (and the

120

Administrative Agent, in respect of any unpaid fees, costs and expenses payable hereunder) is authorized at any time and from time to time, without prior notice to the Borrower, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and each of its Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) (other than escrow, payroll, petty cash, trust and tax accounts) at any time held by, and other Indebtedness at any time owing by, such Lender and its Affiliates or the Administrative Agent to or for the credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations owing to such Lender and its Affiliates or the Administrative Agent hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not suchthe Administrative Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit of other obligations; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.17 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of the Administrative Agent and each Lender under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent and such Lender may have at Law.

Section 10.10    **Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**").  If anythe Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by anthe Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 10.11    **Counterparts**.  This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by facsimile, Docusign or other electronic transmission of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document.  The Administrative Agent may also require that any such documents and signatures delivered by facsimile, Docusign or other electronic transmission be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile, Docusign or other electronic transmission.

Section 10.12    **Integration**.  This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  Subject to Section 10.21, in the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; *provided* that the inclusion of supplemental rights or remedies in favor of the Administrative Agent or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

**Section 10.13    Survival of Representations and Warranties**.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.   Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or the Conversion has not occurred.

**Section 10.14    Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions; *provided*, that the Lenders shall charge no fee in connection with any such amendment.   The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.   Without limiting the foregoing provisions of this Section 10.14, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

**Section 10.15    GOVERNING LAW**.   (a)   THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)     ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY (BOROUGH OF MANHATTAN) OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, OR ANY APPELLATE COURT FROM ANY THEREOF, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY, ~~EACH~~THE ADMINISTRATIVE AGENT AND EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS AND AGREES THAT IT WILL NOT COMMENCE OR SUPPORT ANY SUCH ACTION OR PROCEEDING IN ANOTHER JURISDICTION.   EACH LOAN PARTY, ~~EACH~~THE ADMINISTRATIVE AGENT AND EACH LENDER IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.   EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS IN THE MANNER PROVIDED FOR NOTICES (OTHER THAN FACSIMILE) IN SECTION 10.02.   NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

**Section 10.16    WAIVER OF RIGHT TO TRIAL BY JURY**.   EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER

122

BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.16.

> **Section 10.17    Binding Effect**.  This Agreement shall become effective when it shall have been executed and delivered by the Loan Parties and each other party hereto and the Administrative Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Loan Parties, ~~each~~the Administrative Agent and each Lender and their respective successors and assigns, in each case in accordance with Section 10.07 (if applicable) and except that no Loan Party shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders except as permitted by Section 7.04.

> **Section 10.18    USA Patriot Act**.  Each Lender that is subject to the USA Patriot Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name, address and tax identification number of such Loan Party and other information regarding such Loan Party that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the USA Patriot Act.  This notice is given in accordance with the requirements of the USA Patriot Act and is effective as to the Lenders and the Administrative Agent.  The Borrower shall, promptly following a reasonable request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

> **Section 10.19    No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent are arm's-length commercial transactions between the Loan Parties and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (B) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent and each Lender each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for each Loan Party or any of their respective Affiliates, or any other Person and (B) neither the Administrative Agent nor any Lender has any obligation to the Loan Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and neither the Administrative Agent nor any other Arranger nor any Lender has any obligation to disclose any of such interests to the Loan Parties or any of their respective Affiliates.  To the fullest extent permitted by law, each Loan Party hereby waives and releases any claims that it may have against the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

> **Section 10.20    Judgment Currency**.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day

<div align="center">123</div>

preceding that on which final judgment is given.  The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable law).

Section 10.21   **Intercreditor Agreement**.  Each Lender hereunder (a) acknowledges that it has received a copy of the Intercreditor Agreement, (b) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement and (c) authorizes and instructs the Administrative Agent to enter into the Intercreditor Agreement as Administrative Agent and on behalf of such Lender.  The foregoing provisions are intended as an inducement to the lenders under the ABL Loan Documents, the First Lien Loan Documents and the Loan Documents to extend credit to the Loan Parties and such lenders are intended third party beneficiaries of such provisions.  In the event of any conflict or inconsistency between the provisions of any Intercreditor Agreement and this Agreement, the provisions of such Intercreditor Agreement shall control.

Section 10.22   **Acknowledgement and Consent to Bail-In of EEA Financial Institutions.** Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)       the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution; and

(b)       the effects of any Bail-In Action on any such liability, including, if applicable:

(i)       a reduction in full or in part or cancellation of any such liability;

(ii)       a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)       the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 10.23   **Certain ERISA Matters.**

(a)       Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the

124

date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans,

(ii)      the transaction exemption set forth in one or more prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time ("PTEs"), such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement,

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans and this Agreement, or

(iv)      such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)      In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

(i)      none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii)      the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii)      the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

125

(iv)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans and this Agreement is a fiduciary under ERISA or the US Internal Revenue Code, or both, with respect to the Loans and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)    no fee or other compensation is being paid directly to the Administrative Agent or any its Affiliates for investment advice (as opposed to other services) in connection with the Loans or this Agreement.

(c)    The Administrative Agent hereby inform the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans and this Agreement, (ii) may recognize a gain if it extended the Loans for an amount less than the amount being paid for an interest in the Loans by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

**Section 10.24    AHYDO Payments.** Notwithstanding anything in this Agreement or in any other related document to the contrary, if a Loan shall remain outstanding after the fifth (5th) anniversary of the initial issuance thereof and the aggregate amount that would be includible in the gross income of a Lender with respect to a Loan (within the meaning of Section 163(i) of the Code) for the periods ending on or before any Interest Payment Date that occurs after such fifth (5th) anniversary (the "**Aggregate Accrual**") would otherwise exceed an amount equal to the sum of (i) the aggregate amount of interest to be paid (within the meaning of Section 163(i) of the Code) under such Loan on or before such Interest Payment Date, and (ii) the product of (A) the issue price (as defined in Section 1273(b) of the Code) of such Loan and (B) the yield to maturity (interpreted in accordance with Section 163(i) of the code) of such Loan (such sum, the "**Maximum Accrual**"), then the Borrower shall pay on each applicable Interest Payment Date occurring after such fifth (5th) anniversary that portion of the outstanding principal amount of such Loan necessary to prevent such Loan from constituting an "applicable high yield discount obligation" within the meaning of Section 163(i) of the Code, up to an amount equal to the excess, if any, of the Aggregate Accrual over the Maximum Accrual (each such payment, the "**AHYDO Payment**") and the amount of such AHYDO Payment and any interest thereon shall be treated for U.S. federal income tax purposes as an amount of interest to be paid (within the meaning of Section 163(i)(2)(B)(i) of the Code) under such Loan.  This provision is intended to prevent the Loans from being classified as "applicable high yield discount obligations," as defined in Section 163(i) of the Code, and shall be interpreted consistently therewith.  For purposes of this paragraph, the term "Lender" will include any successor to a Lender.

## ARTICLE XI
## GUARANTEE

**Section 11.01    The Guarantee**.    Each Guarantor hereby jointly and severally with the other Guarantors guarantees, as a primary obligor and not as a surety to each Secured Party and their respective permitted successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of (i) the Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code and (ii) any other Debtor Relief Laws) on the Loans made by the Lenders to, and the Notes held by each Lender of, the

126

Borrower, and all other Secured Obligations from time to time owing to the Secured Parties by any Loan Party under any Loan Document strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"); *provided*, *however*, that Guaranteed Obligations shall exclude all Excluded Swap Obligations.  The Guarantors hereby jointly and severally agree that if the Borrower or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

**Section 11.02   Obligations Unconditional**.  The obligations of the Guarantors under Section 11.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrower under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full).  Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(a)   at any time or from time to time, without notice to the Guarantors, to the extent permitted by Law, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b)   any of the acts mentioned in any of the provisions of this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted (including incurring any increase or decrease in the principal amount of the Guaranteed Obligations or the rate of interest or the fees thereon);

(c)   the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or except as permitted pursuant to Section 11.09, any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d)   any Lien or security interest granted to, or in favor of, any Lender or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(e)   the release of any other Guarantor pursuant to Section 11.09.

The Guarantors hereby expressly waive (to the fullest extent permitted by Law) diligence, presentment, demand of payment, protest and, to the extent permitted by Law, all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations.  The Guarantors waive, to the extent permitted by Law, any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this

127

Guarantee, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee.  This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrower or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto.  This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

Section 11.03    **Reinstatement**.  The obligations of the Guarantors under this Article XI shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 11.04    **Subrogation; Subordination**.  Each Guarantor hereby agrees that until the payment in full in cash and satisfaction in full of all Guaranteed Obligations (other than contingent obligations not yet due and owing) it shall subordinate any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 11.01, whether by subrogation or otherwise, against the Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.

Section 11.05    **Remedies**.  The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrower under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 8.02 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.02) for purposes of Section 11.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 11.01.

Section 11.06    **[Reserved]**.

Section 11.07    **Continuing Guarantee**.  The guarantee in this Article XI is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 11.08    **General Limitation on Guarantee Obligations**.  In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other Law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 11.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 11.09, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount (after giving effect to the liability under this Guaranty and the right of contribution established in Section 11.10, but before giving effect to any other guarantee (including any guarantee of the ABL Obligations and/ or the First Lien Obligations)) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

128

**Section 11.09   Release of Guarantors**.  If, in compliance with the terms and provisions of the Loan Documents, (i) all or substantially all of the Equity Interests of any Subsidiary Guarantor are sold or otherwise transferred to a Person or Persons none of which is a Loan Party in a transaction permitted hereunder or (ii) any Subsidiary Guarantor ceases to be a Subsidiary or becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder (any such Subsidiary Guarantor, and any Subsidiary Guarantor referred to in clause (i), a "**Transferred Guarantor**"), such Transferred Guarantor shall, upon the consummation of such sale or transfer or other transaction (but subject to the proviso below), be automatically released from its obligations under this Agreement (including under Section 10.05 hereof) and the other Loan Documents, including its obligations to pledge and grant any Collateral owned by it pursuant to any Collateral Document and, in the case of a sale of all or substantially all of the Equity Interests of the Transferred Guarantor, the pledge of such Equity Interests to the Administrative Agent pursuant to the Collateral Documents shall be automatically released, and, so long as the Borrower shall have provided the Administrative Agent such certifications or documents as anythe Administrative Agent shall reasonably request, the Administrative Agent shall take such actions as are necessaryreasonably requested by the Borrower or such Guarantor to effect each release described in this Section 11.09 in accordance with the relevant provisions of the Collateral Documents; *provided*, *however*, that the release of any Subsidiary Guarantor from its obligations under this Agreement and the other Loan Documents if such Subsidiary Guarantor becomes an Excluded Subsidiary of the type described in clause (a) of the definition thereof shall only be permitted if at the time such Subsidiary Guarantor becomes an Excluded Subsidiary of such type (1) no Default or Event of Default shall have occurred and be outstanding, (2) after giving *pro forma* effect to such release and the consummation of the transaction that causes such Person to be an Excluded Subsidiary of such type, the Borrower is deemed to have made a new Investment in such Person for purposes of Section 7.02 (as if such Person were then newly acquired) and such Investment is permitted pursuant to Section 7.02 (other than Section 7.02(f)) at such time and (3) a Responsible Officer of the Borrower certifies to the Administrative Agent compliance with preceding clauses (1) and (2); *provided*, *further*, that no such release shall occur if such Subsidiary Guarantor continues to be a guarantor in respect of the ABL Obligations, the First Lien Obligations or any Permitted Refinancing in respect of any of the foregoing.

When all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied (other than contingent obligations as to which no claim has been asserted), this Agreement and the Guarantees made herein shall terminate with respect to all Obligations, except with respect to Obligations that expressly survive such repayment pursuant to the terms of this Agreement.

**Section 11.10   Right of Contribution**.  Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment.  Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 11.04.  The provisions of this Section 11.10 shall in no respect limit the obligations and liabilities of any Guarantor to the Administrative Agent and the Lenders, and each Subsidiary Guarantor shall remain liable to the Administrative Agent and the Lenders for the full amount guaranteed by such Guarantor hereunder.

**Section 11.11   Keepwell**.  Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Guaranty in respect of Swap Obligations (*provided*, *however*, that each Qualified ECP Guarantor shall only be liable under this Section 11.11 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 11.11, or otherwise under this Guarantee, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Guarantor under this Section 11.11 shall remain in full force and effect until all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied.  Each Qualified ECP Guarantor intends that this Section 11.11 constitute, and this Section 11.11 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

WEIL:\97566320\4\10143.0003WEIL:\97566320\8\10143.0003

**Section 11.12   <u>Independent Obligation</u>**.   The obligations of each Guarantor hereunder are independent of the obligations of any other Guarantor, any other party or any Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not action is brought against any other guarantor, any other party or any Borrower and whether or not any other guarantor, any other party or any Borrower be joined in any such action or actions.  Each Guarantor waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof. Any payment by the Borrower or other circumstance which operates to toll any statute of limitations as to the Borrower shall operate to toll the statute of limitations as to the Guarantors.

<center>[Signature Pages Follow]</center>

<center>130</center>

**Exhibit G**

**New Organizational Documents**

This **Exhibit G** includes the following organizational documents for the Reorganized Debtors:

**Exhibit G(i)**: Certificate of Incorporation of Jason Holdings Inc.

Certain documents or portions thereof contained in this **Exhibit G** and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The respective rights of the Debtors and the Consenting Creditors are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement and any of the documents and designations contained herein at any time before the Effective Date of the Plan or any such other date as may be provided for in the Plan or an order of the Bankruptcy Court, and filing of the forms of the documents set forth in this Plan Supplement (including this Exhibit G) shall not be deemed as acceptance of such document by any party to the Restructuring Support Agreement or a waiver of any of the rights of any such party under the Restructuring Support Agreement, the Bankruptcy Code or otherwise.

**Exhibit G-(i)**

**Certification of Incorporation of Jason Holdings Inc.**

# AMENDED AND RESTATED

# CERTIFICATE OF INCORPORATION

# OF

# JASON HOLDINGS INC.

(Pursuant to Sections 241 and 245 of the
General Corporation Law of the State of Delaware)

Jason Holdings Inc., a corporation organized and existing under the laws of the state of Delaware (the "Corporation"), hereby certifies as follows:

1.      The Corporation's original Certificate of Incorporation (the "Original Certificate of Incorporation") was filed with the Secretary of State of the State of Delaware on July 31, 2020.

2.      The Corporation has not received any payment for any of its stock.

3.      This Amended and Restated Certificate of Incorporation has been declared advisable and duly adopted by the Corporation's Board of Directors in accordance with the applicable provisions of Section 241 and 245 of the General Corporation Law of the State of Delaware, as the same may be amended from time to time (the "DGCL"). This Amended and Restated Certificate of Incorporation shall become effective upon filing with the Secretary of State of the State of Delaware.

4.      The Original Certificate of Incorporation of the Corporation is hereby amended and restated in its entirety to read in full as follows:

**FIRST**:      The name of the corporation is Jason Holdings Inc.

**SECOND**:      The address of the Corporation's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware 19801. The name of its registered agent at such address is The Corporation Trust Company.

**THIRD**:      The purpose or purposes of the Corporation shall be to engage in any lawful acts or activities for which corporations may be organized under the DGCL.

**FOURTH**:      The total number of shares of all classes of capital stock, each with a par value of $0.01, which the Corporation is authorized to issue is 15,001,000 shares, consisting of 15,000,000 shares of common stock ("Common Stock") and 1,000 shares of preferred stock ("Preferred Stock").  To the extent prohibited by Section 1123(a)(6) of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), the Corporation will not issue non-voting equity securities; provided, however, that the foregoing restriction will (a) have no further force and effect beyond that required under Section 1123 of the Bankruptcy Code, (b) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to

the Corporation and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.  The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) from time to time by the affirmative vote of the holders of at least a majority of the voting power of the Corporation's then outstanding shares of stock entitled to vote thereon, voting together as a single class, irrespective of the provisions of Sections 242(b)(2) of the DGCL (or any successor provision thereto), and no vote of the holders of any Common Stock voting separately as a class shall be required therefor. Subject to the limitations set forth in that certain Stockholders Agreement by and among the Corporation and the stockholders of the Corporation named therein, dated on or around the date hereof, the Board of Directors (as defined below) is hereby expressly authorized to provide out of the unissued shares of the Preferred Stock for one or more series of Preferred Stock and to establish from time to time the number of shares to be included in each such series and to fix the voting rights, if any, designations, powers, preferences and relative, participating, optional, special and other rights, if any, of each such series and any qualifications, limitations and restrictions thereof, as shall be stated in the resolution or resolutions adopted by the Board of Director providing for the issuance of such series and included in a certificate of designation  filed pursuant to the DGCL, and the Board of Director is hereby expressly vested with the authority to the full extent provided by law, now or hereafter, to adopt any such resolution or resolutions.

**FIFTH**:       The principal place of business of the Corporation is 833 East Michigan Street, Suite 900, Milwaukee WI 53202.

**SIXTH**:       In furtherance and not in limitation of the powers conferred by law, subject to any limitations contained in this Certificate of Incorporation, bylaws of the Corporation may be adopted, amended or repealed by a majority of the Board of Directors of the Corporation (the "Board of Directors"), but any bylaws adopted by the Board of Directors may be amended or repealed by the stockholders entitled to vote thereon.  Election of directors need not be by written ballot.

**SEVENTH**:  In addition to the powers and authority herein before or by statute expressly conferred upon them, the Board of Directors is hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, subject to the provisions of the DGCL, this Certificate of Incorporation and the bylaws of the Corporation.

**EIGHTH**:     The number of directors of the Corporation shall be fixed from time to time by the bylaws or amendment thereof adopted by the Board of Directors.

**NINTH**:        To the fullest extent permitted by law, a director of the Corporation (a "Director") shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.  If the DGCL or any other law of the State of Delaware is amended after approval by the stockholders of this Article Ninth to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a Director shall be eliminated or limited to the fullest extent permitted by the DGCL

2

as so amended. Any repeal or modification of the foregoing provisions of this Article Ninth by the stockholders of the Corporation shall not adversely affect any right or protection of a Director existing at the time of, or increase the liability of any Director with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

**TENTH**: The following indemnification provisions shall apply to the persons enumerated below.

1.      Right to Indemnification of Directors and Officers.   The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (an "Indemnified Person") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that such person, or a person for whom such person is the legal representative, is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Indemnified Person in such Proceeding.   Notwithstanding the preceding sentence, except as otherwise provided in Section 3 of this Article Tenth, the Corporation shall be required to indemnify an Indemnified Person in connection with a Proceeding (or part thereof) commenced by such Indemnified Person only if the commencement of such Proceeding (or part thereof) by the Indemnified Person was authorized in advance by the Board of Directors.

2.      Prepayment of Expenses of Directors and Officers.  The Corporation shall pay the expenses (including attorneys' fees) incurred by an Indemnified Person in defending any Proceeding in advance of its final disposition, provided, however, that, to the extent required by law, such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Indemnified Person to repay all amounts advanced if it should be ultimately determined that the Indemnified Person is not entitled to be indemnified under this Article Tenth or otherwise.

3.      Claims by Directors and Officers.   If a claim for indemnification or advancement of expenses under this Article Tenth is not paid in full within thirty (30) days after a written claim therefor by the Indemnified Person has been received by the Corporation, the Indemnified Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim.  In any such action the Corporation shall have the burden of proving that the Indemnified Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

4.      Indemnification of Employees and Agents. The Corporation may indemnify and advance expenses to any person who was or is made or is threatened to be made or is otherwise involved in any Proceeding by reason of the fact that such person, or a person for whom such person is the legal representative, is or was an employee or agent of the Corporation or, while an employee or agent of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership,

3

joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorney's fees) reasonably incurred by such person in connection with such Proceeding. The ultimate determination of entitlement to indemnification of persons who are non-director or officer employees or agents shall be made in such manner as is determined by the Board of Directors in its sole discretion. Notwithstanding the foregoing sentence, the Corporation shall not be required to indemnify a person in connection with a Proceeding initiated by such person if the Proceeding was not authorized in advance by the Board of Directors.

5.    <u>Advancement of Expenses of Employees and Agents</u>. The Corporation may pay the expenses (including attorney's fees) incurred by an employee or agent in defending any Proceeding in advance of its final disposition on such terms and conditions as may be determined by the Board of Directors.

6.    <u>Non-Exclusivity of Rights</u>. The rights conferred on any person by this Article Tenth shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of this Certificate of Incorporation, the Bylaws or any agreement, or pursuant to a vote of stockholders or disinterested directors or otherwise. The Corporation acknowledges that certain persons entitled to indemnification from the Corporation hereunder may have certain rights to indemnification, advancement of expenses and/or insurance provided by a stockholder of the Corporation or certain affiliates of such stockholder (collectively, the "Secondary Indemnitors"). The Corporation hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to such persons are primary and any obligation of the Secondary Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such persons are secondary), (ii) that it shall be required to advance the full amount of expenses incurred by such persons and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by this Certificate of Incorporation (or any other agreement between the Corporation and such person), without regard to any rights such person may have against the Secondary Indemnitors, and (iii) that it irrevocably waives, relinquishes and releases the Secondary Indemnitors from any and all claims against the Secondary Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Corporation further agrees that no advancement or payment by the Secondary Indemnitors on behalf of such person with respect to any claim for which such person has sought indemnification from the Corporation shall affect the foregoing and the Secondary Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such person against the Corporation. The Corporation and such persons agree that the Secondary Indemnitors are express third party beneficiaries of the terms of this Section 6.

7.    <u>Other Indemnification</u>. The Corporation's obligation, if any, to indemnify any person who was or is serving at its request as a director, officer or employee of another corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise shall be reduced by any amount such person may collect as indemnification from such other corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise.

4

8.      <u>Insurance</u>.  The Board of Directors may, to the full extent permitted by applicable law as it presently exists, or may hereafter be amended from time to time, authorize an appropriate officer or officers to purchase and maintain at the Corporation's expense insurance: (a) to indemnify the Corporation for any obligation which it incurs as a result of the indemnification of directors, officers and employees under the provisions of this Article Tenth; and (b) to indemnify or insure directors, officers and employees against liability in instances in which they may not otherwise be indemnified by the Corporation under the provisions of this Article Tenth.

9.      <u>Amendment or Repeal</u>.  Any repeal or modification of the foregoing provisions of this Article Tenth shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification.  The rights provided hereunder shall inure to the benefit of any Indemnified Person and such person's heirs, executors and administrators.

**ELEVENTH**: The Corporation expressly elects not to be governed by Section 203 of the DGCL.

**TWELFTH**:  To the fullest extent permitted by Section 122(17) of the DGCL (or any successor provision thereto), the Corporation hereby renounces any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any business opportunities that are presented to one or more of its officers, directors or stockholders, other than those officers, directors or stockholders who are employees of the Corporation or its subsidiaries.  No amendment or repeal of this Article Twelfth shall apply to or have any effect on the liability or alleged liability of any officer, director or stockholder of the Corporation for or with respect to any opportunities of which such officer, director or stockholder becomes aware prior to such amendment or repeal.

*[The remainder of this page is intentionally left blank]*

5

IN WITNESS WHEREOF, the undersigned has duly executed this Certificate of Incorporation on this 28th day of August, 2020.

JASON HOLDINGS INC.

By: _____
Name:
Title:

[SIGNATURE PAGE TO CERTIFICATE OF INCORPORATION OF JASON HOLDINGS INC.]

**<u>Exhibit G-1(i)</u>**

**Redline to Version in the First Amended Plan Supplement**

WEIL DRAFT: 8/14/2020

# AMENDED AND RESTATED
# CERTIFICATE OF INCORPORATION
# OF
# JASON HOLDINGS INC.

(Pursuant to Sections 2421 and 245 of the
General Corporation Law of the State of Delaware)

WHEREAS, the

Jason Holdings Inc., a corporation organized and existing under the laws of the state of Delaware (the "Corporation"), hereby certifies as follows:

1.      The Corporation's original Certificate of Incorporation of Jason Holdings Inc. (the "CorporationOriginal Certificate of Incorporation") was filed with the Secretary of State of the State of Delaware on July 31, 2020;.

2.      WHEREAS, thisThe Corporation has not received any payment for any of its stock.

This Amended and Restated Certificate of Incorporation has been declared advisable and duly approvedadopted by the Corporation;

3.      NOW, THEREFORE, theCorporation's Board of Directors in accordance with the applicable provisions of Section 241 and 245 of the General Corporation Law of the State of Delaware, as the same may be amended from time to time (the "DGCL"). This Amended and Restated Certificate of Incorporation shall become effective upon filing with the Secretary of State of the State of Delaware.

2.4.    The Original Certificate of Incorporation of the Corporation is hereby amended and restated to read in its entirety to read in full as follows:

**FIRST**:      The name of the corporation is Jason Holdings Inc.

**SECOND**:      The address of the Corporation's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware 19801. The name of its registered agent at such address is The Corporation Trust Company.

**THIRD**:      The purpose or purposes of the Corporation shall be to engage in any lawful acts or activities for which corporations may be organized under the DGCL.

**FOURTH**:      The total number of shares of all classes of capital stock, each with a par value of $0.01, which the Corporation is authorized to issue is 15,001,000 shares, consisting of 15,000,000 shares of common stock ("Common Stock") and 1,000 shares of preferred stock ("Preferred Stock"). To the extent prohibited by Section 1123(a)(6) of Chapter 11 of Title 11 of

the United States Code (the "Bankruptcy Code"), the Corporation will not issue non-voting equity securities; provided, however, that the foregoing restriction will (a) have no further force and effect beyond that required under Section 1123 of the Bankruptcy Code, (b) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.  The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) from time to time by the affirmative vote of the holders of at least a majority of the voting power of the Corporation's then outstanding shares of stock entitled to vote thereon, voting together as a single class, irrespective of the provisions of Sections 242(b)(2) of the DGCL (or any successor provision thereto), and no vote of the holders of any Common Stock voting separately as a class shall be required therefor. Subject to the limitations set forth in that certain Stockholders Agreement by and among the Corporation and the stockholders of the Corporation named therein, dated on or around the date hereof, the Board of Directors (as defined below) is hereby expressly authorized to provide out of the unissued shares of the Preferred Stock for one or more series of Preferred Stock and to establish from time to time the number of shares to be included in each such series and to fix the voting rights, if any, designations, powers, preferences and relative, participating, optional, special and other rights, if any, of each such series and any qualifications, limitations and restrictions thereof, as shall be stated in the resolution or resolutions adopted by the Board of Director providing for the issuance of such series and included in a certificate of designation  filed pursuant to the DGCL, and the Board of Director is hereby expressly vested with the authority to the full extent provided by law, now or hereafter, to adopt any such resolution or resolutions.

**FIFTH**:        The principal place of business of the Corporation is 833 East Michigan Street, Suite 900, Milwaukee WI 53202.

**SIXTH**:        In furtherance and not in limitation of the powers conferred by law, subject to any limitations contained in this Certificate of Incorporation, bylaws of the Corporation may be adopted, amended or repealed by a majority of the Board of Directors of the Corporation (the "Board of Directors"), but any bylaws adopted by the Board of Directors may be amended or repealed by the stockholders entitled to vote thereon.  Election of directors need not be by written ballot.

**SEVENTH**:  In addition to the powers and authority herein before or by statute expressly conferred upon them, the Board of Directors is hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, subject to the provisions of the DGCL, this Certificate of Incorporation and the bylaws of the Corporation.

**EIGHTH**:        The number of directors of the Corporation shall be fixed from time to time by the bylaws or amendment thereof adopted by the Board of Directors**.**

**NINTH**:        To the fullest extent permitted by law, a director of the Corporation (a "Director") shall not be personally liable to the Corporation or its stockholders for monetary

damages for breach of fiduciary duty as a director.  If the DGCL or any other law of the State of Delaware is amended after approval by the stockholders of this Article Ninth to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a Director shall be eliminated or limited to the fullest extent permitted by the DGCL as so amended. Any repeal or modification of the foregoing provisions of this Article Ninth by the stockholders of the Corporation shall not adversely affect any right or protection of a Director existing at the time of, or increase the liability of any Director with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

TENTH: The following indemnification provisions shall apply to the persons enumerated below.

1.      Right to Indemnification of Directors and Officers.   The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (an "Indemnified Person") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that such person, or a person for whom such person is the legal representative, is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Indemnified Person in such Proceeding.   Notwithstanding the preceding sentence, except as otherwise provided in Section 3 of this Article Tenth, the Corporation shall be required to indemnify an Indemnified Person in connection with a Proceeding (or part thereof) commenced by such Indemnified Person only if the commencement of such Proceeding (or part thereof) by the Indemnified Person was authorized in advance by the Board of Directors.

2.      Prepayment of Expenses of Directors and Officers.  The Corporation shall pay the expenses (including attorneys' fees) incurred by an Indemnified Person in defending any Proceeding in advance of its final disposition, provided, however, that, to the extent required by law, such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Indemnified Person to repay all amounts advanced if it should be ultimately determined that the Indemnified Person is not entitled to be indemnified under this Article Tenth or otherwise.

3.      Claims by Directors and Officers.  If a claim for indemnification or advancement of expenses under this Article Tenth is not paid in full within thirty (30) days after a written claim therefor by the Indemnified Person has been received by the Corporation, the Indemnified Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim.  In any such action the Corporation shall have the burden of proving that the Indemnified Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

4.      Indemnification of Employees and Agents. The Corporation may indemnify and advance expenses to any person who was or is made or is threatened to be made

3

or is otherwise involved in any Proceeding by reason of the fact that such person, or a person for whom such person is the legal representative, is or was an employee or agent of the Corporation or, while an employee or agent of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorney's fees) reasonably incurred by such person in connection with such Proceeding.  The ultimate determination of entitlement to indemnification of persons who are non-director or officer employees or agents shall be made in such manner as is determined by the Board of Directors in its sole discretion.  Notwithstanding the foregoing sentence, the Corporation shall not be required to indemnify a person in connection with a Proceeding initiated by such person if the Proceeding was not authorized in advance by the Board of Directors.

5.    Advancement of Expenses of Employees and Agents.  The Corporation may pay the expenses (including attorney's fees) incurred by an employee or agent in defending any Proceeding in advance of its final disposition on such terms and conditions as may be determined by the Board of Directors.

6.    Non-Exclusivity of Rights.  The rights conferred on any person by this Article Tenth shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of this Certificate of Incorporation, the Bylaws or any agreement, or pursuant to a vote of stockholders or disinterested directors or otherwise. The Corporation acknowledges that certain persons entitled to indemnification from the Corporation hereunder may have certain rights to indemnification, advancement of expenses and/or insurance provided by a stockholder of the Corporation or certain affiliates of such stockholder (collectively, the "Secondary Indemnitors"). The Corporation hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to such persons are primary and any obligation of the Secondary Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such persons are secondary), (ii) that it shall be required to advance the full amount of expenses incurred by such persons and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by this Certificate of Incorporation (or any other agreement between the Corporation and such person), without regard to any rights such person may have against the Secondary Indemnitors, and (iii)  that it irrevocably waives, relinquishes and releases the Secondary Indemnitors from any and all claims against the Secondary Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof.  The Corporation further agrees that no advancement or payment by the Secondary Indemnitors on behalf of such person with respect to any claim for which such person has sought indemnification from the Corporation shall affect the foregoing and the Secondary Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such person against the Corporation. The Corporation and such persons agree that the Secondary Indemnitors are express third party beneficiaries of the terms of this Section 6.

7.    Other Indemnification.  The Corporation's obligation, if any, to indemnify any person who was or is serving at its request as a director, officer or employee of another

4

corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise shall be reduced by any amount such person may collect as indemnification from such other corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise.

8.      Insurance.  The Board of Directors may, to the full extent permitted by applicable law as it presently exists, or may hereafter be amended from time to time, authorize an appropriate officer or officers to purchase and maintain at the Corporation's expense insurance: (a) to indemnify the Corporation for any obligation which it incurs as a result of the indemnification of directors, officers and employees under the provisions of this Article Tenth; and (b) to indemnify or insure directors, officers and employees against liability in instances in which they may not otherwise be indemnified by the Corporation under the provisions of this Article Tenth.

9.      Amendment or Repeal.  Any repeal or modification of the foregoing provisions of this Article Tenth shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification.  The rights provided hereunder shall inure to the benefit of any Indemnified Person and such person's heirs, executors and administrators.

**ELEVENTH**: The Corporation expressly elects not to be governed by Section 203 of the DGCL.

**TWELFTH**:  To the fullest extent permitted by Section 122(17) of the DGCL (or any successor provision thereto), the Corporation hereby renounces any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any business opportunities that are presented to one or more of its officers, directors or stockholders, other than those officers, directors or stockholders who are employees of the Corporation or its subsidiaries.  No amendment or repeal of this Article Twelfth shall apply to or have any effect on the liability or alleged liability of any officer, director or stockholder of the Corporation for or with respect to any opportunities of which such officer, director or stockholder becomes aware prior to such amendment or repeal.

[*The remainder of this page is intentionally left blank*]

IN WITNESS WHEREOF, the undersigned has duly executed this Certificate of Incorporation on this [●]28th day of August, 2020.

**JASON HOLDINGS INC.**

By: _____
Name:
Title:

[SIGNATURE PAGE TO CERTIFICATE OF INCORPORATION OF JASON HOLDINGS INC.]